**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

v.

Case No. 1:19-cv-2379

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

*Defendant*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This is a civil action for declaratory and injunctive relief brought by Plaintiff Committee on the Judiciary of the United States House of Representatives (Judiciary Committee) against Defendant Donald F. McGahn II.  The suit, which the United States House of Representatives has expressly authorized, arises out of the Judiciary Committee's efforts to enforce a duly authorized, issued, and served Congressional subpoena to McGahn (McGahn Subpoena).  The Judiciary Committee alleges as follows:

### INTRODUCTION

1.      In an unprecedented attack on our Nation's democratic institutions, "[t]he Russian government interfered in the 2016 presidential election in sweeping and systematic fashion."[1]  In

---

[1] *Robert S. Mueller III, Report On The Investigation Into Russian Interference In The 2016 Presidential Election*, Vol. I at 1 (March 2019) (*Report*), https://perma.cc/DN3N-9UW8.

his *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* (Report), in his public statement of May 29, 2019, related to the Report, and in testimony before the Judiciary Committee and House Permanent Select Committee on Intelligence, Special Counsel Robert S. Mueller III has told Congress and the American people that President Donald J. Trump repeatedly used his official power to attempt to thwart the Special Counsel's investigation into this interference—including into whether any individuals associated with his own Presidential campaign coordinated with the Russian government.[2]  The Judiciary Committee is now determining whether to recommend articles of impeachment against the President based on the obstructive conduct described by the Special Counsel.  But it cannot fulfill this most solemn constitutional responsibility without hearing testimony from a crucial witness to these events: former White House Counsel Donald F. McGahn II.  McGahn, however, has defied a Congressional subpoena to appear before the Judiciary Committee, at the direction of President Trump, who claims McGahn is "absolutely immune" from testifying, a claim with no basis in law.  The Judiciary Committee thus seeks to enforce the McGahn Subpoena in its entirety.

2.     The Report documents a recurring, troubling pattern of Presidential actions to obstruct the Special Counsel's investigation into Russia's far-reaching interference in the 2016 U.S. election.  The Report describes, among other misdeeds, how President Trump attempted to use his official power to oust Special Counsel Mueller and end his investigation; to force then-Attorney General Jeff Sessions to transgress Department of Justice (DOJ) ethics rules to limit the

---

[2] *Report*, Vol. II; *see also* Exhibit A, *Oversight of the Report on the Investigation Into Russian Interference in the 2016 Presidential Election:  Former Special Counsel Robert S. Mueller, III: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (July 24, 2019), Hearing Tr. at 17; Robert S. Mueller, III, Special Counsel, U.S. Dep't of Justice, *Statement on Investigation into Russian Interference in the 2016 Presidential Election* (May 29, 2019) (Mueller Public Statement), https://perma.cc/7JY5-48XJ.

scope of Mueller's investigation; to demand that White House staff generate false accounts of the President's conduct; and to influence witnesses' testimony or otherwise encourage witnesses not to cooperate with the investigation.[3]  In total, the Report provides evidence of ten separate episodes of potentially obstructive conduct by the President.  As Special Counsel Mueller has emphasized, when a subject of an investigation obstructs that investigation or lies to investigators, it "strikes at the core of the government's effort to find the truth and hold wrongdoers accountable."[4]

3.      Despite the Special Counsel's recitation of compelling evidence that President Trump's actions satisfied each of the elements of criminal obstruction of justice, a DOJ legal interpretation preventing the indictment of a sitting President means that Congress is the sole branch of government currently empowered to hold the President accountable.  Indeed, the Report unmistakably invokes Congress's role, stressing the importance of "constitutional processes for addressing presidential misconduct."[5]  And in his May 29, 2019, statement, Special Counsel Mueller confirmed that "the Constitution requires a process other than the criminal justice system to formally accuse a sitting President of wrongdoing."[6]

4.      That process is underway.  The Judiciary Committee is conducting an investigation to understand the scope and extent of misconduct by President Trump, and that investigation includes consideration of whether the Judiciary Committee should exercise its Article I powers to recommend articles of impeachment.  Articles of impeachment already have been introduced and referred to the Judiciary Committee in this Congress.  To fulfill its duties,

---

[3] *Report*, Vol. II at 7, 157.
[4] Mueller Public Statement.
[5] *Report*, Vol. II at 1.
[6] Mueller Public Statement.

the Judiciary Committee must obtain testimony and evidence from witnesses to the President's actions to determine whether to recommend such articles against the President, or whether to recommend additional or alternative articles that the Judiciary Committee may prepare.

5.      McGahn, who was the White House Counsel during the relevant period, is the most important witness, other than the President, to the key events that are the focus of the Judiciary Committee's investigation.  The Report makes clear that McGahn witnessed multiple serious acts of potential obstruction of justice by the President—including demanding that McGahn himself have the Special Counsel removed and then create a false record to conceal the President's obstructive conduct.  Given his central role in these and other events outlined in the Report, McGahn is uniquely positioned to explain those events, bring additional misconduct to light, and provide evidence regarding the President's intent.

6.      McGahn's testimony is also essential to the Judiciary Committee's other constitutionally authorized legislative and oversight duties, including considering the need for new legislation and amendments to existing laws addressing the types of misconduct the Report describes, overseeing ongoing investigations arising from the Special Counsel's initial investigation, and ensuring the integrity of our elections in 2020 and beyond.

7.      Despite the Judiciary Committee's clear need for McGahn's testimony, President Trump has openly declared his opposition to, and intent to block, the Judiciary Committee's exercise of these legislative, investigative, and oversight responsibilities—especially as they relate to the President's own potential misconduct.  The President has declared, for instance, that

"We're fighting all the subpoenas,"[7] "I don't want people testifying,"[8] and "No Do-Overs!"[9] Consistent with that approach, the President has sought to prevent McGahn—now a private citizen—from testifying before the Judiciary Committee.  The day before McGahn's required appearance before the Judiciary Committee pursuant to the subpoena at issue in this litigation, the President purported to direct McGahn not to appear, claiming that McGahn is "absolutely immune" from compelled testimony.[10]  The next day, without offering any accommodation, McGahn failed to appear based on the President's directive.

8.      The President's claim that McGahn is entitled to "absolute immunity" has no basis in law, and no court has ever accepted this type of blanket claim in response to a Congressional subpoena.  McGahn thus must appear before the Judiciary Committee and answer all of its Members' questions unless a valid basis for asserting executive privilege exists as to any specific matter.  To date, the President has not formally attempted to invoke executive privilege.  Moreover, by authorizing the public release of the Report and extensively commenting about its substance after its release, among other statements and actions, the President has waived any privilege about matters and information discussed in the Report.  When the Report was released publicly, Attorney General William Barr confirmed that the President "would not assert privilege over the Special Counsel's report" and, therefore, the Report

---

[7] *See Remarks by President Trump Before Marine One Departure*, White House (Apr. 24, 2019), https://perma.cc/W7VZ-FZ3T.

[8] Robert Costa et al., *Trump Says He Is Opposed to White House Aides Testifying to Congress, Deepening Power Struggle with Hill*, Wash. Post (Apr. 23, 2019), https://perma.cc/FL3H-TUXL ("I don't want people testifying to [House Democrats], because that is what they're doing if they do this.").

[9] Donald J. Trump (@realDonaldTrump), Twitter (May 22, 2019, 7:31 PM), https://perma.cc/A5NM-F9B3.

[10] Exhibit B, Letter from Pat Cipollone, Counsel to the President, to Jerrold Nadler, Chairman, H. Comm. on the Judiciary, at 1 (May 20, 2019).

contained "no material … redacted based on executive privilege."[11]  And DOJ's Office of Legal Counsel (OLC) has acknowledged that the Attorney General's release "of a redacted version of the Special Counsel's report (with the President's consent) extinguish[ed] the Executive Branch's confidentiality interests in the precise information" revealed in the Report.[12]

9.      Notwithstanding the President's broad declaration of his intent to defy all subpoenas—and his purported direction that McGahn defy this one—the Judiciary Committee has made every effort at accommodation to avoid the need for this litigation.  The Judiciary Committee has initiated multiple discussions with McGahn's counsel, as well as the White House, over several months in an attempt to reach a negotiated resolution—all to no avail.  On July 26, 2019, McGahn made clear that he will follow the President's directive and will not comply with the Judiciary Committee's subpoena for public testimony.  The accommodations process is therefore at an impasse.

10.      McGahn's refusal to testify harms the Judiciary Committee by depriving it of a witness and information that are essential to its investigation, thereby impeding the Judiciary Committee's ability to facilitate the House's fulfillment of its Article I functions.  These functions include the most urgent duty the House can face: determining whether to approve articles of impeachment.  That refusal also is impeding the Judiciary Committee in its ability to assess the need for remedial legislation and to conduct oversight of DOJ.  All of these tasks are time-limited.  The House, and with it the Judiciary Committee's investigation, expires on

---

[11] Press Release, U.S. Dep't of Justice, *Att'y Gen. William P. Barr Delivers Remarks on the Release of the Report on the Investigation into Russian Interference in the 2016 Presidential Election* (Apr. 18, 2019), https://perma.cc/9GVL-G8XZ (Barr Public Statement).

[12] Exhibit C, Memorandum from Steven A. Engel, Assistant Att'y Gen., Office of Legal Counsel, to Pat A. Cipollone, Counsel to the President, *Re: Testimonial Immunity Before Congress of the Former Counsel to the President*, at 13 (May 20, 2019).

January 3, 2021.  The delay caused by McGahn's refusal to testify thus severely impedes the Judiciary Committee's ability to do its time-sensitive work.  Accordingly, to redress these injuries, the Judiciary Committee asks this Court to order McGahn to comply with the subpoena for his testimony and appear before the Judiciary Committee forthwith.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  This case arises under Article I of the Constitution of the United States, and implicates Article I, Section 2, Clause 5, which provides the House of Representatives with "the sole Power of Impeachment," and Article I, Section 1, which vests "[a]ll legislative Powers" in the Congress of the United States.

12.     This Court has authority to issue a declaratory judgment and order other relief that is just and proper pursuant to 28 U.S.C. §§ 2201 and 2202.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## PARTIES

14.     Plaintiff Committee on the Judiciary of the United States House of Representatives is a standing committee of the House that, among other duties, exercises jurisdiction over impeachment and with respect to federal criminal statutes, Presidential succession, and activities that affect the internal security of the United States.  The Judiciary Committee also conducts oversight of the Department of Justice.

15.     Defendant Donald F. McGahn II served as White House Counsel to President Trump from January 20, 2017, until he left the White House on October 17, 2018.  McGahn currently practices law at Jones Day, a law firm, in Washington, D.C.

## ALLEGATIONS

### I.    LEGAL FRAMEWORK

16.    The Judiciary Committee has constitutional and other legal authority to legislate, investigate, and conduct oversight, including into President Trump's misconduct related to the Special Counsel's investigation.

17.    Article I of the Constitution provides that "[t]he House of Representatives … shall have the sole Power of Impeachment."[13]  Article I also vests Congress with "[a]ll legislative Powers."[14]  Congress's powers include the authority to investigate matters relating to subjects within its broad legislative purview; conduct oversight of Executive Branch agencies; examine whether those agencies are faithfully, effectively, and efficiently executing the laws; and determine whether changes to federal law are necessary and proper.  The Supreme Court has long recognized that the Constitution vests the House with the power of inquiry—with process to enforce it—commensurate with the House's Article I legislative authority to investigate any subject on which "legislation could be had."[15]

18.    The Constitution commits to each chamber of Congress the authority to "determine the Rules of its Proceedings."[16]  Pursuant to this authority, the House of Representatives of the 116th Congress adopted the Rules of the House of Representatives (House Rules), which govern the House during the current two-year term.[17]  The House Rules establish

---

[13] U.S. Const. Art. I, § 2, cl. 5.

