**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY,<br>UNITED STATES HOUSE OF<br>REPRESENTATIVES,<br>2138 Rayburn House Office Building<br>Washington, D.C. 20515,<br><br>                              *Plaintiff*,<br><br><br>        v.<br><br><br>DONALD F. MCGAHN II,<br>51 Louisiana Avenue, N.W.<br>Washington, D.C. 20001,<br><br>                              *Defendant*. | Case No. 1:19-cv-2379 |

# Exhibit A

<u>RPTR ZAMORA</u>

<u>EDTR ZAMORA</u>

OVERSIGHT OF THE REPORT ON THE INVESTIGATION INTO RUSSIAN

INTERFERENCE IN THE 2016 PRESIDENTIAL ELECTION: FORMER SPECIAL

COUNSEL ROBERT S. MUELLER, III

Wednesday, July 24, 2019

House of Representatives,

Committee on the Judiciary,

Washington, D.C.

The committee met, pursuant to call, at 8:32 a.m., in Room

2141, Rayburn House Office Building, Hon. Jerrold Nadler [chairman

of the committee] presiding.

Present:  Representatives Nadler, Lofgren, Jackson Lee,

Cohen, Johnson of Georgia, Deutch, Bass, Richmond, Jeffries,

Cicilline, Swalwell, Lieu, Raskin, Jayapal, Demings, Correa,

Scanlon, Garcia, Neguse, McBath, Stanton, Dean, Mucarsel-Powell,

Escobar, Collins, Sensenbrenner, Chabot, Gohmert, Jordan, Buck,

Ratcliffe, Roby, Gaetz, Johnson of Louisiana, Biggs, McClintock,

Lesko, Reschenthaler, Cline, Armstrong, and Steube.

UNOFFICIAL COPY

2

Staff Present:  Aaron Hiller, Deputy Chief Counsel; Arya
Hariharan, Deputy Chief Oversight Counsel; David Greengrass,
Senior Counsel; John Doty, Senior Advisor; Lisette Morton,
Director Policy, Planning, and Member Services; Madeline Strasser,
Chief Clerk; Moh Sharma, Member Services and Outreach Advisor;
Susan Jensen, Parliamentarian/Senior Counsel; Sarah Istel,
Oversight Counsel; Julian Gerson, Staff Assistant; Will Emmons,
Professional Staff Member; Brendan Belair, Minority Staff
Director; Bobby Parmiter, Minority Deputy Staff Director/Chief
Counsel; Jon Ferro, Minority Parliamentarian/General Counsel;
Carlton David, Minority Chief Oversight Counsel; Ashley Callen,
Minority Oversight Counsel; Danny Johnson, Minority Oversight
Counsel; Jake Greenberg, Minority Oversight Counsel; and Erica
Barker, Minority Chief Legislative Clerk.

Chairman <u>Nadler.</u>  The Judiciary Committee will come to order.
Without objection, the chair is authorized to declare recesses of
the committee at any time.

We welcome everyone to today's hearing on oversight of the
report on the investigation into Russian interference in the 2016
Presidential election.  I will now recognize myself for a brief
opening statement.

Director Mueller, thank you for being here.  I want to say
just a few words about our themes today:  responsibility,
integrity, and accountability.  Your career, for example, is a
model of responsibility.  You are a decorated Marine officer.  You
were awarded a Purple Heart and the Bronze Star for valor in
Vietnam.  You served in senior roles at the Department of Justice,
and in the immediate aftermath of 9/11, you served as director of
the FBI.

Two years ago, you return to public service to lead the
investigation into Russian interference in the 2016 elections.
You conducted that investigation with remarkable integrity.  For
22 months, you never commented in public about your work, even
when you were subjected to repeated and grossly unfair personal
attacks.  Instead, your indictments spoke for you and in
astonishing detail.

Over the course of your investigation, you obtained criminal
indictments against 37 people and entities.  You secured the
conviction of President Trump's campaign chairman, his deputy

campaign manager, his National Security Advisor, and his personal lawyer, among others.  In the Paul Manafort case alone, you recovered as much as $42 million so that the cost of your investigation to the taxpayers approaches zero.

And in your report you offer the country accountability as well.  In Volume I, you find that the Russian Government attacked our 2016 elections, quote, in a sweeping and systematic fashion, and that the attacks were designed to benefit the Trump campaign.

Volume II walks us through 10 separate incidents of possible obstruction of justice where, in your words, President Trump attempted to exert undue influence over your investigation.  The President's behavior included, and I quote from your report, quote, public attacks on the investigation, nonpublic efforts to control it, and efforts in both public and private to encourage witnesses not to cooperate, close quote.

Among the most shocking of these incidents, President Trump ordered his White House counsel to have you fired and then to lie and deny that it had happened.  He awarded his former campaign manager to convince the recused Attorney General to step in and to limit your work, and he attempted to prevent witnesses from cooperating with your investigation.

Although Department policy barred you from indicting the President for this conduct, you made clear that he is not exonerated.  Any other person who acted in this way would have been charged with crimes, and in this Nation, not even the

President is above the law, which brings me to this committee's work:  responsibility, integrity, and accountability.  These are the marks by which we who serve on this committee will be measured as well.

Director Mueller, we have a responsibility to address the evidence that you have uncovered.  You recognize as much when you said, quote, the Constitution requires a process other than the criminal justice system to formally accuse a sitting President of wrongdoing, close quote.  That process begins with the work of this committee.

We will follow your example, Director Mueller.  We will act with integrity.  We will follow the facts where they lead.  We will consider all appropriate remedies.  We will make our recommendation to the House when our work concludes.  We will do this work because there must be accountability for the conduct described in your report, especially as it relates to the President.

Thank you again, Director Mueller.  We look forward to your testimony.

It is now my pleasure to recognize the ranking member of the Judiciary Committee, the gentleman from Georgia, Mr. Collins, for his opening statement.

[The statement of Chairman Nadler follows:]


******** COMMITTEE INSERT ********

Mr. <u>Collins.</u>   Thank you, Mr. Chairman.  And thank you, Mr. Mueller, for being here.

For 2 years leading up to the release of the Mueller report and in the 3 months since, Americans were first told what to expect and then what to believe.  Collusion, we were told, was in plain sight, even if the special counsel's team didn't find it.

When Mr. Mueller produced his report and Attorney General Barr provided it to every American, we read no American conspired with Russia to interfere in our elections but learned the depths of Russia's malice toward America.

We are here to ask serious questions about Mr. Mueller's work, and we will do that.  After an extended, unhampered investigation, today marks an end to Mr. Mueller's involvement in an investigation that closed in April.  The burden of proof for accusations that remain unproven is extremely high and especially in light of the special counsel's thoroughness.

We were told this investigation began as an inquiry into whether Russia meddled in our 2016 election.  Mr. Mueller, you concluded they did.  Russians accessed Democrat servers and disseminated sensitive information by tricking campaign insiders into revealing protected information.

The investigation also reviewed whether Donald Trump, the President, sought Russian assistance as a candidate to win the Presidency.  Mr. Mueller concluded he did not.  His family or advisers did not.  In fact, the report concludes no one in the

President's campaign colluded, collaborated, or conspired with the Russians.

The President watched the public narrative surrounding this investigation [inaudible] assume his guilt while he knew the extent of his innocence. Volume II of Mr. Mueller's report details the President's reaction to frustrating investigation where his innocence was established early on. The President's attitude toward the investigation was understandably negative, yet the President did not use his authority to close the investigation. He asked his lawyer if Mr. Mueller had conflicts that disqualified Mr. Mueller from the job, but he did not shut down the investigation. The President knew he was innocent.

Those are the facts of the Mueller report. Russia meddled in the 2016 election, the President did not conspire with the Russians, and nothing we hear today will change those facts. But one element of this story remains: the beginnings of the FBI investigation into the President. I look forward to Mr. Mueller's testimony about what he found during his review of the origins of the investigation.

In addition, the inspector general continues to review how baseless gossip can be used to launch an FBI investigation against a private citizen and eventually a President. Those results will be released, and we will need to learn from them to ensure government intelligence and our law enforcement powers are never again used and turned on a private citizen or a potential -- or a

political candidate as a result of the political leanings of a handful of FBI agents.

The origins and conclusions of the Mueller investigation are the same things:  what it means to be American.  Every American has a voice in our democracy.  We must protect the sanctity of their voice by combatting election interference.  Every American enjoys the presumption of innocence and guarantee of due process. If we carry nothing -- anything away today, it must be that we increase our vigilance against foreign election interference, while we ensure our government officials don't weaponize their power against the constitutional rights guaranteed to every U.S. citizen.

Finally, we must agree that the opportunity cost here is too high.  The months we have spent investigating from this dais failed to end the border crisis or contribute to the growing job market.  Instead, we have gotten stuck, and it's paralyzed this committee and this House.

And as a side note, every week, I leave my family and kids, the most important things to me, to come to this place because I believe this place is a place where we can actually do things and help people.  Six and a half years ago, I came here to work on behalf of the people of the Ninth District in this country, and we accomplished a lot in those first 6 years on a bipartisan basis with many of my friends across the aisle sitting on this dais with me today.  However, this year, because of the majority's dislike

of this President and the endless hearing and to a closed investigation have caused us to accomplish nothing except talk about the problems of our country, while our border is on fire, in crisis, and everything else is stopped.

This hearing is long overdue.  We have had truth for months. No American conspired to throw our election.  What we need today is to let that truth bring us confidence, and I hope, Mr. Chairman, closure.

With that, I yield back.

[The statement of Mr. Collins follows:]


******** COMMITTEE INSERT ********

Chairman <u>Nadler.</u>  Thank you, Mr. Collins.

I will now introduce today's witness.

Robert Mueller served as Director of the FBI from 2001 to 2013, and most recently served as special counsel in the Department of Justice overseeing the investigation into Russian interference in the 2016 special election.

He received his BA from Princeton University and MA from New York University, in my district, and his JD from the University of Virginia.  Mr. Mueller is accompanied by his -- by counsel, Aaron Zebley, who served as deputy special counsel on the investigation.

We welcome our distinguished witness, and we thank you for participating in today's hearing.

Now, if you would please rise, I will begin by swearing you in.

Raise your right hand, please.  Left hand.

Do you swear or affirm under penalty of perjury that the testimony you're about to give is true and correct to the best of your knowledge, information, and belief, so help you God?

Let the record show the witness answered in the affirmative.

Thank you.  And please be seated.

Please note that your written statement will be entered into the record in its entirety.  Accordingly, I ask that you summarize your testimony in 5 minutes.

Director Mueller, you may begin.

**STATEMENT OF ROBERT S. MUELLER, III, SPECIAL COUNSEL, THE SPECIAL COUNSEL'S OFFICE, THE INVESTIGATION INTO RUSSIAN INTERFERENCE IN THE 2016 PRESIDENTIAL ELECTION, MAY 2017 TO MAY 2019**

Mr. <u>Mueller.</u>  Good morning, Chairman Nadler and Ranking Member Collins, and the members of the committee.

As you know, in May 2017, the Acting Attorney General asked me to serve as special counsel.  I undertook that role because I believed that it was of paramount interest to the Nation to determine whether a foreign adversary had interfered in the Presidential election.  As the Acting Attorney General said at the time, the appointment was necessary in order for the American people to have full confidence in the outcome.

My staff and I carried out this assignment with that critical objective in mind:  to work quietly, thoroughly, and with integrity so that the public would have full confidence in the outcome.

The order appointing me as special counsel directed our office to investigate Russian interference in the 2016 Presidential election.  This included investigating any links or coordination between the Russian Government and individuals associated with the Trump campaign.  It also included investigating efforts to interfere with or obstruct our investigation.

Throughout the investigation, I continually stressed two things to the team that we had assembled. First, we needed to do our work as thoroughly as possible and as expeditiously as possible. It was in the public interest for our investigation to be complete but not to last a day longer than was necessary.

Second, the investigation needed to be conducted fairly and with absolute integrity. Our team would not leak or take other actions that could compromise the integrity of our work. All decisions were made based on the facts and the law.

During the course of our investigation, we charged more than 30 defendants with committing Federal crimes, including 12 officers of the Russian military. Seven defendants have been convicted or pled guilty. Certain other charges we brought remain pending today, and for those matters, I stress that the indictments contain allegations and every defendant is presumed innocent unless and until proven guilty.

In addition to the criminal charges we brought, as required by Justice Department regulations, we submitted a confidential report to the Attorney General at the conclusion of our investigation. The report set forth the results of our work and the reasons for our charging and declination decisions. The Attorney General later made the report largely public.

As you know, I made a few limited remarks about our report when we closed the Special Counsel's Office in May of this year, but there are certain points that bear emphasis. First, our

investigation found that the Russian Government interfered in our election in sweeping and systematic fashion.

Second, the investigation did not establish that members of the Trump campaign conspired with the Russian Government in its election interference activities.  We did not address collusion, which is not a legal term; rather, we focused on whether the evidence was sufficient to charge any member of the campaign with taking part in a criminal conspiracy, and it was not.

Third, our investigation of efforts to obstruct the investigation and lie to investigators was of critical importance. Obstruction of justice strikes at the core of the government's effort to find the truth and to hold wrongdoers accountable.

Finally, as described in Volume II of our report, we investigated a series of actions by the President towards the investigation.  Based on Justice Department policy and principles of fairness, we decided we would not make a determination as to whether the President committed a crime.  That was our decision then and it remains our decision today.

Let me say a further word about my appearance today.  It is unusual for a prosecutor to testify about a criminal investigation.  And given my role as a prosecutor, there are reasons why my testimony will necessarily be limited.

First, public testimony could affect several ongoing matters. In some of these matters, court rules or judicial orders limit the disclosure of information to protect the fairness of the

proceedings.  And consistent with longstanding Justice Department
policy, it would be inappropriate for me to comment in any way
that could affect an ongoing matter.

Second, the Justice Department has asserted privileges
concerning investigative information and decisions, ongoing
matters within the Justice Department, and deliberations within
our office.  These are Justice Department privileges that I will
respect.  The Department has released the letter discussing the
restrictions on my testimony.  I therefore will not be able to
answer questions about certain areas that I know are of public
interest.

For example, I am unable to address questions about the
initial opening of the FBI's Russia investigation, which occurred
months before my appointment, or matters related to the so-called
Steele dossier.  These matters are subjects of ongoing review by
the Department.  Any questions on these topics should therefore be
directed to the FBI or the Justice Department.

As I explained when we closed the Special Counsel's Office in
May, our report contains our findings and analysis and the reasons
for the decisions we made.  We conducted an extensive
investigation over 2 years.  In writing the report, we stated the
results of our investigation with precision.  We scrutinized every
word.  I do not intend to summarize or describe the results of our
work in a different way in the course of my testimony today.  And
as I said on May 29, the report is my testimony, and I will stay

within that text.

And as I stated in May, I will not comment on the actions of the Attorney General or of Congress.  I was appointed as a prosecutor, and I intend to adhere to that role and to the Department standards that govern it.

I will be joined today by Deputy Special Counsel Aaron Zebley.  Mr. Zebley has extensive experience as a Federal prosecutor and at the FBI, where he served as my chief of staff. Mr. Zebley was responsible for the day-to-day oversight of the investigations conducted by our office.

Now, I also want to, again, say thank you to the attorneys, the FBI agents, the analysts, the professional staff who helped us conduct this investigation in a fair and independent manner. These individuals, who spent nearly 2 years working on this matter, were of the highest integrity.

Let me say one more thing.  Over the course of my career, I have seen a number of challenges to our democracy.  The Russian Government's effort to interfere in our election is among the most serious.  And as I said on May 29, this deserves the attention of every American.

Thank you, Mr. Chairman.

[The statement of Mr. Mueller follows:]


******** COMMITTEE INSERT ********

Chairman Nadler.  Thank you.

We will now proceed under the 5-minute rule with questions. I will begin by recognizing myself for 5 minutes.

Director Mueller, the President has repeatedly claimed that your report found there was no obstruction and that it completely and totally exonerated him.  But that is not what your report said, is it?

Mr. Mueller.  Correct, that is not what the report said.

Chairman Nadler.  In our reading from page 2 of Volume II of your report that is on the screen, you wrote, quote, if we had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, we would so state.  Based on the facts and the applicable legal standards, however, we are unable to reach that judgment, close quote.

Now, does that say there was no obstruction?

Mr. Mueller.  No.

Chairman Nadler.  In fact, you were actually unable to conclude the President did not commit obstruction of justice.  Is that correct?

Mr. Mueller.  Well, we at the outset, determined that we -- when it came to the President's culpability, we needed to -- we needed to go forward only after taking into account the OLC opinion that indicated that a President -- a sitting President cannot be indicted.

Chairman Nadler.  So the report did not conclude that he did

not commit obstruction of justice.  Is that correct?

Mr. Mueller.  That is correct.

Chairman Nadler.  And what about total exoneration?  Did you actually totally exonerate the President?

Mr. Mueller.  No.

Chairman Nadler.  Now, in fact, your report expressly states that it does not exonerate the President?

Mr. Mueller.  It does.

Chairman Nadler.  And your investigation actually found, quote, multiple acts by the President that were capable of exerting undue influence over law enforcement investigations, including the Russian interference and obstruction investigations. Is that correct?

Mr. Mueller.  Correct.

Chairman Nadler.  Now, Director Mueller, can you explain in plain terms what that finding means so the American people can understand it?

Mr. Mueller.  Well, the finding indicates that the President was not -- that the President was not exculpated for the acts that he allegedly committed.

Chairman Nadler.  In fact, you were talking about incidents, quote, in which the President sought to use his official power outside of usual channels, unquote, to exert undue influence over your investigations.  Is that right?

Mr. Mueller.  That's correct.

Chairman <u>Nadler.</u>  Now, am I correct, then, on page 7 of
Volume II of your report, you wrote, quote, the President became
aware that his own conduct was being investigated in an
obstruction of justice inquiry.  At that point, the President
engaged in a second phase of conduct, involving public attacks on
the investigation, nonpublic efforts to control it, and efforts in
both public and private to encourage witnesses not to cooperate
with the investigation, close quote.

So President Trump's efforts to exert undue influence over
your investigation intensified after the President became aware
that he personally was being investigated?

Mr. <u>Mueller.</u>  I stick with the language that you have in
front of you.

Chairman <u>Nadler.</u>  Which --

Mr. <u>Mueller.</u>  Which comes from page 7, Volume II.

Chairman <u>Nadler.</u>  Now, is it correct that if you concluded
that the President committed the crime of obstruction, you could
not publicly state that in your report or here today?

Mr. <u>Mueller.</u>  Can you repeat the question, sir?

Chairman <u>Nadler.</u>  Is it correct that if you had concluded
that the President committed the crime of obstruction, you could
not publicly state that in your report or here today?

Mr. <u>Mueller.</u>  Well, I would say you could -- the statement
would be that you would not indict and you would not indict
because under the OLC opinion a sitting President cannot be

indicted.  It would be unconstitutional.

Chairman Nadler.  Okay.  So you could not state that because of the OLC opinion if that had been your conclusion?

Mr. Mueller.  OLC opinion with some guide, yes.

Chairman Nadler.  But under DOJ -- under Department of Justice policy, the President could be prosecuted for obstruction of justice crimes after he leaves office, correct?

Mr. Mueller.  True.

Chairman Nadler.  Thank you.

Did any senior White House official refuse a request to be interviewed by you and your team?

Mr. Mueller.  I don't believe so.

Well, let me take that back.  I would have to look at it, but I'm not certain that that was the case.

Chairman Nadler.  Did the President refuse a request to be interviewed by you and your team?

Mr. Mueller.  Yes.

Chairman Nadler.  Yes.  And is it true that you tried for more than a year to secure an interview with the President?

Mr. Mueller.  Yes.

Chairman Nadler.  And is it true that you and your team advised the President's lawyer that, quote, an interview with the President is vital to our investigation, close quote?

Mr. Mueller.  Yes.  Yes.

Chairman Nadler.  And is it true that you also, quote, stated

that it is in the interest of the Presidency and the public for an interview to take place, close quote?

Mr. Mueller.  Yes.

Chairman Nadler.  But the President still refused to sit for an interview by you or your team?

Mr. Mueller.  True.  True.

Chairman Nadler.  And did you also ask him to provide written answers to questions under 10 possible episodes of obstruction of justice crimes involving him?

Mr. Mueller.  Yes.

Chairman Nadler.  Did he provide any answers to a single question about whether he engaged in obstruction of justice crimes?

Mr. Mueller.  I would have to check on that.  I'm not certain.

Chairman Nadler.  Director Mueller, we are grateful that you are here to explain your investigation and findings.  Having reviewed your work, I believe anyone else would engage in the conduct describing your report would have been criminally prosecuted.  Your work is vitally important to this committee and the American people because no one is above the law.

I'll now recognize the gentleman from Georgia, Mr. Collins.

Mr. Collins.  Thank you, Mr. Chairman.

And we are moving, I understand and just reiterate, on the 5-minute rule.  Mr. Mueller, I have several questions, many of

which that you just answered will be questioned here in a moment, but I want to lay some foundations.  So we will go through these fairly quickly.  I will talk slowly.  I am said that I talk fast. I will talk slowly.

Mr. <u>Mueller.</u>  Thank you, sir.

Mr. <u>Collins.</u>  In your press conference, you stated any testimony from your office would not go beyond our report.  We chose these words carefully.  The words speaks for itself.  I will not provide information beyond that which is already public in any appearance before Congress.

Do you stand by that statement?

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Collins.</u>  Since closing the Special Counsel's Office in May of 2019, have you conducted any additional interviews or obtained any new information in your role as special counsel?

Mr. <u>Mueller.</u>  In the wake of the report?

Mr. <u>Collins.</u>  Since the closing of the office in May of 2019.

Mr. <u>Mueller.</u>  And the question was?

Mr. <u>Collins.</u>  Have you conducted any new interviews and any new witnesses or anything?

Mr. <u>Mueller.</u>  No.

Mr. <u>Collins.</u>  And you can confirm you're no longer special counsel, correct?

Mr. <u>Mueller.</u>  I am no longer special counsel.

Mr. <u>Collins.</u>  At any time with the investigation, was your

investigation curtailed or stopped or hindered?

Mr. Mueller.  No.

Mr. Collins.  Were you or your team provided any questions by Members of Congress of the majority ahead of your hearing today?

Mr. Mueller.  No.

Mr. Collins.  Your report states that your investigative team included 19 lawyers and approximately 40 FBI agents and analysts and accountants.  Are those numbers accurate?

Mr. Mueller.  Could you repeat that, please?

Mr. Collins.  Forty FBI agents, 19 lawyers, intelligence analysts, and forensic accountants.  Are those numbers accurate? This is included in your report.

Mr. Mueller.  Generally, yes.

Chairman Nadler.  Is it also true that you issued over 2,800 subpoenas, executed nearly 500 search warrants, obtained more than 230 orders for communication records, and 50 pen registers?

Mr. Mueller.  That went a little fast for me.

Mr. Collins.  Okay.  In your report -- I will make this very simple -- you did a lot of work, correct?

Mr. Mueller.  Yes.  That I agree to.

Mr. Collins.  A lot of subpoenas?  A lot of pen registers?

Mr. Mueller.  A lot of subpoenas, yes.

Mr. Collins.  Okay.  We will walk this really slow if we need to.

Mr. Mueller.  A lot search warrants.

Mr. <u>Collins.</u>  All right.  A lot of search warrants, a lot of things.  So you are very thorough?

Mr. <u>Mueller.</u>  What?

Mr. <u>Collins.</u>  In your opinion, very thorough, you listed this out in your report, correct?

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Collins.</u>  Thank you.

Is it true the evidence gathered during your investigation -- or given the questions that you have just answered, is it true the evidence gathered during your investigation did not establish that the President was involved in the underlying crime related to Russian election interference as stated in Volume I, page 7?

Mr. <u>Mueller.</u>  We found insufficient evidence of the President's culpability --

Mr. <u>Collins.</u>  So that would be a yes.

Mr. <u>Mueller.</u>  -- with -- pardon?

Mr. <u>Collins.</u>  That would be a yes?

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Collins.</u>  Thank you.

Isn't it true the evidence did not establish that the President or those close to him were involved in the charge of Russian computer hacking or active measure conspiracies or that the President otherwise had unlawful relationships with any Russian official, Volume II, pages 76, correct?

Mr. <u>Mueller.</u>  I leave the answer to our report.

Mr. <u>Collins.</u>  So that is a yes.

Is that true, your investigation did not establish that members of the Trump campaign conspired or coordinated with the Russian Government in the election interference activity, Volume I, page 2, Volume I, page 173?

