**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY,<br>UNITED STATES HOUSE OF<br>REPRESENTATIVES,<br>2138 Rayburn House Office Building<br>Washington, D.C. 20515,<br><br>                             *Plaintiff*,<br><br>   v.<br><br>DONALD F. MCGAHN II,<br>51 Louisiana Avenue, N.W.<br>Washington, D.C. 20001,<br><br>                            *Defendant*. | Case No. 1:19-cv-2379 |

# Exhibit C



**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the Assistant Attorney General          *Washington, D.C. 20530*

May 20, 2019

### MEMORANDUM FOR PAT A. CIPOLLONE
### COUNSEL TO THE PRESIDENT

*Re: Testimonial Immunity Before Congress of
the Former Counsel to the President*

On April 22, 2019, the Committee on the Judiciary of the House of Representatives subpoenaed Donald F. McGahn II, the former Counsel to the President, to testify about matters described in the report of Special Counsel Robert S. Mueller, III.  You have asked whether Mr. McGahn is legally required to appear.

We provide the same answer that the Department of Justice has repeatedly provided for nearly five decades:  Congress may not constitutionally compel the President's senior advisers to testify about their official duties.  This testimonial immunity is rooted in the constitutional separation of powers and derives from the President's independence from Congress.  As Attorney General Janet Reno explained, "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions."  *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999) ("Reno Opinion").  Yet Congress may no more summon the President to a congressional committee room than the President may command Members of Congress to appear at the White House.  *See* Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 2 (July 29, 1982) ("Olson Memorandum").

Although the White House has opposed sending senior advisers to testify for almost as long as there has been an Executive Office of the President, Assistant Attorney General William Rehnquist first described the legal basis for immunity in a 1971 memorandum.  *See* Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971) ("Rehnquist Memorandum").  The Rehnquist Memorandum has been consistently reaffirmed by administrations of both political parties, most recently during the Obama Administration.  *See, e.g.*, *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. __, *1 & n.1 (July 15, 2014) ("*Immunity of the Assistant to the President*").

We believe that these established principles apply to bar the Committee from compelling Mr. McGahn to testify. The Counsel to the President clearly qualifies as a senior adviser entitled to testimonial immunity. Attorney General Reno reached that conclusion in her 1999 opinion, and this Office has made the same determination on at least three other occasions. We have also recognized that the immunity continues to apply after the Counsel leaves the White House. *See Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007) ("*Immunity of the Former Counsel*").

The Chairman of the Committee has suggested that the justification for Mr. McGahn's testimonial immunity is undermined by the President's decision not to assert executive privilege over the redacted version of the Special Counsel's report that the Attorney General released last month. *See, e.g.*, Letter for Donald F. McGahn II, from Jerrold Nadler, Chairman, Committee on the Judiciary, U.S. House of Representatives at 1 (May 17, 2019) ("Nadler Letter"). But the question whether an adviser need comply with a subpoena purporting to require an appearance is different from the question whether the adviser's testimony would itself address privileged matters. Therefore, the public disclosure of the Special Counsel's report does not have any legal bearing upon the force of the congressional subpoena. For these reasons, and consistent with nearly 50 years of executive branch precedent, we conclude that Mr. McGahn is not legally required to appear and testify before the Committee.

## I.

Since the 1970s, this Office has consistently advised that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee" on matters related to their official duties. Memorandum for All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice, from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Executive Privilege* at 5 (May 23, 1977) ("Harmon Memorandum"); *see also* Rehnquist Memorandum at 7 ("The President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis—should be deemed absolutely immune from testimonial compulsion by a congressional committee."). Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations.[1]

---

[1] *See Immunity of the Assistant to the President*, 38 Op. O.L.C. at *1; Letter for Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel at 1–2 (Aug. 1, 2007) ("Bradbury Letter"); *Immunity of the Former Counsel*, 31 Op. O.L.C. at 191; Reno Opinion, 23 Op. O.L.C. at 4; *Immunity of the Counsel to the President from Compelled Congressional Testimony*, 20 Op. O.L.C. 308, 308 (1996) ("*Immunity of the Counsel to the President*"); Letter for Jack Brooks, Chairman, Committee on the Judiciary, U.S. House of Representatives, from Nicholas E. Calio, Assistant to the President for Legislative Affairs at 1 (June 16, 1992) ("Calio Letter"); Olson Memorandum at 2; Memorandum for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Demand for Deposition of Counsel to the President Fred F. Fielding* at 2 (July 23, 1982) ("*Congressional Demand for Deposition of Counsel*"); Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Testimony by Presidential Assistants* at 1 (Apr. 14, 1981); Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Dual-Purpose Presidential Advisers* at 5 (Aug. 11, 1977); Harmon Memorandum at 5; Letter to Phillip E. Areeda, Counsel to the President,

This testimonial immunity is distinct from, and broader than, executive privilege. Like executive privilege, the immunity protects confidentiality within the Executive Branch and the candid advice that the Supreme Court has acknowledged is essential to presidential decision-making. *See United States v. Nixon*, 418 U.S. 683, 705 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."). But the immunity extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself. In this regard, the President's immediate advisers are constitutionally distinct from the heads of executive departments and agencies, whose offices are created by acts of Congress, whose appointments require the Senate's advice and consent, and whose responsibilities entail the administration of federal statutes. Those officers can and do testify before Congress. The President's immediate advisers, however, exercise no statutory authority and instead act solely to advise and assist the President. Their independence from Congress reflects that of the President.

