**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY,<br>UNITED STATES HOUSE OF<br>REPRESENTATIVES,<br>2138 Rayburn House Office Building<br>Washington, D.C. 20515,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD F. MCGAHN II,<br>51 Louisiana Avenue, N.W.<br>Washington, D.C. 20001,<br><br>*Defendant*. | Case No. 1:19-cv-2379 |

# Exhibit E

RPTR FORADORI

EDTR SECKMAN

FORMER SPECIAL COUNSEL ROBERT S. MUELLER III ON THE INVESTIGATION INTO

RUSSIAN INTERFERENCE IN THE 2016 PRESIDENTIAL ELECTION

Wednesday, July 24, 2019

U.S. House of Representatives,

Permanent Select Committee on Intelligence,

Washington, D.C.

The committee met, pursuant to call, at 12:50 p.m., in Room HVC-304, Capitol
Visitor Center, the Honorable Adam Schiff (chairman of the committee) presiding.

Present:   Representatives Schiff, Himes, Sewell, Carson, Speier, Quigley,
Swalwell, Castro, Heck, Welch, Maloney, Demings, Krishnamoorthi, Nunes, Conaway,
Turner, Wenstrup, Stewart, Crawford, Stefanik, Hurd, and Ratcliffe.

The Chairman.   The committee will come to order.    At the outset and on behalf of my colleagues, I want to thank you, Special Counsel Mueller, for a lifetime of service to the country.    Your report, for those who have taken the time to study it, is methodical, and it is devastating, for it tells the story of a foreign adversary's sweeping and systematic intervention in a close U.S. Presidential election.    That should be enough to deserve the attention of every American, as you well point out.    But your report tells another story as well.

For the story of the 2016 election is also a story about disloyalty to country, about greed, and about lies.    Your investigation determined that the Trump campaign, including Donald Trump himself, knew that a foreign power was intervening in our election and welcomed it, built Russian meddling into their strategy and used it.

Disloyalty to country.    Those are strong words, but how else are we to describe a Presidential campaign which did not inform the authorities of an foreign offer of dirt on their opponent, which did not publicly shun it or turn it away, but which instead invited it, encouraged it, and made full use of it.    That disloyalty may not have been criminal. Constrained by uncooperative witnesses, the destruction of documents and the use of encrypted communications, your team was not able to establish each of the elements of the crime of conspiracy beyond a reasonable doubt, so not provable crime in any event. But I think maybe something worse.

A crime is the violation of law written by Congress, but disloyalty to country violates the very oath of citizenship, our devotion to a core principle on which our Nation was founded, that we, the people, and not some foreign power that wishes us ill, we decide who governs us.

This is also a story about money, about greed and corruption, about the

leadership of a campaign willing to compromise the Nation's interest, not only to win but to make money at the same time.    About a campaign chairman indebted to pro-Russian interests who tried to use his position to clear his debts and make millions.    About a national security advisory using his position to make money from still other foreign interests.    And about a candidate trying to make more money than all of them put together through a real estate project that to him was worth a fortune, hundreds of millions of dollars and the realization of a life-long ambition: a Trump Tower in the heart of Moscow.    A candidate who in fact viewed his whole campaign as the greatest infomercial in history.

Donald Trump and his senior staff were not alone in their desire to use the election to make money.    For Russia, too, there was a powerful financial motive.    Putin wanted relief from economic sanctions imposed in the wake of Russia's invasion of Ukraine and over human rights violations.

The secret Trump Tower meeting between the Russians and senior campaign officials was about sanctions.    The secret conversations between Flynn and the Russian Ambassador were about sanctions.    Trump and his team wanted more money for themselves, and the Russians wanted more money for themselves and for their oligarchs.

The story doesn't end here either, for your report also tells a story about lies, lots of lies.    Lies about a gleaming tower in Moscow and lies about talks with the Kremlin. Lies about the firing of FBI Director James Comey and lies about efforts to fire you, Director Mueller, and lies to cover it up.    Lies about secret negotiations with the Russians over sanctions and lies about WikiLeaks.    Lies about polling data and lies about hush money payments.    Lies about meetings in the Seychelles to set up secret back channels and lies about a secret meeting in New York Trump Tower.    Lies to the FBI. Lies to your staff.    And lies to this committee.    Lies to obstruct an investigation into the

most serious attack on our democracy by a foreign power in our history.

That is where your report ends, Director Mueller, with a scheme to cover up, obstruct, and deceive every bit as systematic and pervasive as the Russian disinformation campaign itself, but far more pernicious since this rot came from within.    Even now, after 448 pages and 2 volumes, the deception continues.    The President and his acolytes say your report found no collusion, though your report explicitly declined to address that question, since collusion can involve both criminal and noncriminal conduct.

Your report laid out multiple offers of Russian help to the Trump campaign, the campaign's acceptance of that help, and overt acts in furtherance of Russian help.    To most Americans, that is the very definition of collusion, whether it is a crime or not. They say your report found no evidence of obstruction, though you outline numerous actions by the President intended to obstruct the investigation.

They say the President has been fully exonerated, though you specifically declare you could not exonerate him.    In fact, they say your whole investigation was nothing more than a witch hunt, that the Russians didn't interfere in our election, that it is all a terrible hoax.    The real crime, they say, is not that the Russians intervened to help Donald Trump but that the FBI had the temerity to investigate it when they did.

But, worst of all, worse than all the lies and the greed is the disloyalty to country. For that, too, continues.    When asked if the Russians intervene again, will you take their help, Mr. President?    Why not, was the essence of his answer; everyone does it.

No, Mr. President, they don't.    Not in the America envisioned by Jefferson, Madison, and Hamilton.    Not for those who believe in the idea that Lincoln labored until his dying day to preserve the idea animating our great national experiments so unique then, so precious still, that our government is chosen by our people through our franchise, and not by some hostile foreign power.

This is what is at stake, our next election and the one after that for generations to come.    Our democracy.    This is why your work matters, Director Mueller, this is why our investigation matters, to bring these dangers to light.

Ranking Member Nunes.

[The statement of The Chairman follows:]


******** COMMITTEE INSERT ********

Mr. <u>Nunes.</u>    Thank you, Mr. Chairman.

Welcome, everyone, to the last gasp of the Russia collusion conspiracy theory. As Democrats continue to foist this spectacle on the American people, as well as you, Mr. Mueller, the American people may recall the media first began spreading this conspiracy theory in the spring of 2016 when Fusion GPS, funded by the DNC and the Hillary Clinton campaign, started developing the Steele dossier, an collection outlandish accusations that Trump and his associates were Russian agents.

Fusion GPS, Steele, and other confederates fed these absurdities to naive or partisan reporters, and to top officials in numerous agencies, including the FBI, the Department of Justice, and the State Department.    Among other things, the FBI used dossier allegations to obtain a warrant to spy on the Trump campaign, despite acknowledging dossier allegations as being salacious and unverified.    Former FBI Director James Comey briefed those allegations to President Obama and President-elect Trump, those briefings conveniently leaked to the press, resulting in the publication of the dossier and launching thousands of false press stories based on the word of a foreign ex-spy.    One who admitted he was desperate that Trump lose the election, and who was eventually fired as an FBI source for leaking to the press.

After Comey himself was fired, by his own admission, he leaked derogatory information on President Trump to the press for the specific purpose, and successfully so, of engineering the appointment of a special counsel who sits here before us today.

The FBI investigation was marred by further corruption and bizarre abuses.    Top DOJ official Bruce Ohr, whose own wife worked on Fusion GPS' anti-Trump operation, fed Steele's information to the FBI, even after the FBI fired Steele.

The top FBI investigator and his lover, another top FBI official, constantly texted

about how much they hated Trump and wanted to stop him from being elected.    And

the entire investigation was opened based not on Five Eyes intelligence but on a tip from

a foreign politician about a conversation involving Joseph Mifsud.    He is a Maltese

diplomat who's widely portrayed as a Russian agent but seems to have far more

connections with Western governments, including our own FBI and our own State

Department, than with Russia.

Brazenly ignoring all these red flags as well as the transparent absurdity of the

claims they are making, the Democrats have argued for nearly 3 years that evidence of

collusion is hidden just around the corner.    Like the Loch Ness monster, they insist it's

there, even if no one can find it.

Consider this, in March 2017, Democrats on this committee said they had more

than circumstantial evidence of collusion, but they couldn't reveal it yet.    Mr. Mueller

was soon appointed, and they said he would find the collusion.    Then when no collusion

was found in Mr. Mueller's indictments, the Democrats said we'd find it in his final report.

Then when there was no collusion in the report, we were told Attorney General Barr was

hiding it.    Then when it was clear Barr wasn't hiding anything, we were told it will be

revealed through a hearing with Mr. Mueller himself.

And now that Mr. Mueller is here, they're claiming that the collusion has actually

been in his report all along, hidden in plain sight.    And they're right.    There is collusion

in plain sight: collusion between Russia and the Democratic Party.    The Democrats

colluded with Russian sources to develop the Steele dossier.    And Russian lawyer Natalia

Veselnitskaya colluded with the dossier's key architect, Fusion GPS head Glenn Simpson.

The Democrats have already admitted, both in interviews and through their usual

anonymous statements to reporters, that today's hearing is not about getting information

at all.    They said they want to, quote, bring the Mueller report to life and create a

television moment through ploys like having Mr. Mueller recite passages from his own report.

In other words, this hearing is political theater.   It's a Hail Mary attempt to convince the American people that collusion is real and that it's concealed in the report. Granted, that's a strange argument to make about a report that is public.   It's almost like the Democrats prepared arguments accusing Mr. Barr of hiding the report and didn't bother to update their claims once he published the entire thing.

Among congressional Democrats, the Russia investigation was never about finding the truth.   It's always been a simple media operation.   By their own accounts, this operation continues in this room today.   Once again, numerous pressing issues this committee needs to address are put on hold to indulge the political fantasies of people who believed it was their destiny to serve Hillary Clinton's administration.

It's time for the curtain to close on the Russia hoax.   The conspiracy theory is dead.   At some point, I would argue, we're going to have to get back to work.   Until then, I yield back the balance of my time.

[The statement of Mr. Nunes follows:]


******** COMMITTEE INSERT ********

The <u>Chairman.</u>   To ensure fairness and make sure that our hearing is prompt -- I know we got a late start, Director Mueller -- the hearing will be structured as follows. Each member of the committee will be afforded 5 minutes to ask questions, beginning with the chair and ranking member.   As chair, I will recognize thereafter, in an alternating fashion and descending order of seniority, members of the majority and minority.

After each member has asked his or her questions, the ranking member will be afforded an additional 5 minutes to ask questions, followed by the chair, who will have additional 5 minutes for questions.   The ranking member and the chair will not be permitted to delegate or yield our final round of questions to any other member.

After six members of the majority and six members of the minority have concluded their 5-minute rounds of questions, we'll take a 5- or 10-minute break, that we understand you've requested, before resuming the hearing with Congressman Swalwell starting his round of questions.

Special Counsel Mueller is accompanied today by Aaron Zebley, who served as deputy special counsel from May 2017 until May 2019 and had day-to-day oversight of the special counsel's investigation.   Mr. Mueller and Mr. Zebley resigned from the Department of Justice at the end of May 2019 when the Special Counsel's Office was closed.

Both Mr. Mueller and Mr. Zebley will be available to answer questions today and will be sworn in consistent with the rules of the House and the committee.   Mr. Mueller and Mr. Zebley's appearance today before the committee is in keeping with the committee's long-standing practice of receiving testimony from current or former Department of Justice and FBI personnel regarding open and closed investigative matters.

As this hearing is under oath and before we begin your testimony, Mr. Mueller and Zebley, would you please rise and raise your right hands to be sworn.

Do you swear or affirm that the testimony you're about to give at this hearing is the whole truth and nothing but the truth?

Mr. <u>Mueller.</u>   I do.

Mr. <u>Zebley.</u>   I do.

The <u>Chairman.</u>   The record will reflect that the witnesses have been duly sworn. Ranking member?

Mr. <u>Nunes.</u>   Thank you, Mr. Chair.   I just want to clarify that this is highly unusual for Mr. Zebley to be sworn in.   We're here to ask Director Mueller questions. He's here as counsel.   Our side is not going to be directing any questions to Mr. Zebley, and we have concerns about his prior representation of the Hillary Clinton campaign aide. So I just want to voice that concern that we do have, and we will not be addressing any questions to Mr. Zebley today.

The <u>Chairman.</u>   I thank the ranking member.   I realize, as you probably do, Mr. Zebley, that there is an angry man down the street who's not happy about you being here today, but it is up to this committee and not anyone else who will be allowed to be sworn in and testify, and you are welcome, as a private citizen, to testify, and members may direct their questions to whoever they choose.

With that, Director Mueller, you are recognized for any opening remarks you would like to make.

**TESTIMONY OF ROBERT S. MUELLER III, FORMER SPECIAL COUNSEL**


Mr. <u>Mueller.</u>    Thank you.    Good afternoon, Chairman Schiff, Ranking Member Nunes, and members of the committee.    I testified this morning before the House Judiciary Committee.    I ask that the opening statement I made before that committee be incorporated into the record here.

The <u>Chairman.</u>    Without objection, Director.

[The information follows:]


\*\*\*\*\*\*\*\* COMMITTEE INSERT \*\*\*\*\*\*\*\*

Mr. <u>Mueller.</u>   I understand that this committee has a unique jurisdiction and that you are interested in further understanding the counterintelligence implications of our investigation.   So let me say a word about how we handled the potential impact of our investigation on counterintelligence matters.

As we explained in our report, the special counsel regulations effectively gave me the role of United States Attorney.   As a result, we structured our investigation around evidence for possible use in prosecution of Federal crimes.   We did not reach what you would call counterintelligence conclusions.   We did, however, set up processes in the office to identify and pass counterintelligence information on to the FBI.

Members of our office periodically briefed the FBI about counterintelligence information.   In addition, there were agents and analysts from the FBI who were not on our team but whose job it was to identify counterintelligence information in our files and to disseminate that information to the FBI.   For these reasons, questions about what the FBI has done with the counterintelligence information obtained from our investigation should be directed to the FBI.

I also want to reiterate a few points that I made this morning.   I am not making any judgments or offering opinions about the guilt or innocence in any pending case.   It is unusual for a prosecutor to testify about a criminal investigation, and given my role as a prosecutor, there are reasons why my testimony will necessarily be limited.

First, public testimony could affect several ongoing matters.   In some of these matters, court rules or judicial orders limit the disclosure of information to protect the fairness of the proceedings.   And consistent with longstanding Justice Department policy, it would be inappropriate for me to comment in any way that could affect an ongoing matter.

Second, the Justice Department has asserted privileges concerning investigative information and decisions, ongoing matters within the Justice Department, and deliberations within our office.    These are Justice Department privileges that I will respect.    The Department has released a letter discussing the restrictions on my testimony.    I, therefore, will not be able to answer questions about certain areas that I know are of public interest.

For example, I am unable to address questions about the opening of the FBI's Russia investigation, which occurred months before my appointment, or matters related to the so-called Steele dossier.    These matters are the subject of ongoing review by the Department.    Any questions on these topics should, therefore, be directed to the FBI or the Justice Department.

Third, as I explained this morning, it is important for me to adhere to what we wrote in our report.    The report contains our findings and analysis and the reasons for the decisions we made.    We stated the results of our investigation with precision.    I do not intend to summarize or describe the results of our work in a different way in the course of my testimony today.

As I stated in May, I also will not comment on the actions of the Attorney General or of Congress.    I was appointed as a prosecutor, and I intend to adhere to that role and to the Department's standards that govern.

Finally, as I said this morning, over the course of my career, I have seen a number of challenges to our democracy.    The Russian Government's efforts to interfere in our election is among the most serious, and I am sure the committee agrees.

Now, before we go to questions, I want to add one correction to my testimony this morning.    I want to go back to one thing that was said this morning by Mr. Lieu, who said, and I quote:    You didn't charge the President because of the OLC opinion.

That is not the correct way to say it.    As we say in the report, and as I said at the opening, we did not reach a determination as to whether the President committed a crime.

And, with that, Mr. Chairman, I'm ready to answer questions.

[The statement of Mr. Mueller follows:]


******** COMMITTEE INSERT ********

The <u>Chairman.</u>   Thank you, Director Mueller.

