**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

                        *Plaintiff*,

    v.

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

                        *Defendant*.

Case No. 1:19-cv-2379

# Exhibit T

HJU093000                              PAGE      1

1   ALDERSON COURT REPORTING

2   SHAYLAH LYNN BURRILL

3   HJU093000


4   MARKUP OF RESOLUTION AUTHORIZING ISSUANCE OF SUBPOENAS.

5   Wednesday, April 3, 2019

6   House of Representatives

7   Committee on the Judiciary

8   Washington, D.C.


9       The committee met, pursuant to call, at 9:01 a.m., in

10  Room 2141, Rayburn Office Building, Honorable Jerrold Nadler

11  [chairman of the committee] presiding.

12      Present:  Representatives Nadler, Lofgren, Jackson Lee,

13  Cohen, Johnson of Georgia, Deutch, Bass, Richmond, Jeffries,

14  Cicilline, Swalwell, Lieu, Raskin, Jayapal, Demings, Correa,

15  Scanlon, Garcia, Neguse, McBath, Stanton, Dean, Murcarsel-

16  Powell, Escobar, Collins, Sensenbrenner, Chabot, Gohmert,

17  Jordan, Buck, Ratcliffe, Roby, Gaetz, Johnson of Louisiana,

18  Biggs, McClintock, Lesko, Reschenthaler, Cline, Armstrong,

19  and Steube.

20      Staff present:  Aaron Hiller, Deputy Chief Counsel; Arya

HJU093000                                    PAGE      2

21   Hariharan, Oversight Counsel; David Greengrass, Senior

22   Counsel; John Doty, Senior Advisor; Lisette Morton, Director

23   of Policy, Planning, and Member Services; Madeline Strasser,

24   Chief Clerk; Moh Sharma, Member Services and Outreach

25   Advisor; Susan Jensen, Parliamentarian/Senior Counsel; Sophie

26   Brill, Counsel, Constitution Subcommittee; Will Emmons,

27   Professional Staff Member, Constitution Subcommittee; Brendan

28   Belair, Minority Chief of Staff; Robert Parmiter, Minority

29   Deputy Chief of Staff; Jon Ferro, Minority Parliamentarian;

30   Andrea Woodard, Minority Professional Staff Member; Carlton

31   Davis, Minority Oversight Counsel; Jake Greenberg, Minority

32   Professional Staff Member; Ashley Callen, Minority

33   Professional Staff Member; and Danny Johnson, Minority

34   Professional Staff Member.

35

HJU093000                                    PAGE        3

36          Chairman Nadler.  The Judiciary Committee will please

37     come to order, a quorum being present.  Without objection,

38     the chair is authorized to declare a recess at any time.

39          Pursuant to Committee Rule 2 and House Rule XI, Clause

40     2, the chair may postpone further proceedings today on the

41     question of approving any measure or matter or adopting an

42     amendment for which a recorded vote for the yeas and nays are

43     ordered.

44          Pursuant to notice, I now call up the chair's resolution

45     authorizing the issuance of certain subpoenas for documents

46     and testimony for purposes of markup and move that the

47     committee agree to the resolution.

48          The clerk will report the resolution.

49          Ms. Strasser.  Resolution offered by Chairman Jerrold

50     Nadler, "Resolved, that upon the adoption of this resolution,

51     the chairman of the Committee on the Judiciary is authorized

52     to issue subpoenas" --

53          Chairman Nadler.  Without objection, the resolution is

54     considered as read and open for amendment at any point.

55          [The resolution follows:]

56

57      Chairman Nadler.  I will begin by recognizing myself for

58  an opening statement.

59      In late 1973, the Nixon Administration had an idea.

60  When special counsel, Archibald Cox, asked the White House to

61  turn over recordings of conversations held in the Oval

62  Office, President Nixon offered instead to provide the tapes

63  to Senator John Stennis of Mississippi.  Nixon proposed that

64  Stennis, who was famously hard of hearing, would listen to

65  the recordings himself, then provide summaries of the tapes

66  to the special prosecutor.  The Nixon Administration

67  justified the proposal as a means to protect sensitive

68  information that would not ordinarily be made part of the

69  record.  In hindsight, of course, we know that President

70  Nixon had ulterior motives.  In any event, Cox had a job to

71  do.  That job required him to evaluate the full record for

72  himself, and he refused the President's offer.  President

73  Nixon ordered him fired the next day.

74      The dynamics of the Stennis compromise, as it became

75  known, should sound familiar to us.  The Trump Administration

76  has an idea.  They want to redact the Mueller report before

77  they provide it to Congress.  The Department of Justice says

78  the proposal is a means to protect sensitive information that

79  would not ordinarily be made part of the record, but we have

80  reason to suspect this Administration's motives.  The Mueller

81  report probably isn't the "total exoneration" the President

82   claims it to be.  And in any event, the committee has a job

83   to do.  The Constitution charges Congress with holding the

84   President accountable for alleged official misconduct.  That

85   job requires us to evaluate the evidence for ourselves, not

86   the Attorney General's summary, not a substantially redacted

87   synopsis, but the full report and the underlying evidence.

88        The Attorney General proposes to redact four categories

89   of information from the Mueller report:  grand jury

90   information, classified information, information related to

91   ongoing prosecutions, and "information that may unduly

92   infringe on the personal privacy and reputational interests

93   of peripheral third parties."  The Department is wrong to try

94   to withhold that information from this committee.  Congress

95   is entitled to all of the evidence.

96        This isn't just my opinion.  It is also a matter of law.

97   For precedent on 3 of the 4 categories, we need look no

98   further than the summer of 2016 when pursuant to

99   congressional subpoena, the Department and the FBI began to

100  transfer more than 880,000 documents related to the Clinton

101  investigation to the House of Representatives.  That

102  production included classified information which we held in

103  our secure facility and which we handled every day.  It

104  included information related to ongoing investigations, and

105  it included information related to numerous third parties,

106  many of whom this committee later interviewed as part of the

HJU093000                                        PAGE      6

107    Republican investigation into the investigation.

108        The other category of information the Attorney General

109    proposes to redact is grand jury information, normally

110    protected under Rule 6(e) of the Federal Rules of Criminal

111    Procedure.  Many who seem eager to keep this information from

112    Congress argue that the law does not allow grand jury

113    information to be shared outside the Justice Department.

114    That analysis is incomplete if not outright incorrect.  It is

115    true that Rule 6(e) ordinarily prohibits the Department from

116    sharing grand jury information with the public.  It is also

117    true that with proper authorization and under court order the

118    Department must share grand jury information with this

119    committee.

120        That was the case in 1974 when Judge Sirica authorized

121    the release of the Watergate road map to this committee at

122    the request of special counsel, Leon Jaworski.  It was the

123    case in 1998 when a Federal court permitted Ken Starr to

124    release grand jury information along with his report to

125    Congress.  It was the case in 2008 and 2009 when this

126    committee went directly to the grand jury twice to get

127    information relevant to our investigation of Judge Thomas

128    Porteous.

129        On multiple occasions, I have asked Attorney General

130    Barr to work with us, to go to the Court and obtain access to

131    materials the Department deems covered by Rule 6(e).  He has

132   so far refused.  I will give him time to change his mind, but

133   if we cannot reach an accommodation, then we will have no

134   choice but to issue subpoenas for these materials.  And if

135   the Department still refuses, then it should be up to a

136   judge, not the President and not his political appointee, to

137   decide whether or not it is appropriate or the committee to

138   review the complete record.

139       The resolution before us today authorizes subpoenas for

140   two categories of information.  First, the resolution

141   authorizes subpoenas for documents and testimony related to

142   the full and unredacted report of Special Counsel Mueller.  I

143   believe the committee must have access to this information in

144   order to perform its constitutionally-mandated

145   responsibility.  The House of Representatives agreed with

146   this proposition when last month it voted 420-0 in support of

147   a resolution that demanded the release of the full report.

148       Second, the resolution authorizes subpoenas for

149   documents and testimony of former White House employees.

150   Each of these individuals has had more than a month to

151   produce documents to this committee voluntarily.  We believe

152   that these individuals may have received documents from the

153   White House in preparation for their interviews with the

154   special counsel.  We also believe that these individuals may

155   have turned this information over to their private attorneys.

156   Under applicable Federal law, President Trump waived his

157   claims to executive privilege once this information was

158   transmitted to outside counsel.  Because we may have to go to

159   court to obtain the complete text of the special counsel's

160   report, and because the President may attempt to invoke

161   executive privilege to withhold that evidence from us, it is

162   imperative that the committee take possession of these

163   documents and others without delay.

164        Yesterday the President presented me with the high honor

165   of not one, but three separate mentions on Twitter.  He also

166   talked about our relationship, which goes back several years,

167   in a press conference yesterday afternoon.  President Trump

168   seems to think in 1998 I was opposed to public release of the

169   Starr report and that he has caught me changing my mind on

170   the subject.  Let met set the record straight.  In 1998, the

171   debate was not about Congress receiving evidence.  Congress

172   had already received the full 445-page report and 17 boxes of

173   additional documents, including grand jury material.  We are

174   owed that same opportunity today.

175        In 1998, the central debate was about the public release

176   of some of the materials accompanying the Starr report,

177   materials that Congress already had and that described

178   private sexual acts in lurid detail.  Congress has no

179   business broadcasting accounts of the President's sex life.

180   It was inappropriate in 1998.  It would be inappropriate

181   today.  Our focus should be on the law.  That is where our

HJU093000                                    PAGE      9

182   focus will remain so long as I am chairman.

183        We are dealing now not with the President's private

184   affairs, but with a sustained attack on the integrity of the

185   republic by the President and his closest advisers.  This

186   committee requires the full report and the underlying

187   materials because it is our job, not the Attorney General's,

188   to determine whether or not President Trump has abused his

189   office.  And we require the report because one day, one way

190   or another, the country will move on from President Trump.

191   We must make it harder for future presidents to behave this

192   way.  We need a full accounting of the President's actions to

193   do that work.  Accordingly, I urge my colleagues to support

194   the resolution.

195        I now recognize the ranking member of the Judiciary

196   Committee, the gentleman from Georgia, Mr. Collins, for his

197   opening statement.

198        Mr. Collins.  Thank you, Mr. Chairman.  Before we begin

199   today, I want to point out something that I never thought

200   would actually happen.  Jeh Johnson and I actually agree

201   about something.  The former Secretary and I actually agree

202   that there is a crisis on our southern border.  And by doing

203   so, we actually agree that we need to do something about it.

204   Unfortunately, as we saw in the first quarter of this month,

205   and we are starting the second quarter of this committee off

206   in the same vein, and that is desperately searching for

207  something on the President.  When we understand this, then we

208  begin to look because instead of today, instead of dealing

209  with issues that this committee is authorized and should be

210  dealing with, we are moving on to subpoenas, and that for

211  several reasons I cannot support.

