IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY,<br>UNITED STATES HOUSE OF<br>REPRESENTATIVES,<br>2138 Rayburn House Office Building<br>Washington, D.C. 20515,<br><br>                              *Plaintiff*,<br><br>   v.<br><br>DONALD F. MCGAHN II,<br>51 Louisiana Avenue, N.W.<br>Washington, D.C. 20001,<br><br>                              *Defendant*. | Case No. 1:19-cv-2379 |

# Exhibit V

**THE WHITE HOUSE**

WASHINGTON

May 15, 2019

The Honorable Jerrold Nadler
Chairman
Committee on the Judiciary
United States House of Representatives
Washington, D.C. 20515

Dear Chairman Nadler:

    I write in response to your letter of March 4, 2019. As I have previously stated, we will work in good faith to accommodate Congress's legitimate requests for information while at the same time respecting the separation of powers and the constitutional prerogatives of the President. Our approach is guided by long-standing precedent and a desire to seek accommodation and cooperation where possible, consistent with mutual respect for the constitutional roles of each branch of government.

    Since the 116th Congress convened on January 3, 2019, this Administration has gone to great lengths to respond to congressional information requests. Indeed, in under five months, the Administration has provided hundreds of responses to congressional requests and produced tens of thousands of pages of documents to Congress. Administration officials have testified at congressional hearings well over 100 times, and they have provided hundreds of briefings to congressional committees and individual members of the House and Senate. Your recent assertion that the Administration is acting in "blanket defiance of Congress's constitutionally mandated duties" is demonstrably false. Statement of Chairman Jerrold Nadler (May 7, 2019). Similarly, your claim that "virtually all document requests are going unsatisfied" is contradicted by the facts. Statement of Chairman Jerrold Nadler (May 8, 2019).

    The Administration's significant efforts to accommodate Congress's information requests extend to the House Committee on the Judiciary's current investigation. As you know, the Special Counsel's Office recently concluded its investigation into the subjects discussed in your March 4 letter. By any measure, the investigation was exhaustive. Indeed, the evidence considered by the Special Counsel's Office was derived from approximately 2,800 subpoenas, 500 executed search warrants, 230 orders for communication records, and 500 witness interviews. Report of Special Counsel Robert S. Mueller, III, Vol. I at 13 (Mar. 2019); Letter from William P. Barr, Attorney General, to Chairman Lindsey Graham, Chairman Jerrold Nadler, Ranking Member Dianne Feinstein, and Ranking Member Doug Collins 1 (Mar. 24, 2019) (hereinafter Mar. 24, 2019 Barr Letter). Media reports indicate that the Special Counsel's investigation could cost taxpayers "up to $35 million." John Haltiwanger, *The Mueller investigation could cost up to $35 million once all the expense reports are in*, Business Insider (Mar. 25, 2019).

The Honorable Jerrold Nadler
Page 2

On April 18, 2019, the Attorney General went well beyond what is required by law and made the Special Counsel's report available to Congress and the public with minimal redactions. This was an extraordinary accommodation in light of long-standing Department of Justice policies regarding the confidentiality of investigations that do not result in prosecution. The report powerfully demonstrates that the Special Counsel found no evidence that any Americans—including any member of the President's campaign—conspired or coordinated with Russia to interfere with the 2016 election. The Attorney General and then-Deputy Attorney General also "concluded that the evidence developed by the Special Counsel is not sufficient to establish that the President committed an obstruction-of-justice offense." Remarks of Attorney General William P. Barr (Apr. 18, 2019); *see also* Mar. 24, 2019 Barr Letter at 3.

In the interest of transparency, the President did not assert executive privilege over any part of the Special Counsel's report released on April 18, 2019, even though—as the Attorney General correctly stated—"he would have been well within his rights to do so." Remarks of Attorney General William P. Barr (Apr. 18, 2019); *see also* Letter from Emmet T. Flood, Special Counsel to the President, to William P. Barr, Attorney General 3-4 (Apr. 19, 2019) (hereinafter Flood Letter) (the President's decision not to assert executive privilege over any of the presumptively privileged portions of the Special Counsel's report "is not a waiver of executive privilege for any other material or for any other purpose"). Accordingly, the only redactions in the report were made by the Department of Justice (with the assistance of the Special Counsel's Office and the intelligence community) to protect sensitive information that is safeguarded by law, court orders, or long-standing Department of Justice policy regarding open investigations. Remarks of Attorney General William P. Barr (Apr. 18, 2019).

