## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

v.

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

*Defendant*.

Case No. 1:19-cv-2379

# Exhibit Y

1    ALDERSON COURT REPORTING

2    SHAYLAH LYNN BURRILL

3    HJU141000

4    OVERSIGHT OF THE REPORT BY SPECIAL COUNSEL ROBERT S.

5    MUELLER III:  FORMER WHITE HOUSE COUNSEL DONALD F. MCGAHN II

6    Tuesday, May 21, 2019

7    House of Representatives

8    Committee on the Judiciary

9    Washington, D.C.

10         The committee met, pursuant to call, at 10:04 a.m., in

11    Room 2141, Rayburn House Office Building, Hon. Jerrold Nadler

12    [chairman of the committee] presiding.

13         Present:  Representatives Nadler, Lofgren, Jackson Lee,

14    Cohen, Johnson of Georgia, Bass, Richmond, Cicilline, Lieu,

15    Raskin, Jayapal, Demings, Correa, Scanlon, Garcia, Neguse,

16    McBath, Stanton, Dean, Mucarsel-Powell, Escobar, Collins,

17    Chabot, Gohmert, Jordan, Buck, Ratcliffe, Gaetz, Johnson of

18    Louisiana, McClintock, Reschenthaler, Cline, Armstrong, and

19    Steube.

20         Staff Present:  Aaron Hiller, Deputy Chief Counsel; Arya

UNOFFICIAL COPY

21   Harlharan ,Oversight Counsel; David Greengrass, Senior

22   Counsel;  John Doty, Senior Advisor; Lisette Morton, Director

23   of Policy, Planning, and Member Services; Madeline Strasser,

24   Chief Clerk; Moh Sharma, Member Services and Outreach

25   Advisor; Susan Jensen, Parliamentarian/Senior Counsel; Sophie

26   Brill, Counsel; Will Emmons, Professional Staff Member;

27   Brendan Belair, Minority Chief of Staff; Jon Ferro, Minority

28   Parliamentarian; Carlton Davis, Minority Chief Oversight

29   Counsel; Ashley Callen, Minority Senior Adviser and Oversight

30   Counsel; and Erica Barker, Minority Chief Legislative Clerk.

31

32      Chairman Nadler.  The Judiciary Committee will come to

33  order.

34      Without objection, the chair is authorized to declare

35  recesses of the committee at any time.

36      We welcome everyone to today's hearing on Oversight of

37  the Report by Special Counsel Robert Mueller III:  Former

38  White House Counsel Donald McGahn II.  I will now recognize

39  myself for an opening statement.

40      More than a year ago, White House counsel Don McGahn sat

41  for the first of several interviews with special counsel

42  Robert Mueller.  Over the course of those interviews, he

43  described how the President directed him to have the special

44  counsel fired.  He described how the President ordered him to

45  lie about it.  He described several other obstructive

46  incidents outlined in the special counsel's report.

47      The President, in contrast, refused to be interviewed by

48  the special counsel or even to answer written questions about

49  his attempts to obstruct the investigation.  Instead, to

50  address the allegations spelled out by Mr. McGahn and

51  outlined in the report, President Trump relied on his

52  preferred mode of communication.  He took to Twitter to call

53  Mr. McGahn a liar.  His lawyers went on cable television to

54  do the same, to call Mr. McGahn a liar.

55      There are reports of the President and his lieutenants

56  exerting other kinds of pressure on Mr. McGahn.  In short,

57  the President took it upon himself to intimidate a witness

58  who has a legal obligation to be here today.  This conduct is

59  not remotely acceptable.

60     The White House asserts that Mr. McGahn does not have to

61  appear today because he is entitled to "absolute immunity"

62  from our subpoenas.  We know this argument is wrong, of

63  course, because the executive branch has tried this approach

64  before.  In 2007, President George Bush attempted to invoke a

65  similarly broad and unjustified assertion of executive

66  privilege and asked his former counsel Harriet Miers to

67  ignore a subpoena issued by this committee.  Ms. Miers also

68  did not appear at her scheduled hearing.

69     Judge John Bates, who was appointed by President Bush,

70  slapped down that argument fairly quickly.  "The executive

71  cannot identify a single judicial opinion that recognizes

72  absolute immunity for senior presidential advisers in this or

73  any other context.  That simple, yet critical fact bears

74  repeating.  The asserted absolute immunity claim here is

75  entirely unsupported by the case law," from the judicial

76  decision.

