**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

                                        *Plaintiff*,

        v.

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

                                        *Defendant*.

Case No. 1:19-cv-2379

# Exhibit EE

UNOFFICIAL COPY

1

COMMITTEE ON THE JUDICIARY,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:  HOPE HICKS

Wednesday, June 19, 2019

Washington, D.C.

The interview in the above matter was held in Room 2237,

Rayburn House Office Building, commencing at 9:02 a.m.

Members Present:  Representatives Nadler, Lofgren, Jackson

Lee, Cohen, Johnson of Georgia, Deutch, Bass, Cicilline, Swalwell,
Lieu, Raskin, Jayapal, Demings, Correa, Scanlon, Garcia, Neguse,
McBath, Stanton, Dean, Mucarsel-Powell, Escobar, Collins, Chabot,
Gohmert, Jordan, Ratcliffe, Gaetz, Biggs, McClintock, Lesko,
Armstrong, and Steube.

Chairman <u>Nadler.</u>  Good morning.  Let's go on the record.

This is a transcribed interview of Ms. Hope Hicks, former communications director for the White House.  I requested this interview as part of our investigation into allegations of corruption and abuse of power and other misconduct by the Trump administration.

Would the witness please state her name and position in the White House for the record?

Ms. <u>Hicks.</u>  My name is Hope Hicks, and I was the communications director at the White House.

Chairman <u>Nadler.</u>  I wish to thank you for appearing here today.  I appreciate your willingness to appear voluntarily.

Most committees encourage witnesses who appear for a transcribed interview to freely consult with counsel if they so choose, and you are appearing today with private counsel.

Could counsel please state your name and current position for the record?

Mr. <u>Trout.</u>  Yes.  My name is Robert Trout.  I'm with the firm of Trout Cacheris & Solomon in Washington, D.C., and I'm representing Ms. Hicks.

Ms. <u>Solomon.</u>  Gloria Solomon, also with Trout Cacheris & Solomon, also representing Ms. Hicks.

Chairman <u>Nadler.</u>  Thank you.  I note that you are also appearing today with representatives from the White House Counsel's Office.

Could those counsels please state their names and current positions for the record?

Mr. Purpura.  Mr. Chairman, Michael Purpura, deputy counsel to the President.

Mr. Philbin.  And Patrick Philbin, deputy counsel to the President.

Chairman Nadler.  Thank you.

You are also appearing today with representatives from the Department of Justice's Office of Legal Counsel.  I note that the committee does not typically permit agency counsel to be present in a transcribed interview involving nonagency employees. However, in the interest of accommodating both the witness and the White House an exception is being made in this one case, and the Department's presence is permitted.

Could those counsels please state their names and current positions for the record?

Mr. Gannon.  Thank you, Mr. Chairman.  Curtis Gannon, principal deputy assistant attorney general.

Chairman Nadler.  That's the only one?  Okay.

Thank you.

I am Jerrold Nadler, chairman of the House Judiciary Committee.  I am joined today by several members of the committee as well as by counsel for the committee.  I will now ask everyone else from the committee who is present to introduce themselves, starting with the members.

Ms. <u>Scanlon.</u>  Mary Gay Scanlon, vice chair of the Judiciary Committee.

Ms. <u>Dean.</u>  Madeleine Dean, a member from Pennsylvania's Fourth Congressional District.

Mr. <u>Neguse.</u>  Joe Neguse, Colorado's Second Congressional District.

Ms. <u>Garcia.</u>  Sylvia Garcia, Texas 29, the Houston area.

Ms. <u>Escobar.</u>  Veronica Escobar, El Paso.

Mr. <u>Gohmert.</u>  Louie Gohmert, Texas.

Mr. <u>Deutch.</u>  I'm Ted Deutch from Florida.

Mrs. <u>McBath.</u>  Lucy McBath, Georgia's Sixth.

Mr. <u>Lieu.</u>  Ted Lieu, southern California.

Ms. <u>Jayapal.</u>  Pramila Jayapal, Washington's Seventh.

Mrs. <u>Demings.</u>  Val Demings, Florida.

Ms. <u>Mucarsel-Powell.</u>  Debbie Mucarsel-Powell, Florida.

Mr. <u>Gaetz.</u>  Matt Gaetz, Florida.

Mr. <u>Armstrong.</u>  Kelly Armstrong, North Dakota.

Mr. <u>Collins.</u>  Doug Collins, Georgia.

Chairman <u>Nadler.</u>  Our ranking member.

And other people in the room from the committee not members should identify themselves now.

Mr. <u>Eisen.</u>  Norman Eisen for the majority committee.

Ms. <u>Hariharan.</u>  Arya Hariharan, majority staff.

Mr. <u>Berke.</u>  Barry Berke, the majority staff.

Ms. <u>McElvein.</u>  Elizabeth McElvein, majority staff.

Mr. <u>Gayle.</u>  Charlie Gayle, majority staff.

Ms. <u>Istel.</u>  Sarah Istel, majority staff.

Chairman <u>Nadler.</u>  Anybody else?

Mr. <u>Hiller.</u>  Aaron Hiller, majority staff.

Mr. <u>Morgan.</u>  Matt Morgan, majority staff.

Chairman <u>Nadler.</u>  Anybody from the minority staff?

Mr. <u>Parmiter.</u>  Robert Parmiter, minority staff.

Mr. <u>Stewart.</u>  Brice Stewart, minority staff.

Mr. <u>Johnson.</u>  Danny Johnson, minority staff.

Mr. <u>Greenberg.</u>  Jacob Greenberg, minority staff.

Mr. <u>Davis.</u>  Carlton Davis with Mr. Collins.

Ms. <u>Barker.</u>  Erica Barker, minority staff.

Mr. <u>Ferro.</u>  Jon Ferro, minority staff.

Chairman <u>Nadler.</u>  Okay.  And we've been joined by Mr. Cohen
of Tennessee and also Mr. Biggs of Arizona.  And Ms. Hicks and her
counsel have already identified themselves.

The Federal Rules of Civil Procedure do not apply in this
setting, but there are some guidelines that we follow that I will
now go over.

Our questioning will proceed in rounds.  The majority will
ask questions first for an hour, and then the minority will have
an opportunity to ask questions for an equal period of time if
they choose.  We will go back and forth in this manner until there
are no more questions and the interview is over.

Typically we take a short break at the end of each hour of

questioning, but if you would like to take a break apart from that, please let us know.  We will also take a break for lunch at the appropriate point, some appropriate point.

As you can see, there is an official reporter taking down everything we say to make a written record, so we ask that you give verbal responses to all questions.  Do you understand that?

Ms. Hicks.  Yes, sir.

Chairman Nadler.  Thank you.

So that the reporter can take down a clear record, we will do our best to limit the number of members and staff directing questions at you during any given hour.  It is important that we do not talk over one another or interrupt each other and that goes for everybody present at today's interview.

We want you to answer our questions in the most complete and truthful manner possible, so we will take out time.  If you have any questions or if you do not understand one of our questions, please let us know.  And if you honestly do not know the answer to a question or do not remember it, it's best not to guess.  Just give us your best recollection.

It is okay to tell us if you learned information from someone else.  Just indicate how you came to know that information.  If there are things you do not know or cannot remember, just say so, and please inform us who, to the best of your knowledge, might be able to provide a more complete answer to the question.

Ms. Hicks, you should also understand that although this

interview is not under oath you are required by law to answer questions from Congress truthfully.  I assume you understand that?

    Ms. <u>Hicks.</u>  Yes, sir.

    Chairman <u>Nadler.</u>  This applies also to questions posed by congressional staff as well, and I assume you understand that as well?

    Ms. <u>Hicks.</u>  Yes, sir.

    Chairman <u>Nadler.</u>  Witnesses who knowingly provide false testimony could be subject to criminal prosecution for perjury or for making false statements.  Do you understand that?

    Ms. <u>Hicks.</u>  Yes, sir.

    Chairman <u>Nadler.</u>  Is there any reason you are unable to provide truthful answers to today's questions?

    Ms. <u>Hicks.</u>  No, sir.

    Chairman <u>Nadler.</u>  As part of the accommodations process surrounding the May 21st, 2019, subpoena served on Ms. Hicks by the Judiciary Committee, she has agreed to voluntarily appear for a transcribed interview, and the committee has agreed that her appearance satisfies her testimonial obligation under the May 21st, 2019, subpoena.

    Ms. Hicks, through her counsel and the committee, have agreed that any disputes regarding privilege assertions or other objections will be treated as if they occurred during testimony compelled by the May 21st, 2019, subpoena.

Finally, I would like to read from our protocols for
transcribed interviews recently agreed to by Ranking Member
Collins, quote:  To encourage candid testimony by the witnesses,
transcribed interviews will be conducted in a confidential,
closed-door setting.  Members and committee staff should endeavor
to maintain confidentiality regarding the substance of the
testimony.

At the appropriate time, in consultation with the ranking
member, the committee will release the transcript of this
interview.  We anticipate that in the next 48 hours, as soon as we
can do that.

Between now and then, I will ask everybody present to conduct
themselves with the appropriate discretion before we release the
transcript in the next couple days.

Do you have any questions before we begin?

Ms. Hicks.  No, sir.

Chairman Nadler.  Very well.  The time is now 9:09, and our
first hour of questioning will begin.

Ms. Hicks, who is Corey Lewandowski?

Ms. Hicks.  He was Mr. Trump's campaign manager from
January 2015 to June 2016.

Chairman Nadler.  And when and where did you meet him?

Ms. Hicks.  I believe I met him traveling from New York to
Iowa -- sorry, is that better? -- I believe I met him traveling
from New York to Iowa, January 24, 2015.

Chairman Nadler.  And how often did you interact with Mr. Lewandowski during the campaign?

Ms. Hicks.  Every day.

Chairman Nadler.  And what about during the transition?

Ms. Hicks.  We probably spoke frequently.

Chairman Nadler.  Does that mean daily?  Weekly?

Ms. Hicks.  Probably daily.

Chairman Nadler.  Okay.  Can you describe the relationship between Lewandowski and the President during the campaign?

Ms. Hicks.  As I said, Corey was his campaign manager.  Is there any other specifics you're looking for?

Chairman Nadler.  Well, were they friendly?  Were they antagonistic?

Ms. Hicks.  They had a close relationship.

Chairman Nadler.  Okay.  And the same question, what about during the transition?

Ms. Hicks.  I believe they maintained a close relationship.

Chairman Nadler.  Did there come a time when that relationship changed?

Ms. Hicks.  Not that I'm aware of.

Chairman Nadler.  Okay.  After Trump was elected, was Mr. Lewandowski hired to work on the transition in any capacity?

Ms. Hicks.  Not that I'm aware of.

Chairman Nadler.  And what about after the President took office?  Was Mr. Lewandowski hired as an executive branch

official?

     Mr. Purpura.  Objection.  Mr. Chairman, I --

     Chairman Nadler.  It's a matter of public record.  Why would
you object?

     Mr. Purpura.  Mr. Chairman, as we explained in
Mr. Cipollone's letter yesterday, as a matter of longstanding
executive branch precedent in the Department of Justice practice
and advice, as a former senior adviser to the President, Ms. Hicks
may not be compelled to speak about events that occurred during
her service as a senior adviser to the President.  That question
touched upon that area.

     Chairman Nadler.  With all due respect, that is absolute
nonsense as a matter of law.

     Are you asserting any other basis for declining to answer the
question --

     Mr. Purpura.  No, Mr. Chairman.

     Chairman Nadler.  -- besides absolute immunity, which the
gentleman just said?

     Ms. Hicks.  No, sir.

     Chairman Nadler.  No, sir.

     Are you asserting any privileges in declining to answer the
question?

     Mr. Purpura.  We are not, Mr. Chairman.

     Chairman Nadler.  Ms. Lewandowski?

     Ms. Hicks.  As a former senior adviser to the President, I'm

following the instructions from the White House.

Chairman <u>Nadler.</u>  No, no, I asked are you asserting any specific privilege, like executive privilege or anything else, or are you just simply asserting the absolute immunity that Mr. Purpura just announced?

Mr. <u>Trout.</u>  Mr. Chairman, if I could say.  She is not in a position to -- she's not a government employee, and she's not in a position to exercise any privilege, so she is --

Chairman <u>Nadler.</u>  So she is not asserting?

Mr. <u>Trout.</u>  She is not asserting privilege.  It's not her privilege to assert.  And so she is simply following the guidance of the White House.

Chairman <u>Nadler.</u>  So she is not asserting any privileges. She's not asserting executive privilege.

Okay.  So let me make it clear.  You are declining to answer the question?

Ms. <u>Hicks.</u>  Yes, sir.

Chairman <u>Nadler.</u>  This committee, as I said a moment ago, disagrees on the question on the applicability of absolute immunity.  The witness must answer questions or assert privileges on a question-by-question basis.  This assertion of absolute immunity is improper.

How often did you communicate with or meet with Mr. Lewandowski after he left the Trump campaign?

Ms. <u>Hicks.</u>  Communicated regularly, met with very

infrequently.

Chairman <u>Nadler.</u>  When you say regularly, once a week?  Once a month?  I mean --

Ms. <u>Hicks.</u>  No.  Probably daily.

Chairman <u>Nadler.</u>  Probably daily.  Were these communications or meetings related to official matters of the Trump administration?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Overruled.

Mr. <u>Purpura.</u>  Again, same direction as explained in Mr. Cipollone's letter.  And with the chairman's permission, I would like to have Mr. Cipollone's letter marked as an exhibit and entered into the record.

Chairman <u>Nadler.</u>  Do we have a copy of it?

Mr. <u>Purpura.</u>  We have copies, Mr. Chairman.

Chairman <u>Nadler.</u>  Then Mr. Cipollone's letter will be entered into the record, I suppose.

[Hicks Exhibit No. 1

Was marked for identification.]

Mr. <u>Purpura.</u>  Thank you, Mr. Chairman.

Chairman <u>Nadler.</u>  But the question doesn't seem to ask about the administration.  I'm asking about her communications.  Were they related to official matters of the administration?  That would not seem to fall under your --

Mr. <u>Philbin.</u>  Mr. Chairman, with all due respect, whether

they were related to her official duties, that's within the
immunity.

Chairman <u>Nadler.</u>  All right.  Well, these communications were
made -- after Mr. Lewandowski left the campaign, you said you had
regular communications with him.  Does that include during the
transition period?

Ms. <u>Hicks.</u>  Yes.

Chairman <u>Nadler.</u>  The Mueller report describes Corey
Lewandowski as, quote, a devotee, unquote, of the President,
finding that he was, quote, close, unquote, to the President.  Is
that an accurate description of Trump's -- of the President's
relationship with Lewandowski during the campaign?

Ms. <u>Hicks.</u>  Yes.

Chairman <u>Nadler.</u>  And is that an accurate description of
their relationship right after the election?

Ms. <u>Hicks.</u>  Yes.

Chairman <u>Nadler.</u>  And are you aware of any instance in which
the President described Mr. Lewandowski as a surrogate for his
administration?

Ms. <u>Hicks.</u>  I'm not aware of him describing him that way.

Chairman <u>Nadler.</u>  Okay.  Did you -- I'm sorry.  Did anyone
else call Mr. Lewandowski, that you're aware of, did anyone else
that you're aware of call Mr. Lewandowski that or something
similar?

Ms. <u>Hicks.</u>  I guess I would have to understand what capacity

he would be -- that the term "surrogate" is being used in.  As in media appearances or elsewhere?

Chairman Nadler.  No.  Well, media appearances would be one aspect, but I would --

Ms. Hicks.  So, yes, he was, I would say, a devoted surrogate in terms of his media appearances.  Other than that, no, I've never heard anybody use that term to describe him.

Chairman Nadler.  Okay.  He's a surrogate in media, yes, and anything else, no?

Ms. Hicks.  Correct.

Chairman Nadler.  And to the best of your knowledge, did Mr. Lewandowski consider himself a surrogate of the President?

Ms. Hicks.  I don't know.  That's something you would have to ask him.

Chairman Nadler.  And since leaving your official position in the White House, have you communicated or met with Mr. Lewandowski?

Ms. Hicks.  Never.

Chairman Nadler.  Okay.  I'd like to focus now on a specific incident in June 2017.  You were still employed in the White House at that time.  Is that correct?

Ms. Hicks.  Yes, sir.

Chairman Nadler.  During that time, where in the West Wing did you sit in relation to the Oval Office?

Mr. Purpura.  I'm going to object here, Mr. Chairman.  Again,

this talks about --

    Chairman <u>Nadler.</u>  And I'll ask what privilege is being asserted to object to that question other than the nonexistent Presidential -- general immunity or whatever you call it?

    Mr. <u>Purpura.</u>  Mr. Chairman, I understand you disagree with the position and the advice provided by the Department of Justice that's gone back quite a while and has been used by administrations in both parties.

    Chairman <u>Nadler.</u>  I'm not going to debate it.  It's nonsense, but we'll --

    Mr. <u>Purpura.</u>  I understand, Mr. Chairman.

    Chairman <u>Nadler.</u>  I think we'll win in court on that one, but there's no point in wasting time on that now.

    Mr. <u>Purpura.</u>  I understand.

    Chairman <u>Nadler.</u>  I'm asking, are you asserting any other privilege?

    Ms. <u>Hicks.</u>  No.

    Chairman <u>Nadler.</u>  Okay.  Now, are you asserting any other basis than so-called absolute immunity for declining to answer the question?

    Ms. <u>Hicks.</u>  No.

    Chairman <u>Nadler.</u>  Thank you.  And remember, you can't shake. You have to speak.

    Ms. <u>Hicks.</u>  Yes, sir.

    Chairman <u>Nadler.</u>  Are you asserting any privileges in

declining to answer the question?

     Ms. <u>Hicks.</u>  No.

     Chairman <u>Nadler.</u>  Are you asserting executive privilege in declining to answer the question?

     Ms. <u>Hicks.</u>  No.

     Chairman <u>Nadler.</u>  Will you provide any details about this matter so that the committee can assess the applicability of privileges?

     Mr. <u>Trout.</u>  Mr. Chairman, she'll answer whatever questions that the -- that are not objected to by the White House and the executive branch.

     Chairman <u>Nadler.</u>  Okay.  I think that answers the next -- I should ask you the same questions, I am told.  As her attorney, are you asserting any other basis for declining to answer the question?

     Mr. <u>Trout.</u>  So, Mr. Chairman, I do not represent the White House or the executive branch, and it's not my role to assert on behalf of the White House or the executive branch executive or any other privilege.

     Chairman <u>Nadler.</u>  Is your client asserting any other basis for declining to answer the question?

     Mr. <u>Trout.</u>  No.

     Chairman <u>Nadler.</u>  Is your client asserting any privileges in declining to answer the question?

     Mr. <u>Trout.</u>  No.

Chairman <u>Nadler.</u>  Is your client asserting executive

privilege in declining to answer the question?

Mr. <u>Trout.</u>  No.

Chairman <u>Nadler.</u>  Now, Mr. Purpura, on behalf of the

White House, are you asserting any other basis for declining to

answer the question other than absolute immunity?

Mr. <u>Purpura.</u>  No.  As explained in Mr. Cipollone's letter,

that's the only basis.

Chairman <u>Nadler.</u>  Are you asserting -- we have

Mr. Cipollone's letter.  Are you asserting any privileges in

declining to answer the question?

Mr. <u>Purpura.</u>  Not at this time.

Chairman <u>Nadler.</u>  Are you asserting executive privilege in

declining to answer the question?

Mr. <u>Purpura.</u>  Not at this time.

Chairman <u>Nadler.</u>  Okay.  Will you --

Mr. <u>Trout.</u>  Mr. Chairman, on behalf of Ms. Hicks, yesterday

afternoon I did send a letter to you and to the minority, and I

would like that letter to be part of the record.

Chairman <u>Nadler.</u>  Do we have that letter?

Ms. <u>Istel.</u>  Yes.

Chairman <u>Nadler.</u>  It will be inserted into the record.

                    [Hicks Exhibit No. 2

                    Was marked for identification.]

Mr. <u>Trout.</u>  Thank you.

Chairman <u>Nadler.</u>  Now, I will insert our letter dated June 18th, which is yesterday, in reply to Mr. Cipollone's letter rejecting absolute immunity.  And I'll have this entered into the record, too.

[Hicks Exhibit No. 3

Was marked for identification.]

Chairman <u>Nadler.</u>  So did Mr. Lewandowski visit President Trump at the White House after January 2017?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Objection.

Do you recall Corey Lewandowski meeting with President Trump on or around June 19th, 2017?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  I'd like now to introduce as our next exhibit, whatever the number is, page 90 of volume 2 of the report.  Do we have that?

[Hicks Exhibit No. 4

Was marked for identification.]

Ms. <u>Istel.</u>  Yes.

Chairman <u>Nadler.</u>  Could you -- can you please, Ms. Hicks, read aloud -- read out loud the highlighted portion from that page?  Page 91.

Mr. <u>Philbin.</u>  Mr. Chairman, if copies are being distributed, may we have a copy?  Thank you.

Ms. <u>Hicks.</u>  During the June 19th meeting, Lewandowski

recalled that after some small talk the President brought up

Sessions and criticized his recusal from the Russia investigation.

The President told Lewandowski that Sessions was weak and that if

the President had known about the likelihood of recusal in

advance, he would not have appointed Sessions.

The President then asked Lewandowski to deliver a message to

Sessions and said, write this down.  That was the first time the

President had asked Lewandowski to take dictation, and Lewandowski

wrote as fast as possible to make sure he captured the content

correctly.

Mr. Philbin.  I'm sorry.  We've been given the wrong page.

Chairman Nadler.  Ms. Lewandowski -- sorry -- Ms. Hicks, read

the next two sentences also if you have it.

Ms. Hicks.  Sure.  The President directed that Sessions

should give a speech publicly announcing -- the dictated message

went on to state.

Mr. Trout.  So this is -- to be clear, this is page 91, and

I'm not sure which volume we're talking about.

Chairman Nadler.  Volume two.

Ms. Istel.  Volume two.

Chairman Nadler.  I think everything -- okay.

Are you familiar with the events described in that excerpt

from the special counsel's report that you just read?

Mr. Purpura.  Objection.

Chairman Nadler.  And you are objecting on what basis, sir?

Mr. Purpura.  The same basis that would call for her knowledge of events that occurred during her time as senior adviser to the White House.

Chairman Nadler.  In other words, you are asserting absolute immunity that she cannot testify as to any knowledge of anything that occurred after the President was inaugurated?

Mr. Purpura.  During her time as adviser to the President she cannot be --

Chairman Nadler.  She cannot refer to anything -- your contention is that as a result of absolute immunity she cannot state anything about her knowledge of anything during the period of time in which she was employed in the White House?

Mr. Purpura.  For the purpose of this hearing, yes.

Chairman Nadler.  Okay.  When Mr. Lewandowski visited the White House on June 19th, 2017, he was not an employee of the White House or the administration, correct?

Mr. Purpura.  Objection.

Chairman Nadler.  That's a matter of public knowledge.  It has nothing to do with whether she was a member -- a White House staff person or not.  She would know that in any event, so it should not be covered by this.

Mr. Purpura.  Under the terms of the absolute immunity described in Mr. Cipollone's letter, she may not speak about anything that occurred during the time of her employment in the White House as a close adviser to the President.

UNOFFICIAL COPY

Chairman <u>Nadler.</u>  Anything that occurred during that time?

Mr. <u>Purpura.</u>  During her service as close adviser to the President.

Chairman <u>Nadler.</u>  Did a war break out between Israel and Egypt during that time period?

Mr. <u>Purpura.</u>  Same objection.

Chairman <u>Nadler.</u>  Same objection.

Well, I'll ask these questions for the record so you can object for the record.

Do you recall if you knew why Mr. Lewandowski was at the White House that day?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Were you present for any portion of that meeting?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Do you know if anyone else was present for any portions of that meeting?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Have you discussed that meeting with anyone -- do you know if anyone else was present for any portion of that meeting?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Have you discussed that meeting with anyone outside of the White House?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Well, that could happen after she left the White House.

Have you discussed that meeting with anyone outside of the White House?

Mr. <u>Purpura.</u>  Objection to the extent that it did not occur during her time as an official -- close adviser to the President.

Mr. <u>Trout.</u>  Mr. Chairman, I would object to any questions -- conversations she may have had with her counsel.

Chairman <u>Nadler.</u>  I'm sorry?  Oh, with her counsel.  Aside from that.

Mr. <u>Trout.</u>  I don't know whether --

Chairman <u>Nadler.</u>  Have you discussed that meeting with anyone other than your counsel outside of the White House since you left the White House?

Ms. <u>Hicks.</u>  No, sir.

Chairman <u>Nadler.</u>  Okay.  And you haven't discussed it with the special counsel?

Mr. <u>Trout.</u>  You can answer.

Mr. <u>Purpura.</u>  Again, Mr. Chairman, after -- from the time when she was not a close adviser to the President.

Chairman <u>Nadler.</u>  Okay.  With your -- you don't have to repeat the whole thing every time.  With your personal attorneys, same objection?  Oh.  Go ahead.

Mr. <u>Philbin.</u>  I believe Mr. Trout objected to that.

Mr. <u>Trout.</u>  Mr. Chairman, I do not want her and I would

instruct her not to answer any questions about her conversations with her personal counsel.

Chairman <u>Nadler.</u>  Okay.  Fair enough.

Did you discuss that meeting with Mr. Lewandowski?

Mr. <u>Philbin.</u>  The same objection, Mr. Chairman, finding various ways to probe about getting into the events in the White House during the time that she was a senior adviser.

Chairman <u>Nadler.</u>  I think if she -- it wouldn't be within the scope of your objection if she discuss -- answering yes or no with respect to whether she discussed this with Mr. Lewandowski after she left the White House.  The substance of the conversation might be a different question, but whether she --

Mr. <u>Purpura.</u>  That's fine.  Answer.

Ms. <u>Hicks.</u>  As I said earlier, I have not spoken to Mr. Lewandowski since then at the White House.

Chairman <u>Nadler.</u>  With anyone else?

Ms. <u>Hicks.</u>  I already answered that question.

Chairman <u>Nadler.</u>  Have you -- well, have you discussed that meeting with anyone else since you left the White House?

Ms. <u>Hicks.</u>  Again, no.

Chairman <u>Nadler.</u>  Okay.

Do you recall at some point learning about a specific script that on June 19th, 2019, the President asked Mr. Lewandowski to deliver to then Attorney General Jeff Sessions?

Mr. <u>Purpura.</u>  Objection.

Chairman Nadler.  Same basis?

Mr. Purpura.  Yes.

Chairman Nadler.  Please take a moment to review the second highlighted portion of the exhibit.  Would you read it out loud, please?

Ms. Hicks.  I note that I recused myself from certain things having to do with specific areas, but our President of the United States is being treated very unfairly.  He shouldn't have a special prosecutor-slash-counsel because he hasn't done anything wrong.  I was on the campaign with him for 9 months.  There were no Russians involved with him.  I know it for a fact because I was there.  He didn't do anything wrong except he ran the greatest campaign in American history.

Now a group of people want to subvert the Constitution of the United States.  I'm going to meet with the special prosecutor to explain this is very unfair and let the special prosecutor move forward with investigating election meddling for future elections so that nothing can happen in future elections.

Chairman Nadler.  Yeah.  Ms. Lewandowski, I think, in reading this --

Ms. Hicks.  My name is Ms. Hicks.

Chairman Nadler.  I'm sorry, Ms. Hicks.  I'm preoccupied.

I think in reading this you skipped the first sentence, which reads:  The President directed that Sessions should give a speech publicly announcing --

Ms. <u>Hicks.</u>  Sorry.  There wasn't an indication that I was supposed to read that.

The President directed that Sessions should give a speech publicly announcing the portion I just read.

Chairman <u>Nadler.</u>  Okay.  Does that refresh your recollection?

Ms. <u>Hicks.</u>  No.

Chairman <u>Nadler.</u>  After the June 19th meeting, did you see the President?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Can you describe his reaction to that meeting?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Did you at any point discuss with the President any of the matters raised during the meeting?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Did the President at any point ever tell you he dictated that message to Mr. Lewandowski?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  According to the report, the President told Mr. Lewandowski to tell Sessions that if Sessions delivered that statement, he would be the, quote, most popular guy in the country, unquote, from volume 292 -- page 92 of the Mueller report.

Did the President tell you he said that?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Did Lewandowski tell you the President told him that?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  After -- and let me state for the record, again, that all these objections are not based on any assertion of privilege but on the claim of so-called absolute immunity, correct?

Mr. <u>Purpura.</u>  Yes, Mr. Chairman.

Chairman <u>Nadler.</u>  All right.  Where were we?

After the June 19th meeting, did you at any point discuss with Mr. Lewandowski any of the matters raised during the meeting?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Did Mr. Lewandowski express any concerns coming out of that meeting?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Please describe anything else Mr. Lewandowski said about the June 19th meeting.

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Do you recall when the next time Mr. Lewandowski came to the White House was?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  I'd like to introduce into the record page 93 and page 94 of volume two, including footnote 625, as the next exhibit.

[Hicks Exhibit No. 5

Was marked for identification.]

Chairman Nadler.  And can you please read out loud the highlighted portion into the record?

Ms. Hicks.  Immediately following the meeting with the President, Lewandowski --

Chairman Nadler.  You skipped the first sentence.

Ms. Hicks.  It's --

Chairman Nadler.  Oh, okay.  I'm sorry.  Go ahead.

Ms. Hicks.  Immediately following the meeting with the President, Lewandowski saw Dearborn in the anteroom outside the Oval Office and gave him a typewritten version of the message the President had dictated to be delivered to Sessions.  Lewandowski said he asked Hope Hicks to type the notes when he went into the Oval Office and then retrieved the notes from her partway through the meeting with the President.

Chairman Nadler.  Is the account that Mr. Lewandowski gave the special counsel quoted here about asking you to type up his notes from his June 19th meeting accurate?

Mr. Purpura.  Objection.

Chairman Nadler.  You object even though this is recounted in the special counsel's report?

Mr. Purpura.  I object, Mr. Chairman, respectfully to -- the question asked her to characterize whether it was accurate, which would then cause her to talk about things she witnessed and observed during her time as a close adviser to the President.

Chairman <u>Nadler.</u>  Do you recall if you knew why
Mr. Lewandowski was at the White House that day?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  And when did you first learn of the
meeting?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Were you present for any portion of the
July 19th meeting?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Was anyone else present for the meeting
between Lewandowski and the President?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  To the best of your recollection, please
describe exactly what Mr. Lewandowski said to you when he handed
you these notes?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Do you recall what Mr. Lewandowski's notes
said or generally what they were about?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  To the best of your recollection, did the
special counsel's report accurately describe what Mr. Lewandowski
asked you to type up?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Where did you type the notes?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Was anyone else present when
Mr. Lewandowski handed you the notes?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  After you typed the notes, did you give it
back to Mr. Lewandowski?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Did he say anything to you during that
exchange?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Did he then return to the meeting with the
President?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Did you show anyone else the notes or keep
copies for yourself?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Did you discuss this exchange with the
Special Counsel's Office?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  That would be after she was at the
White House.

Mr. <u>Trout.</u>  No.  All of her interviews with special counsel
were while she was at the White House.

Chairman <u>Nadler.</u>  And your objection includes even things
having nothing to do with the White House?

Mr. <u>Trout.</u>  Well, I am not --

Chairman <u>Nadler.</u>  We went through the Israel-Egyptian nonwar before.  Okay.

Did you discuss this exchange with the special counsel's office while you were at the White House?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Did you discuss this exchange with the special counsel's office after you were at the White House?

Ms. <u>Hicks.</u>  I didn't meet with the special counsel after I was at the White House.

Chairman <u>Nadler.</u>  Nor talk to him?  So your answer is no?

Ms. <u>Hicks.</u>  Correct.

Chairman <u>Nadler.</u>  Did you share any notes or documents with the special counsel regarding this meeting?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Did you at any point discuss with the President the notes or Mr. Lewandowski's request to type them?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  During your tenure at the White House, did you know if Mr. Lewandowski did, in fact, deliver the note to Attorney General Sessions or another administration official?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Have you ever discussed -- have you ever discussed this incident with anyone outside of the special counsel and your attorney?

Mr. <u>Purpura.</u>  Objection.

Chairman Nadler.  You can't object to that.  The word is "ever" not "while" she was at the White House.

Mr. Purpura.  Fair point, Mr. Chairman, with the caveat of not discussing events that occurred while she was in the White House.

Chairman Nadler.  Have you ever discussed this incident with anyone outside of the special counsel and your attorney?

Ms. Hicks.  Not to my recollection.

Chairman Nadler.  Okay.  Were there any other times when the President asked Mr. Lewandowski to deliver a message for him specifically to other administration officials or former officials?

Mr. Purpura.  Objection.

Chairman Nadler.  Were there any other times when the President asked someone outside of the White House or the administration other than Mr. Lewandowski to deliver a message to -- for him to other administration officials or former officials?

Mr. Purpura.  Objection.

Chairman Nadler.  What about after you were at the White House?

Ms. Hicks.  I'm not aware of any of those directives.

Chairman Nadler.  Did anyone at the White --

Ms. Hicks.  Sorry.

Ms. Dean.  We're having a hard time hearing.

Chairman Nadler.  Did anyone at the White House give you documents about this incident in preparation for meeting with the special counsel?

Mr. Purpura.  Objection.

Chairman Nadler.  The meeting with special counsel also occurred while you were at the White House?  Okay.

Do you find it unusual at -- I'm sorry -- did you find it unusual at the time that the President asked Mr. Lewandowski to deliver a message to the Attorney General?  Did the President's request raise any concerns for you at the time?

Mr. Purpura.  Objection.

Chairman Nadler.  What about now?

Let me rephrase the question.  Did the President's request at that time raise any concerns for you now?  Are you concerned about it in retrospect?

Ms. Hicks.  I'm not going to answer a hypothetical question.

Chairman Nadler.  It's not a hypothetical question.  I'm asking are you concerned about it?

Mr. Trout.  Mr. Chairman, can we confer just briefly?

Chairman Nadler.  Sure.

[Discussion off the record.]

Ms. Hicks.  I haven't given it any thought.

Chairman Nadler.  Okay.  Well, let me rephrase the question. Sitting here today, do you find it concerning that the President -- today -- that the President asked Mr. Lewandowski to

deliver a message to the Attorney General?

Ms. <u>Hicks.</u>  "Concerning" would not be the word I would use to describe how I view that.

Chairman <u>Nadler.</u>  Well, in any way problematic?

Ms. <u>Hicks.</u>  I view it as odd.

Chairman <u>Nadler.</u>  Odd.  And why do you view it as odd?

Mr. <u>Philbin.</u>  Mr. Chairman, we're going to object to further line of questioning on this --

Chairman <u>Nadler.</u>  On what basis?

Mr. <u>Philbin.</u>  Because it's based on knowledge that she obtained while she was a senior adviser to the President and it's probing into that past and her --

Chairman <u>Nadler.</u>  She is -- I'm asking her about it --

Mr. <u>Philbin.</u>  -- to characterize those events.  And she's immune from testifying about those events whether factually or by giving her characterization of them after the fact.

Chairman <u>Nadler.</u>  I'm sorry.  Repeat that last sentence.

Mr. <u>Philbin.</u>  She is immune from testifying about those events and things that she learned in her role as senior adviser to the President whether by relating the events themselves or by giving a characterization or analysis of them after the fact.

Chairman <u>Nadler.</u>  Well, number one, we disagree with that, obviously.  But number two, I am not asking her about her attitude then or about the events then.  I'm asking her if she is now -- if she finds -- why she finds it odd, as she said a moment ago she

did, based on reading the public record.

Mr. <u>Philbin.</u>  Well, the same objection stands.  And she may

not --

Chairman <u>Nadler.</u>  No, it doesn't.

Mr. <u>Philbin.</u>  She does, Mr. Chairman.  I respectfully

disagree.

Chairman <u>Nadler.</u>  I ask that you answer the question.

Mr. <u>Trout.</u>  There has been an objection.  We have indicated

that we will --

Chairman <u>Nadler.</u>  We've noted the objection.

Mr. <u>Trout.</u>  And consistent with the letter that I wrote to

you yesterday, she is not going to answer any questions as to

which the White House objects.

Chairman <u>Nadler.</u>  Okay.  Do you recall the President giving a

live interview the same day as the July 19th, 2017, meeting with

Mr. Lewandowski, the meeting where you typed the notes?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  I'd like to introduce pages 93 to 94 of

volume two, including footnote 636 of the Mueller report, as the

next exhibit.

                         [Hicks Exhibit No. 6

                         Was marked for identification.]

Chairman <u>Nadler.</u>  Can you please read out loud the

highlighted portion into the record?

Ms. <u>Hicks.</u>  Within hours of the President's meeting with

Lewandowski on July 19th, 2017, the President gave an unplanned interview to The New York Times in which he criticized Sessions' decision to recuse from the Russia investigation.  The President said that, quote, Sessions should never have recused himself, and if he was going to recuse himself, he should have told me before he took the job and I would have picked somebody else, close quote.

