**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff,*

v.

DONALD F. MCGAHN II,

*Defendant.*

No. 19-cv-2379 (KBJ)

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
## MOTION FOR PRELIMINARY INJUNCTION, OR, IN THE ALTERNATIVE,
## FOR EXPEDITED PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF EXHIBITS ................................................................................................................. iii

TABLE OF AUTHORITIES ........................................................................................................ v

INTRODUCTION ........................................................................................................................ 1

FACTS ........................................................................................................................................... 3

I.   The Special Counsel's Report Details Compelling Evidence Of Presidential Wrongdoing .... 3

    A.   The Report Describes Russia's Interference In The 2016 Presidential Election And How The Trump Campaign Welcomed That Assistance .......................................................... 4

    B.   The Report Describes How McGahn Witnessed Multiple Attempts By President Trump To Undermine The Investigation Into Russian Interference ............................................. 5

II.   The Judiciary Committee Has Commenced An Investigation Into Presidential Misconduct, And McGahn's Refusal To Testify Leaves The Parties At An Impasse ............................... 10

    A.   The Judiciary Committee's Authority Under Article I And The House Rules .............. 10

    B.   The Judiciary Committee's Investigation ...................................................................... 12

    C.   The Judiciary Committee's Need For McGahn's Testimony ........................................ 14

    D.   The Accommodations Process Is At An Impasse .......................................................... 16

ARGUMENT ............................................................................................................................... 19

I.   This Court Has Authority To Resolve This Case ................................................................. 20

    A.   This Court Has Subject-Matter Jurisdiction Under 28 U.S.C. § 1331 .......................... 21

    B.   The Judiciary Committee Has Standing ........................................................................ 21

    C.   The Judiciary Committee May Bring This Action To Enforce Its Subpoena ................ 23

    D.   This Case Is Justiciable ................................................................................................. 24

II.   President Trump's Directive That McGahn Not Testify Has No Valid Basis In Law ........... 25

    A.   McGahn Has A Legal Obligation To Appear Before The Judiciary Committee In Response To A Lawfully Issued Congressional Subpoena ............................................. 25

    B.   Presidential Advisors Do Not Enjoy "Absolute Immunity" From Compelled Congressional Testimony ............................................................................................. 27

        1.   No Legal Authority Supports Absolute Immunity For Presidential Advisors ........ 27

        2.   The Executive's Position Contravenes Settled Precedent Rejecting Absolute Immunity In Similar Contexts .............................................................................. 29

3.   Absolute Immunity Would Violate Separation-Of-Powers Principles ................... 34

III. The Judiciary Committee, Obstructed In Fulfilling Its Constitutional Responsibilities,
Requires Injunctive Relief .................................................................................................... 36

A.  McGahn's Refusal To Testify Is Causing The Committee Irreparable Harm ............... 37

B.  Enabling The Committee's Investigation To Proceed With McGahn's Testimony
Serves Equity And Advances The Public Interest ......................................................... 41

CONCLUSION .................................................................................................................................. 42

## TABLE OF EXHIBITS

The exhibits listed below are those attached to this motion.  For the Court's and the

parties' convenience, for the exhibits attached to the Declaration of Todd B. Tatelman (Aug. 26,

2019), where those exhibits were also attached to the complaint in this matter, they are labeled

consistently with the exhibits as attached to the complaint.

### Exhibits to Declaration of Todd B. Tatelman (Aug. 26, 2019)

Exhibit A        Transcript, *Oversight of the Report on the Investigation Into Russian Interference in the 2016 Presidential Election:  Former Special Counsel Robert S. Mueller, III: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (July 24, 2019)

Exhibit B        Letter from Pat Cipollone, Counsel to the President, to Jerrold Nadler, Chairman, H. Comm. on the Judiciary (May 20, 2019)

Exhibit C        Memorandum from Steven A. Engel, Assistant Att'y Gen., Office of Legal Counsel, to Pat A. Cipollone, Counsel to the President, Re: Testimonial Immunity Before Congress of the Former Counsel to the President (May 20, 2019)

Exhibit E        Transcript, *Former Special Counsel Robert S. Mueller III on the Investigation into Russian Interference in the 2016 Presidential Election: Hearing Before the H. Permanent Select Comm. on Intelligence*, 116th Cong. (July 24, 2019)

Exhibit F        Press Release, U.S. Dep't of Justice, Department of Justice Issues Statement on Testimony of Former FBI Director James Comey (June 8, 2017)

Exhibit O        Transcript, *Lessons from the Mueller Report, Part III: "Constitutional Processes for Addressing Presidential Misconduct": Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (July 12, 2019)

Exhibit P        Memorandum from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, to Members of the Comm. on the Judiciary (July 11, 2019)

Exhibit R        Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, to Donald F. McGahn II (Mar. 4, 2019)

Exhibit T        Transcript, *Markup of Resolution Authorizing Issuance of Subpoenas Before the H. Comm. on the Judiciary*, 116th Cong. (Apr. 3, 2019)

Exhibit U        Subpoena from Judiciary Committee to Donald F. McGahn II (Apr. 22, 2019)

Exhibit X        Letter from William A. Burck to Jerrold Nadler, Chairman, H. Comm. on the Judiciary (May 20, 2019)

Exhibit Y        Transcript, *Oversight of the Report by Special Counsel Robert S. Mueller, III: Former White House Counsel Donald F. McGahn, II: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (May 21, 2019)

Exhibit Z        Letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, to Donald F. McGahn II & Pat A. Cipollone, Counsel to the President (May 31, 2019)

Exhibit MM       Transcript of Opinion, *Trump v. Deutsche Bank*, No. 19-cv-3826 (S.D.N.Y. May 22, 2019)

### Exhibits to Declaration of Barry H. Berke (Aug. 26, 2019)

Exhibit 1        Subpoena from the Judiciary Committee to White House Counsel Donald F. McGahn (Apr. 22, 2019)

Exhibit 2        Letter from Mr. Cipollone to Chairman Nadler (May 20, 2019)

Exhibit 3        Memorandum from Steven A. Engel, Assistant Att'y Gen., Office of Legal Counsel, to Pat A. Cipollone, Counsel to the President, Re: Testimonial Immunity Before Congress of the Former Counsel to the President (May 20, 2019)

Exhibit 4        Letter from Mr. Cipollone to Chairman Nadler (May 20, 2019)

Exhibit 5        Letter from Chairman Nadler to Mr. Cipollone (May 31, 2019)

# TABLE OF AUTHORITIES

**Cases**

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
  135 S. Ct. 2652 (2015) ................................................................................................22, 23

*Butz v. Economou,*
  438 U.S. 478 (1978) ...........................................................................................................29

*Byrd v. EPA,*
  174 F.3d 23 (D.C. Cir. 1999) ...........................................................................................40

*California v. Green,*
  399 U.S. 149 (1970) ...........................................................................................................16

*Cellco Partnership v. FCC,*
  357 F.3d 88 (D.C. Cir. 2004) .............................................................................................4

*Clinton v. Jones,*
  520 U.S. 681 (1997) ...........................................................................................31, 34, 35, 40

* *Comm. on the Judiciary v. Miers,*
  558 F. Supp. 2d 53 (D.D.C. 2008) ........................................................................... *passim*

*Comm. on the Judiciary v. Miers,*
  575 F. Supp. 2d 201 (D.D.C. 2008) .................................................................................40

 *Comm. on Oversight & Government Reform v. Holder,*
  979 F. Supp. 2d 1 (D.D.C. 2013) ............................................................................. *passim*

*Cummings v. Murphy,*
  321 F. Supp. 3d 92 (D.D.C. 2018), ..................................................................................22

*Dellums v. Powell,*
  182 F.2d 242 (D.C. Cir. 1977) ..........................................................................................31

*Dunlap v. Presidential Advisory Comm'n on Election Integrity,*
  286 F. Supp. 3d 96 (D.D.C. 2017) ...................................................................................37

*Eastland v. U.S. Servicemen's Fund,*
  421 U.S. 491 (1975) .......................................................................................................12, 26

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
  266 F. Supp. 3d 297 (D.D.C. 2017) .................................................................................40

*Exxon Corp. v. FTC,*
    589 F.2d 582 (D.C. Cir. 1978) .......................................................................41

*Gordon v. Holder,*
    721 F.2d 638 (D.C. Cir. 2013) ................................................................41, 42

*Gravel v. United States,*
    408 U.S. 606 (1972) ................................................................................28, 29

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ................................................................................29, 33

*In re Kellogg Brown & Root, Inc.,*
    796 F.3d 137 (D.C. Cir. 2015) ......................................................................42

*In re Kessler,*
    100 F.3d 1015 (D.C. Cir. 1996) ....................................................................29

*In re Report and Recommendation of June 5, 1972 Grand Jury Concerning Transmission of*
    *Evidence to the House of Representatives,*
    370 F. Supp. 1219 (D.D.C. 1974) ...........................................................35, 41

*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997) ..........................................................29, 30, 31

*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ..........................................................................40

*LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham,*
    347 F.3d 315 (D.C. Cir. 2003) ........................................................................4

*Loving v. United States,*
    517 U.S. 748 (1996) .......................................................................................34

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) ........................................................................20

*Maryland v. King,*
    133 S. Ct. 1 (2012) ........................................................................................41

*McGrain v. Daugherty,*
    273 U.S. 135 (1927) ............................................................................ *passim*

*Medellin v. Texas,*
    552 U.S. 491 (2008) .......................................................................................27

*Nixon v. Adm'r of Gen. Servs.*,
   433 U.S. 425 (1977)..............................................................................24, 34

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982)........................................................................................29

\*   *Nixon v. Sirica*,
   487 F.2d 700 (D.C. Cir. 1973) ................................................. *passim*

*Payne Enters., Inc. v. United States*,
   837 F.2d 486 (D.C. Cir. 1988)......................................................................40

*Sanofi-Aventis U.S. LLC v. FDA*,
   842 F. Supp. 2d 195 (D.D.C. 2012)..............................................................20

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
   498 F.2d 725 (D.C. Cir. 1974)................................................... *passim*

*Sun Oil Co. v. United States*,
   514 F.2d 1020 (Ct. Cl. 1975) ........................................................................31

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ......................................................................19

*Trump v. Deutsche Bank*,
   No. 19-cv-3826 (S.D.N.Y. May 22, 2019) ...........................................39, 40

*United States v. AT&T*,
   551 F.2d 384 (D.C. Cir. 1976)...........................................................21, 23, 24

*United States v. AT&T*,
   567 F.2d 121 (D.C. Cir. 1977) ............................................................. 20-21

*United States v. Bryan*,
   339 U.S. 323 (1950).........................................................................26, 27, 39

*United States v. Burr*,
   25 F. Cas. 187 (C.C. Va. 1807).......................................................20, 30

*United States v. Lee*,
   106 U.S. 196 (1882) ........................................................................................1

\*   *United States v. Nixon*,
   418 U.S. 683 (1974)......................................................... *passim*

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) ................................................................................39

*U.S. House of Representatives v. U.S. Dep't of Commerce*,
    11 F. Supp. 2d 76 (D.D.C. 1998) .....................................................22, 40

*U.S. House of Representatives v. Mnuchin*,
    379 F. Supp. 3d 8 (D.D.C. 2019) ........................................................22

*Virginia House of Delegates v. Bethune-Hill*,
    139 S. Ct. 1945 (2019) .........................................................................23

*Watkins v. United States*,
    354 U.S. 178 (1957) .......................................................................26, 42

*Winter v. NRDC*,
    555 U.S. 7 (2008) ................................................................................20

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................27

**Constitution, Statutes, Federal Rules of Civil Procedure, & Regulations**

U.S. Const., Art. I, § 1 ...............................................................................11

U.S. Const., Art. I, § 2 ........................................................................ *passim*

U.S. Const., Art. I, § 3 ...............................................................................37

U.S. Const., Art. I, § 5 ...............................................................................11

28 U.S.C. § 1331 .......................................................................................21

Fed. R. Civ. P. 56 .....................................................................................19

28 C.F.R. § 45.2 .........................................................................................7

**Rules of the U.S. House of Representatives, 116th Cong.**

House Rule X.1 .....................................................................................11, 12

House Rule X.2 .....................................................................................11, 12

House Rule XI.1 .........................................................................................12

