**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff,*

v.

DONALD F. MCGAHN, II,

*Defendant.*

Case No.  1:19-cv-2379-KBJ

## DECLARATION OF BARRY H. BERKE

I, Barry H. Berke, pursuant to the provisions of 28 U.S.C. § 1746, declare and say:

1.     I am a Consultant for the Committee on the Judiciary of the United States

House of Representatives (Judiciary Committee).  I have served in this capacity since

February 13, 2019.

2.     On April 22, 2019, the Judiciary Committee issued a subpoena *ad testificandum*

to former White House Counsel Donald F. McGahn, II with a return date of May 21, 2019

(McGahn Subpoena).  A true and correct copy of the April 22, 2019 subpoena *ad*

*testificandum* is attached hereto as Exhibit 1.

3.     From April 22 through May 20, 2019, on behalf of the Judiciary Committee, I

engaged in a series of communications with William A. Burck, private counsel for Mr.

McGahn.  The purpose of these communications was to determine if Mr. Burck and the

Committee could reach a mutually acceptable accommodation regarding compliance with the

McGahn Subpoena.

4.     On both May 2 and May 10, 2019, I had telephone conversations with Mr.

Burck during which Mr. McGahn's potential testimony was discussed. In both conversations

the possibility that the White House might issue a directive in direct conflict with Mr.

McGahn's legal obligation under the Committee's subpoena was considered. During those

conversations, Mr. Burck did not indicate what Mr. McGahn's ultimate decision would be

should that scenario arise.

5.     On May 20, 2019, Judiciary Committee Chairman Jerrold Nadler received a

letter from White House Counsel Pat A. Cipollone stating that "the President has directed Mr.

McGahn not to appear at the Committee's scheduled hearing on Tuesday, May 21, 2019." A

true and correct copy of the May 20, 2019 letter from Mr. Cipollone to Chairman Nadler is

attached hereto as Exhibit 2. Mr. Cipollone's letter also attached a Department of Justice

Office of Legal Counsel opinion. That opinion asserts that, as a former senior advisor to the

President, Mr. McGahn is absolutely immune from Congressional process. A true and

correct copy of the May 20, 2019 Office of Legal Counsel opinion is attached hereto as

Exhibit 3.

6.     Also on May 20, Chairman Nadler received a letter from Mr. Burck stating that

Mr. McGahn, "conscious of the duties he, as an attorney, owes to his former client . . . must

decline to appear at the hearing tomorrow." The letter further stated that "the Committee's

dispute is not with Mr. McGahn but with the White House," and that "[i]n the event an

accommodation is agreed between the Committee and the White House, Mr. McGahn will of

course comply with that accommodation." A true and correct copy of the May 20, 2019

letter from Mr. Burck to Chairman Nadler is attached hereto as Exhibit 4.

7.     On May 31, 2019, Chairman Nadler wrote to both Mr. McGahn and Mr.

Cipollone offering to discuss reasonable accommodations for Mr. McGahn's appearance.

Chairman Nadler requested that Mr. McGahn inform the Judiciary Committee whether he was willing to engage in accommodation discussions by June 7, 2019. A true and correct copy of the May 31, 2019 letter from Chairman Nadler is attached hereto as Exhibit 5. Neither Mr. McGahn nor the White House responded to the May 31 letter.

8.      On June 17, 2019, I sent an email to Michael Purpura, Deputy Counsel to the President, requesting a telephone call to discuss, among other subjects, the McGahn Subpoena. That same afternoon, I participated in a call with Mr. Purpura and Patrick Philbin, Deputy Counsel to the President (White House representatives), who I understood were authorized to negotiate on behalf of the White House. Also participating on that call was Judiciary Committee Consultant Norman Eisen. On behalf of the Judiciary Committee, I indicated that we would like to see if we could reach a compromise regarding Mr. McGahn's testimony. I stated that the Committee was willing to discuss limiting the subject matters of Mr. McGahn's testimony to those areas that overlap with the *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* of Special Counsel Robert S. Mueller, III (Mueller Report), if we could otherwise reach agreement. I also stated that excluding from Mr. McGahn's testimony other issues, such as the controversy over the White House security clearance processes, was something that could be discussed as part of any potential agreement. I made clear that during any negotiations, all offered accommodations were part of a compromise and were contingent on reaching an agreement for Mr. McGahn's prompt testimony. Mr. Purpura responded that he would need to get guidance from others in the White House Counsel's Office, including Mr. Cipollone, before responding to our offer. No resolution was reached on that call.

9.      On June 18, 2019, a second call took place with the same participants, plus Judiciary Committee Minority Chief Oversight Counsel Carlton Davis, to discuss Mr.

McGahn's public testimony as well as other outstanding issues regarding the Committee's

investigation. On that call the White House representatives indicated that they had given

some thought to the issue of Mr. McGahn testifying and were willing to discuss it. The fact

that information from Mr. McGahn was already public via the Mueller Report was discussed,

as was the issue of absolute immunity, but no agreement was reached.

10.     On June 21, 2019, a third call was held with the same participants as were on

the June 18 call. Mr. McGahn's possible testimony was again discussed, including the

parameters of the White House's claim of absolute immunity. On behalf of the Judiciary

Committee, Mr. Eisen and I reiterated that the Committee was seeking a compromise to

allow Mr. McGahn's public testimony and was willing to limit the testimony to matters that

overlapped with the Mueller Report and exclude other issues. The White House

representatives responded that they were not sure what could be done as to Mr. McGahn and

that it was a good idea to think about solutions. No resolution as to Mr. McGahn's testimony

was reached on this call.

11.     On June 25, 2019, I, along with Mr. Eisen and Mr. Davis, met with Mr. Purpura

and Mr. Philbin at the White House. During that meeting, the White House representatives

reiterated their views on the institutional importance of the claim of absolute immunity,

particularly with respect to Mr. McGahn as the former Counsel to the President. They also

acknowledged the obligation to attempt accommodations. Possible questions and timing for

Mr. McGahn's testimony were discussed. On behalf of the Judiciary Committee, Mr. Eisen

and I reiterated the Committee's position that it was willing to make any reasonable

accommodation consistent with public testimony, including (i) withdrawing the McGahn

Subpoena, (ii) submitting proposed questions for Mr. McGahn to the White House, and

(iii) consulting with the White House regarding possible objections to those questions in

advance of any public testimony.  Mr. Eisen and I reminded the White House representatives

that all offered accommodations were contingent on reaching an agreement for Mr.

McGahn's prompt testimony.  The timing of an appearance was again discussed.  The White

House representatives stated that they appreciated the discussion and were taking no view on

whether an agreement was possible.

12.     On July 1, 2019, a call took place with the same participants to follow up on the

June 25 meeting.  The White House representatives stated that the White House was not

willing to accept any accommodation involving Mr. McGahn's public testimony.

13.     On July 12, 2019, another call took place with the same participants.  On that

call, Mr. Eisen and I, on behalf on the Judiciary Committee, indicated that we remained

willing to discuss any accommodation for Mr. McGahn's public testimony.  Mr. Eisen and I

reiterated that the Committee was prepared to (i) withdraw the subpoena so Mr. McGahn

could appear voluntarily, (ii) limit testimony to the specific subject matters covered in the

Mueller Report, (iii) allow White House counsel to sit behind Mr. McGahn during any

testimony, (iv) negotiate any issues that arose during that testimony, and (v) consider any

other reasonable limitation on Mr. McGahn's testimony proposed by the White House.  The

White House representatives agreed to consider these offers.

14.     On July 17, 2019, during a call involving the same participants, the White

House representatives stated that the White House would not accept any of the proposed

accommodations for Mr. McGahn's public testimony.  Therefore, the Judiciary Committee

had reached, and remains in, an impasse with the White House over Mr. McGahn's

testimony.

15.     On July 18, 2019, after efforts with the White House proved unsuccessful, I

discussed with Mr. Burck, via telephone, whether the Judiciary Committee could offer any

accommodation that would cause Mr. McGahn to comply with the subpoena for his public testimony.

16.     On July 26, 2019, Mr. Burck rejected all accommodation efforts for public testimony and confirmed that Mr. McGahn would continue to follow the President's directive not to appear.  The Judiciary Committee and Mr. McGahn had reached, and remain in, an impasse over his public testimony.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 26, 2019, in Washington, D.C.

Barry H. Berke

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

                                      *Plaintiff*,

    v.

DONALD F. MCGAHN, II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

                                       *Defendant*.

---

Case No. 1:19 cv-2379 (KBJ)

# Exhibit 1

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Donald F. McGahn II

You are hereby commanded to be and appear before the

Committee on the Judiciary

of the House of Representatives of the United States at the place, date, and time specified below.

[✓] **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 2138 Rayburn House Office Building, Washington, D.C., 20515

Date: May 7, 2019                                      Time: 10:00am

[ ] **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:_____

Date:_____ (and continuing until completed)   Time:_____

[✓] **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:  2141 Rayburn House Office Building, Washington, D.C., 20515

Date: May 21, 2019                                    Time: 10:00am

*To* any authorized staff member or the U.S. Marshals Service

                                                            to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 22       day of April                    , 20 19 .

*Jerold Nadler*

*Chairman or Authorized Member*

Attest:

*Clerk*

## PROOF OF SERVICE

---

Subpoena for

      Donald F. McGahn II

Address c/o William A. Burck, Esq., Quinn, Emanuel, Urquhart, & Sullivan, LLP

  1300 I Street NW, Suite 900, Washington, DC, 20005

before the Committee on the Judiciary

*U.S. House of Representatives*
*116th Congress*

---

Served by (print name) Aaron Hiller

Title Deputy Chief Counsel, House Judiciary Committee

Manner of service Electronic

Date April 22, 2019

Signature of Server

Address 2138 Rayburn House Office Building

Washington, D.C. 20515

## **SCHEDULE**

In accordance with the attached Definitions and Instructions, you are hereby required to produce all documents and communications in your possession, custody or control referring or relating to:

1. Statements by Michael Flynn to the Federal Bureau of Investigation regarding contacts with Sergey Kislyak.

2. The Federal Bureau of Investigation and Department of Justice's investigation of Michael Flynn.

3. Meetings with Department of Justice officials or employees relating to Michael Flynn and underlying evidence relating to Michael Flynn.

4. The resignation or termination of Michael Flynn.

5. Sean Spicer's February 14, 2017 public statements about Michael Flynn's resignation.

6. President Trump's contacts with James Comey on or about January 27, 2017, February 14, 2017, March 30, 2017, and April 11, 2017.

7. The termination of James Comey, including but not limited to any documents or communications relating to draft termination letters, White House Counsel memoranda, or the May 9, 2017 Rod Rosenstein memorandum to Jeff Sessions entitled "Restoring Public Confidence in the FBI."

8. Meetings or communications involving Federal Bureau of Investigation or Department of Justice officials or employees relating to the resignation or termination of James Comey.

9. Jeff Sessions's recusal from any matters arising from the campaigns for President of the United States.

10. Reversing or attempting to reverse Jeff Sessions's recusal from any matters.

11. The resignation or termination, whether contemplated or actual, of Jeff Sessions.

12. The resignation or termination, whether contemplated or actual, of Rod Rosenstein.

13. The resignation or termination, whether contemplated or actual, of Special Counsel Robert Mueller.

14. Your resignation or termination, whether contemplated or actual.

15. The appointment of Special Counsel Robert Mueller.

16. Alleged conflicts of interest on the part of Special Counsel Robert Mueller or other employees of the Special Counsel's Office.

17. Public statements and/or requests to correct the record or deny reports that President Trump asked for Special Counsel Robert Mueller to be removed as Special Counsel.

18. Memoranda directing White House officials or employees to avoid direct contact or communication with the Department of Justice or Jeff Sessions.

19. Meetings or communications with Dana Boente or other Department of Justice officials or employees relating to whether the President was being investigated by the Department of Justice or Federal Bureau of Investigation.

20. Meetings or communications with Department of Justice officials or employees relating to James Comey's testimony before Congress.

21. The President maintaining possession of Jeff Sessions's resignation letter.

22. Communications about Special Counsel Mueller's investigation, including but not limited to whether any action taken, proposed or discussed by President Trump or anyone acting on his behalf may constitute obstruction of justice or any violation of law.