[14] *Id.* § 1, cl. 1.

[15] *McGrain v. Daugherty*, 273 U.S. 135, 174, 177 (1927).

[16] U.S. Const. Art. I, § 5, cl. 2.

[17] *See* H. Res. 6 (116th Cong.) (2019) (adopting House Rules for 116th Congress); *see also* Rules of the House of Representatives, 116th Congress (Jan. 11, 2019) (House Rules), https://perma.cc/X5ZQ-ZZWD.

various standing committees, including the Judiciary Committee, and delegate to each committee "jurisdiction and related functions."[18]

19.   The Judiciary Committee's jurisdiction includes impeachment.[19]  Resolutions that call for impeachment of eligible officials are normally referred by the Speaker of the House to the Judiciary Committee,[20] and are eligible for consideration pursuant to applicable House and Committee Rules.[21]  The House also may choose to direct a particular manner for investigating grounds for impeachment, and in such instances it has voted to refer such investigations to the Judiciary Committee.[22]  Whether by direct referral to the Judiciary Committee or referral

---

[18] House Rule X.1.

[19] *Jefferson's Manual*, H. Doc. 114-192 § 605, at 321 (2017) ("[R]esolutions … that directly call for the impeachment of an officer have been referred to the Committee on the Judiciary[.]").  As *Jefferson's Manual* explains, "[i]n the House various events have been credited with setting an impeachment in motion," including "charges made on the floor"; "a resolution introduced by a Member and referred to a committee"; or "facts developed and reported by an investigating committee of the House."  *Id.* § 603 at 319.

[20] *See, e.g.*, 165 Cong. Rec. H211 (daily ed. Jan. 3, 2019) (referral to the Judiciary Committee of H. Res. 13, 116th Cong., impeaching President Trump); 163 Cong. Rec. H9376 (daily ed. Nov. 15, 2017) (referral to the Judiciary Committee of H. Res. 621,115th Cong., impeaching President Trump); 163 Cong. Rec. H5759 (daily ed. July 12, 2017) (referral to the Judiciary Committee of H. Res. 438, 115th Cong., impeaching President Trump); 162 Cong. Rec. H4926 (daily ed. July 13, 2016) (referral to the Judiciary Committee of H. Res. 828, 114th Cong., impeaching John Andrew Koskinen, Commissioner of the Internal Revenue Service); 135 Cong. Rec. 2553 (1989) (referral to the Judiciary Committee of H. Res. 87, 101st Cong., impeaching Judge Walter Nixon); 133 Cong. Rec. 6522 (1987) (referral to the Judiciary Committee of H. Res. 128, 100th Cong., impeaching Judge Alcee Hastings).

[21] *See* House Rule XI.2(b) ("Each … committee shall meet for the consideration of a bill or resolution pending before the committee or the transaction of other committee business on all regular meeting days fixed by the committee[.]"); House Rule XI.2(c)(1) ("The chair of each standing committee may call and convene, as the chair considers necessary, additional and special meetings of the committee for the consideration of a bill or resolution pending before the committee or for the conduct of other committee business, subject to such rules as the committee may adopt."); *see also* Rule II(c), Rules of the House Committee on the Judiciary for the 116th Congress (Jan. 24, 2019) (Judiciary Committee Rules) ("The Chairman shall furnish each Member of the Committee or Subcommittee with the date, place, and a list of bills and subjects to be considered at a Committee or Subcommittee meeting.").

[22] *See, e.g.*, H. Res. 581, 105th Cong. (1998) (instructing the Judiciary Committee to

following a vote, "[a]ll impeachments to reach the Senate since 1900 have been based on resolutions reported by the Committee on the Judiciary."[23]

20.     The Judiciary Committee's legislative and oversight jurisdiction includes, among other subjects, "[c]riminal law enforcement and criminalization,"[24] including the criminal statutes relevant to the Special Counsel's investigation into the President's conduct.[25]  The Judiciary Committee's jurisdiction also encompasses "[t]he judiciary and judicial proceedings, civil and criminal"; "presidential succession"; and "[s]ubversive activities affecting the internal security of the United States."[26]  Among other matters, the Judiciary Committee exercises jurisdiction with respect to legislation regarding independent counsels and special counsels.[27] The House Rules further mandate that "[a]ll bills, resolutions, and other matters relating to" subjects within the Judiciary Committee's jurisdiction be referred to the Judiciary Committee for its consideration.[28]

21.     In addition, as a standing committee, the Judiciary Committee has "general oversight responsibilities," including with respect to the "operation of Federal agencies and

---

investigate grounds for impeachment against President Clinton); H. Res. 803, 93d Cong. (1974) (instructing the Judiciary Committee to investigate grounds for impeachment against President Nixon).

[23] Charles W. Johnson et al., *House Practice: A Guide to the Rules, Precedents, and Procedures of the House*, Ch. 27 § 6, at 615 (2017).

[24] House Rule X.1(*l*)(7).

[25] *See, e.g.*, 18 U.S.C. §§ 1503, 1505, 1512(b), (c)(2) (obstruction of justice, witness tampering, and related offenses).

[26] House Rule X.1(*l*).

[27] *See, e.g.*, H. Rep. No. 103-224 (1993) (describing the Judiciary Committee's consideration of legislation to reauthorize the independent counsel statute); 165 Cong. Rec. H208 (daily ed. Jan. 3, 2019) (referral of H.R. 197, the "Special Counsel Independence and Integrity Act," 116th Cong., to the Judiciary Committee).

[28] House Rule X.1, XII.2.

entities" within its areas of jurisdiction.[29]  As such, the Judiciary Committee exercises oversight regarding the structure and functions of the DOJ and the Federal Bureau of Investigation (FBI).[30] The Judiciary Committee is charged with, among other responsibilities, reviewing "on a continuing basis … the application, administration, execution, and effectiveness of laws and programs" within its jurisdiction.[31]  The Judiciary Committee must determine whether such laws are being "implemented and carried out in accordance with the intent of Congress," and if there are "any conditions or circumstances that may indicate the necessity or desirability of enacting new or additional legislation."[32]

22.     The House Rules empower the Judiciary Committee to "conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities" over matters within its jurisdiction.[33]  To aid these inquiries, the Judiciary Committee is authorized to issue subpoenas for testimony and documents.[34]

---

[29] House Rule X.2(a), (b)(1)(B).

[30] *See, e.g.*, *Oversight of the U.S. Department of Justice: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (Feb. 8, 2019) (oversight hearing conducted with Matthew Whitaker, Acting Attorney General, DOJ); *Oversight of the Federal Bureau of Investigation: Hearing before the H. Comm. on the Judiciary*, 115th Cong. (Dec. 7, 2017) (oversight hearing with Christopher Wray, Director, FBI).

[31] House Rule X.2(b)(1).

[32] *Id.*

[33] House Rule XI.1(b)(1).

[34] *See* House Rule XI.2(m)(1)(B); House Rule XI.2(m)(3)(A)(i); *see also* Judiciary Committee Rule IV(a) ("A subpoena may be authorized and issued by the Chairman, in accordance with clause 2(m) of rule XI of the House of Representatives, in the conduct of any investigation or activity or series of investigations or activities within the jurisdiction of the Committee, following consultation with the Ranking Minority Member.").

## II.   FACTUAL ALLEGATIONS

### A.  The Special Counsel's Report Exposes Compelling Evidence Of Presidential Wrongdoing

23.     The Judiciary Committee's urgent need for McGahn's testimony arises out of evidence uncovered in the Special Counsel's investigation and detailed in the Report.  That Report describes unprecedented interference by Russia in the 2016 Presidential election and attempts by the President of the United States to undermine an investigation into that interference, including into whether individuals associated with his Presidential campaign coordinated with the Russian government.

24.     On May 17, 2017, pursuant to DOJ regulations,[35] Mueller was appointed as Special Counsel to investigate "the Russian government's efforts to interfere in the 2016 presidential election," including "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump"; any other matters "that arose or may arise directly from the investigation"; and "federal crimes committed in the course of, and with intent to interfere with, the Special Counsel's investigation, such as perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses."[36]

25.     On March 22, 2019, Special Counsel Mueller completed his investigation and provided a written report to Attorney General Barr.[37]  On April 18, 2019, Attorney General Barr released a redacted version of the Report simultaneously to Congress and the public.  The Report is divided into two volumes.  Volume I describes the evidence that Russia interfered in our

---

[35] 28 C.F.R. §§ 600 *et seq.* (2019).

[36] Office of the Deputy Attorney General, Order No. 3915-2017, *Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters* (May 17, 2017); 28 C.F.R. § 600.4 (2019).

[37] Exhibit D, Letter from William P. Barr, Att'y Gen., U.S. Dep't of Justice, to Jerrold Nadler, Chairman, H. Comm. on the Judiciary, et al. (Mar. 22, 2019).

election to benefit President Trump, and that the Trump Campaign welcomed that interference. Volume II documents that, once elected, President Trump took a series of actions to undermine multiple investigations into Russia's interference and his own possible misconduct.  As the Report recognizes, Congress is currently the sole body that can hold the President accountable for these actions.

>   **1.  The Report Describes Russia's Interference In The 2016 Presidential Election And How The Trump Campaign Welcomed Russia's Assistance**

>   >   *a.  Russia Interferes In The 2016 Presidential Election To Benefit Then-Candidate Trump*

26.     The Special Counsel's Report describes a serious attack by a hostile foreign government on our Nation's 2016 Presidential election, executed "in sweeping and systematic fashion" and intended to benefit the Trump Presidential campaign.[38]  Among other things, the Russian government, through its main intelligence directorate, the GRU, used cyber intrusions (hacking) to steal information from then-candidate Hillary Clinton's campaign and the Democratic National Committee, as well as from "U.S. state and local entities, such as state boards of elections … , secretaries of state, and county governments," all of which were "involved in the administration of the elections."[39]  The Russian-funded Internet Research Agency also used "information warfare" to "sow discord in the U.S. political system," with a "targeted operation that by early 2016 favored candidate Trump and disparaged candidate Clinton."[40]  By the end of the 2016 election, the Internet Research Agency had the ability to reach "tens of millions of U.S. persons" to further that agenda.[41]  The evidence obtained by the

---

[38] *Report*, Vol. I at 1; *see also id.* Vol. I at 1-2.
[39] *Id.* Vol. I at 36, 50.
[40] *Id.* Vol. I at 4.
[41] *Id.* Vol. I at 25-26.