Mr. <u>Mueller.</u>  Thank you.  Yes.

Mr. <u>Collins.</u>  Yes.  Thank you.

Although your report states collusion is not a specific offense, and you have said that this morning, or a term of art in Federal criminal law, conspiracy is.

In the colloquial context, are "collusion" and "conspiracy" essentially synonymous terms?

Mr. <u>Mueller.</u>  You're going to have to repeat that for me.

Mr. <u>Collins.</u>  Collusion is not a specific offense or a term of art in the Federal criminal law; conspiracy is.

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Collins.</u>  In the colloquial context, known public context, "collusion" and "conspiracy" are essentially synonymous terms, correct?

Mr. <u>Mueller.</u>  No.

Mr. <u>Collins.</u>  If no, on page 180 of Volume I of your report, you wrote, as defined in legal dictionaries, collusion is largely synonymous with conspiracy as that crime is set forth in the general Federal conspiracy statute, 18 U.S.C. 371.  You said at

your May 29 press conference and here today, you choose your words carefully.  Are you sitting here today testifying to something different than what your report states?

Mr. Mueller.  Well, what I'm asking is, if you can give me the citation, I can look at the citation and evaluate whether it is accurate.

Mr. Collins.  Okay.  Let me just be clarifying.  You stated that you have stayed within the report.  I just stated your report back to you.  And you said that collusion and conspiracy were not synonymous terms.  That was -- your answer was no.

Mr. Mueller.  That's correct.

Mr. Collins.  In that page 180 of Volume I of your report it says, as defined in legal dictionaries, collusion is largely synonymous with conspiracy as that crime is set forth in general conspiracy statute 18 U.S.C. 371.  Now, you said you chose your words carefully.  Are you contradicting your report right now?

Mr. Mueller.  Not when I read it.

Mr. Collins.  So you change your answer to yes then?

Mr. Mueller.  No.  No.  If you look at the language --

Mr. Collins.  I'm reading your report, sir.  It's a yes or no answer.

Mr. Mueller.  Page 180?

Mr. Collins.  Page 180, Volume I.  This is from your report.

Mr. Mueller.  Correct.  And I leave it with the report.

Mr. Collins.  So the report says, yes, they are synonymous.

Mr. Mueller.  Yes.

Mr. Collins.  Hopefully, for finally, out of your own report, we can put to bed the collusion and conspiracy.

One last question as we're going through.  Did you ever look into other countries investigated in the Russian's interference into our election?  Were other countries investigated or found knowledge that they had interference in our election?

Mr. Mueller.  I'm not going to discuss other matters.

Mr. Collins.  With that, I yield back.

Chairman Nadler.  The gentleman yields back.

The gentlelady from California.

Ms. Lofgren.  Director Mueller, as you've heard from the chairman, we're mostly going to talk about obstruction of justice today.  But the investigation of Russia's attack that started your investigation is why evidence of possible obstruction is serious.

To what extent did the Russian Government interfere in the 2016 Presidential election?

Mr. Mueller.  Could you repeat that, ma'am?

Ms. Lofgren.  To what extent did the Russian Government interfere in the 2016 Presidential election?

Mr. Mueller.  Well, particularly when it came to computer crimes and the like, the government was implicated.

Ms. Lofgren.  So you wrote, in Volume I, that the Russian Government interfered in the 2016 Presidential election in sweeping and systematic fashion.  You also described in your

report that the then-Trump campaign chairman Paul Manafort shared

with a Russian operative, Kilimnik, the campaign strategy for

winning Democratic votes in Midwestern States and internal polling

data of the campaign.  Isn't that correct?

        Mr. Mueller.  Correct.

        Ms. Lofgren.  They also discussed the status of the Trump

campaign and Manafort's strategy for winning Democratic votes in

Midwestern States.  Months before that meeting, Manafort had

caused internal data to be shared with Kilimnik, and the sharing

continued for some period of time after their August meeting.

Isn't that correct?

        Mr. Mueller.  Accurate.

        Ms. Lofgren.  In fact, your investigation found that Manafort

briefed Kilimnik on the state of the Trump campaign and Manafort's

plan to win the election, and that briefing encompassed the

campaign's messaging, its internal polling data.  It also included

discussion of battleground States, which Manafort identified as

Michigan, Wisconsin, Pennsylvania, and Minnesota.  Isn't that

correct?

        Mr. Mueller.  That's correct.

        Ms. Lofgren.  Did your investigation determine who requested

the polling data to be shared with Kilimnik?

        Mr. Mueller.  Well, I would direct you to the report and

adopt what we have in the report with regard to that particular

issue.

Ms. <u>Lofgren.</u>  We don't have the redacted version.  That's

maybe another reason why we should get that for Volume I.

Based on your investigation, how could the Russian Government

have used this campaign polling data to further its sweeping and

systematic interference in the 2016 Presidential election?

Mr. <u>Mueller.</u>  That's a little bit out of our path.

Ms. <u>Lofgren.</u>  Fair enough.

Did your investigation find that the Russian Government

perceived it would benefit from one of the candidates winning?

Mr. <u>Mueller.</u>  Yes.

Ms. <u>Lofgren.</u>  And which candidate would that be?

Mr. <u>Mueller.</u>  Well, it would be Trump --

Ms. <u>Lofgren.</u>  Correct.

Mr. <u>Mueller.</u>  -- the President.

Ms. <u>Lofgren.</u>  Now, the Trump campaign wasn't exactly

reluctant to take Russian help.  You wrote, it expected it would

benefit electorally from information stolen and released through

Russian efforts.  Isn't that correct?

Mr. <u>Mueller.</u>  That's correct.

Ms. <u>Lofgren.</u>  Now, was the investigation's

determination -- what was the investigation's determination

regarding the frequency with which the Trump campaign made contact

with the Russian Government?

Mr. <u>Mueller.</u>  Well, I would have to refer you to the report

on that.

Ms. Lofgren.  Well, we went through and we counted 126 contacts between Russians or their agents and Trump campaign officials or their associates.  So would that sound about right?

Mr. Mueller.  I can't say.  I understand the statistic and I believe it.  I understand the statistic.

Ms. Lofgren.  Well, Mr. Mueller, I appreciate your being here and your report.  From your testimony and the report, I think the American people have learned several things.  First, the Russians wanted Trump to win; second, the Russians went on a sweeping cyber influence campaign.  The Russians hacked the DNC, and they got the Democratic game plan for the election.  The Russian campaign chairman met with Russian agents and repeatedly gave them internal data, polling, and messaging in the battleground States.

So while the Russians were buying ads and creating propaganda to influence the outcome of the election, they were armed with inside information that they had stolen through hacking from the DNC and that they had been given by the Trump campaign chairman, Mr. Manafort.

My colleagues will probe the efforts undertaken to keep this information from becoming public, but I think it's important for the American people to understand the gravity of the underlying problem that your report uncovered.

And with that, Mr. Chairman, I would yield back.

Chairman Nadler.  The gentlelady yields back.

The gentleman from Texas.

Mr. Ratcliffe.  Good morning, Director.  If you'll let me quickly summarize your opening statement this morning.  You said in Volume I on the issue of conspiracy, the special counsel determined that the investigation did not establish that members of the Trump campaign conspired or coordinated with the Russian Government in its election interference activities.  And then in Volume II, for reasons that you explain, the special counsel did not make a determination on whether there was an obstruction of justice crime committed by the President.

Is that fair?

Mr. Mueller.  Yes, sir.

Mr. Ratcliffe.  All right.  Now, in explaining the special counsel did not make what you called a traditional prosecution or declination decision, the report on the bottom of page 2 of Volume II reads as follows:  The evidence we obtained about the President's actions and intent presents difficult issues that prevent us from conclusively determining that no criminal conduct occurred.  Accordingly, while this report does not conclude that the President committed a crime, it also does not exonerate him.

Now, I read that correctly?

Mr. Mueller.  Yes.

Mr. Ratcliffe.  All right.  Now, your report, and today, you said that all times the special counsel team operated under was guided by and followed Justice Department policies and principles. So which DOJ policy or principle sets forth a legal standard that

an investigated person is not exonerated if their innocence from
criminal conduct is not conclusively determined?

    Mr. <u>Mueller.</u>  Can you repeat the last part of that question?

    Mr. <u>Ratcliffe.</u>  Yeah.  Which DOJ policy or principle sets
forth a legal standard that an investigated person is not
exonerated if their innocence from criminal conduct is not
conclusively determined?  Where does that language come from,
Director?  Where is the DOJ policy that says that?

    Let me make it easier.

    Mr. <u>Mueller.</u>  Can I answer?

    Mr. <u>Ratcliffe.</u>  Is there --

    Mr. <u>Mueller.</u>  I'm sorry.  Go ahead.

    Mr. <u>Ratcliffe.</u>  Can you give me an example other than Donald
Trump where the Justice Department determined that an investigated
person was not exonerated because their innocence was not
conclusively determined?

    Mr. <u>Mueller.</u>  I cannot, but this is a unique situation.

    Mr. <u>Ratcliffe.</u>  Okay.  Well, you can't -- time is short.
I've got 5 minutes.  Let's just leave it at you can't find it,
because I'll tell you why.  It doesn't exist.  The special
counsel's job -- nowhere does it say that you were to conclusively
determine Donald Trump's innocence or that the special counsel
report should determine whether or not to exonerate him.

    It's not in any of the documents.  It's not in your
appointment order.  It's not in the special counsel regulations.

It's not in the OLC opinions.  It's not in the Justice manual, and it's not in the principles of Federal prosecution.

Nowhere do those words appear together because, respectfully, respectfully, Director, it was not the special counsel's job to conclusively determine Donald Trump's innocence or to exonerate him because the bedrock principle of our justice system is a presumption of innocence.  It exists for everyone.  Everyone is entitled to it, including sitting Presidents.  And because there is a presumption of innocence, prosecutors never, ever need to conclusively determine it.

Now, Director, the special counsel applied this inverted burden of proof that I can't find and you said doesn't exist anywhere in the Department policies, and you used it to write a report.  And the very first line of your report, the very first line of your report says, as you read this morning, it authorizes the special counsel to provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the special counsel.  That's the very first word of your report, right?

Mr. Mueller.  That's correct.

Mr. Ratcliffe.  Here's the problem, Director.  The special counsel didn't do that.  On Volume I, you did.  On Volume II, with respect to potential obstruction of justice, the special counsel made neither a prosecution decision or a declination decision.  You made no decision.  You told us this morning and in your report

that you made no determination.

So, respectfully, Director, you didn't follow the special counsel regulations.  It clearly says write a confidential report about decisions reached.  Nowhere in here does it say write a report about decisions that weren't reached.  You wrote 180 pages, 180 pages about decisions that weren't reached, about potential crimes that weren't charged or decided.  And respectfully, respectfully, by doing that, you managed to violate every principle and the most sacred of traditions about prosecutors not offering extra prosecutorial analysis about potential crimes that aren't charged.

So Americans need to know this, as they listen to the Democrats and socialists on the other side of the aisle as they do dramatic readings from this report, that Volume II of this report was not authorized under the law to be written.  It was written to a legal standard that does not exist at the Justice Department, and it was written in violation of every DOJ principle about extra prosecutorial commentary.

I agree with the chairman this morning when he said Donald Trump is not above the law.  He's not.  But he damn sure shouldn't be below the law, which is where Volume II of this report puts him.

Chairman Nadler.  The gentleman's time is expired.

The gentlelady from Texas.

Ms. Jackson Lee.  Thank you, Mr. Chairman.

Director Mueller, good morning.  Your exchange with the gentlelady from California demonstrates what is at stake.  The Trump campaign chair Paul Manafort was passing sensitive voter information and poller data to a Russian operative.  And there were so many other ways that Russia subverted our democracy.

Together with the evidence in Volume I, I cannot think of a more serious need to investigate.  So now I'm going to ask you some questions about obstruction of justice as it relates to Volume II.

On page 12 of Volume II, you state, we determined that there were sufficient factual and legal basis to further investigate potential obstruction of justice issues involving the President. Is that correct?

Mr. Mueller.  And do you have a citation, ma'am?

Ms. Jackson Lee.  Page 12, Volume II.

Mr. Mueller.  And which portion of that page?

Ms. Jackson Lee.  That is, we determined that there was a sufficient factual and legal basis to further investigate potential obstruction of justice issues involving the President. Is that correct?

Mr. Mueller.  Yes.

Ms. Jackson Lee.  Your report also described at least 10 separate instances of possible obstruction of justice that were investigated by you and your team.  Is that correct?

Mr. Mueller.  Yes.

Ms. Jackson Lee.  In fact, the table of contents serves as a very good guide of some of the acts of that obstruction of justice that you investigated, and I put it up on the screen.  On page 157 of Volume II, you describe those acts, and they range from the President's effort to curtail the special counsel's investigation, the President's further efforts to have the Attorney General take over the investigation, the President's orders Don McGahn to deny that the President tried to fire the special counsel, and many others.  Is that correct?

Mr. Mueller.  Yes.

Ms. Jackson Lee.  I direct you now to what you wrote, Director Mueller:  The President's pattern of conduct as a whole sheds light on the nature of the President's acts and the inferences that can be drawn about his intent.

Does that mean you have to investigate all of his conduct to ascertain true motive?

Mr. Mueller.  No.

Ms. Jackson Lee.  And when you talk about the President's pattern of conduct, that include the 10 possible acts of obstruction that you investigated.  Is that correct?  When you talk about the President's pattern of conduct, that would include the 10 possible acts of obstruction that you investigated, correct?

Mr. Mueller.  I direct you to the report for how that is characterized.

Ms. Jackson Lee.  Thank you.

Let me go to the screen again.  And for each of those 10 potential instances of obstruction of justice, you analyzed three elements of a crime of obstruction of justice:  an obstructive act, a nexus between the act and official proceeding, and corrupt intent.  Is that correct?

Mr. Mueller.  Yes.

Ms. Jackson Lee.  You wrote on page 178, Volume II in your report, about corrupt intent:  Actions by the President to end a criminal investigation into his own conduct to protect against personal embarrassment or legal liability would constitute a core example of corruptly motivated conduct.  Is that correct?

Mr. Mueller.  Yes.

Ms. Jackson Lee.  To the screen again.  Even with the evidence you did find, is it true, as you note on page 76 of Volume II, that the evidence does indicate that a thorough FBI investigation would uncover facts about the campaign and the President personally that the President could have understood to be crimes or that would give rise to legal, personal, and political concerns?

Mr. Mueller.  I rely on the language of the report.

Ms. Jackson Lee.  Is that relevant to potential obstruction of justice?  Is that relevant to potential obstruction of justice?

Mr. Mueller.  Yes.

Ms. Jackson Lee.  You further elaborate on page 157,

obstruction of justice can be motivated by desire to protect noncriminal personal interests to protect against investigations where underlying criminal liability fall into a gray area or to avoid personal embarrassment.  Is that correct?

Mr. <u>Mueller.</u>  I have on the screen --

Ms. <u>Jackson Lee.</u>  Is that correct on the screen?

Mr. <u>Mueller.</u>  Can you repeat the question, now that I have the language on the screen?

Ms. <u>Jackson Lee.</u>  Is it correct, as you further elaborate, obstruction of justice can be motivated by a direct desire to protect noncriminal personal interests to protect against investigations where underlying criminal liability falls into a gray area --

Mr. <u>Mueller.</u>  Yes.

Ms. <u>Jackson Lee.</u>  -- or to avoid -- is that true?

Mr. <u>Mueller.</u>  Yes.

Ms. <u>Jackson Lee.</u>  And is it true that the impact -- pardon?

Mr. <u>Mueller.</u>  Can you read the last question?

Ms. <u>Jackson Lee.</u>  The last question was --

Mr. <u>Mueller.</u>  I want to make certain I got it accurate.

Ms. <u>Jackson Lee.</u>  No.  The last question was the language on the screen asking you if that's correct.

Mr. <u>Mueller.</u>  Yes.

Ms. <u>Jackson Lee.</u>  Okay.  Does a conviction of obstruction of justice result potentially in a lot of years of -- a lot of years

of time in jail?

Mr. Mueller.  Yes.

Well, again, can you repeat the question just to make certain that I have it accurate?

Ms. Jackson Lee.  Does obstruction of justice warrant a lot of time in jail --

Mr. Mueller.  Yes.

Ms. Jackson Lee.  -- if you were convicted?

Mr. Mueller.  Yes.

Ms. Jackson Lee.  And if --

Chairman Nadler.  The time of the gentlelady is expired.

The gentleman from Wisconsin.

Mr. Sensenbrenner.  Thank you very much, Mr. Chairman.

Let me begin by reading the special counsel regulations by which you were appointed.  It reads, quote, at the conclusion of the special counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination's decisions reached by the special counsel.  Is that correct?

Mr. Mueller.  Yes.

Mr. Sensenbrenner.  Okay.  Now, when a regulation uses the word "shall" provide, does it mean that the individual is, in fact, obligated to provide what's being demanded by the regulation or statute, meaning you don't have any wiggle room, right?

Mr. Mueller.  I'd have to look more closely at the statute.

Mr. Sensenbrenner.  Well, I just read it to you.

Okay.  Now, Volume II, page 1, your report boldly states, we determined not to make a traditional prosecutorial judgment.  Is that correct?

Mr. Mueller.  I'm trying to find that citation, Congressman.

Chairman Nadler.  Director, could you speak more directly into the microphone, please?

Mr. Mueller.  Yes.

Chairman Nadler.  Thank you.

Mr. Sensenbrenner.  It's Volume II, page --

Mr. Mueller.  Mr. Chairman -- I am sorry.

Mr. Sensenbrenner.  Volume II, page 1, it said, we determined not to make a traditional prosecutorial judgment.

Mr. Mueller.  Yes.

Mr. Sensenbrenner.  That's right in the beginning.

Now, since you decided under the OLC opinion that you couldn't prosecute a sitting President, meaning President Trump, why did we have all of this investigation of President Trump that the other side is talking about when you knew that you weren't going to prosecute him?

Mr. Mueller.  Well, you don't know where the investigation is going to lie, and the OLC opinion itself says that you can continue the investigation even though you are not going to indict the President.

Mr. Sensenbrenner.  Okay.  Well, if you're not going to

indict the President, then you just continue fishing.  And

that's -- you know, that's my observation.

       Mr. Mueller.  Well --

       Mr. Sensenbrenner.  You know, sure -- my time is limited.

Sure you can indict other people, but you can't indict the sitting

President, right?

       Mr. Mueller.  That's true.

       Mr. Sensenbrenner.  Okay.  Now, there are 182 pages in raw

evidentiary material, including hundreds of references to 302,

which are interviews by the FBI, for individuals who have never

been cross-examined and which did not comply with the special

counsel's governing regulation to explain the prosecution or

declination decisions reached.  Correct?

       Mr. Mueller.  And where are you reading from on that?

       Mr. Sensenbrenner.  I'm reading from my question.

       Mr. Mueller.  Then could you repeat it?

       Mr. Sensenbrenner.  Okay.  You have 182 pages of raw

evidentiary material with hundreds of references to 302s who have

never been cross-examined and which didn't comply with the

governing regulation to explain the prosecution or

declaration -- declination decisions reached.

       Mr. Mueller.  This is one of those areas which I decline to

discuss by --

       Mr. Sensenbrenner.  Okay.  Then let --

       Mr. Mueller.  -- and would direct you to the report itself or

what is done on that --

Mr. Sensenbrenner.  Well, I looked at 182 pages of it.

You know, let me switch gears.  Mr. Chabot and I were on this committee during the Clinton impeachment.  Now, while I recognize that the independent counsel statute under which Kenneth Starr operated is different from the special counsel's statute, he in a number of occasions in his report stated that the -- President Clinton's actions may have risen to impeachable conduct, recognizing that it is up to the House of Representatives to determine what conduct is impeachable.

You never used the term "raising" to impeachable conduct for any of the 10 instances that the gentlewoman from Texas did.  Is it true that there's nothing in Volume II of the report that says that the President may have engaged in impeachable conduct?

Mr. Mueller.  Well, we have studiously kept in the center of our investigation the -- our mandate, and our mandate does not go to other ways of addressing conduct.  Our mandate goes to what -- developing the report and turning the report in to the Attorney General.

Mr. Sensenbrenner.  With due respect, you know, it seems to me, you know, that there are a couple of statements that you made, you know, that said that this is not for me to decide, and the implication is that this is for this committee to decide.

Now, you didn't use the word "impeachable" conduct like Starr did.  There was no statute to prevent you from using the word

"impeachable" conduct.  And I go back to what Mr. Ratcliffe said,
and that is, is that even the President is innocent until proven
guilty.

My time is up.

Chairman Nadler.  The gentleman's time is expired.

The gentleman from Tennessee.

Mr. Cohen.  Thank you, Mr. Chair.

First, I'd just like to restate what Mr. Nadler said about
your career.  It's a model of rectitude, and I thank you.

Mr. Mueller.  Thank you.

Mr. Cohen.  Based upon your investigation, how did
President Trump react to your appointment as special counsel?

Mr. Mueller.  Again, I send you the report for where that is
stated.

Mr. Cohen.  Well, there is a quote from page 78 of your
report, Volume II, which reads, when Sessions told the President
that a special counsel had been appointed, the President slumped
back in his chair and said, quote, oh, my god.  This is terrible.
This is the end of my Presidency.  I'm F'ed, unquote.

Did Attorney General Sessions tell you about that little
talk?

Mr. Mueller.  I'm not sure --

Chairman Nadler.  Director, please speak into the microphone.

Mr. Mueller.  Oh, surely.  My apologies.

I am not certain of the person who originally copied that

quote.

    Mr. Cohen.  Okay.  Well, Sessions apparently said it, and one of his aides had it in his notes too, which I think you had, but that's become record.  He wasn't pleased.  He probably wasn't pleased with the special counsel and particularly you because of your outstanding reputation.

    Mr. Mueller.  Correct.

    Mr. Cohen.  Prior to your appointment, the Attorney General recused himself from the investigation because of his role in the 2016 campaign.  Is that not correct?

    Mr. Mueller.  That's correct.

    Mr. Cohen.  Recusal means the Attorney General cannot be involved in the investigation.  Is that correct?

    Mr. Mueller.  That's the effect of recusal, yes.

    Mr. Cohen.  And so instead, another Trump appointee, as you know Mr. Sessions was, Mr. Rosenstein became in charge of it.  Is that correct?

    Mr. Mueller.  Yes.

    Mr. Cohen.  Wasn't Attorney General Sessions following the rules and professional advice of the Department of Justice ethics folks when he recused himself from the investigation?

    Mr. Mueller.  Yes.

    Mr. Cohen.  And yet the President repeatedly expressed his displeasure at Sessions' decision to follow those ethics rules to recuse himself from oversight of that investigation.  Is that not

correct?

Mr. Mueller.  That's correct based on what is written in the
report.

Mr. Cohen.  And the President's reaction to the recusal, as
noted in the report, Mr. Bannon recalled that the President was
mad, as mad as Bannon had ever seen him, and he screamed at McGahn
about how weak Sessions was.  Do you recall that from the report?

Mr. Mueller.  That's in the report, yes.

Mr. Cohen.  Despite knowing that Attorney General Sessions
was not supposed to be involved in the investigation, the
President still tried to get the Attorney General to unrecuse
himself after you were appointed special counsel.  Is that
correct?

Mr. Mueller.  Yes.

Mr. Cohen.  In fact, your investigation found that at some
point after your appointment, quote, the President called Sessions
at his home and asked if he would unrecuse himself.  Is that not
true?

Mr. Mueller.  It's true.

Mr. Cohen.  Now, that wasn't the first time the President
asked Sessions to unrecuse himself, was it?

Mr. Mueller.  I know there were at least two occasions.

Mr. Cohen.  And one of them was with Flynn, and one of them
was when Sessions and McGahn flew to Mar-a-Largo to meet with the
President.  Sessions recalled that the President pulled him aside

to speak alone and suggest that he should do this unrecusal act, correct?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Cohen.</u>  And then when Michael Flynn -- a few days after Flynn entered a guilty plea for lying to Federal agents and indicated his intent to cooperate with that investigation, Trump asked to speak to Sessions alone again in the Oval Office and again asked Sessions to unrecuse himself.  True?

Mr. <u>Mueller.</u>  I refer you to the report for that.

Mr. <u>Cohen.</u>  Page 109, Volume II.  Thank you, sir.

Do you know of any point when the President personally expressed anger or frustrations at Sessions?

Mr. <u>Mueller.</u>  I'd have to pass on that.