## A.

The President stands at the head of a co-equal branch of government. Yet allowing Congress to subpoena the President to appear and testify would "promote a perception that the President is subordinate to Congress, contrary to the Constitution's separation of governmental powers into equal and coordinate branches." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *3. As Assistant Attorney General Theodore Olson explained in 1982: "The President is a separate branch of government. He may not compel congressmen to appear before him. As a matter of separation of powers, Congress may not compel him to appear before it." Olson Memorandum at 2. The President's immediate advisers are an extension of the President and are likewise entitled to absolute immunity from compelled congressional testimony.

In 2014, our most recent opinion on the topic described the bases for this immunity in detail. "For the President's absolute immunity to be fully meaningful," we explained, "and for these separation of powers principles to be adequately protected, the President's immediate advisers must likewise have absolute immunity from congressional compulsion to testify about matters that occur during the course of discharging their official duties." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *2. The demands of the office require the President to rely on senior advisers who serve "as the President's alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Id.* at *3 (quoting Reno Opinion, 23 Op. O.L.C. at 5); *see also In re Sealed*

---

from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 25, 1974) (enclosing a memorandum, hereinafter "Scalia Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, *Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters* at 6 (Dec. 21, 1972) ("Cramton Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, *Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee* at 1 (Mar. 15, 1972) ("Erickson Memorandum"); Rehnquist Memorandum at 7.

*Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) ("The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers.").

There are dozens of congressional committee and subcommittees with the authority to conduct hearings and subpoena witnesses. Recognizing a congressional authority to compel the President's immediate advisers to appear and testify at the times and places of their choosing would interfere directly with the President's ability to faithfully discharge his responsibilities. It would allow congressional committees to "wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *3. And in the case of the President's current advisers, preparing for such examinations would force them to divert time and attention from their duties to the President at the whim of congressional committees. This "would risk significant congressional encroachment on, and interference with, the President's prerogatives and his ability to discharge his duties with the advice and assistance of his closest advisers," ultimately subordinating senior presidential advisers to Congress rather than the President. *Id.*; *see also Loving v. United States*, 517 U.S. 748, 757 (1996) ("Even when a branch does not arrogate power to itself . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties.").

The immunity of senior presidential advisers also protects the Executive Branch's strong interests in confidentiality as well as the President's ability to obtain sound and candid advice. As the Supreme Court has recognized, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708. While a senior presidential adviser, like other executive officials, could rely on executive privilege to decline to answer specific questions at a hearing, the privilege is insufficient to ameliorate several threats that compelled testimony poses to the independence and candor of executive councils.

First, compelled congressional testimony "create[s] an inherent and substantial risk of inadvertent or coerced disclosure of confidential information," despite the availability of claims of executive privilege with respect to the specific questions asked during such testimony. *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *4. As we explained in 2014, senior presidential advisers

> could be asked, under the express or implied threat of contempt of Congress, a wide range of unanticipated and hostile questions about highly sensitive deliberations and communications. In the heat of the moment, without the opportunity for careful reflection, the adviser might have difficulty confining his remarks to those that do not reveal such sensitive information. Or the adviser could be reluctant to repeatedly invoke executive privilege, even though validly applicable, for fear of the congressional and media condemnation she or the President might endure.

*Id.*; *see also Congressional Demand for Deposition of Counsel*, *supra* note 1, at 2 ("A witness before a Congressional committee may be asked—under threat of contempt—a wide range of unanticipated questions about highly sensitive deliberations and thought processes. He therefore

may be unable to confine his remarks only to those which do not impair the deliberative process.").

Second, even "[t]he prospect of compelled interrogation by a potentially hostile congressional committee about confidential communications with the President or among the President's immediate staff could chill presidential advisers from providing unpopular advice or from fully examining an issue with the President or others." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at*4. This is true whether or not the President might ultimately assert executive privilege over the testimony in question, given the adviser's uncertainty over whether a particular matter will become the subject of future congressional inquiry and whether the President would choose to incur the political costs associated with invoking the privilege.