I recognize myself for 5 minutes.

Director Mueller, your report describes a sweeping and systemic effort by Russia to influence our Presidential election.   Is that correct?

Mr. <u>Mueller.</u>   That is correct.

The <u>Chairman.</u>   And during the course of this Russian interference in the election, the Russians made outreach to the Trump campaign, did they not?

Mr. <u>Mueller.</u>   That occurred over the course of -- yeah, that occurred.

The <u>Chairman.</u>   It's also clear from your report that, during that Russian outreach to the Trump campaign, no one associated with the Trump campaign ever called the FBI to report it.   Am I right?

Mr. <u>Mueller.</u>   I don't know that for sure.

The <u>Chairman.</u>   In fact, the campaign welcomed the Russian help, did they not?

Mr. <u>Mueller.</u>   I think we reported in our -- in the report indications that that occurred.   Yes.

The <u>Chairman.</u>   The President's son said when he was approached about dirt on Hillary Clinton that the Trump campaign would love it?

Mr. <u>Mueller.</u>   That is generally what was said.   Yes.

The <u>Chairman.</u>   The President himself called on the Russians to hack Hillary's emails?

Mr. <u>Mueller.</u>   There was a statement by the President in those general lines.

The <u>Chairman.</u>   And numerous times during the campaign, the President praised the releases of the Russian-hacked emails through WikiLeaks.

Mr. <u>Mueller.</u>   That did occur.

The <u>Chairman.</u>    Your report found that the Trump campaign planned, quote, a press strategy, communications campaign, and messaging, unquote, based on that Russian assistance?

Mr. <u>Mueller.</u>    I am not familiar with that.

The <u>Chairman.</u>    That language comes from Volume I, page 54.

Apart from the Russians wanting to help Trump win, several individuals associated with the Trump campaign were also trying to make money during the campaign and transition.    Is that correct?

Mr. <u>Mueller.</u>    That is true.

The <u>Chairman.</u>    Paul Manafort was trying to make money or achieve debit forgiveness from a Russian oligarch?

Mr. <u>Mueller.</u>    Generally, that is accurate.

The <u>Chairman.</u>    Michael Flynn was trying to make money from Turkey?

Mr. <u>Mueller.</u>    True.

The <u>Chairman.</u>    Donald Trump was trying to make millions from a real estate deal in Moscow?

Mr. <u>Mueller.</u>    To the extent you're talking about the hotel in Moscow?

The <u>Chairman.</u>    Yes.

Mr. <u>Mueller.</u>    Yes.

The <u>Chairman.</u>    When your investigation looked into these matters, numerous Trump associates lied to your team, the grand jury, and Congress?

Mr. <u>Mueller.</u>    A number of persons that we interviewed in our investigation it turns out did lie.

The <u>Chairman.</u>    Mike Flynn lied?

Mr. <u>Mueller.</u>    He was convicted of lying, yes.

The <u>Chairman.</u>   George Papadopoulos was convicted of lying?

Mr. <u>Mueller.</u>   True.

The <u>Chairman.</u>   Paul Manafort was convicted of lying?

Mr. <u>Mueller.</u>   True.

The <u>Chairman.</u>   Paul Manafort, in fact, went so far as to encourage other people to lie?

Mr. <u>Mueller.</u>   That is accurate.

The <u>Chairman.</u>   Manafort's deputy, Rick Gates, lied?

Mr. <u>Mueller.</u>   That is accurate.

The <u>Chairman.</u>   Michael Cohen, the President's lawyer, was indicted for lying?

Mr. <u>Mueller.</u>   True.

The <u>Chairman.</u>   He lied to stay on message with the President?

Mr. <u>Mueller.</u>   Allegedly by him.

The <u>Chairman.</u>   And when Donald Trump called your investigation a witch hunt, that was also false, was it not?

Mr. <u>Mueller.</u>   I like to think so, yes.

The <u>Chairman.</u>   Well, your investigation is not a witch hunt, is it?

Mr. <u>Mueller.</u>   It is not a witch hunt.

The <u>Chairman.</u>   When the President said the Russian interference was a hoax, that was false, wasn't it?

Mr. <u>Mueller.</u>   True.

The <u>Chairman.</u>   When he said it publicly, it was false?

Mr. <u>Mueller.</u>   He did say publicly that it was false.    Yes.

The <u>Chairman.</u>   And when he told it to Putin, that was false, too, wasn't it?

Mr. <u>Mueller.</u>   That I'm not familiar with.

The <u>Chairman.</u>   When the President said he had no business dealings with Russia. That was false, wasn't it?

Mr. <u>Mueller.</u>   I'm not going to go into the details of the report along those lines.

The <u>Chairman.</u>   When the President said he had no business dealings with Russia, in fact, he was seeking to build a Trump Tower in Moscow, was he not?

Mr. <u>Mueller.</u>   I think there's some question about when this was accomplished.

The <u>Chairman.</u>   Well, you would consider a billion dollar deal to build a tower in Moscow to be business dealings, wouldn't you, Director Mueller?

Mr. <u>Mueller.</u>   Absolutely.

The <u>Chairman.</u>   In short, your investigation found evidence that Russia wanted to help Trump win the election, right?

Mr. <u>Mueller.</u>   I think, generally, that would be accurate.

The <u>Chairman.</u>   Russia informed campaign officials of that?

Mr. <u>Mueller.</u>   I'm not certain to what conversation you're referring to.

The <u>Chairman.</u>   Well, through an intermediary, they informed Papadopoulos that they could help with the anonymous release of stolen emails.

Mr. <u>Mueller.</u>   Accurate.

The <u>Chairman.</u>   Russia committed Federal crimes in order to help Donald Trump?

Mr. <u>Mueller.</u>   When you're talking about the computer crimes charged in our case, absolutely.

The <u>Chairman.</u>   The Trump campaign officials built their strategy, their messaging strategy, around those stolen documents?

Mr. <u>Mueller.</u>   Generally, that's true.

The <u>Chairman.</u>   And then they lied to cover it up?

Mr. <u>Mueller.</u>   Generally, that's true.

The <u>Chairman.</u>    Thank you.

Mr. Nunes.

Mr. <u>Nunes.</u>    Thank you.

Welcome, Director.    As a former FBI Director, you'd agree that the FBI is the world's most capable law enforcement agency?

Mr. <u>Mueller.</u>    I would say we're -- yes.

Mr. <u>Nunes.</u>    The FBI claims the counterintelligence investigation of the Trump campaign began on July 31, 2016, but in fact, it began before that.    In June 2016, before the investigation officially opened, Trump campaign associates Carter Page and Stephen Miller, a current Trump advisor, were invited to attend a symposium at Cambridge University in July of 2016.    Your office, however, did not investigate who was responsible for inviting these Trump Associates to this symposium.

Your investigators also failed to interview Steven Schrage, an American citizen who helped organize the event and invited Carter Page to it.    Is that correct?

Mr. <u>Mueller.</u>    Can you repeat the question?

Mr. <u>Nunes.</u>    Whether or not you interviewed Steven Schrage, who organized --

Mr. <u>Mueller.</u>    Those areas I'm going to stay away from.

Mr. <u>Nunes.</u>    The first Trump associate to be investigated was General Flynn. Many of the allegations against him stem from false media reports that he had an affair with a Cambridge academic, Svetlana Lokhova, and that Lokhova was a Russian spy. Some of these allegations were made public in a 2017 article written by British intelligence historian Christopher Andrew.    Your report fails to reveal how or why Andrew and his collaborator, Richard Dearlove, former head of Britain's MI6, spread these allegations.    And you failed to interview Svetlana Lokhova about these matters. Is that correct?

Mr. <u>Mueller.</u>    I'm not going to get into those matters to which you refer.

Mr. <u>Nunes.</u>    You had a team of 19 lawyers, 40 agents, and an unlimited budget, correct, Mr. Mueller?

Mr. <u>Mueller.</u>    I would not say we had an unlimited budget.

Mr. <u>Nunes.</u>    Let's continue with the ongoing or the opening of the investigation supposedly on July 31, 2016.    The investigation was not open based on an official product from Five Eyes intelligence, but based on a rumor conveyed by Alexander Downer.    On Volume I, page 89, your report describes him blandly as a representative of a foreign government, but he was actually a long-time Australia politician, not a military or intelligence official, who had previously arranged a $25 million donation to the Clinton Foundation and has previous ties to Dearlove.

So Downer conveys a rumor he supposedly heard about a conversation between Papadopoulos and Joseph Mifsud.    James Comey has publicly called Mifsud a Russian agent, yet your report does not refer to Mifsud as a Russian agent.    Mifsud has extensive contacts with Western governments and the FBI.

For example, there is a recent photo of him standing next to Boris Johnson, the new Prime Minister of Great Britain.    What we're trying to figure out here, Mr. Mueller, is if our NATO allies or Boris Johnson have been compromised.    So we're trying to figure out, Comey says Mifsud is a Russian agent; you do not.    So do you stand by what's in the report?

Mr. <u>Mueller.</u>    I stand by that which is in the report, and not so necessarily with that which is not in the report.

Mr. <u>Nunes.</u>    I want to return to Mr. Downer, he denies that Papadopoulos mentioned anything to him about Hillary Clinton's emails.    And, in fact, Mifsud denies mentioning that to Papadopoulos.    He denies that Papadopoulos mentioned anything to

him about Hillary Clinton's emails, and in fact, Mifsud denies mentioning them to

Papadopoulos in the first place.

So how does the FBI know to continually ask Papadopoulos about Clinton's emails

for the rest of 2016?    Even more strangely, your sentencing memo on Papadopoulos

blames him for hindering the FBI's ability to potentially detain or arrest Mifsud.    But the

truth is Mifsud waltzed in and out of the United States in December 2016.

The U.S. media could find him.    The Italian press found him.    And he's a

supposed Russian agent at the epicenter of the purported collusion conspiracy.    He's the

guy who knows about Hillary Clinton's emails and that the Russians have them.    But the

FBI failed to question him for a half a year after officially opening the investigation.

And then, according to Volume I, page 193 of your report, once Mifsud finally was

questioned, he made false statements to the FBI.    But you declined to charge him.    Is

that correct?    You did not indict Mr. Mifsud?

Mr. Mueller.    Well, I'm not going to speak to the series of happenings as you

articulated them.

Mr. Nunes.    But you did not indict Mr. Mifsud?

The Chairman.    The time of the gentleman has expired.

Mr. Mueller.    Pardon?

Mr. Nunes.    You did not indict Mr. Mifsud?

Mr. Mueller.    True.

The Chairman.    Mr. Himes.

Mr. Himes.    Director Mueller, thank you for your lifetime of service to this

country, and thank you for your perseverance and patience today.    Director, your report

opens with two statements of remarkable clarity and power.

The first statement is one that is, as of today, not acknowledged by the President

of the United States, and that is, quote:    The Russian Government interfered in the 2016

Presidential election in sweeping and systematic fashion.

The second statement remains controversial amongst Members of this body,

same page on your report, and I quote:    The Russian Government perceived it would

benefit from a Trump Presidency and worked to secure that outcome.    Do I have that

statement right?

Mr. Mueller.    I believe so.

Mr. Himes.    Director Mueller, this attack on our democracy involved, as you said,

two operations.    First, a social media disinformation campaign, this was a targeted

campaign to spread false information on places like Twitter and Facebook.    Is that

correct?

Mr. Mueller.    That's correct.

Mr. Himes.    Facebook estimated, as per your report, that the Russian fake

images reached 126 million people.    Is that correct?

Mr. Mueller.    I believe that's the sum that we record.

Mr. Himes.    Director, who did the Russian social media campaign ultimately

intend benefit, Hillary Clinton or Donald Trump?

Mr. Mueller.    Donald Trump.

Mr. Himes.    The second operation, Director --

Mr. Mueller.    Let me just say Donald Trump, but there were instances where

Hillary Clinton was subject to much the same behavior.

Mr. Himes.    The second operation in the Russian attack was a scheme, what we

call the hack and dump, to steal and release hundreds of thousands of emails from the

Democratic Party and the Clinton campaign.    Is that a fair summary?

Mr. Mueller.    That is.

Mr. <u>Himes.</u>    Did your investigation find that the releases of the hacked emails were strategically timed to maximize impact on the election?

Mr. <u>Mueller.</u>    I'd have to refer you to our report on that question.

Mr. <u>Himes.</u>    Page 36, I quote:    The release of the documents were designed and timed to interfere with the 2016 U.S. Presidential election.    Mr. Mueller, which Presidential candidate was Russia's hacking and dumping operation designed to benefit, Hillary Clinton or Donald Trump?

Mr. <u>Mueller.</u>    Mr. Trump.

Mr. <u>Himes.</u>    Mr. Mueller, is it possible that this sweeping and systematic effort by Russia actually had an effect on the outcome of the Presidential election?

Mr. <u>Mueller.</u>    Those issues are being or have been investigated by other entities.

Mr. <u>Himes.</u>    126 million Facebook impressions, fake rallies, attacks on Hillary Clinton's health, would you rule out that it might have had some effect on the election?

Mr. <u>Mueller.</u>    I'm not going to speculate.

Mr. <u>Himes.</u>    Mr. Mueller, your report describes a third avenue of attempted Russian interference.    That is the numerous links and contacts between the Trump campaign and individuals tied to the Russian Government.    Is that correct?

Mr. <u>Mueller.</u>    Could you repeat that question?

Mr. <u>Himes.</u>    Your report describes what is called a third avenue of Russian interference, and that's the links and contacts between the Trump campaign and individuals tied to the Russian Government?

Mr. <u>Mueller.</u>    Yes.

Mr. <u>Himes.</u>    Let's bring up slide one, which is about George Papadopoulos, and it reads:    On May 6, 2016, 10 days after that meeting with Mifsud, much discussed today, Papadopoulos suggested to a representative of a foreign government that the Trump

campaign had received indications from the Russian Government that it could assist the campaign through the anonymous release of information that would be damaging to Hillary Clinton.

And, Director, that's exactly what happened 2 months later, is it not?

Mr. <u>Mueller.</u>   Well, I can speak to the excerpt that you have on the screen as being accurate from the report, but not the second half of your question.

Mr. <u>Himes.</u>   Well, the second half, just to refer to Page 6 of the report, is that, on July 22, through WikiLeaks, thousands of these emails that were stolen by the Russian Government appeared, correct?   That is on page 6 of the report.   This is the WikiLeaks posting of those emails.

Mr. <u>Mueller.</u>   I can't find it quickly, but I'm -- please continue.

Mr. <u>Himes.</u>   Okay.   So, just to be clear, before the public or the FBI ever knew, the Russians previewed for a Trump campaign official, George Papadopoulos, that they had stolen emails that they could release anonymously to help Donald Trump and hurt Hillary Clinton.   Is that correct?

Mr. <u>Mueller.</u>   I'm not going to speak to that.

Mr. <u>Himes.</u>   Director, rather than report this contact with Joseph Mifsud and the notion that there was dirt that the campaign could use, rather than report that to the FBI, that I think most of my constituents would expect an individual to do, Papadopoulos in fact lied about his Russian contact to you.   Is that not correct?

Mr. <u>Mueller.</u>   That's true.

Mr. <u>Himes.</u>   We have an election coming up in 2020, Director, if a campaign receives an offer of dirt from a foreign individual or a government, generally speaking, should that campaign report those contacts?

Mr. <u>Mueller.</u>   Should be -- can be, depending on the circumstances, a crime.

Mr. <u>Himes.</u>   I will yield back the balance of my time.

The <u>Chairman.</u>   Mr. Conaway.

Mr. <u>Conaway.</u>   Thank you.

Mr. Mueller, did anyone ask you to exclude anything from your report that you felt should have been in the report?

Mr. <u>Mueller.</u>   I don't think so, but it's not a small report.

Mr. <u>Conaway.</u>   But no one asked you specifically to exclude something that you believe should have been in there?

Mr. <u>Mueller.</u>   Not that I can recall.   No.

Mr. <u>Conaway.</u>   I yield the balance of my time to Mr. Ratcliffe.   Thank you.

Mr. <u>Ratcliffe.</u>   I thank the gentleman for yielding.