212      The first, the subpoena for the Mueller report and its

213  underlying evidence commands the Attorney General to do

214  really what the unthinkable is.  Remember, this is something

215  to remind folks.  The Starr report and the Mueller

216  investigation were not under the same authorization.  We keep

217  conflating that around here.  They were not, and this is why

218  we need to understand that.  Basically what we are now saying

219  is we are going to ask the Attorney General to break his

220  regulation, to break the law.

221      The Attorney General's entire mandate is to enforce the

222  law, and he is expressly forbidden from providing grand jury

223  outside the Department in very limited and narrow exceptions.

224  Congress is not one of the exceptions, and the chairman knows

225  it, and I would disagree with his characterization.  I

226  respect my chairman, but I disagree with his characterization

227  of the Starr report because they are under different

228  regulations.  They were put out and sent out, but when it

229  came to grand material, it was material that by law must be

230  secret.  It is grand jury material.  It represents statements

231  which may or may not be true by various witnesses -- I wish

232   many would understand that -- salacious material, all kinds

233   of material that would be unfair to release.

234        Those are not Doug Collins' words.  Those are my

235   chairman's words.  This is a time in which this is not a new

236   idea.  Right now the only thing is, is there is a hope

237   against hope that we are going to find something.  It was

238   just actually said.  We need to start now so we can begin to

239   down to the courtroom because we know we are not going to

240   find anything.  And even if we did, and I love the comment

241   just a moment ago, that there may be -- and I love how we do

242   this -- may be things in there that is not up to the Attorney

243   General to decide right or wrong.  It was not.  It was

244   Mueller's investigation that the Attorney General passed on.

245   Here is what we found.

246        This is the problem we are seeing right now.  But you

247   know something?  A different political landscape compels the

248   chairman to adopt new standards of fairness, ignoring

249   existing law and demanding material he once considered unfair

250   to release to be released.  As much as the chairman and I may

251   want to view this material as the fundamental underpinning of

252   our justice system, we cannot.  In the face of laws and rules

253   he finds inconvenient, the chairman demands our Nation's top

254   law enforcement officer to break the rules and the

255   regulations and the law.  This is reckless, it is

256   irresponsible, and it is disingenuous.

257      It is also confusing since the Attorney General is doing

258  exactly what he said he would be doing, making as much of the

259  report public as possible under Federal law and departmental

260  policy, under regulations -- understand this for the media

261  here -- under regulations written by Janet Reno and other

262  Democrats don't require to do this, but in the name of

263  transparency he is.  He may even furnish the report as early

264  as next week, yet the chairman plows ahead.

265      What is the rush?  Spring break probably.  We don't want

266  to wait until May.  We don't want to wait until the report

267  comes out.  The Attorney General has never said he is not

268  going to provide exactly the regulations say he is to

269  provide.  Why are we doing this again?  Because I guess we

270  are going to out of town and we don't want anybody to forget

271  we are doing something.  We need a press release.  We need to

272  name people.

273      The interesting thing here is, second, the subpoenas in

274  this wonderfully vague deal that we are voting on today aimed

275  at five individuals are completely misguided.  Quite simply,

276  they are to the wrong people.  Understand what I am getting

277  ready to tell you.  Two of the individuals are cooperating

278  with an ill-advised investigation -- remember the 81 letters

279  -- have provided over 3,000 pages of documents.  The chairman

280  is rewarding their cooperation by announcing their subpoenas

281  before even notifying their lawyers.

282        The other three individuals responded to Chairman

283    Nadler's initial inquiry and have indicated willingness to

284    cooperate.  Democrats never followed up with their lawyers

285    either.  In fact, my investigators have had more contact with

286    some of the individuals on the 81 initial letters than the

287    majority has.  These three individuals could not have any

288    documents responsive to the original request because those

289    responsive documents all came during their time at the White

290    House, making them presidential records.  None of these three

291    have custody of responsive documents.  The chairman knows

292    this as well because they have received letters on this.

293        Why would we ignore such obvious facts?  Because

294    Judiciary Democrats conduct oversight via press release.

295    Their investigation into 81 Trump associates has yielded not

296    the dividends they were looking for.  After 1 month, the only

297    revelation is something we knew already.  They have

298    embarrassed themselves by prejudging conclusions that the

299    President obstructed justice.  Now we have acknowledged the

300    next stop in the grinding political axes in the government.

301        What is amazing here is the fact nearly 30 others who

302    have received the Chairman's letter have not responded at all

303    and despite everything going on.  So the message is clear.

304    Here is what is happening.  If you cooperate with this

305    committee, you will get a subpoena.  If you ignore it,

306    Democrats will return the favor.  This seems like a

307   counterintuitive way to conduct oversight, but it does sound
308   familiar.  Remember the acting attorney general, Mr.
309   Whitaker, who agreed to come, who agreed to sit here, and was
310   yet rewarded with a subpoena.  And, oh, by the way, before he
311   ever got here, we caved.  We just did away with the subpoena.
312       I am not sure the purpose of the subpoena with this
313   majority.  It seems to be we want to use it because it sounds
314   good, but yet when it comes down we don't want to use it, and
315   now we are back at it again because this is all preemptive.
316   Five of the people who have been actually listed in the list
317   of subpoenas today have been cooperating or have given advice
318   to this committee, but have never really been followed up.
319   And what they have said is we are helping, but you are now
320   giving us a subpoena.
321       And as far as the Attorney General has gone, he said I
322   am giving you the Mueller report.  I am giving it to you as I
323   should under regulations, but undoubtedly that is not enough.
324   Undoubtedly that doesn't make enough press releases.  So I
325   guess what we do is put people's names on a press release.
326   We tell them that we are going to subpoena them now, although
327   they have actually already cooperated.  You know, it reminds
328   me of what I am having here, and I have made this comment
329   many times.
330       I respect my chairman, but we just disagree on this, and
331   that is the way that it will be, and that is the way we are

332    going to have it.  But it reminds me of the old guys back in

333    my hometown when they wanted to go fishing and nothing was

334    biting.  They would take a big fishing trip and go out.

335    Nothing was biting, and one day this old guy just got tired

336    of it.  Instead of catching anything the way he should, he

337    just reaches in his back pocket and pulls out a piece of

338    dynamite and throws it in the pond.  I can't find anything,

339    so I am just going to blow up everything and maybe something

340    will come to the top.

341        This committee is better than this.  This committee can

342    do this better.  Why are we here today doing preemptive

343    subpoenas?  Because we are going to be out for a while.  We

344    are not going to be here for a while, and we need to keep the

345    story rolling.  The story rolling is there is some innuendo.

346    There are some possibilities that may be in this report, but

347    we can't wait to see it.  Unfortunately what will happen, my

348    friends is this:  Christmas will come again.  They opened the

349    present that they bought early.  Nothing was there.  Now they

350    are dying to open another present.

351        At the end of the day, this President and what the

352    report of the Mueller investigation said was no collusion.

353    No obstruction.  And when we understand that, when we move

354    forward with that, if we can't get what we want, we will try

355    and try again.  Maybe that is the new thing of this

356    committee, the little train that kept looking for something

357   that says I will try and I will try and I will try.

358      But at the end of the day, the President is still

359   president.  The economy is still moving forward.  The

360   regulations that we put in place are there.  And at this

361   point in time, the Attorney General, although he is being

362   smeared repeatedly, is doing exactly what the regulation

363   says.  And for that, congratulations, Mr. Attorney General,

364   you get a subpoena.  With that, I yield back.

365      Chairman Nadler.  Thank you, Mr. Collins.  Without

366   objection, all other opening statements will be included in

367   the record.

368      I now recognize myself for purposes of offering an

369   amendment in the nature of a substitute.  The clerk will

370   report the amendment.

371      Ms. Strasser.  Amendment in the nature of a substitute

372   to a resolution offered by Mr. Nadler.  Strike all after the

373   resolving clause and insert the following.

374      Chairman Nadler.  Without objection, the amendment in

375   the nature of a substitute will be considered as read and

376   shall be considered as --

377      Mr. Buck.  Mr. Chairman, I object.

378      Chairman Nadler.  -- as base text --

379      Mr. Buck.  Mr. Chairman, I object.  I would like to --

380      Chairman Nadler.  -- as base text for purposes of

381   amendment.  I will --

HJU093000                                    PAGE        17

382        Mr. Collins.  Mr. Chairman, there is an objection to

383   the --

384        Chairman Nadler.  I will finish the sentence, and then I

385   will recognize the objection.

386        Mr. Collins.  Thanks.  Well, go right ahead.

387        [Laughter.]

388        Chairman Nadler.  Without objection, the amendment in

389   the nature of a substitute will be considered as read and

390   shall be considered as base text for purposes of amendment.

391        [The amendment of Chairman Nadler follows:]

392

HJU093000                                    PAGE      18

393        Chairman Nadler.  Will the gentleman explain his
394    objection?
395        Mr. Buck.  Yeah, I want it read.  I object.
396        Chairman Nadler.  You want the resolution read?  Very
397    well.  The clerk will read the resolution.
398        Mr. Buck.  Thank you.
399        Chairman Nadler.  The clerk will read the amendment in
400    the nature of a substitute.
401        Ms. Strasser.  Amendment in the nature of a substitute
402    to a resolution offered by Mr. Nadler.  Strike all after the
403    resolving clause and insert the following:  "That upon the
404    adoption of this resolution, the chairman of the Committee of
405    the Judiciary is authorized to issue subpoenas for documents
406    and testimony relating to the following:  final report
407    authored by the Office of the Special Counsel, Robert S.
408    Mueller, III, pursuant to Order Number 3915-2017, and any
409    accompanying exhibits, annexes, tables, appendices, other
410    attachments, and all evidence referred to in the report; and
411    underlying evidence collected, materials prepared, or
412    documents used by the Office of the Special Counsel, Robert
413    S. Mueller, III, in the investigation conducted pursuant to
414    Order Number 3915, 2017.
415        In addition, the chairman at his discretion and as he
416    determines necessary, is authorized to issue subpoenas for
417    documents and testimony to the following individuals or to

418   agents who may have received documents from White House

419   relevant to the investigation on Special Counsel Robert S.

420   Mueller, III, conducted pursuant to Order Number 3915-2017,

421   thereby effecting a waiver of potential applicable

422   privileges:  Donald F. McGahn, II; Steven Bannon; Hope Hicks;

423   Reince Priebus;, Ann Donaldson.

424        This resolution is adopted pursuant to Rule 3 of the

425   Committee on the Judiciary and Clause 2(m) of Rule XI of the

426   U.S. House of Representatives."

427        Chairman Nadler.  I will recognize myself to explain the

428   amendment.