Moreover, the Attorney General indicated that he would "make available to a bipartisan group of leaders from several Congressional committees a version of the report with all redactions removed except those relating to grand-jury information," which the Department of Justice is prohibited by law from disclosing under Rule 6(e) of the Federal Rules of Criminal Procedure. *Id.* (explaining that "these members of Congress will be able to see all of the redacted material for themselves—with the limited exception of that which, by law, cannot be shared"). He also offered to testify voluntarily at a public hearing and to answer questions from all members of the Committee. You refused even to review the less redacted version of the report before declaring that it was inadequate, and you rejected the Attorney General's offer to testify unless he agreed to unprecedented conditions. Instead, you issued a subpoena to the Attorney General demanding not only the "complete and unredacted report," but also "[a]ll documents referenced in the Report" and "[a]ll documents obtained and investigation materials created by the Special Counsel's Office." Subpoena to William P. Barr, Attorney General (Apr. 18, 2019). Thus, the subpoena's plain language covers grand-jury information that the Committee knows the Attorney General cannot provide without violating the law. *See id.*

Even though the Committee had rebuffed a good faith offer to accommodate Congress's interests by disclosing the entire report—except for grand-jury information—to congressional leadership, the Department of Justice proposed further accommodations, including offers "to expand the number of staff members who may review the minimally redacted report; to allow Members of Congress who have reviewed the minimally redacted report to discuss the material freely among themselves; and to allow Members to take and retain their notes following their

The Honorable Jerrold Nadler
Page 3

review." Letter from Stephen E. Boyd, Assistant Attorney General, to Chairman Jerrold Nadler 1 (May 7, 2019). The Committee summarily rejected these additional accommodations, abruptly terminated ongoing negotiations, and prematurely voted to recommend that the Attorney General be held in contempt of Congress—a mere *19 days* after the Committee served its subpoena on the Attorney General. *Id*; Letter from Stephen E. Boyd, Assistant Attorney General, to Chairman Jerrold Nadler 1 (May 8, 2019).

In other words, the Committee rushed to vote on contempt for failing to provide 100% and immediate compliance with a subpoena that seeks *millions of pages* of documents from a prosecutor's files. Moreover, the Committee—for the first time in American history—has voted to recommend that the Attorney General be held in contempt because he *refused to violate the law* by turning over grand-jury materials that he may not lawfully disclose. The Committee took these drastic actions in under three weeks without making any reasonable attempt to engage in the constitutionally mandated accommodation process to narrow its requests.

Lost in the Committee's legally indefensible rush to recommend a contempt citation is the reality that the Committee has not articulated any proper legislative purpose for pursuing inquiries that duplicate matters that were the subject of the Special Counsel's inquiry. Congressional investigations are intended to obtain information to aid in evaluating potential legislation, not to harass political opponents or to pursue an unauthorized "do-over" of exhaustive law enforcement investigations conducted by the Department of Justice.

Under the circumstances, the appropriate course is for the Committee to discontinue the inquiry discussed in the March 4 letter. Unfortunately, it appears that you have already decided to press ahead with a duplicative investigation, including by issuing subpoenas, to replow the same ground the Special Counsel has already covered. I ask that you reconsider that approach. With the Special Counsel's investigation behind us, the President and his team stand ready to work with the Committee cooperatively to advance a legislative agenda for the benefit of the American people.

If the Committee continues to pursue its inquiry, the requests in the Committee's March 4 letter suffer from numerous legal defects and reflect little, if any, respect for the legitimate interests of the Executive Branch or for the accommodation process that governs congressional requests for information from the Executive. The Executive Branch interests at stake are not new and have been uniformly recognized and respected by the President's predecessors—from President Washington to President Obama. The principal legal flaws in the Committee's requests are summarized here and discussed in greater detail below.