77     In other words, when this committee issues a subpoena,

78  even to a senior presidential adviser, the witness must show

79  up.  Our subpoenas are not optional.  Mr. McGahn has a legal

80  obligation to be here for this scheduled appearance.  If he

81  does not immediately correct his mistake, this committee will

82   have no choice but to enforce the subpoena against him.

83       Mr. McGahn did not appear today because the President

84   prevented it, just as the President has said that he would

85   "fight all subpoenas" issued by Congress as part of his

86   broader efforts to cover up his misconduct.  This

87   stonewalling makes it all the more important to highlight

88   some of the incidents that Mr. McGahn is said to have

89   witnessed.  Let me recount some of them.

90       We know that the President directed Mr. McGahn to

91   prevent then Attorney General Sessions from recusing himself

92   from overseeing the investigation into Russian election

93   interference.  On March 3, 2017, shortly after Attorney

94   General Jeff Sessions did recuse himself from the Russia

95   investigation, the President summoned Mr. McGahn to the Oval

96   Office.  According to the Mueller report, "The President

97   opened the conversation by saying, 'I don't have a lawyer.'"

98       The President told Mr. McGahn that he wished that Roy

99   Cohn was his attorney instead.  Roy Cohn, of course, is known

100  principally as the chief architect of the Army-McCarthy

101  hearings that destroyed so many lives back in 1954, an actual

102  political witch hunt, not the imaginary kind that the

103  President decries.

104      Mr. Cohn served as President Trump's lawyer for a long

105  time, defending the President against Federal discrimination

106  suits before he -- that is, Mr. Cohn -- was ultimately

107   disbarred for unethical practices in 1986.

108       Mr. McGahn refused to follow blindly into unethical

109   behavior.  Mr. McGahn told the President that the Department

110   of Justice ethics officials had weighed in and that

111   Mr. Sessions would not unrecuse himself, and he advised the

112   President not to have any contact with Mr. Sessions on the

113   matter.  Days later, the President did exactly the opposite.

114       He summoned Mr. McGahn and Mr. Sessions to Mar-a-Lago,

115   where the President again "expressed his anger."  He said he

116   wanted Mr. Sessions to act as his fixer.  He said he wanted

117   Mr. Sessions to undo his recusal and to limit the scope of

118   the investigation.  But Mr. Sessions, too, refused the

119   President's orders.

120       On June 17, 2017, the President took his displeasure a

121   step further.  He called Mr. McGahn at home and directed him

122   to order Rod Rosenstein to fire Robert Mueller.  "Mueller has

123   to go," the President barked, "Call me back when you do it."

124       Once again, Mr. McGahn refused.  This time, Mr. McGahn

125   felt the President's behavior was so inappropriate that he

126   said he would rather resign than trigger a constitutional

127   crisis.

128       In early 2018, after press reports described the

129   President's attempt to force Mr. McGahn to remove the special

130   counsel on his behalf, the President repeated his pattern.

131   He summoned Mr. McGahn to his office, and he got angry.

132   "This story doesn't look good.  You need to correct this.

133   You are the White House counsel," President Trump told

134   Mr. McGahn.

135       "What about these notes?  Why do you take notes?" the

136   President said to Mr. McGahn, inquiring why Mr. McGahn had

137   documented their conversation.

138       The President then told Mr. McGahn to tell the American

139   people something that was not true.  He asked him to deny

140   those reports publicly.  Mr. McGahn again refused the

141   President's order.  He refused the President's order to lie

142   to the American people on the President's behalf.  Six months

143   later, the President announced that Mr. McGahn would be

144   leaving the White House.

145       The special counsel found Mr. McGahn to be "a credible

146   witness with no motive to lie or exaggerate, given the

147   position he held in the White House."  That is from the

148   Mueller report.

149       The special counsel also found the following,

150   "Substantial evidence indicates that by June 17, 2017, the

151   President knew his conduct was under investigation by a

152   Federal prosecutor who could present any evidence of Federal

153   crimes to a grand jury.  Substantial evidence indicates that

154   the President's attempts to remove the special counsel were

155   linked to the special counsel's oversight of investigations

156   that involved the President's conduct and, most immediately,

157  to reports that the President was being investigated for

158  potential obstruction of justice.