Sessions' recusal, the President said, was very unfair to the President.  How do you take a job and then recuse yourself?  If he would have recused himself before the job, I would have said, Thanks, Jeff, but I can't, you know, I'm not going to take you, close quote.  It's extremely unfair, and that's a mild word to the President.

Hicks, who was present for the interview, recalled trying to, quote, throw herself between the reporters and the President to stop parts of the interview, but the President, quote, loved the interview.

Chairman Nadler.  Is that description of the events accurate?

Mr. Purpura.  Objection.

Chairman Nadler.  Did you discuss this incident with the special counsel?

Mr. Purpura.  Objection.

Chairman Nadler.  Did you tell the special counsel you tried to throw yourself between the reporters and the President, in quotes, to stop parts of the interview?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Is the special counsel's report accurate, to your knowledge?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Is the special counsel's report inaccurate, to your knowledge?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Did you tell the truth to the special counsel?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Objection?

Let me restate the question.  Did you perjure yourself to the special counsel?

Mr. <u>Purpura.</u>  Same objection.

Chairman <u>Nadler.</u>  Same objection.

Why did you want to stop the New York Times interview?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Do you recall discussing the interview with Lewandowski?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  What about anyone else outside the White House or the special counsel's office?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  I'd like to read the second highlighted portion from that -- I'd like you to read the second highlighted

portion from that page into the record.

Ms. <u>Hicks.</u>  Later that day Lewandowski met with Hicks and they discussed the President's New York Times interview. Lewandowski recalled telling Hicks about the President's request that he meet with Sessions and joking with her about the idea of firing Sessions as a private citizen if Sessions would not meet with him.

As Hicks remembered the conversation, Lewandowski told her the President had recently asked him to meet with Sessions and deliver a message that he needed to do, quote, the right thing and resign.  While Hicks and Lewandowski were together, the President called Hicks and told her he was happy with how coverage of his New York Times interview criticizing Sessions was playing out.

Chairman <u>Nadler.</u>  Is that what you told the special counsel?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Is that description of the events accurate?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Do you recall speaking with Lewandowski that day?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Did Lewandowski tell you that the President asked him to meet with Sessions to deliver the note you typed up?

Mr. <u>Purpura.</u>  Objection.

Chairman <u>Nadler.</u>  Did he tell you if he delivered that message?

Mr. Purpura.  Objection.

Chairman Nadler.  Did you ever follow up with him and ask him if he delivered the message?

Mr. Purpura.  Objection.

Chairman Nadler.  Did you ask him not to deliver the message?

Mr. Purpura.  Objection.

Chairman Nadler.  Do you believe what you said to the special counsel?

Mr. Purpura.  Objection.

Chairman Nadler.  I'm asking her what she believes now.

Mr. Philbin.  The same objection.  It's an attempt to have her characterize the testimony that was given during her time as a senior adviser to the President.

Chairman Nadler.  I'm asking you if you believe what you said to the special counsel.

Mr. Philbin.  Objection.

Chairman Nadler.  I assume you would say that you testified truthfully to the special counsel.  Do you object to that, too?

Mr. Philbin.  Yes, Mr. Chairman, for the reasons we've stated.  These are all attempts to have her characterize the testimony that was given which relates to the events at the time she was a senior adviser to the President.  She's immune from being compelled to testify about those events whether in the first instance or by characterizing the testimony she gave about those events.

Chairman Nadler.  Ms. Hicks, again, are you asserting any other basis for declining to answer these questions -- this question or any of the other questions?

Ms. Hicks.  No.

Chairman Nadler.  Are you asserting any privileges in declining to answer the question, any specific privileges?

Ms. Hicks.  No.

Chairman Nadler.  Are you asserting executive privilege in declining to answer the question?

Ms. Hicks.  No, sir.

Chairman Nadler.  And will you answer any other questions about this matter?

Mr. Philbin.  Mr. Chairman, I think Mr. Trout made it clear in his letter yesterday --

Chairman Nadler.  I'm asking Ms. Hicks.  I'll ask Mr. Trout in a moment.

Ms. Hicks.  I'd like to answer whatever is not objected to.

Chairman Nadler.  Okay.  Not objected to by whom?

Ms. Hicks.  By the White House.

Chairman Nadler.  By the White House.

Now, to the White House counsel, are you asserting any other basis for declining -- for advising Ms. Hicks to decline to answer these questions?

Mr. Purpura.  Not at this time.

Chairman Nadler.  So your answer is no?

Mr. Purpura.  Correct.

Chairman Nadler.  Are you asserting any privileges in declining to -- in advising Ms. Hicks to decline to answer these questions?

Mr. Purpura.  Not at this time, Mr. Chairman.

Chairman Nadler.  What?

Mr. Purpura.  Not at this time, Mr. Chairman, no.

Chairman Nadler.  Are you asserting executive privilege -- are you advising Ms. Hicks in refusing to answer these questions on the basis of executive privilege?

Mr. Purpura.  Not at this time, Mr. Chairman, no.

Chairman Nadler.  And will you permit her to answer any other questions about this matter?

Mr. Purpura.  No, Mr. Chairman, not at this time.

Chairman Nadler.  Okay.  Thank you.

I now recognize the gentlelady from Texas, Ms. Jackson Lee, for questions.

Mr. Trout.  Mr. Chairman, I think there are a number of people taking pictures here, and I just want to say that I think it's making the witness uncomfortable.  And I would very much appreciate it as a courtesy, if nothing else, if we could --

Chairman Nadler.  That's fine.  If people will please refrain from taking pictures.

Ms. Jackson Lee.

Ms. Jackson Lee.  Good morning, Ms. Hicks.  I am Sheila

Jackson Lee.

Ms. <u>Hicks.</u>  Good morning.

Ms. <u>Jackson Lee.</u>  I'm going to have one or two questions and -- I've done it again -- one or two questions in a number of different areas.

Let me first start with the report.  According to the report, by late summer of 2016 the Trump campaign was planning a press strategy, a communications campaign and messaging, based on the possible release of Clinton emails by WikiLeaks.  Who was involved in that strategy?

Ms. <u>Hicks.</u>  I don't recall.

Ms. <u>Jackson Lee.</u>  I thought you were intimately involved in the campaign.

Ms. <u>Hicks.</u>  I was.  It's not something I was aware of.

Ms. <u>Jackson Lee.</u>  What about the communications campaign, who was involved there?  Do you not recall or do you not know?

Ms. <u>Hicks.</u>  To my recollection, it's not something I was aware of.

Ms. <u>Jackson Lee.</u>  So you're saying you do not know?

Ms. <u>Hicks.</u>  I'm saying, to the best of my recollection, I was not aware of that at the time.

Ms. <u>Jackson Lee.</u>  What about the actual messaging, who was involved there?

Ms. <u>Hicks.</u>  There were several different people that were involved in different parts of the campaign throughout various

phases.

Ms. <u>Jackson Lee.</u>  What are their names?

Ms. <u>Hicks.</u>  So you'd have to be more specific.

Ms. <u>Jackson Lee.</u>  What are their names?

Ms. <u>Hicks.</u>  There was obviously a lot of turnover, as has been widely reported.

Ms. <u>Jackson Lee.</u>  But in the messaging what would be the core people that you remember?

Ms. <u>Hicks.</u>  Again, if there was a more specific timeframe, that would be helpful.  Post-Republican National Convention, that would be helpful.

Ms. <u>Jackson Lee.</u>  Who specifically was engaged with the Russian strategy, messaging strategy, post the convention, late summer 2016?

Ms. <u>Hicks.</u>  I'm sorry.  I don't understand the question.  I'm not aware of a Russian messaging strategy.

Ms. <u>Jackson Lee.</u>  So specifically it goes to the release of the various WikiLeaks information.  Who was engaged in that?

Ms. <u>Hicks.</u>  So, I mean, I assume you're talking about late July?

Ms. <u>Jackson Lee.</u>  Late July, late summer, July, August 2016.

Ms. <u>Hicks.</u>  So there were several people involved.  It was -- I think a "strategy" is a wildly generous term to describe the use of that information, but --

Ms. <u>Jackson Lee.</u>  But you were engaged in the campaign.  What

names, what specific persons were involved in that strategy of the
impact of Russia and the issuance of the WikiLeaks effort late
summer?

     Ms. <u>Hicks.</u>  Again, you --

     Ms. <u>Jackson Lee.</u>  Were you involved?  Were you part of the
strategy?  You have a communications emphasis.

     Ms. <u>Hicks.</u>  I'm sorry.  I'm just not understanding the
question.  You're talking about a Russian strategy.  The campaign
didn't have a Russian strategy.

     There was an effort made by the campaign to use information
that was publicly available, but I'm not aware of a Russian
strategy, communications or otherwise.

     Ms. <u>Jackson Lee.</u>  Well, what names were engaged in the
strategy that you remember, messaging based on the possible
release of Clinton emails by WikiLeaks, which is what I said?

     Ms. <u>Hicks.</u>  Sorry.  I'd like to confer with my counsel.
Thanks.

     Ms. <u>Jackson Lee.</u>  Thank you.

     [Discussion off the record.]

     Mr. <u>Gaetz.</u>  Ms. Jackson Lee, while Ms. Hicks is speaking with
her counsel, I just want to let you know of a dynamic back here on
the back row.  We're having a little bit of a hard time hearing,
and so if you guys could get right up on the microphone.  And then
there's a good amount of sort of murmuring and people shuffling in
the row directly in front of us.  It's probably Mr. Cicilline.

But if we could --

     Mr. Cicilline.  Gasping in disbelief.

     Mrs. Demings.  You can't hear anybody speaking, so if everybody could speak up.

     Ms. Jackson Lee.  Mr. Gaetz, I will speak as loudly as I possibly can.  Can you hear me now?

     Mr. Gaetz.  Yes, ma'am.  Thank you.  We're all the better for it.

     Ms. Jackson Lee.  Outstanding.  Thank you.

     Ms. Hicks.  Thank you.  Do you want to repeat your question one more time?

     Ms. Jackson Lee.  Yes.  I'm going to read from my earlier comment.  According to the report, by late summer of 2016 the Trump campaign was planning a press strategy, a communications campaign, and messaging based on the possible release of Clinton emails by WikiLeaks, volume 1, 54.  Were you involved in deciding how the campaign would respond to press questions about WikiLeaks?

     Ms. Hicks.  I assume that I was.  I have no recollection of the specifics that you're raising here.

     Ms. Jackson Lee.  With that in mind, would you agree that the campaign benefited from the hacked information on Hillary Clinton?

     Ms. Hicks.  This was publicly available information.

     Ms. Jackson Lee.  Were you -- would you agree that the campaign benefited from the hacked information on Hillary Clinton?

     Ms. Hicks.  I don't know what the direct impact was of the

utilization of that information.

    Ms. <u>Jackson Lee.</u>  Well, let me follow up with, did this information help you attack the opponent of Mr. Trump?

    Ms. <u>Hicks.</u>  I take issue with the phrase "attack."  I think it allowed the campaign to discuss things that would not otherwise be known but that were true.

    Ms. <u>Jackson Lee.</u>  So the campaign -- is it your position the campaign benefited from the hacked emails of Ms. Clinton?

    Ms. <u>Hicks.</u>  It is not my position that we benefited from those emails.  It's my position that we used publicly available information in the course of the campaign --

    Ms. <u>Jackson Lee.</u>  And the campaign benefited from it?

    Ms. <u>Hicks.</u>  -- to differentiate between candidates.

    Ms. <u>Jackson Lee.</u>  Did Mr. Trump win?

    Ms. <u>Hicks.</u>  Yes, he did.

    Ms. <u>Jackson Lee.</u>  Then it is likely that he would have benefited?

    Ms. <u>Hicks.</u>  I think that is a -- I think that's a big jump. I think there are many other reasons that Mr. Trump won that election.  I'm not sure that you can attribute it to one factor.

    Ms. <u>Jackson Lee.</u>  Let me move to another line of questioning regarding Mr. Cohen.  Can you describe Mr. Trump's relationship with Michael Cohen during the campaign?

    Ms. <u>Hicks.</u>  Michael was an employee of The Trump Organization.  He continued in that role throughout the campaign.

And I would say that their contact and interactions were minimal
during that time given Mr. Trump's extensive travel schedule.

Ms. Jackson Lee.  How often would they speak?

Ms. Hicks.  I'm not aware of the frequency with which they
spoke.

Ms. Jackson Lee.  Do you think Mr. Trump trusted Mr. Cohen?

Ms. Hicks.  I am not going to speculate about the feelings or
motivations of others.  I am not --

Ms. Jackson Lee.  Were you ever present when Trump and Cohen
discussed Stormy Daniels?

Ms. Hicks.  No, ma'am.

Ms. Jackson Lee.  You were never present when they discussed
Stormy Daniels?

Ms. Hicks.  No.

Ms. Jackson Lee.  I'm going to say it again.  Were you ever
present when Trump and Mr. Cohen discussed Stormy Daniels, since
it was all over the news that that occurred?

Mr. Philbin.  Let me just object to make -- my understanding
is this question is limited to during campaign.  That's the line
of questioning.

Ms. Jackson Lee.  That's correct, sir.

Ms. Hicks.  So, no is my answer.

Ms. Jackson Lee.  So do you know what they would say?

Ms. Hicks.  I'm sorry.  I don't understand.

Ms. Jackson Lee.  You don't know what would have been said?

You don't have any recollection --

      Ms. <u>Hicks.</u>  I was never present --

      Ms. <u>Jackson Lee.</u>  -- of hearing what was the discussion?

      Ms. <u>Hicks.</u>  I was never present for a conversation --

      Ms. <u>Jackson Lee.</u>  If Cohen was making a public statement, would he get approval from you first?

      Ms. <u>Hicks.</u>  That would be my preference, however, that was not always the case.

      Ms. <u>Jackson Lee.</u>  When did he not get your approval?

      Ms. <u>Hicks.</u>  I can't recall a specific example, but there were many times he would make television appearances or speak to reporters without checking with anybody on the campaign.  He would do so on his own.

      Ms. <u>Jackson Lee.</u>  Were you ever upset about what Mr. Cohen might have said publicly?

      Ms. <u>Hicks.</u>  Yes.

      Ms. <u>Jackson Lee.</u>  And when was that?

      Ms. <u>Hicks.</u>  When he would say things that weren't accurate or that were direct contradictions of campaign messaging.

      Ms. <u>Jackson Lee.</u>  Do you have some examples?

      Ms. <u>Hicks.</u>  One example I recall, the campaign produced an advertisement.  There was a mistake in the footage, or a perceived mistake rather, in the footage that was used.  The campaign's position was that this was an intentional use of footage that was not representative of the United States southern border, but

rather representative of what could happen if Mr. Trump was not elected President.

    Ms. Jackson Lee.  What was the footage you're referring to?

    Ms. Hicks.  It was footage of people crossing the border. And Michael did an interview without anyone's knowledge and went on TV and said that this was not an intentional use of that footage but it was, in fact, a mistake.

    Ms. Jackson Lee.  All right.  Let me ask you this.  Did you -- did Mr. Trump ever direct you to make public statements -- public statements about the hush money payments during the campaign?

    Ms. Hicks.  Sorry.  Can you repeat the question?

    Ms. Jackson Lee.  Did Mr. Trump ever direct you to make public statements about the hush money payments during the campaign?

    Ms. Hicks.  Can I confer with my attorney, please?

    [Discussion off the record.]

    Ms. Hicks.  Thank you.  Sorry.  Go ahead and repeat your question one last time.

    Ms. Jackson Lee.  Did Mr. Trump ever direct you to make public statements about the hush money payments during the campaign?

    Ms. Hicks.  I was directed to make a public statement denying that a relationship existed between Mr. Trump and a woman named Karen McDougal.

Ms. <u>Jackson Lee.</u>  What about hush payments?

Ms. <u>Hicks.</u>  I don't believe I commented on the arrangement that the National Enquirer or American Media had with this woman.

Ms. <u>Jackson Lee.</u>  What statement were you directed to make about Karen McDougal?

Mr. <u>Philbin.</u>  I want to make clear, this is all during the campaign, correct?

Ms. <u>Hicks.</u>  Yes.

I don't -- I don't recall my specific words, but that there was no relationship between the two of them.

Ms. <u>Jackson Lee.</u>  Did you ask the President whether that was true?

Ms. <u>Hicks.</u>  Not to my recollection.

Ms. <u>Jackson Lee.</u>  We will continue.  Thank you so very much.

Ms. <u>Hicks.</u>  Thank you.

Mr. <u>Gohmert.</u>  Just to clarify, though, when you say did she ask the President, that sounds like you're asking about while he was President.  You're talking about did she ask candidate Trump?

Ms. <u>Jackson Lee.</u>  These questions I asked were pertaining to the campaign.

Mr. <u>Neguse.</u>  Good morning, Ms. Hicks.  I want to ask you about a different topic, but just finishing up on that topic with respect to what Representative Gohmert mentioned.  So this was during the campaign.  Who directed you to make this statement?

Ms. <u>Hicks.</u>  Mr. Trump.

Mr. <u>Neguse.</u>  When -- so switching gears -- when did you first become aware that the Russian Government was attempting to interfere in the 2016 elections?

Ms. <u>Hicks.</u>  Whenever that was made publicly available.

Mr. <u>Neguse.</u>  You have no direct recollection of in terms of a time period that you learned that that was happening?

Ms. <u>Hicks.</u>  I have recollections of when it was first raised, I believe, by the Clinton campaign during the Democratic National Convention.  And I don't recall specifically when an assessment was made by anybody outside of the Clinton campaign, but when the information was available publicly that that would be when I learned about it.

Mr. <u>Neguse.</u>  Do you recall being told at any point prior to the election that anyone at the Trump campaign had been offered information on Secretary Clinton?

Ms. <u>Hicks.</u>  No, not to my knowledge.

Mr. <u>Neguse.</u>  You don't, you don't believe that that happened, that you were told at any point prior to the election that that had occurred?

Ms. <u>Hicks.</u>  I don't have any recollection of that.

Mr. <u>Neguse.</u>  Did you discuss who might have hacked Secretary Clinton's campaign emails with anyone during the campaign?

Ms. <u>Hicks.</u>  I believe it was a topic of discussion generally within the media.  I'm sure it was discussed amongst staffers.

Mr. <u>Neguse.</u>  And with respect to the discussions that you had

with staffers on the campaign, what did those discussions entail?
What were the view of folks on the campaign in terms of who hacked
Secretary Clinton's emails?

Ms. Hicks.  There's no definitive point of view that comes to
mind.

Mr. Neguse.  Did you --

Ms. Hicks.  Speculation.

Mr. Neguse.  Did you discuss it ever with Mr. Trump prior to
the election?

Ms. Hicks.  I don't recall any specific conversations.

Mr. Neguse.  So you don't recall ever speaking with Mr. Trump
regarding whether Russia and the Russian Government had hacked
Secretary Clinton's emails?

Ms. Hicks.  Oh, excuse me.  Sorry.  Thank you for rephrasing
the question.

I think that there were conversations about that that I
remember specifically prior to debates, and nothing was said
privately that he hasn't said publicly.

Mr. Neguse.  So -- but I -- I am wanting to know your
recollection as to those conversations of what did he say to you
regarding the hack --

Ms. Hicks.  Like I said, nothing that was said to me
privately that he hasn't also repeated publicly.

Mr. Neguse.  And what would that be?

Ms. Hicks.  I hope I'm not botching his quote, but I believe

that it was something to the effect of it could have been Russia,

it could have been China, it could have been somebody at home in

their basement.

[10:02 a.m.]

Mr. Neguse.  So those comments that he said publicly, that was his position to you privately in your conversations with him --

Ms. Hicks.  Exactly.

Mr. Neguse.  -- during the campaign?

Ms. Hicks.  Yes.

Mr. Neguse.  At the time, who did you think did the hack? Did you agree with him?

Ms. Hicks.  I don't have an opinion on that.

Mr. Neguse.  You didn't have any opinion on that then?

Ms. Hicks.  Correct.

Mr. Neguse.  You do have an opinion on that now, I presume?

Ms. Hicks.  Yes.

Mr. Neguse.  And what is your opinion now?

Ms. Hicks.  I'm not here to discuss my opinions.

Mr. Neguse.  You're here to testify under oath about your views of the matters at issue in this --

Mr. Trout.  I actually don't think that she is under oath, but she is going to tell the truth.

Mr. Neguse.  Under 18 USC 1001, as Chairman Nadler articulated in the beginning of the hearing.  In any event, you're declining to answer your opinion as to the --

Ms. Hicks.  I agree with the assessment of the intelligence community.

Mr. <u>Philbin.</u>  Hold on.  I'd like to object.  To the extent
this question is asking for views formed, based on information she
learned while senior adviser to the President, I'm going to
object.

Mr. <u>Neguse.</u>  That is not the nature of the question, and I
think counsel knows that.  So in any event, we'll move on.

Do you want to complete your answer?  I think you were
essentially --

Ms. <u>Hicks.</u>  I agree with the assessment of our intelligence
community.

Mr. <u>Neguse.</u>  Thank you.

Do you recall receiving requests for interviews from Russian
individuals in the summer of 2015?

Ms. <u>Hicks.</u>  I've reviewed materials over the process that has
ensued in the last few years.  So, yes, I'm aware of those.  I
didn't -- nothing was remarkable about them when I received them
at the time.

Mr. <u>Neguse.</u>  Let's just jump -- we'll jump to a page in the
report just to refresh your recollection, and then we
can -- because I think we're referring to the same thing.

Ms. <u>Hicks.</u>  Sure.

Mr. <u>Neguse.</u>  So on Page 55, Volume 1, footnote 288, quote,
August 18, 2015, on behalf of the editor in chief of the internet
newspaper Vzglyad, I believe, Georgi Asatryan e-mailed campaign
press secretary Hope Hicks asking for a phone or in-person

candidate interview.  One day earlier the publication's founder
and former Russian parliamentarian Konstantin Rykov had registered
two Russian websites, Trump2016.ru and DonaldTrump2016.ru.  No
interview took place.

Does that refresh your recollection?  Do you recall receiving
that request?

Ms. Hicks.  I don't.  I received hundreds of interview
requests, sometimes daily, but at the very least weekly, and I
don't recall receiving that request.

Mr. Neguse.  You don't recall receiving that particular
request?

Ms. Hicks.  No.

Mr. Neguse.  According to the report, on June 3rd, 2016, Rob
Goldstone, on behalf of Russian real estate developers, emailed
Donald Trump, Jr., as you know, to set up a meeting to discuss
Russian officials' possession of, quote, some official documents
and information that would incriminate Hillary in her dealings
with Russia and would be very useful to, bracketed, Donald Jr.'s
father, end quote, which Mr. Goldstone conveyed was, quote, part
of Russia and its government support for Mr. Trump, end quote.
This is on Page 113 of Volume 1.

Donald Trump, Jr. responded, quote, if it's what you say, I
love it, end quote.  Again, this is Page 113, and I believe you
have a copy of the report there at the desk.

Did you have knowledge of those emails that I just referenced

at the time that they were written?

Ms. Hicks.  I did not.

Mr. Neguse.  Did you ever speak to Mr. Trump Jr. about the campaign receiving information, potentially, from foreign officials that would incriminate Secretary Clinton?

Mr. Philbin.  And again just to --

Mr. Purpura.  Just during the campaign period?

Mr. Neguse.  During the campaign period, prior to the election.

Mr. Purpura.  Thank you, sir.

Ms. Hicks.  No, did I not.

Mr. Neguse.  Never, in 2016, prior to the election, had you spoken with Mr. Trump Jr. about this incident in question?

Ms. Hicks.  I have no recollection of any conversations that would fall in that category, no.

Mr. Neguse.  So are you saying you didn't have those conversations or you don't remember whether you had those conversations?

Ms. Hicks.  I'm saying that to the best of my recollection here today, I do not recall ever having those conversations.

Mr. Neguse.  Do you know why he didn't tell you about those emails?

Mr. Purpura.  Objection.  Again, if it's --

Mr. Neguse.  During -- prior to the election.  Again, I understand your -- I would reiterate, obviously, the committee's

vigorous disagreement with your assertion of absolute immunity.
But in any event.

Ms. Hicks.  No, I'm not go to opine on somebody's motivations
for why they did or didn't tell me something.

Mr. Neguse.  Do you have any information as to his motives,
in terms of providing such information or not providing such
information to you, given your role as the senior communications
strategist on the campaign?

Ms. Hicks.  I don't understand the question.  But it sounds
like a question for -- for him.

Mr. Neguse.  Did Mr. Trump during the campaign ever tell you
that he had knowledge that additional information would be
released with respect to the leaks or -- excuse me -- the hacks
done by WikiLeaks and so forth?

Ms. Hicks.  I don't recall any statements or conversations to
that effect, no.

Mr. Neguse.  Let me give you one specific example, and then I
think we have to end this portion of the hearing.

According to the report, the special counsel's report, in
late summer of 2016, then candidate Trump and Mr. Gates were
driving to LaGuardia Airport and had a phone call.  After that
phone call -- there's a portion of the report that's
redacted -- it says, quote, Candidate Trump told Gates that more
releases of damaging information would be coming.  This is on page
54 of Volume 1 of the report.

Were you aware of that conversation?

Ms. Hicks.  I don't have any recollection of that conversation.

Mr. Neguse.  Do you recall Mr. Trump telling anyone at the campaign in your presence that more information would be leaked?

Ms. Hicks.  No, I don't.

Mr. Neguse.  Again, you don't recall, or you are saying that those conversations didn't take place?

Ms. Hicks.  I'm saying I'm not aware of any conversations that are as you describe.

Ms. Harihaan.  All right.  It's the end of the first hour. We'll go off the record now.  It is 10:10 a.m.

[Recess.]

Mr. Collins.  All right, starting time, 10:21.

I'm Congressman Doug Collins from Georgia.  I'm the ranking member of the Judiciary Committee.

And a few things that I want to state up front before we get started.

I do want to say that I am concerned, and making this known to the majority staff and also the chairman as well, that we did have an agreement on members and committee staff to be in here. And it was disturbing to me to find that the majority's press staff was in here for the majority of the first round of questioning, not what I would have considered within the scope of pertinent staff availability in this room at that point.

It just goes, frankly, from my opinion, to show that this is
more for a press availability than it is for actual information,
and I do, you know, object to that.  I think it has been cleared
up at this point, they are no longer in the room, but needed to be
pointed out as we go forward.

But before I get started with my questions, Ms. Hicks, is
there anything from the previous hour that you would like to -- I
want to give you an opportunity to clarify or, you know, elaborate
on.

Ms. Hicks.  Yes, sir.  The last question I was asked
pertaining to candidate Trump being aware of releases of
information prior to, or the discussion of that.  I don't think I
was clear enough in saying that there were discussions based on
public speculation.

So if people in the media were saying things like, if there
were more emails to be distributed, that would be devastating to
the Clinton campaign, certainly that was something that he
would -- he would opine on, but nothing that wasn't in the public
domain.

Mr. Collins.  So nothing out -- it was just basically
responding to what was being out in the press?

Ms. Hicks.  Yes, sir.

Mr. Collins.  All right.  Well, I have a few questions.
We'll go through these.  And I am accused at times of talking
fast.  I am from Georgia, so I do talk slow occasionally.

So let's go through a few things, and, again, we'll go through this.

I just have a question.  How many times have you testified before Congress about your time in the campaign and the transition?

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Collins.</u>  Okay.  Did you -- and I'm going to continue this line here -- did you testify before the House Select Intelligence Committee?

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Collins.</u>  So how long?  How long ago?  And how long did you testify before them?

Mr. <u>Lieu.</u>  We can't hear that objection.

Mr. <u>Philbin.</u>  Just to clarify, the objection is, these questions about her testimony relate to her time as a senior adviser to the President.  She was a senior adviser to the President when these incidents of testimony took place.  It's covered under the immunity that we described earlier.

Mr. <u>Collins.</u>  At this point in time, I'll remind the minority that this is not the minority's time, however, and if they would like to have an extra time, they will have their time at this point.  But I will continue to ask questions at this point.

Did you testify voluntarily?

Mr. <u>Purpura.</u>  Objection.  I think we can stipulate that there was testimony that occurred --

Mr. <u>Collins.</u>  Okay.

Mr. <u>Purpura.</u>  -- and go from there.

Mr. <u>Collins.</u>  All right.  There was testimony that occurred, both in the House and the Senate?  Stipulate to that?

Mr. <u>Purpura.</u>  Stipulate to that, during her time as a senior adviser.

Mr. <u>Collins.</u>  Okay.  The question, did you testify voluntarily?  Or in --

Ms. <u>Hicks.</u>  Yes, sir.

Mr. <u>Collins.</u>  You did.  Okay.  Testified voluntarily.  And I'm assuming you brought a lawyer with you.

Ms. <u>Hicks.</u>  Yes, sir.

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Collins.</u>  Okay.  Did you provide documents to either committee?

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Collins.</u>  And did you provide those documents voluntarily?

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Collins.</u>  Let me ask a different question.  Have you cooperated with every formal investigation over the past 2 years when your documents or testimony have been sought?

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Collins.</u>  Okay.  Changing directions here a little bit. And this is some questions that you may or may not have knowledge

of, but I wanted to find out.

March 4th, 2019, Chairman Nadler -- did Chairman Nadler send you a letter requesting documents?

Mr. Trout.  The answer is yes.

Mr. Collins.  Okay.  Did you provide documents pursuant to this letter?

Mr. Trout.  Her counsel did.

Mr. Collins.  Did you provide these documents voluntarily?

Mr. Trout.  Yes.

Mr. Collins.  Now that the mike is fixed.

Did Chairman Nadler issue you a subpoena for documents and testimony?

Mr. Trout.  Yes.  He issued a subpoena to Ms. Hicks.

Mr. Collins.  Did you provide the documents pursuant to that subpoena?

Mr. Trout.  We provided some documents and withheld other documents pursuant to -- and described all of that in a letter to the chairman and to the minority.  I believe it was June 4th, 2019.

Mr. Collins.  Okay.  So twice the chairman has asked you for documents, and twice you have provided them.  Would that be correct?

Mr. Trout.  Well, we have provided those documents that we were at liberty to provide.

Mr. Collins.  Okay.  Going back to the original 81 letters.

Do you -- were you aware that Chairman Nadler was going to issue a subpoena, or did that strike you as strange, considering the documents that you had already turned over?

Mr. Trout.  Well, the documents that we turned over, there was a specific category of documents that we were requested to turn over that did not include everything that was covered by the subpoena.  So I did not regard the subpoena as remarkable.

Mr. Collins.  Okay.  Was the subpoena necessary given that you had already produced the -- these documents voluntarily?

Mr. Trout.  Well, I don't -- I don't speak for the chairman or for the committee, so I don't know whether it was necessary.

Mr. Collins.  Okay.  But do you feel like the requests that have been made to you, that you have made a good-faith effort to comply with?

Mr. Trout.  Yes.  We have always conducted ourselves in good faith in discussions with the committee, as well as with the White House.

Mr. Collins.  On March 4th -- couple of questions -- March 4th, Chairman Nadler also sent a letter to Julian Assange requesting documents.  Ms. Hicks, do you know if Julian Assange produced these documents pursuant to the chairman's request?

I'll help you.  He didn't.  He did not respond.

March 4th, did Chairman Nadler send a letter to -- and these are others that was in the 81, you were a popular group there -- Carter Page requesting documents?

Ms. <u>Hicks.</u>  I'm not aware of any other requests that were
fulfilled --

Mr. <u>Collins.</u>  So were you aware --

Ms. <u>Hicks.</u>  -- outside of my own obligations.

Mr. <u>Collins.</u>  I apologize.  So you would be aware if they did
not produce any documents for that?

Ms. <u>Hicks.</u>  Again, I'm only aware of my own actions.  I'm
sorry.

Mr. <u>Collins.</u>  Okay.  And let me just clarify, he did not.
And for the record, did not.

Alexander Nix was another one that was asked during this 81
request, that was asked for documents, and I'm going to go ahead
and help you, did not also.  Rob Goldstone was another one that
was actually requested, did not produce anything, and didn't even
respond to the chairman's request.

Do you know why the chairman sent you a subpoena, even though
you had cooperated with his inquiry, but he did not send a
subpoena to the ones that I have just mentioned -- Julian Assange,
Carter Page, Alexander Nix, and Rob Goldstone -- who totally
ignored the chairman's inquiry.

Ms. <u>Hicks.</u>  I do not know the reason.

Mr. <u>Collins.</u>  Let me ask you this, in the sense, from the
perspective of actually doing your best, as was stated earlier,
that you did a good-faith effort to comply with everything that
the chairman sent you, didn't it seem that if you choose to

cooperate here, it seems like that if you choose to cooperate,

you're going to get a subpoena, and if you choose not to

cooperate, the chairman will ignore you.

    Ms. Hicks.  I'd like to confer with my counsel.  I'm teasing.

[Discussion off the record.]

    Ms. Hicks.  I'm not going to speculate about others.

    Mr. Collins.  I think the speculation is obvious by looking

at the record.  What we are seeing in those regards is that -- and

we have seen this consistently -- that if you make a better press

hit in this hub, we are seeing that subpoenas are issued for you.

But if you just choose to willingly ignore, what we're finding is

that you don't get a subpoena and you're allowed to ignore these.

    A couple more questions that I want to go down, and this

would be considered -- and would go back to your subpoenas of your

documents.

    Are you a custodian of documents created by you in your

official duties as a White House official?

    Mr. Purpura.  Objection.  The chief of staff to the White

House is the official custodian of White House records.

    Mr. Collins.  Thank you for clarifying that.  And so the

chief of staff would be the custodian of that.  If the chairman

wanted documents from your time in the White House, wouldn't it

be -- the White House be the appropriate entity to ask for those

documents?

    Mr. Trout.  I think you'd have to ask the White House about

that.

Mr. <u>Purpura.</u>  And the White House would say yes.

Mr. <u>Collins.</u>  Very clear.

Do you know if Chairman Nadler has asked the White House for these documents?

Mr. <u>Trout.</u>  Do you know?

Ms. <u>Hicks.</u>  I don't know.

Mr. <u>Trout.</u>  Okay.  Speak into the --

Ms. <u>Hicks.</u>  I don't know.

Mr. <u>Collins.</u>  Are you the custodian of documents created by you in your official duties as an employee of Donald Trump's campaign for President?

Ms. <u>Hicks.</u>  No, sir.

Mr. <u>Collins.</u>  Okay.  Isn't the campaign, in fact, the custodian of those documents?

Ms. <u>Hicks.</u>  Yes, sir.

Mr. <u>Collins.</u>  Okay.  If the chairman wanted documents from your time on the campaign, wouldn't the campaign be the appropriate entity to ask for those documents?

Ms. <u>Hicks.</u>  Yes, sir.

Mr. <u>Collins.</u>  Do you know if Chairman Nadler has asked for those documents from the campaign?

Ms. <u>Hicks.</u>  I do not.

Mr. <u>Collins.</u>  Do you know if Chairman Nadler has asked for any campaigns for any of the documents that we requested so far?

Ms. <u>Hicks.</u>  I do not.

Mr. <u>Collins.</u>  I have -- probably will have more.  At this time I'm going to pause, and I'm going to yield to the gentleman from Texas, Mr. Gohmert.

Mr. <u>Gohmert.</u>  Thank you.

Before you accepted employment with the Trump White House, Ms. Hicks, did you have any idea that the Clinton campaign had helped fund opposition research getting false information from Russians that would be used against Donald Trump?

Ms. <u>Hicks.</u>  No, sir.

Mr. <u>Gohmert.</u>  And I know you don't want to speculate, but I'm really curious.  Now you've been through a great deal on behalf of your country.  I can't help but be curious, if you had known the hell that you would be put through as a result of the Clinton campaign hiring a foreign agent to get information from Russians and that people within the FBI and the DOJ and potentially intel would be working against the President, would you still have gone to work for the President?

Ms. <u>Hicks.</u>  I'm extremely grateful for the opportunity I had to serve, and, yes, I would do it all over again.

Mr. <u>Gohmert.</u>  Even knowing you had to hire these lawyers?

Ms. <u>Hicks.</u>  Even knowing that.  I would do anything to make a positive contribution for our country, and I'm very grateful I had that opportunity.  I'm proud of my service, and I thank all of you for your service as well.

Mr. <u>Gohmert.</u>  Well, thank you for your service.

Mr. <u>Gaetz.</u>  I have no questions for Ms. Hicks, but it seems worth noting for the record that this is a preposterous proceeding.  The special counsel had an unlimited budget, an unlimited amount of time, 19 prosecutors, dozens of Federal agents, over 2,000 witness statements, over 500 subpoenas, and the concept that a dozen or so Members of Congress are going to sit around with Ms. Hicks over the course of a day and uncover some fact that was left out of the Mueller report belies any common sense.