House Rule XI.2 ...................................................................................11, 12

House Rule XII.2 ......................................................................................................11

**Legislative Authorities**

H. Res. 13, 116th Cong. (2019) .................................................................................11

H. Res. 430, 116th Cong. (2019) ...............................................................................13

H. Res. 507, 116th Cong. (2019) ...............................................................................12

H. Res. 509, 116th Cong. (2019) ...............................................................................12

H. Res. 621, 115th Cong. (2017). ..............................................................................11

163 Cong. Rec. H9376 (daily ed. Nov. 15, 2017) .....................................................11

165 Cong. Rec. H211 (daily ed. Jan. 3, 2019) ....................................................11, 13

H. Rep. No. 103-224 (1993) ......................................................................................11

H. Rep. No. 116-105 (2019) ................................................................................13, 14

*Jefferson's Manual*, H. Doc. 114-192 (2017). ...........................................................10

Congressional Subpoena Compliance and Enforcement Act, H.R. 3732, 116th Cong. (2019) ....13

No President is Above the Law Act, H.R. 2678, 116th Cong. (2019)..........................13

Presidential Pardon Transparency Act, H.R. 1348, 116th Cong. (2019)......................13

Security from Political Interference in Justice Act, H.R. 3380, 116th Cong. (2019) ..............13, 38

Special Counsel Independence and Integrity Act, H.R. 197, 116th Cong. (2019) .......................13

**Other Authorities**

A Sitting President's Amenability to Indictment and Criminal Prosecution,
    24 Op. O.L.C. 222 (2000) .....................................................................................33, 38

Donald J. Trump (@realDonaldTrump), Twitter (April 19, 2019, 4:53 AM),
    https://perma.cc/38VZ-QMD2.................................................................................15

Donald J. Trump (@realDonaldTrump), Twitter (April 25, 2019, 4:47 AM),
    https://perma.cc/CLP3-RU9H.................................................................................15

Donald J. Trump (@realDonaldTrump), Twitter (May 11, 2019, 3:39 PM),
     https://perma.cc/6GHX-4ZPU ...............................................................................15

Immunity of the Assistant to the President and Director of the Office of Political Strategy
     and Outreach from Congressional Subpoena,
     38 Op. O.L.C., 2014 WL 10788678 (2014)...........................................................28

Julie Hirschfeld Davis, Michael S. Schmidt, & Maggie Haberman, *Don McGahn to Leave White
     House Counsel Job This Fall, Trump Says*, N.Y. Times (Aug. 29, 2018),
     https://perma.cc/8S7M-V4F9 .................................................................................9

Memorandum from the Attorney General to Heads of Dep't Components
     and U.S. Attorneys (Dec. 19, 2007),
     https://perma.cc/JK8Y-Z7LN ..................................................................................8

Michael S. Schmidt & Maggie Haberman, *Giuliani Attacks McGahn's Account to Mueller*,
     N.Y. Times (Apr. 19, 2019), https://perma.cc/4TA5-SCYQ..................................15

Michael S. Schmidt & Maggie Haberman, *McGahn, Soldier for Trump and Witness Against
     Him, Leaves White House*, N.Y. Times (Oct. 17, 2018), https://perma.cc/ZG2Z-VUHF .........9

*Lessons from the Mueller Report: Presidential Obstruction and Other Crimes: Hearing Before
     the Comm. on the Judiciary*, 116th Cong. (2019), https://perma.cc/UYV9-F76E ..................14

*Oversight of the U.S. Department of Justice: Report by Special Counsel Robert S. Mueller, III on
     the Investigation Into Russian Interference in the 2016 Presidential Election; and Related
     Matters: Hearing Before the Comm. on the Judiciary*, 116th Cong. (2019),
     https://perma.cc/YS85-GNZ9 .................................................................................14

*Presidential Campaign Activities of 1972: Hearings Before the
     S. Select Comm. on Presidential Campaign Activities*, 93rd Cong. (1973)...........................33

Press Release, House Comm. on the Judiciary, *House Judiciary Committee Unveils Investigation
     into Threats Against the Rule of Law* (Mar. 4, 2019),
     https://perma.cc/MPM8-3MAA................................................................................12

Prosecution for the Contempt of Congress of an Executive Branch Official
     Who Has Asserted a Claim of Executive Privilege, 8 Op. O.L.C. 101 (1984).......................21

*The Records of the Constitutional Convention of 1787* (Max Farrand ed., 1911).........................38

Remarks by President Trump Before Marine One Departure, White House (Apr. 24, 2019),
     https://perma.cc/W7VZ-FZ3T ...............................................................................17

Robert Costa et al., *Trump Says He Is Opposed to White House Aides Testifying to Congress, Deepening Power Struggle with Hill*, Wash. Post (Apr. 23, 2019), https://perma.cc/FL3H-TUXL ..........................................................................................................................17

*Robert S. Mueller III, Report On The Investigation Into Russian Interference In The 2016 Presidential Election* (March 2019), https://perma.cc/DN3N-9UW8 ............................ *passim*

*Special Counsel Robert S. Mueller III Makes Statement on Investigation into Russian Interference in the 2016 Presidential Election*, U.S. Dep't of Justice (May 29, 2019), https://perma.cc/7JY5-48XJ ......................................................................................................36

Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to the President, 43 Op. O.L.C., 2019 WL 3383723 (2019) ...............28

*Transcript: ABC News' George Stephanopoulos' Exclusive Interview with President Trump*, ABC News (June 16, 2019), https://perma.cc/3WL3-G8J9 ...................................................16

*White House Contacts with Treasury/RTC Officials About "Whitewater"-Related Matters—Part 2: Hearing Before the H. Comm. on Banking, Finance, and Urban Affairs*, 103d Cong. (1994) ..................................................................................................................34

Zeke Miller & Jill Colvin, *How White House Lawyer Don McGahn Seems to Have Saved Trump from Himself*, Chi. Tribune (Apr. 20, 2019), https://perma.cc/CC5Y-QCJB ...................................................................................................6

## INTRODUCTION

In our constitutional system of government, "[n]o man in this country is so high that he is above the law." *United States v. Lee*, 106 U.S. 196, 220 (1882).  Plaintiff, the Committee on the Judiciary of the United States House of Representatives ("Judiciary Committee" or "Committee"), seeks to vindicate that bedrock principle in this lawsuit to enforce a subpoena for information necessary to its consideration of whether to recommend articles of impeachment against the President.

In an unprecedented attack on our Nation's democratic institutions, "[t]he Russian government interfered in the 2016 presidential election in sweeping and systematic fashion." *Robert S. Mueller III, Report On The Investigation Into Russian Interference In The 2016 Presidential Election* ("*Report*"), Vol. I at 1 (March 2019), https://perma.cc/DN3N-9UW8. After a two-year investigation, Special Counsel Robert S. Mueller III concluded, among other things, that Russia intended to benefit then-candidate Donald J. Trump, and that the Trump Campaign welcomed Russia's assistance. *Id.*, Vol. I at 4-5.  Once in office, President Trump repeatedly used the power of the Presidency to attempt to thwart the investigation into Russia's election interference—and into his own misconduct, including by ordering the Special Counsel's removal and then ordering his aides to cover up his wrongdoing. *See generally id.*, Vol. II.  The Special Counsel, however, declined to determine whether this obstructive conduct warranted criminal charges, finding himself bound by a legal interpretation from the Office of Legal Counsel ("OLC"), within the Department of Justice ("DOJ"), that precludes the indictment of a sitting President. *Id.*, Vol. II at 1-2.

Therefore, while the President remains in office, only Congress can address the Presidential misconduct described in the Special Counsel's Report.  To that end, the Judiciary Committee has commenced an investigation to determine whether to recommend articles of

impeachment against the President.  It is also evaluating whether remedial legislation is warranted, including to address the types of misconduct described in the Report.  Finally, it is carrying out necessary oversight relating to the conduct of the DOJ, and of the Federal Bureau of Investigation ("FBI"), during and related to the Special Counsel's investigation.

But the Judiciary Committee's ability to fulfill these constitutional responsibilities is hindered without testimony from a crucial witness: defendant Donald F. McGahn II, former White House Counsel.  The Report makes clear that McGahn witnessed multiple acts of potential obstruction of justice by the President, including his demands that McGahn have the Special Counsel removed and create a false record to conceal the President's misconduct.  McGahn's central role in these and other abuses described in the Report make him the Committee's most critical fact witness:  he is uniquely positioned to explain what happened, bring any additional misconduct to light, and testify regarding the President's intent.  Accordingly, in April 2019, the Committee issued a subpoena seeking McGahn's testimony.

Having been subpoenaed, McGahn is legally obligated to testify before the Judiciary Committee.  But he has refused to do so, thereby impeding the Committee in carrying out its grave constitutional obligations.  On the day before McGahn was scheduled to appear before the Committee, he and the White House revealed that President Trump had "directed" McGahn, now a private citizen, to defy the Committee's subpoena.  Decl. of Todd B. Tatelman (Aug. 26, 2019), Ex. B at 2; *id.*, Ex. X at 1.  In support of the President's directive, OLC has opined that McGahn, as a former Presidential advisor, is "absolutely immune" from being compelled to appear before Congress.  *Id.*, Ex. B at 1; *see id.*, Ex. C.

That claim lacks any basis in law.  In the only judicial opinion to have addressed the Executive Branch's absolute immunity theory, Judge Bates deemed it "entirely unsupported by

existing case law" and "virtually foreclosed by the Supreme Court." *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 99, 100 (D.D.C. 2008). The absolute immunity claim conflicts with decades-old precedent rejecting absolute immunity in similar contexts. It impedes the impeachment process that Article I of the Constitution prescribes for addressing Presidential misconduct. It denies Congress important information as the Committee considers legislation and conducts oversight. And its invocation here is permitting the President—who, OLC already has opined, may not be prosecuted while in office—to block crucial testimony in a Congressional investigation into his own potential abuse of office. The Executive's immunity theory for former advisers is as brazen as it is wrong: it places the President above the law and, by blocking testimony from a former official in the best position to condemn him, potentially renders the President unaccountable for misconduct while in office.

The Judiciary Committee's need for McGahn's testimony is urgent. Every day that McGahn defies the Committee's subpoena delays and diminishes its investigation. McGahn and the Executive Branch are encroaching on the Committee's power to consider articles of impeachment, obstructing its efforts to consider legislation and conduct oversight, and irreparably injuring Congress's stature as a co-equal branch of government. The Committee therefore asks this Court to speedily declare that the Executive's directive that McGahn not appear is unlawful, and to enjoin McGahn to testify.

## FACTS

### I.   The Special Counsel's Report Details Compelling Evidence Of Presidential Wrongdoing

In March 2019, Special Counsel Mueller presented a lengthy Report summarizing the results of his almost two-year-long investigation into Russian interference in the 2016 Presidential election. The Judiciary Committee's need for McGahn's testimony arises out of

alarming evidence of Presidential misconduct detailed in the Report, which the Committee has an independent constitutional duty to investigate.

In what follows, the Judiciary Committee does not recount information included in the Report to establish the truth of the matters asserted.  Rather, the Committee relays what the Special Counsel has told Congress and the American people to explain the basis for the Committee's current investigation.[1]

### A.    The Report Describes Russia's Interference In The 2016 Presidential Election And How The Trump Campaign Welcomed That Assistance

The Special Counsel's Report describes in sharp detail how "[t]he Russian government interfered in the 2016 presidential election in sweeping and systematic fashion." *Report*, Vol. I at 1; *see generally id.*, Vol. I.  It concludes, among other points, that "the Russian government perceived it would benefit from a Trump presidency and worked to secure that outcome." *Id.*, Vol. I at 5.  According to the Report, the Russian government, through its military intelligence service, used hacking to steal information from Hillary Clinton's campaign and the Democratic National Committee. *Id.*, Vol. I at 36.  The Russian-funded Internet Research Agency also used "information warfare" to "sow discord in the U.S. political system," with a "targeted operation that … favored candidate Trump and disparaged candidate Clinton." *Id.*, Vol. I at 4.