23. President Trump's exposure in the Special Counsel Investigation relating to "other contacts," "calls," or "ask re Flynn" as mentioned in Volume II, page 82 of the Report.

24. Statements or communications relating to press reports that President Trump was under investigation.

25. Paul Manafort's cooperation with the Special Counsel's Office.

26. The June 9, 2016 Trump Tower meeting.

27. The July 8, 2017 statement and related statements released in the name of Donald Trump Jr. regarding the Trump Tower meeting.

28. Prosecuting or investigating James Comey or Hillary Clinton.

29. Presidential pardons, whether possible or actual, for Paul Manafort, Michael Flynn, Michael Cohen, Rick Gates, Roger Stone, individuals associated with the Trump Campaign, or individuals involved in matters before the U.S. Attorney's Office for the Southern District of New York.

30. Selecting Jeff Sessions's replacement through a recess appointment or appointing an Acting Attorney General under the Federal Vacancies Reform Act.

31. The SDNY Investigations, the recusal of U.S. Attorney Geoffrey Berman from the SDNY Investigations, or the reassignment or potential reassignment of SDNY employees from the SDNY Investigations.

32. Statements by Michael Cohen or White House officials to the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence regarding the timing of the Trump Organization's efforts to develop a property in Moscow, including but not limited to drafts of such statements and communications about such drafts or final statements.

33. Any payment, or potential payment, to any person or entity by Michael Cohen, Essential Consultants LLC, or American Media Inc. ("AMI") for the benefit of Donald Trump or the Trump Campaign, including but not limited to any documents relating to the reimbursement of Cohen, Essential Consultants LLC, or AMI for any such payments, and any documents relating to the omission or inclusion of information about liabilities associated with such payments on Donald Trump's Public Financial Disclosure Reports (OGE Form 278e) filed in 2017 and 2018.

34. Communications relating to United States imposed sanctions or potential sanctions against the Russian Federation from June 16, 2015 to October 18, 2018, including but not limited to the sanctions imposed pursuant to the Magnitsky Act.

35. Communications with the Executive Office of the President regarding your response to the March 4, 2019 document request by the House Committee on the Judiciary.

36. Any documents referenced in the Report.

## DEFINITIONS

As used in this subpoena, the following terms shall be interpreted in accordance with these definitions:

1. "58th Presidential Inaugural Committee" means the entity registered under FEC ID # C00629584 as well as its parent companies, subsidiary companies, affiliated entities, agents, officials, and instrumentalities.

2. "And," and "or," shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this subpoena any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

3. "Any" includes "all," and "all" includes "any."

4. "Communication(s)" means the transmittal of information by any means, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email, text message, instant message, MMS or SMS message, encrypted message, message application, social media, or otherwise.

5. "Employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

6. "Document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, interoffice and intra-office communications, call records, electronic mail ("e-mail"), instant messages, calendars, contracts, cables, notations of any type of conversation, telephone call, meeting or other communication, bulletins, printed matter, computer printouts, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, power point presentations, spreadsheets, and work sheets. The term "document" includes all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments to the foregoing, as well as any attachments or appendices thereto.

7. "Documents in your possession, custody or control" means (a) documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, or representatives acting on your behalf; (b) documents that you have a legal right to obtain, that you have a right to copy, or to which you have access; and (c) documents that have been placed in the possession, custody, or control of any third party. **This includes but is not limited to documents that are or were held by your attorneys.**

8. "Each" shall be construed to include "every," and "every" shall be construed to include "each."

9. "Government" shall include any government's present and former agencies, branches, units, divisions, subdivisions, districts, public corporations, employees, elected and appointed officials, ambassadors, diplomats, emissaries, authorities, agents, assignees, and instrumentalities. This includes, but is not limited to, any government-controlled business entities, entities in which the government has a financial interest, and any person acting or purporting to act on the government's behalf.

10. "Including" shall be construed broadly to mean "including, but not limited to."

11. "Person" or "persons" means natural persons, firms, partnerships, associations, corporations, subsidiaries, division, departments, joint ventures proprietorships, syndicates, or other legal business or government entities, and all subsidiaries, affiliates, divisions, departments, branches, or other units, thereof.

12. "Referenced" means cited, quoted, mentioned, described, alluded to, contained, incorporated, reproduced, or identified in any manner whatsoever.

13. "Relating to" shall mean discussing, describing, reflecting, containing, analyzing, studying, reporting, commenting, evidencing, constituting, comprising, showing, setting forth, considering, recommending, concerning, or pertinent to that subject in any manner whatsoever.

14. "The Russian Federation" shall include the Government of the Russian Federation, as the term "Government" is defined above.

15. "Special Counsel's Office" means the office created pursuant to Department of Justice Order No. 3915-17 issued by the Acting Attorney General on May 17, 2017 appointing Robert S. Mueller III as Special Counsel, and its employees.

16. "Special Counsel's Investigation" means the investigation conducted by the Special Counsel's Office pursuant to Department of Justice Order No. 3915-17 issued by the Acting Attorney General on May 17, 2017.

17. "SDNY Investigations" shall include any investigation or prosecution conducted by the U.S. Attorney's Office for the Southern District of New York relating to: (i) Michael Cohen; (ii) the Trump Organization; (iii) the Trump Campaign; and (iv) the 58th Presidential Inaugural Committee.

18. "The Report" means the complete and unredacted version of the report submitted on or about March 22, 2019 by Special Counsel Robert Mueller, pursuant to his authority under 28 C.F.R. § 600.8(c), entitled, "Report on the Investigation into Russian Interference in the 2016 Presidential Election."

19. "Trump Campaign" for purposes of this subpoena shall include Donald J. Trump for President, Inc., as well as its parent companies, subsidiary companies, affiliated entities, agents, officials, and instrumentalities.

20. The "Trump Organization" for purposes of this subpoena shall include the Trump Organization, Inc., The Trump Organization LLC, and their parent companies, subsidiary companies, affiliated entities, agents, officials, and instrumentalities.

21. The "Trump Tower Meeting" for purposes of this subpoena shall reference the June 9, 2016 Trump Tower meeting attended by the following Donald Trump Jr., Paul Manafort, Kushner, Natalia Veselnitskaya, Rob Goldstone, and Rinat Akhmetshin.

## INSTRUCTIONS

1. In complying with this subpoena, you should produce all responsive documents in unredacted form that are in your possession, custody, or control or otherwise available to you, regardless of whether the documents are possessed directly by you. If a document is referenced in the Report in part, you should produce it in full in a complete and unredacted form.

2. Documents responsive to the subpoena should not be destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee.

3. In the event that a document is withheld in full or in part on any basis, including a claim of privilege, you should provide a log containing the following information concerning every such document: (i) the reason the document is not being produced; (ii) the type of document; (iii) the general subject matter; (iv) the date, author, addressee, and any other recipient(s); (v) the relationship of the author and addressee to each other; and (vi) any other description necessary to identify the document and to explain the basis for not producing the document. If a claimed privilege applies to only a portion of any document, that portion only should be withheld and the remainder of the document should be produced. As used herein, "claim of privilege" includes, but is not limited to, any claim that a document either may or must be withheld from production pursuant to any law, statute, rule, policy or regulation.

4. In the event that a document is withheld in full or in part on the basis of a privilege asserted by or on behalf of the White House, or at the request of the White House, please also include the following information in your privilege log:

   a. The date on which you or any attorney representing you received the document or any copy thereof from the White House, received access to that document from the White House, or removed that document or any copy thereof from the White House;

   b. The name of the person or persons who provided the document to you or your attorney;

   c. The name of any lawyer or other agent or third party outside the White House who, to your knowledge, reviewed the document.

   d. You should log each responsive document as to which you have directed us to the White House, and each document that was previously in your attorneys' possession, custody or control.

5. Any objections or claims of privilege are waived if you fail to provide an explanation of why full compliance is not possible and a log identifying with specificity the ground(s) for withholding each withheld document prior to the request compliance date.

6. In complying with the request, be apprised that (unless otherwise determined by the Committee) the Committee does not recognize: any purported non-disclosure privileges associated with the common law including, but not limited to the deliberative-process privilege, the attorney-client privilege, and attorney work product protections; any purported privileges or protections from disclosure under the Freedom of Information Act; or any purported contractual privileges, such as non-disclosure agreements.

7. Any assertion of any such non-constitutional legal bases for withholding documents or other materials, shall be of no legal force and effect and shall not provide a justification for such withholding or refusal, unless and only to the extent that the Committee has consented to recognize the assertion as valid.

8. Pursuant to 5 U.S.C. § 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

9. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

10. If any document responsive to this subpoena was, but no longer is, in your possession, custody, or control, or has been placed into the possession, custody, or control of any third party and cannot be provided in response to this subpoena, you should identify the document (stating its date, author, subject and recipients) and explain the circumstances under which the document ceased to be in your possession, custody, or control, or was placed in the possession, custody, or control of a third party, including, but not limited to (a) how the document was disposed of; (b) the name, current address, and telephone number of the person who currently has possession, custody, or control over the document; (c) the date of disposition; and (d) the name, current address, and telephone number of each person who authorized said disposition or who had or has knowledge of said disposition.

11. If any document responsive to this subpoena cannot be located, describe with particularity the efforts made to locate the document and the specific reason for its disappearance, destruction or unavailability.

12. In the event that any entity, organization, or individual named in the subpoena has been, or is currently, known by any other name, the subpoena should be read also to include such other names under that alternative identification.

13. All documents should be produced with Bates numbers affixed. The Bates numbers must be unique, sequential, fixed-length numbers and must begin with a prefix referencing the name of the producing party (e.g., ABCD-000001). This format must remain consistent across all productions. The number of digits in the numeric portion of the format should not change in subsequent productions, nor should spaces, hyphens, or other separators be added or deleted. All documents should be Bates-stamped sequentially and produced sequentially.

14. Documents produced pursuant to this subpoena should be produced in the order in which they appear in your files and should not be rearranged. Any documents that are stapled, clipped, or otherwise fastened together should not be separated. Documents produced in response to this subpoena should be produced together with copies of file labels, dividers, or identifying markers with which they were associated when this subpoena was issued. Indicate the office or division and person from whose files each document was produced.

15. Responsive documents must be produced regardless of whether any other person or entity possesses non-identical or identical copies of the same document.

16. Produce electronic documents as created or stored electronically in their original electronic format. Documents produced in electronic format should be organized, identified, and indexed electronically, in a manner comparable to the organization structure called for in Instruction 13 above.

17. Data may be produced on CD, DVD, memory stick, USB thumb drive, hard drive, or via secure file transfer, using the media requiring the least number of deliverables. Label all media with the following:

    a. Production date;

    b. Bates range;

    c. Disk number (1 of X), as applicable.

18. If a date or other descriptive detail set forth in this subpoena referring to a document, communication, meeting, or other event is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the subpoena, you should produce all documents which would be responsive as if the date or other descriptive detail were correct.

19. The subpoena is continuing in nature and applies to any newly discovered document, regardless of the date of its creation. Any document not produced because it has not been located or discovered by the return date should be produced immediately upon location or discovery subsequent thereto.

20. Two sets of each production shall be delivered, one set to the Majority Staff and one set to the Minority Staff. Production sets shall be delivered to the Majority Staff in Room 2138 of the Rayburn House Office Building and the Minority Staff in Room 2142 of the Rayburn House Office Building. You should consult with Committee Majority Staff regarding the method of delivery prior to sending any materials.

21. If compliance with the subpoena cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production. In the event that any responsive documents or other materials contain classified information, please immediately contact Committee staff to discuss how to proceed.

22. Upon completion of the document production, please submit a written certification, signed by you or by counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control which reasonably could contain responsive documents; (2) documents responsive to the subpoena have not been destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee since the date of receiving the Committee's subpoena or in anticipation of receiving the Committee's subpoena, and (3) all documents identified during the search that are responsive have been produced to the Committee, identified in a log provided to the Committee, or otherwise identified as provided herein.

23. A cover letter should be included with each production including the following information:

a. List of each piece of media (hard drive, thumb drive, DVD or CD) included in the production by the unique number assigned to it, and readily apparent on the physical media;

b. List of fields in the order in which they are listed in the metadata load file;

c. The paragraph(s) and/or clause(s) in the Committee's subpoena to which each document responds;

d. Time zone in which emails were standardized during conversion (email collections only);

e. Total page count and bates range for the entire production, including both hard copy and electronic documents.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

Case No. 1:19 cv-2379 (KBJ)

v.