Special Counsel relating to Russia's interference resulted in criminal indictments of more than a dozen defendants.[42]

### b. The Trump Campaign Welcomes Russia's Interference And Maintains Significant Contacts With Russian Nationals

27.     The Report documents that the Trump Campaign both welcomed Russia's interference and did not report the campaign's repeated contacts with Russian-affiliated individuals to law enforcement.  The Report assesses that the Russian government perceived that "it would benefit from a Trump presidency," and the Trump Campaign expected that "it would benefit electorally from information stolen and released through Russian efforts."[43]

28.     The Report discusses several instances in which then-candidate Trump publicly encouraged Russian interference efforts.  On July 27, 2016, for example, then-candidate Trump declared at a public rally: "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing.  I think you will probably be rewarded mightily by our press."[44]  This was "apparently a reference to emails … stored on a personal server that candidate Clinton had used while serving as Secretary of State.  Within approximately five hours of Trump's statement, GRU officers targeted for the first time Clinton's personal office."[45]  Thereafter, then-candidate Trump began publicly praising WikiLeaks, including after WikiLeaks released stolen emails damaging to the Clinton Campaign.  For instance, on October 7, 2016, the *Washington Post* published an *Access Hollywood* video that depicted Trump years earlier in a way that was widely expected to be damaging to his campaign.  Less than an hour after the video's release, WikiLeaks released emails stolen from Clinton's campaign chairman, John Podesta, that were

---

[42] *Id.* Vol. I at 14 n.4; *see also id.* Vol. I at 174-75.
[43] *Id.* Vol. I at 1-2.
[44] *Id.* Vol. I at 49.
[45] *Id.*

harmful to Clinton's campaign.[46]  In response, on October 10, 2016, then-candidate Trump

tweeted: "This just came out.  WikiLeaks!  I love WikiLeaks!" and later: "This WikiLeaks stuff

is unbelievable.  It tells you the inner heart, you gotta read it," and "[b]oy, I love reading those

WikiLeaks."[47]  During the Special Counsel's July 24, 2019, testimony before the House

Permanent Select Committee on Intelligence, Mueller explained that describing these tweets as

"'problematic' is an understatement," including because they gave "hope or some boost to what

is and should be illegal activity."[48]

29.     The Report also describes evidence suggesting that President Trump knew about

upcoming releases of stolen emails in advance.  Deputy Campaign Manager Rick Gates, for

example, explained to the Special Counsel's Office that after WikiLeaks had released its first set

of stolen emails in July 2016, then-candidate Trump "told Gates that more releases of damaging

information would be coming."[49]  WikiLeaks in fact released more emails in October 2016.[50]

30.     The Report further recounts that, while Russia was interfering in the 2016

Presidential election and releasing stolen emails, senior members of the Trump Campaign were

maintaining significant contacts with Russian nationals and seeking damaging information on

candidate Hillary Clinton.  For example, in the spring of 2016, Trump Campaign foreign policy

adviser George Papadopoulos met repeatedly with Russian officials and was told that Russia had

"dirt" on Clinton "in the form of thousands of emails."[51]  Similarly, on June 3, 2016, publicist

---

[46] *Id.* Vol. I at 58.
[47] Exhibit E, *Former Special Counsel Robert S. Mueller III on the Investigation into Russian Interference in the 2016 Presidential Election: Hearing Before the H. Permanent Select Comm. on Intelligence*, 116th Cong. (July 24, 2019), Hearing Tr. at 49.
[48] *Id.*
[49] *Report*, Vol. I at 54.
[50] *Id.* Vol. I at 58.
[51] *Id.* Vol. I at 5-6.

Rob Goldstone, on behalf of Russian real estate developers, emailed Donald Trump Jr. to set up a meeting to discuss Russian officials' possession of "some official documents and information that would incriminate Hillary [Clinton] and her dealings with Russia and would be very useful to [Trump Jr.'s] father," which Goldstone conveyed was "part of Russia and its government's support for Mr. Trump."[52]  Trump Jr. responded, "if it's what you say I love it."[53]  Less than a week later, Trump Jr. and other "senior representatives of the Trump Campaign met in Trump Tower with a Russian attorney expecting to receive derogatory information about Hillary Clinton from the Russian government."[54]  Around this same time, Trump Campaign Chairman Paul Manafort was offering private briefings on the campaign to a Russian oligarch[55] and routinely causing internal campaign polling data to be shared with a Russian national who has "ties to Russian intelligence."[56]

31.     In total, the Report details well over 100 contacts between individuals associated with the Trump Campaign and Russian nationals or their agents during this period.[57]  There is no indication that anyone from the Trump Campaign, including the candidate, reported any of these contacts or offers of foreign assistance to U.S. law enforcement.  As Mueller confirmed, reporting such information is something that campaigns "would and should do," including because "knowingly accepting foreign assistance during a Presidential campaign" is a crime.[58]

---

[52] *Id.* Vol. I at 113.

[53] *Id.*

[54] *Id.* Vol. I at 110.

[55] *Id.* Vol. I at 137.

[56] *Id.* Vol. I at 129; *see id.* at 133-34, 136-37.

[57] *See* Karen Yourish and Larry Buchanan, Mueller Report Shows Depth of Connections Between Trump Campaign and Russians, N.Y. Times (April 19, 2019), https://perma.cc/756L-CH2J ("Donald J. Trump and 18 of his associates had at least 140 contacts with Russian nationals and WikiLeaks, or their intermediaries, during the 2016 campaign and presidential transition, according to a New York Times analysis."  (emphasis omitted)).

[58] Exhibit E, Hearing Tr. at 30, 88.

2.   **The Report Details President Trump's Attempts To Undermine The
Investigation Into Russia's Election Interference And His Own Possible
Misconduct, Events To Which McGahn Is A Key Witness**

32.     In Volume II, the Report describes substantial evidence that President Trump
repeatedly attempted to shut down the investigation into Russia's interference in America's 2016
election and to conceal his own involvement and potential misconduct from the public.  The
Report identifies McGahn, who was the White House Counsel during the relevant time period, as
having been involved in or a witness to many of the most egregious instances of possible
obstructive conduct and attempted coverup.

33.     Specifically, the Report details at least ten separate episodes of potentially
obstructive conduct by the President, ranging "from efforts to remove the Special Counsel and to
reverse the effect of the Attorney General's recusal; to the attempted use of official power to
limit the scope of the investigation";[59] to demanding that McGahn create a false record;[60] "to
direct and indirect contacts with witnesses with the potential to influence their testimony";[61] to
"encourag[ing] witnesses not to cooperate with the investigation."[62]  These incidents were "often
carried out through one-on-one meetings in which the President sought to use his official power
outside of usual channels."[63]  The most significant of these episodes, all of which McGahn
directly witnessed or otherwise was involved in, are set forth in additional detail below.

a.   *President Trump Fires His National Security Advisor And The FBI
Director During The Russia Investigation*

34.     McGahn was a key witness to the events leading up to President Trump's
decisions to terminate both National Security Advisor Michael Flynn and FBI Director James

_____

[59] *Report*, Vol. II at 157.
[60] *Id.* Vol. II at 119.
[61] *Id.* Vol. II at 157.
[62] *Id.* Vol. II at 7.
[63] *Id.* Vol. II at 157.

Comey in apparent attempts to end the investigation into Russian interference, which the FBI was conducting at the time.

35.     The Report recounts that, during the transition period before President Trump took office, incoming National Security Advisor Flynn made false statements to Vice President-elect Michael Pence and other incoming Administration officials regarding his communications with the Russian ambassador about "sanctions on Russia for its election interference."[64]  Those incoming officials thereafter made public statements, based on Flynn's representations to them, that Flynn had not discussed sanctions with the Russian ambassador.[65]  During the first week of the new Administration, on January 24, 2017, Flynn also lied to FBI investigators about the discussions.  Two days later, DOJ informed McGahn that the statements made by Vice President Pence and others—based on what Flynn had told them—were false, which "put Flynn in a potentially compromised position because the Russians would know he had lied."[66]  "That afternoon, McGahn notified the President" of what he had been told, and explained that Flynn's false statements to federal investigators could constitute a federal crime.[67]  Flynn remained in his position, however, for over two weeks until February 13, 2017, when the President requested his resignation.[68]  President Trump told an outside adviser the next day, "[n]ow that we fired Flynn, the Russia thing is over."[69]

36.     McGahn was also a primary witness to President Trump's efforts to shut down the Russia investigation by attempting to influence, and ultimately removing, Comey.  On February

---

[64] *Id.* Vol. II at 3.
[65] *Id*. Vol. II at 29-30.
[66] *Id.* Vol. II at 31.
[67] *Id.*
[68] *Id.* Vol. II at 38.
[69] *Id.*

14, 2017, the day after Flynn resigned, President Trump "cleared the [Oval Office]" to have a one-on-one meeting with Comey.[70]  According to the Report, during this meeting the President told Comey, "I hope you can see your way clear to letting this go, to letting Flynn go."[71]  The Report finds that "[e]vidence does establish that the President connected the Flynn investigation to the FBI's broader Russia investigation and that he believed, as he told [an adviser], that terminating Flynn would end 'the whole Russia thing.'"[72]

37.    Despite these conversations, on March 20, 2017, Comey testified for the first time publicly before the House Permanent Select Committee on Intelligence that the FBI was continuing to investigate Russia's interference in the 2016 election, including any coordination between Russia and the Trump Campaign during the interference.[73]  Three weeks after that testimony, "the President told senior advisors, including McGahn … that he had reached out to Comey twice in several weeks.  The President acknowledged that McGahn would not approve of the outreach to Comey because McGahn had previously cautioned the President that he should not talk to Comey directly to prevent any perception that the White House was interfering with investigations."[74]  However, President Trump, against the advice of McGahn, repeatedly asked "intelligence community officials," including Comey, "to push back publicly on any suggestion that the President had a connection to the Russian election-interference effort."[75]  Comey refused

---

[70] *Id.* Vol. II at 47.

[71] *Id.* Vol. II at 40.

[72] *See id.* Vol. II at 47.

[73] *Id.* Vol. II at 52-53; *see also* Matthew Rosenberg et al., *Comey Confirms F.B.I. Inquiry on Russia; Sees No Evidence of Wiretapping*, N.Y. Times (Mar. 20, 2017), https://perma.cc/46WT-TVTC.

[74] *Report*, Vol. II at 59.

[75] *Id.* Vol. II at 55, 59 (after acknowledging he had reached out to Comey, "[t]he President told McGahn that Comey had indicated the FBI could make a public statement that the President was not under investigation if the Department of Justice approved that action").

to do so and again confirmed the FBI's investigation into Russian interference and any related

coordination with the Trump Campaign during testimony on May 3, 2017, before the Senate

Judiciary Committee.

38.     Six days later, the President fired Comey and subsequently provided conflicting

explanations for his dismissal, some of which the Special Counsel determined were

"pretextual."[76]  McGahn was an integral witness to these events.  For example, McGahn

participated in a May 8, 2017, meeting in which President Trump informed senior White House

aides that he "had decided to terminate Comey," read aloud his draft termination letter—which

stated that the President was not personally under investigation—and told his aides that his

decision "was not up for discussion."[77]  "In an effort to slow down the decision-making process,"

McGahn suggested that that he and other attorneys from the White House Counsel's Office

should discuss the issue with Attorney General Sessions and Deputy Attorney General Rod

Rosenstein before the President took action.[78]  McGahn and another attorney in fact met with

Sessions and Rosenstein to obtain their views, and McGahn was present at another meeting later

that day when President Trump asked Rosenstein to draft a memorandum with his

recommendation to terminate Comey, and told him to "[p]ut the Russia stuff in the memo."[79]

During a meeting the next day, McGahn and the rest of the White House Counsel's Office

reached a consensus that President Trump's initial draft termination letter should "not see the

light of day" and that it would be better to offer "[n]o other rationales" for Comey's firing aside

from what was in Sessions's and Rosenstein's memoranda, which justified Comey's firing only

---

[76] *Id.* Vol. II at 62, 75, 77.
[77] *Id.* Vol. II at 65-66.
[78] *Id.* Vol. II at 66.
[79] *Id.* Vol. II at 66-67.

on the ground that Comey had mishandled the investigation into Hillary Clinton's use of a private email server.[80]

39.     After the White House released an official statement that "President Trump acted based on the clear recommendations of" Sessions and Rosenstein,[81] both "Sessions and Rosenstein … spoke to McGahn and expressed concern that the White House was creating a narrative that Rosenstein had initiated the decision to fire Comey."[82]  As the Report notes, "[s]ubstantial evidence indicates that the catalyst for the President's decision to fire Comey" was actually "Comey's unwillingness to publicly state that the President was not personally under investigation, despite the President's repeated requests that Comey make such an announcement."[83]  The Report finds evidence indicating that the President took these actions because he "wanted to protect himself from an investigation into his campaign."[84]  Indeed, the day after President Trump fired Comey, the President told Russian officials that he had "faced great pressure because of Russia.  That's taken off."[85]

### b.  President Trump Orders McGahn To Remove The Special Counsel

40.     Once the media began reporting that the Special Counsel was investigating the President for obstruction of justice, President Trump repeatedly sought McGahn's help to remove Special Counsel Mueller.