Mr. <u>Cohen.</u>  Do you recall -- and I think it's at page 78 of Volume II, the President told Sessions, you were supposed to protect me, you were supposed to protect me, or words to that effect?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Cohen.</u>  And is the Attorney General supposed to be the Attorney General of the United States of America or the consigliere for the President?

Mr. <u>Mueller.</u>  United States of America.

Mr. <u>Cohen.</u>  Thank you, sir.

In fact, you wrote in your report that the President repeatedly sought to convince Sessions to unrecuse himself so

Sessions could supervise the investigation in a way that would restrict its scope.  Is that correct?

Mr. Mueller.  I rely on the report.

Mr. Cohen.  How could Sessions have restricted the scope of your investigation?

Mr. Mueller.  Well, I'm not going to speculate.  If he -- quite obviously if he took over as Attorney General, he would have greater latitude in his actions that would enable him to do things that otherwise he could not.

Mr. Cohen.  On page 113 you said the President believed that an unrecused Attorney General would play a protective role and could shield the President from the ongoing investigation.

Regardless of all that, I want to thank you, Director Mueller, for your life of rectitude and service to our country. It's clear from your report and the evidence that the President wanted former Attorney General Sessions to violate the Justice Department ethics rules by taking over your investigation and improperly interfering with it to protect himself and his campaign.  Your findings are so important because in America nobody is above the law.

I yield back the balance of my time.

Chairman Nadler.  I thank the gentleman for yielding back.

The gentleman from Ohio.

Mr. Chabot.  Thank you.

Director Mueller, my Democratic colleagues were very

disappointed in your report.  They were expecting you to say
something along the lines of, here's why President Trump deserves
to be impeached, as much as Ken Starr did relative to President
Clinton back about 20 years ago.  Well, you didn't.  So their
strategy had to change.

Now they allege that there's plenty of evidence in your
report to impeach the President but the American people just
didn't read it.  And this hearing today is their last best hope to
build up some sort of ground swell across America to impeach
President Trump.  That's what this is really all about today.

Now, a few questions.  On page 103 of Volume II of your
report, when discussing the June 2016 Trump Tower meeting, you
reference, quote, the firm that produced the Steele reporting,
unquote.  The name of that firm was Fusion GPS.  Is that correct?

Mr. Mueller.  And you're on page 103?

Mr. Chabot.  103, that's correct, Volume II.  When you talk
about the firm that produced the Steele reporting, the name of the
firm that produced that was Fusion GPS.  Is that correct?

Mr. Mueller.  I'm not familiar with that.  Could you --

Mr. Chabot.  Let me just help you.  It was.  It's not a trick
question.  It was Fusion GPS.

Now, Fusion GPS produced the opposition research document
widely known as the Steele dossier, and the owner of Fusion GPS
was someone named Glenn Simpson.  Are you familiar with --

Mr. Mueller.  This is outside my purview.

Mr. <u>Chabot.</u>  Okay.  Glenn Simpson was never mentioned in the 448-page Mueller report, was he?

Mr. <u>Mueller.</u>  Well, as I say, it's outside my purview, and it's being handled in the Department by others.

Mr. <u>Chabot.</u>  Okay.  Well, he was not.  448 pages, the owner of Fusion GPS that did the Steele dossier that started all this, he's not mentioned in there.

Let me move on.  At the same time, Fusion GPS was working to collect opposition research on Donald Trump from foreign sources on behalf of the Clinton campaign and the Democratic National Committee.  It also was representing a Russian-based company, Prevezon, which had been sanctioned by the U.S. Government.  Are you aware of that?

Mr. <u>Mueller.</u>  That's outside my purview.

Mr. <u>Chabot.</u>  Okay.  Thank you.

One of the key players in the -- I'll go to something different.  One of the key players in the June 2016 Trump Tower meeting was Natalia Veselnitskaya, who you described in your report as a Russian attorney who advocated for the repeal of the Magnitsky Act.  Veselnitskaya had been working with none other than Glenn Simpson and Fusion GPS since at least early 2014.  Are you aware of that?

Mr. <u>Mueller.</u>  Outside my purview.

Mr. <u>Chabot.</u>  Thank you.

But you didn't mention that or her connections to Glenn

Simpson at Fusion GPS in your report at all.

Let me move on.  Now, NBC News has reported the following: quote, Russian lawyer Natalia Veselnitskaya says she first received the supposedly incriminating information she brought to Trump Tower describing alleged tax evasion and donation to Democrats from none other than Glenn Simpson, the Fusion GPS owner.

You didn't include that in the report, and I assume --

RPTR BRYANT

EDTR SECKMAN

[9:32 a.m.]

    Mr. Mueller.  -- it is a matter being handled by others at
the Department of Justice.

    Mr. Chabot.  Thank you.  Now, your report spends 14 pages
discussing the June 9, 2016, Trump Tower meeting.  It would be
fair to say, would it not, that you spent significant resources
investigating that meeting?

    Mr. Mueller.  I refer you to the report.

    Mr. Chabot.  Okay.  And President Trump wasn't at the
meeting?

    Mr. Mueller.  No, he was not.

    Mr. Chabot.  Thank you.  Now, in stark contrast to the
actions of the Trump campaign, we know that the Clinton campaign
did pay Fusion GPS to gather dirt on the Trump campaign from
persons associated with foreign governments.  But your report
doesn't mention a thing about Fusion GPS in it, and you didn't
investigate Fusion GPS' connections to Russia.

    So let me just ask you this:  Can you see that, from
neglecting to mention Glenn Simpson and Fusion GPS' involvement
with the Clinton campaign to focusing on a brief meeting at the
Trump Tower that produced nothing to ignoring the Clinton
campaign's own ties to Fusion GPS, why some view your report as a

pretty one-sided attack on the President?

Mr. <u>Mueller.</u>  Well, I tell you, it is still outside my purview.

Mr. <u>Chabot.</u>  And I would just note, finally, that I guess it is just by chance, by coincidence that the things left out of the report tended to be favorable to the President.

Chairman <u>Nadler.</u>  Your time has expired.

Mr. <u>Chabot.</u>  My time has expired.

Chairman <u>Nadler.</u>  The gentleman from Georgia.

Mr. <u>Johnson of Georgia.</u>  Thank you.

Director Mueller, I would like to get us back on track here. Your investigation found that President Trump directed White House Counsel Don McGahn to fire you.  Isn't that correct?

Mr. <u>Mueller.</u>  True.

Mr. <u>Johnson of Georgia.</u>  And the President claimed that he wanted to fire you because you had supposed conflicts of interest. Isn't that correct?

Mr. <u>Mueller.</u>  True.

Mr. <u>Johnson of Georgia.</u>  You had no conflicts of interest that required your removal.  Isn't that a fact?

Mr. <u>Mueller.</u>  Also correct.

Mr. <u>Johnson of Georgia.</u>  And, in fact, Don McGahn advised the President that the asserted conflicts were, in his words, silly and not real conflicts.  Isn't that true?

Mr. <u>Mueller.</u>  I refer to the report on that episode.

Mr. Johnson of Georgia.  Well, page 85 of Volume II speaks to
that.  And, also, Director Mueller, DOJ Ethics officials confirmed
that you had no conflicts that would prevent you from serving as
special counsel.  Isn't that correct?

Mr. Mueller.  That is correct.

Mr. Johnson of Georgia.  But despite Don McGahn and the
Department of Justice guidance, around May 23, 2017, the
President, quote, prodded McGahn to complain to Deputy Attorney
General Rosenstein about these supposed conflicts of interest,
correct?

Mr. Mueller.  Correct.

Mr. Johnson of Georgia.  And McGahn declined to call
Rosenstein -- or Rosenstein, I am sorry -- telling the President
that it would look like still trying to meddle in the
investigation and knocking out Mueller would be another fact used
to claim obstruction of justice.  Isn't that correct?

Mr. Mueller.  Generally so, yes.

Mr. Johnson of Georgia.  And, in other words, Director
Mueller, the White House counsel told the President that if he
tried to remove you that that could be another basis to allege
that the President was obstructing justice, correct?

Mr. Mueller.  That is generally correct, yes.

Mr. Johnson of Georgia.  Now, I would like to review what
happened after the President was warned about obstructing justice.
On Tuesday, June --

Mr. Mueller.  I am sorry, Congressman.  Do you have a
citation for that?

Mr. Johnson of Georgia.  Yes.  Volume II, page 81 --

Mr. Mueller.  Thank you.

Mr. Johnson of Georgia.  -- and 82.  Now, I would like to
review what happened after the President was warned about
obstructing justice.  It is true that, on Tuesday, June 13, 2017,
the President dictated a press statement stating he had, quote, no
intention of firing you, correct?

Mr. Mueller.  Correct.

Mr. Johnson of Georgia.  But the following day, June 14th,
the media reported for the first time that you were investigating
the President for obstruction of justice, correct?

Mr. Mueller.  Correct.

Mr. Johnson of Georgia.  And then, after learning for the
first time that he was under investigation, the very next day the
President, quote, issued a series of tweets acknowledging the
existence of the obstruction investigation and criticizing it.
Isn't that correct?

Mr. Mueller.  Generally so.

Mr. Johnson of Georgia.  And then, on Saturday, June 17th, 2
days later, the President called Don McGahn at home from Camp
David on a Saturday to talk about you.  Isn't that correct?

Mr. Mueller.  Correct.

Mr. Johnson of Georgia.  What was the significant -- what was

significant about that first weekend phone call that Don McGahn
took from President Trump?

Mr. <u>Mueller.</u>  I am going to ask you to rely on what we wrote
about those incidents.

Mr. <u>Johnson of Georgia.</u>  Well, you wrote in you your report
that on -- at page 85, Volume II, that, on Saturday, June 17,
2017, the President called McGahn at home to have the special
counsel removed.  Now, did the President call Don McGahn more than
once that day?

Mr. <u>Mueller.</u>  Well --

Mr. <u>Johnson of Georgia.</u>  I think there were two calls.

Chairman <u>Nadler.</u>  Speak into the mike, please.

Mr. <u>Mueller.</u>  I am sorry about that.

Mr. <u>Johnson of Georgia.</u>  On page 85 of your report, you
wrote, quote, on the first call, McGahn recalled that the
President said something like, quote, "You got to do this, you got
to call Rod," correct?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Johnson of Georgia.</u>  And your investigation and report
found that Don McGahn was perturbed, to use your words, by the
President's request to call Rod Rosenstein to fire him.  Isn't
that correct?

Mr. <u>Mueller.</u>  Well, there was a continuous colloquy.  There
was a continuous involvement of Don McGahn responding to the
President's entreaties.

Mr. <u>Johnson of Georgia.</u>  And he did not want to put himself in the middle of that.  He did not want to have a role in asking the Attorney General to fire the special counsel, correct?

Mr. <u>Mueller.</u>  Well, I would again refer you to the report and the way it is characterized in the report.

Mr. <u>Johnson of Georgia.</u>  Thank you.  At Volume II, page 85, it states that he didn't want to have the Attorney General -- he didn't want to have a role in trying to fire the Attorney General.

So, at this point, I will yield back.

Chairman <u>Nadler.</u>  The gentleman's time is expired.  The gentleman from Texas.

Mr. <u>Gohmert.</u>  Thank you, Mr. Chairman.

Mr. Mueller, well, first, let me ask unanimous consent, Mr. Chairman, to submit this article "Robert Mueller:  Unmasked" for the record.

Chairman <u>Nadler.</u>  Without objection.

[The information follows:]


******** COMMITTEE INSERT ********

Mr. Gohmert.  Now, Mr. Mueller, who wrote the 9-minute comments you read at your May 29th press conference?

Mr. Mueller.  I am not going to get into that.

Mr. Gohmert.  Okay.  So that is what I thought.  You didn't write it.

A 2013 puff piece in The Washingtonian about Comey said, basically, when Comey called, you would drop everything you were doing.  It gave examples:  You were having dinner with your wife and daughter.  Comey calls.  You drop everything and go.

The article quoted Comey as saying:  If a train were coming down the track, and I quote, at least Bob Mueller will be standing on the tracks with me.

You and James Comey have been good friends or were good friends for many years, correct?

Mr. Mueller.  No, we were business associates.  We both started off in the Justice Department about the same time.

Mr. Gohmert.  You were good friends.  You can work together and not be friends, but you and Comey were friends.

Mr. Mueller.  We were friends.

Mr. Gohmert.  That is my question.  Thank you for getting to the answer.

Now, before you were appointed as special counsel, had you talked to James Comey in the preceding 6 months?

Mr. Mueller.  No.

Mr. Gohmert.  When you were appointed as special counsel, was

President Trump's firing of Comey something you anticipated investigating, potentially obstruction of justice?

Mr. Mueller.  I am not going to get into that, internal deliberations at the Justice Department.

Mr. Gohmert.  Actually, it goes to your credibility, and maybe you have been away from the courtroom for a while. Credibility is always relevant.  It is always material.  And that goes for you too.  You are a witness before us.

Let me ask you, when you talked to President Trump the day before he appointed -- or you were appointed as special counsel -- you were talking to him about the FBI Director position again -- did he --

Mr. Mueller.  That is not --

Mr. Gohmert.  -- mention the firing of James Comey --

Mr. Mueller.  -- not as a candidate.  I was asked --

Mr. Gohmert.  Did he mention the firing of James Comey in your discussion with him?

Mr. Mueller.  I cannot remember.

Mr. Gohmert.  Pardon?

Mr. Mueller.  I cannot remember.  I don't believe so, but I am not going to be specific.

Mr. Gohmert.  You don't remember.  But if he did, you could have been a fact witness as to the President's comments and state of mind on firing James Comey.

Mr. Mueller.  I suppose that is possible.

Mr. Gohmert.  Yeah.  So most prosecutors would want to make sure there was no appearance of impropriety, but in your case, you hired a bunch of people that did not like the President.

Let me ask you, when did you first learn of Peter Strzok's animus toward Donald Trump?

Mr. Mueller.  In the summer of 2017.

Mr. Gohmert.  You didn't know before he was hired?

Mr. Mueller.  I am sorry?

Mr. Gohmert.  You didn't know before he was hired for your team?

Mr. Mueller.  Know what?

Mr. Gohmert.  Peter Strzok hated Trump.

Mr. Mueller.  Okay.

Mr. Gohmert.  You didn't know that before he was made part of your team.  Is that what you are saying?

Mr. Mueller.  No, I did not know that.

Mr. Gohmert.  All right.  When did you first learn --

Mr. Mueller.  And, actually, when I did find out, I acted swiftly to have him reassigned elsewhere in the FBI.

Mr. Gohmert.  Well, there is some discussion about how swift that was.  But when did you learn of the ongoing affair he was having with Lisa Page?

Mr. Mueller.  About the same time that I learned of Strzok.

Mr. Gohmert.  Did you ever order anybody to investigate the deletion of all of their texts off of their government phones?

Mr. Mueller.  Once we found that Peter Strzok was author

of --

Mr. Gohmert.  Did you ever order --

Mr. Mueller.  May I finish?

Mr. Gohmert.  Well, you are not answering my question.  Did

you order an investigation into the deletion and reformatting of

their government phones?

Mr. Mueller.  No.  There was an IG investigation ongoing.

Mr. Gohmert.  Listen.  Regarding collusion or conspiracy, you

didn't find evidence of any agreement -- I am quoting you -- among

the Trump campaign officials and any Russia-linked officials to

interfere with our U.S. election, correct?

Mr. Mueller.  Correct.

Mr. Gohmert.  So you also note in the report that an element

of any of those obstructions you referenced requires a corrupt

state of mind, correct?

Mr. Mueller.  Corrupt intent, correct.

Mr. Gohmert.  Right.  And if somebody knows they did not

conspire with anybody from Russia to affect the election, and they

see the big Justice Department with people that hate that person

coming after them, and then a special counsel appointed who hires

a dozen or more people that hate that person, and he knows he is

innocent.  He is not corruptly acting in order to see that justice

is done.  What he is doing is not obstructing justice.  He is

pursuing justice, and the fact that you ran it out 2 years means

you perpetuated injustice.

Mr. Mueller.  I take your question.

Chairman Nadler.  The gentleman's time is expired.  The witness may answer the question.

Mr. Mueller.  I take your question.

Chairman Nadler.  The gentleman from Florida.

Mr. Deutch.  Director Mueller, I would like to get back to your findings covering June of 2017.  There was a bombshell article that reported that the President of the United States was personally under investigation for obstruction of justice.  And you said in your report, on page 90, Volume II, and I quote:  News of the obstruction investigation prompted the President to call McGahn and seek to have the special counsel removed, close quote.

And then, in your report, you wrote about multiple calls from the President to White House Counsel Don McGahn.  And regarding the second call, you wrote, and I quote:  McGahn recalled that the President was more direct, saying something like:  Call Rod, tell Rod that Mueller has conflicts and can't be the special counsel. McGahn recalled the President telling him:  Mueller has to go and call me back when you do it.

Director Mueller, did McGahn understand what the President was ordering him to do?

Mr. Mueller.  I direct you to the -- what we have written in the report in terms of characterizing his feelings.

Mr. Deutch.  And in the report, it says, quote:  McGahn

understood the President to be saying that the special counsel had
to be removed.  You also say, on page 86, that, quote, McGahn
considered the President's request to be an inflection point, and
he wanted to hit the brakes, and he felt trapped, and McGahn
decided he had to resign.

McGahn took action to prepare to resign.  Isn't that correct?

Mr. Mueller.  I direct you again to the report.

Mr. Deutch.  And, in fact, that very day he went to the White
House, and quoting your report, you said, quote:  He then drove to
the office to pack his belongings and submit his resignation
letter, close quote.

Mr. Mueller.  That is directly from the report.

Mr. Deutch.  It is.  And before he resigned, however, he
called the President's chief of staff, Reince Priebus, and he
called the President's senior adviser, Steve Bannon.  Do you
recall what McGahn told them?

Mr. Mueller.  Whatever was said will appear in the report.

Mr. Deutch.  It is.  It is.  And it says on page 87, quote:
Priebus recalled that McGahn said that the President asked him to
do crazy expletive -- in other words, crazy stuff.  The White
House counsel thought that the President's request was completely
out of bounds.  He said the President asked him to do something
crazy.  It was wrong, and he was prepared to resign over it.

Now, these are extraordinarily troubling events, but you
found White House Counsel McGahn to be a credible witness.  Isn't

that correct?

Mr. Mueller.  Correct.

Mr. Deutch.  Director Mueller, the most important question I have for you today is why?  Director Mueller, why did the President of the United States want you fired?

Mr. Mueller.  I can't answer that question.

Mr. Deutch.  Well, on page 89 in your report on Volume II, you said, and I quote:  Substantial evidence indicates that the President's attempts to remove the special counsel were linked to the special counsel's oversight of investigations that involved the President's conduct and, most immediately, to reports that the President was being investigated for potential obstruction of justice, close quote.

Director Mueller, you found evidence, as you lay out in your report, that the President wanted to fire you because you were investigating him for obstruction of justice.  Isn't that correct?

Mr. Mueller.  That is what it says in the report, yes.  And I go -- I stand behind the report.

Mr. Deutch.  Director Mueller, that shouldn't happen in America.  No President should be able to escape investigation by abusing his power.  But that is what you testified to in your report.  The President ordered you fired.  The White House counsel knew it was wrong.  The President knew it was wrong.  In your report, it says there is also evidence the President knew he should not have made those calls to McGahn.  But the President did

it anyway.  He did it anyway.  Anyone else who blatantly
interfered with a criminal investigation like yours would be
arrested and indicted on charges of obstruction of justice.

Director Mueller, you determined that you were barred from
indicting a sitting President.  We have already talked about that
today.  That is exactly why this committee must hold the President
accountable.

I yield back.

Chairman Nadler.  The gentleman yields back.

The gentlelady from Alabama.

Mrs. Roby.  Director Mueller, you just said, in response to
two different lines of questioning, that you would refer, as it
relates to this firing discussion, that I would refer you to the
report and the way it was characterized in the report.

Importantly, the President never said "fire Mueller" or "end
the investigation," and one doesn't necessitate the other.  And
McGahn, in fact, did not resign, he stuck around for a year and a
half.

On March 24th, Attorney General Barr informed the committee
that he had received the special counsel's report, and it was not
until April 18th that the Attorney General released the report to
Congress and the public.  When you submitted your report to the
Attorney General, did you deliver a redacted version of the report
so that he would be able to release it to Congress and the public
without delay, pursuant to his announcement of his intention to do

so during his confirmation hearing?

Mr. <u>Mueller.</u>  I am not going to engage in discussion about what happened after the production of our report.

Mrs. <u>Roby.</u>  Had the Attorney General asked you to provide a redacted version of the report?

Mr. <u>Mueller.</u>  We worked on the redacted versions together.

Mrs. <u>Roby.</u>  Did he ask you for a version where the grand jury material was separated?

Mr. <u>Mueller.</u>  I am not going to get into details.

Mrs. <u>Roby.</u>  Is it your belief that an unredacted version of the report could be released to Congress or the public?

Mr. <u>Mueller.</u>  That is not within my purview.

Mrs. <u>Roby.</u>  In the Starr investigation of President Clinton, it was the special prosecutor who went to court to receive permission to unredact grand jury material, rule 6(e) material. Why did you not take a similar action so Congress could view this material?

Mr. <u>Mueller.</u>  We had a process that we were operating on with the Attorney General's Office.

Mrs. <u>Roby.</u>  Are you aware of any Attorney General going to court to receive similar permission to unredact 6(e) material?

Mr. <u>Mueller.</u>  I am not aware of that being done.

Mrs. <u>Roby.</u>  The Attorney General released the special counsel's report with minimal redactions to the public and an even lesser redacted version to Congress.  Did you write the report

with the expectation that it would be released publicly?

Mr. Mueller.  No, we did not have an expectation.  We wrote the report, understanding that it was demanded by the statute and would go to the Attorney General for further review.

Mrs. Roby.  And pursuant to the special counsel regulations, who is the only party that must receive the charging decision resulting from the special counsel's investigation?

Mr. Mueller.  With regard to the President or generally?

Mrs. Roby.  No, generally.

Mr. Mueller.  Attorney General.

Mrs. Roby.  At Attorney General Barr's confirmation hearing, he made it clear that he intended to release your report to the public.  Do you remember how much of your report had been written at that point?

Mr. Mueller.  I do not.

Mrs. Roby.  Were there significant changes in tone or substance of the report made after the announcement that the report would be made available to Congress and the public?

Mr. Mueller.  I can't get into that.

Mrs. Roby.  During the Senate testimony of Attorney General William Barr, Senator Kamala Harris asked Mr. Barr if he had looked at all the underlying evidence that the special counsel's team had gathered.  He stated that he had not.

So I am going to ask you, did you personally review all of the underlying evidence gathered in your investigation?

Mr. <u>Mueller.</u>  Well, to the extent that it came through the Special Counsel's Office, yes.

Mrs. <u>Roby.</u>  Did any single member of your team review all the underlying evidence gathered during the course of your investigation?

Mr. <u>Mueller.</u>  As has been recited here today, a substantial amount of work was done, whether it be search warrants or --

Mrs. <u>Roby.</u>  My point is there is no one member of the team that looked at everything.

Mr. <u>Mueller.</u>  That is what I am trying to get at.

Mrs. <u>Roby.</u>  Okay.  It is fair to say that, in an investigation as comprehensive as yours, it is normal that different members of the team would have reviewed different sets of documents and few, if anyone, would have reviewed all of the underlying --

Mr. <u>Mueller.</u>  Thank you.  Yes.

Mrs. <u>Roby.</u>  How many of the approximately 500 interviews conducted by the special counsel did you attend personally?

Mr. <u>Mueller.</u>  Very few.

Mrs. <u>Roby.</u>  On March 27, 2019, you wrote a letter to the Attorney General essentially complaining about the media coverage of your report.  You wrote, and I quote:  The summary letter the Department sent to Congress and released to the public late in the afternoon of March 24 did not fully capture the context, nature, and substance of this office's work and conclusions.  We

communicated that concern to the Department on the morning of
March 25th.  There is now public confusion about critical aspects
of the result of our investigation.

Who wrote that March 27th letter?

Mr. Mueller.  Well, I can't get into who wrote it, the
internal deliberations.

Mrs. Roby.  But you signed it?

Mr. Mueller.  What I will say is the letter stands for
itself.

Mrs. Roby.  Okay.  Why did you write a formal letter since
you had already called the Attorney General to express those
concerns?

Mr. Mueller.  I can't get into that, internal deliberations.

Mrs. Roby.  Did you authorize the letter's release to the
media, or was it leaked?

Mr. Mueller.  I have no knowledge on either.

Mrs. Roby.  Well, you went nearly 2 years without a leak.
Why was this letter leaked?

Mr. Mueller.  Well, I can't get into it.