Finally, given the frequency with which the testimony of a senior presidential adviser— whose sole and daily responsibility is to advise and assist the President—would fall within the scope of executive privilege, compelling the adviser's appearance is not likely to promote any valid legislative interests. Coercing senior presidential advisers into situations where they must repeatedly decline to provide answers, citing executive privilege, would be inefficient and contrary to good-faith governance. The President's immediate advisers, if compelled to testify, are unlikely to answer many of the Members' questions, suggesting that the hearing itself will not serve any legitimate purpose for the Committee.

## B.

The Executive Branch's position on testimonial immunity reflects historical practices dating back nearly to the 1939 establishment of the Executive Office of the President. As Assistant Attorney General Antonin Scalia explained in a 1974 memorandum, "at least since the Truman Administration," presidential advisers "have appeared before congressional committees only where the inquiry related to their own private affairs or where they had received Presidential permission." Scalia Memorandum, *supra* note 1, at 6. Although Presidents have occasionally permitted such testimony, the long-standing policy has been to decline invitations for voluntary appearances and to resist congressional subpoenas for involuntary ones.

In surveying the history through 1971, Assistant Attorney General Rehnquist described the earliest application of the policy to be inconclusive and at times inconsistent. *See* Rehnquist Memorandum at 4–6. But even when senior presidential advisers did appear, those appearances were frequently accompanied by a claim of legal privilege not to do so. Assistant Attorney General Rehnquist thus described the claim as an absolute testimonial immunity for the President's immediate advisers, *see id.* at 7, and this Office has reaffirmed and expanded upon that conclusion in the decades since. The following examples, while not exhaustive, demonstrate the strong historical foundation for the Executive Branch's position that Congress may not compel the President's senior advisers to appear and testify.

In 1944, during the Administration of Franklin D. Roosevelt, a subcommittee of the Senate Committee on Agriculture and Forestry subpoenaed Jonathan Daniels, an Administrative Assistant to President Roosevelt, to testify about his reported attempts to compel the resignation of the Rural Electrification Administrator. *See Administration of the Rural Electrification Act: Hearing on S. 197 Before a Subcomm. of the S. Comm. on Agric. and Forestry*, 78th Cong., pt. 3,

at 611–28, 629 (1944). Mr. Daniels appeared at the hearing but advised that he could not answer questions that would concern his confidential relationship with the President. *Id.* After the hearing ended with the subcommittee threatening contempt, Mr. Daniels wrote to the subcommittee and reiterated his belief that the subcommittee could not compel his testimony. *See id.* at 740. However, he stated that the President had determined that his testimony would not be contrary to the public interest and that he therefore was willing to appear in the future. *See id.*; *see also id.* at 695–740. *The New York Times* reported that "[w]ith Daniels' agreement to testify disappeared the possibility of using his previous defiance as the first test of the division between executive and legislative power before the Senate." *Daniels to Answer Senators' Queries: President Agrees*, N.Y. Times, Mar. 5, 1944, at 1.

The first outright refusal of a presidential adviser to appear apparently occurred during the Truman Administration, in 1948, when a special subcommittee of the House Committee on Education and Labor twice subpoenaed John R. Steelman, an Assistant to the President, to testify about his communications with President Truman regarding administration of the Taft-Hartley Act during a strike. *See Investigation of GSI Strike: Hearing Before a Special Subcomm. of the H. Comm. on Educ. and Labor*, 80th Cong. 347–53 (1948). Mr. Steelman declined to comply and returned the subpoenas with a letter stating: "[I]n each instance the President directed me, in view of my duties as his Assistant, not to appear before your subcommittee." H.R. Rep. No. 80-1595, at 3 (1948).

During the Eisenhower Administration, in 1955, a subcommittee of the Senate Committee on the Judiciary invited the President's Chief of Staff, Sherman Adams, to testify about a contract between the Atomic Energy Commission and two power companies. He declined, citing in part his "official and confidential relationship with the President." *Power Policy, Dixon-Yates Contract: Hearing Before the Subcomm. on Antitrust and Monopoly of the S. Comm. on the Judiciary*, 84th Cong., pt. 2, at 675–76, 779 (1955). Later, in 1958, Mr. Adams testified, with President Eisenhower's approval, before a House subcommittee concerning allegations of impropriety relating to his relationship with a New England industrialist. *Investigation of Regulatory Commissions and Agencies: Hearing Before a Subcomm. of the H. Comm. on Interstate and Foreign Commerce*, 85th Cong., pt. 10, at 3712–40 (1958).