Good afternoon, Director Mueller.   In your May 29 press conference, and again in your opening remarks this morning, you made it pretty clear you wanted the special counsel report to speak for itself.   You said at your press conference that that was the office's final position, and we will not comment on any other conclusions or hypotheticals about the President.

Now, you spent the last few hours of your life from Democrats trying to get you to answer all kinds of hypotehticals about the President, and I expect that it may continue for the next few hours of your life.   I think you've stayed pretty much true to what your intent and desire was, but I guess, regardless of that, the Special Counsel's Office is closed, and it has no continuing jurisdiction or authority.   So what would be your authority or jurisdiction for adding new conclusions or determinations to the special counsel's written report?

Mr. <u>Mueller.</u>   As to the latter, I don't know or expect a change in the conclusions that we included in our report.

Mr. Ratcliffe.    So, to that point, you addressed one of the issues that I needed to, which was from your testimony this morning, which some construed as a change to the written report.    You talked about the exchange that you had with Congressman Lieu.    I wrote it down a little bit different.    I want to ask you about it so that the record is perfectly clear.

I recorded that he asked you, quote, "The reason you did not indict Donald Trump is because of the OLC opinion stating you cannot indict a sitting President," to which you responded, "That is correct."    That response is inconsistent, I think you'll agree, with your written report.    I want to be clear that it is not your intent to change your written report.    It is your intent to clarify the record today.

Mr. Mueller.    As I started today, this afternoon, and added either a footnote or an end note, what I wanted to clarify is the fact that we did not make any determination with regard to culpability, in any way.    We did not start that process down the road.

Mr. Ratcliffe.    Terrific.    Thank you for clarifying the record.

A stated purpose of your appointment as special counsel was to ensure a full and thorough investigation of the Russian Government efforts to interfere in the 2016 Presidential election.    As part of that full and thorough investigation, what determination did the Special Counsel Office make about whether the Steele dossier was part of the Russian Government efforts to interfere in the 2016 Presidential election?

Mr. Mueller.    Again, when it comes to Mr. Steele, I defer to the Department of Justice.

Mr. Ratcliffe.    Well, first of all, Director, I very much agree with your determination that Russia's efforts were sweeping and systematic.    I think it should concern every American.    That's why I want to know just how sweeping and systematic those efforts were.    I want to find out if Russia interfered with our election by providing

false information through sources to Christopher Steele about a Trump conspiracy that you determined didn't exist.

Mr. Mueller.   Well, again, I'm not going to discuss the issues with regard to Mr. Steele.   In terms of a portrayal of the conspiracies, we returned two indictments in the computer crimes arena, one GRU, and another, active measures, in which we lay out in excruciating detail what occurred in those two --

Mr. Ratcliffe.   And I --

Mr. Mueller.     -- large conspiracies.

Mr. Ratcliffe.   I agree with respect to that, but why this is important is an application and three renewal applications were submitted by the United States Government to spy or surveil on Trump campaign Carter Page, and on all four occasions, the United States Government submitted the Steele dossier as a central piece of evidence with expect to that.

Now, the basic premise of the dossier, as you know, was that there was a well-developed conspiracy of cooperation between the Trump campaign and the Russian Government.   But the special counsel investigation didn't establish any conspiracy, correct?

Mr. Mueller.   Well, what I can tell you is that the events that you are characterizing here now is part of another matter that is being handled by the Department of Justice.

Mr. Ratcliffe.   But you did not establish any conspiracy, much less a well-developed one?

Mr. Mueller.   Again, I pass on answering that.

Mr. Ratcliffe.   The special counsel did not charge Carter Page with anything?

Mr. Mueller.   Special counsel did not.

Mr. <u>Ratcliffe.</u>    All right.    My time is expired.    I yield back.

The <u>Chairman.</u>    Ms. Sewell.

Ms. <u>Sewell.</u>    Director Mueller, I'd like to turn your attention to the June 9, 2016, Trump Tower meeting.    Slide two, which should be on the screen now, is part of an email campaign between Don Jr. -- Donald Trump, Jr., and a publicist representing the son of a Russian oligarch.    The email exchange ultimately led to the now infamous June 9, 2016, meeting.    The email from the publicist to Donald Trump, Jr., reads in part:    The crown prosecutor of Russia offered to provide the Trump campaign with some official documents and information that would incriminate Hillary and her dealings with Russia, and is a part of Russia and its government's support of Mr. Trump.

In this email Donald Trump, Jr., is being told that the Russian Government wants to pass along information which would hurt Hillary Clinton and help Donald Trump.    Is that correct?

Mr. <u>Mueller.</u>    That's correct.

Ms. <u>Sewell.</u>    Now, Trump, Jr.'s, response to that is slide three.    He said, and I quote:    If it is what you say, I love it, especially later in the summer.

Then Donald Jr. invited senior campaign officials Paul Manafort and Jared Kushner to the meeting, did he not?

Mr. <u>Mueller.</u>    He did.

Ms. <u>Sewell.</u>    This email exchange is evidence of an offer of illegal assistance, is it not?

Mr. <u>Mueller.</u>    I cannot adopt that characterization.

Ms. <u>Sewell.</u>    But isn't it against the law for a Presidential campaign to accept anything of value from a foreign government?

Mr. <u>Mueller.</u>    Generally speaking, yes, but -- generally the cases are unique.

Ms. <u>Sewell.</u>    You say, on page 184 in Volume II, that the Federal campaign-finance law broadly prohibits foreign nationals from making contributions, et cetera, and then you say that foreign nationals may not make a contribution or donation of money or anything of value, it said clearly in the report itself.

Mr. <u>Mueller.</u>    Yeah.    Thank you.

Ms. <u>Sewell.</u>    Now, let's turn to what actually happened at the meeting.    When Donald Trump, Jr., and other got to the June 9th meeting, they realized that the Russian delegation didn't have the promised, quote/unquote, dirt.    In fact, they got upset about that, did they not?

Mr. <u>Mueller.</u>    Generally, yes.

Ms. <u>Sewell.</u>    You say in Volume II, page 118, that Trump, Jr., asked:    What are we doing here?    What do they have on Clinton?    And during the meeting, Kushner actually texted Manafort saying it was, quote, a waste of time, end quote.    Is that correct?

Mr. <u>Mueller.</u>    I believe it's in the report along the lines you specify.

Ms. <u>Sewell.</u>    So, to be clear, top Trump campaign officials learned that Russia wanted to help Donald Trump's campaign by giving him dirt on his opponent.    Trump, Jr., said:    Loved it.    And then he and senior officials held a meeting with the Russians to try to get that Russian help, but they were disappointed because the dirt wasn't as good as they had hoped.

So, to the next step, did anyone to your knowledge in the Trump campaign ever tell the FBI of this offer?

Mr. <u>Mueller.</u>    I don't believe so.

Ms. <u>Sewell.</u>    Did Donald Trump, Jr., tell the FBI that they received an offer of help from the Russians?

Mr. <u>Mueller.</u>   I'm going to -- that's about all I'll say on this aspect of it.

Ms. <u>Sewell.</u>   Wouldn't it be true, sir, that if they had reported it to the FBI or anyone in that campaign during the course of your 2-year investigation, you would have uncovered such a --

Mr. <u>Mueller.</u>   I would hope, yes.

Ms. <u>Sewell.</u>   Yes.   Sir, is it not the responsibility of political campaigns to inform the FBI if they receive information from a foreign government?

Mr. <u>Mueller.</u>   I would think that that's something they would and should do.

Ms. <u>Sewell.</u>   Well, not only did the campaign not tell the FBI, they sought to hide the existence of the June 9th meeting for over a year.   Is that not correct?

Mr. <u>Mueller.</u>   On the general characterization, I would question it.   If you're referring to a later initiative that flowed from the media then --

Ms. <u>Sewell.</u>   No, what I'm suggesting is that you've said in Volume 2, page 5: On several occasions, the President directed aides not to publicly disclose the email setting up the June 9th meeting.

Mr. <u>Mueller.</u>   Yes.   That is accurate.

Ms. <u>Sewell.</u>   Thanks.   Sir, given this illegal assistance by Russians, you chose, even given that, you did not charge Donald Trump, Jr., or any of the other senior officials with conspiracy.   Is that right?

Mr. <u>Mueller.</u>   Correct.

Ms. <u>Sewell.</u>   And while --

Mr. <u>Mueller.</u>    If you're talking about other individuals, you're talking about the attendees of June 9, that's accurate.

Ms. <u>Sewell.</u>   Yes, that's right.   So, Mr. Mueller, even though you didn't charge them with conspiracy, don't you think that the American people would be concerned that

these three senior campaign officials eagerly sought a foreign adversary's help to win

elections, and don't you think reporting that is important that we don't set a precedent

for future elections?

Mr. Mueller.    I can't accept that characterization.

Ms. Sewell.    Well, listen, I think that it seems like a betrayal of the American

values to me, sir, that someone with -- if not being criminal, it is definitely unethical and

wrong, and I would think that we would not want to set a precedent that political

campaigns should not divulge of information of its foreign government assistance.

Thank you, sir.

The Chairman.    Mr. Turner.

Mr. Turner.    Mr. Mueller, I have your opening statement, and in the beginning of

your opening statement, you indicate that, pursuant to Justice Department regulations,

that you submitted a confidential report to the Attorney General at the conclusion of the

investigation.    What I'd like you to confirm is the report that you did that is the subject

matter of this hearing was to the Attorney General?

Mr. Mueller.    Yes.

Mr. Turner.    You also state in this opening statement that you threw overboard

the word "collusion" because it's not a legal term.    You would not conclude because

collusion was not a legal term?

Mr. Mueller.    Well, it depends on how you want to use the word.    In the

general parlance, people can think of it that way, but if you're talking about in a criminal

statute arena, you can't because it's much more accurately described as conspiracy.

Mr. Turner.    In your words, it's not a legal term so you didn't put it in your

conclusion, correct?    That's what your opening statement --

Mr. Mueller.    That's correct.

Mr. <u>Turner.</u>    Mr. Mueller, I want to talk about your powers and authorities. Now, the Attorney General in the appointment order gave you powers and authorities that reside in the Attorney General.    Now, the Attorney General has no ability to give you powers and authority greater than the powers and authority of the Attorney General, correct?

Mr. <u>Mueller.</u>    Yeah, I think that is correct.

Mr. <u>Turner.</u>    Mr. Mueller, I want to focus on one word in your report.    It's the second to the last word in the report; it's "exonerate."    The report states:    Accordingly, while this report does not conclude that the President committed a crime, it does not exonerate him.

Now, in the Judiciary Hearing, in your prior testimony, you have already agreed with Mr. Ratcliffe that "exonerate" is not a legal term, that there is not a legal test for this.    So I have a question for you, Mr. Mueller.

Mr. Mueller, does the Attorney General have the power or authority to exonerate?    Now, what I'm putting up here is the United States Code.    This is where the Attorney General gets his power and the Constitution and the annotated cases of these, which we've searched.    We even went to your law school because I went to Case Western, but I thought maybe your law school teaches it differently, and we got the criminal law textbook from your law school.

Mr. Mueller, nowhere in these, because we had them scanned, is there a process or description on exonerate.    There's no Office of Exoneration at the Attorney General's office.    There's no certificate at the bottom of his desk.    Mr. Mueller, would you agree with me that the Attorney General does not have the power to exonerate?

Mr. <u>Mueller.</u>    I'm going to pass on that.

Mr. <u>Turner.</u>    Why?

Mr. <u>Mueller.</u>   Because it embroils us in a legal discussion, and I'm not prepared to do a legal discussion in that arena.

Mr. <u>Turner.</u>   Well, Mr. Mueller, you would not disagree with me when I say that there is no place that the Attorney General has the power to exonerate and he's not been given that authority?

Mr. <u>Mueller.</u>   Again, I'm not going to -- I take your question.

Mr. <u>Turner.</u>   Well, the one thing that I guess is that the Attorney General probably knows that he can't exonerate either, and that's the part that kind of confuses me.   Because if the Attorney General doesn't have the power to exonerate, then you don't have to power to exonerate, and I believe he knows he doesn't the have power to exonerate.

So this is the part I don't understand.   If your report is to the Attorney General, and the Attorney General doesn't have the power to exonerate, and he does not -- and he knows that you do not have that power, you don't have to tell him that you're not exonerating the President; he knows this already.   So then that kind of changed the context of the report.

Mr. <u>Mueller.</u>   No, we include it in the report for exactly that reason.   He may not know it, and he should know it.

Mr. <u>Turner.</u>   So you believe that Attorney Bill Barr believes that somewhere in the hallways of the Department of Justice, there's an Office of Exoneration?

Mr. <u>Mueller.</u>   No, that's not what I said.

Mr. <u>Turner.</u>   Well, I believe he knows, and I don't believe you put that in there for Mr. Barr.   I think you put that in there for exactly what I'm going to discuss next.   And that is, in The Washington Post yesterday, when speaking of your report, the article said: Trump could not be exonerated of trying to obstruct the investigation itself.   Trump

could not be exonerated.

Now, that statement is correct, Mr. Mueller, in that no one can be exonerated. The reporter wrote this -- this reporter can't be exonerated.    Mr. Mueller, you can't be exonerated.    In fact, in our criminal justice system, there is no power or authority to exonerate.    Now, this is my concern, Mr. Mueller.    This is the headline on all of the news channels while you were testifying today:    "Mueller:    Trump was not exonerated."

Now, Mr. Mueller, what you know is that this can't say, "Mueller exonerated Trump," because you don't have the power or authority to exonerate Trump.    You have no power to declare him exonerated than you have the power to declare him Anderson Cooper.    So the problem that I have here is that since there's no one in the criminal justice system that has that power -- the President pardons; he doesn't exonerate. Courts and juries don't declare innocent; they declare not guilty.    They don't even declare exoneration.    The statement about exoneration is misleading, and it's meaningless, and it colors this investigation.    One word out of the entire portion of your report, and it's a meaningless word that has no legal meaning, and it has colored your entire report.

I yield back.

The Chairman.    The time of the gentleman has expired.    Mr. Carson.

Mr. Carson.    Thank you, Chairman.

Thank you, Director Mueller, for your years of service to our country.    I want to look more closely, sir, at the Trump campaign chairman, Paul Manafort, an individual who I believe betrayed our country, who lied to a grand jury, who tampered with witnesses, and who repeatedly tried to use his position with the Trump campaign to make more money.    Let's focus on the betrayal and greed.

Your investigation, sir, found a number of troubling contacts between Mr. Manafort and Russian individuals during and after the campaign.    Is that right, sir?

Mr. <u>Mueller.</u>    Correct.

Mr. <u>Carson.</u>    In addition to the June 9th meeting just discussed, Manafort often met several times with a man named Konstantin Kilimnik, who the FBI assessed to have ties with Russian intel agencies.    Is that right, sir?

Mr. <u>Mueller.</u>    Correct.

Mr. <u>Carson.</u>    In fact, Mr. Manafort didn't just meet with him; he shared private Trump campaign polling information with this man linked to Russian intelligence.    Is that right, sir?

Mr. <u>Mueller.</u>    That is correct.

Mr. <u>Carson.</u>    And in turn, the information was shared with a Russian oligarch tied to Vladimir Putin.    Is that right, sir?

Mr. <u>Mueller.</u>    Allegedly.

Mr. <u>Carson.</u>    Director Mueller, meeting with him wasn't enough.    Sharing internal polling information wasn't enough.    Mr. Manafort went so far as to offer this Russian oligarch tied to Putin a private briefing on the campaign.    Is that right, sir?

Mr. <u>Mueller.</u>    Yes, sir.

Mr. <u>Carson.</u>    And, finally, Mr. Manafort also discussed internal campaign strategy on four battleground States -- Michigan, Wisconsin, Pennsylvania, and Minnesota -- with the Russian-intelligence-linked individual.    Did he not, sir?

Mr. <u>Mueller.</u>    That's reflected in the report, as were the items you listed previously.

Mr. <u>Carson.</u>    Director Mueller, based on your decades of years of experience at the FBI, would you agree, sir, that it creates a national security risk when a Presidential

campaign chairman shares private polling information on the American people, private political strategy related to winning the votes of the American people, and private information about American battleground States with a foreign adversary?

Mr. Mueller.   Is that the question, sir?

Mr. Carson.   Yes, sir.