429        This amendment makes only technical changes to the

430   underlying resolution.  I would like to use my time to

431   elaborate on the point made in my opening statement, that

432   there is ample precedent from other investigations involving

433   allegations of wrongdoing by the President for the Judiciary

434   Committee to receive not just the full report, but all of the

435   underlying evidence, including grand jury material.

436        In the investigation of Bill Clinton, the independent

437   counsel, Ken Starr, produced to Congress a 445-page report,

438   several thousand pages of appendices, and 17 boxes of

439   underlying evidence and other materials.  These boxes

440   included all of the grand jury information protected by Rule

441   6(e) of the Federal Rules of Criminal Procedure.

442        The Starr report and the underlying evidence and

443   materials produced to this committee fill up volume after

444   volume of the record in the Clinton impeachment proceedings.

445   I am holding up only two of these many volumes that contain

446   some of the evidence and materials underlying the Starr

447   report that he produced to Congress.  Here is Volume 4, Part

448   2 and 3 that contain supplemental materials from the Starr

449   report.  All of these materials were delivered to the House

450   immediately Ken Starr completed the report.

451       Looking at Volume 4, Part 3, it is filled with the grand

452   jury testimony and other evidence from the Starr

453   investigation that was produced to the House Judiciary

454   Committee.  For example, on page 3341, there is grand jury

455   testimony of Stacy Desmond Porter.  Here is a copy of it.

456   There were boxes and boxes of such information produced by

457   Ken Starr.  Starr sought and obtained authorization from the

458   court overseeing the grand jury to share the grand jury

459   materials with Congress.  A similar order permitting Congress

460   to receive the grand jury materials in the Mueller

461   investigation can and should be obtained here.

462       The materials produced to Congress by Starr also

463   included the interview memoranda of the witnesses who agreed

464   to be voluntarily interviewed by Starr's office during his

465   investigation, all of which were produced to the House

466   Judiciary Committee.  For example, on page 3523, there is one

467   of the many memorandum investigation interviews of witnesses

468  by Starr and his staff.  This one is of Deborah Ann Schiff.

469  Here is a copy of it.  There were boxes of such information

470  produced by Ken Starr.  The same type of information has to

471  be produced here, especially when there were approximately

472  500 witnesses interviewed in the Mueller investigation as the

473  Attorney General stated in his March 24th letter to the House

474  and Senate Judiciary Committees.

475      In the Watergate investigation, the Justice Department

476  did exactly the same thing after the grand jury considered

477  evidence and issued a report describing potentially criminal

478  acts by President Nixon.  The Justice Department filed briefs

479  fully supporting disclosure of the report to the House

480  Judiciary Committee, and made the point that, "The need for

481  the House to be able to make its profoundly important

482  judgment on the basis of all available information is as

483  compelling as any that could be conceived."  And here are

484  just two of the volumes from the Nixon impeachment

485  proceedings that include some of the grand jury material,

486  just some of the grand material that was produced to

487  Congress, Volumes 7 and 8 from the hearings before the House

488  Judiciary Committee.

489      Looking at Volume 7, it is filled with grand jury

490  testimony and other evidence from the investigation that was

491  produced to the House Judiciary Committee.  For example, on

492  page 688 of Volume 8, there is the grand jury testimony of

493   Rosemary Woods.  Here is a copy of it.  There were volumes

494   and volumes of such information produced in the Watergate

495   investigation to the House Judiciary Committee.

496        These examples of Congress receiving all of the relevant

497   evidence in other analogous investigations helps show how

498   unprecedented it would be for Attorney General Barr to

499   withhold from Congress potentially significant portions of

500   Special Counsel Mueller's report and the underlying evidence

501   and materials.  The same type of information can and should

502   be produced here.

503        I ask unanimous consent to include these materials in

504   the record.

505        [The information follows:]

506

507          Chairman Nadler.  This subpoena authorization gives this

508    committee the ability to compel production of the full report

509    and related documents if the Attorney General departs from

510    these and other precedents and refuses to produce to Congress

511    the complete record of Special Counsel Mueller's

512    investigation.  I yield back the balance of my time.

513          I now recognize the ranking member of the Judiciary

514    Committee, the gentleman from Georgia, Mr. Collins, for any

515    comments he may have on the amendment in the nature of a

516    substitute.

517          Mr. Collins.  Thank you, Mr. Chairman.  As far as the

518    substitute, that is fine, but I am glad we are using props

519    today because this is what happening here.  The chairman

520    wants you to look at one thing when the reality is another

521    thing.  He is wanting you to look at this bottle of water and

522    say this is full, and then he is wanting you to look at this

523    bottle of water and say it is full, too.  It doesn't work.

524    You can't say the Starr report, or even going back to

525    impeachment which we will get to in a minute, and then come

526    along and say Mueller is full, too.  You see, it is the same.

527    They are not the same.

528          And as long as we perpetrate this fraud of saying that

529    they are the same, then we are going to continue this process

530    of saying that we have got a problem here because the Starr

531    report, which actually came out, let's actually speak to what

532   it said.  Starr had a requirement under the Independent

533   Counsel Act, 28 U.S.C. 595, to advise the House of

534   Representatives of any substantial credible information which

535   may constitute grounds for an impeachment.

536        Remember, it was the Janet Reno Justice Department after

537   the Starr report that rewrote the regulations that we are

538   under today.  Starr, Mueller, two different things.  And if

539   we understand this, then we can understand the problem we

540   have here.  I feel for the chairman.  He is trying to make an

541   analogy that just won't work.  He is doing as good a job as

542   he possibly can.  It just doesn't work.

543        The other interesting thing in here is he has used two

544   precedents for getting this information, both of which are

545   impeachment.  If the chairman truly wanted to get at this

546   information, then he can go to what I believe many in their

547   heart desire is open the impeachment inquiry.  Maybe that is

548   what we are going to get to today.  But if you use the

549   precedent of impeachment, not the precedent of subpoenas,

550   then there is a problem.

551        And we have got to understand this is nothing.  If this

552   was simply about the Mueller report today and we had waited

553   until after we got the Mueller report and we said there is

554   still stuff we don't like, then I could see this happening.

555   I could see why would we would come together and ask for

556   subpoenas.  Any attorney, that is what you do.  When you

557   don't get what you want, you ask for the subpoenas, not

558   beforehand when the Attorney General has already said I am

559   going to do this.

560        So the problem is, look, it is a tough problem.  I feel

561   for him.  But as long as you are trying to compare the full

562   and the empty and say they are both full, that is going to be

563   a problem.  The problem also I have with this is, is it just

564   isn't about the Attorney General and the Mueller report,

565   because he went ahead and added five other individuals.  Why

566   those five other individuals?  Let's take a look at the

567   names.

568        The five other individuals:  Don McGahn, Steve Bannon,

569   Hope Hicks, Reince Priebus, and Ann Donaldson, all of which

570   either gave information or answered and responded to their

571   initial letters.  Why these five?  They are close to the

572   President.  The closer you get to the President, the press

573   writes about it.  The press writes about associates of the

574   President and they get a subpoena.  Let's take this for what

575   it is.  We don't have our popcorn machine yet.  We are

576   getting it for our side because this is great political

577   theater.  But as long as they are trying to convince you that

578   this one and this one are the same, then we are going to down

579   the same sad road.  With that, Mr. Chairman, I yield back.

580        Chairman Nadler.  I thank the gentleman.  I just want to

581   comment on one thing.  The argument is made that the prior

582   history is irrelevant because Mr. Jaworski and Mr. Starr

583   operated under a different law than Mr. Mueller is operating.

584   That fact is true.  However, we have the same constitutional

585   rights as the committee did in those days, and we have the

586   same constitutional duty as the committee did in those days.

587   And we have the right and the necessity to get all the

588   information to fulfill our constitutional duty.

589       Are there any amendments to the amendment in the nature

590   of a substitute?

591       [No response.]

592       Chairman Nadler.  Hearing none --

593       Mr. Buck.  Mr. Chairman, I have an amendment.

594       Chairman Nadler.  The clerk will report the amendment.

595       Mr. Cicilline.  Mr. Chairman, I reserve a point of

596   order.

597       Chairman Nadler.  The gentlelady --

598       Mr. Collins.  The gentleman.

599       Chairman Nadler.  The gentleman reserves a point of

600   order.

601       Ms. Strasser.  Amendment to the amendment in the nature

602   of a substitute, offered by Representative Ken Buck, of

603   Colorado.  At the end of the resolution, insert the following

604   paragraph:  "This resolution shall not be construed as

605   authorizing the chairman to issue a subpoena for the

606   production of information where such production would violate

HJU093000                              PAGE      27

607   Rule 6(e) of the Federal Rules of Criminal Procedure."

608        [The information follows:]

609

610      Chairman Nadler.  The gentleman is recognized to explain
611  his amendment.
612      Mr. Buck.  Thank you, Mr. Chairman.  Mr. Chairman, in
613  Greek mythology, Prometheus looked down from the heavens and
614  saw man eating raw meat.  Out of pity, he stole fire from the
615  heavens, came to earth, and gave fire to man so man could
616  cook his food.  This gift had unintended consequences.  Man
617  used fire to forge metal into swords.  With new weapons man
618  went to war.  This is a cautionary tale about unintended
619  consequences, a lesson we should be mindful of today.
620      The current special counsel regulations were adopted in
621  1999 after Congress allowed the old independent counsel law
622  to expire.  These Clinton-era regs authorized the appointment
623  of Robert Mueller as special counsel and guided his
624  investigation.  They also limit what the AG can release.  So
625  they strike a balance between disclosure and protection of
626  classified and grand jury information.  This resolution,
627  however, leads us down the wrong path.  The resolution fails
628  to ensure certain information remains protected.  This will
629  have unintended consequences.
630      First, this resolution risks politicizing future special
631  counsel investigations.  By protecting grand jury information
632  from public release, the regs encourage the special counsel
633  to produce a candid report for the AG.  By compelling release
634  of an unredacted report, however, the committee risks

635    chilling future investigations and jeopardizes the special

636    counsel process.  This will not serve justice.  It will

637    undermine it.

638        Second, the public release of the full report could

639    compromise intelligence sources and methods.  General Barr

640    expressed concern about this issue in a March 29th letter to

641    Chairman Nadler.  As much as Democrats may hate the

642    President, I would hope you love America more.  If love

643    trumps hate, we should afford the AG time to redact

644    classified information before providing us with a report that

645    could be shared with the public.

646        Third, this resolution fails to protect grand jury

647    information from disclosure.  This is information that by law

648    needs to be protected as confidential.  Under the regs, the

649    AG is required to redact this information.  General Barr

650    wrote to the chairman on March 29th that, "We are preparing

651    the report for release, making the redactions that are

652    required.  The special counsel is assisting us in this

653    process.  Specifically, we are well along in the process of

654    identifying and redacting the following:  materials subject

655    to Federal Rule of Criminal Procedure 6(e) that by law cannot

656    be made public."