- *First*, the letter implicates all four components of executive privilege, seeking core Executive Branch communications that are not subject to disclosure under settled legal principles. This includes (i) confidential communications between the President and his advisors; (ii) confidential deliberations among Executive Branch officials; (iii) information relating to law enforcement investigations; and (iv) confidential communications between the President and foreign leaders. The President's decision to cooperate with the Special Counsel's investigation and not to assert executive privilege over any of the presumptively privileged portions of the Special Counsel's report, as released on April 18, 2019, "is not

The Honorable Jerrold Nadler
Page 4

> a waiver of executive privilege for any other material or for any other purpose." Flood Letter at 3-4.

- *Second*, the letter requests information about functions that the Constitution assigns exclusively to the Executive, which are traditionally deemed beyond the reach of congressional oversight.

- *Third*, it appears that the Committee's inquiry is designed, not to further a legitimate legislative purpose, but rather to conduct a pseudo law enforcement investigation on matters that were already the subject of the Special Counsel's long-running investigation and are outside the constitutional authority of the legislative branch. The only purpose for this duplication seems to be harassing and seeking to embarrass political opponents after an exhaustive two-year investigation by the Department of Justice did not reach the conclusion that some members of the Committee apparently would have preferred. That, of course, is not a permissible purpose for demanding confidential information from the Executive.

- *Finally*, when the requests are evaluated in light of these cumulative defects showing no regard for the legitimate interests of the Executive Branch—combined with the sweeping scope of the requests—it becomes apparent that they bear no relation to any articulated goal of legitimate congressional oversight. Instead, they amount to little more than an unprecedented effort to interfere with the President's ability to perform his constitutional duties. As a result, the requests raise serious concerns of violating the separation of powers enshrined in the Constitution.

As I have repeatedly made clear, we respect the authority of Congress to make legitimate requests for information to aid it in the task of legislating and will work with the Committee through the constitutionally mandated accommodation process to provide the Committee with information it can properly seek. It would greatly advance the first step in that process if the Committee were to narrow the sweeping scope of the requests in the letter and articulate the legislative purpose and legal support for each of the disparate requests it wishes to pursue, including by addressing each of the legal deficiencies that I raise in this letter.

Finally, I reiterate my concern that the Committee has sent letters directly to current and former White House officials, including several individuals who served in the Office of the White House Counsel. As I have consistently emphasized in my correspondence with other committees, any contact with current or former White House officials should be through the Office of the White House Counsel, so that we may ensure appropriate accommodation of the Committee's informational needs while protecting the important constitutional interests of the Executive. As a matter of basic courtesy and respect for a co-equal branch of our government, I request that you direct your staff to work through my office to request information from current or former White House officials. Prior administrations have made the same request. *See, e.g.*, Letter from Kathryn H. Ruemmler, Counsel to President Obama, to Chairman Fred Upton, Chairman Cliff Stearns, Chairman Joseph R. Pitts, and Vice Chairman Michael C. Burgess, M.D. (Nov. 14, 2011) ("[A]ny requests from Committee or Committee staff to speak with current or former White House officials about their official responsibilities at the White House should be directed to the Office of the White

The Honorable Jerrold Nadler
Page 5

House Counsel."). Consulting with my office will ensure that the Committee efficiently obtains access to the information and individuals to which it is entitled and that any disclosure of privileged information to Congress is properly authorized.

## I. The Committee's Requests Unreasonably Target Matters at the Core of Well-Settled Executive Branch Confidentiality Interests.