159      "Substantial evidence indicates --" and these are all

160  quotes from the report.  "Substantial evidence indicates that

161  in repeatedly urging McGahn to dispute that he was ordered to

162  have the special counsel terminated, the President acted for

163  the purpose of influencing McGahn's account in order to

164  deflect or prevent further scrutiny of the President's

165  conduct towards the investigation.  Substantial evidence

166  indicates that the President's efforts to have Sessions limit

167  the scope of the special counsel's investigation to future

168  election interference was intended to prevent further

169  investigative scrutiny of the President and his campaign's

170  conduct."  Those are all quotes from the special counsel's

171  report.

172      I believe that each of these incidents, documented in

173  detail in the Mueller report, constitutes a crime.  But for

174  the Department of Justice's policy of refusing to indict any

175  sitting President, I believe the President would have been

176  indicted and charged with these crimes.

177      I am not alone in this belief.  Over 900 former Federal

178  prosecutors from across the political spectrum whose job was

179  to determine when the elements of a crime have been satisfied

180  have stated -- have agreed that the President committed

181  crimes that would have been charged if he were not the

182    sitting President.  And I believe that the President's

183    conduct since the report was released, with respect to

184    Mr. McGahn's testimony and other information we have sought,

185    has carried this pattern of obstruction and cover-up well

186    beyond the four corners of the Mueller report.

187         The President has declared out loud his intention to

188    cover up this misconduct.  He told Mr. McGahn to commit

189    crimes on his behalf.  He told Mr. McGahn lie about it.

190    After the report came out, the President claimed that

191    Mr. McGahn lied to the special counsel about what happened.

192    Then he directed Mr. McGahn not to come here today so that

193    the public would not hear his testimony and so that we could

194    not question him.

195         President Trump may think he can hide behind his lawyers

196    as he launches a series of baseless legal arguments designed

197    to obstruct our work.  He cannot think these legal arguments

198    will prevail in court, but he can think he can slow us down

199    and run out the clock on the American people.

200         Let me be clear.  This committee will hear Mr. McGahn's

201    testimony, even if we have to go to court to secure it.  We

202    will not allow the President to prevent the American people

203    from hearing from this witness.

204         We will not allow the President to block congressional

205    subpoenas, putting himself and his allies above the law.  We

206    will not allow the President to stop this investigation.  And

207    nothing in these unjustified and unjustifiable legal attacks

208    will stop us from pressing forward with our work on behalf of

209    the American people.  We will hold this President

210    accountable, one way or the other.

211        It is now my pleasure to recognize the ranking member of

212    the Judiciary Committee, the gentleman from Georgia,

213    Mr. Collins, for his opening statement.

214        Mr. Collins.  Thank you, Mr. Chairman, and thank you for

215    all that have gathered here again.

216        Here we go again.  The theater is open, and the

217    summations are coming in.  In fact, right now we are again

218    running over the norms of congressional oversight.  We are

219    dabbing at the edges of running roughshod on the

220    Constitution, asking for things that we don't.

221        But I am glad about one thing.  I am glad that the

222    chairman read into the record today the Mueller report.  I am

223    glad that he quoted, as he said, this is a quote directly

224    from the Mueller report.  I just wish my chairman would

225    actually go read the rest of it that he has been offered to

226    read, which he has chosen not to read.

227        But he did leave out one thing.  He left out something

228    in the Mueller report from just now.  He read McGahn's

229    testimony beautifully, did everything right.  But he left out

230    what he doesn't want to have to come back to and the

231    frustrating thing that has brought us here again and again

232  and again, and that is the conclusions.  There was no

233  collusion.  There was no obstruction charge.  There is

234  nothing here.

235      After 2 years of doing this, we can read it in, you can

236  talk about how you don't like it, you can talk about what you

237  would like to have.  But at the end of the day, it is

238  interesting we will read in the quotes that make the

239  headlines, but we are also not going to read in the bottom

240  line of what was actually concluded.

241      So the Democrats are here trying again.  The Mueller

242  report concluded there was no collusion, no obstruction.

243  Because the report failed to provide damning information

244  against the President, the majority claims we need to dig

245  deeper, deeper than the 2 years of investigation conducted by

246  what is considered a prosecutorial dream team because that

247  probe ended without criminal charges against the President or

248  his family.

249      The special counsel closed up shop without giving

250  Democrats anything to deliver to their base.  Now the

251  Democrats are trying desperately to make something out of

252  nothing, which is why the chairman has again haphazardly

253  subpoenaed today's witness.  That move, though, has actually

254  ensured the witness will not testify.