And given that we are now through the majority's first hour and they have not uncovered a single fact from Ms. Hicks that was not evident in the Mueller report, it seems indicative that this is largely about posturing and not about any development of any facts.

Mr. <u>Biggs.</u>  Thank you.  Andy Biggs from Arizona's Fifth Congressional District.  I thank you for being here today, Ms. Hicks.

And I will say Mr. Gaetz took a lot of my statement, but I will -- I want to add on to something, one aspect of this.

In reviewing the Mueller report, you will find that Ms. Hicks' testimony or 302s have been referenced 27 times, extensively and exhaustively, in the Mueller report.

In fact, the majority keeps wanting you to read what you were quoted as saying in the Mueller report or other quotations from

the Mueller report.

This is really a farce, quite frankly.  It's a waste of your time, it's a waste of our time.  Because what we see here is the majority wants to relitigate the Mueller investigation.  And they believe that the extensive resources that were expended on the Mueller investigation, including the 22 months that it took, the countless interviews, the subpoenas, 1.4 million documents reviewed -- and I keep waiting for them to expand their -- expand what they want to do here.

But we're going to bring you in.  They're going to ask you questions that they know that you can't answer.  And it's, quite frankly, it's an abuse of process, quite frankly, an abuse of the congressional process.

And so, I've called on my colleagues on the majority to get back to work, get back to work.

And with that, I yield back, Mr. Ranking Member.

Mr. Collins.  Mr. Armstrong?

Okay.  I want to come back just for a moment.  And I think what has been said has been interesting.  And I will have to say, is what we have seen so far in the hearings of the, what I'll call the summer of reruns and the relitigation of a report put out from a few weeks ago.  So, you know, there's no -- nothing coming out now, and we're doing reruns of things that we've already read.

And really it's a shame that we're going back through the processes here of what's already been said and already been

stated, but I will have to say, you do a wonderful dramatic

reading of the Mueller report, and it seems like the majority

wants to have that happen as we go forward.

     In this regard, we'll just continue to state, you know, the

objection that this was nothing more than a press hit.  This is

nothing more than the ones standing outside.  And, again, it goes

back to me, and I'm going to comment on this.  And one of the

reasons I put you through the questions of things that you didn't

know about was all the document requests from the 81 has been

forgotten now.  It has been forgotten from this event.

     So if we were actually doing an investigation, my question

is, what happened to them?  They never provide anything, but yet

they subpoena you.

     I think it goes to the motive a great deal of how we look at

this going forward and how we look at our questions and how we

look at the process here.

     I appreciate that the majority would like to find something,

would like to do oversight, as was stated by my colleague from

Florida.  This has been done.  But in this process, what we're

simply hearing is a rehash, good dramatic reading, but

no -- nothing new and, frankly, a waste of the committee's time.

     And with that, no one else on our side, we will yield our

first hour back.

          Ms. Hicks.  Thank you very much.

          [Recess.]

Mr. Eisen.  All right.  Welcome back.  I'm Norman Eisen.  I'm
a lawyer for the staff committee.  And the time is, according to
my watch, a quarter of 11.  I'm just going to ask a couple of
followup questions about Mr. Collins' questions just for the
record.

Mr. Collins.  Could I just -- I apologize, and I know we
talked about this before.  And we'll stop the clock, we'll give
you a full hour.  But it's also been discussed in here that this
was -- and the chairman made a great elaborate statement as we
started this about being confidential and keeping that through
the day.

But Mr. Lieu is live-tweeting this.  So I mean, if he's
willing to break his own chairman, I want it noted for the record
that the Member of the Democratic Party in this committee is
live-tweeting what his own chairman had asked him to keep
confidential.

Now, if this is the way we want to play it, we've now proven
that this is nothing but a political stunt.  It is a press avail
opportunity.  And if Mr. Lieu would like to go outside and testify
to the press, that's fine.  But simply doing this like it is, it's
a mockery.

And I don't care what the answer will be.  This was not what
the chairman had said at the outset.  And unless there was a
meeting for a dramatic reading of what the chairman said, this is
ridiculous.

Mr. Lieu.  I've been live-tweeting their objections because they are so absurd.

Mr. Collins.  Did you have trouble understanding the chairman?

Mr. Lieu.  The objections --

Mr. Collins.  Did you have trouble understanding your chairman?

Mr. Lieu.  [Inaudible.]

Mr. Collins.  Did you have any trouble with your chairman?

Mr. Neguse.  Mr. Chairman, this is the majority's hour.

Mr. Collins.  And I said stop the clock.

Mr. Neguse.  The ranking member's objection has been noted. I think at this point, start back the clock, Mr. Eisen can proceed with the questions.

Mr. Biggs.  I'd like to make a statement.

Mr. Neguse.  It's not -- this isn't -- this isn't the minority's hour to make a statement.

Mr. Cicilline.  Let's be respectful of the witness' time and proceeding with this proceeding.  You'll have an opportunity --

Mr. Neguse.  You're free to make your statement during your hour.

Mr. Biggs.  Well --

Mr. Neguse.  Mr. Eisen.

EXAMINATION

BY MR. EISEN:

Q   Okay.  Ms. Hicks, you were asked by Ms. Jackson Lee about a statement in the Mueller report that by late summer of 2016 the Trump campaign was planning a press strategy, a communications campaign, and messaging based on the possible release of Clinton emails by WikiLeaks, and you answered to the effect that it was wildly inaccurate to call it a strategy.  Do you remember that answer?

A   I believe I said that I wasn't aware of any kind of coordinated strategy like the one described in the report and quoted by Ms. Jackson Lee.

Regardless, the efforts that were under way, to take publicly available information and use that to show a differentiation between Mr. Trump as a candidate and Mrs. Clinton as a candidate, I would say that it would be wildly generous to describe that as a coordinated strategy.

Q   How would you describe it?

A   I would describe it just as I did, which is taking publicly available information to draw a contrast between the candidates.

Q   What do you remember about any specific occasions when that was discussed?

Mr. Purpura.  Again, just to clarify, we're talking about during the campaign?

Mr. Eisen.  Yes, during the campaign, is the question.

Ms. Hicks.  I don't have any specific recollections.  I could

speculate.  I won't, but I don't have any specific recollections.

BY MR. EISEN:

Q   Do you have general recollections?

A   Yes, I do.

Q   Tell me what you remember, everything you remember about that.

A   The things I remember would be just the days that -- that news was made, right?  That there was a new headline based on new information that was available, and how to either incorporate that into a speech or make sure that our surrogates were aware of that information and to utilize it as talking points in any media availabilities, interviews, and what other opportunities there might be to, again, emphasize the contrast between candidates.

Q   Did you ever discuss that with Mr. Trump during the campaign?

A   Again, I don't recall a -- I don't recall discussions about a coordinated strategy.  But more specifically, to your last point about when there were moments that allowed for us to capitalize on new information being distributed, certainly I'm sure I had discussions with him.

Q   Do you remember any of those discussions?

A   I don't.

Q   Do you remember anyone else you discussed that with?

A   Other members of the campaign, specifically,

speech-writing, staff members, or research folks to check the
accuracy of any information, surrogate networks, folks in the
message-development team that were either responsible for
communicating desired messages to our surrogates and other folks
who would be speaking on behalf of the campaign or developing the
message itself.

Q   Can you tell me about how often these conversations
occurred?  Was it a daily occurrence?

A   Sure.  There were daily conversations with the
communications team.  So I imagine this was on the agenda, as it
was happening.

Q   And can you tell me the names of any of the people?  You
just identified the general categories.  Who would those
individuals -- who are those individuals?  Again, I'm confining
myself to the campaign at this time.

A   Other members of the campaign communications team would
be Jason Miller --

Q   Ms. Hicks, I'm going to ask you to speak -- to bring the
microphone closer and to speak up.  Although the room is not quite
as large as it was before, people do want to hear.

A   Other members of the communications team that I recall
would be Jason Miller, Cliff Sims, Steven Cheung, Andrew Surabian.

And there was, you know, there was a combined effort between
the Trump campaign and the Republican National Committee.  So
there were other staffers that were -- would be technically

designated as employees of the RNC that would have been involved.
I'm not as familiar with them.  They were obviously based in D.C.

    Q   Do you recall any of their names?

    A   Raj Shah, Andrew Hemming, Michael Short are the few that
I remember.

    Q   And was there ever any time in any of those
conversations or instances when you learned of any information
about a WikiLeaks release before it was public?

    A   No, sir.

    Q   And did Eric Trump ever discuss anything relating to
WikiLeaks or other releases of hacked information with you?

    A   May I confer with my counsel, please.

[Discussion off the record.]

    Ms. Hicks.  Can you repeat the question, please?

    Mr. Eisen.  Can I have the court reporter read back the
question, please?

    Reporter.  Did Eric Trump ever discuss anything relating to
WikiLeaks or other releases of hacked information with you?

    Ms. Hicks.  I believe I received an email from Eric or some
written communication regarding an opposition research file that
was, I guess, leaked on the internet.  I believe it was publicly
available when he sent it to me.  It was about Donald Trump.

        BY MR. EISEN:

    Q   And do you know if it was publicly available when he
sent it to you?

A   I don't recall.  That's my recollection.

Q   What's the basis for your belief that it was publicly available?

A   I believe there was a link that was included, and I was able to click on that and access the information.

Q   How did he transmit that to you?

A   I don't remember if it was an email or a text message.

Q   Was there also a document attached to that transmission?

A   I don't remember.

Q   Do you remember the date?

A   Spring of 2016.

Q   Spring of 2016.

Just a couple questions about Mr. Collins' examination, the minority examination of you in the previous block.

The White House asserted, Mr. Purpura asserted a number of objections.  Do you understand those objections to be based on absolute immunity?

A   Yes, sir.

Q   Will you answer those questions?

A   I'm going to follow the guidance provided by the White House.

Q   Are you providing any other basis for declining to answer the questions to which Mr. Purpura objected, that Mr. Collins posed?

A   No, sir.

Q   And are you asserting any privileges here today in doing so?

A   No, sir.

Q   Are you asserting executive privilege?

A   No, sir.

Q   And will you answer any other questions about those matters that Mr. Collins was examining you on that drew the objections?

A   I will answer anything that is not objected to.

Mr. Eisen.  Mr. Purpura, can we stipulate for the record that your answers to those questions are the same, that it's absolute immunity, no other basis, not asserting any other privileges in refusing to answer, and not asserting executive privilege in refusing to answer?

Mr. Purpura.  We can stipulate that the answer is, we're not asserting any privileges at this time, and we are asserting the basis of immunity at this time.

Mr. Eisen.  All right.  And not asserting any other basis at this time?

Mr. Purpura.  Not at this time, correct.

Mr. Eisen.  And will you allow the witness to answer additional questions if I ask followup questions to Mr. Collins' questions in those subject matter areas that he raised?

Mr. Purpura.  Not at this time.

Mr. Eisen.  Okay.

BY MR. EISEN:

Q   Oh, one last question on Mr. Collins' question.  I'm
sorry to take so long.  Then I'm going to turn it over to the
members.

Mr. Collins asked you about a voluntary document request that
we made to you and then about a subpoena, correct?

A   Yes, sir.

Q   To your understanding, documents were withheld at the
instruction of the White House in response to our voluntary
request, the first one.  Is that correct?

A   Yes, sir.

Q   And documents were withheld at the request of the White
House in response to our subpoena.  Is that correct?

A   Yes, sir.

Mr. Eisen.  I'll ask the White House if they're prepared to
turn over those documents today that Mr. Collins was asking about.

Mr. Purpura.  We are not.

Mr. Eisen.  Okay.  With that --

Mr. Davis.  Has the chairman asked the White House for those
documents?

Mr. Eisen.  Yes.  For the record, yes.  The chairman has
asked the White House --

Mr. Davis.  Specifically?

Mr. Eisen.  -- did a document request to the White House.

Mr. Purpura.  Well, those are two different things, and those

are part of our ongoing discussions.  It's part of the accommodation, as you know.

So the question was, are we prepared to turn them over today?  The answer is no, because we're in discussions --

Mr. Eisen.  Yes.

Mr. Purpura.  -- as you and I well know.

Mr. Eisen.  So just for record, I'll make it clear for the record, there are ongoing discussions that encompass those documents with the White House.  They have declined to turn them over as of today.  We shall see what becomes of our accommodations.  We're hopeful that they succeed.

And with that, I will turn it over to Ms. Lofgren.

Ms. Lofgren.  Thank you.

Ms. Hicks, it's good to see you, and I know this is not an easy situation to be here answering questions.  We thank you for appearing and doing your best to tell us what you remember of your experiences.

I have some questions.  You know, when you take a look at the Mueller report, as well as some of the other information available in various indictments, it looks like, in the Mueller report, there are 170 contacts between the Trump team and Russia-linked operatives, including 28 meetings.  And if you look at some of the indictments, it's probably 272 contacts and 38 names.  That's a lot of contacts between Russia and the campaign, and I'm interested about that.

One of the things that struck me in reading the Mueller
report -- and it's found on page 136 and 137 of the report -- the
disclosure that the chairman of the campaign and Mr. Gates
repeatedly provided sensitive polling data from swing States to
the Russians.

Now, there was an excuse made in the report about Mr.
Manafort wanting to be reinstated in the good graces of a
Ukrainian oligarch, but it just seemed to me odd that the way he
would do that would be to take internal polling data.

I'm wondering, did you see the internal polling data that was
sent to the Russians?

Ms. Hicks.  I'm not aware of anything that Mr. Manafort or
Mr. Gates were doing.

Ms. Lofgren.  Let me ask you this.  There's a famous
photograph of Mr. Putin at a Russian TV event, and present at the
event were some other Russian operatives, important Russian
oligarchs, Michael Flynn, and Jill Stein.

I'm wondering, did you ever hear from the President a
discussion of Jill Stein in the course of his campaign and how
efforts might be made to eat into the Clinton campaign by
diverting voters to the Stein campaign?

Ms. Hicks.  I think any candidate would be aware of either
the risk or benefit when there's a third-party candidate in the
race.

Ms. Lofgren.  So the President did discuss the Stein campaign

with you, or you overheard his discussion of that?

Ms. Hicks.  There was no concerted effort to capitalize on her candidacy, but certainly, yes, there was an awareness that that could play into the results of the election.

Ms. Lofgren.  Now, did you ever hear from other campaign operatives, Mr. Manafort or others, anyone in the campaign, about a strategy to enhance Ms. Stein's vote total at the expense of Mrs. Clinton's campaign?

Ms. Hicks.  I heard no serious discussions about that.

Ms. Lofgren.  Were you or anyone in the campaign aware that the Internet Research Agency, which has been identified as really the Russian spy agency that meddled in our campaign, posted over a thousand times the phrase "Jill Stein," and the posts were accompanied by the hashtag, "grow a spine, vote Jill Stein," and that this was particularly oriented towards African American voters as a roster of themes that the IRA was pursuing?

Ms. Hicks.  No, I was not aware of that.

Ms. Lofgren.  So you never heard anything about what the campaign was doing about this other campaign, or efforts in the internet, Facebook, or any other platform, that the Russians were doing to meddle in our elections?

Ms. Hicks.  Like I said, I'm not aware of any concerted effort to do anything to enhance her candidacy.

Ms. Lofgren.  So did you ever see tweets or Facebook posts about the campaign?  Was that something you ever saw in your

position?

    Ms. <u>Hicks.</u>  No, ma'am.

    Ms. <u>Lofgren.</u>  You never saw it.  What did you do in your

position?

    Ms. <u>Hicks.</u>  My title was the press secretary, but I don't

think that I did many things that fell under the traditional, you

know, expectations of what one might think that role entails.

    My role was changed on a daily basis, but primarily I

traveled with the candidate, and I organized, coordinated amongst

different parts of the campaign, whether it was speech-writing or

travel, messaging, general strategy, and certainly was available

to the candidate whenever he needed any kind of counsel.

    Ms. <u>Lofgren.</u>  Do you know -- did you have to complete a

background check before joining the campaign?

    Ms. <u>Hicks.</u>  No.

    Ms. <u>Lofgren.</u>  Do you know if anyone on the campaign completed

a background check or conflicts check on others who worked in the

campaign?

    Ms. <u>Hicks.</u>  I don't.  I was probably a little bit of a unique

case, given that I was already an employee of The Trump

Organization and had worked with the Trump family for several

years.  So --

    Ms. <u>Lofgren.</u>  Was there any vetting process for senior

members of the campaign?

    Ms. <u>Hicks.</u>  I'm not aware of --

Ms. Lofgren.  That you were aware.

Who did you report to?  In addition, obviously, the President you knew before, but who else in the campaign did you --

Ms. Hicks.  I reported directly to Mr. Trump.

Ms. Lofgren.  Only to the President, not to anyone else?

Ms. Hicks.  Yes, ma'am.

Ms. Lofgren.  All right.  Thank you very much.

Ms. Hariharan.  Really quickly, the pages that Ms. Lofgren mentioned earlier, we entered them into the record as exhibit 7.

[Hicks Exhibit No. 7

Was marked for identification.]

Mr. Lieu.  Oh, I got it.  Thank you.

Thank you, Ms. Hicks, for being here.  Most of my questions are going to be about your tenure during the campaign.  However, I'm going to ask you a few questions at the beginning about your tenure at the White House to show how absurd the objections from the White House actually are.  I apologize in advance for some of these questions, but absolute immunity is actually not a thing, it doesn't exist.  So I'm going to ask these questions for the purposes of the court proceeding that's going to follow.

On your first day of work at the White House, was it a sunny day or a cloudy day?

Mr. Purpura.  You can answer.

Ms. Hicks.  It was a cloudy day.

Mr. Lieu.  And -- yeah.

Ms. <u>Hicks.</u>  That's probably not helping my reputation, much by the way.  I think people are going to laugh at this.

Mr. <u>Lieu.</u>  And in the White House, where is your office located?

Ms. <u>Hicks.</u>  Pardon?

Mr. <u>Lieu.</u>  In the White House, where is your office located?

Mr. <u>Philbin.</u>  We'll object to that.

Mr. <u>Lieu.</u>  Okay.  During your tenure at the White House, where would you normally have lunch?

Mr. <u>Purpura.</u>  You can answer.

Ms. <u>Hicks.</u>  At my desk.

Mr. <u>Lieu.</u>  Okay.  And would the President ever come in while you're having lunch?

Mr. <u>Philbin.</u>  Objection.

Mr. <u>Lieu.</u>  How often would you talk to the President on a given day?

Mr. <u>Philbin.</u>  Objection.

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Lieu.</u>  All right.  I want to go to questions about your tenure during the campaign.

According to news reports, on September 20th, 2016, Jared Kushner forwarded you an email, and this email was about WikiLeaks had contacted Donald Trump, Jr. with information about PutinTrump.org or a pro-Trump PAC.

Why would Jared Kushner forward such an email to you?

Mr. <u>Purpura.</u>  Excuse me.  I'm sorry, sir.  I didn't hear the date of the email.

Ms. <u>Hicks.</u>  Yes.  I --

Mr. <u>Lieu.</u>  September 20th, 2016.

Mr. <u>Purpura.</u>  Thank you.

Mr. <u>Trout.</u>  I'm sorry.  Could you repeat the question?  I apologize.

Mr. <u>Lieu.</u>  Sure.  According to news reports, on September 20th, 2016, Jared Kushner forwarded you, Ms. Hicks, an email.  That email was about WikiLeaks contacting Donald Trump, Jr. with information about PutinTrump.org and a pro-Trump PAC.

Why would Kushner forward that email to you?

Ms. <u>Hicks.</u>  Most likely for situational awareness.

Mr. <u>Lieu.</u>  Do you remember if Jared Kushner explained why he forwarded that email to you?

Ms. <u>Hicks.</u>  I do not.

Mr. <u>Lieu.</u>  Do you remember sending that email to anyone else?

Ms. <u>Hicks.</u>  I don't.

Mr. <u>Lieu.</u>  Did you discuss that email with candidate Trump?

Ms. <u>Hicks.</u>  No.

Mr. <u>Lieu.</u>  Okay.  Do you have a copy of that email?

Ms. <u>Hicks.</u>  Not in my possession.  I'm sure the campaign --

Mr. <u>Lieu.</u>  Okay.  What's the reason you didn't discuss that email with candidate Trump?

Ms. <u>Hicks.</u>  I don't recall my thinking at the time.

Mr. Lieu.  Did you discuss it with anyone else?

Ms. Hicks.  Probably discussed it with Corey Lewandowski.

Mr. Lieu.  Okay.  Thank you.

Anybody else, other than Corey?

Ms. Hicks.  Not to my --

Mr. Lieu.  Why would you discuss that with Corey Lewandowski?

Ms. Hicks.  We kept in touch and shared information about things going on in the campaign and perhaps any information that might be a moment of levity amongst an intense set of circumstances.

Mr. Lieu.  Did you ever receive information -- I'm sorry.

So you mentioned a moment of levity.  Why would you characterize it that way?

Ms. Hicks.  Just that -- well, I'll say this.  If I received a link of that nature, I probably would not pursue it.

Mr. Lieu.  But you had a conversation with Corey Lewandowski about it, right, that you said?

Ms. Hicks.  Yes.

Mr. Lieu.  Why would you not pursue it?

Ms. Hicks.  I can't say for sure, but just it would be the kind of thing that would set off a red flag in my head, perhaps.

Mr. Lieu.  Do you know if Corey pursued it?

Ms. Hicks.  Oh, I have no idea.  That was not -- that was not the intent of my sharing the information with him.

Mr. Lieu.  What, other than levity, what was the nature of

the conversation you had with Corey about --

    Ms. <u>Hicks.</u>  That was the entirety of the tone of the conversation.

    Mr. <u>Lieu.</u>  And do you know if Donald Trump, Jr. pursued it?

    Ms. <u>Hicks.</u>  I have no idea.

    Mr. <u>Lieu.</u>  Okay.  And you had said earlier it was a red flag.  Why would you characterize it as a red flag?

    Ms. <u>Hicks.</u>  Just clicking on a link from an unknown sender amidst a Presidential election, given that there had already been information about hacks.

    Mr. <u>Lieu.</u>  The sender was Jared Kushner, though.

    Ms. <u>Hicks.</u>  Pardon?

    Mr. <u>Lieu.</u>  The sender of that email was Jared Kushner to you.

    Ms. <u>Hicks.</u>  Yes.

    Mr. <u>Lieu.</u>  But he's a known sender, right?

    Ms. <u>Hicks.</u>  Right.  But the information that was in the body of the email --

    Mr. <u>Lieu.</u>  I got it.

    Ms. <u>Hicks.</u>  -- that it was described how that was obtained, which was an unknown sender.

    Mr. <u>Lieu.</u>  What did Corey say to you when you discussed this email?

    Ms. <u>Hicks.</u>  I don't recall his exact -- any exact words used, but, you know, similar reaction.

    Mr. <u>Lieu.</u>  Did you receive other emails like this from Jared

Kushner?

Ms. Hicks.  There's one other email I can recall.  I believe
it was -- I believe the sender purported to be Guccifer 2.0.  I
don't know if it actually was.  That's what -- that's what
the -- the name said.  And it was basically a demand for
information about Mr. Trump's finances in the days leading up to
the campaign.

Mr. Lieu.  So this was an email Jared Kushner forwarded to
you that Guccifer --

Ms. Hicks.  I don't know if he forwarded to me.  It was one
he received.  We were to the plane together.  I remember him
showing it to me.  He asked me what I thought about it, if it was
legitimate, what he should do with it.

My understanding is that he showed it to the Secret Service
to see if they had any advice on who he should share it with, to
make sure that he hadn't been hacked or that the information
wasn't going to compromise his intellectual property.

And that was the last I heard of it.  I don't know what he
actually did with the email.

Mr. Lieu.  And that email was Guccifer basically allegedly
threatening to blackmail candidate Trump during the campaign,
correct?

Ms. Hicks.  That's my recollection of it, yes.

Mr. Lieu.  Okay.  Did you show that email to anyone else?

Ms. Hicks.  Again, I just described the series of events, and

I had no other involvement.

Mr. Lieu.  Okay.  Did you show the emails that we were talking about at all to the Secret Service?

Ms. Hicks.  Which emails?

Mr. Lieu.  The September 20th, 2016, email.

Ms. Hicks.  No.

Mr. Lieu.  How about the one from Guccifer?

Ms. Hicks.  I did not.  Mr. Kushner did.

Mr. Lieu.  Mr. Kushner showed it to Secret Service?

Ms. Hicks.  Yes.

Mr. Lieu.  And how do you know that?

Ms. Hicks.  We were on the plane --

Mr. Lieu.  Air Force One?

Ms. Hicks.  No.  This was during the campaign.

Mr. Lieu.  I'm sorry.  Of course, it was during the campaign. I apologize.  Okay.

So the Secret Service is there on the plane, and you watched Jared Kushner do this or did he tell you later that he showed it to Secret Service?

Ms. Hicks.  I watched him do it.  I didn't follow up on how they reacted or what advice they gave.  There was a lot going on, but I do know that he went over and shared it with them.

Mr. Lieu.  Did Donald Trump, Jr., or anyone else in the Trump family or on the Trump campaign, report any other emails to the Secret Service, to your knowledge, about the release of

information about Hillary Clinton?

Ms. Hicks.  Not to my knowledge.

Mr. Lieu.  So were you surprised by this email when you read it?

Ms. Hicks.  You know, it looked like junk email, but --

Mr. Lieu.  I'm sorry, what?

Ms. Hicks.  It looked like spam, junk email, but --

Mr. Lieu.  But it was important enough for Jared Kushner to show it to the Secret Service?

Ms. Hicks.  I think he was being cautious.  I believe we were just a few days away from the election.  I think he was more concerned less with the validity of the email and wanting to make sure -- and more concerned with wanting to make sure that his information hadn't been compromised.

Mr. Lieu.  Did you know who Guccifer was at the time?

Ms. Hicks.  I don't have specifics.  Obviously, I had heard things in the media about him being sort of somebody who practiced the dark arts of the internet, I guess you would say.

Mr. Lieu.  Okay.  During the campaign, you were also working for The Trump Organization, correct?

Ms. Hicks.  Yes, sir.

Mr. Lieu.  During the campaign, did The Trump Organization have any financial ties to Russia?

Ms. Hicks.  Not that I was aware of.

Mr. Lieu.  In 2008, Donald Trump, Jr. was quoted as saying:

In terms of high-end product influence -- influx into the U.S.,
Russia -- Russians make up a pretty disproportionate cross section
of a lot of our assets.  We see a lot of money pouring in from
Russia.

Were you aware of that statement at the time?

Ms. Hicks.  In 2008?  No, I wasn't working for the Trumps in
2008.

Mr. Lieu.  But during the campaign, were you aware that --

Ms. Hicks.  Yes.

Mr. Lieu.  -- Donald Trump, Jr. had made that statement?

Ms. Hicks.  Yes.

Mr. Lieu.  Okay.  Did you ever discuss that statement with
Donald Trump, Jr.?

Ms. Hicks.  Yes, I did.

Mr. Lieu.  What did he tell you?

Ms. Hicks.  He explained the context of the remark and, you
know, was asking for my help in making sure that the media wasn't
misrepresenting the remark or presenting it in any misleading way.

Mr. Lieu.  And what would be the accurate representation of
that remark?

Ms. Hicks.  My understanding is that he was describing the
kinds of clientele that were purchasing luxury apartments, both in
New York City, Chicago, and in south Florida, all where they were
either operating or in the process of developing luxury
properties.

Mr. <u>Lieu.</u>  And that clientele, they were Russians?

Ms. <u>Hicks.</u>  I think it's well known in luxury real estate markets, especially in New York, that Russians, Chinese, there's a lot of foreign money that comes in and purchases these very expensive luxury apartments.

Mr. <u>Lieu.</u>  During the campaign, was that still happening?

Ms. <u>Hicks.</u>  You know, not to my knowledge.  I obviously wasn't privy to the finances of the organization.  Speaking -- my previous statements are based on information that I obtained obviously through my conversations with Donald Trump, Jr. and then information that I was aware of, based on my role as a director of communications for a residential real estate and hospitality company, understanding the trends of the market and who the clientele was.  It's all very publicly available.

[11:17 a.m.]

Mr. Lieu.  And how was the media mischaracterizing Donald Trump, Jr.'s remarks?

Ms. Hicks.  I think it made it seem like there was Russian money coming into The Trump Organization in a way that was inappropriate or somehow sinister.  You know, they're a luxury, globally recognized real estate company.  I think it would be odd if they weren't selling to people just because they're affiliated with Russia.  And there's perhaps a political perception that might complicate that.

Mr. Lieu.  So you don't dispute that there was Russian money, as you said, pouring into The Trump Organization from the sale of those luxury properties?

Ms. Hicks.  Again, I'm not privy to the finances of The Trump Organization.  I can only describe what was relayed to me in terms of the context of the remark.

I can also say that I believe in 2008 Mr. Trump sold one of his homes for several -- I believe the price was upwards of $90 million, and it was sold to a Russian individual.  So that would also be a statement that would be categorized and align with Donald Trump, Jr.'s words.

Mr. Lieu.  Okay.  Thank you.

I'm going to turn it over to Congressman Neguse.

Mr. Neguse.  Good morning, Ms. Hicks.

Ms. Hicks.  Hi.

Mr. Neguse.  And thank you for the clarification that you provided to the ranking member regarding my --

Ms. Hicks.  Yes.

Mr. Neguse.  -- question during the first hour.

I just have a few questions, and then I'm going to yield to my colleague here.

Just to clarify Representative Lieu's questioning around the emails, I think there are two emails that we're talking about, correct?  There's the September 20th, 2016, email --

Ms. Hicks.  Yes.  And then --

Mr. Neguse.  -- that Jared Kushner forwarded to you.

Ms. Hicks.  -- he asked me if there were any other emails that Jared Kushner forwarded to me.  The second email I referenced was one -- I'm not sure if it was forwarded.  I know I looked at it on a computer screen.

Mr. Neguse.  Exactly.  And that's the one in October.

Ms. Hicks.  Yes, sir.

Mr. Neguse.  Okay.  So with respect to that October email, is there a chance that that email was sent to Donald Trump, Jr., rather than Jared Kushner?  Do you recall who the email went to?

Ms. Hicks.  My understanding is it went directly to Jared Kushner.

Mr. Neguse.  Okay.

And the email to Mr. Kushner, as Mr. Lieu said, this email related to an attempted effort by someone claiming to be Guccifer

to blackmail then-candidate Trump.

Ms. Hicks.  That's right.

Mr. Neguse.  Okay.  And did this have anything to do with then-candidate Trump's tax returns?

Ms. Hicks.  I can't remember specifically if it said "tax returns" in the email, but it was definitely relating to financial information, financial disclosures.

Mr. Neguse.  It threatened release of then-candidate Trump's --

Ms. Hicks.  That's accurate, yes.

Mr. Neguse.  Okay.  And you mentioned that that was reported to Secret Service by Mr. Kushner.

Ms. Hicks.  That's right.

Mr. Neguse.  Okay.

The email from June 3rd, 2016, from Mr. Goldstone to Mr. Trump, Jr., providing potential information regarding Secretary Clinton, was that email reported to Secret Service?

Ms. Hicks.  I wasn't aware of the email at the time.  I'm not aware of it being reported.

Mr. Neguse.  The email on September 20th, 2016, where, essentially, Mr. Kushner is forwarding to you an email where WikiLeaks is contacting Mr. Trump, Jr., with information about a pro-Trump or Putin -- what is it -- I guess it's PutinTrump.org -- to you, that was enough of a -- I think you used the words "red flag," correct, the phrase "red flag"?  That email

was a red flag to you?

Ms. <u>Hicks.</u>  I just want to be clear.  The red flag that I say I saw in my peripheral vision was not necessarily due to substance but more of just a knee-jerk reaction not to click on links where you don't know the sender.

Mr. <u>Neguse.</u>  Sure.  As you said, during the height of a Presidential campaign, receiving an email from a foreign -- in this case, WikiLeaks, communicating to the campaign, it was a red flag to you to not click on that link.  That is my sense of your testimony.  Is that --

Ms. <u>Hicks.</u>  That is what I recall, yes.

Mr. <u>Neguse.</u>  And that email was not reported to Secret Service either, correct?

Ms. <u>Hicks.</u>  Not by me.  I am not aware of what others did.

Mr. <u>Neguse.</u>  Is it troubling to you that all of these other emails were not reported to Secret Service or law enforcement and yet this one email that you mentioned to Mr. Kushner that involved this threatened blackmail was, in fact, reported to Secret Service, where the others were not?

Ms. <u>Hicks.</u>  No.  I think you learn as you go through the process.  And I'm sure Jared had a lot more information at the time he received the Guccifer email than just a month prior when Don received that link and anything else that took place prior.  So you learn as you go.

Mr. <u>Neguse.</u>  Although it was enough of a red flag for you in

September, at least you personally.

Ms. Hicks.  Again, it wasn't a red flag in terms of the nature of the message.  It was more about, like, just not clicking on links from people you don't know.

I shared in other testimony that I've provided that, early on in the campaign, in 2015, I clicked on a link in my personal email and, you know, compromised my personal email.  So, somewhere in the dark corners of the internet, there's lots of pictures of my family dog.

But, anyway, yeah, lesson learned for me there.  And, like I said, people learn as they go.

Mr. Neguse.  With that, I'll yield to -- thank you, Ms. Hicks -- yield to Representative Cicilline.

Mr. Cicilline.  Thank you.

Thank you, Ms. Hicks.

Did Mr. Trump ever ask you to lie during the campaign?

Ms. Hicks.  I've never been asked to lie about any matters of substance or consequence.

Mr. Cicilline.  My question is, were you asked to lie at all?

Ms. Hicks.  Look, I addressed this in my previous testimony.  I think everyone is aware of what I said.  And I'd like to just reiterate that I've never been asked to lie about matters of substance or consequence --

Mr. Cicilline.  Well --

Ms. Hicks.  Could you let me finish?  I would appreciate it.

But I'm also part of a press operation.  And as I'm sure the press person that was in here earlier would attest to, we're often asked to put a positive spin on things, present the best possible version of events.  But I believe I always did so with integrity.

And I'd like to also note that, just a few minutes after I was warned about the confidential nature of the session in which I shared that information, that information was being discussed on cable news, and it was my integrity that was up for debate.

Mr. Cicilline.  Okay.

Ms. Hicks.  So I stand by my earlier characterization of telling white lies, which I believe to be things like "No, the President is not available right now" when he is.  But, no, I've never been asked to lie about matters of substance or consequence.

Mr. Cicilline.  Okay.  So, to be clear, you're referring to testimony before the House Intel Committee, not this committee, correct?

Ms. Hicks.  Yes, sir.

Mr. Cicilline.  Okay.

So I'm going to get back to my original question.  I appreciate your discussion, but my question is a very specific one.  I'm not asking you to decide what you think is an important lie or not important lie.  My question is, did Mr. Trump ever ask you to lie during the campaign?

Ms. Hicks.  Sir, I've answered the question.

Mr. Cicilline.  So the answer is, yes, you have been asked to

tell lies on non- -- what you characterize as not substantial?
You call them white lies, which I take is still a lie, right?

Ms. Hicks.  I've answered the question.  I stand by my
earlier --

Mr. Cicilline.  I'm asking a new question, Ms. Hicks.  You
have excluded a whole bunch of stuff you're not going to answer,
which is fine.  We have to accept that until a court says
otherwise.  We get to ask questions, and you're required to answer
them.

My question is a very simple one.  Did Mr. Trump ever ask you
to lie during the campaign?

Mr. Trout.  And she has answered that question.

Mr. Cicilline.  She hasn't answered the question.

Mr. Trout.  Yes, she has.

Mr. Cicilline.  The question is, did he ask you to lie during
the campaign?  That's a "yes" or a "no."

Ms. Hicks.  I answered the question, sir.  I'm not going
to --

Mr. Cicilline.  So in any instances where the President did
ask you to lie, what were those?

Ms. Hicks.  I have described those.  They are not matters of
substance or consequence.

Mr. Cicilline.  What are they?  Please tell us what lies the
President asked you to tell during the campaign.

Ms. Hicks.  I've provided an example.  I've said that the

President was busy when he wasn't.  I've said that he had a
conflict when he didn't.  I've said that he would love to
participate in an interview when I know that that would not be his
first choice.

Mr. Cicilline.  So has the President ever asked you to lie
since you've left the White House?

Ms. Hicks.  No.

Mr. Cicilline.  You've read the Mueller report, I take it?

Ms. Hicks.  No, sir.  I lived the Mueller report.  I have
not --

Mr. Cicilline.  Never read it?

Ms. Hicks.  No.

Mr. Cicilline.  Okay.

Did you ever witness Mr. Trump asking anyone else to lie
during the campaign?

Ms. Hicks.  Not that I can recall.

Mr. Cicilline.  What about during the transition?

Ms. Hicks.  No.