The Report also concludes that the Trump "Campaign expected it would benefit electorally from information stolen and released through Russian efforts." *Id.*, Vol. I at 5.  According to the Report, the Trump Campaign "showed interest in" the release of stolen documents "and welcomed their potential to damage candidate Clinton." *Id.*, Vol. I at 5.  For example, then-candidate Trump repeatedly and publicly encouraged Russian interference efforts,

---

[1] As necessary for purposes of the record, the Court can take judicial notice of the Report.  *See Cellco Partnership v. FCC*, 357 F.3d 88, 96 (D.C. Cir. 2004) (taking judicial notice of an agency report); *LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham*, 347 F.3d 315, 325 (D.C. Cir. 2003) (same, letter to Congress).

both urging Russia to "find" 30,000 of Hillary Clinton's emails that allegedly were missing, *id.*, Vol. I at 49, and praising WikiLeaks after it released stolen emails damaging to the Clinton Campaign, *see* Tatelman Decl., Ex. E at 15.  Some evidence suggests that then-candidate Trump may have known about certain releases of stolen emails in advance.  *Report*, Vol. I at 54.

In addition, the Report details "a series of contacts between Trump Campaign officials and individuals with ties to the Russian government."  *Id.*, Vol. I at 5.  For example, in June 2016, top Trump Campaign officials "met in Trump Tower with a Russian attorney expecting to receive derogatory information about Hillary Clinton from the Russian government" in response to an email characterizing the offer of such information as "'part of Russia and its government's support for Mr. Trump.'"  *Id.*, Vol. I at 110; *see id.*, Vol. I at 110-23.  Donald Trump Jr. "immediately responded" to that email offer, *id.*, Vol. I at 110, stating, "'if it's what you say I love it especially later in the summer,'" *id.*, Vol. I at 113.  Around this same time, Trump Campaign Chairman Paul Manafort was offering private briefings on the Presidential campaign to a Russian oligarch, *id.*, Vol. I at 137, and routinely causing internal campaign polling data to be shared with a Russian national who has "ties to Russian intelligence," *id.*, Vol. I at 129; *see id.*, Vol. I at 131-37.

**B.    The Report Describes How McGahn Witnessed Multiple Attempts By President Trump To Undermine The Investigation Into Russian Interference**

The Report chronicles "multiple acts by the President that were capable of exerting undue influence over law enforcement investigations, including the" Special Counsel's own investigations into Russian interference and obstruction.  *Id.*, Vol. II at 157; *see generally id.*, Vol. II.  It identifies McGahn, who was the White House Counsel during the relevant period, as

having been involved in, or a witness to, several attempts by the President to thwart the

investigation into Russian interference and conceal his obstructive conduct from the public.[2]

First, the Report reveals that McGahn was a key witness to events leading up to President

Trump's termination of National Security Advisor Michael Flynn, which the President "believed

… would end the 'whole Russia thing.'"  *Id.*, Vol. II at 47.  When it became apparent that Flynn

had misled Vice President Pence and others about his communications with the Russian

Ambassador, DOJ officials warned McGahn that Flynn was potentially compromised.  *Id.*, Vol.

II at 29-31.  McGahn immediately notified the President of what he had been told, explained that

the FBI previously had questioned Flynn about his communications with the Russian

Ambassador, and discussed the crime of making false statements to the FBI.  *Id.*, Vol. II at 31-

32.  It was not until weeks later, after the news media reported on Flynn's conversations with the

Russian Ambassador, that the President terminated Flynn, suggesting to an advisor, "'Now that

we fired Flynn, the Russia thing is over.'"  *Id.*, Vol. II at 38; *see id.*, Vol. II at 36-38.

Second, according to the Report, McGahn was a primary witness to President Trump's

efforts to shut down the FBI's Russia investigation by attempting to influence, and ultimately

removing, then-FBI Director James Comey.  McGahn was aware of—and counseled against—

President Trump's repeated attempts to influence Comey's handling of the FBI's Russia

investigation.  *Id.*, Vol. II at 59-60.  McGahn was also an integral figure in events leading to the

President's firing of Comey, *id.*, Vol. II at 65-69, 72-73, participating in several meetings on the

issue during which the President was encouraged not to justify the firing by referencing the

Russia investigation, *id.*, Vol. II at 67-69.  McGahn assisted the process that led to the President

---

[2] Before serving as White House Counsel, McGahn served as counsel to the Trump Campaign.  *See, e.g.*, Zeke Miller & Jill Colvin, *How White House Lawyer Don McGahn Seems to Have Saved Trump from Himself*, Chi. Tribune (Apr. 20, 2019), https://perma.cc/CC5Y-QCJB.

seeking an opinion from Deputy Attorney General Rod Rosenstein, who justified Comey's termination on the ground that Comey had mishandled the investigation into Hillary Clinton's use of a private email server.  *Id.*, Vol. II at 66-69.  The White House Counsel's Office was of the view that President Trump's original letter terminating Comey, which included reference to the FBI's Russia investigation, *id.*, Vol. II at 65, should "'not see the light of day' and that it would be better to offer '*no other rationales*' for the firing than what was in" DOJ's memoranda, *id.*, Vol. II at 68 (alterations omitted).  However, the Report states that "[s]ubstantial evidence indicates that the catalyst for the President's decision to fire Comey" was actually "Comey's unwillingness to publicly state that the President was not personally under investigation, despite the President's repeated requests that Comey make such an announcement."  *Id.*, Vol. II at 75. The Report cites evidence indicating that President Trump took these actions because he "wanted to protect himself from an investigation into his campaign."  *Id.*, Vol. II at 76; *see id.*, Vol. II at 76-77.

Third, the Report recounts that President Trump enlisted McGahn to pressure then-Attorney General Jeff Sessions not to recuse himself from overseeing the Russia investigation, and later to reverse his recusal, despite DOJ regulations to the contrary.  In March 2017, the President learned that Sessions, because of his participation in the Trump Campaign, was considering recusing himself in light of DOJ regulations providing that attorneys "should not participate in investigations" pertaining to individuals "with whom the attorney has a political or personal relationship."  Tatelman Decl., Ex. F (citing 28 C.F.R. § 45.2); *see Report*, Vol. II at 48-50.  President Trump urged McGahn to prevent Sessions from recusing, and McGahn "tr[ied] on behalf of the President to avert Sessions's recusal" by speaking to Sessions, "Sessions's personal counsel, Sessions's chief of staff," and even "Senate Majority Leader Mitch McConnell."

*Report*, Vol. II at 49.  After Sessions announced his recusal, the White House Counsel's Office

directed that Sessions should not be contacted about it, *id.*, Vol. II at 50; nonetheless, President

Trump berated McGahn and Sessions about the recusal, *id.*, Vol. II at 50, 60; personally

pressured Sessions to reverse his decision, *id.*, Vol. II at 51, 107-11; and suggested that McGahn

should do the same, *id.*, Vol. II at 51.  In one conversation with McGahn, President Trump also

"pushed back on the DOJ contacts policy"—which restricts communications between DOJ and

the White House regarding ongoing criminal and civil law-enforcement matters[3]—and suggested

that the President should be able to talk to his Attorney General about "'who to investigate.'"

*Id.*, Vol. II at 51.  According to the Report, "at least one purpose of the President's conduct

toward Sessions was to have Sessions assume control over the Russia investigation and supervise

it in a way that would restrict its scope" and "shield the President from the ongoing Russia

investigation." *Id.*, Vol. II at 112, 113.

      Fourth, once the Special Counsel took over the Russia investigation and President Trump

learned that he was being personally investigated for obstruction of justice, the President

repeatedly "called McGahn and directed him to have the Special Counsel removed because of

asserted conflicts of interest." *Id.*, Vol. II at 78; *see id.*, Vol. II at 84-87.  After receiving those

calls, McGahn "recalled feeling trapped because he did not plan to follow the President's

directive but did not know what he would say the next time the President called." *Id.*, Vol. II at

86.  He had earlier advised the President that pressing the conflicts issue "would look like still

trying to meddle in the investigation and knocking out Mueller would be another fact used to

claim obstruction of justice." *Id.*, Vol. II at 81-82 (quotation marks and alterations omitted).

---

[3] *See, e.g.*, Memorandum from the Attorney General to Heads of Dep't Components and U.S. Attorneys (Dec. 19, 2007), https://perma.cc/JK8Y-Z7LN.

McGahn "decided he had to resign," *id.*, Vol. II at 86, but ultimately did not do so then, *see id.*, Vol. II at 87.[4]   The Report states that "[s]ubstantial evidence indicates that the President's attempts to remove the Special Counsel were linked to the Special Counsel's oversight of investigations that involved the President's conduct," including "potential obstruction of justice." *Id.*, Vol. II at 89.

Fifth, President Trump subsequently engaged in "repeated efforts to get McGahn to create a record denying that the President had directed him to remove the Special Counsel." *Id.*, Vol. II at 118.   According to the Report, after news broke in January 2018 that the President had ordered McGahn to fire Mueller, President Trump repeatedly "sought to have McGahn deny that he had been directed to remove the Special Counsel." *Id.*, Vol. II at 113; *see generally id.*, Vol. II at 113-18.   In one instance, for example, a White House aide informed McGahn that the President had ordered McGahn "to write a letter [to the file] to dispute that he was ever ordered to terminate the Special Counsel" and "suggested that McGahn would be fired if he did not write the letter." *Id.*, Vol. II. at 116; *see id.*, Vol. II at 115-16.   In another instance, in a meeting in the Oval Office, the President directed McGahn to "correct" a news story which stated that the President had ordered McGahn to have DOJ fire the Special Counsel. *Id.*, Vol. II at 116-17; *see id.*, Vol. II at 113.   These demands to deny the press's account occurred multiple times. *See id.*, Vol. II at 113-18.   "Each time he was approached, McGahn responded that he would not refute the press accounts because they were accurate in reporting on the President's effort to have the Special Counsel removed." *Id.*, Vol. II at 113.   The Report concludes that "[s]ubstantial

---

[4] McGahn ultimately left the White House in October 2018.   *See* Michael S. Schmidt & Maggie Haberman, McGahn, *Soldier for Trump and Witness Against Him, Leaves White House*, N.Y. Times (Oct. 17, 2018), https://perma.cc/ZG2Z-VUHF; *see also* Julie Hirschfeld Davis, Michael S. Schmidt, & Maggie Haberman, *Don McGahn to Leave White House Counsel Job This Fall, Trump Says*, N.Y. Times (Aug. 29, 2018), https://perma.cc/8S7M-V4F9.

evidence indicates that in repeatedly urging McGahn to dispute that he was ordered to have the Special Counsel terminated, the President acted for the purpose of influencing McGahn's account in order to deflect or prevent further scrutiny of the President's conduct towards the investigation." *Id.*, Vol. II at 120.

## II.     The Judiciary Committee Has Commenced An Investigation Into Presidential Misconduct, And McGahn's Refusal To Testify Leaves The Parties At An Impasse

The Special Counsel decided "not to make a traditional prosecutorial judgment" regarding whether to recommend criminal charges against President Trump for obstruction of justice. *Id.*, Vol. II at 1.  The Report explains that this decision derived from OLC's opinion against indictment and prosecution of a sitting President. *Id.*, Vol. II at 1-2; *see also* Tatelman Decl., Ex. A at 109.  Tellingly, the Report also makes clear that if the Special Counsel's Office "had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, [it] would so state." *Report*, Vol. II at 2.  Further, the Report noted that the Special Counsel's Office did not wish to "preempt constitutional processes for addressing presidential misconduct." *Id.*, Vol. II at 1 (citing, *inter alia*, U.S. Const., Art. I, § 2, cl. 5, assigning the "sole Power of Impeachment" to the House of Representatives).

Those processes are now underway:  pursuant to its Article I powers, the Judiciary Committee is investigating the Presidential misconduct described in the Special Counsel's Report to determine whether to recommend articles of impeachment.  But McGahn and the Executive Branch are obstructing the Committee's critical task.

### A.     The Judiciary Committee's Authority Under Article I And The House Rules

The Constitution provides that "[t]he House of Representatives … shall have the sole Power of Impeachment."  U.S. Const., Art. I, § 2, cl. 5.  Within the House, the Judiciary Committee's jurisdiction includes impeachment. *Jefferson's Manual* § 605, H. Doc. No. 114-

192, at 321 (2017); *see also* U.S. Const., Art. I, § 5, cl. 2 (committing to each chamber of Congress the authority to "determine the Rules of its Proceedings," including as to the jurisdiction of their various committees).  Resolutions that call for impeachment are normally referred by the Speaker of the House to the Judiciary Committee,[5] and are eligible for consideration under applicable House Rules.  *See* Rules XI.2(b), (c)(1), XII.2(b), Rules of the House of Representatives, 116th Congress (2019) ("House Rules"), https://perma.cc/X5ZQ-ZZWD.