DONALD F. MCGAHN, II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

*Defendant.*

# Exhibit 2

# THE WHITE HOUSE

### WASHINGTON

May 20, 2019

The Honorable Jerrold Nadler
Chairman
Committee on the Judiciary
United States House of Representatives
Washington, D.C. 20515

Dear Chairman Nadler:

I write in further reference to the subpoena issued by the Committee on the Judiciary of the United States House of Representatives (the "Committee") to Donald F. McGahn II on April 22, 2019. My previous letter, dated May 7, 2019, informed you that Acting Chief of Staff to the President Mick Mulvaney had directed Mr. McGahn not to produce the White House records sought by the subpoena because they remain subject to the control of the White House and implicate significant Executive Branch confidentiality interests and executive privilege. Accordingly, I asked that the Committee direct any request for such records to the White House. The subpoena also directs Mr. McGahn to appear to testify before the Committee at 10:00 a.m. on Tuesday, May 21, 2019.

The Department of Justice (the "Department") has advised me that Mr. McGahn is absolutely immune from compelled congressional testimony with respect to matters occurring during his service as a senior adviser to the President. *See* Memorandum for Pat A. Cipollone, Counsel to the President, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, *Re: Testimonial Immunity Before Congress of the Former Counsel to the President* (May 20, 2019). The Department has long taken the position  across administrations of both political parties  that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee." *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 191 (2007) (quoting *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) (opinion of Attorney General Janet Reno)); *Immunity of the Counsel to the President from Compelled Congressional Testimony*, 20 Op. O.L.C. 308, 308 (1996). That immunity arises from the President's position as head of the Executive Branch and from Mr. McGahn's former position as a senior adviser to the President, specifically Counsel to the President.

There is no question that the position of Counsel to the President falls within the scope of the immunity. The three previous opinions cited above directly addressed the immunity of Counsel to the President: Harriet Miers was a former Counsel to President George W. Bush, Beth Nolan was the current Counsel to President Clinton, and Jack Quinn was the current Counsel to President Clinton. Accordingly, Mr. McGahn cannot be compelled to appear before the Committee because "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance

The Honorable Jerrold Nadler
Page 2

of his constitutionally assigned executive functions." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. at 5. The constitutional immunity of current and former senior advisers to the President exists to protect the institution of the Presidency and, as stated by Attorney General Reno, "may not be overborne by competing congressional interests." *Id.*

Because of this constitutional immunity, and in order to protect the prerogatives of the Office of the Presidency, the President has directed Mr. McGahn not to appear at the Committee's scheduled hearing on Tuesday, May 21, 2019. This long-standing principle is firmly rooted in the Constitution's separation of powers and protects the core functions of the Presidency, and we are adhering to this well-established precedent in order to ensure that future Presidents can effectively execute the responsibilities of the Office of the Presidency. I attach the legal opinion provided by the Department of Justice for the Committee's review.

Please do not hesitate to contact me directly if you have any questions or would like to discuss this matter.

Sincerely,

Pat A. Cipollone
Counsel to the President

cc: The Honorable Doug Collins, Ranking Member

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

                                    *Plaintiff*,


        v.                                                          Case No. 1:19 cv-2379 (KBJ)


DONALD F. MCGAHN, II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

                                    *Defendant*.

---

# Exhibit 3



**U.S. Department of Justice**

Office of Legal Counsel

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

May 20, 2019

## MEMORANDUM FOR PAT A. CIPOLLONE
## COUNSEL TO THE PRESIDENT

*Re: Testimonial Immunity Before Congress of
the Former Counsel to the President*

On April 22, 2019, the Committee on the Judiciary of the House of Representatives subpoenaed Donald F. McGahn II, the former Counsel to the President, to testify about matters described in the report of Special Counsel Robert S. Mueller, III. You have asked whether Mr. McGahn is legally required to appear.

We provide the same answer that the Department of Justice has repeatedly provided for nearly five decades: Congress may not constitutionally compel the President's senior advisers to testify about their official duties. This testimonial immunity is rooted in the constitutional separation of powers and derives from the President's independence from Congress. As Attorney General Janet Reno explained, "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999) ("Reno Opinion"). Yet Congress may no more summon the President to a congressional committee room than the President may command Members of Congress to appear at the White House. *See* Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 2 (July 29, 1982) ("Olson Memorandum").

Although the White House has opposed sending senior advisers to testify for almost as long as there has been an Executive Office of the President, Assistant Attorney General William Rehnquist first described the legal basis for immunity in a 1971 memorandum. *See* Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971) ("Rehnquist Memorandum"). The Rehnquist Memorandum has been consistently reaffirmed by administrations of both political parties, most recently during the Obama Administration. *See, e.g.*, *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. __, *1 & n.1 (July 15, 2014) ("*Immunity of the Assistant to the President*").

We believe that these established principles apply to bar the Committee from compelling Mr. McGahn to testify. The Counsel to the President clearly qualifies as a senior adviser entitled to testimonial immunity. Attorney General Reno reached that conclusion in her 1999 opinion, and this Office has made the same determination on at least three other occasions. We have also recognized that the immunity continues to apply after the Counsel leaves the White House. *See Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007) (*"Immunity of the Former Counsel"*).

The Chairman of the Committee has suggested that the justification for Mr. McGahn's testimonial immunity is undermined by the President's decision not to assert executive privilege over the redacted version of the Special Counsel's report that the Attorney General released last month. *See, e.g.*, Letter for Donald F. McGahn II, from Jerrold Nadler, Chairman, Committee on the Judiciary, U.S. House of Representatives at 1 (May 17, 2019) ("Nadler Letter"). But the question whether an adviser need comply with a subpoena purporting to require an appearance is different from the question whether the adviser's testimony would itself address privileged matters. Therefore, the public disclosure of the Special Counsel's report does not have any legal bearing upon the force of the congressional subpoena. For these reasons, and consistent with nearly 50 years of executive branch precedent, we conclude that Mr. McGahn is not legally required to appear and testify before the Committee.

## I.

Since the 1970s, this Office has consistently advised that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee" on matters related to their official duties. Memorandum for All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice, from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Executive Privilege* at 5 (May 23, 1977) ("Harmon Memorandum"); *see also* Rehnquist Memorandum at 7 ("The President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis—should be deemed absolutely immune from testimonial compulsion by a congressional committee."). Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations.[1]

---

[1] *See Immunity of the Assistant to the President*, 38 Op. O.L.C. at *1; Letter for Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel at 1–2 (Aug. 1, 2007) ("Bradbury Letter"); *Immunity of the Former Counsel*, 31 Op. O.L.C. at 191; Reno Opinion, 23 Op. O.L.C. at 4; *Immunity of the Counsel to the President from Compelled Congressional Testimony*, 20 Op. O.L.C. 308, 308 (1996) (*"Immunity of the Counsel to the President"*); Letter for Jack Brooks, Chairman, Committee on the Judiciary, U.S. House of Representatives, from Nicholas E. Calio, Assistant to the President for Legislative Affairs at 1 (June 16, 1992) ("Calio Letter"); Olson Memorandum at 2; Memorandum for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Demand for Deposition of Counsel to the President Fred F. Fielding* at 2 (July 23, 1982) (*"Congressional Demand for Deposition of Counsel"*); Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Testimony by Presidential Assistants* at 1 (Apr. 14, 1981); Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Dual-Purpose Presidential Advisers* at 5 (Aug. 11, 1977); Harmon Memorandum at 5; Letter to Phillip E. Areeda, Counsel to the President,

This testimonial immunity is distinct from, and broader than, executive privilege. Like executive privilege, the immunity protects confidentiality within the Executive Branch and the candid advice that the Supreme Court has acknowledged is essential to presidential decision-making. *See United States v. Nixon*, 418 U.S. 683, 705 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."). But the immunity extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself. In this regard, the President's immediate advisers are constitutionally distinct from the heads of executive departments and agencies, whose offices are created by acts of Congress, whose appointments require the Senate's advice and consent, and whose responsibilities entail the administration of federal statutes. Those officers can and do testify before Congress. The President's immediate advisers, however, exercise no statutory authority and instead act solely to advise and assist the President. Their independence from Congress reflects that of the President.

## A.

The President stands at the head of a co-equal branch of government. Yet allowing Congress to subpoena the President to appear and testify would "promote a perception that the President is subordinate to Congress, contrary to the Constitution's separation of governmental powers into equal and coordinate branches." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *3. As Assistant Attorney General Theodore Olson explained in 1982: "The President is a separate branch of government. He may not compel congressmen to appear before him. As a matter of separation of powers, Congress may not compel him to appear before it." Olson Memorandum at 2. The President's immediate advisers are an extension of the President and are likewise entitled to absolute immunity from compelled congressional testimony.

In 2014, our most recent opinion on the topic described the bases for this immunity in detail. "For the President's absolute immunity to be fully meaningful," we explained, "and for these separation of powers principles to be adequately protected, the President's immediate advisers must likewise have absolute immunity from congressional compulsion to testify about matters that occur during the course of discharging their official duties." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *2. The demands of the office require the President to rely on senior advisers who serve "as the President's alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Id.* at *3 (quoting Reno Opinion, 23 Op. O.L.C. at 5); *see also In re Sealed*

---

from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 25, 1974) (enclosing a memorandum, hereinafter "Scalia Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, *Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters* at 6 (Dec. 21, 1972) ("Cramton Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, *Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee* at 1 (Mar. 15, 1972) ("Erickson Memorandum"); Rehnquist Memorandum at 7.

*Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) ("The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers.").

There are dozens of congressional committee and subcommittees with the authority to conduct hearings and subpoena witnesses. Recognizing a congressional authority to compel the President's immediate advisers to appear and testify at the times and places of their choosing would interfere directly with the President's ability to faithfully discharge his responsibilities. It would allow congressional committees to "wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *3. And in the case of the President's current advisers, preparing for such examinations would force them to divert time and attention from their duties to the President at the whim of congressional committees. This "would risk significant congressional encroachment on, and interference with, the President's prerogatives and his ability to discharge his duties with the advice and assistance of his closest advisers," ultimately subordinating senior presidential advisers to Congress rather than the President. *Id.*; *see also Loving v. United States*, 517 U.S. 748, 757 (1996) ("Even when a branch does not arrogate power to itself . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties.").

The immunity of senior presidential advisers also protects the Executive Branch's strong interests in confidentiality as well as the President's ability to obtain sound and candid advice. As the Supreme Court has recognized, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708. While a senior presidential adviser, like other executive officials, could rely on executive privilege to decline to answer specific questions at a hearing, the privilege is insufficient to ameliorate several threats that compelled testimony poses to the independence and candor of executive councils.

First, compelled congressional testimony "create[s] an inherent and substantial risk of inadvertent or coerced disclosure of confidential information," despite the availability of claims of executive privilege with respect to the specific questions asked during such testimony. *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *4. As we explained in 2014, senior presidential advisers

> could be asked, under the express or implied threat of contempt of Congress, a wide range of unanticipated and hostile questions about highly sensitive deliberations and communications. In the heat of the moment, without the opportunity for careful reflection, the adviser might have difficulty confining his remarks to those that do not reveal such sensitive information. Or the adviser could be reluctant to repeatedly invoke executive privilege, even though validly applicable, for fear of the congressional and media condemnation she or the President might endure.

*Id.*; *see also Congressional Demand for Deposition of Counsel*, *supra* note 1, at 2 ("A witness before a Congressional committee may be asked—under threat of contempt—a wide range of unanticipated questions about highly sensitive deliberations and thought processes. He therefore

may be unable to confine his remarks only to those which do not impair the deliberative process.").

Second, even "[t]he prospect of compelled interrogation by a potentially hostile congressional committee about confidential communications with the President or among the President's immediate staff could chill presidential advisers from providing unpopular advice or from fully examining an issue with the President or others." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at*4. This is true whether or not the President might ultimately assert executive privilege over the testimony in question, given the adviser's uncertainty over whether a particular matter will become the subject of future congressional inquiry and whether the President would choose to incur the political costs associated with invoking the privilege.