---

[80] *Id.* Vol. II at 68 (brackets omitted).

[81] *Id.* Vol. II at 69.

[82] *Id.* Vol. II at 72-73.

[83] *Id.* Vol. II at 75.

[84] *Id.* Vol. II at 76.

[85] *Id.* Vol. II at 71; *see also id.* Vol. II at 73 (noting that on May 11, 2017, President Trump told Lester Holt, "I was going to fire regardless of recommendation … . [Rosenstein] made a recommendation.  But regardless of recommendation, I was going to fire Comey … . And in fact, when I decided to just do it, I said to myself—I said, you know, this Russia thing with Trump and Russia is a made-up story").

41.     On June 14, 2017, "the Washington Post published an article stating that the Special Counsel was investigating whether the President had attempted to obstruct justice."[86]  On Saturday, June 17, President Trump twice called McGahn at home to direct him to fire Mueller. During the June 17 calls, the President said to McGahn:  "You gotta do this. You gotta call Rod [Rosenstein].  …  Mueller has to go.  …  Call me back when you do it."[87]  Those calls were part of a "continuous colloquy" of the President directing McGahn to have Mueller removed, and "a continuous involvement of Don McGahn responding to the President's entreaties."[88]  After receiving those calls, McGahn "recalled feeling trapped" and "decided he had to resign."[89]  Only after two of President Trump's senior advisers "urged McGahn not to quit" did he decide to remain.[90]  The Report does not explain what changed McGahn's mind about his resignation.[91]

42.     The Report also explains that President Trump "knew that he should not have made those calls to McGahn," including because "McGahn had specifically told the President that the White House Counsel's Office—and McGahn himself—could not be involved in pressing" claims that Mueller had "conflicts of interest."[92]  Indeed, before the June 17 calls, the President had urged McGahn to tell DOJ that Mueller had conflicts of interest.[93]  McGahn had declined, telling the President that if he wanted to raise that issue he should do so through his

---

[86] *Id.* Vol. II at 84.
[87] *Id.* Vol. II at 85-86.
[88] Exhibit A, Hearing Tr. at 54.
[89] *Report*, Vol. II at 86.
[90] *Id.* Vol. II at 87.
[91] *Id.*
[92] *Id.* Vol. II at 90.
[93] *Id.* Vol. II at 81.

private attorney—and advising him that this "would 'look like still trying to meddle in the investigation'" and "would be 'another fact used to claim obstruction of justice.'"[94]

43.     In fact, the Report finds "[s]ubstantial evidence" that the President's "attempts to remove the Special Counsel were linked to the Special Counsel's oversight of investigations that involved the President's conduct—and, most immediately, to reports that the President was being investigated for potential obstruction of justice."[95]

### c.   *President Trump Demands That McGahn Create A False Record To Cover Up His Attempt To Fire The Special Counsel*

44.     The Report also describes significant measures that President Trump took to conceal this and other misconduct from the public—including directing McGahn to create a false record denying that the President had ordered him to fire Mueller.  On January 25, 2018, news reports broke that President Trump had ordered McGahn to have Mueller fired the previous summer.[96]  Shortly thereafter, the President—first through his personal counsel and two aides, and then by "personally [meeting] with McGahn in the Oval Office"—"tried to get McGahn" to put out a public statement and "write a letter to the file 'for [White House] records'" disputing the event.[97]  Even when McGahn expressed that he "did not want to issue a statement or create a written record denying facts that [he] believed to be true," the "President nevertheless persisted and asked McGahn to repudiate facts that McGahn had repeatedly said were accurate."[98]

---

[94] *Id.* Vol. II at 81-82 (quoting Donaldson's notes) (brackets omitted); *see also id.* Vol. II at 90 ("The evidence indicates that news of the obstruction investigation prompted the President to call McGahn and seek to have the Special Counsel removed.").

[94] *Id.* Vol. II at 89.

[95] *Id.* Vol. II at 89.

[96] *Id.* Vol. II at 113.

[97] *Id.* Vol. II at 113, 115 (quoting statement by staff secretary Robert Porter).

[98] *Id.* Vol. II at 119.

45.     During the President's meeting with McGahn about this issue, which Chief of Staff John Kelly described as "'a little tense,'" the President also asked McGahn "why he had told [the Special Counsel] that the President had told him to have the Special Counsel removed."[99]  McGahn "responded that he had to and that his conversations with the President were not protected by attorney-client privilege."[100]  The President further asked, "[w]hat about these notes?  Why do you take notes?  Lawyers don't take notes.  I never had a lawyer who took notes," to which McGahn responded that he kept notes because he is a "real lawyer and explained that notes create a record and are not a bad thing."[101]

46.     The Report, as confirmed by Mueller's testimony to the Judiciary Committee, finds "substantial evidence support[ing] McGahn's account that the President had directed him to have the Special Counsel removed," and, moreover, that the President's direction to McGahn to deny those facts was an effort "to deflect or prevent further scrutiny of the President's conduct towards the investigation."[102]

### d.  *President Trump Urges McGahn To Pressure Attorney General Sessions To Transgress Federal Ethics Rules In An Effort To Limit The Scope Of The Special Counsel's Investigation*

47.     The Report documents McGahn's role in other efforts by President Trump to interfere in the Russia investigation.  For example, on March 2, 2017, the President enlisted McGahn to tell Attorney General Sessions "not to recuse himself from the Russia investigation."[103]  When that effort failed, "McGahn was called into the Oval Office," where the President personally "expressed anger at McGahn about the recusal" and stated, "I don't have a

---

[99] *Id.* Vol. II at 117.

[100] *Id.*

[101] *Id.* (internal citations omitted).

[102] *Id.* Vol. II at 118, 120; *see also* Exhibit A, Hearing Tr. at 70, 79-80.

[103] *Report*, Vol. II at 49.

lawyer."[104]   The President subsequently "spoke with Sessions about reversing his recusal so that

he could take over the Russia investigation and begin an investigation and prosecution of Hillary

Clinton."[105]   On two other occasions, the President asked his former campaign manager, Corey

Lewandowski, to deliver a message to "Sessions to limit the Special Counsel investigation to

future election interference," as opposed to investigating the President or his campaign's

conduct.[106]

48.     According to the Report, "at least one purpose of the President's conduct toward

Sessions was to have Sessions assume control over the Russia investigation and supervise it in a

way that would restrict its scope."[107]   More specifically, the Report details evidence that the

President believed that, if Sessions assumed control of the investigation, he "would play a

protective role and could shield the President from the ongoing Russia investigation."[108]

49.     When the President asked Sessions to reverse his decision to recuse himself, he

was aware that DOJ had determined that federal ethics rules prohibited Sessions's involvement

in the investigation; indeed, as DOJ publicly explained, those regulations state that a DOJ

attorney "should not participate in investigations" that pertain to individuals "with whom the

attorney has a political or personal relationship," and Sessions had participated in the Trump

---

[104] *Id.* Vol. II at 50.

[105] *See, e.g.*, *id.* Vol. II at 112 ("The President had previously and unsuccessfully sought to have Sessions publicly announce that the Special Counsel investigation would be confined to future election interference.").

[106] *Id.* Vol. II at 5.

[107] *Id.* Vol. II at 112.

[108] *Id.* Vol. II at 113.  President Trump's own public statements confirm the Special Counsel's findings.  On July 29, 2017, the President told the *New York Times*:  "Sessions should have never recused himself, and if he was going to recuse himself, he should have told me before he took the job, and I would have picked somebody else."  Peter Baker et al., *Citing Recusal, Trump Says He Wouldn't Have Hired Sessions*, N.Y. Times (July 19, 2017), https://perma.cc/E9UU-SMV8.

Campaign,[109] and even appeared at events on behalf of then-candidate Trump.[110]  The President

also ignored previous warnings from McGahn that "he should not communicate directly with the

Department of Justice to avoid the perception or reality of political interference in law

enforcement."[111]

### e. President Trump Attempts To Influence Witnesses Or Prevent Them From Cooperating With The Special Counsel's Investigation

50.     The Report describes evidence—including testimony from McGahn—that the

President's efforts to obstruct the investigation also included attempts to prevent witnesses from

cooperating with the Special Counsel or otherwise influence their testimony.  For example,

McGahn told the Special Counsel that the "President discussed with aides whether and in what

way [his former Campaign Chairman] Manafort might be cooperating with the Special Counsel's

investigation, and whether Manafort knew any information that would be harmful to the

President."[112]  The Report then discusses evidence suggesting that President Trump "intended to

encourage Manafort to not cooperate with the government."[113]  Indeed, Manafort told his former

deputy, Gates, not to plead to any charges, because "he had talked to the President's personal

counsel and they [are] 'going to take care of us.'"[114]

51.     The Report recounts other evidence that, similarly, could "support an inference

that the President used inducements in the form of positive messages in an effort to get [the

---

[109] Exhibit F, Department of Justice Issues Statement on Testimony of Former FBI Director James Comey, U.S. Dep't of Justice (June 8, 2017) (citing 28 C.F.R. 45.2 (2019)).

[110] *See, e.g.*, Ashley Parker and Matt Flegenheimer, *Jeff Sessions, Virulent Opponent To 2013 Immigration Bill, Endorses Donald Trump*, N.Y. Times (Feb. 26. 2016), https://perma.cc/9EDL-ZA5J; *Trump in Phoenix: 10-point Plan to End Illegal Immigration*, Ariz. Republic (Aug. 31, 2016), https://perma.cc/5AMK-YVEK.

[111] *Report*, Vol. II at 33.

[112] *Id.* Vol. II at 123.

[113] *Id.* Vol. II at 132.

[114] *Id.* Vol. II at 123.

President's former personal attorney Michael] Cohen not to cooperate, and then turned to attacks and intimidation to deter the provision of information or undermine Cohen's credibility once Cohen began cooperating."[115]  On August 22, 2018, for instance, the day after Cohen pleaded guilty to various campaign-finance violations and other charges, the President stated in a live interview: "[Cohen] makes a better deal when he uses me, like everybody else."[116]

### 3. President Trump Attacks The Special Counsel's Investigation And Denies McGahn's Factual Account

52.     Both before and after the release of the Special Counsel's Report, the President has sought to cast doubt on the integrity of the Special Counsel's investigation and has publicly disputed McGahn's account of the facts.

53.     On more than 300 occasions, the President has described the Special Counsel's investigation as a "Witch Hunt" or a "Hoax."[117]  The President has called the investigation "treason" or "treasonous" more than twenty times,[118] accused the Special Counsel and his team of being "highly conflicted" at least a dozen times,[119] and targeted the FBI investigators and the Special Counsel's team as "very sick and dangerous people who have committed very serious crimes, perhaps even Spying or Treason."[120]

---

[115] *Id.* Vol. II at 154.

[116] *Id.* Vol. II at 126.

[117] "Witch Hunt," FactBase (last visited Aug. 6, 2019), https://perma.cc/7N6N-DTEH (view live page); "Hoax," FactBase (last visited Aug. 7, 2019), https://perma.cc/7BYU-KDAJ (view live page).

[118] "Treason," FactBase (last visited Aug. 6, 2019), https://perma.cc/4AVC-FX4C (view live page); "Treasonous," FactBase (last visited Aug. 6, 2019), https://perma.cc/8VL7-ANE8 (view live page).