Mrs. Roby.  Was this letter written and leaked for the
express purpose of attempting to change the narrative about the
conclusions of your report, and was anything in Attorney General
Barr's letter referred to as principal conclusions inaccurate?

Chairman Nadler.  The time of the gentlelady has expired.

Mrs. Roby.  May he answer the question, please?

Mr. <u>Mueller.</u>  The question is?

Chairman <u>Nadler.</u>  Yes, you may answer the question.

Mrs. <u>Roby.</u>  Was anything in Attorney General Barr's letter referred to as the principal conclusions letter dated March 24th inaccurate?

Mr. <u>Mueller.</u>  Well, I am not going to get into that.

Chairman <u>Nadler.</u>  The time of the gentlelady has expired. The gentlelady from California.

Ms. <u>Bass.</u>  Thank you, Mr. Chair.

Director Mueller, as you know, we are focusing on five obstruction episodes today.  I would like to ask you about the second of those five obstruction episodes.  It is in the section of your report beginning on page 113 of Volume II entitled, quote, "The President orders McGahn to deny that the President tried to fire the special counsel," end quote.

On January 25th, 2018, The New York Times reported that, quote:  The President had ordered McGahn to have the Department of Justice fire you.

Is that correct?

Mr. <u>Mueller.</u>  Correct.

Ms. <u>Bass.</u>  And that story related to the events you already testified about here today, the President's calls to McGahn to have you removed, correct?

Mr. <u>Mueller.</u>  Correct.

Ms. <u>Bass.</u>  After the news broke, did the President go on TV

and deny the story?

Mr. Mueller.  I do not know.

Ms. Bass.  In fact, the President said, quote:  Fake news, folks, fake news, a typical New York Times fake story, end quote. Correct?

Mr. Mueller.  Correct.

Ms. Bass.  But your investigation actually found substantial evidence that McGahn was ordered by the President to fire you, correct?

Mr. Mueller.  Yes.

Ms. Bass.  Did the President's personal lawyer do something the following day in response to that news report?

Mr. Mueller.  I would refer you to the coverage of this in the report.

Ms. Bass.  On page 114, quote:  On January 26, 2018, the President's personal counsel called McGahn's attorney and said that the President wanted McGahn to put out a statement denying that he had been asked to fire the special counsel, end quote.

Did McGahn do what the President asked?

Mr. Mueller.  I refer you to the report.

Ms. Bass.  Communicating through his personal attorney, McGahn refused because he said, quote, that the Times story was accurate in reporting that the President wanted the special counsel removed.  Isn't that right?

Mr. Mueller.  I believe it is, but I refer you again to the

report.

Ms. Bass.  Okay.  So Mr. McGahn, through his personal attorney, told the President that he was not going to lie.  Is that right?

Mr. Mueller.  True.

Ms. Bass.  Did the President drop the issue?

Mr. Mueller.  I refer to the write-up of this in the report.

Ms. Bass.  Okay.  Next, the President told the White House staff secretary, Rob Porter, to try to pressure McGahn to make a false denial.  Is that correct?

Mr. Mueller.  That is correct.

Ms. Bass.  What did he actually direct Porter to do?

Mr. Mueller.  And I send you back to the report.

Ms. Bass.  Okay.  Well, on page 113, it says, quote:  The President then directed Porter to tell McGahn to create a record to make it clear that the President never directed McGahn to fire you, end quote.  Is that correct?

Mr. Mueller.  That is as it is stated in the report.

Ms. Bass.  And you found, quote, the President said he wanted McGahn to write a letter to the file for our records, correct?

Mr. Mueller.  Correct.

Ms. Bass.  And to be clear, the President is asking his White House counsel, Don McGahn, to create a record that McGahn believed to be untrue while you were in the midst of investigating the President for obstruction of justice, correct?

Mr. <u>Mueller.</u>  Generally correct.

Ms. <u>Bass.</u>  And Mr. McGahn was an important witness in that investigation, wasn't he?

Mr. <u>Mueller.</u>  I would have to say yes.

Ms. <u>Bass.</u>  Did the President tell Porter to threaten McGahn if he didn't create the written denial?

Mr. <u>Mueller.</u>  I would refer you to the write-up of it in the report.

Ms. <u>Bass.</u>  In fact, didn't the President say, quote, and this is on page 116, "If he doesn't write a letter, then maybe I will have to get rid of him," end quote?

Mr. <u>Mueller.</u>  Yes.

Ms. <u>Bass.</u>  Did Porter deliver that threat?

Mr. <u>Mueller.</u>  I again refer you to the discussion that is found on page 115.

Ms. <u>Bass.</u>  Okay.  But the President still didn't give up, did he?  So the President told McGahn directly to deny that the President told him to have you fired.  Can you tell me exactly what happened?

Mr. <u>Mueller.</u>  I can't beyond what is in the report.

Ms. <u>Bass.</u>  Well, on page 116, it says:  The President met him in the Oval Office.  Quote:  The President began the Oval Office meeting by telling McGahn that The New York Times story didn't look good and McGahn needed to correct it.

Is that correct?

Mr. <u>Mueller.</u>  As it is written in the report, yes.

Ms. <u>Bass.</u>  The President asked McGahn whether he would do a correction and McGahn said no, correct?

Mr. <u>Mueller.</u>  That is accurate.

Ms. <u>Bass.</u>  Well, Mr. Mueller, thank you for your investigation uncovering this very disturbing evidence.  My friend Mr. Richmond will have additional questions on the subject.  However, it is clear to me if anyone else had ordered a witness to create a false record and cover up acts that are the subject of a law enforcement investigation, that person would be facing criminal charges.

I yield back my time.

Chairman <u>Nadler.</u>  The gentlelady yields back.

The gentleman from Ohio.

Mr. <u>Jordan.</u>  Director, the FBI interviewed Joseph Mifsud on February 10, 2017.  In that interview, Mr. Mifsud lied.  You point this out on page 193, Volume I.  Mifsud denied.  Mifsud also falsely stated.  In addition, Mifsud omitted.

Three times he lied to the FBI, yet you didn't charge him with a crime.  Why not?

Mr. <u>Mueller.</u>  Excuse me, did you say 1 -- I am sorry, did you say 193?

Mr. <u>Jordan.</u>  Volume I, 193.  He lied three times.  You point it out in the report.  Why didn't you charge him with a crime?

Mr. <u>Mueller.</u>  I can't get into internal deliberations with

regard to who would or would not be charged.

Mr. Jordan.  You charged a lot of other people for making false statements.  Let's remember this, let's remember this:  In 2016, the FBI did something they probably haven't done before.  They spied on two American citizens associated with the Presidential campaign:  George Papadopoulos and Carter Page.

With Carter Page, they went to the FISA court.  They used the now famous dossier as part of the reason they were able to get the warrant and spy on Carter Page for the better part of a year.  With Mr. Papadopoulos, they didn't go to the court.  They used human sources, all kinds of -- from about the moment Papadopoulos joins the Trump campaign, you got all these people all around the world starting to swirl around him.  Names like Halper, Downer, Mifsud, Thompson, meeting in Rome, London, all kinds of places.  The FBI even sent, even sent a lady posing as somebody else, went by the name Azra Turk, even dispatched her to London to spy on Mr. Papadopoulos.  In one of these meetings, Mr. Papadopoulos is talking to a foreign diplomat, and he tells the diplomat Russians have dirt on Clinton.  That diplomat then contacts the FBI, and the FBI opens an investigation based on that fact.

You point this out on page 1 of the report.  July 31st, 2016, they open the investigation based on that piece of information.  Diplomat tells Papadopoulos Russians have dirt -- excuse me, Papadopoulos tells the diplomat Russians have dirt on Clinton.  The diplomat tells the FBI.  What I am wondering is who told

Papadopoulos?  How did he find out?

Mr. Mueller.  I can't get into the evidentiary --

Mr. Jordan.  Yes, you can, because you wrote about it.  You
gave us the answer.  Page 192 of the report you tell us who told
him, Joseph Mifsud.  Joseph Mifsud is the guy who told Joseph
Papadopoulos, the mysterious professor who lives in Rome and
London, works and teaches at two different universities; this is
the guy who told Papadopoulos.  He is the guy who starts it all.
And when the FBI interviews him, he lies three times, and yet you
don't charge him with a crime.

You charge Rick Gates for false statements.  You charge Paul
Manafort for false statements.  You charge Michael Cohen with
false statements.  You charge Michael Flynn, a three-star general,
with false statements.  But the guy who puts the country through
this whole saga, starts it all -- for 3 years we have lived this
now -- he lies and you guys don't charge him.  And I am curious as
to why.

Mr. Mueller.  Well, I can't get into it.  And it is obvious I
think that we can't get into charging decisions.

Mr. Jordan.  When the FBI interviewed him in February -- the
FBI interviews him in February.  When the Special Counsel's Office
interviewed Mifsud, did he lie to you guys too?

Mr. Mueller.  I can't get into that.

Mr. Jordan.  Did you interview Mifsud?

Mr. Mueller.  I can't get into that.

Mr. Jordan.  Is Mifsud Western intelligence or Russian
intelligence?

Mr. Mueller.  I can't get into that.

Mr. Jordan.  A lot of things you can't get into.  What is
interesting:  You can charge 13 Russians no one's ever heard of,
no one's ever seen.  No one's ever going to hear of them.  No
one's ever going to see them.  You can charge them.  You can
charge all kinds of people who are around the President with false
statements.  But the guy who launches everything, the guy who puts
this whole story in motion, you can't charge him.  I think that is
amazing.

Mr. Mueller.  I am not certain -- I am not certain I agree
with your characterization.

Mr. Jordan.  Well, I am reading from your report.  Mifsud
told Papadopoulos.  Papadopoulos tells the diplomat.  The diplomat
tells the FBI.  The FBI opens the investigation July 31st, 2016.
And here we are 3 years later, July of 2019.  The country's been
put through this, and the central figure who launches it all lies
to us, and you guys don't hunt him down and interview him again,
and you don't charge him with a crime.

Now, here is the good news.  Here is the good news.  The
President was falsely accused of conspiracy.  The FBI does a
10-month investigation.  And James Comey, when we deposed him a
year ago, told us at that point they had nothing.  You do a
22-month investigation.  At the end of that 22 months, you find no

conspiracy.  And what do the Democrats want to do?  They want to keep investigating.  They want to keep going.

Maybe a better course of action, maybe a better course of action is to figure out how the false accusations started.  Maybe it is to go back and actually figure out why Joseph Mifsud was lying to the FBI.  And here is the good news.  Here is the good news.  That is exactly what Bill Barr is doing, and thank goodness for that.  That is exactly what the Attorney General and John Durham are doing.  They are going to find out why we went through this 3-year --

Chairman Nadler.  The time of the gentleman --

Mr. Jordan.  -- saga and get to the bottom of it.

Chairman Nadler.  The time of the gentleman has expired.

In a moment, we will take a very brief 5-minute break.
First, I ask everyone in the room to please remain seated and quiet while the witness exits the room.  I also want to announce to those in the audience that you may not be guaranteed your seat if you leave the hearing room at this time.  At this time, the committee will stand in a very short recess.

[Recess.]

Chairman Nadler.  People, please take their seats before the special counsel returns.

The gentleman from Louisiana, Mr. Richmond.

Mr. Richmond.  Thank you, Mr. Chairman.

Mr. Mueller, Congressman Deutch addressed Trump's request to

McGahn to fire you.  Representative Bass talked about the
President's request of McGahn to deny the fact that the President
made that request.

I want to pick up where they left off, and I want to pick up
with the President's personal lawyer.  In fact, there was evidence
that the President's personal lawyer was alarmed at the prospect
of the President meeting with Mr. McGahn to discuss Mr. McGahn's
refusal to deny The New York Times report about the President
trying to fire you, correct?

Mr. Mueller.  Correct.

Mr. Richmond.  In fact, the President's counsel was so
alarmed by the prospect of the President's meeting with McGahn
that he called Mr. McGahn's counsel and said that McGahn could not
resign no matter what happened in the Oval Office that day,
correct?

Mr. Mueller.  Correct.

Mr. Richmond.  So it is accurate to say that the President
knew that he was asking McGahn to deny facts that McGahn, quote,
had repeatedly said were accurate, unquote.  Isn't that right?

Mr. Mueller.  Correct.

Mr. Richmond.  Your investigation also found, quote:  By the
time of the Oval Office meeting with the President, the President
was aware, one, that McGahn did not think the story was false;
two, did not want to issue a statement or create a written record
denying facts that McGahn believed to be true.  The President

nevertheless persisted and asked McGahn to repudiate facts that
McGahn had repeatedly said were accurate.

Isn't that correct?

Mr. Mueller.  Generally true.

Mr. Richmond.  I believe that is on page 119.  Thank you.  In
other words, the President was trying to force McGahn to say
something that McGahn did not believe to be true.

Mr. Mueller.  That is accurate.

Mr. Richmond.  I want to reference you to a slide, and it is
on page 120, and it says:  Substantial evidence indicates that in
repeatedly urging McGahn to dispute that he was ordered to have
the special counsel terminated, the President acted for the
purpose of influencing McGahn's account in order to deflect or
prevent further scrutiny of the President's conduct towards the
investigation.

Mr. Mueller.  That is accurate.

Mr. Richmond.  Can you explain what you meant there?

Mr. Mueller.  I am just going to leave it as it appears in
the report.

Mr. Richmond.  So it is fair to say the President tried to
protect himself by asking staff to falsify records relevant to an
ongoing investigation?

Mr. Mueller.  I would say that is generally a summary.

Mr. Richmond.  Would you say that that action, the President
tried to hamper the investigation by asking staff to falsify

records relevant to your investigation?

Mr. Mueller.  I am just going to refer you to the report, if
I could, for review of that episode.

Mr. Richmond.  Thank you.  Also, the President's attempts to
get McGahn to create a false written record were related to Mr.
Trump's concerns about your obstruction of justice inquiry,
correct?

Mr. Mueller.  I believe that to be true.

Mr. Richmond.  In fact, at that same Oval Office meeting, did
the President also ask McGahn why he had told -- quote, "why he
had told Special Counsel's Office investigators that the President
told him to have you removed," unquote?

Mr. Mueller.  And what was the question, sir, if I might?

Mr. Richmond.  Let me go to the next one.  The President,
quote, criticized McGahn for telling your office about the June
17, 2017, events when he told McGahn to have you removed, correct?

Mr. Mueller.  Correct.

Mr. Richmond.  In other words, the President was criticizing
his White House counsel for telling law enforcement officials what
he believed to be the truth.

Mr. Mueller.  I again go back to the text of the report.

Mr. Richmond.  Well, let me go a little bit further.  Would
it have been a crime if Mr. McGahn had lied to you about the
President ordering him to fire you?

Mr. Mueller.  I don't want to speculate.

Mr. Richmond.  Okay.  Is it true that you charged multiple people associated with the President for lying to you during your investigation?

Mr. Mueller.  That is accurate.

Mr. Richmond.  The President also complained that his staff were taking notes during the meeting about firing McGahn.  Is that correct?

Mr. Mueller.  That is what the report says.  Yeah, the report.

Mr. Richmond.  But, in fact, it is completely appropriate for the President's staff, especially his counsels, to take notes during a meeting, correct?

Mr. Mueller.  I rely on the wording of the report.

Mr. Richmond.  Well, thank you, Director Mueller, for your investigation into whether the President attempted to obstruct justice by ordering his White House counsel, Don McGahn, to lie to protect the President and then to create a false record about it. It is clear that any other person who engaged in such conduct would be charged with a crime.  We will continue our investigation, and we will hold the President accountable because no one is above the law.

Chairman Nadler.  The time of the gentleman has expired.

The gentleman from Florida.

Mr. Gaetz.  Director Mueller, can you state with confidence that the Steele dossier was not part of Russia's disinformation

campaign?

Mr. Mueller.  As I said in my opening statement, that part of the building of the case predated me and by at least 10 months.

Mr. Gaetz.  Paul Manafort's alleged crimes regarding tax evasion predated you.  You had no problem charging them.  As a matter of fact, this Steele dossier predated the Attorney General, and he didn't have any problem answering the question.  When Senator Cornyn asked the Attorney General the exact question I asked you, Director, the Attorney General said, and I am quoting: No, I can't state that with confidence.  And that is one of the areas I am reviewing.  I am concerned about it, and I don't think it is entirely speculative.

Now, if something is not entirely speculative, then it must have some factual basis, but you identify no factual basis regarding the dossier or the possibility that it was part of the Russia disinformation campaign.

Now, Christopher Steele's reporting is referenced in your report.  Steele reported to the FBI that senior Russian Foreign Ministry figures, along with other Russians, told him that there was -- and I am quoting from the Steele dossier -- extensive evidence of conspiracy between the Trump campaign team and the Kremlin.

So here is my question:  Did Russians really tell that to Christopher Steele, or did he just make it all up, and was he lying to the FBI?

Mr. <u>Mueller.</u>  Let me back up a second, if I could, and say, as I said earlier with regard to Steele, that that is beyond my purview.

Mr. <u>Gaetz.</u>  No, it is exactly your purview, Director Mueller, and here is why:  Only one of two things is possible, right?  Either Steele made this whole thing up and there were never any Russians telling him of this vast criminal conspiracy that you didn't find, or Russians lied to Steele.  Now, if Russians were lying to Steele to undermine our confidence in our duly elected President, that would seem to be precisely your purview because you stated in your opening that the organizing principle was to fully and thoroughly investigate Russia's interference.  But you weren't interested in whether or not the Russians were interfering through Christopher Steele.  And if Steele was lying, then you should have charged him with lying, like you charged a variety of other people.  But you say nothing about this in your report.

Mr. <u>Mueller.</u>  Well, sir --

Mr. <u>Gaetz.</u>  Meanwhile, Director, you are quite loquacious on other topics.  You write 3,500 words about the June 9 meeting between the Trump campaign and Russian lawyer Veselnitskaya.  You write on page 103 of your report that the President's legal team suggested -- and I am quoting from your report -- that the meeting might have been a setup by individuals working with the firm that produced the Steele reporting.

So I am going to ask you a very easy question, Director

Mueller.  On the week of June 9, who did Russian lawyer Veselnitskaya meet with more frequently, the Trump campaign or Glenn Simpson, who was functionally acting as an operative for the Democratic National Committee?

Mr. Mueller.  Well, what I think is missing here is the fact that this is under investigation elsewhere in the Justice Department --

Mr. Gaetz.  I --

Mr. Mueller.  -- and if I can finish, sir, and if I can finish, sir -- and consequently, it is not within my purview.  The Department of Justice and FBI should be responsive to questions on this particular issue.

Mr. Gaetz.  It is absurd to suggest that an operative for the Democrats was meeting with this Russian lawyer the day before and the day after the Trump Tower meeting, and yet that is not something you reference.

Now, Glenn Simpson testified under oath he had dinner with Veselnitskaya the day before and the day after this meeting with the Trump team.  Do you have any basis, as you sit here today, to believe that Steele was lying?

Mr. Mueller.  As I said before and I will say again, it is not my purview.  Others are investigating what you address.

Mr. Gaetz.  So it is not your purview to look into whether or not Steele is lying.  It is not your purview to look into whether or not anti-Trump Russians are lying to Steele.  And it is not

your purview to look at whether or not Glenn Simpson was meeting
with the Russians the day before and the day after you write 3,500
words about the Trump campaign meeting.

So I am wondering how these decisions are guided.  I look at
the inspector general's report.  I am citing from page 404 of the
inspector general's report.  It states:  Page stated:  Trump's not
ever going to be President, right?  Right.  Strzok replied:  No,
he is not.  We will stop it.

Also in the inspector general's report, there is someone
identified as attorney No. 2.  Attorney No. 2 -- this is page
419 -- replied, "Hell no," and then added, "Viva la resistance."

Attorney No. 2 in the inspector general's report and Strzok
both worked on your team, didn't they?

Mr. <u>Mueller.</u>  Pardon me, can you --

Mr. <u>Gaetz.</u>  They both worked on your team, didn't they?

Mr. <u>Mueller.</u>  I know -- I heard Strzok.  Who else were you
talking about?

Mr. <u>Gaetz.</u>  Attorney No. 2 identified in the inspector
general's report.

Mr. <u>Mueller.</u>  And the question was?

Mr. <u>Gaetz.</u>  Did he work for you?  The guy who said, "Viva la
resistance."

Mr. <u>Mueller.</u>  Peter Strzok worked for me for a period of
time, yes.

Mr. <u>Gaetz.</u>  Yeah, but so did the other guy that said, "Viva

la resistance."  And here is what I am kind of noticing, Director
Mueller:  When people associated with Trump lied, you throw the
book at them.  When Christopher Steele lied, nothing.  And so it
seems to be that when Glenn Simpson met with Russians, nothing.
When the Trump campaign met with Russians, 3,500 words.  And maybe
the reason why there are these discrepancies in what you focused
on is because the team was so biased --

     Chairman Nadler.  The time of the --

     Mr. Gaetz.  -- pledged to the resistance, pledged to stop
Trump.

     Chairman Nadler.  The time of the gentleman has expired.

     Mr. Jeffries of New York is recognized.

     Mr. Jeffries.  Mr. Mueller, obstruction of justice is a
serious crime that strikes at the core of an investigator's effort
to find the truth, correct?

     Mr. Mueller.  Correct.

     Mr. Jeffries.  The crime of obstruction of justice has three
elements, true?

     Mr. Mueller.  True.

     Mr. Jeffries.  The first element is an obstructive act,
correct?

     Mr. Mueller.  Correct.

     Mr. Jeffries.  An obstructive act could include taking an
action that would delay or interfere with an ongoing
investigation, as set forth in Volume II, page 87 and 88 of your

report, true?

Mr. Mueller.  I am sorry.  Could you again repeat the question?

Mr. Jeffries.  An obstructive act could include taking an action that would delay or interfere with an ongoing investigation.

Mr. Mueller.  That is true.

Mr. Jeffries.  Your investigation found evidence that President Trump took steps to terminate the special counsel, correct?

Mr. Mueller.  Correct.

Mr. Jeffries.  Mr. Mueller, does ordering the termination of the head of a criminal investigation constitute an obstructive act?

Mr. Mueller.  That would be -- I would refer you to the report on that.

Mr. Jeffries.  Let me refer you to page 87 and 88 of Volume II, where you conclude:  The attempt to remove the special counsel would qualify as an obstructive act if it would naturally obstruct the investigation and any grand jury proceedings that might flow from the inquiry, correct?

Mr. Mueller.  Yes.  I have got that now.  Thank you.

Mr. Jeffries.  Thank you.  The second element of obstruction of justice is the presence of an obstructive act in connection with an official proceeding, true?

Mr. Mueller.  True.

Mr. Jeffries.  Does the special counsel's criminal investigation into the potential wrongdoing of Donald Trump constitute an official proceeding?

Mr. Mueller.  And that is an area which I cannot get into.

Mr. Jeffries.  Okay.  President Trump tweeted on June 16, 2017, quote:  I am being investigated for firing the FBI Director by the man who told me to fire the FBI Director.  Witch hunt.

The June 16th tweet just read -- was cited on page 89 in Volume II -- constitutes a public acknowledgement by President Trump that he was under criminal investigation, correct?

Mr. Mueller.  I think generally correct.

Mr. Jeffries.  One day later, on Saturday, June 17th, President Trump called White House Counsel Don McGahn at home and directed him to fire the special counsel, true?

Mr. Mueller.  I believe it to be true.  I think we have been -- I may have stated in response to questions some --

Mr. Jeffries.  That is correct.  President Trump told Don McGahn, quote, Mueller has to go, close quote.  Correct?

Mr. Mueller.  Correct.

Mr. Jeffries.  Your report found, on page 89, Volume II, that substantial evidence indicates that, by June 17th, the President knew his conduct was under investigation by a Federal prosecutor who could present any evidence of Federal crimes to a grand jury, true?

Mr. <u>Mueller.</u>  True.

Mr. <u>Jeffries.</u>  The third element -- the second element having just been satisfied, the third element of the crime of obstruction of justice is corrupt intent, true?

Mr. <u>Mueller.</u>  True.

Mr. <u>Jeffries.</u>  Corrupt intent exists if the President acted to obstruct an official proceeding for the improper purpose of protecting his own interests, correct?

Mr. <u>Mueller.</u>  That is generally correct.

Mr. <u>Jeffries.</u>  Thank you.

Mr. <u>Mueller.</u>  The only thing I would say is we're going through the three elements of the proof of the obstruction of justice charges when the fact of the matter is we got -- excuse me, just one second.