During the Administration of President Lyndon B. Johnson, in 1968, the Senate Committee on the Judiciary requested the testimony of Associate Special Counsel to the President W. DeVier Pierson to testify concerning the nomination of Associate Justice Abe Fortas to be Chief Justice of the United States. The inquiry concerned whether Justice Fortas had inappropriately participated in developing certain legislation. Mr. Pierson responded that "[i]t has been firmly established, as a matter of principle and precedents, that members of the President's immediate staff shall not appear before a Congressional committee to testify with respect to the performance of their duties on behalf of the President." *Nominations of Abe Fortas and Homer Thornberry: Hearing Before the S. Comm. on the Judiciary*, 90th Cong., pt. 2, at 1348 (1968). He continued: "This limitation, which has been recognized by the Congress as well as the Executive, is fundamental to our system of government. I must, therefore, respectfully decline the invitation to testify in these hearings." *Id.*

In 1972, during the Nixon Administration, the Senate Committee on the Judiciary invited Peter M. Flanigan, an Assistant to the President, to testify. This Office advised that Mr. Flanigan

occupied "a close and confidential relationship with the President and share[d] the President's immunity from congressional process." Erickson Memorandum, *supra* note 1, at 1.  Our disposition was clear: "[I]t has been firmly established that members of the President's immediate staff may not appear before a congressional committee to testify with respect to the performance of their duties." *Id.*[2]

In 1979, during the Carter Administration, Special Assistant to the President Sarah Weddington was invited to testify before the Senate Human Resources Committee as part of a hearing on "Women in the Coming Decade."  At the instruction of the Counsel to President, she declined to appear, explaining that "it is White House policy for personal aides to the President to decline invitations to testify before Congressional committees."  Letter for Harrison A. Williams, U.S. Senate, from Sarah Weddington, Special Assistant to the President at 1 (Jan. 31, 1979) ("Weddington Letter").  She offered, however, to meet informally with committee members or staff to discuss related programs and proposals. *Id.* at 2.

In 1980, the Subcommittee on Investigations of the House Committee on Armed Services requested the testimony of Deputy Assistant to the President for National Security Affairs David Aaron concerning leaks to *The Washington Post*.  President Carter directed Mr. Aaron not to appear.  The Counsel to the President, Lloyd N. Cutler, explained that "Congress has always respected the privilege of the President to decline requests that the President himself or his immediate White House advisors appear to testify before Congressional committees," instead provided a sworn affidavit by Mr. Aaron denying the allegations, and offered to make Mr. Aaron available for an interview or deposition under oath.  Letter for Samuel S. Stratton, Chairman, Subcommittee on Investigation of the Committee on Armed Services, U.S. House of Representatives, from Lloyd N. Cutler, Counsel to the President at 1–2 (Sept. 30, 1980).

In 1982, during the Reagan Administration, the Senate Labor and Human Resources Committee sought the testimony of Counsel to the President Fred F. Fielding concerning allegations of corruption against Secretary of Labor Raymond Donovan.  Mr. Fielding declined to appear and testify. *See* Olson Memorandum at 1–4 (explaining the legal basis for that decision).  Deputy Attorney General Edward C. Schmults notified the Committee that, "[a]s an institutional matter, the President cannot permit his Counsel to provide sworn testimony to the Legislative Branch regarding the performance of his duties," but offered to arrange for written responses to a reasonable number of written inquiries.  Letter for Orrin G. Hatch, Chairman, Committee on Labor and Human Resources, U.S. Senate, from Edward C. Schmults, Deputy Attorney General at 2–3 (Apr. 19, 1983) ("Schmults Letter").

In 1992, during the George H.W. Bush Administration, the House Committee on the Judiciary requested that C. Boyden Gray, Counsel to the President, and Nicholas Rostow,

_____

[2] In connection with the Watergate investigations, President Nixon reached an agreement with the Senate's Watergate Select Committee to authorize current and former White House officials to appear voluntarily and under oath before the committee in closed session. *See* Remarks Announcing Procedures and Developments in Connection With the Watergate Investigations (Apr. 17, 1973), *Pub. Papers of Pres. Richard Nixon* 298, 298–99 (1973).  President Nixon later determined that he would not claim executive privilege over the subject matters of the testimony and would allow the witnesses to testify in open hearings. *See* Statements About the Watergate Investigations (May 22, 1973), *Pub. Papers of Pres. Richard Nixon* at 547, 554 (1973).  He therefore waived the testimonial immunity to authorize those appearances.

Special Assistant to the President and a Senior Director for Legal Affairs at the National Security Council, testify concerning Bush Administration policies towards Iraq prior to the first Gulf War. The White House declined, citing "the longstanding practice of the Executive Branch to decline requests for testimony by members of the President's personal staff." Calio Letter, *supra* note 1, at 1.

In 1999, President Clinton directed Counsel to the President Beth Nolan not to appear in response to a subpoena from the House Committee on Government Reform and Oversight concerning a clemency decision. President Clinton relied on an opinion from Attorney General Reno that concluded that "the Counsel serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony" on matters related to the performance of official duties. Reno Opinion, 23 Op. O.L.C. at 4.

In 2007, during the George W. Bush Administration, the House Committee on the Judiciary subpoenaed former Counsel to the President Harriet Miers to testify about the Department of Justice's decision to request the resignation of certain United States Attorneys. President Bush directed Ms. Miers not to testify after this Office concluded that she was "immune from compelled congressional testimony about matters . . . that arose during her tenure as Counsel to the President and that relate to her official duties in that capacity." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 193.