Mr. Mueller.   I'm not going to speculate along those lines.   To the extent that it's within the lines of the report, then I'd support it.   Anything beyond that is not part of that which I would support.

Mr. Carson.   Well, I think it does, sir.   I think it shows an infuriating lack of patriotism from the very people seeking the highest office in the land.   Director Mueller, Manafort didn't share this information exchange for nothing, did he, sir?

Mr. Mueller.   I can't answer that question without knowing more about the question.

Mr. Carson.   Well, it's clear that he hoped to be paid back money he was owed by Russian or Ukrainian oligarchs in return for the passage of private campaign information, correct?

Mr. Mueller.   That is true.

Mr. Carson.   Director Mueller, as my colleague, Mr. Heck, will discuss later, greed corrupts.   Would you agree, sir, that the sharing of private campaign information in exchange for money represents a particular kind of corruption, one that presents a national security risk to our country, sir?

Mr. Mueller.   I'm not going to opine on that.   I don't have the expertise in that arena to really opine?

Mr. Carson.   Would you agree, sir, that Manafort's contacts with Russians close to Vladimir Putin and his efforts to exchange private information on Americans for money

left him vulnerable to blackmail by the Russians?

Mr. <u>Mueller.</u>   I think generally so that would be the case.

Mr. <u>Carson.</u>   Would you agree, sir, that these acts demonstrated a betrayal of the democratic values our country rests on?

Mr. <u>Mueller.</u>   I can't agree with that.

Mr. <u>Carson.</u>   Director Mueller --

Mr. <u>Mueller.</u>   Not that it's not true, but I cannot agree with it.

Mr. <u>Carson.</u>   Yes, sir.   Director Mueller, well, I can tell you that, in my years as a law enforcement officer and as a Member of Congress, fortunate to serve on the Intel Committee, I know enough to say, yes, trading political secrets for money with a foreign adversary can corrupt, and it can leave you open to blackmail.   And it certainly represents a betrayal of the values underpinning our democracy.

I want to thank you for your service again, Director Mueller, we appreciate you for coming today.   I yield back, chairman.

The <u>Chairman.</u>   Dr. Wenstrup.

Dr. <u>Wenstrup.</u>   Thank you, Mr. Chairman.

Thank you, Mr. Mueller, for being here today.   Mr. Mueller, is it accurate to say your investigation found no evidence of members of the Trump campaign were involved in the theft or publication of Clinton campaign-related emails?

Mr. <u>Mueller.</u>   Can you repeat the question?

Dr. <u>Wenstrup.</u>   It is accurate to say your investigation found no evidence that members of the Trump campaign were involved in the theft or publication of the Clinton campaign-related emails?

Mr. <u>Mueller.</u>   I don't know the -- I don't know.   I -- well --

Dr. <u>Wenstrup.</u>   Well, Volume II, page 5, the investigation did not establish that

members of the Trump campaign conspired or coordinated with the Russian Government in its election interference activities.    So it would, therefore, be inaccurate, based on this, to describe that finding as open to doubt, and that finding being that the Trump campaign was involved with theft or publication of the Clinton campaign emails.    Are you following that, sir?

Mr. Mueller.    I do believe I'm following it, but it is -- that portion or that matter does not fall within our jurisdiction or fall within our investigation.

Dr. Wenstrup.    Well, basically, what your report says, Volume II, page 5, I just want to be clear that open to doubt is how the committee Democrats describe this finding in their minority views of our 2018 report, and it kind of flies in the face of what you have in your report.    So is it accurate also to say the investigation found no documentary evidence that George Papadopoulos told anyone affiliated with the Trump campaign about Joseph Mifsud's claims that the Russians had dirt on candidate Clinton?

Mr. Mueller.    Let me turn that over to Mr. Zebley.

Dr. Wenstrup.    I'd like to ask you, sir.    This is your report, and that's what I'm basing this on.

Mr. Mueller.    Then could you repeat the question for me again?

Dr. Wenstrup.    Yeah, is it accurate to say that the investigation found no documentary evidence that George Papadopoulos told anyone affiliated with the Trump campaign about Joseph Mifsud's claims that the Russians had dirt on candidate Clinton?

Mr. Mueller.    I believe it appearing in the report, that it is accurate.

Dr. Wenstrup.    So, in the report, it says, no documentary evidence that Papadopoulos shared this information with the campaign.    It's, therefore, inaccurate to conclude that by the time of the June 9, 2016, Trump Tower meeting, quote:    The campaign was likely already on notice via George Papadopoulos' contact with Russian

agents that Russia in fact had damaging information on Trump's opponent.

Would you say that that is inaccurate to say that it's likely already --

Mr. Mueller.    I direct you to the report.

Dr. Wenstrup.    Well, I appreciate that because the Democrats jumped to this incorrect conclusion in their minority views, again, which contradicts what you have in your report.

I'm concerned about a number of statements I'd like you to clarify because a number of Democrats have made some statements that I have concerns with and maybe you can clear them up.    So a member of this committee said President Trump was a Russian agent after your report was publicly released.    That statement is not supported by your report, correct?

Mr. Mueller.    That is accurate.    It's not supported.

Dr. Wenstrup.    Multiple Democrat Members have asserted that Paul Manafort met with Julian Assange in 2016 before WikiLeaks released DNC emails, implying Manafort colluded with Assange.    Because your report does not mention finding evidence that Manafort met with Assange, I would assume that means you found no evidence of this meeting.    Is that assumption correct?

RPTR ZAMORA

EDTR HOFSTAD

[1:52 p.m.]

Mr. Mueller.   I'm not certain I agree with that assumption.

Dr. Wenstrup.   But you make no mention of it in your report.   Would you agree with that?

Mr. Mueller.   Yes, I would agree with that.

Dr. Wenstrup.   Okay.

Mr. Mueller, does your report contain any evidence that President Trump was enrolled in the Russian system of kompromat, as a member of this committee once claimed?

Mr. Mueller.   Well, to -- what I can speak to is information -- evidence that we picked up as the special counsel.   And I think that's accurate, as far as it goes.

Dr. Wenstrup.   Thank you.   I appreciate that.

So let's go for a second to scope.   Did you ask the Department of Justice to expand the scope of the special counsel's mandate related to August 2, 2017, or August 20, 2017, scoping memoranda?

Mr. Mueller.   Well, there -- without looking at the memoranda, I could not answer that question.

Dr. Wenstrup.   Well, let me ask you, did you ever make a request to expand your office's mandate at all?

Mr. Mueller.   Generally, yes.

Dr. Wenstrup.   And was that ever denied?

Mr. Mueller.   I'm not going to speak to that.   It goes to --

Dr. <u>Wenstrup.</u>    You're not going to speak to that?

Mr. <u>Mueller.</u>    -- the internal deliberations.

Dr. <u>Wenstrup.</u>    Well, I'm just trying to understand process.    Does expanding the scope come from the Acting Attorney General or --

Mr. <u>Mueller.</u>    I'm not --

Dr. <u>Wenstrup.</u>    -- Rod Rosenstein?    Or does it come from you?    Or can it come from either?

Mr. <u>Mueller.</u>    Yeah, I'm not going to discuss any other alternatives.

Dr. <u>Wenstrup.</u>    Thank you, Mr. Mueller.

The <u>Chairman.</u>    Ms. Speier.

Ms. <u>Speier.</u>    Thank you, Mr. Chairman.

Mr. Mueller, I think I can say without fear of contradiction that you are the greatest patriot in this room today, and I want to thank you for being here.

Mr. <u>Mueller.</u>    Thank you.

Ms. <u>Speier.</u>    You said in your report -- and I'm going to quibble with your words -- that the Russian intervention was sweeping and systematic.    I would quibble with that because I don't think it was just an intervention; I think it was an invasion.    And I don't think it was just sweeping and systematic; I think it was sinister and scheming.

But having said that, one of my colleagues earlier here referred to this Russian intervention as a hoax.    And I'd like to get your comment on that.

On page 26 of your report, you talk about the Internet Research Agency and how tens of millions of U.S. persons became engaged with the posts that they made, that there were some 80,000 posts on Facebook, that Facebook itself admitted that 126 million people had probably seen the posts that were put up by the Internet Research Agency, that they had 3,800 Twitter accounts and had designed more than 175,000

tweets that probably reached 1.4 million people.

The Internet Research Agency was spending about $1.25 million a month on all of this social media in the United States in what I would call an invasion in our country.

Would you agree that it was not a hoax that the Russians were engaged in trying to impact our election?

Mr. Mueller.   Absolutely.   That was not a hoax.   The indictments we returned against the Russians, two different ones, were substantial in their scope, using the "scope" word again.

And I think one of the -- we have underplayed, to a certain extent, that aspect of our investigation that has and would have long-term damage to the United States that we need to move quickly to address.

Ms. Speier.   Thank you for that.   I'd like to drill down on that a little bit more.

The Internet Research Agency actually started in 2014 by sending over staff as tourists, I guess, to start looking at where they wanted to engage.   And there are many that suggest, and I'm interested in your opinion, as to whether or not Russia is presently in the United States looking for ways to impact the 2020 election.

Mr. Mueller.   I can't speak to that.   That would be in levels of classification.

Ms. Speier.   All right.

Let me ask you this.   Oftentimes when we engage in these hearings, we forget the forest for the trees.   You have a very large report here of over 400 pages.   Most Americans have not read it.   We have read it.   Actually, the FBI Director yesterday said he hadn't read it, which was a little discouraging.

But, on behalf of the American people, I want to give you a minute and 39 seconds to tell the American people what you would like them to glean from this report.

Mr. Mueller.   Well, we spent substantial time ensuring the integrity of the

report, understanding that it would be our living message to those who come after us. But it also is a signal, a flag to those of us who have some responsibility in this area to exercise those responsibilities swiftly and don't let this problem continue to linger as it has over so many years.

Ms. Speier.   All right.   You didn't take the total amount of time, so I'm going to yield the rest of my time to the chairman.

The Chairman.   I thank the gentlewoman for yielding.

Director Mueller, I wanted to ask you about conspiracy.   Generally, a conspiracy requires an offer of something illegal, the acceptance of that offer, and an overt act in furtherance of it.   Is that correct?

Mr. Mueller.   Correct.

The Chairman.   And Don Jr. was made aware that the Russians were offering dirt on his opponent, correct?

Mr. Mueller.   I don't know that for sure, but one would assume, given his presence at the meeting.

The Chairman.   And when you say that you would love to get that help, that would constitute an acceptance of the offer?

Mr. Mueller.   It's a wide-open request.

The Chairman.   And it would certainly be evidence of an acceptance if you say -- when somebody offers you something illegal and you say, "I would love it," that would be considered evidence of an acceptance.

Mr. Mueller.   I'm going to stay away from any -- addressing one particular or two particular situations.

The Chairman.   Well, this particular situation -- well, I'll have to continue in a bit. I now yield to Mr. Stewart.

Mr. <u>Stewart.</u>   Mr. Mueller, it's been a long day.   Thank you for being here.

I do have a series of important questions for you, but before I do that, I want to take a moment to reemphasize something that my friend Mr. Turner has said.   I've heard many people state, "No person is above the law."   And many times recently, they add "not even the President," which I think is blazingly obvious to most of us.

Mr. <u>Mueller.</u>   I'm having a little problem hearing you, sir.

Mr. <u>Stewart.</u>   Is this better?

Mr. <u>Mueller.</u>   That is better.   Thank you.

Mr. <u>Stewart.</u>   I want you to know I agree with the statement that no person is above the law.   But there's another principle that we also have to defend, and that is the presumption of innocence.   And I'm sure you agree with this principle, though I think the way that your office phrased some parts of your report, it does make me wonder, I have to be honest with you.

For going on 3 years, innocent people have been accused of very serious crimes, including treason -- accusations made even here today.   They have had their lives disrupted and in some cases destroyed by false accusations for which there is absolutely no basis other than some people desperately wish that it was so.

But your report is very clear:   no evidence of conspiracy, no evidence of coordination.   And I believe we owe it to these people who have been falsely accused, including the President and his family, to make that very clear.

Mr. Mueller, the credibility of your report is based on the integrity of how it is handled.   And there's something that I think bothers me and other Americans.   I'm holding here in my hand a binder of 25 examples of leaks that occurred from the Special Counsel's Office from those who associated with your work dating back to as early as a few weeks after your inception and the beginning of your work and continuing up to just

a few months ago.

All of these -- all of them have one thing in common:    They were designed to weaken or to embarrass the President.    Every single one.    Never was it leaked that you'd found no evidence of collusion.    Never was it leaked that the Steele dossier was a complete fantasy, nor that it was funded by the Hillary Clinton.    I could go on and on.

Mr. Mueller, are you aware of anyone from your team having given advance knowledge of the raid on Roger Stone's home to any person or the press, including CNN?

Mr. <u>Mueller.</u>    Well, I'm not going to talk about specifics.    I will mention -- but talk for a moment about persons who become involved in an investigation and the understanding that, in a lengthy, thorough investigation, some persons will be under a cloud that should not be under a cloud.

And one of the reasons for emphasizing, as I have, the speed of an election -- or, not election -- the speed of an investigation is that so those persons who are disrupted as a result of their --

Mr. <u>Stewart.</u>    I appreciate that, but I do have a series of questions.

Mr. <u>Mueller.</u>    May -- with the result of that investigation.

Mr. <u>Stewart.</u>    Thank you.    And you're right, it is a cloud, and it's an unfair cloud for dozens of people.

But, to my point, are you aware of anyone providing information to the media regarding the raid on Roger Stone's home, including CNN?

Mr. <u>Mueller.</u>    I'm not going to speak to that.

Mr. <u>Stewart.</u>    Okay.

Mr. Mueller, you sent a letter dated March 27 to Attorney General Barr in which you claimed the Attorney General's memo to Congress did not fully capture the context of your report.    You stated earlier today that response was not authorized.

Did you make any effort to determine who leaked this confidential letter?

Mr. <u>Mueller.</u>   No, and I'm not certain -- this is the letter of March 27?

Mr. <u>Stewart.</u>   Yes, sir.

Mr. <u>Mueller.</u>   Okay.   I'm not certain when it was publicized.   I did know it was publicized, but I do not believe we would be responsible for the leak.

Mr. <u>Stewart.</u>   Well --

Mr. <u>Mueller.</u>   I do believe that we have done a good job in assuring that no leaks occur --

Mr. <u>Stewart.</u>   We have 25 examples here of where you did not do a good job -- not you, sir; I'm not accusing you at all -- but where your office did not do a good job in protecting this information.

One more example.   Do you know anyone who anonymously made claims to the press that Attorney General Barr's March 24 letter to Congress had been misrepresented or misrepresented the basis of your report?

Mr. <u>Mueller.</u>   What was the question?

Mr. <u>Stewart.</u>   Do you know who anonymously made claims to the press that Attorney General Barr's March 24 letter to Congress had misrepresented the findings of your report?

Mr. <u>Mueller.</u>   No.

Mr. <u>Stewart.</u>   Sir, given these examples as well as others, you must have realized that leaks were coming from someone associated with the Special Counsel's Office. What I'd like to ask is, did you --

Mr. <u>Mueller.</u>   I do not believe that.

Mr. <u>Stewart.</u>   Well, sir, this was your work.   You're the only one -- your office is the only one who had information regarding this.   It had to come from your office.

Putting that aside -- which leads me to my final question:     Did you do anything about it?

Mr. Mueller.    From the outset, we've undertaken to make certain that we minimize the possibility of leaks.     And I think we were successful over the 2 years that we were in operation.

Mr. Stewart.    Well, I wish you'd been more successful, sir.    I think it was disruptive to the American people.

My time has expired.    I yield back.

The Chairman.    Mr. Quigley.

Mr. Quigley.    Thank you, Mr. Chairman.

Director, thank you for being here.    This, too, shall pass.

Earlier today and throughout the day, you have stated the policy that a seated President cannot be indicted, correct?

Mr. Mueller.    Correct.

Mr. Quigley.    And upon questioning this morning, you were asked, could a President be indicted after their service, correct?

Mr. Mueller.    Yes.

Mr. Quigley.    And your answer was that they could.

Mr. Mueller.    They could.

The Chairman.    Director, please speak into the microphone.