657        Rule 6(e) is information produced in front of the grand

658    jury.  As a former prosecutor, I hold the grand jury process

659    and the protection against disclosure sacrosanct.  I would

HJU093000                                      PAGE      30

660   urge my colleagues do not undermine the grand jury process

661   for the sake of politics.  This sets a dangerous precedent

662   that is dangerously short-sighted.

663       My amendment is simple.  It modifies the resolution to

664   limit the subpoena to exclude production of any information

665   related to grand jury materials.  This amendment is

666   consistent with the special counsel regs that have been in

667   place for 20 years over which time Democrats and Republicans

668   in Congress during two Democratic administrations and two

669   Republican administrations have respected.

670       This amendment is also completely consistent with H.

671   Con. Res. 24, Chairman Nadler's resolution that the House

672   passed by a vote of 420-0 on March 14th.  If you voted for

673   Chairman Nadler's resolution 3 weeks ago, you essentially

674   voted for the special counsel regulations, and you also voted

675   to protect grand jury information from disclosure, the

676   principle found in my amendment.  For the sake of

677   consistency, you should report my amendment today.  It will

678   help ensure we avoid unintended consequences.

679       I ask unanimous consent that Attorney General Barr's

680   letter of March 29th, 2019 to Chairman Nadler to be included

681   in the record.

682       Chairman Nadler.  Without objection.

683       [The information follows:]

684

685        Mr. Buck.  I urge a yes vote on the amendment.

686        Chairman Nadler.  Does the gentleman from Rhode Island

687   insist on his point of order?

688        Mr. Cicilline.  I do not, Mr. Chairman.

689        Chairman Nadler.  The gentleman from Rhode Island does

690   not insist on his point of order.  I will now recognize

691   myself in opposition to the amendment.

692        The amendment says that "This resolution shall not be

693   construed as authorizing a subpoena for the production of

694   Rule 6(e) information."  This committee's request for grand

695   jury materials, which is to say the 6(e) information, is

696   fully consistent with past instances which I have outlined in

697   my initial comments in which the Justice Department has

698   provided this information to Congress.  The Justice

699   Department can provide these materials to Congress by seeking

700   authorization from the District Court as it has in the past.

701        In response, for example, to Republican-led

702   congressional requests, the Justice Department turned over

703   unprecedented levels of materials in the 114th and 115th

704   Congress, including classified materials, deliberative

705   process documents, and information related to ongoing

706   investigations.  We need these materials to fulfill our

707   constitutional obligations, period.  Our chief constitutional

708   obligation is to hold the President accountable, especially

709   in an instance where the Department of Justice says it cannot

710    hold the President accountable because, as a matter of law,

711    you cannot indict a president and in which the Attorney

712    General tells us that a president cannot commit obstruction

713    of justice.

714        Those judgments must be made by Congress, not by a

715    political appointee, the Attorney General.  We need this

716    information to make those judgments, and the interests can be

717    protected by this Congress deciding which of that information

718    can be released publicly.  But Congress is entitled to all of

719    it, and, therefore, I ask opposition to this amendment.

720        Is there any other discussion on the amendment?

721        Mr. Sensenbrenner.  Mr. Chairman?

722        Chairman Nadler.  The gentleman from Wisconsin.

723        Mr. Sensenbrenner.  Mr. Chairman, I move to strike the

724    last word.

725        Chairman Nadler.  The gentleman is recognized.

726        Mr. Sensenbrenner.  Mr. Chairman, the chair and his

727    supporters are putting the cart before the horse.  And I just

728    draw the attention of the committee to today's *Roll Call*,

729    hardly a Republican mouthpiece.  And what does it say?

730    "Mueller magic not in subpoenas.  Democrats can send a

731    message, but it is one without teeth."  I will delegate

732    myself to become a dentist for the next 4-and-a-half minutes.

733        The chairman of the committee, the distinguished

734    gentleman from New York, you know, says there was grand jury

735    material that was submitted both in the Nixon and Clinton

736    impeachments.  That is correct, but that grand jury material

737    was submitted only after the court in D.C. allowed it to be

738    shared with Congress and made public.  That has not happened

739    in this case if there is any grand jury material in the

740    Mueller report, and I think we all know that there is grand

741    material in the Mueller report.

742        So the thing to do to put teeth into a subpoena is for

743    Congress and this committee to go to court and to ask for an

744    order allowing for the release of the grand jury material.

745    Otherwise, you are going to see the Justice Department move

746    to quash the subpoena that I am sure will be issued today,

747    and it will be in courts for months and maybe years until the

748    Supreme Court decides this issue because it is a dispute

749    between the legislative and executive branches of government.

750        Chairman Nadler.  Will the gentleman yield?

751        Mr. Sensenbrenner.  Let me finish, please.  And I will

752    be happy to be a co-plaintiff in the motion before the

753    district court as I am sure all of us would be because the

754    resolution that was passed 3 weeks ago was passed

755    unanimously.  I voted for it.  All of my Republican

756    colleagues voted for it.  And the way to get the material

757    that is sought by this subpoena quickly, promptly, and

758    without extended litigation is to go to court and get the

759    same kind of order that Mr. Starr got when he sent his

760  material over as independent counsel and what Mr. Jaworski

761  got when he sent his material over as special prosecutor in

762  the Richard Nixon impeachment.

763       Now, secondly, I think we all want to get to the bottom

764  of this, and it is only full disclosure, in my opinion, that

765  will get to the bottom of this.  The law requires that there

766  be certain conditions precedent to get that full disclosure,

767  one of which, as far as the grand jury material and Rule 6(e)

768  of the Federal Rules of Criminal Procedure, is going to court

769  and getting the order, if the court should so desire and be

770  required to, to allow the Justice Department to release this

771  material.  Otherwise, the Justice Department puts itself in

772  the same position as a grand jury witness who breaks the

773  secrecy rule and releases his or her testimony before the

774  grand jury, and that is a Federal crime.

775       So, you know, it seems to me that if we want to protect

776  witnesses under the same rule that the Justice Department is

777  being protected, we ought to do what we need to do first, and

778  that is go to court and let the judge make the decision.  And

779  now I am happy to yield to the chairman.

780       Chairman Nadler.  I thank the gentleman for yielding.

781  We will, as appropriate, go to court.  We think we need a

782  subpoena first, but we will go to court.  We have asked the

783  Attorney General to go to court.  He has thus far declined

784  our request, but we will do whatever is necessary, be it

785   subpoena or courts, to get this material.

786        Mr. Sensenbrenner.  You know, reclaiming my time, you

787   know, the thing is, is Mr. Starr got the appropriate order

788   without us being on his back.  Jaworski got the appropriate

789   order without the Judiciary Committee being on its back.  And

790   that material was used in both the Nixon and in the Clinton

791   impeachments.

792        Mr. Cicilline.  Will the gentleman yield for a question?

793        Mr. Sensenbrenner.  No, I will not.  And as I recall

794   there were obstruction of justice articles of impeachment

795   voted out by this committee, and, in the case of Clinton,

796   approved by the House of Representatives, and that was an

797   issue in both of those impeachments.  So, you know, again,

798   look at *Roll Call*, you know.  Again, *Roll Call* is not printed

799   by the Koch brothers, and it says "Democrats can send a

800   message, but it's one without teeth."  It is about time that

801   when we want to send a message, we send one with teeth, and

802   hopefully the rest of the news media will not be duped as

803   *Roll Call* was not in getting it right.  Thank you.

804        Chairman Nadler.  The gentleman's time has expired.  The

805   gentlelady from Texas.

806        Ms. Jackson Lee.  I thank the gentleman, and I thank my

807   colleagues, both Republicans and Democrats, who sit on this

808   committee to do justice and to adhere to the rule of law.  As

809   I read the resolution proposed by the chair and the majority,

810   it provides an authorization.  It does not dictate an

811   issuance of a subpoena.  And I refer to my colleagues to

812   really some of the underlying reasons why we need to move

813   forward on a subpoena.  For all we know, the Attorney General

814   may respond and present us with the Mueller report in its

815   totality today at the end of business.

816       But in his letter on March 24th, the Attorney General

817   started out by saying that it was his intent to summarize the

818   principle conclusions reached by the special counsel.  And of

819   course he tried to walk that back, but, in essence, he tried

820   to give us 4 pages as a complete summary of the entire

821   Mueller report.  He goes on to say on the question of

822   obstruction of justice that the DOJ did not make a

823   traditional prosecutorial judgment.  That may be accurate,

824   but the standards that you adhere to by the second

825   constitutional body, the executive in Article II, has larger

826   parameters as to whether or not the Administration followed

827   the rule of law and actually adhered to guidelines or actions

828   appropriate for a president of the United States.

829       Further, the Attorney General attempted to swat away the

830   idea of any Russian coordination.  He did that by suggesting

831   that the attorney, Mueller, did not find an underlying crime,

832   and, therefore, refused to move forward on the obstruction,

833   refused to move forward on the obstruction on the basis of

834   not an indictment or a crime.  And we also know that Attorney

835   General Barr has already made his point very clear about his

836   position on the indictment of a President.  We do not sit

837   here in the role of a grand jury to indict the President, but

838   we sit here as a body that to proceed with its constitutional

839   duties to provide oversight and transparency.

840       Let me share with my colleagues what has happened in the

841   past.  Dan Burton, former chair of the Oversight Committee,

842   issued a thousand unilateral subpoenas in the 1990s regarding

843   the Clinton Administration.  Lamar Smith of the Science

844   Committee issued 25 subpoenas in his first year of

845   chairmanship.  Before 2015, this committee had not issued one

846   subpoenas in 21 years.  Chairman Issa issued 100-plus

847   subpoenas, exceeding by over 20 percent the number of

848   subpoenas from Dems and Republicans, lawmakers of any

849   committee.  And then Chairman Gowdy of the Benghazi

850   Committee, who sent U.S. marshals to 70 witness' homes

851   without asking one of them to come voluntarily.  I, frankly,

852   believe that we are being both fair and balanced in our

853   efforts --

854       Mr. Sensenbrenner.  Would the gentlewoman yield?

855       Ms. Jackson Lee.  I would be happy to yield.

856       Mr. Sensenbrenner.  Just for the record, I was chair of

857   this committee for 6 years, and I didn't sign one subpoena at

858   all.  You know, I got what I needed out of the Administration

859   without having to compel it.  So there is a difference

HJU093000                          PAGE       38

860   between nice and being less than nice.

861      Ms. Jackson Lee.  Mr. Sensenbrenner, thank you.  I am

862   restoring my time.  I am reclaiming my time.  As you well

863   know, you have not been mentioned.  You have not been

864   mentioned, nor has the Judiciary Committee been mentioned.