It has long been recognized that robust confidentiality protections are essential for the proper functioning of the Executive Branch. Those protections are firmly rooted in the Constitution and can be overcome by Congress, if at all, only in limited circumstances. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc) (requiring a showing that confidential Executive Branch documents are "demonstrably critical to the responsible fulfillment of the Committee's functions"). The importance of defending this constitutionally based protection for the Executive Branch has been consistently recognized by administrations of both political parties. For example, in response to congressional requests for documents, the Obama Administration strenuously argued that, "[a]s courts have long recognized, the Executive Branch's role in enforcing the law requires that some materials remain confidential so that the Executive's proper functioning under the Constitution is preserved and protected." Mem. in Supp. of Def.'s Mot. for Summ. J. 14, *Comm. on Oversight & Gov't Reform v. Holder*, No. 12-cv-1332, 2014 WL 12662665 (D.D.C. Aug. 20, 2014); *see also* Letter from W. Neil Eggleston, Counsel to President Obama, to Chairman Darrell E. Issa (July 15, 2014) (highlighting the need to "preserv[e] the President's independence and autonomy, as well as his ability to obtain candid advice and counsel to aid him in the discharge of his constitutional duties"). As the Obama Administration rightly explained—contrary to the assertions in your March 4 letter—even "a claim of 'misconduct' does not invalidate" these protections. Mem. in Supp. of Def.'s Mot. for Summ. J. 36, *Comm. on Oversight & Gov't Reform*, 2014 WL 12662665; *see also Senate Select Comm.*, 498 F.2d at 732-33. These rules apply regardless of who occupies the Oval Office or controls the majority in the House or Senate.

Despite bipartisan recognition of the Executive Branch's need to maintain confidentiality with regard to certain kinds of communications, the Committee's requests target four categories of Executive Branch information that are plainly protected from disclosure to Congress. I address each category in turn here and request that the Committee clarify what information it is actually seeking and the justification for pursuing such information. A clear statement of the Committee's needs will enable us to explore developing an appropriate accommodation.

*First*, many of the requests in the letter expressly seek documents involving communications between the President and his most senior advisors. For instance, Request 1(a) seeks communications between the President and the Counsel to the President; Request 1(d) seeks communications involving the President, Vice President, White House Chief of Staff, and other senior advisors to the President; and Request 1(*l*) seeks communications between the President and the Acting Attorney General. The President has a constitutionally grounded interest in being able to consult with his advisors in a confidential manner. *See Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach From Congressional Subpoena*, 38 Op. O.L.C. __, at *6 (July 15, 2014) ("[S]ubjecting an immediate presidential adviser to Congress's subpoena power would threaten the President's autonomy and his ability to

The Honorable Jerrold Nadler
Page 6

receive sound and candid advice."); Letter from W. Neil Eggleston, Counsel to President Obama, to Chairman Jason Chaffetz (May 16, 2016) (noting the importance of the President's "ability to receive candid advice and counsel in the discharge of his constitutional duties.").

The courts have limited Congress's ability to seek disclosure of presidential communications, and for good reason. Informed decisionmaking requires the candid exchange of ideas, and "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *United States v. Nixon*, 418 U.S. 683, 705 (1974). As a result, the Supreme Court has long recognized the Executive's interest in the confidentiality of decisionmaking as a central component of the constitutional separation of powers:

> A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. . . . The [presidential communications] privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.

*Id.* at 708. Accordingly, we ask that the Committee articulate the legislative purpose that justifies the Committee's extraordinary requests seeking disclosure of presidential communications.

*Second*, the Committee requests documents exposing internal predecisional deliberations. For example, numerous requests seek documents reflecting internal discussions concerning the development of public statements, Executive Branch personnel decisions, and the exercise of various Executive powers. *See* Letter Schedule A. But congressional needs generally do not override the Executive Branch's confidentiality interests with respect to documents that are predecisional and deliberative, even if they do not involve communications with the President. Protections ensuring that the deliberative process can remain confidential apply to the entire Executive Branch and cover documents that reflect "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated"—precisely the types of documents requested by the Committee. *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). This position has been consistently recognized by administrations of both political parties. *See Assertion of Executive Privilege Over Documents Generated in Response to Congressional Investigation into Operation Fast and Furious*, 36 Op. O.L.C. __, at *3 (June 19, 2012) ("The threat of compelled disclosure of confidential Executive Branch deliberative material can discourage robust and candid deliberations . . . ."); *Assertion of Executive Privilege Over Communications Regarding EPA's Ozone Air Quality Standards and California's Greenhouse Gas Waiver Request*, 32 Op. O.L.C. 1, 2 (2008) ("Documents generated for the purpose of assisting the President in making a decision are protected" and these protections also "encompass[] Executive Branch deliberative communications that do not implicate presidential decisionmaking"); *Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996) ("The Supreme Court has expressly (and unanimously) recognized that the Constitution gives the President the power to protect the confidentiality of White House communications.").