255      You know, this is becoming a pattern.  The chairman knew

256  this, I believe, when he sent the subpoena last month.  But

257  instead of inviting the witness to testify voluntarily and

258  working with McGahn's counsel to find mutual agreeable time

259  and scope for the testimony, the chairman rushed to maximize

260  headlines by issuing a subpoena.  That subpoena was the third

261  in just 4 months, more subpoenas than the prior chairman

262  issued in 6 years.

263      The chairman had several ways out here.  He took none of

264  them.  The chairman could have invited the witness to testify

265  voluntarily.  That was the practice in the 1990s when the

266  White House counsel testified before Congress.  But the

267  chairman did not do that.  Instead, he launched a subpoena at

268  the witness without any consultation or follow-up with the

269  witness' lawyer.

270      The chairman could have invited the witness to testify

271  behind closed doors, but that would have been politically

272  expedient, and you would not have been here, and the show

273  would not have been as exciting.  A closed-door conversation

274  would not have generated those headlines and everything that

275  we are looking at today.  Even gaveling in today's hearing

276  without a witness is theatrical.

277      The cameras love a spectacle, and the majority loves the

278  chance to rant against the administration.  I just am glad

279  today to see that we don't have chicken on the dais.

280      The chairman orchestrated today's confrontation when he

281  could have avoided it because he is more interested in the

282    fight than the fact finding.  Take the Mueller report, which

283    we have already heard quoted from.  More than 99 percent the

284    Justice Department has offered to the chairman.  For an

285    entire month, the chairman refused to take a look at it.

286        The Attorney General who volunteered to testify before

287    the committee, the chairman changed the rules for the first

288    time in the committee's 200-year history, thus blocking

289    General Barr from testifying.

290        I cannot emphasize this enough.  The track record

291    demonstrates he does not actually want information.  He wants

292    the fight, but not the truth.  The closer he actually comes

293    to obtaining information, the further we run from it.

294        The Democrats claim to need today's witness to

295    investigate obstruction of justice, but that investigation

296    was already done.  Robert Mueller spent 2 years running it

297    and then closed it.  We are not a prosecutorial body, but a

298    legislative body that does have valid congressional

299    oversight.  But let us talk about that Mueller report for

300    just a second.  It is really interesting to me that the

301    Mueller report was actually -- within 24 hours of coming out,

302    the chairman and the majority subpoenaed for all of the

303    documents.

304        In fact, we have a legal subpoena that asked the

305    Attorney General to provide documents he cannot legally

306    provide.  That has been covered in this committee for the

307  last 2 weeks exhaustively, and even the panel that was with

308  us last week agreed that the subpoena asked the Attorney

309  General to do something illegal by exposing 6(e) information.

310  That was his own witnesses said that last week.

311      But you know what is interesting to me is that we have

312  subpoenaed the documents.  We have subpoenaed that we want

313  underlying documents.  We have subpoenaed stuff that we can't

314  get.  But you know the one thing we seem to avoid is

315  Mr. Mueller himself, the one who wrote it.

316      We have asked since April about Mr. Mueller coming.  But

317  every time we seem to get close to Mueller, Mueller just gets

318  pushed on a little bit.  Hadn't seen a subpoena here, and

319  this is what is really amazing.  We will get back to

320  subpoenas in a moment.

321      But just think about that.  You wanted the work of the

322  author, but you don't want to talk to the author.  Keep that

323  pinned for just a moment.  When we look at this, 99 percent

324  of the information is at the Democrats' fingertips, and it is

325  the Mueller report the Attorney General offered to Speaker

326  Pelosi, Chairman Nadler, and others to have seen it, but they

327  refuse.

328      So don't be fooled.  The majority wants the fight.  They

329  want the drama.  He does not actually want the information he

330  claims to be seeking.  After the administration made volumes

331  of information available to this committee, the chairman

332  issued overbroad subpoenas and now harangues the

333  administration for being unable to comply with those

334  subpoenas.

335      In fact, it is the Democrats who are not engaging in the

336  accommodation process, abruptly cutting off negotiations,

337  rejecting olive branches by the administration.  This is what

338  -- I want to come back to something my chairman just said a

339  moment ago.  His quote was in his opening statements that our

340  subpoenas are not optional.

341      Well, we found out a lot about subpoenas over the last

342  month or so in this committee.  I found out that subpoenas

343  maybe now are not optional.  Let us add to the list.

344  Subpoenas are also a discussion starter.  A subpoena is to

345  give us better standing in court.  Not my quotes, the

346  chairman's quotes.