Mr. Cicilline.  What about during your time at the White
House?

Mr. Purpura.  Objection.

Mr. Philbin.  Objection.

Mr. Cicilline.  I take it you are not answering that question
because the President and the White House has ordered you not to
answer that question?

Ms. Hicks.  I'm following the guidance of the White House.

Mr. Cicilline.  But when you say "guidance," it's not guidance; it's a directive, isn't it?  They're not just giving you advice; they're telling you not to answer it.

Mr. Philbin.  Congressman, the White House is making clear that she's not to --

Mr. Cicilline.  Right.  Understood.  There's a witness before us who gets to answer the question.

Are you being advised or ordered not to answer the question?

Mr. Trout.  She's being directed by the White House --

Mr. Cicilline.  Directed.  Okay.

Your lawyer said directed.  That's sufficient for me.

And that basis for refusing to answer the question is not based on a privilege, correct?

Mr. Trout.  Correct.

Mr. Cicilline.  It's not based on an assertion of any other basis other than this newly found, expansive, complete immunity which is alleged in the letter, correct?

Mr. Trout.  Yes, I think the record is clear --

Mr. Cicilline.  Okay.  And rejected by the committee.

Mr. Philbin.  Congressman, just to clarify, this is not a newly found --

Mr. Cicilline.  Well, that's for a court to decide.  I think it's pretty clear it's newly found.

But I'll move on to my next question.  So it's one thing not

to get answers from witnesses, but I certainly don't have to take answers from lawyers who are not part of this proceeding in terms of answering questions.

I want to turn now to the Trump campaign's -- or let me -- you would agree, would you not, Ms. Hicks, that the campaign, the Trump campaign, benefited from the hacked information on Hillary Clinton?  Is that a fair statement?

Ms. <u>Hicks.</u>  No more so than the Clinton campaign benefited from the media helping them and providing information about Mr. Trump.

Mr. <u>Cicilline.</u>  Okay.  But you agree, though, I think, in that question, that the Trump campaign benefited from the hacked information on Hillary Clinton.

Ms. <u>Hicks.</u>  I don't know what the direct impact was.

Mr. <u>Cicilline.</u>  Okay.  You would agree that the campaign was happy to receive information damaging to Hillary Clinton, correct?

Ms. <u>Hicks.</u>  I think that "happy" is not -- I don't think that's a fair characterization.  I think "relief that we weren't the only campaign with issues" is more accurate.

Mr. <u>Cicilline.</u>  I mean, you're aware of Mr. Trump, Jr., saying, "If it's what I think, I love it."  That's an expression of admiration or fondness for information, isn't it?

Ms. <u>Hicks.</u>  That has nothing to do with what you just asked about.  You asked about WikiLeaks.

Mr. <u>Cicilline.</u>  I'm asking about hacked information.

Ms. <u>Hicks.</u>  But I don't -- did those emails describe hacked
information?

Mr. <u>Cicilline.</u>  Well, they -- well, what did those email
describe?

Ms. <u>Hicks.</u>  You have the papers in front of you, sir.  I
don't.  But I don't believe they described hacked information.

Mr. <u>Cicilline.</u>  They described --

Ms. <u>Hicks.</u>  If it was that specific, then I'm wrong, but --

Mr. <u>Cicilline.</u>  Okay.

During the campaign, were you aware of anyone at the campaign
communicating with individuals from Russia?

Ms. <u>Hicks.</u>  No.

Mr. <u>Cicilline.</u>  You're sure of that?

Ms. <u>Hicks.</u>  Look, it's obviously been a few years, and there
is a lot of conflation between other testimony I've provided,
what's publicly available, media reports.  But my recollection is,
during the campaign, throughout that time period, I was not aware
of any individuals that were communicating with foreign officials
from Russia.

Mr. <u>Cicilline.</u>  Okay.  During the campaign, did anyone from
Russia attempt to contact you?

Ms. <u>Hicks.</u>  Based on preparation for other interviews that
I've given, I know that I was -- you know, it was also previously
mentioned here today, somebody reached out to me regarding an
interview.  I believe that may have happened on more than one

occasion.  And after the campaign, on the night of the election, I was contacted by a Russian Ambassador, or somebody that worked for the Embassy.

Mr. Cicilline.  During the campaign, did you ever discuss with Mr. Trump news reports that the Trump campaign was coordinating with Russia?

Ms. Hicks.  I think certainly there was discussion about how to push back on claims, unsubstantiated claims, that were being made either by the Clinton campaign or speculated about in the media.

Mr. Cicilline.  So, in your role as a communications official, you had some discussions with the President about these public reports and how to respond to them.  Is that a fair statement?

Mr. Purpura.  I'm sorry.  Just to clarify, during the campaign?

Mr. Cicilline.  During the campaign.

Ms. Hicks.  That's accurate.

Mr. Cicilline.  And what did Mr. Trump say in those conversations?

Ms. Hicks.  You'd have to be more specific.  I can't repeat everything that was said in every conversation.  I obviously don't remember.  But if you have a specific day that you --

Mr. Cicilline.  What do you remember?  To the best of your knowledge, what were some of the things that you can remember that

the President said about public reports that the Trump campaign
was coordinating with Russia in the conversations you had with him
about this?

Ms. Hicks.  That it was nonsense and that -- at the time,
obviously, no one was certain that it was, in fact, Russia, and
that it appeared as though it was something that the Clinton
campaign had made up to deflect from the information that they
viewed as harmful to their candidate, to their campaign.  And it
just seemed more sporadic than something that was the result of an
intelligence assessment or some kind of detailed knowledge of what
took place.

Mr. Cicilline.  And is that what Mr. Trump told you in that
conversation?

Ms. Hicks.  That was the nature of the conversation, yes.

Mr. Cicilline.  And did you believe him?

Ms. Hicks.  I believed that the claims, unsubstantiated
claims, that we were coordinating with Russia was an attempt to
distract and deflect.  Obviously, we knew that wasn't the case.
And if I was on the other campaign, I probably would have taken a
similar strategy.

Mr. Cicilline.  How about the claims that the Russians were
interfering in an effort to help Mr. Trump and harm Hillary
Clinton?

Ms. Hicks.  I don't recall when that information was
first -- when that theory was first proposed publicly.  So if

someone could help me with the date you're referencing, that would
be helpful.

Mr. Cicilline.  I'm asking, did the President -- did you have
an opportunity to discuss with the President reporting that
the -- public reporting that the Russians were interfering in the
American Presidential election in a way to help Mr. Trump and harm
Secretary Clinton?

Ms. Hicks.  What I'm asking is, when did that information
become publicly available?  Because I don't know if that was
available after --

Mr. Cicilline.  Well, at any time during the campaign.

Ms. Hicks.  Again, I don't know if that was something -- I'm
just asking for you to clarify the dates.  I don't know if that
was something that was brought up during the campaign or if it was
after the fact.

Mr. Cicilline.  Well, do you remember at any point during the
campaign becoming aware of public reporting that --

Ms. Hicks.  I don't.  That's why I'm asking for
clarification.

Mr. Cicilline.  Okay.

Did you ever discuss -- you said you had some discussions
with the President about news reports that the Trump campaign was
coordinating with Russia, and you described that conversation.
Did you discuss those reports with anyone else at the campaign?

Ms. Hicks.  I don't have a vivid recollection of those

conversations, but certainly I would have discussed them with
other folks on the communications team and other senior members of
the campaign.

Mr. Cicilline.  How about with Donald, Jr.?

Ms. Hicks.  I don't recall discussing with Don.

Mr. Cicilline.  Eric Trump, did you discuss it with him?

Ms. Hicks.  I don't recall discussing with Eric.

Mr. Cicilline.  Paul Manafort?

Ms. Hicks.  You know, I don't.  I know that sounds odd.  I
didn't spend a lot of time or interact with Paul very much, so --

Mr. Cicilline.  Rick Gates?  Did you ever discuss it with
him?

Ms. Hicks.  Not to my recollection.

Mr. Cicilline.  So you said there were other people you
discussed it with besides the President.  Who did you discuss it
with?

Ms. Hicks.  Like I said, members of the communications team,
some of the folks I mentioned earlier, likely Jason Miller being
one of them, folks that worked at the RNC in the war room that
would have been compiling research --

Mr. Cicilline.  Who would those people be?

Ms. Hicks.  I listed their names earlier:  Raj Shah, Michael
Short, Andrew Hemming, Jason Miller, Cliff Sims, Steven Cheung.

Mr. Cicilline.  You stated in response to one of my questions
that these were unsubstantiated claims about Russian interference

in the American Presidential election --

    Ms. <u>Hicks.</u>  No, I said that the claims that there was coordination between the Trump campaign and Russians was unsubstantiated.

    Mr. <u>Cicilline.</u>  Did you say contacts between the Russians and the Trump campaign were unsubstantiated?

    Ms. <u>Hicks.</u>  No, I said -- when you asked me about speculation that there was coordination between Russians and the Trump campaign, I said that those were unsubstantiated claims and we regarded them as nonsense, obviously, knowing --

    Mr. <u>Cicilline.</u>  Do you still regard them as unsubstantiated claims?

    Ms. <u>Hicks.</u>  That there was coordination between Russia and the Trump campaign?  Yes, I do.

    Mr. <u>Cicilline.</u>  How about that the Trump campaign spoke with and had contact with Russians during the course of the campaign?

    Ms. <u>Hicks.</u>  If you could be more specific about who you consider to be part of the Trump campaign and the alleged contacts they had, that would be helpful to me.

    Mr. <u>Cicilline.</u>  Paul Manafort?  You don't today believe that Paul Manafort didn't have contacts with Russians during the course of the campaign, do you?

    Ms. <u>Hicks.</u>  Like I said, I wasn't aware of what Paul was doing.  I wasn't --

    Mr. <u>Cicilline.</u>  But you are aware today?

Ms. Hicks.  I am now, yes, sir.

Mr. Cicilline.  Okay.  So, today, you don't say that contacts between the Trump -- or claims that there were contacts between the Trump campaign and Russian operatives is no longer unsubstantiated.  It's, in fact, fully --

Ms. Hicks.  I didn't say that.  I didn't say that.

Mr. Cicilline.  So I'm asking you that question.  You agree that there were, in fact, contacts between the Trump campaign and Russian operatives?

Ms. Hicks.  Like I said, I haven't read the part of the report you're referencing, but based on what you said earlier, I have no reason to dispute that.

[Hicks Exhibit No. 9

Was marked for identification.]

Mr. Cicilline.  Let me just finally go to Volume I, page 102, and look at footnote 589.

And I ask if we can make that available to Ms. Hicks.

If you can read into the record the sentence starting "Following the Convention" and ending with "We have no knowledge of activities past or present and he now officially has been removed from all lists etc."

Mr. Trout.  I'm sorry.  Could you give me the page number again?

Mr. Cicilline.  Yes.  This is page 102.

You asked for an example of one of, I think, almost 200

contacts between the campaign and Russian operatives.  This is one
example I'd like you to read into the record.

    Ms. <u>Hicks.</u>  And where were --

    Mr. <u>Cicilline.</u>  Exhibit 9 it is.

    Ms. <u>Hicks.</u>  Sorry.  Where would you like me to begin reading?

    Mr. <u>Cicilline.</u>  If you can start at "Following the
Convention" --

    Ms. <u>Hicks.</u>  Oh.

    Mr. <u>Cicilline.</u>  -- and read through the paragraph.

    Ms. <u>Hicks.</u>  "Following the Convention, Page's trip to Moscow
and his advocacy for pro-Russia foreign policy drew the media's
attention and began to generate substantial press coverage.  The
Campaign responded by distancing itself from Page, describing him
as an 'informal foreign policy advisor' who did 'not speak for
Mr. Trump or the campaign.'  On September 23, 2016, Yahoo! News
reported that U.S. intelligence officials were investigating
whether Page had opened private communications with senior Russian
officials to discuss U.S. sanctions policy under a possible Trump
Administration.  A Campaign spokesperson told Yahoo! News that
Page had 'no role' in the Campaign and that the Campaign 'was not
aware of any of his activities, past or present.'  On
September 24, 2016, Page was formally removed from the Campaign."

    Mr. <u>Cicilline.</u>  And you agree now that that is an example of
a contact with Russians from a member of the Trump --

    Ms. <u>Hicks.</u>  Well, I take issue with the description provided

here, as it says that the campaign responded by distancing itself
from Page.  I don't recall any instance where we were close.
There was no additional distance needed to be placed between
Carter Page and the campaign.

    Mr. <u>Cicilline.</u>  Well --

    Ms. <u>Hicks.</u>  But if you categorize Carter Page as somebody who
was involved with the Trump campaign, and, you know, certainly he
had Russian contacts, then that is fine.

    Mr. <u>Cicilline.</u>  But didn't you instruct that inquiries about
Mr. Page, if you look the footnote 589, should be answered with,
and I quote, "He was announced as an informal advisor in March.
Since then, he has had no role or official contact with the
campaign.  We have no knowledge of activities past or present and
he now officially has been removed from all our lists"?

    Ms. <u>Hicks.</u>  I think we're saying the same thing.

    Mr. <u>Cicilline.</u>  Thank you.

I now yield to Mr. Deutch.

    Mr. <u>Deutch.</u>  Thank you very much, Mr. Cicilline.

Thanks, Ms. Hicks, for being here.

You said earlier that you hadn't read any of the Mueller
report because you lived it.  Did you review any of the portions
that described you?

    Ms. <u>Hicks.</u>  My counsel has done that.  And, yes -- I have not
done a thorough job, admittedly, but, yes, I have.

    Mr. <u>Deutch.</u>  Do you know how many times you're mentioned in

the Mueller report?

Ms. <u>Hicks.</u>  I don't.  I believe somebody said earlier
27 pages.  Is that right?

Mr. <u>Deutch.</u>  Yeah.

And you told us earlier that you'd like to answer any
questions not objected to by the White House when you were here
today.  Did the White House make any claims of absolute immunity
from being compelled to testify before the special counsel?

Ms. <u>Hicks.</u>  No.

Mr. <u>Deutch.</u>  Do you know if the White House -- were there
discussions with the White House about the possibility that you
might not speak to the special counsel because of the absolute
immunity that they could assert?

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Deutch.</u>  So, to confirm, there was no discussion about
absolute immunity to testify before Muller?

Mr. <u>Philbin.</u>  That's not correct.  We objected to the
question, and she did not answer.  You're asking for whether or
not she had discussions with the White House while she was a
senior --

Mr. <u>Deutch.</u>  I am.  Thanks.  Thanks.

Are you aware of any absolute immunity --

Mr. <u>Davis.</u>  They're part of the --

Mr. <u>Deutch.</u>  No, I understand.  I understand the objection
because I've heard it multiple times.  Thank you very much.

And you aware of -- and were you aware that the possibility existed that absolute immunity could have been claimed to prevent you from testifying before the Mueller investigation?

Mr. <u>Philbin.</u>  Objection.

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Deutch.</u>  Ms. Hicks, I'd like to -- well, let me just turn to this.  On the evening of June 14th, 2017, The Washington Post reported the special counsel was investigating the President's conduct for possible obstruction of justice.

Were there any discussions that took place with the President about his refusal to cooperate with the special counsel on obstruction-of-justice claims?

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Deutch.</u>  Were you in any meetings where there were any discussions with the President of the United States about his refusal to answer any questions about obstruction of justice?

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Deutch.</u>  The Mueller report states that the President called Don McGahn that weekend, on Saturday, June 17th, to direct him to have the special counsel removed because of the asserted conflicts of interest.

I'd like to introduce into the record as exhibit 10 page 86 of Volume II of the Mueller report, which describes what the President said to McGahn when he called, including, and I quote, "Call Rod, tell Rod that Mueller has conflicts and can't be the

Special Counsel"; "Mueller has to go"; and "Call me back when you do it."

[Hicks Exhibit No. 10

Was marked for identification.]

Mr. Deutch.  Did the President tell you that he was making those calls to Mr. McGahn?

Mr. Purpura.  Objection.

Mr. Deutch.  Did you ever learn that Mr. McGahn was considering resigning after that weekend as a result of the President's calls?

Mr. Purpura.  Objection.

Mr. Deutch.  Will you refuse to answer any other questions about whether the President directed his White House counsel to fire the special counsel?

Mr. Purpura.  Objection.

Mr. Deutch.  I'm just asking whether you're refusing to answer any questions.

Mr. Purpura.  Again, sir, her absolute immunity applies. That was during her time at the White House as a close advisor to the President, and she will not answer those questions.

Mr. Deutch.  So perhaps I should ask counsel whether it's your intent to --

Mr. Philbin.  We will object to all of those questions.

Mr. Deutch.  -- object to all of those questions.  Thank you very much.

I refer you back to our list of privilege questions that we entered as exhibit 1, beyond this assertion of absolute immunity. You're going to decline to answer all of those questions, whether you're asserting any privileges -- now, I can go through these again, or I'll read them one time and you can tell me -- sorry?

[Discussion off the record.]

Mr. Deutch.  I'm sorry.  I apologize.  Then I would like to enter into the record as exhibit 11 the questions that have been asked -- the first one, correct?  Yeah.

[Hicks Exhibit No. 11

Was marked for identification.]

Mr. Deutch.  The first question is:  Are you asserting any other basis for declining to answer the question?

Ms. Hicks.  No.

Mr. Deutch.  Are you asserting any privileges in declining to answer the question?

Ms. Hicks.  No.

Mr. Deutch.  Are you asserting executive privilege in declining to answer the question?

Ms. Hicks.  No.

Mr. Deutch.  Will you provide any details about this matter so that the committee can assess the applicability of privileges?

Ms. Hicks.  I will answer any questions that are not objected to.

Mr. Davis.  I'm sorry.  Where did you get this document,

exhibit 11?  I don't know what this is.

Mr. Deutch.  It's a list of questions that I'm --

Mr. Davis.  Where did it come from?

Mr. Deutch.  It's a list of questions that I'm asking now
that I will then submit --

Mr. Davis.  So this is a document that your staff created
during the interview that you're now entering as an exhibit?  Is
that right?

Mr. Deutch.  It's the series of questions that I'm asking
right now to be entered into the record.

Mr. Philbin.  I would note, just for the record, that this is
simply a list of questions that will be reflected in the record as
they are read out loud.  So the purpose of entering this as an
exhibit --

Mr. Deutch.  Great.  Then -- okay.

Mr. Eisen.  It's simply being --

Mr. Deutch.  So, then, I'll just -- please.

Mr. Eisen.  Go ahead.

Mr. Deutch.  I'll just finish asking the questions.

Will you provide any details about this matter so that the
committee can assess the applicability of privileges?

Ms. Hicks.  I will answer any questions that are not objected
to.

Mr. Deutch.  Will you answer any other questions about this
matter?

Ms. <u>Hicks.</u>   As long as they're not objected to.

Mr. <u>Deutch.</u>   On January 25th, 2018, The New York Times
reported that, back in June of 2017, the President had ordered
Mr. McGahn to have the special counsel removed.

And I'd like to introduce as exhibit 12 pages 114 through 117
of Volume II of the report.

[Hicks Exhibit No. 12

Was marked for identification.]

Mr. <u>Deutch.</u>   While we're finding those, since we're going to
be running up against lunch, I'll go ahead and read this, and you
can follow along.

Beginning "On January 26":   "On January 26, 2018, the
President's personal counsel called McGahn's attorney and said
that the President wanted McGahn to put out a statement denying
that he had been asked to fire the Special Counsel and that he had
threatened to quit in protest.   McGahn's attorney spoke with
Mr. McGahn about that request and then called the President's
personal counsel to relay that McGahn would not make a statement.
McGahn's attorney informed the President's personal counsel that
the Times story was accurate in reporting that the President
wanted the Special Counsel removed.   Accordingly, McGahn's
attorney said, although the article was inaccurate in some other
respects, McGahn could not comply with the President's request to
dispute the story.   Hicks recalled relaying to the President that
one of his attorneys had spoken to McGahn's attorney about the

issue."

Now, is that what you said to the special counsel?

Mr. Philbin.  Objection.

Mr. Deutch.  Did you know the President was attempting to get Mr. McGahn to deny that the President asked him to fire the special counsel, even though Mr. McGahn confirmed that the President did ask him to fire the special counsel?

Mr. Purpura.  Objection.

Mr. Deutch.  Did the President ask you to help him get Mr. McGahn to deny the story by communicating with Mr. McGahn's lawyers?

Mr. Purpura.  Objection.

Mr. Deutch.  You've been instructed not to answer any questions about the President instructing his White House counsel to create a false record.  That's correct?

Mr. Purpura.  Objection.

Mr. Deutch.  Let me just finish with this.

Mr. Purpura.  Can you read back that question?

Mr. Deutch.  I'll restate.

You have been instructed not to answer any questions about the President instructing his White House counsel to create a false record.  Is that correct?

Mr. Philbin.  Objection.

Mr. Purpura.  Objection.

Mr. Deutch.  Have you had any discussions, Ms. Hicks, with

Donald Trump's personal lawyers, including Jay Sekulow, about any
of your testimony here today?

Ms. <u>Hicks.</u>  No, sir.

Mr. <u>Deutch.</u>  Have you had any discussions with any of the
President's personal lawyers about your testimony?

Ms. <u>Hicks.</u>  Here today?  No, sir.

Mr. <u>Deutch.</u>  Have you had any discussions with the
President's -- any discussions with -- sorry -- the President's
personal lawyers about cooperating with the government at any
point?

Mr. <u>Philbin.</u>  Objection.  To the extent you're asking
questions about her time as a senior advisor to the President and
the White House, we object to that question.

Mr. <u>Deutch.</u>  Great.

And as to the rest of your time and your longstanding
relationship with the President, have you had any discussions with
the President's personal lawyers about cooperating with the
government at any point?

Ms. <u>Hicks.</u>  No.

Mr. <u>Deutch.</u>  No discussion -- you've not spoken about this
investigation or any efforts by Congress or efforts by the Mueller
team to probe the activities that are covered in the Mueller
report?

Mr. <u>Trout.</u>  Congressman, I think her answer is really limited
to the period that she was not at the White House.

Mr. <u>Deutch.</u>  I understand that.

With respect to that period, you've had no discussions with any of the President's personal lawyers?

Ms. <u>Hicks.</u>  That's --

Mr. <u>Trout.</u>  No.  I'm sorry.  I may have confused the matter. I think she is not answering as to the period of time when she was at the White House.

Mr. <u>Deutch.</u>  Right.

Mr. <u>Trout.</u>  Her answer is for every other time.

Mr. <u>Deutch.</u>  I understand.

Ms. <u>Hicks.</u>  And I'm saying no.

Mr. <u>Deutch.</u>  Okay.

And no one associated with the President has asked to review your testimony before congressional committees prior to giving your testimony?

Mr. <u>Purpura.</u>  Objection.

Ms. <u>Hicks.</u>  I'm not reading anything.  I don't have anything to review.

Mr. <u>Deutch.</u>  Well -- right.  Have you had discussions -- again, excluding the period during which you were a senior advisor to the President, have you had discussions with anyone from the President's team about the testimony you would provide to Congress?

Ms. <u>Hicks.</u>  I have not, no.

Mr. <u>Deutch.</u>  Okay.  And so, just to then clarify, as to your

time while serving in the White House as a senior official, did you have any discussions with the President's personal lawyers, including Jay Sekulow or others about your testimony?

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Philbin.</u>  Objection.

Mr. <u>Deutch.</u>  And while serving in White House in a senior position, did you -- while serving in the White House or since, have you had any conversations with the President's personal lawyers about the time that you served as special counsel in the White House -- as a senior official?

Ms. <u>Hicks.</u>  Sorry.  I'm not following that question.

Mr. <u>Deutch.</u>  I understand the objection.  I just want to make clear that you've had no discussions with any personal lawyer of the President about the time either while you were serving in the White House or after leaving about the time you were serving in the White House?

Mr. <u>Philbin.</u>  Congressman, the question is compound, and we'll object.  Ask as to her time at the White House, and ask as to another time.

Ms. <u>Hicks.</u>  Yeah.

Mr. <u>Deutch.</u>  Did you speak with any of the President's personal lawyers while at the White House about your cooperation with Congress and the investigations?

Mr. <u>Philbin.</u>  Objection.

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Deutch.</u>  And did you speak with any of the President's personal lawyers after you left the White House about the time that you were in the White House?

Ms. <u>Hicks.</u>  No.

Mr. <u>Deutch.</u>  You did not.

When was the last time you spoke with the President?

Ms. <u>Hicks.</u>  April.

Mr. <u>Deutch.</u>  Who initiated that phone call?

Mr. <u>Philbin.</u>  We'll object.

Mr. <u>Deutch.</u>  Why?  Based on?

Mr. <u>Philbin.</u>  Presidential communications that -- the President -- to preserve the opportunity for the President to be able to consider --

Mr. <u>Deutch.</u>  She's not a senior official in the White House, and it wasn't during her time as a senior official in the White House.

Ms. <u>Hicks.</u>  It wasn't a phone call.  We had dinner.

Mr. <u>Deutch.</u>  You had dinner in April.  What did you discuss at dinner?

Ms. <u>Hicks.</u>  We discussed -- it was more of a reminiscing about events from the campaign, rallies, things like that.

Mr. <u>Deutch.</u>  Did you reminisce about any of the things that you've been asked about during the campaign?

Ms. <u>Hicks.</u>  Not that I recall.

Mr. <u>Deutch.</u>  What was the tone of the conversation?

Ms. <u>Hicks.</u>  I just said that.  It was reminiscent of previous experiences.

Mr. <u>Deutch.</u>  Did you discuss your testimony before Congress?

Ms. <u>Hicks.</u>  No.

Mr. <u>Deutch.</u>  Did you discuss any of the President's comments about the congressional investigation that had been made?

Mr. <u>Philbin.</u>  We'll object to that.  To the extent the questions are going into matters that relate to the President's duties, there should be an opportunity to consider whether there would be a claim of privilege.

Mr. <u>Deutch.</u>  Are you asserting privilege over those?

Mr. <u>Purpura.</u>  Not at this time.

Mr. <u>Deutch.</u>  Okay.  So then the witness can answer whether there was a discussion with the President at dinner in April about any of the congressional testimony not relating to the time that Ms. Hicks was a senior White House official, correct?

So were there any discussions about that?

Mr. <u>Purpura.</u>  No, that's not --

Mr. <u>Philbin.</u>  No.  The President should have the opportunity to consider whether these communications are considered privileged.  To the extent that they are concerning -- if there was any discussion, we don't know.  But matters relating to discharge of his duties -- we're not asserting privilege now.  That is up to the President to do.  But to preserve the President's ability to consider that, we are objecting to the

question at this point.

Mr. <u>Deutch.</u>  So, if I understand, you won't allow the witness to answer because you're reserving the right to assert privilege about a conversation at some point in the future?

Ms. <u>Hicks.</u>  That is correct.

Mr. <u>Deutch.</u>  I would ask one last time for the witness to answer.

Ms. <u>Hicks.</u>  No.

Mr. <u>Deutch.</u>  If you wanted to get a hold of the President, how would you do that?

Ms. <u>Hicks.</u>  Sorry.  Can you repeat --

Mr. <u>Deutch.</u>  Yeah.  If you wanted to reach the President, how would you get him?

Ms. <u>Hicks.</u>  I would call him.

Mr. <u>Deutch.</u>  Since leaving the White House, how many times have you spoken with him?  Five?  Ten?  Twenty?

Ms. <u>Hicks.</u>  I would say somewhere between 5 and 10.

Mr. <u>Deutch.</u>  And, again -- well, have you spoken with the President -- April was the last time.  You've not spoken with the President since you agreed to testify before this committee?

Ms. <u>Hicks.</u>  April was the last time I spoke to him.

Mr. <u>Deutch.</u>  So you've not spoken with him since agreeing to testify before the committee.

Ms. <u>Hicks.</u>  That would be accurate.

Mr. <u>Deutch.</u>  Has anyone from the President's legal team,

staff, or his family reached out to you about your testimony today?

    Ms. <u>Hicks.</u>  No.

    Mr. <u>Deutch.</u>  And, finally, do you have thoughts on the President's reaction to your testimony?  Do you think the President will be angry that you're testifying before Congress?

    Ms. <u>Hicks.</u>  I don't want to speculate or hypothesize.

    Mr. <u>Deutch.</u>  Based on your lengthy and extensive relationship with the President, do you think, based on that, just based solely on your experiences with him, that he might be angry about your testifying before Congress today?

    Ms. <u>Hicks.</u>  I think the President knows that I would tell the truth, and the truth is there was no collusion.  And I'm happy to say that as many times as is necessary today.

    Mr. <u>Deutch.</u>  And, also, the President said there was essentially no obstruction.  Does that mean -- what do you think he meant by that?

    Ms. <u>Hicks.</u>  I'm here to talk about the campaign.

    Mr. <u>Deutch.</u>  No, I understand, but you just told me the things the President's been repeating.  So he's also been repeating comments about obstruction of justice where he says there's essentially no obstruction of justice.  What do you think he means by that?

    Ms. <u>Hicks.</u>  I'm here to comment on events that happened during the campaign.  That's what I'm doing.

Mr. <u>Deutch.</u>  Right.  So --

Mr. <u>Davis.</u>  I think your hour is up, sir.

Mr. <u>Deutch.</u>  I understand.

So, just finally, you're prepared to say no collusion, which was clearly about the campaign, but you refuse to answer any questions about obstruction of justice, which also has to do with the campaign.

Ms. <u>Hicks.</u>  I'm not refusing.  Is there a specific question that you're asking?

Mr. <u>Deutch.</u>  Yeah.  Yeah.

Mr. <u>Davis.</u>  Your time is --

Mr. <u>Deutch.</u>  Absolutely.  You've offered up that there was no collusion in talking about the campaign.  I asked about the President's comments, "essentially no obstruction," why do you think he used the word "essentially"?  And on that, you're saying you won't answer because it has to do with the campaign.  I'm pointing out the fact that you were willing to talk about one and not the other.

Ms. <u>Hicks.</u>  That is not what I said.

Mr. <u>Trout.</u>  I will object.  I think that mischaracterizes what she has said.  I think it mischaracterizes the questioning.

Mr. <u>Deutch.</u>  I don't, but --

Mr. <u>Davis.</u>  Sir, but the hour is --

Mr. <u>Deutch.</u>  I understand.  And guess what.  We'll continue this when we come back after lunch.  But I thought it would be

UNOFFICIAL COPY

129

appropriate to try to clear the air because of what we just heard

before we take this break, but I'm glad to break for lunch.

    Ms. <u>Hariharan.</u>  We will go off the record now.  It is 12:01.

    [Discussion off the record.]

    Ms. <u>Hariharan.</u>  We will come back at 1 o'clock.

    [Recess.]

[1:07 p.m.]

Mr. Eisen.  We are back on the record at 1:07, and it is the
minority's hour.

Mr. Collins.  Thank you.  And, again, Doug Collins, Ranking
Member Judiciary.  As we come along with this, I think the
interesting thing that I wanted to settle out, because there is a
conflict here with -- coming up with votes and I know there will
be some questioning on -- is just reiterating, you know, some of
the things that have been very frustrating for me in this hearing,
especially that started out when the chairman laid forth a very
long statement on decorum and issues.

And we had -- the witness' counsel had to be, you know,
reminded -- there were members taking pictures at this.  There was
also live tweeting of this event.  This is -- again, it really
takes away from the decorum.  And whether you agree with this,
which I don't, or don't agree with it is irrelevant.  The decorum
here was botched and became really what I've said this was
is -- for a long time is a photo opportunity and a show.

At this point, I do always like to open up -- when we switch
back, I will open it up.  You've had several lines of questioning
now from both majority and minority side.  Is there anything that
you would like to expound upon that you feel like you didn't get
enough ability to answer?  Is there anything that you would like
to say, Ms. Hicks?

Ms. Hicks.  No, sir.  Thank you for the opportunity.

Mr. Collins.  Okay.  All right.  No problem.  And we will
continue this.  At this time, I do want to yield to the gentlelady
from Arizona for just a few moments.

Mrs. Lesko.  Thank you.  And just for the record, I'm
Congresswoman Debbie Lesko from Arizona, and mine is more of a
statement instead of a question, Ms. Hicks.  It's very frustrating
to me this continual probes, subpoenas, contempt of Congress,
actions taken by my Democratic colleagues after almost 2 years of
special counsel investigating, you know, claims that there was
collusion, coordination, conspiracy with Russia, 2,800 subpoenas,
500 bench warrants, 40 FBI agents, I forget how many attorneys, 19
attorneys.

For my Democratic colleagues to think they are going to come
up with something more than all these FBI agents and attorneys and
something is -- I just don't understand it.  And so, in the time
that I was here today listening to some of the questions, I felt
like they are trying to come up with something that all of these
subpoenas, bench warrants, attorneys weren't able to come up with.

And the fact is that the Mueller report, which I have, you
know, several copies of right here, has said there was no
collusion, coordination, conspiracy with the Trump administration,
nor any American with Russia to influence the 2016 election.  And
also, there were no charges of obstruction of justice.

So, again, I call on my Democratic colleagues to please,
let's move on with America's business.  I was elected to get big

things done, not to continually relitigate this for publicity

purposes.  And I believe my Democratic colleagues are trying to

influence the 2020 presidential election, using taxpayer expense,

and I just think it's a terrible thing.

Mr. Collins.  All right.  With our side, that will be -- from

this round on our side, we, again, will have another round if need

be, but this is our round, we will yield back to the majority.

Mr. Eisen.  Okay.  The majority is going back on the record

at 1:13.

BY MR. EISEN:

Q    Ms. Hicks, are you aware of media reports that you

maintained a diary during your -- at any time during your work

with Donald Trump?

A    Yes, I'm aware of those reports.

Q    And what are you aware of?

A    Just exactly what you described, that I maintained a

diary during my time working for Mr. Trump.

Q    And did you?

A    I did not, no.

Q    Did you maintain any form of keeping notes during your

time working for Donald Trump?

Mr. Philbin.  Can we clarify whether this question is

extending to all time periods or only up to the time she became

senior adviser to the President?

BY MR. EISEN:

Q   I'm going to break the question down.  Let's start with the period up to and including the election.  Did you maintain any form of note taking, regularized note taking during that period?

A   I guess it would depend on your -- the kind of note taking you're describing.  If you're talking about notes pertaining to my professional responsibilities, obviously yes.  If you're talking about notes like, dear diary, great day, no, I did not.

Q   Do you have any idea how this -- these media reports that you maintained a diary originated?

A   I don't know.

Q   And let me ask the same question as to the transition period.  Did you maintain any regularized form of note taking during the transition?

A   No, sir.

Q   Did you -- I'll ask this on both the campaign and the transition.  Did you have a little notebook that you carried around with you like people sometimes do to keep running track of events?

A   Not that I recall.  You know, loose papers maybe. Things were -- they were happening on the fly most of the time. I'm sure I have a lot of Trump Hotel stationery, loose papers somewhere.

Q   And how did you maintain those loose papers during the period of the campaign?

A   Usually I had a to-do list, and I would write down, you know, requests for the President, the candidate at the time, or people I needed to speak to, mostly reporters, other things I needed to get done, and I would sort of check off as I go, and once the items on the list either expired or were completed, I would start a new list.

Q   And have you retained those campaign documents?

A   Not that I'm aware of, those.  I don't think so, no.

Q   Same question on the transition.  How did you keep track of things day-to-day?

A   Same, same way.

Q   And where are those transition materials, those papers you wrote on, if you know?

A   I don't know where those are.

Q   Did you have a practice of retaining any of that paperwork?  I'll ask now for the campaign and the transition in the interest of time.

A   No.  I mean, these were notes probably only I would understand, both given my handwriting and the words that I would jot down, like maybe just the initials of a reporter or the name of an outlet, things like that.

Q   And I'm not going to go too deep into the details, but did you maintain any personal form of note taking or recording events during the campaign or the transition?

A   Not with any regularity, no.

Q   When you say not with any regularity, were there some
things that you did on a less-than-regular basis in that regard?

A   I think there were a couple of occasions where I jotted
down things I wanted to remember, especially as we sort of
approached the final weeks of the campaign, you know, memorable
interactions with supporters of the candidate or special details
of events, but nothing -- like I said, it was very infrequent,
sporadic, nothing remarkable.

Q   And those infrequent and sporadic memorable jottings,
where are those today?

A   They -- most of them, I believe, are located on my
laptop.

Q   And were those reviewed for the purposes of the document
and production that was made in response to the voluntary request
or the subpoena, if you know?

A   My lawyers handled the document production, and --

Mr. Trout.  I believe they were reviewed and all responsive
documents were -- have been produced.

Mr. Eisen.  Okay.  I'd like to ask you the same questions
about the White House.  We're going to pause to see if there is an
objection to asking those -- that identical series of questions
regarding Ms. Hicks' White House tenure.

Mr. Philbin.  If you could --

[Discussion off record.]