Article I also vests Congress with "[a]ll legislative Powers."  U.S. Const., Art. I, § 1, cl. 1.  The Judiciary Committee's legislative jurisdiction encompasses, among other subjects, "[c]riminal law enforcement and criminalization"; "[t]he judiciary and judicial proceedings, civil and criminal"; "presidential succession"; and "[s]ubversive activities affecting the internal security of the United States."  House Rule X.1(l).  Thus, among other matters, the Judiciary Committee exercises jurisdiction over legislation regarding independent counsels and special counsels, as well as the criminal statutes relevant to the Special Counsel's investigation into the President's conduct.[6]  The House Rules mandate that "[a]ll bills, resolutions, and other matters relating to" subjects within the Judiciary Committee's jurisdiction be referred to the Committee for its consideration.  House Rules X.1, XII.2.

In addition, the Judiciary Committee has "general oversight responsibilities" over "Federal agencies and entities" within its areas of jurisdiction, House Rule X.2(a), (b)(1)(B),

---

[5] *See* Compl. ¶ 19 & n.20 (Aug. 7, 2019), ECF No. 1; *see, e.g.*, 165 Cong. Rec. H211 (daily ed. Jan. 3, 2019) (referral to the Judiciary Committee of H. Res. 13, 116th Cong., impeaching President Trump); 163 Cong. Rec. H9376 (daily ed. Nov. 15, 2017) (referral to the Judiciary Committee of H. Res. 621, 115th Cong., impeaching President Trump).

[6] *See* Compl. ¶ 20 & n.27; *see, e.g.*, H. Rep. No. 103-224 (1993) (describing the Judiciary Committee's consideration of legislation to reauthorize the independent counsel statute).

including DOJ and the FBI.[7] Among other matters, the Committee is charged with reviewing "on a continuing basis … the application, administration, execution, and effectiveness of laws and programs" at DOJ and the FBI, and must determine whether such laws and programs are being "implemented and carried out in accordance with the intent of Congress," including with an eye to considering remedial legislation. House Rule X.2(b)(1).

Finally, the Supreme Court has long recognized that Congress's power to investigate extends to any "subject … on which legislation could be had." *McGrain v. Daugherty*, 273 U.S. 135, 177 (1927). Each chamber of Congress may exercise this power directly or may delegate it to its committees. *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 505 (1975). Under House Rules, the Judiciary Committee may conduct any "investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities," House Rule XI.1(b)(1), and may issue subpoenas for testimony and documents, *see* House Rules XI.2(m)(1)(B), (m)(3)(A)(i).

### B. The Judiciary Committee's Investigation

On March 4, 2019, the Judiciary Committee opened an investigation into "threats to the rule of law," encompassing alleged obstruction of justice, public corruption, and other abuses of power by President Trump, his associates, and members of his Administration. Press Release, House Comm. on the Judiciary, *House Judiciary Committee Unveils Investigation into Threats Against the Rule of Law* (Mar. 4, 2019), https://perma.cc/MPM8-3MAA.[8] As the Committee's

---

[7] *See* Compl. ¶ 21 & n.30; *see, e.g.*, H. Rep. 116-105, at 16-17 (2019) (citing February 8, 2019 hearing concerning DOJ oversight).

[8] As explained above, the Judiciary Committee's investigation and its subpoena to McGahn are authorized under the House's Article I powers, U.S. Const., Art. I, § 2, cls. 2, 5; *see Eastland*, 421 U.S. at 505; under its Rules, *see* House Rules X.1(l), XI.2(m)(1)(B); and by resolution of the Committee, *see* Tatelman Decl., Ex. T. In addition, the House has voted to ratify the Judiciary Committee's investigation and its subpoena to McGahn, *see* H. Res. 507, 116th Cong., (2019); *see also* H. Res. 509, 116th Cong., (2019), and has authorized the Committee "to seek

Chairman has explained, *see* Tatelman Decl., Ex. P at 3, and the Committee has confirmed, *see* H. Rep. No. 116-105, at 13, one critical purpose of the Committee's investigation is to determine whether to recommend articles of impeachment against the President.  Articles of impeachment against the President have been introduced and referred to the Committee during the present Congress,[9] and the Chairman has stated they are "under consideration as part of the Committee's investigation."  Tatelman Decl., Ex. P at 3; *see id.*, Ex. O at 4-5.

Additionally, the Judiciary Committee is "considering whether the conduct uncovered may warrant amending or creating new federal authorities, including among other things, relating to election security, campaign finance, misuse of electronic data, and the types of obstructive conduct that the Mueller Report describes."  H. Rep. No. 116-105, at 13.  The Chairman has identified "a non-exclusive list of possible legislative responses that fall within the Judiciary Committee's jurisdiction," Tatelman Decl., Ex. P at 4, including to address improper interference in law enforcement investigations, *see id.* at 4-5; to "protect the integrity and independence of future special counsel investigations," *id.* at 5; *see id.* at 5-6; to increase transparency regarding Presidential pardons, *see id.* at 6-7; to curtail the influence of foreign governments over candidates for federal office, *see id.* at 7-8; and to expedite procedures for Congress to enforce its subpoenas, *see id.* at 8.  Numerous bills related to these issues have already been introduced in the House and referred to the Judiciary Committee for consideration.[10]

---

declaratory judgments and any and all ancillary relief, including injunctive relief, affirming the duty of … Donald F. McGahn, II, … to comply with the subpoena issued to him on April 22, 2019," H. Res. 430, 116th Cong., (2019).

[9] Compl. ¶ 19 & n.20; *see* 165 Cong. Rec. H211 (referral to the Judiciary Committee of H. Res. 13, 116th Cong. (2019), impeaching President Trump).

[10] Compl. ¶ 62 & n.143; *see, e.g.*, Special Counsel Independence and Integrity Act, H.R. 197, 116th Cong. (2019); Presidential Pardon Transparency Act, H.R. 1348, 116th Cong. (2019); Security from Political Interference in Justice Act, H.R. 3380, 116th Cong. (2019); *see also* Congressional Subpoena Compliance and Enforcement Act, H.R. 3732, 116th Cong. (2019) (establishing mechanism to streamline enforcement of Congressional subpoenas); No President is Above the Law Act, H.R. 2678, 116th Cong. (2019) (tolling statute of limitations for offenses committed by a sitting President while in office).

Finally, the Judiciary Committee's investigation is critical to its oversight responsibilities, particularly as they pertain to DOJ and the FBI.  As detailed above, the Special Counsel's Report describes repeated efforts by the President to influence and undermine the Special Counsel's investigation, especially as it related to the President's own conduct.  The Committee therefore faces grave questions concerning, at minimum, the 25 additional matters that the Special Counsel's Office referred or transferred to other offices within DOJ, at least some of which may implicate the President personally.  *Report*, App. D-1 to D-6; *see* Compl. ¶ 101.  Discharging its oversight responsibilities under the House Rules, the Committee is investigating whether there are proper safeguards to protect these and other pending law enforcement investigations against improper interference, and how best to prevent inappropriate political considerations from influencing DOJ's decisionmaking concerning new investigations.[11]

### C.      The Judiciary Committee's Need For McGahn's Testimony

McGahn is the most important fact witness in the Judiciary Committee's investigation into whether to recommend articles of impeachment against the President.  Compl. ¶ 97; *see* Tatelman Decl., Ex. P at 4.  As the Committee has highlighted, McGahn witnessed or participated in many of the most serious occurrences of alleged Presidential obstruction of justice described in the Special Counsel's Report.  *See, e.g.*, H. Rep. No. 116-105, at 3, 15.  McGahn's statements to the Special Counsel's Office are mentioned in the Report more than 160 times.  Accordingly, he is uniquely situated to answer factual questions critical to the Judiciary Committee's investigation regarding the President's efforts to undermine the Special Counsel's

---

[11] *See* Compl. ¶¶ 98, 101; *see, e.g., Lessons from the Mueller Report: Presidential Obstruction and Other Crimes: Hearing Before the Comm. on the Judiciary*, 116th Cong. (2019), https://perma.cc/UYV9-F76E; *Oversight of the U.S. Department of Justice: Report by Special Counsel Robert S. Mueller, III on the Investigation Into Russian Interference in the 2016 Presidential Election; and Related Matters: Hearing Before the Comm. on the Judiciary*, 116th Cong. (2019), https://perma.cc/YS85-GNZ9.

investigation, the President's attempts to conceal that conduct, and the President's possible motivations for doing so.  McGahn's testimony is thus vital for the Committee to discharge its constitutional duties—including to inform the Committee's decision whether to recommend articles of impeachment, its consideration of pending legislation, and the conduct of its oversight.

McGahn's testimony is particularly important because, even as President Trump has directed McGahn to defy the Committee's subpoena, the President has waged an extensive campaign to discredit the Special Counsel's investigation, impugn McGahn's credibility, and deny McGahn's account of the facts.  *See* Compl. ¶¶ 52-54.  On April 19, 2019, President Trump asserted that the "Crazy Mueller Report" is "fabricated & totally untrue."  Donald J. Trump (@realDonaldTrump), Twitter (April 19, 2019, 4:53 AM), https://perma.cc/38VZ-QMD2.  He added, "Watch out for people that take so-called 'notes,'" *id.*—a likely reference to McGahn, whom the President chided for taking notes, *Report*, Vol. II at 117.  That same day, the President's private attorney, Rudolph Giuliani, told the press that McGahn's account "'can't be taken at face value,'" speculating that his statements "'could be the product of an inaccurate recollection or could be the product of something else.'"  Michael S. Schmidt & Maggie Haberman, *Giuliani Attacks McGahn's Account to Mueller*, N.Y. Times (Apr. 19, 2019), https://perma.cc/4TA5-SCYQ.

On April 25—three days after the Committee issued its subpoena to McGahn—President Trump stated, "I never told then White House Counsel Don McGahn to fire Robert Mueller."  Donald J. Trump (@realDonaldTrump), Twitter (April 25, 2019, 4:47 AM), https://perma.cc/CLP3-RU9H.  President Trump repeated that claim on May 11, stating that he "was NOT going to fire Bob Mueller."  Donald J. Trump (@realDonaldTrump), Twitter (May 11, 2019, 3:39 PM), https://perma.cc/6GHX-4ZPU.  The President added, "Actually, lawyer Don

McGahn had a much better chance of being fired than Mueller.  Never a big fan!"  *Id.*  On June

12, the President escalated his public attacks on McGahn.  When asked about McGahn's account

of being told to fire Special Counsel Mueller, the President stated, "I don't care what he says.  It

doesn't matter.  That was to show everyone what a good counsel he was."  *Transcript: ABC*

*News' George Stephanopoulos' Exclusive Interview with President Trump*, ABC News (June 16,

2019), https://perma.cc/3WL3-G8J9.  When asked why McGahn "would … lie under oath,"

President Trump responded, "Because he wanted to make … himself look like a good lawyer."

*Id.*

Additionally, although the President has made repeated public attacks on McGahn's

credibility, the President himself refused to sit for an interview with the Special Counsel's

Office, despite the Special Counsel's Office having informed the President, by counsel, that an

interview was "vital to [the] investigation."  *Report*, App. C at C-1 (quotation marks omitted).

McGahn's testimony—including the opportunity for cross-examination, "the greatest legal

engine ever invented for the discovery of truth," *California v. Green*, 399 U.S. 149, 158

(1970)—is therefore critical to the Judiciary Committee's ability to resolve any conflicting

accounts of events and to base its recommendations on a complete and independent

understanding of the facts.

### D.    The Accommodations Process Is At An Impasse

In an attempt to avoid the need to bring this lawsuit, the Judiciary Committee repeatedly

tried to reach an accommodation to secure McGahn's testimony.  This effort ended in a stalemate

necessitating judicial intervention.