Finally, given the frequency with which the testimony of a senior presidential adviser— whose sole and daily responsibility is to advise and assist the President—would fall within the scope of executive privilege, compelling the adviser's appearance is not likely to promote any valid legislative interests. Coercing senior presidential advisers into situations where they must repeatedly decline to provide answers, citing executive privilege, would be inefficient and contrary to good-faith governance. The President's immediate advisers, if compelled to testify, are unlikely to answer many of the Members' questions, suggesting that the hearing itself will not serve any legitimate purpose for the Committee.

## B.

The Executive Branch's position on testimonial immunity reflects historical practices dating back nearly to the 1939 establishment of the Executive Office of the President. As Assistant Attorney General Antonin Scalia explained in a 1974 memorandum, "at least since the Truman Administration," presidential advisers "have appeared before congressional committees only where the inquiry related to their own private affairs or where they had received Presidential permission." Scalia Memorandum, *supra* note 1, at 6. Although Presidents have occasionally permitted such testimony, the long-standing policy has been to decline invitations for voluntary appearances and to resist congressional subpoenas for involuntary ones.

In surveying the history through 1971, Assistant Attorney General Rehnquist described the earliest application of the policy to be inconclusive and at times inconsistent. *See* Rehnquist Memorandum at 4–6. But even when senior presidential advisers did appear, those appearances were frequently accompanied by a claim of legal privilege not to do so. Assistant Attorney General Rehnquist thus described the claim as an absolute testimonial immunity for the President's immediate advisers, *see id.* at 7, and this Office has reaffirmed and expanded upon that conclusion in the decades since. The following examples, while not exhaustive, demonstrate the strong historical foundation for the Executive Branch's position that Congress may not compel the President's senior advisers to appear and testify.

In 1944, during the Administration of Franklin D. Roosevelt, a subcommittee of the Senate Committee on Agriculture and Forestry subpoenaed Jonathan Daniels, an Administrative Assistant to President Roosevelt, to testify about his reported attempts to compel the resignation of the Rural Electrification Administrator. *See Administration of the Rural Electrification Act: Hearing on S. 197 Before a Subcomm. of the S. Comm. on Agric. and Forestry*, 78th Cong., pt. 3,

at 611–28, 629 (1944). Mr. Daniels appeared at the hearing but advised that he could not answer questions that would concern his confidential relationship with the President. *Id.* After the hearing ended with the subcommittee threatening contempt, Mr. Daniels wrote to the subcommittee and reiterated his belief that the subcommittee could not compel his testimony. *See id.* at 740. However, he stated that the President had determined that his testimony would not be contrary to the public interest and that he therefore was willing to appear in the future. *See id.*; *see also id.* at 695–740. *The New York Times* reported that "[w]ith Daniels' agreement to testify disappeared the possibility of using his previous defiance as the first test of the division between executive and legislative power before the Senate." *Daniels to Answer Senators' Queries: President Agrees*, N.Y. Times, Mar. 5, 1944, at 1.

The first outright refusal of a presidential adviser to appear apparently occurred during the Truman Administration, in 1948, when a special subcommittee of the House Committee on Education and Labor twice subpoenaed John R. Steelman, an Assistant to the President, to testify about his communications with President Truman regarding administration of the Taft-Hartley Act during a strike. *See Investigation of GSI Strike: Hearing Before a Special Subcomm. of the H. Comm. on Educ. and Labor*, 80th Cong. 347–53 (1948). Mr. Steelman declined to comply and returned the subpoenas with a letter stating: "[I]n each instance the President directed me, in view of my duties as his Assistant, not to appear before your subcommittee." H.R. Rep. No. 80-1595, at 3 (1948).

During the Eisenhower Administration, in 1955, a subcommittee of the Senate Committee on the Judiciary invited the President's Chief of Staff, Sherman Adams, to testify about a contract between the Atomic Energy Commission and two power companies. He declined, citing in part his "official and confidential relationship with the President." *Power Policy, Dixon-Yates Contract: Hearing Before the Subcomm. on Antitrust and Monopoly of the S. Comm. on the Judiciary*, 84th Cong., pt. 2, at 675–76, 779 (1955). Later, in 1958, Mr. Adams testified, with President Eisenhower's approval, before a House subcommittee concerning allegations of impropriety relating to his relationship with a New England industrialist. *Investigation of Regulatory Commissions and Agencies: Hearing Before a Subcomm. of the H. Comm. on Interstate and Foreign Commerce*, 85th Cong., pt. 10, at 3712–40 (1958).

During the Administration of President Lyndon B. Johnson, in 1968, the Senate Committee on the Judiciary requested the testimony of Associate Special Counsel to the President W. DeVier Pierson to testify concerning the nomination of Associate Justice Abe Fortas to be Chief Justice of the United States. The inquiry concerned whether Justice Fortas had inappropriately participated in developing certain legislation. Mr. Pierson responded that "[i]t has been firmly established, as a matter of principle and precedents, that members of the President's immediate staff shall not appear before a Congressional committee to testify with respect to the performance of their duties on behalf of the President." *Nominations of Abe Fortas and Homer Thornberry: Hearing Before the S. Comm. on the Judiciary*, 90th Cong., pt. 2, at 1348 (1968). He continued: "This limitation, which has been recognized by the Congress as well as the Executive, is fundamental to our system of government. I must, therefore, respectfully decline the invitation to testify in these hearings." *Id.*

In 1972, during the Nixon Administration, the Senate Committee on the Judiciary invited Peter M. Flanigan, an Assistant to the President, to testify. This Office advised that Mr. Flanigan

occupied "a close and confidential relationship with the President and share[d] the President's immunity from congressional process." Erickson Memorandum, *supra* note 1, at 1.  Our disposition was clear: "[I]t has been firmly established that members of the President's immediate staff may not appear before a congressional committee to testify with respect to the performance of their duties." *Id.*[2]

In 1979, during the Carter Administration, Special Assistant to the President Sarah Weddington was invited to testify before the Senate Human Resources Committee as part of a hearing on "Women in the Coming Decade."  At the instruction of the Counsel to President, she declined to appear, explaining that "it is White House policy for personal aides to the President to decline invitations to testify before Congressional committees."  Letter for Harrison A. Williams, U.S. Senate, from Sarah Weddington, Special Assistant to the President at 1 (Jan. 31, 1979) ("Weddington Letter").  She offered, however, to meet informally with committee members or staff to discuss related programs and proposals. *Id.* at 2.

In 1980, the Subcommittee on Investigations of the House Committee on Armed Services requested the testimony of Deputy Assistant to the President for National Security Affairs David Aaron concerning leaks to *The Washington Post*.  President Carter directed Mr. Aaron not to appear.  The Counsel to the President, Lloyd N. Cutler, explained that "Congress has always respected the privilege of the President to decline requests that the President himself or his immediate White House advisors appear to testify before Congressional committees," instead provided a sworn affidavit by Mr. Aaron denying the allegations, and offered to make Mr. Aaron available for an interview or deposition under oath.  Letter for Samuel S. Stratton, Chairman, Subcommittee on Investigation of the Committee on Armed Services, U.S. House of Representatives, from Lloyd N. Cutler, Counsel to the President at 1–2 (Sept. 30, 1980).

In 1982, during the Reagan Administration, the Senate Labor and Human Resources Committee sought the testimony of Counsel to the President Fred F. Fielding concerning allegations of corruption against Secretary of Labor Raymond Donovan.  Mr. Fielding declined to appear and testify. *See* Olson Memorandum at 1–4 (explaining the legal basis for that decision).  Deputy Attorney General Edward C. Schmults notified the Committee that, "[a]s an institutional matter, the President cannot permit his Counsel to provide sworn testimony to the Legislative Branch regarding the performance of his duties," but offered to arrange for written responses to a reasonable number of written inquiries.  Letter for Orrin G. Hatch, Chairman, Committee on Labor and Human Resources, U.S. Senate, from Edward C. Schmults, Deputy Attorney General at 2–3 (Apr. 19, 1983) ("Schmults Letter").

In 1992, during the George H.W. Bush Administration, the House Committee on the Judiciary requested that C. Boyden Gray, Counsel to the President, and Nicholas Rostow,

---

[2] In connection with the Watergate investigations, President Nixon reached an agreement with the Senate's Watergate Select Committee to authorize current and former White House officials to appear voluntarily and under oath before the committee in closed session. *See* Remarks Announcing Procedures and Developments in Connection With the Watergate Investigations (Apr. 17, 1973), *Pub. Papers of Pres. Richard Nixon* 298, 298–99 (1973).  President Nixon later determined that he would not claim executive privilege over the subject matters of the testimony and would allow the witnesses to testify in open hearings. *See* Statements About the Watergate Investigations (May 22, 1973), *Pub. Papers of Pres. Richard Nixon* at 547, 554 (1973).  He therefore waived the testimonial immunity to authorize those appearances.

Special Assistant to the President and a Senior Director for Legal Affairs at the National Security Council, testify concerning Bush Administration policies towards Iraq prior to the first Gulf War. The White House declined, citing "the longstanding practice of the Executive Branch to decline requests for testimony by members of the President's personal staff." Calio Letter, *supra* note 1, at 1.

In 1999, President Clinton directed Counsel to the President Beth Nolan not to appear in response to a subpoena from the House Committee on Government Reform and Oversight concerning a clemency decision. President Clinton relied on an opinion from Attorney General Reno that concluded that "the Counsel serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony" on matters related to the performance of official duties. Reno Opinion, 23 Op. O.L.C. at 4.

In 2007, during the George W. Bush Administration, the House Committee on the Judiciary subpoenaed former Counsel to the President Harriet Miers to testify about the Department of Justice's decision to request the resignation of certain United States Attorneys. President Bush directed Ms. Miers not to testify after this Office concluded that she was "immune from compelled congressional testimony about matters . . . that arose during her tenure as Counsel to the President and that relate to her official duties in that capacity." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 193.

Also in 2007, the Senate Committee on the Judiciary subpoenaed the testimony of Karl Rove, the Deputy White House Chief of Staff, on the same subject. This Office confirmed that Mr. Rove was "immune from compelled congressional testimony about matters (such as the U.S. Attorney resignations) that arose during his tenure as an immediate presidential adviser and that relate to his official duties in that capacity." Bradbury Letter, *supra* note 1, at 1–2. In 2008, a subcommittee of the House Committee on the Judiciary also subpoenaed Mr. Rove, and he was again directed not to testify. *See* Letter for Robert D. Luskin, Patton Boggs LLP, from Fred F. Fielding, Counsel to the President at 1 (July 9, 2008).

In 2014, during the Obama Administration, the House Committee on Oversight and Government Reform issued a subpoena to David Simas to testify about matters related to his official responsibilities as Assistant to the President and Director of the Office of Political Strategy and Outreach. In particular, the committee requested testimony regarding "the role and function of the White House Office of Political Strategy and Outreach" and the question "whether the White House [was] taking adequate steps to ensure that political activity by Administration officials complies with relevant statutes, including the Hatch Act." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *1 (internal quotation marks omitted). This Office concluded that Mr. Simas was "immune from compulsion to testify before the [c]ommittee on these matters," *id.*, and he declined to testify.

The foregoing historical record demonstrates that the immunity of senior presidential advisers from congressional testimony is long-standing and has been repeatedly asserted against the requests of Congress. These examples do not indicate that senior presidential advisers have always declined to testify before Congress. The practice of asserting testimonial immunity—just like the practice of asserting executive privilege—has long reflected the "spirit of dynamic compromise" that reflects the "efficient and effective functioning" of the political branches of

government. *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). Presidents have occasionally made senior advisers available to accommodate congressional requests, even while defending their legal authority to decline such requests. But these accommodations between the political branches do not compromise the underlying immunity of the President or his senior presidential advisers from compelled congressional testimony. Nor do they nullify the many instances where Presidents have successfully asserted immunity and affirmatively directed their immediate aides not to testify before Congress.