[119] "Highly Conflicted," FactBase (last visited Aug. 6, 2019), https://perma.cc/U4LN-B8JG (view live page).

[120] Donald J. Trump (@realDonaldTrump), Twitter (Apr. 19, 2019, 1:47 PM), https://perma.cc/8AHS-2AC5.

54.    The President also has publicly disputed the evidence described in the Report, focusing his attacks on discrediting McGahn and his crucial interviews with the Special Counsel. For example, shortly after the Report was made public, the President denied McGahn's statements to the Special Counsel, stating, "I never told then White House Counsel Don McGahn to fire Robert Mueller, even though I had the legal right to do so.  If I wanted to fire Mueller, I didn't need McGahn to do it, I could have done it myself."[121]  He has further attacked McGahn's integrity, tweeting: "I was NOT going to fire Bob Mueller, and did not fire Bob Mueller.  In fact, he was allowed to finish his Report with unprecedented help from the Trump Administration. Actually, lawyer Don McGahn had a much better chance of being fired than Mueller.  Never a big fan!"[122]  And in a televised interview, the President stated:  "I was never going to fire Mueller.  I never suggested firing Mueller. … I don't care what [McGahn] says.  It doesn't matter."[123]  When asked why McGahn would "lie under oath," the President responded: "Because he wanted to make … himself look like a good lawyer.  Or … he believed it because I would constantly tell anybody that would listen … that Robert Mueller was conflicted."[124]

---

[121] Donald J. Trump (@realDonaldTrump), Twitter (Apr. 25, 2019, 7:47 AM), https://perma.cc/CLP3-RU9H; *see also* Philip Rucker et al., *Trump Blames McGahn After Mueller Paints Damning Portrait with Notes from White House Aides*, Wash. Post (Apr. 19, 2019), https://perma.cc/MS5Z-KVRJ (President tweeting: "[w]atch out for people that take so-called 'notes,' when the notes never existed until needed," contradicting the testimony of multiple witnesses interviewed by the Special Counsel's Office who described contemporaneous notes including those taken by Annie Donaldson, McGahn's chief of staff).

[122] Donald J. Trump (@realDonaldTrump), Twitter (May 11, 2019, 6:39 PM). https://perma.cc/6GHX-4ZPU.

[123] *Transcript: ABC News' George Stephanopoulos' Exclusive Interview with President Trump*, ABC News (June 16, 2019), https://perma.cc/3WL3-G8J9.

[124] *Id.*

28

### 4. The Special Counsel Declines To Render A Prosecutorial Judgment, Leaving Congress To Address Any Presidential Wrongdoing

55.     One consideration that guided the Special Counsel's investigation was his determination "not to make a traditional prosecutorial judgment" regarding whether to recommend initiating or declining criminal charges against President Trump for obstruction of justice.[125]  The Report explains that this decision derived from DOJ's legal interpretation barring the indictment of a sitting President, and the resulting "fairness" concerns of accusing the President of a crime when no charges could be brought, leaving the President with no opportunity to vindicate himself in court.[126]  Mueller confirmed in his testimony to the Judiciary Committee on July 24, 2019, that he did not make a charging decision "because of [the] OLC opinion stating that you cannot indict a sitting President."[127]  The Report makes clear, however, that if the Special Counsel's Office "had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, [it] would so state."[128]

56.     Absent a charging decision from the Special Counsel, while the President remains in office, only Congress can address the Presidential wrongdoing described in the Report.  As the Special Counsel recognized, "no person is above the law."[129]  It is therefore up to Congress to hold the President accountable if appropriate after an independent investigation.  The Special Counsel recognized as much in his Report, noting that bringing charges against a sitting President could "potentially preempt constitutional processes for addressing presidential

---

[125] *Report*, Vol. II at 1.
[126] *Id.* Vol. II at 1-2.
[127] Exhibit A, Hearing Tr. at 109.
[128] *Report*, Vol. II at 2.
[129] *Id.* Vol. II at 8.

misconduct."[130]  In his May 29, 2019, statement to the press, Mueller reaffirmed the notion that

Congress is the proper body to respond to the Report and the evidence of potential Presidential

misconduct:  The "Constitution requires a process other than the criminal justice system to

formally accuse a sitting President of wrongdoing."[131]

**B.      The Judiciary Committee Has Commenced An Independent Investigation Into Whether The President Has Engaged In Misconduct And McGahn's Testimony Is Necessary For The Judiciary Committee To Fulfill Its Constitutional Functions**

57.      The House of Representatives has a grave constitutional responsibility to address

this serious evidence of potential Presidential misconduct, and the Judiciary Committee is in the

process of fulfilling that duty.  On March 4, 2019, the Judiciary Committee opened an

investigation into allegations of misconduct by the President and his associates.  Pursuant to that

investigation, the Judiciary Committee is conducting oversight and hearings, including assessing

whether to exercise its Article I power to recommend articles of impeachment against the

President, including those articles already referred to the Judiciary Committee, and considering

significant remedial legislation and amendments to existing laws.[132]  But the Judiciary

Committee cannot fulfill these constitutional responsibilities without full access to critical

evidence, including testimony from McGahn, who was a key witness to many of the most

egregious obstructive acts described in the Special Counsel's Report.

---

[130] *Id.* Vol. II at 1 (citing the Impeachment Clause of the Constitution and OLC opinion "discussing [the] relationship between impeachment and criminal prosecution of a sitting President").

[131] Mueller Public Statement.

[132] *See* 165 Cong. Rec. H211 (daily ed. Jan. 3, 2019) (referral of H. Res. 13, 116th Cong. (2019)); *see also* H. Rep. No. 116-105, at 13 (2019) (purposes of the Committee's investigation include considering "whether the conduct uncovered may warrant amending or creating new federal authorities" and "whether any of the conduct described in the [Mueller] Report warrants the Committee in taking any further steps under Congress' Article I power," including recommendation of "articles of impeachment").

### 1. The Judiciary Committee's Independent Investigation Into "Threats To The Rule Of Law," Including Presidential Misconduct

58.     An independent Judiciary Committee investigation into the conduct described in the Special Counsel's Report is well underway.  Beginning in February 2019, Chairman Nadler and the chairs of other committees with relevant jurisdiction alerted Attorney General Barr of Congress's need to review the full Report, once completed, as well as the underlying evidence and investigative materials.  As the Chairs explained, "because the Department has taken the position that a sitting President is immune from indictment and prosecution, Congress could be the only institution currently situated to act on evidence of the President's misconduct."[133]

59.     On March 4, 2019, as that evidence began to mount,[134] the Judiciary Committee officially opened a multi-faceted investigation into "threats to the rule of law" that would encompass alleged obstruction of justice, public corruption, and other abuses of power by President Trump, his associates, and members of his Administration.  As Chairman Nadler

---

[133] *See* Exhibit G, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, et al., to William P. Barr, Att'y Gen., U.S. Dep't of Justice, at 2 (Feb. 22, 2019).

[134] *See, e.g.*, Mark Mazzetti et al., *Intimidation, Pressure and Humiliation: Inside Trump's Two-Year War on the Investigations Encircling Him*, N.Y. Times (Feb. 19, 2019), https://perma.cc/7TR6-EN32 ("[Trump] asked whether Geoffrey S. Berman, the United States attorney for the Southern District of New York and a Trump ally, could be put in charge of the widening [hush payment] investigation"); Larry Buchanan & Karen Yourish, *Trump Has Publicly Attacked the Russia Investigation More Than 1,100 Times*, N.Y. Times (Feb. 19, 2019), https://perma.cc/RNJ5-HH5G ("The [President's] attacks … are part of a strategy to beat back the investigations.  They include statements made on Twitter, in official speeches, at rallies and during news media interviews and other press events."); Matt Zapotosky et al., *Cohen Tells Congress Trump Knew About WikiLeaks' Plans, Directed Hush-Money Payments*, Wash. Post (Feb. 27, 2019), https://perma.cc/VPV7-TUDS (Cohen described hush money payments, which he admitted "violated campaign finance laws," and he "emphasized that the 'coverup' of that crime continued when Trump was president.").

explained, "[i]nvestigating these threats to the rule of law is an obligation of Congress and a core function of the House Judiciary Committee."[135]

60.     On March 14, 2019, the House of Representatives approved H. Con. Res. 24, calling for the release to Congress of the full Report, once completed, by a vote of 420-0.[136]  On April 18, 2019, the Judiciary Committee issued a subpoena for the Report and underlying evidence and investigative materials.[137]

61.     When Attorney General Barr failed to comply with the Judiciary Committee's subpoena for the full Report and underlying materials, the Judiciary Committee voted on May 8, 2019, to recommend that the Attorney General be held in contempt of Congress.[138]  In its accompanying report, the Judiciary Committee detailed the purposes of its investigation and need for the materials:

>  (1) [I]nvestigating and exposing any possible malfeasance, abuse of power, corruption, obstruction of justice, or other misconduct on the part of the President or other members of his Administration; (2) considering whether the conduct uncovered may warrant amending or creating new federal authorities, including among other things, relating to election security, campaign finance, misuse of electronic data, and the types of obstructive conduct that the Mueller Report describes; and (3) considering whether any of the conduct described in the Special Counsel's Report warrants the Committee in taking any further steps under Congress' Article I powers. That includes whether to approve articles of impeachment with respect to the President or any other Administration official[.][139]

---

[135] Press Release, H. Comm. on the Judiciary, *House Judiciary Committee Unveils Investigation Into Threats Against the Rule of Law* (Mar. 4, 2019), https://perma.cc/MPM8-3MAA.

[136] Roll No. 125, 116th Cong. (Mar. 14, 2016).

[137] *See* Exhibit H, Subpoena from the Judiciary Committee to William P. Barr, Att'y Gen., U.S. Dep't of Justice (Apr. 18, 2019); *see also* Exhibit I, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, et al., to William P. Barr, Att'y Gen., U.S. Dep't of Justice, at 2-3 (Apr. 1, 2019) (explaining Congress's need for these materials).

[138] H. Rep. No. 116-105, at 17.

[139] H. Rep. No. 116-105, at 13.  The Judiciary Committee has stressed its authority and the importance of its investigation on many other occasions.  *See, e.g.*, Exhibit J, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, et al., to William P. Barr, Att'y Gen., U.S.

62.     Beginning in June 2019, the Judiciary Committee convened a series of hearings to facilitate its investigation, including to assess the specific evidence of Presidential obstruction documented in the Report and the constitutional processes for addressing such Presidential misconduct.[140]  Chairman Nadler has explained that, in connection with this investigation, "[t]he Committee seeks key documentary evidence and intends to conduct hearings with Mr. McGahn and other critical witnesses testifying to determine whether the Committee should recommend articles of impeachment against the President or any other Article I remedies, and if so, in what form."[141]  He also stressed that this evidence is necessary for the Judiciary Committee to consider "whether the conduct uncovered may warrant amending or creating new federal authorities."[142]  Indeed, numerous bills related to the issues identified in the Report and to which

---

Dep't of Justice, at 1 (Mar. 22, 2019); Exhibit K, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, et al., to Pat A. Cipollone, Counsel to the President, at 1 (Mar. 22, 2019); Exhibit L, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, et al., to William P. Barr, Att'y Gen., U.S. Dep't of Justice, at 1-2 (Mar. 25, 2019); Exhibit M, Letter from Nancy Pelosi, Speaker, House of Representatives, et al., to William P. Barr, Att'y Gen., U.S. Dep't of Justice, at 1 (Apr. 19, 2019); Exhibit N, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, to William P. Barr, Att'y Gen., U.S. Dep't of Justice, at 3 (May 3, 2019); Exhibit II, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary to William A. Burck (May 7, 2019) (responding to Exhibit JJ, Letter from William A. Burck to Jerrold Nadler, Chairman, H. Comm. on the Judiciary (May 7, 2019)).