Mr. <u>Jeffries.</u>  Thank you.  Mr. Mueller, let me move on in the interest of time.  Upon learning about the appointment of the special counsel, your investigation found that Donald Trump stated to the then Attorney General, quote:  Oh my God, this is terrible. This is the end of my Presidency.  I am F'd.

Is that correct?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Jeffries.</u>  Is it fair to say that Donald Trump viewed the special counsel's investigation into his conduct as adverse to his own interests?

Mr. <u>Mueller.</u>  I think that generally is true.

Mr. Jeffries.  The investigation found evidence, quote, that the President knew that he should not have directed Don McGahn to fire the special counsel.  Correct?

Mr. Mueller.  And where do you have that quote?

Mr. Jeffries.  Page 90, Volume II:  There is evidence that the President knew he should not have made those calls to McGahn, close quote.

Mr. Mueller.  I see that.  Yes, that is accurate.

Mr. Jeffries.  The investigation also found substantial evidence that President Trump repeatedly urged McGahn to dispute that he was ordered to have the special counsel terminated, correct?

Mr. Mueller.  Correct.

Mr. Jeffries.  The investigation found substantial evidence that, when the President ordered Don McGahn to fire the special counsel and then lie about it, Donald Trump, one, committed an obstructive act; two, connected to an official proceeding; three, did so with corrupt intent.

Those are the elements of obstruction of justice.  This is the United States of America.  No one is above the law, no one.  The President must be held accountable one way or the other.

Mr. Mueller.  Let me just say, if I might, I don't subscribe necessarily to your -- the way you analyze that.  I am not saying it is out of the ballpark, but I am not supportive of that analytical charge.

Mr. Jeffries.  Thank you.

Chairman Nadler.  The gentleman from Colorado.

Mr. Buck.  Thank you, Mr. Chairman.

Mr. Mueller, over here.

Mr. Mueller.  Hi.

Mr. Buck.  Hi.  I want to start by thanking you for your
service.  You joined the Marines and led a rifle platoon in
Vietnam, where you earned a bronze star, purple heart, and other
commendations.  You served as an assistant United States attorney
leading the homicide unit here in D.C., U.S. attorney for the
District of Massachusetts and later Northern District of
California, Assistant Attorney General for DOJ's Criminal
Division, and the FBI Director.  So thank you, I appreciate that.

But having reviewed your biography, it puzzles me why you
handled your duties in this case the way you did.  The report
contradicts what you taught young attorneys at the Department of
Justice, including to ensure that every defendant is treated
fairly, or, as Justice Sutherland said in the Berger case, a
prosecutor is not the representative of an ordinary party to a
controversy but of a sovereignty whose interest in a criminal
prosecution is not that it shall win a case but that justice shall
be done and that the prosecutor may strike hard blows, but he is
not at liberty to strike foul ones.

By listing the 10 factual situations and not reaching a
conclusion about the merits of the case, you unfairly shifted the

burden of proof to the President, forcing him to prove his
innocence while denying him a legal forum to do so.  And I have
never heard of a prosecutor declining a case and then holding a
press conference to talk about the defendant.  You noted eight
times in your report that you had a legal duty under the
regulations to either prosecute or decline charges.  Despite this,
you disregarded that duty.

As a former prosecutor, I am also troubled with your legal
analysis.  You discussed 10 separate factual patterns involving
alleged obstruction, and then you failed to separately apply the
elements of the applicable statutes.

I looked at the 10 factual situations, and I read the case
law.  And I have to tell you, just looking at the Flynn matter,
for example, the four statutes that you cited for possible
obstruction, 1503, 1505, 1512(b)(3), and 1512(c)(2), when I look
at those concerning the Flynn matter, 1503 is inapplicable because
there wasn't a grand jury or trial jury impaneled, and Director
Comey was not an officer of the court as defined by the statute.

Section 1505 criminalizes acts that would obstruct or impede
administrative proceedings as those before Congress or an
administrative agency.  The Department of Justice criminal
resource manual states that the FBI investigation is not a pending
proceeding.

1512(b)(3) talks about intimidation, threats of force to
tamper with a witness.  General Flynn at the time was not a

witness, and certainly Director Comey was not a witness.

And 1512(c)(2) talks about tampering with a record.  And as Joe Biden described the statute as it was being debated on the Senate floor, he called this a statute criminalizing document shredding, and there is nothing in your report that alleges that the President destroyed any evidence.

So what I have to ask you and what I think people are working around in this hearing is -- let me lay a little foundation for it.  The ethical rules require that a prosecutor have a reasonable probability of conviction to bring a charge.  Is that correct?

Mr. Mueller.  It sounds generally accurate.

Mr. Buck.  And the regulations concerning your job as special counsel state that your job is to provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by your office.

You recommended declining prosecution of President Trump and anyone associated with his campaign because there was insufficient evidence to convict for a charge of conspiracy with Russian interference in the 2016 election.  Is that fair?

Mr. Mueller.  That is fair.

Mr. Buck.  Was there sufficient evidence to convict President Trump or anyone else with obstruction of justice?

Mr. Mueller.  We did not make that calculation.

Mr. Buck.  How could you not have made the calculation with the regulation --

Mr. Mueller.  As the OLC opinion, the OLC opinion, Office of Legal Counsel, indicates that we cannot indict a sitting President.  So one of the tools that a prosecutor would use is not there.

Mr. Buck.  Okay.  But let me just stop.  You made the decision on the Russian interference.  You couldn't have indicted the President on that, and you made the decision on that, but when it came to obstruction, you threw a bunch of stuff up against the wall to see what would stick, and that is really unfair.

Mr. Mueller.  I would not agree to that characterization at all.  What we did is provide to the Attorney General, in the form of a confidential memorandum, our understanding of the case, those cases that were brought, those cases that were declined, and that one case where the President cannot be charged with a crime.

Mr. Buck.  Okay.  Could you charge the President with a crime after he left office?

Mr. Mueller.  Yes.

Mr. Buck.  You believe that he committed -- you could charge the President of the United States with obstruction of justice after he left office?

Mr. Mueller.  Yes.

Mr. Buck.  Ethically, under the ethical standards?

Mr. Mueller.  Well, I am not certain because I haven't looked at the ethical standards, but the OLC opinion says that the prosecutor, while he cannot bring a charge against a sitting

President, nonetheless, he can continue the investigation to see if there are any other persons who might be drawn into the conspiracy.

Chairman Nadler.  The time of the gentleman has expired.

The gentleman from Rhode Island.

Mr. Cicilline.  Director, as you know, we are specifically focusing on five separate obstruction episodes here today.  I would like to ask you about the third episode.  It is the section of your report entitled "The President's efforts to curtail the special counsel investigation," beginning at page 90.  And by "curtail," you mean limit, correct?

Mr. Mueller.  Correct.

Mr. Cicilline.  My colleagues have walked through how the President tried to have you fired through the White House counsel, and because Mr. McGahn refused the order, the President asked others to help limit your investigation.  Is that correct?

Mr. Mueller.  Correct.

Mr. Cicilline.  And was Corey Lewandowski one such individual?

Mr. Mueller.  Again, can you remind me what --

Mr. Cicilline.  Well, Corey Lewandowski is the President's former campaign manager, correct?

Mr. Mueller.  Correct.

Mr. Cicilline.  Did he have any official position with the Trump administration?

Mr. Mueller.  I don't believe so.

Mr. Cicilline.  Your report describes an incident in the Oval Office involving Mr. Lewandowski on June 19, 2017, at Volume II, page 91.  Is that correct.

Mr. Mueller.  I am sorry.  What is the citation, sir?

Mr. Cicilline.  Page 91.

Mr. Mueller.  Of the second volume?

Mr. Cicilline.  Yes.

Mr. Mueller.  And where?

Mr. Cicilline.  A meeting in the Oval Office between Mr. Lewandowski and the President.

Mr. Mueller.  Okay.

Mr. Cicilline.  And that was just 2 days after the President called Don McGahn at home and ordered him to fire you.  Is that correct?

Mr. Mueller.  Apparently so.

Mr. Cicilline.  So, right after his White House counsel, Mr. McGahn, refused to follow the President's order to fire you, the President came up with a new plan, and that was to go around to all of his senior advisers and government aides to have a private citizen try to limit your investigation.

What did the President tell Mr. Lewandowski to do?  Do you recall he told him -- he dictated a message to Mr. Lewandowski for Attorney General Sessions and asked him to write it down.  Is that correct?

Mr. Mueller.  True.

Mr. Cicilline.  And did you and your team see this handwritten message?

Mr. Mueller.  I am not going to get into what we may or may not have included in our investigation.

Mr. Cicilline.  Okay.  The message directed Sessions to give -- and I am quoting from your report -- to give a public speech saying that he planned to meet with the special prosecutor to explain this is very unfair and let the special prosecutor move forward with investigating election meddling for future elections. That is at page 91.  Is that correct?

Mr. Mueller.  Yes, I see that.  Thank you.  Yes, it is.

Mr. Cicilline.  In other words, Mr. Lewandowski, a private citizen, was instructed by the President of the United States to deliver a message from the President to the Attorney General that directed him to limit your investigation, correct?

Mr. Mueller.  Correct.

Mr. Cicilline.  And at this time, Mr. Sessions was still recused from oversight of your investigation, correct?

Mr. Mueller.  I am sorry.  Could you restate that?

Mr. Cicilline.  The Attorney General was recused from oversight.

Mr. Mueller.  Yes, yes.

Mr. Cicilline.  So the Attorney General would have had to violate his own Department's rules in order to comply with the

President's order, correct?

Mr. <u>Mueller.</u>  Well, I am not going to get into the subsidiary details.  I just refer you again to page 91, 92 of the report.

Mr. <u>Cicilline.</u>  And if the Attorney General had followed through with the President's request, Mr. Mueller, it would have effectively ended your investigation into the President and his campaign, as you note on page 97, correct?

Mr. <u>Mueller.</u>  Could you --

Mr. <u>Cicilline.</u>  At page 97, you write, and I quote:  Taken together, the President's directives indicate that Sessions was being instructed to tell the special counsel to end the existing investigation into the President and his campaign, with the special counsel being permitted to move forward with investigating election meddling for future elections.  Is that correct?

Mr. <u>Mueller.</u>  Generally true, yes, sir.

Mr. <u>Cicilline.</u>  And an unsuccessful attempt to obstruct justice is still a crime.  Is that correct?

Mr. <u>Mueller.</u>  That is correct.

Mr. <u>Cicilline.</u>  And Mr. Lewandowski tried to meet with the Attorney General.  Is that right?

Mr. <u>Mueller.</u>  True.

Mr. <u>Cicilline.</u>  And he tried to meet with him in his office so he would be certain there wasn't a public log of the visit.

Mr. <u>Mueller.</u>  According to what we gathered for the report.

Mr. <u>Cicilline.</u>  And the meeting never happened and the

President raised the issue again with Mr. Lewandowski.  And this time, he said, and I quote, if Sessions does not meet with you, Lewandowski should tell Sessions he was fired, correct?

Mr. Mueller.  Correct.

Mr. Cicilline.  So immediately following the meeting with the President, Lewandowski then asked Mr. Dearborn to deliver the message, who is the former chief of staff to Mr. Sessions.  And Mr. Dearborn refuses to deliver it because he doesn't feel comfortable.  Isn't that correct?

Mr. Mueller.  Generally correct, yes.

Mr. Cicilline.  So, just so we are clear, Mr. Mueller, 2 days after the White House Counsel Don McGahn refused to carry out the President's order to fire you, the President directed a private citizen to tell the Attorney General of the United States, who was recused at the time, to limit your investigation to future elections, effectively ending your investigation into the 2016 Trump campaign.  Is that correct?

Mr. Mueller.  I am not going to adopt your characterization. I will say that the facts as laid out in the report are accurate.

Mr. Cicilline.  Well, Mr. Mueller, in your report you, in fact, write at page 99 -- 97:  Substantial evidence indicates that the President's effort to have Sessions limit the scope of the special counsel's investigation to future election interference was intended to prevent further investigative scrutiny of the President and his campaign conduct.  Is that correct?

Mr. Mueller.  Generally.

Mr. Cicilline.  And so, Mr. Mueller, you have seen a letter where a thousand former Republican and Democratic Federal prosecutors have read your report and said, anyone but the President who committed those acts would be charged with obstruction of justice.  Do you agree with those former colleagues, a thousand prosecutors who came to that conclusion?

Chairman Nadler.  The time of the gentleman has expired.

The gentleman from Arizona.

Mr. Biggs.  Thank you, Mr. Chairman.

Mr. Mueller, you guys, your team wrote in the report, quote -- this is at the top of page 2, Volume I, also on page 173, by the way.  You said that you had come to the conclusion that, quote:  The investigation did not establish that members of the Trump campaign conspired or coordinated with the Russian Government in its election interference activities, close quote.

That is an accurate statement, right?

Mr. Mueller.  That is accurate.

Mr. Biggs.  And I am curious, when did you personally come to that conclusion?

Mr. Mueller.  Can you remind me which paragraph you are referring to?

Mr. Biggs.  Top of page 2.

Mr. Mueller.  On two.

Mr. Biggs.  Volume I.

Mr. Mueller.  Okay.  And exactly which paragraph are you looking at on 2?

Mr. Biggs.  The investigation did not establish --

Mr. Mueller.  Of course.  I see it, yes.  What was your question?

Mr. Biggs.  My question now is, when did you personally reach that conclusion?

Mr. Mueller.  Well, we were ongoing for 2 years.

Mr. Biggs.  Right, you were ongoing, and you wrote it at some point during that 2-year period, but at some point, you had to come to a conclusion that I don't think there -- that there is not a conspiracy going on here.  There was no conspiracy between this President.  I am not talking about the rest of the President's team.  I am talking about this President and the Russians.

Mr. Mueller.  As you understand, in developing a criminal case, you get pieces of information, pieces of information, witnesses, and the like as you make your case.

Mr. Biggs.  Right.

Mr. Mueller.  And when you make a decision on a particular case depends on a number of factors.

Mr. Biggs.  Right, I understand.

Mr. Mueller.  So I cannot say specifically that we reached a decision on a particular defendant at a particular point in time.

RPTR MERTENS

EDTR ZAMORA

[10:44 a.m.]

Mr. Biggs.  But it was sometime well before you wrote the report.  Fair enough?  I mean, you wrote the report dealing with a whole myriad of issues.  Certainly, at some time prior to that report is when you reached the decision that, okay, with regard to the President himself, I don't find anything here.  Fair enough?

Mr. Mueller.  Well, I'm not certain I do agree with that.

Mr. Biggs.  So you waited till the last minute when you were actually writing the report and say, oh, okay --

Mr. Mueller.  No.  But there were various aspects of the development and --

Mr. Biggs.  Sure.  And that's my point.  There are various aspects that happen, but somewhere along the pike, you come to a conclusion there's nothing -- there's no there there for this defendant.  Isn't that right?

Mr. Mueller.  I can't -- I can't speak to that.

Mr. Biggs.  You can't say when.  Fair enough.

Mr. Zebley.  Mr. Biggs --

Mr. Biggs.  So -- no, I'm not -- no.  I'm asking the sworn witness.

Mr. Mueller, the evidence suggests that on May 10, 2017, at approximately 7:45 a.m., 6 days before the DAG, the Deputy

Attorney General, appointed you special counsel, Mr. Rosenstein called you and mentioned the appointment of the special counsel. Not necessarily that you'd be appointed, but that you had a discussion to that.  Is that true?  May 10, 2017.

Mr. Mueller.  I don't have any -- no, I don't have any knowledge of that occurring.

Mr. Biggs.  You don't have any knowledge or you don't recall?

Mr. Mueller.  I don't have any knowledge.

Mr. Biggs.  The evidence also suggests --

Mr. Mueller.  Given that what I saw you do, are you questioning that?

Mr. Biggs.  Well, I just find it intriguing.  Let me just tell you that there's evidence that suggests that that phone call took place and that that is what was said.

So let's move to the next question.  The evidence suggests that also on May 12, 2017, 5 days before the DAG appointed you special counsel, you met with Mr. Rosenstein in person.  Did you discuss the appointment of the special counsel then, not necessarily you, but that there would be a special counsel?

Mr. Mueller.  I've gone into waters that don't allow me to give you an answer to that particular question.  It relates to the internal discussions he would have in terms of indicting an individual.

Mr. Biggs.  This has nothing to do with the indictment.  It has to do with special counsel and whether you discussed that with

Mr. Rosenstein.

The evidence also suggests that on May 13, 4 days before you were appointed special counsel, you met with attorney -- former Attorney General Sessions and Rosenstein, and you spoke about special counsel.  Do you remember that?

Mr. <u>Mueller.</u>  Not offhand, no.

Mr. <u>Biggs.</u>  Okay.  And on May 16, the day before you were appointed special counsel, you met with the President and Rod Rosenstein.  Do you remember having that meeting?

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Biggs.</u>  And discussion of the position of FBI Director took place.  Do you remember that?

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Biggs.</u>  And did you discuss at any time in that meeting Mr. Comey's termination?

Mr. <u>Mueller.</u>  No.

Mr. <u>Biggs.</u>  Did you discuss at any time in that meeting the potential appointment of a special counsel, not necessarily you, but just in general terms?

Mr. <u>Mueller.</u>  I can't get into the discussions on that.

Mr. <u>Biggs.</u>  How many times did you speak to Mr. Rosenstein before May 17, which is the day you got appointed, regarding the appointment of special counsel?  How many times prior to that did you discuss that?

Mr. <u>Mueller.</u>  I can't tell you how many times.

Mr. <u>Biggs.</u>  Is that because you don't recall or you just --

Mr. <u>Mueller.</u>  I do not recall.

Mr. <u>Biggs.</u>  Okay.  Thank you.

How many times did you speak with Mr. Comey about any investigations pertaining to Russia prior to May 17, 2017?  Did you have any?

Mr. <u>Mueller.</u>  None at all.

Mr. <u>Biggs.</u>  Zero.

Mr. <u>Mueller.</u>  Zero.

Mr. <u>Biggs.</u>  Okay.  My time has expired, so --

Chairman <u>Nadler.</u>  The time of the gentleman has expired.

The gentleman from California.

Mr. <u>Swalwell.</u>  Director Mueller, going back to the President's obstruction via Corey Lewandowski, it was referenced that a thousand former prosecutors who served under Republican and Democratic administrations with 12,000 years of Federal service wrote a letter regarding the President's conduct.  Are you familiar with that letter?

Mr. <u>Mueller.</u>  I've read about that letter, yes.

Mr. <u>Swalwell.</u>  And some of the individuals who signed that letter, the statement of former prosecutors, are people you worked with.  Is that right?

Mr. <u>Mueller.</u>  Quite probably, yes.

Mr. <u>Swalwell.</u>  People that you respect?

Mr. <u>Mueller.</u>  Quite probably, yes.

Mr. <u>Swalwell.</u>  And in that letter, they said all of this conduct trying to control and impede the investigation against the President by leveraging his authority over others is similar to conduct we have seen charged against other public officials and people in powerful positions.

Are they wrong?

Mr. <u>Mueller.</u>  They had a different case.

Mr. <u>Swalwell.</u>  Do you want to sign that letter, Director Mueller?

Mr. <u>Mueller.</u>  They had a different case.

Mr. <u>Swalwell.</u>  Director Mueller, thank you for your service going all the way back to the sixties when you courageously served in Vietnam.  Because I have a seat on the Intelligence Committee, I will have questions later.  And because of our limited time, I will ask to enter this letter into the record under unanimous consent.

Chairman <u>Nadler.</u>  Without objection.

[The information follows:]


******** COMMITTEE INSERT ********

Mr. Swalwell.  And I yield to my colleague from California,
Mr. Lieu.

Mr. Lieu.  Thank you, Director Mueller, for your long history
of service to our country, including your service as a Marine
where you earned a Bronze Star with a V device.

I'd like to now turn to the elements of obstruction of
justice as applied to the President's attempts to curtail your
investigation.

The first element of obstruction of justice requires an
obstructive act, correct?

Mr. Mueller.  Correct.

Mr. Lieu.  Okay.  I'd like to direct you to page 97 of Volume
II of your report.  And you wrote there on page 97, quote,
Sessions was being instructed to tell the special counsel to end
the existing investigation into the President and his campaign,
unquote.  That's in the report, correct?

Mr. Mueller.  Correct.

Mr. Lieu.  That would be evidence of an obstructive act
because it would naturally obstruct the investigation, correct?

Mr. Mueller.  Correct.

Mr. Lieu.  Okay.  Let's turn now to the second element of the
crime of obstruction of justice which requires a nexus to an
official proceeding.  Again, I'm going to direct you to page 97,
the same page in Volume II, and you wrote, quote, by the time the
President's initial one-on-one meeting with Lewandowski on June

19, 2017, the existence of a grand jury investigation supervised
by the special counsel was public knowledge.

That's in the report, correct?

Mr. Mueller.  Correct.

Mr. Lieu.  That would constitute evidence of a nexus to an
official proceeding because a grand jury investigation is an
official proceeding, correct?

Mr. Mueller.  Yes.

Mr. Lieu.  Okay.  I'd like to now turn to the final element
of the crime of obstruction of justice.  On that same page,
page 97, do you see where there is an intent section on that page?

Mr. Mueller.  I do see that.

Mr. Lieu.  All right.  Would you be willing to read the first
sentence?

Mr. Mueller.  And that was starting with?

Mr. Lieu.  Substantial evidence.

Mr. Mueller.  Indicates that the President's?

Mr. Lieu.  If you could read that first sentence.  Would you
be willing to do that?

Mr. Mueller.  I'm happy to have you read it.

Mr. Lieu.  Okay.  I will read it then.

You wrote, quote, substantial evidence indicates that the
President's effort to have Sessions limit the scope of the special
counsel's investigation to future election interference was
intended to prevent further investigative scrutiny of the

President's and his campaign's conduct, unquote.

That's in the report, correct?

Mr. Mueller.  That is in the report.  And I rely what's in the report to indicate what's happening in the paragraphs that we've been discussing.

Mr. Lieu.  Thank you.

So to recap what we've heard, we have heard today that the President ordered former White House Counsel Don McGahn to fire you.  The President ordered Don McGahn to then cover that up and create a false paper trail.  And now we've heard the President ordered Corey Lewandowski to tell Jeff Sessions to limit your investigation so that he, you, stop investigating the President.

I believe a reasonable person looking at these facts could conclude that all three elements of the crime of obstruction of justice have been met.  And I would like to ask you, the reason, again, that you did not indict Donald Trump is because of OLC opinion stating that you cannot indict a sitting President, correct?

Mr. Mueller.  That is correct.

Mr. Lieu.  The fact that the orders by the President were not carried out, that is not a defense to obstruction of justice because the statute itself is quite broad.  It says that as long as you endeavor or attempt to obstruct justice, that would also constitute a crime.

Mr. Mueller.  I'm not going to get into that at this

juncture.

Mr. Lieu.  Okay.  Thank you.

And based on the evidence that we have heard today, I believe a reasonable person could conclude that at least three crimes of obstruction of justice by the President occurred.  We're going to hear about two additional crimes, and that will be the witness tamperings of Michael Cohen and Paul Manafort.

I yield back.

Mr. Mueller.  The only thing I want to add is that on going through the elements with you do not mean -- or does not mean that I subscribe to what you're trying to prove through those elements.

Chairman Nadler.  The time of the gentleman has expired.

The gentlelady from Arizona.

I'm sorry.  The gentleman from California.

Mr. McClintock.  Thank you, Mr. Chairman.

Mr. Mueller, over here.  Thanks for joining us today.  You had three discussions with Rod Rosenstein about your appointment as special counsel:  May 10, May 12, and May 13, correct?

Mr. Mueller.  If you say so.  I have no reason to dispute that.

Mr. McClintock.  Then you met with the President on the 16th with Rod Rosenstein present.  And then on the 17th, you were formally appointed as special counsel.  Were you meeting with the President on the 16th with knowledge that you were under consideration for appointment to special counsel?

Mr. Mueller.  I did not believe I was under consideration for counsel.  I had served two terms as FBI Director --

Mr. McClintock.  The answer is no.

Mr. Mueller.  The answer is no.

Mr. McClintock.  Greg Jarrett describes your office as the team of partisans.  And as additional information is coming to light, there's a growing concern that political bias caused important facts to be omitted from your report in order to cast the President unfairly in a negative light.  For example, John Dowd, the President's lawyer, leaves an message with Michael Flynn's lawyer on November 17 of -- November of 2017.  The edited version in your report makes it appear that he was improperly asking for confidential information, and that's all we know from your report, except that the judge in the Flynn case ordered the entire transcript released in which Dowd makes it crystal clear that's not what he was suggesting.