Also in 2007, the Senate Committee on the Judiciary subpoenaed the testimony of Karl Rove, the Deputy White House Chief of Staff, on the same subject. This Office confirmed that Mr. Rove was "immune from compelled congressional testimony about matters (such as the U.S. Attorney resignations) that arose during his tenure as an immediate presidential adviser and that relate to his official duties in that capacity." Bradbury Letter, *supra* note 1, at 1–2. In 2008, a subcommittee of the House Committee on the Judiciary also subpoenaed Mr. Rove, and he was again directed not to testify. *See* Letter for Robert D. Luskin, Patton Boggs LLP, from Fred F. Fielding, Counsel to the President at 1 (July 9, 2008).

In 2014, during the Obama Administration, the House Committee on Oversight and Government Reform issued a subpoena to David Simas to testify about matters related to his official responsibilities as Assistant to the President and Director of the Office of Political Strategy and Outreach. In particular, the committee requested testimony regarding "the role and function of the White House Office of Political Strategy and Outreach" and the question "whether the White House [was] taking adequate steps to ensure that political activity by Administration officials complies with relevant statutes, including the Hatch Act." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *1 (internal quotation marks omitted). This Office concluded that Mr. Simas was "immune from compulsion to testify before the [c]ommittee on these matters," *id.*, and he declined to testify.

The foregoing historical record demonstrates that the immunity of senior presidential advisers from congressional testimony is long-standing and has been repeatedly asserted against the requests of Congress. These examples do not indicate that senior presidential advisers have always declined to testify before Congress. The practice of asserting testimonial immunity—just like the practice of asserting executive privilege—has long reflected the "spirit of dynamic compromise" that reflects the "efficient and effective functioning" of the political branches of

government. *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). Presidents have occasionally made senior advisers available to accommodate congressional requests, even while defending their legal authority to decline such requests. But these accommodations between the political branches do not compromise the underlying immunity of the President or his senior presidential advisers from compelled congressional testimony. Nor do they nullify the many instances where Presidents have successfully asserted immunity and affirmatively directed their immediate aides not to testify before Congress.

## C.

While the Executive Branch has asserted for 75 years that senior presidential advisers may decline to testify before Congress, and has formally asserted an immunity for nearly 50 years, neither the Supreme Court nor any court of appeals has specifically addressed the question. This is because disputes over congressional demands for information from the Executive Branch are inherently political, and the historical practice has been to resolve such questions in the political arena. When such conflicts have arisen, Congress has either acceded to the President's claims of immunity or the Executive Branch has accommodated the congressional interest in some fashion. Only one district court has ever addressed the testimonial immunity of the President's senior advisers, and that decision did not come until 2008. *See Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008). Although the district court held that presidential advisers were not entitled to absolute immunity from compelled congressional testimony, the court of appeals stayed that decision pending appeal, and the parties settled without any appellate decision on the merits.

Nonetheless, this Office has recognized that the Executive Branch's long-standing position is consistent with related Supreme Court precedent. *See Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5. In *Gravel v. United States*, 408 U.S. 606 (1972), the Court held that legislative aides share in the constitutional immunity enjoyed by Members of Congress under the Speech or Debate Clause. *Id.* at 616–17. The Court reasoned that the Clause "was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch," and "protect[ion] . . . against prosecutions that directly impinge upon or threaten the legislative process." *Id.* at 616. Because "it is literally impossible . . . for Members of Congress to perform their legislative tasks without the help of aides and assistants," the Court recognized that such aides "must be treated as the [Members'] alter egos." *Id.* at 616–17. For purposes of immunity, the Court concluded, Members of Congress and their aides should be "treated as one." *Id.* at 616 (internal quotation marks omitted). The same logic applies with respect to the President and his senior advisers. The failure to recognize the extension of the President's immunity from compelled congressional testimony to senior advisers would call into question the well-established extension of derivative immunity to congressional staffers.

It is true that in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Court declined to extend *Gravel*'s alter-ego reasoning to a civil suit for damages against senior presidential advisers, and instead concluded that such advisers are entitled only to qualified immunity in those civil actions. *Id.* at 810–11, 813–15. *Harlow* thus distinguished the President's immediate advisers from the President himself, whom the Court held (in another decision issued the same day) to be absolutely immune from civil suits based on official acts. *See Nixon v. Fitzgerald*, 457 U.S. 731,