Mr. Mueller.    I'm sorry.    Thank you.    They could.

Mr. Quigley.    So the followup question that should be concerning is:    What if a President serves beyond the statute of limitations?

Mr. Mueller.    I don't know the answer to that one.

Mr. Quigley.    Would it not indicate that if the statute of limitations on Federal

crimes such as this are 5 years that a President who serves a second term is therefore, under the policy, above the law?

Mr. <u>Mueller.</u>   I'm not certain I would agree with the conclusion.   I'm not certain that I can see the possibility that you suggest.

Mr. <u>Quigley.</u>   But the statute doesn't toll.   Is that correct?

Mr. <u>Mueller.</u>   I don't know specifically.

Mr. <u>Quigley.</u>   It clearly doesn't.

And I just want -- as the American public is watching this and perhaps learning about many of these for the first time, we need to consider that and that the other alternatives are perhaps all that we have.

But I appreciate your response.

Earlier in questioning, someone mentioned that -- it was a question involving whether anyone in the Trump political world publicized the emails, whether or not that was the case.

I just want to refer to Volume I, page 60, where we learn that Trump Jr. publicly tweeted a link to the leak of stolen Podesta emails in October of 2016.   You're familiar with that?

Mr. <u>Mueller.</u>   I am.

Mr. <u>Quigley.</u>   So that would at least be a republishing of this information, would it not?

Mr. <u>Mueller.</u>   I'm not certain I would agree with that.

Mr. <u>Quigley.</u>   Director Pompeo assessed WikiLeaks, at one point, as a hostile intelligence service.

Given your law enforcement experience and your knowledge of what WikiLeaks did here and what they do generally, would you assess that to be accurate or something

similar?    How would you assess what WikiLeaks does?

Mr. Mueller.    Absolutely.    And they are currently under indictment; Julian Assange is.

Mr. Quigley.    But would it be fair to describe them as -- you would agree with Director Pompeo -- that's what he was when he made that remark -- that it's a hostile intelligence service, correct?

Mr. Mueller.    Yes.

Mr. Quigley.    If we could put up slide 6.

"This just came out.    WikiLeaks!    I love WikiLeaks!"    Donald Trump, October 10, 2016.

"This WikiLeaks stuff is unbelievable.    It tells you the inner heart, you gotta read it."    Donald Trump, October 12, 2016.

"This WikiLeaks is like a treasure trove."    Donald Trump, October 31, 2016.

"Boy, I love reading those WikiLeaks."    Donald Trump, November 4, 2016.

Would any of those quotes disturb you, Mr. Director?

Mr. Mueller.    I'm not certain I would say --

Mr. Quigley.    How do you react to them?

Mr. Mueller.    Well, it's -- "problematic" is an understatement in terms of what it displays in terms of giving some -- I don't know -- hope or some boost to what is and should be illegal activity.

Mr. Quigley.    Volume I, page 59:    "Donald Trump, Jr., had direct electronic communications with WikiLeaks during the campaign period."

"On October 3, 2016, WikiLeaks sent another direct message to Trump Jr., asking 'you guys' to help disseminate a link alleging candidate Clinton had advocated a drone to target Julian Assange.    Trump Jr. responded that, quote, he already 'had done so.'"

Same question.    This behavior, at the very least, disturbing?

Mr. <u>Mueller.</u>    Disturbing and also subject to investigation.

Mr. <u>Quigley.</u>    Could it be described as aid and comfort to a hostile intelligence service, sir?

Mr. <u>Mueller.</u>    I wouldn't categorize it with any specificity.

Mr. <u>Quigley.</u>    I yield the balance to the chairman, please.

The <u>Chairman.</u>    I'm not sure I can make good use of 27 seconds, but, Director, I think you made it clear that you think it unethical, to put it politely, to tout a foreign service, like WikiLeaks, publishing stolen political documents in a Presidential campaign?

Mr. <u>Mueller.</u>    Certainly calls for investigation.

The <u>Chairman.</u>    Thank you, Director.

We're going to go now to Mr. Crawford.    And then after Mr. Crawford's 5 minutes, we'll take a 5- or 10-minute break.

Mr. <u>Crawford.</u>    Thank you, Mr. Chairman.

Thank you, Mr. Mueller, for being here.

Days after your appointment, Peter Strzok texted about his concern that there's, quote, "no big there there" in the Trump campaign investigation.

Did Strzok or anyone else who worked on the FBI's investigation tell you that around 10 months into the investigation the FBI still had no case for collusion?

Mr. <u>Mueller.</u>    Who?    Can you repeat that?

Mr. <u>Crawford.</u>    Peter Strzok.

Mr. <u>Mueller.</u>    And could you -- I'm sorry.    Can you move the microphone up a little closer?

Mr. <u>Crawford.</u>    Sure.

Mr. <u>Mueller.</u>    Thank you.

Mr. <u>Crawford.</u>   There's a quote attributed to Peter Strzok.   He texted about his concern that there is, quote, "no big there there" in the Trump campaign investigation.

Did he or anyone else who worked on the FBI's investigation tell you that around 10 months into the investigation the FBI still had no case for collusion?

Mr. <u>Mueller.</u>   No.

Mr. <u>Crawford.</u>   Is the inspector general report correct that the text messages from Peter Strzok and Lisa Page's phones from your office were not retained after they left the Special Counsel's Office?

Mr. <u>Mueller.</u>   Well, I don't -- it depends on what you're talking about.   The investigation into those -- Peter Strzok went on for a period of time, and I am not certain what it encompasses.   It may well have encompassed what you're adverting to.

Mr. <u>Crawford.</u>   Okay.

Let me move on just real quickly.   Did you ask the Department to authorize your office to investigate the origin of the Trump/Russia investigation?

Mr. <u>Mueller.</u>   I'm not going to get into that.   It goes to internal deliberations.

Mr. <u>Crawford.</u>   So the circumstances surrounding the origin of the investigation have yet to be fully vetted then.   I am certainly glad that Attorney General Barr and U.S. Attorney Durham are looking into this matter.

And, with that, I'd like to yield the balance of my time to Ranking Member Nunes.

Mr. <u>Nunes.</u>   I thank the gentleman for yielding.

Mr. Mueller, I want to make sure you're aware of who Fusion GPS is.   Fusion GPS is a political operations firm that was working directly for the Hillary Clinton campaign and the Democrat National Committee.   They produced the dossier.   So they paid Steele, who then went out and got the dossier.

And I know you don't want to answer any dossier questions, so I'm not going

there.    But your report mentions Natalia Veselnitskaya 65 times.    She meets in the Trump Tower -- it's this infamous Trump Tower meeting.    It's in your report.    You've heard many of the Democrats refer to it today.

The meeting was shorter than 20 minutes, I believe.    Is that correct?

Mr. Mueller.    I think what we have in our report reflects it was about that length.

Mr. Nunes.    So do you know -- so Fusion GPS, the main actor at Fusion GPS, the president of the company, or the owner of the company, is a guy named Glenn Simpson, who's working for Hillary Clinton.    Glenn Simpson -- do you know how many times Glenn Simpson met with Natalia Veselnitskaya?

Mr. Mueller.    Myself?    No.

Mr. Nunes.    Would it surprise you that the Clinton campaign dirty-ops arm met with Natalia Veselnitskaya more times than the Trump campaign did?

Mr. Mueller.    Well, this is an area that I'm not going to get into, as I indicated at the outset.

Mr. Nunes.    Did you ever interview Glenn Simpson?

Mr. Mueller.    I'm, again, going to pass on that.

Mr. Nunes.    According to -- I'm going to change topics here.    According to notes from the State Department official Kathleen Kavalec, Christopher Steele told her that former Russian intelligence head Trubnikov and Putin advisor Surkov were sources for the Steele dossier.

Now, knowing that these are -- not getting into whether these sources were real or not real, was there any concern that there could've been disinformation that was going from the Kremlin into the Clinton campaign and then being fed into the FBI?

Mr. Mueller.    Well, as I said before, this is an area that I cannot speak to.

Mr. Nunes.    Is that because you're -- it's not in the report or you're just -- or

because of an ongoing deliberations?

    Mr. <u>Mueller.</u>   Internal deliberations, other proceedings, and the like.

    Mr. <u>Nunes.</u>   Okay.

    When Andrew Weissmann and Zainab Ahmad joined your team, were you aware that Bruce Ohr, a Department of Justice top official, directly briefed the dossier allegations to them in the summer of 2016?

    Mr. <u>Mueller.</u>   Again, I'm not going to speak to that issue.

    Mr. <u>Nunes.</u>   Okay.

    Before you arrested George Papadopoulos in July of 2017, he was given $10,000 in cash in Israel.   Do you know who gave him that cash?

    Mr. <u>Mueller.</u>   Again, that's outside our ambit, and questions such as that should go to the FBI or the Department.

    Mr. <u>Nunes.</u>   But it involved your investigation.

    Mr. <u>Mueller.</u>   It involved persons involved in my investigation.

    Mr. <u>Nunes.</u>   Thank you, Mr. Chairman.

    The <u>Chairman.</u>   The committee will stand in recess for 5 or 10 minutes.   Please, folks, remain in your seats, allow the Director and Mr. Zebley to exit the chamber.

    [Recess.]

    The <u>Chairman.</u>   The committee will come to order.

    Mr. <u>Mueller.</u>   Thank you, sir.

    The <u>Chairman.</u>   Thank you, Director.

    Mr. Swalwell, you're recognized.

    Mr. <u>Swalwell.</u>   Thank you.

    Director Mueller, as a prosecutor, you would agree that if a witness or suspect lies or obstructs or tampers with witnesses or destroys evidence during an investigation that

generally that conduct can be used to show a consciousness of guilt.    Would you agree

with that?

Mr. Mueller.    Yes.

Mr. Swalwell.    Let's go through the different people associated with the Trump

campaign and this investigation who lied to you and other investigators to cover up their

disloyal and unpatriotic conduct.

If we could put exhibit 8 up.

Director Mueller, I'm showing you campaign chairman Paul Manafort; political

advisor Roger Stone; deputy campaign manager Rick Gates; National Security Advisor

Michael Flynn; Donald Trump's personal attorney, Michael Cohen; and foreign policy

advisor George Papadopoulos.

These six individuals have each been charged, convicted, or lied to your office or

other investigators.    Is that right?

Mr. Mueller.    Yes, although I look askance at Mr. Stone, because he is -- he is in a

different case here in D.C.

Mr. Swalwell.    So National Security Advisor Flynn lied about discussions with the

Russian Ambassador related to sanctions.    Is that right?

Mr. Mueller.    That's correct.

Mr. Swalwell.    Michael Cohen lied to this committee about Trump Tower

Moscow.    Is that correct?

Mr. Mueller.    Yes.

Mr. Swalwell.    George Papadopoulos, the President's senior foreign policy

advisor, lied to the FBI about his communications about Russia's possession of dirt on

Hillary Clinton.    Is that right?

Mr. Mueller.    Yes.

Mr. Swalwell.    The President's campaign chairman, Paul Manafort, lied about meetings that he had with someone with ties to Russian intelligence.    Is that correct?

Mr. Mueller.    That's true.

Mr. Swalwell.    And your investigation was hampered by Trump campaign officials' use of encryption communications.    Is that right?

Mr. Mueller.    We believe that to be the case.

Mr. Swalwell.    You also believe to be the case that your investigation was hampered by the deletion of electronic messages.    Is that correct?

Mr. Mueller.    It would be, yes.    And, generally, any case would be if those kinds of communications are used.

Mr. Swalwell.    For example, you noted that deputy campaign manager Rick Gates, who shared internal campaign polling data with a person with ties to Russian intelligence at the direction of Manafort, that Mr. Gates deleted those communications on a daily basis.    Is that right?

Mr. Mueller.    I take your word -- I'd say I don't know specifically, but if it's in the report, then I support it.

Mr. Swalwell.    That's right, Director.    It's Volume I, page 136.

Mr. Mueller.    Thank you.

Mr. Swalwell.    In addition to that, other information was inaccessible because your office determined it was protected by attorney-client privilege.    Is that correct?

Mr. Mueller.    That is true.

Mr. Swalwell.    That would include that you do not know whether communications between Donald Trump and his personal attorneys Jay Sekulow, Rudy Giuliani, and others discouraged witnesses from cooperating with the government.    Is that right?

Mr. Mueller.   I'm not going to talk to that.

Mr. Swalwell.    That would also mean that you can't talk to whether or not pardons were dangled through the President's attorneys because -- the shield of attorney-client privilege.

Mr. Mueller.   I'm not going to discuss that.

Mr. Swalwell.    Did you want to interview Donald Trump, Jr.?

Mr. Mueller.   I'm not going to discuss that.

Mr. Swalwell.    Did you subpoena Donald Trump, Jr.?

Mr. Mueller.   And I'm not going to discuss that.

Mr. Swalwell.    Did you want to interview the President?

Mr. Mueller.   Yes.

Mr. Swalwell.    Director Mueller, on January 1, 2017, through March 2019, Donald Trump met with Vladimir Putin in person 6 times, called him 10 times, and exchanged 4 letters with him.    Between that time period, how many times did you meet with Donald Trump?

Mr. Mueller.   I'm not going to get into that.

Mr. Swalwell.    He did not meet with you in person.    Is that correct?

Mr. Mueller.   He did not.

Mr. Swalwell.    As a result of lies, deletion of text messages, obstruction, and witness tampering, is it fair to say that you were unable to fully assess the scope and scale of Russia's interference in the 2016 election and Trump's role in that interference?

Mr. Mueller.   I'm not certain I would adopt that characterization in total.    There may be pieces of it that are accurate, but not in total.

Mr. Swalwell.    But you did state in Volume I, page 10, that "while this report embodies factual and legal determinations that the Office believes to be accurate and

complete to the greatest extent possible, given these identified gaps, the Office cannot rule out the possibility that the unavailable information would shed additional light."    Is that correct?

Mr. <u>Mueller.</u>    That is correct.    We don't know what we don't know.

Mr. <u>Swalwell.</u>    Why is it so important that witnesses cooperate and tell the truth in an investigation like this?

Mr. <u>Mueller.</u>    Because the testimony of the witnesses goes to the heart of just about any criminal case you have.

Mr. <u>Swalwell.</u>    Thank you.

And, Mr. Chairman, I'd yield back.

And thank you, Director Mueller.

The <u>Chairman.</u>    Ms. Stefanik.

Ms. <u>Stefanik.</u>    Thank you, Mr. Chairman.

Mr. Mueller, as special counsel, did you review documents related to the origin of the counterintelligence investigation into the Trump campaign?

Mr. <u>Mueller.</u>    On occasion.

Ms. <u>Stefanik.</u>    Was the Steele dossier one of those documents that was reviewed?

Mr. <u>Mueller.</u>    And I can't discuss that case.

Ms. <u>Stefanik.</u>    I'm just asking a process question.    Have you read the Steele dossier?

Mr. <u>Mueller.</u>    And, again, I'm not going to respond to that.

Ms. <u>Stefanik.</u>    You were tasked, as special counsel, to investigate whether there was collusion between Russia and the Trump campaign associates to interfere with the 2016 election.    And the FBI, we know, has relevant documents and information related

to the opening of the CI investigation.    Were you and your team permitted to access all of those documents?

Mr. Mueller.    And, again, I can't get into that investigative -- what we collected and what we're doing with investigation materials.

Ms. Stefanik.    Let me ask it this way.    Was there any limitation in your access to documents related to the counterintelligence investigation?

Mr. Mueller.    That's such a broad question.    I have real trouble answering it.

Ms. Stefanik.    Did the Special Counsel's Office undertake any effort to investigate and verify or disprove allegations contained in the Steele dossier?

Mr. Mueller.    Again, I can't respond.

Ms. Stefanik.    The reason I'm asking, for the American public that is watching, it's apparent that the Steele dossier formed part of the basis to justify the FBI's counterintelligence investigation into Russian interference in the 2016 election.    As we know, it was used to obtain a FISA warrant on Carter Page.    This is why I'm asking these questions.

Did your office undertake any efforts to identify Steele's sources or sub-sources?

Mr. Mueller.    Again, the same answer.

Ms. Stefanik.    Were these tasks referred to any other agencies?

[2:35 p.m.]

Mr. <u>Mueller.</u>   Again, I can't speak to it.