865   But the point being made is that there has been a history of

866   subpoenas offered in other areas in other committees.

867      And in this instance, I think the Judiciary Committee is

868   being extremely fair.  So thank you so very much for that

869   clarification that Chairman Sensenbrenner did not, but in

870   this instance, I believe that the committee is being fair.

871   Mr. Nadler is being fair.  This is a resolution to authorize

872   the issuance of a subpoena, and I ask my colleagues to

873   support this resolution.  I yield back.

874      Chairman Nadler.  Thank you.  The gentleman from

875   Arizona, Mr. Biggs, is recognized.

876      Mr. Biggs.  Thank you, Mr. Chairman.  I ask unanimous

877   consent that an article published April 1st, 2019 in the

878   *Atlantic* written by Ben Wittes and entitled, "Bill Barr Has

879   Promised Transparency," be entered into the record.

880      Chairman Nadler.  Without objection.

881      [The information follows:]

882

883      Mr. Biggs.  Thank you.  Wittes is the editor-in-chief of
884   *Lawfare* and a senior fellow at the Brookings Institution.
885   That is the same think tank where Norm Eisen, a member of the
886   chairman's staff, is also a senior fellow, and Barry Berke,
887   another member of the chairman's staff, has published
888   extensively.  And with that, I yield to the gentleman from
889   Colorado, Mr. Buck.
890      Mr. Buck.  I thank the gentleman from Arizona.  Mr.
891   Chairman, we are discussing basically what the standard is
892   for the release of grand jury testimony in the context of an
893   independent counsel or special counsel investigation.  And
894   thankfully you announced the standard on September 9th, 1998
895   when you appeared on the *Charlie Rose Show*.  That is the same
896   day that independent counsel, Ken Starr, and I will repeat
897   that, the same day that independent counsel, Ken Starr,
898   delivered his report into the Clinton investigation to
899   Congress.
900      Here is what you said when explaining why it would be
901   unwise and unfair to release grand jury materials.  "Now, Mr.
902   Starr in his transmittal letter to the Speaker and the
903   Minority Leader made it clear that much of this material is
904   Federal Rule 6(e) material.  That is material that by law,
905   unless contravened by a vote of the House, must be kept
906   secret.  It is grand jury material.  It represents statements
907   which may or may not be true by various witnesses, salacious

908   material, all kinds of material that it would be unfair to

909   release."  Our chairman even went so far as to suggest in

910   that interview that certain material "must not be released at

911   all."

912      I do want to mention that under the independent counsel

913   statute, Congress held a statutory role of oversight so it

914   would have at least been proper for Congress to consider if

915   grand jury materials should be released, but that law has

916   expired.  Under current law, the Attorney General is left

917   with the responsibility of protecting grand jury materials, a

918   different person responsible for deciding, a different

919   responsibility all together.  Despite changes in the law, the

920   chairman's concerns from 1998 about the questionable value in

921   releasing grand jury material and the need to protect those

922   materials are still true today.

923      The chairman's position was also on display 3 weeks ago

924   when the House unanimously approved his resolution, H. Con.

925   Res. 24, calling for the release of the special counsel

926   report while excluding from disclosure any information

927   protected by law which would necessarily protect grand jury

928   material.  Nevertheless, in a *New York Times* op-ed this week,

929   the chairman wrote, "The Department of Justice has an

930   obligation to provide it," meaning the full Mueller report,

931   "in its entirety without delay."

932      Mr. Chairman, you had it right over 20 years ago.  You

933   supported the protection of grand jury information, and I

934   agree with that.  You had it right 3 weeks ago.  Everyone on

935   this committee voted for your resolution to protect against

936   the release of 6(e) materials.  Mr. Chairman, Attorney

937   General Barr agrees with you.  Last week he wrote to you to

938   tell that he was working with the special counsel to redact

939   grand jury materials.

940        Your historic standard, one you held for 7,492 days,

941   from September 8th, 1998 at least until March 14th, 2019, is

942   the same standard that can be found in my amendment.  The

943   standards says the grand jury materials should not be

944   disclosed.  That is the right standard, and I urge the

945   committee to adopt the standard.  And I yield back to the

946   gentleman from Arizona.

947        Mr. Biggs.  Reclaiming my time.

948        Mr. Cicilline.  Mr. Chairman?

949        Chairman Nadler.  The gentleman from Rhode Island.

950        Mr. Biggs.  Excuse me.  I still have time.  I reclaimed

951   my time.

952        Chairman Nadler.  Oh, I am sorry.

953        Mr. Biggs.  Thank you.

954        Chairman Nadler.  Mr. Biggs, continue.

955        Mr. Biggs.  Thank you, Mr. Chairman.  I support the Ken

956   Buck, Representative Buck's, amendment to the amendment in

957   the nature of a substitute to the resolution.  And one thing

958    I want to point out is that when I hear people intimate that

959    the chairman merely has the authorization to issue a

960    subpoena, I get this feeling that maybe this isn't a done

961    deal.  But it is a done deal because the chairman in his

962    response to the gentleman from Wisconsin said very clearly

963    that before going to court we are going to issue a subpoena.

964        So the normal process would naturally be to go to the

965    court and ask for this information to be made available, but

966    that is not what is going to happen here.  You are going to

967    see subpoenas issued, and they are going to be issued

968    because, as the chairman said in his opening statement, the

969    Attorney General may do this, and I am paraphrasing of

970    course, and President Trump may do that.  In other words, he

971    would suggest that this would be conditional, but he is

972    acting and this resolution is going to go forward regardless

973    of what Mr. Barr provides, even if it is in compliance with

974    Rule 6(e).  My time has expired.

975        Chairman Nadler.  The gentleman from Rhode Island.

976        Mr. Cicilline.  Thank you, Mr. Chairman.  I move to

977    strike the last word.

978        Chairman Nadler.  The gentleman is recognized.

979        Mr. Cicilline.  Mr. Chairman, I just want to make two

980    brief points.  One is the gentleman from Wisconsin referenced

981    the Starr report and the Jaworski report as precedent for not

982    issuing a subpoena and, in fact, going to court.  It should

983  be noted that in both of those cases the special and

984  independent counsel went to court to seek authorization for

985  the release of the grand jury testimony before it was

986  delivered to Congress.  They did that on their own.  It

987  didn't require Congress to litigate it.

988      So those individuals recognized that it was important

989  when they delivered the report to also deliver the underlying

990  documents, and they sought permission from the court to do

991  it.  That has not happened in this case.  In fact, Mr. Barr

992  has done just the opposite.  He has attempted to keep this

993  information from Congress.  So the notion that we should just

994  wait and sort of pray and hope that Mr. Barr will suddenly

995  find his way to the courthouse to seek authorization, I

996  think, is foolish.  This subpoena will require him to take

997  that action because as the gentleman from Wisconsin said, he

998  could move to quash the subpoena.  That is one course of

999  action.  He could also go to court and move for the

1000  production of 6(e) materials so he can comply with the

1001  subpoena, and that is what we are hoping he will do if, in

1002  fact, they are interested in getting this information for

1003  Congress.

1004      So I urge my colleagues to oppose this amendment, to set

1005  the precedent so that, in fact, this committee can get the

1006  full report and all the supporting materials so we can do our

1007  oversight responsibility.  And as the chairman said, our

1008   constitutional responsibilities have not changed even if some
1009   regulation has.  I urge a no vote on the amendment and yield
1010   the balance of my time to the chairman.
1011        Chairman Nadler.  I thank the gentleman.
1012        I just want to point out that I was right 21 years ago,
1013   I am right now, and it is totally consistent, because we are
1014   urging now that the underlying 6(e) material be produced to
1015   the committee.  In 1998, that material had been produced to
1016   the Congress, and what we were discussing was its release to
1017   the public.  And before 6(e) material is released to the
1018   public, it has to be reviewed if some of it should not be
1019   released to the public for privacy and other reasons.  But
1020   that determination was made then by Congress, and it should
1021   be made now by Congress.
1022        We are asking now that the material be given to Congress
1023   so we can fulfill our constitutional responsibilities.  In
1024   1998, the material had been given prior to that debate to
1025   Congress so Congress could fulfill its constitutional
1026   responsibilities, and my comments on the floor then and the
1027   debate then was not about whether the material should go to
1028   Congress; it already had.  It was about whether it should be
1029   released to the public in its entirety, and I said then that
1030   you cannot release 6(e) material entirely to the public
1031   without reviewing it, and that is still true.  But it was
1032   then and should be now released to the Congress, to this

HJU093000                                    PAGE      45

1033  committee, in its entirety.

1034      Mr. Sensenbrenner.  Would the gentleman yield?

1035      Chairman Nadler.  Yes, I will yield.

1036      Mr. Sensenbrenner.  Would the gentleman report releasing

1037  to the public the material that we redacted in the Clinton

1038  impeachment?

1039      Mr. Cicilline.  I will reclaim my time.  I would like to

1040  focus on the issue before this committee.  I am reclaiming my

1041  time, Mr. Chairman.

1042      But I again want to suggest that this is an important

1043  responsibility to this committee to ensure that no one is

1044  above the law, that we follow the facts where they lead us,

1045  that this investigation was conducted on behalf of the

1046  American people.  When our democracy was attacked by a

1047  foreign adversary, we fought hard to protect Mr. Mueller so

1048  he could complete his work free from political interference,

1049  and now we have a right, this committee has the right and the

1050  responsibility to see the full contents of this report and

1051  the supporting materials, and I urge a no on this amendment

1052  and yield the balance of my time to the Chairman.

1053      Chairman Nadler.  I thank the gentleman for yielding.

1054      Again, we have the right and the duty to protect certain

1055  material from public disclosure.  If we redacted it from the

1056  public 20 years ago, I assume we had good reason to do that.

1057  But the question before us now is not public release of

1058   information.  It is release to Congress to do our

1059   constitutional duties, and it is a very different situation.

1060        I yield back to the gentleman.

1061        Mr. Cicilline.  I yield back, Mr. Chairman.

1062        Chairman Nadler.  The gentleman from Texas, Mr.

1063   Ratcliffe, is recognized.

1064        Mr. Ratcliffe.  Thank you, Mr. Chairman.

1065        I move to strike the last word.

1066        Mr. Chairman, I have been listening to the arguments

1067   this morning.  I have been trying to decide what is worse.

1068   Was it last week when within 24 hours of the Attorney General

1069   issuing his summary of the Mueller findings I listened to the

1070   Chairman of the House Intelligence Committee, Adam Schiff,

1071   demand the immediate full release of the Mueller report

1072   without consideration for classified information?  The

1073   Chairman of the Intelligence Committee telling all 17

1074   intelligence agencies over which he had oversight essentially

1075   I do not give a damn about classified information, I want the

1076   full release of that report.