The Honorable Jerrold Nadler
Page 7

*Third*, the Executive Branch has a compelling interest in protecting materials associated with law enforcement investigations. The Committee's requests acknowledge the existence of related law enforcement investigations and expressly seek "documents [the White House] furnished" as part of those investigations. *See* Letter Document Requests. It is well settled that the Executive Branch has authority to withhold from Congress documents from law enforcement files in order "to preserve the integrity and independence of criminal investigations and prosecutions"—including "documents related to a closed criminal investigation." *Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7, 10 (2008).

The Committee has no legitimate role in collecting law enforcement materials with the aim of simply duplicating a law enforcement inquiry because it does not like either (i) the conclusions reached by the Department of Justice or (ii) the confidential nature of the investigation, which limits the Committee's ability to access information that is protected from disclosure under existing law. Permitting congressional committees to demand the duplication of information in law enforcement files every time a high-profile and politically charged investigation was underway would irredeemably undermine the integrity and independence of actual law enforcement investigations. *See id.* Mere "exposure" is not a legitimate use of congressional investigative authority. *Watkins v. United States*, 354 U.S. 178, 200 (1957) ("We have no doubt that there is no congressional power to expose for the sake of exposure."). In addition, even after an investigation is completed, congressional access to investigative files raises both "a general concern about the prospect of committees of Congress obtaining confidential records from Justice Department criminal investigative files for the purpose of addressing highly politicized issues in public committee hearings" and, in the current context, a "[m]ore specific[] . . . concern[]" that access would "significantly impair the Department's ability to conduct future law enforcement investigations that would benefit from full White House cooperation." *Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. at 10-11.

The Committee's demand for materials associated with law enforcement investigations is particularly unwarranted here, where the Committee already has access to the Special Counsel's report, as released on April 18, 2019. Any additional materials are thus not "demonstrably critical" to the Committee's work. *Senate Select Comm.*, 498 F.2d at 731.

*Fourth*, the Committee is seeking documents concerning communications between the President and a foreign leader. *See* Request 4(k). As I recently explained in response to similar requests from other House committees, it is settled law that the Constitution entrusts the conduct of foreign relations exclusively to the Executive Branch, as it makes the President "the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936); *see also Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948) ("The President also possesses in his own right certain powers conferred by the Constitution on him as . . . the Nation's organ in foreign affairs."); Letter from Pat A. Cipollone, Counsel to the President, to Chairman Elijah E. Cummings, Chairman Eliot Engel, and Chairman Adam B. Schiff (Mar. 21, 2019) (same). In keeping with Supreme Court precedent, the Executive Branch has consistently taken the position, across administrations of both political parties, that the President has exclusive authority to conduct diplomacy with foreign nations. *See, e.g., Assertion of Executive Privilege for Documents Concerning Conduct of Foreign*

The Honorable Jerrold Nadler
Page 8

*Affairs with Respect to Haiti*, 20 Op. O.L.C. 5, 7 (1996) ("[T]he conduct of foreign affairs is an exclusive prerogative of the executive branch."); *Bill to Relocate United States Embassy from Tel Aviv to Jerusalem*, 19 Op. O.L.C. 123, 124 (1995) ("It is well settled that the Constitution vests the President with the exclusive authority to conduct the Nation's diplomatic relations with other States."); *Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248, 256 (1989) ("The President has the responsibility, under the Constitution, to determine the form and manner in which the United States will maintain relations with foreign nations.").