347      So what is it?  Is a subpoena the legal document that we

348  have talked about all along in here and the forceful document

349  that all attorneys in this country actually use, or is it a

350  discussion starter?  Is it to help our standing in court, or

351  is it we don't want it ignored?

352      At this time, it is amazing to me that the accommodation

353  process -- and we talk about the committee, and the chairman

354  forcefully talked about our oversight.  I agree with the

355  chairman on this point.  This committee and all committees in

356  Congress have oversight responsibility, but it is also the

357    sacred responsibility of the chairman and the majority to use

358    it properly and to not headlong rush into subpoenas when you

359    don't get what you want.

360        That is all we have seen in 5 months here.  When we

361    don't get what we want, we subpoena.  The first one was the

362    Acting Attorney General.  We subpoenaed, and then we backed

363    off.  We caved.  Then everything else has become a race to

364    get a headline.  The accommodation process, not happening.

365    The accommodation process, never here.

366        So don't be fooled.  You may have come wanting -- you

367    may have an opinion that says everything is wrong today with

368    the Mueller report and the President is guilty, but don't

369    undercut congressional oversight because you can't wait.

370    That is the problem we have right now.

371        And so the question is, are we tearing at the fabric of

372    congressional oversight?  It was really interesting to hear

373    some of that last week.  When you have a committee that has

374    issued subpoenas that ask the Attorney General to do

375    something illegal, when you have the subpoenas when no

376    accommodation process has been put in place, when you have

377    contempt issues that have been in part with no process and no

378    time going through, I just submit to you this.

379        Whatever your opinion on the Mueller report, great.

380    Glad you have it.  But you didn't get it here today, and you

381    are not getting it from this committee because this committee

382  undoubtedly doesn't like the author or want to talk to the

383  author of the report.  They just want to talk about the

384  report and make innuendo and attack the President at the

385  middle of the day when this committee, who has charge of

386  immigration, who has charge of intellectual property, who we

387  have touched none of with a crisis at the border.

388      We have an admission that the economy is good, jobs are

389  happening, unemployment is at its lowest rate.  I guess at

390  the end of the day, we can't find something that the Mueller

391  report lets them hang their I-word, "impeachment," on, which

392  they can't even agree on, because the President is continuing

393  to do his job.  And we are here again with the circus in full

394  force.

395      With that, I yield back.

396      Mr. Cohen.  Mr. Chairman?  Mr. Chairman?

397      Mr. Chabot.  Mr. Chairman?

398      Chairman Nadler.  Thank you, Mr. Collins.  Who seeks

399  recognition?

400      Mr. Cohen.  Move to strike the last word.

401      Chairman Nadler.  The gentleman from Tennessee?

402      Mr. Cohen.  Move to adjourn.

403      Chairman Nadler.  Motion is made to adjourn.

404      Mr. Chabot.  Mr. Chairman?  Mr. Chairman?

405      Chairman Nadler.  Motion to adjourn is not debatable.

406      All in favor?

407     Opposed?

408     Mr. Chabot.  Recorded vote.

409     Chairman Nadler.  Do I hear a request for a recorded

410 vote?

411     Mr. Chabot.  Request for recorded vote.

412     Chairman Nadler.  The clerk will call the roll on the

413 motion to adjourn.