Mr. Philbin.  We would object to questions about maintaining

regular series of notes connected with her service as a senior
adviser to the President, things related to her job.  If there is
a question, did you maintain a purely personal diary about
entirely personal things, we would not object.

       BY MR. EISEN:

Q   Did you, during your tenure in the White House, maintain
a purely personal diary in whatever form?  You understand when I
ask that question I mean --

A   I did not, no.

Q   -- I'm including the periodic jottings, memorable events
and other things of the kind we've talked about?

A   I did not, no.

Q   Have you done that since leaving the White House?

A   Yes, I have, actually.

Q   And in the materials that you have created of this kind
since leaving the White House, could you describe to me what they
are?

A   Very similar to what I previously described, anything
memorable, you know, notable interactions that were special to me
or -- that left an -- you know, an impact on me and things that I
wanted to obviously remember from my time there, hopefully to
share with people more familiar to me than the faces I'm looking
at now down the road.  But I believe those were also reviewed by
my counsel in response to the request for documents.

Q   We won't take any offense to your desire to share that

information with more familiar faces than ours.

The -- do those materials, which, if I understand correctly, they were created post your White House service.  Just remind me what day you left the White House?

A   March 30.

Q   We're talking about post March 30.

Mr. Trout.   2018.

BY MR. EISEN:

Q   Of 2018.  What form do you maintain those materials in?

A   They are notes on my iPhone.

Q   You use the Apple iPhone Notes --

A   Yes, sir.

Q   -- the thing that looks like a little notepad?

A   Yes, sir.

Q   And how voluminous are those?

A   They are not voluminous.

Q   And have your attorneys been through those to look for responsive documents?

A   Yes, sir.

Q   And do those -- do some of the materials in there relate to your time in the White House?  We will just take a yes or no, and we will give you an opportunity to --

A   Yeah, I'm just -- I'm just thinking.  You know, a lot of it is things from the campaign that I remembered, but I'm sure there's things in there that pertain to my time in the

White House.

Q    And is there any transition material in there as well, if you know?

A    I don't know.

Q    And roughly, how many of those -- do you have it all in one note, or is it multiple?

A    There's probably about three or four separate notes, and it's like a list of words, basically, that just jot my -- jog my memory to remember a certain series of events, a person, a place.

Q    And other than these three or four notes, any other materials that you've maintained post White House service that would record or recollect events before that?

A    Not that -- no.

Q    And forgive me for asking, but do you have any plans to write a memoir of your time with Mr. Trump?

A    It depends how many more of these sessions we have to do.  These guys are expensive.  I do not, no.

Q    Have you ever prepared a proposal to do that?

A    I have not, no.

Q    Give me one second.

Okay.  We were in and out some of these questions.  I just want to establish for the record the -- we do sometimes enjoy a soundtrack here at the committee.  I just want to establish for the record just quickly, how did you first become involved with the Trump family?

A    Sure.  So I worked at a public relations firm, and
Ivanka Trump was one of the clients that I was assigned to work
with there, so I got to know her.  And my role with her expanded
over time, and I met the rest of the family and started to work
more broadly with the Trump Organization, and their real estate
hospitality and golf assets.

Q    When did you first meet Donald Trump?

A    June of 2013.

Q    And when did your work switch to the Trump Organization?

A    I was hired in August of 2014.

Q    How did you become involved in the Trump campaign?

A    I was working at the Trump Organization at the time as
the director of communications, and Mr. Trump asked me if I would
join the campaign, that he was thinking about running for
President, and would I like to be his press secretary, and I said
yes, and that was it.

Q    Did you take a trip to Iowa in January 2015?

A    We did, yes, sir.

Q    Can you just briefly tell me about that?

A    It was my first trip with Mr. Trump in this capacity.
We had traveled for our Trump Organization work together before,
but we went with a small number of people to, I believe, an event
called the Freedom Summit in Des Moines, Iowa, and it was my first
exposure to any kind of political conference, and certainly my
first exposure to the events leading up to the Iowa caucus a year

later.

Q   Was that trip to Iowa before or after you were formally designated as press secretary?

A   You know, it was -- it was before I was formally designated as press secretary, but after he had asked if I wanted to participate in the campaign if he ran for President.

Q   Was there any allocation of your time or expenses as between the Trump Organization and the campaign in connection with that Iowa trip?

A   No, not that I'm aware of.  Shortly afterwards though, once an exploratory committee was formed, there was a conversation about how my time would be split, how that would be designated in terms of my salary, and what my obligations were to make certain folks aware of how I was spending my time and all of those good rules that we followed.

Q   And about when was that, if you recall?

A   The exploratory committee was formed in early March of 2015, so leading up to that, so probably sometime in mid to late February.

Q   And I take it that you were given a set of instructions on how to allocate time and expenses in connection with the exploratory committee?

A   That's accurate.

Q   And can you give me a sense of the breakdown between the Trump Organization and the exploratory committee around the, let's

say in the -- that quarter when the distinction was first made, in
your time and expenses?

A    Sure.  No expenses that I'm aware of, that I recall.
And time, you know, it was really split out during the week.
Monday through Friday, I worked at the Trump Organization,
probably spent about 10 percent of my day attributing resources to
the presidential exploratory committee, and then we traveled on
the weekends to different summits and speaking opportunities.

Q    And could I ask you, please, to characterize your
relationship, just describe it in your own words, with Donald
Trump during the campaign period.  If it evolved over time, feel
free to tell us how it evolved.

A    Sure.  So early on, I was an employee, and I, you know,
did everything I could to try to accommodate his needs and his
requests from a communications standpoint.  He obviously has
very -- he has a lot of experience in dealing with the media, so
he was willing to provide a lot of guidance to me, which was much
appreciated, given how inexperienced I was.  And over time,
obviously, we grew closer.  The relationship became stronger.
And, you know, I think we both trusted each other and worked very
well together.

Q    And you've been described publicly like a daughter to
him.  Do you agree with that characterization?

A    You would have to ask Mr. Trump that.

Q    Did he ever tell you how to describe your relationship

with him?  During the campaign now, I'm asking.

    A   No.

    Q   And did the relationship change between the campaign and
the transition in any material ways?

    A   No.

    Q   And I'm not going to ask you to get into the substance
of the following question -- I see Mr. Philbin perched on the edge
of his chair -- but I am going to ask you, did the relationship
change between the White House and what came before?
Don't -- just yes or no.  You won't get into the substance.

    A   No.

    Q   And how has the relationship changed since you left the
White House?

    A   Well, I don't see him every day.  I'm no longer an
employee.  So fundamentally, it's very different, but I don't have
anything specific to add.

    Q   Were there ever times when you were making public
statements about Mr. Trump in the campaign or transition when you
checked with him first before making those statements about him?

    A   Yes.

    Q   Was that a general matter?  Would you check with him
before making public statements about him?

    A   I wouldn't say it was a requirement, but if I had the
opportunity to check with him, of course, I would rather say
something that he wanted me to say rather than say something that

he was less than pleased with.

Q   And were there -- how frequent were the occasions when you made public statements without checking with him first? Again, just the general order of magnitude.

A   Well, so you're asking two different things.  You asked if I made statements about him specifically without checking with him, to which I answered that I would -- my preference was to check with him.  My preference was to check with him regarding statements that weren't specifically about him as well, however, it was much more frequent that just the demand for the job required --

Q   Got it.  Got it.

A   -- a faster response.

Q   And there's a point in the Mueller report -- and I'm actually not going to ask you yet about the page in the Mueller report, but there is a page in the Mueller report where there is a description of you suggesting to Mr. Trump that something be taken out of an interview.  And I'm going to ask you some questions about that with respect to the campaign and the transition, if I may.

Mr. Philbin.  Sorry.  If you could clarify, when was the interview?

          BY MR. EISEN:

Q   Do you want me to -- do you want me to do the Mueller report now?  I'm going to hold that -- I'm going to -- I'll hold

that for later.

I'll ask the witness, do you know the episode in the Mueller report that I'm referring to?

A   I do, sir.

Q   So I'm going to save that -- the Mueller report itself for later.  But I want to ask more generally about the practice of asking a reporter to take something out after it has been said. Can you describe what your practice was in that regard in the campaign and transition, if you had one?

A   Sure.  I think it's pretty common practice amongst communications professionals that they try to ensure that their principle comes across as good as possible, as an effective messenger, and as someone who is hopefully relaying something specific.  After all, that's generally the purpose of an interview.  And anything that distracts from that core message is sometimes best not included.

And I think anybody that has any experience in PR would say that that is fairly common practice to make that request.  I would say that it's very rare for the request to be fulfilled, but there's no harm in asking.

Q   And just -- if you can think of any occasions when you made that request to a print reporter or radio, television during the campaign or transition, can you think of any times when that happened?

A   Sure, yeah.  Look, most of the time it's -- it is maybe

not a request to omit the information altogether, but if there's going to be something released at one point, and then a latter portion of the interview released at another point in time, Hey, would you mind putting this in this section of the interview, we have something coming up and we want this to be the primary message of the day, things like that.

Q    What about holding and getting the reporter to hold it back altogether?  Were there occasions when that happened in the campaign or transition that you can think of?

A    Only if I was really lucky.  No, I'm sure there were occasions.  Nothing is coming to mind, but --

Mr. Eisen.   Okay.  We have members who are back with us, so Mr. Cohen.

Mr. Cohen.   Thank you.  I'm Steve Cohen from Memphis, and we had another hearing, which I chaired.  I don't know if these questions were asked, but if they weren't, I want to ask them. During the campaign, there was a meeting at Trump Tower with one of the sons, I think it was Jr., and the Russian lady that came and the alleged story about we have information that might be bad about Hillary Clinton, and then they talked and they -- whatever. Do you know the meeting I'm talking about?

Ms. Hicks.  Yes, sir.

Mr. Cohen.  Did you have any knowledge of that meeting before it was scheduled?

Ms. Hicks.  No, sir.

Mr. Cohen.  Were you on the Air Force One at the time that President Trump, then-Candidate Trump maybe consulted with some people about the answer that Donald Jr. should give to the press?

Mr. Trout.  Well, just --

Mr. Philbin.  Objection.

Mr. Cohen.  He wasn't President.

Mr. Purpura.  No, he was.  You said Air Force One.  That's what we're trying to clarify.

Mr. Cohen.  Well, he wasn't on the Air Force.  He was on Trump One.  Sorry.

Ms. Hicks.  But you're -- I think -- I'm sorry.  I think you're confused.  That took place on Air Force One.  He was President.

Mr. Purpura.  Right.

Mr. Cohen.  And the Trump Tower meeting was before -- was it that time?

Mr. Philbin.  I believe that the meeting was in 2016.

Mr. Cohen.  Right.

Mr. Philbin.  But the discussion that I believe you're referring to didn't take place until 2017.

Mr. Cohen.  So when he drew up a response on the airplane and --

Mr. Neguse.  That was in 2017.

Mr. Cohen.  That was in 2017?

Mr. Trout.  Yes.

Mr. Cohen.   So before he was President, did you know anything about that meeting?

Ms. Hicks.   No, sir.

Mr. Cohen.   None whatsoever?

Did you have any knowledge of any meetings that Mr. Trump had with Mr. Kislyak?

Ms. Hicks.   No, sir.

Mr. Cohen.   How about anybody else with the campaign and Mr. Kislyak?

Ms. Hicks.   At the time they occurred?  After?  Can you be more specific?

Mr. Cohen.   No.   Just tell me what you know about any meetings that the campaign had with Mr. Kislyak, if you would.

Mr. Philbin.   Well, let's limit the answer to what you knew during the campaign or in the transition.

Mr. Cohen.   Right.

Ms. Hicks.   I don't -- I don't recall being aware of the meetings that took place at the time, but later learned about, I believe, the meeting General Flynn and Jared Kushner had with Ambassador Kislyak during the transition.

Mr. Eisen.   I just want to make clear for the record, you're objecting -- the White House is objecting to the question to the extent it covers post January 20, 2017?

Mr. Purpura.   Right.

Mr. Philbin.   Now, to the extent that the question is to

elicit information she learned in her capacity as the senior
adviser to the President after January 20, yes.

Mr. Eisen.  So we probably should stipulate this for the
record.  It will make things go much faster and it will speed up
our review of the morning transcript as well.  When the
White House says objection, that is an absolute immunity objection
and none other, correct?

Mr. Philbin.  For the most part.  There was an incident
earlier where we were talking about something that occurred during
the transition period that could relate to the President-elect's
preparation for making decisions as a President where we might
assert a different privilege.  So for the most part, the objection
will be based on absolute immunity.

Mr. Eisen.  All right.  But you didn't assert the different
privilege earlier.  So far, the privilege, when you've objected,
it has been absolute immunity so far.

Mr. Purpura.  That's correct.

Mr. Eisen.  So we're going to stipulate for the record,
barring an objection from anyone -- I apologize to Mr. Cohen, but
I just want to have a clean transcript -- that when there's a
White House objection, that's an absolute immunity objection,
unless otherwise stated.  And Ms. Hicks is declining to answer
that question.  It saves us from having to go through that over
and over again.  Is that agreeable, Ms. Hicks?  Mr. Trout?

Mr. Trout.  Agreeable.

Mr. Eisen.  Okay.  White House?

Mr. Philbin.  Yes, unless we specify something else, a single-word objection will be absolutely amenable.

Mr. Cohen.  All right.  So with all those caveats, before January 20, 2017, did you have any knowledge of any discussions of Russian sanctions?

Ms. Hicks.  No.

Mr. Cohen.  There was no discussions at all with Mr. Trump and you weren't privy to them about Russian sanctions that we had issued?  You're sure of that?  Think about it.

Ms. Hicks.  I am thinking.  Thank you.  You know, there was -- there was a phone call obviously between General Flynn and the Russian ambassador.  There was news reports after that where it was unclear what was discussed, but that would have been the only context in which Russian sanctions were brought up in my capacity as communications adviser.

Mr. Cohen.  Anything about adoptions?  The Russian adoptions by American citizens come up during your time before January 20, 2017?

Ms. Hicks.  No, sir.

Mr. Cohen.  So that wasn't an issue either?  It wasn't something you all discussed?  It wasn't something the President thought was an important issue?

Ms. Hicks.  No, sir.

Mr. Cohen.  Did the meeting -- you had no knowledge of that

meeting, or you did have knowledge of the meeting in Trump Tower?

Ms. <u>Hicks.</u>  I did no knowledge of that meeting.

Mr. <u>Cohen.</u>  You had no knowledge of it.  You only had knowledge of it after the --

Ms. <u>Hicks.</u>  I learned about the meeting in June of 2017.

Mr. <u>Cohen.</u>  Okay.  Okay.  During the campaign did you learn anything at all about Mr. Stone and his relationship with WikiLeaks?

Ms. <u>Hicks.</u>  No, sir.

Mr. <u>Cohen.</u>  That never came up at all?  There was no discussion of Mr. Stone and his connections with Mr. Assange?

Ms. <u>Hicks.</u>  Not with me, no.

Mr. <u>Cohen.</u>  Did anybody else where you overheard a conversation?

Ms. <u>Hicks.</u>  Not that I'm aware of.

Mr. <u>Cohen.</u>  And you don't remember any discussions at all about WikiLeaks?  Well, you do know about WikiLeaks.  You discussed that earlier.  What did you know about WikiLeaks and their divulgence of information about the emails of Hillary Clinton and Mr. Podesta?

Ms. <u>Hicks.</u>  I know what was publicly available and nothing more.

Mr. <u>Cohen.</u>  Nothing in the campaign at all?

Ms. <u>Hicks.</u>  Pardon?

Mr. <u>Cohen.</u>  You never heard anything at all being privy to

Mr. Trump -- you were with him every day.  Were you not?

    Ms. <u>Hicks.</u>  I was, yes, sir.

    Mr. <u>Cohen.</u>  And you never heard anything from him about WikiLeaks?

    Ms. <u>Hicks.</u>  That's not what I said.  I said the information I knew about WikiLeaks was what was publicly available.

    Mr. <u>Cohen.</u>  So you didn't know anything from being around -- you never heard Mr. Trump talk about it?

    Ms. <u>Hicks.</u>  No, sir.

    Mr. <u>Cohen.</u>  Did you hear anybody in the campaign talk about it?

    Ms. <u>Hicks.</u>  No, sir.

    Mr. <u>Trout.</u>  You mean other than what was discussed in the public domain?

    Ms. <u>Hicks.</u>  Yes.  Earlier I made a clarification that, you know, sometimes there would be speculation about if there would be more emails or information released, but that was prompted by things in the media so -- and, obviously, it wasn't, you know, certain certainty.  It was with speculation and skepticism.

    Mr. <u>Cohen.</u>  And I was here earlier, and you said you'd had no knowledge -- any information about hush payments to Ms. Stormy Daniels.  How about to Ms. -- was it -- McDougal, Miss August?

    Ms. <u>Hicks.</u>  I wasn't aware of anything -- I wasn't aware of a hush payment agreement.  I was aware of an arrangement she had with the National Enquirer based on their statement that they

provided to The Wall Street Journal when the article was written
on November 3 or 4 of 2016.

  Mr. Cohen.  And did you have that knowledge from discussions
or overhearing discussions with Mr. Trump or other members of the
campaign as the family?

  Ms. Hicks.  I had that knowledge as David Pecker provided the
statement that they planned to provide to The Wall Street Journal
to me just before it was given to the reporter as a heads-up.

  Mr. Cohen.  You never met either Ms. Daniels or
Ms. McGuire -- McDougal?

  Ms. Hicks.  No, sir.  I was in high school in 2005.

  Mr. Cohen.  Time flies.

  Mr. Collins.  That hurts.

  Mr. Cohen.  Time flies, yeah.

  Ms. Hicks.  I had to get one in.  You guys have been at me
all day.

  Mr. Cohen.  Yeah.  You'll be happy to know Paul McCartney,
who was in Wings, had his birthday recently, yeah.

  I think I'm going to let you do that.  I'm going to go vote,
otherwise John Stewart will say bad things about me.  Thank you,
Ms. Hicks.

  Ms. Hicks.  Thank you so much.

  Mr. Eisen.  Mr. Neguse.

  Mr. Neguse.  Good afternoon, Ms. Hicks.  I just want to
follow up on a point this morning that we talked about, and

Mr. Cohen kind of followed up as well.  I think you've confirmed
for the record that you weren't aware of the -- we will call it
the Trump Tower meeting in June of 2016, that you didn't learn
about that until the following year, as well as a variety of other
instances that we've talked about this morning and this afternoon.
You are aware -- have you read the special counsel's report?

Ms. Hicks.  Not in its entirety.  I've read little pieces of
it.

Mr. Neguse.  Okay.  Earlier in response to a question from my
colleague, Representative Cicilline, you said there was no
collusion.  Is that right?  That was what you said in response to
a question.

Ms. Hicks.  That's accurate, yes.

Mr. Neguse.  You have not read in full volume one of the
special counsel's report, correct?

Ms. Hicks.  That's correct.

Mr. Neguse.  In volume one, I represented to you that there
is detail surrounding over 120 contacts between members of the
Trump campaign, and various Russian operatives and satellites and
so forth.  You wouldn't have anything to dispute that, correct?

Ms. Hicks.  Again, I don't know the exact nature of those
contacts and how I might characterize the relationship of the
folks described in and what their actual affiliation with the
campaign or lack thereof would be, but I have no reason to dispute
that those contacts took place.

Mr. Neguse.  Well, you know, the two examples that have come
up most frequently today, right, the President's, then
candidate's, son and senior adviser meeting with someone who is
purporting to provide information from the Russian Government
regarding the then-candidate's opponent and the campaign chairman,
Mr. Manafort, sharing polling data with a foreign national.  Those
would clearly be within the ambit of people who were affiliated
with the campaign directly or indirectly, correct?

Ms. Hicks.  Yes.

Mr. Neguse.  Okay.  My question is, you'll recall this
morning we talked about the notification to the Secret Service
around the October 2016 email to Mr. Kushner.  If you had received
the email from Mr. Goldstone in June of 2016, would you have
notified Secret Service?

Ms. Hicks.  I'm not going to speculate on a hypothetical.

Mr. Neguse.  Well, I -- it's -- I'm not asking to speculate.
I'm asking whether or not you would if --

Ms. Hicks.  I think that's speculation.

Mr. Neguse.  -- a foreign national --

Ms. Hicks.  I'm not a lawyer, but --

Mr. Neguse.  Well, okay, let me take a step back.  In October
of 2016, you clearly agreed with Mr. Kushner alerting Secret
Service regarding the email he had received, correct?

Ms. Hicks.  I didn't -- I didn't say that.  You're putting
words in my mouth.

Mr. Neguse.  Did you not -- you don't agree with him notifying Secret Service?

Ms. Hicks.  I didn't have an opinion on it one way or another.  It was --

Mr. Neguse.  You have no opinion of it today?

Ms. Hicks.  -- his choice to do that.  I --

Mr. Neguse.  So you have no opinion as to whether or not Mr. Kushner should have or should have not alerted Secret Service regarding the October 2016 email?

Ms. Hicks.  I --

Mr. Neguse.  Presumably you would agree that he should notify Secret Service, which is what he did?

Mr. Trout.  Objection.

Mr. Neguse.  Well, you can answer the question.  So your position is you have no opinion one way or the other about what he --

Ms. Hicks.  I've never put much thought into it, is the honest answer.

Mr. Neguse.  I guess I'm asking you, sitting here today, as you put thought into it whether or not you agree or disagree.

Mr. Trout.  I'm going to object to that.  I just don't think it has any relevance at all as to what her opinion is today about events that have occurred.  She is here to answer questions about things that she observed in real time.

Mr. Neguse.  Your objection is noted.  And it sounds like

you're refusing to answer the question and so that's -- we will
move forward.  I would say that as a fact witness during this
event in question, it's fair to ask her whether or not she agreed
when she was shown an email from Gucifer or someone purporting to
be Gucifer, and when Mr. Kushner said I'm going to alert the
Secret Service whether or not she agreed with him taking that step
as a senior campaign official.  But if she refuses to answer the
question, we can proceed --

        Ms. Hicks.  I'm happy to answer the question.  I think it was
a fine thing for him to do.  I think that, like I said earlier,
better safe than sorry, especially in these last days of the
campaign.  I just -- I probably wouldn't have put as much validity
behind it as he did, but I think his caution is a good thing, and
I don't have anything else to add.

        Mr. Neguse.  Thank you.  And applying that same reasoning,
would you apply that same reasoning to the June 2016 email that
went to Mr. Trump Jr.?

        Ms. Hicks.  I think they are two very different situations,
and like I said before, I'm not going to speculate on a
hypothetical.

        Mr. Neguse.  Thank you.  I am going to turn it back to
Mr. Eisen.

                BY MR. EISEN:

        Q    Okay.  On June 12, 2016, Julian Assange claimed in a
televised interview to have emails relating to Hillary Clinton

which are pending publication.  Do you recall that on or about
that time?

     A   I don't, no.

     Q   Do you recall any public announcements by anyone
associated with WikiLeaks in the summer of 2016 that documents
would be forthcoming?

     A   I don't, no.

     Q   When is the first that you remember learning that
WikiLeaks might have documents relevant to the Clinton campaign?

     A   Whenever it became publicly available.  I think my first
recollection is just prior to the DNC Convention.

     Q   And what was your reaction when you learned that?

     A   I don't recall.  I think before I described a general
feeling surrounding this topic of not happiness, but a little bit
of relief maybe that other campaigns had obstacles to face as
well.

     Q   And I know we've touched on this but I just want to make
sure we get it into the record.  What's your first recollection of
discussing this issue with Mr. Trump?

     A   Probably around that same time.

     Q   What do you remember about that discussion?

     A   I don't recall anything specific.

     Q   Do -- can you remember anything about his affect, how
he -- his affect?

     A   No.

Q   Did you have a view on whether WikiLeaks actually had that material?

A   I don't understand.

Q   Did you believe it was a true report that WikiLeaks actually had material on --

A   I believe that when I've learned about this, that they were already releasing material, so I had no reason to question whether or not it was real.

Q   And what do you recall, if anything, about Mr. Trump's reaction to the release of those materials?

A   Again, I don't recall anything specific.

Q   And we've talked a little bit about exchanges with members of the Trump family, and either I or someone else asked you about Eric Trump and the receipt of an opposition research file.  And I'll take that exhibit -- took advantage of the lunch break to get it for you.  What exhibit are we on?

Ms. Istel.  We will mark it as Exhibit 13.

[Hicks Exhibit No. 13

Was marked for identification.]

Mr. Philbin.  Do you have copies for the minority members and for us?

Mr. Eisen.  If the White House lawyers want to come up to the table to look at the copy, they are welcome to.

Mr. Purpura.  We're okay.  We have a set.

Mr. Eisen.  Oh, you've got one.  Good.  Okay.

BY MR. EISEN:

Q   Ms. Hicks, would you take a look at exhibit 13, please.

A   Page 13?  No.  This document that your lawyer has handed you, this big document as exhibit No. 13.  It starts with the table of contents.

Mr. Philbin.  And just for the record, this is a 211-page document.

BY MR. EISEN:

Q   I do not intend to ask the witness about all 211 pages.  I'll try to limit myself to 199.

Just have a look at the first few pages, if you would for me, Ms. Hicks, table of contents on just the beginning of it.  Is this the -- ready?

A   Yes, sir.

Q   Is this the document that Eric Trump sent you?

A   I don't know.  I would have to see the email, but --

Q   I'll just ask you to speak into the microphone for the --

A   I can't say for sure.  I would have to go back and look at the email.  That was 3 years ago, and I'm going to guess several thousand emails ago, but it does look familiar.

Q   The email, do you know where we could get a copy of that email?

A   The campaign would have that email.

Q   That was on your official -- was sent to you on your

official campaign account?

A   My guess is yes.  We obviously searched my phone, so
this has got my text messages.

Q   Okay.  Very good.  We will endeavor to get that from the
campaign.  Do you --

A   But as you'll note, this information is all publicly
sourced, so it isn't exactly a bombshell opposition research
document.  It's a compilation of publicly sourced articles, but --

Q   Did you ever discuss this document with Donald Trump?

A   If this is the document that Eric shared with me, yes, I
did.

Q   Tell me about that conversation, please.

A   You know, he asked what was contained in the document
based on a quick glance.  I said essentially what I just said to
you, that this is a summary of publicly sourced information,
number one; and number two, it's all out there.  It already has
been, but now it's just all out there at once versus somebody's
attempt to perhaps bread crumb this out over the months ahead.

Q   And what was his response to that?

A   Not much.

Q   Was he pleased or displeased?

A   I think he was indifferent.

Q   And do you know what the source of this document was?

A   I don't, no.

Q   Do you recall what the source of the document Eric sent

you was?

        A    I don't.  I recall Eric's message maybe mentioning
something about the source being either the DNC, or affiliated
with the DNC, something of that nature.  But I don't recall the
exact phrasing.

        Q    In your experience as a campaign official, is it
valuable to have the opposing political party's opposition
research dossier, even if it's -- even if everything in it is
public?

        A    Well, you know, we have this thing called Google now, so
it's certainly helpful, I guess, to have it compiled in one place,
but I would say, jump ball on this one.

        Q    Is it helpful to know, again, asking during
your -- asking given your experience as a campaign official, is it
helpful to know what your opponent, or the political party of an
opponent might think is the opposition research as to your
candidate?

        A    Yeah.  Look, I -- maybe if the candidate wasn't Donald
Trump, someone who had been in the arena for 40 years and just
gone through a year-long primary where he defeated 17 professional
politicians, this might be more helpful.  But at that point in
time, we were pretty familiar with the kinds of criticisms and
attacks that any opponent would put to Mr. Trump.

        Q    Did you do anything else with the opposition research
report that Eric Trump passed to you in the --

A   I did not personally.  It's possible that either Eric or myself passed it onto the war room at the RNC, but, no, I didn't personally do anything with it.

Q   And what's your basis for stating that it's possible that you or Eric might have passed it onto the RNC?

A   I guess that's me speculating about what the next step might be to -- you know, when you get a 200-page document, so --

Q   I want to go back -- I want to go back to the -- to the questions of the campaign reporting, any information about Russian contacts.  To your knowledge, did the campaign ever report any information about contacts of any kind with Russia to any law enforcement official?

A   Report to law enforcement when?  During the campaign?

Q   During the campaign.

A   Not to my knowledge.

Q   Did you receive a defensive, what's called a defensive FBI briefing or any kind of a law enforcement briefing while you were in the campaign?

A   I did not, no.

Q   Are you aware of whether the campaign received such a briefing?

A   I'm not aware.

Q   Do you understand what I mean by defensive FBI --

A   I do, yes, sir.

Q   -- briefing?

What does that mean to you, Ms. Hicks?

A   It means to have law enforcement make you aware of potential risks, and how best to protect yourself, if those risks exist already, or if they might present themselves at some time in the future.

Q   On July 27, 2016, Mr. Trump publicly stated, "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing.  I think you will probably be rewarded mightily by our press."  Do you recall that statement?

A   I do, yes, sir.

Q   Did you have any discussions with Mr. Trump about that statement prior to the statement being made?

A   Not prior to, no.

Q   Did you have any discussions with him about the statement after it was made?

A   I did, yes.

Q   Were you with him at the time he made the statement?

A   I was, yes, sir.

Q   And when did you discuss it with him?

A   When we got back on the plane to go to our next location.

Q   And what was that discussion?

A   The discussion was me informing him that some in the media had taken the expression quite literally, and that they were concerned he was encouraging foreign governments to, you know,

locate those emails, and that that was obviously something that
the media felt was extremely inappropriate and demanded a response
from Mr. Trump and the campaign as to what exactly he meant by
that.

     Q    And did you have a view on the appropriateness of this
statement?

     A    You know, it was my understanding from both the way he
made the remark, and the discussions afterwards, that this was a
little bit tongue-in-cheek.  This was not a comment that was
intended as an instructive or a directive to a foreign government.
It was a joke.  And that was the intent, based on my conversation
with him, and that was it.

     Q    And what did he say in that conversation about the
statement?

     A    Just what I just said, that it was intended as a
light-hearted comment.

     Q    The President last week told George Stephanopoulos that
he would take information about an opponent from a foreign
adversary in the next election.  There's nothing wrong with
listening.  It's not an interference.  They have information.  I
think I'd take it.  If I thought there was something wrong, I'd go
maybe to the FBI, if I thought there was something wrong.  Do you
think that was a joke?

     A    I don't know.  I have not discussed that remark with the
President.  I didn't -- I didn't see the entire interview, so I

saw the clip you're referencing.  I don't know if there was additional context.  I don't think that was a joke based on what I saw.

Q    All right.  In your experience now, knowing all that you do, you've reflected on it, would you take -- I'm asking you this based on your experience and the expertise you've developed, would you take foreign oppo information from a foreign government, if that were offered when working on a political campaign?

A    You know, knowing how much chaos has been sowed as a result of something like the Steele dossier, no, I would not.

Q    And, again, I'm asking you about your expert opinion. Would you advise another person to do that if they were in a position to do so?

A    No, I would not.

Q    Would you call the FBI if you were offered such information?

A    If I felt it was legitimate enough to have our law enforcement dedicate their time to it, sure.

Q    If you felt it was genuine or credible, you would call the FBI, right?

A    Yes.

Q    I'll ask you the same question as to the campaign. According to Mr. Mueller's report there were over 120 contacts between the Trump campaign and individuals associated with the campaign and Russia.  That's Russian individuals, that's during

the campaign.  I want to ask you a couple questions about specific particular ones, and I am going to direct you -- I'm going to direct you to page 66 of volume one of the Mueller report.

Okay.  And I am going to introduce -- this might make it a little more helpful.

[Hicks Exhibit No. 14

Was marked for identification.]

BY MR. EISEN:

Q   I'm going to introduce as exhibit 14 a selection of excerpts of the Mueller report.  I've handed one to the witness. I'll hand one back to our administration counsel and -- okay.  I wanted to try to get this in before the break that we're going to go in 2 minutes.

A   That's okay.  Let's just keep going.

Q   Okay.  And -- so this is exhibit 14.  I've highlighted at the bottom of page 66 in note 288 a portion of the report.  If you would just read that, start with the words "for example," and read those three lines, please, Ms. Hicks.

A   "For example, on August 18, 2015, on behalf of the editor in chief of the internet newspaper" -- I'm sorry I can't pronounce the title of that publication.  Contrary to popular belief, I do not speak Russian -- "campaign press secretary Hope Hicks was emailed asking for a phone or in-person candidate interview by an individual associated with this publication."

Q   And it's the internet newspaper Vzglyad, and the

person's name is Georgi Asatryan.  And that refers to an 8/18/15

email from Asatryan to Hicks.  Do you recall this episode?

     A   Only because we discussed it earlier.

     Q   Do you have anything else you want to add to what you

said before about this matter?

     A   No, sir.

     Q   Okay.  I am going to -- if my -- if my counsel

will -- my co-counsel will indulge me, I'm going to try to

breeze -- no.  We better take our break.  I can't do it in

2 minutes.  Okay.  Well, we will pick up after a 5-minute break.

     A   Do we have to take the break?

     Q   Majority and minority counsel are consulting.

    Mr. Hiller.  Let's go off the record for a minute, please.

    Mr. Eisen.  Going off the record.

    [Discussion off the record.]

[2:10 p.m.]

Mr. Eisen.  Back on the record at 2:10.

BY MR. EISEN:

Q   Okay.  I'll direct you to the next page, page 102, of Volume I of the Mueller report, and you'll see some language is highlighted in footnote 589.  You'll recall that we -- would you take a look at that footnote, please, Ms. Hicks?  Have you done so?

A   Yes, sir.

Q   You'll recall there were some questions about Carter Page earlier today.  Do you remember that?

A   Yes, sir.

Q   Do you remember this September 25th email from you to Mr. Conway --

A   It's Ms. Conway.

Q   -- Ms. Conway and Mr. Bannon?

A   Yes, sir.

Q   And is this an accurate description of that email?

A   Yes, sir.

Q   Was it your understanding that Mr. Page was announced as an informal advisor in March?

A   He was.  Although I don't believe he ever did anything to remotely fulfill the definition of even an informal advisor.

Q   What was the point at which he ceased serving as an informal advisor?

A   I don't believe he ever served.  I've never met Mr. Page.  I know that he admits he's never spoken to Mr. Trump. I'm not sure what advice he provided, if any, or in what capacity, but --

Q   Let me put it this way.  What was the point at which the announcement to the world that this man was an informal advisor to the Trump campaign, if any, was rescinded?

A   So he was announced as an informal advisor amongst a group sometime in March of 2016.  And, you know, again, contact was limited; there was no service provided by him.  But it was made clear in the fall of 2016 that he, in fact, had no role with the campaign.

Q   And I'm going to direct your attention to the next page, page 115.  And we have highlighted a portion of this material. Will you have a look at it, please?  It starts in the body text after 704 and runs through note 706 in the body text.

A   Yes, sir, I see it.

Q   Okay.  And do you recall the meeting that is written about here?

A   I don't recall this specific meeting, given this description.  But I know we had regular Monday morning meetings with this group, so --

Q   Do you recall at any time Paul Manafort warning that Monday morning group that a meeting would not yield vital information and they should be careful?  Any note of caution of

that kind that you remember coming up at one of these meetings?

A   No, sir.

Q   Okay.  And do you remember discussing this subject with Special Counsel Mueller or his representatives?

Mr. Purpura.  Objection.

Mr. Eisen.  What is the basis for the objection?

Mr. Purpura.  This occurred during her time as a senior White House advisor.  I instruct her not to answer.

Mr. Eisen.  Absolute immunity.

     BY MR. EISEN:

Q   Will you follow the instruction not to answer?

A   I will, yes, sir.

Q   Would you answer any other questions about the subject matter set forth here on page 115?

Mr. Philbin.  Let's be clear what you're asking, the question.

Mr. Eisen.  Let me be more specific.  Would you answer any other questions about your interviews with Robert Mueller, one of which is reflected here in note 706 of page 115?

Mr. Purpura.  We would object.

Mr. Eisen.  And the basis for the objection is absolute immunity?

Mr. Purpura.  Yes.  To the extent you're asking her about the interviews, if you want to ask her about what she knew in 2016 --

Mr. Eisen.  Yes.  We've exhausted what she knew.  Now I'm

moving to the interviews and attempting to close out the Mueller
interviews.

        BY MR. EISEN:

Q   Will you follow the instruction not to answer any
questions about your interviews with Special Counsel Robert
Mueller or the Special Counsel's Office based on the
absolute-immunity instruction of the White House?

A   Yes.  This is like "Inception."  I'm answering questions
about interviews and interviews and interviews.

Q   Yes.

A   I will follow the instructions of the White House.

Q   Okay.

Would you answer any questions designed -- would you answer
any questions about where those interviews took place, when they
took place, who attended those interviews, who you discussed those
interviews with, or any other questions intended by us to explore
the basis for the absolute-immunity assertion with respect to your
interviews with the Special Counsel's Office?