Upon opening its investigation on March 4, 2019, the Judiciary Committee issued

voluntary document requests to McGahn, *see* Tatelman Decl., Ex. R, which McGahn forwarded

to the Trump Campaign and the White House.  When the White House did not respond to the

Committee's voluntary request, on April 3, 2019, the Committee adopted a Resolution

authorizing the issuance of subpoenas in connection with its investigation, including to McGahn.

Tatelman Decl., Ex. T at 18-19, 72.  Nonetheless, the Chairman held off on actually issuing a

subpoena to McGahn to provide him even more time to respond voluntarily.  Compl. ¶ 71.  Yet

with still no response by April 22, 2019, the Chairman issued a subpoena to McGahn with a

return date for McGahn's testimony of May 21, 2019.  Tatelman Decl., Ex. U.[12]  In the days after

that subpoena was issued, President Trump declared, "I don't want people testifying,"[13] and

announced, "We're fighting all the subpoenas."[14]  *See* Compl. ¶ 97.

On May 20, 2019, the afternoon before McGahn's scheduled appearance, the White

House Counsel informed the Judiciary Committee that the President had "directed" McGahn not

to comply with the subpoena.  Tatelman Decl., Ex. B at 2.  The White House Counsel's letter

stated that OLC had advised that "McGahn is absolutely immune from compelled congressional

testimony with respect to matters occurring during his service as a senior advisor to the

President."  *Id.* at 1.  The letter enclosed the OLC opinion, which claimed that "Congress may

not constitutionally compel the President's senior advisors to testify about their official duties."

Tatelman Decl., Ex. C at 1.  The opinion acknowledged, however, that the public release "of a

redacted version of the Special Counsel's report (with the President's consent) does extinguish

the Executive Branch's confidentiality interests in the precise information that has already been

---

[12] Although the subpoena additionally sought documents, the Judiciary Committee has reached an accommodation with the White House regarding the production of these documents.  Accordingly, this case and this motion seek enforcement of the subpoena only as it relates to McGahn's testimony.

[13] Robert Costa et al., *Trump Says He Is Opposed to White House Aides Testifying to Congress, Deepening Power Struggle with Hill*, Wash. Post (Apr. 23, 2019), https://perma.cc/FL3H-TUXL ("I don't want people testifying to [House Democrats], because that is what they're doing if they do this.").

[14] Remarks by President Trump Before Marine One Departure, White House (Apr. 24, 2019), https://perma.cc/W7VZ-FZ3T.

revealed" in the Report.  *Id.* at 13.  That evening, private counsel for McGahn informed the

Judiciary Committee that McGahn "finds himself facing contradictory instructions from two co-

equal branches of government" and would refuse to appear at the next day's hearing.  Tatelman

Decl., Ex. X at 1.

On May 21, 2019, the Judiciary Committee convened for its scheduled hearing.  Neither

McGahn nor the White House had sought any legal recourse in advance.  Instead, McGahn

simply refused to appear.  During opening statements, the Chairman reiterated McGahn's legal

obligation to appear, and offered McGahn the chance to "immediately correct his mistake."

Tatelman Decl., Ex. Y at 4 (line 81).  McGahn did not respond, nor did he respond to the

Chairman's subsequent offer to discuss reasonable accommodations for his testimony.  *See*

Tatelman Decl., Ex. Z; Decl. of Barry H. Berke ¶ 7 (Aug. 26, 2019).

Beginning in June, the Judiciary Committee convened a series of hearings to assess the

evidence of Presidential obstruction documented in the Report and constitutional processes for

addressing Presidential misconduct.  *See, e.g.*, Tatelman Decl., Ex. O.  Around that same time,

the Judiciary Committee had a series of discussions with the White House Counsel's Office to

attempt to reach a compromise concerning McGahn's testimony.  Berke Decl. ¶ 8.  During those

discussions, the Judiciary Committee offered, in exchange for McGahn's prompt public

testimony, to limit McGahn's testimony to matters that overlap with the Special Counsel's

Report.  *Id.*  It also proposed to allow McGahn to appear voluntarily and agreed to consider any

other reasonable accommodations.  *Id.* ¶¶ 11, 13.  Negotiations continued, but in mid-July the

White House declined all of the proposed accommodations.  *Id.* ¶ 14.  At that point, the Judiciary

Committee again contacted McGahn's private counsel to discuss potential accommodations and

avoid the need for litigation.  *Id.* ¶ 15.  On July 26, 2019, McGahn's counsel rejected all

accommodation efforts for public testimony and confirmed that McGahn would continue to follow the President's directive not to appear. *Id.* ¶ 16. The Judiciary Committee and McGahn are therefore now at an impasse, and further negotiation would be futile. *Id.*

## ARGUMENT

McGahn's refusal to comply with the Judiciary Committee's subpoena is unlawful. The theory on which it stands—that, by virtue of his former role in the White House, McGahn is absolutely immune from Congressional process—is at odds with decades of Supreme Court and D.C. Circuit precedent. The Executive's theory would also diminish Congress's Article I powers, upsetting the delicate balance between the branches established by the Constitution. The Judiciary Committee is investigating Presidential misconduct—obstruction of justice, abuse of power—to protect the institutions of government, to safeguard the independence of law enforcement, and, critically, to determine whether to recommend articles of impeachment. While McGahn stonewalls at the Executive's direction, the Committee is hampered in fulfilling its constitutional responsibilities.

Given the gravity of the Judiciary Committee's duties and the irreparable harm it is suffering, the Committee respectfully submits that a preliminary injunction ordering McGahn to comply with its subpoena is justified and appropriate. In the alternative, the Committee moves for summary judgment, and permanent relief, on the issue of whether McGahn is absolutely immune from testifying.[15] Because "immunity is strictly a legal issue," *Miers*, 558 F. Supp. 2d at 97, it is appropriately addressed on summary judgment, *see Swan v. Clinton*, 100 F.3d 973,

---

[15] *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."). The Committee here reserves seeking summary judgment on the issue of whether the President has waived executive privilege as to the subpoenaed testimony. *E.g.*, Compl. ¶ 112; *id.*, Prayer For Relief ¶ A(3).

976 (D.C. Cir. 1996); *see, e.g.*, *Sanofi-Aventis U.S. LLC v. FDA*, 842 F. Supp. 2d 195, 211-12 (D.D.C. 2012).

In either case, by this motion the Committee seeks an injunction, preliminary or permanent, ordering McGahn to comply with the Committee's subpoena, and a declaration that his failure to do so on the President's claim of absolute immunity is unlawful.  The standards for preliminary and permanent injunctions are "essentially the same," *see Winter v. NRDC*, 555 U.S. 7, 32 (2008) (quotation marks omitted), and either would provide the Committee with the same relief here.  As to declaratory relief, *Miers*—which concerns circumstances precisely like these— explains why this Court should exercise its discretion under the Declaratory Judgment Act in favor of review.  *See* 558 F. Supp. 2d at 94-99.  Perhaps most importantly, "entertaining this case will reinforce" the constitutional "separation of powers."  *See id.* at 99.

For the reasons stated below, this Court has jurisdiction (Part I), the Committee prevails on the merits (Part II), and it has satisfied the other requirements for injunctive relief (Part III).

## I.      This Court Has Authority To Resolve This Case

As in prior subpoena-enforcement actions involving one or both of the political branches, the Court has authority to resolve this case.  Since the Jefferson Administration, Article III courts have decided cases involving subpoenas issued against the Executive Branch.  *United States v. Burr*, 25 F. Cas. 187, 191 (C.C. Va. 1807) (Marshall, C.J.) (subpoena of President Jefferson); *see also, e.g.*, *United States v. Nixon*, 418 U.S. 683 (1974) (subpoena of President Nixon).  In previous subpoena-enforcement disputes between Congress and the Executive, federal courts have reaffirmed that "it is the judiciary that must 'say what the law is.'"  *Miers*, 558 F. Supp. 2d at 97 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)); *see Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 11-12 (D.D.C. 2013); *see also United*

*States v. AT&T* ("*AT&T II*"), 567 F.2d 121, 129 (D.C. Cir. 1977).[16]  Here, as in those previous

cases, federal jurisdiction is proper under 28 U.S.C. § 1331, the Judiciary Committee has

standing, the Committee may seek to enforce its duly authorized subpoena, and this case is

otherwise justiciable.

### A.    This Court Has Subject-Matter Jurisdiction Under 28 U.S.C. § 1331

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, which provides that

"[t]he district courts shall have original jurisdiction of all civil actions arising under the

Constitution."  In this case, the Judiciary Committee seeks to enforce a subpoena for testimony

relevant to its ongoing investigation into Presidential misconduct and its consideration of

whether to recommend articles of impeachment.  Because the Judiciary Committee's "subpoena

power derives implicitly from Article I of the Constitution, the case ar[ises] under the

Constitution for purposes of section 1331."  *Holder*, 979 F. Supp. 2d at 17; *accord Miers*, 558 F.

Supp. 2d at 64-65; *see also United States v. AT&T* ("*AT&T I*"), 551 F.2d 384, 388-89 (D.C. Cir.

1976) (finding federal-question jurisdiction over subpoena dispute between Congress and the

Executive due to the "fundamental constitutional rights" involved).

### B.    The Judiciary Committee Has Standing

The Judiciary Committee has standing to enforce its subpoena for McGahn's testimony.

Courts, including the D.C. Circuit and judges of this Court, have concluded that the House, the

Senate, and duly authorized Congressional committees have standing to sue to enforce their

subpoenas.  *See AT&T I*, 551 F.2d at 391 ("It is clear that the House as a whole has standing to

---

[16] *See also* Prosecution for the Contempt of Congress of an Executive Branch Official Who Has Asserted a
Claim of Executive Privilege, 8 Op. O.L.C. 101, 137 (1984) ("Congress [can] obtain a judicial resolution of the
underlying privilege claim and vindicate its asserted right to obtain any documents by a civil action for enforcement
of a congressional subpoena.").

assert its investigatory power, and can designate a member to act on its behalf.").[17]   The Committee is unaware of any decision to the contrary.  The Committee has been authorized by the House to issue a subpoena to McGahn and to initiate this suit, and it has standing to proceed.

The Judiciary Committee satisfies the requirements of Article III.  The Committee is suffering a "concrete and particularized" injury that is both "fairly traceable to" McGahn's refusal to comply with its subpoena and "redressable by a favorable ruling."  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015) (quotation marks omitted).  "It is well established that a legislative body suffers a redressable injury when that body cannot receive information necessary to carry out its constitutional responsibilities." *Holder*, 979 F. Supp. 2d at 10 (quotation marks and alterations omitted).[18]

*Miers* is squarely on point.  Here, too, the Judiciary Committee has issued a subpoena to a former White House Counsel to testify in aid of a pending investigation, 558 F. Supp. 2d at 61, the former advisor has "refused to comply," and the House has "authorized the Committee to proceed to court," *id.* at 71; *see supra* note 8.  The Committee, then, is "duly authorized" to bring suit, *Holder*, 979 F. Supp. 2d at 14 (citing *Miers*, 558 F. Supp. 2d at 68), and is "an institutional plaintiff asserting an institutional injury," *Miers*, 558 F. Supp. 2d at 71.  As the *Miers* court held under these precise circumstances, "[t]he injury incurred by the Committee, for Article III

---

[17] *See, e.g.*, *Holder*, 979 F. Supp. 2d at 21; *Miers*, 558 F. Supp. 2d at 68; *see also Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 728 (D.C. Cir. 1974) (en banc) (reaching the merits in a suit brought by the Senate Select Committee on Presidential Campaign Activities to enforce a subpoena); *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 86 (D.D.C. 1998), *appeal dismissed*, 525 U.S. 1133 (1999) (concluding that the House had Article III standing in suing to seek "information necessary to perform its constitutional" functions).

[18] *See also U.S. House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8, 16 (D.D.C. 2019), *appeal pending*, No. 19-5176 (D.C. Cir.) (the "'subpoena enforcement cases[]' … hold that the legislature 'has standing to assert its investigatory power'" (quoting *Commerce*, 11 F. Supp. 2d at 86)); *Cummings v. Murphy*, 321 F. Supp. 3d 92, 112 (D.D.C. 2018), *appeal pending*, No. 18-5305 (D.C. Cir.)  ("Courts have not … doubted in the congressional subpoena enforcement context that the Executive Branch's refusal to [comply] is a sufficiently concrete injury." (collecting cases)).

purposes, is both the loss of information to which it is entitled and the institutional diminution of its subpoena power." *Id.*; *see id.* at 78 ("Clear judicial precedent … establishes that the Committee has standing[.]").  Thereafter, the *Holder* court—agreeing with the "persuasive opinion" in *Miers*, 979 F. Supp. 2d at 4, and applying the "squarely" controlling decision by the D.C. Circuit in *AT&T*, *id.* at 20—likewise concluded that a Congressional committee has standing to sue to enforce its subpoena, *see id.* at 20-21.  The same result is required here.