## C.

While the Executive Branch has asserted for 75 years that senior presidential advisers may decline to testify before Congress, and has formally asserted an immunity for nearly 50 years, neither the Supreme Court nor any court of appeals has specifically addressed the question. This is because disputes over congressional demands for information from the Executive Branch are inherently political, and the historical practice has been to resolve such questions in the political arena. When such conflicts have arisen, Congress has either acceded to the President's claims of immunity or the Executive Branch has accommodated the congressional interest in some fashion. Only one district court has ever addressed the testimonial immunity of the President's senior advisers, and that decision did not come until 2008. *See Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008). Although the district court held that presidential advisers were not entitled to absolute immunity from compelled congressional testimony, the court of appeals stayed that decision pending appeal, and the parties settled without any appellate decision on the merits.

Nonetheless, this Office has recognized that the Executive Branch's long-standing position is consistent with related Supreme Court precedent. *See Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5. In *Gravel v. United States*, 408 U.S. 606 (1972), the Court held that legislative aides share in the constitutional immunity enjoyed by Members of Congress under the Speech or Debate Clause. *Id.* at 616–17. The Court reasoned that the Clause "was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch," and "protect[ion] . . . against prosecutions that directly impinge upon or threaten the legislative process." *Id.* at 616. Because "it is literally impossible . . . for Members of Congress to perform their legislative tasks without the help of aides and assistants," the Court recognized that such aides "must be treated as the [Members'] alter egos." *Id.* at 616–17. For purposes of immunity, the Court concluded, Members of Congress and their aides should be "treated as one." *Id.* at 616 (internal quotation marks omitted). The same logic applies with respect to the President and his senior advisers. The failure to recognize the extension of the President's immunity from compelled congressional testimony to senior advisers would call into question the well-established extension of derivative immunity to congressional staffers.

It is true that in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Court declined to extend *Gravel*'s alter-ego reasoning to a civil suit for damages against senior presidential advisers, and instead concluded that such advisers are entitled only to qualified immunity in those civil actions. *Id.* at 810–11, 813–15. *Harlow* thus distinguished the President's immediate advisers from the President himself, whom the Court held (in another decision issued the same day) to be absolutely immune from civil suits based on official acts. *See Nixon v. Fitzgerald*, 457 U.S. 731,

749 (1982). Yet we have previously declined to extend *Harlow* to the context of testimonial immunity because the prospect of compelled congressional testimony raises separation of powers concerns that are not present in a civil damages lawsuit brought by a private party. *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5–7. Compelled congressional testimony "threatens to subject presidential advisers to coercion and harassment, create a heightened impression of presidential subordination to Congress, and cause public disclosure of confidential presidential communications in a way that the careful development of evidence through a judicially monitored [proceeding] does not." *Id.* at *6. In a private lawsuit, the court "acts as a disinterested arbiter of a private dispute, not as a party in interest to the very lawsuit it adjudicates," and it "is charged with impartially administering procedural rules designed to protect witnesses from irrelevant, argumentative, harassing, cumulative, privileged, and other problematic questions." *Id.* By contrast, congressional hearings involving the President's immediate advisers contain none of those assurances, and they threaten the President's autonomy and ability to receive sound and candid advice in a way that private civil damages suits do not. *Cf.* Archibald Cox, *Executive Privilege*, 122 U. Pa. L. Rev. 1383, 1429 (1974) (stating that as compared to a civil action, "[t]he need to protect aides and subordinates from reprisals on Capitol Hill and in the media of public debate is a thousand-fold greater in the case of congressional hearings, which are often the preserves of individual Senators and Congressmen not all of whom are invariably characterized by judicious self-restraint").

We recognize that in *Miers*, a federal district court read *Harlow* to imply that senior presidential advisers do not enjoy absolute immunity from congressionally compelled testimony. *See Miers*, 558 F. Supp. 2d at 100–03. But we believe that the court did not adequately consider the different and heightened separation of powers concerns bearing upon the testimony of the President's immediate advisers before Congress. Moreover, the district court's decision was stayed pending appeal. *See Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 910–11 (D.C. Cir. 2008) (per curiam). The case settled and the appeal was dismissed before any further action by the court of appeals. *Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, No. 08-5357, 2009 WL 3568649, at *1 (D.C. Cir. Oct. 14, 2009). For the reasons set forth above, and in greater detail in our 2014 opinion, *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5–9, we respectfully disagree with the district court's conclusion in *Miers* and adhere to this Office's long-established position that the President's immediate advisers are absolutely immune from compelled congressional testimony.

## II.

Having reaffirmed the existence of the testimonial immunity of the President's immediate advisers, we now consider its application to Mr. McGahn, the former Counsel to the President. Plainly, the Counsel to the President qualifies as an immediate adviser to the President. As Attorney General Reno recognized, "the Counsel serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony." Reno Opinion, 23 Op. O.L.C. at 4. Indeed, we have recognized the Counsel's immunity from congressional testimony on multiple occasions. *See, e.g., Immunity of the Former Counsel*, 31 Op. O.L.C. at 192 ("[T]he Counsel to the President 'serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony.'" (quoting Reno Opinion, 23 Op. O.L.C. at 4)); *Immunity of the Counsel to the President*, 20 Op. O.L.C. at 309 ("There is no question that the Counsel to the President falls within Assistant Attorney General Rehnquist's description of

the type of Presidential advisers who are immune from testimonial compulsion."); *Congressional Demand for Deposition of Counsel*, supra note 1, at 2 ("I believe the Counsel to the President possesses an absolute privilege not to testify with regard to any matters relating to his official duties as legal adviser to the President.").

In addition, we have recognized that testimonial immunity continues after the tenure of a particular Counsel to the President. As we explained in 2007, "[s]eparation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 192–93. The Supreme Court has explicitly recognized this principle in the context of executive privilege. The privilege must outlast the tenure of a particular President because, absent a guarantee of lasting confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (adopting the view of the Solicitor General); *see also United States v. Johnson*, 383 U.S. 169 (1966) (applying the Speech or Debate Clause to a former Member of Congress).

In concluding that the former Counsel to the President retained her testimonial immunity, we relied upon the actions of former President Truman, who explained his own refusal to appear and testify before the House Committee on Un-American Activities in the following terms: "[I]f the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 193 (quoting *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14 (reprinting Nov. 12, 1953 letter by President Truman)). It is "just as important to the independence of the Executive that the actions of the President should not be subjected to the questioning by the Congress after he has completed his term of office as that his actions should not be questioned while he is serving as President." *Id.* (quoting *Text of Address by Truman Explaining to Nation His Actions in the White Case*, N.Y. Times, Nov. 17, 1953, at 26). Because the immunity of senior presidential advisers derives from the immunity of the President, this same logic extends to them as well.

Our 2007 conclusion in *Immunity of the Former Counsel* was consistent with the analysis of the immunity interests of former officials during the George H.W. Bush and Nixon Administrations. *See* Letter for Arthur B. Culvahouse, O'Melveny & Myers, from C. Boyden Gray, Counsel to the President at 1 (June 17, 1992) ("[I]t is long-standing White House policy not to assent to formal testimony to Congressional committees by former White House officials about matters occurring during their White House service."). It is true that the President does not have the same need for the daily advice and assistance of his former advisers, as with his current advisers, yet the confidentiality interests associated with the advisers' former role remain just as strong. *See* Cramton Memorandum, *supra* note 1, at 5–6 ("If advice from a staff member were protected from congressional and public scrutiny only for so long as the staff member remained employed in the White House, the protection would be significantly reduced. It would only be a question of time when staff turnovers or a change in administration would remove the shield.").

Even more significantly, the risk to the separation of powers and to the President's autonomy posed by a former adviser's testimony on official matters continues after the conclusion of that adviser's tenure. *See id.* at 6 ("[T]he same considerations that were persuasive to former President Truman would apply to justify a refusal to appear by such a former staff member, if the scope of his testimony is to be limited to his activities while serving in that capacity."). Accordingly, consistent with our prior precedents, we find no material distinction between the compelled congressional testimony of current and former senior advisers to the President. Mr. McGahn's departure as Counsel to the President does not alter his immunity from compelled congressional testimony on matters related to his service to the President.

## III.

In this instance, the Committee seeks to question Mr. McGahn concerning matters addressed in the report of Special Counsel Robert S. Mueller, III, on the Investigation into Russian Interference in the 2016 Presidential Election. The Chairman of the Committee has suggested that the White House's voluntary cooperation with this investigation and the President's decision not to assert executive privilege over the Special Counsel's report may undermine any claim that Mr. McGahn is immune from compelled testimony. Nadler Letter at 1. However, the concept of immunity is distinct from, and broader than, the question whether executive privilege would protect a witness's response to any particular question. *See* Rehnquist Memorandum at 4 (recognizing the "distinction between a claim of absolute immunity from even being sworn as a witness, and a right to claim privilege in answer certain questions in the course of one's testimony as a witness").[3] The President does not waive an adviser's immunity from compelled congressional testimony by authorizing disclosure of any particular information. To the contrary, Presidents have frequently authorized aides to share information as an accommodation to Congress, notwithstanding claims of immunity.

The immunity from compelled congressional testimony implicates fundamental separation of powers principles that are separate from the confidentiality of specific information. *See supra* Part I.A. The constitutional interest in protecting the autonomy and independence of the Presidency remains the same no matter whether the compelled testimony from a presidential adviser would implicate public or potentially privileged matters. The President does not waive his own immunity from compelled congressional testimony by making public statements on a given subject. It follows then that the derivative immunity of senior presidential advisers is not waived either.

Were the rule otherwise, Presidents could not offer partial accommodations to Congress without waiving all privileges or immunities bearing upon the subject. Such a rule would severely hinder the "spirit of dynamic compromise" and "implicit constitutional mandate to seek optimal accommodation" that currently facilitates resolution of inter-branch disputes over information. *Am. Tel. & Tel. Co.*, 567 F.2d at 127. And such a rule would stand in marked

---

[3] The Reno Opinion described the testimonial immunity as "a separate legal basis that would support a claim of executive privilege for the entirety of the Counsel's testimony, thereby eliminating any need for her to appear at the hearing." 23 Op. O.L.C. at 4. We think that the Rehnquist Memorandum's distinction between an immunity and a privilege reflects the more precise formulation, but the distinction appears to be merely a semantic one.

contrast to many instances of historical practice in which senior advisers declined to testify before Congress, but instead offered accommodations through informal meetings or written responses. *See, e.g.*, Schmults Letter at 2–3; Weddington Letter at 1–2. Yet no one has viewed such accommodations, or the testimony of other executive advisers on similar subjects, to constitute a general waiver of immunity.

The Chairman's suggestion that Mr. McGahn can no longer claim immunity appears to be based upon the assumption that the President waived executive privilege by authorizing Mr. McGahn and his senior aides to cooperate with the Special Counsel's investigation. But the question of privilege is distinct from the issue of immunity. And in any event, the premise of the Committee's position is incorrect. The sharing of information between one arm of the Executive Branch and another does not compromise the President's interest in confidentiality. Indeed, in *Nixon v. Administrator of General Services*, the Supreme Court rejected a separation of powers objection to the disclosure of presumptively confidential information because "[t]he Executive Branch remains in full control of the Presidential materials, and . . . the materials can be released only when release is not barred by some applicable privilege inherent in that branch." 433 U.S. at 444. Information that was shared with the Special Counsel was shared *within* the Executive Branch. Such voluntary sharing does not waive confidentiality or the underlying privilege.

This conclusion is consistent with past assertions of executive privilege. In *Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7 (2008), Attorney General Michael Mukasey advised that the President could assert executive privilege against Congress over memoranda recording interviews of White House witnesses with Department of Justice investigators. *Id.* at 9–13. As he explained, "[w]ere future presidents, vice presidents or White House staff to perceive that such voluntary cooperation would create records that would likely be made available to Congress (and then possibly disclosed publicly outside of judicial proceedings such as a trial), there would be an unacceptable risk that such knowledge could adversely impact their willingness to cooperate fully and candidly in a voluntary interview." *Id.* at 11. Implicit in that explanation was the understanding that the White House's voluntary cooperation with the Department's investigation did not constitute a waiver of privilege against third parties outside the Executive Branch. So, too, the White House's voluntary cooperation with the Special Counsel's investigation did not effect a waiver of privilege, much less a waiver of testimonial immunity.