[140] *See, e.g.*, *Lessons from the Mueller Report: Presidential Obstruction and Other Crimes: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (June 10, 2019); *Lessons from the Mueller Report, Part II: Bipartisan Perspectives: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (June 20, 2019); Exhibit O, *Lessons from the Mueller Report, Part III: "Constitutional Processes for Addressing Presidential Misconduct": Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (July 12, 2019) (statement of Rep. Nadler, Chairman, H. Comm. on the Judiciary); *see generally* Exhibit A, Hearing Tr.

[141] Exhibit P, Memorandum from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, to Members of the Committee on the Judiciary, at 3 (July 11, 2019).

[142] *Id.* at 2.

McGahn's testimony would be relevant have been introduced in the House and referred, pursuant to House Rules X.1 and XII.2, to the Judiciary Committee for consideration.[143]

---

[143] These include:

- Special Counsel Independence and Integrity Act, H.R. 197, 116th Cong. (2019) (limiting the removal of a special counsel only for cause and only by personal action of an Attorney General confirmed by the Senate);

- Special Counsel Reporting Act, H.R. 1357, 116th Cong. (2019) (requiring a special counsel to submit a periodic report to Congress and requiring reports upon the removal of the special counsel);

- Special Counsel Transparency Act, H.R. 1356, 116th Cong. (2019) (requiring the Attorney General to provide a written explanation to Congress for any material classified or otherwise not made available to the public from a report by the special counsel and requiring the special counsel to take all steps not prohibited by law to disclose to Congress any information he or she believes should be disclosed as part of the oversight role of Congress);

- Trusted, Reliable, Unquestioned Method of Procedure for Special Counsel Appointment, Limitations, and Powers Act of 2019, H.R. 47, 116th Cong. (2019) (providing that only the Attorney General may remove or discipline the Special Counsel and only for good cause);

- Presidential Pardon Transparency Act, H.R. 1348, 116th Cong. (2019) (requiring the Attorney General within three days of a presidential reprieve or pardon to publish in the Federal Register and on the official website of the President the name of the person pardoned, the date on which the reprieve or pardon issued, and the full text of the reprieve or pardon);

- Abuse of the Pardon Prevention Act, H.R. 1627, 116th Cong. (2019) (requiring the Attorney General to submit to Congress all investigative materials related to an offense for which the President pardons an individual if the offense arises from an investigation in which the President, or a relative of the President, is a target, subject, or witness);

- Security from Political Interference in Justice Act of 2019, H.R. 3380, 116th Cong. (2019) (requiring the White House and DOJ to log certain communications relating to criminal and civil investigations and to disclose those logs to Congress, DOJ's Inspector General, and DOJ's Office of Professional Responsibility);

- Defending Elections against Trolls from Enemy Regimes Act, H.R. 3442, 116th Cong. (2019) (amending the Immigration and Nationality Act to provide that aliens who engage in improper election interference are inadmissible and deportable); and

63.     On July 24, 2019, the House adopted H. Res. 507 (116th Cong.) (2019),[144] which

provides:

> That the House of Representatives ratifies and affirms all current
> and future investigations, as well as all subpoenas previously issued
> or to be issued in the future, by any standing or permanent select
> committee of the House, pursuant to its jurisdiction as established
> by the Constitution of the United States and rules X and XI of the
> Rules of the House of Representatives, concerning or issued directly
> or indirectly to—
>
> > (1) the President in his personal or official capacity;
> >
> > (2) his immediate family, business entities, or organizations;
> >
> > (3) the Office of the President;
> >
> > (4) the Executive Office of the President;
> >
> > (5) the White House;
> >
> > (6) any entity within the White House;
> >
> > (7) *any individual currently or formerly employed by or
> > associated with the White House*;
> >
> > (8) any Federal or State governmental entity or current or
> > former employee or officer thereof seeking information
> > involving, referring, or related to any individual or entity
> > described in paragraphs (1) through (7); or
> >
> > (9) any third party seeking information involving, referring,
> > or related to any individual or entity described in paragraphs
> > (1) through (7).[145]

---

•       Duty to Report Act, H.R. 2424, 116th Cong. (2019) (requiring a political
committee and certain individuals to report to the FBI an offer of a prohibited
contribution, donation, expenditure, or disbursement from a foreign national).

[144] *See* H. Res. 509, § 3 (116th Cong.) (2019) ("House Resolution 507 is hereby
adopted.").

[145] H. Res. 507 (emphasis added).

## 2.   The Judiciary Committee's Specific Need For McGahn's Testimony To Conduct An Independent Assessment Of The President's Misconduct

64.     McGahn's testimony is critical to the Judiciary Committee's independent assessment of President Trump's conduct as described in the Special Counsel's Report.  Given McGahn's central role as a witness to the President's wide-ranging potentially obstructive conduct, the Judiciary Committee cannot fulfill its constitutional legislative, investigative, and oversight responsibilities—including its consideration of whether to recommend articles of impeachment—without hearing from him.

65.     As discussed above, McGahn witnessed or participated in events relevant to nearly all of the most egregious episodes of possible Presidential obstruction and his statements to the Special Counsel's Office are mentioned in the Report more than 160 times.  Accordingly, McGahn is uniquely situated to answer questions critical to the Judiciary Committee's investigation regarding the President's efforts to end or otherwise interfere with the Special Counsel's investigation, as well as the President's attempts to conceal that conduct.  McGahn can give a firsthand account of his discussions with President Trump and other White House aides about the President's actions and their reactions to them.  In addition, McGahn was responsible for facilitating communications between the White House and DOJ, and advising the President on the propriety of such communications.[146]  Further, McGahn can explain the extent to which he raised concerns about the President's behavior to others in the White House or to DOJ personnel, and how or whether the President responded to these concerns.  McGahn also was present when President Trump inquired about the status of certain witnesses' cooperation with

---

[146] For example, on January 27, 2017, McGahn wrote a memorandum to White House Staff governing communications restrictions between the White House and personnel at DOJ. *See* Exhibit Q, Memorandum from Donald F. McGahn II, Counsel to the President, to White House Staff (Jan. 27, 2017).

the government and can accordingly shed additional light on the President's conduct and potential attempts to influence their testimony.[147]

66. In addition, McGahn's testimony would provide significant evidence of the President's motivations for his actions. McGahn's firsthand account of the specific words, tone, emotional state, body language, and other actions of the President when he instructed McGahn to have Special Counsel Mueller fired[148]—and then when the President ordered McGahn to create a document falsely contradicting a press account of the incident[149]—would be of critical aid to the Judiciary Committee in assessing the President's intent, including the extent to which the President may have used his position to intimidate his subordinates even after they raised objections about the propriety of his actions. Because the President refused to sit for an interview or answer written questions related to the investigation into obstructive conduct, McGahn's testimony regarding the context and severity of these events recounted in the Report is particularly important.

67. Finally, because President Trump has disputed significant portions of these events, has openly accused McGahn of fabricating facts, and has made claims that conflict with other facts gathered by the Special Counsel during the investigation, the Judiciary Committee must hear from McGahn directly. The Judiciary Committee has an urgent interest in resolving any factual disputes, including understanding McGahn's responses to the President's recent allegations about him, and assessing McGahn's credibility as a witness to these now-disputed events.

---

[147] *See supra* II(A)(2)(e) (citing *Report*, Vol. II at 123).
[148] *Report*, Vol. II at 85-86.
[149] *Id.* Vol. II at 115-16.

68.     For all of these reasons, live testimony from McGahn is essential to providing a complete and independent understanding of the facts and resolving any conflicting accounts of the evidence.  Indeed, the Supreme Court has long recognized the importance of live testimony for such purposes, including the necessity of cross-examining a witness in person, "the greatest legal engine ever invented for the discovery of truth."[150]  Mueller similarly affirmed that "the testimony of [a] witness[] goes to the heart of just about any criminal case."[151]

### 3.    The Judiciary Committee's Unsuccessful Attempts To Reach An Accommodation With McGahn

#### a.   *Efforts To Secure McGahn's Testimony*

69.     In an attempt to avoid the need to bring this lawsuit, the Judiciary Committee has repeatedly tried to reach an accommodation to secure McGahn's testimony.  This effort has not succeeded and has resulted in a stalemate.

70.     Upon opening its investigation, on March 4, 2019, the Judiciary Committee issued voluntary document requests to McGahn, along with a number of other witnesses it believed to possess relevant information.[152]  On March 18, 2019, private counsel for McGahn notified the Judiciary Committee that he had forwarded the requests to the Trump Campaign and the White House.[153]

71.     On April 3, 2019, when the White House did not respond to the Judiciary Committee's voluntary document request to McGahn and others, the Judiciary Committee adopted a Resolution authorizing the issuance of subpoenas in connection with its investigation,

---

[150] *California v. Green*, 399 U.S. 149, 158 (1970).
[151] Exhibit E, Hearing Tr. at 57.
[152] Exhibit R, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, to Donald F. McGahn II, at 1 (Mar. 4, 2019).
[153] Exhibit S, Letter from William A. Burck to Jerrold Nadler, Chairman, H. Comm. on the Judiciary (Mar. 18, 2019).

including the McGahn Subpoena.[154]  Chairman Nadler did not issue the subpoenas at that time in

order to allow those subject to the authorized subpoenas, including McGahn, the opportunity to

provide the materials voluntarily.

72.     On April 22, 2019, when the Judiciary Committee still had not received a single

document in response to its requests, Chairman Nadler issued the McGahn Subpoena with a

return date for McGahn's testimony on May 21, 2019.[155]

73.     On May 15, 2019, the White House responded to the Judiciary Committee's

March 4 voluntary requests, stating that "the appropriate course is for the Committee to

discontinue its inquiry discussed in the March 4 letter," and refusing to provide any documents at

that time.[156]

---

[154] Exhibit T, *Markup of Resolution Authorizing Issuance of Subpoenas Before the H. Comm. on the Judiciary*, 116th Cong. (Apr. 3, 2019).

[155] Exhibit U, Subpoena from Judiciary Committee to Donald F. McGahn II (Apr. 22, 2019).  The McGahn Subpoena additionally sought documents in McGahn's possession, custody, or control by May 7, 2019.  The Judiciary Committee has engaged in extensive negotiations with the White House regarding McGahn's document production to allow the Judiciary Committee to review these documents, which are also in the possession of DOJ.  The Judiciary Committee and the White House reached an accommodation whereby the Judiciary Committee will be provided the opportunity to review these documents on a rolling basis at specific times designated by DOJ but will not be able to retain them or disclose the contents.  On July 26, the Judiciary Committee confirmed its acceptance of that agreement, and, on August 1, the White House said that it would shortly be in touch on scheduling for the document review.  Accordingly, this Complaint addresses and seeks enforcement of the McGahn Subpoena only as it relates to McGahn's testimony.

[156] Exhibit V, Letter from Pat A. Cipollone, Counsel to the President, to Jerrold Nadler, Chairman, H. Comm. on the Judiciary, at 3-4 (May 15, 2019) (stating that if "the Committee intends to continue its inquiry, it would greatly advance that process if the Committee were to narrow the scope of the requests in the March 4 letter and articulate the legislative purpose and legal basis supporting each of the remaining requests"); *see* Exhibit KK, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary to Letter to Pat A. Cipollone, Counsel to the President (May 16, 2019) (responding, in part, to Exhibit V).