So my question is, why did you edit the transcript to hide the exculpatory part of the message?

Mr. Mueller.  Well, I'm not sure I would agree with your characterization that we did anything to hide.

Mr. McClintock.  Well, you omitted it.  You quoted the part where he says we need some kind of heads-up just for the sake of protecting all of our interests, if we can, but you omitted the portion where he says without giving up any confidential information.

Mr. Mueller.  Well, I'm not going to go further in terms of discussing the --

Mr. McClintock.  Let's go on.  You extensively discussed Konstantin Kilimnik's activities with Paul Manafort.  And you describe him as, quote, a Russian-Ukrainian political consultant and long-time employee of Paul Manafort assessed by the FBI to have ties to Russian intelligence.  And, again, that's all we know from your report, except we've since learned from news articles that Kilimnik was actually a U.S. State Department intelligence source, yet nowhere in your report is he so identified.  Why was that fact omitted?

Mr. Mueller.  I don't necessarily credit what you're saying occurred.

Mr. McClintock.  Were you aware that Kilimnik was a U.S. State Department source?

Mr. Mueller.  I'm not going to go into the ins and outs -- I'm not going to go into the ins and outs of what we had in the course of our investigation.

Mr. McClintock.  Did you interview Konstantin Kilimnik?

Mr. Mueller.  Pardon?

Mr. McClintock.  Did you interview Konstantin Kilimnik?

Mr. Mueller.  I can't go into the discussion of our investigative moves.

Mr. McClintock.  And yet that is the basis of your report. Again, the problem we're having is we have to rely on your report

for an accurate reflection of the evidence, and we're starting to find out that's not true.

For example, your report famously links Russian internet troll farms with the Russian Government.  Yet at a hearing on May 28 in the Concord Management IRA prosecution that you initiated, the judge excoriated both you and Mr. Barr for producing no evidence to support this claim.  Why did you suggest Russia was responsible for the troll farms, when in court you've been unable to produce any evidence to support it?

Mr. Mueller.  Well, I'm not going to get into that any further than I already have.

Mr. McClintock.  But you have left the clear impression throughout the country through your report that it was the Russian Government behind the troll farms, and yet when you're called upon to provide actual evidence in court, you fail to do so.

Mr. Mueller.  Well, again, I dispute your characterization of what occurred in that proceeding.

Mr. McClintock.  In fact, the judge considered holding the prosecutors in criminal contempt.  She backed off only after your hastily called press conference the next day in which you retroactively made the distinction between the Russian Government and the Russia troll farms.  Did your press conference of May 29 have anything to do with the threat to hold your prosecutors in contempt the previous day for publicly misrepresenting the evidence?

Mr. <u>Mueller.</u>  What was the question?

Mr. <u>McClintock.</u>  The question is, did your May 29 press conference have anything to do with the fact that the previous day, the judge threatened to hold your prosecutors in contempt for misrepresenting evidence?

Mr. <u>Mueller.</u>  No.

Mr. <u>McClintock.</u>  Now, the fundamental problem is, as I said, we've got to take your word.  Your team faithfully, accurately, impartially, and completely described all of the underlying evidence in the Mueller report, and we're finding more and more instances where this just isn't the case.  And it's starting to look like, you know, having desperately tried and failed to make a legal case against the President, you made a political case instead.  You put it in a paper sack, lit it on fire, dropped it on our porch, rang the doorbell and ran.

Mr. <u>Mueller.</u>  I don't think you reviewed a report that is as thorough, as fair, as consistent as the report that we have in front of us.

Mr. <u>McClintock.</u>  Then why is contradictory information --

Chairman <u>Nadler.</u>  The time of the gentleman has expired.

The gentleman from Maryland is recognized.

Mr. <u>Raskin.</u>  Director Mueller, let's go to a fourth episode of obstruction of justice in the form of witness tampering, which is urging witnesses not to cooperate with law enforcement, either by persuading them or intimidating them.  Witness tampering is a

felony punishable by 20 years in prison.  You found evidence that
the President engaged in efforts, and I quote, to encourage
witnesses not to cooperate with the investigation.  Is that right?

    Mr. Mueller.  That's correct.  Have you got a citation?

    Mr. Raskin.  I'm at page 7 on Volume II.

    Mr. Mueller.  Thank you.

    Mr. Raskin.  Now, one of these witnesses was Michael Cohen,
the President's personal lawyer, who ultimately pled guilty to
campaign violations based on secret hush money payments to women
the President knew and also to lying to Congress about the hope
for a $1 billion Trump Tower deal.

    After the FBI searched Cohen's home, the President called him
up personally, he said, to check in, and told him to, quote, hang
in there and stay strong.  Is that right?  Do you remember finding
that?

    Mr. Mueller.  If it's in the report as stated, yes, it is
right.

    Mr. Raskin.  Yes.  Also in the report, actually, are a series
of calls made by other friends of the President.  One reached out
to say he was with the boss at Mar-a-Lago, and the President said
he loves you.  His name is redacted.  Another redacted friend
called to say, the boss loves you.  And the third redacted friend
called to say, everyone knows the boss has your back.

    Do you remember finding that sequence of calls?

    Mr. Mueller.  Generally, yes.

Mr. Raskin.  When the news -- and, in fact, Cohen said that

following the receipt of these messages -- I'm quoting here,

page 147, Volume II -- he believed he had the support of the White

House if he continued to toe the party line, and he determined to

stay on message and be part of the team.  That's at page 147.  Do

you remember generally finding that?

Mr. Mueller.  Generally, yes.

Mr. Raskin.  Well, and Robert Costello, a lawyer close to the

President's legal team, emailed Cohen to say, quote, you are

loved, they're in our corner, sleep well tonight, and you have

friends in high places.  And that's up on the screen, page 147.

Do you remember reporting that?

Mr. Mueller.  I see that.

Mr. Raskin.  Okay.  Now, when the news first broke that Cohen

had arranged payoffs to Stormy Daniels, Cohen faithfully stuck to

this party line.  He said publicly that neither the Trump

Organization nor the Trump campaign was a part of the transaction

and neither reimbursed him.  Trump's personal attorney at that

point quickly texted Cohen to say, quote, client says thank you

for what you do.

Mr. Mueller, who is the capital C client thanking Cohen for

what he does?

Mr. Mueller.  I can't speak to that.

Mr. Raskin.  Okay.  The assumption in the context suggests

very strongly it's President Trump.

Mr. Mueller.  I can't speak to that.

Mr. Raskin.  Okay.  Cohen later broke and pled guilty to campaign finance offenses, and admitted fully they were made, quote, at the direction of candidate Trump.  Do you remember that?

Mr. Mueller.  Yes.

Mr. Raskin.  After Cohen's guilty plea, the President suddenly changed his tune towards Mr. Cohen, didn't he?

Mr. Mueller.  I would say I rely on what's in the report.

Mr. Raskin.  Well, he made the suggestion that Cohen family members had committed crimes.  He targeted, for example, Cohen's father-in-law and repeatedly suggested that he was guilty of committing crimes, right?

Mr. Mueller.  Generally accurate.

Mr. Raskin.  Okay.  On page 154, you give a powerful summary of these changing dynamics, and you said -- I'm happy to have you read it, but I'm happy to do it if not.

Mr. Mueller.  I have it in front of me.  Thank you.

Mr. Raskin.  Would you like to read it?

Mr. Mueller.  I would.

Mr. Raskin.  Can you read it out loud to everybody?

Mr. Mueller.  I would be happy to have you read it out loud.

Mr. Raskin.  Okay.  Very good.  We'll read it at the same time.

The evidence concerning this sequence of events could support an inference that the President used inducements in the form of

positive messages in an effort to get Cohen not to cooperate and then turned to attacks and intimidation to deter the provision of information or to undermine Cohen's credibility once Cohen began cooperating.

Mr. Mueller.  I believe that's accurate.

Mr. Raskin.  Okay.  And in my view, if anyone else in America engaged in these actions, they would have been charged with witness tampering.  We must enforce the principle in Congress that you emphasize so well in the very last sentence of your report, which is that in America, no person is so high as to be above the law.

I yield back, Mr. Chairman.

Chairman Nadler.  The gentleman leads back.

The gentlelady from Arizona.

Mrs. Lesko.  Thank you, Mr. Chairman.

Just recently, Mr. Mueller, you said -- Mr. Lieu was asking you questions.  And Mr. Lieu's question, I quote, the reason you didn't indict the President is because of the OLC opinion.  And you answered, that is correct.  But that is not what you said in the report, and it's not what you told Attorney General Barr.

And, in fact, in a joint statement that you released with DOJ on May 29, after your press conference, your office issued a joint statement with the Department of Justice that said:  The Attorney General has previously stated that the special counsel repeatedly affirmed that he was not saying that but for the OLC opinion he

would have found the President obstructed justice.  The special counsel's report and his statement today made clear that the office concluded it would not reach a determination one way or the other whether the President committed a crime.  There is no conflict between these statements.

So, Mr. Mueller, do you stand by your joint statement with DOJ that you issued on May 29 as you sit here today?

Mr. Mueller.  I would have to look at it more closely before I said I agree with it.

Mrs. Lesko.  Well, so, you know, my conclusion is that what you told Mr. Lieu really contradicts what you said in the report, and specifically what you said apparently repeatedly to Attorney General Barr that -- and then you issued a joint statement on May 29 saying that the Attorney General has previously stated that the special counsel repeatedly affirmed that he was not saying but for the OLC report that we would have found the President obstructed justice, so I just say there's a conflict.

I do have some more questions.  Mr. Mueller, there's been a lot of talk today about firing the special counsel and curtailing the investigation.  Were you ever fired, Mr. Mueller?

Mr. Mueller.  Was I what?

Mrs. Lesko.  Were you ever fired as special counsel, Mr. Mueller?

Mr. Mueller.  Not that I -- no.

Mrs. Lesko.  No.  Were you allowed to complete your

investigation unencumbered?

Mr. <u>Mueller.</u>  Yes.

Mrs. <u>Lesko.</u>  And, in fact, you resigned as special counsel when you closed up the office in late May 2019.  Is that correct?

Mr. <u>Mueller.</u>  That's correct.

Mrs. <u>Lesko.</u>  Thank you.

Mr. Mueller, on April 18, the Attorney General held a press conference in conjunction with the public release of your report. Did Attorney General Barr say anything inaccurate, either in his press conference or his March 24 letter to Congress, summarizing the principal conclusions of your report?

Mr. <u>Mueller.</u>  Well, what you are not mentioning is a letter we sent on March 27 to Mr. Barr that raised some issues, and that letter speaks for itself.

Mrs. <u>Lesko.</u>  But then I don't see how you could -- that could be since AG Barr's letter detailed the principal conclusions of your report, and you have said before that -- that there wasn't anything inaccurate.  In fact, you have this joint statement.  But let me go on to another question.

Mr. Mueller, rather than purely relying on the evidence provided by witnesses and documents, I think you relied a lot on media.  I'd like to know how many times you cited The Washington Post in your report.

Mr. <u>Mueller.</u>  How many times I what?

Mrs. <u>Lesko.</u>  Cited The Washington Post in your report.

Mr. <u>Mueller.</u>  I do not have knowledge of that figure, but I -- well, that's it.  I don't have knowledge of that figure.

Mrs. <u>Lesko.</u>  I counted about 60 times.

How many times did you cite The New York Times?  I counted --

Mr. <u>Mueller.</u>  Again, I have no idea.

Mrs. <u>Lesko.</u>  I counted about 75 times.

How many times did you cite Fox News?

Mr. <u>Mueller.</u>  As with the other two, I have no idea.

Mrs. <u>Lesko.</u>  About 25 times.

I've got to say it looks like Volume II is mostly regurgitated press stories.  Honestly, there's almost nothing in Volume II that I didn't already hear or know simply by having a $50 cable news subscription.  However, your investigation cost the American taxpayers $25 million.

Mr. Mueller, you cited media reports nearly 200 times in your report.  Then in a footnote, a small footnote, No. 7, page 15 of Volume II of your report, you wrote, I quote, this section summarizes and cites various news stories, not for the truth of the information contained in the stories, but rather, to place candidate Trump's response to those stories in context.

Since nobody but lawyers reads footnotes, are you concerned that the American public took the embedded news stories --

Chairman <u>Nadler.</u>  The time of the gentlelady has expired.

The gentlelady from Washington.

Mrs. <u>Lesko.</u>  Can Mr. Mueller answer the question?

Chairman <u>Nadler.</u>  No.  No.  No.  We're running short on time.

I said the gentlelady from Washington.

Ms. <u>Jayapal.</u>  Thank you.

Director Mueller, let's turn to the fifth of the obstruction episodes in your report, and that is the evidence of whether President Trump engaged in witness tampering with Trump campaign chairman Paul Manafort, whose foreign ties were critical to your investigation into Russia's interference in our elections.  And this starts at Volume II, page 123.

Your office got indictments against Manafort and Trump deputy campaign manager Rick Gates in two different jurisdictions, correct?

Mr. <u>Mueller.</u>  Correct.

Ms. <u>Jayapal.</u>  And your office found that after a grand jury indicted them, Manafort told Gates not to plead guilty to any charges because, quote, he had talked to the President's personal counsel, and they were going to take care of us.  Is that correct?

Mr. <u>Mueller.</u>  That's accurate.

Ms. <u>Jayapal.</u>  And according to your report, 1 day after Manafort's conviction on eight felony charges, quote, the President said that flipping was not fair and almost ought to be outlawed.  Is that correct?

Mr. <u>Mueller.</u>  I'm aware of that.

Ms. <u>Jayapal.</u>  In this context, Director Mueller, what does it mean to flip?

UNOFFICIAL COPY

Mr. Mueller.  Have somebody cooperate in a criminal
investigation.

Ms. Jayapal.  And how essential is that cooperation to any
efforts to combat crime?

Mr. Mueller.  I'm not going to go beyond that, characterizing
that effort.

Ms. Jayapal.  Thank you.

In your report, you concluded that President Trump and his
personal counsel, Rudy Giuliani, quote, made repeated statements
suggesting that a pardon was a possibility for Manafort, while
also making it clear that the President did not want Manafort to
flip and cooperate with the government, end quote.  Is that
correct?

Mr. Mueller.  Correct.

Ms. Jayapal.  And as you stated earlier, witness tampering
can be shown where someone with an improper motive encourages
another person not to cooperate with law enforcement.  Is that
correct?

Mr. Mueller.  Correct.

Ms. Jayapal.  Now, on page 123 of Volume II, you also discuss
the President's motive, and you say that as court proceedings
moved forward against Manafort, President Trump, quote, discussed
with aides whether and in what way Manafort might be cooperating
and whether Manafort knew any information that would be harmful to
the President, end quote.  Is that correct?

Mr. <u>Mueller.</u>  And that was a quote from?

Ms. <u>Jayapal.</u>  From page 123, Volume II.

Mr. <u>Mueller.</u>  I have that.  Thank you.  Yes.

Ms. <u>Jayapal.</u>  And when someone tries to stop another person from working with law enforcement and they do it because they're worried about what that person will say, it seems clear from what you wrote that this is a classic definition of witness tampering.

Now, Mr. Manafort did eventually decide to cooperate with your office, and he entered into a plea agreement, but then he broke that agreement.  Can you describe what he did that caused you to tell the court that the agreement was off?

Mr. <u>Mueller.</u>  I refer you to the court proceedings on that issue.

Ms. <u>Jayapal.</u>  So on page 127 of Volume II, you told the court that Mr. Manafort lied about a number of matters that were material to the investigation, and you said that Manafort's lawyers also, quote, regularly briefed the President's lawyers on topics discussed and the information that Manafort had provided in interviews with the Special Counsel's Office.  Does that sound right?

Mr. <u>Mueller.</u>  And the source of that is?

Ms. <u>Jayapal.</u>  That's page 127, Volume II.  That's a direct quote.

Mr. <u>Mueller.</u>  If it's from the report, yes, I support it.

Ms. <u>Jayapal.</u>  Thank you.

And 2 days after you told the court that Manafort broke his plea agreement by lying repeatedly, did President Trump tell the press that Mr. Manafort was, quote, very brave because he did not flip?  This is page 128 of Volume II.

Mr. Mueller.  If it's in the report, I support it as it is -- as it is set forth.

Ms. Jayapal.  Thank you.

Director Mueller, in your report, you make a very serious conclusion about the evidence regarding the President's involvement with the Manafort criminal proceedings.  Let me read to you from your report.

Evidence concerning the President's conduct toward Manafort indicates that the President intended to encourage Manafort to not cooperate with the government.  It is clear that the President, both publicly and privately, discouraged Mr. Manafort's cooperation or flipping, while also dangling the promise of a pardon if he stayed loyal and did not share what he knew about the President.  Anyone else who did these things would be prosecuted for them.  We must ensure that no one is above the law.

And I thank you for being here, Director Mueller.

I yield back.

Chairman Nadler.  The gentleman from Pennsylvania.

Mr. Reschenthaler.  Thank you, Mr. Chairman.

Mr. Mueller, I'm over here.  I'm sorry.

Mr. Mueller, are you familiar with the now expired

Independent Counsel Statute?  It's the statute under which Ken
Starr was appointed.

    Mr. Mueller.  That Ken Starr did what?  I'm sorry.

    Mr. Reschenthaler.  Are you familiar with the Independent
Counsel Statute?

    Mr. Mueller.  Are you talking about the one we're operating
now or a previous?

    Mr. Reschenthaler.  No, under which Ken Starr was appointed.

    Mr. Mueller.  I am not that familiar with that, but I'd be
happy to take your question.

    Mr. Reschenthaler.  Well, the Clinton administration allowed
the Independent Counsel Statute to expire after Ken Starr's
investigation.  The final report requirement was a major reason
why the statute was allowed to expire.  Even President Clinton's
AG, Janet Reno, expressed concerns about the final report
requirement.  And I will quote AG Reno.

    She said:  On one hand, the American people have an interest
in knowing the outcome of an investigation of their highest
officials.  On the other hand, the report requirement cuts against
many of the most basic traditions and practices of American law
enforcement.  Under our system, we presume innocence, and we value
privacy.  We believe that information obtained during criminal
investigations should, in most cases, be made public only if
there's an indictment and prosecution, not in a lengthy and
detailed report filed after a decision has been made not to

prosecute.  The final report provides a forum for unfairly airing
any target's dirty laundry.  It also creates yet another incentive
for an independent counsel to overinvestigate in order to justify
his or her tenure and to avoid criticism that the independent
counsel may have left a stone unturned.

Again, Mr. Mueller, those are AG Reno's words.  Didn't you do
exactly what AG Reno feared?  Didn't you publish a lengthy report
unfairly airing the target's dirty laundry without recommending
charges?

Mr. Mueller.  I disagree with that, and I -- may I finish?

Mr. Reschenthaler.  Did any of your witnesses have a chance
to be cross-examined?

Mr. Mueller.  Can I just finish my answer on this?

Mr. Reschenthaler.  Quickly.

Mr. Mueller.  I operate under the current statute, not the
original statute, so I am most familiar with the current statute,
not the older statute.

Mr. Reschenthaler.  Did any of the witnesses have a chance to
be cross-examined?

Mr. Mueller.  Did any of the witnesses in our investigation?

Mr. Reschenthaler.  Yes.

Mr. Mueller.  I'm not going to answer that.

Mr. Reschenthaler.  Did you allow the people mentioned in
your report to challenge how they were characterized?

Mr. Mueller.  I'm not going to get into that.

Mr. Reschenthaler.   Okay.  Given that AG Barr stated multiple times during his confirmation hearing that he would make as much of your report public as possible, did you write your report knowing that it would likely be shared with the public?

Mr. Mueller.  No.

Mr. Reschenthaler.  Did knowing that the report could and likely would be made public, did that alter the contents which you included?

Mr. Mueller.  I can't speak to that.

Mr. Reschenthaler.  Despite the expectations that your report would be released to the public, you left out significant exculpatory evidence, in other words, evidence favorable to the President, correct?

Mr. Mueller.  Well, I actually would disagree with you.  I think we strove to put into the report the exculpatory evidence as well.

Mr. Reschenthaler.  One of my colleagues got into that with you where you said there was evidence you left out.

Mr. Mueller.  Well, you make a choice as to what goes into an indictment.

Mr. Reschenthaler.  Isn't it true, Mr. Mueller, isn't it true that on page 1 of Volume II, you state when you're quoting the statute you have an obligation to either prosecute or not prosecute?

Mr. Mueller.  Well, generally that is the case, although most

cases are not done in the context of the President.

Mr. Reschenthaler.  And in this case, you made a decision not to prosecute, correct?

Mr. Mueller.  No.  We made a decision not to decide whether to prosecute or not.

Mr. Reschenthaler.  So, essentially, what your report did was everything that AG Reno warned against?

Mr. Mueller.  I can't agree with that characterization.

Mr. Reschenthaler.  Well, what you did is you compiled nearly 450 pages of the very worst information you gathered against the target of your investigation, who happens to be the President of the United States, and you did this knowing that you were not going to recommend charges and that the report would be made public.

Mr. Mueller.  Not true.

Mr. Reschenthaler.  Mr. Mueller, as a former officer in the United States JAG Corps, I prosecuted nearly 100 terrorists in a Baghdad courtroom.  I cross-examined the butcher of Fallujah in defense of our Navy SEALS.  As a civilian, I was elected a magisterial district judge in Pennsylvania, so I am very well versed in the American legal system.

The drafting and the publication of some of the information in this report without an indictment, without prosecution, frankly, flies in the face of American justice.  And I find those facts and this entire process un-American.

I yield the remainder of my time to my colleague, Jim Jordan.

Mr. <u>Jordan.</u>  Director Mueller, the third FISA renewal happens a month after you're named special counsel.  What role did your office play in the third FISA renewal of Carter Page?

Mr. <u>Mueller.</u>  I'm not going to talk to that.

Chairman <u>Nadler.</u>  The time of the gentleman has expired.

The gentlelady from Florida.

Mrs. <u>Demings.</u>  Director Mueller, a couple of my colleagues -- right here -- wanted to talk to you or ask you about lies, so let's talk about lies.  According to your report, page 9, Volume I, witnesses lied to your office and to Congress.  Those lies materially impaired the investigation of Russia interference, according to your report.

Other than the individuals who pled guilty to crimes based on their lying to you and your team, did other witnesses lie to you?

Mr. <u>Mueller.</u>  I think there are probably a spectrum of witnesses in terms of those who are not telling the full truth and those who are outright liars.

Mrs. <u>Demings.</u>  Thank you very much.

Outright liars.  It is fair to say, then, that there were limits on what evidence was available to your investigation of both Russia election interference and obstruction of justice?

Mr. <u>Mueller.</u>  That's true and is usually the case.

Mrs. <u>Demings.</u>  And that lies about Trump campaign officials and administration officials impeded your investigation?

Mr. <u>Mueller.</u>  I would generally agree with that.

Mrs. <u>Demings.</u>  Thank you so much, Director Mueller.  You will be hearing more from me in the next hearing.

So I yield the balance of my time to Mr. Correa.  Thank you.

Mr. <u>Correa.</u>  Mr. Mueller, first of all, let me welcome you. Thank you for your service to our country.  You're a hero, Vietnam war vet, a wounded war vet.  We won't forget your service to our country.

Mr. <u>Mueller.</u>  Thank you, sir.

Mr. <u>Correa.</u>  If I may begin.  Because of time limits, we have gone in depth on only five possible episodes of obstruction. There's so much more, and I want to focus on another section of obstruction, which is the President's conduct concerning Michael Flynn, the President's National Security Advisor.

In early 2017, the White House Counsel and the President were informed that Mr. Flynn had lied to government authorities about his communications with the Russian Ambassador during the Trump campaign and transition.  Is this correct?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Correa.</u>  If a hostile nation knows that a U.S. official has lied publicly, that can be used to blackmail that government official, correct?

Mr. <u>Mueller.</u>  I'm not going to speak to that.  I don't disagree with it necessarily, but I'm not going to speak any more to that issue.

Mr. <u>Correa.</u>  Thank you very much, sir.

Flynn resigned on February 13, 2016, and the very next day, when the President was having lunch with New Jersey Governor Chris Christie, did the President say, open quotes, now that we fired Flynn, the Russia thing is over, close quote?  Is that correct?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Correa.</u>  And is it true that Christie responded by saying, open quotes, no way, and this Russia thing is far from over, close quote?

Mr. <u>Mueller.</u>  That's the way we have it in the report.

Mr. <u>Correa.</u>  Thank you.

And after the President met with Christie, later that same day, the President arranged to meet with then FBI Director James Comey alone in the Oval Office, correct?