749 (1982). Yet we have previously declined to extend *Harlow* to the context of testimonial immunity because the prospect of compelled congressional testimony raises separation of powers concerns that are not present in a civil damages lawsuit brought by a private party. *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5–7. Compelled congressional testimony "threatens to subject presidential advisers to coercion and harassment, create a heightened impression of presidential subordination to Congress, and cause public disclosure of confidential presidential communications in a way that the careful development of evidence through a judicially monitored [proceeding] does not." *Id.* at *6. In a private lawsuit, the court "acts as a disinterested arbiter of a private dispute, not as a party in interest to the very lawsuit it adjudicates," and it "is charged with impartially administering procedural rules designed to protect witnesses from irrelevant, argumentative, harassing, cumulative, privileged, and other problematic questions." *Id.* By contrast, congressional hearings involving the President's immediate advisers contain none of those assurances, and they threaten the President's autonomy and ability to receive sound and candid advice in a way that private civil damages suits do not. *Cf.* Archibald Cox, *Executive Privilege*, 122 U. Pa. L. Rev. 1383, 1429 (1974) (stating that as compared to a civil action, "[t]he need to protect aides and subordinates from reprisals on Capitol Hill and in the media of public debate is a thousand-fold greater in the case of congressional hearings, which are often the preserves of individual Senators and Congressmen not all of whom are invariably characterized by judicious self-restraint").

We recognize that in *Miers*, a federal district court read *Harlow* to imply that senior presidential advisers do not enjoy absolute immunity from congressionally compelled testimony. *See Miers*, 558 F. Supp. 2d at 100–03. But we believe that the court did not adequately consider the different and heightened separation of powers concerns bearing upon the testimony of the President's immediate advisers before Congress. Moreover, the district court's decision was stayed pending appeal. *See Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 910–11 (D.C. Cir. 2008) (per curiam). The case settled and the appeal was dismissed before any further action by the court of appeals. *Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, No. 08-5357, 2009 WL 3568649, at *1 (D.C. Cir. Oct. 14, 2009). For the reasons set forth above, and in greater detail in our 2014 opinion, *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5–9, we respectfully disagree with the district court's conclusion in *Miers* and adhere to this Office's long-established position that the President's immediate advisers are absolutely immune from compelled congressional testimony.

## II.

Having reaffirmed the existence of the testimonial immunity of the President's immediate advisers, we now consider its application to Mr. McGahn, the former Counsel to the President. Plainly, the Counsel to the President qualifies as an immediate adviser to the President. As Attorney General Reno recognized, "the Counsel serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony." Reno Opinion, 23 Op. O.L.C. at 4. Indeed, we have recognized the Counsel's immunity from congressional testimony on multiple occasions. *See, e.g.*, *Immunity of the Former Counsel*, 31 Op. O.L.C. at 192 ("[T]he Counsel to the President 'serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony.'" (quoting Reno Opinion, 23 Op. O.L.C. at 4)); *Immunity of the Counsel to the President*, 20 Op. O.L.C. at 309 ("There is no question that the Counsel to the President falls within Assistant Attorney General Rehnquist's description of

the type of Presidential advisers who are immune from testimonial compulsion."); *Congressional Demand for Deposition of Counsel*, supra note 1, at 2 ("I believe the Counsel to the President possesses an absolute privilege not to testify with regard to any matters relating to his official duties as legal adviser to the President.").

In addition, we have recognized that testimonial immunity continues after the tenure of a particular Counsel to the President. As we explained in 2007, "[s]eparation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 192–93. The Supreme Court has explicitly recognized this principle in the context of executive privilege. The privilege must outlast the tenure of a particular President because, absent a guarantee of lasting confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (adopting the view of the Solicitor General); *see also United States v. Johnson*, 383 U.S. 169 (1966) (applying the Speech or Debate Clause to a former Member of Congress).

In concluding that the former Counsel to the President retained her testimonial immunity, we relied upon the actions of former President Truman, who explained his own refusal to appear and testify before the House Committee on Un-American Activities in the following terms: "[I]f the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 193 (quoting *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14 (reprinting Nov. 12, 1953 letter by President Truman)). It is "just as important to the independence of the Executive that the actions of the President should not be subjected to the questioning by the Congress after he has completed his term of office as that his actions should not be questioned while he is serving as President." *Id.* (quoting *Text of Address by Truman Explaining to Nation His Actions in the White Case*, N.Y. Times, Nov. 17, 1953, at 26). Because the immunity of senior presidential advisers derives from the immunity of the President, this same logic extends to them as well.

Our 2007 conclusion in *Immunity of the Former Counsel* was consistent with the analysis of the immunity interests of former officials during the George H.W. Bush and Nixon Administrations. *See* Letter for Arthur B. Culvahouse, O'Melveny & Myers, from C. Boyden Gray, Counsel to the President at 1 (June 17, 1992) ("[I]t is long-standing White House policy not to assent to formal testimony to Congressional committees by former White House officials about matters occurring during their White House service."). It is true that the President does not have the same need for the daily advice and assistance of his former advisers, as with his current advisers, yet the confidentiality interests associated with the advisers' former role remain just as strong. *See* Cramton Memorandum, *supra* note 1, at 5–6 ("If advice from a staff member were protected from congressional and public scrutiny only for so long as the staff member remained employed in the White House, the protection would be significantly reduced. It would only be a question of time when staff turnovers or a change in administration would remove the shield.").