Ms. <u>Stefanik.</u>   Did your office consider whether the Russian Government used Steele's sources to provide Steele with disinformation?

Mr. <u>Mueller.</u>   Again, I can't speak to that.

Ms. <u>Stefanik.</u>   I understand.   I'm asking these questions just for the record, so thanks for your patience.

Shifting gears here, did any member of the Special Counsel's Office staff travel overseas as part of the investigation?

Mr. <u>Mueller.</u>   Yes, but I can't go further than that.

Ms. <u>Stefanik.</u>   I'm going to ask, to which countries?

Mr. <u>Mueller.</u>   And I can't answer that.

Ms. <u>Stefanik.</u>   Did they meet with foreign government officials?

Mr. <u>Mueller.</u>   Again, it's out of our bailiwick.

Ms. <u>Stefanik.</u>   Did they meet with foreign private citizens?

Mr. <u>Mueller.</u>   Again, same response.

Ms. <u>Stefanik.</u>   Did they seek information about a U.S. citizen or any U.S. citizens?

Mr. <u>Mueller.</u>   Again, territory that I cannot go to.

Ms. <u>Stefanik.</u>   Thank you for answering on the record.   These are important questions for the American public, and we're hopeful that the IG is able to answer these questions.

I will yield the balance of my time to the ranking member.

Mr. <u>Nunes.</u>   I thank the gentlelady for yielding.

Mr. Mueller, I want to go back to -- we started off with Joseph Mifsud, who is at

the center of this investigation.    He appears in your report a dozen times or more.    He really is the epicenter.    He's at the origin of this.    He's the man who supposedly knows about Clinton's emails.

You've seen on the screen, the Democrats have continually put up all the prosecutions that you made against Trump campaign officials and others, but I'm struggling to understand why you didn't indict Joseph Mifsud, who seems to be the man in the middle of all of this.

Mr. Mueller.    Well, I think you understand that you cannot get into either classified or law enforcement information without a rationale for doing it.    And I have said all I'm going to be able to say with regard to Mr. Mifsud.

Mr. Nunes.    Were you aware of Kathleen Kavalec's involvement, that she had met with Mr. Steele?    The State Department official.

Mr. Mueller.    And, again, I can't respond to that question.    It's outside my jurisdiction.

Mr. Nunes.    Okay.

The Carter Page FISA warrant was re-upped three times.    The last time it was re-upped was under your watch.    So were you in the approval process of that last time that the Carter Page warrant was --

Mr. Mueller.    Well, I can't speak specifically about that warrant, but if you ask was I in the approval chain, the answer is no.

Mr. Nunes.    Okay.    That's very helpful.

Thank you, Mr. Chairman.    I yield back.

The Chairman.    Mr. Castro.

Mr. Castro.    Thank you, Chairman.

Thank you, Special Counsel Mueller, for your testimony and for your service to our

country.

Donald Trump, over the years, has surrounded himself with some very shady people, people that lied for him, people that covered up for him, people that helped him enrich himself.    I want to talk specifically about one of those instances that's in your report.

Specifically, let's turn to the Trump Tower Moscow project, which you described in your report as a, quote, "highly lucrative deal" for The Trump Organization.    Is that right?

Mr. <u>Mueller.</u>   I would have to look at the quote from the report, if you have it.

Mr. <u>Castro.</u>   Sure.    It's on Volume II, page 135.    It's described as highly lucrative.

Mr. <u>Mueller.</u>   Okay.    I have it.    Thank you, sir.

Mr. <u>Castro.</u>   Yeah.    No problem.

Your office prosecuted Michael Cohen -- and Michael Cohen was Donald Trump's lawyer -- for lying to this committee about several aspects of The Trump Organization's pursuit of the Trump Tower Moscow deal.    Is that right?

Mr. <u>Mueller.</u>   That's correct.

Mr. <u>Castro.</u>   According to your report, Cohen lied to, quote, "minimize links between the project and Trump," unquote, and to, quote, "stick to the party line," unquote, in order not to contradict Trump's public message that no connection existed between Trump and Russia.    Is that right?

Mr. <u>Mueller.</u>   That's -- yes.    That's correct.

Mr. <u>Castro.</u>   Now, when you're talking about the party line here, the party line in this case --

Mr. <u>Mueller.</u>   If I could interject, the one thing I should've said at the outset:    If

it was in the report, then, consequently, I do believe it to be true.

Mr. <u>Castro.</u>   Thank you.

The party line, in this case, was that the deal ended in January 2016.   In other words, they were saying that the deal ended in January 2016, before the Republican primaries.   In truth, though, the deal extended to June 2016, when Donald Trump was already the presumptive Republican nominee.   Is that correct?

Mr. <u>Mueller.</u>   That's correct.

Mr. <u>Castro.</u>   The party line was also that Cohen discussed the deal with Trump only three times, when, in truth, they discussed it multiple times.   Is that right?

Mr. <u>Mueller.</u>   Also true, and the basis for -- and part of the basis for that plea that he entered for lying to this entity.

Mr. <u>Castro.</u>   Thank you.   And thank you for prosecuting that.

The party line was also that Cohen and Trump never discussed traveling to Russia during the campaign, when, in truth, they did discuss it.   Is that right?

Mr. <u>Mueller.</u>   That's accurate.

Mr. <u>Castro.</u>   And the party line was that Cohen never received a response from the Kremlin to his inquiries about the Trump Tower Moscow deal.   In fact, Cohen not only received a response from the Kremlin to his email but also had a lengthy conversation with a Kremlin representative who had a detailed understanding of the project.   Is that right?

Mr. <u>Mueller.</u>   If it's in the report, that is an accurate recitation of that piece of the report.

Mr. <u>Castro.</u>   So you have the candidate Trump at the time saying he had no business dealings with Russia, his lawyer who was lying about it, and then the Kremlin who during that time was talking to President Trump's lawyer about the deal.   Is that

right?

Mr. <u>Mueller.</u>   I can't adopt your characterization.

Mr. <u>Castro.</u>   Not only was Cohen lying on Trump's behalf, but so was the Kremlin. On August 30, 2017, 2 days after Cohen submitted his false statement to this committee claiming that he never received a response to his email to the Kremlin, Vladimir Putin's press secretary told reporters that the Kremlin left the email unanswered.

That statement by Putin's press secretary was false, wasn't it?

Mr. <u>Mueller.</u>   I can't speak to that.

Mr. <u>Castro.</u>   Although it was widely reported in the press.

Mr. <u>Mueller.</u>   Again, I can't speak to that, particularly if it was dependent upon media sources.

Mr. <u>Castro.</u>   But it was consistent with the lie that Cohen had made to the committee.   Is that right?

Mr. <u>Mueller.</u>   I'm not certain I could go that far.

Mr. <u>Castro.</u>   So Cohen, President Trump, and the Kremlin were all telling the same lie.

Mr. <u>Mueller.</u>   I defer to you on that.   That's -- I can't get into the details.

Mr. <u>Castro.</u>   Special Counsel Mueller, I want to ask you something that's very important to the Nation.   Did your investigation evaluate whether President Trump could be vulnerable to blackmail by the Russians because the Kremlin knew that Trump and his associates lied about connections to Russia related to the Trump Tower deal?

Mr. <u>Mueller.</u>   I can't speak to that.

Mr. <u>Castro.</u>   I yield back, Chairman.

The <u>Chairman.</u>   Mr. Hurd.

Mr. <u>Hurd.</u>   Thank you, Mr. Chairman.

Director Mueller, you've been asked many times this afternoon about collusion, obstruction of justice, and impeachment, and the Steele dossier.    And I don't think your answers are going to change if I ask you about those questions.

So I'm going to ask about a couple of press stories, because a lot of what the American people have received about this have been on press stories, and some of that has been wrong, and some of those press stories have been accurate.

On April 13, 2018, McClatchy reported that you had evidence Michael Cohen made a secret trip to Prague during the 2016 Presidential election.    I think he told one of the committees here in Congress that that was incorrect.    Is that story true?

Mr. Mueller.    I can't -- well, I can't go into it.

Mr. Hurd.    Gotcha.

On October 31, 2016, Slate published a report suggesting that a server at Trump Tower was secretly communicating with Russia's Alfa Bank, and then I quote, "akin to what criminal syndicates do."

Do you know if that story is true?

Mr. Mueller.    Do not.    Do not --

Mr. Hurd.    You do not?

Mr. Mueller.    -- know whether it's true.

Mr. Hurd.    So did you not investigate these allegations which are suggestive of a potential Trump-Russia --

Mr. Mueller.    Because I believe it not true doesn't mean it would not be investigated.    It may well have been investigated.    Although my belief at this point, it's not true.

Mr. Hurd.    Good copy.    Thank you.

As a former CIA officer, I want to focus on something I think both sides of the

political aisle can agree on -- that is, how do we prevent Russian intelligence and other adversaries from doing this again.

And after overseeing counterintelligence operations for 12 years as FBI Director and then investigating what the Russians have done in the 2016 election, you've seen tactics, techniques, and results of Russian intelligence operations.

Our committee made a recommendation that the FBI should improve its victim notification process when a person, entity, or campaign has fallen victim to an active-measures attack.    Would you agree with this?

Mr. <u>Mueller.</u>    It sounds like a worthwhile endeavor.    I will tell you, though, that the ability of our intelligence agencies to work together in this arena is perhaps more important than that.    And adopting whatever -- and I'm not that familiar with the legislation -- but whatever legislation will encourage us working together -- by "us," I mean the FBI, CIA, NSA, and the rest -- it should be pursued aggressively, early.

Mr. <u>Hurd.</u>    Who do you think should be responsible within the Federal Government to counter disinformation?

Mr. <u>Mueller.</u>    I'm no longer in the Federal Government, so I --

Mr. <u>Hurd.</u>    But you've had a long, storied career, and I don't think there's anybody who better understands the threat that we are facing than you.    Do you have an opinion as a former FBI officer?

Mr. <u>Mueller.</u>    As to?

Mr. <u>Hurd.</u>    As to who should be the coordinating point within the Federal Government on how to deal with disinformation.

Mr. <u>Mueller.</u>    I don't want to wade in those waters.

Mr. <u>Hurd.</u>    Good copy.

One of the most striking things in your report is that the Internet Research Agency

not only undertook a social media campaign in the U.S. but they were able to organize political rallies after the election.

Our committee issued a report and insight on saying that Russian active measures are growing with frequency and intensity and including their expanded use of groups such as the IRA, and these groups pose a significant threat to the United States and our allies in upcoming elections.    Would you agree with that?

Mr. Mueller.    Yes.    In fact, one of the other areas that we have to look at are many more companies -- not companies -- many more countries are developing capability to replicate what the Russians have done.

Mr. Hurd.    You alluded to making sure all the elements of the Federal Government should be working together.    Do you have a suggestion on a strategy to do that, to counter this disinformation?

Mr. Mueller.    Not overarching.

Mr. Hurd.    In your investigation, did you think that this was a single attempt by the Russians to get involved in our election, or did you find evidence to suggest they will try to do this again?

Mr. Mueller.    Oh, it wasn't a single attempt.    They're doing it as we sit here. And they expect to do it during the next campaign.

Mr. Hurd.    Director Mueller, I appreciate your time and indulging us here in multiple committees.

And I yield back to the ranking member if he has -- I yield back to the chairman.

The Chairman.    Mr. Heck.

Mr. Heck.    Director Mueller, I'd like to go to the motives behind the Trump campaign encouragement and acceptance of help during the election.    Obviously, a clear motivation was to help them in what would turn out to be a very close election.

But there was another key motivation, and that was, frankly, the desire to make money.

I always try to remember what my dad, who never had the opportunity to go beyond the 8th grade, taught me, which is that I should never, ever underestimate the capacity of some people to cut corners and even more in order to worship and chase the almighty buck.

And this is important, because I think it, in fact, does go to the heart of why the Trump campaign was so unrelentingly intent on developing relationships with the Kremlin.

So let's quickly revisit one financial scheme we just discussed, which was the Trump Tower in Moscow.   We indicated earlier that it was a lucrative deal.   Trump, in fact, stood, he and his company, to earn many millions of dollars on that deal, did they not, sir?

Mr. Mueller.   True.

Mr. Heck.   And Cohen, Mr. Cohen, his attorney, testified before this committee that President Trump believed the deal required Kremlin approval.   Is that consistent with what he told you?

Mr. Mueller.   I'm not certain whether it's Mr. Trump himself or others associated with that enterprise that had discussed the necessity of having the input from the state, meaning the Russian Government, in order for it to go forward successfully.

Mr. Heck.   Isn't it also true that Donald Trump viewed his Presidential campaign, as he told top campaign aides, that the campaign was an infomercial for The Trump Organization and his properties?

Mr. Mueller.   I'm not familiar with that.

Mr. Heck.   Then let's turn to Trump campaign chair Paul Manafort.   Did, in fact, your investigation find any evidence that Manafort intended to use his position as

Trump's campaign chair for his own personal financial benefit?

Mr. <u>Mueller.</u>   I would say there was some indication of that, but I won't go further.

Mr. <u>Heck.</u>   I think you'll find it on page 135 of Volume I.

During the transition, Trump's son-in-law, Jared Kushner, met with Sergey Gorkov, the head of a Russian-owned bank that was under -- is under U.S. sanctions.   And according to the head of the bank, he met with Kushner in his capacity as CEO of Kushner Companies to discuss business opportunities.

Is that correct, sir?

Mr. <u>Mueller.</u>   I'm not certain --

Mr. <u>Heck.</u>   It was --

Mr. <u>Mueller.</u>   I'm not certain about that.   Let me just put it that way.

Mr. <u>Heck.</u>   It was asserted thusly in your report, Volume I, on pages 161 and 162. Your report notes that, at the time, Kushner Companies were trying to renegotiate a billion-, with a "B," a billion-dollar lease of their flagship building at 666 5th Avenue, correct?

Mr. <u>Mueller.</u>   I am not familiar with those financial arrangements.

Mr. <u>Heck.</u>   Also on page 162 where Kushner Companies, it was asserted, had debt obligations coming due on the company.

Erik Prince, a supporter close to Trump --

Mr. <u>Mueller.</u>   A supporter -- I'm sorry.

Mr. <u>Heck.</u>   -- campaign and administrative --

Mr. <u>Mueller.</u>   I just -- a supporter.   I was --

Mr. <u>Heck.</u>   Yes.   He met in the Seychelles during the transition with Kirill Dmitriev, who was the head of a sanctioned Russian Government investment arm which

had close ties to Vladimir Putin, correct, sir?

      Mr. <u>Mueller.</u>   Yes.

      Mr. <u>Heck.</u>   Your investigation determined that Mr. Prince had not known nor conducted business with Dmitriev before Trump won the election, correct?

      Mr. <u>Mueller.</u>   Well, I defer to the report on that.

      Mr. <u>Heck.</u>   Yet -- it does.   And yet Prince, who had connections to top Trump administration officials, met with Dmitriev during the transition period to discuss business opportunities, among other things.

      But it wasn't just Trump and his associates who were trying to make money off this deal, nor hide it, nor lie about it.   Russia was too.   That was the whole point, to gain relief from sanctions which would hugely benefit their incredibly wealthy oligarchs.

      For example, sanctions relief was discussed at that June 9 meeting in the Trump Tower, was it not, sir?

      Mr. <u>Mueller.</u>   Yes.   But it was not a main subject for discussion.

      Mr. <u>Heck.</u>   Trump administration National Security Advisor-designate Michael Flynn also discussed sanctions in a secret conversation with the Russian Ambassador, did he not?

      Mr. <u>Mueller.</u>   Correct.

      Mr. <u>Heck.</u>   So, to summarize, Donald Trump, Michael Cohen, Paul Manafort, Jared Kushner, Erik Prince, and others in the Trump orbit all tried to use their connections with The Trump Organization to profit from Russia, which was openly seeking relief from sanctions.   Is that true, sir?

      Mr. <u>Mueller.</u>   I'm not -- I'm not certain I can adopt what you articulate.

      Mr. <u>Heck.</u>   Well, I will.   And I'd further assert that was not only dangerous, it was un-American.   Greed corrupts.   Greed corrupts, and it is a terrible foundation for

developing American foreign policy.

The <u>Chairman.</u>    Mr. Ratcliffe.