1077        Or was it this week, when I am sitting here today

1078   listening to the Chairman of the Judiciary Committee say I do

1079   not care what the law says, I do not care what the Special

1080   Counsel regulations say, I do not care that the Attorney

1081   General has complied with both, that the Attorney General has

1082   done everything the law requires, everything the Special

1083   Counsel regulations require, and is promising to do more, but

1084   that is not good enough, and now he is going to be subpoenaed

1085   for that.

1086        In that theater of the absurd, I am still trying to

1087   decide which of those is worse.  The Attorney General did not

1088   comply with the Democrats' arbitrary April 2nd demand

1089   deadline because he cannot comply, because the law precludes

1090   him from complying, because the Attorney General was not

1091   going to commit crimes to comply with that deadline.

1092        Mr. Chairman, today I heard you say over and over again

1093   Congress requires, Congress requires, there are

1094   constitutional rights, or there is a necessity for this

1095   information.  What I did not hear was what law the Special

1096   Counsel -- where in the Special Counsel regulation does it

1097   say that the Attorney General must turn over an un-redacted

1098   full Special Counsel report?  The Special Counsel regulation

1099   does not say that.  No law says that.

1100        The Attorney General has promised to provide as much

1101   transparency as he possibly can, but I am afraid that is

1102   never going to be good enough for some in here, and that is

1103   because we are here having this argument because some, not

1104   all, of my Democratic colleagues promised the American people

1105   evidence that never existed.  Some, not all, Democrats

1106   shouted fire in the theater of the American public, feeding a

1107   false Trump-Russia collusion narrative that never existed and

1108   that, in fact, some Democrats created with a fake, phony

1109   dossier.

1110      Now Special Counsel Mueller, who some Democrats demanded

1111   be protected so that he could do his job, did his job, and

1112   the minute that he finished doing that job and said no

1113   collusion, that the Trump-Russia collusion narrative does not

1114   exist, is not real, protect Bob Mueller suddenly has become

1115   to hell with Bob Mueller.

1116      I have always believed that Bob Mueller could write the

1117   definitive narrative on how Russia tried to meddle in our

1118   election.  I have never called what Bob Mueller was doing in

1119   that regard a witch hunt.  But Bob Mueller has provided his

1120   findings to the Attorney General, who has accurately

1121   summarized those.

1122      And with respect to Trump-Russia collusion, Bob Mueller

1123   has said there are no witches.  So these investigations

1124   should end.  We should move on.  We should not be issuing

1125   subpoenas today.

1126      But if we are going to issue subpoenas today, let's not

1127   issue a subpoena for the Mueller report.  Let's issue one for

1128   Bob Mueller.

1129      Mr. Cohen.  Would the gentleman yield?

1130      Mr. Raskin.  Would the gentleman yield?

1131      Mr. Ratcliffe.  Let me finish this thought.

1132      Let Bob Mueller come and let's ask Bob Mueller whether

1133    or not he thinks that the report that he created should be

1134    disclosed without considerations of redactions of classified

1135    national security information or without redactions for grand

1136    jury information or other information relating to ongoing

1137    investigations.  I may have questioned Bob Mueller's actions

1138    in certain regards, but I have never questioned his

1139    integrity, and I would be happy to hear his answer under oath

1140    before this committee with respect to that issue.

1141        So I urge all my colleagues to follow the law and to

1142    therefore support the Buck amendment.

1143        And I yield to the gentleman from Georgia.

1144        Chairman Nadler.  The gentleman's time has expired.

1145        Mr. Ratcliffe.  I yield back.

1146        Chairman Nadler.  The gentleman from Tennessee.

1147        Mr. Cohen.  Thank you, Mr. Chairman.

1148        I was just going to say that Mr. Ratcliffe, who I

1149    respect greatly, said that Mr. Barr accurately described the

1150    Mueller report.  We do not know that.  That is why we want to

1151    see it, so we can know if he accurately did.  He talked about

1152    he went through fire.  He might be suggesting I am one of

1153    those fire throwers.  I want to find out if I was wrong, and

1154    I want the public to see it too.

1155        I yield back the balance of my time.

1156        Chairman Nadler.  The gentleman from Texas, Mr. Gohmert.

1157        Mr. Gohmert.  Thank you, Mr. Chair.

1158       I have to say, I witnessed one of the proof positive of

1159    the brilliant mental acumen of our Chairman as he explained

1160    adroitly how he was right 21 years ago and is right today,

1161    just a work of beauty and argument.

1162       As Chairman said, 21 years ago, we should always

1163    remember this as a prosecutor's report by its nature.  It is

1164    one-sided.  I also said it was salacious material, all kinds

1165    of material that it would be unfair to release.

1166       I would point out the gentleman did not know exactly

1167    what all the material was at that time, and we do not know at

1168    this time either.  In February 1999, a New York Times

1169    article, our current Chairman called the Starr report and

1170    impeachment efforts a "partisan coup d'état."

1171       What has gone on in this country did absolutely,

1172    unequivocally, no doubt about it involve collusion of people

1173    at the highest level with a foreign entity to try to bring

1174    down a candidate and then bring down a sitting president.

1175    That was collusion between top FBI officials, Justice

1176    officials, a former MI6 intelligence officer who has been

1177    discredited by those same Justice officials, FBI officials,

1178    but they colluded with him to try to bring down a candidate

1179    and now a sitting president.

1180       Enough is enough.  At some point, we have to say what

1181    will be written in the annals of history of this country as

1182    an outrageous attempt at a real coup d'état was unsuccessful.

1183  The truth came out about who really colluded with foreign

1184  agents.

1185      And by the way, they did involve the Democrats' campaign

1186  and a foreign agent who was colluding with some of Putin's

1187  agents, in all likelihood, as he was not even in Russia but

1188  was talking by phone to Russian agents in his efforts to help

1189  the Clinton campaign and top Justice officials bring down a

1190  sitting president.  And for us to continue this outrageous

1191  assault on the office of president, even after the truth has

1192  come out that there was no conspiracy by the Trump campaign

1193  or President Trump or anybody in his family with Russia, and

1194  to continue to push, we are still going to make a big deal

1195  out of this, we cannot stand the fact that the facts show it

1196  was the Democrats that colluded with foreign agents to try to

1197  change the outcome of the election.

1198      Enough is enough, for heaven's sake.  Let's please move

1199  on.  There was a time when I loved and appreciated the

1200  current Chairman's desire to protect privacy rights.  I saw

1201  that dramatically eroded during the Obama Administration, but

1202  I am still hoping and praying that our now-Chairman's once

1203  great desire to protect privacy rights and to try to hold

1204  back the bounds of what Orwell described as happening now --

1205  obviously, the only thing you got wrong was the year, because

1206  we have seen what the Obama Administration did with those

1207  Orwellian abilities to spy on American citizens.

1208     It is time to go back and clean up the mess that has

1209 been made over years of abuse.  And this subpoena, the

1210 subpoenas is not what we need to be voting for, and I support

1211 my friend's amendment.

1212     I yield back.

1213     Chairman Nadler.  The gentleman yields back.

1214     The gentleman from Georgia is recognized.

1215     Mr. Johnson of Georgia.  I move to strike the last word.

1216     Chairman Nadler.  The gentleman is recognized.

1217     Mr. Johnson of Georgia.  I yield to the gentle lady from

1218 Texas.

1219     Ms. Jackson Lee.  Thank you very much.

1220     I wanted to read into the record the information

1221 regarding the Chairman of the Benghazi committee sent U.S.

1222 Marshalls to witness without asking that witness to come in

1223 voluntarily.

1224     And I yield back, Mr. Chairman.

1225     Chairman Nadler.  Does the gentleman from Georgia yield

1226 back?

1227     Mr. Johnson of Georgia.  I yield back.

1228     Chairman Nadler.  The gentle lady from Arizona, Ms.

1229 Lesko.

1230     Mrs. Lesko.  Thank you, Mr. Chairman.

1231     I want to move to strike the last word.

1232     Chairman Nadler.  The gentle lady is recognized.

1233        Mrs. Lesko.  Thank you.

1234        Mr. Chairman, I support Representative Buck's amendment.

1235   What basically we are doing here is, in my opinion, the

1236   Democrats are asking Attorney General Barr to violate the

1237   law.  It is not only against the law, but it would even be

1238   criminal to disclose grand jury material without a court

1239   order.

1240        It is obvious to me that this is just a continuation of

1241   an attempt to undermine the President of the United States.

1242   For the last two years, members on this committee have said

1243   that there has been collusion with the Trump Administration

1244   and President Trump with Russia to undermine the 2016

1245   election, and as revealed in the summary, this is absolutely

1246   not true.

1247        So I really wish that we could work on big issues

1248   instead of continuing this circus on undermining the

1249   President of the United States.  I serve on three committees,

1250   and on every single committee it is obvious from the very

1251   first organizational meeting that there is a coordinated

1252   attempt by the Democrats to undermine the President of the

1253   United States, and this is all about the 2020 presidential

1254   election.

1255        The public really wants us to work on big issues

1256   together, and I ask my Democratic colleagues to do that and

1257   quit this circus.

1258      I will yield time to the gentleman, Mr. Jordan, from
1259   Ohio.
1260      Mr. Jordan.  I thank the gentle lady for yielding, and I
1261   too wish to support the Buck amendment.
1262      I would just ask the fundamental question:  Why are we
1263   here?  It seems to me we are here because the Mueller report
1264   was not what the Democrats thought it was going to be.  In
1265   fact -- in fact -- it was just the opposite.
1266      What did the Attorney General tell us that the principal
1267   findings of Mr. Mueller's report were?  No new indictments,
1268   no sealed indictments, no collusion, no obstruction.
1269      Mr. Cicilline.  Would the gentleman yield?
1270      Mr. Jordan.  I only got a little bit of time because --
1271      Mr. Cicilline.  I only have a short question.  You made
1272   reference to the Mueller report.  Have you seen it?  Because
1273   we have not.
1274      Mr. Jordan.  I have seen the principal findings from the
1275   Attorney General.
1276      Mr. Raskin.  Would the gentleman yield for a quick
1277   question?  I promise it is short.
1278      You reported that the report states that there is no
1279   obstruction.  What is your basis for saying that?
1280      Mr. Jordan.  The sentence where he said they did not
1281   find obstruction.  I understand the sentence you are
1282   referring to where he talks about no exoneration either, but

1283    then there are three paragraphs after where he points out

1284    that there was not the elements of obstruction.

1285        In fact, the report -- excuse me -- the letter from the

1286    Attorney General referencing the Special Counsel report said

1287    no new indictments, no sealed indictments, no collusion, and

1288    as I just pointed out, did not find obstruction.