The President must be free to engage in discussions with foreign leaders without fear that those communications will be disclosed and used as fodder for partisan political purposes. And foreign leaders must be assured of this as well. No foreign leader would engage in private conversations with the President, or the President's senior advisors, if such conversations were subject to public disclosure (or disclosure to committees of Congress). Indeed, President George Washington made this point when he declined a House committee's request for copies of documents relating to the negotiation of the Jay Treaty with Great Britain. *See History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751, 753 (1982) (noting that President Washington sent a letter to Congress stating, "[t]o admit, then, a right in the House of Representatives to demand, and to have, as a matter of course, all the papers respecting a negotiation with a foreign Power, would be to establish a dangerous precedent"). This Administration intends to adhere to the same confidentiality principles that have governed American diplomacy for well over 200 years.

## II.     The Committee Has No Authority to Inquire into the President's Discharge of Duties Assigned Exclusively to the Executive by the Constitution.

The Committee's requests repeatedly run afoul of the Constitution by encroaching upon authorities that the Constitution assigns exclusively to the Executive Branch. These requests have no legitimate legislative purpose and exceed Congress's limited authority. The Supreme Court explained decades ago that "[s]ince Congress may only investigate into those areas in which it may potentially legislate or appropriate, it cannot inquire into matters which are within the exclusive province of one of the other branches of the Government." *Barenblatt v. United States*, 360 U.S. 109, 111-12 (1959).

For example, the Committee has announced its intention to investigate "the pardon power." *See* March 4, 2019 Press Release. But the pardon power is exclusively in the province of the Executive. The power "flows from the Constitution alone, not from any legislative enactments, and . . . it cannot be modified, abridged, or diminished by the Congress." *Schick v. Reed*, 419 U.S. 256, 266 (1974); *see also Ex parte Garland*, 71 U.S. 333, 380 (1866) ("This power of the President is not subject to legislative control. Congress can neither limit the effect of his pardon, nor exclude from its exercise any class of offenders. The benign prerogative of mercy reposed in him cannot be fettered by any legislative restrictions."). Thus, Congress's oversight authority does not extend to the President's pardon power. *See Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 3-4 (1999) ("[I]t appears that Congress' oversight authority does not extend to the process employed in connection with a particular clemency decision, to the materials generated or the discussions that took place as part of that process, or to the advice or views the President received in connection with a clemency decision.").

The Honorable Jerrold Nadler
Page 9

Similarly, the Committee's plan to "investigate" "other presidential authorities," *see* March 4, 2019 Press Release, plainly crosses the line to inquire into functions exclusively assigned to the President, including communications between the President and foreign leaders (e.g., Request 4(k)) and presidential personnel decisions (e.g., Requests 1(b), 1(d), 1(e), 1(f), 1(h)). *See Curtiss-Wright Export Corp.*, 299 U.S. at 320 ("[T]he President [is] the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress."); *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) ("Article II . . . gives [the President] the flexibility to organize his advisors and seek advice from them as he wishes."). Because Congress lacks authority in these areas of exclusive presidential authority, there is no legitimate legislative purpose for the Committee's information requests. *See Barenblatt*, 360 U.S. at 111-12.

## III. The Committee's Efforts to Conduct a Law Enforcement Investigation for the Purpose of Embarrassing, Harassing, or Punishing Political Opponents are Improper.

As presently framed, the Committee's inquiries transparently amount to little more than an attempt to duplicate—and supplant—law enforcement inquiries, and apparently to do so simply because the *actual* law enforcement investigations conducted by the Department of Justice did not reach a conclusion favored by some members of the Committee. That is not a proper legislative purpose. As you know, the Committee is not a law enforcement agency. Thus, the Committee cannot justify its inquiry simply by asserting that it is searching for possible evidence of its false claims of "obstruction of justice" or—more vaguely—that it is launching an investigation into nonexistent purported "threats against the rule of law." *See* March 4, 2019 Press Release. Pursuing investigations into alleged violations of the criminal code is indisputably a "function[] of the executive and judicial departments of government." *Watkins*, 354 U.S. at 187 (explaining that Congress is not "a law enforcement or trial agency"); *see also Quinn v. United States*, 349 U.S. 155, 161 (1955) (Congress's "power to investigate must not be confused with any of the powers of law enforcement; those powers are assigned under our Constitution to the Executive and the Judiciary"). The Department of Justice—not the Committee on the Judiciary—is the appropriate authority to conduct law enforcement investigations.