414     Ms. Strasser.  Mr. Nadler?

415     Chairman Nadler.  Aye.

416     Ms. Strasser.  Mr. Nadler votes aye.

417     Ms. Lofgren?

418     Ms. Lofgren.  Aye.

419     Ms. Strasser.  Ms. Lofgren votes aye.

420     Ms. Jackson Lee?

421     Ms. Jackson Lee.  Aye.

422     Ms. Strasser.  Ms. Jackson Lee votes aye.

423     Mr. Cohen?

424     Mr. Cohen.  Aye.

425     Ms. Strasser.  Mr. Cohen votes aye.

426     Mr. Johnson of Georgia?

427     Mr. Johnson of Georgia.  Aye.

428     Ms. Strasser.  Mr. Johnson of Georgia votes aye.

429     Mr. Deutch?

430     Ms. Bass?

431     Ms. Bass.  Aye.

432        Ms. Strasser.  Ms. Bass votes aye.

433        Mr. Richmond?

434        Mr. Richmond.  Aye.

435        Ms. Strasser.  Mr. Richmond votes aye.

436        Mr. Jeffries?

437        Mr. Cicilline?

438        Mr. Cicilline.  Aye.

439        Ms. Strasser.  Mr. Cicilline votes aye.

440        Mr. Swalwell?

441        Mr. Lieu?

442        Mr. Lieu.  Aye.

443        Ms. Strasser.  Mr. Lieu votes aye.

444        Mr. Raskin?

445        Mr. Raskin.  Aye.

446        Ms. Strasser.  Mr. Raskin votes aye.

447        Ms. Jayapal?

448        Ms. Jayapal.  Aye.

449        Ms. Strasser.  Ms. Jayapal votes aye.

450        Mrs. Demings?

451        Mrs. Demings.  Aye.

452        Ms. Strasser.  Mrs. Demings votes aye.

453        Mr. Correa?

454        Mr. Correa.  Aye.

455        Ms. Strasser.  Mr. Correa votes aye.

456        Ms. Scanlon?

457        Ms. Scanlon.  Aye.

458        Ms. Strasser.  Ms. Scanlon votes aye.

459        Ms. Garcia?

460        Ms. Garcia.  Aye.

461        Ms. Strasser.  Ms. Garcia votes aye.

462        Mr. Neguse?

463        Mr. Neguse.  Aye.

464        Ms. Strasser.  Mr. Neguse votes aye.

465        Mrs. McBath?

466        Mrs. McBath.  Aye.

467        Ms. Strasser.  Mrs. McBath votes aye.

468        Mr. Stanton?

469        Mr. Stanton.  Aye.

470        Ms. Strasser.  Mr. Stanton votes aye.

471        Ms. Dean?

472        Ms. Dean.  Aye.

473        Ms. Strasser.  Ms. Dean votes aye.

474        Ms. Mucarsel-Powell?

475        Ms. Mucarsel-Powell.  Aye.

476        Ms. Strasser.  Ms. Mucarsel-Powell votes aye.

477        Ms. Escobar?

478        Ms. Escobar.  Aye.

479        Ms. Strasser.  Ms. Escobar votes aye.

480        Mr. Collins?

481        Mr. Collins.  No.

482      Ms. Strasser.  Mr. Collins votes no.

483      Mr. Sensenbrenner?

484      Mr. Chabot?

485      Mr. Chabot.  No.  And this is disgraceful.

486      Ms. Strasser.  Mr. Chabot votes no.

487      Mr. Gohmert?

488      Mr. Gohmert.  No.

489      Ms. Strasser.  Mr. Gohmert votes no.

490      Mr. Jordan?

491      Mr. Jordan.  No.

492      Ms. Strasser.  Mr. Jordan votes no.

493      Mr. Buck?

494      Mr. Buck.  No.

495      Ms. Strasser.  Mr. Buck votes no.

496      Mr. Ratcliffe?

497      Mr. Ratcliffe.  No.

498      Ms. Strasser.  Mr. Ratcliffe votes no.

499      Mrs. Roby?

500      Mr. Gaetz?

501      Mr. Gaetz.  No.

502      Ms. Strasser.  Mr. Gaetz votes no.

503      Mr. Johnson of Louisiana?

504      Mr. Johnson of Louisiana.  No.

505      Ms. Strasser.  Mr. Johnson of Louisiana votes no.

506      Mr. Biggs?

507        Mr. McClintock?

508        Mr. McClintock.  No.

509        Ms. Strasser.  Mr. McClintock votes no.

510        Mrs. Lesko?

511        Mr. Reschenthaler?

512        Mr. Reschenthaler.  No.

513        Ms. Strasser.  Mr. Reschenthaler votes no.

514        Mr. Cline?

515        Mr. Cline.  No.

516        Ms. Strasser.  Mr. Cline votes no.

517        Mr. Armstrong?

518        Mr. Armstrong.  No.

519        Ms. Strasser.  Mr. Armstrong votes no.

520        Mr. Steube?

521        Mr. Steube.  No.

522        Ms. Strasser.  Mr. Steube votes no.

523        Chairman Nadler.  Is there anyone who wishes to vote who

524    hasn't voted?

525        [No response.]

526        Chairman Nadler.  The clerk will report.

527        Ms. Strasser.  Mr. Chairman, there are 21 ayes and 13

528    noes.

529        Chairman Nadler.  There are 21 ayes and 13 noes.  The

530    motion to adjourn is adopted, and the hearing is adjourned.

531        [Whereupon, at 10:27 a.m., the committee was adjourned.]