    Mr. Purpura.  We would object to all of those questions.

    Mr. Eisen.  Object on the basis of absolute immunity.

And will you follow that instruction?

    Ms. Hicks.  Yes, sir.

    Mr. Eisen.  Are there any other privileges that are being
asserted at this time as to the Mueller interviews?

    Mr. Philbin.  Not at this time.

Mr. <u>Purpura.</u>  Not at this time.

Ms. <u>Hicks.</u>  No, sir.

Mr. <u>Eisen.</u>  None by you.  Okay.  Good.

          BY MR. EISEN:

Q    Okay.  I'm going to pivot over now to the -- we'll do one more from Volume I.  Then I'm going to hand you over to my colleagues.  Anytime you need a break, just say so.

     I'm going to ask you some questions about outreach from the Russian Government, starting with approximately 3:00 a.m. on election night.  Do you remember receiving a telephone call at that time?

A    Yes, sir.

Q    What do you remember about that telephone call?

A    I couldn't understand much, but I remember hearing the name "Putin" and an attempt to offer congratulations, a request for a forum in which to do that.

Q    And what device did the phone arrive on?

A    The phone call arrived on my personal iPhone, which was the phone I'd used throughout the campaign, and its number was well-known, so --

Q    Did you have a view at the time the call arrived of what the source of the call was?

A    Meaning the number?

Q    Meaning who was calling.  Did --

A    No.

Q   -- you have any idea?  Could you tell if they were a
domestic or foreign individual?

A   I believe the number was a 202 number.

Q   And tell me everything that you remember the person
saying, to the extent you could hear and understand it.

A   Sure.  I just did.  I responded by requesting that this
individual send me an email because it was difficult to understand
them, and they did that.

Q   And when did they send you that email?

A   I believe it was shortly after the phone call took
place.

Q   That same day?  Do you remember the date?

A   It was the same day, because we're talking about
4 o'clock in the morning.  I can't remember if it was an hour
later or if it was when I woke up at 6:00, 2 hours later.

Q   If you'll take a look at exhibit 14, Volume I, page 145,
you'll see that footnote 967 indicates there was an email to you
at 5:27 a.m.  Does that refresh your recollection as to the time?

A   Yes.

Q   Okay.  And who sent that email?

A   I suppose it was the person on the phone, identified as
Sergey Kuznetsov.

Q   And who is Sergey Kuznetsov?

A   An official from the Russian Embassy.

Q   Do you know what role he has at the Russian Embassy?

A   I don't, no.

Q   And other than the engagement that we asked you about, the email in Volume I, page 66, note 288 of exhibit 14, was this the only other time, up to this date, that you had received a direct contact from someone associated with Russia on the campaign?

A   I believe I had also received an email in February of 2016 from maybe the same individual or somebody from the Russian Embassy requesting -- trying to coordinate an interview with a Russian news outlet, I believe.

Q   Tell us what you remember about that.

A   That is what I remember.  And I believe I responded saying that we would not be participating and have a nice day.

Q   And do you remember what account the email arrived from?

A   What account the email arrived from?

Q   This -- I'm back on November 9th now.

A   What it arrived from?

Q   Yes.

A   I don't remember, but I have this paper in front of me. It was a Gmail address.

Q   Does it refresh your recollection, or are you just reading for me off it?

A   I'm just reading off the page.  I don't remember.

Q   Well, don't do that.  We don't like that.

Do you recall what account the gentleman sent it to you from?

A    I don't.

Q    You don't have an independent recollection.

A    No.

Q    Okay.  Do you recall anything else about the email?

A    There was an attachment that was a congratulatory letter from Putin to the President-elect.

Q    And what languages was it in?

A    Russian and English.

Q    And do you recall your reaction when you got this email purporting to be a note from Mr. Putin in Russian and English?

A    I wasn't sure if it was legitimate.  Wanted to find out how we could validate the sender and the information attached and make sure that the President-elect wasn't getting any false information.

Q    And what did you do?

A    I sent the email to Jared Kushner to ask for his help in identifying this individual, ensuring that they were affiliated with the Embassy, and then passing it along to the transition officials that would now be maintaining these records and coordinating these communications.

Q    And did you learn at the time whether the email was genuine or not?

A    My recollection was that Jared reached out to somebody, a contact that he had, that might know individuals at the Russian Embassy and that that was not -- the person that the email was

sent from was not the Russian Ambassador, but didn't have a comment, necessarily, on the validity of the email itself.

Q    Did you do anything with the -- after checking with Mr. Kushner, did you do anything further?

A    Like I said, I believe I shared the email with the transition officials that were now in charge of the President-elect's communications with foreign leaders.  He was obviously taking a lot of congratulatory calls in the days after the election, and that was all beginning to be run through a formal process, so I believe they took over from there.

Q    I would like to ask you some -- if I were to ask you the same questions about the special counsel interview on this subject, it would be the same objection, correct?

Mr. Purpura.  Yes.

Mr. Eisen.  Okay.  I think that we're going to jump right to it or -- okay.

Ms. Istel.  Unless you'd like to take a break.

Ms. Hicks.  No, that's okay.

Ms. Istel.  So I'll introduce myself for the record.  Sarah Istel with the majority staff.

Good afternoon, Ms. Hicks.

Ms. Hicks.  Hi.

Ms. Istel.  I'm going to apologize, because we're going to be jumping around a little.  We'll try to clarify a couple things that happened.  And I want to make sure I get your words right, so

if I repeat something that you testified to earlier, you can just
let me know if that's correct.

     Ms. <u>Hicks.</u>  Sure.

     Ms. <u>Istel.</u>  Thank you.

     So a Congresswoman asked you earlier about whether the
President had asked you to make any statements regarding his
relationship with Karen McDougal and with Stormy Daniels, and you
had said that the President asked you to deny that he had an
affair with Karen McDougal.  Is that correct?

     Mr. <u>Philbin.</u>  This is referring to during the campaign?

     Ms. <u>Istel.</u>  During the campaign.

     Ms. <u>Hicks.</u>  I believe the statement that I issued said that
they did not have a relationship.

       BY MS. ISTEL:

     Q   Okay.  So did you ever ask him if they had -- a
relationship, can we agree that that encompasses an affair?

     A   Yes.

     Q   Great.  And did you ask him if that was true?

     A   I did not.

     Q   Did you generally make public statements that he asked
you to make without asking him if those statements were true?

     A   No, but I wasn't in the business of -- I wasn't in the
business of questioning him.  This was not something that I would
have direct knowledge of, so I took his word.

     Q   But he did tell you that it was not true.

A    That's accurate.

Q    Okay.

So we're going to go back a little bit.  We talked earlier about your relationship with Michael Cohen during the campaign and the President's relationship with Michael Cohen during the campaign.

I take it you're aware that Michael Cohen has now pled guilty to multiple Federal charges on campaign finance violations?

A    I'm aware.

Q    Have you seen the information where the allegations against Mr. Cohen are laid out?

A    Yes.

Q    Okay.

I'll let your counsel confer.

Mr. Trout.  Yeah.  There is information which is a charge, a formal charge --

Ms. Istel.  Right, so --

Mr. Trout.  -- and then there's information which everybody else uses --

Mr. Eisen.  She means the information --

Ms. Istel.  I do.  And, actually, we have that as an exhibit, so we'll just introduce it now so that you can just see.

Mr. Trout.  I'm not sure that --

Ms. Istel.  I'm just going to read one sentence from it really quickly to make sure we're all on the same page as to what

that refers to.

         BY MS. ISTEL:

    Q    "But the complaint alleges that Individual One directed
Mr. Cohen to make hush-money payments to women who had affairs
with Individual One during Individual One's Presidential
campaign."

    Are you familiar with that allegation?

    A    Yes, I am.

    Q    Do you have any knowledge of whether the President knew
that Mr. Cohen had made payments to Stormy Daniels during the
campaign?

    A    I don't have any direct knowledge.

    Q    Did you ever witness Mr. Cohen and the President discuss
payments to any women during the campaign?

    A    I did not.

    Q    Were you ever present when Mr. Cohen and the President
had meetings about the President's relationship with other women
during the campaign?

    A    Actually, there is one discussion that I was part of, in
terms of -- you know, that involved Mr. Trump, Michael, myself,
and it was regarding another woman.  Her name was Jill Harth.

    She had made allegations about something she claimed had
happened, I believe, 20 years prior, but, you know, at the same
time, had been sending requests to Mr. Trump's office for jobs,
other, I believe, gifts, stating her support for his candidacy,

and generally just praising him for being a friend and a good person over the years, and then shortly thereafter, you know, changed her tune a bit publicly.

So that was the one conversation I was part of with that group of people.

Q   When you say "changed her tune," can you describe what that means for the record?

A   She began publicly to disparage Mr. Trump and, again, make claims about some things she said happened 20 years prior.

Q   Do you have any knowledge of whether she made any demands on Mr. Trump?

A   Like I said, she was making requests for various jobs that were not fulfilled, but I don't know if there were any other sort of more extreme requests or attempts to elicit help from him.

Q   So, just to clarify, did she ever say, if you don't do X for me, then I will continue to disparage you publicly, to your knowledge?

A   Not to my knowledge.

Q   What did Mr. Trump respond, or -- at the time, respond?

A   The nature of our conversations was just to ensure that, you know, any media outlets that were interviewing this person or attempting to write her story, that they were also aware of this additional context.

Most of the communications, you know, describing her support for Mr. Trump and his candidacy, saying how she had attended

rallies, requesting jobs, things like that, she had put in emails to his office.  So wanting to make sure that the reporters had access to that information as well and, if they were going to proceed with the story, that they would present a full picture of all of the information.

Q   Thank you.

Now, earlier you mentioned that, before receiving a story, David Pecker emailed you to give you a heads-up.  Is that right?

A   This was specific to the Wall Street Journal story, I guess November 3rd or November 4th.  I wasn't aware of the circumstances described to me by the reporter, as what -- as what they were planning to write.  It obviously involved American Media.  I reached out to David Pecker to see if he was engaging with the reporter and if he knew what they were talking about, since I didn't, and he wasn't available.

He called me back and let me know that he had been made aware of the story and that his communications team was going to respond and shared the statement with me that they had provided to The Wall Street Journal or were in the process of.

Q   Did he regularly tell you in advance of stories published about Mr. Trump?

A   This was the only instance.

Q   Did you have any other contact with him during the campaign?

A   I had contact in the sense that he was an acquaintance

of Mr. Trump.  So sometimes -- you know, Mr. Trump doesn't email
and was often extremely busy, so sometimes when we were on the
road I would send a message to him or give his office a call to
relay something for Mr. Trump -- dinner plans, a positive article
that Mr. Trump wanted David to read, something interesting, maybe
a picture from our travels on the campaign.

    Q   And I'll come back to that in a second, but you
mentioned that Mr. Trump didn't email during the campaign.  Did he
ever tell you why he didn't send emails during the campaign?

    A   He just doesn't -- it's not specific to the campaign
period.  He just doesn't use email.

    Q   Have you ever seen him write an email?

    A   No.

    Q   Did you ever ask him why he doesn't write emails?

    A   I just know he prefers to speak on the phone.  He
prefers the interaction.

    Q   Does he text?

    A   Not that I'm aware of.

    Q   So if you want to reach him, the only way to do so is to
call him?

    A   That's my understanding, unless something's changed.

    Q   If he doesn't pick up and it's urgent, how would you get
in touch with him during the campaign?

    A   He usually picks up.  But, you know, there's usually
somebody else with him that you can try to reach out to as

well -- security, an advance person, right?  There's always people
around.

Q    And we'll come back to that in a second, but I want to
just finish on this issue while we can.

You mentioned that that was the only time that David Pecker
had reached out to you or discussed a negative story about Trump
in advance of the story.  Did you have any discussions with anyone
else at AMI about a negative story and Trump prior to the release
during the campaign?

Ms. <u>Solomon.</u>  I'm sorry.  Can we just clarify?  You mentioned
about David Pecker reaching out.  I'm not sure that that correctly
describes Ms. Hicks' testimony.

Ms. <u>Istel.</u>  Sure.  I think she said -- and you can correct
the record.

Ms. <u>Hicks.</u>  I reached out --

Ms. <u>Istel.</u>  Yeah.

Ms. <u>Hicks.</u>  -- to Mr. Pecker based on the inquiry I received
from The Wall Street Journal, which described American Media's
involvement in the situation.  I wasn't aware of any of the
circumstances surrounding the situation they described.  So, to
get more information -- Mr. Trump was on stage giving a speech at
the time, so I reached out to David to see if he knew about this.

Like I said, he acknowledged that his communications team had
also been made aware by The Wall Street Journal of the story
coming out and that they had responded or were in the process of

responding with the statement that he read to me.

       BY MS. ISTEL:

Q  So I'll just clarify, then, for the record --

A  I didn't offer any changes or suggestions.  It was purely an information-gathering phone call.

Q  That's helpful.  Thank you.

And can we ask the same question about Dylan Howard or anyone else at AMI?  Did you speak with anyone at AMI about a negative story about Trump prior to its release?

A  Not that I'm aware of.

Q  Did you have any contact with Keith Davidson during the campaign?

A  Not that I'm aware of.

Q  Okay.

So I think, if we can go back and talk through a little bit more about the campaign, I just want to clarify for the record: Mr. Eisen asked you about who kept your schedule during the campaign.  Do you know who kept Mr. Trump's schedule -- or if he wrote down notes during the campaign.  So I'd like to ask similar questions about Mr. Trump's time during the campaign.  Do you know who kept his schedule?

A  Sure.  So there were multiple people.  Rhona Graff, his longtime executive assistant and senior vice president at The Trump Organization, kept a record of his meetings.  And, obviously, the campaign had a scheduler that primarily handled

travel.

Q    So if someone wanted to reach Mr. Trump, who would they contact?

A    Most likely Rhona.  Obviously, things evolved a little bit as we worked on the road more, and sometimes they would contact me.  Sometimes they would contact Mr. Trump directly. Keith Schiller.

Q    And did Rhona also keep Mr. Trump's phone messages during the campaign?

A    She did, yeah.

Q    And what about the rest of the senior staff's schedule? If you wanted to reach Manafort on a given day, during the campaign, how would you do that?

A    I have no idea.

Q    So you were with Mr. Trump during most days on the campaign.  Is that correct?

A    Yes.

Q    And if he said, I'd like to get in touch with Manafort or my Deputy Chairman Gates, how would you do that?

A    I would call Paul's, I guess, cell phone number.

Mr. Trout.  Paul Manafort?

Ms. Hicks.  Yes.

        BY MS. ISTEL:

Q    Okay.  So is it fair to say that you -- at a given day during the campaign, would you know where the senior staff members

were, of the campaign?

A   Most senior staff traveled with the candidate.  You
know, we were a very small team.  And other members of the
campaign, either -- if you worked in the States, pretty obvious
where we might find you.  And someone like Paul was a little bit
more difficult perhaps.  He split his time between New York and
Washington and was also running the convention, so he spent quite
a bit of time in Cleveland.

Q   Did you have weekly senior staff meetings during the
campaign?

A   Like I said earlier, we usually met Monday mornings.
This started around the time that Paul took on more
responsibility.

Q   Was Mr. Trump at those meetings?

A   No.

Q   Did anyone brief him about those meetings after they
occurred?

A   Sometimes he would be briefed on changes to his
schedule, like if there was a travel day added or a rally, but --

Q   What about the substance of those meetings?  Did you
ever talk about messaging or any big issues that occurred?

A   Again, it was mostly travel-based, so, like, you know,
we're going to be traveling on Thursday, we're going to
North Carolina, this is going to be a great opportunity for you to
give a speech on X.  But that was the primary reason for

debriefing him on those meetings.

Q   Do you recall a senior staff meeting on the week of June 9th, 2016?

A   I don't.

Q   So, if we can --

A   I mean, I'm sure it -- I'm not saying it didn't happen. I just don't remember anything remarkable about it.

Q   Yeah, no, that makes total sense.

So if we can, let's go to Volume I, page 115.  I think that's the passage where Mr. Eisen read you previously.  And so it just discusses the meeting that day.  And I just wanted to clarify, if we could just -- it says:  In the days before June 9, 2016, Trump, Jr., announced at a regular meeting of senior staff he had a lead on negative information about the Clinton Foundation.  Gates believed that Trump, Jr., said the information was coming from a group in Kyrgyzstan and that he was introduced to the group by a friend.  Gates recalled that the same meeting was attended by Trump, Jr.; Eric Trump; Paul Manafort; Hope Hicks; and, joining late, Ivanka Trump and Jared Kushner.  According to Gates, Manafort warned the group that the meeting likely would not yield vital information and they should be careful.

Mr. Philbin.  Is this the same --

Ms. Istel.  Yeah, it's the same one we just went over before.

Mr. Philbin.  Hicks denied any knowledge of the June 9th meeting before 2019.

Ms. Istel.  Yes.

So just a quick followup, which is just, did you tell the President about that meeting, Mr. Trump, at the time?

Ms. Hicks.  I don't remember the meeting taking place.

Ms. Istel.  Okay.

So I think we're going to pivot to the transition.

Sorry.  I'm just going to ask my colleagues if they have other questions before we continue.

I'm going to yield back to Mr. Eisen.

        BY MR. EISEN:

Q   Okay.  We were on the Mueller report, Volume II, back in exhibit No. 14.  And I'm going to direct you now to page 21 and the page after that, which is page 23, for some questions about the transition, Ms. Hicks.

Do you recall the President -- and I don't want you to divulge any information.  I'm just asking you a yes-or-no question.  Do you recall that the intelligence community publicly released an assessment with respect to the Russian attack on the elections during the transition?  Do you remember a public IC assessment being released on that subject?

A   Yes, sir.

Q   And over on page 23, do you remember discussing that public IC assessment with President Trump?

Mr. Trout.  President-elect Trump or President Trump?

Mr. Eisen.  President-elect Trump.

Ms. <u>Hicks.</u>  Yes.

Mr. <u>Eisen.</u>  Tell me about that conversation.

Mr. <u>Philbin.</u>  Objection.  If you're going to be asking broadly about what the President-elect thought or had to say about an intelligence community assessment, even if it later became public, it was communication from the intelligence community to the President-elect prior to taking office.

So, if you want to narrow your question, we can see if we have objections.

Mr. <u>Eisen.</u>  Did the President tell you that he viewed the intelligence community assessment as his Achilles' heel because, even if Russia had no impact on the election, people would think Russia helped him win, taking away from what he accomplished?

Ms. <u>Hicks.</u>  He did not say that to me.

Mr. <u>Eisen.</u>  Did he say that in some form of words, not those exact words, but some form of words?

Mr. <u>Philbin.</u>  Mr. Trout, you might want to have the witness read that paragraph.  He's asking questions about that paragraph.

Mr. <u>Eisen.</u>  Perfectly fine for the witness to read the paragraph.

The question is, do you recall that the President-elect viewed the intelligence community assessment as his Achilles' heel?

Ms. <u>Hicks.</u>  I think the following statement is most accurate, that the President thought the Russia story was developed to

undermine the legitimacy of his election.

Mr. Eisen.  And, at this time, did you agree with that?

Ms. Hicks.  I think --

Mr. Trout.  Let's confer.

[Discussion off the record.]

Ms. Hicks.  Sorry about that.

So I think that to say that it was developed as a means to undermine the legitimacy of his election is not accurate.  But to say that the assessment of the intelligence community, which I already testified I agree with -- I feel that it has been weaponized by certain people with an agenda for the purpose of trying to undermine his legitimacy.

BY MR. EISEN:

Q   At this time during the transition, did the President accept the IC's assessment?

A   I think that the President has been consistent in his private and public statements regarding his thoughts on the assessment of the intelligence community on this topic.

Q   So his private -- he expressed the same doubts privately that he has publicly?

A   Yes.  And I think, primarily, at that time, his hesitation was, as he has stated, that this assessment was being made by the previous administration officials.  And once his officials were in place, he had greater confidence in their assessments.

Q   Have you discussed this matter with the President since leaving the White House?

A   I have not, no.

Q   Did you discuss this matter with the President -- the intelligence community assessment, did you discuss it with the President while you were a White House official?

Mr. Purpura.  Objection.

Mr. Eisen.  Will you answer any questions at all on the subject matter of the IC's views about the Russian attack on the 2016 election based on your time in the White House?

Mr. Purpura.  We would object.

    BY MR. EISEN:

Q   Okay.  Who was Michael Flynn?

A   Michael Flynn was somebody that supported Mr. Trump.  He was at one point in time considered a possible Vice Presidential candidate.  And he became somebody who frequently traveled with the candidate and introduced him at rallies.

Q   And are you aware that President Obama made comments about Mr. Flynn to the --

A   Yes.

Q   -- the President-elect?

A   Yes.

Q   And how did the President-elect receive those comments?

Mr. Purpura.  You can answer.

Ms. Hicks.  I think he was a bit bewildered that, you know,

of all the things that the two of them could have been discussing, that that was something that came up.

Mr. Eisen.  And did you feel that President Obama's comments sat with the President-elect more than you expected?

Ms. Hicks.  I did, yes.

Mr. Eisen.  Can you -- go ahead.  Sorry.  I cut you off.

Ms. Hicks.  That's okay.  I feel like it maybe tainted his view of General Flynn just a little bit.

Mr. Eisen.  Did there come a time when the President formed the opinion -- during the transition; I'm asking now about the transition -- that Flynn had bad judgment?

Mr. Philbin.  Could you give us a moment there?

[Discussion off the record.]

Mr. Eisen.  Can you read the question back, please?

Okay.  I've asked the court reporter to read the question back.

[The reporter read back the record as requested.]

Ms. Hicks.  Yes.

Mr. Eisen.  Tell me about that.

Ms. Hicks.  I don't think this was an overall characterization.  I think that this was something where he felt like there were a few things that maybe caused him to think that he was capable of being a person who exercised bad judgment.

Mr. Eisen.  What were those things?

Mr. Philbin.  I'm sorry.  Can I again suggest that, since the

question seemed to be based on footnote 155, page 32, Ms. Hicks
have a chance to review that footnote?

Ms. Hicks.  Yeah.  I mean, primarily the comment by President
Obama and the incident with General Flynn's son concerning a fake
news story and some of the tweets that were posted surrounding
that.

BY MR. EISEN:

Q   Posted by?

A   I believe they were posted by his son, and then it led
to reporters also looking back at tweets that General Flynn had
posted.

Q   Do you recall David Ignatius writing a column about a
Michael Flynn phone conversation with the Russian Ambassador
during the transition?

A   Yes.

Q   And what do you remember about that?

A   I don't remember much about the substance of the column,
to be honest, but I remember several email exchanges between the
National Security Advisor, General Flynn at the time, and some of
his national security staffers, a desire to perhaps have David
Ignatius clarify some things in that column, and a failure to do
so.

Q   Were you involved in the clarification efforts?

A   I was on the email thread, so I was following the
discussion that ensued, but I was not involved in any kind of

message development or outreach to Mr. Ignatius.

Q   Did you have any advance knowledge of a phone call between Mr. Flynn and the Russian Ambassador that was the subject of this Ignatius reporting?

A   I believe I was aware of it the day that it took place. I don't know if it was before or after.  But I recall being at Mar-a-Lago, and Flynn, I think -- sorry.  Off the record.

[Discussion off the record.]

Ms. Hicks.  I think it was afterwards.  Perhaps even several days afterwards.

Mr. Eisen.  When did you first learn that there was an issue about -- if you learned -- actually, let me rephrase that question.  Did Mr. Flynn talk to you after the column was published about the column?

Mr. Philbin.  And we're still asking --

Mr. Eisen.  We're asking transition.  We're about to come to the post-transition period.

Ms. Hicks.  I don't recall any direct conversations with him, only the email thread that I described.

Mr. Eisen.  During the transition, did you develop any additional information about the truth or falsity of anything in the Ignatius column?

Ms. Hicks.  Not to my recollection.

Mr. Eisen.  What about after the transition?

Mr. Philbin.  Objection.

Mr. Purpura.  Objection.

BY MR. EISEN:

Q   Okay.  When did you first become aware of the "Access Hollywood" tape?

A   About an hour before it was made public.

Q   And what was your reaction to it?

A   Honestly, my reaction was, it was a Friday afternoon, and I was hoping to get home to see my family for the first time in a few months, and that wasn't happening.

Q   Did you have any other reactions?

A   Look, I obviously knew that it was going to be a challenge from a communications standpoint.

Q   Did you discuss it with Mr. Trump?

A   I did, yes.

Q   Tell me about those discussions, please.

A   I made him aware of the email I received from The Washington Post which described the tape.  And I don't know if the initial email did this, but certainly one of the subsequent emails and exchange provided a transcript of the tape.  So, described those different components to Mr. Trump and tried to evaluate the situation.

Q   And how did he react to that?

A   You know, he wanted to be certain, before we engaged, that it was legitimate.  And I think we all felt it was important that we request to see the actual tape or listen to the audio

before responding.

Q   Was he upset?

A   Yes.  I think everybody was in, like, a little bit of
shock.

Q   And did he ask you how -- did he seek your advice on how
to respond?

A   Yes.  There were quite a few of us, so it was very much
a group discussion, given that this unfolded at a debate-prep
session.

Q   And do you remember who else you discussed the tape
with?

A   Who else was present there?

Q   Yeah, at that time.

A   Sure.  Reince Priebus, Chris Christie, Jeff Sessions,
Stephen Miller, Jason Miller, Steve Bannon, David Bossie,
Kellyanne Conway.  Later, Jared Kushner.  I think that's it.

Q   Do you recall reaching out to Michael Cohen about the
tape?

A   My recollection of reaching out to Michael took place
the following day.  And it wasn't about the tape; it was
about -- this is going to get confusing, but the day after the
tape, there were rumors going around -- I'm not sure exactly
where -- I heard it from our campaign spokesperson, Katrina
Pierson, who was sort of like a -- she had a lot of contacts,
grassroots.  And she had called to tell me that -- or maybe sent

me a message about rumors of a tape involving Mr. Trump in Moscow
with, you know -- can I say this?

[Discussion off the record.]

Ms. Hicks.  -- with Russian hookers, participating in some
lewd activities.

And so, obviously, I didn't -- I felt this was exactly how it
had been described to me, which was a rumor.  Nonetheless, I
wanted to make sure that I stayed on top of it before it developed
any further, to try to contain it from spiraling out of control.

And the person that made me aware of the rumor said that TMZ
might be the person that has access to this tape.  I knew Michael
Cohen had a good relationship with Harvey Levin, who works at TMZ.
So I reached out to Michael to ask if he had heard of anything
like this; if Harvey contacted him, if he could be in touch with
me.

        BY MR. EISEN:

    Q   And do you recall anything happening in connection with
WikiLeaks at this time?

    A   Yes.

    Q   And what happened in that connection, Ms. Hicks?

    A   I believe the same day that the tape was released,
WikiLeaks also released emails from John Podesta's account.

    Q   Do you have any information about how those came to be
released at that time?

    A   No.

Q    Okay.  And any other reason you reached Mr. Cohen besides the Harvey Levin connection?

A    No.  I know what Michael said in his testimony about reaching out to him to help, quote, spin reporters.  Number one, I wouldn't reach out to Michael for help spinning reporters at that point in time.  And, number two, you know, there was really no spinning that tape.

Q    Did there come a point at which you learned during the transition about the press reporting on hush-money payments?

A    During the transition?

Q    I'm asking during the campaign and transition.

A    No.

Q    Okay.

Do you remember a Wall Street Journal article from November 4th, 2016?

A    Yes.

Q    What do you remember about that?

A    Like we already discussed, I remember receiving a request from The Wall Street Journal asking if candidate Trump had a relationship with a woman named Karen McDougal.  I forget the exact phrasing of the email, but obviously it led me to American Media, where David Pecker said that they were responding to the story and that their response was going to indicate that they had a relationship with Ms. McDougal, who had done work for them in the past.  They had a contract with her to provide content.  I

believe it was, you know, fitness and nutrition-related content. And that was the extent of their response.

Q   Did Mr. Cohen, to your knowledge, have a relationship with AMI or any --

A   He did, yes.

Q   -- of its personnel?

A   Yes.

Q   And what was the basis -- or what was that relationship?

A   I don't know.  I never witnessed the relationship firsthand.  I don't know if it was professional or personal or both.  I don't know.

Q   How did you become aware of it?

A   I don't know exactly.

Q   Okay.  I'm going to come back over to the Mueller report.  That's exhibit No. 14.  And I'm going to ask a series of questions.  We're just going to go through.

I'm now going to take you to -- and I'm going to go in order through the report, for the sake of moving as briskly as we can. I'm going to take you to page number 44 of Volume II.

Do you recall -- this is note number 268.  Do you know who Jim Comey is?

A   Yes.

Q   Do you recall the President telling you that he had never asked Jim Comey to stay behind in his office?

Mr. Purpura.  Objection.

Mr. Eisen.  Okay.

The White House objects on the basis of absolute immunity. Will you follow that instruction?

Ms. Hicks.  I will.

Mr. Eisen.  Refuse to answer?

Ms. Hicks.  I will.

Mr. Eisen.  Will you answer any questions at all about the subject matter set forth in note 268 of page 44?

Mr. Purpura.  We would object to that subject matter.

Mr. Eisen.  Would you answer any questions designed to establish the predicate for the absolute immunity, such as who was present, where the conversation happened, the purpose of the conversation, or any other predicate questions?

Mr. Purpura.  We would object to all those questions.

Mr. Eisen.  Are you asserting any other privilege as to my question?

Mr. Philbin.  Not at this time from the White House.

[3:06 p.m.]

Mr. Eisen.  On to page 47.  Now I'm going to ask a series of questions about Mr. Flynn within the White House.

Are you willing to answer any questions about the President becoming unhappy with Mr. Flynn before he was forced to resign? Now I'm asking about the White House period.

Mr. Purpura.  And we object.

Mr. Eisen.  And the answers to questions about establishing the predicate and other privileges would be the same.  We'll just stipulate that going forward.

Mr. Philbin.  Let me clarify.  I mean, the absolute immunity applies to a senior adviser to the President, given the senior adviser role in proximity to the President overall.  So the premise of the question seems to be that we would have to pick apart each incident as to whether the immunity applies to that incident.  We disagree with that premise.  It applies to the senior adviser in the role, in connection with service and discharge of their duties as senior adviser to the President.

Mr. Eisen.  Understood.  That's the White House's view.  We take a different view in the committee.

My question is, other than the assertion of absolute immunity, are you willing to ask -- to answer any questions about the subject matter of Mr. Flynn, the President's views towards Mr. Flynn, starting with the January 20th, 2017?

Mr. Purpura.  Object -- we would object.

Mr. Eisen.  Okay.  Do you recall that after Attorney General Sessions recused himself, the President became angry and scolded the Attorney General in your presence?

Mr. Purpura.  Objection.

Mr. Eisen.  Okay.  Same basis?

Mr. Purpura.  The basis is immunity, yes.

Mr. Eisen.  Asserting any privileges in that regard beyond absolute immunity at this time?

Mr. Purpura.  Not at this time.

Mr. Eisen.  And will you answer the question?

Ms. Hicks.  I will not, no.

Mr. Eisen.  Okay.  On to page 59, which we alluded to earlier.  Have it here in exhibit 14 as well.

Do you recall telling the President after an interview that his comment about Mr. Comey should be removed from the broadcast of that interview, but the President wanted to keep it in, which you thought was unusual?  Will you answer any questions about that?

Mr. Purpura.  Objection.

Mr. Eisen.  Do you recall the President telling his communication team that he was unhappy with the press coverage of Comey's termination and ordering them to go out and defend him?

Mr. Purpura.  Objection.

Mr. Eisen.  Will you answer any questions on that subject matter or on the subject matter set forth in the preceding pages

of the Mueller report, Volume II?

Mr. Purpura.  Well, I guess, sort of to clarify,
you -- couple things run together.  If the subject matter is the
President's reaction and direction to the press team as to the
firing of Director Comey, we would provide -- we would have the
same objection.

Mr. Eisen.  Let's specify what the subject matters are:  the
Sessions recusal; the President's reaction to the Sessions
recusal; the subject of Jim Comey post-January 20; the President's
firing of Jim Comey; press coverage of that; all of those subject
matters that are covered in the Mueller report, Volume II.

Would you object to Ms. Hicks answering questions on those
subject matters based on absolute immunity?

Mr. Purpura.  Yes.

Mr. Eisen.  Okay.  Also in connection with the firing of Mr.
Comey, there are a series of statements, Ms. Hicks, on page 71 of
Volume II.

If it's easier, exhibit 14 has the relevant portions
highlighted.

Ms. Hicks.  I'm just going to move this, because I know I'm
going to spill it.  Sorry.  Take that off the record.

Mr. Eisen.  Okay.  Would you answer any questions about the
President's reactions to reports on his meeting with Mr. Lavrov
regarding Mr. Comey?

Mr. Purpura.  Objection.

Mr. <u>Eisen.</u>  Any questions at all regarding the Comey firing?

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Eisen.</u>  Okay.

Now we'll pivot to the subject of the special counsel's appointment and the President's reaction to that.

Would you answer any questions on that subject?

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Eisen.</u>  You told the special counsel that you saw the President shortly after Sessions departed and described the President as being extremely upset by the special counsel's appointment and that you had only seen the President like that one other time, when the "Access Hollywood" tape came out during the campaign.

Will you answer any questions about that?

Mr. <u>Purpura.</u>  We would object.

Mr. <u>Eisen.</u>  Any questions at all about your special counsel interviews?

Mr. <u>Purpura.</u>  We would object.

Mr. <u>Eisen.</u>  Do you remember the President on his flight from Saudi Arabia to Tel Aviv removing Sessions' resignation letter from his pocket and showing it to a group of senior advisers and asking them what he should do about it?

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Eisen.</u>  Will you answer any questions about that subject matter?

Mr. Purpura.  We would object to those questions.

Mr. Eisen.  The chairman asked you a series of questions this morning about some notes that Mr. Lewandowski told the special counsel he asked you to type when he went into the Oval Office in a discussion, again, relating to Mr. Sessions and that he retrieved the notes from you part way through his meeting.  This is on page 93 of the special counsel's report, note 625.

Would you answer any questions about that subject matter?

Mr. Purpura.  We would object.

Mr. Eisen.  On page 94, exhibit 14 has some portions highlighted relating to your conversations with Mr. Lewandowski about the New York Times interview and about firing Sessions. Will you answer any questions about that?

Mr. Purpura.  There will be an objection.

Mr. Eisen.  To all related subject matter?

Mr. Purpura.  Yes.

Mr. Eisen.  Do you remember ever discussing a recess appointment of a replacement for Mr. Sessions with the President?

Mr. Purpura.  Objection.

Mr. Eisen.  And that is Volume II, page 94, note 636.

Okay.  Will you answer any questions relating to your time at the White House or your conversations with the office of the special counsel about the campaign arranging a meeting between Donald Trump, Jr., Paul Manafort, Jared Kushner, and a Russian attorney?

This is the -- sometimes referred to as the Trump Tower meeting.  But now I'm asking her knowledge during the White House period.

Mr. Purpura.  Objection.

Mr. Eisen.  Have you had any conversations about that subject, the Trump Tower meeting, post your White House service with anyone at all, other than your lawyers?

Ms. Hicks.  Not to my recollection.  Not to my recollection.

Mr. Eisen.  Okay.  Will you answer any questions about the subject matter of the Trump Tower meeting on June 9th, 2016, with respect to information you learned or actions you took while you were a White House employee?

Mr. Purpura.  Objection.

Mr. Eisen.  On page 100 through 103 of the Mueller report there is a discussion of direction by the President to his communications staff not to publicly disclose information about the June 9th meeting and the response to press -- the President directing Donald Trump, Jr.'s response to press inquiries about the June 9th meeting and related matters.

Will you answer any questions about the special counsel's statements on page 100 to page 103?

Mr. Purpura.  There would be an objection.

Mr. Eisen.  Will you answer any questions relating to that subject matter at all?

Mr. Purpura.  There will also be an objection.

Mr. Eisen.  Okay.  Moving to -- do you remember telling Mr. Corallo that certain materials will never get out?

Mr. Purpura.  Objection.

Mr. Eisen.  Okay.  We're going to pause.  Ms. Dean has joined us from the votes as other members are coming and have questions.

Ms. Dean.  Thank you, Counsel.

Good afternoon.

Ms. Hicks.  Hi.

Ms. Dean.  I know it's been a long day for you, and I apologize.  If I ask something that will wind up being a slight repeat of what you have been asked, we also were in hearings on reparations, important hearings on reparations.  So I apologize for my running between these two important meetings.

Ms. Hicks.  I totally understand.  And this is one of many repetitions over the last several years.  So go ahead.

Ms. Dean.  And you know something about a crazy schedule like that?

Ms. Hicks.  Yes, ma'am.

Ms. Dean.  I wanted to ask you about the time of transition and immediately after the election.  And what was your role at that time?