At root, this case concerns injuries to interests held by each body of Congress and its committees separately—the constitutional power to investigate and gather facts, "an attribute" of the Article I "power to legislate." *McGrain*, 273 U.S. at 161.  Moreover, it involves an interest held by the House *exclusively*—the constitutional power of impeachment.  *See* U.S. Const., Art. I, § 2, cl. 5.  Accordingly, the Supreme Court's decision in *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), has no bearing here.  In that case, there was a "mismatch between the body seeking to litigate and the body to which the relevant constitutional provision allegedly assigned … authority." *Id.* at 1953.  No such mismatch exists here.  *See id.* (distinguishing *Arizona State Legislature*, where the Court had held that a state legislature had standing to sue as "an institutional plaintiff asserting an institutional injury," 135 S. Ct. at 2664).  Binding and persuasive precedent establishes that in this case, the Judiciary Committee, duly authorized by the House, may sue to vindicate institutional interests.  *AT&T I*, 551 F.2d at 391; *Holder*, 979 F. Supp. 2d at 21; *Miers*, 558 F. Supp. 2d at 68.

### C.      The Judiciary Committee May Bring This Action To Enforce Its Subpoena

The Judiciary Committee seeks to exercise its subpoena power and its concomitant right to receive information, both of which derive from Article I of the Constitution.  *See McGrain*, 273 U.S. at 175; *see also Holder*, 979 F. Supp. 2d at 22 ("It is well established that the Committee's power to investigate, and its right to further an investigation by issuing subpoenas

and enforcing them in court, derives from the legislative function assigned to Congress in Article I of the Constitution."); *Miers*, 558 F. Supp. 2d at 84 ("[T]here can be no question that Congress has a right—derived from its Article I legislative function—to issue and enforce subpoenas, and a corresponding right to the information that is the subject of such subpoenas."). Absent an enforcement mechanism, these rights would be undermined—and Congress would be hamstrung in its ability to perform its core constitutional functions. Accordingly, as in past cases involving enforcement of Congressional subpoenas, the Judiciary Committee may vindicate these rights in court directly under Article I of the Constitution and through the Declaratory Judgment Act. *See Miers*, 558 F. Supp. 2d at 78-94; *Holder*, 979 F. Supp. 2d at 22-24.

### D.    This Case Is Justiciable

This case is justiciable and appropriate for this Court's review. As described above, after months of attempting to reach an accommodation for McGahn's testimony, the parties are at an impasse. With further negotiations now futile, this Court's involvement is warranted. *See Holder*, 979 F. Supp. 2d at 25 ("It is sufficient that [the Court] finds the conclusion that there is an impasse to be inescapable, and that under those circumstances, it does not appear that there would be any point to sending this matter back.").

Moreover, "the mere fact that there is a conflict between the legislative and executive branches over a Congressional subpoena does not preclude judicial resolution of the conflict." *AT&T I*, 551 F.2d at 390. Courts have found justiciable numerous separation-of-powers disputes between the Executive and Congress. *Holder*, 979 F. Supp. 2d at 4; *Miers*, 558 F. Supp. 2d at 84-85; *see AT&T II*, 567 F.2d at 125-130; *Senate Select Comm.*, 498 F.2d at 728; *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977). Indeed, "endorsing the proposition that the executive may assert an unreviewable right to withhold materials from the legislature would offend the Constitution more than undertaking to resolve the specific dispute that has been

presented here.  After all, the Constitution contemplates not only a separation, but a balance, of

powers." *Holder*, 979 F. Supp. 2d at 3; *see Nixon v. Sirica*, 487 F.2d 700, 715 (D.C. Cir. 1973)

("To leave the proper scope and application of Executive privilege to the President's sole

discretion would represent a mixing, rather than a separation, of Executive and Judicial

functions.").  In addition, judicial review is particularly appropriate where, as here, "the narrow

legal question posed by the complaint is precisely the sort of crisp legal issue that courts are

well-equipped to address and routinely called upon to resolve." *Holder*, 979 F. Supp. 2d at 4.

## II.     President Trump's Directive That McGahn Not Testify Has No Valid Basis In Law

Pursuant to its Article I powers, the Judiciary Committee is investigating Presidential

misconduct.  Its investigation is critical to its determination whether to recommend articles of

impeachment against the President, and will also inform its legislative and oversight functions.

As part of its investigation, the Committee is constitutionally authorized to compel McGahn to

testify.

Simply put, President Trump's claim that McGahn, whom the President has publicly

accused of giving false statements to the Special Counsel, is absolutely immune from testifying

before the Judiciary Committee is wrong as a matter of law.  It reflects a serious and fundamental

misunderstanding of the position of the Executive with regard to the constitutional powers and

prerogatives of the other two branches of our federal government:  Congress and the Judiciary.

This position must be emphatically rejected now, as it has been before.

### A.     McGahn Has A Legal Obligation To Appear Before The Judiciary
### Committee In Response To A Lawfully Issued Congressional Subpoena

The Judiciary Committee has issued a subpoena for McGahn's testimony in connection

with its investigation into Presidential misconduct and consideration of whether to recommend

articles of impeachment.  Tatelman Decl., Ex U.  In light of that subpoena, McGahn's legal

obligation is straightforward:  he must appear and testify before the Committee.  *See Sirica*, 487

F.2d at 737 ("[A] congressional subpoena … carries at least as much weight as a judicial

subpoena[.]").

"The Supreme Court has made it abundantly clear that compliance with a congressional

subpoena is a legal requirement."  *Miers*, 558 F. Supp. 2d at 99.  The Court has long recognized

that Congress's Article I authority to conduct investigations depends on the ability to compel

witness testimony.  *McGrain*, 273 U.S. at 175 ("Experience has taught that mere requests for

such information often are unavailing … so some means of compulsion are essential to obtain

what is needed.");  *Eastland*, 421 U.S. at 504 ("Issuance of subpoenas … has long been held to be

a legitimate use by Congress of its power to investigate.").  Accordingly, "[i]t is unquestionably

the duty of all citizens to cooperate with Congress in its efforts to obtain the facts needed" for the

exercise of its constitutional functions.  *Watkins v. United States*, 354 U.S. 178, 187-88 (1957).

More specifically, "[i]t is their unremitting obligation to respond to subpoenas, to respect the

dignity of the Congress and its committees and to testify fully with respect to matters within the

province of proper investigations."  *Id.* at 187-88; *see United States v. Bryan*, 339 U.S. 323, 331

(1950) ("We have often iterated the importance of this public duty [to comply with

Congressional subpoenas], which every person within the jurisdiction of the Government is

bound to perform[.]").

In this case, McGahn's refusal to comply with Judiciary Committee's subpoena is based

solely on the "direct[ion]" of President Trump.  Tatelman Decl., Ex. X at 1 (stating that McGahn

is "facing contradictory instructions from two co-equal branches of government").  But the

President's direction to disobey a legal command from a coequal branch of government does not

create a conflicting legal obligation.  "The President's authority to act … 'must stem from either

an act of Congress or from the Constitution itself.'"  *Medellin v. Texas*, 552 U.S. 491, 524 (2008)

(quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)).  The White

House's letter to the Judiciary Committee, however, cites no authority for the President's

instruction to disobey Congress, Tatelman Decl., Ex. B—and there is none.  Directing McGahn,

a former White House employee no longer subject to the President's control, to ignore a

Congressional subpoena is no more permissible than directing a private litigant to defy an order

of this Court.  *See Bryan*, 339 U.S. at 331 ("[P]ersons summoned as witnesses by competent

authority have certain minimum duties and obligations which are necessary concessions to the

public interest in the orderly operation of legislative and judicial machinery.  A subpoena has

never been treated as an invitation to a game of hare and hounds, in which the witness must

testify only if cornered at the end of the chase.").

**B.  Presidential Advisors Do Not Enjoy "Absolute Immunity" From Compelled Congressional Testimony**

In an effort to justify the President's direction to McGahn, the White House solicited an

OLC opinion asserting that McGahn, as a former Presidential advisor, is "absolutely immune"

from being compelled to testify before Congress.  *See* Tatelman Decl., Ex. C.  But this invented

doctrine has been soundly rejected by the only court to consider it, and for good reason:  it is

unsupported in the law, contravenes decades-old precedent rejecting absolute immunity in

similar contexts, and violates separation-of-powers principles by impairing Congress's ability to

fulfill its constitutional functions.

**1.  No Legal Authority Supports Absolute Immunity For Presidential Advisors**

The Executive's theory of absolute immunity finds no support in the Constitution, federal

statutes, or judicial precedent.  Indeed, in 2008, the only court to have considered the doctrine

rejected it outright in circumstances nearly identical to this case (save for the absence of an

ongoing impeachment investigation). *Miers*, 558 F. Supp. 2d 53.  As noted above, in *Miers*,

Judge Bates denied the Executive's contention that a former White House Counsel was

absolutely immune from testifying before the Judiciary Committee.  *Id.* at 108.  He found that

the Executive's theory had no basis in law and declared that the former White House Counsel

was required to testify.  *Id.* at 99-108.  Despite this clear authority, OLC has continued to advise

former and current senior White House advisors that they are absolutely immune from compelled

Congressional testimony, stating that it "respectfully disagree[s] with [Judge Bates's] conclusion

in *Miers*."  Tatelman Decl., Ex. C at 10; *see* Testimonial Immunity Before Congress of the

Assistant to the President and Senior Counselor to the President, 43 Op. O.L.C., 2019 WL

3383723 (2019); Immunity of the Assistant to the President and Director of the Office of

Political Strategy and Outreach from Congressional Subpoena, 38 Op. O.L.C., 2014 WL

10788678 (2014).

OLC's position has no more support in the law today than it did in 2008.  As Judge Bates

observed then, "[t]he Executive cannot identify a single judicial opinion that recognizes absolute

immunity for senior presidential advisors in this or any other context.  That simple yet critical

fact bears repeating:  the asserted absolute immunity claim here is entirely unsupported by

existing case law."  *Miers*, 558 F. Supp. 2d at 99.  Eleven years later, that fact remains

unchanged, as OLC's opinion itself demonstrates.  *See generally* Tatelman Decl., Ex. C.

Lacking any authority supporting its theory, OLC attempts to analogize to the Supreme

Court's decision in *Gravel v. United States*, 408 U.S. 606 (1972).  Tatelman Decl., Ex. C at 9.

This line of argument, however, "has been virtually foreclosed by the Supreme Court."  *Miers*,

558 F. Supp. 2d at 100.  *Gravel* held that Congressional aides are entitled to derivative immunity

from testifying about legislative acts under the Speech or Debate Clause because they are "alter

egos" of the Members they serve.  408 U.S. at 616-22.  If Congressional aides are entitled to

such immunity, the reasoning goes, then senior Presidential advisors must share in any

testimonial immunity the President has.  But to dispense with this argument this Court need not

address the scope of the President's theoretical immunity:  the Supreme Court already has

declined to extend *Gravel*'s "alter ego" concept to Presidential advisors.  In *Harlow v.*

*Fitzgerald*, the Court held that Presidential aides, unlike the President, are not absolutely immune

from civil damages liability based on their official acts, rejecting the analogy to *Gravel* as

"sweep[ing] too far."  457 U.S. 800, 810 (1982); *see Miers*, 558 F. Supp. 2d at 101 ("[T]he

Executive asks this Court to recognize precisely the type of blanket derivative absolute immunity

that the Supreme Court declined to acknowledge in *Harlow*.").