In contrast with the White House's cooperation with the Special Counsel, the Attorney General's public release of a redacted version of the Special Counsel's report (with the President's consent) does extinguish the Executive Branch's confidentiality interests in the precise information that has already been revealed. But, as the D.C. Circuit has held, the "release of a document only waives [executive] privileges for the document or information specifically released, and not for related materials." *In re Sealed Case*, 121 F.3d at 741; *see id.* ("[An] all-or-nothing approach has not been adopted with regard to executive privileges generally, or to the deliberative process privilege in particular."). As Assistant Attorney General Scalia explained, the purposes underlying executive privilege "would be jeopardized if harmful information had to be disclosed merely because the President permitted the release of related information that could be revealed safely." Scalia Memorandum, *supra* note 1, at 6–7. Such a result "would have the effect of requiring the concealment of much information which would be released, merely because it was connected with sensitive information." *Id.* at 7.

Thus, the public disclosure of particular information does not waive the Executive Branch's confidentiality interests over the subject matters involved in the prior disclosure. *See, e.g., Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 8 (2007) (opinion of Acting Attorney General Paul Clement) ("The Department[ of Justice]'s accommodation with respect to some White House-Department communications does not constitute a waiver and does not preclude the President from asserting executive privilege with respect to White House materials or testimony concerning such communications."). Consequently, the public disclosure of the Special Counsel's report did not constitute a general waiver concerning Mr. McGahn's communications with the President on those subjects or on any other subjects. And in any event, as discussed above, the disclosure's impact on executive privilege does not ultimately bear on Mr. McGahn's underlying immunity from compelled testimony.

## IV.

Because Congress may not constitutionally compel Mr. McGahn to testify about his official duties, the President may lawfully direct him not to appear in response to the House Judiciary Committee's subpoena. Should the President provide that direction, Mr. McGahn may not constitutionally be penalized, civilly or criminally, for following it.

The Department of Justice has long recognized "that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("*Prosecution for Contempt*"); *see also Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. 350, 356 (1995) ("[T]he criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege."). As Assistant Attorney General Olson explained, "the Constitution does not permit Congress to make it a crime for an official to assist the President in asserting a constitutional privilege that is an integral part of the President's responsibilities under the Constitution." *Prosecution for Contempt*, 8 Op. O.L.C. at 140. To do so "would be to deter the President from asserting executive privilege and to make it difficult for him to enlist the aid of his subordinates in the process," thereby "burden[ing] and immeasurably impair[ing] the President's ability to fulfill his constitutional duties." *Id.* at 134, 137. Assistant Attorney General Walter Dellinger adhered to that reasoning in 1995, recounting that the "application of the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress." *Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. at 356.

This Office has further confirmed that the same "principles . . . similarly shield a current or former senior adviser to the President from prosecution for lawfully invoking his or her immunity from compelled congressional testimony." *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68 (2008). Subjecting a senior presidential adviser to prosecution for asserting a good-faith claim of testimonial immunity would equally impose upon the President "'the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to exercise a responsibility he found necessary to the performance of his

constitutional duty.'" *Id.* (quoting *Prosecution for Contempt*, 8 Op. O.L.C. at 136). In sum, "'[t]o seek criminal punishment for those who have acted to aid the President's performance of his duty would be . . . inconsistent with the Constitution.'" *Id.* at 69 (quoting *Prosecution for Contempt*, 8 Op. O.L.C. at 142).

We similarly believe that Congress could not lawfully exercise any inherent contempt authority against Mr. McGahn for asserting immunity. The constitutional separation of powers bars Congress from exercising its inherent contempt power in the face of a presidential assertion of executive privilege. An attempt to exercise inherent contempt powers in such a circumstance would be without precedent and "would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions." *Prosecution for Contempt*, 8 Op. O.L.C. at 136. This is so because, as Assistant Attorney General Olson concluded, "the same reasoning that suggests that the [criminal contempt] statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well." *Id.* at 140 n.42. Congress may not impede the President's ability to carry out his constitutionally assigned functions by "arrest[ing], bring[ing] to trial, and punish[ing] an executive official who asserted a Presidential claim of executive privilege." *Id.* The same rationale applies equally to an exercise of inherent contempt powers against a senior aide who has complied with a presidential direction that he not provide testimony to a congressional committee.

## V.

The immunity of the President's immediate advisers from compelled congressional testimony on matters related to their official responsibilities has long been recognized and arises from the fundamental workings of the separation of powers. This immunity applies to the former White House Counsel. Accordingly, Mr. McGahn is not legally required to appear and testify about matters related to his official duties as Counsel to the President.

Please let us know if we may be of further assistance.

STEVEN A. ENGEL
*Assistant Attorney General*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

                    *Plaintiff*,

      v.

DONALD F. MCGAHN, II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

                    *Defendant*.

Case No. 1:19 cv-2379 (KBJ)

# Exhibit 4

quinn emanuel trial lawyers | washington, dc

1300 I Street NW, Suite 900, Washington, District of Columbia 20005-3314 | TEL (202) 538-8000 FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8120**

WRITER'S EMAIL ADDRESS
**williamburck@quinnemanuel.com**

May 20, 2019

<u>VIA E-MAIL</u>

The Honorable Jerrold Nadler
Chairman
United States House of Representatives
Committee on the Judiciary
Washington, DC 20515-6216
HJUD.Correspondence@mail.house.gov

Dear Chairman Nadler,

I am in receipt today of two documents provided by the White House Counsel's Office: first, a letter from the Honorable Pat A. Cipollone, the current Counsel to the President of the United States, informing me that the President has directed that my client, Donald F. McGahn, not appear at the Committee's hearing scheduled for tomorrow, Tuesday, May 21, 2019, at 10:00am EDT; and second, a memorandum from the Honorable Steven A. Engel, Assistant Attorney General for the Office of Legal Counsel at the Department of Justice, to Mr. Cipollone advising him that Mr. McGahn, as a former senior advisor to the President, is immune from compelled congressional testimony.

As you know, OLC performs the vital role of providing legal advice to the President and executive branch agencies.  Consistent with that advice as reflected in Mr. Engel's memorandum, the President has unambiguously directed my client not to comply with the Committee's subpoena for testimony.  As with the subpoena for documents, Mr. McGahn again finds himself facing contradictory instructions from two co-equal branches of government.  The direction from the President finds further support in Mr. Engel's detailed and persuasive memorandum.  Under these circumstances, and also conscious of the duties he, as an attorney, owes to his former client, Mr. McGahn must decline to appear at the hearing tomorrow.

Mr. McGahn understands from your prior correspondence that the Committee would vote to hold him in contempt should he not appear tomorrow and the House of Representatives may follow suit.  While we disagree with the Committee's position and hope it will instead seek an accommodation with the White House, Mr. McGahn also must honor his ethical and legal

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON | SALT LAKE CITY
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

obligations as a former senior lawyer and senior advisor to the President.  In short, it is our view that the Committee's dispute is not with Mr. McGahn but with the White House.

Mr. McGahn remains obligated to maintain the status quo and respect the President's instruction. In the event an accommodation is agreed between the Committee and the White House, Mr. McGahn will of course comply with that accommodation.


Sincerely,

William A. Burck


cc:  Honorable Doug Collins, Ranking Member

Enclosures

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

                                    *Plaintiff*,


         v.                                                    Case No. 1:19 cv-2379 (KBJ)


DONALD F. MCGAHN, II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

                                    *Defendant*.

---

# Exhibit 5

JERROLD NADLER, New York
CHAIRMAN

DOUG COLLINS, Georgia
RANKING MINORITY MEMBER

# U.S. House of Representatives
## Committee on the Judiciary

Washington, DC 20515–6216
One Hundred Sixteenth Congress

May 31, 2019

Donald F. McGahn II, Esq.
c/o William A. Burck, Esq.
Quinn Emanuel Urquhart & Sullivan
1300 I St. NW
Suite 9000
Washington, D.C. 20005

Mr. Pat Cipollone
Counsel to the President
The White House
1600 Pennsylvania Ave, N.W.
Washington, D.C. 20002

Dear Mr. McGahn and Mr. Cipollone:

I write to follow up on the Committee's prior correspondence to Donald F. McGahn II and/or his counsel dated May 7, 2019, May 17, 2019, and May 20, 2019 (all of which are attached), regarding the Judiciary Committee's April 22, 2019 subpoena to Mr. McGahn.

First, with respect to the production of documents, counsel for Mr. McGahn informed us on May 7, 2019 that he would not produce documents in his possession responsive to the Committee's subpoena. The stated reason for the failure to produce responsive documents was that the White House directed that such materials be withheld "'because they implicate significant Executive Branch confidentiality interests and executive privilege.'" As explained in the Committee's May 7 letter to Mr. McGahn's counsel, the Committee does not consider a direction by the White House to be a proper or legitimate assertion of any legal privilege. Moreover, the Committee disputes that any valid claim of privilege exists as to documents provided by the White House to Mr. McGahn and/or his counsel. Finally, as the May 7 letter made clear, regardless of the White House's direction, the Committee's subpoena to Mr. McGahn obligates him to produce a log as to any documents in his possession, custody, or control that are being withheld on the grounds of privilege.

We have not yet received such a log, which was due on May 7. To facilitate the resolution of this dispute regarding the log, the Committee is prepared to accept a modified log

that sets forth only the author, recipient(s), and the general subject matter of the record being withheld, as well as the basis for the assertion of the privilege. That is the minimum amount of information that has been accepted by the federal courts.[1] We request that Mr. McGahn produce a modified log not later than June 7, 2019, as well as any documents responsive to the subpoena for which no claim of privilege is being asserted.

Turning to Mr. McGahn's testimony, for all the reasons explained in the Committee's May 7, May 17, and May 20 letters, it was unlawful for Mr. McGahn to fail to appear altogether before the Committee on May 21. He, like any other witness, "must appear before the Committee to provide testimony, and invoke executive privilege where appropriate."[2] In addition, the Committee intends to inquire about certain events that postdate Mr. McGahn's time at the White House, such as the President's public statements regarding Mr. McGahn and the White House's communications with and requests of Mr. McGahn or his counsel. The Committee views these subjects as not subject to any possible claim of privilege. Nevertheless, the Committee remains willing to discuss any reasonable accommodation(s) that would facilitate Mr. McGahn's appearance before the Committee, including limiting the testimony to the specific events detailed in the Special Counsel's report, identifying with greater specificity the precise areas of intended inquiry, and agreeing to the presence of White House counsel during any testimony, so that Mr. McGahn may consult regarding the assertion of executive privilege. Please let us know whether you are willing to engage in such accommodation discussions by no later than June 7.

Sincerely,

Jerrold Nadler
Chairman
House Committee on the Judiciary

cc:     The Hon. Doug Collins
        Ranking Member, House Committee on the Judiciary

Enclosures

---

[1] *Comm. on Oversight & Gov't Reform v. Holder*, No. CV 12-1332 (ABJ), 2014 WL 12662665, at *2 (D.D.C. Aug. 20, 2014), *modified*, No. CV 12-1332 (ABJ), 2014 WL 12662666 (D.D.C. Sept. 9, 2014) (citing *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 107 (D.D.C. 2008)).

[2] *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 107 (D.D.C. 2008). *See also U.S. v. Bryan*, 339 U.S. 323, 331 (1950) ("persons summoned as witnesses by competent authority have certain minimum duties and obligations which are necessary concessions to the public interest in the orderly operation of legislative and judicial machinery").