74.     On May 17, 2019, Chairman Nadler wrote to McGahn, noting that his presence before the Judiciary Committee on May 21, 2019, was legally required pursuant to the April 22 subpoena.[157]   The letter explained that the Judiciary Committee intended "to focus on the very topics covered in the Special Counsel's Report," over which "there can be no valid assertion of executive privilege."[158]

75.     On May 20, 2019, the afternoon before McGahn's scheduled appearance, White House Counsel Pat Cipollone wrote to Chairman Nadler.  Cipollone's letter stated that DOJ had advised that "McGahn is absolutely immune from compelled congressional testimony with respect to matters occurring during his service as a senior adviser to the President."[159]   The letter attached an OLC opinion advising that "Congress may not constitutionally compel the President's senior advisers to testify about their official duties."[160]   That opinion acknowledged, however, that the Attorney General's public release "of a redacted version of the Special Counsel's report (with the President's consent) does extinguish the Executive Branch's confidentiality interests in the precise information that has already been revealed" in the Report.[161]   Based on OLC's advice, Cipollone notified the Judiciary Committee that the President had directed McGahn not to attend the hearing.[162]

76.     That same evening, private counsel for McGahn wrote to Chairman Nadler that McGahn "finds himself facing contradictory instructions from two co-equal branches of

---

[157] Exhibit W, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, to Donald F. McGahn II, at 2 (May 17, 2019).

[158] *Id.* at 1.

[159] Exhibit B at 1.

[160] Exhibit C at 1.

[161] *Id.* at 13.

[162] Exhibit B at 2.

government" and therefore would decline to appear at the next day's hearing.[163]  McGahn's

counsel further asserted that "McGahn remains obligated to maintain the status quo," pending

any accommodation between the Judiciary Committee and the White House.[164]

77.     Chairman Nadler immediately responded to McGahn, stating that McGahn's

appearance was compelled by law, regardless of the White House's direction, including because

OLC's analysis "has no support in relevant case law, and its arguments have been flatly rejected

by the courts."[165]  Further, Chairman Nadler explained that President Trump's order that

McGahn not appear was "unprecedented"—OLC did not point to any prior instance "where

Congress planned to ask [a] White House aide about possible crimes committed by the

President" and that aide "refused to testify."[166]

78.     On May 21, 2019, the Judiciary Committee convened for its scheduled hearing.

Neither McGahn nor the White House had sought any legal recourse—McGahn simply refused

to appear.  During opening statements, Chairman Nadler reiterated McGahn's legal obligation to

appear, and offered McGahn the chance to "immediately correct his mistake."[167]  McGahn did

not respond.

---

[163] Exhibit X, Letter from William A. Burck to Jerrold Nadler, Chairman, H. Comm. on the Judiciary, at 1-2 (May 20, 2019).

[164] *Id.* at 2.

[165] Exhibit GG, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, to Donald F. McGahn II, at 1 (May 20, 2019).

[166] *Id.* at 1-2.

[167] Exhibit Y, *Oversight of the Report by Special Counsel Robert S. Mueller, III: Former White House Counsel Donald F. McGahn, II: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (May 21, 2019) (statement by Jerrold Nadler, Chairman, H. Comm. on the Judiciary), Hearing Tr. at 4.

79.     On May 31, 2019, Chairman Nadler again wrote to McGahn and Cipollone.[168] Chairman Nadler offered "to discuss any reasonable accommodation(s) that would facilitate McGahn's appearance" before the Judiciary Committee, including "limiting [his] testimony," "identifying with greater specificity the precise areas of intended inquiry," and "agreeing to the presence of White House counsel during any testimony."[169]  Chairman Nadler requested that McGahn inform the Judiciary Committee whether he was willing to engage in accommodation discussions by June 7, 2019.[170]  Neither McGahn nor Cipollone responded to the Judiciary Committee's letter.

80.     From mid to late June, the Judiciary Committee had a series of discussions with attorneys in the White House Counsel's Office to discuss the McGahn Subpoena and attempt to reach a compromise regarding McGahn's public testimony.  During those discussions, the Judiciary Committee offered to limit McGahn's testimony to matters that overlap with the Special Counsel's Report.  It also proposed withdrawing the McGahn Subpoena so that McGahn's appearance would be voluntary and agreed to consider any other reasonable accommodation for McGahn's public testimony that would be amenable to the President.  These offered accommodations were contingent on reaching an agreement for McGahn's prompt testimony.  The White House Counsel attorneys agreed to consider the offers, and negotiations continued through mid-July.

81.     On July 17, 2019, attorneys in the White House Counsel's Office indicated that they would not accept any of the proposed accommodations for McGahn's public testimony.

---

[168] Exhibit Z, Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, to Donald F. McGahn II and Pat A. Cipollone, Counsel to the President (May 31, 2019).
[169] *Id.* at 2.
[170] *Id.*

82.     On July 18, the Judiciary Committee reached out again to McGahn's private counsel to discuss whether the Judiciary Committee could offer any accommodation that would cause McGahn to comply with the subpoena and to avoid the need for litigation.

83.     On July 26, McGahn's counsel rejected all accommodation efforts for public testimony and confirmed that McGahn would continue to follow the President's instruction not to appear.  After months of attempted accommodation, the Judiciary Committee and McGahn are therefore now at an impasse.

### b. The Judiciary Committee's Efforts To Secure Relevant Information Through Other Means

84.     In addition to seeking a reasonable accommodation with McGahn for his testimony, the Judiciary Committee has made efforts to secure information from other witnesses to President Trump's obstructive conduct described in the Report.  The White House has blocked those efforts as well.

85.     On May 21, 2019, the Judiciary Committee issued subpoenas to Annie Donaldson Talley, McGahn's former chief of staff, and Hope Hicks, the former White House communications director, both of whom were present for certain of the episodes of Presidential obstruction described in the Report.[171]

86.     The White House has taken the position that Hicks, like McGahn, is "absolutely immune" from being compelled to testify before Congress.[172]  Although Hicks voluntarily appeared for an interview on June 19, 2019, lawyers from the White House and OLC objected

---

[171] *See* Exhibit AA, Subpoena from Judiciary Committee to Annie Donaldson Talley (May 21, 2019); *see also* Exhibit BB, Subpoena from Judiciary Committee to Hope Hicks (May 21, 2019).

[172] Exhibit CC, Letter from Pat A. Cipollone, Counsel to the President, to Jerrold Nadler, Chairman, H. Comm. on the Judiciary, at 1 (June 18, 2019).

155 times to questions posed to Hicks on the asserted basis of "absolute immunity."[173]  As to

Donaldson, although the Judiciary Committee reached an accommodation due to medical reasons

allowing her to submit written answers to its questions, her responses included a direction by the

White House not to answer over 200 of the questions because the answers would "implicate

constitutionally-based Executive Branch confidentiality interests."[174]

### 4. The Administration's Purported Justifications For McGahn's Refusal To Testify

#### a.    *"Absolute Immunity"*

87.     McGahn, a private citizen, has defied the Judiciary Committee's subpoena based

on a purported order from President Trump.  The sole basis for this order and for McGahn's

resulting refusal to testify is the assertion that McGahn, as a former Presidential adviser, is

"absolutely immune" from compelled testimony to Congress.[175]

88.     Specifically, the Executive Branch has taken the position that, under separation-

of-powers principles, "Congress may not constitutionally compel the President's senior advisers

to testify about their official duties."[176]  Under this theory, certain Presidential advisers are

absolutely immune from appearing before Congress to testify—even if Congress can

demonstrate a compelling need for the information.

---

[173] *See generally* Exhibit EE, *Transcribed Interview of Hope Hicks*, H. Comm. on the Judiciary, 116th Cong. (June 19, 2019).

[174] Exhibit FF, Letter from Michael M. Purpura, Dep'y Gen. Counsel to the President, to Sandra Moser, at 1 (July 5, 2019); *see also* Exhibit DD, Letter from Pat A. Cipollone, Counsel to the President, to Jerrold Nadler, Chairman, H. Comm. on the Judiciary, at 1 (June 4, 2019).  The White House, however, did not object to Ms. Donaldson answering other questions, including whether she told the truth during her interview with the Special Counsel in response to questions about specific statements attributed to her in the Report.  *See* Exhibit HH, Letter from Sandra Moser to Jerrold Nadler, Chairman, H. Comm. on the Judiciary, at 3-5 (July 5, 2019).

[175] Exhibit B at 1; Exhibit C at 1.

[176] *Id.*

89.     This "absolute immunity" doctrine has no grounding in the Constitution, any statutes, or case law and never has been accepted by any court.  Indeed, the only court ever to consider the issue "reject[ed] the Executive's claim of absolute immunity for senior presidential aides," explaining that the Executive Branch's position would, among other things, "eviscerate Congress's historical oversight function."[177]  Moreover, the President has cited no legal authority for his purported ability to direct a private citizen to disobey a lawfully issued Congressional subpoena other than an OLC opinion, which is not law and has no binding effect outside the Executive Branch.

### b.   Executive Privilege

90.     The Executive Branch has long taken the position that the President can protect certain Presidential communications from disclosure by asserting executive privilege.[178]  The President, however, has not invoked executive privilege in response to the Judiciary Committee's McGahn Subpoena.

91.     Regardless, the President has waived executive privilege over much of the testimony the Judiciary Committee seeks, including McGahn's testimony about matters and information discussed in the published Report.  Courts, including the D.C. Circuit, have recognized that the release of a document or information to a third party "waives [executive] privilege[] for the document or information specifically released."[179]

92.     Here, President Trump has waived executive privilege over the matters and information discussed in the Special Counsel's publicly released Report.  In a press conference

---

[177] *Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 99, 103 (D.D.C. 2008).

[178] *See In re Sealed Case*, 121 F.3d 729, 736-40 (D.C. Cir. 1997).

[179] *Id.* at 741.

accompanying Attorney General Barr's public release of a redacted version of the Report, the Attorney General confirmed that the President "would not assert privilege over the Special Counsel's report" and, therefore, the Report contained "no material … redacted based on executive privilege."[180]  Moreover, OLC has admitted that the Attorney General's release "of a redacted version of the Special Counsel's report (with the President's consent) … extinguish[ed] the Executive Branch's confidentiality interests in the precise information" revealed in the Report.[181]

93.     By allowing the Special Counsel to interview White House aides and obtain White House documents, President Trump also has waived executive privilege over the information disclosed during those interviews and in those documents.  Indeed, the President's personal attorney informed the Special Counsel that, "[i]n an effort to provide complete transparency, the President waived the obviously applicable privileges" to allow relevant witnesses to share information with the Special Counsel's Office.[182]

94.     McGahn sat for at least five interviews with the Special Counsel's investigators from November 30, 2017, through February 28, 2019.[183]  According to a public statement issued by McGahn's counsel, "President Trump, through counsel, declined to assert any privilege over Mr. McGahn's testimony" when the Special Counsel's team sought these interviews, "so Mr.

---

[180] Barr Public Statement.

[181] Exhibit C at 13.

[182] Letter from John M. Dowd and Jay A. Sekulow to Robert S. Mueller, Re: Request for Testimony on Alleged Obstruction of Justice (Jan. 29, 2018), https://perma.cc/HUW9-J4VD.

[183] *See, e.g., Report* Vol. II at 31, 35, 52, 63, and 84 (citing FBI "302" reports of McGahn's interviews from five separate dates: Nov. 30, 2017; Dec. 12, 2017; Dec. 14, 2017; Mar. 8, 2018; and Feb. 28, 2019).