Mr. <u>Mueller.</u>  Correct, particularly if you have the citation to the report.

Mr. <u>Correa.</u>  Page 39-40, Volume II.

Mr. <u>Mueller.</u>  Thank you very much.

Mr. <u>Correa.</u>  And according to Comey, the President told him, open quote, I hope you can see your way clear to letting this thing go, to letting Flynn go.  He's a good guy, and I hope you can let it go, close quote.  Page 40, Volume II.

Mr. <u>Mueller.</u>  Accurate.

Mr. <u>Correa.</u>  What did Comey understand the President to be asking?

Mr. Mueller.  I'm not going to get into what was in Mr. Comey's mind.

Mr. Correa.  Comey understood this to be a direction because of the President's position and the circumstances of the one-to-one meeting?  Page 40, Volume II.

Mr. Mueller.  Well, I understand it's in the report, and I support it as being in the report.

Mr. Correa.  Thank you, sir.

Even though the President publicly denied telling Comey to drop the investigation, you found, open quote, substantial evidence corroborating Comey's account over the President's.  Is this correct?

Mr. Mueller.  That's correct.

Mr. Correa.  The President fired Comey on May 9.  Is that correct, sir?

Mr. Mueller.  I believe that's the accurate date.

Mr. Correa.  That's page 77, Volume II.

You found substantial evidence that the catalyst for the President's firing of Comey was Comey's, open quote, unwillingness to publicly state that the President was not personally under investigation.

Mr. Mueller.  I'm not going to delve more into the details of what happened.  If it's in the report, again, I'll support it because it's already been reviewed and appropriately appears in the report.

Mr. Correa.  And that's page 75, Volume II.

Mr. Mueller.  Thank you.

Mr. Correa.  Thank you.

And, in fact, the very next day, the President told the
Russian foreign minister, open quote, I just fired the head of the
FBI.  He was crazy, a real nut job.  I faced great pressure
because of Russia.  That's taken off.  I'm not under
investigation, close quote.  Is that correct?

Mr. Mueller.  If that's what was written in the report, yes.

Chairman Nadler.  The time of the gentleman has expired.

Mr. Correa.  Thank you, sir.

Chairman Nadler.  The gentleman from Virginia.

Mr. Cline.  Thank you, Mr. Chairman.

Mr. Mueller, we've heard a lot about what you're not going to
talk about today.  So let's talk about something that you should
be able to talk about, the law itself, the underlying obstruction
statute and your creative legal analysis of the statutes in Volume
II, particularly an interpretation of 18 U.S.C. 1512 C.
Section 1512 C is an obstruction of justice statute created as
part of auditing financial regulations for public companies.  And
as you write on page 164 of Volume II, this provision was added as
a floor amendment in the Senate and explained as closing a certain
loophole with respect to document shredding.

And to read the statute, whoever corruptly alters, destroys,
mutilates, or conceals a record, document, or other object or

attempts to do so with the intent to impair the object's integrity or availability for use in an official proceeding or otherwise obstructs, influences, or impedes any official proceeding or attempts to do so shall be fined under the statute and imprisoned not more than 20 years or both.

Your analysis and application of the statute proposes to give clause C2 a much broader interpretation than commonly used. First, your analysis proposes to read clause C2 in isolation, reading it as a freestanding, all-encompassing provision prohibiting any act influencing a proceeding if done with an improper motive.  And second, your analysis of the statute proposes to apply the sweeping prohibition to lawful acts taken by public officials exercising their discretionary powers if those acts influence a proceeding.

So, Mr. Mueller, I'd ask you, in analyzing the obstruction, you state that you recognize that the Department of Justice and the courts have not definitively resolved these issues, correct?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Cline.</u>  You would agree that not everyone in the Justice Department agreed with your legal theory of the obstruction of justice statute, correct?

Mr. <u>Mueller.</u>  I'm not going to be involved in a discussion on that at this juncture.

Mr. <u>Cline.</u>  In fact, the Attorney General himself disagrees with your interpretation of the law, correct?

Mr. <u>Mueller.</u>  I leave that to the Attorney General to
identify.

Mr. <u>Cline.</u>  And you would agree that prosecutors sometimes
incorrect apply the law, correct?

Mr. <u>Mueller.</u>  I would have to agree with that one, yes.

Mr. <u>Cline.</u>  And members of your legal team, in fact, have had
convictions overturned because they were based on an incorrect
legal theory, correct?

Mr. <u>Mueller.</u>  I don't know to what you aver.  We've all spent
time in the trenches trying cases and not won every one of those
cases.

Mr. <u>Cline.</u>  Well, let me ask you about one in particular.
One of your top prosecutors, Andrew Weissmann, obtained a
conviction against auditing firm Arthur Andersen, lower court,
which was subsequently overturned in a unanimous Supreme Court
decision that rejected the legal theory advanced by Weissmann,
correct?

Mr. <u>Mueller.</u>  Well, I'm not going to get into that, delve
into that.

Mr. <u>Cline.</u>  Well, let me read from that and maybe it will --

Mr. <u>Mueller.</u>  May I just finish?  May I just finish --

Mr. <u>Cline.</u>  Yes.

Mr. <u>Mueller.</u>  -- my answer to say that I'm not going to
be -- get involved in a discussion on that.  I will refer you to
that citation that you gave me at the outset for the lengthy

discussion on just what you're talking about.  And to the extent
that I have anything to say about it, it is what we've already put
into the report on that issue.

    Mr. Cline.  I am reading from your report when discussing
this section.  I will read from the decision of the Supreme Court
unanimously reversing Mr. Weissmann when he said, indeed, it's
striking how little culpability the instructions required.  For
example, the jury was told that even if petitioner honestly and
sincerely believed its conduct was lawful, the jury could convict.
The instructions also diluted the meaning of corruptly such that
it covered innocent conduct.

    Mr. Mueller.  Well, let me just say --

    Mr. Cline.  Let me move on.  I have limited time.

    Your report takes the broadest possible reading of this
provision in applying it to the President's official acts, and I'm
concerned about the implications of your theory for
overcriminalizing conduct by public officials and private citizens
alike.

    So to emphasize how broad your theory of liability is, I want
to ask you about a few examples.  On October 11, 2015, during an
FBI investigation into Hillary Clinton's use of a private email
server, President Obama said, I don't think it posed a national
security problem.  And he later said, I can tell you that this is
not a situation in which America's national security was
endangered.

Assuming for a moment that his comments did influence the investigation, couldn't President Obama be charged, under your interpretation, with obstruction of justice?

Mr. Mueller.  Well, again, I'd refer you to the report.  But let me say with Andrew Weissmann, who is one of the more talented attorneys that we have on board --

Mr. Cline.  Okay.  Well, I'll take that as --

Mr. Mueller.  -- over a period of time, he has run a number of units.

Mr. Cline.  I have very little time.

In August 2015, a very senior DOJ official called FBI Deputy Director Andrew McCabe expressing concern that FBI agents were still openly pursuing the Clinton Foundation probe.  The DOJ official was apparently very pissed off, quote/unquote.  McCabe questioned this official, asking, are you telling me I need to shut down a validly predicated investigation, to which the official replied, of course not.

This seems to be a clear example of somebody within the executive branch attempting to influence an FBI investigation.  So under your theory, couldn't that person be charged with obstruction as long as the prosecutor could come up with a potentially corrupt motive?

Mr. Mueller.  I refer you to our lengthy dissertation on exactly those issues that appears at the end of the report.

Mr. Cline.  Mr. Mueller, I'd argue that it says above the

Supreme Court equal justice --

Chairman <u>Nadler.</u>  The time of the gentleman has expired.

Our intent was to conclude this hearing in 3 hours.  Given the break, that would bring us to approximately 11:40.  With Director Mueller's indulgence, we will be asking our remaining Democratic members to voluntarily limit their time below the 5 minutes so that we can complete our work as close to that timeframe as possible.

And I recognize the gentlelady from Pennsylvania.

Ms. <u>Scanlon.</u>  Thank you.

Director Mueller, I want to ask you some questions about the President's statements regarding advance knowledge of the WikiLeaks dumps.  So the President refused to sit down with your investigators for an in-person interview, correct?

Mr. <u>Mueller.</u>  Correct.

Ms. <u>Scanlon.</u>  So the only answers we have to questions from the President are contained in Appendix C to your report?

Mr. <u>Mueller.</u>  That's correct.

Ms. <u>Scanlon.</u>  Okay.  So looking at Appendix C on page 5, you asked the President over a dozen questions about whether he had knowledge that WikiLeaks possessed or might possess the emails that were stolen by the Russians.

Mr. <u>Mueller.</u>  I apologize.

Ms. <u>Scanlon.</u>  Sure.

Mr. <u>Mueller.</u>  Can you start it again?

Ms. <u>Scanlon.</u>  Okay.  Sure.

Mr. <u>Mueller.</u>  Thank you.

Ms. <u>Scanlon.</u>  So we are looking at Appendix C.

Mr. <u>Mueller.</u>  Right.

Ms. <u>Scanlon.</u>  And at Appendix C, page 5, you ask the President about a dozen questions about whether he had knowledge that WikiLeaks possessed the stolen emails that might be released in a way helpful to his campaign or harmful to the Clinton campaign.  Is that correct?  You asked those questions?

Mr. <u>Mueller.</u>  Yes.

Ms. <u>Scanlon.</u>  Okay.  In February of this year, Mr. Trump's personal attorney, Michael Cohen, testified to Congress under oath that, quote:  Mr. Trump knew from Roger Stone in advance about the WikiLeaks drop of emails, end quote.

That is a matter of public record, isn't it?

Mr. <u>Mueller.</u>  Well, are you referring to the report or some other public record?

Ms. <u>Scanlon.</u>  This was testimony before Congress by Mr. Cohen.  Do you know if he told you --

Mr. <u>Mueller.</u>  I am not familiar with -- explicitly familiar with what he testified to before Congress.

Ms. <u>Scanlon.</u>  Okay.  Let's look at an event described on page 18 of Volume II of your report.  Now, according -- and we are going to put it up in a slide, I think.  According to Deputy Campaign Manager Rick Gates, in the summer of 2016, he and

candidate Trump were on the way to an airport shortly after
WikiLeaks released its first set of stolen emails.  And Gates told
your investigators that candidate Trump was on a phone call, and
when the call ended, Trump told Gates that more releases of
damaging information would be coming, end quote.  Do you recall
that from the report?

     Mr. Mueller.  If it is in the report, I support it.

     Ms. Scanlon.  Okay.  And that is on page 18 of Volume II.
Now, on page 77 of Volume II, your report also stated, quote:  In
addition, some witnesses said that Trump privately sought
information about future WikiLeaks releases, end quote.  Is that
correct?

     Mr. Mueller.  Correct.

     Ms. Scanlon.  Now, in Appendix C where the President did
answer some written questions, he said, quote:  I do not recall
discussing WikiLeaks with him, nor do I recall being aware of
Mr. Stone having discussed WikiLeaks with individuals associated
with my campaign, end quote.  Is that correct?

     Mr. Mueller.  If it is from the report, it is correct.

     Ms. Scanlon.  Okay.  So is it fair to say the President
denied ever discussing WikiLeaks with Mr. Stone and denied being
aware that anyone associated with his campaign discussed WikiLeaks
with Stone?

     Mr. Mueller.  I am sorry.  Could you repeat that one?

     Ms. Scanlon.  Is it fair, then, that the President denied

knowledge of himself or anyone else discussing WikiLeaks dumps
with Mr. Stone?

Mr. Mueller. Yes.  Yes.

Ms. Scanlon. Okay.  And, with that, I would yield back.

Mr. Mueller. Thank you, ma'am.

Chairman Nadler.  The gentlelady yields back.

The gentleman from Florida.

Mr. Steube. Thank you, Mr. Chair.

Mr. Mueller, did you indeed interview for the FBI Director
job one day before you were appointed as special counsel?

Mr. Mueller.  In my understanding, I was not applying for the
job.  I was asked to give my input on what it would take to do the
job, which triggered the interview you are talking about.

Mr. Steube.  So you don't recall on May 16, 2017, that you
interviewed with the President regarding the FBI Director job?

Mr. Mueller.  I interviewed with the President, but it wasn't
about the Director job.

Mr. Steube.  The FBI Director job?

Mr. Mueller.  It was about the job but not about me applying
for the job.

Mr. Steube.  So your statement here today is that you didn't
interview to apply for the FBI Director job?

Mr. Mueller.  That is correct.

Mr. Steube.  So did you tell the Vice President that the FBI
Director position would be the one job that you would come back

for?

Mr. Mueller.  I don't recall that one.

Mr. Steube.  You don't recall that?

Mr. Mueller.  No.

Mr. Steube.  Okay.  Given your 22 months of investigation, tens of millions of dollars spent, and millions of documents reviewed, did you obtain any evidence at all that any American voter changed their vote as a result of Russian's election interference?

Mr. Mueller.  I can't speak to that.

Mr. Steube.  You can't speak to that?

Mr. Mueller.  No.

Mr. Steube.  After 22 months of investigation, there is not any evidence in that document before us that any voter changed their vote because of their interference, and I am asking you based on all of the documents that you reviewed.

Mr. Mueller.  That was outside our purview.

Mr. Steube.  Russian meddling was outside your purview?

Mr. Mueller.  The impact of that meddling was undertaken by other agencies.

Mr. Steube.  Okay.  You stated in your opening statement that you would not get into the details of the Steele dossier. However, multiple times in Volume II on page 23, 27, and 28, you mentioned the unverified allegations.  How long did it take you to reach the conclusion that it was unverified?

Mr. Mueller.  I am not going to speak to that.

Mr. Steube.  It is actually in your report multiple times as unverified, and you are telling me that you are not willing to tell us how you came to the conclusion that it was unverified?

Mr. Mueller.  True.

Mr. Steube.  When did you become aware that the unverified Steele dossier was included in the FISA application to spy on Carter Page?

Mr. Mueller.  I am sorry.  What was the question?

Mr. Steube.  When did you become aware that the unverified Steele dossier was intended -- was included in the FISA application to spy on Carter Page?

Mr. Mueller.  I am not going to speak to that.

Mr. Steube.  Your team interviewed Christopher Steele.  Is that correct?

Mr. Mueller.  I am not going to get into that.  As I said at the outset --

Mr. Steube.  You can't tell this committee as to whether or not you interviewed Christopher Steele in a 22-month investigation with 18 lawyers?

Mr. Mueller.  As I said at the outset, that is one of those -- one of the investigations that is being handled by others in the Department of Justice.

Mr. Steube.  Yeah, but you're here testifying about this investigation today, and I am asking you directly, did any members

of your team or did you interview Christopher Steele in the course
of your investigation?

Mr. <u>Mueller.</u>  And I am not going to answer that question,
sir.

Mr. <u>Steube.</u>  You had 2 years to investigate.  Not once did
you consider or even investigate how an unverified document that
was paid for by a political opponent was used to obtain a warrant
to spy on the opposition political campaign.  Did you do any
investigation on that whatsoever?

Mr. <u>Mueller.</u>  I do not accept your characterization of what
occurred.

Mr. <u>Steube.</u>  What would be your characterization?

Mr. <u>Mueller.</u>  I am not going to speak any more to it.

Mr. <u>Steube.</u>  So you can't speak any more to it, but you are
not going to agree with my characterization.  Is that correct?

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Steube.</u>  The FISA application makes reference to Source
1, who is Christopher Steele, the author of the Steele dossier.
The FISA application says nothing Source 1's reason for conducting
the research into Candidate 1's ties to Russia based on Source 1's
previous reporting history with FBI whereby Source 1 provided
reliable information to the FBI.  The FBI believes Source 1's
reporting herein to be credible.  Do you believe the FBI's
representation that Source 1's reporting was credible to be
accurate?

Mr. Mueller.  I am not going to answer that.

Mr. Steube.  So you are not going to respond to any of the questions regarding Christopher Steele or your interviews with him?

Mr. Mueller.  Well, as I said at the outset this morning, that was one of the investigations that I could not speak to.

Mr. Steube.  Well, I don't understand how if you interviewed an individual in the purview of this investigation that you are testifying to us today that you've closed that investigation, how that is not within the purview to tell us about that investigation and who you interviewed.

Mr. Mueller.  I have nothing to add.

Mr. Steube.  Okay.  Well, I can guarantee that the American people want to know, and I am very hopeful and glad that AG Barr is looking into this and the inspector general is looking into this because you are unwilling to answer the questions of the American people as it relates to the very basis of this investigation into the President and the very basis of this individual who you did interview.  You are just refusing to answer those questions.  Can't the President fire the FBI Director at any time without reason under Article I of the Constitution?

Mr. Mueller.  Yes.

Mr. Steube.  Article II.

Mr. Mueller.  Yes.

Mr. Steube.  That is correct.  Can he also fire you as

special counsel at any time without any reason?

Mr. Mueller.  I believe that to be the case.

Mr. Steube.  Under Article II.

Mr. Mueller.  Well, hold on just a second.  You said without any reason.  I know that special counsel can be fired, but I am not sure it extends to whatever reason is given.

Mr. Steube.  Well, and you've testified that you weren't fired.  You were able to complete your investigation in full.  Is that correct?

Mr. Mueller.  I am not going to add to what I have stated before.

Mr. Steube.  My time has expired.

Chairman Nadler.  The gentleman's time has expired.

The gentlelady from Pennsylvania -- from Texas.

Ms. Garcia.  Thank you, Mr. Chairman, and thank you, Mr. Mueller, for being with us.  It is close to the afternoon now.

Director Mueller, now I would like to ask you about the President's answers relating to Roger Stone.  Roger Stone was indicted for multiple Federal crimes, and the indictment alleges that Mr. Stone discussed future WikiLeaks email releases with the Trump campaign.  Understanding there is a gag order on the Stone case, I will keep my questions restricted to publicly available information.  Mr. Stone's --

Mr. Mueller.  Let me just say at the outset.  I don't mean to disrupt you, but I am not -- I would like some demarcation of that

which is applicable to this but also in such a way that it does
not hinder the other prosecution that is taking place in D.C.

Ms. Garcia.  I understand that.  I am only going to be
talking about the questions that you asked in writing to the
President --

Mr. Mueller.  Thank you, ma'am.

Ms. Garcia.  -- that relate to Mr. Stone.  Mr. Stone's
indictment states, among other things, the following quote:  Stone
was contacted by senior Trump officials to inquire about future
releases of Organization 1, Organization 1 being WikiLeaks.  The
indictment continues, quote:  Stone thereafter told the Trump
campaign about potential future release of damaging material by
WikiLeaks.  So, in short, the indictment alleges that Stone was
asked by the Trump campaign to get information about more
WikiLeaks releases and that Stone, in fact, did tell the Trump
campaign about potential future releases, correct?

Mr. Mueller.  Yes, ma'am, but I see you are quoting from the
indictment.  Even though the indictment is a public document, I
feel uncomfortable discussing anything having to do with the Stone
prosecution.

Ms. Garcia.  Right.  The indictment is of record, and we
pulled it off the --

Mr. Mueller.  I understand.

Ms. Garcia.  I am reading straight from it.  Well, turning
back to the President's answers to your questions, then, on this

very subject, the President denied ever discussing future

WikiLeaks releases with Stone and denied knowing whether anyone

else on his campaign had those discussions with Stone.  If you had

learned that other witnesses -- putting aside the President, if

other witnesses had lied to your investigators in response to

specific questions, whether in writing or in an interview, could

they be charged with false statement crimes?

Mr. Mueller.  Well, I am not going to speculate.  I think you

are asking for me to speculate given a set of circumstances.

Ms. Garcia.  Well, let's make it more specific.  What if I

had made a false statement to an investigator on your team?  Could

I go to jail for up to 5 years?

Mr. Mueller.  Yes.

Ms. Garcia.  Yes.

Mr. Mueller.  Well, although -- it is Congress, so --

Ms. Garcia.  Well, that is the point, though, isn't it, that

no one is above the law?

Mr. Mueller.  That is right.

Ms. Garcia.  Not you, not the Congress, and certainly not the

President.  And I think it is just troubling to have to hear some

of these things, and that is why the American people deserve to

learn the full facts of the misconduct described in your report

for which any other person would have been charged with crimes.

So thank you for being here, and again, the point has been

underscored many times, but I will repeat it.  No one is above the

law.  Thank you.

Mr. Mueller.  Thank you, ma'am.

Chairman Nadler.  The gentleman from North Dakota is
recognized.

Mr. Armstrong.  Mr. Mueller, how many people did you fire?
How many people on your staff did you fire during the course of
the investigation?

Mr. Mueller.  How many people?

Mr. Armstrong.  Did you fire?

Mr. Mueller.  I am not going to discuss that.

Mr. Armstrong.  According to the inspector general's report,
Attorney No. 2 was let go, and we know Peter Strzok was let go,
correct?

Mr. Mueller.  Yes, and there may have been other persons on
other issues that have been either transferred or fired.

Mr. Armstrong.  Peter Strzok testified before this committee
on July 12, 2018, that he was fired because you were concerned
about preserving the appearance of independence.  Do you agree
with his testimony?

Mr. Mueller.  Say that again, if you could.

Mr. Armstrong.  He said he was fired at least partially
because you were worried about, concerned about preserving the
appearance of independence with the special counsel's
investigation.  Do you agree with that statement?

Mr. Mueller.  The statement was by whom?

Mr. Armstrong.  Peter Strzok at this hearing.

Mr. Mueller.  I am not familiar with that.

Mr. Armstrong.  Did you fire him because you were worried about the appearance of independence of the investigation?

Mr. Mueller.  No.  He was transferred as a result of instances involving texts.

Mr. Armstrong.  Do you agree that your office did not only have an obligation to operate with independence but to operate with the appearance of independence as well?

Mr. Mueller.  Absolutely.  We strove to do that over the 2 years.

Mr. Armstrong.  Andrew Weissmann --

Mr. Mueller.  Part of that was making certain that --

Mr. Armstrong.  Andrew Weissmann is one of your top attorneys.

Mr. Mueller.  Yes.

Mr. Armstrong.  Did Weissmann have a role in selecting other members of your team?

Mr. Mueller.  He had some role but not a major role.

Mr. Armstrong.  Andrew Weissmann attended a Hillary Clinton's election night party.  Did you know that before or after he came onto the team?

Mr. Mueller.  I don't know when I found that out.

Mr. Armstrong.  On January 30, 2017 Weissmann wrote an email to Deputy Attorney General Yates stating,

"I am so proud and in awe," regarding her disobeying a direct order from the President.

Did Weissmann disclose that email to you before he joined the team?

Mr. <u>Mueller.</u>  I am not going to talk about that.

Mr. <u>Armstrong.</u>  Is that not a conflict of interest?

Mr. <u>Mueller.</u>  I am not going to talk about that.

Mr. <u>Armstrong.</u>  Are you aware that Ms. Jeannie Rhee represented Hillary Clinton in litigation regarding personal emails originating from Clinton's time as Secretary of State?

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Armstrong.</u>  Did you know that before she came on the team?

Mr. <u>Mueller.</u>  No.

Mr. <u>Armstrong.</u>  Aaron Zebley, the guy sitting next to you, represented Justin Cooper, a Clinton aide, who destroyed one of Clinton's mobile devices.  And you must be aware by now that six of your lawyers donated $12,000 directly to Hillary Clinton.  I am not even talking about the $49,000 they donated to other Democrats, just the donations to the opponent who was the target of your investigation.

Mr. <u>Mueller.</u>  Can I speak for a second to the hiring practices?

Mr. <u>Armstrong.</u>  Sure.

Mr. <u>Mueller.</u>  We strove to hire those individuals that could

do the job.

Mr. Armstrong.  Okay.

Mr. Mueller.  I've been in this business for almost 25 years. And in those 25 years, I have not had occasion once to ask somebody about their political affiliation.  It is not done.  What I care about is the capability of the individual to do the job and do the job quickly and seriously and with integrity.

Mr. Armstrong.  But that is what I am saying, Mr. Mueller. This isn't just about you being able to vouch for your team.  This is about knowing that the day you accepted this role, you had to be aware, no matter what this report concluded, half of the country was going to be skeptical of your team's findings, and that is why we have recusal laws that define bias and perceived bias for this very reason.  28 United States Code 528 specifically lists not just political conflict of interest but the appearance of political conflict of interest.  It is just simply not enough that you vouch for your team.  The interest of justice demands that no perceived bias exist.  I can't imagine a single prosecutor or judge that I have ever appeared in front of would be comfortable with these circumstances where over half of the prosecutorial team had a direct relationship to the opponent of the person being investigated.

RPTR ZAMORA

EDTR ZAMORA

[11:43 a.m.]