Even more significantly, the risk to the separation of powers and to the President's autonomy posed by a former adviser's testimony on official matters continues after the conclusion of that adviser's tenure. *See id.* at 6 ("[T]he same considerations that were persuasive to former President Truman would apply to justify a refusal to appear by such a former staff member, if the scope of his testimony is to be limited to his activities while serving in that capacity."). Accordingly, consistent with our prior precedents, we find no material distinction between the compelled congressional testimony of current and former senior advisers to the President. Mr. McGahn's departure as Counsel to the President does not alter his immunity from compelled congressional testimony on matters related to his service to the President.

## III.

In this instance, the Committee seeks to question Mr. McGahn concerning matters addressed in the report of Special Counsel Robert S. Mueller, III, on the Investigation into Russian Interference in the 2016 Presidential Election. The Chairman of the Committee has suggested that the White House's voluntary cooperation with this investigation and the President's decision not to assert executive privilege over the Special Counsel's report may undermine any claim that Mr. McGahn is immune from compelled testimony. Nadler Letter at 1. However, the concept of immunity is distinct from, and broader than, the question whether executive privilege would protect a witness's response to any particular question. *See* Rehnquist Memorandum at 4 (recognizing the "distinction between a claim of absolute immunity from even being sworn as a witness, and a right to claim privilege in answer certain questions in the course of one's testimony as a witness").[3] The President does not waive an adviser's immunity from compelled congressional testimony by authorizing disclosure of any particular information. To the contrary, Presidents have frequently authorized aides to share information as an accommodation to Congress, notwithstanding claims of immunity.

The immunity from compelled congressional testimony implicates fundamental separation of powers principles that are separate from the confidentiality of specific information. *See supra* Part I.A. The constitutional interest in protecting the autonomy and independence of the Presidency remains the same no matter whether the compelled testimony from a presidential adviser would implicate public or potentially privileged matters. The President does not waive his own immunity from compelled congressional testimony by making public statements on a given subject. It follows then that the derivative immunity of senior presidential advisers is not waived either.

Were the rule otherwise, Presidents could not offer partial accommodations to Congress without waiving all privileges or immunities bearing upon the subject. Such a rule would severely hinder the "spirit of dynamic compromise" and "implicit constitutional mandate to seek optimal accommodation" that currently facilitates resolution of inter-branch disputes over information. *Am. Tel. & Tel. Co.*, 567 F.2d at 127. And such a rule would stand in marked

---

[3] The Reno Opinion described the testimonial immunity as "a separate legal basis that would support a claim of executive privilege for the entirety of the Counsel's testimony, thereby eliminating any need for her to appear at the hearing." 23 Op. O.L.C. at 4. We think that the Rehnquist Memorandum's distinction between an immunity and a privilege reflects the more precise formulation, but the distinction appears to be merely a semantic one.

contrast to many instances of historical practice in which senior advisers declined to testify before Congress, but instead offered accommodations through informal meetings or written responses. *See, e.g.*, Schmults Letter at 2–3; Weddington Letter at 1–2. Yet no one has viewed such accommodations, or the testimony of other executive advisers on similar subjects, to constitute a general waiver of immunity.

The Chairman's suggestion that Mr. McGahn can no longer claim immunity appears to be based upon the assumption that the President waived executive privilege by authorizing Mr. McGahn and his senior aides to cooperate with the Special Counsel's investigation. But the question of privilege is distinct from the issue of immunity. And in any event, the premise of the Committee's position is incorrect. The sharing of information between one arm of the Executive Branch and another does not compromise the President's interest in confidentiality. Indeed, in *Nixon v. Administrator of General Services*, the Supreme Court rejected a separation of powers objection to the disclosure of presumptively confidential information because "[t]he Executive Branch remains in full control of the Presidential materials, and . . . the materials can be released only when release is not barred by some applicable privilege inherent in that branch." 433 U.S. at 444. Information that was shared with the Special Counsel was shared *within* the Executive Branch. Such voluntary sharing does not waive confidentiality or the underlying privilege.

This conclusion is consistent with past assertions of executive privilege. In *Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7 (2008), Attorney General Michael Mukasey advised that the President could assert executive privilege against Congress over memoranda recording interviews of White House witnesses with Department of Justice investigators. *Id.* at 9–13. As he explained, "[w]ere future presidents, vice presidents or White House staff to perceive that such voluntary cooperation would create records that would likely be made available to Congress (and then possibly disclosed publicly outside of judicial proceedings such as a trial), there would be an unacceptable risk that such knowledge could adversely impact their willingness to cooperate fully and candidly in a voluntary interview." *Id.* at 11. Implicit in that explanation was the understanding that the White House's voluntary cooperation with the Department's investigation did not constitute a waiver of privilege against third parties outside the Executive Branch. So, too, the White House's voluntary cooperation with the Special Counsel's investigation did not effect a waiver of privilege, much less a waiver of testimonial immunity.