Mr. <u>Ratcliffe.</u>    Director Mueller, given your constraints on what you're able or allowed to answer with respect to counterintelligence matters or other matters that are currently open and under investigation, you're not going to be able to answer my remaining questions.

So I thank you for your courtesies in the answers that you have given to my prior questions, and I do thank you for your extraordinary career and record of service, and yield back the balance of my time to the ranking member.

Mr. <u>Mueller.</u>    Thank you.

Mr. <u>Nunes.</u>    Thank you, Mr. Ratcliffe.

And, Mr. Mueller, let me associate my words with Mr. Ratcliffe.

I've got a few more questions.    I want to clean up a little bit about the Erik Prince Seychelles meeting.

So Erik Prince testified before this committee that he was surveilled by the U.S. Government and that information from this surveillance was leaked to the press.    Did you investigate whether Prince was surveilled and whether classified information on him was illegally leaked to the media?

Mr. <u>Mueller.</u>    Did you say "did you" or "will you"?

Mr. <u>Nunes.</u>    Well, I know you can't.    I know you're not going to join --

Mr. <u>Mueller.</u>    So I can't discuss it either way.

Mr. <u>Nunes.</u>    -- back up in the ranks.    But did you refer -- were you aware that -- you know, Prince has made these allegations that he was surveilled.    He's concerned that there were leaks about the surveillance.    Did you make any referrals about these leaks?

Mr. <u>Mueller.</u>   No, and I can't get into discussion on it.

Mr. <u>Nunes.</u>   Okay.

I also want to -- General Flynn.   I know you came after the leak of his phone call with the Russian Ambassador.   Your time at FBI, it would be a major scandal, wouldn't it, for the leak of the National Security Advisor and anyone in any government --

Mr. <u>Mueller.</u>   I can't -- I can't adopt that hypothesis.

Mr. <u>Nunes.</u>   Did your report name any people who were acting as U.S. Government informants or sources without disclosing that fact?

Mr. <u>Mueller.</u>   I can't answer that.

Mr. <u>Nunes.</u>   Okay.

On Volume I, page 133 of your report, you state that Konstantin Kilimnik has ties to Russian intelligence.   His name came up quite often today.   But your report omits to mention that Kilimnik has long-term relationships with U.S. Government officials, including our own State Department.

Mr. <u>Mueller.</u>   I can't be -- I can't get into that.

Mr. <u>Nunes.</u>   I know it's not in the report, but, you know, if Kilimnik is being used in the report to say that he was possibly some type of Russian agent, then I think it is important for this committee to know if Kilimnik has ties to our own State Department, which it appears that he does.

Mr. <u>Mueller.</u>   Again, it's the same territory that I'm loathe to get into.

Mr. <u>Nunes.</u>   Okay.

You were asked this earlier about Trump attorney John Dowd, that pieces of his phone call were omitted from the report.   It was what Mr. Dowd calls exculpatory evidence.

Are you concerned about --

Mr. <u>Mueller.</u>   I'm not certain I would agree with that characterization.

Mr. <u>Nunes.</u>   Okay.

Mr. <u>Mueller.</u>   I think I said that before.

Mr. <u>Nunes.</u>   Yes.

An American citizen from the Republic of Georgia, who your report misidentifies as a Russian, claims that your report omitted parts of a text message he had with Michael Cohen about stopping the flow of compromising tapes of Donald Trump.    In the omitted portions, he says he did not know what the tapes actually showed.

Was that portion of the exchange left out of the report for a reason?

Mr. <u>Mueller.</u>   No.    We got an awful lot into the report, but we did not get every intersection or conversation and the like.    So I am not familiar with that particular episode you're talking about.

Mr. <u>Nunes.</u>   Thank you, Mr. Mueller.

And thank you, Mr. Chairman.

The <u>Chairman.</u>   Mr. Welch.

Mr. <u>Welch.</u>   Director Mueller, did you find there was no collusion between the Trump campaign and Russia?

Mr. <u>Mueller.</u>   Well, we don't use the word "collusion."    I think the word we usually use is the -- well, not "collusion" but one of the other terms that fills in when "collusion" is not used.

In any event, we decided not to use the word "collusion" inasmuch as it has no relevance to the criminal law arena.

Mr. <u>Welch.</u>   The term is "conspiracy" that you prefer to use?

Mr. <u>Mueller.</u>   That's it, "conspiracy."    Exactly right.

Mr. <u>Welch.</u>   You help me, I'll help you.

Mr. <u>Mueller.</u>    Thank you.

Mr. <u>Welch.</u>    It's an agreement.    Thank you.

And, in fact, you had to then make a charging decision after your investigation where, unless there was enough evidence to prove beyond a reasonable doubt, you wouldn't make a charge, correct?

Mr. <u>Mueller.</u>    Generally, that's the case.

Mr. <u>Welch.</u>    But making that decision does not mean your investigation failed to turn up evidence of conspiracy.

Mr. <u>Mueller.</u>    Absolutely correct.

Mr. <u>Welch.</u>    And, in fact, I will go through some of the significant findings that your exhaustive investigation made.

You found, as I understand it, that from May 2016 until the end of the campaign, campaign chairman Mr. Manafort gave private polling information to Russian agents, correct?

Mr. <u>Mueller.</u>    Correct.

The <u>Chairman.</u>    Could you speak into the microphone?

Mr. <u>Mueller.</u>    Yep, I will.    My apologies.

Mr. <u>Welch.</u>    Thank you.

And your investigation found that, in June 2016, Donald Trump, Jr., made an arrangement to meet at Trump Tower, along with Jared Kushner and others, expecting to receive dirt on the Hillary Clinton campaign, correct?

Mr. <u>Mueller.</u>    Correct.

Mr. <u>Welch.</u>    And you found in your investigation that, on July 27, candidate Trump called on Russia to hack Hillary Clinton's emails, something that for the first time they did about 5 hours later, correct?

Mr. <u>Mueller.</u>   That's correct.

Mr. <u>Welch.</u>   And you also found that, on August 2, Mr. Manafort met with a person tied to Russian intelligence, Mr. Kilimnik, and gave him internal campaign strategy, aware that Russia was intending to do a misinformation social media campaign, correct?

Mr. <u>Mueller.</u>   I'm not certain of the tie there.

Mr. <u>Welch.</u>   But the fact of that meeting you agree with?

Mr. <u>Mueller.</u>   The fact that the meeting took place is accurate.

Mr. <u>Welch.</u>   And your investigation, as I understand it, also found that, in late summer of 2016, the Trump campaign in fact devised its strategy and messaging around WikiLeaks releases of materials that were stolen from the Democratic National Committee, correct?

Mr. <u>Mueller.</u>   Is that from the report?

Mr. <u>Welch.</u>   Yes.

Mr. <u>Mueller.</u>   Yes.

Mr. <u>Welch.</u>   It's according to Mr. Gates.

Mr. <u>Mueller.</u>   Yes.

Mr. <u>Welch.</u>   Yes.   Thank you.

And you also talked earlier about the finding in your investigation that, in September and October of 2016, Donald Trump, Jr., had email communications with WikiLeaks, now indicted, about releasing information damaging to the Clinton campaign, correct?

Mr. <u>Mueller.</u>   True.

Mr. <u>Welch.</u>   All right.

So I understand you made the decision, a prosecutorial decision, that this would not rise to proof beyond a reasonable doubt.   But I ask if you share my concern.   And

my concern is:    Have we established a new normal from this past campaign that is going to apply to future campaigns so that if any one of us running for the U.S. House, any candidate for the U.S. Senate, any candidate for the Presidency of the United States, aware that a hostile foreign power is trying to influence an election, has no duty to report that to the FBI or other authorities --

       Mr. <u>Mueller.</u>    Well, I hope --

       Mr. <u>Welch.</u>    -- that -- go ahead.

       Mr. <u>Mueller.</u>    Well, I hope this is not the new normal, but I fear it is.

       Mr. <u>Welch.</u>    -- and would, in fact, have the ability without fear of legal repercussion to meet with agents of that foreign entity hostile to the American election?

       Mr. <u>Mueller.</u>    I'm sorry.    What is the question?

       Mr. <u>Welch.</u>    Is that an apprehension that you share with me?

       Mr. <u>Mueller.</u>    Yes.

       Mr. <u>Welch.</u>    And that there would be no repercussions whatsoever to Russia if they did this again.    And as you stated earlier, as we sit here, they're doing it now.    Is that correct?

       Mr. <u>Mueller.</u>    You're absolutely right.

       Mr. <u>Welch.</u>    Do you have any advice to this Congress as to, together, what we should do to protect our electoral system and accept responsibility on our part to report to you or your successor when we're aware of hostile foreign engagement in our elections?

       Mr. <u>Mueller.</u>    I would say, a basis -- first line of defense, really, is the ability of the various agencies who have some piece of this to not only share information but share expertise, share targets, and use the full resources that we have to address this problem.

       Mr. <u>Welch.</u>    Thank you, Director Mueller.

I yield back.

The Chairman.    Mr. Maloney.

Mr. Maloney.    Mr. Mueller, thank you.    I know it's been a long day.    And I want to make clear how much respect I have for your service and for your extraordinary career, and I want you to understand my questions in that context, sir.

I'm going to be asking you about Appendix C to your report and, in particular, the decision not to do a sworn interview with the President.    It's really the only subject I want to talk to you about, sir.

Why didn't you subpoena the President?

Mr. Mueller.    Well, at the outset, after we took over and initiated the investigation --

Mr. Maloney.    If I could ask you to speak into the mike.

Mr. Mueller.    Yeah.    Of course.

At the outset, after we took over the investigation and began it and pursued it, quite obviously, one of the things we anticipated wanting to accomplish in that is having the interview of the President.    We negotiated with him for a little over a year, and I think what you adverted to in the appendix lays out our expectations as a result of those negotiations.

But, finally, when we were almost towards the end of our investigation and we'd had little success in pushing to get the interview of the President, we decided that we did not want to exercise the subpoena powers because of the necessity of expediting the end of the investigation.

Mr. Maloney.    Was that -- excuse me.    Did you --

Mr. Mueller.    I was going to say, the expectation was, if we did subpoena the President, he would fight the subpoena and we would be in the midst of the investigation

for a substantial period of time.

      Mr. <u>Maloney.</u>    Right.

      But as we sit here, you've never had an opportunity to ask the President in-person questions under oath.    And so, obviously, that must have been a difficult decision.    And you're right; Appendix C lays that out.    And, indeed, I believe you describe the in-person interview as vital.    That's your word.

      And, of course, you make clear you had the authority and the legal justification to do it.    As you point out, you waited a year, you put up with a lot of negotiations, you made numerous accommodations, which you lay out, so that he could prepare and not be surprised.    I take it you were trying to be fair to the President.

      And, by the way, you were going to limit the questions, when you got to written questions, to Russia only.    And, in fact, you did go with written questions after about 9 months, sir, right?    And the President responded to those.

      And you have some hard language for what you thought of those responses. What did you think of the President's written responses, Mr. Mueller?

RPTR FORADORI

EDTR HOFSTAD

[3:05 p.m.]

Mr. Mueller.   Certainly not as useful as the interview would be.

Mr. Maloney.   In fact, you pointed out, and by my count, there were more than 30 times when the President said he didn't recall, he didn't remember, no independent recollection, no current recollection.

And I take it by your answer that it wasn't as helpful.   That's why you used words like "incomplete," "imprecise," "inadequate," "insufficient."   Is that a fair summary of what thought of those written answers?

Mr. Mueller.   That is a fair summary.   And I presume that comes from the report.

Mr. Maloney.   And yet, sir -- and I ask this respectfully -- by the way, the President didn't ever claim the Fifth Amendment, did he?

Mr. Mueller.   I'm not going to talk to that.

Mr. Maloney.   Well, from what I can tell, sir, at one point it was vital and then at another point it wasn't vital.   And my question to you is, why did it stop being vital?

And I can only think of three explanations.   One is that somebody told you you couldn't do it.   But nobody told you you couldn't subpoena the President.   Is that right?

Mr. Mueller.   No.   We understood we could subpoena the President.

Mr. Maloney.   Rosenstein didn't tell you, Whitaker didn't tell you, Barr didn't tell you you couldn't --

Mr. Mueller.   We could serve a subpoena.

Mr. Maloney.   So the only other explanation -- well, there's two others, I guess:

one, that you just flinched, that you had the opportunity to do it and you didn't do it. But, sir, you don't strike me as the kind of guy who flinches.

Mr. <u>Mueller.</u>   I'd hope not.

Mr. <u>Maloney.</u>   Well, then the third explanation -- I hope not, too, sir.   And the third explanation I can think of is that you didn't think you needed it.

And, in fact, what caught my eye was page 13 of Volume II, where you said, in fact, you had a substantial body of evidence.   And you cite a bunch of cases there, don't you, about how you often have to prove intent to obstruct justice without an in-person interview.   That's the kind of nature of it.   And you used terms like "a substantial body of evidence," "significant evidence" of the President's intent.

So my question, sir, is did you have sufficient evidence of the President's intent to obstruct justice, and is that why you didn't do the interview?

Mr. <u>Mueller.</u>   Well, there's a balance -- in other words, how much evidence you have that satisfy the last element against how much time are you willing to spend in the courts litigating the interview of the President.

Mr. <u>Maloney.</u>   And, in this case, you felt that you had enough evidence of the President's intent.

Mr. <u>Mueller.</u>   We had to make a balanced decision in terms of how much evidence we had compared to the length of time it would take to do the --

Mr. <u>Maloney.</u>   And, sir, because I have limited time, you thought that if you gave it to the Attorney General or to this Congress that there was sufficient evidence, that it was better than that delay.

Mr. <u>Mueller.</u>   Can you state that again?

Mr. <u>Maloney.</u>   Well, that it was better than the delay to present the sufficient evidence -- your term -- of the President's intent to obstruct justice to the Attorney

General and to this committee.    Isn't that why you didn't do the interview?

Mr. Mueller.    No.    The reason we didn't do the interview is because of the length of time that it would take to resolve the issues attendant to that.

Mr. Maloney.    Thank you, sir.

The Chairman.    Mrs. Demings.

Mrs. Demings.    Thank you so much, Mr. Chairman.

And, Director Mueller, thank you so much for being a person of honor and integrity.    Thank you for your service to the Nation.    We are certainly better for it.

Director Mueller, I, too, want to focus on the written responses that the President did provide and the continued efforts to lie and cover up what happened during the 2016 election.

Were the President's answers submitted under oath?

Mr. Mueller.    Yes.    Yes.

Mrs. Demings.    Thank you.    They were.

Were these all the answers your office wanted to ask the President about Russian interference in the 2016 election?

Mr. Mueller.    No, not necessarily.

Mrs. Demings.    So there were other --

Mr. Mueller.    Yes.

Mrs. Demings.    -- questions that you wanted to answer.

Did you analyze his written answers on Russian interference to draw conclusions about the President's credibility?

Mr. Mueller.    No.    It was perhaps one of the factors, but nothing more than that.

Mrs. Demings.    It was one of the factors.    So what did you determine about the

President's credibility?

      Mr. <u>Mueller.</u>    And that I can't get into.

      Mrs. <u>Demings.</u>    Director Mueller, I know based on your decades of experience you've probably had an opportunity to analyze the credibility of countless witnesses, but you weren't able to do so with this witness?

      Mr. <u>Mueller.</u>    Well, with every witness, particularly a leading witness, one assesses the credibility day by day, witness by witness, document by document.    And that's what happened in this case.    So we started with very little, and, by the end, we ended up with a fair amount.    My -- yeah, a fair amount.

      Mrs. <u>Demings.</u>    Thank you.    Well, let's go through some of the answers to take a closer look at his credibility, because it seems to me, Director Mueller, that his answers were not credible at all.

      Did some of President Trump's incomplete answers relate to Trump Tower Moscow?

      Mr. <u>Mueller.</u>    Yes.

      Mrs. <u>Demings.</u>    For example, did you ask the President whether he had at any time directed or suggested that discussions about Trump Moscow project should cease?

      Mr. <u>Mueller.</u>    Should what?

      Mrs. <u>Demings.</u>    Cease.

      Mr. <u>Mueller.</u>    Do you have a citation?