1289        On the question of collusion, it was very clear.  He

1290    said there were multiple opportunities for Trump associates,

1291    people associated with the Trump campaign to collude, and

1292    they did not.  So multiple times where the forbidden fruit

1293    was placed in front of them and they did not bite.

1294        I would also point out this.  There has been reference

1295    from the Democrats relative to Watergate and the Clinton

1296    Special Counsel.  Watergate, there was a break-in.  With

1297    Clinton, there was perjury.  With the chief charge of this

1298    Special Counsel's investigation, there was no collusion.

1299        But here we are today.  Well, actually three weeks ago,

1300    the Chairman of the committee launched 81 letters to 60-some

1301    different individuals, and now today we are going to subpoena

1302    documents that the AG said he will give us in a matter of

1303    days.

1304        But maybe the most important point, I think, is the one

1305    that my colleague from Texas made, Mr. Ratcliffe.  The idea

1306    that the Chairman of the Intelligence Committee said he wants

1307    everything made public, including classified information, and

1308   the idea that the Chair of the Judiciary Committee, the House

1309   Judiciary Committee said last week, or this week, that he

1310   wants everything made public, including grand jury material,

1311   that is maybe the scariest thing of all.

1312       So the Attorney General has said he is going to turn

1313   this over in a matter of days.  Let's wait.  Let's get the

1314   information, and then let's look at it then.

1315       With that, I would yield back the remaining 20 seconds

1316   to the gentle lady from Arizona.

1317       Mrs. Lesko.  I yield back my time.

1318       Chairman Nadler.  The gentleman from Florida, Mr. Gaetz.

1319       Mr. Gaetz.  Move to strike the last word.

1320       Chairman Nadler.  The gentleman is recognized.

1321       Mr. Gaetz.  Thank you.  I support the Buck amendment.

1322       When the human body sees life expire within it, one of

1323   the final sounds that it can make in dramatic and loud

1324   fashion is a death rattle, and I would suggest to the

1325   American people that what they are witnessing is the death

1326   rattle of the Democrats' Russia collusion lie.

1327       For 22 months my colleagues on the other side, many of

1328   them said there was actual evidence of collusion.  And so

1329   now, clearly seeing that that is not true, we observe our

1330   colleagues moving through the stages of grief.

1331       First we saw shock and surprise.  My colleagues would

1332   huddle together after the findings of the Mueller report

1333   release wondering what to do next, what play to run after

1334   losing all credibility with the American people.

1335       And after shock, we now are in the stage of denial,

1336   where the principal findings of the Mueller report, they just

1337   cannot be true, they cannot be accepted, they must be false,

1338   there must be more information we can discover.

1339       I know we are beginning the baseball season, so perhaps

1340   a baseball analogy would be appropriate.  This would be like

1341   saying, well, we have lost the game, but we have to tweeze

1342   through the box score to see if we won the third inning.

1343   That is what is essentially happening with the desire of

1344   Democrats in the production of these subpoenas and voting on

1345   them today.

1346       It also represents a stark departure from the standards

1347   and statements that my own Democratic colleagues have laid

1348   out just last Congress and this Congress.  I am quoting now

1349   from the Speaker of the House, Ms. Pelosi.  In February of

1350   2018 she said, "President Trump has surrendered his

1351   constitutional responsibility as Commander in Chief by

1352   releasing highly classified and distorted intelligence.  By

1353   not protecting intelligence sources and methods, he just sent

1354   his friend Putin a bouquet."

1355       Well, there was no bouquet, no untoward relationship

1356   with Vladimir Putin, but there was a statement from the

1357   Speaker of the House acknowledging that if you do not review

1358   sources and methods, you are derelict in your duty to the
1359   country.  Well, now that they are going through their stages
1360   of grief, perhaps we are approaching bargaining, because now
1361   they are trying to bargain away their own standards.

1362        But it is not just the Speaker of the House.  Let's look
1363   to statements from the Chairman of the Judiciary Committee,
1364   the gentleman from New York, Mr. Nadler.  He said on June
1365   28th of 2018, "Republicans are requesting documents they know
1366   they cannot have."  He continued, speaking of the
1367   Republicans, "Right is rightly denied.  They will do their
1368   best to undermine the credibility of the Department of
1369   Justice."

1370        Well, Mr. Chairman, you are now asking for documents you
1371   know you cannot have, and you are doing so in order to erode
1372   confidence in the Attorney General who leads the Department
1373   of Justice because he has concluded that there was not
1374   collusion and that your principal Russian narrative was not
1375   truthful, was not credible.  We were right, you were wrong,
1376   and the American people know it.

1377        And so as we proceed now on this unfocused, 81-pronged
1378   investigation of the Judiciary Committee has launched, as we
1379   continue to have these mindless votes on unnecessary
1380   subpoenas, I sincerely hope that the American people will
1381   remember what things the Democrats were saying just months
1382   ago, that there was collusion, that there was actual evidence

1383   of collusion, and that sources and methods could never be

1384   disclosed as a consequence of our fidelity to our oath and to

1385   the people of this country.

1386       Let's have some consistency, and let's at least have

1387   some acknowledgment that you all were not telling the truth

1388   to the American people for an extended period of time.  We

1389   were, and you should not be trusted.

1390       I yield back.

1391       Chairman Nadler.  The question occurs on the amendment.

1392       All those in favor of the Buck amendment will signify by

1393   saying aye.

1394       Those opposed, no.

1395       In the opinion of the Chair, the noes have it.

1396       The noes have it.  The amendment is not agreed to.

1397       Mr. Collins.  Mr. Chairman, I ask for a recorded vote.

1398       Chairman Nadler.  A roll call vote has been requested.

1399       As your name is called, all those in favor will signify

1400   by saying aye; opposed, no.

1401       The Clerk will call the roll.

1402       Ms. Strasser.  Mr. Nadler?

1403       Chairman Nadler.  No.

1404       Ms. Strasser.  Mr. Nadler votes no.

1405       Ms. Lofgren?

1406       Ms. Lofgren.  No.

1407       Ms. Strasser.  Ms. Lofgren votes no.

1408        Ms. Jackson Lee?

1409        Ms. Jackson Lee.  No.

1410        Ms. Strasser.  Ms. Jackson Lee votes no.

1411        Mr. Cohen?

1412        Mr. Cohen.  No.

1413        Ms. Strasser.  Mr. Cohen votes no.

1414        Mr. Johnson of Georgia?

1415        Mr. Johnson of Georgia.  No.

1416        Ms. Strasser.  Mr. Johnson of Georgia votes no.

1417        Mr. Deutch?

1418        Mr. Deutch.  No.

1419        Ms. Strasser.  Mr. Deutch votes no.

1420        Ms. Bass?

1421        Mr. Richmond?

1422        Mr. Richmond.  No.

1423        Ms. Strasser.  Mr. Richmond votes no.

1424        Mr. Jeffries?

1425        Mr. Jeffries.  No.

1426        Ms. Strasser.  Mr. Jeffries votes no.

1427        Mr. Cicilline?

1428        Mr. Cicilline.  No.

1429        Ms. Strasser.  Mr. Cicilline votes no.

1430        Mr. Swalwell?

1431        Mr. Swalwell.  No.

1432        Ms. Strasser.  Mr. Swalwell votes no.

1433        Mr. Lieu?

1434        Mr. Lieu.  No.

1435        Ms. Strasser.  Mr. Lieu votes no.

1436        Mr. Raskin?

1437        Mr. Raskin.  No.

1438        Ms. Strasser.  Mr. Raskin votes no.

1439        Ms. Jayapal?

1440        Ms. Jayapal.  No.

1441        Ms. Strasser.  Ms. Jayapal votes no.

1442        Mrs. Demings?

1443        Mrs. Demings.  No.

1444        Ms. Strasser.  Mrs. Demings votes no.

1445        Mr. Correa?

1446        Mr. Correa.  No.

1447        Ms. Strasser.  Mr. Correa votes no.

1448        Ms. Scanlon?

1449        Ms. Scanlon.  No.

1450        Ms. Strasser.  Ms. Scanlon votes no.

1451        Ms. Garcia?

1452        Ms. Garcia.  No.

1453        Ms. Strasser.  Ms. Garcia votes no.

1454        Mr. Neguse?

1455        Mr. Neguse.  No.

1456        Ms. Strasser.  Mr. Neguse votes no.

1457        Mrs. McBath?

1458        Mrs. McBath.   No.

1459        Ms. Strasser.   Mrs. McBath votes no.

1460        Mr. Stanton?

1461        Mr. Stanton.   No.

1462        Ms. Strasser.   Mr. Stanton votes no.

1463        Ms. Dean?

1464        Ms. Dean.   No.

1465        Ms. Strasser.   Ms. Dean votes no.

1466        Ms. Mucarsel-Powell?

1467        Ms. Mucarsel-Powell.   No.

1468        Ms. Strasser.   Ms. Mucarsel-Powell votes no.

1469        Ms. Escobar?

1470        Ms. Escobar.   No.

1471        Ms. Strasser.   Ms. Escobar votes no.

1472        Mr. Collins?

1473        Mr. Collins.   Yes.

1474        Ms. Strasser.   Mr. Collins votes yes.

1475        Mr. Sensenbrenner?

1476        Mr. Sensenbrenner.   Aye.

1477        Ms. Strasser.   Mr. Sensenbrenner votes aye.

1478        Mr. Chabot?

1479        Mr. Chabot.   Aye.

1480        Ms. Strasser.   Mr. Chabot votes aye.

1481        Mr. Gohmert?

1482        Mr. Gohmert.   Aye.

HJU093000                              PAGE      63

1483        Ms. Strasser.  Mr. Gohmert votes aye.

1484        Mr. Jordan?

1485        Mr. Jordan.  Yes.

1486        Ms. Strasser.  Mr. Jordan votes yes.

1487        Mr. Buck?

1488        Mr. Buck.  Aye.

1489        Ms. Strasser.  Mr. Buck votes aye.

1490        Mr. Ratcliffe?

1491        Mr. Ratcliffe.  Yes.

1492        Ms. Strasser.  Mr. Ratcliffe votes yes.

1493        Mrs. Roby?

1494        Mr. Gaetz?

1495        Mr. Gaetz.  Aye.

1496        Ms. Strasser.  Mr. Gaetz votes aye.

1497        Mr. Johnson of Louisiana?

1498        Mr. Johnson of Louisiana.  Aye.

1499        Ms. Strasser.  Mr. Johnson of Louisiana votes aye.

1500        Mr. Biggs?

1501        Mr. Biggs.  Aye.

1502        Ms. Strasser.  Mr. Biggs votes aye.

1503        Mr. McClintock?

1504        Mr. McClintock.  Aye.

1505        Ms. Strasser.  Mr. McClintock votes aye.

1506        Mrs. Lesko?

1507        Mrs. Lesko.  Aye.

HJU093000                                          PAGE        64

1508        Ms. Strasser.  Mrs. Lesko votes aye.

1509        Mr. Reschenthaler?

1510        Mr. Reschenthaler.  Aye.

1511        Ms. Strasser.  Mr. Reschenthaler votes aye.

1512        Mr. Cline?

1513        Mr. Cline.  Aye.

1514        Ms. Strasser.  Mr. Cline votes aye.

1515        Mr. Armstrong?

1516        Mr. Armstrong.  Yes.

1517        Ms. Strasser.  Mr. Armstrong votes yes.

1518        Mr. Steube?

1519        Mr. Steube.  Yes.

1520        Ms. Strasser.  Mr. Steube votes yes.

1521        Chairman Nadler.  The Clerk will report.

1522        One more?  The Clerk will suspend.

1523        Ms. Strasser.  Ms. Bass votes no.

1524        Chairman Nadler.  Has everyone else voted?

1525        The Clerk will report.

1526        Ms. Strasser.  Ms. Jackson Lee is recorded as no.

1527        Mr. Chairman, the vote is 16 ayes and 24 noes.

1528        Chairman Nadler.  A majority having voted against the

1529   amendment, the amendment is not agreed to.