Nor can the Committee justify its requests simply by asserting that it intends to *expose* for the sake of exposure. *See* Letter at 1 (pledging to "present our findings to the American people, whatever those findings may be"). The Supreme Court long ago made clear that congressional investigations premised on that purported authority are an abuse of power because "there is no congressional power to expose for the sake of exposure," and there is no "general power to expose where the predominant result can only be an invasion of the private rights of individuals." *Watkins*, 354 U.S. at 200; *see also Quinn*, 349 U.S. at 161 (congressional investigations "cannot be used to inquire into private affairs unrelated to a valid legislative purpose"). As then-Attorney General Eric Holder explained during the Obama Administration, "Congress's legislative function does not imply a freestanding authority to gather information for the sole purpose of informing 'the American people.'" *Congressional Investigation into Operation Fast and Furious*, 36 Op. O.L.C. __, at *7 (internal quotation marks omitted). To the contrary, the "only informing function" of Congress "is that of informing itself about subjects susceptible to legislation, not that of informing

The Honorable Jerrold Nadler
Page 10

the public." *Id.* (internal quotation marks omitted). Moreover, it is well settled that "[i]nvestigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Watkins*, 354 U.S. at 187.

Instead, the Committee's inquiries must be tied to a valid legislative purpose—that is, they must be tied to evaluating or formulating potential legislation on some subject within the Committee's authority. As then-Attorney General Holder explained in articulating the Obama Administration's position, congressional information requests "must be in furtherance of Congress's legitimate *legislative* responsibilities" because "[c]ongressional oversight of Executive Branch actions is justifiable only as a means of facilitating the legislative task of enacting, amending, or repealing laws." *Congressional Investigation into Operation Fast and Furious*, 36 Op. O.L.C. __, at *5 (alteration and emphasis in original). And it is critical to the constitutionally mandated accommodation process that the Committee articulate its legislative purpose. Only with that purpose in mind can this office evaluate in good faith the Committee's need for information, formulate potential accommodations to address the Committee's need for information, and evaluate, in light of the Executive's constitutionally based interests in preserving confidentiality, what information is "demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm.*, 498 F.2d at 731.

In addition, even if the Committee were to attempt to articulate a legitimate legislative purpose for some of its inquiries, the authority of congressional committees to explore in detail any particular case of alleged wrongdoing is limited. In restricting the scope of legitimate congressional oversight, the U.S. Court of Appeals for the District of Columbia Circuit has explained that "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events." *Id.* at 732. To the extent the Committee's current press statements and list of inquiries suggest a probe akin to that undertaken by the Executive Branch, I respectfully submit that they reflect a misunderstanding of the Committee's legitimate functions. Under settled law, it is not the Committee's legislative function to conduct a detailed inquiry into a particular event or series of events in order to reconstruct a precise picture of the facts. *Id.* Thus, demands for such detail will rarely be "demonstrably critical to the responsible fulfillment of the Committee's functions." *See id.* at 731.

I also find it particularly disturbing that the Committee is not only improperly setting out to duplicate law enforcement investigations when some Committee members disagree with the conclusions of these investigations without articulating any properly defined legislative purpose, but it is doing so having already announced a predetermined conclusion. *See, e.g.*, Interview with Chairman Jerrold Nadler, ABC's "This Week" (Mar. 3, 2019). In contrast, the Department of Justice reached its conclusions after the Special Counsel exhaustively conducted an investigation for nearly two years. The Attorney General, who previously served as Attorney General and is one of the nation's most respected lawyers, and the then-Deputy Attorney General, a career public servant who has spent nearly thirty years as a federal prosecutor, reviewed the Special Counsel's report and made decisions based on the evidence, Department of Justice guidelines, and their collective experience. *See* Remarks of Attorney General William P. Barr (Apr. 18, 2019); Mar. 24, 2019 Barr Letter 1, 3. The White House will not participate in the Committee's "investigation"

The Honorable Jerrold Nadler
Page 11

that brushes aside the conclusions of the Department of Justice after a two-year-long effort in favor of political theater pre-ordained to reach a preconceived and false result.