Ms. Hicks.  My title was press secretary, and my role was very similar to my role on the campaign.  I served as sort of a liaison between the different leadership positions and the different components that go into preparing the President-elect to

take office, and maintaining a public presence at that time, and
starting to execute his agenda, as well as communicating with the
media.

Ms. Dean.  Terrific.  And during the transition, who was
principally responsible for messaging in response to the
allegations of Russian interference?

Ms. Hicks.  There were several people involved.  Mr. Trump
was involved directly and Jason Miller --

Ms. Dean.  Jason -- go ahead.

Ms. Hicks.  Sorry.  I was just waiting for the door to close.

Ms. Dean.  Oh, thank you.

Ms. Hicks.  Stephen Miller, myself, Steve Bannon, Kellyanne
Conway, Sean Spicer, to name a few.

Ms. Dean.  And so in your role on that front, during the
transition, did you discuss with the President-elect how to
message about Russia's interference with our election?

Ms. Hicks.  Yes.

Ms. Dean.  And could you tell us about that conversation?
This was during transition.

Ms. Hicks.  Yes.

Ms. Dean.  Could you tell us about that?

Ms. Hicks.  I believe the response that he put out, the
statement, was something to the effect of, you know, that these
are the same intelligence agencies that determined Saddam Hussein
had weapons of mass destruction, perhaps [inaudible].

The <u>Reporter.</u>  I'm sorry.  The audio has gone out.

Ms. <u>Hicks.</u>  -- an approach would be the best.

[Discussion off the record.]

Ms. <u>Hicks.</u>  I guess that's it.

Ms. <u>Dean.</u>  So in response to that, the President -- rather than talking about Russian interference with the 2016 election, he made the comparison to a falsehood of the past?  That's what he said?

Ms. <u>Hicks.</u>  I don't believe that's a falsehood.  But yes, that's what he said.

Ms. <u>Dean.</u>  Okay.  Was he concerned?  Did he express concern to you about the Russians' interference with our 2016 elections?

Ms. <u>Hicks.</u>  I think he was concerned, but I think he was simultaneously concerned that folks with a political agenda, were going to weaponize that assessment to try to undermine the legitimacy of this election.

Ms. <u>Dean.</u>  And two days after the President was elected, what was your statement to the press about the Trump campaign and any kind of meetings or contacts with Russia during the campaign?

Ms. <u>Hicks.</u>  Sure.  So -- yeah, I was responding to a statement made by a Russian official.  I believe his statement is not verbatim, but it was something to the effect of we were in constant communication or constant contact with members of Trump's inner circle throughout the campaign.

You know, to my knowledge, that was not true.  That had not

been my experience.  I think I missed a total of 4 days throughout the entire primary and general election season, if you will, cycle.  It was an overbroad answer that obviously didn't account for other communications with foreign officials from places like Mexico, where we took a very -- campaign-affiliated trip; Scotland; meetings with Prime Minister Netanyahu during U.N. General Assembly week.

So it was an overbroad answer, but, you know, even to this day, knowing some of the contact that members of Mr. Trump's inner circle had with Russian officials, I don't believe that that characterization made by that diplomat or whoever that was speaking was accurate.  It seems like one of those situations -- maybe -- I'm sure everyone has had one of these before, where those interactions meant a lot more to them than it did to us.  These were handshakes at events and things of that nature.

Mr. Philbin.  And just to clarify the record, Ms. Hicks, when you referred to members of Mr. Trump's inner circle, you were making air quotes with your hands, were you not?

Ms. Hicks.  Yes.

Mr. Philbin.  Could you explain what that means, because --

Ms. Hicks.  I guess everyone has a varying definition of who would be considered part of the inner circle, but I would consider that to be people that regularly traveled with the candidate, had decisionmaking roles, things like that.

Mr. Philbin.  And it was your point that those people were not part of the inner circle?  Is that what the air quotes were?

Ms. Hicks.  My point is that I'm not aware of anybody that regularly interacted with Mr. Trump that was a decisionmaker that advised him on a frequent basis that had, quote, regular contacts with any Russian officials.  I wasn't aware of any contacts with Russian officials until some of this has been made publicly available, so --

Ms. Dean.  And that's my next area of questions.

You, as you just described, you were an important part of the campaign for all but 4 days.  And in your experience, what, if any, contacts did anybody on the campaign have with Russians, Russian officials, nonofficials?  What, if any?

Ms. Hicks.  Are you asking about my knowledge of it during the campaign or now after the fact?

Ms. Dean.  Let's start with during the campaign.

Ms. Hicks.  During the campaign, I wasn't aware of any -- of any contact, but I also wouldn't describe something -- like an email I received with an interview with a Russian outlet to be contact with Russian officials.  It's a totally insignificant, random --

Ms. Dean.  My question was broader than that.

Any Russians or Russian officials?  So there were emails?

Ms. Hicks.  Again, I understand what you're asking.  I just -- I don't feel as though the interactions that I learned of

later, as it pertains to key members of the campaign, were
substantive.

Ms. Dean.  I'm really unclear what that means.  So there were
meetings, there were interactions, there was some engagement,
whether it was by email or phone or in person.  But you decided
they're not substantive, therefore, they didn't happen?

Mr. Trout.  Objection, I think that mischaracterizes --

Ms. Hicks.  That is not what I said at all.

If you want to repeat your question so we can get on the same
page, that might be best.

Ms. Dean.  What, if any, communications, contact, was there
between the Trump campaign and Russians or Russian officials?

Ms. Hicks.  Like I said, during the campaign, I wasn't aware
of any contacts.  That is why I answered the question the way I
did.  Later, having learned about some of the contacts that have
been described in media reports, like Jeff Sessions meeting
Ambassador Kislyak at a foreign policy speech event, I think that
I would still characterize the answer I gave in response to a
question about, quote, constant contact with members of Trump's
inner circle.

Ms. Dean.  I didn't ask you about constant contacts.  I asked
you what, if any, contact.

Ms. Hicks.  I'm answering the question as best as I can.  I
wasn't aware of any during the campaign.  And the contact I'm
aware of now is irrelevant to me.

Ms. <u>Dean.</u>  But to be honest, you immediately cited at least one example of email contact that you had from Russia -- from Russians.

So what other contacts were there like that that you're dismissing from my question, but I'm just interested in --

Ms. <u>Hicks.</u>  I'm not dismissing it.  I just -- it's irrelevant.  It was an email that I received from --

Ms. <u>Dean.</u>  Maybe we get to decide what is relevant in our oversight.

So the question is factual; it's not -- it's not your opinion based.  It is what, if any, contacts.

Mr. <u>Trout.</u>  Objection.  Ms. Hicks has answered the question and --

Ms. <u>Hicks.</u>  And everything that goes on in this committee is factual and not opinion-based?

Ms. <u>Dean.</u>  We're trying to get facts.  That's what I know my ambition is.

Ms. <u>Hicks.</u>  That is not the purpose of today's hearing or anything that has gone on concerning this committee's work and -- and this investigation --

Ms. <u>Dean.</u>  Again, this is --

Ms. <u>Hicks.</u>  -- from my perspective.

Ms. <u>Dean.</u>  I know that.

Ms. <u>Hicks.</u>  So if you all wanted to get facts, you know, I would say that those are available in this report, of which most

of this session has consisted of repeating, which I'm happy to do.
We can do a reading of that.  But if you want facts, I think I'm
trying to answer your question.  I'm telling you I wasn't aware in
the campaign of any contacts with Russian officials after the
fact.

Ms. Dean.  I didn't ask you just about just Russian
officials.  Ms. Hicks, I'm really asking you, just stick with the
parameters of my question, not your opinion as to what we're doing
here.

Ms. Hicks.  Okay.  I -- let me try this again.

During the campaign, I was not aware of any contacts with
Russian individuals or Russian officials.

Ms. Dean.  Your one testimony to the contrary.  You vetted
emails from possible Russia outlets.

Ms. Hicks.  I learned of that after the fact.  I wasn't aware
when I was communicating with that person or receiving their email
request that this was an individual from Russia.

Ms. Dean.  And you were the press secretary?

Ms. Hicks.  Yes, ma'am.

Ms. Dean.  Usually the press secretary would find out what
outlet this is contacting us.  Am I correct?

Ms. Hicks.  I was the only press staffer for the Donald Trump
campaign.  So I received hundreds of press requests in a day.  And
we weren't participating in interviews, so it was not relevant to
me who the outlet was.

Ms. <u>Dean.</u>  I have empathy for how you must have been swamped. That was a very busy campaign.

Ms. <u>Hicks.</u>  I'm not asking for empathy.  I'm just asking for you to understand the context.

Ms. <u>Dean.</u>  So to your question, you said I was asking you about then.  Now, what do you know to be the truth as to the number of contacts -- what, if any, contacts between the campaign that you were press secretary for and Russia or Russia -- Russian officials, that you know now?

Mr. <u>Philbin.</u>  If you're asking about material that she learned in her role as a senior adviser to the President while at the White House, we'll object.

Ms. <u>Dean.</u>  I understand that objection.

How about outside of that?  Because you are now a private citizen.  You're outside of that role.

What do you now understand to have been the extent of contacts between the campaign that you were press secretary for and Russia?

Ms. <u>Hicks.</u>  I don't -- I don't have a -- I couldn't repeat back to you all of the contacts that are described in the Mueller report, if that's what you're asking.

Ms. <u>Dean.</u>  So you had a chance to read Volume I?

Ms. <u>Hicks.</u>  I have not read the entirety of the report.

Ms. <u>Dean.</u>  What extent do you now know of the context between the campaign and Russia?  Could you summarize maybe or guesstimate

the number?  Are we talking dozens or are we talking 50?  Are we

talking 100?  Are we talking more?

Ms. <u>Hicks.</u>  I think someone mentioned upwards of 100 earlier

today.  I don't know if that's accurate or if that's an accurate

recollection.

Ms. <u>Dean.</u>  Are you surprised to learn that?

Ms. <u>Hicks.</u>  Yes, very surprised.

Ms. <u>Dean.</u>  Why?

Ms. <u>Hicks.</u>  Because I, like I said, wasn't aware of any

contacts during my time on the campaign.

Ms. <u>Dean.</u>  And when you made the statement to the

press -- this will be my final question so other people can get to

the things that they're interested in learning about.

But when you made the statement to the press that there were

no contacts between the Trump campaign and Russia -- I'm

paraphrasing a little -- I appreciate that it's November the 8th

of election year.  Did you have a conversation with the President

before or after that statement?

Ms. <u>Hicks.</u>  I did not speak to him before.  I spoke to others

on the campaign, other senior officials.

Ms. <u>Dean.</u>  And what was their guidance in terms of making

that answer?

Ms. <u>Hicks.</u>  That there were no contacts.

Ms. <u>Dean.</u>  And who was it who told you there were no

contacts?

Ms. Hicks.  I believe I spoke to several people.  Jason
Miller, Jared Kushner.  I believe Jason Miller may have reached
out to Kellyanne Conway and Steve Bannon.

Ms. Dean.  How about Donald Trump, Jr.?

Ms. Hicks.  I did not seek his guidance before responding to
that question.

Ms. Dean.  And my final question is, what did the
President -- you said you did not talk to the President before the
statement.  What was your conversation with the President-elect
after that statement?

Ms. Hicks.  I don't recall any specific conversations.

Ms. Dean.  You and he in transition did not talk about your
statements to the press regarding Russia?

Ms. Hicks.  I'm sure there were conversations.  I just don't
recall anything specific that I could relay to you.

Ms. Dean.  Thank you.

Ms. Mucarsel-Powell.  Ms. Hicks, my name is Debbie
Mucarsel-Powell, and I represent Florida's 26th District.

Thank you for coming.  I really do commend you for coming
here today.  I know it's a very difficult situation to be in, you
know, having the Judiciary Committee questioning you.  So I'm
grateful that you decided to come in and testify.  And I apologize
if we've heard this before, but we've been in and out, so I just
want to regroup a little bit.

You were hired by the campaign when exactly?  What was the

date?

Ms. Hicks.  I started working -- well, the campaign didn't exist until later in the spring.  But I started working on campaign-related events in January of 2015.

Ms. Mucarsel-Powell.  And when you started working for the campaign, what was -- did you have a title?  What were your job responsibilities?  What was asked of you?

Ms. Hicks.  I was the press secretary and primarily consisted of coordinating media opportunities at speaking engagements. There were a lot of summits that Mr. Trump attended as a prospective candidate and then as a candidate, as well as, you know, days spent in New Hampshire, Iowa, South Carolina, and media opportunities associated with those trips.

Ms. Mucarsel-Powell.  And you reported to the President, President Trump, from the very beginning?

Ms. Hicks.  I did, yes.

Ms. Mucarsel-Powell.  And were you with him, you say, on a daily basis, communicating with him personally on the part of the senior team advising him on the campaign?

Ms. Hicks.  Yes, ma'am.

Ms. Mucarsel-Powell.  Who in the campaign was responsible for the messaging strategy?

Ms. Hicks.  Primarily Mr. Trump.

Ms. Mucarsel-Powell.  Okay.  What do you think was the message that was ultimately the winning message for the campaign?

Ms. <u>Hicks.</u>  I think that he -- I think he gave people who
lost faith a reason to keep fighting for what they believed in,
and I think he offered change, because he was an outsider and he
was going to come here and shake up the system.

Ms. <u>Mucarsel-Powell.</u>  Were there any conversations that you
were involved in that dealt with anti-immigration campaign
messaging?

[Discussion off the record.]

Ms. <u>Hicks.</u>  I don't believe any of Mr. Trump's messaging is
anti-immigrant.  I believe he's very pro-legal immigration.  I
believe he's opposed to illegal immigration.  And I think he's
made that distinction.

Ms. <u>Mucarsel-Powell.</u>  Were there any points during the
campaign that you thought he was saying things that were not
appropriate or that you felt uncomfortable with?

Ms. <u>Hicks.</u>  Yeah.  I don't know anybody that agrees 100
percent with what their boss says and does.  I think that's a
ridiculous standard.  So of course there are things.

Ms. <u>Mucarsel-Powell.</u>  So the President has tweeted that
nobody disobeys my orders.  Would you say that that's true?  Is
that correct?

Mr. <u>Philbin.</u>  To the extent that the question is relating to
her time in the White House as a senior adviser to the President,
I object to --

Ms. <u>Mucarsel-Powell.</u>  It's a question of whether he

thinks -- that that's an accurate statement from the President.
It's not when she was working, as today.  And I'm asking the
question.

Mr. Philbin.  But if it's based on knowledge, you're asking
about what --

Ms. Mucarsel-Powell.  I'm asking what she believes today.

Mr. Philbin.  Based on knowledge being while at the White
House.  To the extent you're asking about that, we object.

Ms. Mucarsel-Powell.  So are you claiming privilege?

Mr. Philbin.  We're claiming that she has an absolute
immunity, as we've gone through many times already today, to be
compelled to testify.

Ms. Mucarsel-Powell.  On her opinion?

Mr. Philbin.  To be compelled to testify about her time as a
senior adviser from the President.  If you're asking about her
opinions formed during her experience during that time, we object.

Ms. Mucarsel-Powell.  Okay.  Thank you.

If Mr. Trump asked you to do something that you felt was
improper, would you have told him no during the campaign?

Ms. Hicks.  I'm not going to speculate on that hypothetical.
If you have a specific example.

Ms. Mucarsel-Powell.  Have you ever told the President that
you don't agree with him directly?

Ms. Hicks.  Of course.

Ms. Mucarsel-Powell.  When you were -- during the campaign?

Ms. <u>Hicks.</u>  Of course.

Ms. <u>Mucarsel-Powell.</u>  You did.  And what was the President's reaction at the time?

Ms. <u>Hicks.</u>  The President is very willing to listen.  I think he likes dissenting voices.  I think he likes to hear many different perspectives.  Ultimately he does what he feels is best, but he's always willing to listen.  I always felt very respected in that regard.

Ms. <u>Mucarsel-Powell.</u>  Can you give me an example of a time that you told him you didn't agree with him on something?

Mr. <u>Philbin.</u>  On the campaign?

Ms. <u>Mucarsel-Powell.</u>  Yeah, on the campaign.

Ms. <u>Hicks.</u>  I can't think of anything right now, but certainly -- certainly many times, I'm certain, that --

Ms. <u>Mucarsel-Powell.</u>  You can't recall one example of the many times during the campaign?

Ms. <u>Hicks.</u>  You know, most of them related to things like -- certain messages, whether or not to pursue certain opportunities, whether or not to engage with certain individuals, whether they be opponents or, you know, reporters, journalists, those kinds of things.

Ms. <u>Mucarsel-Powell.</u>  Okay.  Now, one question.  If the President-elect had asked you to do something that you felt was improper, would you have told him no during the transition?

Ms. <u>Hicks.</u>  I'm not going to speculate on a hypothetical.

Ms. Mucarsel-Powell.  Did you ever tell him that during the transition, if he was doing something that you felt was improper?

Mr. Trout.  Objection.  She's answered that.  She's not going to speculate about --

Ms. Mucarsel-Powell.  No, no.  It's not speculating.  I'm asking if she ever has told him no during the transition, if he was asking her to do something that was improper or if he was conducting himself in an improper manner.

Mr. Trout.  Well, it assumes that he did ask her something that was improper.

Ms. Istel.  She's asking if that's true, though, did he ever ask her to do something improper during the transition.

Ms. Hicks.  Not that I recall.

Ms. Mucarsel-Powell.  Did you ever see anybody during the campaign telling Mr. Trump no when he asked them to do something?

Ms. Hicks.  Yes.

Ms. Mucarsel-Powell.  Can you give me a specific example?

Ms. Hicks.  I don't want to speak for others' experience. I've shared my experiences, and I'm good with that.

Ms. Mucarsel-Powell.  Let me move on to your time -- your current employment.

So what are you doing right now?  What is your current employment?

Ms. Hicks.  The executive vice president and chief communications officer for the Fox Corporation.

Ms. <u>Mucarsel-Powell.</u>  Okay.  And how did you get that job?

Ms. <u>Hicks.</u>  I interviewed for that job with Lachlan Murdoch.

Ms. <u>Mucarsel-Powell.</u>  Did you discuss the job with the President before taking it?

Mr. <u>Purpura.</u>  Objection.

Ms. <u>Mucarsel-Powell.</u>  This is after she resigned.

Mr. <u>Purpura.</u>  Okay.  Thank you.

Ms. <u>Hicks.</u>  I did discuss it with him after I'd been offered the position.

Ms. <u>Mucarsel-Powell.</u>  And what was his -- what did he say to you?  What was his reaction?

Ms. <u>Hicks.</u>  Congratulations.

Ms. <u>Mucarsel-Powell.</u>  Anything else?

Ms. <u>Hicks.</u>  No.  That was the nature of our conversation.  I was calling to let him know that I planned to accept the offer and that I was moving on to my next step.

Ms. <u>Mucarsel-Powell.</u>  And did you list him as a reference?

Ms. <u>Hicks.</u>  I don't believe I listed any references.

Ms. <u>Mucarsel-Powell.</u>  They didn't ask for references when they interviewed you for the job?

Ms. <u>Hicks.</u>  Not that I provided.  Obviously quite public, much to my chagrin, and I believe that most of the people that they spoke with were actually reporters, journalists, those types of people.

Ms. <u>Mucarsel-Powell.</u>  And when you joined the Fox team, do

you recall issuing a statement supporting the First Step Act?

          Ms. Hicks.  The Fox Corporation did that, yes.

          Ms. Mucarsel-Powell.  And you were a part of the team that issued that statement?

          Ms. Hicks.  Yes.

          Ms. Mucarsel-Powell.  Okay.  And did you -- prior to doing that, did you discuss it with anybody from the Trump administration?

          Ms. Hicks.  Yes.

          Ms. Mucarsel-Powell.  And who was that person?

          Ms. Hicks.  Jared Kushner.

          Ms. Mucarsel-Powell.  Okay.  So -- because you knew that he supported -- publicly supported that act?

          Ms. Hicks.  That's not a question.  That's a statement.

          Ms. Mucarsel-Powell.  Did you know that Jared Kushner publicly supported that act?

          Ms. Hicks.  I knew that the Trump administration supported that.  Jared conveyed that to me.  But I also follow the news.

          Ms. Mucarsel-Powell.  And did he ask you to support it and to release a statement?

          Ms. Hicks.  Not me personally.  He asked if this would be something that Fox would be interested in supporting legislation. It's something Fox has done previously, offer their support to legislation.  At least that's my understanding.  I'm obviously new.  And it was something that our government relations team had

spoken to other Members of Congress about.  So that's how that
unfolded.

Ms. Mucarsel-Powell.  According to some of the news articles,
Kushner called you about the act prior to issuing your statement
in support.  Is that true?

Ms. Hicks.  I just said that, yes.

Ms. Mucarsel-Powell.  Okay.  And since joining the Fox team,
has anyone from the Trump administration, the Trump family, anyone
working for the President, asked you to make any public
statements?

Ms. Hicks.  No.

Ms. Mucarsel-Powell.  Okay.  Who is right now paying your
lawyer fees?

[Discussion off the record.]

Ms. Mucarsel-Powell.  Does the RNC pay for the --

Mr. Trout.  I think it's a matter of public record that the
RNC pays --

Ms. Mucarsel-Powell.  Is it the RNC?

Mr. Trout.  Yes, and it's been publicly disclosed.

Ms. Mucarsel-Powell.  And has anybody else paid for your
legal fees during this process?

Ms. Hicks.  No.

Ms. Mucarsel-Powell.  So it seems that the news had reported
that the RNC paid nearly half a million dollars to Trout Cacheris
& Janis, which is your law firm, to pay for legal fees for members

of the Trump campaign.  Do you know if the RNC paid for these
fees?  You confirm that?

    Ms. Hicks.  Yes.

    Ms. Mucarsel-Powell.  I'm going to move now to some of the
special counsel investigation interviews.

    You interviewed with the special counsel three times,
correct?

    Mr. Philbin.  Objection.  All of the interviews with the
special counsel took place when Ms. Hicks was a senior adviser to
the President.  And as was explained earlier today, questions
about those interviews and her role as a senior adviser is subject
to immunity.

    Ms. Mucarsel-Powell.  All right.  I don't have anything right
now further.  Thank you.

    Ms. Hariharan.  We just want to quickly address on the
record, while the ranking member is here, he had flagged the
protocols that govern this interview and some concerns that he had
and he raised them on the record.  And just want to say that we
appreciate that he raised them and that they were addressed
immediately and --

    Mr. Collins.  You had a member live tweeting and taking
pictures.

    [Discussion off the record.]

    Mr. Gaetz.  I'll reclaim a portion of the minority's time,
just to seek clarification on that last point you made.

What event were you referencing and how was it handled, just for the sake of the record?

Ms. Hariharan.  My understanding is that it involved a member taking a picture and a member tweeting about the transcribed interview, and we put a stop to it.

Mr. Gaetz.  So will there be any remediation on those -- like the deletion of tweets or any further action?  Or was it merely a directive to the member to stop?

Ms. Hariharan.  If I may, sir, that is above my pay grade, but --

Mr. Gaetz.  Would it be okay if we saw that verification, just for the sake of the record?

Ms. Hariharan.  Yes.

Mr. Gaetz.  Thank you.  We'll yield back.

Ms. Scanlon.  Ms. Hicks, Mary Gay Scanlon from Pennsylvania's Fifth Congressional District.

Ms. Hicks.  Hi.

Ms. Scanlon.  Can we just -- just to clarify, what was the date you started working in the White House?

Ms. Hicks.  January 20th, 2017.

Ms. Scanlon.  Okay.  And when did you leave the employment of the White House?

Ms. Hicks.  May 30th, 2018.

Ms. Scanlon.  May 30th, 2018.

Ms. Hicks.  Excuse me -- March.  March 30th.

Ms. Scanlon.  March 30th, 2018.

So that's when you left the White House?

Ms. Hicks.  Yes.

Ms. Scanlon.  And upon advice of White House counsel, you're not answering any questions regarding any events that occurred while you were working at the White House.  Is that correct?

Ms. Hicks.  Yes, ma'am.

Ms. Scanlon.  What's your opinion of Don McGahn?

Ms. Hicks.  I don't believe I'm here to offer opinions.

Ms. Scanlon.  But I'm asking your opinion.

Mr. Philbin.  And this question is based solely on her experience with him at the campaign?

Ms. Scanlon.  At the campaign and the transition and any contact she's had with him since she left the White House.

Ms. Hicks.  I haven't had any contact with him since I left the White House.  And my opinion of him during the campaign and transition was that he was a good lawyer.

Ms. Scanlon.  Has he ever lied to you?

Ms. Hicks.  I don't know.  You would have to ask Don McGahn that.

Ms. Scanlon.  So you're unaware if he ever lied to you?

Ms. Hicks.  Again, I don't know.  You would have to ask Don.

Ms. Scanlon.  Okay.  Are you aware of him ever having lied to you?

Mr. Trout.  I think she's answered this.

Ms. <u>Scanlon.</u>  Is that a yes or a no?  It's pretty simple.

Mr. <u>Trout.</u>  No.

Ms. <u>Scanlon.</u>  Do you know if Mr. McGahn has ever lied to you?
Yes or no?

[Discussion off the record.]

Mr. <u>Trout.</u>  I think she's indicated that she doesn't
know -- she doesn't know.

Ms. <u>Scanlon.</u>  Are you aware of any instance in which he told
you an untruth, to your knowledge?

Ms. <u>Hicks.</u>  I don't --

Mr. <u>Philbin.</u>  During the campaign or transition?

Ms. <u>Scanlon.</u>  Or since then.

Ms. <u>Hicks.</u>  During the campaign or transition, no.  Since
then, I don't know.

Ms. <u>Scanlon.</u>  Have you -- during the campaign or transition
or since then, are you aware of him ever having lied to anyone
else, from your personal knowledge?

Ms. <u>Hicks.</u>  Not during the campaign or transition.

Ms. <u>Scanlon.</u>  Okay.  Are you aware of him having lied to
anyone else, to your personal knowledge?

Ms. <u>Hicks.</u>  I don't know the answer to that.

Ms. <u>Scanlon.</u>  Okay.  Do you have any reason to doubt the
truth of his account of his time in the White House as described
in the special counsel's report?

Mr. <u>Philbin.</u>  Objection.  It's inherently a question about

the events in the White House.  She can't answer it without
referring to her knowledge from her time in the White House.  So
it's --

     Ms. Scanlon.  So White House counsel is instructing her not
to answer based upon this unsubstantiated claim of absolute
immunity?

     Mr. Philbin.  We're saying that she is immune under
longstanding opinions of the Department of Justice across both
Republican and Democratic administrations dating at least to the
1970s, and we are asserting that immunity here.

     Mr. Collins.  Going back to -- reclaiming -- going back, this
has been stipulated to by your staff attorney.  We went through
this while people were not here so that we didn't have to go
through this.  So if they do make the objection, it's already
stated in the record this is why it's for, and there's no need to
lay a foundation any longer for this witness.  Staff counsel on
your side agreed to that characterization.

     Mr. Eisen.  Mr. Collins, I think that the question is a
legitimate one, but they have -- I have continued to ask those
questions in order to close out the area, as the Congresswoman has
done.

     Mr. Collins.  But -- so if we wanted to, then we could refer
back to the -- or I'll reclaim my whole hour and go back to this.
But this is exactly -- we spent the whole time -- we spent about
10 minutes of this about 2 hours ago stipulating to this.  And if

he's not stipulating to it, then why do we go through the

exercise?

    Ms. <u>Scanlon.</u>  I'm happy to move --

    Mr. <u>Collins.</u>  No.  I want Mr. Berke to answer this.

    Ms. <u>Istel.</u>  That's Mr. Eisen.

    Mr. <u>Collins.</u>  I apologize.  Your counsel right there.

    Mr. <u>Eisen.</u>  I can ask Mr. Berke, too.

    Mr. <u>Collins.</u>  Mr. Berke, do you want to answer this as well?

    Mr. <u>Berke.</u>  I have a lot to say.  I don't have a mike though.

    Mr. <u>Collins.</u>  You didn't stipulate.  He did.

    Mr. <u>Eisen.</u>  I think that -- that we've agreed that when the

White House counsel says objection, that implicates absolute

immunity.  I do think it will -- all you need to say is objection.

That has been stipulated -- that has been stipulated for the

record.

    The Congresswoman is entitled to her questions.

    Mr. <u>Collins.</u>  But you also -- the reason you stipulated was

so we could move this forward.  Is that not correct?

    So your exact words, I believe, were so that we would not

have to spend time on this.

    Mr. <u>Trout.</u>  So could I interject?

    Ms. Hicks has a flight out of Dulles at 7 o'clock, and as a

matter of courtesy, I would hope that we can expedite the

questioning and allow her to take her flight.

    Mr. <u>Collins.</u>  I've got no problem with that.  We've spent the

last 35 minutes asking questions that were asked earlier.

Ms. Scanlon.  I'm ready to move on, Mr. Collins.

Mr. Collins.  Okay.  Go ahead.

Ms. Scanlon.  Okay.  All right.

Have you spoken with Mr. McGahn since he left the White House?  Since you left the White House?  I'm sorry.

Ms. Hicks.  No.

Ms. Scanlon.  Okay.  Did you ever see Mr. McGahn or anyone -- anyone else taking notes during meetings during the campaign?

Ms. Hicks.  I wasn't often in meetings with Mr. McGahn during the campaign, so I don't have any recollection of that.  He was based in Washington, D.C.

Ms. Scanlon.  Okay.  So you never saw Mr. McGahn taking notes during campaign meetings?

Ms. Hicks.  I just don't have any recollection of it.  There were very rare occasions, so --

Ms. Scanlon.  Did you observe anyone else taking notes during campaign meetings?

Ms. Hicks.  Anyone on the campaign?  Sure.  I'm --

Ms. Scanlon.  Who?

Ms. Hicks.  Advance team members writing down instructions, schedulers writing down dates.  I mean --

Ms. Scanlon.  Okay.  Did you ever see Mr. McGahn's Chief of Staff Ann Donaldson taking notes, whether during the campaign or

during the transition period?

      Ms. <u>Hicks.</u>  I don't believe I met Ann in person until we started working at the White House.

      Ms. <u>Scanlon.</u>  Okay.  Do you now or have you had any joint defense agreements with anyone in connection with your activities either during the campaign or since then?

      Mr. <u>Trout.</u>  Objection.

      Ms. <u>Hicks.</u>  Be privileged with my counsel.

      Mr. <u>Trout.</u>  I'm not going to answer that.

      Ms. <u>Scanlon.</u>  I believe you're not going to answer, but is she going to answer it?

      Mr. <u>Trout.</u>  No.

      Ms. <u>Scanlon.</u>  Okay.  On what basis?

      Mr. <u>Trout.</u>  On privilege.

      Ms. <u>Scanlon.</u>  What kind of privilege.

      Mr. <u>Trout.</u>  Joint defense privilege.

      Ms. <u>Scanlon.</u>  The fact of having a joint defense agreement is not --

      Mr. <u>Trout.</u>  I will -- it will be privileged.

      Ms. <u>Scanlon.</u>  So you're not going to answer whether or not she has a joint defense agreement?

      Mr. <u>Trout.</u>  Right.

      Ms. <u>Scanlon.</u>  Okay.  I think I'm through.

Thank you.

      Mr. <u>Trout.</u>  Thank you.

Mr. Eisen.  Go off the record for 1 second.

Mrs. Demings.  I'm sorry.  Not quite, but I won't be all day.

Again, Ms. Hicks, thank you so much for being here.

I'm just going to make this statement.  I worked a lot of years around a lot of good men and women who took oaths to protect and defend the Constitution.

Ms. Hicks.  And I read about your service in the police department.  It's very impressive.

Mrs. Demings.  Thank you.  But I was talking about others.

Ms. Hicks.  Yes.

Mrs. Demings.  Because I like to give credit away.

I've attended a lot of law enforcement funerals of people who died, people of integrity, people of honor, people who have a relationship with the truth and lost their lives trying to defend it.

And so this -- again, I'm honored to serve on the Judiciary Committee.  But there are some things that this committee is working hard for every day to try to protect, and it's those things that those men and women lost their lives for.

So I do thank you for coming in today, because there has been, as you know very well, a move to totally ignore the authority that has been given to this committee and to ignore subpoenas.

I'd just like to start off by -- why did you come today?  Why did you show up today?

Ms. Hicks.  Because I was asked to be here, and I, like you, have great respect for those that have served, to protect the freedoms and institutions which you all serve and sacrifice on behalf of.  And so it's my pleasure to be here.  I just want to make sure we use our time as efficiently as possible.  That was my only comment earlier.

Mrs. Demings.  I don't have a problem with that.  I believe time is our greatest resource.

Ms. Hicks.  Yeah.

Mrs. Demings.  But sometimes getting to the bottom of exactly what happened can take its time.

Ms. Hicks.  I totally understand.

Mrs. Demings.  And that's why we're here.

Going back to -- and thank you for your answer, because that's refreshing and encouraging, the reason why you're here today.

Going back to your time during the campaign.

Ms. Hicks.  Yes, ma'am.

Mrs. Demings.  And it's been interesting listening to all of the objections that we've had here today, because I really believe investigations and questioning cannot only -- you know, we're in search of the truth, right?  So in order for us to be able to get there, I think we need to hear all of the information.

So it's been interesting to listen to all of the objections coming from the White House about anything that you are asked

during that time, because I believe it could be used as a way to clear up any suspicions of things that may have taken place or that you may have been involved in.

So I really see it, as a former law enforcement officer, as a disservice to the White House for you not to be able to talk about anything or any experience, good or bad, that you had there.

But anyway, getting back to your time on the campaign, did you ever have any conversations or overhear then candidate Trump talk about or acknowledge Russia's interference in the election or any other state actor interfering in the 2016 election?  Did you ever hear any conversations?

Ms. Hicks.  I think I said this earlier --

Mrs. Demings.  I'm sorry, I --

Ms. Hicks.  That's okay -- that any discussion about the hacked emails or interference, any discussion privately, only echoed what he stated publicly.

So, for example, some of those conversations were around debate prep, how he would answer that question in the debate.  And I will tell you the answer that he said privately is exactly what he said publicly.

Mrs. Demings.  In terms of messaging, you were the press secretary and the only one.  We've certainly heard that.  Did you ever hear him exhibit any frustration, as someone who was running for President of the United States and is responsible for protecting our Nation against cyber attacks or any other type of

attacks, did you ever hear him during the campaign indicate any frustration at even the possibility of Russia or any other foreign actor attacking the United States of America?

Ms. <u>Hicks.</u>   Yes.   And I hesitate to speculate, but I believe that --

Mrs. <u>Demings.</u>   I'm just asking if you overheard conversations.   You don't have to speculate.

Ms. <u>Hicks.</u>   I did.   I did.   And I hesitate to speculate.   But I'd also add that I believe that Mr. Trump feels and many others feel that we would all be better served if that is what we were all focused on rather than --

Mrs. <u>Demings.</u>   I'm focused on it right now.

Ms. <u>Hicks.</u>   I know you are -- rather than, you know, if anything untoward happened with the campaign.

Mrs. <u>Demings.</u>   I'm focused on it right now, because this is where this all started, right, an attack on the United States of America.   And we should all be concerned about that.

Ms. <u>Hicks.</u>   Yes, ma'am.

Mrs. <u>Demings.</u>   So during the campaign, as the press secretary, do you remember then candidate Trump expressing any frustration at the very thought of Russia or any other foreign actor attacking the country that he wanted to be the President of?

Ms. <u>Hicks.</u>   Yes.   I think that was -- I think that was inherent in his responses.

Mrs. <u>Demings.</u>   And what were some of those?   Could you give

me some examples of what his responses would have been to
demonstrate that frustration or any action that he would take
should he win the Presidency?

     Ms. Hicks.  I don't recall any -- anything verbatim
certainly.  But, you know, I think that it was inherent in his
message about being respected again as a power on the world stage
and that he would take action to ensure that America was respected
again and that we weren't subject to these kind of attacks.

     Mrs. Demings.  Did you ever hear him again talk about
specifically, since Russia's name was being thrown around, that he
would hold Russia accountable should he win the Presidency?

     Ms. Hicks.  I don't recall him --

     Mrs. Demings.  That would have been a major part of his
messaging?

     Ms. Hicks.  Yeah, I don't -- I don't recall him making any
kind of assertions like that.  I know he was hesitant to do things
like draw, quote, redlines, right?  So I don't recall him stating
any specific action he would take if that were, in fact, true.
But I'm happy to go back and look and see what was said.  And I'm
sure you all will do that as well.

     Mrs. Demings.  During your time with the campaign -- let me
make that clear -- did you ever hear mention of the Trump Tower
Moscow project?

     Ms. Hicks.  So just to clarify, I worked at The Trump
Organization as well.

Mrs. <u>Demings.</u>  Okay.