The Supreme Court's conclusion in *Harlow* accords with precedent holding that "[t]he

President's unique status under the Constitution distinguishes him from other executive

officials," and that he is therefore entitled to greater protections in certain contexts.  *Nixon v.*

*Fitzgerald*, 457 U.S. 731, 750 (1982); *see also Butz v. Economou*, 438 U.S. 478, 504 (1978) (no

absolute immunity for cabinet-level officials from civil suit for official acts); *In re Sealed Case*,

121 F.3d 729, 748 (D.C. Cir. 1997); *In re Kessler*, 100 F.3d 1015, 1017 (D.C. Cir. 1996) ("[F]or

purposes of separation of powers, the President stands in an entirely different position than other

members of the executive branch.").  Accordingly, as *Miers* recognized, "[t]he derivative, 'alter

ego' immunity that the Executive requests here … has been explicitly and definitively rejected."

558 F. Supp. 2d at 101.

### 2.    The Executive's Position Contravenes Settled Precedent Rejecting Absolute Immunity In Similar Contexts

Not only is absolute testimonial immunity for Presidential advisors unsupported by any

case law, but the very notion contravenes a long line of precedent rejecting Executive Branch

claims of absolute *Presidential* immunity in closely analogous settings.  Most significantly, it has

been well established, since 1807, that the President can be compelled to respond to subpoenas

for documents, and courts have long denied the Executive's contention that the President enjoys

an "absolute privilege" in that context.  *See Burr*, 25 F. Cas. at 191-92 (President Jefferson could

be compelled to produce documents based on a showing of need); *see also United States v.*

*Nixon*, 418 U.S. at 705-07 (President cannot claim absolute privilege in response to judicial

subpoena); *Senate Select Comm.*, 498 F.2d at 731 (President cannot claim absolute privilege in

response to Congressional subpoena).

　　　During the Watergate era, the Supreme Court and the D.C. Circuit definitively rejected

the contention that the Executive has an absolute privilege from compulsory process, when

President Nixon defied several subpoenas for audiotapes containing Presidential

communications.  In *United States v. Nixon*, the President resisted a judicial subpoena requiring

production of the tapes for use in a criminal trial, arguing that the constitutional separation of

powers dictated that the President was absolutely privileged from responding to judicial

compulsion.  418 U.S. at 686.  The Supreme Court disagreed, explaining that "neither the

doctrine of separation of powers nor the need for confidentiality of high-level communications,

without more, can sustain an absolute, unqualified Presidential privilege of immunity … under

all circumstances."  *Id*. at 706; *see In re Sealed Case*, 121 F.3d at 743.  The Court emphasized

that "[t]he impediment that an absolute, unqualified privilege would place in the way of the

primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions."  *Nixon*,

418 U.S. at 707.  According to the Court, such a doctrine

> would plainly conflict with the function of the courts under Art. III. … To read the
> Art. II powers of the President as providing an absolute privilege as against a
> subpoena essential to enforcement of criminal statutes on no more than a
> generalized claim of public interest in confidentiality … would upset the

constitutional balance of "a workable government" and gravely impair the role of
the courts under Art. III.

*Id.*

For similar reasons, the D.C. Circuit also denied President Nixon's claim of absolute

privilege over the tapes in response to a grand jury subpoena, refusing the President's

"invitations to refashion the Constitution" and noting that "[t]he Constitution mentions no

Executive privileges, much less any absolute Executive privileges." *Sirica*, 487 F.2d at 711,

715; *see id.* at 713 ("[C]ounsel for the President can point to no case in which a court has

accepted the Executive's mere assertion of privilege as sufficient to overcome the need of the

party subpoenaing the documents."). The D.C. Circuit also recognized that absolute privilege

did not apply in response to a subpoena for the tapes from the Senate Select Committee on

Presidential Campaign Activities. *Senate Select Comm.*, 498 F.2d at 731. In addition, courts

have denied claims of absolute privilege over Presidential communications in civil litigation.

*See Dellums v. Powell*, 561 F.2d 242, 245-48  (D.C. Cir. 1977); *Sun Oil Co. v. United States*, 514

F.2d 1020, 1024 (Ct. Cl. 1975); *cf. Clinton v. Jones*, 520 U.S. 681 (1997) (holding that the

President is not absolutely immune from a civil action arising from his personal conduct).

These courts uniformly have held that the President enjoys only a qualified privilege over

Presidential communications, which requires a case-by-case balancing of competing

constitutional values consistent with separation-of-powers principles. *See, e.g.*, *Nixon*, 418 U.S.

at 705-08; *Sirica*, 487 F.2d at 716-17. In particular, "application of Executive privilege depends

on a weighing of the public interest protected by the privilege against the public interests that

would be served by disclosure in a particular case." *Sirica*, 487 F.2d at 716. Executive

privilege, therefore, "can be overcome by an adequate showing of need" by a coequal branch. *In

re Sealed Case*, 121 F.3d at 745; *see Senate Select Comm.*, 498 F.2d at 731. Thus, for example,

the Supreme Court in *Nixon* and the D.C. Circuit in *Sirica* held that President Nixon's generalized interest in confidentiality had to yield when weighed against the judiciary's overriding need for relevant evidence in specific criminal investigations or prosecutions. *Nixon*, 418 U.S. at 711-13; *Sirica*, 487 F.2d at 716-18.

Here, though repackaged as "absolute immunity," the Executive's theory is at bottom the same "absolute privilege" argument that courts already have rejected outright. OLC's justification for a sweeping absolute testimonial immunity for senior Presidential advisors— which it admits is even "broader than[] executive privilege," Tatelman Decl., Ex. C at 3—relies heavily on the "Executive Branch's strong interests in confidentiality," and the notion that "compelled congressional testimony create[s] an inherent and substantial risk of inadvertent or coerced disclosure of confidential information," *id.* at 4 (quotation marks omitted). But, as discussed above, ample Supreme Court and D.C. Circuit precedent makes clear that such generalized confidentiality concerns regarding Executive Branch communications are properly addressed through a case-specific assertion of executive privilege and weighing of competing interests, rather than through blanket immunity. *See Nixon*, 418 U.S. at 713 ("[W]hen the ground for asserting privilege as to subpoenaed materials … is based only on the generalized interest in confidentiality, it … must yield to the demonstrated, specific need for evidence[.]"); *Sirica*, 487 F.2d at 715 (Executive's interest in confidentiality "is an argument for recognizing Executive privilege … , not for making the Executive the judge of its own privilege"). As Judge Bates recognized in *Miers*, "a claim of absolute immunity from compulsory process cannot be erected by the Executive as a surrogate for the claim of absolute executive privilege already firmly rejected by the courts." 558 F. Supp. 2d at 103.

OLC also offers policy arguments to bolster its case for absolute testimonial immunity for Presidential advisors, but those arguments either are sufficiently addressed by a qualified executive privilege or simply are incorrect.  For example, OLC asserts that the prospect of having to testify before Congress could chill Presidential advisors from giving him candid or unpopular advice.  Tatelman Decl., Ex. C at 5.  The Supreme Court, however, acknowledged this same concern when it rejected the Executive's absolute privilege claim in *Nixon*, explaining that "[t]hese are the considerations justifying a *presumptive* privilege for Presidential communications."  418 U.S. at 708 (emphasis added) (concluding that a qualified privilege is sufficient to protect "the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking").  In addition, the Supreme Court has held that Presidential advisors are subject to civil suits for their official acts, *see Harlow*, 457 U.S. at 807-09, and "civil suits for money damages present a greater potential risk for such a chilling effect," *Miers*, 558 F. Supp. 2d at 101-02.

OLC also claims that, because much of a Presidential advisor's testimony "would fall within the scope of executive privilege, compelling the adviser's appearance is not likely to promote any valid legislative interests."  Tatelman Decl., Ex. C at 5.  But it is not for the Executive to opine on what constitutes a "valid legislative interest."  And this argument incorrectly "mak[es] the Executive the judge of its own privilege," which is precisely what the qualified privilege doctrine seeks to avoid.  *Sirica*, 487 F.2d at 715.[19]

---

[19] Although OLC also contends that historical practice supports its conclusion that Presidential advisors are absolutely immune from testifying before Congress, *see* Tatelman Decl., Ex. C at 5-10, that position is undercut by the fact that "senior advisors to the President have often testified before Congress," both under subpoena and voluntarily.  *Miers*, 558 F. Supp. 2d at 102.  For example, several aides to President Nixon testified before the Senate Select Committee on Presidential Campaign Activities in connection with the Watergate investigation.  *See, e.g.*, *Presidential Campaign Activities of 1972: Hearings Before the S. Select Comm. on Presidential Campaign Activities*, 93rd Cong. 911-1094 (1973) (testimony of John Dean); *id.* at 2866-906, 3017-229 (testimony of H.R. Haldeman).  Similarly, multiple White House aides testified before committees of the House and Senate during

### 3.      Absolute Immunity Would Violate Separation-Of-Powers Principles

As in *Nixon*, the Executive's absolute immunity theory also threatens the separation of

powers when invoked in the context of compelled Congressional testimony.  As the Supreme

Court has recognized, "the separation-of-powers doctrine requires that a branch not impair

another in the performance of its constitutional duties."  *Jones*, 520 U.S. at 701 (quoting *Loving*

*v. United States*, 517 U.S. 748, 757 (1996)); *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. at

443.  By impeding Congress's access to information important for its impeachment, legislative,

and oversight functions under the Constitution, the Executive's claim of absolute immunity

would do precisely that.  *See Miers*, 558 F. Supp. 2d at 103, 106 (warning that absolute

testimonial immunity for Presidential advisors "would eviscerate Congress's historical oversight

function," and that "Congress's legitimate interest in inquiry could be easily thwarted"); *see also*

*Sirica*, 487 F.2d at 715 ("If the claim of absolute privilege was recognized, its mere invocation

by the President or his surrogates could deny access to all documents in all the Executive

departments to all citizens and their representatives, *including Congress*[.]" (emphasis added)).

Here, the Judiciary Committee's need for information relevant to the discharge of its

constitutional duties is at its zenith.  The Committee is investigating serious allegations of

Presidential misconduct.  Were its fact-finding crucial only to its consideration of pending

legislation and its oversight duties, that alone would be enough.  But the Judiciary Committee is

also evaluating whether to recommend articles of impeachment—a responsibility expressly

assigned to the House by the Constitution.  U.S. Const., Art. I, § 2, cl. 5; *see Senate Select*

---

investigations related to the Madison Guaranty Savings and Loan Association, the Whitewater Development
Corporation, and alleged campaign fund-raising abuses.  *See, e.g.*, *White House Contacts with Treasury/RTC*
*Officials About "Whitewater"-Related Matters—Part 2: Hearing Before the H. Comm. on Banking, Finance, and*
*Urban Affairs*, 103d Cong., 7-96 (1994) (testimony of Bernard Nussbaum); *id.* at 97-200 (testimony of Thomas F.
McLarty).

*Comm.*, 498 F.2d at 732.  During the Watergate controversy, Judge Sirica described "an impeachment investigation involving the President of the United States" as "a matter of the most critical moment to the Nation," noting that "[i]t would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on all the pertinent information."  *In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to the House of Representatives*, 370 F. Supp. 1219, 1230 (D.D.C. 1974).  But the Committee's ability to conduct an "unswervingly fair" impeachment investigation will be impaired if it cannot obtain the important testimony and other pertinent information it should have to conduct the best possible examination of the President's misconduct.

Moreover, absolute testimonial immunity for Presidential advisors is particularly inappropriate where, as here, the investigation at issue concerns impeachment of the President and the purported doctrine is invocable by the President himself.  The Executive's position would allow the President to greatly hinder the Judiciary Committee's investigative power by blocking the Committee's access to key evidence relevant to his own misdeeds.  When, as in this case, Presidential advisors are significant witnesses to potentially unlawful activities, the Executive's position effectively places the President above the law, including the constitutional impeachment process.