JERROLD NADLER, New York
CHAIRMAN

ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR., Georgia
TED DEUTCH, Florida
KAREN BASS, California
CEDRIC L. RICHMOND, Louisiana
HAKEEM S. JEFFRIES, New York
DAVID CICILLINE, Rhode Island
ERIC SWALWELL, California
TED LIEU, California
JAMIE RASKIN, Maryland
PRAMILA JAYAPAL, Washington
VAL DEMINGS, Florida
LOU CORREA, California
MARY GAY SCANLON, Pennsylvania
SYLVIA GARCIA, Texas
JOSEPH NEGUSE, Colorado
LUCY McBATH, Georgia
GREG STANTON, Arizona
MADELEINE DEAN, Pennsylvania
DEBBIE MUCARSEL-POWELL, Florida
VERONICA ESCOBAR, Texas

ONE HUNDRED SIXTEENTH CONGRESS

# Congress of the United States
## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–3951
http://www.house.gov/judiciary

DOUG COLLINS, Georgia
RANKING MEMBER

F. JAMES SENSENBRENNER, JR., Wisconsin
STEVE CHABOT, Ohio
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio
KEN BUCK, Colorado
JOHN RATCLIFFE, Texas
MARTHA ROBY, Alabama
MATT GAETZ, Florida
MIKE JOHNSON, Louisiana
ANDY BIGGS, Arizona
TOM McCLINTOCK, California
DEBBIE LESKO, Arizona
GUY RESCHENTHALER, Pennsylvania
BEN CLINE, Virginia
KELLY ARMSTRONG, Alabama
GREG STEUBE, Florida

May 7, 2019

William A. Burck, Esq.
Quinn Emanuel Urquhart & Sullivan
1300 I St. NW
Suite 9000
Washington, D.C. 20005

Dear Mr. Burck:

On Monday, April 22, the House Committee on the Judiciary served a subpoena on your client, former White House Counsel Donald F. McGahn II, compelling the production of documents in Mr. McGahn's possession or control by May 7, and his testimony on May 21, 2019. We write in response to your letter received this morning regarding that subpoena.

As an initial matter, regarding the subpoenaed documents, the White House Counsel's letter did not actually *invoke* executive privilege, but rather merely suggested at the 11th hour – without providing any supporting authority – that all requested documents "*implicate* significant Executive Branch confidential interests and executive privilege."[1] This blanket suggestion of potential privilege is entirely insufficient. As the district court for the District of Columbia held in *Committee on the Judiciary v. Miers*, a subpoena recipient is "not excused from compliance with [a] Committee's subpoena by virtue of a claim of executive privilege that *may ultimately be made*."[2] Nor can a "blanket assertion of privilege over all records generated after a particular date . . . pass muster," without a "showing . . . that any of the individual records satisf[y] the prerequisites for the application of the privilege."[3]

Even if the President were to properly invoke privilege, any claim of executive privilege has been waived as to documents that the White House voluntarily disclosed to Mr. McGahn and

---

[1] Letter to Chairman Nadler from Pat A. Cipollone (May 7, 2019) (*emphasis added*).

[2] Mem. Op., *Comm. on Judiciary v. Miers*, No. 08-cv-0409-JDB (D.D.C. Jul. 31, 2008), at 91 (emphasis added).

[3] *Committee on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008).

his counsel. The D.C. Circuit expressly held in *In re Sealed Case (Espy)* that the White House "waive[s] its claims of privilege in regard to specific documents that it voluntarily reveal[s] to third parties outside the White House."[4] In *Espy*, as is the case here, the disclosure at issue was to the attorney for a former government official.[5] Thus, given that there has been neither an actual assertion of executive privilege, nor an individualized showing that the privilege would apply to the subpoenaed records, the Committee continues to insist upon compliance with the subpoena.

As to Mr. McGahn's own document production obligations, the subpoena plainly directs that your client must provide a privilege log containing specific information for any document in his possession or control that "is withheld in full or in part on any basis," including on "the basis of a privilege asserted by or on behalf of the White House, or at the request of the White House."[6] As the instructions also make clear, any "objections or claims of privilege are waived if you fail to provide an explanation of why full compliance is not possible and a log identifying with specificity the ground(s) for withholding each withheld document prior to the request compliance date."[7] In accordance with the requirements laid out in our subpoena, we expect a full privilege log specifying each document withheld, the asserted basis for so doing and the other information demanded, to be provided forthwith.

Turning to the other requirement of the subpoena – that Mr. McGahn appear before the Committee to provide testimony in two weeks – I fully expect that the Committee will hold Mr. McGahn in contempt if he fails to appear before the Committee, unless the White House secures a court order directing otherwise.[8] Further, even if Mr. McGahn is authorized by court order to invoke executive privilege as to certain testimony, he still is required by law to "appear before the Committee to provide testimony, and invoke executive privilege where appropriate."[9]

Consistent with the rules of the House of Representatives, and as the Supreme Court has admonished, "[a] subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase. If that were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity."[10] And the Supreme Court has "often iterated the

---

[4] *In re Sealed Case*, 121 F.3d 729, 741-42 (D.C. Cir. 1997).

[5] *See id.*

[6] Subpoena by Authority of the House of Representatives of the United States of America to Donald F. McGahn for documents and testimony, signed by Representative Jerrold Nadler, April 22, 2019.

[7] *Id.*

[8] *See, e.g., United States v. Bryan*, 339 U.S. 323, 332 (1950) (reasoning that a party cannot fail to comply with a subpoena absent a "return of the writ" providing reasons for non-compliance, because to "deny the Committee the opportunity to consider the objection or remedy it is in itself a contempt of its authority and an obstruction of its processes").

[9] *Miers*, 558 F. Supp. 2d 53, 106 (D.D.C. 2008).

[10] *Bryan*, 339 U.S. at 331.

2

importance of this public duty, which every person within the jurisdiction of the Government is bound to perform when properly summoned."[11]

As I am sure you are aware, the President recently declared that he is "fighting *all* the subpoenas" issued by Congress, evidently without regard to whether he has any legal basis to do so.[12] To be clear, a letter from the White House in service of the President's apparent goal of blocking or delaying testimony that the President believes would be politically damaging is not a basis for Mr. McGahn to violate his legal obligation to appear before the Committee. Rather, if the President wishes to block Mr. McGahn's appearance in the face of a duly issued subpoena, the burden rests with the White House to file an action in court to attempt to do so.

Moreover, with regard to Mr. McGahn's testimonial obligations, there is no valid executive privilege invocation that could be asserted in good faith regarding the subject of the Special Counsel's investigation and report. President Trump had the opportunity to assert executive privilege over Mr. McGahn's interviews with the Special Counsel and, for strategic reasons, "declined to assert any privilege over Mr. McGahn's testimony," allowing Mr. McGahn to answer the Special Counsel's questions "fulsomely and honestly."[13] Thereafter, the White House made the same strategic decision with regard to publication of the report itself not to assert executive privilege over *any* portion of the report, including portions describing Mr. McGahn's communications with the President and other senior officials in extensive detail.[14] As the D.C. Circuit has already recognized, publication of such information "waives [] privileges for the document or information specifically released."[15]

The President and his personal counsel have also routinely commented publicly regarding the President's communications with Mr. McGahn, and the content of Mr. McGahn's testimony to the Special Counsel. By way of example, on April 25, shortly after the Report was released, President Trump denied a central event described by Mr. McGahn, tweeting, "I never told the White House Counsel Don McGahn to fire Robert Mueller."[16] As has long been recognized, no person—not even the President—can employ privilege as both a sword and a shield, selectively cherry picking which information to tout publicly in his defense, and which information to deliberately withhold from the American people.[17]

---

[11] *Id.*
[12] Charlie Savage, *Trump Vows Stonewall of 'All' House Subpoenas*, N.Y. Times, Apr. 24, 2019 (emphasis added).
[13] Michael S. Schmidt & Maggie Haberman, *White House Counsel, Don McGahn, Has Cooperated Extensively in Mueller Inquiry*, N.Y. TIMES, Aug. 18, 2018.
[14] Attorney General Barr Press Conference on April 18, 2019 (the President confirmed that "he would not assert privilege over the Special Counsel's report . . . [and] no material has been redacted based on executive privilege.").
[15] *In re Sealed Case*, 121 F.3d. at 741.
[16] Donald J. Trump (@realDonaldTrump), Twitter (Apr. 25, 2019, 4:47 AM).
[17] *See, e.g., Nixon v. Sirica*, 487 F.2d 700, 717-18 (D.C. Cir. 1973) (considering public statements by President Nixon to be a factor undermining the White House claimed need for confidentiality in related conversations).

3

Lastly, this Committee is currently engaged in an investigation into alleged obstruction of justice, public corruption and other abuses of power by the President and his administration. Even in its redacted form, the Special Counsel's report offers substantial evidence and analysis that the President did, in fact, engage in multiple acts of obstruction. Mr. McGahn provided critical information that appears throughout Volume II of the Special Counsel's report, detailing incidents in which, *inter alia*, the President: sought to stop former Attorney General Sessions from recusing himself from the Russia investigation and then to have Sessions reverse his recusal decision[18]; directed Mr. McGahn to have Special Counsel Mueller fired[19]; directed Mr. McGahn to deny that attempted firing[20]; and sought to curtail the scope of the Special Counsel's investigation.[21] Where, as here, there is substantial evidence indicating that the President engaged in such misconduct, the public interest in the "fair administration of justice" outweighs the President's "generalized interest in confidentiality."[22]

For all these reasons, Mr. McGahn is required to appear and provide testimony before the Committee absent a court order authorizing non-compliance, as well as provide a privilege log for any documents withheld. Otherwise, the Committee will have no choice but to resort to contempt proceedings to ensure that it has access to the information it requires to fulfill its constitutionally mandated duties.

Sincerely,

Jerrold Nadler
Chairman
House Committee on the Judiciary

cc:     Doug Collins
        Ranking Member
        House Committee on the Judiciary

---

[18] Special Counsel Robert S. Mueller III, *Report on the Investigation Into Russian Interference in the 2016 Presidential Election*, Vol. II, at 48-51, 107-11 (hereinafter "Mueller Report").
[19] *Id.* Vol. II, at 77-87.
[20] *Id.* Vol. II, at 90-94.
[21] *Id.* Vol. II, at 113-18.
[22] *United States v. Nixon*, 418 U.S. 683, 713 (1974).

4

JERROLD NADLER, New York
CHAIRMAN

DOUG COLLINS, Georgia
RANKING MINORITY MEMBER

# U.S. House of Representatives
## Committee on the Judiciary

Washington, DC 20515–6216
One Hundred Sixteenth Congress
May 17, 2019

Donald F. McGahn II, Esq.
c/o William A. Burck, Esq.
Quinn Emanuel Urquhart & Sullivan
1300 I St. NW
Suite 9000
Washington, D.C. 20005

Dear Mr. McGahn:

      The Committee on the Judiciary will hold a hearing on "Oversight of the Report by Special Counsel Robert S. Mueller, III:  Former White House Counsel Donald F. McGahn, II," on May 21, 2019 at 10:00 a.m., in Room 2141 of the Rayburn House Office Building.  As you know, your presence is required pursuant to the subpoena the Committee served on you compelling your testimony for that date.[1]

      On May 7, 2019, I wrote to your counsel and made clear that, absent a court order directing otherwise, you must appear or the Committee will proceed to hold you in contempt.[2] We have received no information indicating that any such order has been sought, much less obtained.  In fact, the Committee has not even been provided a Department of Justice, Office of Legal Counsel (OLC) opinion articulating a legitimate legal basis that prevents you from providing testimony about the subject matters disclosed in the Special Counsel's report.  This is not surprising given that you have already discussed these subjects at length as part of an investigation for which the President expressly waived privilege, has publicly commented on, and even has disputed not only your account of the relevant events but also your good faith.

      As I have previously stated, the Committee intends to focus on the very topics covered in the Special Counsel's Report.  For that reason, there can be no valid assertion of executive privilege given that President Trump "declined to assert any privilege over Mr. McGahn's testimony,"[3] or over any portion of the Report itself.[4]

---

[1] Subpoena by Authority of the House of Representatives of the United States of America to Donald F. McGahn for documents and testimony, signed by Representative Jerrold Nadler, April 22, 2019.  Enclosed please find additional information related to your testimony.

[2] Letter to William A. Burck from Chairman Jerrold Nadler (May 7, 2019).

[3] Michael S. Schmidt & Maggie Haberman, *White House Counsel, Don McGahn, Has Cooperated Extensively in Mueller Inquiry*, N.Y. TIMES, Aug. 18, 2018.

[4] *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) (holding that publication of information "waives [] privileges for the document or information specifically release[d].").

Moreover, the subject of your testimony is critical to this Committee's ongoing investigative, oversight, and legislative efforts.[5]  Since the Committee's last letter, the President on May 11, 2019, tweeted: "I was NOT going to fire Bob Mueller, and did not fire Bob Mueller. . . . Actually, Don McGahn had a much better chance of being fired than Mueller. Never a big fan!" The President's personal attorney, Rudolph Guiliani, likewise previously stated in an interview that your accounting of events "can't be taken at face value" and "could be the product of an inaccurate recollection or could be the product of something else."[6]  Your testimony regarding these events—which the President and his counsel now unequivocally dispute—is thus critical to the Committee's ongoing investigation. In addition, the Committee is committed to providing you the opportunity to address the scurrilous allegations by the President and his counsel that you were not truthful or accurate in your interviews with the Special Counsel.