McGahn answered the special counsel team's questions fulsomely and honestly."[184]  The White House also provided McGahn and his counsel documents relating to his interviews, and upon information and belief they retained these documents after McGahn left government service, which would also waive any executive privilege over the information contained in those documents.[185]

95.     Finally, even aside from the fact that it was waived here, executive privilege is a qualified privilege that can be overcome by a sufficient showing of need.[186]  McGahn's testimony regarding President Trump's potentially obstructive conduct is crucial to the Judiciary Committee's independent investigation and its decision whether to recommend articles of impeachment.  Additionally, President Trump's conduct has diminished any legitimate confidentiality interest he may have had over McGahn's testimony, while underscoring the Judiciary Committee's need for that testimony.  The President has, as set forth, repeatedly and publicly addressed the events described in the Mueller Report—primarily by denying that he ever attempted to fire Special Counsel Mueller.  He has attacked McGahn's character and credibility, including by accusing McGahn of lying to Special Counsel Mueller in order to "make … himself look like a good lawyer."[187]  As the D.C. Circuit has long held, "a party may not use privilege 'as a tool for manipulation of the truth-seeking process.'"[188]  Therefore, even if the

---

[184] Michael S. Schmidt & Maggie Haberman, *White House Counsel, Don McGahn, Has Cooperated Extensively in Mueller Inquiry*, N.Y. Times (Aug. 18, 2018), https://perma.cc/5MN4-JN52.

[185] *See In re Sealed Case*, 121 F.3d at 741-42.

[186] *United States v. Nixon*, 418 U.S. 683, 705-07 (1974).

[187] *See, e.g.*, *Transcript: ABC News' George Stephanopoulos' Exclusive Interview with President Trump*, ABC News (June 16, 2019), https://perma.cc/3WL3-G8J9; *see also supra* II(A)(3).

[188] *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 145 (D.C. Cir. 2015) (quoting *In re Sealed Case*, 676 F.2d 793, 807 (D.C. Cir. 1982)).

President were to assert executive privilege over McGahn's testimony at this late date, the Judiciary Committee's need for the information outweighs any asserted Executive Branch interest in confidentiality.[189]

### 5.  Injury To The Judiciary Committee

96.     McGahn's refusal without a lawful basis to testify before the Judiciary Committee constitutes an ongoing and irreparable injury.

97.     McGahn is the Judiciary Committee's most important fact witness in its consideration of whether to recommend articles of impeachment and its related investigation of misconduct by the President, including acts of obstruction of justice described in the Special Counsel's Report.  President Trump has redoubled his efforts to prevent the Judiciary Committee's scrutiny of his conduct by attempting to block the Judiciary Committee's subpoena to McGahn.  Indeed, he has publicly declared, "I don't want people testifying to [House Democrats],"[190] and has announced, "We're fighting all the subpoenas."[191]  These actions, and McGahn's resultant refusal to testify, deprive the Judiciary Committee of its ability to exercise its proper functions and strike at the core of Congress's mandated role in our constitutional system.

98.     In addition, the Judiciary Committee has an urgent oversight duty to protect ongoing investigations from improper interference, to ascertain whether improper political considerations are causing DOJ to open new investigations, and to consider potential legislation before the Judiciary Committee on these issues.  McGahn, who repeatedly advised the President

---

[189] *See id.* at 707-13.

[190] Robert Costa et al., *Trump Says He Is Opposed to White House Aides Testifying to Congress, Deepening Power Struggle with Hill*, Wash. Post (Apr. 23, 2019), https://perma.cc/FL3H-TUXL.

[191] *See Remarks by President Trump Before Marine One Departure*, White House (Apr. 24, 2019), https://perma.cc/W7VZ-FZ3T.

against interfering in DOJ investigations and was responsible for managing contacts between the

White House and DOJ, is uniquely situated to inform the Judiciary Committee's current

oversight efforts with regard to these concerns.

99.     McGahn's refusal to comply with the Judiciary Committee's subpoena interferes

with the House's ability to perform these core constitutional functions in at least the following

specific ways:

100.    *First*, as set forth above, the Judiciary Committee has the responsibility of

determining whether to recommend articles of impeachment against the President for possible

misconduct described in the Special Counsel's Report—whether in the form of those articles

already referred to the Judiciary Committee,[192] or through additional or other articles the

Judiciary Committee itself may choose to draft.  Consideration of this remedy is an urgent task.

As DOJ itself has explained, "the Framers … specifically determined that the public interest in

*immediately* removing a sitting President whose continuation in office poses a threat to the

Nation's welfare outweighs the public interest in avoiding the Executive burdens incident

thereto."[193]  As discussed above, McGahn's testimony is crucial to the Judiciary Committee's

investigation—and by refusing to comply with the Judiciary Committee's subpoena, McGahn is

interfering with the House's ability to exercise its constitutional responsibility.  Without

McGahn's firsthand testimony regarding the key episodes of potential Presidential misconduct

he observed, the Judiciary Committee is significantly hampered in assessing the full facts and

circumstances surrounding the President's actions.

---

[192] *See* 165 Cong. Rec. H211 (daily ed. Jan. 3, 2019) (noting referral of H. Res. 13 to Comm. on the Judiciary).

[193] A Sitting President's Amenability to Indictment and Criminal Prosecution, 24 Op. O.L.C. 222, 258 (2000) (emphasis added).

101.    *Second*, McGahn's refusal to testify deprives the Judiciary Committee of information urgently needed to conduct oversight of DOJ, including regarding any improper political interference with ongoing investigations.  The Report describes repeated efforts by the President to influence and undermine the Special Counsel's investigation.  The Special Counsel's Office referred or transferred 25 additional matters to other offices within the Department, many of which are ongoing.[194]  At least some ongoing matters may implicate the President personally, such as the prosecution of Roger Stone and the reported investigation of the President's 2017 inaugural committee.[195]  Given the President's extensively documented attempts to interfere with the Special Counsel's investigation, these matters may be equally vulnerable to the President's interference.  For example, public reporting indicates that President Trump may already have attempted to interfere in proceedings in New York involving his former personal attorney, Michael Cohen.[196]

102.    *Third*, McGahn's refusal to testify is impeding the Judiciary Committee's ability to fully assess potential remedial legislation relating to the types of obstructive conduct described in the Special Counsel's Report.  For example, McGahn's testimony would directly inform the Committee's consideration of whether existing regulatory protections for special counsels are adequate.  His testimony also would directly inform the Judiciary Committee's consideration of

---

[194] *Report*, App. D-1 to D-6.

[195] Indictment, *United States v. Roger Stone*, No. 1:19-cr-18 (D.D.C. Jan. 24, 2019); Maggie Haberman & Ben Protess, *Trump Inaugural Committee Ordered to Hand Over Documents to Federal Investigators*, N.Y. Times (Feb. 4, 2019) (describing investigation of President Trump's 2017 inaugural committee), https://perma.cc/3F27-YLAZ.

[196] Mark Mazzetti et al., *Intimidation, Pressure and Humiliation: Inside Trump's Two-Year War on the Investigations Encircling Him*, N.Y. Times (Feb. 19, 2019), https://perma.cc/7TR6-EN32.

pending legislation referred to the Judiciary Committee to protect the independence of special counsel investigations.[197]

103.    *Fourth*, McGahn's refusal to testify deprives the Judiciary Committee of important evidence needed to (1) ensure that DOJ and the FBI are allocating appropriate resources toward protecting America's elections in 2020 and thereafter; and (2) consider fully potential remedial legislation on election security, including requiring candidates to report certain foreign contacts.

104.    These injuries to the Judiciary Committee are grave, ongoing, and irreparable. Each day that McGahn refuses to testify, the Judiciary Committee is deprived of its ability to carry out the significant Article I task of determining whether to recommend that the President be impeached and potentially removed from office.  Moreover, each day McGahn refuses to testify, the Judiciary Committee is deprived of testimony that would inform its oversight of DOJ and consideration of legislation that may be urgently needed.

105.    Furthermore, because the House is not a continuing body, the Judiciary Committee's investigation and the articles of impeachment referred to the Committee related to that investigation will necessarily end on January 3, 2021.  The Judiciary Committee requires a substantial period in advance of that date to perform its constitutional duties.  Every day that the Judiciary Committee is without McGahn's testimony further delays its ability to pursue its inquiries on issues of national importance before the current Congress ends.  Even assuming a future Judiciary Committee were to decide to continue the investigation, it would have to

---

[197] *See, e.g.*, Special Counsel Independence and Integrity Act, H.R. 197, 116th Cong. (2019).

reconsider any articles of impeachment and reissue similar requests and subpoenas, thus resulting in even further delay.

## SPECIFIC CLAIM FOR RELIEF

## COUNT: ARTICLE I OF THE CONSTITUTION

106.    The Judiciary Committee incorporates by reference and realleges the preceding paragraphs, as if set forth fully herein.

107.    The McGahn Subpoena was duly authorized, issued, and served pursuant to the Judiciary Committee's powers under Article I of the Constitution of the United States.

108.    The McGahn Subpoena required McGahn to appear for testimony before the House Judiciary Committee on May 21, 2019, yet McGahn did not appear as required.

109.    The Judiciary Committee has attempted to make reasonable accommodations for McGahn's testimony, but those efforts are at an impasse and McGahn continues to refuse to testify publicly before the Committee.

110.    There is no lawful basis for McGahn's refusal to appear before the Judiciary Committee.

111.    McGahn enjoys no absolute immunity from appearing before the Judiciary Committee.

112.    The President has waived executive privilege as to the subpoenaed testimony that relates to matters and information discussed in the Report.

113.    McGahn has violated and continues to violate his legal obligations by refusing to appear before the Judiciary Committee as required by the subpoena and, moreover, by refusing to answer questions where there has been no assertion of executive or other privilege or where executive privilege has been waived.

114.    As a result, the Judiciary Committee has been, and will continue to be, injured by McGahn's actions.

## PRAYER FOR RELIEF

WHEREFORE, the Judiciary Committee respectfully prays that this Court:

A.    Pursuant to 28 U.S.C. §§ 2201 and 2202, enter declaratory and injunctive relief as follows:

1. Declare that McGahn's refusal to appear before the Committee in response to the subpoena issued to him was without legal justification;

2. Issue an injunction ordering McGahn to appear and testify forthwith before the Committee; and

3. Issue an injunction ordering McGahn to testify as to matters and information discussed in the Special Counsel's Report and any other matters and information over which executive privilege has been waived or is not asserted.

B.    Retain jurisdiction to review any disputes that may arise regarding compliance with this Court's order.

C.    Grant the Committee such other and further relief as may be just and proper under the circumstances.

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (D.C. Bar No. 253492),
   *General Counsel*
Todd B. Tatelman (VA Bar No. 66008),
   *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854),
   *Associate General Counsel*
Josephine Morse (D.C. Bar No. 1531317),
   *Associate General Counsel*
Sarah E. Clouse (MA Bar No. 688187),
   *Attorney*
OFFICE OF GENERAL COUNSEL[198]
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
Douglas.Letter@mail.house.gov

Annie L. Owens (D.C. Bar No. 976604)
Joshua A. Geltzer (D.C. Bar No. 1018768)
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, D.C. 20001
Telephone: (202) 662-9042
ao700@georgetown.edu

*Counsel for Plaintiff Committee on the Judiciary of the U.S. House of Representatives*

August 7, 2019

---

[198] Attorneys for the Office of General Counsel for the U.S. House of Representatives are "entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States or of any State or political subdivision thereof without compliance with any requirements for admission to practice before such court." 2 U.S.C. § 5571.  The Office of General Counsel wishes to acknowledge the assistance of law clerks Lily Hsu, a student at The George Washington University Law School, Nate King, a student at The Catholic University of America, Columbus School of Law, and legal assistant Henry Raffel, a student at the University of Michigan, in preparing this complaint.  The Institute for Constitutional Advocacy and Protection also wishes to acknowledge the assistance of law clerk Nikita Lalwani, a student at Yale Law School.