Mr. Mueller.  Let me -- one other fact that I put on the table, and that is we hired 19 lawyers over a period of time.  Of those 19 lawyers, 14 of them were transferred from elsewhere in the Department of Justice.  Only five came from outside.  So we did not have --

Mr. Armstrong.  And half of them had a direct relationship, political or personal, with the opponent of the person you were investigating.  And that's my point.  I wonder if not a single word in this entire report was changed, but rather, the only difference was we switched Hillary Clinton and President Trump.

If Peter Strzok had texted those terrible things about Hillary Clinton instead of President Trump, if a team of lawyers worked for, donated thousands of dollars to, and went to Trump's parties instead of Clinton's, I don't think we'd be here trying to prop up an obstruction allegation.

My colleagues would have spent the last 4 months accusing your team of being bought and paid for by the Trump campaign and we couldn't trust a single word of this report.  They would still be accusing the President of conspiracy with Russia, and they would be accusing your team of aiding and abetting with that conspiracy.

And with that, I yield back.

Chairman Nadler.  The gentleman yields back.

The gentleman from Colorado.

Mr. Neguse.  Director Mueller, thank you for your service to our country.  I'd like to talk to you about one of the other incidents of obstruction, and that's the evidence in your report showing the President directing his son and his communications director to issue a false public statement in June of 2017 about a meeting between his campaign and Russian individuals at Trump Tower in June of 2016.

According to your report, Mr. Trump, Jr. was the only Trump associate who participated in that meeting and who declined to be voluntarily interviewed by your office.  Is that correct?

Mr. Mueller.  Yes.

Mr. Neguse.  Did Mr. Trump, Jr. or his counsel ever communicate to your office any intent to invoke his Fifth Amendment right against self-incrimination?

Mr. Mueller.  I'm not going to answer that.

Mr. Neguse.  You did pose written questions to the President about his knowledge of the Trump Tower meeting.  You included -- also asked him about whether or not he had directed a false press statement.  The President did not answer at all that question, correct?

Mr. Mueller.  I don't have it in front of me.  I take your word.

Mr. Neguse.  I can represent to you that appendix C,
specifically C13, states as much.

According to page 100 of Volume II of your report, your
investigation found that Hope Hicks, the President's
communications director, in June of 2017 was shown emails that set
up the Trump Tower meeting, and she told your office that she was,
quote, shocked by the emails because they looked, quote, really
bad.  True?

Mr. Mueller.  Do you have the citation?

Mr. Neguse.  Sure.  It's page 100 of Volume II.

While you're flipping to that page, Director Mueller, I will
also tell you that according to page 99 of Volume II, those emails
in question stated, according to your report, that the crown
prosecutor of Russia had offered to provide the Trump campaign
with some official documents and information that would
incriminate Hillary and her dealings with Russia as part of Russia
and its government support for Mr. Trump.

Trump Jr. responded, if it's what you say, I love it.  And
he, Kushner, and Manafort, met with the Russian attorneys and
several other Russian individuals at Trump Tower on June 9, 2016,
end quote.  Correct?

Mr. Mueller.  Generally accurate.

Mr. Neguse.  Isn't it true that Ms. Hicks told your office
that she went multiple times to the President to, quote, urge him
that they should be fully transparent about the June 9 meeting,

end quote, but the President each time said no.  Correct?

Mr. Mueller.  Accurate.

Mr. Neguse.  And the reason was because of those emails which the President, quote, believed would not leak, correct?

Mr. Mueller.  Well, I'm not certain how it's characterized, but generally correct.

Mr. Neguse.  Did the President direct Ms. Hicks to say, quote, only that Trump Jr. took a brief meeting and it was about Russian adoption, end quote, because Trump Jr.'s statement to The New York Times, quote, said too much, according to page 102 of Volume II?

Mr. Mueller.  Okay.

Mr. Neguse.  Correct?

Mr. Mueller.  Let me just check one thing.

Yes.

Mr. Neguse.  And according to Ms. Hicks, the President still directed her to say the meeting was only about Russian adoption, correct?

Mr. Mueller.  Yes.

Mr. Neguse.  Despite knowing that to be untrue.

Thank you, Director Mueller.

I yield back the balance of my time.

Mr. Mueller.  The gentleman from Louisiana.

Mr. Johnson of Louisiana.  Mr. Mueller, you've been asked -- over here on the far right, sir.

You've been asked a lot of questions here today.  To be
frank, you've performed as most of us expected.  You've stuck
closely to your report, and you have declined to answer many of
our questions on both sides.

As the closer for the Republican side -- I know you're glad
to get to the close -- I want to summarize the highlights of what
we have heard and what we know.

You spent 2 years and nearly $30 million taxpayer and
unlimited resources to prepare a nearly 450-page report which you
describe today as very thorough.  Millions of Americans today
maintain genuine concerns about your work, in large part, because
of the infamous and widely publicized bias of your investigating
team members, which we now know included 14 Democrats and zero
Republicans.

Campaign finance reports later showed that team --

Mr. Mueller.  Can I --

Mr. Johnson of Louisiana.  Excuse me.  It's my time.  That
team of Democrat investigators you hired donated more than $60,000
to the Hillary Clinton campaign and other Democratic candidates.
Your team also included Peter Strzok and Lisa Page, which have
been discussed today, and they had the lurid text messages that
confirmed they openly mocked and hated Donald Trump and his
supporters and they vowed to take him out.

Mr. Ratcliffe asked you earlier this morning, quote, can you
give me an example other than Donald Trump where the Justice

Department determined that an investigated person was not
exonerated because their innocence was not conclusively
determined, unquote.  You answered, I cannot.  Sir, that is
unprecedented.

The President believed from the very beginning that you and
your special counsel team had serious conflicts.  This is stated
in the report and acknowledged by everybody.  And yet
President Trump cooperated fully with the investigation.  He knew
he had done nothing wrong, and he encouraged all witnesses to
cooperate with the investigation and produce more than 1.4 million
pages of information and allowed over 40 witnesses, who were
directly affiliated with the White House or his campaign.

Your report acknowledges on page 61, Volume II, that a volume
of evidence exists of the President telling many people privately,
quote, the President was concerned about the impact of the Russian
investigation on his ability to govern and to address important
foreign relations issues and even matters of national security.

And on page 174 of Volume II, your report also acknowledges
that the Supreme Court has held, quote, the President's removal
powers are at their zenith with respect to principal officers,
that is officers who must be appointed by the President and who
report to him directly.  The President's exclusive and illimitable
power of removal of those principal officers furthers the
President's ability to ensure that the laws are faithfully
executed, unquote.  And that would even include the Attorney

General.

Look, in spite of all of that, nothing ever happened to stop or impede your special counsel's investigation.  Nobody was fired by the President, nothing was curtailed, and the investigation continued unencumbered for 22 long months.

As you finally concluded in Volume I, the evidence, quote, did not establish that the President was involved in an underlying crime related to Russian election interference, unquote.  And the evidence, quote, did not establish that the President or those close to him were involved in any Russian conspiracies or had an unlawful relationship with any Russian official, unquote.

Over those 22 long months that your investigation dragged along, the President became increasingly frustrated, as many of the American people did, with its affects on our country and his ability to govern.  He vented about this to his lawyer and his close associates, and he even shared his frustrations, as we all know, on Twitter.

But while the President's social media accounts might have influenced some in the media or the opinion of some of the American people, none of those audiences were targets or witnesses in your investigation.  The President never affected anybody's testimony; he never demanded to end the investigation or demanded that you be terminated; and he never misled Congress, the DOJ, or the special counsel.  Those, sir, are undisputed facts.

There will be a lot of discussion, I predict, today and great

frustration throughout the country about the fact that you wouldn't answer any questions here about the origins of this whole charade, which was the infamous Christopher Steele dossier, now proven to be totally bogus, even though it is listed and specifically referenced in your report.  But as our hearing is concluding, we apparently will get no comment on that from you.

Mr. Mueller, there's one primary reason why you were called here today by the Democrat majority of our committee.  Our colleagues on the other side of the aisle just want political cover.  They desperately wanted you today to tell them they should impeach the President.  But the one thing you have said very clearly today is that your report is complete and thorough, and you completely agree with and stand by its recommendations and all of its content.  Is that right?

Mr. Mueller.  True.

Mr. Johnson of Louisiana.  Mr. Mueller, one last important question.  Your report does not recommend impeachment, does it?

Mr. Mueller.  I'm not going to talk about the recommendations.

Mr. Johnson of Louisiana.  It does not conclude that impeachment would be appropriate here, right?

Mr. Mueller.  I'm not going to talk -- I'm not going to talk about that issue.

Mr. Johnson of Louisiana.  That's one of the many things you wouldn't talk about today, but I think we can all draw our own

conclusions.

I do thank you for your service to the country.  And I'm glad this charade will come to an end soon and we can get back to the important business of this committee with its broad jurisdiction of so many important issues for the country.

With that, I yield back.

Chairman Nadler.  The gentleman yields back.

I want to announce that our intent was to conclude this hearing at around 11:45.  All of the Republican members have now asked their questions, but we have a few remaining Democratic members.  They will be limiting their questions, so with Director Mueller's indulgence, we expect to finish within 15 minutes.

The gentlelady from Georgia is recognized.

Mrs. McBath.  Thank you, Mr. Chairman.

And thank you, Director Mueller.  Your investigations of the Russian attack on our democracy and of obstruction of justice were extraordinarily productive.  And under 2 years, you charged at least 37 people or entities with crimes.  You convicted seven individuals, five of whom were top Trump campaign or White House aides.  Charges remain pending against more than 2 dozen Russian persons or entities and against others.

Now, let me start with those five Trump campaign administration aides that you convicted.  Would you agree with me that they are Paul Manafort, President Trump's campaign manager; Rick Gates, President Trump's deputy campaign manager; Michael

Flynn, President Trump's former National Security Advisor; Michael Cohen, the President's personal attorney; George Papadopoulos, President Trump's former campaign foreign policy adviser, correct?

Mr. <u>Mueller.</u>  Correct.

Mrs. <u>McBath.</u>  And the sixth Trump associate will face trial later this year, correct?  And that person would be Roger Stone, correct?

Mr. <u>Mueller.</u>  Correct.

Mrs. <u>McBath.</u>  Thank you.

Mr. <u>Mueller.</u>  Well, I'm not certain what you said about Stone, but he is in another court system, as I indicated before.

Mrs. <u>McBath.</u>  Exactly.  He's still under investigation.

Mr. <u>Mueller.</u>  And I do not want to discuss.

Mrs. <u>McBath.</u>  Correct.  Thank you.

And there are many other charges as well, correct?

Mr. <u>Mueller.</u>  Correct.

Mrs. <u>McBath.</u>  So, sir, I just want to thank you so much, in my limited time today, for your team, the work that you did, and your dedication.  In less than 2 years, your team was able to uncover an incredible amount of information related to Russia's attack on our elections and to obstruction of justice.

And there is still more that we have to learn.  Despite facing unfair attacks by the President and even here today, your work has been substantive and fair.  The work has laid the critical foundation for our investigation, and for that, I thank

you.  I thank you.

And with that, I yield back the balance of my time.

Chairman Nadler.  The gentlelady yields back.

The gentleman from Arizona.

Mr. Stanton.  Thank you.

Director Mueller, I'm disappointed that some have questioned your motives throughout this process, and I want to take a moment to remind the American people of who you are and your exemplary service to our country.

You are a Marine, you served in Vietnam and earned a Bronze Star and a Purple Heart, correct?

Mr. Mueller.  Correct.

Mr. Stanton.  Which President appointed you to become the United States attorney for Massachusetts?

Mr. Mueller.  Which Senator?

Mr. Stanton.  Which President?

Mr. Mueller.  Oh, which President.  I think that was President Bush.

Mr. Stanton.  According to my notes, it was President Ronald Reagan had the honor to do so.

Under whose --

Mr. Mueller.  My mistake.

Mr. Stanton.  Under whose administration did you serve as the assistant attorney general in charge of the DOJ's Criminal Division?

Mr. <u>Mueller.</u>  Under which President?

Mr. <u>Stanton.</u>  Yep.

Mr. <u>Mueller.</u>  That would be George Bush I.

Mr. <u>Stanton.</u>  That is correct, President George H.W. Bush.

After that, you took a job at a prestigious law firm, and after only a couple years, you did something extraordinary.  You left that lucrative position to reenter public service prosecuting homicides here in Washington, D.C.  Is that correct?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Stanton.</u>  When you were named Director of the FBI, which President first appointed you?

Mr. <u>Mueller.</u>  Bush.

Mr. <u>Stanton.</u>  And the Senate confirmed you with a vote of 98 to 0, correct?

Mr. <u>Mueller.</u>  Surprising.

Mr. <u>Stanton.</u>  And you were sworn in as Director just one week before the September 11 attacks.

Mr. <u>Mueller.</u>  True.

Mr. <u>Stanton.</u>  You helped to protect this Nation against another attack.  You did such an outstanding job that when your 10-year term expired, the Senate unanimously voted to extend your term for another 2 years, correct?

Mr. <u>Mueller.</u>  True.

Mr. <u>Stanton.</u>  When you were asked in 2017 to take the job as special counsel, the President had just fired FBI Director James

Comey.  The Justice Department and the FBI were in turmoil.  You must have known there would be an extraordinary challenge.  Why did you accept?

Mr. <u>Mueller.</u>  I'm not going to get into -- that's a little bit off track.  It was a challenge, period.

Mr. <u>Stanton.</u>  Some people have attacked the political motivations of your team, even suggested your investigation was a witch hunt.  When you considered people to join your team, did you ever even once ask about their political affiliation?

Mr. <u>Mueller.</u>  Never once.

Mr. <u>Stanton.</u>  In your entire career as a law enforcement official, have you ever made a hiring decision based upon a person's political affiliation?

Mr. <u>Mueller.</u>  No.

Mr. <u>Stanton.</u>  I'm not surprised --

Mr. <u>Mueller.</u>  And if I might just interject, the capabilities that we have shown in the report that's been discussed here today was a result of a team of agents and lawyers who were absolutely exemplary and were hired because of the value they could contribute to getting the job done and getting it done expeditiously.

Mr. <u>Stanton.</u>  Sir, you're a patriot.  And clear to me in reading your report and listening to your testimony today, you acted fairly and with restraint.  There were circumstances where you could have filed charges against other people mentioned in the

report but you declined.  Not every prosecutor does that,

certainly not one on a witch hunt.

The attacks made against you and your team intensified

because your report is damning.  And I believe you did uncover

substantial evidence of high crimes and misdemeanors.

Let me also say something else that you were right about.

The only remedy for this situation is for Congress to take action.

I yield back.

Chairman Nadler.  The gentleman yields back.

The gentlelady from Pennsylvania.

Ms. Dean.  Good morning, Director Mueller.  Madeleine Dean.

Mr. Mueller.  Ah, gotcha.  Sorry.

Ms. Dean.  Thank you.

I wanted to ask you about public confusion connected with

Attorney General Barr's release of your report.  I will be quoting

your March 27 letter.

Sir, in that letter, and at several other times, did you

convey to the Attorney General that the, quote, introductions and

executive summaries of our two-volume report accurately summarize

this office's work and conclusions, end quote?

Mr. Mueller.  I have to say that the letter itself speaks for

itself.

Ms. Dean.  And those were your words in that letter.

Continuing with your letter, you wrote to the Attorney

General that, quote, the summary letter that the Department sent

to Congress and released to the public late in the afternoon of March 24 did not fully capture the context, nature, and substance of this office's work and conclusions, end quote.  Is that correct?

Mr. <u>Mueller.</u>  Again, I rely on the letter itself for its terms.

Ms. <u>Dean.</u>  Thank you.

What was it about the report's context, nature, substance that the Attorney General's letter did not capture?

Mr. <u>Mueller.</u>  I think we captured that in the March 27 responsive letter.

Ms. <u>Dean.</u>  And this is from the 27th letter.  What were some of the specifics that you thought --

Mr. <u>Mueller.</u>  I direct you to the letter itself.

Ms. <u>Dean.</u>  Okay.  You finished that letter by saying, there is now public confusion about critical aspects as a result of our investigation.  Could you tell us specifically some of the public confusion you identified?

Mr. <u>Mueller.</u>  Not generally.  Again, I go back to the letter. The letters speaks for itself.

Ms. <u>Dean.</u>  And could Attorney General Barr have avoided public confusion if he had released your summaries and executive introduction and summaries?

Mr. <u>Mueller.</u>  I don't feel comfortable speculating on that.

Ms. <u>Dean.</u>  Shifting to May 30, the Attorney General, in an

interview with CBS News, said that you could have
reached -- quote, you could have reached a decision as to whether
it was criminal activity, end quote, on the part of the President.
Did the Attorney General or his staff ever tell you that he
thought you should make a decision on whether the President
engaged in criminal activity?

    Mr. Mueller.  I'm not going to speak to what the Attorney
General was thinking or saying.

    Ms. Dean.  If the Attorney General had directed you or
ordered you to make a decision on whether the President engaged in
criminal activity, would you have so done?

    Mr. Mueller.  I can't answer that question in the vacuum.

    Ms. Dean.  Director Mueller, again, I thank you for being
here.  I agree with your March 27 letter.  There was public
confusion, and the President took full advantage of that confusion
by falsely claiming your report found no obstruction.

    Let us be clear, your report did not exonerate the President;
instead, it provided substantial evidence of obstruction of
justice leaving Congress to do its duty.  We shall not shrink from
that duty.

    I yield back.

    Chairman Nadler.  The gentlelady yields back.  The --

    Mr. Johnson of Louisiana.  Mr. Chairman, I have a point of
inquiry, over on your left.

    Chairman Nadler.  The gentleman will state his point of

inquiry.

Mr. <u>Johnson of Louisiana.</u>  Was the point of this hearing to get Mr. Mueller to recommended impeachment?

Mr. <u>Mueller.</u>  That is not a fair point of inquiry.

The gentlelady from Florida is recognized.

Mr. <u>Johnson of Louisiana.</u>  Mr. Chairman?

Chairman <u>Nadler.</u>  The gentlelady from Florida is recognized.

Ms. <u>Mucarsel-Powell.</u>  Director Mueller, thank you so much for coming here.  You're a patriot.

I want to refer you now to Volume II, page 158.  You wrote that, quote, the President's efforts to influence the investigation were mostly unsuccessful, but that is largely because the persons who surrounded the President declined to carry out orders or accede to his request.  Is that right?

Mr. <u>Mueller.</u>  That is accurate.  That is what we found.

Ms. <u>Mucarsel-Powell.</u>  And you're basically referring to senior advisers who disobeyed the President's orders, like White House Counsel Don McGahn, former Trump campaign manager Corey Lewandowski.  Is that right?

Mr. <u>Mueller.</u>  Well, we have not specified the persons mentioned.

Ms. <u>Mucarsel-Powell.</u>  Well, in page 158, White House Counsel Don McGahn, quote, did not tell the Acting Attorney General that the special counsel must be removed but was instead prepared to resign over the President's orders.

You also explained that an attempt to obstruct justice does not have to succeed to be a crime, right?

Mr. Mueller.  True.

Ms. Mucarsel-Powell.  Simply attempting to obstruct justice can be a crime, correct?

Mr. Mueller.  Yes.

Ms. Mucarsel-Powell.  So even though the President's aides refused to carry out his orders to interfere with your investigation, that is not a defense to obstruction of justice by this President, is it?

Mr. Mueller.  I'm not going to speculate.

Ms. Mucarsel-Powell.  So to reiterate, simply trying to obstruct justice can be a crime, correct?

Mr. Mueller.  Yes.

Ms. Mucarsel-Powell.  And you say that the President's efforts to influence the investigation were, quote, mostly unsuccessful.  And that's because not all of his efforts were unsuccessful, right?

Mr. Mueller.  Are you reading into what I -- what we have written in the report?

Ms. Dean.  I was going to ask you if you could just tell me which ones you had in mind as successful when you wrote that sentence.

Mr. Mueller.  I'm going to pass on that.

Ms. Mucarsel-Powell.  Yeah.  Director Mueller, today, we've

talked a lot about the separate acts by this President, but you also wrote in your report that, quote, the overall pattern of the President's conduct towards the investigations can shed light on the nature of the President's acts, and the inferences can be drawn about his intent, correct?

Mr. <u>Mueller.</u>  Accurate recitation from the report.

Ms. <u>Mucarsel-Powell.</u>  Right.  And on page 158 again, I think it's important for everyone to note that the President's conduct had a significant change when he realized that it was -- the investigations were conducted to investigate his obstruction acts.

So in other words, when the American people are deciding whether the President committed obstruction of justice, they need to look at all of the President's conduct and overall pattern of behavior.  Is that correct?

Mr. <u>Mueller.</u>  I don't disagree.

Ms. <u>Mucarsel-Powell.</u>  Thank you.  Dr. Mueller -- Director Mueller -- Doctor also, I'll designate that too -- I have certainly made up my mind about whether we -- what we have reviewed today meets the elements of obstruction, including whether there was corrupt intent.  And what is clear is that anyone else, including some Members of Congress, would have been charged with crimes for these acts.  We would not have allowed this behavior from any of the previous 44 Presidents.  We should not allow it now or for the future to protect our democracy.  And, yes, we will continue to investigate because, as you clearly state

at the end of your report, no one is above the law.

I yield back my time.

Chairman Nadler.  The gentlelady yields back.

The gentlelady from Texas.

Ms. Escobar.  Director Mueller, you wrote in your report that you, quote, determined not to make a traditional prosecutorial judgment, end quote.  Was that in part because of an opinion by the Department of Justice Office of Legal Counsel that a sitting President can't be charged with a crime?

Mr. Mueller.  Yes.

Ms. Escobar.  Director Mueller, at your May 29, 2019, press conference, you explained that, quote, the opinion says that the Constitution requires a process other than the criminal justice system to formally accuse a sitting President of wrongdoing, end quote.  That process other than the criminal justice system for accusing a President of wrongdoing, is that impeachment?

Mr. Mueller.  I'm not going to comment on that.

Ms. Escobar.  In your report, you also wrote that you did not want to, quote, potentially preempt constitutional processes for addressing Presidential misconduct, end quote.  For the nonlawyers in the room, what did you mean by, quote, potentially preempt constitutional processes?

Mr. Mueller.  I'm not going to try to explain that.

Ms. Escobar.  That actually is coming from page 1 of Volume II.  In the footnote is the reference to this.  What are those

constitutional processes?

Mr. <u>Mueller.</u>  I think I heard you mention at least one.

Ms. <u>Escobar.</u>  Impeachment, correct?

Mr. <u>Mueller.</u>  I'm not going to comment.

Ms. <u>Escobar.</u>  Okay.  That is one of the constitutional processes listed in the report in the footnote in Volume II.

Your report documents the many ways the President sought to interfere with your investigation.  And you state in your report on page 10, Volume II, that with a -- interfering with a congressional inquiry or investigation with corrupt intent can also constitute obstruction of justice.

Mr. <u>Mueller.</u>  True.

Ms. <u>Escobar.</u>  Well, the President has told us that he intends to fight all the subpoenas.  His continued efforts to interfere with investigations of his potential misconduct certainly reinforce the importance of the process the Constitution requires to, quote, formally accuse a sitting President of wrongdoing, as you cited in the report.

And in this -- and this hearing has been very helpful to this committee as it exercises its constitutional duty to determine whether to recommend articles of impeachment against the President.

I agree with you, Director Mueller, that we all have a vital role in holding this President accountable for his actions.  More than that, I believe we in Congress have a duty to demand

accountability and safeguard one of our Nation's highest
principles that no one is above the law.

From everything that I have heard you say here today, it's
clear that anyone else would have been prosecuted based on the
evidence available in your report.  It now falls on us to hold
President Trump accountable.  Thank you for being here.

Chairman, I yield back.

Mr. Collins.  Mr. Chairman?

Chairman Nadler.  The gentlelady yields back.

Mr. Collins.  Just one point of personal privilege.

Chairman Nadler.  Point of personal privilege.

Mr. Collins.  I just want to thank the chairman.  We did get
in our time.  After this was first developed to us, we did both
get in time.  Our side got our 5 minutes in.

Also, Mr. Mueller, thank you for being here, and I join the
chairman in thanking you for being here.

Chairman Nadler.  Thank you.

Director Mueller, we thank you for attending today's hearing.

Before we conclude, I ask everyone to please remain seated
and quiet while the witness exits the room.

Without objection, all members will have 5 legislative days
to submit additional written questions for the witness or
additional materials for the record.

And without objection, the hearing is now adjourned.

[Whereupon, at 12:11 p.m., the committee was adjourned.]

UNOFFICIAL COPY   176