In contrast with the White House's cooperation with the Special Counsel, the Attorney General's public release of a redacted version of the Special Counsel's report (with the President's consent) does extinguish the Executive Branch's confidentiality interests in the precise information that has already been revealed. But, as the D.C. Circuit has held, the "release of a document only waives [executive] privileges for the document or information specifically released, and not for related materials." *In re Sealed Case*, 121 F.3d at 741; *see id.* ("[An] all-or-nothing approach has not been adopted with regard to executive privileges generally, or to the deliberative process privilege in particular."). As Assistant Attorney General Scalia explained, the purposes underlying executive privilege "would be jeopardized if harmful information had to be disclosed merely because the President permitted the release of related information that could be revealed safely." Scalia Memorandum, *supra* note 1, at 6–7. Such a result "would have the effect of requiring the concealment of much information which would be released, merely because it was connected with sensitive information." *Id.* at 7.

Thus, the public disclosure of particular information does not waive the Executive Branch's confidentiality interests over the subject matters involved in the prior disclosure. *See, e.g., Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 8 (2007) (opinion of Acting Attorney General Paul Clement) ("The Department[ of Justice]'s accommodation with respect to some White House-Department communications does not constitute a waiver and does not preclude the President from asserting executive privilege with respect to White House materials or testimony concerning such communications."). Consequently, the public disclosure of the Special Counsel's report did not constitute a general waiver concerning Mr. McGahn's communications with the President on those subjects or on any other subjects. And in any event, as discussed above, the disclosure's impact on executive privilege does not ultimately bear on Mr. McGahn's underlying immunity from compelled testimony.

## IV.

Because Congress may not constitutionally compel Mr. McGahn to testify about his official duties, the President may lawfully direct him not to appear in response to the House Judiciary Committee's subpoena. Should the President provide that direction, Mr. McGahn may not constitutionally be penalized, civilly or criminally, for following it.

The Department of Justice has long recognized "that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("*Prosecution for Contempt*"); *see also Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. 350, 356 (1995) ("[T]he criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege."). As Assistant Attorney General Olson explained, "the Constitution does not permit Congress to make it a crime for an official to assist the President in asserting a constitutional privilege that is an integral part of the President's responsibilities under the Constitution." *Prosecution for Contempt*, 8 Op. O.L.C. at 140. To do so "would be to deter the President from asserting executive privilege and to make it difficult for him to enlist the aid of his subordinates in the process," thereby "burden[ing] and immeasurably impair[ing] the President's ability to fulfill his constitutional duties." *Id.* at 134, 137. Assistant Attorney General Walter Dellinger adhered to that reasoning in 1995, recounting that the "application of the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress." *Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. at 356.

This Office has further confirmed that the same "principles . . . similarly shield a current or former senior adviser to the President from prosecution for lawfully invoking his or her immunity from compelled congressional testimony." *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68 (2008). Subjecting a senior presidential adviser to prosecution for asserting a good-faith claim of testimonial immunity would equally impose upon the President "'the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to exercise a responsibility he found necessary to the performance of his

constitutional duty.'" *Id.* (quoting *Prosecution for Contempt*, 8 Op. O.L.C. at 136). In sum, "'[t]o seek criminal punishment for those who have acted to aid the President's performance of his duty would be . . . inconsistent with the Constitution.'" *Id.* at 69 (quoting *Prosecution for Contempt*, 8 Op. O.L.C. at 142).

We similarly believe that Congress could not lawfully exercise any inherent contempt authority against Mr. McGahn for asserting immunity. The constitutional separation of powers bars Congress from exercising its inherent contempt power in the face of a presidential assertion of executive privilege. An attempt to exercise inherent contempt powers in such a circumstance would be without precedent and "would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions." *Prosecution for Contempt*, 8 Op. O.L.C. at 136. This is so because, as Assistant Attorney General Olson concluded, "the same reasoning that suggests that the [criminal contempt] statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well." *Id.* at 140 n.42. Congress may not impede the President's ability to carry out his constitutionally assigned functions by "arrest[ing], bring[ing] to trial, and punish[ing] an executive official who asserted a Presidential claim of executive privilege." *Id.* The same rationale applies equally to an exercise of inherent contempt powers against a senior aide who has complied with a presidential direction that he not provide testimony to a congressional committee.

**V.**

The immunity of the President's immediate advisers from compelled congressional testimony on matters related to their official responsibilities has long been recognized and arises from the fundamental workings of the separation of powers. This immunity applies to the former White House Counsel. Accordingly, Mr. McGahn is not legally required to appear and testify about matters related to his official duties as Counsel to the President.

Please let us know if we may be of further assistance.

STEVEN A. ENGEL
*Assistant Attorney General*