      Mrs. <u>Demings.</u>    Yes.    We're still in Appendix C, section 1-7.

      Mr. <u>Mueller.</u>    The first page?

      Mrs. <u>Demings.</u>    Uh-huh.    It says:    "The President 'did not answer whether he had at any time directed or suggested that discussions about the Trump Moscow project should cease...but he has since made public comments about that topic.'"

Mr. <u>Mueller.</u>   Okay.   And the question was?

Mrs. <u>Demings.</u>   Did the President -- let me go on to the next.   Did the President fully answer that question in his written statement to you about the Trump Moscow project ceasing?   Again, in Appendix C.

Mr. <u>Mueller.</u>   And can you direct me to the particular paragraph you're adverting to?

Mrs. <u>Demings.</u>   It would be Appendix C, C-1.   But let me move forward.

Nine days after he submitted his written answers, didn't the President say publicly that he, quote, "decided not to do the project," unquote?   And that is in your report.

Mr. <u>Mueller.</u>   I'd ask you, if you would, to point out the particular paragraph that you're focused on.

Mrs. <u>Demings.</u>   Okay.   We can move on.

Did the President answer your followup questions?   According to the report, there were followup questions because of the President's incomplete answers about the Moscow project.   Did the President answer your followup questions, either in writing or orally?

And we're now in --

Mr. <u>Mueller.</u>   No.

Mrs. <u>Demings.</u>   -- Volume II, page 150 through 151.

Mr. <u>Mueller.</u>   No.

Mrs. <u>Demings.</u>   He did not.

In fact, there were many questions that you asked the President that he simply didn't answer.   Isn't that correct?

Mr. <u>Mueller.</u>   True.

Mrs. <u>Demings.</u>   And there were many answers that contradicted other evidence

you had gathered during the investigation.    Isn't that correct --

Mr. Mueller.    Yes.

Mrs. Demings.    -- Director Mueller?

Director Mueller, for example, the President, in his written answers, stated he did not recall having advance knowledge of WikiLeaks releases.    Is that correct?

Mr. Mueller.    I think that's what he said.

Mrs. Demings.    But didn't your investigation uncover evidence that the President did, in fact, have advance knowledge of WikiLeaks public releases of emails damaging to his opponent?

Mr. Mueller.    And I can't get into that area.

Mrs. Demings.    Did your investigation determine after very careful vetting of Rick Gates and Michael Cohen that you found them to be credible?

Mr. Mueller.    That we found the President to be credible?

Mrs. Demings.    That you found Gates and Cohen to be credible in their statements about WikiLeaks?

Mr. Mueller.    Those areas I'm not going to discuss.

Mrs. Demings.    Okay.

Could you say, Director Mueller, that the President was credible?

Mr. Mueller.    I can't answer that question.

Mrs. Demings.    Director Mueller, isn't it fair to say that the President's written answers were not only inadequate and incomplete, because he didn't answer many of your questions, but where he did, his answers showed that he wasn't always being truthful?

Mr. Mueller.    There I would say generally.

Mrs. Demings.    Generally.

Director Mueller, it's one thing for the President to lie to the American people about your investigation, falsely claiming that you found no collusion or no obstruction. But it's something else altogether for him to get away with not answering your questions and lying about them.    And as a former law enforcement officer of almost 30 years, I find that a disgrace to our criminal justice system.

Thank you so --

Mr. Mueller.    Thank you, ma'am.

Mrs. Demings.    -- much.

I yield back to the chairman.

The Chairman.    Mr. Krishnamoorthi.

Mr. Krishnamoorthi.    Director Mueller, thank you for your devoted service to your country.

Earlier today, you described your report as detailing a criminal investigation, correct?

Mr. Mueller.    Yes.

Mr. Krishnamoorthi.    Director, since it was outside the purview of your investigation, your report did not reach counterintelligence conclusions regarding the subject matter of your report.

Mr. Mueller.    That's true.

Mr. Krishnamoorthi.    For instance, since it was outside your purview, your report did not reach counterintelligence conclusions regarding any Trump administration officials who might potentially be vulnerable to compromise or blackmail by Russia, correct?

Mr. Mueller.    Those decisions probably were made in a counter -- in the FBI.

Mr. Krishnamoorthi.    But not in your report, correct?

Mr. <u>Mueller.</u>    Not in our report.    We advert to the counterintelligence goals of our investigation, which were secondary to any criminal wrongdoing that we could find.

Mr. <u>Krishnamoorthi.</u>    Let's talk about one administration official in particular -- namely, President Donald Trump.    Other than Trump Tower Moscow, your report does not address or detail the President's financial ties or dealings with Russia, correct?

Mr. <u>Mueller.</u>    Correct.

Mr. <u>Krishnamoorthi.</u>    Similarly, since it was outside your purview, your report does not address the question of whether Russian oligarchs engaged in money laundering through any of the President's businesses, correct?

Mr. <u>Mueller.</u>    Correct.

Mr. <u>Krishnamoorthi.</u>    And, of course, your office did not obtain the President's tax returns, which could otherwise show foreign financial sources, correct?

Mr. <u>Mueller.</u>    I'm not going to speak to that.    I'm not going to speak to that.

Mr. <u>Krishnamoorthi.</u>    In July 2017, the President said his personal finances were off limits or outside the purview of your investigation, and he drew a, quote/unquote, "red line" around his personal finances.

Were the President's personal finances outside the purview of your investigation?

Mr. <u>Mueller.</u>    I'm not going to get into that.

Mr. <u>Krishnamoorthi.</u>    Were you instructed by anyone not to investigate the President's personal finances?

Mr. <u>Mueller.</u>    No.

Mr. <u>Krishnamoorthi.</u>    Mr. Mueller, I'd like to turn your attention to counterintelligence risks associated with lying.

Individuals can be subject to blackmail if they lie about their interactions with

foreign countries, correct?

    Mr. Mueller.   True.

    Mr. Krishnamoorthi.   For example, you successfully charged former National

Security Advisor Michael Flynn of lying to Federal agents about his conversations with

Russian officials, correct?

    Mr. Mueller.   Correct.

    Mr. Krishnamoorthi.   Since it was outside the purview of your investigation, your

report did not address how Flynn's false statements could pose a national security risk

because the Russians knew the falsity of those statements, right?

    Mr. Mueller.   I cannot get into that mainly because there are many elements of

the FBI that are looking at different aspects of that issue.

    Mr. Krishnamoorthi.   Currently?

    Mr. Mueller.   Currently.

    Mr. Krishnamoorthi.   Thank you.

    As you noted in Volume II of your report, Donald Trump repeated five times in one

press conference, Mr. Mueller, in 2016, quote, "I have nothing to do with Russia."

    Of course, Michael Cohen said Donald Trump was not being truthful because, at

this time, Trump was attempting to build Trump Tower Moscow.

    Your report does not address whether Donald Trump was compromised in any

way because of any potential false statements that he made about Trump Tower

Moscow, correct?

    Mr. Mueller.   I think that's right.   I think that's right.

    Mr. Krishnamoorthi.   Director Mueller, I want to turn your attention to a couple

other issues.

    You've served as FBI Director during three Presidential elections, correct?

Mr. <u>Mueller.</u>   Yes.

Mr. <u>Krishnamoorthi.</u>   And during those three Presidential elections, you have never initiated an investigation at the FBI looking into whether a foreign government interfered in our elections the same way you did in this particular instance, correct?

Mr. <u>Mueller.</u>   I would say I, personally, no.   But the FBI, quite obviously, has the -- how you defense an attack such as the Russians undertook in 2016.

Mr. <u>Krishnamoorthi.</u>   Now, Director Mueller, is there any information you'd like to share with this committee that you have not so far today?

Mr. <u>Mueller.</u>   Boy, that's a broad question.   And it'd take me a while to get an answer to it, but I'll say:   No.

Mr. <u>Krishnamoorthi.</u>   Mr. Mueller, you said that every American should pay very close attention to the systematic and sweeping fashion in which the Russians interfered in our democracy.

Are you concerned that we are not doing enough currently to prevent this from happening again?

Mr. <u>Mueller.</u>   Well, I'll speak generally and what I said in my opening statement this morning and here, that, no, much more needs to be done in order to protect against this intrusion, not just by the Russians but others as well.

Mr. <u>Krishnamoorthi.</u>   Thank you, Director.

The <u>Chairman.</u>   We have two 5-minute periods remaining, Mr. Nunes and myself.

Mr. Nunes, you are recognized.

Mr. <u>Nunes.</u>   Mr. Mueller, it's been a long day for you.   And you've had a long, great career.   I want to thank you for your longtime service, starting in Vietnam, obviously in the U.S. Attorney's Office, Department of Justice, and the FBI.   And I want to thank you for doing something you didn't have to do; you came here upon your own

free will.    And we appreciate your time today.

With that, I yield back.

Mr. Mueller.    Thank you, sir.

The Chairman.    Director Mueller, I want to, to close out my questions, turn to some of the exchange you had with Mr. Welch a bit earlier.    I'd like to see if we can broaden the aperture at the end of the hearing.

From your testimony today, I gather that you believe that knowingly accepting foreign assistance during a Presidential campaign is an unethical thing to do.

Mr. Mueller.    And a crime --

The Chairman.    And a crime.

Mr. Mueller.    -- in certain circumstances.    Yes.

The Chairman.    And to the degree it undermines our democracy and our institutions, we can agree that it's also unpatriotic.

Mr. Mueller.    True.

The Chairman.    And wrong.

Mr. Mueller.    True.

The Chairman.    The standard of behavior for a Presidential candidate or any candidate, for that matter, shouldn't be merely whether something is criminal; they should be held to a higher standard.    You would agree?

Mr. Mueller.    I will not get into that because it goes to the standards to be applied by other institutions besides ours.

The Chairman.    Well, I'm just referring to ethical standards.    We should hold our elected officials to a standard higher than mere avoidance of criminality, shouldn't we?

Mr. Mueller.    Absolutely.

The <u>Chairman.</u>   You have served this country for decades.   You've taken an oath to defend the Constitution.   You hold yourself to a standard of doing what's right.

Mr. <u>Mueller.</u>   I would hope.

The <u>Chairman.</u>   You have.   I think we can all see that.   And befitting the times, I'm sure your reward will be unending criticism.   But we are grateful.

The need to act in an ethical manner is not just a moral one but, when people act unethically, it also exposes them to compromise, particularly in dealing with foreign powers.   Is that true?

Mr. <u>Mueller.</u>   True.

The <u>Chairman.</u>   Because when someone acts unethically in connection with a foreign partner, that foreign partner can later expose their wrongdoing and extort them?

Mr. <u>Mueller.</u>   True.

The <u>Chairman.</u>   And that conduct, that unethical conduct, could be of a financial nature if you have a financial motive or an elicit business dealing.   Am I right?

Mr. <u>Mueller.</u>   Yes.

The <u>Chairman.</u>   But it can also just involve deception.   If you're lying about something that can be exposed, then you can be blackmailed.

Mr. <u>Mueller.</u>   Also true.

The <u>Chairman.</u>   In the case of Michael Flynn, he was secretly doing business with Turkey, correct?

Mr. <u>Mueller.</u>   Yes.

The <u>Chairman.</u>   And that could open him up to compromise, that financial relationship?

Mr. <u>Mueller.</u>   I presume.

The <u>Chairman.</u>   He also lied about his discussions with the Russian Ambassador.

And since the Russians were on the other side of that conversation, they could've exposed that, could they not?

Mr. Mueller.   Yes.

The Chairman.   If a Presidential candidate was doing business in Russia and saying he wasn't, Russians could expose that too, could they not?

Mr. Mueller.   I leave that to you.

The Chairman.   Well, let's look at Dmitry Peskov, the spokesperson for the Kremlin, someone that the The Trump Organization was in contact with to make that deal happen.

Your report indicates that Michael Cohen had a long conversation on the phone with someone from Dmitry Peskov's office.   Presumably the Russians could record that conversation, could they not?

Mr. Mueller.   Yes.

The Chairman.   And so, if Candidate Trump was saying "I have no dealings with the Russians" but the Russians had a tape recording, they could expose that, could they not?

Mr. Mueller.   Yes.

The Chairman.   That's the stuff of counterintelligence nightmares, is it not?

Mr. Mueller.   Well, it has to do with counterintelligence and the need for a strong counterintelligence entity.

The Chairman.   It does indeed.

And when this was revealed, that there were these communications notwithstanding the President's denials, the President was confronted about this, and he said two things:   first of all, "That's not a crime."   But I think you and I have already agreed that that shouldn't be the standard, right, Mr. Mueller?

Mr. <u>Mueller.</u>   True.

The <u>Chairman.</u>   And the second thing he said was, "Why should I miss out on all those opportunities?"   I mean, why indeed, merely running a Presidential campaign, why should you miss out on making all that money, was the import of his statement.

Were you ever able to ascertain whether Donald Trump still intends to build that tower when he leaves office?

Mr. <u>Mueller.</u>   Was that a question, sir?

The <u>Chairman.</u>   Yes.   Were you able to ascertain -- because he wouldn't answer your questions completely -- whether or if he ever ended that desire to build that tower?

Mr. <u>Mueller.</u>   I'm not going to speculate on that.

The <u>Chairman.</u>   If the President was concerned that if he lost his election, he didn't want to miss out on that money, might he have the same concern about losing his reelection and --

Mr. <u>Mueller.</u>   Again --

The <u>Chairman.</u>   -- missing out on that money?

Mr. <u>Mueller.</u>   -- speculation.

The <u>Chairman.</u>   The difficulty with this, of course, is we are all left to wonder whether the President is representing us or his financial interests.

That concludes my questions.

Mr. Nunes, do you have any concluding remarks?

Mr. <u>Nunes.</u>   I don't.

The <u>Chairman.</u>   Director Mueller, let me close by returning to where I began. Thank you for your service, and thank you for leading this investigation.

The facts you set out in your report and have elucidated here today tell a disturbing tale of a massive Russian intervention in our election, of a campaign so eager

to win, so driven by greed that it was willing to accept the help of a hostile foreign power in a Presidential election decided by a handful of votes in a few key States.

Your work tells of a campaign so determined to conceal their corrupt use of foreign help that they risked going to jail by lying to you, to the FBI, and to Congress about it.    And, indeed, some have gone to jail over such lies.

And your works speaks of a President who committed countless acts of obstruction of justice that, in my opinion and that of many other prosecutors, had it been anyone else in the country, they would've been indicted.

Notwithstanding the many things you have addressed today and in your report, there were questions you could not answer given the constraints you're operating under.

You would not tell us whether you would've indicted the President but for the OLC opinion that you could not.    And so the Justice Department will have to make that decision when the President leaves office, both as to the crime of obstruction of justice and as to the campaign finance fraud scheme that Individual 1 directed and coordinated and for which Michael Cohen went to jail.

You would not tell us whether the President should be impeached, nor did we ask you, since it is our responsibility to determine the proper remedy for the conduct outlined in your report.    Whether we decide to impeach the President in the House or we do not, we must take any action necessary to protect the country while he is in office.

You would not tell us the results or whether other bodies looked into Russian compromise in the form of money laundering, so we must do so.

You would not tell us whether the counterintelligence investigation revealed whether people still serving within the administration pose a risk of compromise and should never have been given a security clearance, so we must find out.

We did not bother to ask whether financial inducements from any Gulf nations

were influencing U.S. policy since it is outside the four corners of your report, and so we must find out.

But one thing is clear from your report, your testimony, from Director Wray's statements yesterday:    The Russians massively intervened in 2016, and they are prepared to do so again in voting that is set to begin a mere 8 months from now.    The President seems to welcome the help again, and so we must make all efforts to harden our elections infrastructure, to ensure there is a paper trail for all voting, to deter the Russians from meddling, to discover it when they do, to disrupt it, and to make them pay.

Protecting the sanctity of our elections begins, however, with the recognition that accepting foreign help is disloyal to our country, unethical, and wrong.    We cannot control what the Russians do, not completely, but we can decide what we do and that this centuries-old experiment we call American democracy is worth cherishing.

Director Mueller, thank you again for being here today.    And before I adjourn, I would like to excuse you and Mr. Zebley.

Everyone else, please remain seated.

This hearing is adjourned.

[Whereupon, at 3:30 p.m., the committee was adjourned.]