1530        Are there any other amendments?  Is there another

1531   amendment?

1532        The gentleman is recognized.

1533      Mr. McClintock.  I move to strike the last word.

1534      Chairman Nadler.  The gentleman is recognized.

1535      Mr. McClintock.  Thank you.  Mr. Chairman, I called for

1536 the --

1537      Chairman Nadler.  Wait a minute.  The Clerk will report

1538 the amendment.

1539      Voice.  There is no amendment.

1540      Chairman Nadler.  I am sorry.

1541      Go ahead.

1542      Mr. McClintock.  Mr. Chairman, I called for the

1543 appointment of a Special Counsel to look into charges of

1544 collusion before Mr. Mueller was appointed because I believed

1545 the President was completely innocent of these outlandish

1546 charges and that a full and independent investigation would

1547 show that.

1548      Now it has, and I too want to see as much of the report

1549 made public as quickly as humanly possible to put the lie to

1550 these politicians who have been telling us for more than two

1551 years that they held in their hands irrefutable evidence of

1552 coordination between the Russian government and the Trump

1553 campaign.  I want to know all aspects of this lie and who was

1554 responsible for using it to tear this country apart and to

1555 interfere with the legitimate election of the President.

1556      What I do not want to do is illegally release material

1557 in that report that is related to ongoing investigations into

1558   political corruption at the highest levels of the FBI and the

1559   Justice Department.

1560       It is clear that high-ranking officials entrusted with

1561   the law enforcement powers of our country abused this trust

1562   to influence the 2016 presidential election and ultimately to

1563   undermine its outcome.  It is inconceivable that the Mueller

1564   investigation did not look into the fake Steele dossier that

1565   was the source of these outlandish charges and that was

1566   knowingly invoked by these officials in their attempt to

1567   delegitimize the constitutional right of the American people

1568   to elect their president.

1569       The premature release of such information while the

1570   Inspector General is conducting investigations into this

1571   matter, and while future prosecutions of these officials is

1572   possible, would itself be a deliberate and calculated attempt

1573   to obstruct justice by this committee, and I am opposed to

1574   the motion.

1575       Chairman Nadler.  The question occurs on the amendment

1576   in the nature of a substitute.

1577       All those in favor, respond by saying aye.

1578       Opposed, no?

1579       In the opinion of the Chair, the ayes have it, and the

1580   amendment in the nature of a substitute is agreed to.

1581       A reporting quorum being present, the question is on the

1582   motion to agree to the resolution as amended.

HJU093000                                      PAGE        67

1583        Those in favor, respond by saying aye.

1584        Those opposed?

1585        The ayes have it.  The resolution --

1586        Mr. Collins.  Roll call.

1587        Chairman Nadler.  A recorded vote has been requested,

1588   and the Clerk will call the roll.

1589        Ms. Strasser.  Mr. Nadler?

1590        Chairman Nadler.  Aye.

1591        Ms. Strasser.  Mr. Nadler votes aye.

1592        Ms. Lofgren?

1593        Ms. Lofgren.  Aye.

1594        Ms. Strasser.  Ms. Lofgren votes aye.

1595        Ms. Jackson Lee?

1596        Mr. Cohen?

1597        Mr. Cohen.  Aye.

1598        Ms. Strasser.  Mr. Cohen votes aye.

1599        Mr. Johnson of Georgia?

1600        Mr. Johnson of Georgia.  Aye.

1601        Ms. Strasser.  Mr. Johnson of Georgia votes aye.

1602        Mr. Deutch?

1603        Mr. Deutch.  Aye.

1604        Ms. Strasser.  Mr. Deutch votes aye.

1605        Ms. Bass?

1606        Mr. Richmond?

1607        Mr. Richmond.  Aye.

HJU093000                              PAGE      68

1608        Ms. Strasser.  Mr. Richmond votes aye.

1609        Mr. Jeffries?

1610        Mr. Jeffries.  Aye.

1611        Ms. Strasser.  Mr. Jeffries votes aye.

1612        Mr. Cicilline?

1613        Mr. Cicilline.  Aye.

1614        Ms. Strasser.  Mr. Cicilline votes aye.

1615        Mr. Swalwell?

1616        Mr. Swalwell.  Aye.

1617        Ms. Strasser.  Mr. Swalwell votes aye.

1618        Mr. Lieu?

1619        Mr. Lieu.  Aye.

1620        Ms. Strasser.  Mr. Lieu votes aye.

1621        Mr. Raskin?

1622        Mr. Raskin.  Aye.

1623        Ms. Strasser.  Mr. Raskin votes aye.

1624        Ms. Jayapal?

1625        Ms. Jayapal.  Aye.

1626        Ms. Strasser.  Ms. Jayapal votes aye.

1627        Mrs. Demings?

1628        Mrs. Demings.  Aye.

1629        Ms. Strasser.  Mrs. Demings votes aye.

1630        Mr. Correa?

1631        Mr. Correa.  Aye.

1632        Ms. Strasser.  Mr. Correa votes aye.

1633        Ms. Scanlon?

1634        Ms. Scanlon.  Aye.

1635        Ms. Strasser.  Ms. Scanlon votes aye.

1636        Ms. Garcia?

1637        Ms. Garcia.  Aye.

1638        Ms. Strasser.  Ms. Garcia votes aye.

1639        Mr. Neguse?

1640        Mr. Neguse.  Aye.

1641        Ms. Strasser.  Mr. Neguse votes aye.

1642        Mrs. McBath?

1643        Mrs. McBath.  Aye.

1644        Ms. Strasser.  Mrs. McBath votes aye.

1645        Mr. Stanton?

1646        Mr. Stanton.  Aye.

1647        Ms. Strasser.  Mr. Stanton votes aye.

1648        Ms. Dean?

1649        Ms. Dean.  Aye.

1650        Ms. Strasser.  Ms. Dean votes aye.

1651        Ms. Mucarsel-Powell?

1652        Ms. Mucarsel-Powell.  Aye.

1653        Ms. Strasser.  Ms. Mucarsel-Powell votes aye.

1654        Ms. Escobar?

1655        Ms. Escobar.  Aye.

1656        Ms. Strasser.  Ms. Escobar votes aye.

1657        Mr. Collins?

1658        Ms. Bass?

1659        Ms. Bass.  Aye.

1660        Ms. Strasser.  Ms. Bass votes aye.

1661        Mr. Collins.  No.

1662        Ms. Strasser.  Mr. Collins votes no.

1663        Mr. Sensenbrenner?

1664        Mr. Sensenbrenner.  No.

1665        Ms. Strasser.  Mr. Sensenbrenner votes no.

1666        Mr. Chabot?

1667        Mr. Chabot.  No.

1668        Ms. Strasser.  Mr. Chabot votes no.

1669        Mr. Gohmert?

1670        Mr. Gohmert.  No.

1671        Ms. Strasser.  Mr. Gohmert votes no.

1672        Mr. Jordan?

1673        Mr. Jordan.  No.

1674        Ms. Strasser.  Mr. Jordan votes no.

1675        Mr. Buck?

1676        Mr. Buck.  No.

1677        Ms. Strasser.  Mr. Buck votes no.

1678        Mr. Ratcliffe?

1679        Mrs. Roby?

1680        Mrs. Roby.  No.

1681        Ms. Strasser.  Mrs. Roby votes no.

1682        Mr. Gaetz?

1683        Mr. Gaetz.  No.

1684        Ms. Strasser.  Mr. Gaetz votes no.

1685        Mr. Johnson of Louisiana?

1686        Mr. Johnson of Louisiana.  No.

1687        Ms. Strasser.  Mr. Johnson of Louisiana votes no.

1688        Mr. Biggs?

1689        Mr. Biggs.  No.

1690        Ms. Strasser.  Mr. Biggs votes no.

1691        Mr. McClintock?

1692        Mr. McClintock.  No.

1693        Ms. Strasser.  Mr. McClintock votes no.

1694        Mrs. Lesko?

1695        Mrs. Lesko.  No.

1696        Ms. Strasser.  Mrs. Lesko votes no.

1697        Mr. Reschenthaler?

1698        Mr. Reschenthaler.  No.

1699        Ms. Strasser.  Mr. Reschenthaler votes no.

1700        Mr. Cline?

1701        Mr. Cline.  No.

1702        Ms. Strasser.  Mr. Cline votes no.

1703        Mr. Armstrong?

1704        Mr. Armstrong.  No.

1705        Ms. Strasser.  Mr. Armstrong votes no.

1706        Mr. Steube?

1707        Mr. Steube.  No.

HJU093000                                              PAGE      72

1708      Ms. Strasser.  Mr. Steube votes no.

1709      Chairman Nadler.  Has every member voted who wishes to

1710  vote?

1711      Ms. Jackson Lee.  Mr. Chairman, how am I recorded?

1712      Ms. Strasser.  Ms. Jackson Lee, you are not recorded.

1713      Ms. Jackson Lee.  Aye.

1714      Ms. Strasser.  Ms. Jackson Lee votes aye.

1715      Chairman Nadler.  The gentleman from Texas?

1716      Ms. Strasser.  Mr. Ratcliffe votes no.

1717      Chairman Nadler.  Does any other member wish to vote who

1718  has not voted?

1719      The Clerk will report.

1720      Ms. Strasser.  Mr. Chairman, the vote is 24 ayes, 17

1721  noes.

1722      Chairman Nadler.  The ayes have it.  The resolution is

1723  amended as agreed to.

1724      This concludes our business for today.  Thanks to all of

1725  our members for attending.

1726      The mark-up is adjourned.

1727      [Whereupon, at 10:25 a.m., the hearing was adjourned.]