## IV. The Committee's Sweeping Document Requests, Unmoored from Any Properly Defined Legislative Purpose, Violate the Separation of Powers.

Overall, the March 4 letter must be understood in light of the cumulative effect of the numerous defects outlined above. Viewed in that light, the sweeping requests spelled out in the letter in their current form run afoul of the constitutional principle that a co-equal branch of government cannot abuse its role under the Constitution by undertaking actions that amount to "an unwarranted impairment of another branch in the performance of its constitutional duties." *Cheney v. United States Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 390 (2004); *see also Loving v. United States*, 517 U.S. 748, 757 (1996) ("Even when a branch does not arrogate power to itself, . . . the separation-of-powers doctrine requires that a branch not impair another branch in the performance of its constitutional duties."); *Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch*, 9 Op. O.L.C. 60, 62 (1985) ("Congress' power of inquiry must not be permitted to negate the President's constitutional responsibility for managing and controlling affairs committed to the Executive Branch.").

The Supreme Court has applied this broad separation of powers principle to document requests that affect the functioning of the Executive. In *Cheney*, plaintiffs in civil litigation served overly broad discovery requests on a presidential task force chaired by the Vice President. 542 U.S. at 372, 387. The Court held that the defendants were not required to undertake the burden associated with responding to such requests before the requests were properly limited based on separation-of-powers concerns. *Id.* at 388. In reaching its conclusion, the Court noted that "special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Id.* at 385. The Court further noted that "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery," and that "the Executive's constitutional responsibilities and status [are] factors counseling judicial deference and restraint in the conduct of litigation against it." *Id.* (alteration in original) (internal quotation marks and citations omitted). Accordingly, the Court remanded the case to the U.S. Court of Appeals for the District of Columbia Circuit to determine whether the discovery orders were improper because they constituted an "unwarranted impairment" of the Executive Branch. *Id.* at 390, 392.

Under the principle applied in *Cheney*, the Committee's sweeping document requests violate the separation of powers. The nearly thirty document requests in the letter (some with multiple subparts) are not only incredibly voluminous, but also breathtaking in scope, covering a sweeping array of events, communications, topics, time periods, and individuals. The Committee's requests do not come close to reflecting restraint in volume and scope, as required under *Cheney*—particularly when those requests are directed at the President. As outlined above, the requests repeatedly and directly target documents at the core of each of the four recognized components of executive privilege. Based on the sheer number and scope of the Committee's requests, it is clear that the Committee is trying to unduly burden the Office of the President so as

The Honorable Jerrold Nadler
Page 12

to impair the President's ability to carry out his constitutional duties. The Constitution does not permit Congress to undermine the President in this manner.

\*   \*   \*

As the Supreme Court has recognized, "[t]he power of the Congress to conduct investigations is inherent in the legislative process," but this "power of inquiry . . . is not unlimited." *Watkins*, 354 U.S. at 187. Indeed, "[n]o inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress." *Id.* We respect Congress and its authority to seek information to aid it in considering legislation, and we stand ready to work to accommodate all congressional committees that have a legitimate legislative interest in seeking information. We do not believe the investigation discussed in the March 4 letter is a legitimate exercise of oversight authority, particularly now that the Special Counsel's Office of the Department of Justice has completed its work. As discussed, it seeks information that directly implicates core separation of powers and Executive Branch confidentiality interests. Our responsibility to the constitutionally based prerogatives of the Executive Branch, our obligation to protect those prerogatives for all future occupants of the Office of the Presidency, and our respect for the rule of law require that we resist the overbroad demands in the Committee's letter.

As I have said numerous times, my office will work with the Committee through the constitutionally mandated accommodation process to provide the Committee with materials it can properly request. If the Committee intends to continue its inquiry, it would greatly advance that process if the Committee were to narrow the scope of the requests in the March 4 letter and articulate the legislative purpose and legal basis supporting each of the remaining requests.

Thank you for your attention to the important issues discussed above. I welcome the opportunity to discuss any of these points.

Sincerely,

Pat A. Cipollone
Counsel to the President

cc: The Honorable Doug Collins, Ranking Member