Ms. <u>Hicks.</u>  And Trump Tower Moscow was somewhat of a pipe dream over the years.  So I did hear, you know, through reviews of past projects or deals in pipelines or things that were pursued -- not directly from him, perhaps, but I did hear of past attempts to enter that market.  But I did not hear any discussion from any Trump Organization employees or Mr. Trump about an ongoing effort to pursue a potential Trump Tower Moscow at that time.

Mrs. <u>Demings.</u>  Is that where you met Mr. Trump, was during that -- and if you have already answered, I apologize for that -- but is that where you met Mr. Trump, was during your employment at The Trump Organization?

Ms. <u>Hicks.</u>  I met Mr. Trump before I became a full-time employee there.  But I was working with the organization and the family via an agency that I was employed by.

Mrs. <u>Demings.</u>  So you didn't hear any mention or don't remember any mention of the Trump Tower Moscow deal directly from Mr. Trump?

Ms. <u>Hicks.</u>  That's correct.

Mrs. <u>Demings.</u>  Did you ever hear any mention of that deal from Michael Cohen?

Ms. <u>Hicks.</u>  I did not.

Mrs. <u>Demings.</u>  Or Donald Jr.?

Ms. <u>Hicks.</u>  I did not.

Mrs. <u>Demings.</u>  Okay.  And how many -- so back to the Trump
Moscow Tower project.  You heard it as pipe dream; this was
something he was very interested in.

Do you remember in your time at the organization --

Ms. <u>Hicks.</u>  That's not -- that's not totally accurate.

Mrs. <u>Demings.</u>  Oh, okay.

Ms. <u>Hicks.</u>  I heard it as -- it was mentioned as, you know, a
marketplace that had been previously pursued, when we would talk
about growth pipelines for the hotel, which was -- the hotel
division of the company was undergoing sort of a rapid expansion.
I think they had over 80 potential deals in the pipeline at the
time I joined the company.  So, you know, in talking about the
strategy and growth.

Mrs. <u>Demings.</u>  Who did you hear that from, those discussions
about the possibilities in --

Ms. <u>Hicks.</u>  A combination of people, people that worked on
the development side of the company, the marketing side of the
company, license -- the license division of the company.

So it was more of an historical reference, if anything, to
something that had been pursued in the past.  But again, nothing
current from anyone at The Trump Organization, including the
President or Michael Cohen or Don Jr.

Mrs. <u>Demings.</u>  Okay.  Do you know who Felix Sater is?

Ms. <u>Hicks.</u>  Only from media reports and --

Mrs. <u>Demings.</u>  You never heard the name prior to any media

reports?

Ms. Hicks.  I did not, no.

Mrs. Demings.  Okay.

Ms. Hicks.  I obviously discussed media reports with people at The Trump Organization.  Like I got a request about this person, who is it, or there's this article, do we know this person, things like that.  But prior to seeing his name, either from a media request or in the press, no, I did not.

Mrs. Demings.  Okay.  And during your time with the campaign, did you ever hear the name Felix Sater associated with the campaign?

[4:07 p.m.]

Ms. <u>Hicks.</u>   Associated with the campaign?

Mrs. <u>Demings.</u>   Or during the campaign, during the time of the campaign.

Ms. <u>Hicks.</u>   Yes.  You know, there were often media requests sort of asking about his past affiliation with The Trump Organization, what exactly his role was, who he worked with, what he did, if he was affiliated with The Trump Organization.  I think there was some confusion about that.

The one specific thing is I think he may have made an online donation to the campaign that we weren't aware of until the press pointed it out to us, and that was sort of a storyline.  I might be mixing him up with someone else, but I believe that's accurate.

Mrs. <u>Demings.</u>   And excuse me, but who was talking about Felix Sater during the campaign?  Who would that have been?

Ms. <u>Hicks.</u>   Nobody in the campaign -- this is purely in response to media requests or media reports.

Mrs. <u>Demings.</u>   Okay.  Okay.  So the only discussions that you had or overheard or know of about Felix Sater was from The Trump Organization --

Ms. <u>Hicks.</u>   Yes.

Mrs. <u>Demings.</u>   -- those who worked --

Ms. <u>Hicks.</u>   Yes.  The Trump Organization, there was a lawyer there that I would often work with, crafting responses to questions, as he understood Felix's involvement with The Trump

Organization years prior to my role there.

        Mrs. <u>Demings.</u>  Okay.

        During the campaign, did Mr. Trump or Michael Cohen or

Donald, Jr., or anyone associated with the campaign ever advise

you to not be truthful about The Trump Organization's

relationships or dealings or conversations or timeline as it

pertained to the Trump Tower project?

        Ms. <u>Hicks.</u>  No.  Like I said, I wasn't aware of the project.

So I couldn't be advised to lie about something I didn't know

about.

        Mrs. <u>Demings.</u>  Okay.  Did anybody associated with that long

list -- because I know we're on a timeline here -- that I just

went through -- don't make me do it again --

        Ms. <u>Hicks.</u>  Yeah.

        Mrs. <u>Demings.</u>  -- talk to you about not even discussing in

any fashion anything about Moscow or the possibility of building

something lucrative or making a deal in Moscow?

        Ms. <u>Hicks.</u>  No.

        And, again, I don't want to speculate, but I'd just like to

say that, knowing Mr. Trump the way I do, I think that if there

were anything more than just the pursuit of a deal, I believe it

would be something, regardless of the location, Moscow or not,

that he would view as a success and he would be touting it.

        I think the only reason that it wasn't discussed openly was

because it wasn't -- it was nothing.  It was a letter of intent.

There are dozens of those signed by real estate companies on a daily basis.

Mrs. <u>Demings.</u>  Right.  When did you learn of the letter of intent?

Ms. <u>Hicks.</u>  In the fall of 2017.

Mrs. <u>Demings.</u>  Do you remember any discussions at all about any dealings of any kind during the campaign with Russia?

Ms. <u>Hicks.</u>  We went through this earlier and --

Mrs. <u>Demings.</u>  I'm sorry.

Ms. <u>Hicks.</u>  No, that's okay -- described conversations I had with Don, Jr., contextualizing statements he made in 2008 regarding what I believe he said was Russian money pouring in. And that was it.

Mrs. <u>Demings.</u>  And Don, Jr., made that statement?

Ms. <u>Hicks.</u>  In 2008, yes, and the press wrote about it.

Mrs. <u>Demings.</u>  And you never heard him discuss anything about dealings or business deals in Russia after 2008 that you remember?

Ms. <u>Hicks.</u>  No.  And, again, you know, I wasn't an employee in 2008.  I just meant that I discussed during the campaign the context of that comment that he made.

Mrs. <u>Demings.</u>  Did you ever remember any conversations either directly with Mr. Trump or others associated with him during the campaign regarding him traveling -- Mr. Trump, that is -- to Russia?

Ms. <u>Hicks.</u>  Just for the Miss Universe Pageant.

Mrs. <u>Demings.</u>  Okay.  That was the only conversation that you ever heard.  Nothing to do with any deals, projects, or any of that?

Ms. <u>Hicks.</u>  No, ma'am.

Mrs. <u>Demings.</u>  Okay.  Thank you.

Did you ever discuss with anyone the possibility or overhear a discussion about the possibility during the campaign of then-candidate Trump meeting with Vladimir Putin?

Ms. <u>Hicks.</u>  No.  No.  Obviously, as part of this process, I've reviewed emails which indicate that that was being discussed perhaps in the press at a point in September 2015.  But I never heard anything directly from anyone, and obviously it didn't happen.

Mrs. <u>Demings.</u>  Okay.

And do you have any knowledge of a foreign government providing cash or any other thing of value to Mr. Trump during the campaign?

Ms. <u>Hicks.</u>  No, ma'am.

Mrs. <u>Demings.</u>  Okay.

Sorry.  Just give me just one second here.

You made a comment to Ms. Dean, the woman who was sitting here, blond hair --

Ms. <u>Hicks.</u>  Uh-huh.

Mrs. <u>Demings.</u>  -- and I made a note about it.  I can't find it right now.  But it said something to the effect of questioning

the purpose of this interview today.

What did you mean by that?  You said that the purpose -- you questioned the purpose of the interview.  I mean, what do you believe or what do you feel the purpose of this interview is today?

Ms. <u>Hicks.</u>  To be honest, I'm not really sure.  I don't believe I've provided --

Mrs. <u>Demings.</u>  I'm sure your attorneys -- you have several here that are either representing the White House and others. What do you believe, based on your conversations with them or whatever, in any discussions you've had with others, about the purpose of your being here today?  What do you believe --

Ms. <u>Hicks.</u>  Well, as we discussed --

Mr. <u>Trout.</u>  Just to be clear --

Ms. <u>Hicks.</u>  I'm sorry, Bob.

Mr. <u>Trout.</u>  -- the attorneys in the White House do not represent her.  She's represented by Gloria Solomon and myself alone.

Ms. <u>Hicks.</u>  And as --

Mrs. <u>Demings.</u>  She certainly looked to them for guidance today, but --

Mr. <u>Trout.</u>  She's made this clear and we've made this clear, that because she is a former employee she is going to accept the guidance of the executive branch about what questions are appropriate for her to answer and that, absent any objection from

the White House, she would answer questions.

    Mrs. <u>Demings.</u>  Okay.

    So, Ms. Hicks, back to you.  Thank you so much for being willing to answer the questions.

    Ms. <u>Hicks.</u>  Yeah, sure.  Like we exchanged earlier, I'm happy to -- it's my pleasure to be here.  It was a privilege to serve, and if this is part of my ongoing responsibilities as part of that service, I'm more than happy to show up here and answer questions and hopefully be helpful to you.

    And all I meant by questioning the purpose was just that I don't believe that I've provided any new information that I haven't provided to multiple different bodies investigating this very same thing.  Hopefully you all feel differently and you got something out of this, but that was all I meant by that.

    Mrs. <u>Demings.</u>  It probably could've been more productive had we not heard "objection" a thousand times.  But, anyway, thank you so much for your cooperation.

    Ms. <u>Hicks.</u>  You're welcome.

    Mrs. <u>Demings.</u>  Thank you.

      BY MR. EISEN:

    Q   Ms. Hicks, returning to the Mueller report, Volume II, I believe we were on or around page 104, the Don, Jr., statement about the Trump Tower meeting.  There's a reference to Mr. Corallo.  Who is Mr. Corallo?

    A   I don't really know him, to be honest.  He was part of

the team the President assembled of outside lawyers.  I don't

believe he was serving in a counsel role.  He was primarily in a

communications role.

Q   And he was not a government employee at that time,

correct?

A   That's my understanding.

Q   Not a government official --

A   That is my understanding.

Q   -- at the time of these communications.

Okay.  On to page 105.

Will you answer any questions about the special counsel's

statement that on, at least three occasions in June and July

of 2017, the President directed you and others not to publicly

disclose information?

Mr. Purpura.  We would object to those questions.

Mr. Eisen.  And would you assert absolute immunity as to this

entire area of subject matter?

Mr. Purpura.  Well, again, the subject matter being the

statements and subjects that are described in --

Mr. Eisen.  Yes, this section of the special counsel report.

Mr. Philbin.  Just to be clear, by "section" are you

referring to the subsection lettered A that begins on page 105 and

extends to 106 or subsections B and C as well?

Mr. Eisen.  I'm referring to the entire section on the

subject matter of Ms. Hicks' activities in the White House

relating to the Don, Jr., statement about the Trump Tower meeting, that entire subject matter in the Mueller report.

Mr. <u>Purpura.</u>  We would object to those questions.

Mr. <u>Eisen.</u>  Okay.

And just for the record, Ms. Hicks, would you answer any information about the President's efforts to have Mr. McGahn dispute the press reports as set forth on page 114?  There's a recollection about what you relayed to the President.

Ms. <u>Hicks.</u>  I was already asked this, and they objected.

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Eisen.</u>  Same objection as to this entire, again, subject matter --

Mr. <u>Purpura.</u>  Yes.

Mr. <u>Eisen.</u>  -- this entire subject matter.

Do you remember calling Michael Flynn during your White House service to relay on behalf of the President that the President hoped Flynn was okay?

Mr. <u>Purpura.</u>  Objection.

Mr. <u>Eisen.</u>  Same objection as the entire subject matter?

Mr. <u>Purpura.</u>  Meaning any phone calls or discussions relaying a message to --

Mr. <u>Eisen.</u>  Yes.

Mr. <u>Purpura.</u>  -- General Flynn?

Mr. <u>Eisen.</u>  Yes.

Mr. <u>Purpura.</u>  Yes.

Mr. <u>Eisen.</u>  All communications concerning Michael Flynn while she was serving in the White House.

Mr. <u>Purpura.</u>  Yes.

BY MR. EISEN:

Q    Okay.  Did you hear candidate Trump tell Mr. Gates, Rick Gates, to keep an eye on Manafort at any point during the campaign?

A    Yes.

Q    Tell me about that incident.

A    It was sometime after the Republican Convention.  I think Mr. Trump was displeased with the press reports regarding the platform change, the confusion around the communications of that, Paul sort of stumbling in some interviews and then trying to clarify later and it just being messy.  So he was frustrated with that.

I don't think that Mr. Trump understood the longstanding relationship between Rick and Paul.  I think he, you know, obviously knew that Rick was Paul's deputy but not maybe to the extent of -- you know, didn't understand the extent of their relationship.

And he said something to the effect of -- you know, I'm very much paraphrasing here, so I want to be very careful -- but sort of questioned Paul's past work with other foreign governments, foreign campaigns, and said that, you know, none of that would be appropriate to be ongoing during his service with the Trump

campaign and that Rick needed to keep an eye on that and make sure
Mr. Trump was aware if anything led him to believe that was
ongoing.

Q   What do you mean by the "platform change"?

A   Whatever was reported in the press.  To be honest, I had
no knowledge of it during the actual convention.

Q   Is it a reference to the change in the RNC platform
concerning arming Ukraine?

A   Again, I'm not familiar with the details.

Mr. Davis.  Quick question.  I'm sorry to interrupt your
flow.  I'm just trying to get a gauge for how much you have left.
We're on hour 8.

Mr. Eisen.  Very little.

Mr. Davis.  Okay.  That's great.  Thank you.  I just want to
be mindful of northern Virginia traffic on the way to Dulles,
which is getting worse by the day.

Mr. Eisen.  We are mindful.

Ms. Hicks.  I still have to get my bags.

Mr. Eisen.  Did you have any question while serving as a
government -- any conversations while serving as a government
employee in the White House about Paul Manafort?

Mr. Purpura.  Objection.

Mr. Eisen.  Would you answer any questions on the subject
matter of Paul Manafort while serving in the White House?

Mr. Purpura.  We would assert the objection.

Mr. Eisen.  Okay.  We're just going to --

Ms. Hicks.  I'm happy to answer any outside of my government service.

Mr. Eisen.  I think we've stipulated -- okay.  Ms. Istel is going to ask a couple of last questions.  We're going to do the documents and call it a day.

Ms. Istel.  So I'll be as quick as I can.  I'm going to give you a copy of your production that you gave us.  We just have a couple of clarifying questions.  I have a copy for your counsel or the White House counsel or whichever counsel.

Mr. Collins.  Do you have extra copies of that?

Thank you.

Ms. Istel.  I'm happy to share mine.

Mr. Collins.  We are still here, so thank you.

      BY MS. ISTEL:

Q   Okay.  So HCH1 through 08 looks like an amended SF-86 form?

A   Correct.

Q   The first page is a letter to Ms. Rodgers from Jay -- you'll have to excuse my pronunciation.

A   Malcynsky.

Q   -- Malcynsky.  Thank you.  And this describes that you had amended your SF-86 form.  Is that correct?

A   Yes.

Q   Who told you to amend that form?

A   I don't recall.

Mr. <u>Trout.</u>  Yeah, don't get into conversations you had with Mr. Malcynsky, her attorney at the time.  But, otherwise --

BY MS. ISTEL:

Q   Well, how did you become aware that you needed to submit amended answers to this form, if you recall?

A   I believe it was instigated by my agreement to respond to -- you know, my agreement to voluntarily respond to questions from the Senate Intel Committee in writing, which you see here, and, when going through those questions, realized that I had left off some contacts that needed to be shared.

Q   And just so we can clarify for the record, Ms. Hicks is referring to HCH09 through 011, which is -- I guess you're saying that these questions were written in response to an inquiry from the Senate Intelligence Committee.  Is that correct?

A   That's right.  The questions are there provided as well.

Q   Yes.  Thank you.

And did you provide the Senate Intelligence Committee any other documents in connection with that testimony?

A   Bob?

To my recollection, not to this initial voluntary response, but Bob can answer more fully regarding the followup that ensued.

Mr. <u>Trout.</u>  Yeah.  I think that HCH12 and, I believe, following to --

Ms. <u>Istel.</u>  Through 30 is the first production you gave to

us.

Mr. Trout.  Through 14.

Ms. Istel.  Okay.  Were those the one documents provided?

Mr. Trout.  Yes, as part of this supplemental.

Ms. Istel.  When you say "supplemental," was there an initial production that you provided to the Senate Intelligence Committee?

Mr. Trout.  Well, in other words, this is supplementing the amendment to the SF-86.

Ms. Istel.  But so, just to clarify, did you provide any other documents aside from what's in this packet to the Senate Intelligence Committee?

Mr. Trout.  No.

Ms. Istel.  Did the White House provide you any documents in preparation for your testimony with the Senate Intelligence Committee?

Mr. Philbin.  Objection.

Mr. Purpura.  Objection.

Mr. Philbin.  That was during her time when she served as a senior advisor, and any interactions with the White House would be subject to the immunity.

Ms. Istel.  Did the White House provide you any documents in connection with preparation for your testimony for this hearing?

Mr. Purpura.  Objection.

Ms. Istel.  That's since she left the White House, correct?

Mr. Trout.  No, the White House has not provided documents.

Ms. Istel.  I imagine I'll get the same response, but did the White House provide any documents in connection with Ms. Hicks' interviews with the special counsel?

Mr. Purpura.  Objection.

Ms. Istel.  Did the White House assert any privilege over Ms. Hicks's testimony to the special counsel?

Mr. Purpura.  Objection.

Mr. Philbin.  Well, we're asserting immunity here.  If you want to ask us our legal views about immunity and privilege, we could get into that, but the objection --

Ms. Istel.  I think I'll spare Ms. Hicks from that dialogue. We'll move on.

HCH12, 13, and 14 are emails to Ms. Hicks from various individuals.  And they were referenced in footnotes in the Mueller report that Mr. Eisen read into the record, so we won't waste anyone's time on those.

But I just want to ask whether there will be an objection to Ms. Hicks testifying about these documents.  January 27th, 2017, and --

Mr. Philbin.  Well, for anything after January 20th, 2017, at noon, we would object to her testifying about the documents unless -- and we're only seeing these for the first time -- unless these are personal, which they don't appear to be.

Ms. Istel.  Okay.

HCH0015, to clarify for the record, is an email chain.  The

UNOFFICIAL COPY

first email is on Sunday, August 27th, from Tom Hamburger to
Michael Cohen, and it asks a series of questions relating to Trump
Tower Moscow project.  Mr. Cohen forwarded that email to
Ms. Hicks, Jay Sekulow, and Stephen Ryan on August 27th, 2017.

    Do you recall why Michael Cohen forwarded you that email?

    Mr. Philbin.  We'll object to that.

    Ms. Istel.  Did Michael Cohen forward you any emails during
the transition relating to Trump Tower Moscow?

    Ms. Hicks.  Not that I'm aware of, no.  The first time I
recall learning about this project was in August of 2017.

    Ms. Istel.  Was this email the first time you learned about
the project?

    Ms. Hicks.  No, but just prior to is my recollection.

    Ms. Istel.  I just want to clarify for the record that the
White House is objecting to our examination of documents that have
already been produced.  Is that correct?

    Mr. Philbin.  We are objecting to her answering questions
about communications that she had while she was a senior advisor
to the President even if this document has been produced.  She is
immune from being compelled to testify about her service as a
senior advisor to the President.

    This is the first time that we've seen this document, here
live.  And as we've discussed with Eisen, after today, we may be
able to talk about things.  But for today, for purposes of the
subpoena and for this hearing, we are asserting immunity.

Ms. <u>Istel.</u>  All right.

And just to clarify for the record, the email exchange goes, actually, through --

Mr. <u>Purpura.</u>  To be clear, we have seen the documents before in relation to what was produced to this committee.

Mr. <u>Trout.</u>  Right.

Mr. <u>Purpura.</u>  But we are saying the first time we are seeing it today is -- you know, there was no discussion of what documents may be shown or what discussions there may be.  And so, consistent with what Mr. Philbin said on the immunity, we're not going to allow questioning on the documents today during the time of her service as a close advisor to the President.  But reiterating what Mr. Philbin said and consistent with our conversations with Mr. Eisen and Mr. Berke, these may be subject to our further discussions.

Ms. <u>Istel.</u>  It's okay with me, but Norm is not as nice as I am.  So okay.

Okay.  HCH015 through 017, for the record, that's the email exchange over which we were just discussing.

HCH018 and HCH019 and HCH020 and 021 and 022 and 23 are all text message exchanges between you and Michael Cohen.  Is that correct?

Ms. <u>Hicks.</u>  Yes.

Ms. <u>Istel.</u>  These say January 8th, but they don't have a year.  Do you recall if this is 2016 or 2017?

Ms. <u>Hicks.</u>  It's 2018.

Ms. <u>Istel.</u>  2018.  Will you answer questions on these text messages?

Mr. <u>Purpura.</u>  No.  We would object for the same reason.

Mr. <u>Eisen.</u>  Was Mr. Cohen a government employee at the time you exchanged these text messages with him?

Ms. <u>Hicks.</u>  He was never a government employee.

      BY MS. ISTEL:

Q   HCH024 is a text message exchange with Brian and the initials B.L.  Who is Bryan L.?

A   Bryan Lanza.  He's a surrogate.

Q   A surrogate for?

A   The Trump administration.  He worked on the Trump campaign.

Q   And these are also from January.  Is this also January 2018?

A   Yes, that's 2018.

Q   Will you answer questions relating to this text message?

Mr. <u>Purpura.</u>  We will assert an objection.

      BY MS. ISTEL:

Q   Was Bryan L. a Trump administration official?

A   No.

Q   Okay.  HCH025 is an email from Josh Raffel to Ms. Hicks on April 10th, 2018.  It's a forward originally from Peter Nicholas to Josh Raffel.  Who is Josh --

A   It's Josh Raffel.

Q   -- Raffel?  Raffel.  Sorry.

A   He's a friend.

Q   Does he have any connection to the Trump administration?

A   Yes.  He was the deputy communications director.

Q   What about the White House?  Does he have any connection
in the White House?

A   Yes.  He worked in the White House, yes.

Q   Okay.

A   But this is after our service to the White House, and
he's just asking if he can give this reporter my new contact
information.  That's all.

Q   Did you still comment on behalf of the White House after
you left your formal position?

A   No, I didn't.  I think they were just asking me to weigh
in for my perspective.

Q   Okay.  Thank you.

A   Obviously, Josh said to ignore, and that's what I did.

Q   Did you ignore?  Did you respond to that email?

A   I don't believe I did, no.

Q   Okay.  Thank you.

HCH026, 027, 028, 029 are all text messages between you,
Ms. Hicks, and Charles H.  He introduces himself in the first
message as Charles Harder.  Did I get his last name right?

A   Yes, you did.

Q   Okay.  And who is Charles Harder?

A   He is one of the President's attorneys.

Q   Personal attorney or White House attorney?

A   Personal.

Q   Will you answer questions on these text messages?

Mr. Philbin.  Could we clarify the date?

Ms. Istel.  Sure.

Ms. Hicks.  It's May 2018.

Ms. Istel.  That was after Ms. Hicks' time at the
White House.

Mr. Philbin.  Can you give us just a moment to look?

Ms. Istel.  Sure.

[Discussion off the record.]

Mr. Purpura.  No objection.

    BY MS. ISTEL:

Q   Can you provide context for when Mr. Harder says, "Sorry
to bother you.  If you have a minute, can you give me a call?"  Do
you recall if you called him on that date?

A   I did.

Q   Do you recall what you discussed?

A   I do.

Q   Can you describe that for us, please?

A   He wanted my advice about information he had regarding
Michael Avenatti and how to best get that information into the
press.

Q   Can you read HCH027, please, into the record?

A   Sure.

"Charles, just reading the front page story in the New York Times about contradicting statements.  The story says the payment was made by Cohen at a time when media outlets were poised to pay Daniels for a story about an alleged affair.  I don't believe this point has been raised in interview or tweets and not sure if it helps you, but I would say, 'Why is it acceptable for media outlets to pay to publicize mere accusations, but not OK for a person to pay to keep false allegations from being made public?  Would these media outlets have disclosed the payment and would it have been considered a contribution to the Crooked Clinton Campaign, whom they were already working so hard on behalf of?'"

Q   Do you mind just finishing the text message on page 028?

A   Sure.

"The WSJ reported that she was shopping her story to GMA -- not a tabloid.  'Mr. Davidson also represented Stephanie Clifford, a former adult-film star whose professional name is Stormy Daniels and who was in discussions with ABC's "Good Morning America" in recent months to publicly disclose what she said was a past relationship with Mr. Trump, according to people familiar with the talks.'

"Anyways I need to stay out of this and will leave with you, but just a thought in terms of changing the narrative a bit from who knew what when."

Q   Did you discuss that text with anyone before you sent it
to him?

A   I did not.

Q   Did you discuss the subject matter of this text with the
President?

A   I did not.

Q   You mentioned that you'd spoken to him 5 to 10 times in
addition to your April dinner.  In any of those conversations did
you discuss Stormy Daniels?

A   Never.

Q   Hush money payments at all?

A   Never.

Q   Okay.

HCH029, he texted you again on May the 10th -- well, he first
asked, "Thanks.  When are you coming to LA?"  There was no
response.  Then May 10th:  "Hi.  Sorry to bother you, but do you
have 5 minutes to talk?"

Do you recall if you called him when he sent you that
message?

A   I already answered that question.

Q   This is the same one as before?

A   Yes.

Q   I think it's a different --

A   No, it's the same.

Q   The first one was from May 1st, and it says, "If you

have a minute, can you give me a call?"  And then this one is on

May 10th, and it says, "Hi.  Sorry to bother you, but do you have

5 minutes to talk?"

    A   Oh, I'm sorry.  You're right.

    Q   That's all right.  It's been a long day.

    A   I don't recall what this second text is.

    Q   But you sent him that article.  Do you recall sending

that article to him?

    A   Yes.

    Q   Did you discuss that article with anyone before sending

it to him?

    A   You know what?  Perhaps this was the conversation

that --

    Q   That you meant originally from --

    A   Yes.  And this, I don't know what that was about.

    Q   Okay.

    Mr. Eisen.  Just for the record, when you say "this, I don't

know what that was about" --

    Ms. Hicks.  Sorry.  That was 27.

    Mr. Eisen.  That's all right.  I'll do it for you.

The witness was pointing to 27 and 28, right?

        BY MS. ISTEL:

    Q   The May 1st conversation in response to asking for a

call, that's when she was -- okay.

    Okay.  HCH030, it's a text message exchange between Ms. Hicks

and Sarah H.  Who is Sarah H.?

    A   Sarah Huckabee Sanders.

    Q   What is your relationship with Sarah Huckabee Sanders?

    A   She's a close friend.

    Q   And this is Wednesday, April 18th.  Do you recall the year of this conversation?

    A   I believe it was 2018.

    Q   Were you still communicating with White House officials in providing advice on how to respond to the press at that time?

    A   I don't think she's asking for my advice.  I think she's just curious if I know anything about this.  I had just left the White House, and some things were --

    Q   Overlapping?

    A   -- still up in the air in terms of who to go to on things.

    Q   And you say, "No idea," so I'm not going to ask you if you have any idea.

    HCH031 and 032, for the record, are two drafts of emails from Hope Hicks to Hope Hicks on November 4th, 2016.

    Would you mind just reading both of them into the record?  Because they're slightly different, and I just want to understand the difference between them.

    A   Sure.

    "We have no knowledge of this false story allegedly being shopped around, although it comes as no surprise -- yet another

publicity hungry individual with a get rich and famous quick scheme at the expense of Mr. Trump.  We suggest you reach out to the parties involved as we have nothing to do with this final attempt by the liberal elite to disparage Donald Trump and stop this historic movement."

The second version, HCH0032:  "We have nothing to do with this final attempt by the liberal elite to disparage Donald Trump and stop this historic movement.  We have no knowledge of this false story allegedly being shopped around, although it comes as no surprise -- yet another publicity hungry individual with a get rich and famous quick scheme at the expense of Mr. Trump."

Q   Do you know what this was in reference to?

A   I believe these were statements considered as we, you know, formulated a response to the Wall Street Journal inquiry about Karen McDougal.

Q   Did anyone have input in these statements?

A   Yes.  Michael Cohen did.  And I don't recall who else, but --

Q   What about the President, or Mr. Trump at the time?

A   He ultimately had input in what was said to The Wall Street Journal, but not in crafting these statements.

Q   Did you show him these statements?

A   Most likely I did.  I don't remember, but most likely.

Q   So I won't ask if you recall his reaction to them.

A   Well, we gave a different statement, so if I did, it

probably wasn't good.

Q   Okay.

Last one, HCH033.  It's another text message exchange between yourself and Michael Cohen, November 5th, 2016.

Do you recall what you were discussing in this exchange?

Would it be helpful to read out loud into the record?  I just was going to spare you, but --

A   No.  No.  That's okay.  Thank you.  Yes, I remember.  We were discussing the traction the Wall Street Journal story regarding Karen McDougal was getting.

Q   So when you say -- I guess Cohen sent to you, "Keep praying!!  It's working!"  When he says "it's working," do you recall what he meant by that?

A   I guess that our prayers were being answered.

Q   He also says, "I have a statement by Storm denying everything and contradicting the other porn stars statement."  Do you recall how he got that statement?

A   I have no idea.

Q   Did you ask him?

A   I did not.  I don't recall speaking to him about Stormy other than to relay what the reporter said to me, that she would be mentioned in story, but there was no additional context.

Q   Did you discuss with the President having a statement from Stormy Daniels denying the incident?

A   I don't recall that.  I know the President had

conversations with Michael separate from me, so it's possible it was part of those.  I don't recall being part of those conversations.

Q   When they were having those conversations, did they ever ask you to leave the room?

A   The conversations were had while we were traveling. Michael wasn't with us.  And I was not present when the person was speaking to Michael on the phone.

Q   We've asked ad nauseam about the President's relationship with Karen McDougal, but did you ever ask him if he had a relationship with Stormy Daniels?  During the campaign.  I see the movement from behind you.

A   Again, I had no knowledge of Stormy Daniels other than to say she was going to be mentioned in the story amongst people that were shopping stories around.  There were no specifics offered by the reporter, and I didn't have any other information other than what was being relayed to me by the reporter.  So, no, I did not.

Q   When you made statements during the campaign that the President did not have any relationship with Stormy Daniels, did you have a basis for saying that?  Did the President tell you that he did not have a relationship?

A   Again, I was relaying information from the reporter to the different parties involved, primarily Michael and Mr. Trump, and that was the response that was dictated to me.  I didn't ask

about the nature of the relationships.

Q   Okay.

So, going forward in the exchange, it looks like Michael Cohen asks for David Pecker's cell and -- or, actually, you ask for David Pecker's cell and say, "I have it but he thinks it's wrong."  And then he, I imagine, provides the cell phone number. And you say, "Same one!  Thanks!"  And Michael Cohen says, "He called me from this number this morning."  And then you say, "They spoke.  All good!"  Or, it's "The spoke," but I imagine you meant "they."

Do you recall who "they" was?

A   The President and David Pecker.

Q   Do you recall what they discussed during that call?

A   No.

Q   So how did you know to say "all good"?

A   I was referring to the fact that we didn't need to search for a phone number, that I was all set.  They spoke and we were good.

Q   Okay.

Does any of my counsel at any table have any followups?

Mr. Collins.   Reclaiming my time.

After almost 8 hours, and over the last 2 hours of which, especially among many questions were repetitive, not just in content but actual word and verse on many of these questions, I think this is something that we will take up in the next, you

know -- hopefully not, but in negotiations.  This was,
frankly -- I want to put it on the record -- a waste of time, the
last part.  Members, understandably -- I am one, so we do like our
5 minutes to question, but it was, unfortunately, a very much
repetitive situation.

In light of everything and the fact we've gone through -- and
also forcibly reading documents, the question I have is, the
majority, through this witness, are we expecting another call from
a woman who has testified now three times before Congress and been
a part of this and also went through numerous documents?  Is the
counsel for the majority willing to make a statement about that?

Mr. Eisen.  Mr. Collins, we heard a large number of absolute
immunity claims that not only the majority believes are unfounded
but that the United States District Court for the District of
Columbia has rejected on absolute immunity.  The necessity to put
that on the record stems from the assertion of those claims.

We appreciate the White House willingness to continue
conversations on this matter, but we feel very strongly that but
for the assertion of absolute immunity we would have been able to
avoid the necessary creation of a record.  So that has a
contributed to the situation in which we find ourselves.

I will note that the White House has expressed -- that's
another reason we need the transcript, is the White House has
expressed a willingness to review the questions that are asked,
the objection.  We've tried to create a complete transcript for

that purpose.

I think Mr. Collins knows better than I do the exigencies of having Members who do want to have the firsthand, percipient testimony and dealing with the challenges of votes.

If the minority will indulge us, I do think -- I see some restless movement from our witness.

Ms. Hicks.  No.  Sorry.  I --

Mr. Eisen.  No.  No.  You're entitled.

And I would like to excuse the witness so she can make her flight.

Mr. Collins.  At this point, I appreciate that.  I will not have an objection that she will be excused.

I will note that your long and eloquent conversation we just now had absolutely nothing to do with my answer -- that the question was actually answered.  I appreciate no one actually discussing -- Ms. Hicks, I have no problem --

Ms. Hicks.  I'm happy to stick around if we're going to resolve the answer to that question.

Mr. Collins.  Yeah.  I mean, I think the interesting issue is, again, not -- I have no -- and we've had to go back and forth on this concerning the foundation of the opinion from the White House.  That was never the question I asked, and it was never the concern that I had about multiple questions.  You did attempt, at least toward the end, to make a head nod toward that.

My question was, and you did not answer it, are you through

with this witness, not just today but in the future?  What is the
plans of this committee?

Mr. Eisen.  The next step is to engage in an accommodation
process on the many, many, many questions in the record that we
believe absolute immunity was -- we respectfully disagreed with
the view of absolute immunity.  It is, in our view and the view of
the courts, we believe, unfounded.  And then we will make an
assessment of next steps.

I appreciate the recognition of my gesture.  I thought it was
not just a head nod but a full-body move towards expediting.

And I want to express my appreciation to the witness, to her
counsel, and to the White House lawyers also for -- as we sped
through, I think we covered Volume II of the Mueller report in
record time.

And, of course, the minority was on our call, the
accommodations call, yesterday, and we'll continue to be a part of
that.  And we'll try to proceed with all due courtesy to everyone.

We're very appreciative of you being here, Ms. Hicks.

Mr. Philbin.  If we could make one observation in response to
the ranking member's comments also and to Mr. Eisen's comments,
the usual process -- and it would've been much more -- the usual
process -- and it would've been much more respectful to Ms. Hicks'
time -- is to talk about accommodations and engage in negotiations
before a subpoena is issued.  And that would've avoided the need
to have this hearing today under subpoena and then try to go about

the process as it's usually handled.

Mr. Collins.  But reclaiming my time, that is not what this majority wants.  They prefer the subpoena-first approach.  And they can roll their eyes and sigh, but that's exactly what happened.  As proven earlier today when I asked about ones who never were responsive to any of your requests and they've never been subpoenaed.

I want to go back to this quick, and I'm going to solve this so you can get home.  Two questions, straightforward:  Are you through with her or not?  And number two is, when will the transcript be available?  That's all I'm asking.

Mr. Eisen.  We've asked that the transcript be made available -- to take the easy one first -- with all deliberate speed.

And that really goes to the answer to number one.  We're now going to engage in an accommodation process, including whether we can get answers to some of these questions, and that will determine next steps here.

I do take strong exception to the White House's characterization of the accommodation efforts.  I think there's a long trail of letters, unilateral offers on our part.  But we're engaged in it.  We're going to proceed with it.

We're very grateful to the witness for being here today.  And with that, I'd like to release her, with the permission of the ranking member.

Mr. Collins.  Well, seeing that I did not still get an answer, I'll take that as a no.  I'll have to talk to the chairman, who will decide this.  But it is interesting that you will not answer the question whether you were through with her not just today but in the future.  We'll get the transcript as soon as possible.  Again, accommodations is something we can talk about at another time.

Mr. Eisen.  Thank you, Ms. Hicks.  And we want to thank your counsel as well.

Ms. Hicks.  Thank you very much.

[Whereupon, at 4:52 p.m., the interview was concluded.]