OLC has long taken the position that the President cannot be prosecuted for crimes while in office, citing "the constitutionally specified impeachment process" as assurance that the President will remain accountable for any misconduct while in office.  A Sitting President's Amenability to Indictment and Criminal Prosecution, 24 Op. O.L.C. 222, 257, 2000 WL 33711291, at *27 (2000); *cf. Jones*, 520 U.S. at 696 ("With respect to acts taken in his 'public

character'—that is, official acts—the President may be disciplined principally by impeachment."); *Fitzgerald*, 457 U.S. at 757 (recognizing that, even though Presidents are absolutely immune from civil suits for official misconduct, "[t]here remains the constitutional remedy of impeachment" to hold the President accountable).  This reasoning is consistent with the Special Counsel's acknowledgment that the "Constitution requires a process other than the criminal justice system to formally accuse a sitting President of wrongdoing."  *Special Counsel Robert S. Mueller III Makes Statement on Investigation into Russian Interference in the 2016 Presidential Election*, U.S. Dep't of Justice (May 29, 2019), https://perma.cc/7JY5-48XJ.  The Executive's contention that the President is both immune from criminal prosecution *and* able to direct his former advisors to refuse to provide highly relevant testimony in an impeachment investigation would allow the President to remain unaccountable for wrongdoing while in office.

## III.    The Judiciary Committee, Obstructed In Fulfilling Its Constitutional Responsibilities, Requires Injunctive Relief

The very nature of the Committee's investigation speaks to its urgency:  the Committee is examining conduct by a sitting President that strikes at the foundations of the rule of law. President Trump's conduct may constitute obstruction of justice and other abuses of office; it may comprise impeachable offenses.  McGahn is the single most important witness in the Committee's investigation of the President's wrongdoing.  The Executive's directive preventing McGahn from complying with the Committee's subpoena stands in the way of the Committee's work.

This Court should issue an injunction requiring McGahn to appear before the Committee. For the reasons stated above, the Committee has demonstrated that it succeeds on the merits.  *See Winter*, 555 U.S. at 20.  For the reasons stated below, the Committee will suffer irreparable

injury in the absence of injunctive relief, and the balance of the equities and the public interest are in its favor.  *See id.*  Under these exigent circumstances, an injunction should issue.

### A.    McGahn's Refusal To Testify Is Causing The Committee Irreparable Harm

Pursuant to its Article I powers and duties, the Judiciary Committee is investigating the President's concerted efforts, described at length in the Special Counsel's Report, to undermine, constrain, or terminate an investigation into a hostile nation's attack against our democracy.  As explained above, *see supra* pp. 14-16, McGahn's perspective is unique because he was witness to many of the events described in the Report.  Without McGahn's testimony, the Committee is deprived of important information to which it is entitled.  That alone ordinarily suffices for irreparable injury:  as another judge of this Court has explained, "where an obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate."  *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 110 (D.D.C. 2017).  Yet this is no ordinary case.  By refusing to permit McGahn to comply with the subpoena and to permit the Committee to assess the full facts and circumstances surrounding the President's actions, the Executive is improperly hindering the Committee from discharging its constitutional duty to determine whether to recommend articles of impeachment, and obstructing its legislative and oversight functions.

When, as here, the Judiciary Committee has begun an investigation into Presidential impeachment, its "investigative authority … with respect to presidential conduct has an express constitutional source."  *Senate Select Comm.*, 498 F.2d at 732 (citing U.S. Const., Art. I, § 2).  The Constitution provides that "[t]he House of Representatives … shall have the sole Power of Impeachment," U.S. Const., Art. I, § 2, cl. 5, and that "[t]he Senate shall have the sole Power to try all Impeachments," U.S. Const., Art. I, § 3, cl. 5.  The structure of the impeachment power makes clear that Congress's consideration of this remedy is among the most important of its

constitutional obligations.  Impeachment provides a mechanism for the House and Senate to remove the President from office before his term is over, when the circumstances so warrant.  As James Madison explained, "[t]he limitation of the period of [the President's] service[] was not a sufficient security" against incapacity or corruption, which could be "fatal to the Republic."  2 *The Records of the Constitutional Convention of 1787*, at 65-66 (Max Farrand ed., 1911).  Thus, by empowering Congress to impeach, "the Framers themselves" recognized "the public interest in *immediately* removing a sitting President whose continuation in office poses a threat to the Nation's welfare."  A Sitting President's Amenability to Indictment and Criminal Prosecution, 24 Op. O.L.C. at 258, 2000 WL 33711291, at *27 (emphasis added).  McGahn's refusal to testify at the Executive's direction is undermining the Committee's ability to complete its investigation with the urgency that the Constitution requires.

McGahn and the Executive are also imperiling the Committee's Article I legislative powers and its related power to secure "needed information."  *McGrain*, 273 U.S. at 161; *see id.* at 174 ("[Congress's] power of inquiry—*with process to enforce it*—is an essential and appropriate auxiliary to the legislative function" (emphasis added)).  The Judiciary Committee is considering at least eight bills related to the events identified in the Special Counsel's Report, events about which McGahn possesses unique knowledge.  *See* Compl. ¶ 62 & n.143.  One such bill, for example, would require disclosure to Congress and oversight bodies within DOJ of certain contacts between the White House and DOJ that pertain to ongoing enforcement matters.  *Id.*; *see* Security from Political Interference in Justice Act, H.R. 3380, 116th Cong. (2019).  Such a law might serve as a check against precisely the kind of political interference in law enforcement that the Report says McGahn witnessed—interference that may be ongoing and may require immediate intervention.  *See, e.g.*, *supra* at pp. 7-8 (Report recounts that the President

enlisted McGahn to tell Attorney General Sessions not to recuse himself from the Russia investigation); *supra* at pp. 8-9 (Report recounts that the President ordered McGahn to remove the Special Counsel); *see also* Compl. ¶ 101.

The Committee "cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to effect or change; and where the legislative body does not itself possess the requisite information … recourse *must be had* to others who do possess it." *McGrain*, 273 U.S. at 175 (emphasis added). The same principle applies to oversight. McGahn's testimony is significant for the Judiciary Committee to adequately guard against any improper political interference with, at a minimum, the many criminal investigatory matters that the Special Counsel's Office referred to other DOJ offices. *See supra* p. 14; *see also* Compl. ¶¶ 98, 101. "[A]ccording to the Supreme Court, the ability to compel testimony is '*necessary to the effective functioning of … legislatures*.'" *Miers*, 558 F. Supp. 2d at 102 (quoting *Bryan*, 339 U.S. at 331). And where Congressional "committees have alleged a pressing need for … subpoenaed [information] to further their investigation, … it is not the role of the Court … to second guess that need." Tr. of Opinion at 85:2-5, *Trump v. Deutsche Bank*, No. 19-cv-3826 (S.D.N.Y. May 22, 2019) (attached as Tatelman Decl., Ex. MM), *appeal pending*, No. 19-1540 (2d Cir.); *cf. United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 497 (2001) ("Once Congress, exercising its delegated powers, has decided the order of priorities in a given area [through legislation], it is … for the courts to enforce them when enforcement is sought." (quotation marks omitted)).

As demonstrated above, *see supra* Part I(B), the Judiciary Committee "suffers a redressable injury when [it] cannot receive information necessary to carry out its constitutional responsibilities." *Miers*, 558 F. Supp. 2d at 67 (quoting *Commerce*, 11 F. Supp. 2d at 86). That

injury is "beyond remediation"; it is irreparable. *League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016). Each day that McGahn refuses to testify, he obstructs the Committee's determination whether to recommend that the President be impeached. Each day that McGahn refuses to testify, he deprives the Committee of testimony relevant to its consideration of legislation and its conduct of oversight. Each day that goes by without McGahn's testimony "increase[s] the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts." *Jones*, 520 U.S. at 707-08. "Indeed, the D.C. Circuit has held that stale information is of little value … and that the harm in delaying disclosure is not necessarily redressed even if the information is provided at some later date[.]" *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 319 (D.D.C. 2017) (citation and quotation marks omitted) (citing *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988); *Byrd v. EPA*, 174 F.3d 23, 244 (D.C. Cir. 1999)).

The Committee's work here is not only time-sensitive. It is also time-*intensive*— particularly given the thorough consideration required in determining whether to recommend articles of impeachment—and, critically, time-limited. "[B]ecause the House of Representatives is not a 'continuing body,' *see Eastland*, 421 U.S. at 512, any delay in the proceedings may result in irreparable harm to the [Committee]." Tr. of Op. at 85:9-12, *Trump v. Deutsche Bank*; *see also Comm. on the Judiciary v. Miers*, 575 F. Supp. 2d 201, 207 (D.D.C. 2008) (suggesting that the Judiciary Committee would have a claim to irreparable harm where, absent relief, "the Committee would very likely be denied … testimony … which it has deemed vital to its investigation, prior to the lapse of Congress"). McGahn's refusal to testify, at the Executive's direction, is already causing the Committee irreparable harm. It will be compounded if the

Executive prevents the Committee from discharging its constitutional duties before the current Congress ends.

The Committee's injury is "certain and great." *Newby*, 838 F.3d at 7.  Courts have recognized that analogous invasions of constitutional prerogatives cause irreparable harm.  For example, "suits for declaratory and injunctive relief against the threatened invasion of a [personal] constitutional right do not ordinarily require proof of an injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quotation marks omitted).  And "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (quotation marks omitted).  Here, the Executive's baseless directive to McGahn is hindering the Judiciary Committee's performance of its constitutionally mandated duties.  That constitutional injury is no less irreparable than those suffered by a private litigant enforcing a personal right or a state prevented from implementing a statute.

**B.     Enabling The Committee's Investigation To Proceed With McGahn's Testimony Serves Equity And Advances The Public Interest**

The balance of equities and the public interest are in the Judiciary Committee's favor. The Committee has subpoenaed testimony key to its investigation, and as the D.C. Circuit has observed, there is a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress." *Exxon Corp. v. FTC*, 589 F.2d 582, 594 (D.C. Cir. 1978).  That is particularly so when impeachment is at stake—when "[i]t would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on all the pertinent information." *In re Report & Recommendation of June 5, 1972 Grand Jury*, 370 F. Supp. at 1230.

On the other side of the ledger, McGahn has no valid interest in defying the Committee's subpoena, as it is his "unremitting obligation" to respond to it. *Watkins*, 354 U.S. at 187. The Executive has no more valid interest in unlawfully preventing McGahn's testimony to Congress than it would have in "enforcement of an unconstitutional law," which "is always contrary to the public interest." *Gordon*, 721 F.3d at 653. And the President has no legitimate interest in "us[ing] privilege as a tool for manipulation of the truth-seeking process," *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 145 (D.C. Cir. 2015) (quotation marks omitted), by accusing McGahn of fabricating facts but preventing him from telling his side of the story.

Indeed, any valid interests the Executive has in confidentiality—notwithstanding what it has already disclosed—can be protected adequately through means far less drastic than absolute immunity: President Trump may instruct McGahn to "invoke executive privilege as appropriate on a question-by-question basis." *Comm. on the Judiciary v. Miers*, 575 F. Supp. 2d at 209. Thus, "the public's interest in the Committee completing its investigation … is more concrete." *Id.* McGahn's testimony is immensely important for the Committee to "determine what remedial legislative steps, if any, should be taken," *id.*, in response to the President's misconduct—and, of utmost importance, to determine whether to recommend articles of impeachment against him. McGahn and the Executive Branch must not be permitted to prevent the Committee from fulfilling its constitutional responsibilities.

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction ordering McGahn to comply with the Judiciary Committee's subpoena. In the alternative, the Court should grant summary judgment to the Committee on the issue of absolute immunity, declare that the Executive's directive that McGahn not appear is unlawful, and order McGahn to appear.

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (D.C. Bar No. 253492)
  *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
  *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854)
  *Associate General Counsel*
Josephine Morse (D.C. Bar No. 1531317)
  *Associate General Counsel*
Adam A. Grogg (D.C. Bar No. 1552438)
  *Assistant General Counsel*
Sarah E. Clouse (MA Bar No. 688187)
  *Attorney*
OFFICE OF GENERAL COUNSEL[*]
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

Annie L. Owens (D.C. Bar No. 976604)
Joshua A. Geltzer (D.C. Bar No. 1018768)
Seth Wayne (D.C. Bar No. 888273455)
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, D.C. 20001
Telephone: (202) 662-9042
ao700@georgetown.edu

*Counsel for Plaintiff Committee on the Judiciary of
the U.S. House of Representatives*

August 26, 2019

---

[*] The Office of General Counsel wishes to acknowledge the assistance of law clerks Christine Coogle, a student at The George Washington University Law School, Lily Hsu, a student at The George Washington University Law School, and Nate King, a student at The Catholic University of America, Columbus School of Law, in preparing this memorandum.