For all these reasons, the Committee looks forward to your testimony on May 21. To be clear, even if the President—supported by an OLC Opinion—invokes executive privilege over your testimony, and you decide to abide by that improper assertion, you are still required under the law and the penalty of contempt to "appear before the Committee to provide testimony, and invoke executive privilege where appropriate."[7]

Sincerely,

Jerrold Nadler
Chairman
House Committee on the Judiciary

cc:   Doug Collins
Ranking Member
House Committee on the Judiciary

---

[5] The Committee's need for this information is indisputably of the highest order, including fulfilling its constitutionally mandated legislative and oversight duties relating to election security, and investigating allegations of *Presidential* obstruction of justice. *See* Resolution Recommending that the House of Representatives Find William P. Barr, Attorney General, U.S. Department of Justice, In Contempt of Congress for Refusal to Comply with a Subpoena Duly Issued by the Committee on the Judiciary, Committee on the Judiciary, House, 116th Cong. 1. (2019).

[6] Michael S. Schmidt and Maggie Haberman, *Giuliani Attacks McGahn's Account to Mueller*, N.Y. TIMES, Apr. 19, 2019.

[7] *See* Mem. Op., *Comm. on Judiciary v. Miers*, No. 08-cv-0409-JDB (D.D.C. Jul. 31, 2008), at 106.

Oversight of the Report by Special Counsel Robert S. Mueller, III:
Former White House Counsel Donald F. McGahn, II
May 21, 2019 at 10:00 a.m.
Room 2141 of the Rayburn House Office Building

You are welcome to prepare a written statement of proposed testimony prior to your appearance. The written statement may be as extensive as you wish and will be included in the hearing record. To allow sufficient time for questions at the hearing, please briefly highlight the most significant points of the written statement in an oral presentation lasting five minutes or less. Oral testimony at the hearing, including answers to questions submitted for the record, will be printed as part of the verbatim record of the hearing.

To enable the Committee to prepare for the hearing, please submit an electronic copy of any written statement, together with any supplemental materials; a current curriculum vitae; and a completed Truth in Testimony Disclosure Form (Disclosure Form). Your written statement and CV should be prepared in Microsoft Word or Adobe Acrobat. Please number all pages of the written statement, and attach a cover page with your name, position, date, and the title of the hearing.

Be advised that your written statement, CV, and Disclosure Form will be made part of the public record and posted on the Committee's website pursuant to House Rule XI cl. 2(g)(5). In addition, should you want any portion of these documents to be redacted, please submit a separate redacted version of such document(s). These documents should be emailed to Madeline Strasser on my staff at Madeline.Strasser@mail.house.gov.

If you have any questions or concerns, please contact Arya Hariharan, Deputy Chief Oversight Counsel, on my staff at 202-225-3951.

# Truth in Testimony Disclosure Form

In accordance with Rule XI, clause 2(g)(5)*, of the *Rules of the House of Representatives*, witnesses are asked to disclose the following information. Please complete this form electronically by filling in the provided blanks.

**Committee:** _____

**Subcommittee:** _____

**Hearing Date:** _____

**Hearing Subject:**

**Witness Name:** _____

**Position/Title:** _____

**Witness Type:**  ○ Governmental   ○ Non-governmental

**Are you representing yourself or an organization?**   ○ Self      ○ Organization

If you are representing an organization, please list what entity or entities you are representing:

If you are a <u>non-governmental witness</u>, please list any federal grants or contracts (including subgrants or subcontracts) related to the hearing's subject matter that you or the organization(s) you represent at this hearing received in the current calendar year and previous two calendar years. Include the source and amount of each grant or contract. *If necessary, attach additional sheet(s) to provide more information.*

If you are a <u>non-governmental witness</u>, please list any contracts or payments originating with a foreign government and related to the hearing's subject matter that you or the organization(s) you represent at this hearing received in the current year and previous two calendar years. Include the amount and country of origin of each contract or payment. *If necessary, attach additional sheet(s) to provide more information.*

**False Statements Certification**

Knowingly providing material false information to this committee/subcommittee, or knowingly concealing material information from this committee/subcommittee, is a crime (18 U.S.C. § 1001). This form will be made part of the hearing record.

Witness signature                                                                                      Date

**Please attach, when applicable, the following documents to this disclosure. Check the box(es) to acknowledge that you have done so.**

☐  Written statement of proposed testimony

☐  Curriculum vitae or biography

*Rule XI, clause 2(g)(5), of the U.S. House of Representatives provides:

(5)(A) Each committee shall, to the greatest extent practicable, require witnesses who appear before it to submit in advance written statements of proposed testimony and to limit their initial presentations to the committee to brief summaries thereof.

(B) In the case of a witness appearing in a nongovernmental capacity, a written statement of proposed testimony shall include a curriculum vitae and a disclosure of any Federal grants or contracts, or contracts or payments originating with a foreign government, received during the current calendar year or either of the two previous calendar years by the witness or by an entity represented by the witness and related to the subject matter of the hearing.

(C) The disclosure referred to in subdivision (B) shall include—

(i) the amount and source of each Federal grant (or subgrant thereof) or contract (or subcontract thereof) related to the subject matter of the hearing; and

(ii) the amount and country of origin of any payment or contract related to the subject matter of the hearing originating with a foreign government.

(D) Such statements, with appropriate redactions to protect the privacy or security of the witness, shall be made publicly available in electronic form not later than one day after the witness appears.

JERROLD NADLER, New York
CHAIRMAN

DOUG COLLINS, Georgia
RANKING MINORITY MEMBER

# U.S. House of Representatives

## Committee on the Judiciary

Washington, DC 20515–6216
One Hundred Sixteenth Congress

May 20, 2019

Donald F. McGahn II, Esq.
c/o William A. Burck, Esq.
Quinn Emanuel Urquhart & Sullivan
1300 I St. NW
Suite 9000
Washington, D.C. 20005

Dear Mr. McGahn:

As you know, your presence is required tomorrow morning for a hearing before the Committee on the Judiciary pursuant to a subpoena compelling your testimony.[1] This afternoon, White House Counsel Pat Cipollone informed me that President Trump has ordered you not to testify.[2] President Trump's order—which seeks to block a former official from informing a coequal branch of government about his own misconduct—is unprecedented and, contrary to the letter received from your counsel this evening, does not excuse your obligation to appear before the Committee.

*First*, although the Justice Department's Office of Legal Counsel (OLC) has produced an opinion purporting to excuse you from testifying, that opinion has no support in relevant case law, and its arguments have been flatly rejected by the courts. As Judge Bates previously explained, the notion that a former White House Counsel is "absolutely immune" from a congressional subpoena has been "virtually foreclosed by the Supreme Court," which held several decades ago that senior White House aides do not enjoy such immunity even from civil damages suits.[3] OLC's most recent opinion—which relies almost entirely on its own prior opinions—offers no persuasive reasoning for distinguishing Judge Bates's ruling or relevant Supreme Court case law.[4]

---

[1] Subpoena by Authority of the House of Representatives of the United States of America to Donald F. McGahn for documents and testimony, signed by Representative Jerrold Nadler, April 22, 2019.

[2] Letter to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary from Pat Cipollone, White House Counsel (May 20, 2019).

[3] *Comm. on the Judiciary, U.S. House of Reps. v. Miers*, 558 F. Supp. 2d 53, 100 (D.D.C. 2008) (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)).

[4] *See* Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, *Testimonial Immunity Before Congress of the Former Counsel to the President* (May 20, 2019) ("Engel Op.").

*Second*, the Justice Department's own longstanding policy is that "executive privilege. . . should not be invoked to conceal evidence of wrongdoing or criminality on the part of executive officers."[5] Tellingly, the Department's opinion ignores that policy entirely. Yet as I have already made clear, the Committee plans to ask you about instances in which the President took actions or ordered you to take actions that may constitute criminal offenses, including obstruction of justice. Despite the Department's apparent efforts to catalogue every instance in which a White House aide has refused to testify before Congress, the Department can cite no example where Congress planned to ask that White House aide about possible crimes committed by the President. Perhaps that is because—until now—no President would have engaged in such a transparent effort to block his own former aides from testifying about the President's misconduct.

*Third*, in addition to the President not asserting executive privilege with respect to your account of the relevant events that was published in the Special Counsel's report, the President himself has already called your credibility into question. He tweeted less than 10 days ago that he "was NOT going to fire Bob Mueller," denying a central event that you described to Special Counsel Mueller under penalty of felony. At the same time, he has asked you to state publicly that he did not engage in obstruction of justice.[6] In attacking your credibility and asking you to make public comments about these events, the President has not only further waived any possible privilege with regard to your testimony; he has also created substantial concerns about acts of witness intimidation and further obstruction of Congress's ongoing investigations. Because these incidents post-date your service as White House Counsel and occurred while you were a private citizen, the Committee is plainly entitled to ask you about them without raising even potential privilege issues.

*Fourth*, nowhere in OLC's 15-page opinion or in Mr. Cipollone's letter to me is there mention of President Trump actually invoking executive privilege. OLC's opinion deals exclusively with your purported "immunity" from testimony and concludes (erroneously) that you are "not legally required to appear and testify."[7] Mr. Cipollone's letter to me reiterates that conclusion and states that "the President has directed Mr. McGahn not to appear" at tomorrow's hearing.[8] But—in marked contrast to the letter sent by the White House to former White House Counsel Harriet Miers (which itself was rejected as improper by the court)—Mr. Cipollone's

---

[5] Robert B. Shanks, *Congressional Subpoenas of Department of Justice Investigative Files*, 8 Op. O.L.C. 252, 267 (1984).

[6] Michael S. Schmidt, *White House Asked McGahn to Declare Trump Never Obstructed Justice*, N.Y. Times, May 10, 2019.

[7] Engel Op. at 15.

[8] Letter to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary from Pat Cipollone, White House Counsel (May 20, 2019).

Case 1:19-cv-02379-KBJ Document 22-2 Filed 08/26/19 Page 56 of 56

letter does not state that President Trump has asserted executive privilege with respect to your testimony, nor could he.[9] At most, the Department's conclusions regarding your "immunity" (even if accepted as correct, which they are not) mean that the decision whether to comply with the Committee's lawful subpoena rests solely in your hands.

*Fifth*, contrary to the reference in your counsel's letter, there has been no suggestion by President Trump or by anyone speaking on his behalf that attorney-client privilege poses an obstacle to your testimony. In fact, any invocation of attorney-client privilege in these circumstances is foreclosed by the D.C. Circuit case law, which makes clear that the privilege is inapplicable with respect to White House attorneys where the investigation relates to criminal wrongdoing.[10]

Finally, the Justice Department has no place informing you about the potential remedies that Congress may pursue in the exercise of its own Article I powers.[11] The Committee has made clear that you risk serious consequences if you do not appear tomorrow. As the district court already held with respect to Ms. Miers, you are "not excused from compliance with the Committee's subpoena by virtue of a claim of executive privilege that may ultimately be made."[12] Instead, you "must appear before the Committee to provide testimony, and invoke executive privilege where appropriate."[13] Should you fail to do so, the Committee is prepared to use all enforcement mechanisms at its disposal.

Sincerely,

Jerrold Nadler
Chairman
House Committee on the Judiciary

cc:     The Hon. Doug Collins
        Ranking Member, House Committee on the Judiciary

---

[9] *See* Letter to George T. Manning, Esq. from Fred F. Fielding, Counsel to the President (July 9, 2007), attached as Exhibit 20 in *Miers*, No. 08-409, 558 F. Supp. 2d 53 (D.D.C); *see also Miers*, 558 F. Supp. 2d at 62 (White House Counsel informed Miers that President Bush "had decided to assert executive privilege over the substance of Ms. Miers's testimony").

[10] *In re Lindsey*, 158 F.3d 1263, 1271-78 (D.C. Cir. 1998).
[11] *See* Engel Op. at 15

[12] *Miers*, 558 F. Supp. 2d at 106.

[13] *Id.*