**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

        *Plaintiff,*

v.

DONALD F. MCGAHN II,

        *Defendant.*

Case No. 1:19-cv-2379 (KBJ)

**DECLARATION OF TODD B. TATELMAN IN SUPPORT OF PLAINTIFF**
**COMMITTEE ON THE JUDICIARY'S MOTION FOR PRELIMINARY INJUNCTION,**
**OR, IN THE ALTERNATIVE, FOR EXPEDITED SUMMARY JUDGMENT**

I, Todd B. Tatelman, declare as follows:

1.  I am the Deputy General Counsel, Office of General Counsel, U.S. House of

Representatives, counsel for Plaintiff Committee on the Judiciary, United States House of

Representatives, in this action.

2.  I make this declaration in support of the Plaintiff Committee on the Judiciary's

Motion for Preliminary Injunction, or, in the Alternative Expedited Summary Judgment.

3.  Attached hereto as Exhibit A[1] is a true and accurate copy of the hearing transcript

from *Oversight of the Report on the Investigation into Russian Interference in the 2016*

*Presidential Election:  Former Special Counsel Robert S. Mueller, III: Hearing Before the H.*

*Comm. on the Judiciary*, 116th Cong. (July 24, 2019).

---

[1] For the Court's and the parties' convenience, where the exhibits attached here were also attached to the complaint in this matter, they are labeled consistently with the exhibits as attached to the complaint.

4. Attached hereto as Exhibit B is a true and accurate copy of the letter from Pat Cipollone, Counsel to the President, to Jerrold Nadler, Chairman, H. Comm. on the Judiciary (May 20, 2019).

5. Attached hereto as Exhibit C is a true and accurate copy of the memorandum from Steven A. Engel, Assistant Att'y Gen., Office of Legal Counsel, to Pat A. Cipollone, Counsel to the President, Re: Testimonial Immunity Before Congress of the Former Counsel to the President (May 20, 2019).

6. Attached hereto as Exhibit E is a true and accurate copy of the hearing transcript of *Former Special Counsel Robert S. Mueller III on the Investigation into Russian Interference in the 2016 Presidential Election: Hearing Before the H. Permanent Select Comm. on Intelligence*, 116th Cong. (July 24, 2019).

7. Attached hereto as Exhibit F is a true and accurate copy of the press release issued by the Department of Justice on the Testimony of Former FBI Director James Comey (June 8, 2017).

8. Attached hereto as Exhibit O is a true and accurate copy of the transcript from *Lessons from the Mueller Report, Part III: "Constitutional Processes for Addressing Presidential Misconduct": Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (July 12, 2019).

9. Attached hereto as Exhibit P is a true and accurate copy of the memorandum from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, to Members of the Comm. on the Judiciary (July 11, 2019).

10. Attached hereto as Exhibit R is a true and accurate copy of a letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, to Donald F. McGahn II (Mar. 4, 2019).

2

11.     Attached hereto as Exhibit T is a true and accurate copy of the transcript from the *Markup of Resolution Authorizing Issuance of Subpoenas Before the H. Comm. on the Judiciary*, 116th Cong. (Apr. 3, 2019).

12.     Attached hereto as Exhibit U is a true and accurate copy of the subpoena from Judiciary Committee to Donald F. McGahn II (Apr. 22, 2019).

13.     Attached hereto as Exhibit X is a true and accurate copy of the letter from William A. Burck to Jerrold Nadler, Chairman, H. Comm. on the Judiciary (May 20, 2019).

14.     Attached hereto as Exhibit Y is a true and accurate copy of the hearing transcript, *Oversight of the Report by Special Counsel Robert S. Mueller, III: Former White House Counsel Donald F. McGahn, II: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (May 21, 2019).

15.     Attached hereto as Exhibit Z is a true and accurate copy of the letter from Jerrold Nadler, Chairman, H. Comm. on the Judiciary, to Donald F. McGahn II & Pat A. Cipollone, Counsel to the President (May 31, 2019).

16.     Attached hereto as Exhibit MM is a true and accurate copy of excerpts from the transcript of the May 22, 2019 hearing in *Trump v. Deutsche Bank*, No. 19-cv-3826 (S.D.N.Y.), including the Court's opinion denying the plaintiff's motion for preliminary injunction, starting on page 50.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge.

Executed on August 26, 2019, in Washington, DC.

Todd B. Tatelman

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, 2138 Rayburn House Office Building Washington, D.C. 20515,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD F. MCGAHN II, 51 Louisiana Avenue, N.W. Washington, D.C. 20001,<br><br>*Defendant*. | Case No. 1:19-cv-2379 (KBJ) |

# Exhibit A

<u>RPTR ZAMORA</u>

<u>EDTR ZAMORA</u>

OVERSIGHT OF THE REPORT ON THE INVESTIGATION INTO RUSSIAN

INTERFERENCE IN THE 2016 PRESIDENTIAL ELECTION: FORMER SPECIAL

COUNSEL ROBERT S. MUELLER, III

Wednesday, July 24, 2019

House of Representatives,

Committee on the Judiciary,

Washington, D.C.

The committee met, pursuant to call, at 8:32 a.m., in Room

2141, Rayburn House Office Building, Hon. Jerrold Nadler [chairman

of the committee] presiding.

Present:  Representatives Nadler, Lofgren, Jackson Lee,

Cohen, Johnson of Georgia, Deutch, Bass, Richmond, Jeffries,

Cicilline, Swalwell, Lieu, Raskin, Jayapal, Demings, Correa,

Scanlon, Garcia, Neguse, McBath, Stanton, Dean, Mucarsel-Powell,

Escobar, Collins, Sensenbrenner, Chabot, Gohmert, Jordan, Buck,

Ratcliffe, Roby, Gaetz, Johnson of Louisiana, Biggs, McClintock,

Lesko, Reschenthaler, Cline, Armstrong, and Steube.

Staff Present:  Aaron Hiller, Deputy Chief Counsel; Arya Hariharan, Deputy Chief Oversight Counsel; David Greengrass, Senior Counsel; John Doty, Senior Advisor; Lisette Morton, Director Policy, Planning, and Member Services; Madeline Strasser, Chief Clerk; Moh Sharma, Member Services and Outreach Advisor; Susan Jensen, Parliamentarian/Senior Counsel; Sarah Istel, Oversight Counsel; Julian Gerson, Staff Assistant; Will Emmons, Professional Staff Member; Brendan Belair, Minority Staff Director; Bobby Parmiter, Minority Deputy Staff Director/Chief Counsel; Jon Ferro, Minority Parliamentarian/General Counsel; Carlton David, Minority Chief Oversight Counsel; Ashley Callen, Minority Oversight Counsel; Danny Johnson, Minority Oversight Counsel; Jake Greenberg, Minority Oversight Counsel; and Erica Barker, Minority Chief Legislative Clerk.

Chairman <u>Nadler.</u>  The Judiciary Committee will come to order. Without objection, the chair is authorized to declare recesses of the committee at any time.

We welcome everyone to today's hearing on oversight of the report on the investigation into Russian interference in the 2016 Presidential election.  I will now recognize myself for a brief opening statement.

Director Mueller, thank you for being here.  I want to say just a few words about our themes today:  responsibility, integrity, and accountability.  Your career, for example, is a model of responsibility.  You are a decorated Marine officer.  You were awarded a Purple Heart and the Bronze Star for valor in Vietnam.  You served in senior roles at the Department of Justice, and in the immediate aftermath of 9/11, you served as director of the FBI.

Two years ago, you return to public service to lead the investigation into Russian interference in the 2016 elections. You conducted that investigation with remarkable integrity.  For 22 months, you never commented in public about your work, even when you were subjected to repeated and grossly unfair personal attacks.  Instead, your indictments spoke for you and in astonishing detail.

Over the course of your investigation, you obtained criminal indictments against 37 people and entities.  You secured the conviction of President Trump's campaign chairman, his deputy

campaign manager, his National Security Advisor, and his personal lawyer, among others.  In the Paul Manafort case alone, you recovered as much as $42 million so that the cost of your investigation to the taxpayers approaches zero.

And in your report you offer the country accountability as well.  In Volume I, you find that the Russian Government attacked our 2016 elections, quote, in a sweeping and systematic fashion, and that the attacks were designed to benefit the Trump campaign.

Volume II walks us through 10 separate incidents of possible obstruction of justice where, in your words, President Trump attempted to exert undue influence over your investigation.  The President's behavior included, and I quote from your report, quote, public attacks on the investigation, nonpublic efforts to control it, and efforts in both public and private to encourage witnesses not to cooperate, close quote.

Among the most shocking of these incidents, President Trump ordered his White House counsel to have you fired and then to lie and deny that it had happened.  He awarded his former campaign manager to convince the recused Attorney General to step in and to limit your work, and he attempted to prevent witnesses from cooperating with your investigation.

Although Department policy barred you from indicting the President for this conduct, you made clear that he is not exonerated.  Any other person who acted in this way would have been charged with crimes, and in this Nation, not even the

President is above the law, which brings me to this committee's work:  responsibility, integrity, and accountability.  These are the marks by which we who serve on this committee will be measured as well.

Director Mueller, we have a responsibility to address the evidence that you have uncovered.  You recognize as much when you said, quote, the Constitution requires a process other than the criminal justice system to formally accuse a sitting President of wrongdoing, close quote.  That process begins with the work of this committee.

We will follow your example, Director Mueller.  We will act with integrity.  We will follow the facts where they lead.  We will consider all appropriate remedies.  We will make our recommendation to the House when our work concludes.  We will do this work because there must be accountability for the conduct described in your report, especially as it relates to the President.

Thank you again, Director Mueller.  We look forward to your testimony.

It is now my pleasure to recognize the ranking member of the Judiciary Committee, the gentleman from Georgia, Mr. Collins, for his opening statement.

[The statement of Chairman Nadler follows:]


******** COMMITTEE INSERT ********

Mr. Collins.  Thank you, Mr. Chairman.  And thank you,
Mr. Mueller, for being here.

For 2 years leading up to the release of the Mueller report
and in the 3 months since, Americans were first told what to
expect and then what to believe.  Collusion, we were told, was in
plain sight, even if the special counsel's team didn't find it.

When Mr. Mueller produced his report and Attorney General
Barr provided it to every American, we read no American conspired
with Russia to interfere in our elections but learned the depths
of Russia's malice toward America.

We are here to ask serious questions about Mr. Mueller's
work, and we will do that.  After an extended, unhampered
investigation, today marks an end to Mr. Mueller's involvement in
an investigation that closed in April.  The burden of proof for
accusations that remain unproven is extremely high and especially
in light of the special counsel's thoroughness.

We were told this investigation began as an inquiry into
whether Russia meddled in our 2016 election.  Mr. Mueller, you
concluded they did.  Russians accessed Democrat servers and
disseminated sensitive information by tricking campaign insiders
into revealing protected information.

The investigation also reviewed whether Donald Trump, the
President, sought Russian assistance as a candidate to win the
Presidency.  Mr. Mueller concluded he did not.  His family or
advisers did not.  In fact, the report concludes no one in the

President's campaign colluded, collaborated, or conspired with the Russians.

The President watched the public narrative surrounding this investigation [inaudible] assume his guilt while he knew the extent of his innocence.  Volume II of Mr. Mueller's report details the President's reaction to frustrating investigation where his innocence was established early on.  The President's attitude toward the investigation was understandably negative, yet the President did not use his authority to close the investigation.  He asked his lawyer if Mr. Mueller had conflicts that disqualified Mr. Mueller from the job, but he did not shut down the investigation.  The President knew he was innocent.

Those are the facts of the Mueller report.  Russia meddled in the 2016 election, the President did not conspire with the Russians, and nothing we hear today will change those facts.  But one element of this story remains:  the beginnings of the FBI investigation into the President.  I look forward to Mr. Mueller's testimony about what he found during his review of the origins of the investigation.

In addition, the inspector general continues to review how baseless gossip can be used to launch an FBI investigation against a private citizen and eventually a President.  Those results will be released, and we will need to learn from them to ensure government intelligence and our law enforcement powers are never again used and turned on a private citizen or a potential -- or a

political candidate as a result of the political leanings of a handful of FBI agents.

The origins and conclusions of the Mueller investigation are the same things:  what it means to be American.  Every American has a voice in our democracy.  We must protect the sanctity of their voice by combatting election interference.  Every American enjoys the presumption of innocence and guarantee of due process. If we carry nothing -- anything away today, it must be that we increase our vigilance against foreign election interference, while we ensure our government officials don't weaponize their power against the constitutional rights guaranteed to every U.S. citizen.

Finally, we must agree that the opportunity cost here is too high.  The months we have spent investigating from this dais failed to end the border crisis or contribute to the growing job market.  Instead, we have gotten stuck, and it's paralyzed this committee and this House.

And as a side note, every week, I leave my family and kids, the most important things to me, to come to this place because I believe this place is a place where we can actually do things and help people.  Six and a half years ago, I came here to work on behalf of the people of the Ninth District in this country, and we accomplished a lot in those first 6 years on a bipartisan basis with many of my friends across the aisle sitting on this dais with me today.  However, this year, because of the majority's dislike

of this President and the endless hearing and to a closed investigation have caused us to accomplish nothing except talk about the problems of our country, while our border is on fire, in crisis, and everything else is stopped.

This hearing is long overdue.  We have had truth for months. No American conspired to throw our election.  What we need today is to let that truth bring us confidence, and I hope, Mr. Chairman, closure.

With that, I yield back.

[The statement of Mr. Collins follows:]


******** COMMITTEE INSERT ********

Chairman <u>Nadler.</u>  Thank you, Mr. Collins.

I will now introduce today's witness.

Robert Mueller served as Director of the FBI from 2001 to 2013, and most recently served as special counsel in the Department of Justice overseeing the investigation into Russian interference in the 2016 special election.

He received his BA from Princeton University and MA from New York University, in my district, and his JD from the University of Virginia.  Mr. Mueller is accompanied by his -- by counsel, Aaron Zebley, who served as deputy special counsel on the investigation.

We welcome our distinguished witness, and we thank you for participating in today's hearing.

Now, if you would please rise, I will begin by swearing you in.

Raise your right hand, please.  Left hand.

Do you swear or affirm under penalty of perjury that the testimony you're about to give is true and correct to the best of your knowledge, information, and belief, so help you God?

Let the record show the witness answered in the affirmative.

Thank you.  And please be seated.

Please note that your written statement will be entered into the record in its entirety.  Accordingly, I ask that you summarize your testimony in 5 minutes.

Director Mueller, you may begin.

**STATEMENT OF ROBERT S. MUELLER, III, SPECIAL COUNSEL, THE SPECIAL COUNSEL'S OFFICE, THE INVESTIGATION INTO RUSSIAN INTERFERENCE IN THE 2016 PRESIDENTIAL ELECTION, MAY 2017 TO MAY 2019**

Mr. Mueller.  Good morning, Chairman Nadler and Ranking Member Collins, and the members of the committee.

As you know, in May 2017, the Acting Attorney General asked me to serve as special counsel.  I undertook that role because I believed that it was of paramount interest to the Nation to determine whether a foreign adversary had interfered in the Presidential election.  As the Acting Attorney General said at the time, the appointment was necessary in order for the American people to have full confidence in the outcome.

My staff and I carried out this assignment with that critical objective in mind:  to work quietly, thoroughly, and with integrity so that the public would have full confidence in the outcome.

The order appointing me as special counsel directed our office to investigate Russian interference in the 2016 Presidential election.  This included investigating any links or coordination between the Russian Government and individuals associated with the Trump campaign.  It also included investigating efforts to interfere with or obstruct our investigation.

Throughout the investigation, I continually stressed two things to the team that we had assembled.  First, we needed to do our work as thoroughly as possible and as expeditiously as possible.  It was in the public interest for our investigation to be complete but not to last a day longer than was necessary.

Second, the investigation needed to be conducted fairly and with absolute integrity.  Our team would not leak or take other actions that could compromise the integrity of our work.  All decisions were made based on the facts and the law.

During the course of our investigation, we charged more than 30 defendants with committing Federal crimes, including 12 officers of the Russian military.  Seven defendants have been convicted or pled guilty.  Certain other charges we brought remain pending today, and for those matters, I stress that the indictments contain allegations and every defendant is presumed innocent unless and until proven guilty.

In addition to the criminal charges we brought, as required by Justice Department regulations, we submitted a confidential report to the Attorney General at the conclusion of our investigation.  The report set forth the results of our work and the reasons for our charging and declination decisions.  The Attorney General later made the report largely public.

As you know, I made a few limited remarks about our report when we closed the Special Counsel's Office in May of this year, but there are certain points that bear emphasis.  First, our

investigation found that the Russian Government interfered in our election in sweeping and systematic fashion.

Second, the investigation did not establish that members of the Trump campaign conspired with the Russian Government in its election interference activities.  We did not address collusion, which is not a legal term; rather, we focused on whether the evidence was sufficient to charge any member of the campaign with taking part in a criminal conspiracy, and it was not.

Third, our investigation of efforts to obstruct the investigation and lie to investigators was of critical importance. Obstruction of justice strikes at the core of the government's effort to find the truth and to hold wrongdoers accountable.

Finally, as described in Volume II of our report, we investigated a series of actions by the President towards the investigation.  Based on Justice Department policy and principles of fairness, we decided we would not make a determination as to whether the President committed a crime.  That was our decision then and it remains our decision today.

Let me say a further word about my appearance today.  It is unusual for a prosecutor to testify about a criminal investigation.  And given my role as a prosecutor, there are reasons why my testimony will necessarily be limited.

First, public testimony could affect several ongoing matters. In some of these matters, court rules or judicial orders limit the disclosure of information to protect the fairness of the

proceedings.  And consistent with longstanding Justice Department policy, it would be inappropriate for me to comment in any way that could affect an ongoing matter.

Second, the Justice Department has asserted privileges concerning investigative information and decisions, ongoing matters within the Justice Department, and deliberations within our office.  These are Justice Department privileges that I will respect.  The Department has released the letter discussing the restrictions on my testimony.  I therefore will not be able to answer questions about certain areas that I know are of public interest.

For example, I am unable to address questions about the initial opening of the FBI's Russia investigation, which occurred months before my appointment, or matters related to the so-called Steele dossier.  These matters are subjects of ongoing review by the Department.  Any questions on these topics should therefore be directed to the FBI or the Justice Department.

As I explained when we closed the Special Counsel's Office in May, our report contains our findings and analysis and the reasons for the decisions we made.  We conducted an extensive investigation over 2 years.  In writing the report, we stated the results of our investigation with precision.  We scrutinized every word.  I do not intend to summarize or describe the results of our work in a different way in the course of my testimony today.  And as I said on May 29, the report is my testimony, and I will stay

within that text.

And as I stated in May, I will not comment on the actions of the Attorney General or of Congress.  I was appointed as a prosecutor, and I intend to adhere to that role and to the Department standards that govern it.

I will be joined today by Deputy Special Counsel Aaron Zebley.  Mr. Zebley has extensive experience as a Federal prosecutor and at the FBI, where he served as my chief of staff.  Mr. Zebley was responsible for the day-to-day oversight of the investigations conducted by our office.

Now, I also want to, again, say thank you to the attorneys, the FBI agents, the analysts, the professional staff who helped us conduct this investigation in a fair and independent manner.  These individuals, who spent nearly 2 years working on this matter, were of the highest integrity.

Let me say one more thing.  Over the course of my career, I have seen a number of challenges to our democracy.  The Russian Government's effort to interfere in our election is among the most serious.  And as I said on May 29, this deserves the attention of every American.

Thank you, Mr. Chairman.

[The statement of Mr. Mueller follows:]


******** COMMITTEE INSERT ********

Chairman Nadler.  Thank you.

We will now proceed under the 5-minute rule with questions. I will begin by recognizing myself for 5 minutes.

Director Mueller, the President has repeatedly claimed that your report found there was no obstruction and that it completely and totally exonerated him.  But that is not what your report said, is it?

Mr. Mueller.  Correct, that is not what the report said.

Chairman Nadler.  In our reading from page 2 of Volume II of your report that is on the screen, you wrote, quote, if we had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, we would so state.  Based on the facts and the applicable legal standards, however, we are unable to reach that judgment, close quote.

Now, does that say there was no obstruction?

Mr. Mueller.  No.

Chairman Nadler.  In fact, you were actually unable to conclude the President did not commit obstruction of justice.  Is that correct?

Mr. Mueller.  Well, we at the outset, determined that we -- when it came to the President's culpability, we needed to -- we needed to go forward only after taking into account the OLC opinion that indicated that a President -- a sitting President cannot be indicted.

Chairman Nadler.  So the report did not conclude that he did

not commit obstruction of justice.  Is that correct?

Mr. Mueller.  That is correct.

Chairman Nadler.  And what about total exoneration?  Did you actually totally exonerate the President?

Mr. Mueller.  No.

Chairman Nadler.  Now, in fact, your report expressly states that it does not exonerate the President?

Mr. Mueller.  It does.

Chairman Nadler.  And your investigation actually found, quote, multiple acts by the President that were capable of exerting undue influence over law enforcement investigations, including the Russian interference and obstruction investigations. Is that correct?

Mr. Mueller.  Correct.

Chairman Nadler.  Now, Director Mueller, can you explain in plain terms what that finding means so the American people can understand it?

Mr. Mueller.  Well, the finding indicates that the President was not -- that the President was not exculpated for the acts that he allegedly committed.

Chairman Nadler.  In fact, you were talking about incidents, quote, in which the President sought to use his official power outside of usual channels, unquote, to exert undue influence over your investigations.  Is that right?

Mr. Mueller.  That's correct.

Chairman <u>Nadler.</u>  Now, am I correct, then, on page 7 of Volume II of your report, you wrote, quote, the President became aware that his own conduct was being investigated in an obstruction of justice inquiry.  At that point, the President engaged in a second phase of conduct, involving public attacks on the investigation, nonpublic efforts to control it, and efforts in both public and private to encourage witnesses not to cooperate with the investigation, close quote.

So President Trump's efforts to exert undue influence over your investigation intensified after the President became aware that he personally was being investigated?

Mr. <u>Mueller.</u>  I stick with the language that you have in front of you.

Chairman <u>Nadler.</u>  Which --

Mr. <u>Mueller.</u>  Which comes from page 7, Volume II.

Chairman <u>Nadler.</u>  Now, is it correct that if you concluded that the President committed the crime of obstruction, you could not publicly state that in your report or here today?

Mr. <u>Mueller.</u>  Can you repeat the question, sir?

Chairman <u>Nadler.</u>  Is it correct that if you had concluded that the President committed the crime of obstruction, you could not publicly state that in your report or here today?

Mr. <u>Mueller.</u>  Well, I would say you could -- the statement would be that you would not indict and you would not indict because under the OLC opinion a sitting President cannot be

indicted.  It would be unconstitutional.

Chairman Nadler.  Okay.  So you could not state that because of the OLC opinion if that had been your conclusion?

Mr. Mueller.  OLC opinion with some guide, yes.

Chairman Nadler.  But under DOJ -- under Department of Justice policy, the President could be prosecuted for obstruction of justice crimes after he leaves office, correct?

Mr. Mueller.  True.

Chairman Nadler.  Thank you.

Did any senior White House official refuse a request to be interviewed by you and your team?

Mr. Mueller.  I don't believe so.

Well, let me take that back.  I would have to look at it, but I'm not certain that that was the case.

Chairman Nadler.  Did the President refuse a request to be interviewed by you and your team?

Mr. Mueller.  Yes.

Chairman Nadler.  Yes.  And is it true that you tried for more than a year to secure an interview with the President?

Mr. Mueller.  Yes.

Chairman Nadler.  And is it true that you and your team advised the President's lawyer that, quote, an interview with the President is vital to our investigation, close quote?

Mr. Mueller.  Yes.  Yes.

Chairman Nadler.  And is it true that you also, quote, stated

that it is in the interest of the Presidency and the public for an interview to take place, close quote?

Mr. <u>Mueller.</u>  Yes.

Chairman <u>Nadler.</u>  But the President still refused to sit for an interview by you or your team?

Mr. <u>Mueller.</u>  True.  True.

Chairman <u>Nadler.</u>  And did you also ask him to provide written answers to questions under 10 possible episodes of obstruction of justice crimes involving him?

Mr. <u>Mueller.</u>  Yes.

Chairman <u>Nadler.</u>  Did he provide any answers to a single question about whether he engaged in obstruction of justice crimes?

Mr. <u>Mueller.</u>  I would have to check on that.  I'm not certain.

Chairman <u>Nadler.</u>  Director Mueller, we are grateful that you are here to explain your investigation and findings.  Having reviewed your work, I believe anyone else would engage in the conduct describing your report would have been criminally prosecuted.  Your work is vitally important to this committee and the American people because no one is above the law.

I'll now recognize the gentleman from Georgia, Mr. Collins.

Mr. <u>Collins.</u>  Thank you, Mr. Chairman.

And we are moving, I understand and just reiterate, on the 5-minute rule.  Mr. Mueller, I have several questions, many of

which that you just answered will be questioned here in a moment,
but I want to lay some foundations.  So we will go through these
fairly quickly.  I will talk slowly.  I am said that I talk fast.
I will talk slowly.

Mr. Mueller.  Thank you, sir.

Mr. Collins.  In your press conference, you stated any
testimony from your office would not go beyond our report.  We
chose these words carefully.  The words speaks for itself.  I will
not provide information beyond that which is already public in any
appearance before Congress.

Do you stand by that statement?

Mr. Mueller.  Yes.

Mr. Collins.  Since closing the Special Counsel's Office in
May of 2019, have you conducted any additional interviews or
obtained any new information in your role as special counsel?

Mr. Mueller.  In the wake of the report?

Mr. Collins.  Since the closing of the office in May of 2019.

Mr. Mueller.  And the question was?

Mr. Collins.  Have you conducted any new interviews and any
new witnesses or anything?

Mr. Mueller.  No.

Mr. Collins.  And you can confirm you're no longer special
counsel, correct?

Mr. Mueller.  I am no longer special counsel.

Mr. Collins.  At any time with the investigation, was your

investigation curtailed or stopped or hindered?

Mr. Mueller. No.

Mr. Collins. Were you or your team provided any questions by Members of Congress of the majority ahead of your hearing today?

Mr. Mueller. No.

Mr. Collins. Your report states that your investigative team included 19 lawyers and approximately 40 FBI agents and analysts and accountants. Are those numbers accurate?

Mr. Mueller. Could you repeat that, please?

Mr. Collins. Forty FBI agents, 19 lawyers, intelligence analysts, and forensic accountants. Are those numbers accurate? This is included in your report.

Mr. Mueller. Generally, yes.

Chairman Nadler. Is it also true that you issued over 2,800 subpoenas, executed nearly 500 search warrants, obtained more than 230 orders for communication records, and 50 pen registers?

Mr. Mueller. That went a little fast for me.

Mr. Collins. Okay. In your report -- I will make this very simple -- you did a lot of work, correct?

Mr. Mueller. Yes. That I agree to.

Mr. Collins. A lot of subpoenas? A lot of pen registers?

Mr. Mueller. A lot of subpoenas, yes.

Mr. Collins. Okay. We will walk this really slow if we need to.

Mr. Mueller. A lot search warrants.

Mr. <u>Collins.</u>  All right.  A lot of search warrants, a lot of things.  So you are very thorough?

Mr. <u>Mueller.</u>  What?

Mr. <u>Collins.</u>  In your opinion, very thorough, you listed this out in your report, correct?

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Collins.</u>  Thank you.

Is it true the evidence gathered during your investigation -- or given the questions that you have just answered, is it true the evidence gathered during your investigation did not establish that the President was involved in the underlying crime related to Russian election interference as stated in Volume I, page 7?

Mr. <u>Mueller.</u>  We found insufficient evidence of the President's culpability --

Mr. <u>Collins.</u>  So that would be a yes.

Mr. <u>Mueller.</u>  -- with -- pardon?

Mr. <u>Collins.</u>  That would be a yes?

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Collins.</u>  Thank you.

Isn't it true the evidence did not establish that the President or those close to him were involved in the charge of Russian computer hacking or active measure conspiracies or that the President otherwise had unlawful relationships with any Russian official, Volume II, pages 76, correct?

Mr. <u>Mueller.</u>  I leave the answer to our report.

Mr. <u>Collins.</u>  So that is a yes.

Is that true, your investigation did not establish that members of the Trump campaign conspired or coordinated with the Russian Government in the election interference activity, Volume I, page 2, Volume I, page 173?

Mr. <u>Mueller.</u>  Thank you.  Yes.

Mr. <u>Collins.</u>  Yes.  Thank you.

Although your report states collusion is not a specific offense, and you have said that this morning, or a term of art in Federal criminal law, conspiracy is.

In the colloquial context, are "collusion" and "conspiracy" essentially synonymous terms?

Mr. <u>Mueller.</u>  You're going to have to repeat that for me.

Mr. <u>Collins.</u>  Collusion is not a specific offense or a term of art in the Federal criminal law; conspiracy is.

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Collins.</u>  In the colloquial context, known public context, "collusion" and "conspiracy" are essentially synonymous terms, correct?

Mr. <u>Mueller.</u>  No.

Mr. <u>Collins.</u>  If no, on page 180 of Volume I of your report, you wrote, as defined in legal dictionaries, collusion is largely synonymous with conspiracy as that crime is set forth in the general Federal conspiracy statute, 18 U.S.C. 371.  You said at

your May 29 press conference and here today, you choose your words carefully.  Are you sitting here today testifying to something different than what your report states?

Mr. <u>Mueller.</u>  Well, what I'm asking is, if you can give me the citation, I can look at the citation and evaluate whether it is accurate.

Mr. <u>Collins.</u>  Okay.  Let me just be clarifying.  You stated that you have stayed within the report.  I just stated your report back to you.  And you said that collusion and conspiracy were not synonymous terms.  That was -- your answer was no.

Mr. <u>Mueller.</u>  That's correct.

Mr. <u>Collins.</u>  In that page 180 of Volume I of your report it says, as defined in legal dictionaries, collusion is largely synonymous with conspiracy as that crime is set forth in general conspiracy statute 18 U.S.C. 371.  Now, you said you chose your words carefully.  Are you contradicting your report right now?

Mr. <u>Mueller.</u>  Not when I read it.

Mr. <u>Collins.</u>  So you change your answer to yes then?

Mr. <u>Mueller.</u>  No.  No.  If you look at the language --

Mr. <u>Collins.</u>  I'm reading your report, sir.  It's a yes or no answer.

Mr. <u>Mueller.</u>  Page 180?

Mr. <u>Collins.</u>  Page 180, Volume I.  This is from your report.

Mr. <u>Mueller.</u>  Correct.  And I leave it with the report.

Mr. <u>Collins.</u>  So the report says, yes, they are synonymous.

Mr. Mueller.  Yes.

Mr. Collins.  Hopefully, for finally, out of your own report, we can put to bed the collusion and conspiracy.

One last question as we're going through.  Did you ever look into other countries investigated in the Russian's interference into our election?  Were other countries investigated or found knowledge that they had interference in our election?

Mr. Mueller.  I'm not going to discuss other matters.

Mr. Collins.  With that, I yield back.

Chairman Nadler.  The gentleman yields back.

The gentlelady from California.

Ms. Lofgren.  Director Mueller, as you've heard from the chairman, we're mostly going to talk about obstruction of justice today.  But the investigation of Russia's attack that started your investigation is why evidence of possible obstruction is serious.

To what extent did the Russian Government interfere in the 2016 Presidential election?

Mr. Mueller.  Could you repeat that, ma'am?

Ms. Lofgren.  To what extent did the Russian Government interfere in the 2016 Presidential election?

Mr. Mueller.  Well, particularly when it came to computer crimes and the like, the government was implicated.

Ms. Lofgren.  So you wrote, in Volume I, that the Russian Government interfered in the 2016 Presidential election in sweeping and systematic fashion.  You also described in your

report that the then-Trump campaign chairman Paul Manafort shared

with a Russian operative, Kilimnik, the campaign strategy for

winning Democratic votes in Midwestern States and internal polling

data of the campaign.  Isn't that correct?

Mr. Mueller.  Correct.

Ms. Lofgren.  They also discussed the status of the Trump

campaign and Manafort's strategy for winning Democratic votes in

Midwestern States.  Months before that meeting, Manafort had

caused internal data to be shared with Kilimnik, and the sharing

continued for some period of time after their August meeting.

Isn't that correct?

Mr. Mueller.  Accurate.

Ms. Lofgren.  In fact, your investigation found that Manafort

briefed Kilimnik on the state of the Trump campaign and Manafort's

plan to win the election, and that briefing encompassed the

campaign's messaging, its internal polling data.  It also included

discussion of battleground States, which Manafort identified as

Michigan, Wisconsin, Pennsylvania, and Minnesota.  Isn't that

correct?

Mr. Mueller.  That's correct.

Ms. Lofgren.  Did your investigation determine who requested

the polling data to be shared with Kilimnik?

Mr. Mueller.  Well, I would direct you to the report and

adopt what we have in the report with regard to that particular

issue.

Ms. Lofgren.  We don't have the redacted version.  That's maybe another reason why we should get that for Volume I.

Based on your investigation, how could the Russian Government have used this campaign polling data to further its sweeping and systematic interference in the 2016 Presidential election?

Mr. Mueller.  That's a little bit out of our path.

Ms. Lofgren.  Fair enough.

Did your investigation find that the Russian Government perceived it would benefit from one of the candidates winning?

Mr. Mueller.  Yes.

Ms. Lofgren.  And which candidate would that be?

Mr. Mueller.  Well, it would be Trump --

Ms. Lofgren.  Correct.

Mr. Mueller.  -- the President.

Ms. Lofgren.  Now, the Trump campaign wasn't exactly reluctant to take Russian help.  You wrote, it expected it would benefit electorally from information stolen and released through Russian efforts.  Isn't that correct?

Mr. Mueller.  That's correct.

Ms. Lofgren.  Now, was the investigation's determination -- what was the investigation's determination regarding the frequency with which the Trump campaign made contact with the Russian Government?

Mr. Mueller.  Well, I would have to refer you to the report on that.

Ms. Lofgren. Well, we went through and we counted 126 contacts between Russians or their agents and Trump campaign officials or their associates. So would that sound about right?

Mr. Mueller. I can't say. I understand the statistic and I believe it. I understand the statistic.

Ms. Lofgren. Well, Mr. Mueller, I appreciate your being here and your report. From your testimony and the report, I think the American people have learned several things. First, the Russians wanted Trump to win; second, the Russians went on a sweeping cyber influence campaign. The Russians hacked the DNC, and they got the Democratic game plan for the election. The Russian campaign chairman met with Russian agents and repeatedly gave them internal data, polling, and messaging in the battleground States.

So while the Russians were buying ads and creating propaganda to influence the outcome of the election, they were armed with inside information that they had stolen through hacking from the DNC and that they had been given by the Trump campaign chairman, Mr. Manafort.

My colleagues will probe the efforts undertaken to keep this information from becoming public, but I think it's important for the American people to understand the gravity of the underlying problem that your report uncovered.

And with that, Mr. Chairman, I would yield back.

Chairman Nadler. The gentlelady yields back.

The gentleman from Texas.

Mr. Ratcliffe.  Good morning, Director.  If you'll let me
quickly summarize your opening statement this morning.  You said
in Volume I on the issue of conspiracy, the special counsel
determined that the investigation did not establish that members
of the Trump campaign conspired or coordinated with the Russian
Government in its election interference activities.  And then in
Volume II, for reasons that you explain, the special counsel did
not make a determination on whether there was an obstruction of
justice crime committed by the President.

Is that fair?

Mr. Mueller.  Yes, sir.

Mr. Ratcliffe.  All right.  Now, in explaining the special
counsel did not make what you called a traditional prosecution or
declination decision, the report on the bottom of page 2 of Volume
II reads as follows:  The evidence we obtained about the
President's actions and intent presents difficult issues that
prevent us from conclusively determining that no criminal conduct
occurred.  Accordingly, while this report does not conclude that
the President committed a crime, it also does not exonerate him.

Now, I read that correctly?

Mr. Mueller.  Yes.

Mr. Ratcliffe.  All right.  Now, your report, and today, you
said that all times the special counsel team operated under was
guided by and followed Justice Department policies and principles.
So which DOJ policy or principle sets forth a legal standard that

an investigated person is not exonerated if their innocence from criminal conduct is not conclusively determined?

Mr. Mueller.  Can you repeat the last part of that question?

Mr. Ratcliffe.  Yeah.  Which DOJ policy or principle sets forth a legal standard that an investigated person is not exonerated if their innocence from criminal conduct is not conclusively determined?  Where does that language come from, Director?  Where is the DOJ policy that says that?

Let me make it easier.

Mr. Mueller.  Can I answer?

Mr. Ratcliffe.  Is there --

Mr. Mueller.  I'm sorry.  Go ahead.

Mr. Ratcliffe.  Can you give me an example other than Donald Trump where the Justice Department determined that an investigated person was not exonerated because their innocence was not conclusively determined?

Mr. Mueller.  I cannot, but this is a unique situation.

Mr. Ratcliffe.  Okay.  Well, you can't -- time is short. I've got 5 minutes.  Let's just leave it at you can't find it, because I'll tell you why.  It doesn't exist.  The special counsel's job -- nowhere does it say that you were to conclusively determine Donald Trump's innocence or that the special counsel report should determine whether or not to exonerate him.

It's not in any of the documents.  It's not in your appointment order.  It's not in the special counsel regulations.

It's not in the OLC opinions.  It's not in the Justice manual, and it's not in the principles of Federal prosecution.

Nowhere do those words appear together because, respectfully, respectfully, Director, it was not the special counsel's job to conclusively determine Donald Trump's innocence or to exonerate him because the bedrock principle of our justice system is a presumption of innocence.  It exists for everyone.  Everyone is entitled to it, including sitting Presidents.  And because there is a presumption of innocence, prosecutors never, ever need to conclusively determine it.

Now, Director, the special counsel applied this inverted burden of proof that I can't find and you said doesn't exist anywhere in the Department policies, and you used it to write a report.  And the very first line of your report, the very first line of your report says, as you read this morning, it authorizes the special counsel to provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the special counsel.  That's the very first word of your report, right?

Mr. Mueller.  That's correct.

Mr. Ratcliffe.  Here's the problem, Director.  The special counsel didn't do that.  On Volume I, you did.  On Volume II, with respect to potential obstruction of justice, the special counsel made neither a prosecution decision or a declination decision.  You made no decision.  You told us this morning and in your report

that you made no determination.

So, respectfully, Director, you didn't follow the special counsel regulations.  It clearly says write a confidential report about decisions reached.  Nowhere in here does it say write a report about decisions that weren't reached.  You wrote 180 pages, 180 pages about decisions that weren't reached, about potential crimes that weren't charged or decided.  And respectfully, respectfully, by doing that, you managed to violate every principle and the most sacred of traditions about prosecutors not offering extra prosecutorial analysis about potential crimes that aren't charged.

So Americans need to know this, as they listen to the Democrats and socialists on the other side of the aisle as they do dramatic readings from this report, that Volume II of this report was not authorized under the law to be written.  It was written to a legal standard that does not exist at the Justice Department, and it was written in violation of every DOJ principle about extra prosecutorial commentary.

I agree with the chairman this morning when he said Donald Trump is not above the law.  He's not.  But he damn sure shouldn't be below the law, which is where Volume II of this report puts him.

Chairman Nadler.  The gentleman's time is expired.

The gentlelady from Texas.

Ms. Jackson Lee.  Thank you, Mr. Chairman.

Director Mueller, good morning.  Your exchange with the gentlelady from California demonstrates what is at stake.  The Trump campaign chair Paul Manafort was passing sensitive voter information and poller data to a Russian operative.  And there were so many other ways that Russia subverted our democracy.

Together with the evidence in Volume I, I cannot think of a more serious need to investigate.  So now I'm going to ask you some questions about obstruction of justice as it relates to Volume II.

On page 12 of Volume II, you state, we determined that there were sufficient factual and legal basis to further investigate potential obstruction of justice issues involving the President. Is that correct?

Mr. Mueller.  And do you have a citation, ma'am?

Ms. Jackson Lee.  Page 12, Volume II.

Mr. Mueller.  And which portion of that page?

Ms. Jackson Lee.  That is, we determined that there was a sufficient factual and legal basis to further investigate potential obstruction of justice issues involving the President. Is that correct?

Mr. Mueller.  Yes.

Ms. Jackson Lee.  Your report also described at least 10 separate instances of possible obstruction of justice that were investigated by you and your team.  Is that correct?

Mr. Mueller.  Yes.

Ms. Jackson Lee.  In fact, the table of contents serves as a very good guide of some of the acts of that obstruction of justice that you investigated, and I put it up on the screen.  On page 157 of Volume II, you describe those acts, and they range from the President's effort to curtail the special counsel's investigation, the President's further efforts to have the Attorney General take over the investigation, the President's orders Don McGahn to deny that the President tried to fire the special counsel, and many others.  Is that correct?

Mr. Mueller.  Yes.

Ms. Jackson Lee.  I direct you now to what you wrote, Director Mueller:  The President's pattern of conduct as a whole sheds light on the nature of the President's acts and the inferences that can be drawn about his intent.

Does that mean you have to investigate all of his conduct to ascertain true motive?

Mr. Mueller.  No.

Ms. Jackson Lee.  And when you talk about the President's pattern of conduct, that include the 10 possible acts of obstruction that you investigated.  Is that correct?  When you talk about the President's pattern of conduct, that would include the 10 possible acts of obstruction that you investigated, correct?

Mr. Mueller.  I direct you to the report for how that is characterized.

Ms. Jackson Lee.  Thank you.

Let me go to the screen again.  And for each of those 10 potential instances of obstruction of justice, you analyzed three elements of a crime of obstruction of justice:  an obstructive act, a nexus between the act and official proceeding, and corrupt intent.  Is that correct?

Mr. Mueller.  Yes.

Ms. Jackson Lee.  You wrote on page 178, Volume II in your report, about corrupt intent:  Actions by the President to end a criminal investigation into his own conduct to protect against personal embarrassment or legal liability would constitute a core example of corruptly motivated conduct.  Is that correct?

Mr. Mueller.  Yes.

Ms. Jackson Lee.  To the screen again.  Even with the evidence you did find, is it true, as you note on page 76 of Volume II, that the evidence does indicate that a thorough FBI investigation would uncover facts about the campaign and the President personally that the President could have understood to be crimes or that would give rise to legal, personal, and political concerns?

Mr. Mueller.  I rely on the language of the report.

Ms. Jackson Lee.  Is that relevant to potential obstruction of justice?  Is that relevant to potential obstruction of justice?

Mr. Mueller.  Yes.

Ms. Jackson Lee.  You further elaborate on page 157,

obstruction of justice can be motivated by desire to protect noncriminal personal interests to protect against investigations where underlying criminal liability fall into a gray area or to avoid personal embarrassment.  Is that correct?

Mr. Mueller.  I have on the screen --

Ms. Jackson Lee.  Is that correct on the screen?

Mr. Mueller.  Can you repeat the question, now that I have the language on the screen?

Ms. Jackson Lee.  Is it correct, as you further elaborate, obstruction of justice can be motivated by a direct desire to protect noncriminal personal interests to protect against investigations where underlying criminal liability falls into a gray area --

Mr. Mueller.  Yes.

Ms. Jackson Lee.  -- or to avoid -- is that true?

Mr. Mueller.  Yes.

Ms. Jackson Lee.  And is it true that the impact -- pardon?

Mr. Mueller.  Can you read the last question?

Ms. Jackson Lee.  The last question was --

Mr. Mueller.  I want to make certain I got it accurate.

Ms. Jackson Lee.  No.  The last question was the language on the screen asking you if that's correct.

Mr. Mueller.  Yes.

Ms. Jackson Lee.  Okay.  Does a conviction of obstruction of justice result potentially in a lot of years of -- a lot of years

of time in jail?

 Mr. <u>Mueller.</u>  Yes.

 Well, again, can you repeat the question just to make certain that I have it accurate?

 Ms. <u>Jackson Lee.</u>  Does obstruction of justice warrant a lot of time in jail --

 Mr. <u>Mueller.</u>  Yes.

 Ms. <u>Jackson Lee.</u>  -- if you were convicted?

 Mr. <u>Mueller.</u>  Yes.

 Ms. <u>Jackson Lee.</u>  And if --

 Chairman <u>Nadler.</u>  The time of the gentlelady is expired.

 The gentleman from Wisconsin.

 Mr. <u>Sensenbrenner.</u>  Thank you very much, Mr. Chairman.

 Let me begin by reading the special counsel regulations by which you were appointed.  It reads, quote, at the conclusion of the special counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination's decisions reached by the special counsel.  Is that correct?

 Mr. <u>Mueller.</u>  Yes.

 Mr. <u>Sensenbrenner.</u>  Okay.  Now, when a regulation uses the word "shall" provide, does it mean that the individual is, in fact, obligated to provide what's being demanded by the regulation or statute, meaning you don't have any wiggle room, right?

 Mr. <u>Mueller.</u>  I'd have to look more closely at the statute.

Mr. Sensenbrenner.  Well, I just read it to you.

Okay.  Now, Volume II, page 1, your report boldly states, we determined not to make a traditional prosecutorial judgment.  Is that correct?

Mr. Mueller.  I'm trying to find that citation, Congressman.

Chairman Nadler.  Director, could you speak more directly into the microphone, please?

Mr. Mueller.  Yes.

Chairman Nadler.  Thank you.

Mr. Sensenbrenner.  It's Volume II, page --

Mr. Mueller.  Mr. Chairman -- I am sorry.

Mr. Sensenbrenner.  Volume II, page 1, it said, we determined not to make a traditional prosecutorial judgment.

Mr. Mueller.  Yes.

Mr. Sensenbrenner.  That's right in the beginning.

Now, since you decided under the OLC opinion that you couldn't prosecute a sitting President, meaning President Trump, why did we have all of this investigation of President Trump that the other side is talking about when you knew that you weren't going to prosecute him?

Mr. Mueller.  Well, you don't know where the investigation is going to lie, and the OLC opinion itself says that you can continue the investigation even though you are not going to indict the President.

Mr. Sensenbrenner.  Okay.  Well, if you're not going to

indict the President, then you just continue fishing.  And
that's -- you know, that's my observation.

　　Mr. <u>Mueller.</u>  Well --

　　Mr. <u>Sensenbrenner.</u>  You know, sure -- my time is limited.
Sure you can indict other people, but you can't indict the sitting
President, right?

　　Mr. <u>Mueller.</u>  That's true.

　　Mr. <u>Sensenbrenner.</u>  Okay.  Now, there are 182 pages in raw
evidentiary material, including hundreds of references to 302,
which are interviews by the FBI, for individuals who have never
been cross-examined and which did not comply with the special
counsel's governing regulation to explain the prosecution or
declination decisions reached.  Correct?

　　Mr. <u>Mueller.</u>  And where are you reading from on that?

　　Mr. <u>Sensenbrenner.</u>  I'm reading from my question.

　　Mr. <u>Mueller.</u>  Then could you repeat it?

　　Mr. <u>Sensenbrenner.</u>  Okay.  You have 182 pages of raw
evidentiary material with hundreds of references to 302s who have
never been cross-examined and which didn't comply with the
governing regulation to explain the prosecution or
declaration -- declination decisions reached.

　　Mr. <u>Mueller.</u>  This is one of those areas which I decline to
discuss by --

　　Mr. <u>Sensenbrenner.</u>  Okay.  Then let --

　　Mr. <u>Mueller.</u>  -- and would direct you to the report itself or

what is done on that --

Mr. Sensenbrenner.  Well, I looked at 182 pages of it.

You know, let me switch gears.  Mr. Chabot and I were on this
committee during the Clinton impeachment.  Now, while I recognize
that the independent counsel statute under which Kenneth Starr
operated is different from the special counsel's statute, he in a
number of occasions in his report stated that the -- President
Clinton's actions may have risen to impeachable conduct,
recognizing that it is up to the House of Representatives to
determine what conduct is impeachable.

You never used the term "raising" to impeachable conduct for
any of the 10 instances that the gentlewoman from Texas did.  Is
it true that there's nothing in Volume II of the report that says
that the President may have engaged in impeachable conduct?

Mr. Mueller.  Well, we have studiously kept in the center of
our investigation the -- our mandate, and our mandate does not go
to other ways of addressing conduct.  Our mandate goes to
what -- developing the report and turning the report in to the
Attorney General.

Mr. Sensenbrenner.  With due respect, you know, it seems to
me, you know, that there are a couple of statements that you made,
you know, that said that this is not for me to decide, and the
implication is that this is for this committee to decide.

Now, you didn't use the word "impeachable" conduct like Starr
did.  There was no statute to prevent you from using the word

"impeachable" conduct.  And I go back to what Mr. Ratcliffe said, and that is, is that even the President is innocent until proven guilty.

My time is up.

Chairman Nadler.  The gentleman's time is expired.

The gentleman from Tennessee.

Mr. Cohen.  Thank you, Mr. Chair.

First, I'd just like to restate what Mr. Nadler said about your career.  It's a model of rectitude, and I thank you.

Mr. Mueller.  Thank you.

Mr. Cohen.  Based upon your investigation, how did President Trump react to your appointment as special counsel?

Mr. Mueller.  Again, I send you the report for where that is stated.

Mr. Cohen.  Well, there is a quote from page 78 of your report, Volume II, which reads, when Sessions told the President that a special counsel had been appointed, the President slumped back in his chair and said, quote, oh, my god.  This is terrible.  This is the end of my Presidency.  I'm F'ed, unquote.

Did Attorney General Sessions tell you about that little talk?

Mr. Mueller.  I'm not sure --

Chairman Nadler.  Director, please speak into the microphone.

Mr. Mueller.  Oh, surely.  My apologies.

I am not certain of the person who originally copied that

quote.

Mr. Cohen.  Okay.  Well, Sessions apparently said it, and one
of his aides had it in his notes too, which I think you had, but
that's become record.  He wasn't pleased.  He probably wasn't
pleased with the special counsel and particularly you because of
your outstanding reputation.

Mr. Mueller.  Correct.

Mr. Cohen.  Prior to your appointment, the Attorney General
recused himself from the investigation because of his role in the
2016 campaign.  Is that not correct?

Mr. Mueller.  That's correct.

Mr. Cohen.  Recusal means the Attorney General cannot be
involved in the investigation.  Is that correct?

Mr. Mueller.  That's the effect of recusal, yes.

Mr. Cohen.  And so instead, another Trump appointee, as you
know Mr. Sessions was, Mr. Rosenstein became in charge of it.  Is
that correct?

Mr. Mueller.  Yes.

Mr. Cohen.  Wasn't Attorney General Sessions following the
rules and professional advice of the Department of Justice ethics
folks when he recused himself from the investigation?

Mr. Mueller.  Yes.

Mr. Cohen.  And yet the President repeatedly expressed his
displeasure at Sessions' decision to follow those ethics rules to
recuse himself from oversight of that investigation.  Is that not

correct?

Mr. Mueller.  That's correct based on what is written in the report.

Mr. Cohen.  And the President's reaction to the recusal, as noted in the report, Mr. Bannon recalled that the President was mad, as mad as Bannon had ever seen him, and he screamed at McGahn about how weak Sessions was.  Do you recall that from the report?

Mr. Mueller.  That's in the report, yes.

Mr. Cohen.  Despite knowing that Attorney General Sessions was not supposed to be involved in the investigation, the President still tried to get the Attorney General to unrecuse himself after you were appointed special counsel.  Is that correct?

Mr. Mueller.  Yes.

Mr. Cohen.  In fact, your investigation found that at some point after your appointment, quote, the President called Sessions at his home and asked if he would unrecuse himself.  Is that not true?

Mr. Mueller.  It's true.

Mr. Cohen.  Now, that wasn't the first time the President asked Sessions to unrecuse himself, was it?

Mr. Mueller.  I know there were at least two occasions.

Mr. Cohen.  And one of them was with Flynn, and one of them was when Sessions and McGahn flew to Mar-a-Largo to meet with the President.  Sessions recalled that the President pulled him aside

to speak alone and suggest that he should do this unrecusal act, correct?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Cohen.</u>  And then when Michael Flynn -- a few days after Flynn entered a guilty plea for lying to Federal agents and indicated his intent to cooperate with that investigation, Trump asked to speak to Sessions alone again in the Oval Office and again asked Sessions to unrecuse himself.  True?

Mr. <u>Mueller.</u>  I refer you to the report for that.

Mr. <u>Cohen.</u>  Page 109, Volume II.  Thank you, sir.

Do you know of any point when the President personally expressed anger or frustrations at Sessions?

Mr. <u>Mueller.</u>  I'd have to pass on that.

Mr. <u>Cohen.</u>  Do you recall -- and I think it's at page 78 of Volume II, the President told Sessions, you were supposed to protect me, you were supposed to protect me, or words to that effect?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Cohen.</u>  And is the Attorney General supposed to be the Attorney General of the United States of America or the consigliere for the President?

Mr. <u>Mueller.</u>  United States of America.

Mr. <u>Cohen.</u>  Thank you, sir.

In fact, you wrote in your report that the President repeatedly sought to convince Sessions to unrecuse himself so

Sessions could supervise the investigation in a way that would restrict its scope.  Is that correct?

Mr. Mueller.  I rely on the report.

Mr. Cohen.  How could Sessions have restricted the scope of your investigation?

Mr. Mueller.  Well, I'm not going to speculate.  If he -- quite obviously if he took over as Attorney General, he would have greater latitude in his actions that would enable him to do things that otherwise he could not.

Mr. Cohen.  On page 113 you said the President believed that an unrecused Attorney General would play a protective role and could shield the President from the ongoing investigation.

Regardless of all that, I want to thank you, Director Mueller, for your life of rectitude and service to our country. It's clear from your report and the evidence that the President wanted former Attorney General Sessions to violate the Justice Department ethics rules by taking over your investigation and improperly interfering with it to protect himself and his campaign.  Your findings are so important because in America nobody is above the law.

I yield back the balance of my time.

Chairman Nadler.  I thank the gentleman for yielding back.

The gentleman from Ohio.

Mr. Chabot.  Thank you.

Director Mueller, my Democratic colleagues were very

disappointed in your report.  They were expecting you to say
something along the lines of, here's why President Trump deserves
to be impeached, as much as Ken Starr did relative to President
Clinton back about 20 years ago.  Well, you didn't.  So their
strategy had to change.

Now they allege that there's plenty of evidence in your
report to impeach the President but the American people just
didn't read it.  And this hearing today is their last best hope to
build up some sort of ground swell across America to impeach
President Trump.  That's what this is really all about today.

Now, a few questions.  On page 103 of Volume II of your
report, when discussing the June 2016 Trump Tower meeting, you
reference, quote, the firm that produced the Steele reporting,
unquote.  The name of that firm was Fusion GPS.  Is that correct?

Mr. Mueller.  And you're on page 103?

Mr. Chabot.  103, that's correct, Volume II.  When you talk
about the firm that produced the Steele reporting, the name of the
firm that produced that was Fusion GPS.  Is that correct?

Mr. Mueller.  I'm not familiar with that.  Could you --

Mr. Chabot.  Let me just help you.  It was.  It's not a trick
question.  It was Fusion GPS.

Now, Fusion GPS produced the opposition research document
widely known as the Steele dossier, and the owner of Fusion GPS
was someone named Glenn Simpson.  Are you familiar with --

Mr. Mueller.  This is outside my purview.

Mr. Chabot.  Okay.  Glenn Simpson was never mentioned in the 448-page Mueller report, was he?

Mr. Mueller.  Well, as I say, it's outside my purview, and it's being handled in the Department by others.

Mr. Chabot.  Okay.  Well, he was not.  448 pages, the owner of Fusion GPS that did the Steele dossier that started all this, he's not mentioned in there.

Let me move on.  At the same time, Fusion GPS was working to collect opposition research on Donald Trump from foreign sources on behalf of the Clinton campaign and the Democratic National Committee.  It also was representing a Russian-based company, Prevezon, which had been sanctioned by the U.S. Government.  Are you aware of that?

Mr. Mueller.  That's outside my purview.

Mr. Chabot.  Okay.  Thank you.

One of the key players in the -- I'll go to something different.  One of the key players in the June 2016 Trump Tower meeting was Natalia Veselnitskaya, who you described in your report as a Russian attorney who advocated for the repeal of the Magnitsky Act.  Veselnitskaya had been working with none other than Glenn Simpson and Fusion GPS since at least early 2014.  Are you aware of that?

Mr. Mueller.  Outside my purview.

Mr. Chabot.  Thank you.

But you didn't mention that or her connections to Glenn

Simpson at Fusion GPS in your report at all.

Let me move on.  Now, NBC News has reported the following: quote, Russian lawyer Natalia Veselnitskaya says she first received the supposedly incriminating information she brought to Trump Tower describing alleged tax evasion and donation to Democrats from none other than Glenn Simpson, the Fusion GPS owner.

You didn't include that in the report, and I assume --

RPTR BRYANT

EDTR SECKMAN

[9:32 a.m.]

Mr. Mueller.  -- it is a matter being handled by others at the Department of Justice.

Mr. Chabot.  Thank you.  Now, your report spends 14 pages discussing the June 9, 2016, Trump Tower meeting.  It would be fair to say, would it not, that you spent significant resources investigating that meeting?

Mr. Mueller.  I refer you to the report.

Mr. Chabot.  Okay.  And President Trump wasn't at the meeting?

Mr. Mueller.  No, he was not.

Mr. Chabot.  Thank you.  Now, in stark contrast to the actions of the Trump campaign, we know that the Clinton campaign did pay Fusion GPS to gather dirt on the Trump campaign from persons associated with foreign governments.  But your report doesn't mention a thing about Fusion GPS in it, and you didn't investigate Fusion GPS' connections to Russia.

So let me just ask you this:  Can you see that, from neglecting to mention Glenn Simpson and Fusion GPS' involvement with the Clinton campaign to focusing on a brief meeting at the Trump Tower that produced nothing to ignoring the Clinton campaign's own ties to Fusion GPS, why some view your report as a

pretty one-sided attack on the President?

Mr. <u>Mueller.</u>  Well, I tell you, it is still outside my purview.

Mr. <u>Chabot.</u>  And I would just note, finally, that I guess it is just by chance, by coincidence that the things left out of the report tended to be favorable to the President.

Chairman <u>Nadler.</u>  Your time has expired.

Mr. <u>Chabot.</u>  My time has expired.

Chairman <u>Nadler.</u>  The gentleman from Georgia.

Mr. <u>Johnson of Georgia.</u>  Thank you.

Director Mueller, I would like to get us back on track here. Your investigation found that President Trump directed White House Counsel Don McGahn to fire you.  Isn't that correct?

Mr. <u>Mueller.</u>  True.

Mr. <u>Johnson of Georgia.</u>  And the President claimed that he wanted to fire you because you had supposed conflicts of interest. Isn't that correct?

Mr. <u>Mueller.</u>  True.

Mr. <u>Johnson of Georgia.</u>  You had no conflicts of interest that required your removal.  Isn't that a fact?

Mr. <u>Mueller.</u>  Also correct.

Mr. <u>Johnson of Georgia.</u>  And, in fact, Don McGahn advised the President that the asserted conflicts were, in his words, silly and not real conflicts.  Isn't that true?

Mr. <u>Mueller.</u>  I refer to the report on that episode.

Mr. Johnson of Georgia.  Well, page 85 of Volume II speaks to that.  And, also, Director Mueller, DOJ Ethics officials confirmed that you had no conflicts that would prevent you from serving as special counsel.  Isn't that correct?

Mr. Mueller.  That is correct.

Mr. Johnson of Georgia.  But despite Don McGahn and the Department of Justice guidance, around May 23, 2017, the President, quote, prodded McGahn to complain to Deputy Attorney General Rosenstein about these supposed conflicts of interest, correct?

Mr. Mueller.  Correct.

Mr. Johnson of Georgia.  And McGahn declined to call Rosenstein -- or Rosenstein, I am sorry -- telling the President that it would look like still trying to meddle in the investigation and knocking out Mueller would be another fact used to claim obstruction of justice.  Isn't that correct?

Mr. Mueller.  Generally so, yes.

Mr. Johnson of Georgia.  And, in other words, Director Mueller, the White House counsel told the President that if he tried to remove you that that could be another basis to allege that the President was obstructing justice, correct?

Mr. Mueller.  That is generally correct, yes.

Mr. Johnson of Georgia.  Now, I would like to review what happened after the President was warned about obstructing justice. On Tuesday, June --

Mr. Mueller.  I am sorry, Congressman.  Do you have a citation for that?

Mr. Johnson of Georgia.  Yes.  Volume II, page 81 --

Mr. Mueller.  Thank you.

Mr. Johnson of Georgia.  -- and 82.  Now, I would like to review what happened after the President was warned about obstructing justice.  It is true that, on Tuesday, June 13, 2017, the President dictated a press statement stating he had, quote, no intention of firing you, correct?

Mr. Mueller.  Correct.

Mr. Johnson of Georgia.  But the following day, June 14th, the media reported for the first time that you were investigating the President for obstruction of justice, correct?

Mr. Mueller.  Correct.

Mr. Johnson of Georgia.  And then, after learning for the first time that he was under investigation, the very next day the President, quote, issued a series of tweets acknowledging the existence of the obstruction investigation and criticizing it.  Isn't that correct?

Mr. Mueller.  Generally so.

Mr. Johnson of Georgia.  And then, on Saturday, June 17th, 2 days later, the President called Don McGahn at home from Camp David on a Saturday to talk about you.  Isn't that correct?

Mr. Mueller.  Correct.

Mr. Johnson of Georgia.  What was the significant -- what was

significant about that first weekend phone call that Don McGahn

took from President Trump?

Mr. Mueller.  I am going to ask you to rely on what we wrote

about those incidents.

Mr. Johnson of Georgia.  Well, you wrote in you your report

that on -- at page 85, Volume II, that, on Saturday, June 17,

2017, the President called McGahn at home to have the special

counsel removed.  Now, did the President call Don McGahn more than

once that day?

Mr. Mueller.  Well --

Mr. Johnson of Georgia.  I think there were two calls.

Chairman Nadler.  Speak into the mike, please.

Mr. Mueller.  I am sorry about that.

Mr. Johnson of Georgia.  On page 85 of your report, you

wrote, quote, on the first call, McGahn recalled that the

President said something like, quote, "You got to do this, you got

to call Rod," correct?

Mr. Mueller.  Correct.

Mr. Johnson of Georgia.  And your investigation and report

found that Don McGahn was perturbed, to use your words, by the

President's request to call Rod Rosenstein to fire him.  Isn't

that correct?

Mr. Mueller.  Well, there was a continuous colloquy.  There

was a continuous involvement of Don McGahn responding to the

President's entreaties.

Mr. <u>Johnson of Georgia.</u>  And he did not want to put himself in the middle of that.  He did not want to have a role in asking the Attorney General to fire the special counsel, correct?

Mr. <u>Mueller.</u>  Well, I would again refer you to the report and the way it is characterized in the report.

Mr. <u>Johnson of Georgia.</u>  Thank you.  At Volume II, page 85, it states that he didn't want to have the Attorney General -- he didn't want to have a role in trying to fire the Attorney General.

So, at this point, I will yield back.

Chairman <u>Nadler.</u>  The gentleman's time is expired.  The gentleman from Texas.

Mr. <u>Gohmert.</u>  Thank you, Mr. Chairman.

Mr. Mueller, well, first, let me ask unanimous consent, Mr. Chairman, to submit this article "Robert Mueller:  Unmasked" for the record.

Chairman <u>Nadler.</u>  Without objection.

[The information follows:]


******** COMMITTEE INSERT ********

Mr. Gohmert.  Now, Mr. Mueller, who wrote the 9-minute comments you read at your May 29th press conference?

Mr. Mueller.  I am not going to get into that.

Mr. Gohmert.  Okay.  So that is what I thought.  You didn't write it.

A 2013 puff piece in The Washingtonian about Comey said, basically, when Comey called, you would drop everything you were doing.  It gave examples:  You were having dinner with your wife and daughter.  Comey calls.  You drop everything and go.

The article quoted Comey as saying:  If a train were coming down the track, and I quote, at least Bob Mueller will be standing on the tracks with me.

You and James Comey have been good friends or were good friends for many years, correct?

Mr. Mueller.  No, we were business associates.  We both started off in the Justice Department about the same time.

Mr. Gohmert.  You were good friends.  You can work together and not be friends, but you and Comey were friends.

Mr. Mueller.  We were friends.

Mr. Gohmert.  That is my question.  Thank you for getting to the answer.

Now, before you were appointed as special counsel, had you talked to James Comey in the preceding 6 months?

Mr. Mueller.  No.

Mr. Gohmert.  When you were appointed as special counsel, was

President Trump's firing of Comey something you anticipated investigating, potentially obstruction of justice?

Mr. Mueller.  I am not going to get into that, internal deliberations at the Justice Department.

Mr. Gohmert.  Actually, it goes to your credibility, and maybe you have been away from the courtroom for a while. Credibility is always relevant.  It is always material.  And that goes for you too.  You are a witness before us.

Let me ask you, when you talked to President Trump the day before he appointed -- or you were appointed as special counsel -- you were talking to him about the FBI Director position again -- did he --

Mr. Mueller.  That is not --

Mr. Gohmert.  -- mention the firing of James Comey --

Mr. Mueller.  -- not as a candidate.  I was asked --

Mr. Gohmert.  Did he mention the firing of James Comey in your discussion with him?

Mr. Mueller.  I cannot remember.

Mr. Gohmert.  Pardon?

Mr. Mueller.  I cannot remember.  I don't believe so, but I am not going to be specific.

Mr. Gohmert.  You don't remember.  But if he did, you could have been a fact witness as to the President's comments and state of mind on firing James Comey.

Mr. Mueller.  I suppose that is possible.

Mr. <u>Gohmert.</u>  Yeah.  So most prosecutors would want to make sure there was no appearance of impropriety, but in your case, you hired a bunch of people that did not like the President.

Let me ask you, when did you first learn of Peter Strzok's animus toward Donald Trump?

Mr. <u>Mueller.</u>  In the summer of 2017.

Mr. <u>Gohmert.</u>  You didn't know before he was hired?

Mr. <u>Mueller.</u>  I am sorry?

Mr. <u>Gohmert.</u>  You didn't know before he was hired for your team?

Mr. <u>Mueller.</u>  Know what?

Mr. <u>Gohmert.</u>  Peter Strzok hated Trump.

Mr. <u>Mueller.</u>  Okay.

Mr. <u>Gohmert.</u>  You didn't know that before he was made part of your team.  Is that what you are saying?

Mr. <u>Mueller.</u>  No, I did not know that.

Mr. <u>Gohmert.</u>  All right.  When did you first learn --

Mr. <u>Mueller.</u>  And, actually, when I did find out, I acted swiftly to have him reassigned elsewhere in the FBI.

Mr. <u>Gohmert.</u>  Well, there is some discussion about how swift that was.  But when did you learn of the ongoing affair he was having with Lisa Page?

Mr. <u>Mueller.</u>  About the same time that I learned of Strzok.

Mr. <u>Gohmert.</u>  Did you ever order anybody to investigate the deletion of all of their texts off of their government phones?

Mr. Mueller.  Once we found that Peter Strzok was author of --

Mr. Gohmert.  Did you ever order --

Mr. Mueller.  May I finish?

Mr. Gohmert.  Well, you are not answering my question.  Did you order an investigation into the deletion and reformatting of their government phones?

Mr. Mueller.  No.  There was an IG investigation ongoing.

Mr. Gohmert.  Listen.  Regarding collusion or conspiracy, you didn't find evidence of any agreement -- I am quoting you -- among the Trump campaign officials and any Russia-linked officials to interfere with our U.S. election, correct?

Mr. Mueller.  Correct.

Mr. Gohmert.  So you also note in the report that an element of any of those obstructions you referenced requires a corrupt state of mind, correct?

Mr. Mueller.  Corrupt intent, correct.

Mr. Gohmert.  Right.  And if somebody knows they did not conspire with anybody from Russia to affect the election, and they see the big Justice Department with people that hate that person coming after them, and then a special counsel appointed who hires a dozen or more people that hate that person, and he knows he is innocent.  He is not corruptly acting in order to see that justice is done.  What he is doing is not obstructing justice.  He is pursuing justice, and the fact that you ran it out 2 years means

you perpetuated injustice.

Mr. Mueller.  I take your question.

Chairman Nadler.  The gentleman's time is expired.  The
witness may answer the question.

Mr. Mueller.  I take your question.

Chairman Nadler.  The gentleman from Florida.

Mr. Deutch.  Director Mueller, I would like to get back to
your findings covering June of 2017.  There was a bombshell
article that reported that the President of the United States was
personally under investigation for obstruction of justice.  And
you said in your report, on page 90, Volume II, and I quote:  News
of the obstruction investigation prompted the President to call
McGahn and seek to have the special counsel removed, close quote.

And then, in your report, you wrote about multiple calls from
the President to White House Counsel Don McGahn.  And regarding
the second call, you wrote, and I quote:  McGahn recalled that the
President was more direct, saying something like:  Call Rod, tell
Rod that Mueller has conflicts and can't be the special counsel.
McGahn recalled the President telling him:  Mueller has to go and
call me back when you do it.

Director Mueller, did McGahn understand what the President
was ordering him to do?

Mr. Mueller.  I direct you to the -- what we have written in
the report in terms of characterizing his feelings.

Mr. Deutch.  And in the report, it says, quote:  McGahn

understood the President to be saying that the special counsel had to be removed.  You also say, on page 86, that, quote, McGahn considered the President's request to be an inflection point, and he wanted to hit the brakes, and he felt trapped, and McGahn decided he had to resign.

McGahn took action to prepare to resign.  Isn't that correct?

Mr. Mueller.  I direct you again to the report.

Mr. Deutch.  And, in fact, that very day he went to the White House, and quoting your report, you said, quote:  He then drove to the office to pack his belongings and submit his resignation letter, close quote.

Mr. Mueller.  That is directly from the report.

Mr. Deutch.  It is.  And before he resigned, however, he called the President's chief of staff, Reince Priebus, and he called the President's senior adviser, Steve Bannon.  Do you recall what McGahn told them?

Mr. Mueller.  Whatever was said will appear in the report.

Mr. Deutch.  It is.  It is.  And it says on page 87, quote: Priebus recalled that McGahn said that the President asked him to do crazy expletive -- in other words, crazy stuff.  The White House counsel thought that the President's request was completely out of bounds.  He said the President asked him to do something crazy.  It was wrong, and he was prepared to resign over it.

Now, these are extraordinarily troubling events, but you found White House Counsel McGahn to be a credible witness.  Isn't

that correct?

    Mr. <u>Mueller.</u>  Correct.

    Mr. <u>Deutch.</u>  Director Mueller, the most important question I have for you today is why?  Director Mueller, why did the President of the United States want you fired?

    Mr. <u>Mueller.</u>  I can't answer that question.

    Mr. <u>Deutch.</u>  Well, on page 89 in your report on Volume II, you said, and I quote:  Substantial evidence indicates that the President's attempts to remove the special counsel were linked to the special counsel's oversight of investigations that involved the President's conduct and, most immediately, to reports that the President was being investigated for potential obstruction of justice, close quote.

    Director Mueller, you found evidence, as you lay out in your report, that the President wanted to fire you because you were investigating him for obstruction of justice.  Isn't that correct?

    Mr. <u>Mueller.</u>  That is what it says in the report, yes.  And I go -- I stand behind the report.

    Mr. <u>Deutch.</u>  Director Mueller, that shouldn't happen in America.  No President should be able to escape investigation by abusing his power.  But that is what you testified to in your report.  The President ordered you fired.  The White House counsel knew it was wrong.  The President knew it was wrong.  In your report, it says there is also evidence the President knew he should not have made those calls to McGahn.  But the President did

it anyway.  He did it anyway.  Anyone else who blatantly
interfered with a criminal investigation like yours would be
arrested and indicted on charges of obstruction of justice.

Director Mueller, you determined that you were barred from
indicting a sitting President.  We have already talked about that
today.  That is exactly why this committee must hold the President
accountable.

I yield back.

Chairman Nadler.  The gentleman yields back.

The gentlelady from Alabama.

Mrs. Roby.  Director Mueller, you just said, in response to
two different lines of questioning, that you would refer, as it
relates to this firing discussion, that I would refer you to the
report and the way it was characterized in the report.

Importantly, the President never said "fire Mueller" or "end
the investigation," and one doesn't necessitate the other.  And
McGahn, in fact, did not resign, he stuck around for a year and a
half.

On March 24th, Attorney General Barr informed the committee
that he had received the special counsel's report, and it was not
until April 18th that the Attorney General released the report to
Congress and the public.  When you submitted your report to the
Attorney General, did you deliver a redacted version of the report
so that he would be able to release it to Congress and the public
without delay, pursuant to his announcement of his intention to do

so during his confirmation hearing?

Mr. <u>Mueller.</u>  I am not going to engage in discussion about what happened after the production of our report.

Mrs. <u>Roby.</u>  Had the Attorney General asked you to provide a redacted version of the report?

Mr. <u>Mueller.</u>  We worked on the redacted versions together.

Mrs. <u>Roby.</u>  Did he ask you for a version where the grand jury material was separated?

Mr. <u>Mueller.</u>  I am not going to get into details.

Mrs. <u>Roby.</u>  Is it your belief that an unredacted version of the report could be released to Congress or the public?

Mr. <u>Mueller.</u>  That is not within my purview.

Mrs. <u>Roby.</u>  In the Starr investigation of President Clinton, it was the special prosecutor who went to court to receive permission to unredact grand jury material, rule 6(e) material. Why did you not take a similar action so Congress could view this material?

Mr. <u>Mueller.</u>  We had a process that we were operating on with the Attorney General's Office.

Mrs. <u>Roby.</u>  Are you aware of any Attorney General going to court to receive similar permission to unredact 6(e) material?

Mr. <u>Mueller.</u>  I am not aware of that being done.

Mrs. <u>Roby.</u>  The Attorney General released the special counsel's report with minimal redactions to the public and an even lesser redacted version to Congress.  Did you write the report

with the expectation that it would be released publicly?

Mr. <u>Mueller.</u>  No, we did not have an expectation.  We wrote the report, understanding that it was demanded by the statute and would go to the Attorney General for further review.

Mrs. <u>Roby.</u>  And pursuant to the special counsel regulations, who is the only party that must receive the charging decision resulting from the special counsel's investigation?

Mr. <u>Mueller.</u>  With regard to the President or generally?

Mrs. <u>Roby.</u>  No, generally.

Mr. <u>Mueller.</u>  Attorney General.

Mrs. <u>Roby.</u>  At Attorney General Barr's confirmation hearing, he made it clear that he intended to release your report to the public.  Do you remember how much of your report had been written at that point?

Mr. <u>Mueller.</u>  I do not.

Mrs. <u>Roby.</u>  Were there significant changes in tone or substance of the report made after the announcement that the report would be made available to Congress and the public?

Mr. <u>Mueller.</u>  I can't get into that.

Mrs. <u>Roby.</u>  During the Senate testimony of Attorney General William Barr, Senator Kamala Harris asked Mr. Barr if he had looked at all the underlying evidence that the special counsel's team had gathered.  He stated that he had not.

So I am going to ask you, did you personally review all of the underlying evidence gathered in your investigation?

Mr. Mueller.  Well, to the extent that it came through the Special Counsel's Office, yes.

Mrs. Roby.  Did any single member of your team review all the underlying evidence gathered during the course of your investigation?

Mr. Mueller.  As has been recited here today, a substantial amount of work was done, whether it be search warrants or --

Mrs. Roby.  My point is there is no one member of the team that looked at everything.

Mr. Mueller.  That is what I am trying to get at.

Mrs. Roby.  Okay.  It is fair to say that, in an investigation as comprehensive as yours, it is normal that different members of the team would have reviewed different sets of documents and few, if anyone, would have reviewed all of the underlying --

Mr. Mueller.  Thank you.  Yes.

Mrs. Roby.  How many of the approximately 500 interviews conducted by the special counsel did you attend personally?

Mr. Mueller.  Very few.

Mrs. Roby.  On March 27, 2019, you wrote a letter to the Attorney General essentially complaining about the media coverage of your report.  You wrote, and I quote:  The summary letter the Department sent to Congress and released to the public late in the afternoon of March 24 did not fully capture the context, nature, and substance of this office's work and conclusions.  We

communicated that concern to the Department on the morning of March 25th.  There is now public confusion about critical aspects of the result of our investigation.

Who wrote that March 27th letter?

Mr. Mueller.  Well, I can't get into who wrote it, the internal deliberations.

Mrs. Roby.  But you signed it?

Mr. Mueller.  What I will say is the letter stands for itself.

Mrs. Roby.  Okay.  Why did you write a formal letter since you had already called the Attorney General to express those concerns?

Mr. Mueller.  I can't get into that, internal deliberations.

Mrs. Roby.  Did you authorize the letter's release to the media, or was it leaked?

Mr. Mueller.  I have no knowledge on either.

Mrs. Roby.  Well, you went nearly 2 years without a leak. Why was this letter leaked?

Mr. Mueller.  Well, I can't get into it.

Mrs. Roby.  Was this letter written and leaked for the express purpose of attempting to change the narrative about the conclusions of your report, and was anything in Attorney General Barr's letter referred to as principal conclusions inaccurate?

Chairman Nadler.  The time of the gentlelady has expired.

Mrs. Roby.  May he answer the question, please?

Mr. Mueller.  The question is?

Chairman Nadler.  Yes, you may answer the question.

Mrs. Roby.  Was anything in Attorney General Barr's letter referred to as the principal conclusions letter dated March 24th inaccurate?

Mr. Mueller.  Well, I am not going to get into that.

Chairman Nadler.  The time of the gentlelady has expired. The gentlelady from California.

Ms. Bass.  Thank you, Mr. Chair.

Director Mueller, as you know, we are focusing on five obstruction episodes today.  I would like to ask you about the second of those five obstruction episodes.  It is in the section of your report beginning on page 113 of Volume II entitled, quote, "The President orders McGahn to deny that the President tried to fire the special counsel," end quote.

On January 25th, 2018, The New York Times reported that, quote:  The President had ordered McGahn to have the Department of Justice fire you.

Is that correct?

Mr. Mueller.  Correct.

Ms. Bass.  And that story related to the events you already testified about here today, the President's calls to McGahn to have you removed, correct?

Mr. Mueller.  Correct.

Ms. Bass.  After the news broke, did the President go on TV

and deny the story?

Mr. <u>Mueller.</u>  I do not know.

Ms. <u>Bass.</u>  In fact, the President said, quote:  Fake news, folks, fake news, a typical New York Times fake story, end quote. Correct?

Mr. <u>Mueller.</u>  Correct.

Ms. <u>Bass.</u>  But your investigation actually found substantial evidence that McGahn was ordered by the President to fire you, correct?

Mr. <u>Mueller.</u>  Yes.

Ms. <u>Bass.</u>  Did the President's personal lawyer do something the following day in response to that news report?

Mr. <u>Mueller.</u>  I would refer you to the coverage of this in the report.

Ms. <u>Bass.</u>  On page 114, quote:  On January 26, 2018, the President's personal counsel called McGahn's attorney and said that the President wanted McGahn to put out a statement denying that he had been asked to fire the special counsel, end quote.

Did McGahn do what the President asked?

Mr. <u>Mueller.</u>  I refer you to the report.

Ms. <u>Bass.</u>  Communicating through his personal attorney, McGahn refused because he said, quote, that the Times story was accurate in reporting that the President wanted the special counsel removed.  Isn't that right?

Mr. <u>Mueller.</u>  I believe it is, but I refer you again to the

report.

Ms. Bass.  Okay.  So Mr. McGahn, through his personal attorney, told the President that he was not going to lie.  Is that right?

Mr. Mueller.  True.

Ms. Bass.  Did the President drop the issue?

Mr. Mueller.  I refer to the write-up of this in the report.

Ms. Bass.  Okay.  Next, the President told the White House staff secretary, Rob Porter, to try to pressure McGahn to make a false denial.  Is that correct?

Mr. Mueller.  That is correct.

Ms. Bass.  What did he actually direct Porter to do?

Mr. Mueller.  And I send you back to the report.

Ms. Bass.  Okay.  Well, on page 113, it says, quote:  The President then directed Porter to tell McGahn to create a record to make it clear that the President never directed McGahn to fire you, end quote.  Is that correct?

Mr. Mueller.  That is as it is stated in the report.

Ms. Bass.  And you found, quote, the President said he wanted McGahn to write a letter to the file for our records, correct?

Mr. Mueller.  Correct.

Ms. Bass.  And to be clear, the President is asking his White House counsel, Don McGahn, to create a record that McGahn believed to be untrue while you were in the midst of investigating the President for obstruction of justice, correct?

Mr. Mueller.  Generally correct.

Ms. Bass.  And Mr. McGahn was an important witness in that investigation, wasn't he?

Mr. Mueller.  I would have to say yes.

Ms. Bass.  Did the President tell Porter to threaten McGahn if he didn't create the written denial?

Mr. Mueller.  I would refer you to the write-up of it in the report.

Ms. Bass.  In fact, didn't the President say, quote, and this is on page 116, "If he doesn't write a letter, then maybe I will have to get rid of him," end quote?

Mr. Mueller.  Yes.

Ms. Bass.  Did Porter deliver that threat?

Mr. Mueller.  I again refer you to the discussion that is found on page 115.

Ms. Bass.  Okay.  But the President still didn't give up, did he?  So the President told McGahn directly to deny that the President told him to have you fired.  Can you tell me exactly what happened?

Mr. Mueller.  I can't beyond what is in the report.

Ms. Bass.  Well, on page 116, it says:  The President met him in the Oval Office.  Quote:  The President began the Oval Office meeting by telling McGahn that The New York Times story didn't look good and McGahn needed to correct it.

Is that correct?

Mr. Mueller.  As it is written in the report, yes.

Ms. Bass.  The President asked McGahn whether he would do a correction and McGahn said no, correct?

Mr. Mueller.  That is accurate.

Ms. Bass.  Well, Mr. Mueller, thank you for your investigation uncovering this very disturbing evidence.  My friend Mr. Richmond will have additional questions on the subject. However, it is clear to me if anyone else had ordered a witness to create a false record and cover up acts that are the subject of a law enforcement investigation, that person would be facing criminal charges.

I yield back my time.

Chairman Nadler.  The gentlelady yields back.

The gentleman from Ohio.

Mr. Jordan.  Director, the FBI interviewed Joseph Mifsud on February 10, 2017.  In that interview, Mr. Mifsud lied.  You point this out on page 193, Volume I.  Mifsud denied.  Mifsud also falsely stated.  In addition, Mifsud omitted.

Three times he lied to the FBI, yet you didn't charge him with a crime.  Why not?

Mr. Mueller.  Excuse me, did you say 1 -- I am sorry, did you say 193?

Mr. Jordan.  Volume I, 193.  He lied three times.  You point it out in the report.  Why didn't you charge him with a crime?

Mr. Mueller.  I can't get into internal deliberations with

regard to who would or would not be charged.

Mr. Jordan.  You charged a lot of other people for making false statements.  Let's remember this, let's remember this:  In 2016, the FBI did something they probably haven't done before.  They spied on two American citizens associated with the Presidential campaign:  George Papadopoulos and Carter Page.

With Carter Page, they went to the FISA court.  They used the now famous dossier as part of the reason they were able to get the warrant and spy on Carter Page for the better part of a year.  With Mr. Papadopoulos, they didn't go to the court.  They used human sources, all kinds of -- from about the moment Papadopoulos joins the Trump campaign, you got all these people all around the world starting to swirl around him.  Names like Halper, Downer, Mifsud, Thompson, meeting in Rome, London, all kinds of places.  The FBI even sent, even sent a lady posing as somebody else, went by the name Azra Turk, even dispatched her to London to spy on Mr. Papadopoulos.  In one of these meetings, Mr. Papadopoulos is talking to a foreign diplomat, and he tells the diplomat Russians have dirt on Clinton.  That diplomat then contacts the FBI, and the FBI opens an investigation based on that fact.

You point this out on page 1 of the report.  July 31st, 2016, they open the investigation based on that piece of information.  Diplomat tells Papadopoulos Russians have dirt -- excuse me, Papadopoulos tells the diplomat Russians have dirt on Clinton.  The diplomat tells the FBI.  What I am wondering is who told

Papadopoulos?  How did he find out?

Mr. Mueller.  I can't get into the evidentiary --

Mr. Jordan.  Yes, you can, because you wrote about it.  You gave us the answer.  Page 192 of the report you tell us who told him, Joseph Mifsud.  Joseph Mifsud is the guy who told Joseph Papadopoulos, the mysterious professor who lives in Rome and London, works and teaches at two different universities; this is the guy who told Papadopoulos.  He is the guy who starts it all.  And when the FBI interviews him, he lies three times, and yet you don't charge him with a crime.

You charge Rick Gates for false statements.  You charge Paul Manafort for false statements.  You charge Michael Cohen with false statements.  You charge Michael Flynn, a three-star general, with false statements.  But the guy who puts the country through this whole saga, starts it all -- for 3 years we have lived this now -- he lies and you guys don't charge him.  And I am curious as to why.

Mr. Mueller.  Well, I can't get into it.  And it is obvious I think that we can't get into charging decisions.

Mr. Jordan.  When the FBI interviewed him in February -- the FBI interviews him in February.  When the Special Counsel's Office interviewed Mifsud, did he lie to you guys too?

Mr. Mueller.  I can't get into that.

Mr. Jordan.  Did you interview Mifsud?

Mr. Mueller.  I can't get into that.

Mr. Jordan.  Is Mifsud Western intelligence or Russian intelligence?

Mr. Mueller.  I can't get into that.

Mr. Jordan.  A lot of things you can't get into.  What is interesting:  You can charge 13 Russians no one's ever heard of, no one's ever seen.  No one's ever going to hear of them.  No one's ever going to see them.  You can charge them.  You can charge all kinds of people who are around the President with false statements.  But the guy who launches everything, the guy who puts this whole story in motion, you can't charge him.  I think that is amazing.

Mr. Mueller.  I am not certain -- I am not certain I agree with your characterization.

Mr. Jordan.  Well, I am reading from your report.  Mifsud told Papadopoulos.  Papadopoulos tells the diplomat.  The diplomat tells the FBI.  The FBI opens the investigation July 31st, 2016. And here we are 3 years later, July of 2019.  The country's been put through this, and the central figure who launches it all lies to us, and you guys don't hunt him down and interview him again, and you don't charge him with a crime.

Now, here is the good news.  Here is the good news.  The President was falsely accused of conspiracy.  The FBI does a 10-month investigation.  And James Comey, when we deposed him a year ago, told us at that point they had nothing.  You do a 22-month investigation.  At the end of that 22 months, you find no

conspiracy.  And what do the Democrats want to do?  They want to keep investigating.  They want to keep going.

Maybe a better course of action, maybe a better course of action is to figure out how the false accusations started.  Maybe it is to go back and actually figure out why Joseph Mifsud was lying to the FBI.  And here is the good news.  Here is the good news.  That is exactly what Bill Barr is doing, and thank goodness for that.  That is exactly what the Attorney General and John Durham are doing.  They are going to find out why we went through this 3-year --

Chairman Nadler.  The time of the gentleman --

Mr. Jordan.  -- saga and get to the bottom of it.

Chairman Nadler.  The time of the gentleman has expired.

In a moment, we will take a very brief 5-minute break. First, I ask everyone in the room to please remain seated and quiet while the witness exits the room.  I also want to announce to those in the audience that you may not be guaranteed your seat if you leave the hearing room at this time.  At this time, the committee will stand in a very short recess.

[Recess.]

Chairman Nadler.  People, please take their seats before the special counsel returns.

The gentleman from Louisiana, Mr. Richmond.

Mr. Richmond.  Thank you, Mr. Chairman.

Mr. Mueller, Congressman Deutch addressed Trump's request to

McGahn to fire you.  Representative Bass talked about the
President's request of McGahn to deny the fact that the President
made that request.

I want to pick up where they left off, and I want to pick up
with the President's personal lawyer.  In fact, there was evidence
that the President's personal lawyer was alarmed at the prospect
of the President meeting with Mr. McGahn to discuss Mr. McGahn's
refusal to deny The New York Times report about the President
trying to fire you, correct?

Mr. Mueller.  Correct.

Mr. Richmond.  In fact, the President's counsel was so
alarmed by the prospect of the President's meeting with McGahn
that he called Mr. McGahn's counsel and said that McGahn could not
resign no matter what happened in the Oval Office that day,
correct?

Mr. Mueller.  Correct.

Mr. Richmond.  So it is accurate to say that the President
knew that he was asking McGahn to deny facts that McGahn, quote,
had repeatedly said were accurate, unquote.  Isn't that right?

Mr. Mueller.  Correct.

Mr. Richmond.  Your investigation also found, quote:  By the
time of the Oval Office meeting with the President, the President
was aware, one, that McGahn did not think the story was false;
two, did not want to issue a statement or create a written record
denying facts that McGahn believed to be true.  The President

nevertheless persisted and asked McGahn to repudiate facts that McGahn had repeatedly said were accurate.

Isn't that correct?

Mr. Mueller.  Generally true.

Mr. Richmond.  I believe that is on page 119.  Thank you.  In other words, the President was trying to force McGahn to say something that McGahn did not believe to be true.

Mr. Mueller.  That is accurate.

Mr. Richmond.  I want to reference you to a slide, and it is on page 120, and it says:  Substantial evidence indicates that in repeatedly urging McGahn to dispute that he was ordered to have the special counsel terminated, the President acted for the purpose of influencing McGahn's account in order to deflect or prevent further scrutiny of the President's conduct towards the investigation.

Mr. Mueller.  That is accurate.

Mr. Richmond.  Can you explain what you meant there?

Mr. Mueller.  I am just going to leave it as it appears in the report.

Mr. Richmond.  So it is fair to say the President tried to protect himself by asking staff to falsify records relevant to an ongoing investigation?

Mr. Mueller.  I would say that is generally a summary.

Mr. Richmond.  Would you say that that action, the President tried to hamper the investigation by asking staff to falsify

records relevant to your investigation?

Mr. Mueller.  I am just going to refer you to the report, if I could, for review of that episode.

Mr. Richmond.  Thank you.  Also, the President's attempts to get McGahn to create a false written record were related to Mr. Trump's concerns about your obstruction of justice inquiry, correct?

Mr. Mueller.  I believe that to be true.

Mr. Richmond.  In fact, at that same Oval Office meeting, did the President also ask McGahn why he had told -- quote, "why he had told Special Counsel's Office investigators that the President told him to have you removed," unquote?

Mr. Mueller.  And what was the question, sir, if I might?

Mr. Richmond.  Let me go to the next one.  The President, quote, criticized McGahn for telling your office about the June 17, 2017, events when he told McGahn to have you removed, correct?

Mr. Mueller.  Correct.

Mr. Richmond.  In other words, the President was criticizing his White House counsel for telling law enforcement officials what he believed to be the truth.

Mr. Mueller.  I again go back to the text of the report.

Mr. Richmond.  Well, let me go a little bit further.  Would it have been a crime if Mr. McGahn had lied to you about the President ordering him to fire you?

Mr. Mueller.  I don't want to speculate.

Mr. Richmond.  Okay.  Is it true that you charged multiple people associated with the President for lying to you during your investigation?

Mr. Mueller.  That is accurate.

Mr. Richmond.  The President also complained that his staff were taking notes during the meeting about firing McGahn.  Is that correct?

Mr. Mueller.  That is what the report says.  Yeah, the report.

Mr. Richmond.  But, in fact, it is completely appropriate for the President's staff, especially his counsels, to take notes during a meeting, correct?

Mr. Mueller.  I rely on the wording of the report.

Mr. Richmond.  Well, thank you, Director Mueller, for your investigation into whether the President attempted to obstruct justice by ordering his White House counsel, Don McGahn, to lie to protect the President and then to create a false record about it. It is clear that any other person who engaged in such conduct would be charged with a crime.  We will continue our investigation, and we will hold the President accountable because no one is above the law.

Chairman Nadler.  The time of the gentleman has expired.

The gentleman from Florida.

Mr. Gaetz.  Director Mueller, can you state with confidence that the Steele dossier was not part of Russia's disinformation

campaign?

Mr. <u>Mueller.</u>  As I said in my opening statement, that part of the building of the case predated me and by at least 10 months.

Mr. <u>Gaetz.</u>  Paul Manafort's alleged crimes regarding tax evasion predated you.  You had no problem charging them.  As a matter of fact, this Steele dossier predated the Attorney General, and he didn't have any problem answering the question.  When Senator Cornyn asked the Attorney General the exact question I asked you, Director, the Attorney General said, and I am quoting: No, I can't state that with confidence.  And that is one of the areas I am reviewing.  I am concerned about it, and I don't think it is entirely speculative.

Now, if something is not entirely speculative, then it must have some factual basis, but you identify no factual basis regarding the dossier or the possibility that it was part of the Russia disinformation campaign.

Now, Christopher Steele's reporting is referenced in your report.  Steele reported to the FBI that senior Russian Foreign Ministry figures, along with other Russians, told him that there was -- and I am quoting from the Steele dossier -- extensive evidence of conspiracy between the Trump campaign team and the Kremlin.

So here is my question:  Did Russians really tell that to Christopher Steele, or did he just make it all up, and was he lying to the FBI?

Mr. Mueller.  Let me back up a second, if I could, and say, as I said earlier with regard to Steele, that that is beyond my purview.

Mr. Gaetz.  No, it is exactly your purview, Director Mueller, and here is why:  Only one of two things is possible, right?  Either Steele made this whole thing up and there were never any Russians telling him of this vast criminal conspiracy that you didn't find, or Russians lied to Steele.  Now, if Russians were lying to Steele to undermine our confidence in our duly elected President, that would seem to be precisely your purview because you stated in your opening that the organizing principle was to fully and thoroughly investigate Russia's interference.  But you weren't interested in whether or not the Russians were interfering through Christopher Steele.  And if Steele was lying, then you should have charged him with lying, like you charged a variety of other people.  But you say nothing about this in your report.

Mr. Mueller.  Well, sir --

Mr. Gaetz.  Meanwhile, Director, you are quite loquacious on other topics.  You write 3,500 words about the June 9 meeting between the Trump campaign and Russian lawyer Veselnitskaya.  You write on page 103 of your report that the President's legal team suggested -- and I am quoting from your report -- that the meeting might have been a setup by individuals working with the firm that produced the Steele reporting.

So I am going to ask you a very easy question, Director

Mueller.  On the week of June 9, who did Russian lawyer Veselnitskaya meet with more frequently, the Trump campaign or Glenn Simpson, who was functionally acting as an operative for the Democratic National Committee?

Mr. Mueller.  Well, what I think is missing here is the fact that this is under investigation elsewhere in the Justice Department --

Mr. Gaetz.  I --

Mr. Mueller.  -- and if I can finish, sir, and if I can finish, sir -- and consequently, it is not within my purview.  The Department of Justice and FBI should be responsive to questions on this particular issue.

Mr. Gaetz.  It is absurd to suggest that an operative for the Democrats was meeting with this Russian lawyer the day before and the day after the Trump Tower meeting, and yet that is not something you reference.

Now, Glenn Simpson testified under oath he had dinner with Veselnitskaya the day before and the day after this meeting with the Trump team.  Do you have any basis, as you sit here today, to believe that Steele was lying?

Mr. Mueller.  As I said before and I will say again, it is not my purview.  Others are investigating what you address.

Mr. Gaetz.  So it is not your purview to look into whether or not Steele is lying.  It is not your purview to look into whether or not anti-Trump Russians are lying to Steele.  And it is not

your purview to look at whether or not Glenn Simpson was meeting with the Russians the day before and the day after you write 3,500 words about the Trump campaign meeting.

So I am wondering how these decisions are guided.  I look at the inspector general's report.  I am citing from page 404 of the inspector general's report.  It states:  Page stated:  Trump's not ever going to be President, right?  Right.  Strzok replied:  No, he is not.  We will stop it.

Also in the inspector general's report, there is someone identified as attorney No. 2.  Attorney No. 2 -- this is page 419 -- replied, "Hell no," and then added, "Viva la resistance."

Attorney No. 2 in the inspector general's report and Strzok both worked on your team, didn't they?

Mr. Mueller.  Pardon me, can you --

Mr. Gaetz.  They both worked on your team, didn't they?

Mr. Mueller.  I know -- I heard Strzok.  Who else were you talking about?

Mr. Gaetz.  Attorney No. 2 identified in the inspector general's report.

Mr. Mueller.  And the question was?

Mr. Gaetz.  Did he work for you?  The guy who said, "Viva la resistance."

Mr. Mueller.  Peter Strzok worked for me for a period of time, yes.

Mr. Gaetz.  Yeah, but so did the other guy that said, "Viva

la resistance."  And here is what I am kind of noticing, Director

Mueller:  When people associated with Trump lied, you throw the

book at them.  When Christopher Steele lied, nothing.  And so it

seems to be that when Glenn Simpson met with Russians, nothing.

When the Trump campaign met with Russians, 3,500 words.  And maybe

the reason why there are these discrepancies in what you focused

on is because the team was so biased --

    Chairman Nadler.  The time of the --

    Mr. Gaetz.  -- pledged to the resistance, pledged to stop

Trump.

    Chairman Nadler.  The time of the gentleman has expired.

    Mr. Jeffries of New York is recognized.

    Mr. Jeffries.  Mr. Mueller, obstruction of justice is a

serious crime that strikes at the core of an investigator's effort

to find the truth, correct?

    Mr. Mueller.  Correct.

    Mr. Jeffries.  The crime of obstruction of justice has three

elements, true?

    Mr. Mueller.  True.

    Mr. Jeffries.  The first element is an obstructive act,

correct?

    Mr. Mueller.  Correct.

    Mr. Jeffries.  An obstructive act could include taking an

action that would delay or interfere with an ongoing

investigation, as set forth in Volume II, page 87 and 88 of your

report, true?

Mr. <u>Mueller.</u>  I am sorry.  Could you again repeat the question?

Mr. <u>Jeffries.</u>  An obstructive act could include taking an action that would delay or interfere with an ongoing investigation.

Mr. <u>Mueller.</u>  That is true.

Mr. <u>Jeffries.</u>  Your investigation found evidence that President Trump took steps to terminate the special counsel, correct?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Jeffries.</u>  Mr. Mueller, does ordering the termination of the head of a criminal investigation constitute an obstructive act?

Mr. <u>Mueller.</u>  That would be -- I would refer you to the report on that.

Mr. <u>Jeffries.</u>  Let me refer you to page 87 and 88 of Volume II, where you conclude:  The attempt to remove the special counsel would qualify as an obstructive act if it would naturally obstruct the investigation and any grand jury proceedings that might flow from the inquiry, correct?

Mr. <u>Mueller.</u>  Yes.  I have got that now.  Thank you.

Mr. <u>Jeffries.</u>  Thank you.  The second element of obstruction of justice is the presence of an obstructive act in connection with an official proceeding, true?

Mr. Mueller.  True.

Mr. Jeffries.  Does the special counsel's criminal investigation into the potential wrongdoing of Donald Trump constitute an official proceeding?

Mr. Mueller.  And that is an area which I cannot get into.

Mr. Jeffries.  Okay.  President Trump tweeted on June 16, 2017, quote:  I am being investigated for firing the FBI Director by the man who told me to fire the FBI Director.  Witch hunt.

The June 16th tweet just read -- was cited on page 89 in Volume II -- constitutes a public acknowledgement by President Trump that he was under criminal investigation, correct?

Mr. Mueller.  I think generally correct.

Mr. Jeffries.  One day later, on Saturday, June 17th, President Trump called White House Counsel Don McGahn at home and directed him to fire the special counsel, true?

Mr. Mueller.  I believe it to be true.  I think we have been -- I may have stated in response to questions some --

Mr. Jeffries.  That is correct.  President Trump told Don McGahn, quote, Mueller has to go, close quote.  Correct?

Mr. Mueller.  Correct.

Mr. Jeffries.  Your report found, on page 89, Volume II, that substantial evidence indicates that, by June 17th, the President knew his conduct was under investigation by a Federal prosecutor who could present any evidence of Federal crimes to a grand jury, true?

Mr. <u>Mueller.</u>  True.

Mr. <u>Jeffries.</u>  The third element -- the second element having just been satisfied, the third element of the crime of obstruction of justice is corrupt intent, true?

Mr. <u>Mueller.</u>  True.

Mr. <u>Jeffries.</u>  Corrupt intent exists if the President acted to obstruct an official proceeding for the improper purpose of protecting his own interests, correct?

Mr. <u>Mueller.</u>  That is generally correct.

Mr. <u>Jeffries.</u>  Thank you.

Mr. <u>Mueller.</u>  The only thing I would say is we're going through the three elements of the proof of the obstruction of justice charges when the fact of the matter is we got -- excuse me, just one second.

Mr. <u>Jeffries.</u>  Thank you.  Mr. Mueller, let me move on in the interest of time.  Upon learning about the appointment of the special counsel, your investigation found that Donald Trump stated to the then Attorney General, quote:  Oh my God, this is terrible. This is the end of my Presidency.  I am F'd.

Is that correct?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Jeffries.</u>  Is it fair to say that Donald Trump viewed the special counsel's investigation into his conduct as adverse to his own interests?

Mr. <u>Mueller.</u>  I think that generally is true.

Mr. <u>Jeffries.</u>  The investigation found evidence, quote, that the President knew that he should not have directed Don McGahn to fire the special counsel.  Correct?

Mr. <u>Mueller.</u>  And where do you have that quote?

Mr. <u>Jeffries.</u>  Page 90, Volume II:  There is evidence that the President knew he should not have made those calls to McGahn, close quote.

Mr. <u>Mueller.</u>  I see that.  Yes, that is accurate.

Mr. <u>Jeffries.</u>  The investigation also found substantial evidence that President Trump repeatedly urged McGahn to dispute that he was ordered to have the special counsel terminated, correct?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Jeffries.</u>  The investigation found substantial evidence that, when the President ordered Don McGahn to fire the special counsel and then lie about it, Donald Trump, one, committed an obstructive act; two, connected to an official proceeding; three, did so with corrupt intent.

Those are the elements of obstruction of justice.  This is the United States of America.  No one is above the law, no one.  The President must be held accountable one way or the other.

Mr. <u>Mueller.</u>  Let me just say, if I might, I don't subscribe necessarily to your -- the way you analyze that.  I am not saying it is out of the ballpark, but I am not supportive of that analytical charge.

Mr. <u>Jeffries.</u>   Thank you.

Chairman <u>Nadler.</u>   The gentleman from Colorado.

Mr. <u>Buck.</u>   Thank you, Mr. Chairman.

Mr. Mueller, over here.

Mr. <u>Mueller.</u>   Hi.

Mr. <u>Buck.</u>   Hi.  I want to start by thanking you for your service.  You joined the Marines and led a rifle platoon in Vietnam, where you earned a bronze star, purple heart, and other commendations.  You served as an assistant United States attorney leading the homicide unit here in D.C., U.S. attorney for the District of Massachusetts and later Northern District of California, Assistant Attorney General for DOJ's Criminal Division, and the FBI Director.  So thank you, I appreciate that.

But having reviewed your biography, it puzzles me why you handled your duties in this case the way you did.  The report contradicts what you taught young attorneys at the Department of Justice, including to ensure that every defendant is treated fairly, or, as Justice Sutherland said in the Berger case, a prosecutor is not the representative of an ordinary party to a controversy but of a sovereignty whose interest in a criminal prosecution is not that it shall win a case but that justice shall be done and that the prosecutor may strike hard blows, but he is not at liberty to strike foul ones.

By listing the 10 factual situations and not reaching a conclusion about the merits of the case, you unfairly shifted the

burden of proof to the President, forcing him to prove his innocence while denying him a legal forum to do so.  And I have never heard of a prosecutor declining a case and then holding a press conference to talk about the defendant.  You noted eight times in your report that you had a legal duty under the regulations to either prosecute or decline charges.  Despite this, you disregarded that duty.

As a former prosecutor, I am also troubled with your legal analysis.  You discussed 10 separate factual patterns involving alleged obstruction, and then you failed to separately apply the elements of the applicable statutes.

I looked at the 10 factual situations, and I read the case law.  And I have to tell you, just looking at the Flynn matter, for example, the four statutes that you cited for possible obstruction, 1503, 1505, 1512(b)(3), and 1512(c)(2), when I look at those concerning the Flynn matter, 1503 is inapplicable because there wasn't a grand jury or trial jury impaneled, and Director Comey was not an officer of the court as defined by the statute.

Section 1505 criminalizes acts that would obstruct or impede administrative proceedings as those before Congress or an administrative agency.  The Department of Justice criminal resource manual states that the FBI investigation is not a pending proceeding.

1512(b)(3) talks about intimidation, threats of force to tamper with a witness.  General Flynn at the time was not a

witness, and certainly Director Comey was not a witness.

And 1512(c)(2) talks about tampering with a record.  And as Joe Biden described the statute as it was being debated on the Senate floor, he called this a statute criminalizing document shredding, and there is nothing in your report that alleges that the President destroyed any evidence.

So what I have to ask you and what I think people are working around in this hearing is -- let me lay a little foundation for it.  The ethical rules require that a prosecutor have a reasonable probability of conviction to bring a charge.  Is that correct?

Mr. Mueller.  It sounds generally accurate.

Mr. Buck.  And the regulations concerning your job as special counsel state that your job is to provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by your office.

You recommended declining prosecution of President Trump and anyone associated with his campaign because there was insufficient evidence to convict for a charge of conspiracy with Russian interference in the 2016 election.  Is that fair?

Mr. Mueller.  That is fair.

Mr. Buck.  Was there sufficient evidence to convict President Trump or anyone else with obstruction of justice?

Mr. Mueller.  We did not make that calculation.

Mr. Buck.  How could you not have made the calculation with the regulation --

Mr. Mueller.  As the OLC opinion, the OLC opinion, Office of Legal Counsel, indicates that we cannot indict a sitting President.  So one of the tools that a prosecutor would use is not there.

Mr. Buck.  Okay.  But let me just stop.  You made the decision on the Russian interference.  You couldn't have indicted the President on that, and you made the decision on that, but when it came to obstruction, you threw a bunch of stuff up against the wall to see what would stick, and that is really unfair.

Mr. Mueller.  I would not agree to that characterization at all.  What we did is provide to the Attorney General, in the form of a confidential memorandum, our understanding of the case, those cases that were brought, those cases that were declined, and that one case where the President cannot be charged with a crime.

Mr. Buck.  Okay.  Could you charge the President with a crime after he left office?

Mr. Mueller.  Yes.

Mr. Buck.  You believe that he committed -- you could charge the President of the United States with obstruction of justice after he left office?

Mr. Mueller.  Yes.

Mr. Buck.  Ethically, under the ethical standards?

Mr. Mueller.  Well, I am not certain because I haven't looked at the ethical standards, but the OLC opinion says that the prosecutor, while he cannot bring a charge against a sitting

President, nonetheless, he can continue the investigation to see if there are any other persons who might be drawn into the conspiracy.

Chairman Nadler.  The time of the gentleman has expired.

The gentleman from Rhode Island.

Mr. Cicilline.  Director, as you know, we are specifically focusing on five separate obstruction episodes here today.  I would like to ask you about the third episode.  It is the section of your report entitled "The President's efforts to curtail the special counsel investigation," beginning at page 90.  And by "curtail," you mean limit, correct?

Mr. Mueller.  Correct.

Mr. Cicilline.  My colleagues have walked through how the President tried to have you fired through the White House counsel, and because Mr. McGahn refused the order, the President asked others to help limit your investigation.  Is that correct?

Mr. Mueller.  Correct.

Mr. Cicilline.  And was Corey Lewandowski one such individual?

Mr. Mueller.  Again, can you remind me what --

Mr. Cicilline.  Well, Corey Lewandowski is the President's former campaign manager, correct?

Mr. Mueller.  Correct.

Mr. Cicilline.  Did he have any official position with the Trump administration?

Mr. Mueller.  I don't believe so.

Mr. Cicilline.  Your report describes an incident in the Oval Office involving Mr. Lewandowski on June 19, 2017, at Volume II, page 91.  Is that correct.

Mr. Mueller.  I am sorry.  What is the citation, sir?

Mr. Cicilline.  Page 91.

Mr. Mueller.  Of the second volume?

Mr. Cicilline.  Yes.

Mr. Mueller.  And where?

Mr. Cicilline.  A meeting in the Oval Office between Mr. Lewandowski and the President.

Mr. Mueller.  Okay.

Mr. Cicilline.  And that was just 2 days after the President called Don McGahn at home and ordered him to fire you.  Is that correct?

Mr. Mueller.  Apparently so.

Mr. Cicilline.  So, right after his White House counsel, Mr. McGahn, refused to follow the President's order to fire you, the President came up with a new plan, and that was to go around to all of his senior advisers and government aides to have a private citizen try to limit your investigation.

What did the President tell Mr. Lewandowski to do?  Do you recall he told him -- he dictated a message to Mr. Lewandowski for Attorney General Sessions and asked him to write it down.  Is that correct?

Mr. Mueller.  True.

Mr. Cicilline.  And did you and your team see this handwritten message?

Mr. Mueller.  I am not going to get into what we may or may not have included in our investigation.

Mr. Cicilline.  Okay.  The message directed Sessions to give -- and I am quoting from your report -- to give a public speech saying that he planned to meet with the special prosecutor to explain this is very unfair and let the special prosecutor move forward with investigating election meddling for future elections. That is at page 91.  Is that correct?

Mr. Mueller.  Yes, I see that.  Thank you.  Yes, it is.

Mr. Cicilline.  In other words, Mr. Lewandowski, a private citizen, was instructed by the President of the United States to deliver a message from the President to the Attorney General that directed him to limit your investigation, correct?

Mr. Mueller.  Correct.

Mr. Cicilline.  And at this time, Mr. Sessions was still recused from oversight of your investigation, correct?

Mr. Mueller.  I am sorry.  Could you restate that?

Mr. Cicilline.  The Attorney General was recused from oversight.

Mr. Mueller.  Yes, yes.

Mr. Cicilline.  So the Attorney General would have had to violate his own Department's rules in order to comply with the

President's order, correct?

Mr. <u>Mueller.</u>  Well, I am not going to get into the subsidiary details.  I just refer you again to page 91, 92 of the report.

Mr. <u>Cicilline.</u>  And if the Attorney General had followed through with the President's request, Mr. Mueller, it would have effectively ended your investigation into the President and his campaign, as you note on page 97, correct?

Mr. <u>Mueller.</u>  Could you --

Mr. <u>Cicilline.</u>  At page 97, you write, and I quote:  Taken together, the President's directives indicate that Sessions was being instructed to tell the special counsel to end the existing investigation into the President and his campaign, with the special counsel being permitted to move forward with investigating election meddling for future elections.  Is that correct?

Mr. <u>Mueller.</u>  Generally true, yes, sir.

Mr. <u>Cicilline.</u>  And an unsuccessful attempt to obstruct justice is still a crime.  Is that correct?

Mr. <u>Mueller.</u>  That is correct.

Mr. <u>Cicilline.</u>  And Mr. Lewandowski tried to meet with the Attorney General.  Is that right?

Mr. <u>Mueller.</u>  True.

Mr. <u>Cicilline.</u>  And he tried to meet with him in his office so he would be certain there wasn't a public log of the visit.

Mr. <u>Mueller.</u>  According to what we gathered for the report.

Mr. <u>Cicilline.</u>  And the meeting never happened and the

President raised the issue again with Mr. Lewandowski.  And this time, he said, and I quote, if Sessions does not meet with you, Lewandowski should tell Sessions he was fired, correct?

Mr. Mueller.  Correct.

Mr. Cicilline.  So immediately following the meeting with the President, Lewandowski then asked Mr. Dearborn to deliver the message, who is the former chief of staff to Mr. Sessions.  And Mr. Dearborn refuses to deliver it because he doesn't feel comfortable.  Isn't that correct?

Mr. Mueller.  Generally correct, yes.

Mr. Cicilline.  So, just so we are clear, Mr. Mueller, 2 days after the White House Counsel Don McGahn refused to carry out the President's order to fire you, the President directed a private citizen to tell the Attorney General of the United States, who was recused at the time, to limit your investigation to future elections, effectively ending your investigation into the 2016 Trump campaign.  Is that correct?

Mr. Mueller.  I am not going to adopt your characterization. I will say that the facts as laid out in the report are accurate.

Mr. Cicilline.  Well, Mr. Mueller, in your report you, in fact, write at page 99 -- 97:  Substantial evidence indicates that the President's effort to have Sessions limit the scope of the special counsel's investigation to future election interference was intended to prevent further investigative scrutiny of the President and his campaign conduct.  Is that correct?

Mr. Mueller.  Generally.

Mr. Cicilline.  And so, Mr. Mueller, you have seen a letter where a thousand former Republican and Democratic Federal prosecutors have read your report and said, anyone but the President who committed those acts would be charged with obstruction of justice.  Do you agree with those former colleagues, a thousand prosecutors who came to that conclusion?

Chairman Nadler.  The time of the gentleman has expired.

The gentleman from Arizona.

Mr. Biggs.  Thank you, Mr. Chairman.

Mr. Mueller, you guys, your team wrote in the report, quote -- this is at the top of page 2, Volume I, also on page 173, by the way.  You said that you had come to the conclusion that, quote:  The investigation did not establish that members of the Trump campaign conspired or coordinated with the Russian Government in its election interference activities, close quote.

That is an accurate statement, right?

Mr. Mueller.  That is accurate.

Mr. Biggs.  And I am curious, when did you personally come to that conclusion?

Mr. Mueller.  Can you remind me which paragraph you are referring to?

Mr. Biggs.  Top of page 2.

Mr. Mueller.  On two.

Mr. Biggs.  Volume I.

Mr. <u>Mueller.</u>  Okay.  And exactly which paragraph are you looking at on 2?

Mr. <u>Biggs.</u>  The investigation did not establish --

Mr. <u>Mueller.</u>  Of course.  I see it, yes.  What was your question?

Mr. <u>Biggs.</u>  My question now is, when did you personally reach that conclusion?

Mr. <u>Mueller.</u>  Well, we were ongoing for 2 years.

Mr. <u>Biggs.</u>  Right, you were ongoing, and you wrote it at some point during that 2-year period, but at some point, you had to come to a conclusion that I don't think there -- that there is not a conspiracy going on here.  There was no conspiracy between this President.  I am not talking about the rest of the President's team.  I am talking about this President and the Russians.

Mr. <u>Mueller.</u>  As you understand, in developing a criminal case, you get pieces of information, pieces of information, witnesses, and the like as you make your case.

Mr. <u>Biggs.</u>  Right.

Mr. <u>Mueller.</u>  And when you make a decision on a particular case depends on a number of factors.

Mr. <u>Biggs.</u>  Right, I understand.

Mr. <u>Mueller.</u>  So I cannot say specifically that we reached a decision on a particular defendant at a particular point in time.

RPTR MERTENS

EDTR ZAMORA

[10:44 a.m.]

Mr. Biggs.  But it was sometime well before you wrote the report.  Fair enough?  I mean, you wrote the report dealing with a whole myriad of issues.  Certainly, at some time prior to that report is when you reached the decision that, okay, with regard to the President himself, I don't find anything here.  Fair enough?

Mr. Mueller.  Well, I'm not certain I do agree with that.

Mr. Biggs.  So you waited till the last minute when you were actually writing the report and say, oh, okay --

Mr. Mueller.  No.  But there were various aspects of the development and --

Mr. Biggs.  Sure.  And that's my point.  There are various aspects that happen, but somewhere along the pike, you come to a conclusion there's nothing -- there's no there there for this defendant.  Isn't that right?

Mr. Mueller.  I can't -- I can't speak to that.

Mr. Biggs.  You can't say when.  Fair enough.

Mr. Zebley.  Mr. Biggs --

Mr. Biggs.  So -- no, I'm not -- no.  I'm asking the sworn witness.

Mr. Mueller, the evidence suggests that on May 10, 2017, at approximately 7:45 a.m., 6 days before the DAG, the Deputy

Attorney General, appointed you special counsel, Mr. Rosenstein

called you and mentioned the appointment of the special counsel.

Not necessarily that you'd be appointed, but that you had a

discussion to that.  Is that true?  May 10, 2017.

Mr. Mueller.  I don't have any -- no, I don't have any

knowledge of that occurring.

Mr. Biggs.  You don't have any knowledge or you don't recall?

Mr. Mueller.  I don't have any knowledge.

Mr. Biggs.  The evidence also suggests --

Mr. Mueller.  Given that what I saw you do, are you

questioning that?

Mr. Biggs.  Well, I just find it intriguing.  Let me just

tell you that there's evidence that suggests that that phone call

took place and that that is what was said.

So let's move to the next question.  The evidence suggests

that also on May 12, 2017, 5 days before the DAG appointed you

special counsel, you met with Mr. Rosenstein in person.  Did you

discuss the appointment of the special counsel then, not

necessarily you, but that there would be a special counsel?

Mr. Mueller.  I've gone into waters that don't allow me to

give you an answer to that particular question.  It relates to the

internal discussions he would have in terms of indicting an

individual.

Mr. Biggs.  This has nothing to do with the indictment.  It

has to do with special counsel and whether you discussed that with

Mr. Rosenstein.

The evidence also suggests that on May 13, 4 days before you were appointed special counsel, you met with attorney -- former Attorney General Sessions and Rosenstein, and you spoke about special counsel.  Do you remember that?

Mr. <u>Mueller.</u>  Not offhand, no.

Mr. <u>Biggs.</u>  Okay.  And on May 16, the day before you were appointed special counsel, you met with the President and Rod Rosenstein.  Do you remember having that meeting?

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Biggs.</u>  And discussion of the position of FBI Director took place.  Do you remember that?

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Biggs.</u>  And did you discuss at any time in that meeting Mr. Comey's termination?

Mr. <u>Mueller.</u>  No.

Mr. <u>Biggs.</u>  Did you discuss at any time in that meeting the potential appointment of a special counsel, not necessarily you, but just in general terms?

Mr. <u>Mueller.</u>  I can't get into the discussions on that.

Mr. <u>Biggs.</u>  How many times did you speak to Mr. Rosenstein before May 17, which is the day you got appointed, regarding the appointment of special counsel?  How many times prior to that did you discuss that?

Mr. <u>Mueller.</u>  I can't tell you how many times.

Mr. <u>Biggs.</u>  Is that because you don't recall or you just --

Mr. <u>Mueller.</u>  I do not recall.

Mr. <u>Biggs.</u>  Okay.  Thank you.

How many times did you speak with Mr. Comey about any investigations pertaining to Russia prior to May 17, 2017?  Did you have any?

Mr. <u>Mueller.</u>  None at all.

Mr. <u>Biggs.</u>  Zero.

Mr. <u>Mueller.</u>  Zero.

Mr. <u>Biggs.</u>  Okay.  My time has expired, so --

Chairman <u>Nadler.</u>  The time of the gentleman has expired.

The gentleman from California.

Mr. <u>Swalwell.</u>  Director Mueller, going back to the President's obstruction via Corey Lewandowski, it was referenced that a thousand former prosecutors who served under Republican and Democratic administrations with 12,000 years of Federal service wrote a letter regarding the President's conduct.  Are you familiar with that letter?

Mr. <u>Mueller.</u>  I've read about that letter, yes.

Mr. <u>Swalwell.</u>  And some of the individuals who signed that letter, the statement of former prosecutors, are people you worked with.  Is that right?

Mr. <u>Mueller.</u>  Quite probably, yes.

Mr. <u>Swalwell.</u>  People that you respect?

Mr. <u>Mueller.</u>  Quite probably, yes.

Mr. Swalwell.  And in that letter, they said all of this
conduct trying to control and impede the investigation against the
President by leveraging his authority over others is similar to
conduct we have seen charged against other public officials and
people in powerful positions.

Are they wrong?

Mr. Mueller.  They had a different case.

Mr. Swalwell.  Do you want to sign that letter, Director
Mueller?

Mr. Mueller.  They had a different case.

Mr. Swalwell.  Director Mueller, thank you for your service
going all the way back to the sixties when you courageously served
in Vietnam.  Because I have a seat on the Intelligence Committee,
I will have questions later.  And because of our limited time, I
will ask to enter this letter into the record under unanimous
consent.

Chairman Nadler.  Without objection.

[The information follows:]


******** COMMITTEE INSERT ********

Mr. Swalwell.  And I yield to my colleague from California,
Mr. Lieu.

Mr. Lieu.  Thank you, Director Mueller, for your long history
of service to our country, including your service as a Marine
where you earned a Bronze Star with a V device.

I'd like to now turn to the elements of obstruction of
justice as applied to the President's attempts to curtail your
investigation.

The first element of obstruction of justice requires an
obstructive act, correct?

Mr. Mueller.  Correct.

Mr. Lieu.  Okay.  I'd like to direct you to page 97 of Volume
II of your report.  And you wrote there on page 97, quote,
Sessions was being instructed to tell the special counsel to end
the existing investigation into the President and his campaign,
unquote.  That's in the report, correct?

Mr. Mueller.  Correct.

Mr. Lieu.  That would be evidence of an obstructive act
because it would naturally obstruct the investigation, correct?

Mr. Mueller.  Correct.

Mr. Lieu.  Okay.  Let's turn now to the second element of the
crime of obstruction of justice which requires a nexus to an
official proceeding.  Again, I'm going to direct you to page 97,
the same page in Volume II, and you wrote, quote, by the time the
President's initial one-on-one meeting with Lewandowski on June

19, 2017, the existence of a grand jury investigation supervised
by the special counsel was public knowledge.

That's in the report, correct?

Mr. Mueller.  Correct.

Mr. Lieu.  That would constitute evidence of a nexus to an
official proceeding because a grand jury investigation is an
official proceeding, correct?

Mr. Mueller.  Yes.

Mr. Lieu.  Okay.  I'd like to now turn to the final element
of the crime of obstruction of justice.  On that same page,
page 97, do you see where there is an intent section on that page?

Mr. Mueller.  I do see that.

Mr. Lieu.  All right.  Would you be willing to read the first
sentence?

Mr. Mueller.  And that was starting with?

Mr. Lieu.  Substantial evidence.

Mr. Mueller.  Indicates that the President's?

Mr. Lieu.  If you could read that first sentence.  Would you
be willing to do that?

Mr. Mueller.  I'm happy to have you read it.

Mr. Lieu.  Okay.  I will read it then.

You wrote, quote, substantial evidence indicates that the
President's effort to have Sessions limit the scope of the special
counsel's investigation to future election interference was
intended to prevent further investigative scrutiny of the

President's and his campaign's conduct, unquote.

That's in the report, correct?

Mr. Mueller.  That is in the report.  And I rely what's in the report to indicate what's happening in the paragraphs that we've been discussing.

Mr. Lieu.  Thank you.

So to recap what we've heard, we have heard today that the President ordered former White House Counsel Don McGahn to fire you.  The President ordered Don McGahn to then cover that up and create a false paper trail.  And now we've heard the President ordered Corey Lewandowski to tell Jeff Sessions to limit your investigation so that he, you, stop investigating the President.

I believe a reasonable person looking at these facts could conclude that all three elements of the crime of obstruction of justice have been met.  And I would like to ask you, the reason, again, that you did not indict Donald Trump is because of OLC opinion stating that you cannot indict a sitting President, correct?

Mr. Mueller.  That is correct.

Mr. Lieu.  The fact that the orders by the President were not carried out, that is not a defense to obstruction of justice because the statute itself is quite broad.  It says that as long as you endeavor or attempt to obstruct justice, that would also constitute a crime.

Mr. Mueller.  I'm not going to get into that at this

juncture.

Mr. Lieu.  Okay.  Thank you.

And based on the evidence that we have heard today, I believe a reasonable person could conclude that at least three crimes of obstruction of justice by the President occurred.  We're going to hear about two additional crimes, and that will be the witness tamperings of Michael Cohen and Paul Manafort.

I yield back.

Mr. Mueller.  The only thing I want to add is that on going through the elements with you do not mean -- or does not mean that I subscribe to what you're trying to prove through those elements.

Chairman Nadler.  The time of the gentleman has expired.

The gentlelady from Arizona.

I'm sorry.  The gentleman from California.

Mr. McClintock.  Thank you, Mr. Chairman.

Mr. Mueller, over here.  Thanks for joining us today.  You had three discussions with Rod Rosenstein about your appointment as special counsel:  May 10, May 12, and May 13, correct?

Mr. Mueller.  If you say so.  I have no reason to dispute that.

Mr. McClintock.  Then you met with the President on the 16th with Rod Rosenstein present.  And then on the 17th, you were formally appointed as special counsel.  Were you meeting with the President on the 16th with knowledge that you were under consideration for appointment to special counsel?

Mr. Mueller.  I did not believe I was under consideration for counsel.  I had served two terms as FBI Director --

Mr. McClintock.  The answer is no.

Mr. Mueller.  The answer is no.

Mr. McClintock.  Greg Jarrett describes your office as the team of partisans.  And as additional information is coming to light, there's a growing concern that political bias caused important facts to be omitted from your report in order to cast the President unfairly in a negative light.  For example, John Dowd, the President's lawyer, leaves an message with Michael Flynn's lawyer on November 17 of -- November of 2017.  The edited version in your report makes it appear that he was improperly asking for confidential information, and that's all we know from your report, except that the judge in the Flynn case ordered the entire transcript released in which Dowd makes it crystal clear that's not what he was suggesting.

So my question is, why did you edit the transcript to hide the exculpatory part of the message?

Mr. Mueller.  Well, I'm not sure I would agree with your characterization that we did anything to hide.

Mr. McClintock.  Well, you omitted it.  You quoted the part where he says we need some kind of heads-up just for the sake of protecting all of our interests, if we can, but you omitted the portion where he says without giving up any confidential information.

Mr. Mueller.  Well, I'm not going to go further in terms of discussing the --

Mr. McClintock.  Let's go on.  You extensively discussed Konstantin Kilimnik's activities with Paul Manafort.  And you describe him as, quote, a Russian-Ukrainian political consultant and long-time employee of Paul Manafort assessed by the FBI to have ties to Russian intelligence.  And, again, that's all we know from your report, except we've since learned from news articles that Kilimnik was actually a U.S. State Department intelligence source, yet nowhere in your report is he so identified.  Why was that fact omitted?

Mr. Mueller.  I don't necessarily credit what you're saying occurred.

Mr. McClintock.  Were you aware that Kilimnik was a U.S. State Department source?

Mr. Mueller.  I'm not going to go into the ins and outs -- I'm not going to go into the ins and outs of what we had in the course of our investigation.

Mr. McClintock.  Did you interview Konstantin Kilimnik?

Mr. Mueller.  Pardon?

Mr. McClintock.  Did you interview Konstantin Kilimnik?

Mr. Mueller.  I can't go into the discussion of our investigative moves.

Mr. McClintock.  And yet that is the basis of your report. Again, the problem we're having is we have to rely on your report

for an accurate reflection of the evidence, and we're starting to find out that's not true.

For example, your report famously links Russian internet troll farms with the Russian Government.  Yet at a hearing on May 28 in the Concord Management IRA prosecution that you initiated, the judge excoriated both you and Mr. Barr for producing no evidence to support this claim.  Why did you suggest Russia was responsible for the troll farms, when in court you've been unable to produce any evidence to support it?

Mr. Mueller.  Well, I'm not going to get into that any further than I already have.

Mr. McClintock.  But you have left the clear impression throughout the country through your report that it was the Russian Government behind the troll farms, and yet when you're called upon to provide actual evidence in court, you fail to do so.

Mr. Mueller.  Well, again, I dispute your characterization of what occurred in that proceeding.

Mr. McClintock.  In fact, the judge considered holding the prosecutors in criminal contempt.  She backed off only after your hastily called press conference the next day in which you retroactively made the distinction between the Russian Government and the Russia troll farms.  Did your press conference of May 29 have anything to do with the threat to hold your prosecutors in contempt the previous day for publicly misrepresenting the evidence?

Mr. Mueller.  What was the question?

Mr. McClintock.  The question is, did your May 29 press conference have anything to do with the fact that the previous day, the judge threatened to hold your prosecutors in contempt for misrepresenting evidence?

Mr. Mueller.  No.

Mr. McClintock.  Now, the fundamental problem is, as I said, we've got to take your word.  Your team faithfully, accurately, impartially, and completely described all of the underlying evidence in the Mueller report, and we're finding more and more instances where this just isn't the case.  And it's starting to look like, you know, having desperately tried and failed to make a legal case against the President, you made a political case instead.  You put it in a paper sack, lit it on fire, dropped it on our porch, rang the doorbell and ran.

Mr. Mueller.  I don't think you reviewed a report that is as thorough, as fair, as consistent as the report that we have in front of us.

Mr. McClintock.  Then why is contradictory information --

Chairman Nadler.  The time of the gentleman has expired.

The gentleman from Maryland is recognized.

Mr. Raskin.  Director Mueller, let's go to a fourth episode of obstruction of justice in the form of witness tampering, which is urging witnesses not to cooperate with law enforcement, either by persuading them or intimidating them.  Witness tampering is a

felony punishable by 20 years in prison.  You found evidence that the President engaged in efforts, and I quote, to encourage witnesses not to cooperate with the investigation.  Is that right?

Mr. Mueller.  That's correct.  Have you got a citation?

Mr. Raskin.  I'm at page 7 on Volume II.

Mr. Mueller.  Thank you.

Mr. Raskin.  Now, one of these witnesses was Michael Cohen, the President's personal lawyer, who ultimately pled guilty to campaign violations based on secret hush money payments to women the President knew and also to lying to Congress about the hope for a $1 billion Trump Tower deal.

After the FBI searched Cohen's home, the President called him up personally, he said, to check in, and told him to, quote, hang in there and stay strong.  Is that right?  Do you remember finding that?

Mr. Mueller.  If it's in the report as stated, yes, it is right.

Mr. Raskin.  Yes.  Also in the report, actually, are a series of calls made by other friends of the President.  One reached out to say he was with the boss at Mar-a-Lago, and the President said he loves you.  His name is redacted.  Another redacted friend called to say, the boss loves you.  And the third redacted friend called to say, everyone knows the boss has your back.

Do you remember finding that sequence of calls?

Mr. Mueller.  Generally, yes.

Mr. Raskin.  When the news -- and, in fact, Cohen said that following the receipt of these messages -- I'm quoting here, page 147, Volume II -- he believed he had the support of the White House if he continued to toe the party line, and he determined to stay on message and be part of the team.  That's at page 147.  Do you remember generally finding that?

Mr. Mueller.  Generally, yes.

Mr. Raskin.  Well, and Robert Costello, a lawyer close to the President's legal team, emailed Cohen to say, quote, you are loved, they're in our corner, sleep well tonight, and you have friends in high places.  And that's up on the screen, page 147. Do you remember reporting that?

Mr. Mueller.  I see that.

Mr. Raskin.  Okay.  Now, when the news first broke that Cohen had arranged payoffs to Stormy Daniels, Cohen faithfully stuck to this party line.  He said publicly that neither the Trump Organization nor the Trump campaign was a part of the transaction and neither reimbursed him.  Trump's personal attorney at that point quickly texted Cohen to say, quote, client says thank you for what you do.

Mr. Mueller, who is the capital C client thanking Cohen for what he does?

Mr. Mueller.  I can't speak to that.

Mr. Raskin.  Okay.  The assumption in the context suggests very strongly it's President Trump.

Mr. <u>Mueller.</u>  I can't speak to that.

Mr. <u>Raskin.</u>  Okay.  Cohen later broke and pled guilty to campaign finance offenses, and admitted fully they were made, quote, at the direction of candidate Trump.  Do you remember that?

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Raskin.</u>  After Cohen's guilty plea, the President suddenly changed his tune towards Mr. Cohen, didn't he?

Mr. <u>Mueller.</u>  I would say I rely on what's in the report.

Mr. <u>Raskin.</u>  Well, he made the suggestion that Cohen family members had committed crimes.  He targeted, for example, Cohen's father-in-law and repeatedly suggested that he was guilty of committing crimes, right?

Mr. <u>Mueller.</u>  Generally accurate.

Mr. <u>Raskin.</u>  Okay.  On page 154, you give a powerful summary of these changing dynamics, and you said -- I'm happy to have you read it, but I'm happy to do it if not.

Mr. <u>Mueller.</u>  I have it in front of me.  Thank you.

Mr. <u>Raskin.</u>  Would you like to read it?

Mr. <u>Mueller.</u>  I would.

Mr. <u>Raskin.</u>  Can you read it out loud to everybody?

Mr. <u>Mueller.</u>  I would be happy to have you read it out loud.

Mr. <u>Raskin.</u>  Okay.  Very good.  We'll read it at the same time.

The evidence concerning this sequence of events could support an inference that the President used inducements in the form of

positive messages in an effort to get Cohen not to cooperate and then turned to attacks and intimidation to deter the provision of information or to undermine Cohen's credibility once Cohen began cooperating.

Mr. Mueller.  I believe that's accurate.

Mr. Raskin.  Okay.  And in my view, if anyone else in America engaged in these actions, they would have been charged with witness tampering.  We must enforce the principle in Congress that you emphasize so well in the very last sentence of your report, which is that in America, no person is so high as to be above the law.

I yield back, Mr. Chairman.

Chairman Nadler.  The gentleman leads back.

The gentlelady from Arizona.

Mrs. Lesko.  Thank you, Mr. Chairman.

Just recently, Mr. Mueller, you said -- Mr. Lieu was asking you questions.  And Mr. Lieu's question, I quote, the reason you didn't indict the President is because of the OLC opinion.  And you answered, that is correct.  But that is not what you said in the report, and it's not what you told Attorney General Barr.

And, in fact, in a joint statement that you released with DOJ on May 29, after your press conference, your office issued a joint statement with the Department of Justice that said:  The Attorney General has previously stated that the special counsel repeatedly affirmed that he was not saying that but for the OLC opinion he

would have found the President obstructed justice.  The special
counsel's report and his statement today made clear that the
office concluded it would not reach a determination one way or the
other whether the President committed a crime.  There is no
conflict between these statements.

So, Mr. Mueller, do you stand by your joint statement with
DOJ that you issued on May 29 as you sit here today?

Mr. Mueller.  I would have to look at it more closely before
I said I agree with it.

Mrs. Lesko.  Well, so, you know, my conclusion is that what
you told Mr. Lieu really contradicts what you said in the report,
and specifically what you said apparently repeatedly to Attorney
General Barr that -- and then you issued a joint statement on May
29 saying that the Attorney General has previously stated that the
special counsel repeatedly affirmed that he was not saying but for
the OLC report that we would have found the President obstructed
justice, so I just say there's a conflict.

I do have some more questions.  Mr. Mueller, there's been a
lot of talk today about firing the special counsel and curtailing
the investigation.  Were you ever fired, Mr. Mueller?

Mr. Mueller.  Was I what?

Mrs. Lesko.  Were you ever fired as special counsel,
Mr. Mueller?

Mr. Mueller.  Not that I -- no.

Mrs. Lesko.  No.  Were you allowed to complete your

investigation unencumbered?

Mr. Mueller.  Yes.

Mrs. Lesko.  And, in fact, you resigned as special counsel when you closed up the office in late May 2019.  Is that correct?

Mr. Mueller.  That's correct.

Mrs. Lesko.  Thank you.

Mr. Mueller, on April 18, the Attorney General held a press conference in conjunction with the public release of your report. Did Attorney General Barr say anything inaccurate, either in his press conference or his March 24 letter to Congress, summarizing the principal conclusions of your report?

Mr. Mueller.  Well, what you are not mentioning is a letter we sent on March 27 to Mr. Barr that raised some issues, and that letter speaks for itself.

Mrs. Lesko.  But then I don't see how you could -- that could be since AG Barr's letter detailed the principal conclusions of your report, and you have said before that -- that there wasn't anything inaccurate.  In fact, you have this joint statement.  But let me go on to another question.

Mr. Mueller, rather than purely relying on the evidence provided by witnesses and documents, I think you relied a lot on media.  I'd like to know how many times you cited The Washington Post in your report.

Mr. Mueller.  How many times I what?

Mrs. Lesko.  Cited The Washington Post in your report.

Mr. Mueller.  I do not have knowledge of that figure, but I -- well, that's it.  I don't have knowledge of that figure.

Mrs. Lesko.  I counted about 60 times.

How many times did you cite The New York Times?  I counted --

Mr. Mueller.  Again, I have no idea.

Mrs. Lesko.  I counted about 75 times.

How many times did you cite Fox News?

Mr. Mueller.  As with the other two, I have no idea.

Mrs. Lesko.  About 25 times.

I've got to say it looks like Volume II is mostly regurgitated press stories.  Honestly, there's almost nothing in Volume II that I didn't already hear or know simply by having a $50 cable news subscription.  However, your investigation cost the American taxpayers $25 million.

Mr. Mueller, you cited media reports nearly 200 times in your report.  Then in a footnote, a small footnote, No. 7, page 15 of Volume II of your report, you wrote, I quote, this section summarizes and cites various news stories, not for the truth of the information contained in the stories, but rather, to place candidate Trump's response to those stories in context.

Since nobody but lawyers reads footnotes, are you concerned that the American public took the embedded news stories --

Chairman Nadler.  The time of the gentlelady has expired.

The gentlelady from Washington.

Mrs. Lesko.  Can Mr. Mueller answer the question?

Chairman <u>Nadler.</u>  No.  No.  No.  We're running short on time.
I said the gentlelady from Washington.

Ms. <u>Jayapal.</u>  Thank you.

Director Mueller, let's turn to the fifth of the obstruction
episodes in your report, and that is the evidence of whether
President Trump engaged in witness tampering with Trump campaign
chairman Paul Manafort, whose foreign ties were critical to your
investigation into Russia's interference in our elections.  And
this starts at Volume II, page 123.

Your office got indictments against Manafort and Trump deputy
campaign manager Rick Gates in two different jurisdictions,
correct?

Mr. <u>Mueller.</u>  Correct.

Ms. <u>Jayapal.</u>  And your office found that after a grand jury
indicted them, Manafort told Gates not to plead guilty to any
charges because, quote, he had talked to the President's personal
counsel, and they were going to take care of us.  Is that correct?

Mr. <u>Mueller.</u>  That's accurate.

Ms. <u>Jayapal.</u>  And according to your report, 1 day after
Manafort's conviction on eight felony charges, quote, the
President said that flipping was not fair and almost ought to be
outlawed.  Is that correct?

Mr. <u>Mueller.</u>  I'm aware of that.

Ms. <u>Jayapal.</u>  In this context, Director Mueller, what does it
mean to flip?

Mr. Mueller.  Have somebody cooperate in a criminal
investigation.

Ms. Jayapal.  And how essential is that cooperation to any
efforts to combat crime?

Mr. Mueller.  I'm not going to go beyond that, characterizing
that effort.

Ms. Jayapal.  Thank you.

In your report, you concluded that President Trump and his
personal counsel, Rudy Giuliani, quote, made repeated statements
suggesting that a pardon was a possibility for Manafort, while
also making it clear that the President did not want Manafort to
flip and cooperate with the government, end quote.  Is that
correct?

Mr. Mueller.  Correct.

Ms. Jayapal.  And as you stated earlier, witness tampering
can be shown where someone with an improper motive encourages
another person not to cooperate with law enforcement.  Is that
correct?

Mr. Mueller.  Correct.

Ms. Jayapal.  Now, on page 123 of Volume II, you also discuss
the President's motive, and you say that as court proceedings
moved forward against Manafort, President Trump, quote, discussed
with aides whether and in what way Manafort might be cooperating
and whether Manafort knew any information that would be harmful to
the President, end quote.  Is that correct?

Mr. <u>Mueller.</u>  And that was a quote from?

Ms. <u>Jayapal.</u>  From page 123, Volume II.

Mr. <u>Mueller.</u>  I have that.  Thank you.  Yes.

Ms. <u>Jayapal.</u>  And when someone tries to stop another person from working with law enforcement and they do it because they're worried about what that person will say, it seems clear from what you wrote that this is a classic definition of witness tampering.

Now, Mr. Manafort did eventually decide to cooperate with your office, and he entered into a plea agreement, but then he broke that agreement.  Can you describe what he did that caused you to tell the court that the agreement was off?

Mr. <u>Mueller.</u>  I refer you to the court proceedings on that issue.

Ms. <u>Jayapal.</u>  So on page 127 of Volume II, you told the court that Mr. Manafort lied about a number of matters that were material to the investigation, and you said that Manafort's lawyers also, quote, regularly briefed the President's lawyers on topics discussed and the information that Manafort had provided in interviews with the Special Counsel's Office.  Does that sound right?

Mr. <u>Mueller.</u>  And the source of that is?

Ms. <u>Jayapal.</u>  That's page 127, Volume II.  That's a direct quote.

Mr. <u>Mueller.</u>  If it's from the report, yes, I support it.

Ms. <u>Jayapal.</u>  Thank you.

And 2 days after you told the court that Manafort broke his plea agreement by lying repeatedly, did President Trump tell the press that Mr. Manafort was, quote, very brave because he did not flip?  This is page 128 of Volume II.

Mr. Mueller.  If it's in the report, I support it as it is -- as it is set forth.

Ms. Jayapal.  Thank you.

Director Mueller, in your report, you make a very serious conclusion about the evidence regarding the President's involvement with the Manafort criminal proceedings.  Let me read to you from your report.

Evidence concerning the President's conduct toward Manafort indicates that the President intended to encourage Manafort to not cooperate with the government.  It is clear that the President, both publicly and privately, discouraged Mr. Manafort's cooperation or flipping, while also dangling the promise of a pardon if he stayed loyal and did not share what he knew about the President.  Anyone else who did these things would be prosecuted for them.  We must ensure that no one is above the law.

And I thank you for being here, Director Mueller.

I yield back.

Chairman Nadler.  The gentleman from Pennsylvania.

Mr. Reschenthaler.  Thank you, Mr. Chairman.

Mr. Mueller, I'm over here.  I'm sorry.

Mr. Mueller, are you familiar with the now expired

Independent Counsel Statute?  It's the statute under which Ken
Starr was appointed.

Mr. Mueller.  That Ken Starr did what?  I'm sorry.

Mr. Reschenthaler.  Are you familiar with the Independent
Counsel Statute?

Mr. Mueller.  Are you talking about the one we're operating
now or a previous?

Mr. Reschenthaler.  No, under which Ken Starr was appointed.

Mr. Mueller.  I am not that familiar with that, but I'd be
happy to take your question.

Mr. Reschenthaler.  Well, the Clinton administration allowed
the Independent Counsel Statute to expire after Ken Starr's
investigation.  The final report requirement was a major reason
why the statute was allowed to expire.  Even President Clinton's
AG, Janet Reno, expressed concerns about the final report
requirement.  And I will quote AG Reno.

She said:  On one hand, the American people have an interest
in knowing the outcome of an investigation of their highest
officials.  On the other hand, the report requirement cuts against
many of the most basic traditions and practices of American law
enforcement.  Under our system, we presume innocence, and we value
privacy.  We believe that information obtained during criminal
investigations should, in most cases, be made public only if
there's an indictment and prosecution, not in a lengthy and
detailed report filed after a decision has been made not to

prosecute.  The final report provides a forum for unfairly airing
any target's dirty laundry.  It also creates yet another incentive
for an independent counsel to overinvestigate in order to justify
his or her tenure and to avoid criticism that the independent
counsel may have left a stone unturned.

Again, Mr. Mueller, those are AG Reno's words.  Didn't you do
exactly what AG Reno feared?  Didn't you publish a lengthy report
unfairly airing the target's dirty laundry without recommending
charges?

Mr. Mueller.  I disagree with that, and I -- may I finish?

Mr. Reschenthaler.  Did any of your witnesses have a chance
to be cross-examined?

Mr. Mueller.  Can I just finish my answer on this?

Mr. Reschenthaler.  Quickly.

Mr. Mueller.  I operate under the current statute, not the
original statute, so I am most familiar with the current statute,
not the older statute.

Mr. Reschenthaler.  Did any of the witnesses have a chance to
be cross-examined?

Mr. Mueller.  Did any of the witnesses in our investigation?

Mr. Reschenthaler.  Yes.

Mr. Mueller.  I'm not going to answer that.

Mr. Reschenthaler.  Did you allow the people mentioned in
your report to challenge how they were characterized?

Mr. Mueller.  I'm not going to get into that.

Mr. Reschenthaler.  Okay.  Given that AG Barr stated multiple times during his confirmation hearing that he would make as much of your report public as possible, did you write your report knowing that it would likely be shared with the public?

Mr. Mueller.  No.

Mr. Reschenthaler.  Did knowing that the report could and likely would be made public, did that alter the contents which you included?

Mr. Mueller.  I can't speak to that.

Mr. Reschenthaler.  Despite the expectations that your report would be released to the public, you left out significant exculpatory evidence, in other words, evidence favorable to the President, correct?

Mr. Mueller.  Well, I actually would disagree with you.  I think we strove to put into the report the exculpatory evidence as well.

Mr. Reschenthaler.  One of my colleagues got into that with you where you said there was evidence you left out.

Mr. Mueller.  Well, you make a choice as to what goes into an indictment.

Mr. Reschenthaler.  Isn't it true, Mr. Mueller, isn't it true that on page 1 of Volume II, you state when you're quoting the statute you have an obligation to either prosecute or not prosecute?

Mr. Mueller.  Well, generally that is the case, although most

cases are not done in the context of the President.

Mr. Reschenthaler.  And in this case, you made a decision not to prosecute, correct?

Mr. Mueller.  No.  We made a decision not to decide whether to prosecute or not.

Mr. Reschenthaler.  So, essentially, what your report did was everything that AG Reno warned against?

Mr. Mueller.  I can't agree with that characterization.

Mr. Reschenthaler.  Well, what you did is you compiled nearly 450 pages of the very worst information you gathered against the target of your investigation, who happens to be the President of the United States, and you did this knowing that you were not going to recommend charges and that the report would be made public.

Mr. Mueller.  Not true.

Mr. Reschenthaler.  Mr. Mueller, as a former officer in the United States JAG Corps, I prosecuted nearly 100 terrorists in a Baghdad courtroom.  I cross-examined the butcher of Fallujah in defense of our Navy SEALS.  As a civilian, I was elected a magisterial district judge in Pennsylvania, so I am very well versed in the American legal system.

The drafting and the publication of some of the information in this report without an indictment, without prosecution, frankly, flies in the face of American justice.  And I find those facts and this entire process un-American.

I yield the remainder of my time to my colleague, Jim Jordan.

Mr. <u>Jordan.</u>  Director Mueller, the third FISA renewal happens a month after you're named special counsel.  What role did your office play in the third FISA renewal of Carter Page?

Mr. <u>Mueller.</u>  I'm not going to talk to that.

Chairman <u>Nadler.</u>  The time of the gentleman has expired.

The gentlelady from Florida.

Mrs. <u>Demings.</u>  Director Mueller, a couple of my colleagues -- right here -- wanted to talk to you or ask you about lies, so let's talk about lies.  According to your report, page 9, Volume I, witnesses lied to your office and to Congress.  Those lies materially impaired the investigation of Russia interference, according to your report.

Other than the individuals who pled guilty to crimes based on their lying to you and your team, did other witnesses lie to you?

Mr. <u>Mueller.</u>  I think there are probably a spectrum of witnesses in terms of those who are not telling the full truth and those who are outright liars.

Mrs. <u>Demings.</u>  Thank you very much.

Outright liars.  It is fair to say, then, that there were limits on what evidence was available to your investigation of both Russia election interference and obstruction of justice?

Mr. <u>Mueller.</u>  That's true and is usually the case.

Mrs. <u>Demings.</u>  And that lies about Trump campaign officials and administration officials impeded your investigation?

Mr. <u>Mueller.</u>  I would generally agree with that.

Mrs. <u>Demings.</u>   Thank you so much, Director Mueller.  You will be hearing more from me in the next hearing.

So I yield the balance of my time to Mr. Correa.  Thank you.

Mr. <u>Correa.</u>  Mr. Mueller, first of all, let me welcome you. Thank you for your service to our country.  You're a hero, Vietnam war vet, a wounded war vet.  We won't forget your service to our country.

Mr. <u>Mueller.</u>  Thank you, sir.

Mr. <u>Correa.</u>  If I may begin.  Because of time limits, we have gone in depth on only five possible episodes of obstruction. There's so much more, and I want to focus on another section of obstruction, which is the President's conduct concerning Michael Flynn, the President's National Security Advisor.

In early 2017, the White House Counsel and the President were informed that Mr. Flynn had lied to government authorities about his communications with the Russian Ambassador during the Trump campaign and transition.  Is this correct?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Correa.</u>  If a hostile nation knows that a U.S. official has lied publicly, that can be used to blackmail that government official, correct?

Mr. <u>Mueller.</u>  I'm not going to speak to that.  I don't disagree with it necessarily, but I'm not going to speak any more to that issue.

Mr. Correa.  Thank you very much, sir.

Flynn resigned on February 13, 2016, and the very next day, when the President was having lunch with New Jersey Governor Chris Christie, did the President say, open quotes, now that we fired Flynn, the Russia thing is over, close quote?  Is that correct?

Mr. Mueller.  Correct.

Mr. Correa.  And is it true that Christie responded by saying, open quotes, no way, and this Russia thing is far from over, close quote?

Mr. Mueller.  That's the way we have it in the report.

Mr. Correa.  Thank you.

And after the President met with Christie, later that same day, the President arranged to meet with then FBI Director James Comey alone in the Oval Office, correct?

Mr. Mueller.  Correct, particularly if you have the citation to the report.

Mr. Correa.  Page 39-40, Volume II.

Mr. Mueller.  Thank you very much.

Mr. Correa.  And according to Comey, the President told him, open quote, I hope you can see your way clear to letting this thing go, to letting Flynn go.  He's a good guy, and I hope you can let it go, close quote.  Page 40, Volume II.

Mr. Mueller.  Accurate.

Mr. Correa.  What did Comey understand the President to be asking?

Mr. Mueller.  I'm not going to get into what was in
Mr. Comey's mind.

Mr. Correa.  Comey understood this to be a direction because
of the President's position and the circumstances of the
one-to-one meeting?  Page 40, Volume II.

Mr. Mueller.  Well, I understand it's in the report, and I
support it as being in the report.

Mr. Correa.  Thank you, sir.

Even though the President publicly denied telling Comey to
drop the investigation, you found, open quote, substantial
evidence corroborating Comey's account over the President's.  Is
this correct?

Mr. Mueller.  That's correct.

Mr. Correa.  The President fired Comey on May 9.  Is that
correct, sir?

Mr. Mueller.  I believe that's the accurate date.

Mr. Correa.  That's page 77, Volume II.

You found substantial evidence that the catalyst for the
President's firing of Comey was Comey's, open quote, unwillingness
to publicly state that the President was not personally under
investigation.

Mr. Mueller.  I'm not going to delve more into the details of
what happened.  If it's in the report, again, I'll support it
because it's already been reviewed and appropriately appears in
the report.

Mr. Correa.  And that's page 75, Volume II.

Mr. Mueller.  Thank you.

Mr. Correa.  Thank you.

And, in fact, the very next day, the President told the
Russian foreign minister, open quote, I just fired the head of the
FBI.  He was crazy, a real nut job.  I faced great pressure
because of Russia.  That's taken off.  I'm not under
investigation, close quote.  Is that correct?

Mr. Mueller.  If that's what was written in the report, yes.

Chairman Nadler.  The time of the gentleman has expired.

Mr. Correa.  Thank you, sir.

Chairman Nadler.  The gentleman from Virginia.

Mr. Cline.  Thank you, Mr. Chairman.

Mr. Mueller, we've heard a lot about what you're not going to
talk about today.  So let's talk about something that you should
be able to talk about, the law itself, the underlying obstruction
statute and your creative legal analysis of the statutes in Volume
II, particularly an interpretation of 18 U.S.C. 1512 C.
Section 1512 C is an obstruction of justice statute created as
part of auditing financial regulations for public companies.  And
as you write on page 164 of Volume II, this provision was added as
a floor amendment in the Senate and explained as closing a certain
loophole with respect to document shredding.

And to read the statute, whoever corruptly alters, destroys,
mutilates, or conceals a record, document, or other object or

attempts to do so with the intent to impair the object's integrity
or availability for use in an official proceeding or otherwise
obstructs, influences, or impedes any official proceeding or
attempts to do so shall be fined under the statute and imprisoned
not more than 20 years or both.

Your analysis and application of the statute proposes to give
clause C2 a much broader interpretation than commonly used.
First, your analysis proposes to read clause C2 in isolation,
reading it as a freestanding, all-encompassing provision
prohibiting any act influencing a proceeding if done with an
improper motive.  And second, your analysis of the statute
proposes to apply the sweeping prohibition to lawful acts taken by
public officials exercising their discretionary powers if those
acts influence a proceeding.

So, Mr. Mueller, I'd ask you, in analyzing the obstruction,
you state that you recognize that the Department of Justice and
the courts have not definitively resolved these issues, correct?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Cline.</u>  You would agree that not everyone in the Justice
Department agreed with your legal theory of the obstruction of
justice statute, correct?

Mr. <u>Mueller.</u>  I'm not going to be involved in a discussion on
that at this juncture.

Mr. <u>Cline.</u>  In fact, the Attorney General himself disagrees
with your interpretation of the law, correct?

Mr. <u>Mueller.</u>  I leave that to the Attorney General to identify.

Mr. <u>Cline.</u>  And you would agree that prosecutors sometimes incorrect apply the law, correct?

Mr. <u>Mueller.</u>  I would have to agree with that one, yes.

Mr. <u>Cline.</u>  And members of your legal team, in fact, have had convictions overturned because they were based on an incorrect legal theory, correct?

Mr. <u>Mueller.</u>  I don't know to what you aver.  We've all spent time in the trenches trying cases and not won every one of those cases.

Mr. <u>Cline.</u>  Well, let me ask you about one in particular. One of your top prosecutors, Andrew Weissmann, obtained a conviction against auditing firm Arthur Andersen, lower court, which was subsequently overturned in a unanimous Supreme Court decision that rejected the legal theory advanced by Weissmann, correct?

Mr. <u>Mueller.</u>  Well, I'm not going to get into that, delve into that.

Mr. <u>Cline.</u>  Well, let me read from that and maybe it will --

Mr. <u>Mueller.</u>  May I just finish?  May I just finish --

Mr. <u>Cline.</u>  Yes.

Mr. <u>Mueller.</u>  -- my answer to say that I'm not going to be -- get involved in a discussion on that.  I will refer you to that citation that you gave me at the outset for the lengthy

discussion on just what you're talking about.  And to the extent

that I have anything to say about it, it is what we've already put

into the report on that issue.

Mr. Cline.  I am reading from your report when discussing

this section.  I will read from the decision of the Supreme Court

unanimously reversing Mr. Weissmann when he said, indeed, it's

striking how little culpability the instructions required.  For

example, the jury was told that even if petitioner honestly and

sincerely believed its conduct was lawful, the jury could convict.

The instructions also diluted the meaning of corruptly such that

it covered innocent conduct.

Mr. Mueller.  Well, let me just say --

Mr. Cline.  Let me move on.  I have limited time.

Your report takes the broadest possible reading of this

provision in applying it to the President's official acts, and I'm

concerned about the implications of your theory for

overcriminalizing conduct by public officials and private citizens

alike.

So to emphasize how broad your theory of liability is, I want

to ask you about a few examples.  On October 11, 2015, during an

FBI investigation into Hillary Clinton's use of a private email

server, President Obama said, I don't think it posed a national

security problem.  And he later said, I can tell you that this is

not a situation in which America's national security was

endangered.

Assuming for a moment that his comments did influence the investigation, couldn't President Obama be charged, under your interpretation, with obstruction of justice?

Mr. Mueller.  Well, again, I'd refer you to the report.  But let me say with Andrew Weissmann, who is one of the more talented attorneys that we have on board --

Mr. Cline.  Okay.  Well, I'll take that as --

Mr. Mueller.  -- over a period of time, he has run a number of units.

Mr. Cline.  I have very little time.

In August 2015, a very senior DOJ official called FBI Deputy Director Andrew McCabe expressing concern that FBI agents were still openly pursuing the Clinton Foundation probe.  The DOJ official was apparently very pissed off, quote/unquote.  McCabe questioned this official, asking, are you telling me I need to shut down a validly predicated investigation, to which the official replied, of course not.

This seems to be a clear example of somebody within the executive branch attempting to influence an FBI investigation.  So under your theory, couldn't that person be charged with obstruction as long as the prosecutor could come up with a potentially corrupt motive?

Mr. Mueller.  I refer you to our lengthy dissertation on exactly those issues that appears at the end of the report.

Mr. Cline.  Mr. Mueller, I'd argue that it says above the

Supreme Court equal justice --

Chairman Nadler.  The time of the gentleman has expired.

Our intent was to conclude this hearing in 3 hours.  Given the break, that would bring us to approximately 11:40.  With Director Mueller's indulgence, we will be asking our remaining Democratic members to voluntarily limit their time below the 5 minutes so that we can complete our work as close to that timeframe as possible.

And I recognize the gentlelady from Pennsylvania.

Ms. Scanlon.  Thank you.

Director Mueller, I want to ask you some questions about the President's statements regarding advance knowledge of the WikiLeaks dumps.  So the President refused to sit down with your investigators for an in-person interview, correct?

Mr. Mueller.  Correct.

Ms. Scanlon.  So the only answers we have to questions from the President are contained in Appendix C to your report?

Mr. Mueller.  That's correct.

Ms. Scanlon.  Okay.  So looking at Appendix C on page 5, you asked the President over a dozen questions about whether he had knowledge that WikiLeaks possessed or might possess the emails that were stolen by the Russians.

Mr. Mueller.  I apologize.

Ms. Scanlon.  Sure.

Mr. Mueller.  Can you start it again?

Ms. <u>Scanlon.</u>   Okay.  Sure.

Mr. <u>Mueller.</u>   Thank you.

Ms. <u>Scanlon.</u>   So we are looking at Appendix C.

Mr. <u>Mueller.</u>   Right.

Ms. <u>Scanlon.</u>   And at Appendix C, page 5, you ask the President about a dozen questions about whether he had knowledge that WikiLeaks possessed the stolen emails that might be released in a way helpful to his campaign or harmful to the Clinton campaign.  Is that correct?  You asked those questions?

Mr. <u>Mueller.</u>   Yes.

Ms. <u>Scanlon.</u>   Okay.  In February of this year, Mr. Trump's personal attorney, Michael Cohen, testified to Congress under oath that, quote:  Mr. Trump knew from Roger Stone in advance about the WikiLeaks drop of emails, end quote.

That is a matter of public record, isn't it?

Mr. <u>Mueller.</u>   Well, are you referring to the report or some other public record?

Ms. <u>Scanlon.</u>   This was testimony before Congress by Mr. Cohen.  Do you know if he told you --

Mr. <u>Mueller.</u>   I am not familiar with -- explicitly familiar with what he testified to before Congress.

Ms. <u>Scanlon.</u>   Okay.  Let's look at an event described on page 18 of Volume II of your report.  Now, according -- and we are going to put it up in a slide, I think.  According to Deputy Campaign Manager Rick Gates, in the summer of 2016, he and

candidate Trump were on the way to an airport shortly after
WikiLeaks released its first set of stolen emails.  And Gates told
your investigators that candidate Trump was on a phone call, and
when the call ended, Trump told Gates that more releases of
damaging information would be coming, end quote.  Do you recall
that from the report?

     Mr. Mueller.  If it is in the report, I support it.

     Ms. Scanlon.  Okay.  And that is on page 18 of Volume II.
Now, on page 77 of Volume II, your report also stated, quote:  In
addition, some witnesses said that Trump privately sought
information about future WikiLeaks releases, end quote.  Is that
correct?

     Mr. Mueller.  Correct.

     Ms. Scanlon.  Now, in Appendix C where the President did
answer some written questions, he said, quote:  I do not recall
discussing WikiLeaks with him, nor do I recall being aware of
Mr. Stone having discussed WikiLeaks with individuals associated
with my campaign, end quote.  Is that correct?

     Mr. Mueller.  If it is from the report, it is correct.

     Ms. Scanlon.  Okay.  So is it fair to say the President
denied ever discussing WikiLeaks with Mr. Stone and denied being
aware that anyone associated with his campaign discussed WikiLeaks
with Stone?

     Mr. Mueller.  I am sorry.  Could you repeat that one?

     Ms. Scanlon.  Is it fair, then, that the President denied

knowledge of himself or anyone else discussing WikiLeaks dumps with Mr. Stone?

Mr. Mueller. Yes.  Yes.

Ms. Scanlon. Okay.  And, with that, I would yield back.

Mr. Mueller. Thank you, ma'am.

Chairman Nadler.  The gentlelady yields back.

The gentleman from Florida.

Mr. Steube.  Thank you, Mr. Chair.

Mr. Mueller, did you indeed interview for the FBI Director job one day before you were appointed as special counsel?

Mr. Mueller.  In my understanding, I was not applying for the job.  I was asked to give my input on what it would take to do the job, which triggered the interview you are talking about.

Mr. Steube.  So you don't recall on May 16, 2017, that you interviewed with the President regarding the FBI Director job?

Mr. Mueller.  I interviewed with the President, but it wasn't about the Director job.

Mr. Steube.  The FBI Director job?

Mr. Mueller.  It was about the job but not about me applying for the job.

Mr. Steube.  So your statement here today is that you didn't interview to apply for the FBI Director job?

Mr. Mueller.  That is correct.

Mr. Steube.  So did you tell the Vice President that the FBI Director position would be the one job that you would come back

for?

Mr. <u>Mueller.</u>  I don't recall that one.

Mr. <u>Steube.</u>  You don't recall that?

Mr. <u>Mueller.</u>  No.

Mr. <u>Steube.</u>  Okay.  Given your 22 months of investigation, tens of millions of dollars spent, and millions of documents reviewed, did you obtain any evidence at all that any American voter changed their vote as a result of Russian's election interference?

Mr. <u>Mueller.</u>  I can't speak to that.

Mr. <u>Steube.</u>  You can't speak to that?

Mr. <u>Mueller.</u>  No.

Mr. <u>Steube.</u>  After 22 months of investigation, there is not any evidence in that document before us that any voter changed their vote because of their interference, and I am asking you based on all of the documents that you reviewed.

Mr. <u>Mueller.</u>  That was outside our purview.

Mr. <u>Steube.</u>  Russian meddling was outside your purview?

Mr. <u>Mueller.</u>  The impact of that meddling was undertaken by other agencies.

Mr. <u>Steube.</u>  Okay.  You stated in your opening statement that you would not get into the details of the Steele dossier. However, multiple times in Volume II on page 23, 27, and 28, you mentioned the unverified allegations.  How long did it take you to reach the conclusion that it was unverified?

Mr. <u>Mueller.</u>  I am not going to speak to that.

Mr. <u>Steube.</u>  It is actually in your report multiple times as unverified, and you are telling me that you are not willing to tell us how you came to the conclusion that it was unverified?

Mr. <u>Mueller.</u>  True.

Mr. <u>Steube.</u>  When did you become aware that the unverified Steele dossier was included in the FISA application to spy on Carter Page?

Mr. <u>Mueller.</u>  I am sorry.  What was the question?

Mr. <u>Steube.</u>  When did you become aware that the unverified Steele dossier was intended -- was included in the FISA application to spy on Carter Page?

Mr. <u>Mueller.</u>  I am not going to speak to that.

Mr. <u>Steube.</u>  Your team interviewed Christopher Steele.  Is that correct?

Mr. <u>Mueller.</u>  I am not going to get into that.  As I said at the outset --

Mr. <u>Steube.</u>  You can't tell this committee as to whether or not you interviewed Christopher Steele in a 22-month investigation with 18 lawyers?

Mr. <u>Mueller.</u>  As I said at the outset, that is one of those -- one of the investigations that is being handled by others in the Department of Justice.

Mr. <u>Steube.</u>  Yeah, but you're here testifying about this investigation today, and I am asking you directly, did any members

of your team or did you interview Christopher Steele in the course of your investigation?

Mr. <u>Mueller.</u>  And I am not going to answer that question, sir.

Mr. <u>Steube.</u>  You had 2 years to investigate.  Not once did you consider or even investigate how an unverified document that was paid for by a political opponent was used to obtain a warrant to spy on the opposition political campaign.  Did you do any investigation on that whatsoever?

Mr. <u>Mueller.</u>  I do not accept your characterization of what occurred.

Mr. <u>Steube.</u>  What would be your characterization?

Mr. <u>Mueller.</u>  I am not going to speak any more to it.

Mr. <u>Steube.</u>  So you can't speak any more to it, but you are not going to agree with my characterization.  Is that correct?

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Steube.</u>  The FISA application makes reference to Source 1, who is Christopher Steele, the author of the Steele dossier. The FISA application says nothing Source 1's reason for conducting the research into Candidate 1's ties to Russia based on Source 1's previous reporting history with FBI whereby Source 1 provided reliable information to the FBI.  The FBI believes Source 1's reporting herein to be credible.  Do you believe the FBI's representation that Source 1's reporting was credible to be accurate?

Mr. Mueller.  I am not going to answer that.

Mr. Steube.  So you are not going to respond to any of the questions regarding Christopher Steele or your interviews with him?

Mr. Mueller.  Well, as I said at the outset this morning, that was one of the investigations that I could not speak to.

Mr. Steube.  Well, I don't understand how if you interviewed an individual in the purview of this investigation that you are testifying to us today that you've closed that investigation, how that is not within the purview to tell us about that investigation and who you interviewed.

Mr. Mueller.  I have nothing to add.

Mr. Steube.  Okay.  Well, I can guarantee that the American people want to know, and I am very hopeful and glad that AG Barr is looking into this and the inspector general is looking into this because you are unwilling to answer the questions of the American people as it relates to the very basis of this investigation into the President and the very basis of this individual who you did interview.  You are just refusing to answer those questions.  Can't the President fire the FBI Director at any time without reason under Article I of the Constitution?

Mr. Mueller.  Yes.

Mr. Steube.  Article II.

Mr. Mueller.  Yes.

Mr. Steube.  That is correct.  Can he also fire you as

special counsel at any time without any reason?

Mr. Mueller.  I believe that to be the case.

Mr. Steube.  Under Article II.

Mr. Mueller.  Well, hold on just a second.  You said without any reason.  I know that special counsel can be fired, but I am not sure it extends to whatever reason is given.

Mr. Steube.  Well, and you've testified that you weren't fired.  You were able to complete your investigation in full.  Is that correct?

Mr. Mueller.  I am not going to add to what I have stated before.

Mr. Steube.  My time has expired.

Chairman Nadler.  The gentleman's time has expired.

The gentlelady from Pennsylvania -- from Texas.

Ms. Garcia.  Thank you, Mr. Chairman, and thank you, Mr. Mueller, for being with us.  It is close to the afternoon now.

Director Mueller, now I would like to ask you about the President's answers relating to Roger Stone.  Roger Stone was indicted for multiple Federal crimes, and the indictment alleges that Mr. Stone discussed future WikiLeaks email releases with the Trump campaign.  Understanding there is a gag order on the Stone case, I will keep my questions restricted to publicly available information.  Mr. Stone's --

Mr. Mueller.  Let me just say at the outset.  I don't mean to disrupt you, but I am not -- I would like some demarcation of that

which is applicable to this but also in such a way that it does
not hinder the other prosecution that is taking place in D.C.

Ms. Garcia.  I understand that.  I am only going to be
talking about the questions that you asked in writing to the
President --

Mr. Mueller.  Thank you, ma'am.

Ms. Garcia.  -- that relate to Mr. Stone.  Mr. Stone's
indictment states, among other things, the following quote:  Stone
was contacted by senior Trump officials to inquire about future
releases of Organization 1, Organization 1 being WikiLeaks.  The
indictment continues, quote:  Stone thereafter told the Trump
campaign about potential future release of damaging material by
WikiLeaks.  So, in short, the indictment alleges that Stone was
asked by the Trump campaign to get information about more
WikiLeaks releases and that Stone, in fact, did tell the Trump
campaign about potential future releases, correct?

Mr. Mueller.  Yes, ma'am, but I see you are quoting from the
indictment.  Even though the indictment is a public document, I
feel uncomfortable discussing anything having to do with the Stone
prosecution.

Ms. Garcia.  Right.  The indictment is of record, and we
pulled it off the --

Mr. Mueller.  I understand.

Ms. Garcia.  I am reading straight from it.  Well, turning
back to the President's answers to your questions, then, on this

very subject, the President denied ever discussing future

WikiLeaks releases with Stone and denied knowing whether anyone

else on his campaign had those discussions with Stone.  If you had

learned that other witnesses -- putting aside the President, if

other witnesses had lied to your investigators in response to

specific questions, whether in writing or in an interview, could

they be charged with false statement crimes?

Mr. Mueller.  Well, I am not going to speculate.  I think you

are asking for me to speculate given a set of circumstances.

Ms. Garcia.  Well, let's make it more specific.  What if I

had made a false statement to an investigator on your team?  Could

I go to jail for up to 5 years?

Mr. Mueller.  Yes.

Ms. Garcia.  Yes.

Mr. Mueller.  Well, although -- it is Congress, so --

Ms. Garcia.  Well, that is the point, though, isn't it, that

no one is above the law?

Mr. Mueller.  That is right.

Ms. Garcia.  Not you, not the Congress, and certainly not the

President.  And I think it is just troubling to have to hear some

of these things, and that is why the American people deserve to

learn the full facts of the misconduct described in your report

for which any other person would have been charged with crimes.

So thank you for being here, and again, the point has been

underscored many times, but I will repeat it.  No one is above the

law.  Thank you.

Mr. Mueller.  Thank you, ma'am.

Chairman Nadler.  The gentleman from North Dakota is recognized.

Mr. Armstrong.  Mr. Mueller, how many people did you fire? How many people on your staff did you fire during the course of the investigation?

Mr. Mueller.  How many people?

Mr. Armstrong.  Did you fire?

Mr. Mueller.  I am not going to discuss that.

Mr. Armstrong.  According to the inspector general's report, Attorney No. 2 was let go, and we know Peter Strzok was let go, correct?

Mr. Mueller.  Yes, and there may have been other persons on other issues that have been either transferred or fired.

Mr. Armstrong.  Peter Strzok testified before this committee on July 12, 2018, that he was fired because you were concerned about preserving the appearance of independence.  Do you agree with his testimony?

Mr. Mueller.  Say that again, if you could.

Mr. Armstrong.  He said he was fired at least partially because you were worried about, concerned about preserving the appearance of independence with the special counsel's investigation.  Do you agree with that statement?

Mr. Mueller.  The statement was by whom?

Mr. <u>Armstrong.</u>  Peter Strzok at this hearing.

Mr. <u>Mueller.</u>  I am not familiar with that.

Mr. <u>Armstrong.</u>  Did you fire him because you were worried about the appearance of independence of the investigation?

Mr. <u>Mueller.</u>  No.  He was transferred as a result of instances involving texts.

Mr. <u>Armstrong.</u>  Do you agree that your office did not only have an obligation to operate with independence but to operate with the appearance of independence as well?

Mr. <u>Mueller.</u>  Absolutely.  We strove to do that over the 2 years.

Mr. <u>Armstrong.</u>  Andrew Weissmann --

Mr. <u>Mueller.</u>  Part of that was making certain that --

Mr. <u>Armstrong.</u>  Andrew Weissmann is one of your top attorneys.

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Armstrong.</u>  Did Weissmann have a role in selecting other members of your team?

Mr. <u>Mueller.</u>  He had some role but not a major role.

Mr. <u>Armstrong.</u>  Andrew Weissmann attended a Hillary Clinton's election night party.  Did you know that before or after he came onto the team?

Mr. <u>Mueller.</u>  I don't know when I found that out.

Mr. <u>Armstrong.</u>  On January 30, 2017 Weissmann wrote an email to Deputy Attorney General Yates stating,

"I am so proud and in awe," regarding her disobeying a direct order from the President.

Did Weissmann disclose that email to you before he joined the team?

Mr. <u>Mueller.</u>  I am not going to talk about that.

Mr. <u>Armstrong.</u>  Is that not a conflict of interest?

Mr. <u>Mueller.</u>  I am not going to talk about that.

Mr. <u>Armstrong.</u>  Are you aware that Ms. Jeannie Rhee represented Hillary Clinton in litigation regarding personal emails originating from Clinton's time as Secretary of State?

Mr. <u>Mueller.</u>  Yes.

Mr. <u>Armstrong.</u>  Did you know that before she came on the team?

Mr. <u>Mueller.</u>  No.

Mr. <u>Armstrong.</u>  Aaron Zebley, the guy sitting next to you, represented Justin Cooper, a Clinton aide, who destroyed one of Clinton's mobile devices.  And you must be aware by now that six of your lawyers donated $12,000 directly to Hillary Clinton.  I am not even talking about the $49,000 they donated to other Democrats, just the donations to the opponent who was the target of your investigation.

Mr. <u>Mueller.</u>  Can I speak for a second to the hiring practices?

Mr. <u>Armstrong.</u>  Sure.

Mr. <u>Mueller.</u>  We strove to hire those individuals that could

do the job.

Mr. Armstrong.  Okay.

Mr. Mueller.  I've been in this business for almost 25 years. And in those 25 years, I have not had occasion once to ask somebody about their political affiliation.  It is not done.  What I care about is the capability of the individual to do the job and do the job quickly and seriously and with integrity.

Mr. Armstrong.  But that is what I am saying, Mr. Mueller. This isn't just about you being able to vouch for your team.  This is about knowing that the day you accepted this role, you had to be aware, no matter what this report concluded, half of the country was going to be skeptical of your team's findings, and that is why we have recusal laws that define bias and perceived bias for this very reason.  28 United States Code 528 specifically lists not just political conflict of interest but the appearance of political conflict of interest.  It is just simply not enough that you vouch for your team.  The interest of justice demands that no perceived bias exist.  I can't imagine a single prosecutor or judge that I have ever appeared in front of would be comfortable with these circumstances where over half of the prosecutorial team had a direct relationship to the opponent of the person being investigated.

<u>RPTR ZAMORA</u>

<u>EDTR ZAMORA</u>

[11:43 a.m.]

Mr. <u>Mueller.</u>  Let me -- one other fact that I put on the table, and that is we hired 19 lawyers over a period of time.  Of those 19 lawyers, 14 of them were transferred from elsewhere in the Department of Justice.  Only five came from outside.  So we did not have --

Mr. <u>Armstrong.</u>  And half of them had a direct relationship, political or personal, with the opponent of the person you were investigating.  And that's my point.  I wonder if not a single word in this entire report was changed, but rather, the only difference was we switched Hillary Clinton and President Trump.

If Peter Strzok had texted those terrible things about Hillary Clinton instead of President Trump, if a team of lawyers worked for, donated thousands of dollars to, and went to Trump's parties instead of Clinton's, I don't think we'd be here trying to prop up an obstruction allegation.

My colleagues would have spent the last 4 months accusing your team of being bought and paid for by the Trump campaign and we couldn't trust a single word of this report.  They would still be accusing the President of conspiracy with Russia, and they would be accusing your team of aiding and abetting with that conspiracy.

And with that, I yield back.

Chairman Nadler.  The gentleman yields back.

The gentleman from Colorado.

Mr. Neguse.  Director Mueller, thank you for your service to our country.  I'd like to talk to you about one of the other incidents of obstruction, and that's the evidence in your report showing the President directing his son and his communications director to issue a false public statement in June of 2017 about a meeting between his campaign and Russian individuals at Trump Tower in June of 2016.

According to your report, Mr. Trump, Jr. was the only Trump associate who participated in that meeting and who declined to be voluntarily interviewed by your office.  Is that correct?

Mr. Mueller.  Yes.

Mr. Neguse.  Did Mr. Trump, Jr. or his counsel ever communicate to your office any intent to invoke his Fifth Amendment right against self-incrimination?

Mr. Mueller.  I'm not going to answer that.

Mr. Neguse.  You did pose written questions to the President about his knowledge of the Trump Tower meeting.  You included -- also asked him about whether or not he had directed a false press statement.  The President did not answer at all that question, correct?

Mr. Mueller.  I don't have it in front of me.  I take your word.

Mr. Neguse.  I can represent to you that appendix C,
specifically C13, states as much.

According to page 100 of Volume II of your report, your
investigation found that Hope Hicks, the President's
communications director, in June of 2017 was shown emails that set
up the Trump Tower meeting, and she told your office that she was,
quote, shocked by the emails because they looked, quote, really
bad.  True?

Mr. Mueller.  Do you have the citation?

Mr. Neguse.  Sure.  It's page 100 of Volume II.

While you're flipping to that page, Director Mueller, I will
also tell you that according to page 99 of Volume II, those emails
in question stated, according to your report, that the crown
prosecutor of Russia had offered to provide the Trump campaign
with some official documents and information that would
incriminate Hillary and her dealings with Russia as part of Russia
and its government support for Mr. Trump.

Trump Jr. responded, if it's what you say, I love it.  And
he, Kushner, and Manafort, met with the Russian attorneys and
several other Russian individuals at Trump Tower on June 9, 2016,
end quote.  Correct?

Mr. Mueller.  Generally accurate.

Mr. Neguse.  Isn't it true that Ms. Hicks told your office
that she went multiple times to the President to, quote, urge him
that they should be fully transparent about the June 9 meeting,

end quote, but the President each time said no.  Correct?

Mr. Mueller.  Accurate.

Mr. Neguse.  And the reason was because of those emails which the President, quote, believed would not leak, correct?

Mr. Mueller.  Well, I'm not certain how it's characterized, but generally correct.

Mr. Neguse.  Did the President direct Ms. Hicks to say, quote, only that Trump Jr. took a brief meeting and it was about Russian adoption, end quote, because Trump Jr.'s statement to The New York Times, quote, said too much, according to page 102 of Volume II?

Mr. Mueller.  Okay.

Mr. Neguse.  Correct?

Mr. Mueller.  Let me just check one thing.

Yes.

Mr. Neguse.  And according to Ms. Hicks, the President still directed her to say the meeting was only about Russian adoption, correct?

Mr. Mueller.  Yes.

Mr. Neguse.  Despite knowing that to be untrue.

Thank you, Director Mueller.

I yield back the balance of my time.

Mr. Mueller.  The gentleman from Louisiana.

Mr. Johnson of Louisiana.  Mr. Mueller, you've been asked -- over here on the far right, sir.

You've been asked a lot of questions here today.  To be frank, you've performed as most of us expected.  You've stuck closely to your report, and you have declined to answer many of our questions on both sides.

As the closer for the Republican side -- I know you're glad to get to the close -- I want to summarize the highlights of what we have heard and what we know.

You spent 2 years and nearly $30 million taxpayer and unlimited resources to prepare a nearly 450-page report which you describe today as very thorough.  Millions of Americans today maintain genuine concerns about your work, in large part, because of the infamous and widely publicized bias of your investigating team members, which we now know included 14 Democrats and zero Republicans.

Campaign finance reports later showed that team --

Mr. <u>Mueller.</u>  Can I --

Mr. <u>Johnson of Louisiana.</u>  Excuse me.  It's my time.  That team of Democrat investigators you hired donated more than $60,000 to the Hillary Clinton campaign and other Democratic candidates.  Your team also included Peter Strzok and Lisa Page, which have been discussed today, and they had the lurid text messages that confirmed they openly mocked and hated Donald Trump and his supporters and they vowed to take him out.

Mr. Ratcliffe asked you earlier this morning, quote, can you give me an example other than Donald Trump where the Justice

Department determined that an investigated person was not exonerated because their innocence was not conclusively determined, unquote.  You answered, I cannot.  Sir, that is unprecedented.

The President believed from the very beginning that you and your special counsel team had serious conflicts.  This is stated in the report and acknowledged by everybody.  And yet President Trump cooperated fully with the investigation.  He knew he had done nothing wrong, and he encouraged all witnesses to cooperate with the investigation and produce more than 1.4 million pages of information and allowed over 40 witnesses, who were directly affiliated with the White House or his campaign.

Your report acknowledges on page 61, Volume II, that a volume of evidence exists of the President telling many people privately, quote, the President was concerned about the impact of the Russian investigation on his ability to govern and to address important foreign relations issues and even matters of national security.

And on page 174 of Volume II, your report also acknowledges that the Supreme Court has held, quote, the President's removal powers are at their zenith with respect to principal officers, that is officers who must be appointed by the President and who report to him directly.  The President's exclusive and illimitable power of removal of those principal officers furthers the President's ability to ensure that the laws are faithfully executed, unquote.  And that would even include the Attorney

General.

Look, in spite of all of that, nothing ever happened to stop or impede your special counsel's investigation.  Nobody was fired by the President, nothing was curtailed, and the investigation continued unencumbered for 22 long months.

As you finally concluded in Volume I, the evidence, quote, did not establish that the President was involved in an underlying crime related to Russian election interference, unquote.  And the evidence, quote, did not establish that the President or those close to him were involved in any Russian conspiracies or had an unlawful relationship with any Russian official, unquote.

Over those 22 long months that your investigation dragged along, the President became increasingly frustrated, as many of the American people did, with its affects on our country and his ability to govern.  He vented about this to his lawyer and his close associates, and he even shared his frustrations, as we all know, on Twitter.

But while the President's social media accounts might have influenced some in the media or the opinion of some of the American people, none of those audiences were targets or witnesses in your investigation.  The President never affected anybody's testimony; he never demanded to end the investigation or demanded that you be terminated; and he never misled Congress, the DOJ, or the special counsel.  Those, sir, are undisputed facts.

There will be a lot of discussion, I predict, today and great

frustration throughout the country about the fact that you wouldn't answer any questions here about the origins of this whole charade, which was the infamous Christopher Steele dossier, now proven to be totally bogus, even though it is listed and specifically referenced in your report.  But as our hearing is concluding, we apparently will get no comment on that from you.

Mr. Mueller, there's one primary reason why you were called here today by the Democrat majority of our committee.  Our colleagues on the other side of the aisle just want political cover.  They desperately wanted you today to tell them they should impeach the President.  But the one thing you have said very clearly today is that your report is complete and thorough, and you completely agree with and stand by its recommendations and all of its content.  Is that right?

Mr. Mueller.  True.

Mr. Johnson of Louisiana.  Mr. Mueller, one last important question.  Your report does not recommend impeachment, does it?

Mr. Mueller.  I'm not going to talk about the recommendations.

Mr. Johnson of Louisiana.  It does not conclude that impeachment would be appropriate here, right?

Mr. Mueller.  I'm not going to talk -- I'm not going to talk about that issue.

Mr. Johnson of Louisiana.  That's one of the many things you wouldn't talk about today, but I think we can all draw our own

conclusions.

I do thank you for your service to the country.  And I'm glad this charade will come to an end soon and we can get back to the important business of this committee with its broad jurisdiction of so many important issues for the country.

With that, I yield back.

Chairman Nadler.  The gentleman yields back.

I want to announce that our intent was to conclude this hearing at around 11:45.  All of the Republican members have now asked their questions, but we have a few remaining Democratic members.  They will be limiting their questions, so with Director Mueller's indulgence, we expect to finish within 15 minutes.

The gentlelady from Georgia is recognized.

Mrs. McBath.  Thank you, Mr. Chairman.

And thank you, Director Mueller.  Your investigations of the Russian attack on our democracy and of obstruction of justice were extraordinarily productive.  And under 2 years, you charged at least 37 people or entities with crimes.  You convicted seven individuals, five of whom were top Trump campaign or White House aides.  Charges remain pending against more than 2 dozen Russian persons or entities and against others.

Now, let me start with those five Trump campaign administration aides that you convicted.  Would you agree with me that they are Paul Manafort, President Trump's campaign manager; Rick Gates, President Trump's deputy campaign manager; Michael

Flynn, President Trump's former National Security Advisor; Michael
Cohen, the President's personal attorney; George Papadopoulos,
President Trump's former campaign foreign policy adviser, correct?

Mr. Mueller.  Correct.

Mrs. McBath.  And the sixth Trump associate will face trial
later this year, correct?  And that person would be Roger Stone,
correct?

Mr. Mueller.  Correct.

Mrs. McBath.  Thank you.

Mr. Mueller.  Well, I'm not certain what you said about
Stone, but he is in another court system, as I indicated before.

Mrs. McBath.  Exactly.  He's still under investigation.

Mr. Mueller.  And I do not want to discuss.

Mrs. McBath.  Correct.  Thank you.

And there are many other charges as well, correct?

Mr. Mueller.  Correct.

Mrs. McBath.  So, sir, I just want to thank you so much, in
my limited time today, for your team, the work that you did, and
your dedication.  In less than 2 years, your team was able to
uncover an incredible amount of information related to Russia's
attack on our elections and to obstruction of justice.

And there is still more that we have to learn.  Despite
facing unfair attacks by the President and even here today, your
work has been substantive and fair.  The work has laid the
critical foundation for our investigation, and for that, I thank

you.  I thank you.

And with that, I yield back the balance of my time.

Chairman Nadler.  The gentlelady yields back.

The gentleman from Arizona.

Mr. Stanton.  Thank you.

Director Mueller, I'm disappointed that some have questioned your motives throughout this process, and I want to take a moment to remind the American people of who you are and your exemplary service to our country.

You are a Marine, you served in Vietnam and earned a Bronze Star and a Purple Heart, correct?

Mr. Mueller.  Correct.

Mr. Stanton.  Which President appointed you to become the United States attorney for Massachusetts?

Mr. Mueller.  Which Senator?

Mr. Stanton.  Which President?

Mr. Mueller.  Oh, which President.  I think that was President Bush.

Mr. Stanton.  According to my notes, it was President Ronald Reagan had the honor to do so.

Under whose --

Mr. Mueller.  My mistake.

Mr. Stanton.  Under whose administration did you serve as the assistant attorney general in charge of the DOJ's Criminal Division?

Mr. <u>Mueller.</u>  Under which President?

Mr. <u>Stanton.</u>  Yep.

Mr. <u>Mueller.</u>  That would be George Bush I.

Mr. <u>Stanton.</u>  That is correct, President George H.W. Bush.

After that, you took a job at a prestigious law firm, and after only a couple years, you did something extraordinary.  You left that lucrative position to reenter public service prosecuting homicides here in Washington, D.C.  Is that correct?

Mr. <u>Mueller.</u>  Correct.

Mr. <u>Stanton.</u>  When you were named Director of the FBI, which President first appointed you?

Mr. <u>Mueller.</u>  Bush.

Mr. <u>Stanton.</u>  And the Senate confirmed you with a vote of 98 to 0, correct?

Mr. <u>Mueller.</u>  Surprising.

Mr. <u>Stanton.</u>  And you were sworn in as Director just one week before the September 11 attacks.

Mr. <u>Mueller.</u>  True.

Mr. <u>Stanton.</u>  You helped to protect this Nation against another attack.  You did such an outstanding job that when your 10-year term expired, the Senate unanimously voted to extend your term for another 2 years, correct?

Mr. <u>Mueller.</u>  True.

Mr. <u>Stanton.</u>  When you were asked in 2017 to take the job as special counsel, the President had just fired FBI Director James

Comey.  The Justice Department and the FBI were in turmoil.  You must have known there would be an extraordinary challenge.  Why did you accept?

Mr. Mueller.  I'm not going to get into -- that's a little bit off track.  It was a challenge, period.

Mr. Stanton.  Some people have attacked the political motivations of your team, even suggested your investigation was a witch hunt.  When you considered people to join your team, did you ever even once ask about their political affiliation?

Mr. Mueller.  Never once.

Mr. Stanton.  In your entire career as a law enforcement official, have you ever made a hiring decision based upon a person's political affiliation?

Mr. Mueller.  No.

Mr. Stanton.  I'm not surprised --

Mr. Mueller.  And if I might just interject, the capabilities that we have shown in the report that's been discussed here today was a result of a team of agents and lawyers who were absolutely exemplary and were hired because of the value they could contribute to getting the job done and getting it done expeditiously.

Mr. Stanton.  Sir, you're a patriot.  And clear to me in reading your report and listening to your testimony today, you acted fairly and with restraint.  There were circumstances where you could have filed charges against other people mentioned in the

report but you declined.  Not every prosecutor does that,

certainly not one on a witch hunt.

The attacks made against you and your team intensified

because your report is damning.  And I believe you did uncover

substantial evidence of high crimes and misdemeanors.

Let me also say something else that you were right about.

The only remedy for this situation is for Congress to take action.

I yield back.

Chairman Nadler.  The gentleman yields back.

The gentlelady from Pennsylvania.

Ms. Dean.  Good morning, Director Mueller.  Madeleine Dean.

Mr. Mueller.  Ah, gotcha.  Sorry.

Ms. Dean.  Thank you.

I wanted to ask you about public confusion connected with

Attorney General Barr's release of your report.  I will be quoting

your March 27 letter.

Sir, in that letter, and at several other times, did you

convey to the Attorney General that the, quote, introductions and

executive summaries of our two-volume report accurately summarize

this office's work and conclusions, end quote?

Mr. Mueller.  I have to say that the letter itself speaks for

itself.

Ms. Dean.  And those were your words in that letter.

Continuing with your letter, you wrote to the Attorney

General that, quote, the summary letter that the Department sent

to Congress and released to the public late in the afternoon of
March 24 did not fully capture the context, nature, and substance
of this office's work and conclusions, end quote.  Is that
correct?

Mr. Mueller.  Again, I rely on the letter itself for its
terms.

Ms. Dean.  Thank you.

What was it about the report's context, nature, substance
that the Attorney General's letter did not capture?

Mr. Mueller.  I think we captured that in the March 27
responsive letter.

Ms. Dean.  And this is from the 27th letter.  What were some
of the specifics that you thought --

Mr. Mueller.  I direct you to the letter itself.

Ms. Dean.  Okay.  You finished that letter by saying, there
is now public confusion about critical aspects as a result of our
investigation.  Could you tell us specifically some of the public
confusion you identified?

Mr. Mueller.  Not generally.  Again, I go back to the letter.
The letters speaks for itself.

Ms. Dean.  And could Attorney General Barr have avoided
public confusion if he had released your summaries and executive
introduction and summaries?

Mr. Mueller.  I don't feel comfortable speculating on that.

Ms. Dean.  Shifting to May 30, the Attorney General, in an

interview with CBS News, said that you could have

reached -- quote, you could have reached a decision as to whether

it was criminal activity, end quote, on the part of the President.

Did the Attorney General or his staff ever tell you that he

thought you should make a decision on whether the President

engaged in criminal activity?

Mr. <u>Mueller.</u>  I'm not going to speak to what the Attorney

General was thinking or saying.

Ms. <u>Dean.</u>  If the Attorney General had directed you or

ordered you to make a decision on whether the President engaged in

criminal activity, would you have so done?

Mr. <u>Mueller.</u>  I can't answer that question in the vacuum.

Ms. <u>Dean.</u>  Director Mueller, again, I thank you for being

here.  I agree with your March 27 letter.  There was public

confusion, and the President took full advantage of that confusion

by falsely claiming your report found no obstruction.

Let us be clear, your report did not exonerate the President;

instead, it provided substantial evidence of obstruction of

justice leaving Congress to do its duty.  We shall not shrink from

that duty.

I yield back.

Chairman <u>Nadler.</u>  The gentlelady yields back.  The --

Mr. <u>Johnson of Louisiana.</u>  Mr. Chairman, I have a point of

inquiry, over on your left.

Chairman <u>Nadler.</u>  The gentleman will state his point of

inquiry.

Mr. Johnson of Louisiana.  Was the point of this hearing to get Mr. Mueller to recommended impeachment?

Mr. Mueller.  That is not a fair point of inquiry.

The gentlelady from Florida is recognized.

Mr. Johnson of Louisiana.  Mr. Chairman?

Chairman Nadler.  The gentlelady from Florida is recognized.

Ms. Mucarsel-Powell.  Director Mueller, thank you so much for coming here.  You're a patriot.

I want to refer you now to Volume II, page 158.  You wrote that, quote, the President's efforts to influence the investigation were mostly unsuccessful, but that is largely because the persons who surrounded the President declined to carry out orders or accede to his request.  Is that right?

Mr. Mueller.  That is accurate.  That is what we found.

Ms. Mucarsel-Powell.  And you're basically referring to senior advisers who disobeyed the President's orders, like White House Counsel Don McGahn, former Trump campaign manager Corey Lewandowski.  Is that right?

Mr. Mueller.  Well, we have not specified the persons mentioned.

Ms. Mucarsel-Powell.  Well, in page 158, White House Counsel Don McGahn, quote, did not tell the Acting Attorney General that the special counsel must be removed but was instead prepared to resign over the President's orders.

You also explained that an attempt to obstruct justice does not have to succeed to be a crime, right?

Mr. Mueller.  True.

Ms. Mucarsel-Powell.  Simply attempting to obstruct justice can be a crime, correct?

Mr. Mueller.  Yes.

Ms. Mucarsel-Powell.  So even though the President's aides refused to carry out his orders to interfere with your investigation, that is not a defense to obstruction of justice by this President, is it?

Mr. Mueller.  I'm not going to speculate.

Ms. Mucarsel-Powell.  So to reiterate, simply trying to obstruct justice can be a crime, correct?

Mr. Mueller.  Yes.

Ms. Mucarsel-Powell.  And you say that the President's efforts to influence the investigation were, quote, mostly unsuccessful.  And that's because not all of his efforts were unsuccessful, right?

Mr. Mueller.  Are you reading into what I -- what we have written in the report?

Ms. Dean.  I was going to ask you if you could just tell me which ones you had in mind as successful when you wrote that sentence.

Mr. Mueller.  I'm going to pass on that.

Ms. Mucarsel-Powell.  Yeah.  Director Mueller, today, we've

talked a lot about the separate acts by this President, but you also wrote in your report that, quote, the overall pattern of the President's conduct towards the investigations can shed light on the nature of the President's acts, and the inferences can be drawn about his intent, correct?

Mr. Mueller.  Accurate recitation from the report.

Ms. Mucarsel-Powell.  Right.  And on page 158 again, I think it's important for everyone to note that the President's conduct had a significant change when he realized that it was -- the investigations were conducted to investigate his obstruction acts.

So in other words, when the American people are deciding whether the President committed obstruction of justice, they need to look at all of the President's conduct and overall pattern of behavior.  Is that correct?

Mr. Mueller.  I don't disagree.

Ms. Mucarsel-Powell.  Thank you.  Dr. Mueller -- Director Mueller -- Doctor also, I'll designate that too -- I have certainly made up my mind about whether we -- what we have reviewed today meets the elements of obstruction, including whether there was corrupt intent.  And what is clear is that anyone else, including some Members of Congress, would have been charged with crimes for these acts.  We would not have allowed this behavior from any of the previous 44 Presidents.  We should not allow it now or for the future to protect our democracy.  And, yes, we will continue to investigate because, as you clearly state

at the end of your report, no one is above the law.

I yield back my time.

Chairman Nadler.  The gentlelady yields back.

The gentlelady from Texas.

Ms. Escobar.  Director Mueller, you wrote in your report that you, quote, determined not to make a traditional prosecutorial judgment, end quote.  Was that in part because of an opinion by the Department of Justice Office of Legal Counsel that a sitting President can't be charged with a crime?

Mr. Mueller.  Yes.

Ms. Escobar.  Director Mueller, at your May 29, 2019, press conference, you explained that, quote, the opinion says that the Constitution requires a process other than the criminal justice system to formally accuse a sitting President of wrongdoing, end quote.  That process other than the criminal justice system for accusing a President of wrongdoing, is that impeachment?

Mr. Mueller.  I'm not going to comment on that.

Ms. Escobar.  In your report, you also wrote that you did not want to, quote, potentially preempt constitutional processes for addressing Presidential misconduct, end quote.  For the nonlawyers in the room, what did you mean by, quote, potentially preempt constitutional processes?

Mr. Mueller.  I'm not going to try to explain that.

Ms. Escobar.  That actually is coming from page 1 of Volume II.  In the footnote is the reference to this.  What are those

constitutional processes?

Mr. Mueller.  I think I heard you mention at least one.

Ms. Escobar.  Impeachment, correct?

Mr. Mueller.  I'm not going to comment.

Ms. Escobar.  Okay.  That is one of the constitutional processes listed in the report in the footnote in Volume II.

Your report documents the many ways the President sought to interfere with your investigation.  And you state in your report on page 10, Volume II, that with a -- interfering with a congressional inquiry or investigation with corrupt intent can also constitute obstruction of justice.

Mr. Mueller.  True.

Ms. Escobar.  Well, the President has told us that he intends to fight all the subpoenas.  His continued efforts to interfere with investigations of his potential misconduct certainly reinforce the importance of the process the Constitution requires to, quote, formally accuse a sitting President of wrongdoing, as you cited in the report.

And in this -- and this hearing has been very helpful to this committee as it exercises its constitutional duty to determine whether to recommend articles of impeachment against the President.

I agree with you, Director Mueller, that we all have a vital role in holding this President accountable for his actions.  More than that, I believe we in Congress have a duty to demand

accountability and safeguard one of our Nation's highest
principles that no one is above the law.

From everything that I have heard you say here today, it's
clear that anyone else would have been prosecuted based on the
evidence available in your report.  It now falls on us to hold
President Trump accountable.  Thank you for being here.

Chairman, I yield back.

Mr. Collins.  Mr. Chairman?

Chairman Nadler.  The gentlelady yields back.

Mr. Collins.  Just one point of personal privilege.

Chairman Nadler.  Point of personal privilege.

Mr. Collins.  I just want to thank the chairman.  We did get
in our time.  After this was first developed to us, we did both
get in time.  Our side got our 5 minutes in.

Also, Mr. Mueller, thank you for being here, and I join the
chairman in thanking you for being here.

Chairman Nadler.  Thank you.

Director Mueller, we thank you for attending today's hearing.

Before we conclude, I ask everyone to please remain seated
and quiet while the witness exits the room.

Without objection, all members will have 5 legislative days
to submit additional written questions for the witness or
additional materials for the record.

And without objection, the hearing is now adjourned.

[Whereupon, at 12:11 p.m., the committee was adjourned.]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

                            *Plaintiff*,

        v.                                           Case No. 1:19-cv-2379 (KBJ)

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

                            *Defendant*.

# Exhibit B

**THE WHITE HOUSE**

WASHINGTON

May 20, 2019

The Honorable Jerrold Nadler
Chairman
Committee on the Judiciary
United States House of Representatives
Washington, D.C. 20515

Dear Chairman Nadler:

I write in further reference to the subpoena issued by the Committee on the Judiciary of the United States House of Representatives (the "Committee") to Donald F. McGahn II on April 22, 2019. My previous letter, dated May 7, 2019, informed you that Acting Chief of Staff to the President Mick Mulvaney had directed Mr. McGahn not to produce the White House records sought by the subpoena because they remain subject to the control of the White House and implicate significant Executive Branch confidentiality interests and executive privilege. Accordingly, I asked that the Committee direct any request for such records to the White House. The subpoena also directs Mr. McGahn to appear to testify before the Committee at 10:00 a.m. on Tuesday, May 21, 2019.

The Department of Justice (the "Department") has advised me that Mr. McGahn is absolutely immune from compelled congressional testimony with respect to matters occurring during his service as a senior adviser to the President. *See* Memorandum for Pat A. Cipollone, Counsel to the President, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, *Re: Testimonial Immunity Before Congress of the Former Counsel to the President* (May 20, 2019). The Department has long taken the position across administrations of both political parties that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee." *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 191 (2007) (quoting *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) (opinion of Attorney General Janet Reno)); *Immunity of the Counsel to the President from Compelled Congressional Testimony*, 20 Op. O.L.C. 308, 308 (1996). That immunity arises from the President's position as head of the Executive Branch and from Mr. McGahn's former position as a senior adviser to the President, specifically Counsel to the President.

There is no question that the position of Counsel to the President falls within the scope of the immunity. The three previous opinions cited above directly addressed the immunity of Counsel to the President: Harriet Miers was a former Counsel to President George W. Bush, Beth Nolan was the current Counsel to President Clinton, and Jack Quinn was the current Counsel to President Clinton. Accordingly, Mr. McGahn cannot be compelled to appear before the Committee because "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance

The Honorable Jerrold Nadler
Page 2

of his constitutionally assigned executive functions." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. at 5. The constitutional immunity of current and former senior advisers to the President exists to protect the institution of the Presidency and, as stated by Attorney General Reno, "may not be overborne by competing congressional interests." *Id.*

Because of this constitutional immunity, and in order to protect the prerogatives of the Office of the Presidency, the President has directed Mr. McGahn not to appear at the Committee's scheduled hearing on Tuesday, May 21, 2019. This long-standing principle is firmly rooted in the Constitution's separation of powers and protects the core functions of the Presidency, and we are adhering to this well-established precedent in order to ensure that future Presidents can effectively execute the responsibilities of the Office of the Presidency. I attach the legal opinion provided by the Department of Justice for the Committee's review.

Please do not hesitate to contact me directly if you have any questions or would like to discuss this matter.

Sincerely,

Pat A. Cipollone
Counsel to the President

cc: The Honorable Doug Collins, Ranking Member

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

                                    *Plaintiff,*

          v.

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

                                    *Defendant.*

Case No. 1:19-cv-2379 (KBJ)

# Exhibit C



**U.S. Department of Justice**

Office of Legal Counsel

Office of the Assistant Attorney General                    *Washington, D.C.  20530*

May 20, 2019

**MEMORANDUM FOR PAT A. CIPOLLONE
COUNSEL TO THE PRESIDENT**

*Re: Testimonial Immunity Before Congress of
the Former Counsel to the President*

On April 22, 2019, the Committee on the Judiciary of the House of Representatives subpoenaed Donald F. McGahn II, the former Counsel to the President, to testify about matters described in the report of Special Counsel Robert S. Mueller, III.  You have asked whether Mr. McGahn is legally required to appear.

We provide the same answer that the Department of Justice has repeatedly provided for nearly five decades:  Congress may not constitutionally compel the President's senior advisers to testify about their official duties.  This testimonial immunity is rooted in the constitutional separation of powers and derives from the President's independence from Congress.  As Attorney General Janet Reno explained, "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions."  *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999) ("Reno Opinion").  Yet Congress may no more summon the President to a congressional committee room than the President may command Members of Congress to appear at the White House.  *See* Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 2 (July 29, 1982) ("Olson Memorandum").

Although the White House has opposed sending senior advisers to testify for almost as long as there has been an Executive Office of the President, Assistant Attorney General William Rehnquist first described the legal basis for immunity in a 1971 memorandum.  *See* Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971) ("Rehnquist Memorandum").  The Rehnquist Memorandum has been consistently reaffirmed by administrations of both political parties, most recently during the Obama Administration.  *See, e.g.*, *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. __, *1 & n.1 (July 15, 2014) ("*Immunity of the Assistant to the President*").

We believe that these established principles apply to bar the Committee from compelling Mr. McGahn to testify. The Counsel to the President clearly qualifies as a senior adviser entitled to testimonial immunity. Attorney General Reno reached that conclusion in her 1999 opinion, and this Office has made the same determination on at least three other occasions. We have also recognized that the immunity continues to apply after the Counsel leaves the White House. *See Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007) (*"Immunity of the Former Counsel"*).

The Chairman of the Committee has suggested that the justification for Mr. McGahn's testimonial immunity is undermined by the President's decision not to assert executive privilege over the redacted version of the Special Counsel's report that the Attorney General released last month. *See, e.g.*, Letter for Donald F. McGahn II, from Jerrold Nadler, Chairman, Committee on the Judiciary, U.S. House of Representatives at 1 (May 17, 2019) ("Nadler Letter"). But the question whether an adviser need comply with a subpoena purporting to require an appearance is different from the question whether the adviser's testimony would itself address privileged matters. Therefore, the public disclosure of the Special Counsel's report does not have any legal bearing upon the force of the congressional subpoena. For these reasons, and consistent with nearly 50 years of executive branch precedent, we conclude that Mr. McGahn is not legally required to appear and testify before the Committee.

## I.

Since the 1970s, this Office has consistently advised that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee" on matters related to their official duties. Memorandum for All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice, from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Executive Privilege* at 5 (May 23, 1977) ("Harmon Memorandum"); *see also* Rehnquist Memorandum at 7 ("The President and his immediate advisers   that is, those who customarily meet with the President on a regular or frequent basis   should be deemed absolutely immune from testimonial compulsion by a congressional committee."). Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations.[1]

---

[1] *See Immunity of the Assistant to the President*, 38 Op. O.L.C. at *1; Letter for Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel at 1–2 (Aug. 1, 2007) ("Bradbury Letter"); *Immunity of the Former Counsel*, 31 Op. O.L.C. at 191; Reno Opinion, 23 Op. O.L.C. at 4; *Immunity of the Counsel to the President from Compelled Congressional Testimony*, 20 Op. O.L.C. 308, 308 (1996) (*"Immunity of the Counsel to the President"*); Letter for Jack Brooks, Chairman, Committee on the Judiciary, U.S. House of Representatives, from Nicholas E. Calio, Assistant to the President for Legislative Affairs at 1 (June 16, 1992) ("Calio Letter"); Olson Memorandum at 2; Memorandum for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Demand for Deposition of Counsel to the President Fred F. Fielding* at 2 (July 23, 1982) ("*Congressional Demand for Deposition of Counsel*"); Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Testimony by Presidential Assistants* at 1 (Apr. 14, 1981); Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Dual-Purpose Presidential Advisers* at 5 (Aug. 11, 1977); Harmon Memorandum at 5; Letter to Phillip E. Areeda, Counsel to the President,

This testimonial immunity is distinct from, and broader than, executive privilege. Like executive privilege, the immunity protects confidentiality within the Executive Branch and the candid advice that the Supreme Court has acknowledged is essential to presidential decision-making. *See United States v. Nixon*, 418 U.S. 683, 705 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."). But the immunity extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser   as a function of the independence and autonomy of the President himself. In this regard, the President's immediate advisers are constitutionally distinct from the heads of executive departments and agencies, whose offices are created by acts of Congress, whose appointments require the Senate's advice and consent, and whose responsibilities entail the administration of federal statutes. Those officers can and do testify before Congress. The President's immediate advisers, however, exercise no statutory authority and instead act solely to advise and assist the President. Their independence from Congress reflects that of the President.

### A.

The President stands at the head of a co-equal branch of government. Yet allowing Congress to subpoena the President to appear and testify would "promote a perception that the President is subordinate to Congress, contrary to the Constitution's separation of governmental powers into equal and coordinate branches." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *3. As Assistant Attorney General Theodore Olson explained in 1982: "The President is a separate branch of government. He may not compel congressmen to appear before him. As a matter of separation of powers, Congress may not compel him to appear before it." Olson Memorandum at 2. The President's immediate advisers are an extension of the President and are likewise entitled to absolute immunity from compelled congressional testimony.

In 2014, our most recent opinion on the topic described the bases for this immunity in detail. "For the President's absolute immunity to be fully meaningful," we explained, "and for these separation of powers principles to be adequately protected, the President's immediate advisers must likewise have absolute immunity from congressional compulsion to testify about matters that occur during the course of discharging their official duties." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *2. The demands of the office require the President to rely on senior advisers who serve "as the President's alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Id.* at *3 (quoting Reno Opinion, 23 Op. O.L.C. at 5); *see also In re Sealed*

---

from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 25, 1974) (enclosing a memorandum, hereinafter "Scalia Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, *Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters* at 6 (Dec. 21, 1972) ("Cramton Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, *Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee* at 1 (Mar. 15, 1972) ("Erickson Memorandum"); Rehnquist Memorandum at 7.

*Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) ("The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers.").

There are dozens of congressional committee and subcommittees with the authority to conduct hearings and subpoena witnesses. Recognizing a congressional authority to compel the President's immediate advisers to appear and testify at the times and places of their choosing would interfere directly with the President's ability to faithfully discharge his responsibilities. It would allow congressional committees to "wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *3. And in the case of the President's current advisers, preparing for such examinations would force them to divert time and attention from their duties to the President at the whim of congressional committees. This "would risk significant congressional encroachment on, and interference with, the President's prerogatives and his ability to discharge his duties with the advice and assistance of his closest advisers," ultimately subordinating senior presidential advisers to Congress rather than the President. *Id.*; *see also Loving v. United States*, 517 U.S. 748, 757 (1996) ("Even when a branch does not arrogate power to itself . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties.").

The immunity of senior presidential advisers also protects the Executive Branch's strong interests in confidentiality as well as the President's ability to obtain sound and candid advice. As the Supreme Court has recognized, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708. While a senior presidential adviser, like other executive officials, could rely on executive privilege to decline to answer specific questions at a hearing, the privilege is insufficient to ameliorate several threats that compelled testimony poses to the independence and candor of executive councils.

First, compelled congressional testimony "create[s] an inherent and substantial risk of inadvertent or coerced disclosure of confidential information," despite the availability of claims of executive privilege with respect to the specific questions asked during such testimony. *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *4. As we explained in 2014, senior presidential advisers

> could be asked, under the express or implied threat of contempt of Congress, a wide range of unanticipated and hostile questions about highly sensitive deliberations and communications. In the heat of the moment, without the opportunity for careful reflection, the adviser might have difficulty confining his remarks to those that do not reveal such sensitive information. Or the adviser could be reluctant to repeatedly invoke executive privilege, even though validly applicable, for fear of the congressional and media condemnation she or the President might endure.

*Id.*; *see also Congressional Demand for Deposition of Counsel*, *supra* note 1, at 2 ("A witness before a Congressional committee may be asked — under threat of contempt — a wide range of unanticipated questions about highly sensitive deliberations and thought processes. He therefore

may be unable to confine his remarks only to those which do not impair the deliberative process.").

Second, even "[t]he prospect of compelled interrogation by a potentially hostile congressional committee about confidential communications with the President or among the President's immediate staff could chill presidential advisers from providing unpopular advice or from fully examining an issue with the President or others." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at*4. This is true whether or not the President might ultimately assert executive privilege over the testimony in question, given the adviser's uncertainty over whether a particular matter will become the subject of future congressional inquiry and whether the President would choose to incur the political costs associated with invoking the privilege.

Finally, given the frequency with which the testimony of a senior presidential adviser whose sole and daily responsibility is to advise and assist the President   would fall within the scope of executive privilege, compelling the adviser's appearance is not likely to promote any valid legislative interests. Coercing senior presidential advisers into situations where they must repeatedly decline to provide answers, citing executive privilege, would be inefficient and contrary to good-faith governance. The President's immediate advisers, if compelled to testify, are unlikely to answer many of the Members' questions, suggesting that the hearing itself will not serve any legitimate purpose for the Committee.

## B.

The Executive Branch's position on testimonial immunity reflects historical practices dating back nearly to the 1939 establishment of the Executive Office of the President. As Assistant Attorney General Antonin Scalia explained in a 1974 memorandum, "at least since the Truman Administration," presidential advisers "have appeared before congressional committees only where the inquiry related to their own private affairs or where they had received Presidential permission." Scalia Memorandum, *supra* note 1, at 6. Although Presidents have occasionally permitted such testimony, the long-standing policy has been to decline invitations for voluntary appearances and to resist congressional subpoenas for involuntary ones.

In surveying the history through 1971, Assistant Attorney General Rehnquist described the earliest application of the policy to be inconclusive and at times inconsistent. *See* Rehnquist Memorandum at 4  6. But even when senior presidential advisers did appear, those appearances were frequently accompanied by a claim of legal privilege not to do so. Assistant Attorney General Rehnquist thus described the claim as an absolute testimonial immunity for the President's immediate advisers, *see id.* at 7, and this Office has reaffirmed and expanded upon that conclusion in the decades since. The following examples, while not exhaustive, demonstrate the strong historical foundation for the Executive Branch's position that Congress may not compel the President's senior advisers to appear and testify.

In 1944, during the Administration of Franklin D. Roosevelt, a subcommittee of the Senate Committee on Agriculture and Forestry subpoenaed Jonathan Daniels, an Administrative Assistant to President Roosevelt, to testify about his reported attempts to compel the resignation of the Rural Electrification Administrator. *See Administration of the Rural Electrification Act: Hearing on S. 197 Before a Subcomm. of the S. Comm. on Agric. and Forestry*, 78th Cong., pt. 3,

at 611 28, 629 (1944). Mr. Daniels appeared at the hearing but advised that he could not answer questions that would concern his confidential relationship with the President. *Id.* After the hearing ended with the subcommittee threatening contempt, Mr. Daniels wrote to the subcommittee and reiterated his belief that the subcommittee could not compel his testimony. *See id.* at 740. However, he stated that the President had determined that his testimony would not be contrary to the public interest and that he therefore was willing to appear in the future. *See id.*; *see also id.* at 695 740. *The New York Times* reported that "[w]ith Daniels' agreement to testify disappeared the possibility of using his previous defiance as the first test of the division between executive and legislative power before the Senate." *Daniels to Answer Senators' Queries: President Agrees*, N.Y. Times, Mar. 5, 1944, at 1.

The first outright refusal of a presidential adviser to appear apparently occurred during the Truman Administration, in 1948, when a special subcommittee of the House Committee on Education and Labor twice subpoenaed John R. Steelman, an Assistant to the President, to testify about his communications with President Truman regarding administration of the Taft-Hartley Act during a strike. *See Investigation of GSI Strike: Hearing Before a Special Subcomm. of the H. Comm. on Educ. and Labor*, 80th Cong. 347 53 (1948). Mr. Steelman declined to comply and returned the subpoenas with a letter stating: "[I]n each instance the President directed me, in view of my duties as his Assistant, not to appear before your subcommittee." H.R. Rep. No. 80-1595, at 3 (1948).

During the Eisenhower Administration, in 1955, a subcommittee of the Senate Committee on the Judiciary invited the President's Chief of Staff, Sherman Adams, to testify about a contract between the Atomic Energy Commission and two power companies. He declined, citing in part his "official and confidential relationship with the President." *Power Policy, Dixon-Yates Contract: Hearing Before the Subcomm. on Antitrust and Monopoly of the S. Comm. on the Judiciary*, 84th Cong., pt. 2, at 675 76, 779 (1955). Later, in 1958, Mr. Adams testified, with President Eisenhower's approval, before a House subcommittee concerning allegations of impropriety relating to his relationship with a New England industrialist. *Investigation of Regulatory Commissions and Agencies: Hearing Before a Subcomm. of the H. Comm. on Interstate and Foreign Commerce*, 85th Cong., pt. 10, at 3712 40 (1958).

During the Administration of President Lyndon B. Johnson, in 1968, the Senate Committee on the Judiciary requested the testimony of Associate Special Counsel to the President W. DeVier Pierson to testify concerning the nomination of Associate Justice Abe Fortas to be Chief Justice of the United States. The inquiry concerned whether Justice Fortas had inappropriately participated in developing certain legislation. Mr. Pierson responded that "[i]t has been firmly established, as a matter of principle and precedents, that members of the President's immediate staff shall not appear before a Congressional committee to testify with respect to the performance of their duties on behalf of the President." *Nominations of Abe Fortas and Homer Thornberry: Hearing Before the S. Comm. on the Judiciary*, 90th Cong., pt. 2, at 1348 (1968). He continued: "This limitation, which has been recognized by the Congress as well as the Executive, is fundamental to our system of government. I must, therefore, respectfully decline the invitation to testify in these hearings." *Id.*

In 1972, during the Nixon Administration, the Senate Committee on the Judiciary invited Peter M. Flanigan, an Assistant to the President, to testify. This Office advised that Mr. Flanigan

occupied "a close and confidential relationship with the President and share[d] the President's immunity from congressional process." Erickson Memorandum, *supra* note 1, at 1.  Our disposition was clear:  "[I]t has been firmly established that members of the President's immediate staff may not appear before a congressional committee to testify with respect to the performance of their duties."  *Id.*[2]

In 1979, during the Carter Administration, Special Assistant to the President Sarah Weddington was invited to testify before the Senate Human Resources Committee as part of a hearing on "Women in the Coming Decade."  At the instruction of the Counsel to President, she declined to appear, explaining that "it is White House policy for personal aides to the President to decline invitations to testify before Congressional committees."  Letter for Harrison A. Williams, U.S. Senate, from Sarah Weddington, Special Assistant to the President at 1 (Jan. 31, 1979) ("Weddington Letter").  She offered, however, to meet informally with committee members or staff to discuss related programs and proposals.  *Id.* at 2.

In 1980, the Subcommittee on Investigations of the House Committee on Armed Services requested the testimony of Deputy Assistant to the President for National Security Affairs David Aaron concerning leaks to *The Washington Post*.  President Carter directed Mr. Aaron not to appear.  The Counsel to the President, Lloyd N. Cutler, explained that "Congress has always respected the privilege of the President to decline requests that the President himself or his immediate White House advisors appear to testify before Congressional committees," instead provided a sworn affidavit by Mr. Aaron denying the allegations, and offered to make Mr. Aaron available for an interview or deposition under oath.  Letter for Samuel S. Stratton, Chairman, Subcommittee on Investigation of the Committee on Armed Services, U.S. House of Representatives, from Lloyd N. Cutler, Counsel to the President at 1 2 (Sept. 30, 1980).

In 1982, during the Reagan Administration, the Senate Labor and Human Resources Committee sought the testimony of Counsel to the President Fred F. Fielding concerning allegations of corruption against Secretary of Labor Raymond Donovan.  Mr. Fielding declined to appear and testify.  *See* Olson Memorandum at 1 4 (explaining the legal basis for that decision).  Deputy Attorney General Edward C. Schmults notified the Committee that, "[a]s an institutional matter, the President cannot permit his Counsel to provide sworn testimony to the Legislative Branch regarding the performance of his duties," but offered to arrange for written responses to a reasonable number of written inquiries.  Letter for Orrin G. Hatch, Chairman, Committee on Labor and Human Resources, U.S. Senate, from Edward C. Schmults, Deputy Attorney General at 2 3 (Apr. 19, 1983) ("Schmults Letter").

In 1992, during the George H.W. Bush Administration, the House Committee on the Judiciary requested that C. Boyden Gray, Counsel to the President, and Nicholas Rostow,

---

[2] In connection with the Watergate investigations, President Nixon reached an agreement with the Senate's Watergate Select Committee to authorize current and former White House officials to appear voluntarily and under oath before the committee in closed session.  *See* Remarks Announcing Procedures and Developments in Connection With the Watergate Investigations (Apr. 17, 1973), *Pub. Papers of Pres. Richard Nixon* 298, 298–99 (1973).  President Nixon later determined that he would not claim executive privilege over the subject matters of the testimony and would allow the witnesses to testify in open hearings.  *See* Statements About the Watergate Investigations (May 22, 1973), *Pub. Papers of Pres. Richard Nixon* at 547, 554 (1973).  He therefore waived the testimonial immunity to authorize those appearances.

Special Assistant to the President and a Senior Director for Legal Affairs at the National Security Council, testify concerning Bush Administration policies towards Iraq prior to the first Gulf War. The White House declined, citing "the longstanding practice of the Executive Branch to decline requests for testimony by members of the President's personal staff." Calio Letter, *supra* note 1, at 1.

In 1999, President Clinton directed Counsel to the President Beth Nolan not to appear in response to a subpoena from the House Committee on Government Reform and Oversight concerning a clemency decision. President Clinton relied on an opinion from Attorney General Reno that concluded that "the Counsel serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony" on matters related to the performance of official duties. Reno Opinion, 23 Op. O.L.C. at 4.

In 2007, during the George W. Bush Administration, the House Committee on the Judiciary subpoenaed former Counsel to the President Harriet Miers to testify about the Department of Justice's decision to request the resignation of certain United States Attorneys. President Bush directed Ms. Miers not to testify after this Office concluded that she was "immune from compelled congressional testimony about matters . . . that arose during her tenure as Counsel to the President and that relate to her official duties in that capacity." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 193.

Also in 2007, the Senate Committee on the Judiciary subpoenaed the testimony of Karl Rove, the Deputy White House Chief of Staff, on the same subject. This Office confirmed that Mr. Rove was "immune from compelled congressional testimony about matters (such as the U.S. Attorney resignations) that arose during his tenure as an immediate presidential adviser and that relate to his official duties in that capacity." Bradbury Letter, *supra* note 1, at 1 2. In 2008, a subcommittee of the House Committee on the Judiciary also subpoenaed Mr. Rove, and he was again directed not to testify. *See* Letter for Robert D. Luskin, Patton Boggs LLP, from Fred F. Fielding, Counsel to the President at 1 (July 9, 2008).

In 2014, during the Obama Administration, the House Committee on Oversight and Government Reform issued a subpoena to David Simas to testify about matters related to his official responsibilities as Assistant to the President and Director of the Office of Political Strategy and Outreach. In particular, the committee requested testimony regarding "the role and function of the White House Office of Political Strategy and Outreach" and the question "whether the White House [was] taking adequate steps to ensure that political activity by Administration officials complies with relevant statutes, including the Hatch Act." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *1 (internal quotation marks omitted). This Office concluded that Mr. Simas was "immune from compulsion to testify before the [c]ommittee on these matters," *id.*, and he declined to testify.

The foregoing historical record demonstrates that the immunity of senior presidential advisers from congressional testimony is long-standing and has been repeatedly asserted against the requests of Congress. These examples do not indicate that senior presidential advisers have always declined to testify before Congress. The practice of asserting testimonial immunity just like the practice of asserting executive privilege has long reflected the "spirit of dynamic compromise" that reflects the "efficient and effective functioning" of the political branches of

government. *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). Presidents have occasionally made senior advisers available to accommodate congressional requests, even while defending their legal authority to decline such requests. But these accommodations between the political branches do not compromise the underlying immunity of the President or his senior presidential advisers from compelled congressional testimony. Nor do they nullify the many instances where Presidents have successfully asserted immunity and affirmatively directed their immediate aides not to testify before Congress.

## C.

While the Executive Branch has asserted for 75 years that senior presidential advisers may decline to testify before Congress, and has formally asserted an immunity for nearly 50 years, neither the Supreme Court nor any court of appeals has specifically addressed the question. This is because disputes over congressional demands for information from the Executive Branch are inherently political, and the historical practice has been to resolve such questions in the political arena. When such conflicts have arisen, Congress has either acceded to the President's claims of immunity or the Executive Branch has accommodated the congressional interest in some fashion. Only one district court has ever addressed the testimonial immunity of the President's senior advisers, and that decision did not come until 2008. *See Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008). Although the district court held that presidential advisers were not entitled to absolute immunity from compelled congressional testimony, the court of appeals stayed that decision pending appeal, and the parties settled without any appellate decision on the merits.

Nonetheless, this Office has recognized that the Executive Branch's long-standing position is consistent with related Supreme Court precedent. *See Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5. In *Gravel v. United States*, 408 U.S. 606 (1972), the Court held that legislative aides share in the constitutional immunity enjoyed by Members of Congress under the Speech or Debate Clause. *Id.* at 616 17. The Court reasoned that the Clause "was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch," and "protect[ion] . . . against prosecutions that directly impinge upon or threaten the legislative process." *Id.* at 616. Because "it is literally impossible . . . for Members of Congress to perform their legislative tasks without the help of aides and assistants," the Court recognized that such aides "must be treated as the [Members'] alter egos." *Id.* at 616 17. For purposes of immunity, the Court concluded, Members of Congress and their aides should be "treated as one." *Id.* at 616 (internal quotation marks omitted). The same logic applies with respect to the President and his senior advisers. The failure to recognize the extension of the President's immunity from compelled congressional testimony to senior advisers would call into question the well-established extension of derivative immunity to congressional staffers.

It is true that in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Court declined to extend *Gravel*'s alter-ego reasoning to a civil suit for damages against senior presidential advisers, and instead concluded that such advisers are entitled only to qualified immunity in those civil actions. *Id.* at 810 11, 813 15. *Harlow* thus distinguished the President's immediate advisers from the President himself, whom the Court held (in another decision issued the same day) to be absolutely immune from civil suits based on official acts. *See Nixon v. Fitzgerald*, 457 U.S. 731,

749 (1982). Yet we have previously declined to extend *Harlow* to the context of testimonial immunity because the prospect of compelled congressional testimony raises separation of powers concerns that are not present in a civil damages lawsuit brought by a private party. *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5 7. Compelled congressional testimony "threatens to subject presidential advisers to coercion and harassment, create a heightened impression of presidential subordination to Congress, and cause public disclosure of confidential presidential communications in a way that the careful development of evidence through a judicially monitored [proceeding] does not." *Id.* at *6. In a private lawsuit, the court "acts as a disinterested arbiter of a private dispute, not as a party in interest to the very lawsuit it adjudicates," and it "is charged with impartially administering procedural rules designed to protect witnesses from irrelevant, argumentative, harassing, cumulative, privileged, and other problematic questions." *Id.* By contrast, congressional hearings involving the President's immediate advisers contain none of those assurances, and they threaten the President's autonomy and ability to receive sound and candid advice in a way that private civil damages suits do not. *Cf.* Archibald Cox, *Executive Privilege*, 122 U. Pa. L. Rev. 1383, 1429 (1974) (stating that as compared to a civil action, "[t]he need to protect aides and subordinates from reprisals on Capitol Hill and in the media of public debate is a thousand-fold greater in the case of congressional hearings, which are often the preserves of individual Senators and Congressmen not all of whom are invariably characterized by judicious self-restraint").

We recognize that in *Miers*, a federal district court read *Harlow* to imply that senior presidential advisers do not enjoy absolute immunity from congressionally compelled testimony. *See Miers*, 558 F. Supp. 2d at 100 03. But we believe that the court did not adequately consider the different and heightened separation of powers concerns bearing upon the testimony of the President's immediate advisers before Congress. Moreover, the district court's decision was stayed pending appeal. *See Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 910 11 (D.C. Cir. 2008) (per curiam). The case settled and the appeal was dismissed before any further action by the court of appeals. *Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, No. 08-5357, 2009 WL 3568649, at *1 (D.C. Cir. Oct. 14, 2009). For the reasons set forth above, and in greater detail in our 2014 opinion, *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5 9, we respectfully disagree with the district court's conclusion in *Miers* and adhere to this Office's long-established position that the President's immediate advisers are absolutely immune from compelled congressional testimony.

## II.

Having reaffirmed the existence of the testimonial immunity of the President's immediate advisers, we now consider its application to Mr. McGahn, the former Counsel to the President. Plainly, the Counsel to the President qualifies as an immediate adviser to the President. As Attorney General Reno recognized, "the Counsel serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony." Reno Opinion, 23 Op. O.L.C. at 4. Indeed, we have recognized the Counsel's immunity from congressional testimony on multiple occasions. *See, e.g.*, *Immunity of the Former Counsel*, 31 Op. O.L.C. at 192 ("[T]he Counsel to the President 'serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony.'" (quoting Reno Opinion, 23 Op. O.L.C. at 4)); *Immunity of the Counsel to the President*, 20 Op. O.L.C. at 309 ("There is no question that the Counsel to the President falls within Assistant Attorney General Rehnquist's description of

the type of Presidential advisers who are immune from testimonial compulsion."); *Congressional Demand for Deposition of Counsel*, supra note 1, at 2 ("I believe the Counsel to the President possesses an absolute privilege not to testify with regard to any matters relating to his official duties as legal adviser to the President.").

In addition, we have recognized that testimonial immunity continues after the tenure of a particular Counsel to the President. As we explained in 2007, "[s]eparation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 192 93. The Supreme Court has explicitly recognized this principle in the context of executive privilege. The privilege must outlast the tenure of a particular President because, absent a guarantee of lasting confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (adopting the view of the Solicitor General); *see also United States v. Johnson*, 383 U.S. 169 (1966) (applying the Speech or Debate Clause to a former Member of Congress).

In concluding that the former Counsel to the President retained her testimonial immunity, we relied upon the actions of former President Truman, who explained his own refusal to appear and testify before the House Committee on Un-American Activities in the following terms: "[I]f the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 193 (quoting *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14 (reprinting Nov. 12, 1953 letter by President Truman)). It is "just as important to the independence of the Executive that the actions of the President should not be subjected to the questioning by the Congress after he has completed his term of office as that his actions should not be questioned while he is serving as President." *Id.* (quoting *Text of Address by Truman Explaining to Nation His Actions in the White Case*, N.Y. Times, Nov. 17, 1953, at 26). Because the immunity of senior presidential advisers derives from the immunity of the President, this same logic extends to them as well.

Our 2007 conclusion in *Immunity of the Former Counsel* was consistent with the analysis of the immunity interests of former officials during the George H.W. Bush and Nixon Administrations. *See* Letter for Arthur B. Culvahouse, O'Melveny & Myers, from C. Boyden Gray, Counsel to the President at 1 (June 17, 1992) ("[I]t is long-standing White House policy not to assent to formal testimony to Congressional committees by former White House officials about matters occurring during their White House service."). It is true that the President does not have the same need for the daily advice and assistance of his former advisers, as with his current advisers, yet the confidentiality interests associated with the advisers' former role remain just as strong. *See* Cramton Memorandum, *supra* note 1, at 5 6 ("If advice from a staff member were protected from congressional and public scrutiny only for so long as the staff member remained employed in the White House, the protection would be significantly reduced. It would only be a question of time when staff turnovers or a change in administration would remove the shield.").

Even more significantly, the risk to the separation of powers and to the President's autonomy posed by a former adviser's testimony on official matters continues after the conclusion of that adviser's tenure. *See id.* at 6 ("[T]he same considerations that were persuasive to former President Truman would apply to justify a refusal to appear by such a former staff member, if the scope of his testimony is to be limited to his activities while serving in that capacity."). Accordingly, consistent with our prior precedents, we find no material distinction between the compelled congressional testimony of current and former senior advisers to the President. Mr. McGahn's departure as Counsel to the President does not alter his immunity from compelled congressional testimony on matters related to his service to the President.

## III.

In this instance, the Committee seeks to question Mr. McGahn concerning matters addressed in the report of Special Counsel Robert S. Mueller, III, on the Investigation into Russian Interference in the 2016 Presidential Election. The Chairman of the Committee has suggested that the White House's voluntary cooperation with this investigation and the President's decision not to assert executive privilege over the Special Counsel's report may undermine any claim that Mr. McGahn is immune from compelled testimony. Nadler Letter at 1. However, the concept of immunity is distinct from, and broader than, the question whether executive privilege would protect a witness's response to any particular question. *See* Rehnquist Memorandum at 4 (recognizing the "distinction between a claim of absolute immunity from even being sworn as a witness, and a right to claim privilege in answer certain questions in the course of one's testimony as a witness").[3] The President does not waive an adviser's immunity from compelled congressional testimony by authorizing disclosure of any particular information. To the contrary, Presidents have frequently authorized aides to share information as an accommodation to Congress, notwithstanding claims of immunity.

The immunity from compelled congressional testimony implicates fundamental separation of powers principles that are separate from the confidentiality of specific information. *See supra* Part I.A. The constitutional interest in protecting the autonomy and independence of the Presidency remains the same no matter whether the compelled testimony from a presidential adviser would implicate public or potentially privileged matters. The President does not waive his own immunity from compelled congressional testimony by making public statements on a given subject. It follows then that the derivative immunity of senior presidential advisers is not waived either.

Were the rule otherwise, Presidents could not offer partial accommodations to Congress without waiving all privileges or immunities bearing upon the subject. Such a rule would severely hinder the "spirit of dynamic compromise" and "implicit constitutional mandate to seek optimal accommodation" that currently facilitates resolution of inter-branch disputes over information. *Am. Tel. & Tel. Co.*, 567 F.2d at 127. And such a rule would stand in marked

---

[3] The Reno Opinion described the testimonial immunity as "a separate legal basis that would support a claim of executive privilege for the entirety of the Counsel's testimony, thereby eliminating any need for her to appear at the hearing." 23 Op. O.L.C. at 4. We think that the Rehnquist Memorandum's distinction between an immunity and a privilege reflects the more precise formulation, but the distinction appears to be merely a semantic one.

contrast to many instances of historical practice in which senior advisers declined to testify before Congress, but instead offered accommodations through informal meetings or written responses. *See, e.g.*, Schmults Letter at 2 3; Weddington Letter at 1 2. Yet no one has viewed such accommodations, or the testimony of other executive advisers on similar subjects, to constitute a general waiver of immunity.

The Chairman's suggestion that Mr. McGahn can no longer claim immunity appears to be based upon the assumption that the President waived executive privilege by authorizing Mr. McGahn and his senior aides to cooperate with the Special Counsel's investigation. But the question of privilege is distinct from the issue of immunity. And in any event, the premise of the Committee's position is incorrect. The sharing of information between one arm of the Executive Branch and another does not compromise the President's interest in confidentiality. Indeed, in *Nixon v. Administrator of General Services*, the Supreme Court rejected a separation of powers objection to the disclosure of presumptively confidential information because "[t]he Executive Branch remains in full control of the Presidential materials, and . . . the materials can be released only when release is not barred by some applicable privilege inherent in that branch." 433 U.S. at 444. Information that was shared with the Special Counsel was shared *within* the Executive Branch. Such voluntary sharing does not waive confidentiality or the underlying privilege.

This conclusion is consistent with past assertions of executive privilege. In *Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7 (2008), Attorney General Michael Mukasey advised that the President could assert executive privilege against Congress over memoranda recording interviews of White House witnesses with Department of Justice investigators. *Id.* at 9 13. As he explained, "[w]ere future presidents, vice presidents or White House staff to perceive that such voluntary cooperation would create records that would likely be made available to Congress (and then possibly disclosed publicly outside of judicial proceedings such as a trial), there would be an unacceptable risk that such knowledge could adversely impact their willingness to cooperate fully and candidly in a voluntary interview." *Id.* at 11. Implicit in that explanation was the understanding that the White House's voluntary cooperation with the Department's investigation did not constitute a waiver of privilege against third parties outside the Executive Branch. So, too, the White House's voluntary cooperation with the Special Counsel's investigation did not effect a waiver of privilege, much less a waiver of testimonial immunity.

In contrast with the White House's cooperation with the Special Counsel, the Attorney General's public release of a redacted version of the Special Counsel's report (with the President's consent) does extinguish the Executive Branch's confidentiality interests in the precise information that has already been revealed. But, as the D.C. Circuit has held, the "release of a document only waives [executive] privileges for the document or information specifically released, and not for related materials." *In re Sealed Case*, 121 F.3d at 741; *see id.* ("[An] all-or-nothing approach has not been adopted with regard to executive privileges generally, or to the deliberative process privilege in particular."). As Assistant Attorney General Scalia explained, the purposes underlying executive privilege "would be jeopardized if harmful information had to be disclosed merely because the President permitted the release of related information that could be revealed safely." Scalia Memorandum, *supra* note 1, at 6 7. Such a result "would have the effect of requiring the concealment of much information which would be released, merely because it was connected with sensitive information." *Id.* at 7.

Thus, the public disclosure of particular information does not waive the Executive Branch's confidentiality interests over the subject matters involved in the prior disclosure. *See, e.g., Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 8 (2007) (opinion of Acting Attorney General Paul Clement) ("The Department[ of Justice]'s accommodation with respect to some White House-Department communications does not constitute a waiver and does not preclude the President from asserting executive privilege with respect to White House materials or testimony concerning such communications."). Consequently, the public disclosure of the Special Counsel's report did not constitute a general waiver concerning Mr. McGahn's communications with the President on those subjects or on any other subjects. And in any event, as discussed above, the disclosure's impact on executive privilege does not ultimately bear on Mr. McGahn's underlying immunity from compelled testimony.

## IV.

Because Congress may not constitutionally compel Mr. McGahn to testify about his official duties, the President may lawfully direct him not to appear in response to the House Judiciary Committee's subpoena. Should the President provide that direction, Mr. McGahn may not constitutionally be penalized, civilly or criminally, for following it.

The Department of Justice has long recognized "that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("*Prosecution for Contempt*"); *see also Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. 350, 356 (1995) ("[T]he criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege."). As Assistant Attorney General Olson explained, "the Constitution does not permit Congress to make it a crime for an official to assist the President in asserting a constitutional privilege that is an integral part of the President's responsibilities under the Constitution." *Prosecution for Contempt*, 8 Op. O.L.C. at 140. To do so "would be to deter the President from asserting executive privilege and to make it difficult for him to enlist the aid of his subordinates in the process," thereby "burden[ing] and immeasurably impair[ing] the President's ability to fulfill his constitutional duties." *Id.* at 134, 137. Assistant Attorney General Walter Dellinger adhered to that reasoning in 1995, recounting that the "application of the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress." *Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. at 356.

This Office has further confirmed that the same "principles . . . similarly shield a current or former senior adviser to the President from prosecution for lawfully invoking his or her immunity from compelled congressional testimony." *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68 (2008). Subjecting a senior presidential adviser to prosecution for asserting a good-faith claim of testimonial immunity would equally impose upon the President "'the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to exercise a responsibility he found necessary to the performance of his

constitutional duty.'" *Id.* (quoting *Prosecution for Contempt*, 8 Op. O.L.C. at 136). In sum, "'[t]o seek criminal punishment for those who have acted to aid the President's performance of his duty would be . . . inconsistent with the Constitution.'" *Id.* at 69 (quoting *Prosecution for Contempt*, 8 Op. O.L.C. at 142).

We similarly believe that Congress could not lawfully exercise any inherent contempt authority against Mr. McGahn for asserting immunity. The constitutional separation of powers bars Congress from exercising its inherent contempt power in the face of a presidential assertion of executive privilege. An attempt to exercise inherent contempt powers in such a circumstance would be without precedent and "would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions." *Prosecution for Contempt*, 8 Op. O.L.C. at 136. This is so because, as Assistant Attorney General Olson concluded, "the same reasoning that suggests that the [criminal contempt] statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well." *Id.* at 140 n.42. Congress may not impede the President's ability to carry out his constitutionally assigned functions by "arrest[ing], bring[ing] to trial, and punish[ing] an executive official who asserted a Presidential claim of executive privilege." *Id.* The same rationale applies equally to an exercise of inherent contempt powers against a senior aide who has complied with a presidential direction that he not provide testimony to a congressional committee.

## V.

The immunity of the President's immediate advisers from compelled congressional testimony on matters related to their official responsibilities has long been recognized and arises from the fundamental workings of the separation of powers. This immunity applies to the former White House Counsel. Accordingly, Mr. McGahn is not legally required to appear and testify about matters related to his official duties as Counsel to the President.

Please let us know if we may be of further assistance.

STEVEN A. ENGEL
*Assistant Attorney General*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, 2138 Rayburn House Office Building Washington, D.C. 20515, | |
| *Plaintiff,* | |
| v. | Case No. 1:19-cv-2379 (KBJ) |
| DONALD F. MCGAHN II, 51 Louisiana Avenue, N.W. Washington, D.C. 20001, | |
| *Defendant.* | |

# Exhibit E

RPTR FORADORI

EDTR SECKMAN

FORMER SPECIAL COUNSEL ROBERT S. MUELLER III ON THE INVESTIGATION INTO

RUSSIAN INTERFERENCE IN THE 2016 PRESIDENTIAL ELECTION

Wednesday, July 24, 2019

U.S. House of Representatives,

Permanent Select Committee on Intelligence,

Washington, D.C.

The committee met, pursuant to call, at 12:50 p.m., in Room HVC-304, Capitol

Visitor Center, the Honorable Adam Schiff (chairman of the committee) presiding.

Present:    Representatives Schiff, Himes, Sewell, Carson, Speier, Quigley,

Swalwell, Castro, Heck, Welch, Maloney, Demings, Krishnamoorthi, Nunes, Conaway,

Turner, Wenstrup, Stewart, Crawford, Stefanik, Hurd, and Ratcliffe.

The <u>Chairman.</u>   The committee will come to order.   At the outset and on behalf of my colleagues, I want to thank you, Special Counsel Mueller, for a lifetime of service to the country.   Your report, for those who have taken the time to study it, is methodical, and it is devastating, for it tells the story of a foreign adversary's sweeping and systematic intervention in a close U.S. Presidential election.   That should be enough to deserve the attention of every American, as you well point out.   But your report tells another story as well.

For the story of the 2016 election is also a story about disloyalty to country, about greed, and about lies.   Your investigation determined that the Trump campaign, including Donald Trump himself, knew that a foreign power was intervening in our election and welcomed it, built Russian meddling into their strategy and used it.

Disloyalty to country.   Those are strong words, but how else are we to describe a Presidential campaign which did not inform the authorities of an foreign offer of dirt on their opponent, which did not publicly shun it or turn it away, but which instead invited it, encouraged it, and made full use of it.   That disloyalty may not have been criminal. Constrained by uncooperative witnesses, the destruction of documents and the use of encrypted communications, your team was not able to establish each of the elements of the crime of conspiracy beyond a reasonable doubt, so not provable crime in any event. But I think maybe something worse.

A crime is the violation of law written by Congress, but disloyalty to country violates the very oath of citizenship, our devotion to a core principle on which our Nation was founded, that we, the people, and not some foreign power that wishes us ill, we decide who governs us.

This is also a story about money, about greed and corruption, about the

leadership of a campaign willing to compromise the Nation's interest, not only to win but to make money at the same time.   About a campaign chairman indebted to pro-Russian interests who tried to use his position to clear his debts and make millions.   About a national security advisory using his position to make money from still other foreign interests.   And about a candidate trying to make more money than all of them put together through a real estate project that to him was worth a fortune, hundreds of millions of dollars and the realization of a life-long ambition: a Trump Tower in the heart of Moscow.   A candidate who in fact viewed his whole campaign as the greatest infomercial in history.

Donald Trump and his senior staff were not alone in their desire to use the election to make money.   For Russia, too, there was a powerful financial motive.   Putin wanted relief from economic sanctions imposed in the wake of Russia's invasion of Ukraine and over human rights violations.

The secret Trump Tower meeting between the Russians and senior campaign officials was about sanctions.   The secret conversations between Flynn and the Russian Ambassador were about sanctions.   Trump and his team wanted more money for themselves, and the Russians wanted more money for themselves and for their oligarchs.

The story doesn't end here either, for your report also tells a story about lies, lots of lies.   Lies about a gleaming tower in Moscow and lies about talks with the Kremlin. Lies about the firing of FBI Director James Comey and lies about efforts to fire you, Director Mueller, and lies to cover it up.   Lies about secret negotiations with the Russians over sanctions and lies about WikiLeaks.   Lies about polling data and lies about hush money payments.   Lies about meetings in the Seychelles to set up secret back channels and lies about a secret meeting in New York Trump Tower.   Lies to the FBI. Lies to your staff.   And lies to this committee.   Lies to obstruct an investigation into the

most serious attack on our democracy by a foreign power in our history.

That is where your report ends, Director Mueller, with a scheme to cover up, obstruct, and deceive every bit as systematic and pervasive as the Russian disinformation campaign itself, but far more pernicious since this rot came from within.    Even now, after 448 pages and 2 volumes, the deception continues.    The President and his acolytes say your report found no collusion, though your report explicitly declined to address that question, since collusion can involve both criminal and noncriminal conduct.

Your report laid out multiple offers of Russian help to the Trump campaign, the campaign's acceptance of that help, and overt acts in furtherance of Russian help.    To most Americans, that is the very definition of collusion, whether it is a crime or not. They say your report found no evidence of obstruction, though you outline numerous actions by the President intended to obstruct the investigation.

They say the President has been fully exonerated, though you specifically declare you could not exonerate him.    In fact, they say your whole investigation was nothing more than a witch hunt, that the Russians didn't interfere in our election, that it is all a terrible hoax.    The real crime, they say, is not that the Russians intervened to help Donald Trump but that the FBI had the temerity to investigate it when they did.

But, worst of all, worse than all the lies and the greed is the disloyalty to country. For that, too, continues.    When asked if the Russians intervene again, will you take their help, Mr. President?    Why not, was the essence of his answer; everyone does it.

No, Mr. President, they don't.    Not in the America envisioned by Jefferson, Madison, and Hamilton.    Not for those who believe in the idea that Lincoln labored until his dying day to preserve the idea animating our great national experiments so unique then, so precious still, that our government is chosen by our people through our franchise, and not by some hostile foreign power.

This is what is at stake, our next election and the one after that for generations to come.    Our democracy.    This is why your work matters, Director Mueller, this is why our investigation matters, to bring these dangers to light.

Ranking Member Nunes.

[The statement of The Chairman follows:]


******** COMMITTEE INSERT ********

Mr. <u>Nunes.</u>     Thank you, Mr. Chairman.

Welcome, everyone, to the last gasp of the Russia collusion conspiracy theory. As Democrats continue to foist this spectacle on the American people, as well as you, Mr. Mueller, the American people may recall the media first began spreading this conspiracy theory in the spring of 2016 when Fusion GPS, funded by the DNC and the Hillary Clinton campaign, started developing the Steele dossier, an collection outlandish accusations that Trump and his associates were Russian agents.

Fusion GPS, Steele, and other confederates fed these absurdities to naive or partisan reporters, and to top officials in numerous agencies, including the FBI, the Department of Justice, and the State Department.    Among other things, the FBI used dossier allegations to obtain a warrant to spy on the Trump campaign, despite acknowledging dossier allegations as being salacious and unverified.    Former FBI Director James Comey briefed those allegations to President Obama and President-elect Trump, those briefings conveniently leaked to the press, resulting in the publication of the dossier and launching thousands of false press stories based on the word of a foreign ex-spy.   One who admitted he was desperate that Trump lose the election, and who was eventually fired as an FBI source for leaking to the press.

After Comey himself was fired, by his own admission, he leaked derogatory information on President Trump to the press for the specific purpose, and successfully so, of engineering the appointment of a special counsel who sits here before us today.

The FBI investigation was marred by further corruption and bizarre abuses.    Top DOJ official Bruce Ohr, whose own wife worked on Fusion GPS' anti-Trump operation, fed Steele's information to the FBI, even after the FBI fired Steele.

The top FBI investigator and his lover, another top FBI official, constantly texted

about how much they hated Trump and wanted to stop him from being elected.    And

the entire investigation was opened based not on Five Eyes intelligence but on a tip from

a foreign politician about a conversation involving Joseph Mifsud.    He is a Maltese

diplomat who's widely portrayed as a Russian agent but seems to have far more

connections with Western governments, including our own FBI and our own State

Department, than with Russia.

Brazenly ignoring all these red flags as well as the transparent absurdity of the

claims they are making, the Democrats have argued for nearly 3 years that evidence of

collusion is hidden just around the corner.    Like the Loch Ness monster, they insist it's

there, even if no one can find it.

Consider this, in March 2017, Democrats on this committee said they had more

than circumstantial evidence of collusion, but they couldn't reveal it yet.    Mr. Mueller

was soon appointed, and they said he would find the collusion.    Then when no collusion

was found in Mr. Mueller's indictments, the Democrats said we'd find it in his final report.

Then when there was no collusion in the report, we were told Attorney General Barr was

hiding it.    Then when it was clear Barr wasn't hiding anything, we were told it will be

revealed through a hearing with Mr. Mueller himself.

And now that Mr. Mueller is here, they're claiming that the collusion has actually

been in his report all along, hidden in plain sight.    And they're right.    There is collusion

in plain sight: collusion between Russia and the Democratic Party.    The Democrats

colluded with Russian sources to develop the Steele dossier.    And Russian lawyer Natalia

Veselnitskaya colluded with the dossier's key architect, Fusion GPS head Glenn Simpson.

The Democrats have already admitted, both in interviews and through their usual

anonymous statements to reporters, that today's hearing is not about getting information

at all.    They said they want to, quote, bring the Mueller report to life and create a

television moment through ploys like having Mr. Mueller recite passages from his own report.

In other words, this hearing is political theater.    It's a Hail Mary attempt to convince the American people that collusion is real and that it's concealed in the report. Granted, that's a strange argument to make about a report that is public.    It's almost like the Democrats prepared arguments accusing Mr. Barr of hiding the report and didn't bother to update their claims once he published the entire thing.

Among congressional Democrats, the Russia investigation was never about finding the truth.    It's always been a simple media operation.    By their own accounts, this operation continues in this room today.    Once again, numerous pressing issues this committee needs to address are put on hold to indulge the political fantasies of people who believed it was their destiny to serve Hillary Clinton's administration.

It's time for the curtain to close on the Russia hoax.    The conspiracy theory is dead.    At some point, I would argue, we're going to have to get back to work.    Until then, I yield back the balance of my time.

[The statement of Mr. Nunes follows:]


******** COMMITTEE INSERT ********

The <u>Chairman.</u>   To ensure fairness and make sure that our hearing is prompt -- I know we got a late start, Director Mueller -- the hearing will be structured as follows. Each member of the committee will be afforded 5 minutes to ask questions, beginning with the chair and ranking member.   As chair, I will recognize thereafter, in an alternating fashion and descending order of seniority, members of the majority and minority.

After each member has asked his or her questions, the ranking member will be afforded an additional 5 minutes to ask questions, followed by the chair, who will have additional 5 minutes for questions.   The ranking member and the chair will not be permitted to delegate or yield our final round of questions to any other member.

After six members of the majority and six members of the minority have concluded their 5-minute rounds of questions, we'll take a 5- or 10-minute break, that we understand you've requested, before resuming the hearing with Congressman Swalwell starting his round of questions.

Special Counsel Mueller is accompanied today by Aaron Zebley, who served as deputy special counsel from May 2017 until May 2019 and had day-to-day oversight of the special counsel's investigation.   Mr. Mueller and Mr. Zebley resigned from the Department of Justice at the end of May 2019 when the Special Counsel's Office was closed.

Both Mr. Mueller and Mr. Zebley will be available to answer questions today and will be sworn in consistent with the rules of the House and the committee.   Mr. Mueller and Mr. Zebley's appearance today before the committee is in keeping with the committee's long-standing practice of receiving testimony from current or former Department of Justice and FBI personnel regarding open and closed investigative matters.

As this hearing is under oath and before we begin your testimony, Mr. Mueller and Zebley, would you please rise and raise your right hands to be sworn.

Do you swear or affirm that the testimony you're about to give at this hearing is the whole truth and nothing but the truth?

Mr. <u>Mueller.</u>    I do.

Mr. <u>Zebley.</u>    I do.

The <u>Chairman.</u>    The record will reflect that the witnesses have been duly sworn. Ranking member?

Mr. <u>Nunes.</u>    Thank you, Mr. Chair.    I just want to clarify that this is highly unusual for Mr. Zebley to be sworn in.    We're here to ask Director Mueller questions. He's here as counsel.    Our side is not going to be directing any questions to Mr. Zebley, and we have concerns about his prior representation of the Hillary Clinton campaign aide. So I just want to voice that concern that we do have, and we will not be addressing any questions to Mr. Zebley today.

The <u>Chairman.</u>    I thank the ranking member.    I realize, as you probably do, Mr. Zebley, that there is an angry man down the street who's not happy about you being here today, but it is up to this committee and not anyone else who will be allowed to be sworn in and testify, and you are welcome, as a private citizen, to testify, and members may direct their questions to whoever they choose.

With that, Director Mueller, you are recognized for any opening remarks you would like to make.

**TESTIMONY OF ROBERT S. MUELLER III, FORMER SPECIAL COUNSEL**


Mr. <u>Mueller.</u>    Thank you.    Good afternoon, Chairman Schiff, Ranking Member Nunes, and members of the committee.    I testified this morning before the House Judiciary Committee.    I ask that the opening statement I made before that committee be incorporated into the record here.

The <u>Chairman.</u>    Without objection, Director.

[The information follows:]


******** COMMITTEE INSERT ********

Mr. <u>Mueller.</u>   I understand that this committee has a unique jurisdiction and that you are interested in further understanding the counterintelligence implications of our investigation.   So let me say a word about how we handled the potential impact of our investigation on counterintelligence matters.

As we explained in our report, the special counsel regulations effectively gave me the role of United States Attorney.   As a result, we structured our investigation around evidence for possible use in prosecution of Federal crimes.   We did not reach what you would call counterintelligence conclusions.   We did, however, set up processes in the office to identify and pass counterintelligence information on to the FBI.

Members of our office periodically briefed the FBI about counterintelligence information.   In addition, there were agents and analysts from the FBI who were not on our team but whose job it was to identify counterintelligence information in our files and to disseminate that information to the FBI.   For these reasons, questions about what the FBI has done with the counterintelligence information obtained from our investigation should be directed to the FBI.

I also want to reiterate a few points that I made this morning.   I am not making any judgments or offering opinions about the guilt or innocence in any pending case.   It is unusual for a prosecutor to testify about a criminal investigation, and given my role as a prosecutor, there are reasons why my testimony will necessarily be limited.

First, public testimony could affect several ongoing matters.   In some of these matters, court rules or judicial orders limit the disclosure of information to protect the fairness of the proceedings.   And consistent with longstanding Justice Department policy, it would be inappropriate for me to comment in any way that could affect an ongoing matter.

Second, the Justice Department has asserted privileges concerning investigative information and decisions, ongoing matters within the Justice Department, and deliberations within our office.    These are Justice Department privileges that I will respect.    The Department has released a letter discussing the restrictions on my testimony.    I, therefore, will not be able to answer questions about certain areas that I know are of public interest.

For example, I am unable to address questions about the opening of the FBI's Russia investigation, which occurred months before my appointment, or matters related to the so-called Steele dossier.    These matters are the subject of ongoing review by the Department.    Any questions on these topics should, therefore, be directed to the FBI or the Justice Department.

Third, as I explained this morning, it is important for me to adhere to what we wrote in our report.    The report contains our findings and analysis and the reasons for the decisions we made.    We stated the results of our investigation with precision.    I do not intend to summarize or describe the results of our work in a different way in the course of my testimony today.

As I stated in May, I also will not comment on the actions of the Attorney General or of Congress.    I was appointed as a prosecutor, and I intend to adhere to that role and to the Department's standards that govern.

Finally, as I said this morning, over the course of my career, I have seen a number of challenges to our democracy.    The Russian Government's efforts to interfere in our election is among the most serious, and I am sure the committee agrees.

Now, before we go to questions, I want to add one correction to my testimony this morning.    I want to go back to one thing that was said this morning by Mr. Lieu, who said, and I quote:    You didn't charge the President because of the OLC opinion.

That is not the correct way to say it.    As we say in the report, and as I said at the opening, we did not reach a determination as to whether the President committed a crime.

And, with that, Mr. Chairman, I'm ready to answer questions.

[The statement of Mr. Mueller follows:]


******** COMMITTEE INSERT ********

The <u>Chairman.</u>    Thank you, Director Mueller.

I recognize myself for 5 minutes.

Director Mueller, your report describes a sweeping and systemic effort by Russia to influence our Presidential election.    Is that correct?

Mr. <u>Mueller.</u>    That is correct.

The <u>Chairman.</u>    And during the course of this Russian interference in the election, the Russians made outreach to the Trump campaign, did they not?

Mr. <u>Mueller.</u>    That occurred over the course of -- yeah, that occurred.

The <u>Chairman.</u>    It's also clear from your report that, during that Russian outreach to the Trump campaign, no one associated with the Trump campaign ever called the FBI to report it.    Am I right?

Mr. <u>Mueller.</u>    I don't know that for sure.

The <u>Chairman.</u>    In fact, the campaign welcomed the Russian help, did they not?

Mr. <u>Mueller.</u>    I think we reported in our -- in the report indications that that occurred.    Yes.

The <u>Chairman.</u>    The President's son said when he was approached about dirt on Hillary Clinton that the Trump campaign would love it?

Mr. <u>Mueller.</u>    That is generally what was said.    Yes.

The <u>Chairman.</u>    The President himself called on the Russians to hack Hillary's emails?

Mr. <u>Mueller.</u>    There was a statement by the President in those general lines.

The <u>Chairman.</u>    And numerous times during the campaign, the President praised the releases of the Russian-hacked emails through WikiLeaks.

Mr. <u>Mueller.</u>    That did occur.

The <u>Chairman.</u>    Your report found that the Trump campaign planned, quote, a press strategy, communications campaign, and messaging, unquote, based on that Russian assistance?

Mr. <u>Mueller.</u>    I am not familiar with that.

The <u>Chairman.</u>    That language comes from Volume I, page 54.

Apart from the Russians wanting to help Trump win, several individuals associated with the Trump campaign were also trying to make money during the campaign and transition.    Is that correct?

Mr. <u>Mueller.</u>    That is true.

The <u>Chairman.</u>    Paul Manafort was trying to make money or achieve debit forgiveness from a Russian oligarch?

Mr. <u>Mueller.</u>    Generally, that is accurate.

The <u>Chairman.</u>    Michael Flynn was trying to make money from Turkey?

Mr. <u>Mueller.</u>    True.

The <u>Chairman.</u>    Donald Trump was trying to make millions from a real estate deal in Moscow?

Mr. <u>Mueller.</u>    To the extent you're talking about the hotel in Moscow?

The <u>Chairman.</u>    Yes.

Mr. <u>Mueller.</u>    Yes.

The <u>Chairman.</u>    When your investigation looked into these matters, numerous Trump associates lied to your team, the grand jury, and Congress?

Mr. <u>Mueller.</u>    A number of persons that we interviewed in our investigation it turns out did lie.

The <u>Chairman.</u>    Mike Flynn lied?

Mr. <u>Mueller.</u>    He was convicted of lying, yes.

The <u>Chairman.</u>   George Papadopoulos was convicted of lying?

Mr. <u>Mueller.</u>   True.

The <u>Chairman.</u>   Paul Manafort was convicted of lying?

Mr. <u>Mueller.</u>   True.

The <u>Chairman.</u>   Paul Manafort, in fact, went so far as to encourage other people

to lie?

Mr. <u>Mueller.</u>   That is accurate.

The <u>Chairman.</u>   Manafort's deputy, Rick Gates, lied?

Mr. <u>Mueller.</u>   That is accurate.

The <u>Chairman.</u>   Michael Cohen, the President's lawyer, was indicted for lying?

Mr. <u>Mueller.</u>   True.

The <u>Chairman.</u>   He lied to stay on message with the President?

Mr. <u>Mueller.</u>   Allegedly by him.

The <u>Chairman.</u>   And when Donald Trump called your investigation a witch hunt,

that was also false, was it not?

Mr. <u>Mueller.</u>   I like to think so, yes.

The <u>Chairman.</u>   Well, your investigation is not a witch hunt, is it?

Mr. <u>Mueller.</u>   It is not a witch hunt.

The <u>Chairman.</u>   When the President said the Russian interference was a hoax,

that was false, wasn't it?

Mr. <u>Mueller.</u>   True.

The <u>Chairman.</u>   When he said it publicly, it was false?

Mr. <u>Mueller.</u>   He did say publicly that it was false.   Yes.

The <u>Chairman.</u>   And when he told it to Putin, that was false, too, wasn't it?

Mr. <u>Mueller.</u>   That I'm not familiar with.

The <u>Chairman.</u>    When the President said he had no business dealings with Russia. That was false, wasn't it?

Mr. <u>Mueller.</u>    I'm not going to go into the details of the report along those lines.

The <u>Chairman.</u>    When the President said he had no business dealings with Russia, in fact, he was seeking to build a Trump Tower in Moscow, was he not?

Mr. <u>Mueller.</u>    I think there's some question about when this was accomplished.

The <u>Chairman.</u>    Well, you would consider a billion dollar deal to build a tower in Moscow to be business dealings, wouldn't you, Director Mueller?

Mr. <u>Mueller.</u>    Absolutely.

The <u>Chairman.</u>    In short, your investigation found evidence that Russia wanted to help Trump win the election, right?

Mr. <u>Mueller.</u>    I think, generally, that would be accurate.

The <u>Chairman.</u>    Russia informed campaign officials of that?

Mr. <u>Mueller.</u>    I'm not certain to what conversation you're referring to.

The <u>Chairman.</u>    Well, through an intermediary, they informed Papadopoulos that they could help with the anonymous release of stolen emails.

Mr. <u>Mueller.</u>    Accurate.

The <u>Chairman.</u>    Russia committed Federal crimes in order to help Donald Trump?

Mr. <u>Mueller.</u>    When you're talking about the computer crimes charged in our case, absolutely.

The <u>Chairman.</u>    The Trump campaign officials built their strategy, their messaging strategy, around those stolen documents?

Mr. <u>Mueller.</u>    Generally, that's true.

The <u>Chairman.</u>    And then they lied to cover it up?

Mr. <u>Mueller.</u>    Generally, that's true.

The <u>Chairman.</u>     Thank you.

Mr. Nunes.

Mr. <u>Nunes.</u>     Thank you.

Welcome, Director.     As a former FBI Director, you'd agree that the FBI is the world's most capable law enforcement agency?

Mr. <u>Mueller.</u>     I would say we're -- yes.

Mr. <u>Nunes.</u>     The FBI claims the counterintelligence investigation of the Trump campaign began on July 31, 2016, but in fact, it began before that.     In June 2016, before the investigation officially opened, Trump campaign associates Carter Page and Stephen Miller, a current Trump advisor, were invited to attend a symposium at Cambridge University in July of 2016.     Your office, however, did not investigate who was responsible for inviting these Trump Associates to this symposium.

Your investigators also failed to interview Steven Schrage, an American citizen who helped organize the event and invited Carter Page to it.     Is that correct?

Mr. <u>Mueller.</u>     Can you repeat the question?

Mr. <u>Nunes.</u>     Whether or not you interviewed Steven Schrage, who organized --

Mr. <u>Mueller.</u>     Those areas I'm going to stay away from.

Mr. <u>Nunes.</u>     The first Trump associate to be investigated was General Flynn. Many of the allegations against him stem from false media reports that he had an affair with a Cambridge academic, Svetlana Lokhova, and that Lokhova was a Russian spy. Some of these allegations were made public in a 2017 article written by British intelligence historian Christopher Andrew.     Your report fails to reveal how or why Andrew and his collaborator, Richard Dearlove, former head of Britain's MI6, spread these allegations.     And you failed to interview Svetlana Lokhova about these matters. Is that correct?

Mr. Mueller.    I'm not going to get into those matters to which you refer.

Mr. Nunes.    You had a team of 19 lawyers, 40 agents, and an unlimited budget, correct, Mr. Mueller?

Mr. Mueller.    I would not say we had an unlimited budget.

Mr. Nunes.    Let's continue with the ongoing or the opening of the investigation supposedly on July 31, 2016.    The investigation was not open based on an official product from Five Eyes intelligence, but based on a rumor conveyed by Alexander Downer.    On Volume I, page 89, your report describes him blandly as a representative of a foreign government, but he was actually a long-time Australia politician, not a military or intelligence official, who had previously arranged a $25 million donation to the Clinton Foundation and has previous ties to Dearlove.

So Downer conveys a rumor he supposedly heard about a conversation between Papadopoulos and Joseph Mifsud.    James Comey has publicly called Mifsud a Russian agent, yet your report does not refer to Mifsud as a Russian agent.    Mifsud has extensive contacts with Western governments and the FBI.

For example, there is a recent photo of him standing next to Boris Johnson, the new Prime Minister of Great Britain.    What we're trying to figure out here, Mr. Mueller, is if our NATO allies or Boris Johnson have been compromised.    So we're trying to figure out, Comey says Mifsud is a Russian agent; you do not.    So do you stand by what's in the report?

Mr. Mueller.    I stand by that which is in the report, and not so necessarily with that which is not in the report.

Mr. Nunes.    I want to return to Mr. Downer, he denies that Papadopoulos mentioned anything to him about Hillary Clinton's emails.    And, in fact, Mifsud denies mentioning that to Papadopoulos.    He denies that Papadopoulos mentioned anything to

him about Hillary Clinton's emails, and in fact, Mifsud denies mentioning them to Papadopoulos in the first place.

So how does the FBI know to continually ask Papadopoulos about Clinton's emails for the rest of 2016?    Even more strangely, your sentencing memo on Papadopoulos blames him for hindering the FBI's ability to potentially detain or arrest Mifsud.    But the truth is Mifsud waltzed in and out of the United States in December 2016.

The U.S. media could find him.    The Italian press found him.    And he's a supposed Russian agent at the epicenter of the purported collusion conspiracy.    He's the guy who knows about Hillary Clinton's emails and that the Russians have them.    But the FBI failed to question him for a half a year after officially opening the investigation.

And then, according to Volume I, page 193 of your report, once Mifsud finally was questioned, he made false statements to the FBI.    But you declined to charge him.    Is that correct?    You did not indict Mr. Mifsud?

Mr. Mueller.    Well, I'm not going to speak to the series of happenings as you articulated them.

Mr. Nunes.    But you did not indict Mr. Mifsud?

The Chairman.    The time of the gentleman has expired.

Mr. Mueller.    Pardon?

Mr. Nunes.    You did not indict Mr. Mifsud?

Mr. Mueller.    True.

The Chairman.    Mr. Himes.

Mr. Himes.    Director Mueller, thank you for your lifetime of service to this country, and thank you for your perseverance and patience today.    Director, your report opens with two statements of remarkable clarity and power.

The first statement is one that is, as of today, not acknowledged by the President

of the United States, and that is, quote:    The Russian Government interfered in the 2016

Presidential election in sweeping and systematic fashion.

        The second statement remains controversial amongst Members of this body,

same page on your report, and I quote:    The Russian Government perceived it would

benefit from a Trump Presidency and worked to secure that outcome.    Do I have that

statement right?

        Mr. Mueller.    I believe so.

        Mr. Himes.    Director Mueller, this attack on our democracy involved, as you said,

two operations.    First, a social media disinformation campaign, this was a targeted

campaign to spread false information on places like Twitter and Facebook.    Is that

correct?

        Mr. Mueller.    That's correct.

        Mr. Himes.    Facebook estimated, as per your report, that the Russian fake

images reached 126 million people.    Is that correct?

        Mr. Mueller.    I believe that's the sum that we record.

        Mr. Himes.    Director, who did the Russian social media campaign ultimately

intend benefit, Hillary Clinton or Donald Trump?

        Mr. Mueller.    Donald Trump.

        Mr. Himes.    The second operation, Director --

        Mr. Mueller.    Let me just say Donald Trump, but there were instances where

Hillary Clinton was subject to much the same behavior.

        Mr. Himes.    The second operation in the Russian attack was a scheme, what we

call the hack and dump, to steal and release hundreds of thousands of emails from the

Democratic Party and the Clinton campaign.    Is that a fair summary?

        Mr. Mueller.    That is.

Mr. <u>Himes.</u>   Did your investigation find that the releases of the hacked emails were strategically timed to maximize impact on the election?

Mr. <u>Mueller.</u>   I'd have to refer you to our report on that question.

Mr. <u>Himes.</u>   Page 36, I quote:   The release of the documents were designed and timed to interfere with the 2016 U.S. Presidential election.   Mr. Mueller, which Presidential candidate was Russia's hacking and dumping operation designed to benefit, Hillary Clinton or Donald Trump?

Mr. <u>Mueller.</u>   Mr. Trump.

Mr. <u>Himes.</u>   Mr. Mueller, is it possible that this sweeping and systematic effort by Russia actually had an effect on the outcome of the Presidential election?

Mr. <u>Mueller.</u>   Those issues are being or have been investigated by other entities.

Mr. <u>Himes.</u>   126 million Facebook impressions, fake rallies, attacks on Hillary Clinton's health, would you rule out that it might have had some effect on the election?

Mr. <u>Mueller.</u>   I'm not going to speculate.

Mr. <u>Himes.</u>   Mr. Mueller, your report describes a third avenue of attempted Russian interference.   That is the numerous links and contacts between the Trump campaign and individuals tied to the Russian Government.   Is that correct?

Mr. <u>Mueller.</u>   Could you repeat that question?

Mr. <u>Himes.</u>   Your report describes what is called a third avenue of Russian interference, and that's the links and contacts between the Trump campaign and individuals tied to the Russian Government?

Mr. <u>Mueller.</u>   Yes.

Mr. <u>Himes.</u>   Let's bring up slide one, which is about George Papadopoulos, and it reads:   On May 6, 2016, 10 days after that meeting with Mifsud, much discussed today, Papadopoulos suggested to a representative of a foreign government that the Trump

campaign had received indications from the Russian Government that it could assist the campaign through the anonymous release of information that would be damaging to Hillary Clinton.

And, Director, that's exactly what happened 2 months later, is it not?

Mr. <u>Mueller.</u>   Well, I can speak to the excerpt that you have on the screen as being accurate from the report, but not the second half of your question.

Mr. <u>Himes.</u>   Well, the second half, just to refer to Page 6 of the report, is that, on July 22, through WikiLeaks, thousands of these emails that were stolen by the Russian Government appeared, correct?   That is on page 6 of the report.   This is the WikiLeaks posting of those emails.

Mr. <u>Mueller.</u>   I can't find it quickly, but I'm -- please continue.

Mr. <u>Himes.</u>   Okay.   So, just to be clear, before the public or the FBI ever knew, the Russians previewed for a Trump campaign official, George Papadopoulos, that they had stolen emails that they could release anonymously to help Donald Trump and hurt Hillary Clinton.   Is that correct?

Mr. <u>Mueller.</u>   I'm not going to speak to that.

Mr. <u>Himes.</u>   Director, rather than report this contact with Joseph Mifsud and the notion that there was dirt that the campaign could use, rather than report that to the FBI, that I think most of my constituents would expect an individual to do, Papadopoulos in fact lied about his Russian contact to you.   Is that not correct?

Mr. <u>Mueller.</u>   That's true.

Mr. <u>Himes.</u>   We have an election coming up in 2020, Director, if a campaign receives an offer of dirt from a foreign individual or a government, generally speaking, should that campaign report those contacts?

Mr. <u>Mueller.</u>   Should be -- can be, depending on the circumstances, a crime.

Mr. <u>Himes.</u>   I will yield back the balance of my time.

The <u>Chairman.</u>   Mr. Conaway.

Mr. <u>Conaway.</u>   Thank you.

Mr. Mueller, did anyone ask you to exclude anything from your report that you felt should have been in the report?

Mr. <u>Mueller.</u>   I don't think so, but it's not a small report.

Mr. <u>Conaway.</u>   But no one asked you specifically to exclude something that you believe should have been in there?

Mr. <u>Mueller.</u>   Not that I can recall.   No.

Mr. <u>Conaway.</u>   I yield the balance of my time to Mr. Ratcliffe.   Thank you.

Mr. <u>Ratcliffe.</u>   I thank the gentleman for yielding.

Good afternoon, Director Mueller.   In your May 29 press conference, and again in your opening remarks this morning, you made it pretty clear you wanted the special counsel report to speak for itself.   You said at your press conference that that was the office's final position, and we will not comment on any other conclusions or hypotheticals about the President.

Now, you spent the last few hours of your life from Democrats trying to get you to answer all kinds of hypotehticals about the President, and I expect that it may continue for the next few hours of your life.   I think you've stayed pretty much true to what your intent and desire was, but I guess, regardless of that, the Special Counsel's Office is closed, and it has no continuing jurisdiction or authority.   So what would be your authority or jurisdiction for adding new conclusions or determinations to the special counsel's written report?

Mr. <u>Mueller.</u>   As to the latter, I don't know or expect a change in the conclusions that we included in our report.

Mr. <u>Ratcliffe.</u>    So, to that point, you addressed one of the issues that I needed to, which was from your testimony this morning, which some construed as a change to the written report.    You talked about the exchange that you had with Congressman Lieu.    I wrote it down a little bit different.    I want to ask you about it so that the record is perfectly clear.

I recorded that he asked you, quote, "The reason you did not indict Donald Trump is because of the OLC opinion stating you cannot indict a sitting President," to which you responded, "That is correct."    That response is inconsistent, I think you'll agree, with your written report.    I want to be clear that it is not your intent to change your written report.    It is your intent to clarify the record today.

Mr. <u>Mueller.</u>    As I started today, this afternoon, and added either a footnote or an end note, what I wanted to clarify is the fact that we did not make any determination with regard to culpability, in any way.    We did not start that process down the road.

Mr. <u>Ratcliffe.</u>    Terrific.    Thank you for clarifying the record.

A stated purpose of your appointment as special counsel was to ensure a full and thorough investigation of the Russian Government efforts to interfere in the 2016 Presidential election.    As part of that full and thorough investigation, what determination did the Special Counsel Office make about whether the Steele dossier was part of the Russian Government efforts to interfere in the 2016 Presidential election?

Mr. <u>Mueller.</u>    Again, when it comes to Mr. Steele, I defer to the Department of Justice.

Mr. <u>Ratcliffe.</u>    Well, first of all, Director, I very much agree with your determination that Russia's efforts were sweeping and systematic.    I think it should concern every American.    That's why I want to know just how sweeping and systematic those efforts were.    I want to find out if Russia interfered with our election by providing

false information through sources to Christopher Steele about a Trump conspiracy that you determined didn't exist.

Mr. <u>Mueller.</u>   Well, again, I'm not going to discuss the issues with regard to Mr. Steele.   In terms of a portrayal of the conspiracies, we returned two indictments in the computer crimes arena, one GRU, and another, active measures, in which we lay out in excruciating detail what occurred in those two --

Mr. <u>Ratcliffe.</u>   And I --

Mr. <u>Mueller.</u>   -- large conspiracies.

Mr. <u>Ratcliffe.</u>   I agree with respect to that, but why this is important is an application and three renewal applications were submitted by the United States Government to spy or surveil on Trump campaign Carter Page, and on all four occasions, the United States Government submitted the Steele dossier as a central piece of evidence with expect to that.

Now, the basic premise of the dossier, as you know, was that there was a well-developed conspiracy of cooperation between the Trump campaign and the Russian Government.   But the special counsel investigation didn't establish any conspiracy, correct?

Mr. <u>Mueller.</u>   Well, what I can tell you is that the events that you are characterizing here now is part of another matter that is being handled by the Department of Justice.

Mr. <u>Ratcliffe.</u>   But you did not establish any conspiracy, much less a well-developed one?

Mr. <u>Mueller.</u>   Again, I pass on answering that.

Mr. <u>Ratcliffe.</u>   The special counsel did not charge Carter Page with anything?

Mr. <u>Mueller.</u>   Special counsel did not.

Mr. <u>Ratcliffe.</u>   All right.   My time is expired.   I yield back.

The <u>Chairman.</u>   Ms. Sewell.

Ms. <u>Sewell.</u>   Director Mueller, I'd like to turn your attention to the June 9, 2016, Trump Tower meeting.   Slide two, which should be on the screen now, is part of an email campaign between Don Jr. -- Donald Trump, Jr., and a publicist representing the son of a Russian oligarch.   The email exchange ultimately led to the now infamous June 9, 2016, meeting.   The email from the publicist to Donald Trump, Jr., reads in part:   The crown prosecutor of Russia offered to provide the Trump campaign with some official documents and information that would incriminate Hillary and her dealings with Russia, and is a part of Russia and its government's support of Mr. Trump.

In this email Donald Trump, Jr., is being told that the Russian Government wants to pass along information which would hurt Hillary Clinton and help Donald Trump.   Is that correct?

Mr. <u>Mueller.</u>   That's correct.

Ms. <u>Sewell.</u>   Now, Trump, Jr.'s, response to that is slide three.   He said, and I quote:   If it is what you say, I love it, especially later in the summer.

Then Donald Jr. invited senior campaign officials Paul Manafort and Jared Kushner to the meeting, did he not?

Mr. <u>Mueller.</u>   He did.

Ms. <u>Sewell.</u>   This email exchange is evidence of an offer of illegal assistance, is it not?

Mr. <u>Mueller.</u>   I cannot adopt that characterization.

Ms. <u>Sewell.</u>   But isn't it against the law for a Presidential campaign to accept anything of value from a foreign government?

Mr. <u>Mueller.</u>   Generally speaking, yes, but -- generally the cases are unique.

Ms. <u>Sewell.</u>   You say, on page 184 in Volume II, that the Federal
campaign-finance law broadly prohibits foreign nationals from making contributions, et
cetera, and then you say that foreign nationals may not make a contribution or donation
of money or anything of value, it said clearly in the report itself.

Mr. <u>Mueller.</u>   Yeah.   Thank you.

Ms. <u>Sewell.</u>   Now, let's turn to what actually happened at the meeting.   When
Donald Trump, Jr., and other got to the June 9th meeting, they realized that the Russian
delegation didn't have the promised, quote/unquote, dirt.   In fact, they got upset about
that, did they not?

Mr. <u>Mueller.</u>   Generally, yes.

Ms. <u>Sewell.</u>   You say in Volume II, page 118, that Trump, Jr., asked:   What are
we doing here?   What do they have on Clinton?   And during the meeting, Kushner
actually texted Manafort saying it was, quote, a waste of time, end quote.   Is that
correct?

Mr. <u>Mueller.</u>   I believe it's in the report along the lines you specify.

Ms. <u>Sewell.</u>   So, to be clear, top Trump campaign officials learned that Russia
wanted to help Donald Trump's campaign by giving him dirt on his opponent.   Trump,
Jr., said:   Loved it.   And then he and senior officials held a meeting with the Russians to
try to get that Russian help, but they were disappointed because the dirt wasn't as good
as they had hoped.

So, to the next step, did anyone to your knowledge in the Trump campaign ever
tell the FBI of this offer?

Mr. <u>Mueller.</u>   I don't believe so.

Ms. <u>Sewell.</u>   Did Donald Trump, Jr., tell the FBI that they received an offer of help
from the Russians?

Mr. <u>Mueller.</u>   I'm going to -- that's about all I'll say on this aspect of it.

Ms. <u>Sewell.</u>   Wouldn't it be true, sir, that if they had reported it to the FBI or anyone in that campaign during the course of your 2-year investigation, you would have uncovered such a --

Mr. <u>Mueller.</u>   I would hope, yes.

Ms. <u>Sewell.</u>   Yes.   Sir, is it not the responsibility of political campaigns to inform the FBI if they receive information from a foreign government?

Mr. <u>Mueller.</u>   I would think that that's something they would and should do.

Ms. <u>Sewell.</u>   Well, not only did the campaign not tell the FBI, they sought to hide the existence of the June 9th meeting for over a year.   Is that not correct?

Mr. <u>Mueller.</u>   On the general characterization, I would question it.   If you're referring to a later initiative that flowed from the media then --

Ms. <u>Sewell.</u>   No, what I'm suggesting is that you've said in Volume 2, page 5: On several occasions, the President directed aides not to publicly disclose the email setting up the June 9th meeting.

Mr. <u>Mueller.</u>   Yes.   That is accurate.

Ms. <u>Sewell.</u>   Thanks.   Sir, given this illegal assistance by Russians, you chose, even given that, you did not charge Donald Trump, Jr., or any of the other senior officials with conspiracy.   Is that right?

Mr. <u>Mueller.</u>   Correct.

Ms. <u>Sewell.</u>   And while --

Mr. <u>Mueller.</u>   If you're talking about other individuals, you're talking about the attendees of June 9, that's accurate.

Ms. <u>Sewell.</u>   Yes, that's right.   So, Mr. Mueller, even though you didn't charge them with conspiracy, don't you think that the American people would be concerned that

these three senior campaign officials eagerly sought a foreign adversary's help to win

elections, and don't you think reporting that is important that we don't set a precedent

for future elections?

Mr. Mueller.    I can't accept that characterization.

Ms. Sewell.    Well, listen, I think that it seems like a betrayal of the American

values to me, sir, that someone with -- if not being criminal, it is definitely unethical and

wrong, and I would think that we would not want to set a precedent that political

campaigns should not divulge of information of its foreign government assistance.

Thank you, sir.

The Chairman.    Mr. Turner.

Mr. Turner.    Mr. Mueller, I have your opening statement, and in the beginning of

your opening statement, you indicate that, pursuant to Justice Department regulations,

that you submitted a confidential report to the Attorney General at the conclusion of the

investigation.    What I'd like you to confirm is the report that you did that is the subject

matter of this hearing was to the Attorney General?

Mr. Mueller.    Yes.

Mr. Turner.    You also state in this opening statement that you threw overboard

the word "collusion" because it's not a legal term.    You would not conclude because

collusion was not a legal term?

Mr. Mueller.    Well, it depends on how you want to use the word.    In the

general parlance, people can think of it that way, but if you're talking about in a criminal

statute arena, you can't because it's much more accurately described as conspiracy.

Mr. Turner.    In your words, it's not a legal term so you didn't put it in your

conclusion, correct?    That's what your opening statement --

Mr. Mueller.    That's correct.

Mr. <u>Turner.</u>    Mr. Mueller, I want to talk about your powers and authorities. Now, the Attorney General in the appointment order gave you powers and authorities that reside in the Attorney General.    Now, the Attorney General has no ability to give you powers and authority greater than the powers and authority of the Attorney General, correct?

Mr. <u>Mueller.</u>    Yeah, I think that is correct.

Mr. <u>Turner.</u>    Mr. Mueller, I want to focus on one word in your report.    It's the second to the last word in the report; it's "exonerate."    The report states:    Accordingly, while this report does not conclude that the President committed a crime, it does not exonerate him.

Now, in the Judiciary Hearing, in your prior testimony, you have already agreed with Mr. Ratcliffe that "exonerate" is not a legal term, that there is not a legal test for this.    So I have a question for you, Mr. Mueller.

Mr. Mueller, does the Attorney General have the power or authority to exonerate?    Now, what I'm putting up here is the United States Code.    This is where the Attorney General gets his power and the Constitution and the annotated cases of these, which we've searched.    We even went to your law school because I went to Case Western, but I thought maybe your law school teaches it differently, and we got the criminal law textbook from your law school.

Mr. Mueller, nowhere in these, because we had them scanned, is there a process or description on exonerate.    There's no Office of Exoneration at the Attorney General's office.    There's no certificate at the bottom of his desk.    Mr. Mueller, would you agree with me that the Attorney General does not have the power to exonerate?

Mr. <u>Mueller.</u>    I'm going to pass on that.

Mr. <u>Turner.</u>    Why?

Mr. <u>Mueller.</u>   Because it embroils us in a legal discussion, and I'm not prepared to do a legal discussion in that arena.

Mr. <u>Turner.</u>   Well, Mr. Mueller, you would not disagree with me when I say that there is no place that the Attorney General has the power to exonerate and he's not been given that authority?

Mr. <u>Mueller.</u>   Again, I'm not going to -- I take your question.

Mr. <u>Turner.</u>   Well, the one thing that I guess is that the Attorney General probably knows that he can't exonerate either, and that's the part that kind of confuses me.   Because if the Attorney General doesn't have the power to exonerate, then you don't have to power to exonerate, and I believe he knows he doesn't the have power to exonerate.

So this is the part I don't understand.   If your report is to the Attorney General, and the Attorney General doesn't have the power to exonerate, and he does not -- and he knows that you do not have that power, you don't have to tell him that you're not exonerating the President; he knows this already.   So then that kind of changed the context of the report.

Mr. <u>Mueller.</u>   No, we include it in the report for exactly that reason.   He may not know it, and he should know it.

Mr. <u>Turner.</u>   So you believe that Attorney Bill Barr believes that somewhere in the hallways of the Department of Justice, there's an Office of Exoneration?

Mr. <u>Mueller.</u>   No, that's not what I said.

Mr. <u>Turner.</u>   Well, I believe he knows, and I don't believe you put that in there for Mr. Barr.   I think you put that in there for exactly what I'm going to discuss next.   And that is, in The Washington Post yesterday, when speaking of your report, the article said: Trump could not be exonerated of trying to obstruct the investigation itself.   Trump

could not be exonerated.

Now, that statement is correct, Mr. Mueller, in that no one can be exonerated. The reporter wrote this -- this reporter can't be exonerated.    Mr. Mueller, you can't be exonerated.    In fact, in our criminal justice system, there is no power or authority to exonerate.    Now, this is my concern, Mr. Mueller.    This is the headline on all of the news channels while you were testifying today:    "Mueller:    Trump was not exonerated."

Now, Mr. Mueller, what you know is that this can't say, "Mueller exonerated Trump," because you don't have the power or authority to exonerate Trump.    You have no power to declare him exonerated than you have the power to declare him Anderson Cooper.    So the problem that I have here is that since there's no one in the criminal justice system that has that power -- the President pardons; he doesn't exonerate. Courts and juries don't declare innocent; they declare not guilty.    They don't even declare exoneration.    The statement about exoneration is misleading, and it's meaningless, and it colors this investigation.    One word out of the entire portion of your report, and it's a meaningless word that has no legal meaning, and it has colored your entire report.

I yield back.

The Chairman.    The time of the gentleman has expired.    Mr. Carson.

Mr. Carson.    Thank you, Chairman.

Thank you, Director Mueller, for your years of service to our country.    I want to look more closely, sir, at the Trump campaign chairman, Paul Manafort, an individual who I believe betrayed our country, who lied to a grand jury, who tampered with witnesses, and who repeatedly tried to use his position with the Trump campaign to make more money.    Let's focus on the betrayal and greed.

Your investigation, sir, found a number of troubling contacts between Mr. Manafort and Russian individuals during and after the campaign.    Is that right, sir?

Mr. <u>Mueller.</u>    Correct.

Mr. <u>Carson.</u>    In addition to the June 9th meeting just discussed, Manafort often met several times with a man named Konstantin Kilimnik, who the FBI assessed to have ties with Russian intel agencies.    Is that right, sir?

Mr. <u>Mueller.</u>    Correct.

Mr. <u>Carson.</u>    In fact, Mr. Manafort didn't just meet with him; he shared private Trump campaign polling information with this man linked to Russian intelligence.    Is that right, sir?

Mr. <u>Mueller.</u>    That is correct.

Mr. <u>Carson.</u>    And in turn, the information was shared with a Russian oligarch tied to Vladimir Putin.    Is that right, sir?

Mr. <u>Mueller.</u>    Allegedly.

Mr. <u>Carson.</u>    Director Mueller, meeting with him wasn't enough.    Sharing internal polling information wasn't enough.    Mr. Manafort went so far as to offer this Russian oligarch tied to Putin a private briefing on the campaign.    Is that right, sir?

Mr. <u>Mueller.</u>    Yes, sir.

Mr. <u>Carson.</u>    And, finally, Mr. Manafort also discussed internal campaign strategy on four battleground States -- Michigan, Wisconsin, Pennsylvania, and Minnesota -- with the Russian-intelligence-linked individual.    Did he not, sir?

Mr. <u>Mueller.</u>    That's reflected in the report, as were the items you listed previously.

Mr. <u>Carson.</u>    Director Mueller, based on your decades of years of experience at the FBI, would you agree, sir, that it creates a national security risk when a Presidential

campaign chairman shares private polling information on the American people, private political strategy related to winning the votes of the American people, and private information about American battleground States with a foreign adversary?

Mr. Mueller.   Is that the question, sir?

Mr. Carson.   Yes, sir.

Mr. Mueller.   I'm not going to speculate along those lines.   To the extent that it's within the lines of the report, then I'd support it.   Anything beyond that is not part of that which I would support.

Mr. Carson.   Well, I think it does, sir.   I think it shows an infuriating lack of patriotism from the very people seeking the highest office in the land.   Director Mueller, Manafort didn't share this information exchange for nothing, did he, sir?

Mr. Mueller.   I can't answer that question without knowing more about the question.

Mr. Carson.   Well, it's clear that he hoped to be paid back money he was owed by Russian or Ukrainian oligarchs in return for the passage of private campaign information, correct?

Mr. Mueller.   That is true.

Mr. Carson.   Director Mueller, as my colleague, Mr. Heck, will discuss later, greed corrupts.   Would you agree, sir, that the sharing of private campaign information in exchange for money represents a particular kind of corruption, one that presents a national security risk to our country, sir?

Mr. Mueller.   I'm not going to opine on that.   I don't have the expertise in that arena to really opine?

Mr. Carson.   Would you agree, sir, that Manafort's contacts with Russians close to Vladimir Putin and his efforts to exchange private information on Americans for money

left him vulnerable to blackmail by the Russians?

Mr. <u>Mueller.</u>   I think generally so that would be the case.

Mr. <u>Carson.</u>   Would you agree, sir, that these acts demonstrated a betrayal of the democratic values our country rests on?

Mr. <u>Mueller.</u>   I can't agree with that.

Mr. <u>Carson.</u>   Director Mueller --

Mr. <u>Mueller.</u>   Not that it's not true, but I cannot agree with it.

Mr. <u>Carson.</u>   Yes, sir.   Director Mueller, well, I can tell you that, in my years as a law enforcement officer and as a Member of Congress, fortunate to serve on the Intel Committee, I know enough to say, yes, trading political secrets for money with a foreign adversary can corrupt, and it can leave you open to blackmail.   And it certainly represents a betrayal of the values underpinning our democracy.

I want to thank you for your service again, Director Mueller, we appreciate you for coming today.   I yield back, chairman.

The <u>Chairman.</u>   Dr. Wenstrup.

Dr. <u>Wenstrup.</u>   Thank you, Mr. Chairman.

Thank you, Mr. Mueller, for being here today.   Mr. Mueller, is it accurate to say your investigation found no evidence of members of the Trump campaign were involved in the theft or publication of Clinton campaign-related emails?

Mr. <u>Mueller.</u>   Can you repeat the question?

Dr. <u>Wenstrup.</u>   It is accurate to say your investigation found no evidence that members of the Trump campaign were involved in the theft or publication of the Clinton campaign-related emails?

Mr. <u>Mueller.</u>   I don't know the -- I don't know.   I -- well --

Dr. <u>Wenstrup.</u>   Well, Volume II, page 5, the investigation did not establish that

members of the Trump campaign conspired or coordinated with the Russian Government in its election interference activities.   So it would, therefore, be inaccurate, based on this, to describe that finding as open to doubt, and that finding being that the Trump campaign was involved with theft or publication of the Clinton campaign emails.   Are you following that, sir?

Mr. Mueller.   I do believe I'm following it, but it is -- that portion or that matter does not fall within our jurisdiction or fall within our investigation.

Dr. Wenstrup.   Well, basically, what your report says, Volume II, page 5, I just want to be clear that open to doubt is how the committee Democrats describe this finding in their minority views of our 2018 report, and it kind of flies in the face of what you have in your report.   So is it accurate also to say the investigation found no documentary evidence that George Papadopoulos told anyone affiliated with the Trump campaign about Joseph Mifsud's claims that the Russians had dirt on candidate Clinton?

Mr. Mueller.   Let me turn that over to Mr. Zebley.

Dr. Wenstrup.   I'd like to ask you, sir.   This is your report, and that's what I'm basing this on.

Mr. Mueller.   Then could you repeat the question for me again?

Dr. Wenstrup.   Yeah, is it accurate to say that the investigation found no documentary evidence that George Papadopoulos told anyone affiliated with the Trump campaign about Joseph Mifsud's claims that the Russians had dirt on candidate Clinton?

Mr. Mueller.   I believe it appearing in the report, that it is accurate.

Dr. Wenstrup.   So, in the report, it says, no documentary evidence that Papadopoulos shared this information with the campaign.   It's, therefore, inaccurate to conclude that by the time of the June 9, 2016, Trump Tower meeting, quote:   The campaign was likely already on notice via George Papadopoulos' contact with Russian

agents that Russia in fact had damaging information on Trump's opponent.

Would you say that that is inaccurate to say that it's likely already --

Mr. <u>Mueller.</u>   I direct you to the report.

Dr. <u>Wenstrup.</u>   Well, I appreciate that because the Democrats jumped to this incorrect conclusion in their minority views, again, which contradicts what you have in your report.

I'm concerned about a number of statements I'd like you to clarify because a number of Democrats have made some statements that I have concerns with and maybe you can clear them up.   So a member of this committee said President Trump was a Russian agent after your report was publicly released.   That statement is not supported by your report, correct?

Mr. <u>Mueller.</u>   That is accurate.   It's not supported.

Dr. <u>Wenstrup.</u>   Multiple Democrat Members have asserted that Paul Manafort met with Julian Assange in 2016 before WikiLeaks released DNC emails, implying Manafort colluded with Assange.   Because your report does not mention finding evidence that Manafort met with Assange, I would assume that means you found no evidence of this meeting.   Is that assumption correct?

RPTR ZAMORA

EDTR HOFSTAD

[1:52 p.m.]

Mr. Mueller.    I'm not certain I agree with that assumption.

Dr. Wenstrup.    But you make no mention of it in your report.    Would you agree with that?

Mr. Mueller.    Yes, I would agree with that.

Dr. Wenstrup.    Okay.

Mr. Mueller, does your report contain any evidence that President Trump was enrolled in the Russian system of kompromat, as a member of this committee once claimed?

Mr. Mueller.    Well, to -- what I can speak to is information -- evidence that we picked up as the special counsel.    And I think that's accurate, as far as it goes.

Dr. Wenstrup.    Thank you.    I appreciate that.

So let's go for a second to scope.    Did you ask the Department of Justice to expand the scope of the special counsel's mandate related to August 2, 2017, or August 20, 2017, scoping memoranda?

Mr. Mueller.    Well, there -- without looking at the memoranda, I could not answer that question.

Dr. Wenstrup.    Well, let me ask you, did you ever make a request to expand your office's mandate at all?

Mr. Mueller.    Generally, yes.

Dr. Wenstrup.    And was that ever denied?

Mr. Mueller.    I'm not going to speak to that.    It goes to --

Dr. <u>Wenstrup.</u>    You're not going to speak to that?

Mr. <u>Mueller.</u>    -- the internal deliberations.

Dr. <u>Wenstrup.</u>    Well, I'm just trying to understand process.    Does expanding the scope come from the Acting Attorney General or --

Mr. <u>Mueller.</u>    I'm not --

Dr. <u>Wenstrup.</u>    -- Rod Rosenstein?    Or does it come from you?    Or can it come from either?

Mr. <u>Mueller.</u>    Yeah, I'm not going to discuss any other alternatives.

Dr. <u>Wenstrup.</u>    Thank you, Mr. Mueller.

The <u>Chairman.</u>    Ms. Speier.

Ms. <u>Speier.</u>    Thank you, Mr. Chairman.

Mr. Mueller, I think I can say without fear of contradiction that you are the greatest patriot in this room today, and I want to thank you for being here.

Mr. <u>Mueller.</u>    Thank you.

Ms. <u>Speier.</u>    You said in your report -- and I'm going to quibble with your words -- that the Russian intervention was sweeping and systematic.    I would quibble with that because I don't think it was just an intervention; I think it was an invasion.    And I don't think it was just sweeping and systematic; I think it was sinister and scheming.

But having said that, one of my colleagues earlier here referred to this Russian intervention as a hoax.    And I'd like to get your comment on that.

On page 26 of your report, you talk about the Internet Research Agency and how tens of millions of U.S. persons became engaged with the posts that they made, that there were some 80,000 posts on Facebook, that Facebook itself admitted that 126 million people had probably seen the posts that were put up by the Internet Research Agency, that they had 3,800 Twitter accounts and had designed more than 175,000

tweets that probably reached 1.4 million people.

The Internet Research Agency was spending about $1.25 million a month on all of this social media in the United States in what I would call an invasion in our country.

Would you agree that it was not a hoax that the Russians were engaged in trying to impact our election?

Mr. <u>Mueller.</u>   Absolutely.   That was not a hoax.   The indictments we returned against the Russians, two different ones, were substantial in their scope, using the "scope" word again.

And I think one of the -- we have underplayed, to a certain extent, that aspect of our investigation that has and would have long-term damage to the United States that we need to move quickly to address.

Ms. <u>Speier.</u>   Thank you for that.   I'd like to drill down on that a little bit more.

The Internet Research Agency actually started in 2014 by sending over staff as tourists, I guess, to start looking at where they wanted to engage.   And there are many that suggest, and I'm interested in your opinion, as to whether or not Russia is presently in the United States looking for ways to impact the 2020 election.

Mr. <u>Mueller.</u>   I can't speak to that.   That would be in levels of classification.

Ms. <u>Speier.</u>   All right.

Let me ask you this.   Oftentimes when we engage in these hearings, we forget the forest for the trees.   You have a very large report here of over 400 pages.   Most Americans have not read it.   We have read it.   Actually, the FBI Director yesterday said he hadn't read it, which was a little discouraging.

But, on behalf of the American people, I want to give you a minute and 39 seconds to tell the American people what you would like them to glean from this report.

Mr. <u>Mueller.</u>   Well, we spent substantial time ensuring the integrity of the

report, understanding that it would be our living message to those who come after us. But it also is a signal, a flag to those of us who have some responsibility in this area to exercise those responsibilities swiftly and don't let this problem continue to linger as it has over so many years.

Ms. Speier.   All right.   You didn't take the total amount of time, so I'm going to yield the rest of my time to the chairman.

The Chairman.   I thank the gentlewoman for yielding.

Director Mueller, I wanted to ask you about conspiracy.   Generally, a conspiracy requires an offer of something illegal, the acceptance of that offer, and an overt act in furtherance of it.   Is that correct?

Mr. Mueller.   Correct.

The Chairman.   And Don Jr. was made aware that the Russians were offering dirt on his opponent, correct?

Mr. Mueller.   I don't know that for sure, but one would assume, given his presence at the meeting.

The Chairman.   And when you say that you would love to get that help, that would constitute an acceptance of the offer?

Mr. Mueller.   It's a wide-open request.

The Chairman.   And it would certainly be evidence of an acceptance if you say -- when somebody offers you something illegal and you say, "I would love it," that would be considered evidence of an acceptance.

Mr. Mueller.   I'm going to stay away from any -- addressing one particular or two particular situations.

The Chairman.   Well, this particular situation -- well, I'll have to continue in a bit. I now yield to Mr. Stewart.

Mr. <u>Stewart.</u>   Mr. Mueller, it's been a long day.   Thank you for being here.

I do have a series of important questions for you, but before I do that, I want to take a moment to reemphasize something that my friend Mr. Turner has said.   I've heard many people state, "No person is above the law."   And many times recently, they add "not even the President," which I think is blazingly obvious to most of us.

Mr. <u>Mueller.</u>   I'm having a little problem hearing you, sir.

Mr. <u>Stewart.</u>   Is this better?

Mr. <u>Mueller.</u>   That is better.   Thank you.

Mr. <u>Stewart.</u>   I want you to know I agree with the statement that no person is above the law.   But there's another principle that we also have to defend, and that is the presumption of innocence.   And I'm sure you agree with this principle, though I think the way that your office phrased some parts of your report, it does make me wonder, I have to be honest with you.

For going on 3 years, innocent people have been accused of very serious crimes, including treason -- accusations made even here today.   They have had their lives disrupted and in some cases destroyed by false accusations for which there is absolutely no basis other than some people desperately wish that it was so.

But your report is very clear:   no evidence of conspiracy, no evidence of coordination.   And I believe we owe it to these people who have been falsely accused, including the President and his family, to make that very clear.

Mr. Mueller, the credibility of your report is based on the integrity of how it is handled.   And there's something that I think bothers me and other Americans.   I'm holding here in my hand a binder of 25 examples of leaks that occurred from the Special Counsel's Office from those who associated with your work dating back to as early as a few weeks after your inception and the beginning of your work and continuing up to just

a few months ago.

All of these -- all of them have one thing in common:   They were designed to weaken or to embarrass the President.   Every single one.   Never was it leaked that you'd found no evidence of collusion.   Never was it leaked that the Steele dossier was a complete fantasy, nor that it was funded by the Hillary Clinton.   I could go on and on.

Mr. Mueller, are you aware of anyone from your team having given advance knowledge of the raid on Roger Stone's home to any person or the press, including CNN?

Mr. Mueller.   Well, I'm not going to talk about specifics.   I will mention -- but talk for a moment about persons who become involved in an investigation and the understanding that, in a lengthy, thorough investigation, some persons will be under a cloud that should not be under a cloud.

And one of the reasons for emphasizing, as I have, the speed of an election -- or, not election -- the speed of an investigation is that so those persons who are disrupted as a result of their --

Mr. Stewart.   I appreciate that, but I do have a series of questions.

Mr. Mueller.   May -- with the result of that investigation.

Mr. Stewart.   Thank you.   And you're right, it is a cloud, and it's an unfair cloud for dozens of people.

But, to my point, are you aware of anyone providing information to the media regarding the raid on Roger Stone's home, including CNN?

Mr. Mueller.   I'm not going to speak to that.

Mr. Stewart.   Okay.

Mr. Mueller, you sent a letter dated March 27 to Attorney General Barr in which you claimed the Attorney General's memo to Congress did not fully capture the context of your report.   You stated earlier today that response was not authorized.

Did you make any effort to determine who leaked this confidential letter?

Mr. Mueller.   No, and I'm not certain -- this is the letter of March 27?

Mr. Stewart.   Yes, sir.

Mr. Mueller.   Okay.   I'm not certain when it was publicized.   I did know it was publicized, but I do not believe we would be responsible for the leak.

Mr. Stewart.   Well --

Mr. Mueller.   I do believe that we have done a good job in assuring that no leaks occur --

Mr. Stewart.   We have 25 examples here of where you did not do a good job -- not you, sir; I'm not accusing you at all -- but where your office did not do a good job in protecting this information.

One more example.   Do you know anyone who anonymously made claims to the press that Attorney General Barr's March 24 letter to Congress had been misrepresented or misrepresented the basis of your report?

Mr. Mueller.   What was the question?

Mr. Stewart.   Do you know who anonymously made claims to the press that Attorney General Barr's March 24 letter to Congress had misrepresented the findings of your report?

Mr. Mueller.   No.

Mr. Stewart.   Sir, given these examples as well as others, you must have realized that leaks were coming from someone associated with the Special Counsel's Office. What I'd like to ask is, did you --

Mr. Mueller.   I do not believe that.

Mr. Stewart.   Well, sir, this was your work.   You're the only one -- your office is the only one who had information regarding this.   It had to come from your office.

Putting that aside -- which leads me to my final question:     Did you do anything about it?

Mr. <u>Mueller.</u>     From the outset, we've undertaken to make certain that we minimize the possibility of leaks.     And I think we were successful over the 2 years that we were in operation.

Mr. <u>Stewart.</u>     Well, I wish you'd been more successful, sir.     I think it was disruptive to the American people.

My time has expired.     I yield back.

The <u>Chairman.</u>     Mr. Quigley.

Mr. <u>Quigley.</u>     Thank you, Mr. Chairman.

Director, thank you for being here.     This, too, shall pass.

Earlier today and throughout the day, you have stated the policy that a seated President cannot be indicted, correct?

Mr. <u>Mueller.</u>     Correct.

Mr. <u>Quigley.</u>     And upon questioning this morning, you were asked, could a President be indicted after their service, correct?

Mr. <u>Mueller.</u>     Yes.

Mr. <u>Quigley.</u>     And your answer was that they could.

Mr. <u>Mueller.</u>     They could.

The <u>Chairman.</u>     Director, please speak into the microphone.

Mr. <u>Mueller.</u>     I'm sorry.     Thank you.     They could.

Mr. <u>Quigley.</u>     So the followup question that should be concerning is:     What if a President serves beyond the statute of limitations?

Mr. <u>Mueller.</u>     I don't know the answer to that one.

Mr. <u>Quigley.</u>     Would it not indicate that if the statute of limitations on Federal

crimes such as this are 5 years that a President who serves a second term is therefore, under the policy, above the law?

Mr. Mueller.   I'm not certain I would agree with the conclusion.   I'm not certain that I can see the possibility that you suggest.

Mr. Quigley.   But the statute doesn't toll.   Is that correct?

Mr. Mueller.   I don't know specifically.

Mr. Quigley.   It clearly doesn't.

And I just want -- as the American public is watching this and perhaps learning about many of these for the first time, we need to consider that and that the other alternatives are perhaps all that we have.

But I appreciate your response.

Earlier in questioning, someone mentioned that -- it was a question involving whether anyone in the Trump political world publicized the emails, whether or not that was the case.

I just want to refer to Volume I, page 60, where we learn that Trump Jr. publicly tweeted a link to the leak of stolen Podesta emails in October of 2016.   You're familiar with that?

Mr. Mueller.   I am.

Mr. Quigley.   So that would at least be a republishing of this information, would it not?

Mr. Mueller.   I'm not certain I would agree with that.

Mr. Quigley.   Director Pompeo assessed WikiLeaks, at one point, as a hostile intelligence service.

Given your law enforcement experience and your knowledge of what WikiLeaks did here and what they do generally, would you assess that to be accurate or something

similar?   How would you assess what WikiLeaks does?

Mr. Mueller.   Absolutely.   And they are currently under indictment; Julian Assange is.

Mr. Quigley.   But would it be fair to describe them as -- you would agree with Director Pompeo -- that's what he was when he made that remark -- that it's a hostile intelligence service, correct?

Mr. Mueller.   Yes.

Mr. Quigley.   If we could put up slide 6.

"This just came out.   WikiLeaks!   I love WikiLeaks!"   Donald Trump, October 10, 2016.

"This WikiLeaks stuff is unbelievable.   It tells you the inner heart, you gotta read it."   Donald Trump, October 12, 2016.

"This WikiLeaks is like a treasure trove."   Donald Trump, October 31, 2016.

"Boy, I love reading those WikiLeaks."   Donald Trump, November 4, 2016.

Would any of those quotes disturb you, Mr. Director?

Mr. Mueller.   I'm not certain I would say --

Mr. Quigley.   How do you react to them?

Mr. Mueller.   Well, it's -- "problematic" is an understatement in terms of what it displays in terms of giving some -- I don't know -- hope or some boost to what is and should be illegal activity.

Mr. Quigley.   Volume I, page 59:   "Donald Trump, Jr., had direct electronic communications with WikiLeaks during the campaign period."

"On October 3, 2016, WikiLeaks sent another direct message to Trump Jr., asking 'you guys' to help disseminate a link alleging candidate Clinton had advocated a drone to target Julian Assange.   Trump Jr. responded that, quote, he already 'had done so.'"

Same question.    This behavior, at the very least, disturbing?

Mr. <u>Mueller.</u>    Disturbing and also subject to investigation.

Mr. <u>Quigley.</u>    Could it be described as aid and comfort to a hostile intelligence service, sir?

Mr. <u>Mueller.</u>    I wouldn't categorize it with any specificity.

Mr. <u>Quigley.</u>    I yield the balance to the chairman, please.

The <u>Chairman.</u>    I'm not sure I can make good use of 27 seconds, but, Director, I think you made it clear that you think it unethical, to put it politely, to tout a foreign service, like WikiLeaks, publishing stolen political documents in a Presidential campaign?

Mr. <u>Mueller.</u>    Certainly calls for investigation.

The <u>Chairman.</u>    Thank you, Director.

We're going to go now to Mr. Crawford.    And then after Mr. Crawford's 5 minutes, we'll take a 5- or 10-minute break.

Mr. <u>Crawford.</u>    Thank you, Mr. Chairman.

Thank you, Mr. Mueller, for being here.

Days after your appointment, Peter Strzok texted about his concern that there's, quote, "no big there there" in the Trump campaign investigation.

Did Strzok or anyone else who worked on the FBI's investigation tell you that around 10 months into the investigation the FBI still had no case for collusion?

Mr. <u>Mueller.</u>    Who?    Can you repeat that?

Mr. <u>Crawford.</u>    Peter Strzok.

Mr. <u>Mueller.</u>    And could you -- I'm sorry.    Can you move the microphone up a little closer?

Mr. <u>Crawford.</u>    Sure.

Mr. <u>Mueller.</u>    Thank you.

Mr. <u>Crawford.</u>   There's a quote attributed to Peter Strzok.   He texted about his concern that there is, quote, "no big there there" in the Trump campaign investigation.

Did he or anyone else who worked on the FBI's investigation tell you that around 10 months into the investigation the FBI still had no case for collusion?

Mr. <u>Mueller.</u>   No.

Mr. <u>Crawford.</u>   Is the inspector general report correct that the text messages from Peter Strzok and Lisa Page's phones from your office were not retained after they left the Special Counsel's Office?

Mr. <u>Mueller.</u>   Well, I don't -- it depends on what you're talking about.   The investigation into those -- Peter Strzok went on for a period of time, and I am not certain what it encompasses.   It may well have encompassed what you're adverting to.

Mr. <u>Crawford.</u>   Okay.

Let me move on just real quickly.   Did you ask the Department to authorize your office to investigate the origin of the Trump/Russia investigation?

Mr. <u>Mueller.</u>   I'm not going to get into that.   It goes to internal deliberations.

Mr. <u>Crawford.</u>   So the circumstances surrounding the origin of the investigation have yet to be fully vetted then.   I am certainly glad that Attorney General Barr and U.S. Attorney Durham are looking into this matter.

And, with that, I'd like to yield the balance of my time to Ranking Member Nunes.

Mr. <u>Nunes.</u>   I thank the gentleman for yielding.

Mr. Mueller, I want to make sure you're aware of who Fusion GPS is.   Fusion GPS is a political operations firm that was working directly for the Hillary Clinton campaign and the Democrat National Committee.   They produced the dossier.   So they paid Steele, who then went out and got the dossier.

And I know you don't want to answer any dossier questions, so I'm not going

there.    But your report mentions Natalia Veselnitskaya 65 times.    She meets in the

Trump Tower -- it's this infamous Trump Tower meeting.    It's in your report.    You've

heard many of the Democrats refer to it today.

    The meeting was shorter than 20 minutes, I believe.    Is that correct?

    Mr. <u>Mueller.</u>    I think what we have in our report reflects it was about that length.

    Mr. <u>Nunes.</u>    So do you know -- so Fusion GPS, the main actor at Fusion GPS, the

president of the company, or the owner of the company, is a guy named Glenn Simpson,

who's working for Hillary Clinton.    Glenn Simpson -- do you know how many times Glenn

Simpson met with Natalia Veselnitskaya?

    Mr. <u>Mueller.</u>    Myself?    No.

    Mr. <u>Nunes.</u>    Would it surprise you that the Clinton campaign dirty-ops arm met

with Natalia Veselnitskaya more times than the Trump campaign did?

    Mr. <u>Mueller.</u>    Well, this is an area that I'm not going to get into, as I indicated at

the outset.

    Mr. <u>Nunes.</u>    Did you ever interview Glenn Simpson?

    Mr. <u>Mueller.</u>    I'm, again, going to pass on that.

    Mr. <u>Nunes.</u>    According to -- I'm going to change topics here.    According to notes

from the State Department official Kathleen Kavalec, Christopher Steele told her that

former Russian intelligence head Trubnikov and Putin advisor Surkov were sources for the

Steele dossier.

    Now, knowing that these are -- not getting into whether these sources were real

or not real, was there any concern that there could've been disinformation that was going

from the Kremlin into the Clinton campaign and then being fed into the FBI?

    Mr. <u>Mueller.</u>    Well, as I said before, this is an area that I cannot speak to.

    Mr. <u>Nunes.</u>    Is that because you're -- it's not in the report or you're just -- or

because of an ongoing deliberations?

Mr. <u>Mueller.</u>   Internal deliberations, other proceedings, and the like.

Mr. <u>Nunes.</u>   Okay.

When Andrew Weissmann and Zainab Ahmad joined your team, were you aware that Bruce Ohr, a Department of Justice top official, directly briefed the dossier allegations to them in the summer of 2016?

Mr. <u>Mueller.</u>   Again, I'm not going to speak to that issue.

Mr. <u>Nunes.</u>   Okay.

Before you arrested George Papadopoulos in July of 2017, he was given $10,000 in cash in Israel.   Do you know who gave him that cash?

Mr. <u>Mueller.</u>   Again, that's outside our ambit, and questions such as that should go to the FBI or the Department.

Mr. <u>Nunes.</u>   But it involved your investigation.

Mr. <u>Mueller.</u>   It involved persons involved in my investigation.

Mr. <u>Nunes.</u>   Thank you, Mr. Chairman.

The <u>Chairman.</u>   The committee will stand in recess for 5 or 10 minutes.   Please, folks, remain in your seats, allow the Director and Mr. Zebley to exit the chamber.

[Recess.]

The <u>Chairman.</u>   The committee will come to order.

Mr. <u>Mueller.</u>   Thank you, sir.

The <u>Chairman.</u>   Thank you, Director.

Mr. Swalwell, you're recognized.

Mr. <u>Swalwell.</u>   Thank you.

Director Mueller, as a prosecutor, you would agree that if a witness or suspect lies or obstructs or tampers with witnesses or destroys evidence during an investigation that

generally that conduct can be used to show a consciousness of guilt.    Would you agree

with that?

Mr. <u>Mueller.</u>   Yes.

Mr. <u>Swalwell.</u>    Let's go through the different people associated with the Trump

campaign and this investigation who lied to you and other investigators to cover up their

disloyal and unpatriotic conduct.

If we could put exhibit 8 up.

Director Mueller, I'm showing you campaign chairman Paul Manafort; political

advisor Roger Stone; deputy campaign manager Rick Gates; National Security Advisor

Michael Flynn; Donald Trump's personal attorney, Michael Cohen; and foreign policy

advisor George Papadopoulos.

These six individuals have each been charged, convicted, or lied to your office or

other investigators.    Is that right?

Mr. <u>Mueller.</u>    Yes, although I look askance at Mr. Stone, because he is -- he is in a

different case here in D.C.

Mr. <u>Swalwell.</u>    So National Security Advisor Flynn lied about discussions with the

Russian Ambassador related to sanctions.    Is that right?

Mr. <u>Mueller.</u>   That's correct.

Mr. <u>Swalwell.</u>    Michael Cohen lied to this committee about Trump Tower

Moscow.    Is that correct?

Mr. <u>Mueller.</u>   Yes.

Mr. <u>Swalwell.</u>    George Papadopoulos, the President's senior foreign policy

advisor, lied to the FBI about his communications about Russia's possession of dirt on

Hillary Clinton.    Is that right?

Mr. <u>Mueller.</u>   Yes.

Mr. <u>Swalwell.</u>    The President's campaign chairman, Paul Manafort, lied about meetings that he had with someone with ties to Russian intelligence.    Is that correct?

Mr. <u>Mueller.</u>    That's true.

Mr. <u>Swalwell.</u>    And your investigation was hampered by Trump campaign officials' use of encryption communications.    Is that right?

Mr. <u>Mueller.</u>    We believe that to be the case.

Mr. <u>Swalwell.</u>    You also believe to be the case that your investigation was hampered by the deletion of electronic messages.    Is that correct?

Mr. <u>Mueller.</u>    It would be, yes.    And, generally, any case would be if those kinds of communications are used.

Mr. <u>Swalwell.</u>    For example, you noted that deputy campaign manager Rick Gates, who shared internal campaign polling data with a person with ties to Russian intelligence at the direction of Manafort, that Mr. Gates deleted those communications on a daily basis.    Is that right?

Mr. <u>Mueller.</u>    I take your word -- I'd say I don't know specifically, but if it's in the report, then I support it.

Mr. <u>Swalwell.</u>    That's right, Director.    It's Volume I, page 136.

Mr. <u>Mueller.</u>    Thank you.

Mr. <u>Swalwell.</u>    In addition to that, other information was inaccessible because your office determined it was protected by attorney-client privilege.    Is that correct?

Mr. <u>Mueller.</u>    That is true.

Mr. <u>Swalwell.</u>    That would include that you do not know whether communications between Donald Trump and his personal attorneys Jay Sekulow, Rudy Giuliani, and others discouraged witnesses from cooperating with the government.    Is that right?

Mr. <u>Mueller.</u>   I'm not going to talk to that.

Mr. <u>Swalwell.</u>   That would also mean that you can't talk to whether or not pardons were dangled through the President's attorneys because -- the shield of attorney-client privilege.

Mr. <u>Mueller.</u>   I'm not going to discuss that.

Mr. <u>Swalwell.</u>   Did you want to interview Donald Trump, Jr.?

Mr. <u>Mueller.</u>   I'm not going to discuss that.

Mr. <u>Swalwell.</u>   Did you subpoena Donald Trump, Jr.?

Mr. <u>Mueller.</u>   And I'm not going to discuss that.

Mr. <u>Swalwell.</u>   Did you want to interview the President?

Mr. <u>Mueller.</u>   Yes.

Mr. <u>Swalwell.</u>   Director Mueller, on January 1, 2017, through March 2019, Donald Trump met with Vladimir Putin in person 6 times, called him 10 times, and exchanged 4 letters with him.   Between that time period, how many times did you meet with Donald Trump?

Mr. <u>Mueller.</u>   I'm not going to get into that.

Mr. <u>Swalwell.</u>   He did not meet with you in person.   Is that correct?

Mr. <u>Mueller.</u>   He did not.

Mr. <u>Swalwell.</u>   As a result of lies, deletion of text messages, obstruction, and witness tampering, is it fair to say that you were unable to fully assess the scope and scale of Russia's interference in the 2016 election and Trump's role in that interference?

Mr. <u>Mueller.</u>   I'm not certain I would adopt that characterization in total.   There may be pieces of it that are accurate, but not in total.

Mr. <u>Swalwell.</u>   But you did state in Volume I, page 10, that "while this report embodies factual and legal determinations that the Office believes to be accurate and

complete to the greatest extent possible, given these identified gaps, the Office cannot

rule out the possibility that the unavailable information would shed additional light."   Is

that correct?

Mr. Mueller.   That is correct.   We don't know what we don't know.

Mr. Swalwell.   Why is it so important that witnesses cooperate and tell the truth

in an investigation like this?

Mr. Mueller.   Because the testimony of the witnesses goes to the heart of just

about any criminal case you have.

Mr. Swalwell.   Thank you.

And, Mr. Chairman, I'd yield back.

And thank you, Director Mueller.

The Chairman.   Ms. Stefanik.

Ms. Stefanik.   Thank you, Mr. Chairman.

Mr. Mueller, as special counsel, did you review documents related to the origin of

the counterintelligence investigation into the Trump campaign?

Mr. Mueller.   On occasion.

Ms. Stefanik.   Was the Steele dossier one of those documents that was

reviewed?

Mr. Mueller.   And I can't discuss that case.

Ms. Stefanik.   I'm just asking a process question.   Have you read the Steele

dossier?

Mr. Mueller.   And, again, I'm not going to respond to that.

Ms. Stefanik.   You were tasked, as special counsel, to investigate whether there

was collusion between Russia and the Trump campaign associates to interfere with the

2016 election.   And the FBI, we know, has relevant documents and information related

to the opening of the CI investigation.    Were you and your team permitted to access all of those documents?

Mr. <u>Mueller.</u>    And, again, I can't get into that investigative -- what we collected and what we're doing with investigation materials.

Ms. <u>Stefanik.</u>    Let me ask it this way.    Was there any limitation in your access to documents related to the counterintelligence investigation?

Mr. <u>Mueller.</u>    That's such a broad question.    I have real trouble answering it.

Ms. <u>Stefanik.</u>    Did the Special Counsel's Office undertake any effort to investigate and verify or disprove allegations contained in the Steele dossier?

Mr. <u>Mueller.</u>    Again, I can't respond.

Ms. <u>Stefanik.</u>    The reason I'm asking, for the American public that is watching, it's apparent that the Steele dossier formed part of the basis to justify the FBI's counterintelligence investigation into Russian interference in the 2016 election.    As we know, it was used to obtain a FISA warrant on Carter Page.    This is why I'm asking these questions.

Did your office undertake any efforts to identify Steele's sources or sub-sources?

Mr. <u>Mueller.</u>    Again, the same answer.

Ms. <u>Stefanik.</u>    Were these tasks referred to any other agencies?

[2:35 p.m.]

Mr. Mueller.   Again, I can't speak to it.

Ms. Stefanik.   Did your office consider whether the Russian Government used Steele's sources to provide Steele with disinformation?

Mr. Mueller.   Again, I can't speak to that.

Ms. Stefanik.   I understand.   I'm asking these questions just for the record, so thanks for your patience.

Shifting gears here, did any member of the Special Counsel's Office staff travel overseas as part of the investigation?

Mr. Mueller.   Yes, but I can't go further than that.

Ms. Stefanik.   I'm going to ask, to which countries?

Mr. Mueller.   And I can't answer that.

Ms. Stefanik.   Did they meet with foreign government officials?

Mr. Mueller.   Again, it's out of our bailiwick.

Ms. Stefanik.   Did they meet with foreign private citizens?

Mr. Mueller.   Again, same response.

Ms. Stefanik.   Did they seek information about a U.S. citizen or any U.S. citizens?

Mr. Mueller.   Again, territory that I cannot go to.

Ms. Stefanik.   Thank you for answering on the record.   These are important questions for the American public, and we're hopeful that the IG is able to answer these questions.

I will yield the balance of my time to the ranking member.

Mr. Nunes.   I thank the gentlelady for yielding.

Mr. Mueller, I want to go back to -- we started off with Joseph Mifsud, who is at

the center of this investigation.    He appears in your report a dozen times or more.    He really is the epicenter.    He's at the origin of this.    He's the man who supposedly knows about Clinton's emails.

You've seen on the screen, the Democrats have continually put up all the prosecutions that you made against Trump campaign officials and others, but I'm struggling to understand why you didn't indict Joseph Mifsud, who seems to be the man in the middle of all of this.

Mr. Mueller.    Well, I think you understand that you cannot get into either classified or law enforcement information without a rationale for doing it.    And I have said all I'm going to be able to say with regard to Mr. Mifsud.

Mr. Nunes.    Were you aware of Kathleen Kavalec's involvement, that she had met with Mr. Steele?    The State Department official.

Mr. Mueller.    And, again, I can't respond to that question.    It's outside my jurisdiction.

Mr. Nunes.    Okay.

The Carter Page FISA warrant was re-upped three times.    The last time it was re-upped was under your watch.    So were you in the approval process of that last time that the Carter Page warrant was --

Mr. Mueller.    Well, I can't speak specifically about that warrant, but if you ask was I in the approval chain, the answer is no.

Mr. Nunes.    Okay.    That's very helpful.

Thank you, Mr. Chairman.    I yield back.

The Chairman.    Mr. Castro.

Mr. Castro.    Thank you, Chairman.

Thank you, Special Counsel Mueller, for your testimony and for your service to our

country.

Donald Trump, over the years, has surrounded himself with some very shady people, people that lied for him, people that covered up for him, people that helped him enrich himself.    I want to talk specifically about one of those instances that's in your report.

Specifically, let's turn to the Trump Tower Moscow project, which you described in your report as a, quote, "highly lucrative deal" for The Trump Organization.    Is that right?

Mr. Mueller.    I would have to look at the quote from the report, if you have it.

Mr. Castro.    Sure.    It's on Volume II, page 135.    It's described as highly lucrative.

Mr. Mueller.    Okay.    I have it.    Thank you, sir.

Mr. Castro.    Yeah.    No problem.

Your office prosecuted Michael Cohen -- and Michael Cohen was Donald Trump's lawyer -- for lying to this committee about several aspects of The Trump Organization's pursuit of the Trump Tower Moscow deal.    Is that right?

Mr. Mueller.    That's correct.

Mr. Castro.    According to your report, Cohen lied to, quote, "minimize links between the project and Trump," unquote, and to, quote, "stick to the party line," unquote, in order not to contradict Trump's public message that no connection existed between Trump and Russia.    Is that right?

Mr. Mueller.    That's -- yes.    That's correct.

Mr. Castro.    Now, when you're talking about the party line here, the party line in this case --

Mr. Mueller.    If I could interject, the one thing I should've said at the outset:    If

it was in the report, then, consequently, I do believe it to be true.

Mr. <u>Castro.</u>   Thank you.

The party line, in this case, was that the deal ended in January 2016.   In other words, they were saying that the deal ended in January 2016, before the Republican primaries.   In truth, though, the deal extended to June 2016, when Donald Trump was already the presumptive Republican nominee.   Is that correct?

Mr. <u>Mueller.</u>   That's correct.

Mr. <u>Castro.</u>   The party line was also that Cohen discussed the deal with Trump only three times, when, in truth, they discussed it multiple times.   Is that right?

Mr. <u>Mueller.</u>   Also true, and the basis for -- and part of the basis for that plea that he entered for lying to this entity.

Mr. <u>Castro.</u>   Thank you.   And thank you for prosecuting that.

The party line was also that Cohen and Trump never discussed traveling to Russia during the campaign, when, in truth, they did discuss it.   Is that right?

Mr. <u>Mueller.</u>   That's accurate.

Mr. <u>Castro.</u>   And the party line was that Cohen never received a response from the Kremlin to his inquiries about the Trump Tower Moscow deal.   In fact, Cohen not only received a response from the Kremlin to his email but also had a lengthy conversation with a Kremlin representative who had a detailed understanding of the project.   Is that right?

Mr. <u>Mueller.</u>   If it's in the report, that is an accurate recitation of that piece of the report.

Mr. <u>Castro.</u>   So you have the candidate Trump at the time saying he had no business dealings with Russia, his lawyer who was lying about it, and then the Kremlin who during that time was talking to President Trump's lawyer about the deal.   Is that

right?

Mr. <u>Mueller.</u>   I can't adopt your characterization.

Mr. <u>Castro.</u>   Not only was Cohen lying on Trump's behalf, but so was the Kremlin. On August 30, 2017, 2 days after Cohen submitted his false statement to this committee claiming that he never received a response to his email to the Kremlin, Vladimir Putin's press secretary told reporters that the Kremlin left the email unanswered.

That statement by Putin's press secretary was false, wasn't it?

Mr. <u>Mueller.</u>   I can't speak to that.

Mr. <u>Castro.</u>   Although it was widely reported in the press.

Mr. <u>Mueller.</u>   Again, I can't speak to that, particularly if it was dependent upon media sources.

Mr. <u>Castro.</u>   But it was consistent with the lie that Cohen had made to the committee.   Is that right?

Mr. <u>Mueller.</u>   I'm not certain I could go that far.

Mr. <u>Castro.</u>   So Cohen, President Trump, and the Kremlin were all telling the same lie.

Mr. <u>Mueller.</u>   I defer to you on that.   That's -- I can't get into the details.

Mr. <u>Castro.</u>   Special Counsel Mueller, I want to ask you something that's very important to the Nation.   Did your investigation evaluate whether President Trump could be vulnerable to blackmail by the Russians because the Kremlin knew that Trump and his associates lied about connections to Russia related to the Trump Tower deal?

Mr. <u>Mueller.</u>   I can't speak to that.

Mr. <u>Castro.</u>   I yield back, Chairman.

The <u>Chairman.</u>   Mr. Hurd.

Mr. <u>Hurd.</u>   Thank you, Mr. Chairman.

Director Mueller, you've been asked many times this afternoon about collusion, obstruction of justice, and impeachment, and the Steele dossier.     And I don't think your answers are going to change if I ask you about those questions.

So I'm going to ask about a couple of press stories, because a lot of what the American people have received about this have been on press stories, and some of that has been wrong, and some of those press stories have been accurate.

On April 13, 2018, McClatchy reported that you had evidence Michael Cohen made a secret trip to Prague during the 2016 Presidential election.     I think he told one of the committees here in Congress that that was incorrect.     Is that story true?

Mr. <u>Mueller.</u>     I can't -- well, I can't go into it.

Mr. <u>Hurd.</u>     Gotcha.

On October 31, 2016, Slate published a report suggesting that a server at Trump Tower was secretly communicating with Russia's Alfa Bank, and then I quote, "akin to what criminal syndicates do."

Do you know if that story is true?

Mr. <u>Mueller.</u>     Do not.     Do not --

Mr. <u>Hurd.</u>     You do not?

Mr. <u>Mueller.</u>     -- know whether it's true.

Mr. <u>Hurd.</u>     So did you not investigate these allegations which are suggestive of a potential Trump-Russia --

Mr. <u>Mueller.</u>     Because I believe it not true doesn't mean it would not be investigated.     It may well have been investigated.     Although my belief at this point, it's not true.

Mr. <u>Hurd.</u>     Good copy.     Thank you.

As a former CIA officer, I want to focus on something I think both sides of the

political aisle can agree on -- that is, how do we prevent Russian intelligence and other adversaries from doing this again.

And after overseeing counterintelligence operations for 12 years as FBI Director and then investigating what the Russians have done in the 2016 election, you've seen tactics, techniques, and results of Russian intelligence operations.

Our committee made a recommendation that the FBI should improve its victim notification process when a person, entity, or campaign has fallen victim to an active-measures attack.    Would you agree with this?

Mr. Mueller.    It sounds like a worthwhile endeavor.    I will tell you, though, that the ability of our intelligence agencies to work together in this arena is perhaps more important than that.    And adopting whatever -- and I'm not that familiar with the legislation -- but whatever legislation will encourage us working together -- by "us," I mean the FBI, CIA, NSA, and the rest -- it should be pursued aggressively, early.

Mr. Hurd.    Who do you think should be responsible within the Federal Government to counter disinformation?

Mr. Mueller.    I'm no longer in the Federal Government, so I --

Mr. Hurd.    But you've had a long, storied career, and I don't think there's anybody who better understands the threat that we are facing than you.    Do you have an opinion as a former FBI officer?

Mr. Mueller.    As to?

Mr. Hurd.    As to who should be the coordinating point within the Federal Government on how to deal with disinformation.

Mr. Mueller.    I don't want to wade in those waters.

Mr. Hurd.    Good copy.

One of the most striking things in your report is that the Internet Research Agency

not only undertook a social media campaign in the U.S. but they were able to organize political rallies after the election.

Our committee issued a report and insight on saying that Russian active measures are growing with frequency and intensity and including their expanded use of groups such as the IRA, and these groups pose a significant threat to the United States and our allies in upcoming elections.    Would you agree with that?

Mr. Mueller.    Yes.    In fact, one of the other areas that we have to look at are many more companies -- not companies -- many more countries are developing capability to replicate what the Russians have done.

Mr. Hurd.    You alluded to making sure all the elements of the Federal Government should be working together.    Do you have a suggestion on a strategy to do that, to counter this disinformation?

Mr. Mueller.    Not overarching.

Mr. Hurd.    In your investigation, did you think that this was a single attempt by the Russians to get involved in our election, or did you find evidence to suggest they will try to do this again?

Mr. Mueller.    Oh, it wasn't a single attempt.    They're doing it as we sit here. And they expect to do it during the next campaign.

Mr. Hurd.    Director Mueller, I appreciate your time and indulging us here in multiple committees.

And I yield back to the ranking member if he has -- I yield back to the chairman.

The Chairman.    Mr. Heck.

Mr. Heck.    Director Mueller, I'd like to go to the motives behind the Trump campaign encouragement and acceptance of help during the election.    Obviously, a clear motivation was to help them in what would turn out to be a very close election.

But there was another key motivation, and that was, frankly, the desire to make money.

I always try to remember what my dad, who never had the opportunity to go beyond the 8th grade, taught me, which is that I should never, ever underestimate the capacity of some people to cut corners and even more in order to worship and chase the almighty buck.

And this is important, because I think it, in fact, does go to the heart of why the Trump campaign was so unrelentingly intent on developing relationships with the Kremlin.

So let's quickly revisit one financial scheme we just discussed, which was the Trump Tower in Moscow.   We indicated earlier that it was a lucrative deal.   Trump, in fact, stood, he and his company, to earn many millions of dollars on that deal, did they not, sir?

Mr. Mueller.   True.

Mr. Heck.   And Cohen, Mr. Cohen, his attorney, testified before this committee that President Trump believed the deal required Kremlin approval.   Is that consistent with what he told you?

Mr. Mueller.   I'm not certain whether it's Mr. Trump himself or others associated with that enterprise that had discussed the necessity of having the input from the state, meaning the Russian Government, in order for it to go forward successfully.

Mr. Heck.   Isn't it also true that Donald Trump viewed his Presidential campaign, as he told top campaign aides, that the campaign was an infomercial for The Trump Organization and his properties?

Mr. Mueller.   I'm not familiar with that.

Mr. Heck.   Then let's turn to Trump campaign chair Paul Manafort.   Did, in fact, your investigation find any evidence that Manafort intended to use his position as

Trump's campaign chair for his own personal financial benefit?

Mr. Mueller.   I would say there was some indication of that, but I won't go further.

Mr. Heck.   I think you'll find it on page 135 of Volume I.

During the transition, Trump's son-in-law, Jared Kushner, met with Sergey Gorkov, the head of a Russian-owned bank that was under -- is under U.S. sanctions.   And according to the head of the bank, he met with Kushner in his capacity as CEO of Kushner Companies to discuss business opportunities.

Is that correct, sir?

Mr. Mueller.   I'm not certain --

Mr. Heck.   It was --

Mr. Mueller.   I'm not certain about that.   Let me just put it that way.

Mr. Heck.   It was asserted thusly in your report, Volume I, on pages 161 and 162. Your report notes that, at the time, Kushner Companies were trying to renegotiate a billion-, with a "B," a billion-dollar lease of their flagship building at 666 5th Avenue, correct?

Mr. Mueller.   I am not familiar with those financial arrangements.

Mr. Heck.   Also on page 162 where Kushner Companies, it was asserted, had debt obligations coming due on the company.

Erik Prince, a supporter close to Trump --

Mr. Mueller.   A supporter -- I'm sorry.

Mr. Heck.   -- campaign and administrative --

Mr. Mueller.   I just -- a supporter.   I was --

Mr. Heck.   Yes.   He met in the Seychelles during the transition with Kirill Dmitriev, who was the head of a sanctioned Russian Government investment arm which

had close ties to Vladimir Putin, correct, sir?

    Mr. <u>Mueller.</u>   Yes.

    Mr. <u>Heck.</u>   Your investigation determined that Mr. Prince had not known nor conducted business with Dmitriev before Trump won the election, correct?

    Mr. <u>Mueller.</u>   Well, I defer to the report on that.

    Mr. <u>Heck.</u>   Yet -- it does.   And yet Prince, who had connections to top Trump administration officials, met with Dmitriev during the transition period to discuss business opportunities, among other things.

But it wasn't just Trump and his associates who were trying to make money off this deal, nor hide it, nor lie about it.   Russia was too.   That was the whole point, to gain relief from sanctions which would hugely benefit their incredibly wealthy oligarchs.

For example, sanctions relief was discussed at that June 9 meeting in the Trump Tower, was it not, sir?

    Mr. <u>Mueller.</u>   Yes.   But it was not a main subject for discussion.

    Mr. <u>Heck.</u>   Trump administration National Security Advisor-designate Michael Flynn also discussed sanctions in a secret conversation with the Russian Ambassador, did he not?

    Mr. <u>Mueller.</u>   Correct.

    Mr. <u>Heck.</u>   So, to summarize, Donald Trump, Michael Cohen, Paul Manafort, Jared Kushner, Erik Prince, and others in the Trump orbit all tried to use their connections with The Trump Organization to profit from Russia, which was openly seeking relief from sanctions.   Is that true, sir?

    Mr. <u>Mueller.</u>   I'm not -- I'm not certain I can adopt what you articulate.

    Mr. <u>Heck.</u>   Well, I will.   And I'd further assert that was not only dangerous, it was un-American.   Greed corrupts.   Greed corrupts, and it is a terrible foundation for

developing American foreign policy.

The <u>Chairman.</u>    Mr. Ratcliffe.

Mr. <u>Ratcliffe.</u>    Director Mueller, given your constraints on what you're able or allowed to answer with respect to counterintelligence matters or other matters that are currently open and under investigation, you're not going to be able to answer my remaining questions.

So I thank you for your courtesies in the answers that you have given to my prior questions, and I do thank you for your extraordinary career and record of service, and yield back the balance of my time to the ranking member.

Mr. <u>Mueller.</u>    Thank you.

Mr. <u>Nunes.</u>    Thank you, Mr. Ratcliffe.

And, Mr. Mueller, let me associate my words with Mr. Ratcliffe.

I've got a few more questions.    I want to clean up a little bit about the Erik Prince Seychelles meeting.

So Erik Prince testified before this committee that he was surveilled by the U.S. Government and that information from this surveillance was leaked to the press.    Did you investigate whether Prince was surveilled and whether classified information on him was illegally leaked to the media?

Mr. <u>Mueller.</u>    Did you say "did you" or "will you"?

Mr. <u>Nunes.</u>    Well, I know you can't.    I know you're not going to join --

Mr. <u>Mueller.</u>    So I can't discuss it either way.

Mr. <u>Nunes.</u>    -- back up in the ranks.    But did you refer -- were you aware that -- you know, Prince has made these allegations that he was surveilled.    He's concerned that there were leaks about the surveillance.    Did you make any referrals about these leaks?

Mr. <u>Mueller.</u>   No, and I can't get into discussion on it.

Mr. <u>Nunes.</u>   Okay.

I also want to -- General Flynn.   I know you came after the leak of his phone call with the Russian Ambassador.   Your time at FBI, it would be a major scandal, wouldn't it, for the leak of the National Security Advisor and anyone in any government --

Mr. <u>Mueller.</u>   I can't -- I can't adopt that hypothesis.

Mr. <u>Nunes.</u>   Did your report name any people who were acting as U.S. Government informants or sources without disclosing that fact?

Mr. <u>Mueller.</u>   I can't answer that.

Mr. <u>Nunes.</u>   Okay.

On Volume I, page 133 of your report, you state that Konstantin Kilimnik has ties to Russian intelligence.   His name came up quite often today.   But your report omits to mention that Kilimnik has long-term relationships with U.S. Government officials, including our own State Department.

Mr. <u>Mueller.</u>   I can't be -- I can't get into that.

Mr. <u>Nunes.</u>   I know it's not in the report, but, you know, if Kilimnik is being used in the report to say that he was possibly some type of Russian agent, then I think it is important for this committee to know if Kilimnik has ties to our own State Department, which it appears that he does.

Mr. <u>Mueller.</u>   Again, it's the same territory that I'm loathe to get into.

Mr. <u>Nunes.</u>   Okay.

You were asked this earlier about Trump attorney John Dowd, that pieces of his phone call were omitted from the report.   It was what Mr. Dowd calls exculpatory evidence.

Are you concerned about --

Mr. <u>Mueller.</u>   I'm not certain I would agree with that characterization.

Mr. <u>Nunes.</u>   Okay.

Mr. <u>Mueller.</u>   I think I said that before.

Mr. <u>Nunes.</u>   Yes.

An American citizen from the Republic of Georgia, who your report misidentifies as a Russian, claims that your report omitted parts of a text message he had with Michael Cohen about stopping the flow of compromising tapes of Donald Trump.   In the omitted portions, he says he did not know what the tapes actually showed.

Was that portion of the exchange left out of the report for a reason?

Mr. <u>Mueller.</u>   No.   We got an awful lot into the report, but we did not get every intersection or conversation and the like.   So I am not familiar with that particular episode you're talking about.

Mr. <u>Nunes.</u>   Thank you, Mr. Mueller.

And thank you, Mr. Chairman.

The <u>Chairman.</u>   Mr. Welch.

Mr. <u>Welch.</u>   Director Mueller, did you find there was no collusion between the Trump campaign and Russia?

Mr. <u>Mueller.</u>   Well, we don't use the word "collusion."   I think the word we usually use is the -- well, not "collusion" but one of the other terms that fills in when "collusion" is not used.

In any event, we decided not to use the word "collusion" inasmuch as it has no relevance to the criminal law arena.

Mr. <u>Welch.</u>   The term is "conspiracy" that you prefer to use?

Mr. <u>Mueller.</u>   That's it, "conspiracy."   Exactly right.

Mr. <u>Welch.</u>   You help me, I'll help you.

Mr. <u>Mueller.</u>    Thank you.

Mr. <u>Welch.</u>    It's an agreement.    Thank you.

And, in fact, you had to then make a charging decision after your investigation where, unless there was enough evidence to prove beyond a reasonable doubt, you wouldn't make a charge, correct?

Mr. <u>Mueller.</u>    Generally, that's the case.

Mr. <u>Welch.</u>    But making that decision does not mean your investigation failed to turn up evidence of conspiracy.

Mr. <u>Mueller.</u>    Absolutely correct.

Mr. <u>Welch.</u>    And, in fact, I will go through some of the significant findings that your exhaustive investigation made.

You found, as I understand it, that from May 2016 until the end of the campaign, campaign chairman Mr. Manafort gave private polling information to Russian agents, correct?

Mr. <u>Mueller.</u>    Correct.

The <u>Chairman.</u>    Could you speak into the microphone?

Mr. <u>Mueller.</u>    Yep, I will.    My apologies.

Mr. <u>Welch.</u>    Thank you.

And your investigation found that, in June 2016, Donald Trump, Jr., made an arrangement to meet at Trump Tower, along with Jared Kushner and others, expecting to receive dirt on the Hillary Clinton campaign, correct?

Mr. <u>Mueller.</u>    Correct.

Mr. <u>Welch.</u>    And you found in your investigation that, on July 27, candidate Trump called on Russia to hack Hillary Clinton's emails, something that for the first time they did about 5 hours later, correct?

Mr. <u>Mueller.</u>   That's correct.

Mr. <u>Welch.</u>   And you also found that, on August 2, Mr. Manafort met with a person tied to Russian intelligence, Mr. Kilimnik, and gave him internal campaign strategy, aware that Russia was intending to do a misinformation social media campaign, correct?

Mr. <u>Mueller.</u>   I'm not certain of the tie there.

Mr. <u>Welch.</u>   But the fact of that meeting you agree with?

Mr. <u>Mueller.</u>   The fact that the meeting took place is accurate.

Mr. <u>Welch.</u>   And your investigation, as I understand it, also found that, in late summer of 2016, the Trump campaign in fact devised its strategy and messaging around WikiLeaks releases of materials that were stolen from the Democratic National Committee, correct?

Mr. <u>Mueller.</u>   Is that from the report?

Mr. <u>Welch.</u>   Yes.

Mr. <u>Mueller.</u>   Yes.

Mr. <u>Welch.</u>   It's according to Mr. Gates.

Mr. <u>Mueller.</u>   Yes.

Mr. <u>Welch.</u>   Yes.   Thank you.

And you also talked earlier about the finding in your investigation that, in September and October of 2016, Donald Trump, Jr., had email communications with WikiLeaks, now indicted, about releasing information damaging to the Clinton campaign, correct?

Mr. <u>Mueller.</u>   True.

Mr. <u>Welch.</u>   All right.

So I understand you made the decision, a prosecutorial decision, that this would not rise to proof beyond a reasonable doubt.   But I ask if you share my concern.   And

my concern is:    Have we established a new normal from this past campaign that is going

to apply to future campaigns so that if any one of us running for the U.S. House, any

candidate for the U.S. Senate, any candidate for the Presidency of the United States,

aware that a hostile foreign power is trying to influence an election, has no duty to report

that to the FBI or other authorities --

     Mr. Mueller.    Well, I hope --

     Mr. Welch.    -- that -- go ahead.

     Mr. Mueller.    Well, I hope this is not the new normal, but I fear it is.

     Mr. Welch.    -- and would, in fact, have the ability without fear of legal

repercussion to meet with agents of that foreign entity hostile to the American election?

     Mr. Mueller.    I'm sorry.    What is the question?

     Mr. Welch.    Is that an apprehension that you share with me?

     Mr. Mueller.    Yes.

     Mr. Welch.    And that there would be no repercussions whatsoever to Russia if

they did this again.    And as you stated earlier, as we sit here, they're doing it now.    Is

that correct?

     Mr. Mueller.    You're absolutely right.

     Mr. Welch.    Do you have any advice to this Congress as to, together, what we

should do to protect our electoral system and accept responsibility on our part to report

to you or your successor when we're aware of hostile foreign engagement in our

elections?

     Mr. Mueller.    I would say, a basis -- first line of defense, really, is the ability of the

various agencies who have some piece of this to not only share information but share

expertise, share targets, and use the full resources that we have to address this problem.

     Mr. Welch.    Thank you, Director Mueller.

I yield back.

The <u>Chairman.</u>    Mr. Maloney.

Mr. <u>Maloney.</u>    Mr. Mueller, thank you.    I know it's been a long day.    And I want to make clear how much respect I have for your service and for your extraordinary career, and I want you to understand my questions in that context, sir.

I'm going to be asking you about Appendix C to your report and, in particular, the decision not to do a sworn interview with the President.    It's really the only subject I want to talk to you about, sir.

Why didn't you subpoena the President?

Mr. <u>Mueller.</u>    Well, at the outset, after we took over and initiated the investigation --

Mr. <u>Maloney.</u>    If I could ask you to speak into the mike.

Mr. <u>Mueller.</u>    Yeah.    Of course.

At the outset, after we took over the investigation and began it and pursued it, quite obviously, one of the things we anticipated wanting to accomplish in that is having the interview of the President.    We negotiated with him for a little over a year, and I think what you adverted to in the appendix lays out our expectations as a result of those negotiations.

But, finally, when we were almost towards the end of our investigation and we'd had little success in pushing to get the interview of the President, we decided that we did not want to exercise the subpoena powers because of the necessity of expediting the end of the investigation.

Mr. <u>Maloney.</u>    Was that -- excuse me.    Did you --

Mr. <u>Mueller.</u>    I was going to say, the expectation was, if we did subpoena the President, he would fight the subpoena and we would be in the midst of the investigation

for a substantial period of time.

Mr. <u>Maloney.</u>    Right.

But as we sit here, you've never had an opportunity to ask the President in-person questions under oath.    And so, obviously, that must have been a difficult decision.    And you're right; Appendix C lays that out.    And, indeed, I believe you describe the in-person interview as vital.    That's your word.

And, of course, you make clear you had the authority and the legal justification to do it.    As you point out, you waited a year, you put up with a lot of negotiations, you made numerous accommodations, which you lay out, so that he could prepare and not be surprised.    I take it you were trying to be fair to the President.

And, by the way, you were going to limit the questions, when you got to written questions, to Russia only.    And, in fact, you did go with written questions after about 9 months, sir, right?    And the President responded to those.

And you have some hard language for what you thought of those responses. What did you think of the President's written responses, Mr. Mueller?

RPTR FORADORI

EDTR HOFSTAD

[3:05 p.m.]

Mr. Mueller.   Certainly not as useful as the interview would be.

Mr. Maloney.   In fact, you pointed out, and by my count, there were more than 30 times when the President said he didn't recall, he didn't remember, no independent recollection, no current recollection.

And I take it by your answer that it wasn't as helpful.   That's why you used words like "incomplete," "imprecise," "inadequate," "insufficient."   Is that a fair summary of what thought of those written answers?

Mr. Mueller.   That is a fair summary.   And I presume that comes from the report.

Mr. Maloney.   And yet, sir -- and I ask this respectfully -- by the way, the President didn't ever claim the Fifth Amendment, did he?

Mr. Mueller.   I'm not going to talk to that.

Mr. Maloney.   Well, from what I can tell, sir, at one point it was vital and then at another point it wasn't vital.   And my question to you is, why did it stop being vital?

And I can only think of three explanations.   One is that somebody told you you couldn't do it.   But nobody told you you couldn't subpoena the President.   Is that right?

Mr. Mueller.   No.   We understood we could subpoena the President.

Mr. Maloney.   Rosenstein didn't tell you, Whitaker didn't tell you, Barr didn't tell you you couldn't --

Mr. Mueller.   We could serve a subpoena.

Mr. Maloney.   So the only other explanation -- well, there's two others, I guess:

one, that you just flinched, that you had the opportunity to do it and you didn't do it.
But, sir, you don't strike me as the kind of guy who flinches.

Mr. Mueller.    I'd hope not.

Mr. Maloney.    Well, then the third explanation -- I hope not, too, sir.    And the
third explanation I can think of is that you didn't think you needed it.

And, in fact, what caught my eye was page 13 of Volume II, where you said, in fact,
you had a substantial body of evidence.    And you cite a bunch of cases there, don't you,
about how you often have to prove intent to obstruct justice without an in-person
interview.    That's the kind of nature of it.    And you used terms like "a substantial body
of evidence," "significant evidence" of the President's intent.

So my question, sir, is did you have sufficient evidence of the President's intent to
obstruct justice, and is that why you didn't do the interview?

Mr. Mueller.    Well, there's a balance -- in other words, how much evidence you
have that satisfy the last element against how much time are you willing to spend in the
courts litigating the interview of the President.

Mr. Maloney.    And, in this case, you felt that you had enough evidence of the
President's intent.

Mr. Mueller.    We had to make a balanced decision in terms of how much
evidence we had compared to the length of time it would take to do the --

Mr. Maloney.    And, sir, because I have limited time, you thought that if you gave
it to the Attorney General or to this Congress that there was sufficient evidence, that it
was better than that delay.

Mr. Mueller.    Can you state that again?

Mr. Maloney.    Well, that it was better than the delay to present the sufficient
evidence -- your term -- of the President's intent to obstruct justice to the Attorney

General and to this committee.     Isn't that why you didn't do the interview?

Mr. <u>Mueller.</u>   No.   The reason we didn't do the interview is because of the length of time that it would take to resolve the issues attendant to that.

Mr. <u>Maloney.</u>   Thank you, sir.

The <u>Chairman.</u>   Mrs. Demings.

Mrs. <u>Demings.</u>   Thank you so much, Mr. Chairman.

And, Director Mueller, thank you so much for being a person of honor and integrity.   Thank you for your service to the Nation.   We are certainly better for it.

Director Mueller, I, too, want to focus on the written responses that the President did provide and the continued efforts to lie and cover up what happened during the 2016 election.

Were the President's answers submitted under oath?

Mr. <u>Mueller.</u>   Yes.   Yes.

Mrs. <u>Demings.</u>   Thank you.   They were.

Were these all the answers your office wanted to ask the President about Russian interference in the 2016 election?

Mr. <u>Mueller.</u>   No, not necessarily.

Mrs. <u>Demings.</u>   So there were other --

Mr. <u>Mueller.</u>   Yes.

Mrs. <u>Demings.</u>   -- questions that you wanted to answer.

Did you analyze his written answers on Russian interference to draw conclusions about the President's credibility?

Mr. <u>Mueller.</u>   No.   It was perhaps one of the factors, but nothing more than that.

Mrs. <u>Demings.</u>   It was one of the factors.   So what did you determine about the

President's credibility?

Mr. <u>Mueller.</u>   And that I can't get into.

Mrs. <u>Demings.</u>   Director Mueller, I know based on your decades of experience you've probably had an opportunity to analyze the credibility of countless witnesses, but you weren't able to do so with this witness?

Mr. <u>Mueller.</u>   Well, with every witness, particularly a leading witness, one assesses the credibility day by day, witness by witness, document by document.   And that's what happened in this case.   So we started with very little, and, by the end, we ended up with a fair amount.   My -- yeah, a fair amount.

Mrs. <u>Demings.</u>   Thank you.   Well, let's go through some of the answers to take a closer look at his credibility, because it seems to me, Director Mueller, that his answers were not credible at all.

Did some of President Trump's incomplete answers relate to Trump Tower Moscow?

Mr. <u>Mueller.</u>   Yes.

Mrs. <u>Demings.</u>   For example, did you ask the President whether he had at any time directed or suggested that discussions about Trump Moscow project should cease?

Mr. <u>Mueller.</u>   Should what?

Mrs. <u>Demings.</u>   Cease.

Mr. <u>Mueller.</u>   Do you have a citation?

Mrs. <u>Demings.</u>   Yes.   We're still in Appendix C, section 1-7.

Mr. <u>Mueller.</u>   The first page?

Mrs. <u>Demings.</u>   Uh-huh.   It says:   "The President 'did not answer whether he had at any time directed or suggested that discussions about the Trump Moscow project should cease...but he has since made public comments about that topic.'"

Mr. <u>Mueller.</u>   Okay.   And the question was?

Mrs. <u>Demings.</u>   Did the President -- let me go on to the next.   Did the President fully answer that question in his written statement to you about the Trump Moscow project ceasing?   Again, in Appendix C.

Mr. <u>Mueller.</u>   And can you direct me to the particular paragraph you're adverting to?

Mrs. <u>Demings.</u>   It would be Appendix C, C-1.   But let me move forward.

Nine days after he submitted his written answers, didn't the President say publicly that he, quote, "decided not to do the project," unquote?   And that is in your report.

Mr. <u>Mueller.</u>   I'd ask you, if you would, to point out the particular paragraph that you're focused on.

Mrs. <u>Demings.</u>   Okay.   We can move on.

Did the President answer your followup questions?   According to the report, there were followup questions because of the President's incomplete answers about the Moscow project.   Did the President answer your followup questions, either in writing or orally?

And we're now in --

Mr. <u>Mueller.</u>   No.

Mrs. <u>Demings.</u>   -- Volume II, page 150 through 151.

Mr. <u>Mueller.</u>   No.

Mrs. <u>Demings.</u>   He did not.

In fact, there were many questions that you asked the President that he simply didn't answer.   Isn't that correct?

Mr. <u>Mueller.</u>   True.

Mrs. <u>Demings.</u>   And there were many answers that contradicted other evidence

you had gathered during the investigation.    Isn't that correct --

Mr. Mueller.    Yes.

Mrs. Demings.    -- Director Mueller?

Director Mueller, for example, the President, in his written answers, stated he did not recall having advance knowledge of WikiLeaks releases.    Is that correct?

Mr. Mueller.    I think that's what he said.

Mrs. Demings.    But didn't your investigation uncover evidence that the President did, in fact, have advance knowledge of WikiLeaks public releases of emails damaging to his opponent?

Mr. Mueller.    And I can't get into that area.

Mrs. Demings.    Did your investigation determine after very careful vetting of Rick Gates and Michael Cohen that you found them to be credible?

Mr. Mueller.    That we found the President to be credible?

Mrs. Demings.    That you found Gates and Cohen to be credible in their statements about WikiLeaks?

Mr. Mueller.    Those areas I'm not going to discuss.

Mrs. Demings.    Okay.

Could you say, Director Mueller, that the President was credible?

Mr. Mueller.    I can't answer that question.

Mrs. Demings.    Director Mueller, isn't it fair to say that the President's written answers were not only inadequate and incomplete, because he didn't answer many of your questions, but where he did, his answers showed that he wasn't always being truthful?

Mr. Mueller.    There I would say generally.

Mrs. Demings.    Generally.

Director Mueller, it's one thing for the President to lie to the American people about your investigation, falsely claiming that you found no collusion or no obstruction. But it's something else altogether for him to get away with not answering your questions and lying about them.    And as a former law enforcement officer of almost 30 years, I find that a disgrace to our criminal justice system.

Thank you so --

Mr. Mueller.    Thank you, ma'am.

Mrs. Demings.    -- much.

I yield back to the chairman.

The Chairman.    Mr. Krishnamoorthi.

Mr. Krishnamoorthi.    Director Mueller, thank you for your devoted service to your country.

Earlier today, you described your report as detailing a criminal investigation, correct?

Mr. Mueller.    Yes.

Mr. Krishnamoorthi.    Director, since it was outside the purview of your investigation, your report did not reach counterintelligence conclusions regarding the subject matter of your report.

Mr. Mueller.    That's true.

Mr. Krishnamoorthi.    For instance, since it was outside your purview, your report did not reach counterintelligence conclusions regarding any Trump administration officials who might potentially be vulnerable to compromise or blackmail by Russia, correct?

Mr. Mueller.    Those decisions probably were made in a counter -- in the FBI.

Mr. Krishnamoorthi.    But not in your report, correct?

Mr. <u>Mueller.</u>   Not in our report.   We advert to the counterintelligence goals of our investigation, which were secondary to any criminal wrongdoing that we could find.

Mr. <u>Krishnamoorthi.</u>   Let's talk about one administration official in particular -- namely, President Donald Trump.   Other than Trump Tower Moscow, your report does not address or detail the President's financial ties or dealings with Russia, correct?

Mr. <u>Mueller.</u>   Correct.

Mr. <u>Krishnamoorthi.</u>   Similarly, since it was outside your purview, your report does not address the question of whether Russian oligarchs engaged in money laundering through any of the President's businesses, correct?

Mr. <u>Mueller.</u>   Correct.

Mr. <u>Krishnamoorthi.</u>   And, of course, your office did not obtain the President's tax returns, which could otherwise show foreign financial sources, correct?

Mr. <u>Mueller.</u>   I'm not going to speak to that.   I'm not going to speak to that.

Mr. <u>Krishnamoorthi.</u>   In July 2017, the President said his personal finances were off limits or outside the purview of your investigation, and he drew a, quote/unquote, "red line" around his personal finances.

Were the President's personal finances outside the purview of your investigation?

Mr. <u>Mueller.</u>   I'm not going to get into that.

Mr. <u>Krishnamoorthi.</u>   Were you instructed by anyone not to investigate the President's personal finances?

Mr. <u>Mueller.</u>   No.

Mr. <u>Krishnamoorthi.</u>   Mr. Mueller, I'd like to turn your attention to counterintelligence risks associated with lying.

Individuals can be subject to blackmail if they lie about their interactions with

foreign countries, correct?

Mr. <u>Mueller.</u>   True.

Mr. <u>Krishnamoorthi.</u>   For example, you successfully charged former National Security Advisor Michael Flynn of lying to Federal agents about his conversations with Russian officials, correct?

Mr. <u>Mueller.</u>   Correct.

Mr. <u>Krishnamoorthi.</u>   Since it was outside the purview of your investigation, your report did not address how Flynn's false statements could pose a national security risk because the Russians knew the falsity of those statements, right?

Mr. <u>Mueller.</u>   I cannot get into that mainly because there are many elements of the FBI that are looking at different aspects of that issue.

Mr. <u>Krishnamoorthi.</u>   Currently?

Mr. <u>Mueller.</u>   Currently.

Mr. <u>Krishnamoorthi.</u>   Thank you.

As you noted in Volume II of your report, Donald Trump repeated five times in one press conference, Mr. Mueller, in 2016, quote, "I have nothing to do with Russia."

Of course, Michael Cohen said Donald Trump was not being truthful because, at this time, Trump was attempting to build Trump Tower Moscow.

Your report does not address whether Donald Trump was compromised in any way because of any potential false statements that he made about Trump Tower Moscow, correct?

Mr. <u>Mueller.</u>   I think that's right.   I think that's right.

Mr. <u>Krishnamoorthi.</u>   Director Mueller, I want to turn your attention to a couple other issues.

You've served as FBI Director during three Presidential elections, correct?

Mr. Mueller.    Yes.

Mr. Krishnamoorthi.    And during those three Presidential elections, you have never initiated an investigation at the FBI looking into whether a foreign government interfered in our elections the same way you did in this particular instance, correct?

Mr. Mueller.    I would say I, personally, no.    But the FBI, quite obviously, has the -- how you defense an attack such as the Russians undertook in 2016.

Mr. Krishnamoorthi.    Now, Director Mueller, is there any information you'd like to share with this committee that you have not so far today?

Mr. Mueller.    Boy, that's a broad question.    And it'd take me a while to get an answer to it, but I'll say:    No.

Mr. Krishnamoorthi.    Mr. Mueller, you said that every American should pay very close attention to the systematic and sweeping fashion in which the Russians interfered in our democracy.

Are you concerned that we are not doing enough currently to prevent this from happening again?

Mr. Mueller.    Well, I'll speak generally and what I said in my opening statement this morning and here, that, no, much more needs to be done in order to protect against this intrusion, not just by the Russians but others as well.

Mr. Krishnamoorthi.    Thank you, Director.

The Chairman.    We have two 5-minute periods remaining, Mr. Nunes and myself.

Mr. Nunes, you are recognized.

Mr. Nunes.    Mr. Mueller, it's been a long day for you.    And you've had a long, great career.    I want to thank you for your longtime service, starting in Vietnam, obviously in the U.S. Attorney's Office, Department of Justice, and the FBI.    And I want to thank you for doing something you didn't have to do; you came here upon your own

free will.    And we appreciate your time today.

With that, I yield back.

Mr. <u>Mueller.</u>    Thank you, sir.

The <u>Chairman.</u>    Director Mueller, I want to, to close out my questions, turn to some of the exchange you had with Mr. Welch a bit earlier.    I'd like to see if we can broaden the aperture at the end of the hearing.

From your testimony today, I gather that you believe that knowingly accepting foreign assistance during a Presidential campaign is an unethical thing to do.

Mr. <u>Mueller.</u>    And a crime --

The <u>Chairman.</u>    And a crime.

Mr. <u>Mueller.</u>    -- in certain circumstances.    Yes.

The <u>Chairman.</u>    And to the degree it undermines our democracy and our institutions, we can agree that it's also unpatriotic.

Mr. <u>Mueller.</u>    True.

The <u>Chairman.</u>    And wrong.

Mr. <u>Mueller.</u>    True.

The <u>Chairman.</u>    The standard of behavior for a Presidential candidate or any candidate, for that matter, shouldn't be merely whether something is criminal; they should be held to a higher standard.    You would agree?

Mr. <u>Mueller.</u>    I will not get into that because it goes to the standards to be applied by other institutions besides ours.

The <u>Chairman.</u>    Well, I'm just referring to ethical standards.    We should hold our elected officials to a standard higher than mere avoidance of criminality, shouldn't we?

Mr. <u>Mueller.</u>    Absolutely.

The <u>Chairman.</u>   You have served this country for decades.   You've taken an oath to defend the Constitution.   You hold yourself to a standard of doing what's right.

Mr. <u>Mueller.</u>   I would hope.

The <u>Chairman.</u>   You have.   I think we can all see that.   And befitting the times, I'm sure your reward will be unending criticism.   But we are grateful.

The need to act in an ethical manner is not just a moral one but, when people act unethically, it also exposes them to compromise, particularly in dealing with foreign powers.   Is that true?

Mr. <u>Mueller.</u>   True.

The <u>Chairman.</u>   Because when someone acts unethically in connection with a foreign partner, that foreign partner can later expose their wrongdoing and extort them?

Mr. <u>Mueller.</u>   True.

The <u>Chairman.</u>   And that conduct, that unethical conduct, could be of a financial nature if you have a financial motive or an elicit business dealing.   Am I right?

Mr. <u>Mueller.</u>   Yes.

The <u>Chairman.</u>   But it can also just involve deception.   If you're lying about something that can be exposed, then you can be blackmailed.

Mr. <u>Mueller.</u>   Also true.

The <u>Chairman.</u>   In the case of Michael Flynn, he was secretly doing business with Turkey, correct?

Mr. <u>Mueller.</u>   Yes.

The <u>Chairman.</u>   And that could open him up to compromise, that financial relationship?

Mr. <u>Mueller.</u>   I presume.

The <u>Chairman.</u>   He also lied about his discussions with the Russian Ambassador.

And since the Russians were on the other side of that conversation, they could've exposed that, could they not?

Mr. Mueller.   Yes.

The Chairman.   If a Presidential candidate was doing business in Russia and saying he wasn't, Russians could expose that too, could they not?

Mr. Mueller.   I leave that to you.

The Chairman.   Well, let's look at Dmitry Peskov, the spokesperson for the Kremlin, someone that the The Trump Organization was in contact with to make that deal happen.

Your report indicates that Michael Cohen had a long conversation on the phone with someone from Dmitry Peskov's office.   Presumably the Russians could record that conversation, could they not?

Mr. Mueller.   Yes.

The Chairman.   And so, if Candidate Trump was saying "I have no dealings with the Russians" but the Russians had a tape recording, they could expose that, could they not?

Mr. Mueller.   Yes.

The Chairman.   That's the stuff of counterintelligence nightmares, is it not?

Mr. Mueller.   Well, it has to do with counterintelligence and the need for a strong counterintelligence entity.

The Chairman.   It does indeed.

And when this was revealed, that there were these communications notwithstanding the President's denials, the President was confronted about this, and he said two things:   first of all, "That's not a crime."   But I think you and I have already agreed that that shouldn't be the standard, right, Mr. Mueller?

Mr. <u>Mueller.</u>   True.

The <u>Chairman.</u>   And the second thing he said was, "Why should I miss out on all those opportunities?"   I mean, why indeed, merely running a Presidential campaign, why should you miss out on making all that money, was the import of his statement.

Were you ever able to ascertain whether Donald Trump still intends to build that tower when he leaves office?

Mr. <u>Mueller.</u>   Was that a question, sir?

The <u>Chairman.</u>   Yes.   Were you able to ascertain -- because he wouldn't answer your questions completely -- whether or if he ever ended that desire to build that tower?

Mr. <u>Mueller.</u>   I'm not going to speculate on that.

The <u>Chairman.</u>   If the President was concerned that if he lost his election, he didn't want to miss out on that money, might he have the same concern about losing his reelection and --

Mr. <u>Mueller.</u>   Again --

The <u>Chairman.</u>   -- missing out on that money?

Mr. <u>Mueller.</u>   -- speculation.

The <u>Chairman.</u>   The difficulty with this, of course, is we are all left to wonder whether the President is representing us or his financial interests.

That concludes my questions.

Mr. Nunes, do you have any concluding remarks?

Mr. <u>Nunes.</u>   I don't.

The <u>Chairman.</u>   Director Mueller, let me close by returning to where I began. Thank you for your service, and thank you for leading this investigation.

The facts you set out in your report and have elucidated here today tell a disturbing tale of a massive Russian intervention in our election, of a campaign so eager

to win, so driven by greed that it was willing to accept the help of a hostile foreign power in a Presidential election decided by a handful of votes in a few key States.

Your work tells of a campaign so determined to conceal their corrupt use of foreign help that they risked going to jail by lying to you, to the FBI, and to Congress about it.    And, indeed, some have gone to jail over such lies.

And your works speaks of a President who committed countless acts of obstruction of justice that, in my opinion and that of many other prosecutors, had it been anyone else in the country, they would've been indicted.

Notwithstanding the many things you have addressed today and in your report, there were questions you could not answer given the constraints you're operating under.

You would not tell us whether you would've indicted the President but for the OLC opinion that you could not.    And so the Justice Department will have to make that decision when the President leaves office, both as to the crime of obstruction of justice and as to the campaign finance fraud scheme that Individual 1 directed and coordinated and for which Michael Cohen went to jail.

You would not tell us whether the President should be impeached, nor did we ask you, since it is our responsibility to determine the proper remedy for the conduct outlined in your report.    Whether we decide to impeach the President in the House or we do not, we must take any action necessary to protect the country while he is in office.

You would not tell us the results or whether other bodies looked into Russian compromise in the form of money laundering, so we must do so.

You would not tell us whether the counterintelligence investigation revealed whether people still serving within the administration pose a risk of compromise and should never have been given a security clearance, so we must find out.

We did not bother to ask whether financial inducements from any Gulf nations

were influencing U.S. policy since it is outside the four corners of your report, and so we must find out.

But one thing is clear from your report, your testimony, from Director Wray's statements yesterday:    The Russians massively intervened in 2016, and they are prepared to do so again in voting that is set to begin a mere 8 months from now.    The President seems to welcome the help again, and so we must make all efforts to harden our elections infrastructure, to ensure there is a paper trail for all voting, to deter the Russians from meddling, to discover it when they do, to disrupt it, and to make them pay.

Protecting the sanctity of our elections begins, however, with the recognition that accepting foreign help is disloyal to our country, unethical, and wrong.    We cannot control what the Russians do, not completely, but we can decide what we do and that this centuries-old experiment we call American democracy is worth cherishing.

Director Mueller, thank you again for being here today.    And before I adjourn, I would like to excuse you and Mr. Zebley.

Everyone else, please remain seated.

This hearing is adjourned.

[Whereupon, at 3:30 p.m., the committee was adjourned.]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff,*

v.

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

*Defendant.*

Case No. 1:19-cv-2379 (KBJ)

# Exhibit F

8/5/2019                  Department of Justice Issues Statement on Testimony of Former FBI Director James Comey | OPA | Department of Justice

Case 1:19-cv-02379-KBJ   Document 22-3   Filed 08/26/19   Page 295 of 589

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                    Thursday, June 8, 2017

## Department of Justice Issues Statement on Testimony of Former FBI Director James Comey

In response to testimony given today by former FBI Director James Comey, Department of Justice Spokesman Ian Prior issued the following statement:

- Shortly after being sworn in, Attorney General Sessions began consulting with career Department of Justice ethics officials to determine whether he should recuse himself from any existing or future inve tigation  of any matter  related in any way to the campaign  for Pre ident of the United State

Those discussions were centered upon 28 CFR 45.2, which provides that a Department of Justice attorney should not participate in investigations that may involve entities or individuals with whom the attorney has a political or personal relationship. That regulation goes on to define "political relationship" as:

"[A] close identification with an elected official, a candidate (whether or not successful) for elective, public office, a political party, or a campaign organization, ari ing from  ervice a  a principal advi er thereto or a principal official thereof ***"

Given Attorney General Sessions' participation in President Trump's campaign, it was for that reason, and that reason alone, the Attorney General made the decision on March 2, 2017 to recuse himself from any existing or future investigations of any matters related in any way to the campaigns for President of the United States.

- In hi  te timony, Mr  Comey  tated that he wa  "not *** aware of" "any kind of memorandum i ued from the Attorney General or the Department of Justice to the FBI outlining the parameters of [the Attorney General'  ] recu al " However, on March 2, 2017, the Attorney General'  Chief of Staff  ent the attached email specifically informing Mr. Comey and other relevant Department officials of the recusal and its parameters, and advising that each of them instruct their staff "not to brief the Attorney General *** about, or otherwise involve the Attorney General *** in, any such matters described."

- During hi  te timony, Mr  Comey confirmed that he did not inform the Attorney General of hi  concern about the substance of any one-on-one conversation he had with the President. Mr. Comey said, following a morning threat briefing, that he wanted to en ure he and hi  FBI  taff were following proper communications protocol with the White House. The Attorney General was not silent; he responded to thi  comment by  aying that the FBI and Department of Ju tice needed to be careful about following appropriate policies regarding contacts with the White House.

- De pite previou  inaccurate media report , Mr  Comey did not  ay that he ever a ked anyone at the Department of Justice for more resources related to this investigation.

- In conclusion, it is important to note that after his initial meeting with career ethics officials regarding recusal (and including the period prior to his formal recusal on March 2, 2017), the Attorney General has not been briefed on or participated in any investigation within the scope of his recusal.

---

**Component(s):**
<u>Office of the Attorney General</u>

**Press Release Number:**
17-631

*Updated June 8, 2017*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff,*

v.

Case No. 1:19-cv-2379 (KBJ)

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

*Defendant.*

# Exhibit O

RPTR JOHNSON

EDTR ZAMORA


LESSONS FROM THE MUELLER REPORT, PART III:

"CONSTITUTIONAL PROCESSES FOR ADDRESSING

PRESIDENTIAL MISCONDUCT"

Friday, July 12, 2019

House of Representatives,

Committee on the Judiciary,

Washington, D.C.


The committee met, pursuant to call, at 9:10 a.m., in Room 2141, Rayburn House Office Building, Hon. Jerrold Nadler [chairman of the committee] presiding.

Present:  Representatives Nadler, Lofgren, Jackson Lee, Cohen, Johnson of Georgia, Deutch, Bass, Cicilline, Swalwell, Lieu, Raskin, Jayapal, Demings, Scanlon, Garcia, Neguse, Stanton, Dean, Mucarsel-Powell, Escobar, Collins, Gohmert, Jordan, Gaetz, Johnson of Louisiana, Biggs, McClintock, Lesko, Cline, Armstrong, and Steube.

Staff Present:  Arya Hariharan, Deputy Chief Oversight Counsel; David Greengrass, Senior Counsel; Lisette Morton, Director Policy,

Planning and Member Services; Madeline Strasser, Chief Clerk; Moh

Sharma, Member Services and Outreach Advisor; Susan Jensen,

Parliamentarian/Senior Counsel; Sophie Brill, Counsel; Matt Morgan,

Counsel; Brendan Belair, Minority Staff Director; Bobby Parmiter,

Minority Deputy Staff Director/Chief Counsel; Jon Ferro, Minority

Parliamentarian/General Counsel; Paul Taylor, Minority Chief Counsel,

Constitution Subcommittee; and Andrea Woodard, Minority Professional

Staff Member.

Chairman <u>Nadler.</u>  The Judiciary Committee will please come to order.  Without objection, the chair is authorized to declare recesses of the committee at any time.

We welcome everyone to today's hearing on Lessons from the Mueller Report, Part III:  Constitutional Processes for Addressing Presidential Misconduct.

I will now recognize myself for an opening statement.

The title of today's hearing is Lessons from the Mueller Report, Part III:  Constitutional Processes for Addressing Presidential Misconduct.  As many of you may already know, the subtitle is a quote taken directly from Volume II of the Mueller report where the special counsel describes why he did not reach a, quote, prosecutorial judgment, close quote, regarding President Trump's conduct.

There the special counsel explained that as an attorney operating within the Department of Justice, he is bound by Department policy, including an Office of Legal Counsel opinion that asserts that a President is immune from prosecution while in office.

The special counsel, quote, recognized that a Federal criminal accusation against a sitting President would place burdens on the -- undue burdens on the -- or burdens on the President's capacity to govern, close quote.  Yet the Mueller report also acknowledged that such an accusation could, quote, potentially preempt constitutional processes for addressing Presidential misconduct, close quote.

The special counsel's mention of these constitutional processes

should not be taken lightly.  It goes to the heart of Congress' role in our constitutional system of checks and balances, and that is the subject of today's hearing.

As the Mueller report's frequent references to Congress make clear, Congress has a role in investigating the potential Presidential misconduct he uncovered so that it may determine how best to exercise its Article I authorities to act as check on the abuse or misuse of executive branch power.

In light of its jurisdiction and past precedent, this committee in particular has a constitutional duty to investigate allegations of misconduct by executive branch officials, including the President of the United States, and is currently investigating allegations of abuse of power, public corruption, and obstruction of justice within the Trump administration.

The purpose of this hearing is to examine the range of constitutional remedies available for addressing Presidential misconduct under its authority Article I authorities.  Today's discussion will aid the committee in determining the remedies available to it as the investigation unfolds.

Under its Article I authorities, Congress has a number of responses to Presidential misconduct available to it.  With regard to the committee's responsibility to determine whether to recommend Articles of Impeachment against the President, Articles of Impeachment are already -- I'm sorry -- Articles of Impeachment are under consideration as part of the committee's investigation, although no

final determination has made.

In addition, the committee has the authority to recommend its own Articles of Impeachment for consideration by the full House of Representatives.

The committee seeks documentary evidence and intends to conduct hearings with Mr. McGahn and other critical witnesses testifying before us.   That is necessary to determine whether the committee should recommend Articles of Impeachment or any other Article I remedies, and, if so, in what form.

The committee is also considering other responses to the conduct under investigation.   While censure of the President is rare, Congress has previously passed measures expressing disagreement with specific Presidential conduct.   The committee is considering several pieces of legislation that would address the allegations of misconduct uncovered by the special counsel's investigation and other serious policy concerns raised by the Mueller report.

Legislative proposals to determine misconduct described in the Mueller report include measures that would increase transparency with regard to White House communications concerning law enforcement investigations.   Those proposals also include measures to impose additional safeguards to protect the integrity and independence of future special counsel investigations.

The committee also has been referred proposals to amend the Constitution to limit the scope of executive clemency and legislation to increase transparency regarding Presidential pardons, which

responds to additional fact patterns described in the report.

Volume I of the Mueller report also documented numerous troubling contacts between the Trump campaign and individuals associated with the Russian Government.  As a result, several Members have introduced legislation that would impose a duty on campaigns to report their contacts with foreign governments.

With regard to possible criminal, civil, or administrative referrals, the Justice Department has discretion as to whether to act upon a referral by Congress for prosecution or civil enforcement.  As even DOJ policy acknowledges, a President is not immune from criminal prosecution after leaving office, and I have introduced legislation that would toll the statute of limitations on Federal offenses during a President's term in office.

State authorities may also enforce State laws against the President.  The congressional referral process serves the important purpose of creating a record and preserving evidence for such time as prosecution, civil enforcement, or other administrative response is feasible.

The committee cannot, however, determine which Article I remedies are appropriate without first ascertaining all of the relevant facts, and it cannot do so when the administration refuses to cooperate with legitimate congressional oversight.  That is why today's hearing will also give the committee the opportunity to consider the lawfulness of the administration's efforts to limit congressional oversight requests.

The Trump administration has asserted that several current and former government officials are, quote, absolutely immune, unquote, from having to comply with congressional subpoenas for testimony. However, the only court to ever consider such claims rejected them in a case involving this very committee's past effort to seek information about inappropriate White House involvement in the firing of several U.S. attorneys.

In addition to asserting claims of absolute immunity, in quotes, the White House has instructed several witnesses not to comply with the committee's duly issued subpoenas for documents or to answer questions on the basis that the documents and answers are subject to executive privilege or would otherwise, quote, implicate constitutionally based executive branch confidentiality interests, close quote.  Needless to say, these assertions raise a host of problematic legal and constitutional issues.

We have a distinguished panel of witnesses who can help us sort through the various constitutional processes implicated by the Mueller report, and I look forward to hearing their testimony.

It is now my pleasure to recognize the ranking member of the Judiciary Committee, the gentleman from Georgia, Mr. Collins, for his opening statement.

[The statement of Chairman Nadler follows:]


******** COMMITTEE INSERT ********

Mr. <u>Collins.</u>   Thank you, Mr. Chairman.

I was sorry I was -- for a moment, I was -- you ever have one of those dreams, and there have been movies about this.  You have a dream that you wake up and you're back in school, you're back in high school. For me, it was back in Ms. McCall's class in North Hall High School government, American Government class.  And it's the proper role of government and the different checks and balances and, you know, what is Congress' role and what's the President's role and what's the judiciary's role.

We can stop this hearing right now, because the chairman just laid out all of the congressional routes and avenues that Congress has to it.  And we're going to have a time -- and I'm glad the panel's here. Y'all are great folks.  You've got scholarly work.  We're going to hear some, you know, wonderful things.  But we've stopped right here.  The problem is we're just dragging this on.

It's not that you want to come to impeachment.  The chairman talked about impeachment.  If that's what you want to do, then that's the part -- we don't need to discuss is this a constitutional right of Congress to do impeachment.  That is exactly what Congress' right to do.  The constitutional processes are very well addressed in the Constitution and in our processes.

But instead, we come here today to have another almost impeachment hearing but not an impeachment hearing.  We want to get facts; we want to do this.  No, we're just waiting on and on.

I'm trapped back in 9th grade.  Ms. McCall was a wonderful teacher, but I don't want to go back through it again.  This is black and white.  We know this problem here.

So what are we not doing?  Instead of this morning at 9 o'clock on a Friday, on a fly-out day, when we are actually -- the chairman and I have a bill on the floor here in just a little bit that actually touches real people's lives in New York from the 9/11 fund, which is a very valid thing that we need to be doing.

Yesterday, we spent this entire committee time arguing over subpoenas and the discussion on the border, but yet why wouldn't we use this 9 o'clock time to actually have a markup of actual immigration bills such as mine that addresses border issues?  Now, you may discuss agree with what I propose, but that's what markups are for.  That's what actually is taking this time.  And you have a bill.  Put your bills up.  Let's actually get to actually solving real issues instead of having theoretical college discussions on what is Congress' power.  If we don't know what Congress' power is now, this hearing is not going to help us.  In fact, it's ridiculous.

Legislation.  I agree with the chairman.  The chairman talked about election -- which actually the Mueller report actually found election interference.  Why aren't we putting those bills forward instead of having our authority taken over by the House Admin Committee on election bills because they don't want to run it through here?  Let's solve problems.

Process.  Here's our biggest thing from yesterday.  And maybe

this is it, is what the process is.  We know what the process is.  The majority just can't find their way to figure out what they want to do with that process.

And so next week, we have Robert Mueller coming in here, and the whole bottom row is disenfranchised, for the most part.  I guess there is some more negotiations going on.  I've read that in the media.  Maybe I need to call Chairman Schiff and make sure that that was okay, because they were undoubtedly driving this ship, because they all get to talk next week.  My side doesn't and neither does the Democratic side get to talk.  It disenfranchises Florida, it disenfranchises North Dakota, it disenfranchises everyone.

But instead of that, we're doing this.  It just, frankly, boggles the mind.  But I will say this:  If there's anybody on this committee -- and there are very wonderful people on both sides of this committee who are very, very intelligent.  And you can ask your questions today, and we can talk about the constitutional process, and you have got some great folks here to talk to you about it.

But in all due respect, we know what the constitutional process is here.  We just want to dance around it so we can keep another round of stories going that the Judiciary Committee is pursuing harassment and doing what it needs to do to make sure this administration is held accountable because we don't like him.

The economy is good, life is going better, and we don't like it because we don't like the November 2016 election.  That's all this is about.  We found that out again yesterday.  We're going to find it out

again this morning.

So for everybody who didn't get to the wonderful ability to be in Ms. McCall's 9th grade American Government class at North Hall High School, this may be your opportunity.  Get your hornbooks out, get your study books out.  This is going to be a constitutional process of what we already know is our processes, but we're going to have some experts tell us what those processes are.

Mr. Chairman, there's a lot of things you could be calling today. This isn't one of them.  Why don't we actually take up real legislation to fix the border crisis, to fix the issues that we all talk up about here?  Instead, we have hearings.

Our body is to actually legislate.  You and I have legislated before.  Let's start legislating and stop the show.  But it is again -- the popcorn is cooking.  It's time, as I've always said, let the show begin.

I yield back.

[The statement of Mr. Collins follows:]


******** COMMITTEE INSERT ********

Chairman Nadler.  Thank you, Mr. Collins.

And I will now introduce today's witnesses.

Caroline Fredrickson is president of the American Constitutional Society for Law and Policy.  Previously, she was the director of the American Civil Liberty Union's Washington legislative office, held various positions in the Senate and served in the Clinton administration.

Ms. Fredrickson received her JD from Columbia Law School, in my district, and her BA from Yale University.

John Eastman is the Henry Salvatori Professor of Law and Community Service and the former dean at Chapman University's Dale Fowler School of Law.  He also serves as director of the Center for Constitutional Jurisprudence at the Claremont Institute.  Previously, Dr. Eastman served as a law clerk to Justice Clarence Thomas and to Judge J. Michael Luttig.

Dr. Eastman received his Ph.D. from Claremont Graduate School, his JD from the University of Chicago Law School, and his BA from the University of Dallas.

Michael Gerhardt is the Samuel Ashe Distinguished Professor in Constitutional Law at the University of North Carolina School of Law in Chapel Hill.  Professor Gerhardt served on then President-elect Bill Clinton's Justice Department transition team and drafted the administration's judicial selection policy.  He later served as special counsel to the Clinton administration and the Senate Judiciary

Committee.

Professor Gerhardt received his JD from the University of Chicago Law School, his MS from the London School of Economics, and his BA from Yale University.

We welcome our distinguished witnesses, and we thank you for participating in today's hearing.

Now if you would please rise, I'll begin by swearing you in.

Would you raise your right hands.

Do you swear or affirm under penalty of perjury the testimony you're about to give is true and correct, to the best of your knowledge, information, and belief, so help you God?

Thank you.

Let the record show the witnesses answered in the affirmative. And thank you and please be seated.

Please note that your written statements will be entered into the record in its entirety.  Accordingly, I ask that you summarize your testimony in 5 minutes.  To help you stay within that time, there's a timing light on your table.  When the light switches from green to yellow, you have 1 minute to conclude your testimony.  When the light turns red, it signals your 5 minutes have expired.

Mr. Fredrickson, you may begin -- Ms. Fredrickson -- I'm sorry -- you may begin.

**TESTIMONY OF CAROLINE FREDRICKSON, PRESIDENT, AMERICAN CONSTITUTION SOCIETY; JOHN EASTMAN, HENRY SALVATORI PROFESSOR OF LAW AND COMMUNITY SERVICE AND DIRECTOR, CENTER FOR CONSTITUTIONAL JURISPRUDENCE, CHAPMAN UNIVERSITY, FOWLER SCHOOL OF LAW; AND MICHAEL GERHARDT, SAMUEL ASHE DISTINGUISHED PROFESSOR IN CONSTITUTIONAL LAW, THE UNIVERSITY OF NORTH CAROLINA SCHOOL OF LAW**

TESTIMONY OF CAROLINE FREDRICKSON

Ms. <u>Fredrickson.</u>  Good morning.  Thank you, Mr. Chairman.

My name is Caroline Fredrickson.  I'm the president of the American Constitution Society.

ACS has worked to promote informed public evaluation of the investigations into Russian interference in the 2016 election.  It is with this background that I'm pleased to testify on the constitutional processes for addressing Presidential misconduct.

The final report issued by Special Counsel Robert Mueller on Russian interference in the 2016 election reached several chilling conclusions.  Russia conducted wide-ranging attacks on our Nation's election system.  The Trump campaign had multiple contacts with Russian nationals and did not report these interactions to U.S. authorities.  And there's substantial evidence that President Trump repeatedly attempted to thwart the investigation, including through his unheeded requests to the White House Counsel to fire the special

counsel, create a false paper trail, and make public misrepresentations regarding this incident.

To say these findings are troubling is an understatement.  It is Congress' constitutional duty to respond.  Close examination of how Russia executed these interference strategies is necessary to inform this committee and other committees of jurisdiction how to best tailor a wide range of legislative initiatives on subjects from electronic data protections to the provision of additional funding or resources for U.S. agencies responsible for monitoring and investigating foreign interference, to the integrity of special counsel inquiries, to ensuring limits on political interference with Department of Justice decisionmaking.

Although congressional oversight might eventually lead to impeachment, it does not have to do so.  The Supreme Court has long held that Congress' oversight authorities are inherent in the Article I legislative powers.  These authorities are broad and encompass matters including, quote, the administration of existing laws, proposed or possibly needed statutes, and probes to expose corruption, inefficiency, and waste.  Indeed, the Court has emphasized that oversight is essential to the conduct of government.

This committee has additional constitutional authorities to conduct oversight, under Article I, Section 2, stating that the House of Representatives has the sole power of impeachment.

Congressional investigations often lead to new laws, but some investigations have led Congress to conclude that enacting new laws

is not necessary to address issues identified in the inquiry. Sometimes congressional oversight has led to executive branch reforms. Other times, inquiries into alleged administration corruption have resulted in resignations, referrals, House or Senate resolutions memorializing disapproval of Presidential or other administration misconduct, or impeachment proceedings.

Congressional oversight history is replete with investigations into alleged White House misconduct that did not involve impeachment. Many involved testimony from top White House aides, including White House counsels, chiefs of staff to the President, National Security Advisors, and top advisors to the Vice President and First Lady. Impeachment proceedings have begun without any formal vote of the House.

In addition, for Presidential impeachments, the Judiciary Committee has conducted hearings to determine whether or not to recommend articles to the full House.   In the impeachment of President Nixon, the House Judiciary Committee had been considering Articles of Impeachment for close to a year before there was a full House vote in February 1974.

With respect to the Mueller report and related information, several key unanswered questions demand rigorous congressional review. For example, how can Congress best protect our elections from future attacks by Russia or other hostile nations?  Why did Trump campaign officials, associates, and then-candidate Trump continue to have contact with Russians after becoming aware of the hacking?  Why did

some lie to investigators about these contacts, and why did they suggest publicly that Trump, quote, had nothing to do with Russia?  Does the substantial evidence of obstruction of justice and other misconduct merit further congressional action, including legislation, censure, impeachment, or referrals?  And finally, does the content behind the Mueller report redactions and gaps in evidence suggest any additional wrongdoing by the President or others?

Congress' job has been made substantially harder by the administration's intransigence in resisting congressional oversight at every turn, instructing officials to disobey congressional subpoenas, and invoking broad claims of executive privilege.  And it has gone so far as to claim that this committee even lacks authority to investigate these matters in the first instance.

Given the gravity of the Mueller report conclusions and the related information that has emerged publicly to date, a failure by Congress to examine these issues would constitute an abdication of Congress' fundamental constitutional oversight responsibilities.

Thank you.

[The statement of Ms. Fredrickson follows:]


******** INSERT 1-1 ********

Chairman <u>Nadler.</u>   Thank you.

Dr. Eastman.

**TESTIMONY OF JOHN EASTMAN**

Mr. <u>Eastman.</u>   Thank you, Chairman Nadler and members of the committee.   I'm delighted to be here to participate in this hearing.

But before turning to the substance of my remarks and addressing the precise question you've posed, I think it's important to take issue with the underlying assumption of the hearing contained in the full title of this hearing.

By tying the question of Presidential misconduct to the Mueller report, you imply that the Mueller report identified Presidential misconduct that should trigger whatever constitutional processes might be available.   As a factual matter, I could not disagree more, for I do not find anything in that report even remotely rising to the level that would trigger the one constitutional path designed to address Presidential misconduct, and that's impeachment.

I should also note that this is not the first time the judiciary -- a congressional judiciary committee has considered this question.   In 1998, the Senate Judiciary Committee, Subcommittee on the Constitution, held a hearing on impeachment or indictment.   I commend the proceedings of that hearing to your attention, particularly the extremely persuasive testimony and submitted scholarly work of Yale

law professor, Akhil Amar.   The conclusion he reached then is the same one I reach now, and it is the same one that has been reached by the Office of Legal Counsel in both Democrat and Republican administrations spanning nearly a half a century.

Because of the unique role the Constitution assigns to the Office of President, a sitting President cannot be indicted.   That does not place the President above the law, as some have claimed, but it does recognize that the sole remedy envisioned by the Constitution for illegal conduct by a President, while he is President, is the impeachment process outlined in Article I, Section 3.

As Professor Amar so aptly put it, the grand jury in such a case is the House, the indictment is the Articles of Impeachment, and the Senate is the petit jury.

I won't go through the -- the conclusions of those two OLC reports, other than to very quickly summarize them.   The notion that the President can be himself a criminal defendant in a Federal prosecution would put him on both sides of the criminal prosecution. He is, after all, the Chief Executive of the Nation, responsible for the prosecutorial function of the Federal Government.

It's also true that he has unique official duties that no one else in the government has, most of which, as the OLC report in 2000 under the Clinton administration acknowledged, most of which cannot be exercised by anybody else.   That strongly counseled them, both OLCs, to conclude that the President could not -- not only not be tried or incarcerated if convicted, but not even indicted, because it would

amount to such a fundamental intrusion on his executive duties, and therefore, impact greatly the entire Nation.

But there's a third thing that the OLC report in 2000 offered that I think is even more dispositive:  The President's role as guardian and executor of the 4-year popular mandate expressed in the most recent balloting for the Presidency.  To allow a single prosecutor or a single grand jury regionally drawn in someplace in the country the ability to incapacitate a President who had been chosen through a national election by the people -- by the whole people of the United States is really contrary to our basic system of government.  That's why the OLC concluded the decision to terminate the mandate is more fittingly handled by the Congress than by a jury.

And I think I want to close by looking at those OLC reports.  They focus on the fact that the impeachment process is done by elected Members of Congress who are politically accountable.  And it's that piece that I want to focus on.  Because if there is indeed anything in the Mueller report that rises to the level of treason, bribery, or other high crimes and misdemeanors, then the Members of this body will likely be held accountable politically if the House does not initiate impeachment proceedings.

But the flip side of that coin is also true.  If, as I believe is clearly the case, nothing identified in the Mueller report remotely rises to that level, then the Members of this body who continue to pursue impeachment investigations and even formal impeachment proceedings that manifestly appear to the public to be an attempt to distract the

President from the performance of his constitutional duties, or worse, to negate the results of the 2000 election, then they too should be and likely will be held politically accountable.  That's why the Constitution assigns this awesome oversight authority to this body, but it comes with a political accountability that flows from that.

We can get into the question and answer about the specific instances, but I think that the various instances that are alleged for obstruction of justice or Russia collusion pale in comparison to some of the things we know occurred by the prior administration.  And it's that level of comparison that I think the American people will ultimately choose to make as the political accountability for this committee and every Member of the House of Representative if they continue to pursue these things.

Thank you for your attention.

[The statement of Mr. Eastman follows:]


******** INSERT 1-2 ********

Chairman <u>Nadler.</u>   Thank you.

Professor Gerhardt.


**TESTIMONY OF MICHAEL GERHARDT**


Mr. <u>Gerhardt.</u>   Thank you, Mr. Chairman.

It's an honor to be here today and an honor to participate in today's hearings and to be a part of an important discussion about constitutional processes for Presidential misconduct.

A good place to begin our discussion, I believe, is with the Supreme Court's decision in Nixon v. Fitzgerald, a 1982 decision by the Supreme Court that held that the President is immune to civil lawsuits seeking damages based on his official conduct.

Near the end of its opinion, the Supreme Court talks about -- recognizes a number of other ways in which the Constitution allows for the President to be held accountable for his misconduct.

There are formal mechanisms, for example, such as impeachment, such as congressional oversight, such as popular elections, that allows for considerable opportunity and, in fact, legitimacy for this committee and Congress to consider which, if any, possible ways it wants to consider for holding a President accountable for his misconduct.

There's long history here, but let me cut to the chase.   The first mechanism, congressional oversight, is, of course, a longstanding legitimacy.   The Constitution does not require that this house follow

any particular procedures in trying to determine whether or not and how it may hold a President accountable for his misconduct.  In fact, just the opposite.

Article I, Section 5 of the Constitution vests each body of Congress -- the House, the Senate -- with the authority to determine its own internal rules of governance.  The committee today is doing nothing more than following through in -- following through in accordance with the House rules.  That's all that's happening.  It's as simple as that.

Besides congressional oversight, there are, as we recognize, other mechanisms.  One of them, of course, is impeachment.  I won't dally on that right now, but one thing to recognize about the possibility of impeachment is that the House, and particularly this committee, is fully entitled to consider what evidence there may be on whether a President committed misconduct, but also, what other evidence needs to be determined in order to reach a decision about whether or not to proceed further on any particular process relating to Presidential misconduct.  It's that simple.

The Constitution does not require a series of hoops that this committee has to go through in order to make its determinations about what, if anything, to do with Presidential misconduct.  Just the opposite, as I said.  The Constitution vests considerable authority in each Chamber to determine its rules of governance, and here the committee's following through on that.

Another mechanism we haven't discussed but could is censure.  I

have longed believed that censure is a legitimate option for this committee to consider, if and when it encounters or finds that a President or any other official has engaged in misconduct.  The authority isn't just derived from the fact the Constitution doesn't disallow censure; the authority is established by longstanding traditions and exercise of power within this body.

For example, when Abraham Lincoln was a Member of the House of Representatives, he introduced a resolution criticizing President Polk's initiating, in his opinion, the illegal Mexican War.  His resolution didn't pass, but he did vote for a resolution that did pass 82-81 holding President Polk accountable for unnecessarily initiating an unlawful war.

That's good enough for me.  If President Lincoln thinks it's good enough for the House, I think it's longstanding authority we can follow.

Other mechanisms, of course, involve possible lawsuits.  Civil lawsuits based on unofficial misconduct have been recognized, in Clinton v. Jones, as legitimate and they may proceed.  In addition, of course, there may be the possibility of criminal trials.

One thing to understand about the possibility of criminal trials is, as Dr. Eastman just suggested, that there's a longstanding debate of whether or not a sitting President may be subject to criminal process.  I believe so.  I've set forth my arguments in my written statement.  I won't expound on them here, but I'm happy to answer questions about it.

And, of course, the -- a final thing I hope you'll allow me to

just finish with is something that Raoul Berger, long recognized as one of the great authorities on impeachment, said 30 years ago in The New York Times.  He said by refusing to comply with the subpoenas of the House Judiciary Committee, President Clinton is setting himself above the Constitution.  No President is above the law.  No President can use his authority or any of his powers to thwart the powers of this body and therefore to be above and beyond any accountability to the law.

Thank you very much for the opportunity to be here today.

[The statement of Mr. Gerhardt follows:]


******** INSERT 1-3 ********

Chairman <u>Nadler.</u>  The committee will now stand in recess for 5 minutes, and Democratic members will meet over here and the Republican members on their side.

This will be a 5-minute recess.

[Recess.]

Ms. <u>Scanlon.</u>  [Presiding.]  The committee will now resume.

And we'll now proceed under the 5-minute rule with questions, and I'll begin by recognizing Mr. Collins.

Mr. <u>Collins.</u>  And I thank the chairwoman for doing that.  We've got to go to the floor and take up the 9/11 bill, so I appreciate that. And I won't be long.

But, Mr. Eastman, let's talk just for a moment.  Do you think there's any possibility that this group of attorneys and nonattorneys on this Judiciary Committee have any -- or their staffs have any problem understanding the constitutional role of Congress and oversight of the administration, on any administration?

Mr. <u>Eastman.</u>  I don't know the background of every member, but I think the usual member ought to know the answer to that.

Mr. <u>Collins.</u>  And that would come from just, if nothing else, life growing up and taking, you know, government classes growing up, correct?

One of the things I want to be interested in -- and there's a lot of things that people will talk about today, and we'll get into a lot of different things.  But one of the problems that I've had here -- and

we talk about constitutional process.  We also talk and the professor here talked about our internal processes and going on.  And one of the things that I've just been very disappointed in our committee for the last 6 months is our way we handle subpoenas and the way that we have went through contempt and how we have rushed through this process and how we've instead of -- you're familiar with subpoenas, correct?

Mr. Eastman.  Yes.

Mr. Collins.  And how they should operate.  Has a subpoena ever been -- and from a perception that you ever had, could a -- would a Black's Law Dictionary of a subpoena say that it is an opening to a dialogue?

Mr. Eastman.  No.

Mr. Collins.  Would it ever be said that a subpoena should be to enhance your standing in court?

Mr. Eastman.  No.

Mr. Collins.  Okay.  If that be true, then my question is, do you believe that it hurts us as an institution when we rush through these issues of contempt and subpoena?  And I would love for you to talk about that for a minute.

Mr. Eastman.  Well, look, you know, I want to take up -- I agree with most of what Professor Gerhardt said.  The one point of disagreement I have is I don't think he gave enough credit to the notion that these fights over congressional subpoenas and congressional testimonies by the executive are ones that arise out of a deliberate design function of the Constitution, which is a separation and a

counterbalance of powers.

Yes, the Congress has oversight authority, but there are limits to that authority, and those limits we typically classify generally as executive privilege.  And so most of the fights in our Nation's history over the issuance of subpoenas and the testimony of high-ranking executive officials deal with that counterbalancing authority that the executive has.  Congress cannot, in its oversight capacity, intrude on the executive functions, including the confidentiality of Presidential communications.  And I think that's well established as well.

And the fight, then, is over whether these current round of subpoenas and demands for testimony are really designed to intrude on the executive in an unconstitutional way.  And I think that's where the conversation has to focus.

Mr. Collins.  You talk about conversation and dialogue.  And this is one of the things that I've been in Congress, not my life, but the last 6-1/2 years, and I've noticed the battles that go between both Democrat and Republican administrations in the Hill.  This has been going on forever.

Do you believe it's good -- and I've got several questions.  Do you believe it's good for a committee just to lead, with no conversation with an individual, to lead with a subpoena?

Mr. Eastman.  I don't.  I think there's a lot of negotiation that has historically gone on on those issues.

Mr. Collins.  And we went to the floor for contempt on very

limited terms, especially with the Attorney General in a shortened time here.

The question that I would have here is -- if you look at this from a judge's perspective, when they say -- and we talk about -- and by the way, this committee seems to be unique in this, because other committees, such as the Intel Committee, actually negotiated and began to get stuff in the proper way of back and forth and back and forth. When we go to -- if we were to try and enforce one of these contempts that we have done with lack of foundation, lack of background, do you believe it hurts this committee and this institution as a whole?

Mr. Eastman.  I think it would certainly undermine the claims in the court that the subpoenas or the efforts were made in good faith, and that would certainly undermine any -- any court's plan on giving enforcement effort to those things.

Mr. Collins.  I appreciate it.  I know in my home county  of Hall County, my judges would look at me and say go back and do your job before you bring it to me.

So with that, I do appreciate the chair's indulgence.  And with that, I'll yield back.

Ms. Scanlon.  Okay.  Thank you.

The chair recognizes Representative Lofgren for 5 minutes.

Ms. Lofgren.  Thanks very much.

I think this is an important hearing.  I noted the ranking member's comment that we should be taking up other subjects instead of this one.  And I can't help but recall that the Democrats, in terms

of election security, as a first order of business, introduced H.R. 1 about election security and got no help from the minority party.   And my own bill, the SAFE Act, that we just passed 2 weeks ago to harden election systems got only one Republican vote.   So I think that's a bit disingenuous.

Let me talk about the OLC opinion.   I've been interested in that for some time, and I'm wondering whether, Ms. Fredrickson or Mr. Gerhardt, you believe that the OLC opinion would cover activities -- criminal activities for any President that occurred prior to that President assuming office.

For example, Spiro Agnew was -- left his position for bribery that was engaged in while he was in Maryland, before he was Vice President.

What is your view on that?

Ms. Fredrickson.   Well, I think -- just say two quick things, and then I think Professor Gerhardt probably has a more thorough answer.

It's a -- one thing is that I think the Vice President is not covered.

Ms. Lofgren.   No, I understand that.   I just meant that as an example.

Ms. Fredrickson.   But I think that's just one of the weaknesses of the OLC opinion, is it does seem to indicate that -- insulate a President from judicial process in a way that I think is not consistent with the rule of law as understood by the Founders.

Ms. Lofgren.   One of the questions I've had, if I can throw at you, in addition, Professor Gerhardt, is, is there any limit to this?

Let's say some day in the future, President A is annoyed with the Vice President, pulls out a gun, shoots the Vice President in the head in the Oval Office.  That would be a Federal crime.  Would that President A in the future be immune from prosecution?

     Mr. Gerhardt.  I hope -- I hope not.  And I respectfully disagree with the OLC opinion.  Obviously, OLC does fantastic work.  They're not right about everything.  Everybody is subject to scrutiny.  And in this case, I think they got it wrong.

     I've long thought that the President is not special.  Everybody in government is subject to criminal process.  And should anybody in government commit a crime, they're not entitled to any immunity.  I think that's the Constitution we have.

     In fact, to go back to your earlier question about whether or not a President -- we can just -- let's keep it hypothetical -- commits a crime before he is elected and nobody knows about it.  If we find out about it later, it's -- it becomes almost absurd to imagine that the country has to somehow sit tight for 4 or 8 years until he leaves office before he is subject to a criminal trial.  If that crime has any relationship to his election, and it almost certainly does because it would have affected people's votes to know about it, then I think the Constitution gets turned on its head.

     Ms. Lofgren.  Let me ask you this.  In terms of the OLC opinion, obviously they're just looking at Federal prosecutions.  We have 50 States.  If the President A shoots somebody who is not a Federal official, in a State, that would be a violation of State law.

Would -- do you believe that the Constitution prohibits a State prosecution of a President for a State law violation?

Mr. Gerhardt.  I don't believe it does, but I also should just point out, for the record, that this committee and this House of Representatives has confronted this issue already, to some extent, in the case of Thomas Porteous.

Ms. Lofgren.  Right.

Mr. Gerhardt.  Thomas Porteous was a Federal district judge who nobody knew --

Ms. Lofgren.  We were on the committee during the impeachment, so --

Mr. Gerhardt.  I won't go into details, if you don't want, but I think they're quite pertinent.  The point is he committed criminal misconduct before he entered his office as a Federal district judge.  He didn't tell the Senate about it, and that turned out basically to be fraud against the Senate and was the basis for his impeachment.

Ms. Lofgren.  Let me just ask a final question.  If the DOJ opinion is correct, it seems a logical extension is that the Federal prosecutors could not be expected to actually investigate a President.

When you think back to the Nixon impeachment, Jaworski was -- you know, provided information to the Congress.  Certainly, Ken Starr provided us information.  I was on the committee at that time.  Presumably, that would not be permitted if you could not prosecute a sitting President.

Is that -- what do you think of that?

Ms. <u>Scanlon.</u>  Time has expired, but you can answer.

Mr. <u>Gerhardt.</u>  Well, I think if a prosecutor finds evidence of obstruction, for example, then that may be an appropriate time to consider the propriety and legitimacy of criminal process.

I think that no one -- the very principle of no one being above the law means just what it says.  Nobody's above the law.  A President can't obstruct an impeachment, you know, a House committee looking into the possibility of whatever misconduct he has committed, because if he could do that, then he really is above the law.

Ms. <u>Lofgren.</u>  Thank you.  My time has expired.

Ms. <u>Scanlon.</u>  Thank you.

The chair recognizes the gentleman from Florida for 5 minutes.

Mr. <u>Gaetz.</u>  Thank you, Madam Chair.

Mr. Eastman, you've commented on the potential harms that can come with a special counsel that's unbridled.  Is there anything you'd like to add to that?

Mr. <u>Eastman.</u>  Well, I mean, you know, I want to pick up on something that Professor Gerhardt said, the notion that the President would be above the law.  One of the things that has troubled me about the OLC opinions, which I think are correct, is that potential criminal liability may not exist at all for a sitting President for conduct either -- criminal conduct either while in office or before, given the statute of limitations problems.

Both OLC memos recommended to Congress that they could address that issue, and I would encourage you to do so.  That would ensure that

no President is above the law at the end of the day.   But it would also
ensure -- and I think this is what the OLC memos are both based on,
and they would apply whether the criminal conduct occurred while in
office or before -- the unique responsibilities of the President in
our system of government and the ability of a single prosecutor or a
single grand jury to interfere with that.   And I think that's why the
OLC memos are correct.

But to remedy the one shortcoming from that, you could address
the statute of limitations thing.   And I think Chairman Nadler in his
opening statement mentioned that that was one of the things that might
be worth considering.   And I would endorse that.

I do think, though, that the reasoning of the OLC memos,
implicitly in the first one and explicitly in the second, also extends,
although for different -- not separation of powers reasons, but for
federalism reasons, to State authorities being able to indict the
President.   And I think they're right about that as well.   That door
is closed as well for the same reasons that a Federal indictment against
the President, while he is sitting, is closed.

And I think that's right.   It's a balancing act.   But the
balance, given the unique nature of the President's role and the unique
nature of his election, the only one, save for the Vice President, who
is elected nationally, those two things have contributed to this
immunity that OLCs of both sides of the political aisle have recognized,
like I said earlier, over a span of 50 years.

That doesn't keep the President off the hook, but it does shift

the discussion to a politically accountable body where people can be held to account if they abuse the investigative process.

Mr. Gaetz.   You made mention of the President's unique powers and how they interface with an analysis of proper versus improper conduct, and you also make reference to the dealing with Director Comey.  Is there anything you'd like to add on that front?

Mr. Eastman.   Well, you know, something that Chairman Nadler said in his opening that I disagree with, and I think is important to get out here, one of the pieces of legislation that is being considered is to expose White House communications with the Department of Justice to identify whether the President is having any role in prosecutorial decisions.  I think that idea fundamentally misunderstands the nature of Article II of the Constitution, which says the executive power, all of it, is vested in the President of the United States.

The Attorney General, in its prosecutorial functions at the Department of Justice, holds that power derivatively from the President.  The FBI, in its investigative power, holds that power derivatively from the President.  The notion that the President can't be the one to make the prosecutorial or the investigative decisions is to completely undermine that core aspect of Article II.  And so I think that idea is just simply misguided.

Now, if the President decided that Director Comey -- and I outline in my testimony why I think both sides of the political aisle in Congress were upset enough with Mr. Comey to have warranted removing him long before the President did, but the President had that authority himself.

And, you know, I don't think that -- exercising an authority that he constitutionally has rises to the level of obstruction of justice.

Mr. Gaetz.  Thank you, Madam Chair.  I yield back.

Ms. Scanlon.  The chair recognizes the gentlewoman from Texas for 5 minutes.

Ms. Jackson Lee.  I thank the chair very much.

I'm going to read partly a statement by the former -- by former Federal prosecutors.  And I would also like to add, having been here in 1998 and also for a number of impeachment proceedings regarding Federal judges, when Mr. Starr handed our friends on the other side of the aisle the Starr report, they immediately began impeachment proceedings.  That was the historical record that was created.  I don't know if they were concerned about any factual basis other than the Starr report.

In this instance, we are meticulously listening to scholars and interviewing individuals by way of subpoena and building -- the building blocks of the constitutional process and as well the building blocks of the understanding of the American people.

Each of us believes that the conduct of President Trump described in Special Counsel Robert Mueller's report would, in the case of any other person not covered by the Office of Legal Counsel policy against indicting a sitting President, result in multiple felony charges for obstruction of justice.  They recount the President's efforts to fire Mueller and to falsify evidence about that report, about that effort, the President's efforts to limit the scope of Mueller's investigation

to exclude his conduct, and the President's effort to prevent witnesses from cooperating with investigators probing him and his campaign.

Professor Fredrickson, do you find agreement with 1,025 prosecutors, the possibility of such?

Ms. Fredrickson.  Well, I have to say I've never been a prosecutor, but I think it's a very impressive list of some of our Nation's most illustrative prosecutors who have engaged in lengthy careers.  And I think -- I take what they say very seriously.  I think it is very important for this committee to go further and examine the allegations that were laid out in the Mueller report.

Ms. Jackson Lee.  Thank you.

And I ask the chairwoman to ask unanimous consent to place the statement by former Federal prosecutors, part of what I just read, 1,025 indicate that the President would be subject to felony charges if he was not the President of the United States.

Let me also make mention --

Ms. Scanlon.  Without objection.

[The information follows:]


******** COMMITTEE INSERT ********

Ms. Jackson Lee.  Thank you very much -- of H. Res. 396, Resolution of Investigation, Professor Gerhardt -- and welcome to all of you, by the way, thank you so very much for your presence.  It recounts -- it's under our rules 6 and 7 of House practices -- it is an instruction for the Judiciary Committee to investigate.  But included in the resolution, it indicates various elements of investigation, violation of the Foreign Emoluments Clause of the United States Constitution, violation of the Domestic Emoluments Clause of the United States Constitution, obstruction of justice, abuse of power, misfeasance in public office, malfeasance in public office, failure to protect the confidentiality of national secrets from enemies, foreign and domestic -- just a litany similar almost to one -- Articles of Impeachment.

But let me ask you this.  In your written testimony, you note that the theme that clearly emerges from early discussions of the scope of impeachable offenses are that they are not neatly delineated but depend on context and gravity, of which the responsibility of this is housed in the Judiciary Committee, and not all crimes are impeachable and not all impeachable offenses are crimes.

But I would ask you, is impeachment limited to criminal acts?

Mr. Gerhardt.  Not at all, Congresswoman.  In fact, it's important to understand that one of the most -- that a significant theme in the Constitutional Convention was that when the delegates thought of possible impeachable offenses, they were trying to figure out the

scope of them.  They never listed something that wasn't actually a crime; they listed things that were not crimes.  And, in fact, many impeachments have been based on things that are not crimes.

Ms. Jackson Lee.  I'm going to go on to another -- can a President be impeached for conduct related to improper exercise of his Article II powers, such as removing a subordinate Federal officer?  And let me add, would all communications between the President and, say, the Department of Justice always be protected, always be not subject to review or suggesting that they were inappropriate?

Mr. Gerhardt.  I think it's an overreach to suggest the President somehow can insulate all his communications with anybody from congressional inquiry.  That essentially makes the Presidency unaccountable.

Ms. Jackson Lee.  And so can he be impeached for the improper exercise of Article II?

Mr. Gerhardt.  Absolutely.

Ms. Jackson Lee.  And can the President be impeached at least partly on his conduct or her conduct before assuming office?

Mr. Gerhardt.  I believe if -- I've suggested both through my statement and other writings that I think a Presidency could be subject to impeachment for that.

Ms. Jackson Lee.  And, clearly, the Mueller report, in Volume I, has talked about a number of incidences dealing with the Russian intrusion into our elections that seemingly this administration and the Office of the President was involved in.

Mr. Gerhardt.  At the very least, this committee is entitled to look into things.  So you have got the Mueller report.  The Mueller report obviously contains a lot of different things, such as possible acts of obstruction of justice.  It's quite reasonable and legitimate for a committee -- for this particular committee to look at that and to ask whether or not more investigation is needed.

There is nothing in the Constitution that precludes the committee.  In fact, there's a lot in the Constitution that supports this committee looking at that material and deciding whether or not it does provide evidence of misconduct or whether or not it needs more evidence.

Ms. Jackson Lee.  I thank the chairwoman.  I yield back.

RPTR WARREN

EDTR ZAMORA

[10:16 a.m.]

Ms. Scanlon. Okay.  Thank you.

The chair recognizes the gentleman from California.

Mr. McClintock.  I thank you, Madam Chairman.

Dr. Eastman, the more that comes out on the Mueller report, the more I become concerned that it appears to me that they couldn't make a legal case against the President.  So they decided instead to try to make a political case, and they did so by seriously misrepresenting the evidence that they had.  Give you a few examples.

The John Dowd conversation, the President's lawyer, calls Robert Kelner, Michael Flynn's lawyer.  The Mueller report quotes only a small portion of the conversation that leaves the impression that Dowd's trying to influence testimony.  It deliberately omitted a very large part of the conversation where Dowd made it absolutely crystal clear that it was not what he was suggesting.

Another example.  Konstantin Kilimnik is repeatedly referenced as a Russian Government operative in his interactions with Paul Manafort.  What Mueller knew but failed to mention in his report was that Kilimnik was, in fact, a U.S. intelligence asset.

There was an article just published in The Federalist.  It notes the recent developments in the Concord case that involves the Internet Research Agency, the internet troll farm at the center of the Russian

Government interference narrative.  The judge in that case asked
prosecutors to address also the specific tie to the Russian Government,
and the DOJ responded the report doesn't say that.  It was that next
day that Mueller held his press conference where he walked back the
linkage that he had made between the Russian Government and the internet
troll farms.

So I have to tell you, having reviewed some of the material behind
the report, I'm concerned this report seriously misrepresents the
supporting evidence that it's supposed to be based upon.  So I'd like
to hear your opinion of the nature of the report itself and what does
it say of the integrity of the report if exculpatory evidence was
deliberately omitted from that report.

Mr. Eastman.  Congressman McClintock, we've seen a number of
stories about the political biases of the members of Mr. Mueller's team
that have, you know, occupied our Nation's attention for some time now,
and I think one of the allegations that the President attempted to
obstruct judges was his alleged direction to White House Counsel Don
McGahn to notify Deputy Attorney General Rod Rosenstein to fire Mueller
because of his alleged conflict of interest.  And I think this is
critical and I think it may well full explain why we don't have in that
report some of the triggering events that led to the report that any
competent investigation would have explored.

And Department of Justice guidelines specifically say that people
ought not to be leading an investigation when they have
personal -- close, personal relationships with targets or key

witnesses of the investigation or with an organization of the investigation, and Mr. Mueller had both.  He had very close, personal relationships with FBI Director Comey who, of course, whose own leak of information to The New York Times is what triggered the appointment of Mr. Mueller in the first place and who was a key witness in one of the allegations against the President about, you know, can you see your way to letting the case drop against Mr. Flynn?  He suffered enough. He had a close relationship with Mr. Rosenstein who was a signer on one of the FISA warrants that triggered the whole Russia collusion story in the first place.

Those things alone ought to have forced Mr. Mueller to recuse himself because they are conflicts of interest that would have not led to his appointment under Department of Justice guidelines in the first place.  For the President as the top national executive to raise the question about those conflicts is not obstruction of justice; it's doing his job.  If he had said, because of that conflict, we're going to shut down the whole investigation because I don't like it going after me, then you might have had obstruction of justice, but that's not what we have here.

And the perpetuation of this myth is rising to the level of farce, and it is distracting, not only the President and the country domestically, but on the world stage.  In fact, we are perilously close to the ongoing proceedings here rising to this very same level that is why the Department of Justice has over a half a century twice concluded the President ought not to be indicted while he's in office.

They recognize that the impeachment proceeding is a necessary evil that would suffer those consequences but on things that are much more grave than we have at issue here.

Mr. McClintock.   Is it fair to say that this report was corrupted both by personal relationships and by political biases?

Mr. Eastman.   When you see the things that are omitted from it, that's the conclusion that one has to go.

Mr. McClintock.   And this is, so far, just the tip of the iceberg. They're dribbling out all the time and of grave concern.

Mr. Eastman.   And I think when Mr. Horowitz' full IG report comes out on the origins of this thing, I think we're going to be shocked to learn how much more there is.

Mr. McClintock.   Thank you.

Ms. Scanlon.   The chair recognizes the gentleman from Tennessee for 5 minutes.

Mr. Cohen.   Thank you, Madam Chair.

Firstly, I'd just like to comment the question about exculpatory evidence being put in and questioning Mr. Mueller's compliance. Mr. Mueller made clear that he did not suggest the President should be indicted or was indicted because of the OLC's opinion that he couldn't be indicted.   That's pretty much dealing -- taking exculpatory evidence when you put that in.   We're not indicting him because we can't do it, not because we didn't find evidence of criminal activity; and if we did, we would have said so.   So that's firstly.

And, secondly, the question about his closeness to Mr. Rosenstein

and Mr. Comey.  He was also close to Mr. Barr.  So maybe Mr. Barr
shouldn't have taken the job.

Although existing regulations governing the appointment and
removal of a special counsel already provides some limitations on the
removal of the Attorney General, those can be rescinded or modified
because they're the Attorney General's regulations.  They can modify
those protections against unwarranted removal.

The chair has introduced a bill, H.R. 197, that's called the
Special Counsel Independence and Integrity Act, which would codify
those protections and would permit the special counsel who believes
his or her removal was unlawful to contest that removal in court.

Ms. Fredrickson, what are the benefits of enacting the current
protections that the Department has for unwarranted removal of a
special counsel and make them statutory law?

Ms. <u>Fredrickson.</u>  Thank you so much for the question.  So, I
mean, I think there are a number of benefits, and one is it's clear
that the Attorney General could repeal the existing regulations, and
there was quite a bit of worry that that might happen.  I know -- I
believe Senator Graham on the Senate side has introduced a partner to
this legislation for the very same reasons, that the regulations lay
out some important protections for the independence of the special
counsel but they're not enough because they're not actually insulated
from action by an Attorney General who might himself want to see, or
herself, want to see an investigation curtailed.  So I think it's an
important piece of legislation to consider.

I did also just want to go back to the prior question regarding the factual disputes and the accusation that Special Counsel Mueller was biased and omitted important information.  You know, I don't want to speak to that, but I do want to say it seems to me that that's actually an extremely strong reason, if people believe that, to want to get as much of this information into the public hands as possible but certainly into for this committee to review.

Mr. Cohen.  I'm sure we'll do that.

How would providing a special counsel a private right of action to contest his or her unlawful removal deter some of the conduct described in the Mueller report?

Ms. Fredrickson.  Well, I mean, I think that, you know, to have some kind of a legal recourse to ensure that a special counsel isn't removed for less than good cause, I think, is an important mechanism to protect that authority and to protect the integrity of an investigation that might be necessary.

Mr. Cohen.  And then maybe some of the instances that were cited in the report that might amount to obstruction of justice wouldn't have occurred because they would have known that they could -- Mr. Mueller could have gone to court to contest those in an open hearing.

Ms. Fredrickson.  Absolutely.  And I think Mr. Mueller laid out numerous examples of where he was thwarted along the way and was threatened that if he had had some additional legal recourse --

Mr. Cohen.  And let me ask.  We're going to run out of time. You've read the Mueller report, have you not?

Ms. <u>Fredrickson.</u>  Yes.

Mr. <u>Cohen.</u>  All right.  How many instances of obstruction of justice do you believe were shown where all three elements of obstruction of justice were met?

Ms. <u>Fredrickson.</u>  Well, I think the report itself describes it in extremely good detail, but there are certainly several examples dealing with the efforts to get the White House Counsel to fire Mr. Mueller.

Mr. <u>Cohen.</u>  That's one.  And then telling Mr. McGahn to lie about it?

Ms. <u>Fredrickson.</u>  Telling him to lie about it and to tell him to create a fake paper trail.  I think all of those are --

Mr. <u>Cohen.</u>  What are some others?

Ms. <u>Fredrickson.</u>  The effort -- the removal of the FBI Director. There are --

Mr. <u>Cohen.</u>  Asking Mr. Sessions to unrecuse himself?

Ms. <u>Fredrickson.</u>  Exactly.  Or asking Corey Lewandowski to go to the Attorney General to tell him to resign, holding the resignation letter for future use.

Mr. <u>Cohen.</u>  So you don't have a specific number.  That's at least four or five.  Do you think there are seven or eight or four or five or 10, or how many do you think there are?

Ms. <u>Fredrickson.</u>  Well, you know, I think that is something for this committee to consider is --

Mr. <u>Cohen.</u>  Thank you.

Professor Gerhardt, do you have an opinion on how many there are?

Mr. Gerhardt.  I'm sorry.  I missed part of the --

Mr. Cohen.  How many cases of obstruction of justice were in the Mueller report that you think all elements were met?

Mr. Gerhardt.  While I've read it, I can't say off the top of my head how many instances there are, but I do think it's important to recognize that there is certainly evidence of possible obstruction in there.  There's no question about that.

The report doesn't exonerate the President.  Instead, it actually suggests at several moments that one of the processes that's important to consider, given the limitations the prosecutor felt that were imposed on him, was for Congress or this committee to look into possible evidence of misconduct.  That's perfectly within the power and legitimacy of this committee.

Mr. Cohen.  Thank you.

And I yield back the time I do not have.

Ms. Scanlon.  Thank you.

The chair recognizes the gentleman from Texas for 5 minutes.

Mr. Gohmert.  Thank you.  I appreciate y'all being here.

Dr. Eastman, in looking at page 2 -- well, it's page 2 because you had a cover sheet, but talks about you're not -- you implied -- you're talking about the title of this hearing, that the Mueller report identified Presidential misconduct that would trigger whatever constitutional process might have been available.  As a factual matter, I could not disagree more.  I don't find anything

remotely rising to the level that would trigger the one constitutional path designed to address Presidential misconduct, namely impeachment.

But I want to take you back to the prior administration, something that was called Fast and Furious.  We know crimes were committed.  We had people within our Justice Department who forced people to sell guns that we knew the sales constituted a crime because we knew they were going to end up in criminal hands, and they were required to do it and we know at least one Federal agent was killed as a result.  Somebody somewhere in the Justice Department had to say, we're not going to -- we're not going to prosecute that.  We're not going to investigate it.  We know what happened.  And, of course, some of us here that reviewed e-mails that were disclosed, made public thanks to Judicial Watch, there were crimes being committed and nobody prosecuted.

During the Clinton administration, my U.S. Attorney friends back in Texas were telling me they'd been given -- and I couldn't tell you, some of them -- I couldn't tell you whether they vote Democrat or Republican, but I know they cared about justice.  But they were saying they'd been directed, let's back off of the pursuit of drug crimes. Let's start pursuing white-collar crime.  They got that directive.

Somebody within the Department of Justice who knew there were crimes, drug crimes being committed with regard to Fast and Furious, knew crimes were committed and at least one Federal agent died, had directed, we're not going to pursue those.  Just leave them alone. This is where we want to concentrate, because obviously, no Department

of Justice can pursue every single crime.

In your opinion, just knowing what we know from the public information, would you say Eric Holder or President Obama, his boss, obstructed justice?

Mr. Eastman.  Congressman, I think there's an important distinction to be made here --

Mr. Gohmert.  Exactly.

Mr. Eastman.  -- between prosecutorial discretion and shielding high-ranking officials.  I've outlined in my testimony several other examples --

Mr. Gohmert.  But the drug -- shifting from drug prosecution to white-collar crime, that's prosecutorial discretion.

Mr. Eastman.  That's right.  But preventing an investigation in order to shield the person that committed the crime because he was a high-ranking official or to alter the FBI investigative report on the advent of the email personal server and Hillary Clinton's conduct, to remove the language of one of the elements of the crime, I think that rises to obstruction of justice rather than prosecutorial discretion.

Mr. Gohmert.  So you're talking about when James Comey eliminated the mental state necessary --

Mr. Eastman.  The -- he said mental state was an element; it was not.  The FBI original draft of the report called it gross negligence, which is an element of the crime.  He changed that language in order to avoid the element of the crime.  That's not prosecutorial discretion.  I think those things do rise and have an intent to obstruct

or interfere with the investigation.

Mr. Gohmert.  Well, that brings up another issue.  You know, Mueller was required to -- or we know -- I'm not supposed to really get into the scopes memos I've reviewed, but -- well, at least some of them.  But we know publicly he was allowed to pursue things that -- crimes that came to his attention during the investigation.

Hillary Clinton's emails, private server, disclosure of classified information, those surely came to his attention.  He would have been authorized, just from what you know publicly, to pursue and investigate Hillary Clinton, would he not?

Mr. Eastman.  Well, he would.  And even more directly, the use of campaign funds funneled through a law firm illegally, not reported to the Federal Election Commission, to pay for the Steele dossier, which we now know had as his sources high Russian-level officials that triggered the entire narrative, that certainly was within his jurisdiction, and that's not investigated at all.

Mr. Gohmert.  Yes.  Well, I appreciate the effort that you took.  I know all three of you got paid well for being here today.

Mr. Eastman.  I missed that.

Mr. Gohmert.  And for those that don't know that, didn't get paid at all.  But thank you all for the time you took to prepare.  Thank you.

Ms. Scanlon.  The chair recognizes Mr. Johnson from Georgia --

Mr. Johnson of Georgia.  I thank the chairwoman.

Ms. Scanlon.  -- for 5 minutes.

Mr. <u>Johnson of Georgia.</u>   And I've heard more and more Republicans starting to pronounce Director Mueller's name as Mueller.  I've been hearing that over the past few weeks.  Is that some kind of Republican attempt to somehow besmirch Director Mueller?  Dr. Eastman?

Mr. <u>Eastman.</u>  No.  Maybe it's bit of my German heritage.  My mother's maiden name was Stein, and the Mueller is the German pronunciation.

Mr. <u>Johnson of Georgia.</u>  It's Mueller, and I've heard so many people saying Mueller on the other side.  It just seems like there's something that -- there's some kind of secret memo flowing out there.

But, listen, you are a -- an officer.  You are the chairman of The Federalist Society's Federalism & Separation of Powers Practice Group, are you not?

Mr. <u>Eastman.</u>  I am, Congressman.

Mr. <u>Johnson of Georgia.</u>  And so there's no doubt that you are a Republican or perhaps a Libertarian, but I suspect more Republican.

Mr. <u>Eastman.</u>  The Federalist Society is a nonpartisan organization.

Mr. <u>Johnson of Georgia.</u>  And it raises about $20 million a year for its various purposes, correct?

Mr. <u>Eastman.</u>  I've not looked into the budget of the Federal Society.  I'm a chairman of one of its practice groups.

Mr. <u>Johnson of Georgia.</u>  I understand.

Mr. <u>Eastman.</u>  And I should say that I'm not here speaking on behalf of The Federalist Society.

Mr. <u>Johnson of Georgia.</u>  Certainly.  Certainly.

And you're familiar with Director Mueller and his reputation.
You know that he is a former Marine officer, that he has practiced law
both in government, outside of government, former U.S. attorney,
United States Assistant Attorney General for the Criminal Division,
a homicide prosecutor in Washington, D.C.  He's been the Acting United
States Deputy Attorney General and he's been appointed to
Senate-confirmed positions by Presidents George Herbert Walker Bush,
Bill Clinton, George W. Bush, and Barack Obama.  And he's a Republican
too.

You're familiar with that, right?

Mr. <u>Eastman.</u>  I know he's got a long resume.  I didn't know he
was a Republican.

Mr. <u>Johnson of Georgia.</u>  You didn't know he was a registered
Republican?

Mr. <u>Eastman.</u>  It doesn't matter on my criticism of the report.

Mr. <u>Johnson of Georgia.</u>  Well, I mean, a man of that kind of
distinction, you do -- you may disagree with some of the conclusions
that he reached, but you have no -- you have no problem with his
truthfulness and veracity, do you?

Mr. <u>Eastman.</u>  Congressman, I have a real problem with his
flipping the burden of proof in Part II of the volume.

Mr. <u>Johnson of Georgia.</u>  That's not my question.  My question,
you believe him to be a man of good character?

Mr. <u>Eastman.</u>  I don't know his character.  I've never met the

man.  I will say this --

    Mr. Johnson of Georgia.  Let me ask --

    Mr. Eastman.  -- he staffed his office with people --

    Mr. Johnson of Georgia.  Let me ask this.

    Mr. Eastman.  -- who had an obvious political bias, and that's troubling to me.

    Mr. Johnson of Georgia.  Let me ask you this.  You're at a congressional hearing, the title of the hearing being about the various constitutional processes for addressing Presidential misconduct.

    Now, certainly this hearing that we're having today, you don't think we're overstepping our bounds by having this hearing, do you?

    Mr. Eastman.  I do.  I have never said that Congress doesn't have oversight authority.

    Mr. Johnson of Georgia.  But, I mean --

    Mr. Eastman.  But it can be abused, and I think --

    Mr. Johnson of Georgia.  For this hearing, you think that we're overstepping?

    Mr. Eastman.  I do.  This matter has become a farce.

    Mr. Johnson of Georgia.  Well, question --

    Mr. Eastman.  It has become a farce.

    Mr. Johnson of Georgia.  Question asked and answered.  Okay.  Thank you.

    Let me ask Professor Gerhardt.  Sir, in your written testimony, you note that the theme that clearly emerges from early discussions of the scope of impeachable offenses are that they are not neatly

delineated but depend on context and gravity, and that you say also that not all crimes are impeachable and not all impeachable offenses are crimes.

I want to ask you this question:  Is impeachment limited only to criminal acts?

Mr. Gerhardt.  Not at all.  If you'll allow me, I just want to make sort of two points to clarify a couple of things.  The first is I've not been paid at all.  I've got three kids, one in college.  It would be great, you know, but --

Mr. Johnson of Georgia.  You're not being paid either to be here, right?

Mr. Gerhardt.  I'm not being paid to come here.  I'm not being paid to be here.  It's an honor.

The second point I just want to make is that kind of follows a little bit from what you've just suggested is a concern I have, and that is if the President -- and I think that concern has been sort of overshadowed by the efforts to deflect the attention away from the purpose of this hearing.

But if the President of the United States can remove the special prosecutor, not comply with lawful subpoenas, and is immune to criminal prosecution while he's in office, that's the definition of being above the law.

Mr. Johnson of Georgia.  Thank you.

And I yield back.

Ms. Scanlon.  And the chair recognizes the gentleman from

Virginia for 5 minutes.

        Mr. <u>Cline.</u>   Thank you, Madam Chair.

        And I want to thank our witnesses for taking the time out of their schedules, without pay, to be here today to participate in this exercise.   I want to also apologize to them because this is little more than an attempt, a blatant attempt to keep on life support this ongoing impeachment by any other name.   And as you can see from the audience, which is half full and the committee which is half full, I'm -- there are other things going on on the Hill today that are of importance as well.   There's a hearing about the border that is down the hall.   I think that is a critical issue about the humanitarian crisis going on at the border.   I would like to see this committee use its jurisdiction to look into the humanitarian crisis that's going on at the border.

        I see the TV cameras here, and I want to apologize to people at home who've tuned in and think they're looking at a repeat of a past hearing because, no, it's not a repeat.   It's just the same pundits, journalists, and academics here opining about Volume I or Volume II of the Mueller report, not moving the ball forward at all, just really spinning the wheels of this committee, using up time and using up resources to come to no conclusion, other than the fact that the Democrats want to impeach this President but they don't have really enough to go on in the Mueller report.   And there are other issues that are of primary importance facing this country that are being addressed by other committees around this Congress.

        And as a member of this committee, I worked hard to get on this

committee.  It is very disappointing to me that we continue just to spin the wheels of this committee.

So, Professor Eastman, I will ask you, as a former prosecutor, I was very confused by Volume II and the Mueller report, 400 pages of no charges, no recommendations for charges.  Robert Mueller determined he could not exonerate President Trump of the allegations that he obstructed justice.

I've never seen this as a prosecutor.  Have you ever seen a prosecutor use that line of logic?

Mr. Eastman.  No, I haven't.  And that's my fundamental disagreement with Part II.  It reassigns the burden of proof to the object of the investigation having to prove his innocence, rather than the prosecutor having to demonstrate guilt beyond a reasonable doubt.  And that violates one of our most fundamental precepts of fairness and justice in the criminal justice system, the presumption of innocence.

For him to have said that the President couldn't convince me he didn't do any of this, when his job was to determine whether he had enough information to bring an indictment or to present to this body things that would lead to either an impeachment or a post President-in-office indictment, that's what his job was.  And I think that is the greatest flaw in Volume II of the Mueller report.

Mr. Cline.  So in our systems, prosecutors either indict or not indict, and leave it at that.

So Mueller here is putting the burden on the President to prove his innocence instead of the burden being on Mueller to prove his guilt.

Professor Eastman, can a President obstruct justice by simply exercising his Article II powers?

Mr. <u>Eastman.</u>  That's a close question.  The reason it's close and the reason I'm hesitating and not giving you an unqualified no is if the President exercised his powers with a deliberate intent to prevent -- but we have no evidence of his intent here at all.  What we do have is documented in the report itself, things like, can you clear the way to let Flynn go because he suffered enough.  That's perfectly within the President's authority, and there's no even hint of bad intent there.  Can you get rid of Mueller because of his conflicts of interest?  No bad intent; that's clearly within the President's authority.

Mr. <u>Cline.</u>  When Bill Clinton tried to alter witness testimony before a grand jury, that --

Mr. <u>Eastman.</u>  That had the necessary intent and was rightly troubling.  Deliberately changing an FBI report to remove an element of a crime of trafficking into classified information in order to shield the Presidential candidate I prefer, that's an obstruction of justice with the requisite intent.

Mr. <u>Cline.</u>  Section 4 of Article II says the President, Vice President, and all civil officers of the United States shall be removed from office on impeachment for and conviction of treason, bribery, or other high crimes and misdemeanors.

Do you see anything in Volume II that rises to that level?

Mr. <u>Eastman.</u>  I do not, because I don't see anything in there that

demonstrates a requisite intent that would otherwise alter the President's perfect authority to control the executive branch.

Mr. Cline.  Thank you.

I yield back.

Ms. Scanlon.  The chair recognizes the gentleman from Florida for 5 minutes.

Mr. Deutch.  Thank you, Madam Chairman.

Thanks to all the witnesses for being here.

Mr. Gerhardt, your testimony describes several categories of formal remedies for Presidential misconduct:  congressional oversight activities, impeachment, censure, election, civil suits, criminal trials.

Was Special Counsel Mueller able to pursue any of these remedies for potential misconduct by President Trump?

Mr. Gerhardt.  No, he was not.  He was not in the sense of being able to do anything more than issue his report.

Mr. Deutch.  His investigation, just to be clear, was a criminal investigation, right?

Mr. Gerhardt.  Right.  It certainly was, yes.

Mr. Deutch.  And if he found criminal wrongdoing by the President, could he pursue a trial?

Mr. Gerhardt.  He could, or he might have thought he might be able to, but he was also -- he also plainly felt, as he said, that he was restricted by Department of Justice policy on this.

Mr. Deutch.  Well, he said he was restricted by the OLC policy,

didn't he?

Mr. <u>Gerhardt.</u>  Right.  That's what I'm saying, yeah.

Mr. <u>Deutch.</u>  Right.  So Presidential misconduct uncovered by Mueller didn't come with an inherent remedy, did it?

Mr. <u>Gerhardt.</u>  No, it did not come with an inherent remedy.

Mr. <u>Deutch.</u>  So the Mueller report itself, the Mueller report itself was never going to hold the President of the United States accountable?

Mr. <u>Gerhardt.</u>  That is absolutely true.  And, in fact, a couple of times, a couple of key times when discussing obstruction of justice, he mentions Congress.

Mr. <u>Deutch.</u>  Right.  So if -- exactly.  So, Mr. Gerhardt, if the special counsel cannot hold the President accountable, who can?

Mr. <u>Gerhardt.</u>  The answer is nobody.

Mr. <u>Deutch.</u>  Nobody can hold the President accountable?

Mr. <u>Gerhardt.</u>  Well, that is to say if the President -- I may have misunderstood.

Mr. <u>Deutch.</u>  Mr. Gerhardt, Congress can hold the President accountable, can't it?

Mr. <u>Gerhardt.</u>  Of course.  And I just --

Mr. <u>Deutch.</u>  Right.  I just wanted to clarify that.

Mr. <u>Gerhardt.</u>  Yeah.

Mr. <u>Deutch.</u>  Ms. Fredrickson, in your testimony, you note that special counsel couldn't exonerate President Trump, but he also couldn't proceed with a criminal remedy because he accepted the OLC

policy that a sitting President cannot be indicted.

Without those options, what did Mr. Mueller do in his report?

Ms. <u>Fredrickson.</u>  Well, I think he did the appropriate thing, which was to refer to Congress to pursue its constitutional processes, which is, in fact, what this committee is doing now.

Mr. <u>Deutch.</u>  Right.  So you -- he conducted the investigation. He preserved evidence.  He provided analysis of that.  And then, as you quote from the report and as you've just said now, the separation of powers doctrine authorizes Congress to protect official proceedings including, those of courts and grand juries, from corrupt, obstructive acts, regardless of their source.  Further, Special Counsel Mueller closes Volume II by stating, and I quote, the protection of the criminal justice system from corrupt acts by any person, including the President, accords with the fundamental principle of our government that no person in this country is so high that he is above the law.

Ms. Fredrickson, do you read these sections of the report as a referral to Congress to pick up where Mr. Mueller left off?

Ms. <u>Fredrickson.</u>  Well, I certainly read it as a -- as saying to Congress that there is important -- this was -- these allegations are incredibly disturbing, indicate actions by the President and his associates that are very destructive to rule of law and that Congress needs to examine.  I think it has a congressional duty to --

Mr. <u>Deutch.</u>  Thank you very much.

Mr. Gerhardt, on May 30, President Trump said he can't be impeached because there was no crime.  It appeared he was suggesting

that he would need to be found guilty in a criminal trial in order to be impeached.

Is that how impeachment works?  Is that what impeachment requires?

Mr. Gerhardt.  Impeachment --

Mr. Deutch.  Yes or no.

Mr. Gerhardt.  Impeachment does not require what the President said.

Mr. Deutch.  Right.  And you described, in fact, how the Framers thought of high crimes as violations of public trust and violations of a duty to our society.  Some have argued the President can't commit the crime of obstruction of justice when he's exercising his Article II powers.  We've heard that here today.

Regardless of the merits of that argument in a criminal trial, isn't the corrupt use of power exactly the sort of abuse that the Framers and historical Presidents show qualified as a high crime?

Mr. Gerhardt.  Absolutely.  That's why we have it.

Mr. Deutch.  Right.  So let me finish with this.

Professor Gerhardt, we heard that impeachment proceedings have begun without any formal vote for impeachment.  Who has the power to set the proceedings for this body, for Congress to implement a constitutional power such as impeachment?

Mr. Gerhardt.  Congress.

Mr. Deutch.  Right.  And do the House rules require a formal authorization of an impeachment inquiry?

Mr. <u>Gerhardt.</u>   Absolutely not.   It doesn't say that in any place.

Mr. <u>Deutch.</u>   Professor Gerhardt, does the United States Constitution require a formal authorization of an impeachment inquiry?

Mr. <u>Gerhardt.</u>   Absolutely not.   The words "impeachment inquiry" are not in the Constitution.

Mr. <u>Deutch.</u>   Thank you.

I yield back.

Ms. <u>Scanlon.</u>   Thank you.

The chair recognizes the gentleman from Louisiana for 5 minutes.

Mr. <u>Johnson of Louisiana.</u>   Thank you, Madam Chair.

Thank you to the witnesses for being here.

Mr. Gerhardt, over here on your right.   Yeah, sorry.   We've got a big committee.

You said in a recent interview with The New Yorker magazine that, quote, if the President has misled people, unquote, then it could be the basis for impeachment.

President Obama made a statement that became rather famous regarding ObamaCare, and he said, quote, if you like your healthcare plan, you can keep it, unquote.   It was famously called the lie of the year by PolitiFact.

So I don't mean this to be flippant.   I want to ask you a question about your intellectual consistency.   Is that an impeachable offense?

Mr. <u>Gerhardt.</u>   I would not say so, and it's partly because I think the President made a mistake.   Acting in good faith is pertinent to any impeachment inquiry.

Mr. <u>Johnson of Louisiana.</u>  Well, but didn't you just explain in your last set of answers here that a violation of the public trust is an impeachable offense?  I just heard you say that a few minutes ago.

Mr. <u>Gerhardt.</u>  That's true.  Absolutely true.

Mr. <u>Johnson of Louisiana.</u>  So is that not a violation of the public trust when half of America relied upon that great promise?

Mr. <u>Gerhardt.</u>  I don't think I would say it violated public trust. I think you need two things at least.  One is you need to have -- be doing a bad act.  That's one of the things required.  But the other is you need to have bad intent.  I think there are times when Presidents obviously are mistaken.  I don't think that was a deliberate falsehood at all.  I think that an inquiry would be justified any time that this committee or the House has concern about whether or not the President had said or done something with bad faith and that was a bad act.

Mr. <u>Johnson of Louisiana.</u>  Okay.  In a 1999 article that was entitled, The Lessons of Impeachment History, you quoted Alexander Hamilton in Federalist 65, and you wrote, quote, in the Federalist No. 65, Alexander Hamilton warned that impeachments often would begin in a partisan atmosphere.  Consequently, Hamilton counseled the further along an impeachment proceeded, the more that Members of Congress needed to find a nonpartisan basis on which to resolve the proceedings, unquote.  That's what you wrote.

Mr. <u>Gerhardt.</u>  Yes.

Mr. <u>Johnson of Louisiana.</u>  The Mueller report, of course, has been out for almost 3 months.  As of June 30, there were 79 elected

Democrats calling for impeachment and zero Republicans.  Our friend, Representative Amash, is now a registered Independent.

So the question is, if this body were to take Alexander Hamilton's advice, shouldn't impeachment be off the table at this point because there's no way that we find a nonpartisan basis to proceed?

Mr. Gerhardt.  The answer is no.  And part of the reason for that is because if one party decides to obstruct something, that is to say, doesn't agree, can't find common ground, that can't hamstring the institution.

Mr. Johnson of Louisiana.  Wait a minute.  So are you suggesting the Republicans are obstructing this now?

Mr. Gerhardt.  I'm sorry if that's overstated, but the point is --

Mr. Johnson of Louisiana.  It's greatly overstated.  Thank you for acknowledging, yes.

Mr. Gerhardt.  But the point is that if -- it may or may not begin in a partisan atmosphere.  You need fact-finding.  You need investigation to determine the evidence and the gravity.

Mr. Johnson of Louisiana.  That's what we had with the Mueller report, right?  Two years and $30 million and endless resources to do this.  Didn't we have that?

Mr. Gerhardt.  Congressman, the Mueller report does not bind this committee.  It does not bind --

Mr. Johnson of Louisiana.  No, but that was begun in a nonpartisan manner.  He was famously the objective arbiter of all this.

Let me move on.

Mr. Gerhardt.   I don't think he was the supreme arbiter of this.

Mr. Johnson of Louisiana.   All right.   Well, I mean, we've known your true colors now when you say we're obstructing, so I guess --

Mr. Gerhardt.   I'm sorry for that phraseology.   But the point is that it can become a strategy, let's say, to be able to prevent bipartisanship by simply choosing not to go along if there are other political motivations for that.

Mr. Johnson of Louisiana.   I got it.   I'm just saying, based upon your earlier scholarship, Alexander Hamilton would want this farce to end.   Okay.

Ms. Fredrickson, on March 22, 2019, your group, the American Constitution Center, issued a press release entitled, quote, Mueller Report, How far up the chain did the Trump campaign's efforts to conspire with Russia go?   It quoted you.   And you said, quote, the question isn't whether members of the Trump campaign conspired with Russia to sway the 2016 elections.   We already know they did, unquote.

As you may know, conspiracy to commit an offense or to defraud the U.S. is a Federal crime under 18 U.S. Code, Section 371.   I just want to know if you can remind this committee which members of the Trump campaign were charged and prosecuted for conspiring with Russia.

Ms. Fredrickson.   Well, and first, I'd like to say that I think it's unfortunate that so many on your side of the aisle don't seem to want to get to the bottom of what happened in terms of the Russian interference in our election.

Mr. <u>Johnson of Louisiana.</u>  To the contrary.  To the contrary.
Just answer the question.

Ms. <u>Fredrickson.</u>  And that all of our intelligence agencies have
indicated that there was sweeping attacks on our elections, that they
were renewed in 2018 with some impact, and that there are anticipated
attacks in 2020.

Mr. <u>Johnson of Louisiana.</u>  So you disagree with the Mueller
report's findings, Volume I?

Ms. <u>Fredrickson.</u>  I think there is much more work for this
Congress to do to understand what Russia has attempted, what they were
successful at, and what they're planning.

Mr. <u>Johnson of Louisiana.</u>  I got it, but I'm out of time.  But
just to follow up on that.  So with all the vast resources, the
$30 million, the endless supply of investigators, the 500 witnesses,
everything that the Mueller report had, did, and was involved in for
2 years, you think there's yet more for the people on this --

Ms. <u>Fredrickson.</u>  I do.

Mr. <u>Johnson of Louisiana.</u>  -- dais to dig into, right?

Ms. <u>Fredrickson.</u>  I do.  I think there were many people who had
destroyed evidence.  There were people who Mueller was not allowed to
interview.  And so I do think there's -- I mean, look, I'm deeply
worried about the integrity of our elections, and I hope Congress is
as well.

Mr. <u>Johnson of Louisiana.</u>  Well, I'm deeply worried about the
integrity of your organization.

Ms. <u>Scanlon.</u>   The gentleman's time has expired.

Mr. <u>Johnson of Louisiana.</u>   I'm out of time.   I yield back.

Ms. <u>Scanlon.</u>   The chair recognizes the gentleman from Rhode Island for 5 minutes.

Mr. <u>Cicilline.</u>   Thank you, Ms. Fredrickson, for your last comment.   I know there are many on this committee who share your concern and frustration with the obstruction from our colleagues on the other side of the aisle.   And I think if Alexander Hamilton, great Founder who my friend mentioned, were alive, they would be appalled, frankly, at the conduct of this committee and their unwillingness to take on these very serious issues.

So I thank the chairman for convening this hearing on this very important question.

The hearing is entitled, Lessons from the Mueller Report: "Constitutional Processes for Addressing Presidential Misconduct."

Ms. Fredrickson, could you tell me what is the principle constitutional process available for addressing Presidential misconduct?

Mr. <u>Eastman.</u>   I'm sorry.   Was that addressed to me?

Mr. <u>Cicilline.</u>   No, it was addressed to Ms. Fredrickson.

Ms. <u>Fredrickson.</u>   Well, I mean, there -- Article I lays out Congress' authorities.   And they're multiple, but certainly the legislative power includes oversight as an essential part of it.   But also in Article I is the power to impeach.   Those tools are not alternative.   They're --

Mr. Cicilline.   And is it fair to say impeachment is the principal process to address Presidential misconduct?

Ms. Fredrickson.   I think it's one of the processes.   I don't think that -- I think there's more of a continuum.   As I mention in my testimony, during the Nixon -- during the Watergate hearings, there was actually -- almost a year went by before there was a referral to the full House for a vote on the articles.   So I think it's hard to separate, I would say.

Mr. Cicilline.   Okay.   Professor.

Mr. Gerhardt.   I agree.   I think that I agree with everything she just said.   I believe that it is completely within the discretion of this committee and the power of this committee to be able to, not just read the Mueller report, but to ask the very reasonable question whether we need to know anything else in order to undertake the constitutional responsibilities we have.

Mr. Cicilline.   And related to that, many of our -- many of our -- Congress' ability to hold the President accountable rely on the executive branch providing Congress with information that it needs to legislate, to conduct oversight, or to consider remedies like impeachment or censure.

Could you begin, Ms. Fredrickson, to describe generally what the Supreme Court has said about Congress' power to conduct investigations and to collect documents and testimony, including by use of subpoena, how the Court has described our power in that context?

Ms. Fredrickson.   The Court has been -- has used very sweeping

language to describe Congress' power.  Again, it's inherent and the legislative power is the power to conduct oversight and investigations.

Mr. Cicilline.  And the Court has, in fact, said the power to secure needed information is an attribute of the power to legislate, which is a core function of Congress.

Ms. Fredrickson.  Well, exactly.  I mean, Congress would not know how to respond to statutory gaps if it can't examine what the statutory gaps are.

Mr. Cicilline.  And the perils of Congress being unable to do its constitutionally required work if an executive branch decides to prevent witnesses from coming forward or to instruct witnesses not to cooperate or to not make the documents available is significant.

Professor, would you speak a little bit about, Professor Gerhardt, what the consequences of that would be for Congress?  I mean, we have a President, for example, who's told -- said publicly that he is going to fight all efforts by Congress to get information, that he's going to tell witnesses not to come and defy subpoenas.  What are the implications of that?

Mr. Gerhardt.  Well, they're not good.  I mean, the implications of that is, at the very least, Congress should be concerned. Obviously, this committee should be concerned.  And this committee is acting perfectly reasonably to consider what evidence -- I don't know if this has been put forward in the report or anywhere else.  If I may, can I read one sentence from the report from Mr. Mueller that just goes along these lines?

He says, with respect to the President -- with respect to whether the President can be found to have obstructed justice by exercising his powers under Article II of the Constitution, we concluded that Congress has authority to prohibit a President's corrupt use of his authority in order to protect the integrity of the administration of justice.

Congress has that authority.   This committee has that authority.

Mr. Cicilline.  So we have had a number of examples, both with respect to the White House Counsel Don McGahn and the former White House Communications Director Hope Hicks, where the White House asserted something called -- that they claim is absolute immunity, which is basically our right to prevent you from hearing anything relevant from these witnesses.

Would that sort of obstruction that we're seeing in an effort to prevent witnesses from appearing before the committee or producing documents in and of itself be an appropriate basis for an article of impeachment against a President, if proved?

Yes, Ms. Fredrickson.

Ms. Fredrickson.  Well, I think if you look again at the Nixon impeachment, you'll see that that exact kind of obstruction formed one of the articles in that.

Mr. Cicilline.  And, Professor Gerhardt.

Mr. Gerhardt.  Clearly, the Constitution allows this body and this committee to consider whether or not obstruction's happened. It's just important to really emphasize that it doesn't have to be a

technical violation of a statute.  It still may be a problem if the President obstructs justice in any way.

Mr. Cicilline.  Thank you.

I yield back, Madam Chair.

Ms. Scanlon.  The chair recognizes the gentleman from California for 5 minutes.

Mr. Lieu.  Thank you, Madam Chair.

Ms. Fredrickson, you were asked earlier a question about Russia. So for Special Counsel Mueller's investigation, 34 individuals were indicted.  Isn't that correct?

Ms. Fredrickson.  Yes, that's correct.

Mr. Lieu.  And at least eight have either pled guilty or been convicted.  Isn't that correct?

Ms. Fredrickson.  That's correct.

Mr. Lieu.  And the Mueller report identifies that Paul Manafort gave internal polling date to the Russians.  Isn't that correct?

Ms. Fredrickson.  That's correct.

Mr. Lieu.  And the Mueller report also shows numerous contacts between Russians and Trump campaign officials.  Isn't that correct?

Ms. Fredrickson.  That's correct.

Mr. Lieu.  And a fair reading of Volume I of the report would be that the Trump campaign knew about the Russian interference, welcomed it, embraced it, gave them internal information, and knew it was going to help Donald Trump win the election.  Isn't that correct?

Ms. Fredrickson.  That is correct.

Mr. <u>Lieu.</u>   Okay.   Let's move to Volume II now which focuses on obstruction of justice.   In the Nixon impeachment hearings, the first article of impeachment, what was that on?   It was obstruction of justice, wasn't it?

Ms. <u>Fredrickson.</u>   It was obstruction, yes.

Mr. <u>Lieu.</u>   All right.   Obstruction of justice, certainly under the Nixon hearings, was important enough to be the very first article of impeachment.   So if there was obstruction of justice related to Donald Trump, that would also certainly qualify as important enough to be an article of impeachment if it was established, correct?

Ms. <u>Fredrickson.</u>   It certainly could be.

Mr. <u>Lieu.</u>   Okay.   Let me talk to you now, Professor Gerhardt, about the obstruction we're seeing from the Trump administration to congressional oversight investigations.   And it's not just on the Mueller report; it's on everything.   So we want to know, for example, why is the Trump administration supporting the lawsuit to eliminate healthcare coverage for Americans with preexisting conditions?   We can't get that information.   We wanted to know why did Trump officials lie about the census?   We couldn't get that information.   We can't even get witnesses simply to show up here even under subpoena.

And the Trump administration is asserting something called absolute immunity.   No court has ever found that, correct?

Mr. <u>Gerhardt.</u>   No court has ever found that the President has kind of absolute immunity you're talking about, no.

Mr. <u>Lieu.</u>   Okay.   So given the assertions of this sort of fake

immunity, do you agree that if these witnesses don't show up, they would be subject, not just to the lawful subpoena, but also to any potential other consequences, and that they themselves would be liable for not showing up?

Mr. Gerhardt.  Absolutely.  And the committee and the chair have the power to issue subpoenas.  Subpoenas are lawful orders.  And it's a question of whether or not they're complying with the law when they're considering whether or not to comply with the subpoena.

Mr. Lieu.  Okay.  And then let's talk specifically again about obstruction of justice.  The Mueller report lays out multiple instances of obstruction of justice.  And then the special counsel goes, all right, here's three elements to establish obstruction of justice.  And in multiple cases, he shows that there's significant evidence of all three elements.  Isn't that correct?

Mr. Gerhardt.  Right.

Mr. Lieu.  And on the issue of intent, you can certainly infer intent from the very words of Donald Trump.  Isn't that right?

Mr. Gerhardt.  Well, you can infer intent from words, from circumstances, from context.

Mr. Lieu.  And when Trump fired Comey, he stated that he receiving great pressure from the Russia investigation and that that pressure's been taken off.  That's certainly evidence of intent, isn't it?

Mr. Gerhardt.  It's perfectly reasonable to wonder about what's going on when he says something like that, yes.

Mr. Lieu.  When the President goes on national TV and says he fired Comey because of the Russia thing, that's certainly evidence of intent, isn't it?

Mr. Gerhardt.  It could be evidence of intent, absolutely.  It's certainly the statement of something that sounds like obstruction.

Mr. Lieu.  When the President orders one of their senior officials to create a fake document, that's certainly evidence of intent?

Mr. Gerhardt.  I'm sorry.  I missed that.

Mr. Lieu.  When the President orders one of his officials to create a fake document, that's certainly evidence of intent, isn't it?

Mr. Gerhardt.  Yeah, that's -- that's hugely problematic.  And, one, it's obstruction.  And I might also go further to say that one of the consequences of vesting the President with so many entitlements, such as absolute executive privilege, absolute immunity, means that if there's any delay that relates to something criminal 4 years or longer, what happens to the evidence?  That's a tremendous concern.  And so that's why I have argued that I don't think the President's immune to the criminal process or other processes.

Mr. Lieu.  And in the Mueller report, Special Counsel Mueller doesn't even put out any burden of proof.  He doesn't shift the burden. He simply says, because I could not indict under the DOJ policy, I'm not going to make that prosecutorial judgment.  Isn't that right?

Mr. Gerhardt.  That's correct.

Mr. Lieu.  I yield back.

Ms. Scanlon.   The chair recognizes Mr. Raskin for 5 minutes.

Mr. Raskin.   Madam Chair, thank you very much.

Professor Gerhardt, let me start with you.   Why does the Congress have the power to impeach the President but the President doesn't have the power to dissolve the Congress or to impeach individual Members? Why does the Congress have the power to impeach justice in the Supreme Court but they don't have the power to remove Members of Congress?

Mr. Gerhardt.   Well, that's all part of checks and balances. And, of course, Congress has the power, in part, because Congress is accountable politically.

Mr. Raskin.   Yeah.

Mr. Gerhardt.   And the idea is clearly behind those restrictions and is, as you well know, the effort to actually prevent the President or prevent the COURT from becoming all-powerful.

Mr. Raskin.   Do you agree with the rhetoric of coequal branches? Every time the President tramples another constitutional right or value or principle of separation of powers, one of my colleagues would get up and say, we're coequal branches, Mr. President.   Please pay attention to us.

Do you agree with that?

Mr. Gerhardt.   I do agree.

Mr. Raskin.   Before you go on, let me just say I disagree with it, and I want to tell you why.   And I don't think it's just because I'm a Member of Congress now.   When I was a professor of constitutional law, I disagreed with it.   That's not the way I see the Constitution.

The Preamble starts with, We, the people, in order to form a more perfect union, and so on, established the Constitution.   The very next sentence says, All legislative powers are vested in the Congress of the United States.

Then you get pages of description of what the powers of Congress are, and they are comprehensive.   We have the power to declare war, to regulate domestic commerce --

Mr. Gerhard.   Right.

Mr. Raskin.   -- international commerce.   We have the power to impeach.   We have the power to control the seat of government, post office, copyright, you name it.   All of it's in there.

Then for the President, the President is the Commander in Chief in times of actual conflict, and his job is to take care that the laws are faithfully executed.

So the reason I ask the question about impeachment is, don't we have the power to impeach the President because this is a representative democracy and Article I puts Congress first and the President works to implement the laws that we've adopted?

Mr. Gerhardt.   I think what you've said makes imminent sense. And I don't want us to be talking past each other.

Mr. Raskin.   Yeah.

Mr. Gerhardt.   I think that each branch, of course, is vested with certain powers, and no other branch can interfere or undermine those powers.

Mr. Raskin.   Right.   But I think at least it's constitutionally

important to note that it's Congress that has the power to impeach everybody else and they don't have the power to impeach the Congress --

Mr. Gerhardt.  Absolutely right.

Mr. Raskin.  -- because we are elected by the people.

Mr. Gerhardt.  That's correct.

Mr. Raskin.  I want to ask you, Ms. Fredrickson, a question about impeachment, about law and politics.  There's been a lot of confusion in the country about this.  Some people say, well, look, it's very clear that there were 9 or 10 episodes of Presidential obstruction of justice. It's very clear from everything that the special counsel wrote and from what he did in sending two letters of protest to the Attorney General for misstating and distorting the contents of the report and for -- from his having a press conference to come out and say the reason that we didn't indict the President was because of the DOJ policy that we can't indict the President.

So some people are saying it's very clear there's Presidential obstruction of justice.  Why doesn't Congress just go ahead and impeach?  And then others say, well, you know, it's not just a legal question.  It's a political question because it's invested with Article I, with Congress.  It's not in the courts.  The courts don't have the power to do it.  Congress has to do it.

And so Members of Congress have to take into account, with everything else we're doing, with the border crisis, with trying to lower prescription drug prices.  We've got to think about public opinion.  We've got to think about our districts.

Are those political considerations really proper and appropriate in terms of what Congress should think about?  Should we be trying to think about this just as judges or should we think about it in the context of everything else we're trying to do?

Ms. Fredrickson.  I think Professor Gerhardt did an excellent job of explaining the language in the Constitution, what are high crimes and misdemeanors.  And they're not necessarily crimes.  They could be crimes, but they could be other types of activity that might be fully lawful but might have really harmed the fabric of the Nation.  And so it's a judgment call, and it's one that Congress has to make, among all of its other responsibilities.

Mr. Raskin.  Okay.  Very good.

Professor Gerhardt, let me come back to you.  What about the role of public opinion here?  Some people have said, well, only 19 percent of the people supported impeaching Richard Nixon before the impeachment hearings got started.  Forty-six percent of the people support impeachment today, which is extraordinary given that we haven't formally launched impeachment inquiry.  He's never reached 50 percent in the polls.  He's the only President since World War II who never has gotten up to 50 percent in his approval ratings.

Some people say, take that into account.  The President has committed high crimes and misdemeanors.  He's a sitting duck, and we should take that into account.  Others say public opinion is irrelevant.  And lots of Republicans, the majority of the Republicans still oppose it.  We should take that into account instead.

What is the role of public opinion in this decision?

Mr. Gerhardt.  Well, it's a great question.  I think the role of public opinion is something, of course, that you should take -- you're fully entitled to take into account.  It makes imminent sense for that to happen.  At the same time, there are fiduciary duties within each Chamber of Congress to consider how to exercise their respective powers, and public opinion, hopefully, will support that.  That's what Congress, of course, hopes for.

But as in the Watergate situation, as you just mentioned, it took a year at least to be able to figure out through an investigation, with no help from the President, on whether or not he had committed any kind of misconduct.  And it's entirely possible that public opinion wouldn't necessarily support Congress or the House or any particular -- as it moves along, but the evidence might inform public opinion and it might turn around, just like it did with President Nixon.

Mr. Raskin.  Finally, I have a yes-or-no question.  Does anyone here think that the -- that President Clinton should have been impeached for what I consider a low crime and misdemeanor, lying about sex?  Does anybody think that he -- that the House was correct in impeaching him?

Mr. Eastman.  I think he was.  It was not a low crime.  It was --

Mr. Raskin.  So yes, you believe that.

Mr. Eastman.  It was obstruction of justice.

Mr. Raskin.  Let me follow up with you then, Mr. Eastman.

Ms. Scanlon.  Time's up.

The chair recognizes Mr. Armstrong for 5 minutes.

Mr. Armstrong.  Thank you.

And I think that line of questioning is interesting in a lot of different reasons.  One, I think that's where you get the distinction between political and legal, because I think lying under oath is lying under oath, and it's a political distinction as to whether or not it's a minor crime or a major crime, so -- and I think Mr. Raskin and I could have long esoteric debates about this issue in a different format.

But, Professor Eastman, just I want to go to the obstruction stuff because we were just talking about it a little bit.  Do you think any of the 10 potential episodes of obstruction outlined in the Mueller report constitute obstruction of justice?

Mr. Eastman.  I do not, because I don't think any of them demonstrate the necessary intent to obstruct.  I think they are all well within the President's Article II authorities.

Mr. Armstrong.  Well, and I have two different questions about that, and one starts with the Article II authority.  And, I mean, so when you're -- I mean, the answer is any President can't be guilty of obstruction just for exercising their Article II authority.  I mean, otherwise, we'd get into this whole separation of powers, and there's -- I mean, we all want the President treated like everybody else because that makes everybody sound, I mean, like it is, but there's actually real sound separation of powers and policy reasons why that's not the case.

So can you elaborate on that just a little bit?

Mr. Eastman.   I agree.   And I think the two OLC memos that I focus on extensively in my written testimony outline why that's the case. The President -- and I'll go back to something Mr. Raskin said.   The powers given to the Congress are enumerated.   The power given to the President is unenumerated.   It is the executive power, the entirety of it.   And the Framers of the Constitution did that deliberately because the system they had before that under the articles of confession -- confederation was not working because we did not have an energetic executive who could execute the law both domestically and deal with anything that arose on the international scene.   That's not a part of a legislative power; that is a core executive power.

Mr. Armstrong.   Well, and then that goes to why that memo exists. I mean, without that memo in place and the President getting indicted, can you explain, I mean, where we end up on separation of powers and how that would affect, I mean, essentially governing structure of the United States?

Mr. Eastman.   It would be fundamentally altered.   Any individual prosecutor in any State or in any Federal U.S.   Attorney's Office could effectively unravel the results of an election.   And to think that those processes themselves won't become politicized is, I think, naive in the extreme.   And I think that's why the OLC memos, both under the Nixon administration and under the Clinton administration -- I want to point out.   This is a bipartisan conclusion by different administrations by the Office of Legal Counsel.

Mr. Armstrong.   Now, and I want to go back to now let's assume

the OLC memo doesn't exist.  Does your answer change on obstruction
of justice?

Mr. Eastman.  No.  No.  And this goes back to the earlier comment
I made about I think the fundamental flaw in the analysis in Part II
of the report is that it put the burden on the target of the
investigation to prove his innocence, rather than the normal
prosecutorial function which is to lay out a case to a grand jury -- in
this case, the grand jury would be the House -- to lay out a case of
why I have probable cause to bring an indictment that would lead me
to think I could get, you know, proof beyond a reasonable doubt.

The standard is not criminal, I agree with Professor Gerhardt on
that, but it also rises to the level of impeachment.  And I don't think
anything here, particularly in comparison to things we've witnessed
recently in recent administrations, I don't think anything gets close
to that standard.

Mr. Armstrong.  Well, and so there's been a lot made -- and I
practiced law in Federal court and done criminal law in my life, and
one of the things is we all understand you can have obstruction even
if the underlying crime doesn't exist.  There is a legal way that
occurs, and that is actually true.  But intent becomes a huge part of
this conversation.  It's also true that it's very rarely charged when
you find out there's not an underlying offense, and one of the reasons
is is illegitimate purpose and legitimate purpose.

And under the best or worst reading of any of these 10 obstruction
charges, can you -- I mean, can you find any one of those that doesn't

have a legitimate purpose?

Mr. Eastman.  You know, I don't find any of them that don't have a perfectly legitimate purpose, and it's a much more plausible purpose than any of the other stories that are being spun out to try and prove that there was an illegitimate purpose.

Mr. Armstrong.  Thank you.

With that, I yield back.

Ms. Scanlon.  The chair recognizes the gentlewoman from Washington for 5 minutes.

Ms. Jayapal.  Thank you, Madam Chair.

Ms. Fredrickson, let me start with you.  In his written testimony, Dr. Eastman argues that a sitting President is immune from prosecution and that, therefore, impeachment is the only constitutional remedy for Presidential misconduct.

Do you agree that a President is immune from prosecution?

Ms. Fredrickson.  No, I don't believe so.  I think, you know, again, just Professor Gerhardt laid out, I think rather extensively, the arguments with the OLC memo.  But, you know, I would say, however, that there is something interesting about this idea of sort of the structural arguments that make the President immune.  That is it's too cumbersome on his or her, hopefully someday, responsibilities and that, therefore, we just have to then find not in the text and not in the historical information an immunity for the President.

If that were the case, we should be able to find inherent in that text as well an automatic tolling of statute of limitations for criminal

prosecutions.  You should really need to pass -- have to pass

legislation to do that.  So I think there's -- it's certainly very

disputed that the President is immune.  I think there have been many

scholars who have contested that, and certainly those who would also

indicate that perhaps there can't be a prosecution but there could be

an indictment.  Would an indictment actually be that cumbersome for

a President?

So I think they are very important questions.  Again, I think it's

indicative of how important it is for Congress to continue to examine

the evidence underlying the Mueller report.

RPTR JOHNSON

EDTR ZAMORA

Ms. Jayapal.  I mean, you've sort of answered this, but let me ask the question anyway for anyone who might be listening that hasn't been following.

Can a President violate Federal criminal law through his exercise of Article II powers?

Ms. Fredrickson.  Oh, absolutely.

Ms. Jayapal.  Okay.  So, for example, could -- could a President violate Federal bribery statutes if he or she were to offer a pardon to a witness in exchange for refusing to cooperate with a Federal investigator?

Ms. Fredrickson.  Yes.

Ms. Jayapal.  Okay.  And, Professor Gerhardt, do you agree with Dr. Eastman that the only constitutional remedy for Presidential misconduct is impeachment?  Just briefly.

Mr. Gerhardt.  Not at all.  No, he and I respectfully disagree on that.  I tried to lay out in my written statement a variety of other processes for handling or addressing Presidential misconduct.  Impeachment obviously is one, but there may be others, depending upon the severity and gravity of the offense and what else this committee determines through legitimate investigation.

Ms. Jayapal.  So let me turn to another subject, and I'll stay with you, Professor Gerhardt.  In Nixon v. Fitzgerald, the Supreme

Court held that the President is entitled to absolute immunity from damages liability based on his official acts.   Anticipating concerns that that finding would leave Nixon -- it would leave the Nation without sufficient -- and these are quoted words -- without sufficient protection against misconduct by the Chief Executive, and quote, the Court articulated several formal and informal checks on Presidential misconduct in addition to the constitutional remedy of impeachment.

And the Court described those checks as constant press scrutiny, vigilant oversight by Congress --

Mr. Gerhardt.   Yes.

Ms. Jayapal.   -- the desire to earn reelection, and the need to maintain prestige as an element of Presidential influence, and a President's traditional concern for his historical stature.

So can you elaborate on this -- this concept of informal checks?

Mr. Gerhardt.   I'll try to as briefly as possible.   So there are things that are spelled out in the Constitution that clearly are formal mechanisms for addressing Presidential misconduct.   The quote obviously sort of mentioned those.   Among them are the things you just mentioned as well, impeachment, public opinion among them. Congressional oversight's a key element of that.

But the informal checks are things that are not done by government or -- or done in any kind of official way, but they nevertheless might constrain a President.   So they would include some of the things that you just mentioned.

For example, concern about maintaining influence; you know,

popularity is important for a President to succeed in office.  At the
same time, Presidents are in that unique position of thinking about
what kind of influence or impact they'll have on the office itself or
the Constitution over time.  And those things might constrain them as
well.

Ms. Jayapal.  And let's talk about press for a second.  Because
President Trump has repeatedly referred to the press as the enemy of
the people, but the Court in Fitzgerald named the press as a really
important check on the Presidency.

Mr. Gerhardt.  Yes.

Ms. Jayapal.  So when you have a President who openly encourages
violence against the press, praised Representative Gianforte for
assaulting a reporter, regularly attacks judges who rule against his
policies, and refuses to release his tax returns, what effect does that
have?

Mr. Gerhardt.  A terrible effect.  And that's something, of
course, to take into account as well.  But the point you're making,
I think, is a very sound one, that the press serves a very important
function in this country of trying to put a spotlight on government
and trying to actually allow for transparency in government.  And
efforts to obstruct that -- I hope I'm using the word correctly in that
context -- I think would be matters of great concern.

Ms. Jayapal.  Thank you, Professor.

I yield back.

Ms. Scanlon.  Okay.  The chair recognizes Mrs. Lesko for

5 minutes.

Mrs. <u>Lesko.</u>  Thank you, Madam Chairman.

I have a question for Professor Eastman.  And it is basically, Professor Eastman, did the Office of Legal Counsel memo that holds a sitting President cannot be indicted stop Mueller from ending his report with a suggestion that President Trump should be indicted for obstruction of justice?  Was there anything preventing him from doing that?

Mr. <u>Eastman.</u>  No, there was not.

Mrs. <u>Lesko.</u>  And I think this has been asked before maybe, because I was in the other room in the other committee actually being a witness.  But, you know, when I went -- have read through the Mueller report several times now, and what popped out to me was the thing about corrupt intent, that there was no underlying crime, no corrupt intent.  I don't know if you have anything to add on that, how it would be difficult, is what Mr. Mueller said, my reading, to prove corrupt intent when there's no underlying crime.

Mr. <u>Eastman.</u>  Well, it's difficult.  I agree with Professor Gerhardt that it's not impossible.  But we normally look at when there are two explanations for inaction, one's perfectly legitimate and the other a stretch to get to corrupt intent.  We tend to Occam's razor, take the short path to say the legitimate one is probably the right one.

Mrs. <u>Lesko.</u>  Well, good.  And, Mr. Eastman, since I wasn't here the whole time, is there anything that hasn't been said that you would

like to add for our record?

Mr. Eastman.  I think the bottom line conclusion of both OLC memos that I think is absolutely correct is precisely why they came to the conclusion that a sitting President, while he remains President, cannot be indicted, that the constitutional remedy is impeachment, because it puts the issue into a body that is itself politically accountable.  And I think that is the most important piece to take away this.

If the members of this committee and of this House truly believe that the things that Mr. Mueller has identified rise to the level of high crimes and misdemeanors, you would be being derelict in your duty not to bring impeachment charges.  So bring it on.

I don't think there's anything in here -- and I don't think the American people will agree that there's anything here that rises to that level.

The political accountability on that works both ways.  If you don't bring actions against a President who has committed high crimes and misdemeanors, you will be held to political account.  If you do pursue investigations on things that do not remotely rise to that level, you will also be held to political account.  That's the beauty of our system, and I think that's why the OLC memos reach the conclusion that they do.

Mrs. Lesko.  Thank you, Mr. Eastman and the other witnesses.

And I yield back my time.

Ms. Scanlon.  Thank you.

I recognize myself for 5 minutes.

Professor Gerhardt, you know, the purpose of these hearings are not just to educate Members of Congress but also the general public on topics they may not have had the opportunity to look at.  So I wanted to take a couple minutes to tap your expertise as a constitutional scholar and talk about what the authors of the Constitution considered to be impeachable offenses.

We had a little bit of quotation of Alexander Hamilton in the Federalist papers earlier, but I wanted to focus on his declaration that impeachable offenses are, and I quote, those offenses which proceed from the misconduct of public men, or in other words, the abuse or violation of the public trust.

Could you comment on what the Founders of our country meant to be impeachable offenses and any examples they discuss that might be relevant to our inquiry today?

Mr. Gerhardt.  Well, I'll try, certainly.  Alexander Hamilton obviously gets it right; that is to say his formulation or his understanding of the scope of impeachable offenses is very consistent with what we learn from the Constitutional Convention and what we can infer from the structure of our Constitution.

So the core elements or core, I guess, paradigms of impeachable offenses become things like abuse of power, things like a breach of public trust, things that seriously injure the republic.

So those won't be limited just to technical crimes.  They'll be limited to the kinds of unique things that a President is able to do.

He has the pardon power.  But in the Constitutional Convention, it's mentioned that if the pardon power is used to shield somebody with whom the President is in criminal conspiracy with -- I'm paraphrasing -- that's an impeachable offense.  And I think almost everybody would agree that that would be an abuse of power.

And so the terms that Mr. Hamilton used and the terms that others such as Justice James Wilson used in describing the scope of impeachable offense set up categories, if you will, set up the kinds of things that would have to be proved in order to constitute an impeachable offense.

Ms. Scanlon.  Thank you.

Turning to the history of impeachment proceedings in this country, and you may have touched on this a little bit already.  Given what you know of the facts laid out in the Mueller report, would it be appropriate for us to draw any parallels between the current moment and previous impeachment inquiries?

Mr. Gerhardt.  Absolutely.  The most obvious is obstruction of justice.  There was an obstruction of justice article approved by the House Judiciary Committee against President Nixon.

I will hope that that's not serious.

Ms. Scanlon.  Happens all the time.

Mr. Gerhardt.  Okay.  There was an impeachment article approved by the House against President Clinton.

It's well settled that obstruction of justice may provide a basis for Presidential impeachment.  It's Presidential misconduct of the worst kind, invading, undermining the other branches as they try to

exercise their legitimate powers to try and make -- try and determine the President's accountability.

Ms. Scanlon.  And we've heard a little bit of discussion about whether or not this particular President intended to obstruct justice. You have reviewed the Mueller report, right?

Mr. Gerhardt.  I've read it, yes.

Ms. Scanlon.  And you know that the President refused to answer any questions regarding the allegations of obstruction of justice, right?

Mr. Gerhardt.  Right.

Ms. Scanlon.  So we wouldn't have those words from his mouth unless he tweeted them.

Mr. Gerhardt.  That's correct.  And it's important to remember, the Mueller report doesn't just not bind this committee or the House, it doesn't displace this committee or the House.  So the committee certainly has the authority to inquire into these things.

Ms. Scanlon.  So I come to this proceeding with really profound concerns that misconduct by this President isn't limited to some ill-advised tweets but that his defiance of congressional subpoenas and the Constitution and the rule of law places our country in jeopardy. Call me old-fashioned, but I strongly have the opinion that the highest duty of the President is to serve the public and not to serve himself or to see how much he can get away with.

Can you speak to, you know, what our oversight or impeachment or other powers have to do with, you know, reigning in an administration

that might be defying the rule of law?

Mr. Gerhardt.  They have everything to do with trying to make sure that a President is accountable under law and pursuant to the Constitution.  And so I think that there -- I won't go into a long line of hypotheticals, but the important thing to understand is that it's perfectly reasonable for the committee to be able to inquire into the gravity of things, to look at evidence.  And if that evidence takes them to -- if that evidence supports approval of Articles of Impeachment, that's your job to consider.

There may be a variety of different processes, and we talked about them, that may be appropriate for holding a President accountable for misconduct, and we shouldn't lose sight of all of those different things.  I think all those different things empower the committee to do what it's doing.

Ms. Scanlon.  Thank you.

With that, I would recognize the gentlewoman from Texas, for 5 minutes.

Ms. Garcia.  Thank you, Madam Chair.  And thank you to the witnesses for being here this morning.

And let me just say that, for me, it's refreshing to hear some good dialogue about the important role of Congress and the role that we have in this process, not only in oversight, as has been laid out by Professor Gerhardt, but in continuing to look at this, and Ms. Fredrickson, for you to also outline that these things do take time.

I know that the ranking member made a show of talking about the

show that he thinks this is and bringing out the popcorn, and if we're
going to do an impeachment, we ought to just say it, and this is an
impeachment want-to-be -- inquiry want-to-be.  But we've done the
opposite and met the first day -- or the second time we met and
immediately gone and said it's time for impeachment, here's what we're
going to do.  Everybody would have said we rushed to judgment one day.
So it's about striking a balance and making sure that we're thorough
and that we look at everything.

And one thing that has really concerned me as a lawyer and as a
former judge -- and, Professor Gerhardt, I'll ask you the question,
is this whole notion of the absolute immunity.  And it struck me that
you said that no court has ever opined on that.

Mr. Gerhardt.  Right.

Ms. Garcia.  Is that because no President has ever exerted this
complete absolute immunity?

Mr. Gerhardt.  Immunity to criminal process?

Ms. Garcia.  Yes, sir.

Mr. Gerhardt.  Not yet.

Ms. Garcia.  Or even from testifying.  If you recall, I was -- I,
for one, was totally frustrated when Hope Hicks a couple of weeks ago
came to -- to testify, and she walks in with, I forget, four or five
lawyers, they objected to just about every question we asked.  I think
they objected like about 155 times.  And it was anything having to do
from the beginning of her -- the minute she walks in the White House,
that she has absolute immunity and she can't testify about it.

Mr. Gerhardt.   No --

Ms. Garcia.   And it just seemed to me to be one of the most ridiculous assertions of any kind of privilege.

Mr. Gerhardt.   That would be an abuse of privilege, in my opinion. So privilege, executive privilege, attorney-client privilege, neither of these protects anyone, including the President or anybody that works for the President, to engage in criminal activity.

You wouldn't have the privilege to maintain the confidentiality of that.  In fact, the privilege is maybe not just waived but doesn't apply to conversations that -- or actions that may relate to criminal activity.

Ms. Garcia.   But in her case, it was more than just criminal -- potential criminal activity.

Have you read the transcript?  I mean, it was even talking about her job.

Mr. Gerhardt.   Right.

Ms. Garcia.   I mean, do you think that she's at a level of position that is so sensitive that she couldn't just say what she did at the White House?

Mr. Gerhardt.   And nobody is in that position, not even the President.  Executive privilege may well apply to certain conversations that happened, but they're fairly narrowly defined.  It certainly does not apply to everything the President does or the executive branch does.  If it did, then that -- then in the executive branch, the President would be immune from any kind of check and balance

that can be imposed by either of the other branches.

Ms. Garcia.  And it certainly -- you know, we've also seen many other Trump administration officials either be ordered not to come or they come and they don't really respond to many of our questions.  You know, what does that do to this check and balance that you're referring to?  I mean --

Mr. Gerhardt.  It impedes the authority.

Ms. Garcia.  Can you explain so that the average American understands just why really it's important for us to have Mr. Mueller come here next week, for Hope Hicks to come, for Jared Kushner, and all of the subpoenas?  I mean, this isn't about harassment; this is about getting to the truth.  Because if we don't do that, what might happen?

Mr. Gerhardt.  Yes.  I think it is immensely important.  As a constitutional law professor, my client's the Constitution.  I care about the Constitution.  I care about it being appropriately read and appropriately applied and understood.  And among the things that we would -- should understand about the Constitution is the fact that impeachment is something that happens at the end of a process.  It's not required at the beginning of a process.

You need to be able to have a process, of which this committee clearly, legitimately has the authority to conduct, to determine what happened, the gravity of what happened, and whether or not Articles of Impeachment are appropriate or some other mechanism is appropriate for addressing them.

Ms. <u>Garcia.</u>  And as you said, impeachment inquiry is not in the Constitution, the words?

Mr. <u>Gerhardt.</u>  No.  But impeachment, of course, is.  But Article I, Section 5, vests this committee with the -- vests this Congress the authority to -- to adopt rules for its internal governance. That's -- it's the rules that govern the process that each committee conducts.

Ms. <u>Garcia.</u>  All right.  One final question.  If you were here next week with us, what question would you ask Mr. Mueller?

Ms. <u>Scanlon.</u>  I'm sorry, it's time.

Mr. <u>Gerhardt.</u>  Thank you.

Ms. <u>Scanlon.</u>  You may finish -- did you have a quick answer?

Ms. <u>Garcia.</u>  Do you have a quick answer?  She's --

Mr. <u>Gerhardt.</u>  Oh, well, I can think of a lot of questions.  I do think it's important to clarify and make sure you probably understand the moments in his report when he defers to Congress and is passing the ball to Congress.

Ms. <u>Garcia.</u>  All right.  Thank you.

Thank you, Madam Chair.  I yield back.

Ms. <u>Scanlon.</u>  Okay.  I recognize the gentlewoman from Florida for 5 minutes.

Ms. <u>Mucarsel-Powell.</u>  Thank you, Madam Chair.

I wanted to ask -- start by asking Mr. Gerhardt a question. According to the Mueller report, and among other things, President Trump requested then-Attorney General Jeff Sessions to reverse his

recusal from the special counsel investigation with an eye toward curtailing its scope.  Once President Trump learned that he was under investigation for potential obstruction of justice, President Trump then ordered White House Counsel Don McGahn to have Special Counsel Mueller removed altogether.

So President Trump finds out of Jeff Sessions' recusal, he's extremely upset about this, then he asks Don McGahn to remove the special counsel.  Would this be considered, in your opinion, impeachable conduct?

Mr. Gerhardt.  Well, it certainly raises serious concerns.  And I would -- I would suggest that those actions do raise legitimate suspicions about, not just the motivation, but about the effort to obstruct the investigations into obstructing inquiries that Mr. Mueller was authorized to conduct.

Ms. Mucarsel-Powell.  And can you elaborate on your opinion on whether obstruction has also occurred after this President took office as we in this committee have requested for several fact witnesses to appear before us but they have been ordered by the President to not appear before us?  How would you constitute that?

Mr. Gerhardt.  Well, that's an exercise of power that he's attempting.  The question is whether or not that's an abuse of power.  To be able to direct people, not just who are currently in government, but who used to be in government, from speaking at all to the committee strikes me as a matter of great concern.  That could be an abuse of power, because it stymies the committee's ability to gather evidence

and to make determinations based on that evidence.

Ms. Mucarsel-Powell.  And do you have a view on the Miers holding that there's no absolute immunity for a Presidential aide?  What is your view on that?

Mr. Gerhardt.  Now, immunity from what?  I just want to clarify.

Ms. Mucarsel-Powell.  From testifying.

Mr. Gerhardt.  Oh, from testifying.  I think that -- this is one of those areas where it has to be kind of carefully circumscribed.  So a President obviously has some ability to protect certain things, such as legitimate material protected by executive privilege.  But he -- it doesn't extend to preventing people from doing their constitutional duty, I would say, to be able to comply with a subpoena and come before the committee and talk about things that might have crossed the line and might have been illegal or unconstitutional.

Ms. Mucarsel-Powell.  Okay.  Thank you.

A couple of more questions.  If the executive branch has taken this position that a sitting President can't be indicted as a matter of constitutional law, then Congress probably can't change it through a statute.

Mr. Gerhardt.  Right.

Ms. Mucarsel-Powell.  But we can at least ensure that the statute of limitations for any offense doesn't run out before the President leaves office.

So this is for Ms. Fredrickson.  If the President is immune from prosecution while in office, do you agree that it would make sense for

us to pass a law tolling the statute of limitations for any offenses, to ensure that there will ultimately be a mode of accountability?

Ms. Fredrickson.  Well, it certainly seems like something Congress should examine.  And I think Professor Eastman actually had said that he supports that legislation, so maybe it's a place where you can get strong bipartisan support.

But I would hate to think that our Constitution insulates the President from -- from any kind of accountability while he's President. And so I think it's very important for Congress to consider how to ensure that the President is not above the law.

Ms. Mucarsel-Powell.  Thank you.

And, Mr. Gerhardt, are there any other types of legislation that Congress could enact that would help ensure some measure of accountability in situations where the Justice Department is refusing to bring charges against a sitting President?

Mr. Gerhardt.  I said quite possibly.  For example, I understand there may be legislation under consideration about protecting special prosecutors, special counsels from being easily terminated.  That would be one obvious thing to try to do to try and protect the person whose job it is to consider whether or not there's any misconduct undertaken by the President or anybody at his direction that -- that is criminal or possibly impeachable.

Ms. Mucarsel-Powell.  Thank you.

I yield back my time.

Ms. Scanlon.  Okay.  I just want to remind our committee members

that House rules and precedents require us to refrain from making inappropriate personal references to protected parties, including the President, and this includes accusations of dishonesty, criminality, treason, or other unethical or improper motive.

And with that, I would recognize Mr. Jordan for 5 minutes.

Mr. <u>Jordan.</u>  Thank you, Madam Chair.

Ms. Fredrickson, what's the name of the organization that you -- you head up?

Ms. <u>Fredrickson.</u>  The American Constitution Society.

Mr. <u>Jordan.</u>  American Constitution Society.

Before the Mueller report was made public, and actually 2 days before Attorney General Barr did his first letter to tell us anything about the report, which was March 24 of this year, 2 days prior to that, on March 22, 2019, you said this.  You said, the question isn't whether members of the Trump campaign conspired with Russia to sway the 2016 elections.  We already know they did.

How did you know that before the report even came out?

Ms. <u>Fredrickson.</u>  We had seen multiple indictments as well as prosecutions and convictions of people associated with Russia.

Mr. <u>Jordan.</u>  But shouldn't normally someone who's heading up the Constitution Society, don't you normally wait until an investigation is over?  Isn't -- in this great Nation, people are presumed to be innocent until -- till proven otherwise, and you are already making a finding, stating a finding as the head of the American Constitution Society before we even had the report by the special counsel's office.

Ms. Fredrickson.  There was quite a lot of evidence already in the record.  And I think the Mueller report then goes further to lay out multiple instances of contacts between Trump administration --

Mr. Jordan.  What's interesting -- you just mentioned the Mueller report.  What's interesting is that same day that you said the question isn't whether members of the Trump campaign conspired with Russia to sway the elections, we already know they did -- even though we didn't know that because the report wasn't done -- that same day you wrote an op-ed -- you just mentioned the Mueller report, but you wrote an op-ed that same day, March 22, 2019, where you said we don't need to read the Mueller report.  And now you're telling us we do.

So before the report came out, before Bill Barr said anything, you said we already know he's guilty and, oh, by the way, don't read the report.

Ms. Fredrickson.  Sir, I --

Mr. Jordan.  Now you're telling us we should read the report?

Ms. Fredrickson.  The point was a rhetorical one, that there is already so much evidence out there that Congress needs to examine.

Mr. Jordan.  That's not what -- I've got the headline right there.  We don't need to read the Mueller report.  You wrote that, right?

Ms. Fredrickson.  I didn't write the title actually.  If you read the body of the opinion piece, you will see that it says Congress needs to get this report.  So --

Mr. Jordan.  Here's what you wrote -- just -- second paragraph.

Mr. Mueller's report may never go public, but we don't need to peek
at the recommendations anyway.

So did you write that?

Ms. Fredrickson.  I did.

Mr. Jordan.  Okay.  So you did.  But now you're telling us we
should read the report?

Ms. Fredrickson.  I do, yes.  There is much more in there.

Mr. Jordan.  Let's read the report --

Ms. Fredrickson.  We knew a fair amount already, but now we know
more.  And I think Congress needs to actually see the full report and
the evidence underlying it.  And --

Mr. Jordan.  Let's read the report.  Let's read the report.

Ms. Fredrickson.  -- understand how Russia interfered in our
elections.  Which, again, I will state, I think it's troubling that
your side of the aisle doesn't seem to want to examine --

Mr. Jordan.  I think it's troubling that the head of the American
Constitution Society said we already know that he did something before
the report was final.  Now you're telling us to read the report.

I'm going to read it on page 2.  Page 2, the investigation did
not establish that members of the Trump campaign conspired or
coordinated with the Russian Government in its election interference
activity.

So now that you -- first, you said don't read the report.  Now
you're saying read the report.  I'm reading the report, and it directly
contradicts what you said as the head of the American Constitution

Society.

And, of course, the Democrats think it's fine and appropriate to have the head of the American Constitution Society come in here and lecture us today and tell us today how we need to move towards impeachment.  I mean, I just -- I fail to get it.  I fail to get it.

So what do you say about that sentence right there on page 2, that now that you've changed your mind and say we should read the report, where Bob Mueller says -- the special counsel's office says the investigation did not establish that members of the Trump campaign conspired or coordinated with the Russian Government in its election interference activities?

Ms. Fredrickson.  Well, I think it's unfortunate that you actually haven't read the opinion piece, which does say that Congress needs to see the full Mueller report.  That is what the opinion piece says.

Mr. Jordan.  We're talking about what you wrote, what you said, and what Bob Mueller said.  You said that --

Ms. Fredrickson.  Exactly what the opinion piece says, that Congress needs to get the full Mueller report.

Mr. Jordan.  I think -- Mr. Chairman, here's what's interesting.  Here's what's interesting.  We have a witness today, who before the Mueller report was out, said we already know the President's guilty.  Before Bill Barr issued his first statement on the report, says we already know he's guilty.  That same day that she said those things, she writes an op-ed piece saying don't read the Mueller report, because

if you do, you'll find out what she claimed is absolutely not true.

Ms. <u>Fredrickson.</u>  I would actually --

Mr. <u>Jordan.</u>  And she's an expert witness today.

Ms. <u>Fredrickson.</u>  -- once again, would recommend that you actually read the piece so that you can see what it says.

Mr. <u>Jordan.</u>  I read your piece.  I read the whole --

Ms. <u>Fredrickson.</u>  Apparently not, because it does say that Congress --

Mr. <u>Jordan.</u>  I did just a few minutes ago.  Because I remember the exchange we had a few months ago right after -- right after Bill Barr had sent his March 24 letter we had a little discussion about this same type -- I can't believe the Democrats invited you back.

I yield back.

Ms. <u>Fredrickson.</u>  As I said, it's really unfortunate you don't actually bother to read beyond the title.

Mr. <u>Jordan.</u>  Mr. Chairman, I've got 20 seconds -- I've got 4 seconds.  I did read -- and you know what?  I did not follow her advice.  I read the Mueller report.  She's telling people not to.

Ms. <u>Scanlon.</u>  Okay.  And I know that the Mueller report then goes on to say that his conclusions would change if he were given access to additional evidence.

I now recognize Mr. Swalwell for 5 minutes.

Mr. <u>Swalwell.</u>  Thank you, Madam Chair.

Professor Fredrickson, is there a difference between criminal conspiracy, something that could be proved beyond a reasonable doubt,

and conspiracy?

Ms. <u>Fredrickson.</u>  Well, there's certainly a distinction in how the public talks about it and our understanding.  And one of the things I had, you know, was hoping to engage in with your colleague here from the other side of the aisle, is an understanding that all of our intelligence agencies have indicated that the Russians had made sweeping attacks on our election systems.  There were multiple contacts with Trump campaign officials that there were indictments, there were prosecutions.  There's an enormous need for Congress to actually probe more deeply into how this happened and how to prevent it from happening again.

Mr. <u>Swalwell.</u>  And when you read the 200 pages of Volume I that lay out the multiplicity of contacts between the Trump campaign and the Russians, do you see a failure of imagination by prior Congresses to write laws that would protect us from this type of conduct and to have a criminal remedy?  Do you see gaps that occurred, like being approached and not telling the FBI that foreign adversaries are trying to --

Ms. <u>Fredrickson.</u>  I know that Members of Congress are proposing such legislation.  I think it's important to, again, I think as part of your authorities, to examine what happened, to see if in fact the laws were too weak and that allowed hostile foreign powers to have undue influence on campaign officials and to understand how influence might have been reached.

And so, yes, I think it's a very important part of your duties

to protect the integrity of our elections.

Mr. <u>Swalwell.</u>  Thank you, Professor.

And, Professor Gerhardt, recognizing that the Mueller report says criminally the laws that we have now, no proof beyond a reasonable doubt that there was conspiracy in Volume I.  However, functionally, as a Congress and constitutionally, because of the conduct that's laid out, is there recourse through impeachment -- just in what you have seen in how the Founders have described impeachment and how prior Congresses have engaged on impeachment, do you see a recourse for impeachment based on the 200 pages of just Volume I conduct?

Mr. <u>Gerhardt.</u>  I think it's reasonable -- quite reasonable to consider the propriety of it.  I think that it is reasonable to inquire, to investigate, to determine evidence and, again, to be able to hear witnesses and put together a record that is helpful to Congress to understand the gravity of whatever's happened, and as well as just whatever did happen.

One other thing I would just sort of emphasize in this context is something we've repeated a few times today, but it's really important to remember, and that is impeachable offenses don't have to be actual crimes.  And so this committee, this House, or another committee or another House another time, may decide that there is something that's really serious, and they may want to call it conspiracy or they might want to call it something else, and they're entitled to do that.  And they can take -- they have the authority to conduct proceedings to figure out what's happened.

Mr. <u>Swalwell.</u>   And in your reading of the report, would you agree, Professor Gerhardt, that the Mueller team did not look at financial compromise of the President or anyone on his team?

Mr. <u>Gerhardt.</u>   That's correct.   And, again --

Mr. <u>Swalwell.</u>   And I'll just let you -- let me add on to that. And would you agree that an impeachment inquiry would not prohibit the inquiring body from looking at financial compromise?

Mr. <u>Gerhardt.</u>   That's correct.

Mr. <u>Swalwell.</u>   Great.   Thank you.

And I would yield back.   Thank you.

Ms. <u>Scanlon.</u>   Okay.   Thank you.

Okay.   This will conclude today's hearing.   I want to thank all the witnesses for attending.   We really appreciate your insights.

And without objection, all members will have 5 legislative days to submit additional written questions for the witnesses or additional materials for the record.

Without objection, the hearing's adjourned.

[Whereupon, at 11:47 a.m., the committee was adjourned.]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

                              *Plaintiff*,

        v.                                              Case No. 1:19-cv-2379 (KBJ)

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

                              *Defendant*.

# Exhibit P

# U.S. House of Representatives
## Committee on the Judiciary
### Washington, DC 20515–6216
#### One Hundred Sixteenth Congress
### MEMORANDUM

| | |
|---|---|
| **To:** | Members of the Committee on the Judiciary |
| **From:** | Chairman Jerrold Nadler |
| **Date:** | July 11, 2019 |
| **Re:** | Lessons from the Mueller Report, Part III: "Constitutional Processes for Addressing Presidential Misconduct" |

The Committee on the Judiciary on Friday, July 12, 2019, at 9:00 a.m. in room 2141 of the Rayburn House Office Building will hold a hearing on "Lessons from the Mueller Report, Part III: 'Constitutional Processes for Addressing Presidential Misconduct.'" The Majority witnesses are Caroline Fredrickson, President, American Constitution Society; and Michael Gerhardt, Samuel Ashe Distinguished Professor in Constitutional Law, University of North Carolina School of Law. The Minority witness is Dr. John Eastman, Henry Salvatori Professor of Law and Community Service Director, Center for Constitutional Jurisprudence, Dale E. Fowler School of Law.

## I.    Congress' Article I Authorities

The purpose of this hearing is to examine the range of constitutional remedies for addressing presidential misconduct available to Congress under its Article I powers.

By way of background, the redacted version of the "Report On The Investigation Into Russian Interference In The 2016 Presidential Election" ("Mueller Report" or "the Report") finds that the Russian government attacked the 2016 U.S. presidential election in "sweeping and systematic fashion." The Mueller Report, released on April 18, 2019, also describes multiple instances of possible obstruction of justice by President Donald Trump that were investigated by Special Counsel Robert S. Mueller, III. As the Special Counsel states in the Mueller Report:

> [I]f we had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, we would so state. Based on the facts and the applicable legal standards, however, we are unable to reach that judgment. The evidence we obtained about the President's actions and intent presents difficult issues that prevent us from conclusively determining that no criminal conduct occurred. Accordingly, while this report does not conclude that the President committed a crime, it also does not exonerate him.[1]

The Committee on the Judiciary has a constitutional duty to investigate credible allegations of misconduct by executive branch officials, including the President of the United States. The Mueller

---

[1] Mueller Report, Vol. II at 2.

Report explicitly acknowledged Congress's role in investigating and potentially rectifying presidential misconduct. In explaining why the Report did not reach a "traditional prosecution or declination decision" regarding the President's conduct outlined in Volume II, the Special Counsel "recognized that a federal criminal accusation against a sitting President would place burdens on the President's capacity to govern and potentially preempt **constitutional processes for addressing presidential misconduct.**"[2] That passage is the source for tomorrow's hearing title and reflects the Special Counsel's recognition that under our Nation's tripartite system of government each branch acts as a check on the power of the others. As the Mueller Report's frequent references to Congress make clear, Congress has a role in investigating the potential presidential misconduct he uncovered so that it may determine how best to exercise its Article I powers to act as a check on the abuse or misuse of Executive Branch power.

Accordingly, the Committee has sought to obtain the full version of the Mueller Report, in addition to key underlying evidentiary and investigative materials.[3] The Committee has also sought to obtain documents and testimony from former White House Counsel Donald McGahn[4] and others as part of its "investigation into the alleged obstruction of justice, public corruption, and other abuses of power by President Donald Trump, his associates, and members of his Administration and related concerns."[5] The Committee has previously specified that the purpose of this investigation is to independently ascertain the relevant facts in order to determine the appropriate steps to take pursuant to its Article I powers:

> The purposes of this investigation include: (1) investigating and exposing any possible malfeasance, abuse of power, corruption, obstruction of justice, or other misconduct on the part of the President or other members of his Administration; (2) considering whether the conduct uncovered may warrant amending or creating new federal authorities, including among other things, relating to election security, campaign finance, misuse of electronic data, and the types of obstructive conduct that the Mueller Report describes; and (3) considering whether any of the conduct described in the Special Counsel's Report warrants the Committee in taking any further steps under Congress' Article I powers. That includes whether to approve articles of impeachment with respect to the President or any other Administration official, as well as the consideration of other steps such as

---

[2] Mueller Report, Vol. II at 1 (citing U.S. CONST. Art. I § 2, cl. 5; § 3, cl. 6) (emphasis added).

[3] On April 19, 2019, the Committee issued a subpoena to Attorney General Barr seeking an unredacted copy of the Mueller Report and underlying materials. The Attorney General failed to comply with subpoena. The Committee voted to hold him in contempt on May 8, 2019. The specific factual circumstances surrounding the Barr subpoena are described in House Report 116-105, which was filed by the Judiciary Committee on June 6, 2019. On June 10, 2019, the Department of Justice agreed to begin complying with this subpoena by setting up a process by which all Members of the Committee are permitted to review key underlying documents referenced in the Mueller Report and to review a less-redacted version of Volume II of the Mueller Report, excluding grand jury information. The Department's production of underlying documents remains ongoing, and enforcement of the subpoena therefore remains pending. The Committee's effort to obtain these materials is consistent with the views expressed by the House in H. Con. Res. 24, which passed the House unanimously and called for "the full release to Congress of any report, including findings, Special Counsel Mueller provides to the Attorney General."

[4] The Mueller Report revealed that Mr. McGahn was a witness to multiple instances of potential obstruction of justice. As such, on April 22, 2019, Chairman Nadler issued a subpoena for testimony and documents from Mr. McGahn. The subpoena requested that Mr. McGahn produce documents shared with him or his counsel by the White House during the Special Counsel's investigation by May 7, 2019 and appear to testify before the Committee on May 21, 2019. On May 21, 2019 the Judiciary Committee held its scheduled hearing and Mr. McGahn did not appear. More specific details surrounding the McGahn subpoena are set forth in the relevant section of House Report 116-108.

[5] H. Rep. No. 116-105, at 13 (2019).

censure or issuing criminal, civil or administrative referrals. No determination has been made as to such further actions, and the Committee needs to review the unredacted report, the underlying evidence, and associated documents so that it can ascertain the facts and consider its next steps. [6]

H. Res. 430, authorizing the Committee on the Judiciary to initiate or intervene in judicial proceedings to enforce certain subpoenas and for other purposes, as passed by the House on June 11, 2019 affirmed "[t]hat in connection with any judicial proceeding brought under the first or second resolving clauses, the chair of any standing or permanent select committee exercising authority thereunder has any and all necessary authority under Article I of the Constitution."[7]

As described above, this Committee is currently investigating allegations of presidential misconduct described in the Mueller Report and other potential abuses of power. With regard to the Committee's responsibility to determine whether to recommend articles of impeachment against the President, articles of impeachment have already been introduced in this Congress and referred to the Judiciary Committee.[8] They are under consideration as part of the Committee's investigation, although no final determination has been made. In addition, the Committee has the authority to recommend its own articles of impeachment for consideration by the full House of Representatives. The Committee seeks key documentary evidence and intends to conduct hearings with Mr. McGahn and other critical witnesses testifying to determine whether the Committee should recommend articles of impeachment against the President or any other Article I remedies, and if so, in what form. With respect to the grand jury information included in the Mueller Report, because the Committee has not been provided access to any grand jury materials, H. Res. 430 also authorized the Committee to petition the federal court to provide it with access to that information.[9] As such, the hearing discussion may cover the question of how to best safeguard any grand jury materials the Committee receives.

While censure of the President is rare, Congress has previously passed measures expressing disagreement with specific presidential conduct.[10] Examples include an 1834 Senate resolution repudiating President Andrew Jackson for removing his Treasury Secretary because of his refusal to withdraw government deposits from the Bank of the United States, and an 1842 House committee report criticizing President John Tyler's use of the veto, accusing him of a "gross abuse of constitutional power."[11] There is also precedent for a more formal version of censure, in which a house of Congress adopts a resolution not only stating its disagreement with presidential conduct, but also announcing that it finds the conduct worthy of an explicit and official reprimand.[12] In 1860, for example, the House

---

[6] *Id.*

[7] As explained in House Report 116-108 accompanying H. Res. 430, "this clause confirms that each committee has the full authority of the House of Representatives to enforce its subpoenas" and that "Committees may, in connection with exercising their authority under this resolved clause, choose to specify the precise constitutional powers upon which they are relying, as well as the legitimate legislative purposes and details of their work within the full bounds of their authority under Article I, whether at or in connection with hearings, in Committee reports, memoranda, or through other means."

[8] H. Res. 13, 116th Cong. (2019).

[9] H. Res. 430, 116th Cong. (2019).

[10] Todd Garvey, *The Constitutionality of Censuring the President*, CRS Legal Side Bar LSB10096, at 2 (Mar. 12, 2018) (referred to as CRS Legal Side Bar LSB10096).

[11] *Id.*

[12] *Id.*

adopted a resolution stating that President James Buchanan deserved the "reproof of this House" for awarding federal contracts to party loyalists.[13]

With regard to a possible criminal, civil, or administrative referral, the Department of Justice has discretion as to whether to act upon a referral by Congress for prosecution or civil enforcement. Moreover, with regard to presidential misconduct, the Department's policy prohibiting the prosecution of a sitting president is an obstacle to DOJ holding him or her accountable for misconduct while in office.[14] State authorities may be more willing to consider enforcing state laws against a president to the extent they deem appropriate under applicable law. Nonetheless, the President is not immune from criminal prosecution after leaving office, and the Supreme Court has already held that a sitting President may be sued in his or her personal capacity for conduct that occurred before taking office.[15] Thus, the congressional referral process serves the important purpose of creating a record and preserving and referring evidence for such time as prosecution, civil enforcement, or other administrative response is feasible.

In addition to these Article I authorities, the hearing is also expected to consider a range of legislative responses to allegations of presidential misconduct, including the operation of the special counsel regulations, and the Administration's efforts to use expansive theories of absolute immunity, executive privilege, and other legal theories to block and limit congressional investigations. These matters raise important constitutional questions.

## II.     Possible Legislative Remedies Related to Presidential Misconduct

The following is a non-exclusive list of possible legislative responses that fall within the Judiciary Committee's jurisdiction.

### A.     Transparency With Regard to White House/DOJ Communications Concerning Law Enforcement Investigations

As described in Volume II of the Mueller Report, President Trump repeatedly attempted to curtail or impede the Special Counsel's investigation. According to the Report, among other things, President Trump requested then-Attorney General Jeff Sessions to reverse his recusal from the Special Counsel investigation with an eye toward curtailing its scope.[16] Once President Trump learned that he was under investigation for potential obstruction of justice, President Trump ordered White House Counsel Don McGahn to have Special Counsel Mueller removed altogether.[17]

---

[13] *Id.*

[14] *See A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (2000) ("2000 OLC Memo").

[15] Clinton v. Jones, 520 U.S. 681 (1997).

[16] Mueller Report, Vol II at 5.

[17] *Id.* Vol. II at 4. In an exchange with Senator Kamala Harris (D-CA) at a May 1, 2019 hearing, Attorney General Barr struggled to answer whether "the President or anyone at the White House ever asked or suggested" that he "open an investigation of anyone," stating "I'm, I'm trying to grapple with the word 'suggest.' I mean, there have been discussions of, of matters out there that, uh—they have not asked me to open an investigation, but..." *The Department of Justice's Investigation of Russian Interference with the 2016 Presidential Election: hearing before the S. Comm. on the Judiciary,* 116th Cong. (2019). Additionally, at a February 8, 2019 hearing before this Committee, Acting Attorney General Matthew Whitaker would not explicitly deny that he had any contacts with the President or the White House regarding ongoing Trump-related investigations in the Southern District of New York in response to direct questions posed by numerous

4

A number of legislative proposals would address this type of interference in law enforcement investigations. H.R. 3380, the "Security from Political Interference in Justice Act," introduced by Rep. Hakeem Jeffries (D-NY), would serve to deter further White House interference in law enforcement investigations through the imposition of transparency and recordkeeping requirements on the White House and the Justice Department related to certain communications between the two. The legislation would require the White House and the Department of Justice to log certain covered communications between their personnel relating to criminal and civil investigations, and to periodically share those logs with Congress, along with the Department's Inspector General and Office of Professional Responsibility. Additionally, the head of each of these investigative offices would be required to notify Congress if after reviewing the logs they determine that a covered communication is inappropriate from a law enforcement perspective or raises concerns about improper political interference.

## B.     Special Counsel Reform Legislation; Tolling of Statutes of Limitation

Various bills have been introduced that would impose additional safeguards designed to protect the integrity and independence of future special counsel investigations. Although, existing regulations governing the appointment and removal of a special counsel already provide some limitations on his or her removal, the Attorney General may ultimately rescind or modify these protections against unwarranted removal. H.R. 197, the "Special Counsel Independence and Integrity Act," introduced by Chairman Nadler (D-NY), would codify those protections by statute and would permit a special counsel who believes his or her removal was unlawful to contest that removal in court. Senator Lindsey Graham (R-SC), Chairman of the Senate Committee on the Judiciary, has proposed similar legislation that would also codify other aspects of existing special counsel regulations.[18] Another related bill, H.R. 47, the "TRUMP Special Counsel Act," introduced by Rep. Sheila Jackson Lee (D-TX), would also impose additional safeguards.

Attorney General Barr's oversight of the Special Counsel's investigation and his handling of the Mueller Report's release have also raised several additional policy concerns. Under current Department of Justice regulations, the Attorney General is not required to release the report of a special counsel to Congress or the public. While Attorney General Barr eventually publicly released a redacted version of the Report, he published a letter purportedly summarizing the Report's chief conclusions prior to its release. Additionally, immediately before he released the Report to the public and Congress, Attorney General Barr held a press conference at which he publicly characterized the Special Counsel's findings. Furthermore, Attorney General Barr initially only provided a redacted version of the Report to Congress. While the Committee eventually negotiated greater Member access to a less redacted version of Volume II of the Report, those efforts entailed months of negotiations and the threat of a criminal contempt referral. To date, no Member of Congress has seen the full unredacted Report.

To address these transparency concerns, Rep. Lloyd Doggett (D-TX) introduced H.R. 1356, the "Special Counsel Transparency Act," which requires a Special Counsel's report to be given directly to the Chair and Ranking Member of the House and Senate Judiciary Committees, while being made

---

Members of the Committee. *See, e.g.*, Aaron Blake, *Matthew Whitaker's testimony about Trump trying to influence the Cohen inquiry was cagey. Now we might know why*, WASH. POST, Feb. 20, 2019; Mark Mazzetti et al., *Intimidation, Pressure and Humiliation: Inside Trump's Two-Year War on the Investigations Encircling Him*, N.Y. TIMES, Feb. 19, 2019.
[18] S. 71, the "Special Counsel Independence and Integrity Act," 116th Cong. (2019).

available to the public in a manner consistent with the Freedom of Information Act. H.R. 1357, the "Special Counsel Reporting Act," also introduced by Rep. Doggett, would additionally require the Special Counsel to update certain Members of Congress during the course of an investigation, among other congressional reporting requirements.

In addition, Attorney General Barr's decision declining to charge the President has raised important public policy issues. The Department of Justice's Office of Legal Counsel (OLC) has concluded that a sitting President cannot be indicted or prosecuted.[19] In his May 24, 2019 letter summarizing the principal conclusions of the Special Counsel's report, Attorney General Barr wrote "that the evidence developed during the Special Counsel's investigation is not sufficient to establish that the President committed an obstruction-of-justice offense," and that this "determination was made without regard to, and is not based on, the constitutional considerations that surround the indictment and criminal prosecution of a sitting president." The decision by Attorney General Barr, a political appointee of the President, to nonetheless make an express declination determination favoring the President raises significant policy issues. Moreover, the Special Counsel raised those very "constitutional considerations" in the Report to explain why he had declined to make a traditional prosecutorial judgment. There, he noted that Department policy forbids the prosecution of a sitting president and that "[f]airness concerns counseled against potentially reaching that judgment when no charges can be brought."[20]

The circumstances created by this policy also raise significant questions regarding Congress's ability under Article I to enact legislation to create accountability for presidential misconduct, as a president may be technically criminally liable for conduct in office yet remain effectively above the law. While potential legislation directly negating the policy raises potential constitutional concerns, there is little debate that the President may be prosecuted after leaving office. As such, Chairman Nadler has introduced H.R. 2678, the "No President is Above the Law Act," which would toll the statute of limitations on any offense committed by a president, whether before or during his or her term of office, to ensure that he or she is ultimately held accountable for any criminal wrongdoing.

## C.    Pardon Legislation

As part of the investigation into potential obstruction of justice, the Special Counsel also examined the President's conduct toward witnesses such as Paul Manafort and Michael Cohen. Volume II of the Mueller Report noted that the "President's acts directed at witnesses" included "discouragement of cooperation with the government and suggestions of possible pardons," many of which took place in plain view.[21] Additionally, in June 2018, in the midst of the Special Counsel investigation, President Trump implied that he may pardon himself in relation to the investigation, tweeting "As has been stated by numerous legal scholars, I have the absolute right to PARDON myself, but why would I do that when I have done nothing wrong? In the meantime, the never ending Witch Hunt, led by 13 very Angry and Conflicted Democrats (& others) . . . ."[22]

---

[19] 2000 OLC Memo; *see also* Memorandum from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, *Re: Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973).

[20] Mueller Report, Vol. I at 2.

[21] Mueller Report, Vol. II at 5-6.

[22] Caroline Kenny, *Trump: 'I have the absolute right to pardon myself'*, CNN (Jun. 4, 2018) *available at* https://www.cnn.com/2018/06/04/politics/donald-trump-pardon-tweet/index.html.

Several Members of Congress have introduced legislation either proposing an amendment to the Constitution to limit the scope of executive clemency or to increase transparency regarding presidential pardons.  Rep. Steve Cohen (D-TN) has introduced a proposed amendment to the Constitution that would prohibit the President from granting clemency to him or herself, certain specified close family members, or "to any current or former member of the President's administration, or to anyone who worked on the President's presidential campaign as a paid employee."[23]  Rep. Al Green (D-TX) has introduced a similar proposed amendment that would only prohibit the President from granting clemency to him or herself.[24]  Rep. Adam Schiff (D-CA) has introduced legislation to require the Department of Justice within 30 days after a pardon to produce to the appropriate Congressional committees all investigative materials related to an offense that arises from an investigation involving the President or a President's relative for whom a pardon is granted.[25]  Rep. Raja Krishnamoorthi (D-IL) has introduced legislation to require the Attorney General within three days of a presidential reprieve or pardon to publish in the Federal Register and on the official website of the President the name of the person, the date on which the reprieve or pardon issued, and the full text of the reprieve or pardon.[26]

### D.    Foreign Contacts

Volume I of the Mueller Report, which begins by describing the Russian government's extensive attacks against the integrity of the 2016 presidential election, also describes certain conduct by the Trump Campaign and individuals associated with the Campaign that could constitute evidence of potential coordination between the Trump Campaign and the Russian government.  The Mueller Report documents numerous Russian contacts, which "consisted of business connections, offers of assistance to the Campaign, invitations for candidate Trump and Putin to meet in person, invitations for Campaign officials and representatives of the Russian government to meet, and policy positions seeking improved U.S.-Russian relations."[27]

The Trump Campaign's conduct during the 2016 presidential election therefore presents significant concerns regarding the influence of foreign governments over candidates for federal office.  As such, several Members of Congress have introduced legislation that would require campaigns to report their contacts with foreign governments.  Rep. Eric Swalwell (D-CA) has introduced legislation that would impose on political committees, their agents, or the committee of a candidate for federal office an affirmative duty: 1) to report to the Federal Election Commission any offers of prohibited contributions, donations, expenditures, or disbursements may by a foreign national; and 2) to disclose the identity and purpose of any meeting with a foreign government or agent of a foreign power, with

---

[23] H.J. Res. 8, 116th Cong. (2019).

[24] H.J. Res. 13, 116th Cong. (2019).

[25] H.R. 1627, 116th Cong. (2019).

[26] H.R. 1348, 116th Cong. (2019).

[27] Mueller Report, Vol. 1 at 5.  During a recent interview, in response to a question on whether his campaign would accept information damaging to his opponent from foreign governments or report such an offer to the FBI, President Trump said, "I think maybe you do both."  He went on to say, "It's not an interference, they have information -- I think I'd take it…If I thought there was something wrong, I'd go maybe to the FBI -- if I thought there was something wrong. But when somebody comes up with oppo research, right, they come up with oppo research, 'oh let's call the FBI.' The FBI doesn't have enough agents to take care of it. When you go and talk, honestly, to congressman, they all do it, they always have, and that's the way it is. It's called oppo research." ABC News' Oval Office interview with President Trump, Jun. 13, 2019 *available at* https://abcnews.go.com/Politics/abc-news-oval-office-interview-president-donald-trump/story?id=63688943.

failure to comply with these reporting resulting in criminal penalties.[28]  Rep. Sheila Jackson Lee (R-TX) has introduced a similar bill, H.R. 2353, the "Duty to Refuse and Report Foreign Interference in American Elections Act of 2019."  Senator Mark Warner (D-VA) has also introduced S.1562, the "Foreign Influence Reporting in Elections Act."

### E.      Subpoena Enforcement

The Trump Administration's refusal to comply with many Congressional subpoenas also raises constitutional concerns.   In the 115th Congress, the Committee considered H.R. 4010, the "Congressional Subpoena Compliance and Enforcement Act of 2017," introduced by Rep. Darrell Issa (R-CA).[29]  This legislation provided expedited procedures for Congress to enforce a subpoena in court and would impose monetary penalties on the head of an agency that refused to comply with a subpoena. The Judiciary Committee reported H.R. 4010 unanimously, and it passed by voice vote on the House floor.   Representative Madeleine Dean (D-PA) plans to reintroduce the legislation in the 116th Congress.

## III.    Additional Legal and Constitutional Issues Presented

### A.      Presidential Immunity from Prosecution

The Special Counsel specifically cited the OLC opinion about whether a sitting President can be prosecuted as one of the principal grounds for his decision not to reach a traditional prosecutorial judgment regarding President Trump's conduct outlined in Volume II of the Report.  As noted previously, this policy gives rise to significant concerns about whether the President is effectively placed above the law while in office.  Because OLC's opinion is based on constitutional considerations, it also gives rise to significant concerns about Congress's own Article I abilities to enact legislation ensuring accountability for presidential misconduct.

In 1973, OLC issued a memorandum concluding that a sitting President cannot be indicted or prosecuted while in office.[30]  OLC's 1973 opinion acknowledged that no explicit textual provision of the Constitution precludes the prosecution of the President.  OLC also considered but did not ultimately accept the argument that the President's position as head of the executive branch precludes him or her from being prosecuted by officers who are, as a structural matter, the President's subordinates.  Instead, OLC based its reasoning on the notion that facing criminal charges would "unduly interfere in a direct or formal sense with the conduct of the Presidency."[31]  OLC assessed that having to face a criminal trial and possible prison sentence would essentially incapacitate the President, making it impossible to perform essential constitutional functions.  It also noted that "under our constitutional plan as outlined in Article I, sec. 3, only the Congress by the formal process of impeachment, and not a court by any process should be accorded the power to interrupt the Presidency or oust an incumbent."[32]

---

[28] H.R. 2424, 116th Cong. (2019).

[29] H.R. 4010, 115th Cong. (2017).

[30] Memorandum from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, *Re: Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973).

[31] *Id.* at 27.

[32] *Id.* at 28.

In 2000, OLC reaffirmed its analysis and its conclusion.[33] Its lengthy opinion first described the 1973 opinion in detail, followed by a description of a brief filed by then-Solicitor General Robert Bork (also in 1973) arguing that then-Vice President Spiro Agnew was amenable to prosecution while in office. That brief, consistent with the 1973 OLC opinion, argued that only the President was immune from prosecution while in office.[34] Next, OLC assessed whether any intervening case law warranted changing its conclusions, and it determined that three relevant decisions were "largely consistent" with its prior analysis.[35]

OLC examined three Supreme Court decisions: (1) *United States v. Nixon*,[36] in which the Court recognized the existence of executive privilege but held that the privilege was not absolute and affirmed a judgment ordering President Nixon to turn over various tape recordings to Special Prosecutor Jaworksi; (2) *Nixon v. Fitzgerald*,[37] in which the Court held that the President is absolutely immune from civil damages suits based upon his official acts while in office; and (3) *Clinton v. Jones*,[38] in which the Court held that the President can be sued for civil damages while in office over claims based on his personal conduct before he became President. OLC described all three cases as having "balance[d] the constitutional interests underlying a claim of presidential immunity against the governmental interests in rejecting that immunity."[39] In OLC's view, the same balancing analysis supports a conclusion that a President cannot be indicted or prosecuted while in office because of the unique burdens that such proceedings—and, potentially, an actual sentence of imprisonment—would impose.[40]

OLC acknowledged the "important national interest in ensuring that no person—including the President—is above the law."[41] It also acknowledged the importance of avoiding the possibility that the statute of limitations could run out by the time the President leaves office.[42] However, it noted that "a President suspected of the most serious criminal wrongdoing might well face impeachment and removal from office before his term expired, permitting criminal prosecution at that point."[43] Additionally, it noted that the statute of limitations could be tolled by a court—or that Congress "could overcome any such obstacle by imposing its own tolling rule."[44] As to the argument that impeachment itself might pose the same or similar types of burdens on the President's exercise of his or her constitutional duties, OLC stated that this risk is "expressly contemplated by the Constitution," and that "the Framers themselves specifically determined that the public interest in immediately removing a sitting President whose continuation in office poses a threat to the Nation's welfare outweighs the public interest in avoiding the Executive burdens incident thereto."[45]

Some scholars have criticized OLC's analysis and conclusions. Professor Laurence Tribe, for example, has argued that it is untenable that a President could commit a crime in order to win an election, escape accountability while in office, and then benefit from a pardon from a hand-picked Vice

---

[33] 2000 OLC Memo.
[34] *See id.* at 232-36.
[35] *Id.* at 238.
[36] 418 U.S. 683 (1974).
[37] 457 U.S. 731 (1982).
[38] 520 U.S. 681 (1997).
[39] 2000 OLC Memo at 244.
[40] *Id.* at 246-58.
[41] *Id.* at 255.
[42] *Id.* at 256.
[43] *Id.*
[44] *Id.*
[45] *Id.* at 258.

9

President upon the President's resignation or impeachment.[46]  Walter Dellinger, who served as the Assistant Attorney General in charge of OLC from 1993 to 1996, has argued that the President could potentially be *indicted* while in office even if not prosecuted.[47]  Nonetheless, Special Counsel Mueller stated that his office accepted OLC's conclusions for purposes of their investigation.[48]

OLC opinions are generally considered to be binding upon the executive branch.  On rare occasions, OLC has rescinded prior opinions if it later determines their reasoning to be fundamentally unsound.  This occurred, for example, with respect to several opinions authored by former Deputy Assistant Attorney General John Yoo regarding the treatment of detainees, the Foreign Intelligence Surveillance Act, and other national security matters.[49]  The Attorney General also has the authority to override OLC, and he or she could conceivably rescind prior OLC opinions.  The President, as chief executive, could also conceivably instruct the Attorney General to take such actions, although it is unclear whether any President has done so previously.

### B.   White House Officials' Purported "Absolute Immunity" from Compelled Testimony and Excessive use of Executive Privilege

#### 1.   Absolute Immunity

In several recent instances, the Trump administration has asserted that various former White House officials are "absolutely immune" from having to comply with congressional subpoenas for testimony.  On this basis, President Trump instructed former White House Counsel Don McGahn not to appear before this Committee in response to its subpoena.  He also instructed former White House Communications Director Hope Hicks not to answer any questions in a transcribed interview that related to her service in the White House.  Additionally, the Trump administration has indicated that the President may assert "absolute immunity" with respect to White House adviser Kellyanne Conway in response to a subpoena from the Committee on Oversight and Reform.[50]

On May 20, 2019, OLC issued an opinion (the "Engel Memorandum") supporting this position with respect to Mr. McGahn.[51]  The Engel Memorandum correctly notes that administrations of both parties have claimed that White House officials are "absolutely immune" from having to provide compelled testimony before Congress.  One well-known instance occurred when President George W. Bush took this position with respect to former White House Counsel Harriet Miers, who was subpoenaed by this Committee in the course of its investigation into the firings of several U.S. Attorneys.  President Obama also took this position with respect to then-White House adviser David Simas, who was subpoenaed by the Committee on Oversight and Government Reform in the course of an investigation into possible Hatch Act violations.[52]  The basis for such a claim was first described in a

---

[46] Laurence H. Tribe, *Constitution Rules Out Immunity for Sitting Presidents*, BOSTON GLOBE, Dec. 12, 2018.

[47] Walter Dellinger, *Indicting a Sitting President Is Not Foreclosed: The Complex History*, Lawfare Blog, June 18, 2018.

[48] Special Counsel Robert S. Mueller, III, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election*, Vol. II at 3 (March 2019).

[49] *See* Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, Memorandum *Re: Status of Certain OLC Opinions Issued in the Aftermath of the Terrorist Attacks of September 11, 2001* (Jan. 15, 2009).

[50] *See* Letter to Elijah E. Cummings, Chair, H. Comm. on Oversight & Reform, from Pat A. Cipollone, Counsel to the President (June 24, 2019) (stating that Ms. Conway would decline a voluntary invitation for testimony.  In response, the committee voted to authorize a subpoena.).

[51] Memorandum from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, *Re: Testimonial Immunity Before Congress of the Former Counsel to the President* (May 20, 2019) ("Engel Memorandum").

[52] *See Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. __ (July 15, 2014).

1971 memorandum written by William Rehnquist, who was then serving as the Assistant Attorney General in charge of OLC.[53]

The Engel Memorandum principally argues that requiring senior White House officials to testify before Congress would interfere in various ways with the separation of powers. It asserts that this would create an opportunity for Congress to try to "supervise the President's actions," because senior White House aides essentially serve as the President's "alter egos."[54] It also claims that having to testify in front of Congress could divert senior White House aides from their primary responsibilities to the President. Additionally, OLC claims that such compelled testimony would create an inherent risk of disclosing privileged material, notwithstanding the witness's ability to assert privilege on a question-by-question basis.[55]

However, the only court ever to consider these arguments has decisively rejected them. When this Committee sued to compel Ms. Miers's testimony, the U.S. District Court for the District of Columbia, in an opinion issued by Judge Bates, held that the "absolute immunity" doctrine had no basis in any case law.[56] To the contrary, Judge Bates pointed out that in the most closely analogous case, *Harlow v. Fitzgerald*,[57] the Supreme Court had concluded that senior White House aides are not absolutely immune from civil damages suits.[58] In doing so, the Court had rejected the idea that such advisers serve as "alter egos" to the President—a central underpinning of OLC's rationale for absolute immunity from compelled testimony. Judge Bates concluded that the rationales for excusing White House aides from congressional testimony are in fact weaker than those for excusing them from civil damages suits, noting that other senior administration officials, such as Cabinet officials in charge of various departments and agencies, testify before Congress on a regular basis.[59]

The Engel Memorandum also states that the administration's position is "the same answer that the Department of Justice has repeatedly provided for nearly five decades."[60] However, although the Department has maintained a position that senior White House aides are immune from compelled testimony, the record of the White House permitting senior aides to testify before Congress—whether on a voluntary basis or through some other accommodation reached with the relevant congressional committee—is decidedly more mixed. The Congressional Research Service, for example, has catalogued dozens of instances in recent decades in which senior White House aides have testified before various committees.[61] Thus, although the Department and OLC have maintained their position as a theoretical matter that a White House aide cannot be forced to testify over the President's objections, as a practical matter such objections have often been reserved or withdrawn in the face of congressional subpoenas or other pressures.

## 2.    Executive Privilege

---

[53] *See* Engel Memorandum at 2.

[54] *Id.* at 5; *see id.* at 13.

[55] *Id.* at 5-6.

[56] *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008).

[57] 457 U.S. 800 (1982).

[58] *Miers*, 558 F. Supp. at 100-01.

[59] *Id.* at 101.

[60] Engel Memorandum at 1.

[61] *See* Harold C. Relyea & Todd B. Tatelman, *Presidential Advisers' Testimony Before Congressional Committees: An Oversight*, Congressional Research Service, Apr. 10, 2007.

I'm

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

                *Plaintiff*,

    v.

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

               *Defendant*.

Case No. 1:19-cv-2379 (KBJ)

# Exhibit R

JERROLD NADLER, New York
CHAIRMAN

DOUG COLLINS, Georgia
RANKING MINORITY MEMBER

# 𝔘.𝔖. 𝔥𝔬𝔲𝔰𝔢 𝔬𝔣 𝔯𝔢𝔭𝔯𝔢𝔰𝔢𝔫𝔱𝔞𝔱𝔦𝔳𝔢𝔰

## Committee on the Judiciary

### Washington, DC 20515–6216

#### One Hundred Sixteenth Congress

March 4, 2019

Donald McGahn, Esq.
c/o William A. Burck, Esq.
Quinn Emanuel Urquhart & Sullivan
1300 I Street NW
Suite 900
Washington, D.C. 20005

Dear Mr. McGahn,

The House Judiciary Committee is investigating a number of actions that threaten our nation's longstanding commitment to the rule of law, including allegations of obstruction of justice, public corruption, and other abuses of power. As part of that work, I write to request that you provide the documents set forth in the attached Document Requests no later than March 18, 2019.

This is a critical time for our nation. President Trump and his administration face wide-ranging allegations of misconduct that strike at the heart of our constitutional order. Congress has a constitutional duty to serve as a check and balance against any such excesses. We have an obligation to investigate evidence of abuses of executive power, public corruption, and acts of obstruction designed to undermine both our laws and the credibility of the agencies that enforce those laws. We are also responsible for passing laws to address, and prevent the recurrence, of any such misconduct.

Under the Rules of the House of Representatives, the Committee's jurisdiction includes the judiciary and judicial proceedings, civil liberties, criminal law enforcement, and questions of constitutional law. The Committee is the main oversight authority for the Department of Justice, including its component agencies, its personnel, and its law enforcement activities. The Committee has also played a historic role as the primary forum for hearings on the abuse of executive power.

Given this charge, over the course of our investigation, the Committee is determined to ask critical questions, gather all of the relevant information, judiciously assess the evidence, and present our findings to the American people, whatever those findings may be.

To that end, I respectfully ask that you produce the documents set forth in the Document Requests. As you will see, I have limited the initial production to materials that have already been produced in other proceedings to reduce the burden on you and so that they may be provided to us by March 18. My staff will work with you on a mutually agreeable schedule for the production of the remainder of the documents in Schedule A.

Thank you for your prompt attention to these requests.

Sincerely,

Jerrold Nadler
Chairman
House Committee on the Judiciary

cc:     Honorable Doug Collins, Ranking Member, House Committee on the Judiciary

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

                              *Plaintiff*,

        v.                                            Case No. 1:19-cv-2379 (KBJ)

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

                              *Defendant*.

# Exhibit T

HJU093000                                    PAGE       1

1   ALDERSON COURT REPORTING

2   SHAYLAH LYNN BURRILL

3   HJU093000


4   MARKUP OF RESOLUTION AUTHORIZING ISSUANCE OF SUBPOENAS.

5   Wednesday, April 3, 2019

6   House of Representatives

7   Committee on the Judiciary

8   Washington, D.C.


9       The committee met, pursuant to call, at 9:01 a.m., in

10  Room 2141, Rayburn Office Building, Honorable Jerrold Nadler

11  [chairman of the committee] presiding.

12      Present:  Representatives Nadler, Lofgren, Jackson Lee,

13  Cohen, Johnson of Georgia, Deutch, Bass, Richmond, Jeffries,

14  Cicilline, Swalwell, Lieu, Raskin, Jayapal, Demings, Correa,

15  Scanlon, Garcia, Neguse, McBath, Stanton, Dean, Murcarsel-

16  Powell, Escobar, Collins, Sensenbrenner, Chabot, Gohmert,

17  Jordan, Buck, Ratcliffe, Roby, Gaetz, Johnson of Louisiana,

18  Biggs, McClintock, Lesko, Reschenthaler, Cline, Armstrong,

19  and Steube.

20      Staff present:  Aaron Hiller, Deputy Chief Counsel; Arya

21    Hariharan, Oversight Counsel; David Greengrass, Senior

22    Counsel; John Doty, Senior Advisor; Lisette Morton, Director

23    of Policy, Planning, and Member Services; Madeline Strasser,

24    Chief Clerk; Moh Sharma, Member Services and Outreach

25    Advisor; Susan Jensen, Parliamentarian/Senior Counsel; Sophie

26    Brill, Counsel, Constitution Subcommittee; Will Emmons,

27    Professional Staff Member, Constitution Subcommittee; Brendan

28    Belair, Minority Chief of Staff; Robert Parmiter, Minority

29    Deputy Chief of Staff; Jon Ferro, Minority Parliamentarian;

30    Andrea Woodard, Minority Professional Staff Member; Carlton

31    Davis, Minority Oversight Counsel; Jake Greenberg, Minority

32    Professional Staff Member; Ashley Callen, Minority

33    Professional Staff Member; and Danny Johnson, Minority

34    Professional Staff Member.

35

36          Chairman Nadler.  The Judiciary Committee will please

37   come to order, a quorum being present.  Without objection,

38   the chair is authorized to declare a recess at any time.

39          Pursuant to Committee Rule 2 and House Rule XI, Clause

40   2, the chair may postpone further proceedings today on the

41   question of approving any measure or matter or adopting an

42   amendment for which a recorded vote for the yeas and nays are

43   ordered.

44          Pursuant to notice, I now call up the chair's resolution

45   authorizing the issuance of certain subpoenas for documents

46   and testimony for purposes of markup and move that the

47   committee agree to the resolution.

48          The clerk will report the resolution.

49          Ms. Strasser.  Resolution offered by Chairman Jerrold

50   Nadler, "Resolved, that upon the adoption of this resolution,

51   the chairman of the Committee on the Judiciary is authorized

52   to issue subpoenas" --

53          Chairman Nadler.  Without objection, the resolution is

54   considered as read and open for amendment at any point.

55          [The resolution follows:]

56

57        Chairman Nadler.   I will begin by recognizing myself for

58   an opening statement.

59        In late 1973, the Nixon Administration had an idea.

60   When special counsel, Archibald Cox, asked the White House to

61   turn over recordings of conversations held in the Oval

62   Office, President Nixon offered instead to provide the tapes

63   to Senator John Stennis of Mississippi.   Nixon proposed that

64   Stennis, who was famously hard of hearing, would listen to

65   the recordings himself, then provide summaries of the tapes

66   to the special prosecutor.   The Nixon Administration

67   justified the proposal as a means to protect sensitive

68   information that would not ordinarily be made part of the

69   record.   In hindsight, of course, we know that President

70   Nixon had ulterior motives.   In any event, Cox had a job to

71   do.   That job required him to evaluate the full record for

72   himself, and he refused the President's offer.   President

73   Nixon ordered him fired the next day.

74        The dynamics of the Stennis compromise, as it became

75   known, should sound familiar to us.   The Trump Administration

76   has an idea.   They want to redact the Mueller report before

77   they provide it to Congress.   The Department of Justice says

78   the proposal is a means to protect sensitive information that

79   would not ordinarily be made part of the record, but we have

80   reason to suspect this Administration's motives.   The Mueller

81   report probably isn't the "total exoneration" the President

82   claims it to be.  And in any event, the committee has a job

83   to do.  The Constitution charges Congress with holding the

84   President accountable for alleged official misconduct.  That

85   job requires us to evaluate the evidence for ourselves, not

86   the Attorney General's summary, not a substantially redacted

87   synopsis, but the full report and the underlying evidence.

88       The Attorney General proposes to redact four categories

89   of information from the Mueller report:  grand jury

90   information, classified information, information related to

91   ongoing prosecutions, and "information that may unduly

92   infringe on the personal privacy and reputational interests

93   of peripheral third parties."  The Department is wrong to try

94   to withhold that information from this committee.  Congress

95   is entitled to all of the evidence.

96       This isn't just my opinion.  It is also a matter of law.

97   For precedent on 3 of the 4 categories, we need look no

98   further than the summer of 2016 when pursuant to

99   congressional subpoena, the Department and the FBI began to

100  transfer more than 880,000 documents related to the Clinton

101  investigation to the House of Representatives.  That

102  production included classified information which we held in

103  our secure facility and which we handled every day.  It

104  included information related to ongoing investigations, and

105  it included information related to numerous third parties,

106  many of whom this committee later interviewed as part of the

107    Republican investigation into the investigation.

108         The other category of information the Attorney General

109    proposes to redact is grand jury information, normally

110    protected under Rule 6(e) of the Federal Rules of Criminal

111    Procedure.  Many who seem eager to keep this information from

112    Congress argue that the law does not allow grand jury

113    information to be shared outside the Justice Department.

114    That analysis is incomplete if not outright incorrect.  It is

115    true that Rule 6(e) ordinarily prohibits the Department from

116    sharing grand jury information with the public.  It is also

117    true that with proper authorization and under court order the

118    Department must share grand jury information with this

119    committee.

120         That was the case in 1974 when Judge Sirica authorized

121    the release of the Watergate road map to this committee at

122    the request of special counsel, Leon Jaworski.  It was the

123    case in 1998 when a Federal court permitted Ken Starr to

124    release grand jury information along with his report to

125    Congress.  It was the case in 2008 and 2009 when this

126    committee went directly to the grand jury twice to get

127    information relevant to our investigation of Judge Thomas

128    Porteous.

129         On multiple occasions, I have asked Attorney General

130    Barr to work with us, to go to the Court and obtain access to

131    materials the Department deems covered by Rule 6(e).  He has

132    so far refused.  I will give him time to change his mind, but

133    if we cannot reach an accommodation, then we will have no

134    choice but to issue subpoenas for these materials.  And if

135    the Department still refuses, then it should be up to a

136    judge, not the President and not his political appointee, to

137    decide whether or not it is appropriate or the committee to

138    review the complete record.

139        The resolution before us today authorizes subpoenas for

140    two categories of information.  First, the resolution

141    authorizes subpoenas for documents and testimony related to

142    the full and unredacted report of Special Counsel Mueller.  I

143    believe the committee must have access to this information in

144    order to perform its constitutionally-mandated

145    responsibility.  The House of Representatives agreed with

146    this proposition when last month it voted 420-0 in support of

147    a resolution that demanded the release of the full report.

148        Second, the resolution authorizes subpoenas for

149    documents and testimony of former White House employees.

150    Each of these individuals has had more than a month to

151    produce documents to this committee voluntarily.  We believe

152    that these individuals may have received documents from the

153    White House in preparation for their interviews with the

154    special counsel.  We also believe that these individuals may

155    have turned this information over to their private attorneys.

156    Under applicable Federal law, President Trump waived his

157   claims to executive privilege once this information was

158   transmitted to outside counsel.  Because we may have to go to

159   court to obtain the complete text of the special counsel's

160   report, and because the President may attempt to invoke

161   executive privilege to withhold that evidence from us, it is

162   imperative that the committee take possession of these

163   documents and others without delay.

164       Yesterday the President presented me with the high honor

165   of not one, but three separate mentions on Twitter.  He also

166   talked about our relationship, which goes back several years,

167   in a press conference yesterday afternoon.  President Trump

168   seems to think in 1998 I was opposed to public release of the

169   Starr report and that he has caught me changing my mind on

170   the subject.  Let met set the record straight.  In 1998, the

171   debate was not about Congress receiving evidence.  Congress

172   had already received the full 445-page report and 17 boxes of

173   additional documents, including grand jury material.  We are

174   owed that same opportunity today.

175       In 1998, the central debate was about the public release

176   of some of the materials accompanying the Starr report,

177   materials that Congress already had and that described

178   private sexual acts in lurid detail.  Congress has no

179   business broadcasting accounts of the President's sex life.

180   It was inappropriate in 1998.  It would be inappropriate

181   today.  Our focus should be on the law.  That is where our

182    focus will remain so long as I am chairman.

183        We are dealing now not with the President's private

184    affairs, but with a sustained attack on the integrity of the

185    republic by the President and his closest advisers.  This

186    committee requires the full report and the underlying

187    materials because it is our job, not the Attorney General's,

188    to determine whether or not President Trump has abused his

189    office.  And we require the report because one day, one way

190    or another, the country will move on from President Trump.

191    We must make it harder for future presidents to behave this

192    way.  We need a full accounting of the President's actions to

193    do that work.  Accordingly, I urge my colleagues to support

194    the resolution.

195        I now recognize the ranking member of the Judiciary

196    Committee, the gentleman from Georgia, Mr. Collins, for his

197    opening statement.

198        Mr. Collins.  Thank you, Mr. Chairman.  Before we begin

199    today, I want to point out something that I never thought

200    would actually happen.  Jeh Johnson and I actually agree

201    about something.  The former Secretary and I actually agree

202    that there is a crisis on our southern border.  And by doing

203    so, we actually agree that we need to do something about it.

204    Unfortunately, as we saw in the first quarter of this month,

205    and we are starting the second quarter of this committee off

206    in the same vein, and that is desperately searching for

207   something on the President.  When we understand this, then we

208   begin to look because instead of today, instead of dealing

209   with issues that this committee is authorized and should be

210   dealing with, we are moving on to subpoenas, and that for

211   several reasons I cannot support.

212        The first, the subpoena for the Mueller report and its

213   underlying evidence commands the Attorney General to do

214   really what the unthinkable is.  Remember, this is something

215   to remind folks.  The Starr report and the Mueller

216   investigation were not under the same authorization.  We keep

217   conflating that around here.  They were not, and this is why

218   we need to understand that.  Basically what we are now saying

219   is we are going to ask the Attorney General to break his

220   regulation, to break the law.

221        The Attorney General's entire mandate is to enforce the

222   law, and he is expressly forbidden from providing grand jury

223   outside the Department in very limited and narrow exceptions.

224   Congress is not one of the exceptions, and the chairman knows

225   it, and I would disagree with his characterization.  I

226   respect my chairman, but I disagree with his characterization

227   of the Starr report because they are under different

228   regulations.  They were put out and sent out, but when it

229   came to grand material, it was material that by law must be

230   secret.  It is grand jury material.  It represents statements

231   which may or may not be true by various witnesses -- I wish

232  many would understand that -- salacious material, all kinds

233  of material that would be unfair to release.

234      Those are not Doug Collins' words.  Those are my

235  chairman's words.  This is a time in which this is not a new

236  idea.  Right now the only thing is, is there is a hope

237  against hope that we are going to find something.  It was

238  just actually said.  We need to start now so we can begin to

239  down to the courtroom because we know we are not going to

240  find anything.  And even if we did, and I love the comment

241  just a moment ago, that there may be -- and I love how we do

242  this -- may be things in there that is not up to the Attorney

243  General to decide right or wrong.  It was not.  It was

244  Mueller's investigation that the Attorney General passed on.

245  Here is what we found.

246      This is the problem we are seeing right now.  But you

247  know something?  A different political landscape compels the

248  chairman to adopt new standards of fairness, ignoring

249  existing law and demanding material he once considered unfair

250  to release to be released.  As much as the chairman and I may

251  want to view this material as the fundamental underpinning of

252  our justice system, we cannot.  In the face of laws and rules

253  he finds inconvenient, the chairman demands our Nation's top

254  law enforcement officer to break the rules and the

255  regulations and the law.  This is reckless, it is

256  irresponsible, and it is disingenuous.

257        It is also confusing since the Attorney General is doing

258   exactly what he said he would be doing, making as much of the

259   report public as possible under Federal law and departmental

260   policy, under regulations -- understand this for the media

261   here -- under regulations written by Janet Reno and other

262   Democrats don't require to do this, but in the name of

263   transparency he is.  He may even furnish the report as early

264   as next week, yet the chairman plows ahead.

265        What is the rush?  Spring break probably.  We don't want

266   to wait until May.  We don't want to wait until the report

267   comes out.  The Attorney General has never said he is not

268   going to provide exactly the regulations say he is to

269   provide.  Why are we doing this again?  Because I guess we

270   are going to out of town and we don't want anybody to forget

271   we are doing something.  We need a press release.  We need to

272   name people.

273        The interesting thing here is, second, the subpoenas in

274   this wonderfully vague deal that we are voting on today aimed

275   at five individuals are completely misguided.  Quite simply,

276   they are to the wrong people.  Understand what I am getting

277   ready to tell you.  Two of the individuals are cooperating

278   with an ill-advised investigation -- remember the 81 letters

279   -- have provided over 3,000 pages of documents.  The chairman

280   is rewarding their cooperation by announcing their subpoenas

281   before even notifying their lawyers.

282     The other three individuals responded to Chairman

283  Nadler's initial inquiry and have indicated willingness to

284  cooperate.  Democrats never followed up with their lawyers

285  either.  In fact, my investigators have had more contact with

286  some of the individuals on the 81 initial letters than the

287  majority has.  These three individuals could not have any

288  documents responsive to the original request because those

289  responsive documents all came during their time at the White

290  House, making them presidential records.  None of these three

291  have custody of responsive documents.  The chairman knows

292  this as well because they have received letters on this.

293     Why would we ignore such obvious facts?  Because

294  Judiciary Democrats conduct oversight via press release.

295  Their investigation into 81 Trump associates has yielded not

296  the dividends they were looking for.  After 1 month, the only

297  revelation is something we knew already.  They have

298  embarrassed themselves by prejudging conclusions that the

299  President obstructed justice.  Now we have acknowledged the

300  next stop in the grinding political axes in the government.

301     What is amazing here is the fact nearly 30 others who

302  have received the Chairman's letter have not responded at all

303  and despite everything going on.  So the message is clear.

304  Here is what is happening.  If you cooperate with this

305  committee, you will get a subpoena.  If you ignore it,

306  Democrats will return the favor.  This seems like a

307    counterintuitive way to conduct oversight, but it does sound

308    familiar.  Remember the acting attorney general, Mr.

309    Whitaker, who agreed to come, who agreed to sit here, and was

310    yet rewarded with a subpoena.  And, oh, by the way, before he

311    ever got here, we caved.  We just did away with the subpoena.

312        I am not sure the purpose of the subpoena with this

313    majority.  It seems to be we want to use it because it sounds

314    good, but yet when it comes down we don't want to use it, and

315    now we are back at it again because this is all preemptive.

316    Five of the people who have been actually listed in the list

317    of subpoenas today have been cooperating or have given advice

318    to this committee, but have never really been followed up.

319    And what they have said is we are helping, but you are now

320    giving us a subpoena.

321        And as far as the Attorney General has gone, he said I

322    am giving you the Mueller report.  I am giving it to you as I

323    should under regulations, but undoubtedly that is not enough.

324    Undoubtedly that doesn't make enough press releases.  So I

325    guess what we do is put people's names on a press release.

326    We tell them that we are going to subpoena them now, although

327    they have actually already cooperated.  You know, it reminds

328    me of what I am having here, and I have made this comment

329    many times.

330        I respect my chairman, but we just disagree on this, and

331    that is the way that it will be, and that is the way we are

332   going to have it.  But it reminds me of the old guys back in

333   my hometown when they wanted to go fishing and nothing was

334   biting.  They would take a big fishing trip and go out.

335   Nothing was biting, and one day this old guy just got tired

336   of it.  Instead of catching anything the way he should, he

337   just reaches in his back pocket and pulls out a piece of

338   dynamite and throws it in the pond.  I can't find anything,

339   so I am just going to blow up everything and maybe something

340   will come to the top.

341       This committee is better than this.  This committee can

342   do this better.  Why are we here today doing preemptive

343   subpoenas?  Because we are going to be out for a while.  We

344   are not going to be here for a while, and we need to keep the

345   story rolling.  The story rolling is there is some innuendo.

346   There are some possibilities that may be in this report, but

347   we can't wait to see it.  Unfortunately what will happen, my

348   friends is this:  Christmas will come again.  They opened the

349   present that they bought early.  Nothing was there.  Now they

350   are dying to open another present.

351       At the end of the day, this President and what the

352   report of the Mueller investigation said was no collusion.

353   No obstruction.  And when we understand that, when we move

354   forward with that, if we can't get what we want, we will try

355   and try again.  Maybe that is the new thing of this

356   committee, the little train that kept looking for something

357   that says I will try and I will try and I will try.

358        But at the end of the day, the President is still

359   president.  The economy is still moving forward.  The

360   regulations that we put in place are there.  And at this

361   point in time, the Attorney General, although he is being

362   smeared repeatedly, is doing exactly what the regulation

363   says.  And for that, congratulations, Mr. Attorney General,

364   you get a subpoena.  With that, I yield back.

365        Chairman Nadler.  Thank you, Mr. Collins.  Without

366   objection, all other opening statements will be included in

367   the record.

368        I now recognize myself for purposes of offering an

369   amendment in the nature of a substitute.  The clerk will

370   report the amendment.

371        Ms. Strasser.  Amendment in the nature of a substitute

372   to a resolution offered by Mr. Nadler.  Strike all after the

373   resolving clause and insert the following.

374        Chairman Nadler.  Without objection, the amendment in

375   the nature of a substitute will be considered as read and

376   shall be considered as --

377        Mr. Buck.  Mr. Chairman, I object.

378        Chairman Nadler.  -- as base text --

379        Mr. Buck.  Mr. Chairman, I object.  I would like to --

380        Chairman Nadler.  -- as base text for purposes of

381   amendment.  I will --

382      Mr. Collins.  Mr. Chairman, there is an objection to

383   the --

384      Chairman Nadler.  I will finish the sentence, and then I

385   will recognize the objection.

386      Mr. Collins.  Thanks.  Well, go right ahead.

387      [Laughter.]

388      Chairman Nadler.  Without objection, the amendment in

389   the nature of a substitute will be considered as read and

390   shall be considered as base text for purposes of amendment.

391      [The amendment of Chairman Nadler follows:]

392

393       Chairman Nadler.  Will the gentleman explain his

394   objection?

395       Mr. Buck.  Yeah, I want it read.  I object.

396       Chairman Nadler.  You want the resolution read?  Very

397   well.  The clerk will read the resolution.

398       Mr. Buck.  Thank you.

399       Chairman Nadler.  The clerk will read the amendment in

400   the nature of a substitute.

401       Ms. Strasser.  Amendment in the nature of a substitute

402   to a resolution offered by Mr. Nadler.  Strike all after the

403   resolving clause and insert the following:  "That upon the

404   adoption of this resolution, the chairman of the Committee of

405   the Judiciary is authorized to issue subpoenas for documents

406   and testimony relating to the following:  final report

407   authored by the Office of the Special Counsel, Robert S.

408   Mueller, III, pursuant to Order Number 3915-2017, and any

409   accompanying exhibits, annexes, tables, appendices, other

410   attachments, and all evidence referred to in the report; and

411   underlying evidence collected, materials prepared, or

412   documents used by the Office of the Special Counsel, Robert

413   S. Mueller, III, in the investigation conducted pursuant to

414   Order Number 3915, 2017.

415       In addition, the chairman at his discretion and as he

416   determines necessary, is authorized to issue subpoenas for

417   documents and testimony to the following individuals or to

418   agents who may have received documents from White House

419   relevant to the investigation on Special Counsel Robert S.

420   Mueller, III, conducted pursuant to Order Number 3915-2017,

421   thereby effecting a waiver of potential applicable

422   privileges:  Donald F. McGahn, II; Steven Bannon; Hope Hicks;

423   Reince Priebus;, Ann Donaldson.

424        This resolution is adopted pursuant to Rule 3 of the

425   Committee on the Judiciary and Clause 2(m) of Rule XI of the

426   U.S. House of Representatives."

427        Chairman Nadler.  I will recognize myself to explain the

428   amendment.

429        This amendment makes only technical changes to the

430   underlying resolution.  I would like to use my time to

431   elaborate on the point made in my opening statement, that

432   there is ample precedent from other investigations involving

433   allegations of wrongdoing by the President for the Judiciary

434   Committee to receive not just the full report, but all of the

435   underlying evidence, including grand jury material.

436        In the investigation of Bill Clinton, the independent

437   counsel, Ken Starr, produced to Congress a 445-page report,

438   several thousand pages of appendices, and 17 boxes of

439   underlying evidence and other materials.  These boxes

440   included all of the grand jury information protected by Rule

441   6(e) of the Federal Rules of Criminal Procedure.

442        The Starr report and the underlying evidence and

443    materials produced to this committee fill up volume after

444    volume of the record in the Clinton impeachment proceedings.

445    I am holding up only two of these many volumes that contain

446    some of the evidence and materials underlying the Starr

447    report that he produced to Congress.  Here is Volume 4, Part

448    2 and 3 that contain supplemental materials from the Starr

449    report.  All of these materials were delivered to the House

450    immediately Ken Starr completed the report.

451        Looking at Volume 4, Part 3, it is filled with the grand

452    jury testimony and other evidence from the Starr

453    investigation that was produced to the House Judiciary

454    Committee.  For example, on page 3341, there is grand jury

455    testimony of Stacy Desmond Porter.  Here is a copy of it.

456    There were boxes and boxes of such information produced by

457    Ken Starr.  Starr sought and obtained authorization from the

458    court overseeing the grand jury to share the grand jury

459    materials with Congress.  A similar order permitting Congress

460    to receive the grand jury materials in the Mueller

461    investigation can and should be obtained here.

462        The materials produced to Congress by Starr also

463    included the interview memoranda of the witnesses who agreed

464    to be voluntarily interviewed by Starr's office during his

465    investigation, all of which were produced to the House

466    Judiciary Committee.  For example, on page 3523, there is one

467    of the many memorandum investigation interviews of witnesses

468   by Starr and his staff.  This one is of Deborah Ann Schiff.

469   Here is a copy of it.  There were boxes of such information

470   produced by Ken Starr.  The same type of information has to

471   be produced here, especially when there were approximately

472   500 witnesses interviewed in the Mueller investigation as the

473   Attorney General stated in his March 24th letter to the House

474   and Senate Judiciary Committees.

475       In the Watergate investigation, the Justice Department

476   did exactly the same thing after the grand jury considered

477   evidence and issued a report describing potentially criminal

478   acts by President Nixon.  The Justice Department filed briefs

479   fully supporting disclosure of the report to the House

480   Judiciary Committee, and made the point that, "The need for

481   the House to be able to make its profoundly important

482   judgment on the basis of all available information is as

483   compelling as any that could be conceived."  And here are

484   just two of the volumes from the Nixon impeachment

485   proceedings that include some of the grand jury material,

486   just some of the grand material that was produced to

487   Congress, Volumes 7 and 8 from the hearings before the House

488   Judiciary Committee.

489       Looking at Volume 7, it is filled with grand jury

490   testimony and other evidence from the investigation that was

491   produced to the House Judiciary Committee.  For example, on

492   page 688 of Volume 8, there is the grand jury testimony of

493   Rosemary Woods.  Here is a copy of it.  There were volumes

494   and volumes of such information produced in the Watergate

495   investigation to the House Judiciary Committee.

496       These examples of Congress receiving all of the relevant

497   evidence in other analogous investigations helps show how

498   unprecedented it would be for Attorney General Barr to

499   withhold from Congress potentially significant portions of

500   Special Counsel Mueller's report and the underlying evidence

501   and materials.  The same type of information can and should

502   be produced here.

503       I ask unanimous consent to include these materials in

504   the record.

505       [The information follows:]

506

507        Chairman Nadler.  This subpoena authorization gives this

508    committee the ability to compel production of the full report

509    and related documents if the Attorney General departs from

510    these and other precedents and refuses to produce to Congress

511    the complete record of Special Counsel Mueller's

512    investigation.  I yield back the balance of my time.

513        I now recognize the ranking member of the Judiciary

514    Committee, the gentleman from Georgia, Mr. Collins, for any

515    comments he may have on the amendment in the nature of a

516    substitute.

517        Mr. Collins.  Thank you, Mr. Chairman.  As far as the

518    substitute, that is fine, but I am glad we are using props

519    today because this is what happening here.  The chairman

520    wants you to look at one thing when the reality is another

521    thing.  He is wanting you to look at this bottle of water and

522    say this is full, and then he is wanting you to look at this

523    bottle of water and say it is full, too.  It doesn't work.

524    You can't say the Starr report, or even going back to

525    impeachment which we will get to in a minute, and then come

526    along and say Mueller is full, too.  You see, it is the same.

527    They are not the same.

528        And as long as we perpetrate this fraud of saying that

529    they are the same, then we are going to continue this process

530    of saying that we have got a problem here because the Starr

531    report, which actually came out, let's actually speak to what

532    it said.  Starr had a requirement under the Independent

533    Counsel Act, 28 U.S.C. 595, to advise the House of

534    Representatives of any substantial credible information which

535    may constitute grounds for an impeachment.

536        Remember, it was the Janet Reno Justice Department after

537    the Starr report that rewrote the regulations that we are

538    under today.  Starr, Mueller, two different things.  And if

539    we understand this, then we can understand the problem we

540    have here.  I feel for the chairman.  He is trying to make an

541    analogy that just won't work.  He is doing as good a job as

542    he possibly can.  It just doesn't work.

543        The other interesting thing in here is he has used two

544    precedents for getting this information, both of which are

545    impeachment.  If the chairman truly wanted to get at this

546    information, then he can go to what I believe many in their

547    heart desire is open the impeachment inquiry.  Maybe that is

548    what we are going to get to today.  But if you use the

549    precedent of impeachment, not the precedent of subpoenas,

550    then there is a problem.

551        And we have got to understand this is nothing.  If this

552    was simply about the Mueller report today and we had waited

553    until after we got the Mueller report and we said there is

554    still stuff we don't like, then I could see this happening.

555    I could see why would we would come together and ask for

556    subpoenas.  Any attorney, that is what you do.  When you

557   don't get what you want, you ask for the subpoenas, not

558   beforehand when the Attorney General has already said I am

559   going to do this.

560        So the problem is, look, it is a tough problem.  I feel

561   for him.  But as long as you are trying to compare the full

562   and the empty and say they are both full, that is going to be

563   a problem.  The problem also I have with this is, is it just

564   isn't about the Attorney General and the Mueller report,

565   because he went ahead and added five other individuals.  Why

566   those five other individuals?  Let's take a look at the

567   names.

568        The five other individuals:  Don McGahn, Steve Bannon,

569   Hope Hicks, Reince Priebus, and Ann Donaldson, all of which

570   either gave information or answered and responded to their

571   initial letters.  Why these five?  They are close to the

572   President.  The closer you get to the President, the press

573   writes about it.  The press writes about associates of the

574   President and they get a subpoena.  Let's take this for what

575   it is.  We don't have our popcorn machine yet.  We are

576   getting it for our side because this is great political

577   theater.  But as long as they are trying to convince you that

578   this one and this one are the same, then we are going to down

579   the same sad road.  With that, Mr. Chairman, I yield back.

580        Chairman Nadler.  I thank the gentleman.  I just want to

581   comment on one thing.  The argument is made that the prior

582  history is irrelevant because Mr. Jaworski and Mr. Starr

583  operated under a different law than Mr. Mueller is operating.

584  That fact is true.  However, we have the same constitutional

585  rights as the committee did in those days, and we have the

586  same constitutional duty as the committee did in those days.

587  And we have the right and the necessity to get all the

588  information to fulfill our constitutional duty.

589      Are there any amendments to the amendment in the nature

590  of a substitute?

591      [No response.]

592      Chairman Nadler.  Hearing none --

593      Mr. Buck.  Mr. Chairman, I have an amendment.

594      Chairman Nadler.  The clerk will report the amendment.

595      Mr. Cicilline.  Mr. Chairman, I reserve a point of

596  order.

597      Chairman Nadler.  The gentlelady --

598      Mr. Collins.  The gentleman.

599      Chairman Nadler.  The gentleman reserves a point of

600  order.

601      Ms. Strasser.  Amendment to the amendment in the nature

602  of a substitute, offered by Representative Ken Buck, of

603  Colorado.  At the end of the resolution, insert the following

604  paragraph:  "This resolution shall not be construed as

605  authorizing the chairman to issue a subpoena for the

606  production of information where such production would violate

607    Rule 6(e) of the Federal Rules of Criminal Procedure."

608        [The information follows:]

609

610      Chairman Nadler.  The gentleman is recognized to explain

611  his amendment.

612      Mr. Buck.  Thank you, Mr. Chairman.  Mr. Chairman, in

613  Greek mythology, Prometheus looked down from the heavens and

614  saw man eating raw meat.  Out of pity, he stole fire from the

615  heavens, came to earth, and gave fire to man so man could

616  cook his food.  This gift had unintended consequences.  Man

617  used fire to forge metal into swords.  With new weapons man

618  went to war.  This is a cautionary tale about unintended

619  consequences, a lesson we should be mindful of today.

620      The current special counsel regulations were adopted in

621  1999 after Congress allowed the old independent counsel law

622  to expire.  These Clinton-era regs authorized the appointment

623  of Robert Mueller as special counsel and guided his

624  investigation.  They also limit what the AG can release.  So

625  they strike a balance between disclosure and protection of

626  classified and grand jury information.  This resolution,

627  however, leads us down the wrong path.  The resolution fails

628  to ensure certain information remains protected.  This will

629  have unintended consequences.

630      First, this resolution risks politicizing future special

631  counsel investigations.  By protecting grand jury information

632  from public release, the regs encourage the special counsel

633  to produce a candid report for the AG.  By compelling release

634  of an unredacted report, however, the committee risks

635  chilling future investigations and jeopardizes the special

636  counsel process.  This will not serve justice.  It will

637  undermine it.

638      Second, the public release of the full report could

639  compromise intelligence sources and methods.  General Barr

640  expressed concern about this issue in a March 29th letter to

641  Chairman Nadler.  As much as Democrats may hate the

642  President, I would hope you love America more.  If love

643  trumps hate, we should afford the AG time to redact

644  classified information before providing us with a report that

645  could be shared with the public.

646      Third, this resolution fails to protect grand jury

647  information from disclosure.  This is information that by law

648  needs to be protected as confidential.  Under the regs, the

649  AG is required to redact this information.  General Barr

650  wrote to the chairman on March 29th that, "We are preparing

651  the report for release, making the redactions that are

652  required.  The special counsel is assisting us in this

653  process.  Specifically, we are well along in the process of

654  identifying and redacting the following:  materials subject

655  to Federal Rule of Criminal Procedure 6(e) that by law cannot

656  be made public."

657      Rule 6(e) is information produced in front of the grand

658  jury.  As a former prosecutor, I hold the grand jury process

659  and the protection against disclosure sacrosanct.  I would

660    urge my colleagues do not undermine the grand jury process

661    for the sake of politics.  This sets a dangerous precedent

662    that is dangerously short-sighted.

663         My amendment is simple.  It modifies the resolution to

664    limit the subpoena to exclude production of any information

665    related to grand jury materials.  This amendment is

666    consistent with the special counsel regs that have been in

667    place for 20 years over which time Democrats and Republicans

668    in Congress during two Democratic administrations and two

669    Republican administrations have respected.

670         This amendment is also completely consistent with H.

671    Con. Res. 24, Chairman Nadler's resolution that the House

672    passed by a vote of 420-0 on March 14th.  If you voted for

673    Chairman Nadler's resolution 3 weeks ago, you essentially

674    voted for the special counsel regulations, and you also voted

675    to protect grand jury information from disclosure, the

676    principle found in my amendment.  For the sake of

677    consistency, you should report my amendment today.  It will

678    help ensure we avoid unintended consequences.

679         I ask unanimous consent that Attorney General Barr's

680    letter of March 29th, 2019 to Chairman Nadler to be included

681    in the record.

682         Chairman Nadler.  Without objection.

683         [The information follows:]

684

685        Mr. Buck.  I urge a yes vote on the amendment.

686        Chairman Nadler.  Does the gentleman from Rhode Island

687   insist on his point of order?

688        Mr. Cicilline.  I do not, Mr. Chairman.

689        Chairman Nadler.  The gentleman from Rhode Island does

690   not insist on his point of order.  I will now recognize

691   myself in opposition to the amendment.

692        The amendment says that "This resolution shall not be

693   construed as authorizing a subpoena for the production of

694   Rule 6(e) information."  This committee's request for grand

695   jury materials, which is to say the 6(e) information, is

696   fully consistent with past instances which I have outlined in

697   my initial comments in which the Justice Department has

698   provided this information to Congress.  The Justice

699   Department can provide these materials to Congress by seeking

700   authorization from the District Court as it has in the past.

701        In response, for example, to Republican-led

702   congressional requests, the Justice Department turned over

703   unprecedented levels of materials in the 114th and 115th

704   Congress, including classified materials, deliberative

705   process documents, and information related to ongoing

706   investigations.  We need these materials to fulfill our

707   constitutional obligations, period.  Our chief constitutional

708   obligation is to hold the President accountable, especially

709   in an instance where the Department of Justice says it cannot

710   hold the President accountable because, as a matter of law,

711   you cannot indict a president and in which the Attorney

712   General tells us that a president cannot commit obstruction

713   of justice.

714        Those judgments must be made by Congress, not by a

715   political appointee, the Attorney General.  We need this

716   information to make those judgments, and the interests can be

717   protected by this Congress deciding which of that information

718   can be released publicly.  But Congress is entitled to all of

719   it, and, therefore, I ask opposition to this amendment.

720        Is there any other discussion on the amendment?

721        Mr. Sensenbrenner.  Mr. Chairman?

722        Chairman Nadler.  The gentleman from Wisconsin.

723        Mr. Sensenbrenner.  Mr. Chairman, I move to strike the

724   last word.

725        Chairman Nadler.  The gentleman is recognized.

726        Mr. Sensenbrenner.  Mr. Chairman, the chair and his

727   supporters are putting the cart before the horse.  And I just

728   draw the attention of the committee to today's *Roll Call*,

729   hardly a Republican mouthpiece.  And what does it say?

730   "Mueller magic not in subpoenas.  Democrats can send a

731   message, but it is one without teeth."  I will delegate

732   myself to become a dentist for the next 4-and-a-half minutes.

733        The chairman of the committee, the distinguished

734   gentleman from New York, you know, says there was grand jury

735    material that was submitted both in the Nixon and Clinton

736    impeachments.  That is correct, but that grand jury material

737    was submitted only after the court in D.C. allowed it to be

738    shared with Congress and made public.  That has not happened

739    in this case if there is any grand jury material in the

740    Mueller report, and I think we all know that there is grand

741    material in the Mueller report.

742        So the thing to do to put teeth into a subpoena is for

743    Congress and this committee to go to court and to ask for an

744    order allowing for the release of the grand jury material.

745    Otherwise, you are going to see the Justice Department move

746    to quash the subpoena that I am sure will be issued today,

747    and it will be in courts for months and maybe years until the

748    Supreme Court decides this issue because it is a dispute

749    between the legislative and executive branches of government.

750        Chairman Nadler.  Will the gentleman yield?

751        Mr. Sensenbrenner.  Let me finish, please.  And I will

752    be happy to be a co-plaintiff in the motion before the

753    district court as I am sure all of us would be because the

754    resolution that was passed 3 weeks ago was passed

755    unanimously.  I voted for it.  All of my Republican

756    colleagues voted for it.  And the way to get the material

757    that is sought by this subpoena quickly, promptly, and

758    without extended litigation is to go to court and get the

759    same kind of order that Mr. Starr got when he sent his

760   material over as independent counsel and what Mr. Jaworski

761   got when he sent his material over as special prosecutor in

762   the Richard Nixon impeachment.

763        Now, secondly, I think we all want to get to the bottom

764   of this, and it is only full disclosure, in my opinion, that

765   will get to the bottom of this.  The law requires that there

766   be certain conditions precedent to get that full disclosure,

767   one of which, as far as the grand jury material and Rule 6(e)

768   of the Federal Rules of Criminal Procedure, is going to court

769   and getting the order, if the court should so desire and be

770   required to, to allow the Justice Department to release this

771   material.  Otherwise, the Justice Department puts itself in

772   the same position as a grand jury witness who breaks the

773   secrecy rule and releases his or her testimony before the

774   grand jury, and that is a Federal crime.

775        So, you know, it seems to me that if we want to protect

776   witnesses under the same rule that the Justice Department is

777   being protected, we ought to do what we need to do first, and

778   that is go to court and let the judge make the decision.  And

779   now I am happy to yield to the chairman.

780        Chairman Nadler.  I thank the gentleman for yielding.

781   We will, as appropriate, go to court.  We think we need a

782   subpoena first, but we will go to court.  We have asked the

783   Attorney General to go to court.  He has thus far declined

784   our request, but we will do whatever is necessary, be it

785   subpoena or courts, to get this material.

786        Mr. Sensenbrenner.  You know, reclaiming my time, you

787   know, the thing is, is Mr. Starr got the appropriate order

788   without us being on his back.  Jaworski got the appropriate

789   order without the Judiciary Committee being on its back.  And

790   that material was used in both the Nixon and in the Clinton

791   impeachments.

792        Mr. Cicilline.  Will the gentleman yield for a question?

793        Mr. Sensenbrenner.  No, I will not.  And as I recall

794   there were obstruction of justice articles of impeachment

795   voted out by this committee, and, in the case of Clinton,

796   approved by the House of Representatives, and that was an

797   issue in both of those impeachments.  So, you know, again,

798   look at *Roll Call*, you know.  Again, *Roll Call* is not printed

799   by the Koch brothers, and it says "Democrats can send a

800   message, but it's one without teeth."  It is about time that

801   when we want to send a message, we send one with teeth, and

802   hopefully the rest of the news media will not be duped as

803   *Roll Call* was not in getting it right.  Thank you.

804        Chairman Nadler.  The gentleman's time has expired.  The

805   gentlelady from Texas.

806        Ms. Jackson Lee.  I thank the gentleman, and I thank my

807   colleagues, both Republicans and Democrats, who sit on this

808   committee to do justice and to adhere to the rule of law.  As

809   I read the resolution proposed by the chair and the majority,

810  it provides an authorization.  It does not dictate an

811  issuance of a subpoena.  And I refer to my colleagues to

812  really some of the underlying reasons why we need to move

813  forward on a subpoena.  For all we know, the Attorney General

814  may respond and present us with the Mueller report in its

815  totality today at the end of business.

816       But in his letter on March 24th, the Attorney General

817  started out by saying that it was his intent to summarize the

818  principle conclusions reached by the special counsel.  And of

819  course he tried to walk that back, but, in essence, he tried

820  to give us 4 pages as a complete summary of the entire

821  Mueller report.  He goes on to say on the question of

822  obstruction of justice that the DOJ did not make a

823  traditional prosecutorial judgment.  That may be accurate,

824  but the standards that you adhere to by the second

825  constitutional body, the executive in Article II, has larger

826  parameters as to whether or not the Administration followed

827  the rule of law and actually adhered to guidelines or actions

828  appropriate for a president of the United States.

829       Further, the Attorney General attempted to swat away the

830  idea of any Russian coordination.  He did that by suggesting

831  that the attorney, Mueller, did not find an underlying crime,

832  and, therefore, refused to move forward on the obstruction,

833  refused to move forward on the obstruction on the basis of

834  not an indictment or a crime.  And we also know that Attorney

835   General Barr has already made his point very clear about his

836   position on the indictment of a President.  We do not sit

837   here in the role of a grand jury to indict the President, but

838   we sit here as a body that to proceed with its constitutional

839   duties to provide oversight and transparency.

840      Let me share with my colleagues what has happened in the

841   past.  Dan Burton, former chair of the Oversight Committee,

842   issued a thousand unilateral subpoenas in the 1990s regarding

843   the Clinton Administration.  Lamar Smith of the Science

844   Committee issued 25 subpoenas in his first year of

845   chairmanship.  Before 2015, this committee had not issued one

846   subpoenas in 21 years.  Chairman Issa issued 100-plus

847   subpoenas, exceeding by over 20 percent the number of

848   subpoenas from Dems and Republicans, lawmakers of any

849   committee.  And then Chairman Gowdy of the Benghazi

850   Committee, who sent U.S. marshals to 70 witness' homes

851   without asking one of them to come voluntarily.  I, frankly,

852   believe that we are being both fair and balanced in our

853   efforts --

854      Mr. Sensenbrenner.  Would the gentlewoman yield?

855      Ms. Jackson Lee.  I would be happy to yield.

856      Mr. Sensenbrenner.  Just for the record, I was chair of

857   this committee for 6 years, and I didn't sign one subpoena at

858   all.  You know, I got what I needed out of the Administration

859   without having to compel it.  So there is a difference

860   between nice and being less than nice.

861       Ms. Jackson Lee.  Mr. Sensenbrenner, thank you.  I am

862   restoring my time.  I am reclaiming my time.  As you well

863   know, you have not been mentioned.  You have not been

864   mentioned, nor has the Judiciary Committee been mentioned.

865   But the point being made is that there has been a history of

866   subpoenas offered in other areas in other committees.

867       And in this instance, I think the Judiciary Committee is

868   being extremely fair.  So thank you so very much for that

869   clarification that Chairman Sensenbrenner did not, but in

870   this instance, I believe that the committee is being fair.

871   Mr. Nadler is being fair.  This is a resolution to authorize

872   the issuance of a subpoena, and I ask my colleagues to

873   support this resolution.  I yield back.

874       Chairman Nadler.  Thank you.  The gentleman from

875   Arizona, Mr. Biggs, is recognized.

876       Mr. Biggs.  Thank you, Mr. Chairman.  I ask unanimous

877   consent that an article published April 1st, 2019 in the

878   *Atlantic* written by Ben Wittes and entitled, "Bill Barr Has

879   Promised Transparency," be entered into the record.

880       Chairman Nadler.  Without objection.

881       [The information follows:]

882

883      Mr. Biggs.  Thank you.  Wittes is the editor-in-chief of

884  *Lawfare* and a senior fellow at the Brookings Institution.

885  That is the same think tank where Norm Eisen, a member of the

886  chairman's staff, is also a senior fellow, and Barry Berke,

887  another member of the chairman's staff, has published

888  extensively.  And with that, I yield to the gentleman from

889  Colorado, Mr. Buck.

890      Mr. Buck.  I thank the gentleman from Arizona.  Mr.

891  Chairman, we are discussing basically what the standard is

892  for the release of grand jury testimony in the context of an

893  independent counsel or special counsel investigation.  And

894  thankfully you announced the standard on September 9th, 1998

895  when you appeared on the *Charlie Rose Show*.  That is the same

896  day that independent counsel, Ken Starr, and I will repeat

897  that, the same day that independent counsel, Ken Starr,

898  delivered his report into the Clinton investigation to

899  Congress.

900      Here is what you said when explaining why it would be

901  unwise and unfair to release grand jury materials.  "Now, Mr.

902  Starr in his transmittal letter to the Speaker and the

903  Minority Leader made it clear that much of this material is

904  Federal Rule 6(e) material.  That is material that by law,

905  unless contravened by a vote of the House, must be kept

906  secret.  It is grand jury material.  It represents statements

907  which may or may not be true by various witnesses, salacious

908  material, all kinds of material that it would be unfair to

909  release."  Our chairman even went so far as to suggest in

910  that interview that certain material "must not be released at

911  all."

912      I do want to mention that under the independent counsel

913  statute, Congress held a statutory role of oversight so it

914  would have at least been proper for Congress to consider if

915  grand jury materials should be released, but that law has

916  expired.  Under current law, the Attorney General is left

917  with the responsibility of protecting grand jury materials, a

918  different person responsible for deciding, a different

919  responsibility all together.  Despite changes in the law, the

920  chairman's concerns from 1998 about the questionable value in

921  releasing grand jury material and the need to protect those

922  materials are still true today.

923      The chairman's position was also on display 3 weeks ago

924  when the House unanimously approved his resolution, H. Con.

925  Res. 24, calling for the release of the special counsel

926  report while excluding from disclosure any information

927  protected by law which would necessarily protect grand jury

928  material.  Nevertheless, in a *New York Times* op-ed this week,

929  the chairman wrote, "The Department of Justice has an

930  obligation to provide it," meaning the full Mueller report,

931  "in its entirety without delay."

932      Mr. Chairman, you had it right over 20 years ago.  You

933   supported the protection of grand jury information, and I

934   agree with that.  You had it right 3 weeks ago.  Everyone on

935   this committee voted for your resolution to protect against

936   the release of 6(e) materials.  Mr. Chairman, Attorney

937   General Barr agrees with you.  Last week he wrote to you to

938   tell that he was working with the special counsel to redact

939   grand jury materials.

940        Your historic standard, one you held for 7,492 days,

941   from September 8th, 1998 at least until March 14th, 2019, is

942   the same standard that can be found in my amendment.  The

943   standards says the grand jury materials should not be

944   disclosed.  That is the right standard, and I urge the

945   committee to adopt the standard.  And I yield back to the

946   gentleman from Arizona.

947        Mr. Biggs.  Reclaiming my time.

948        Mr. Cicilline.  Mr. Chairman?

949        Chairman Nadler.  The gentleman from Rhode Island.

950        Mr. Biggs.  Excuse me.  I still have time.  I reclaimed

951   my time.

952        Chairman Nadler.  Oh, I am sorry.

953        Mr. Biggs.  Thank you.

954        Chairman Nadler.  Mr. Biggs, continue.

955        Mr. Biggs.  Thank you, Mr. Chairman.  I support the Ken

956   Buck, Representative Buck's, amendment to the amendment in

957   the nature of a substitute to the resolution.  And one thing

958    I want to point out is that when I hear people intimate that

959    the chairman merely has the authorization to issue a

960    subpoena, I get this feeling that maybe this isn't a done

961    deal.  But it is a done deal because the chairman in his

962    response to the gentleman from Wisconsin said very clearly

963    that before going to court we are going to issue a subpoena.

964        So the normal process would naturally be to go to the

965    court and ask for this information to be made available, but

966    that is not what is going to happen here.  You are going to

967    see subpoenas issued, and they are going to be issued

968    because, as the chairman said in his opening statement, the

969    Attorney General may do this, and I am paraphrasing of

970    course, and President Trump may do that.  In other words, he

971    would suggest that this would be conditional, but he is

972    acting and this resolution is going to go forward regardless

973    of what Mr. Barr provides, even if it is in compliance with

974    Rule 6(e).  My time has expired.

975        Chairman Nadler.  The gentleman from Rhode Island.

976        Mr. Cicilline.  Thank you, Mr. Chairman.  I move to

977    strike the last word.

978        Chairman Nadler.  The gentleman is recognized.

979        Mr. Cicilline.  Mr. Chairman, I just want to make two

980    brief points.  One is the gentleman from Wisconsin referenced

981    the Starr report and the Jaworski report as precedent for not

982    issuing a subpoena and, in fact, going to court.  It should

983    be noted that in both of those cases the special and

984    independent counsel went to court to seek authorization for

985    the release of the grand jury testimony before it was

986    delivered to Congress.  They did that on their own.  It

987    didn't require Congress to litigate it.

988         So those individuals recognized that it was important

989    when they delivered the report to also deliver the underlying

990    documents, and they sought permission from the court to do

991    it.  That has not happened in this case.  In fact, Mr. Barr

992    has done just the opposite.  He has attempted to keep this

993    information from Congress.  So the notion that we should just

994    wait and sort of pray and hope that Mr. Barr will suddenly

995    find his way to the courthouse to seek authorization, I

996    think, is foolish.  This subpoena will require him to take

997    that action because as the gentleman from Wisconsin said, he

998    could move to quash the subpoena.  That is one course of

999    action.  He could also go to court and move for the

1000   production of 6(e) materials so he can comply with the

1001   subpoena, and that is what we are hoping he will do if, in

1002   fact, they are interested in getting this information for

1003   Congress.

1004        So I urge my colleagues to oppose this amendment, to set

1005   the precedent so that, in fact, this committee can get the

1006   full report and all the supporting materials so we can do our

1007   oversight responsibility.  And as the chairman said, our

1008   constitutional responsibilities have not changed even if some

1009   regulation has.  I urge a no vote on the amendment and yield

1010   the balance of my time to the chairman.

1011       Chairman Nadler.  I thank the gentleman.

1012       I just want to point out that I was right 21 years ago,

1013   I am right now, and it is totally consistent, because we are

1014   urging now that the underlying 6(e) material be produced to

1015   the committee.  In 1998, that material had been produced to

1016   the Congress, and what we were discussing was its release to

1017   the public.  And before 6(e) material is released to the

1018   public, it has to be reviewed if some of it should not be

1019   released to the public for privacy and other reasons.  But

1020   that determination was made then by Congress, and it should

1021   be made now by Congress.

1022       We are asking now that the material be given to Congress

1023   so we can fulfill our constitutional responsibilities.  In

1024   1998, the material had been given prior to that debate to

1025   Congress so Congress could fulfill its constitutional

1026   responsibilities, and my comments on the floor then and the

1027   debate then was not about whether the material should go to

1028   Congress; it already had.  It was about whether it should be

1029   released to the public in its entirety, and I said then that

1030   you cannot release 6(e) material entirely to the public

1031   without reviewing it, and that is still true.  But it was

1032   then and should be now released to the Congress, to this

1033   committee, in its entirety.

1034       Mr. Sensenbrenner.  Would the gentleman yield?

1035       Chairman Nadler.  Yes, I will yield.

1036       Mr. Sensenbrenner.  Would the gentleman report releasing

1037   to the public the material that we redacted in the Clinton

1038   impeachment?

1039       Mr. Cicilline.  I will reclaim my time.  I would like to

1040   focus on the issue before this committee.  I am reclaiming my

1041   time, Mr. Chairman.

1042       But I again want to suggest that this is an important

1043   responsibility to this committee to ensure that no one is

1044   above the law, that we follow the facts where they lead us,

1045   that this investigation was conducted on behalf of the

1046   American people.  When our democracy was attacked by a

1047   foreign adversary, we fought hard to protect Mr. Mueller so

1048   he could complete his work free from political interference,

1049   and now we have a right, this committee has the right and the

1050   responsibility to see the full contents of this report and

1051   the supporting materials, and I urge a no on this amendment

1052   and yield the balance of my time to the Chairman.

1053       Chairman Nadler.  I thank the gentleman for yielding.

1054       Again, we have the right and the duty to protect certain

1055   material from public disclosure.  If we redacted it from the

1056   public 20 years ago, I assume we had good reason to do that.

1057   But the question before us now is not public release of

1058   information.  It is release to Congress to do our

1059   constitutional duties, and it is a very different situation.

1060        I yield back to the gentleman.

1061        Mr. Cicilline.  I yield back, Mr. Chairman.

1062        Chairman Nadler.  The gentleman from Texas, Mr.

1063   Ratcliffe, is recognized.

1064        Mr. Ratcliffe.  Thank you, Mr. Chairman.

1065        I move to strike the last word.

1066        Mr. Chairman, I have been listening to the arguments

1067   this morning.  I have been trying to decide what is worse.

1068   Was it last week when within 24 hours of the Attorney General

1069   issuing his summary of the Mueller findings I listened to the

1070   Chairman of the House Intelligence Committee, Adam Schiff,

1071   demand the immediate full release of the Mueller report

1072   without consideration for classified information?  The

1073   Chairman of the Intelligence Committee telling all 17

1074   intelligence agencies over which he had oversight essentially

1075   I do not give a damn about classified information, I want the

1076   full release of that report.

1077        Or was it this week, when I am sitting here today

1078   listening to the Chairman of the Judiciary Committee say I do

1079   not care what the law says, I do not care what the Special

1080   Counsel regulations say, I do not care that the Attorney

1081   General has complied with both, that the Attorney General has

1082   done everything the law requires, everything the Special

1083   Counsel regulations require, and is promising to do more, but

1084   that is not good enough, and now he is going to be subpoenaed

1085   for that.

1086       In that theater of the absurd, I am still trying to

1087   decide which of those is worse.  The Attorney General did not

1088   comply with the Democrats' arbitrary April 2nd demand

1089   deadline because he cannot comply, because the law precludes

1090   him from complying, because the Attorney General was not

1091   going to commit crimes to comply with that deadline.

1092       Mr. Chairman, today I heard you say over and over again

1093   Congress requires, Congress requires, there are

1094   constitutional rights, or there is a necessity for this

1095   information.  What I did not hear was what law the Special

1096   Counsel -- where in the Special Counsel regulation does it

1097   say that the Attorney General must turn over an un-redacted

1098   full Special Counsel report?  The Special Counsel regulation

1099   does not say that.  No law says that.

1100       The Attorney General has promised to provide as much

1101   transparency as he possibly can, but I am afraid that is

1102   never going to be good enough for some in here, and that is

1103   because we are here having this argument because some, not

1104   all, of my Democratic colleagues promised the American people

1105   evidence that never existed.  Some, not all, Democrats

1106   shouted fire in the theater of the American public, feeding a

1107   false Trump-Russia collusion narrative that never existed and

1108    that, in fact, some Democrats created with a fake, phony

1109    dossier.

1110        Now Special Counsel Mueller, who some Democrats demanded

1111    be protected so that he could do his job, did his job, and

1112    the minute that he finished doing that job and said no

1113    collusion, that the Trump-Russia collusion narrative does not

1114    exist, is not real, protect Bob Mueller suddenly has become

1115    to hell with Bob Mueller.

1116        I have always believed that Bob Mueller could write the

1117    definitive narrative on how Russia tried to meddle in our

1118    election.  I have never called what Bob Mueller was doing in

1119    that regard a witch hunt.  But Bob Mueller has provided his

1120    findings to the Attorney General, who has accurately

1121    summarized those.

1122        And with respect to Trump-Russia collusion, Bob Mueller

1123    has said there are no witches.  So these investigations

1124    should end.  We should move on.  We should not be issuing

1125    subpoenas today.

1126        But if we are going to issue subpoenas today, let's not

1127    issue a subpoena for the Mueller report.  Let's issue one for

1128    Bob Mueller.

1129        Mr. Cohen.  Would the gentleman yield?

1130        Mr. Raskin.  Would the gentleman yield?

1131        Mr. Ratcliffe.  Let me finish this thought.

1132        Let Bob Mueller come and let's ask Bob Mueller whether

1133    or not he thinks that the report that he created should be

1134    disclosed without considerations of redactions of classified

1135    national security information or without redactions for grand

1136    jury information or other information relating to ongoing

1137    investigations.  I may have questioned Bob Mueller's actions

1138    in certain regards, but I have never questioned his

1139    integrity, and I would be happy to hear his answer under oath

1140    before this committee with respect to that issue.

1141         So I urge all my colleagues to follow the law and to

1142    therefore support the Buck amendment.

1143         And I yield to the gentleman from Georgia.

1144         Chairman Nadler.  The gentleman's time has expired.

1145         Mr. Ratcliffe.  I yield back.

1146         Chairman Nadler.  The gentleman from Tennessee.

1147         Mr. Cohen.  Thank you, Mr. Chairman.

1148         I was just going to say that Mr. Ratcliffe, who I

1149    respect greatly, said that Mr. Barr accurately described the

1150    Mueller report.  We do not know that.  That is why we want to

1151    see it, so we can know if he accurately did.  He talked about

1152    he went through fire.  He might be suggesting I am one of

1153    those fire throwers.  I want to find out if I was wrong, and

1154    I want the public to see it too.

1155         I yield back the balance of my time.

1156         Chairman Nadler.  The gentleman from Texas, Mr. Gohmert.

1157         Mr. Gohmert.  Thank you, Mr. Chair.

1158        I have to say, I witnessed one of the proof positive of

1159    the brilliant mental acumen of our Chairman as he explained

1160    adroitly how he was right 21 years ago and is right today,

1161    just a work of beauty and argument.

1162        As Chairman said, 21 years ago, we should always

1163    remember this as a prosecutor's report by its nature.  It is

1164    one-sided.  I also said it was salacious material, all kinds

1165    of material that it would be unfair to release.

1166        I would point out the gentleman did not know exactly

1167    what all the material was at that time, and we do not know at

1168    this time either.  In February 1999, a New York Times

1169    article, our current Chairman called the Starr report and

1170    impeachment efforts a "partisan coup d'état."

1171        What has gone on in this country did absolutely,

1172    unequivocally, no doubt about it involve collusion of people

1173    at the highest level with a foreign entity to try to bring

1174    down a candidate and then bring down a sitting president.

1175    That was collusion between top FBI officials, Justice

1176    officials, a former MI6 intelligence officer who has been

1177    discredited by those same Justice officials, FBI officials,

1178    but they colluded with him to try to bring down a candidate

1179    and now a sitting president.

1180        Enough is enough.  At some point, we have to say what

1181    will be written in the annals of history of this country as

1182    an outrageous attempt at a real coup d'état was unsuccessful.

1183   The truth came out about who really colluded with foreign

1184   agents.

1185       And by the way, they did involve the Democrats' campaign

1186   and a foreign agent who was colluding with some of Putin's

1187   agents, in all likelihood, as he was not even in Russia but

1188   was talking by phone to Russian agents in his efforts to help

1189   the Clinton campaign and top Justice officials bring down a

1190   sitting president.  And for us to continue this outrageous

1191   assault on the office of president, even after the truth has

1192   come out that there was no conspiracy by the Trump campaign

1193   or President Trump or anybody in his family with Russia, and

1194   to continue to push, we are still going to make a big deal

1195   out of this, we cannot stand the fact that the facts show it

1196   was the Democrats that colluded with foreign agents to try to

1197   change the outcome of the election.

1198       Enough is enough, for heaven's sake.  Let's please move

1199   on.  There was a time when I loved and appreciated the

1200   current Chairman's desire to protect privacy rights.  I saw

1201   that dramatically eroded during the Obama Administration, but

1202   I am still hoping and praying that our now-Chairman's once

1203   great desire to protect privacy rights and to try to hold

1204   back the bounds of what Orwell described as happening now --

1205   obviously, the only thing you got wrong was the year, because

1206   we have seen what the Obama Administration did with those

1207   Orwellian abilities to spy on American citizens.

1208      It is time to go back and clean up the mess that has

1209   been made over years of abuse.  And this subpoena, the

1210   subpoenas is not what we need to be voting for, and I support

1211   my friend's amendment.

1212      I yield back.

1213      Chairman Nadler.  The gentleman yields back.

1214      The gentleman from Georgia is recognized.

1215      Mr. Johnson of Georgia.  I move to strike the last word.

1216      Chairman Nadler.  The gentleman is recognized.

1217      Mr. Johnson of Georgia.  I yield to the gentle lady from

1218   Texas.

1219      Ms. Jackson Lee.  Thank you very much.

1220      I wanted to read into the record the information

1221   regarding the Chairman of the Benghazi committee sent U.S.

1222   Marshalls to witness without asking that witness to come in

1223   voluntarily.

1224      And I yield back, Mr. Chairman.

1225      Chairman Nadler.  Does the gentleman from Georgia yield

1226   back?

1227      Mr. Johnson of Georgia.  I yield back.

1228      Chairman Nadler.  The gentle lady from Arizona, Ms.

1229   Lesko.

1230      Mrs. Lesko.  Thank you, Mr. Chairman.

1231      I want to move to strike the last word.

1232      Chairman Nadler.  The gentle lady is recognized.

1233      Mrs. Lesko.  Thank you.

1234      Mr. Chairman, I support Representative Buck's amendment.

1235  What basically we are doing here is, in my opinion, the

1236  Democrats are asking Attorney General Barr to violate the

1237  law.  It is not only against the law, but it would even be

1238  criminal to disclose grand jury material without a court

1239  order.

1240      It is obvious to me that this is just a continuation of

1241  an attempt to undermine the President of the United States.

1242  For the last two years, members on this committee have said

1243  that there has been collusion with the Trump Administration

1244  and President Trump with Russia to undermine the 2016

1245  election, and as revealed in the summary, this is absolutely

1246  not true.

1247      So I really wish that we could work on big issues

1248  instead of continuing this circus on undermining the

1249  President of the United States.  I serve on three committees,

1250  and on every single committee it is obvious from the very

1251  first organizational meeting that there is a coordinated

1252  attempt by the Democrats to undermine the President of the

1253  United States, and this is all about the 2020 presidential

1254  election.

1255      The public really wants us to work on big issues

1256  together, and I ask my Democratic colleagues to do that and

1257  quit this circus.

1258      I will yield time to the gentleman, Mr. Jordan, from

1259  Ohio.

1260      Mr. Jordan.  I thank the gentle lady for yielding, and I

1261  too wish to support the Buck amendment.

1262      I would just ask the fundamental question:  Why are we

1263  here?  It seems to me we are here because the Mueller report

1264  was not what the Democrats thought it was going to be.  In

1265  fact -- in fact -- it was just the opposite.

1266      What did the Attorney General tell us that the principal

1267  findings of Mr. Mueller's report were?  No new indictments,

1268  no sealed indictments, no collusion, no obstruction.

1269      Mr. Cicilline.  Would the gentleman yield?

1270      Mr. Jordan.  I only got a little bit of time because --

1271      Mr. Cicilline.  I only have a short question.  You made

1272  reference to the Mueller report.  Have you seen it?  Because

1273  we have not.

1274      Mr. Jordan.  I have seen the principal findings from the

1275  Attorney General.

1276      Mr. Raskin.  Would the gentleman yield for a quick

1277  question?  I promise it is short.

1278      You reported that the report states that there is no

1279  obstruction.  What is your basis for saying that?

1280      Mr. Jordan.  The sentence where he said they did not

1281  find obstruction.  I understand the sentence you are

1282  referring to where he talks about no exoneration either, but

1283    then there are three paragraphs after where he points out

1284    that there was not the elements of obstruction.

1285        In fact, the report -- excuse me -- the letter from the

1286    Attorney General referencing the Special Counsel report said

1287    no new indictments, no sealed indictments, no collusion, and

1288    as I just pointed out, did not find obstruction.

1289        On the question of collusion, it was very clear.  He

1290    said there were multiple opportunities for Trump associates,

1291    people associated with the Trump campaign to collude, and

1292    they did not.  So multiple times where the forbidden fruit

1293    was placed in front of them and they did not bite.

1294        I would also point out this.  There has been reference

1295    from the Democrats relative to Watergate and the Clinton

1296    Special Counsel.  Watergate, there was a break-in.  With

1297    Clinton, there was perjury.  With the chief charge of this

1298    Special Counsel's investigation, there was no collusion.

1299        But here we are today.  Well, actually three weeks ago,

1300    the Chairman of the committee launched 81 letters to 60-some

1301    different individuals, and now today we are going to subpoena

1302    documents that the AG said he will give us in a matter of

1303    days.

1304        But maybe the most important point, I think, is the one

1305    that my colleague from Texas made, Mr. Ratcliffe.  The idea

1306    that the Chairman of the Intelligence Committee said he wants

1307    everything made public, including classified information, and

1308   the idea that the Chair of the Judiciary Committee, the House

1309   Judiciary Committee said last week, or this week, that he

1310   wants everything made public, including grand jury material,

1311   that is maybe the scariest thing of all.

1312      So the Attorney General has said he is going to turn

1313   this over in a matter of days.  Let's wait.  Let's get the

1314   information, and then let's look at it then.

1315      With that, I would yield back the remaining 20 seconds

1316   to the gentle lady from Arizona.

1317      Mrs. Lesko.  I yield back my time.

1318      Chairman Nadler.  The gentleman from Florida, Mr. Gaetz.

1319      Mr. Gaetz.  Move to strike the last word.

1320      Chairman Nadler.  The gentleman is recognized.

1321      Mr. Gaetz.  Thank you.  I support the Buck amendment.

1322      When the human body sees life expire within it, one of

1323   the final sounds that it can make in dramatic and loud

1324   fashion is a death rattle, and I would suggest to the

1325   American people that what they are witnessing is the death

1326   rattle of the Democrats' Russia collusion lie.

1327      For 22 months my colleagues on the other side, many of

1328   them said there was actual evidence of collusion.  And so

1329   now, clearly seeing that that is not true, we observe our

1330   colleagues moving through the stages of grief.

1331      First we saw shock and surprise.  My colleagues would

1332   huddle together after the findings of the Mueller report

1333    release wondering what to do next, what play to run after

1334    losing all credibility with the American people.

1335        And after shock, we now are in the stage of denial,

1336    where the principal findings of the Mueller report, they just

1337    cannot be true, they cannot be accepted, they must be false,

1338    there must be more information we can discover.

1339        I know we are beginning the baseball season, so perhaps

1340    a baseball analogy would be appropriate.  This would be like

1341    saying, well, we have lost the game, but we have to tweeze

1342    through the box score to see if we won the third inning.

1343    That is what is essentially happening with the desire of

1344    Democrats in the production of these subpoenas and voting on

1345    them today.

1346        It also represents a stark departure from the standards

1347    and statements that my own Democratic colleagues have laid

1348    out just last Congress and this Congress.  I am quoting now

1349    from the Speaker of the House, Ms. Pelosi.  In February of

1350    2018 she said, "President Trump has surrendered his

1351    constitutional responsibility as Commander in Chief by

1352    releasing highly classified and distorted intelligence.  By

1353    not protecting intelligence sources and methods, he just sent

1354    his friend Putin a bouquet."

1355        Well, there was no bouquet, no untoward relationship

1356    with Vladimir Putin, but there was a statement from the

1357    Speaker of the House acknowledging that if you do not review

1358   sources and methods, you are derelict in your duty to the

1359   country.  Well, now that they are going through their stages

1360   of grief, perhaps we are approaching bargaining, because now

1361   they are trying to bargain away their own standards.

1362       But it is not just the Speaker of the House.  Let's look

1363   to statements from the Chairman of the Judiciary Committee,

1364   the gentleman from New York, Mr. Nadler.  He said on June

1365   28th of 2018, "Republicans are requesting documents they know

1366   they cannot have."  He continued, speaking of the

1367   Republicans, "Right is rightly denied.  They will do their

1368   best to undermine the credibility of the Department of

1369   Justice."

1370       Well, Mr. Chairman, you are now asking for documents you

1371   know you cannot have, and you are doing so in order to erode

1372   confidence in the Attorney General who leads the Department

1373   of Justice because he has concluded that there was not

1374   collusion and that your principal Russian narrative was not

1375   truthful, was not credible.  We were right, you were wrong,

1376   and the American people know it.

1377       And so as we proceed now on this unfocused, 81-pronged

1378   investigation of the Judiciary Committee has launched, as we

1379   continue to have these mindless votes on unnecessary

1380   subpoenas, I sincerely hope that the American people will

1381   remember what things the Democrats were saying just months

1382   ago, that there was collusion, that there was actual evidence

1383   of collusion, and that sources and methods could never be

1384   disclosed as a consequence of our fidelity to our oath and to

1385   the people of this country.

1386        Let's have some consistency, and let's at least have

1387   some acknowledgment that you all were not telling the truth

1388   to the American people for an extended period of time.  We

1389   were, and you should not be trusted.

1390        I yield back.

1391        Chairman Nadler.  The question occurs on the amendment.

1392        All those in favor of the Buck amendment will signify by

1393   saying aye.

1394        Those opposed, no.

1395        In the opinion of the Chair, the noes have it.

1396        The noes have it.  The amendment is not agreed to.

1397        Mr. Collins.  Mr. Chairman, I ask for a recorded vote.

1398        Chairman Nadler.  A roll call vote has been requested.

1399        As your name is called, all those in favor will signify

1400   by saying aye; opposed, no.

1401        The Clerk will call the roll.

1402        Ms. Strasser.  Mr. Nadler?

1403        Chairman Nadler.  No.

1404        Ms. Strasser.  Mr. Nadler votes no.

1405        Ms. Lofgren?

1406        Ms. Lofgren.  No.

1407        Ms. Strasser.  Ms. Lofgren votes no.

1408        Ms. Jackson Lee?

1409        Ms. Jackson Lee.  No.

1410        Ms. Strasser.  Ms. Jackson Lee votes no.

1411        Mr. Cohen?

1412        Mr. Cohen.  No.

1413        Ms. Strasser.  Mr. Cohen votes no.

1414        Mr. Johnson of Georgia?

1415        Mr. Johnson of Georgia.  No.

1416        Ms. Strasser.  Mr. Johnson of Georgia votes no.

1417        Mr. Deutch?

1418        Mr. Deutch.  No.

1419        Ms. Strasser.  Mr. Deutch votes no.

1420        Ms. Bass?

1421        Mr. Richmond?

1422        Mr. Richmond.  No.

1423        Ms. Strasser.  Mr. Richmond votes no.

1424        Mr. Jeffries?

1425        Mr. Jeffries.  No.

1426        Ms. Strasser.  Mr. Jeffries votes no.

1427        Mr. Cicilline?

1428        Mr. Cicilline.  No.

1429        Ms. Strasser.  Mr. Cicilline votes no.

1430        Mr. Swalwell?

1431        Mr. Swalwell.  No.

1432        Ms. Strasser.  Mr. Swalwell votes no.

1433        Mr. Lieu?

1434        Mr. Lieu.  No.

1435        Ms. Strasser.  Mr. Lieu votes no.

1436        Mr. Raskin?

1437        Mr. Raskin.  No.

1438        Ms. Strasser.  Mr. Raskin votes no.

1439        Ms. Jayapal?

1440        Ms. Jayapal.  No.

1441        Ms. Strasser.  Ms. Jayapal votes no.

1442        Mrs. Demings?

1443        Mrs. Demings.  No.

1444        Ms. Strasser.  Mrs. Demings votes no.

1445        Mr. Correa?

1446        Mr. Correa.  No.

1447        Ms. Strasser.  Mr. Correa votes no.

1448        Ms. Scanlon?

1449        Ms. Scanlon.  No.

1450        Ms. Strasser.  Ms. Scanlon votes no.

1451        Ms. Garcia?

1452        Ms. Garcia.  No.

1453        Ms. Strasser.  Ms. Garcia votes no.

1454        Mr. Neguse?

1455        Mr. Neguse.  No.

1456        Ms. Strasser.  Mr. Neguse votes no.

1457        Mrs. McBath?

1458        Mrs. McBath.  No.

1459        Ms. Strasser.  Mrs. McBath votes no.

1460        Mr. Stanton?

1461        Mr. Stanton.  No.

1462        Ms. Strasser.  Mr. Stanton votes no.

1463        Ms. Dean?

1464        Ms. Dean.  No.

1465        Ms. Strasser.  Ms. Dean votes no.

1466        Ms. Mucarsel-Powell?

1467        Ms. Mucarsel-Powell.  No.

1468        Ms. Strasser.  Ms. Mucarsel-Powell votes no.

1469        Ms. Escobar?

1470        Ms. Escobar.  No.

1471        Ms. Strasser.  Ms. Escobar votes no.

1472        Mr. Collins?

1473        Mr. Collins.  Yes.

1474        Ms. Strasser.  Mr. Collins votes yes.

1475        Mr. Sensenbrenner?

1476        Mr. Sensenbrenner.  Aye.

1477        Ms. Strasser.  Mr. Sensenbrenner votes aye.

1478        Mr. Chabot?

1479        Mr. Chabot.  Aye.

1480        Ms. Strasser.  Mr. Chabot votes aye.

1481        Mr. Gohmert?

1482        Mr. Gohmert.  Aye.

1483        Ms. Strasser.  Mr. Gohmert votes aye.

1484        Mr. Jordan?

1485        Mr. Jordan.  Yes.

1486        Ms. Strasser.  Mr. Jordan votes yes.

1487        Mr. Buck?

1488        Mr. Buck.  Aye.

1489        Ms. Strasser.  Mr. Buck votes aye.

1490        Mr. Ratcliffe?

1491        Mr. Ratcliffe.  Yes.

1492        Ms. Strasser.  Mr. Ratcliffe votes yes.

1493        Mrs. Roby?

1494        Mr. Gaetz?

1495        Mr. Gaetz.  Aye.

1496        Ms. Strasser.  Mr. Gaetz votes aye.

1497        Mr. Johnson of Louisiana?

1498        Mr. Johnson of Louisiana.  Aye.

1499        Ms. Strasser.  Mr. Johnson of Louisiana votes aye.

1500        Mr. Biggs?

1501        Mr. Biggs.  Aye.

1502        Ms. Strasser.  Mr. Biggs votes aye.

1503        Mr. McClintock?

1504        Mr. McClintock.  Aye.

1505        Ms. Strasser.  Mr. McClintock votes aye.

1506        Mrs. Lesko?

1507        Mrs. Lesko.  Aye.

1508        Ms. Strasser.  Mrs. Lesko votes aye.

1509        Mr. Reschenthaler?

1510        Mr. Reschenthaler.  Aye.

1511        Ms. Strasser.  Mr. Reschenthaler votes aye.

1512        Mr. Cline?

1513        Mr. Cline.  Aye.

1514        Ms. Strasser.  Mr. Cline votes aye.

1515        Mr. Armstrong?

1516        Mr. Armstrong.  Yes.

1517        Ms. Strasser.  Mr. Armstrong votes yes.

1518        Mr. Steube?

1519        Mr. Steube.  Yes.

1520        Ms. Strasser.  Mr. Steube votes yes.

1521        Chairman Nadler.  The Clerk will report.

1522        One more?  The Clerk will suspend.

1523        Ms. Strasser.  Ms. Bass votes no.

1524        Chairman Nadler.  Has everyone else voted?

1525        The Clerk will report.

1526        Ms. Strasser.  Ms. Jackson Lee is recorded as no.

1527        Mr. Chairman, the vote is 16 ayes and 24 noes.

1528        Chairman Nadler.  A majority having voted against the

1529    amendment, the amendment is not agreed to.

1530        Are there any other amendments?  Is there another

1531    amendment?

1532        The gentleman is recognized.

1533      Mr. McClintock.  I move to strike the last word.

1534      Chairman Nadler.  The gentleman is recognized.

1535      Mr. McClintock.  Thank you.  Mr. Chairman, I called for

1536 the --

1537      Chairman Nadler.  Wait a minute.  The Clerk will report

1538 the amendment.

1539      Voice.  There is no amendment.

1540      Chairman Nadler.  I am sorry.

1541      Go ahead.

1542      Mr. McClintock.  Mr. Chairman, I called for the

1543 appointment of a Special Counsel to look into charges of

1544 collusion before Mr. Mueller was appointed because I believed

1545 the President was completely innocent of these outlandish

1546 charges and that a full and independent investigation would

1547 show that.

1548      Now it has, and I too want to see as much of the report

1549 made public as quickly as humanly possible to put the lie to

1550 these politicians who have been telling us for more than two

1551 years that they held in their hands irrefutable evidence of

1552 coordination between the Russian government and the Trump

1553 campaign.  I want to know all aspects of this lie and who was

1554 responsible for using it to tear this country apart and to

1555 interfere with the legitimate election of the President.

1556      What I do not want to do is illegally release material

1557 in that report that is related to ongoing investigations into

1558   political corruption at the highest levels of the FBI and the

1559   Justice Department.

1560       It is clear that high-ranking officials entrusted with

1561   the law enforcement powers of our country abused this trust

1562   to influence the 2016 presidential election and ultimately to

1563   undermine its outcome.  It is inconceivable that the Mueller

1564   investigation did not look into the fake Steele dossier that

1565   was the source of these outlandish charges and that was

1566   knowingly invoked by these officials in their attempt to

1567   delegitimize the constitutional right of the American people

1568   to elect their president.

1569       The premature release of such information while the

1570   Inspector General is conducting investigations into this

1571   matter, and while future prosecutions of these officials is

1572   possible, would itself be a deliberate and calculated attempt

1573   to obstruct justice by this committee, and I am opposed to

1574   the motion.

1575       Chairman Nadler.  The question occurs on the amendment

1576   in the nature of a substitute.

1577       All those in favor, respond by saying aye.

1578       Opposed, no?

1579       In the opinion of the Chair, the ayes have it, and the

1580   amendment in the nature of a substitute is agreed to.

1581       A reporting quorum being present, the question is on the

1582   motion to agree to the resolution as amended.

1583        Those in favor, respond by saying aye.

1584        Those opposed?

1585        The ayes have it.  The resolution --

1586        Mr. Collins.  Roll call.

1587        Chairman Nadler.  A recorded vote has been requested,

1588   and the Clerk will call the roll.

1589        Ms. Strasser.  Mr. Nadler?

1590        Chairman Nadler.  Aye.

1591        Ms. Strasser.  Mr. Nadler votes aye.

1592        Ms. Lofgren?

1593        Ms. Lofgren.  Aye.

1594        Ms. Strasser.  Ms. Lofgren votes aye.

1595        Ms. Jackson Lee?

1596        Mr. Cohen?

1597        Mr. Cohen.  Aye.

1598        Ms. Strasser.  Mr. Cohen votes aye.

1599        Mr. Johnson of Georgia?

1600        Mr. Johnson of Georgia.  Aye.

1601        Ms. Strasser.  Mr. Johnson of Georgia votes aye.

1602        Mr. Deutch?

1603        Mr. Deutch.  Aye.

1604        Ms. Strasser.  Mr. Deutch votes aye.

1605        Ms. Bass?

1606        Mr. Richmond?

1607        Mr. Richmond.  Aye.

1608        Ms. Strasser.  Mr. Richmond votes aye.

1609        Mr. Jeffries?

1610        Mr. Jeffries.  Aye.

1611        Ms. Strasser.  Mr. Jeffries votes aye.

1612        Mr. Cicilline?

1613        Mr. Cicilline.  Aye.

1614        Ms. Strasser.  Mr. Cicilline votes aye.

1615        Mr. Swalwell?

1616        Mr. Swalwell.  Aye.

1617        Ms. Strasser.  Mr. Swalwell votes aye.

1618        Mr. Lieu?

1619        Mr. Lieu.  Aye.

1620        Ms. Strasser.  Mr. Lieu votes aye.

1621        Mr. Raskin?

1622        Mr. Raskin.  Aye.

1623        Ms. Strasser.  Mr. Raskin votes aye.

1624        Ms. Jayapal?

1625        Ms. Jayapal.  Aye.

1626        Ms. Strasser.  Ms. Jayapal votes aye.

1627        Mrs. Demings?

1628        Mrs. Demings.  Aye.

1629        Ms. Strasser.  Mrs. Demings votes aye.

1630        Mr. Correa?

1631        Mr. Correa.  Aye.

1632        Ms. Strasser.  Mr. Correa votes aye.

1633        Ms. Scanlon?

1634        Ms. Scanlon.  Aye.

1635        Ms. Strasser.  Ms. Scanlon votes aye.

1636        Ms. Garcia?

1637        Ms. Garcia.  Aye.

1638        Ms. Strasser.  Ms. Garcia votes aye.

1639        Mr. Neguse?

1640        Mr. Neguse.  Aye.

1641        Ms. Strasser.  Mr. Neguse votes aye.

1642        Mrs. McBath?

1643        Mrs. McBath.  Aye.

1644        Ms. Strasser.  Mrs. McBath votes aye.

1645        Mr. Stanton?

1646        Mr. Stanton.  Aye.

1647        Ms. Strasser.  Mr. Stanton votes aye.

1648        Ms. Dean?

1649        Ms. Dean.  Aye.

1650        Ms. Strasser.  Ms. Dean votes aye.

1651        Ms. Mucarsel-Powell?

1652        Ms. Mucarsel-Powell.  Aye.

1653        Ms. Strasser.  Ms. Mucarsel-Powell votes aye.

1654        Ms. Escobar?

1655        Ms. Escobar.  Aye.

1656        Ms. Strasser.  Ms. Escobar votes aye.

1657        Mr. Collins?

1658        Ms. Bass?

1659        Ms. Bass.  Aye.

1660        Ms. Strasser.  Ms. Bass votes aye.

1661        Mr. Collins.  No.

1662        Ms. Strasser.  Mr. Collins votes no.

1663        Mr. Sensenbrenner?

1664        Mr. Sensenbrenner.  No.

1665        Ms. Strasser.  Mr. Sensenbrenner votes no.

1666        Mr. Chabot?

1667        Mr. Chabot.  No.

1668        Ms. Strasser.  Mr. Chabot votes no.

1669        Mr. Gohmert?

1670        Mr. Gohmert.  No.

1671        Ms. Strasser.  Mr. Gohmert votes no.

1672        Mr. Jordan?

1673        Mr. Jordan.  No.

1674        Ms. Strasser.  Mr. Jordan votes no.

1675        Mr. Buck?

1676        Mr. Buck.  No.

1677        Ms. Strasser.  Mr. Buck votes no.

1678        Mr. Ratcliffe?

1679        Mrs. Roby?

1680        Mrs. Roby.  No.

1681        Ms. Strasser.  Mrs. Roby votes no.

1682        Mr. Gaetz?

1683        Mr. Gaetz.  No.

1684        Ms. Strasser.  Mr. Gaetz votes no.

1685        Mr. Johnson of Louisiana?

1686        Mr. Johnson of Louisiana.  No.

1687        Ms. Strasser.  Mr. Johnson of Louisiana votes no.

1688        Mr. Biggs?

1689        Mr. Biggs.  No.

1690        Ms. Strasser.  Mr. Biggs votes no.

1691        Mr. McClintock?

1692        Mr. McClintock.  No.

1693        Ms. Strasser.  Mr. McClintock votes no.

1694        Mrs. Lesko?

1695        Mrs. Lesko.  No.

1696        Ms. Strasser.  Mrs. Lesko votes no.

1697        Mr. Reschenthaler?

1698        Mr. Reschenthaler.  No.

1699        Ms. Strasser.  Mr. Reschenthaler votes no.

1700        Mr. Cline?

1701        Mr. Cline.  No.

1702        Ms. Strasser.  Mr. Cline votes no.

1703        Mr. Armstrong?

1704        Mr. Armstrong.  No.

1705        Ms. Strasser.  Mr. Armstrong votes no.

1706        Mr. Steube?

1707        Mr. Steube.  No.

1708      Ms. Strasser.  Mr. Steube votes no.

1709      Chairman Nadler.  Has every member voted who wishes to

1710  vote?

1711      Ms. Jackson Lee.  Mr. Chairman, how am I recorded?

1712      Ms. Strasser.  Ms. Jackson Lee, you are not recorded.

1713      Ms. Jackson Lee.  Aye.

1714      Ms. Strasser.  Ms. Jackson Lee votes aye.

1715      Chairman Nadler.  The gentleman from Texas?

1716      Ms. Strasser.  Mr. Ratcliffe votes no.

1717      Chairman Nadler.  Does any other member wish to vote who

1718  has not voted?

1719      The Clerk will report.

1720      Ms. Strasser.  Mr. Chairman, the vote is 24 ayes, 17

1721  noes.

1722      Chairman Nadler.  The ayes have it.  The resolution is

1723  amended as agreed to.

1724      This concludes our business for today.  Thanks to all of

1725  our members for attending.

1726      The mark-up is adjourned.

1727      [Whereupon, at 10:25 a.m., the hearing was adjourned.]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

v.

Case No. 1:19-cv-2379 (KBJ)

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

*Defendant.*

# Exhibit U

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Donald F. McGahn II

You are hereby commanded to be and appear before the
Committee on the Judiciary

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 2138 Rayburn House Office Building, Washington, D.C., 20515

Date: May 7, 2019                                     Time: 10:00am

☐ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____          (and continuing until completed)          Time: _____

☑ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:  2141 Rayburn House Office Building, Washington, D.C., 20515

Date: May 21, 2019                                     Time: 10:00am

*To* any authorized staff member or the U.S. Marshals Service _____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 22      day of April              , 20 19 .

*Chairman or Authorized Member*

Attest:

*Clerk*

# PROOF OF SERVICE

Subpoena for

   Donald F. McGahn II

Address  c/o William A. Burck, Esq., Quinn, Emanuel, Urquhart, & Sullivan, LLP

   1300 I Street NW, Suite 900, Washington, DC, 20005

before the  Committee on the Judiciary

*U.S. House of Representatives*
*116th Congress*

Served by (print name)  Aaron Hiller

Title  Deputy Chief Counsel, House Judiciary Committee

Manner of service  Electronic

Date  April 22, 2019

Signature of Server

Address  2138 Rayburn House Office Building

Washington, D.C. 20515

## SCHEDULE

In accordance with the attached Definitions and Instructions, you are hereby required to produce all documents and communications in your possession, custody or control referring or relating to:

1. Statements by Michael Flynn to the Federal Bureau of Investigation regarding contacts with Sergey Kislyak.

2. The Federal Bureau of Investigation and Department of Justice's investigation of Michael Flynn.

3. Meetings with Department of Justice officials or employees relating to Michael Flynn and underlying evidence relating to Michael Flynn.

4. The resignation or termination of Michael Flynn.

5. Sean Spicer's February 14, 2017 public statements about Michael Flynn's resignation.

6. President Trump's contacts with James Comey on or about January 27, 2017, February 14, 2017, March 30, 2017, and April 11, 2017.

7. The termination of James Comey, including but not limited to any documents or communications relating to draft termination letters, White House Counsel memoranda, or the May 9, 2017 Rod Rosenstein memorandum to Jeff Sessions entitled "Restoring Public Confidence in the FBI."

8. Meetings or communications involving Federal Bureau of Investigation or Department of Justice officials or employees relating to the resignation or termination of James Comey.

9. Jeff Sessions's recusal from any matters arising from the campaigns for President of the United States.

10. Reversing or attempting to reverse Jeff Sessions's recusal from any matters.

11. The resignation or termination, whether contemplated or actual, of Jeff Sessions.

12. The resignation or termination, whether contemplated or actual, of Rod Rosenstein.

13. The resignation or termination, whether contemplated or actual, of Special Counsel Robert Mueller.

14. Your resignation or termination, whether contemplated or actual.

15. The appointment of Special Counsel Robert Mueller.

16. Alleged conflicts of interest on the part of Special Counsel Robert Mueller or other employees of the Special Counsel's Office.

17. Public statements and/or requests to correct the record or deny reports that President Trump asked for Special Counsel Robert Mueller to be removed as Special Counsel.

18. Memoranda directing White House officials or employees to avoid direct contact or communication with the Department of Justice or Jeff Sessions.

19. Meetings or communications with Dana Boente or other Department of Justice officials or employees relating to whether the President was being investigated by the Department of Justice or Federal Bureau of Investigation.

20. Meetings or communications with Department of Justice officials or employees relating to James Comey's testimony before Congress.

21. The President maintaining possession of Jeff Sessions's resignation letter.

22. Communications about Special Counsel Mueller's investigation, including but not limited to whether any action taken, proposed or discussed by President Trump or anyone acting on his behalf may constitute obstruction of justice or any violation of law.

23. President Trump's exposure in the Special Counsel Investigation relating to "other contacts," "calls," or "ask re Flynn" as mentioned in Volume II, page 82 of the Report.

24. Statements or communications relating to press reports that President Trump was under investigation.

25.  Paul Manafort's cooperation with the Special Counsel's Office.

26. The June 9, 2016 Trump Tower meeting.

27. The July 8, 2017 statement and related statements released in the name of Donald Trump Jr. regarding the Trump Tower meeting.

28. Prosecuting or investigating James Comey or Hillary Clinton.

29. Presidential pardons, whether possible or actual, for Paul Manafort, Michael Flynn, Michael Cohen, Rick Gates, Roger Stone, individuals associated with the Trump Campaign, or individuals involved in matters before the U.S. Attorney's Office for the Southern District of New York.

30. Selecting Jeff Sessions's replacement through a recess appointment or appointing an Acting Attorney General under the Federal Vacancies Reform Act.

31. The SDNY Investigations, the recusal of U.S. Attorney Geoffrey Berman from the SDNY Investigations, or the reassignment or potential reassignment of SDNY employees from the SDNY Investigations.

32. Statements by Michael Cohen or White House officials to the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence regarding the timing of the Trump Organization's efforts to develop a property in Moscow, including but not limited to drafts of such statements and communications about such drafts or final statements.

33. Any payment, or potential payment, to any person or entity by Michael Cohen, Essential Consultants LLC, or American Media Inc. ("AMI") for the benefit of Donald Trump or the Trump Campaign, including but not limited to any documents relating to the reimbursement of Cohen, Essential Consultants LLC, or AMI for any such payments, and any documents relating to the omission or inclusion of information about liabilities associated with such payments on Donald Trump's Public Financial Disclosure Reports (OGE Form 278e) filed in 2017 and 2018.

34. Communications relating to United States imposed sanctions or potential sanctions against the Russian Federation from June 16, 2015 to October 18, 2018, including but not limited to the sanctions imposed pursuant to the Magnitsky Act.

35. Communications with the Executive Office of the President regarding your response to the March 4, 2019 document request by the House Committee on the Judiciary.

36. Any documents referenced in the Report.

## DEFINITIONS

As used in this subpoena, the following terms shall be interpreted in accordance with these definitions:

1. "58th Presidential Inaugural Committee" means the entity registered under FEC ID # C00629584 as well as its parent companies, subsidiary companies, affiliated entities, agents, officials, and instrumentalities.

2. "And," and "or," shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this subpoena any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

3. "Any" includes "all," and "all" includes "any."

4. "Communication(s)" means the transmittal of information by any means, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email, text message, instant message, MMS or SMS message, encrypted message, message application, social media, or otherwise.

5. "Employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

6. "Document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, interoffice and intra-office communications, call records, electronic mail ("e-mail"), instant messages, calendars, contracts, cables, notations of any type of conversation, telephone call, meeting or other communication, bulletins, printed matter, computer printouts, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, power point presentations, spreadsheets, and work sheets. The term "document" includes all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments to the foregoing, as well as any attachments or appendices thereto.

7. "Documents in your possession, custody or control" means (a) documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, or representatives acting on your behalf; (b) documents that you have a legal right to obtain, that you have a right to copy, or to which you have access; and (c) documents that have been placed in the possession, custody, or control of any third party. **This includes but is not limited to documents that are or were held by your attorneys.**

8. "Each" shall be construed to include "every," and "every" shall be construed to include "each."

9. "Government" shall include any government's present and former agencies, branches, units, divisions, subdivisions, districts, public corporations, employees, elected and appointed officials, ambassadors, diplomats, emissaries, authorities, agents, assignees, and instrumentalities. This includes, but is not limited to, any government-controlled business entities, entities in which the government has a financial interest, and any person acting or purporting to act on the government's behalf.

10. "Including" shall be construed broadly to mean "including, but not limited to."

11. "Person" or "persons" means natural persons, firms, partnerships, associations, corporations, subsidiaries, division, departments, joint ventures proprietorships, syndicates, or other legal business or government entities, and all subsidiaries, affiliates, divisions, departments, branches, or other units, thereof.

12. "Referenced" means cited, quoted, mentioned, described, alluded to, contained, incorporated, reproduced, or identified in any manner whatsoever.

13. "Relating to" shall mean discussing, describing, reflecting, containing, analyzing, studying, reporting, commenting, evidencing, constituting, comprising, showing, setting forth, considering, recommending, concerning, or pertinent to that subject in any manner whatsoever.

14. "The Russian Federation" shall include the Government of the Russian Federation, as the term "Government" is defined above.

15. "Special Counsel's Office" means the office created pursuant to Department of Justice Order No. 3915-17 issued by the Acting Attorney General on May 17, 2017 appointing Robert S. Mueller III as Special Counsel, and its employees.

16. "Special Counsel's Investigation" means the investigation conducted by the Special Counsel's Office pursuant to Department of Justice Order No. 3915-17 issued by the Acting Attorney General on May 17, 2017.

17. "SDNY Investigations" shall include any investigation or prosecution conducted by the U.S. Attorney's Office for the Southern District of New York relating to: (i) Michael Cohen; (ii) the Trump Organization; (iii) the Trump Campaign; and (iv) the 58th Presidential Inaugural Committee.

18. "The Report" means the complete and unredacted version of the report submitted on or about March 22, 2019 by Special Counsel Robert Mueller, pursuant to his authority under 28 C.F.R. § 600.8(c), entitled, "Report on the Investigation into Russian Interference in the 2016 Presidential Election."

19. "Trump Campaign" for purposes of this subpoena shall include Donald J. Trump for President, Inc., as well as its parent companies, subsidiary companies, affiliated entities, agents, officials, and instrumentalities.

20. The "Trump Organization" for purposes of this subpoena shall include the Trump Organization, Inc., The Trump Organization LLC, and their parent companies, subsidiary companies, affiliated entities, agents, officials, and instrumentalities.

21. The "Trump Tower Meeting" for purposes of this subpoena shall reference the June 9, 2016 Trump Tower meeting attended by the following Donald Trump Jr., Paul Manafort, Kushner, Natalia Veselnitskaya, Rob Goldstone, and Rinat Akhmetshin.

## INSTRUCTIONS

1. In complying with this subpoena, you should produce all responsive documents in unredacted form that are in your possession, custody, or control or otherwise available to you, regardless of whether the documents are possessed directly by you. If a document is referenced in the Report in part, you should produce it in full in a complete and unredacted form.

2. Documents responsive to the subpoena should not be destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee.

3. In the event that a document is withheld in full or in part on any basis, including a claim of privilege, you should provide a log containing the following information concerning every such document: (i) the reason the document is not being produced; (ii) the type of document; (iii) the general subject matter; (iv) the date, author, addressee, and any other recipient(s); (v) the relationship of the author and addressee to each other; and (vi) any other description necessary to identify the document and to explain the basis for not producing the document. If a claimed privilege applies to only a portion of any document, that portion only should be withheld and the remainder of the document should be produced. As used herein, "claim of privilege" includes, but is not limited to, any claim that a document either may or must be withheld from production pursuant to any law, statute, rule, policy or regulation.

4. In the event that a document is withheld in full or in part on the basis of a privilege asserted by or on behalf of the White House, or at the request of the White House, please also include the following information in your privilege log:

   a. The date on which you or any attorney representing you received the document or any copy thereof from the White House, received access to that document from the White House, or removed that document or any copy thereof from the White House;

   b. The name of the person or persons who provided the document to you or your attorney;

   c. The name of any lawyer or other agent or third party outside the White House who, to your knowledge, reviewed the document.

   d. You should log each responsive document as to which you have directed us to the White House, and each document that was previously in your attorneys' possession, custody or .control.

5. Any objections or claims of privilege are waived if you fail to provide an explanation of why full compliance is not possible and a log identifying with specificity the ground(s) for withholding each withheld document prior to the request compliance date.

6. In complying with the request, be apprised that (unless otherwise determined by the Committee) the Committee does not recognize:  any purported non-disclosure privileges associated with the common law including, but not limited to the deliberative-process privilege, the attorney-client privilege, and attorney work product protections; any purported privileges or protections from disclosure under the Freedom of Information Act; or any purported contractual privileges, such as non-disclosure agreements.

7. Any assertion of any such non-constitutional legal bases for withholding documents or other materials, shall be of no legal force and effect and shall not provide a justification for such withholding or refusal, unless and only to the extent that the Committee has consented to recognize the assertion as valid.

8. Pursuant to 5 U.S.C. § 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

9. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

10. If any document responsive to this subpoena was, but no longer is, in your possession, custody, or control, or has been placed into the possession, custody, or control of any third party and cannot be provided in response to this subpoena, you should identify the document (stating its date, author, subject and recipients) and explain the circumstances under which the document ceased to be in your possession, custody, or control, or was placed in the possession, custody, or control of a third party, including, but not limited to (a) how the document was disposed of; (b) the name, current address, and telephone number of the person who currently has possession, custody, or control over the document; (c) the date of disposition; and (d) the name, current address, and telephone number of each person who authorized said disposition or who had or has knowledge of said disposition.

11. If any document responsive to this subpoena cannot be located, describe with particularity the efforts made to locate the document and the specific reason for its disappearance, destruction or unavailability.

12. In the event that any entity, organization, or individual named in the subpoena has been, or is currently, known by any other name, the subpoena should be read also to include such other names under that alternative identification.

13. All documents should be produced with Bates numbers affixed. The Bates numbers must be unique, sequential, fixed-length numbers and must begin with a prefix referencing the name of the producing party (e.g., ABCD 000001). This format must remain consistent across all productions. The number of digits in the numeric portion of the format should not change in subsequent productions, nor should spaces, hyphens, or other separators be added or deleted. All documents should be Bates-stamped sequentially and produced sequentially.

14. Documents produced pursuant to this subpoena should be produced in the order in which they appear in your files and should not be rearranged. Any documents that are stapled, clipped, or otherwise fastened together should not be separated. Documents produced in response to this subpoena should be produced together with copies of file labels, dividers, or identifying markers with which they were associated when this subpoena was issued. Indicate the office or division and person from whose files each document was produced.

15. Responsive documents must be produced regardless of whether any other person or entity possesses non-identical or identical copies of the same document.

16. Produce electronic documents as created or stored electronically in their original electronic format. Documents produced in electronic format should be organized, identified, and indexed electronically, in a manner comparable to the organization structure called for in Instruction 13 above.

17. Data may be produced on CD, DVD, memory stick, USB thumb drive, hard drive, or via secure file transfer, using the media requiring the least number of deliverables. Label all media with the following:

    a. Production date;

    b. Bates range;

    c. Disk number (1 of X), as applicable.

18. If a date or other descriptive detail set forth in this subpoena referring to a document, communication, meeting, or other event is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the subpoena, you should produce all documents which would be responsive as if the date or other descriptive detail were correct.

19. The subpoena is continuing in nature and applies to any newly discovered document, regardless of the date of its creation. Any document not produced because it has not been located or discovered by the return date should be produced immediately upon location or discovery subsequent thereto.

20. Two sets of each production shall be delivered, one set to the Majority Staff and one set to the Minority Staff. Production sets shall be delivered to the Majority Staff in Room 2138 of the Rayburn House Office Building and the Minority Staff in Room 2142 of the Rayburn House Office Building. You should consult with Committee Majority Staff regarding the method of delivery prior to sending any materials.

21. If compliance with the subpoena cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production. In the event that any responsive documents or other materials contain classified information, please immediately contact Committee staff to discuss how to proceed.

22. Upon completion of the document production, please submit a written certification, signed by you or by counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control which reasonably could contain responsive documents; (2) documents responsive to the subpoena have not been destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee since the date of receiving the Committee's subpoena or in anticipation of receiving the Committee's subpoena, and (3) all documents identified during the search that are responsive have been produced to the Committee, identified in a log provided to the Committee, or otherwise identified as provided herein.

23. A cover letter should be included with each production including the following information:

a.  List of each piece of media (hard drive, thumb drive, DVD or CD) included in the production by the unique number assigned to it, and readily apparent on the physical media;

b.  List of fields in the order in which they are listed in the metadata load file;

c.  The paragraph(s) and/or clause(s) in the Committee's subpoena to which each document responds;

d.  Time zone in which emails were standardized during conversion (email collections only);

e.  Total page count and bates range for the entire production, including both hard copy and electronic documents.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

                              *Plaintiff*,

        v.                                              Case No. 1:19-cv-2379 (KBJ)

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

                              *Defendant*.

# Exhibit X

**quinn emanuel** trial lawyers | washington, dc

1300 I Street NW, Suite 900, Washington, District of Columbia 20005-3314 | TEL (202) 538-8000 FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8120**

WRITER'S EMAIL ADDRESS
**williamburck@quinnemanuel.com**

May 20, 2019

<u>VIA E-MAIL</u>

The Honorable Jerrold Nadler
Chairman
United States House of Representatives
Committee on the Judiciary
Washington, DC 20515-6216
HJUD.Correspondence@mail.house.gov

Dear Chairman Nadler,

I am in receipt today of two documents provided by the White House Counsel's Office: first, a letter from the Honorable Pat A. Cipollone, the current Counsel to the President of the United States, informing me that the President has directed that my client, Donald F. McGahn, not appear at the Committee's hearing scheduled for tomorrow, Tuesday, May 21, 2019, at 10:00am EDT; and second, a memorandum from the Honorable Steven A. Engel, Assistant Attorney General for the Office of Legal Counsel at the Department of Justice, to Mr. Cipollone advising him that Mr. McGahn, as a former senior advisor to the President, is immune from compelled congressional testimony.

As you know, OLC performs the vital role of providing legal advice to the President and executive branch agencies. Consistent with that advice as reflected in Mr. Engel's memorandum, the President has unambiguously directed my client not to comply with the Committee's subpoena for testimony. As with the subpoena for documents, Mr. McGahn again finds himself facing contradictory instructions from two co-equal branches of government. The direction from the President finds further support in Mr. Engel's detailed and persuasive memorandum. Under these circumstances, and also conscious of the duties he, as an attorney, owes to his former client, Mr. McGahn must decline to appear at the hearing tomorrow.

Mr. McGahn understands from your prior correspondence that the Committee would vote to hold him in contempt should he not appear tomorrow and the House of Representatives may follow suit. While we disagree with the Committee's position and hope it will instead seek an accommodation with the White House, Mr. McGahn also must honor his ethical and legal

quinn emanuel urquhart & sullivan, llp
LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON | SALT LAKE CITY
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

obligations as a former senior lawyer and senior advisor to the President.  In short, it is our view that the Committee's dispute is not with Mr. McGahn but with the White House.

Mr. McGahn remains obligated to maintain the status quo and respect the President's instruction. In the event an accommodation is agreed between the Committee and the White House, Mr. McGahn will of course comply with that accommodation.


Sincerely,

William A. Burck


cc:  Honorable Doug Collins, Ranking Member

Enclosures

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

       *Plaintiff*,

   v.

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

       *Defendant*.

Case No. 1:19-cv-2379 (KBJ)

# Exhibit Y

1    ALDERSON COURT REPORTING

2    SHAYLAH LYNN BURRILL

3    HJU141000


4    OVERSIGHT OF THE REPORT BY SPECIAL COUNSEL ROBERT S.

5    MUELLER III:  FORMER WHITE HOUSE COUNSEL DONALD F. MCGAHN II

6    Tuesday, May 21, 2019

7    House of Representatives

8    Committee on the Judiciary

9    Washington, D.C.


10       The committee met, pursuant to call, at 10:04 a.m., in

11   Room 2141, Rayburn House Office Building, Hon. Jerrold Nadler

12   [chairman of the committee] presiding.

13       Present:  Representatives Nadler, Lofgren, Jackson Lee,

14   Cohen, Johnson of Georgia, Bass, Richmond, Cicilline, Lieu,

15   Raskin, Jayapal, Demings, Correa, Scanlon, Garcia, Neguse,

16   McBath, Stanton, Dean, Mucarsel-Powell, Escobar, Collins,

17   Chabot, Gohmert, Jordan, Buck, Ratcliffe, Gaetz, Johnson of

18   Louisiana, McClintock, Reschenthaler, Cline, Armstrong, and

19   Steube.

20       Staff Present:  Aaron Hiller, Deputy Chief Counsel; Arya

21    Harlharan ,Oversight Counsel; David Greengrass, Senior

22    Counsel;  John Doty, Senior Advisor; Lisette Morton, Director

23    of Policy, Planning, and Member Services; Madeline Strasser,

24    Chief Clerk; Moh Sharma, Member Services and Outreach

25    Advisor; Susan Jensen, Parliamentarian/Senior Counsel; Sophie

26    Brill, Counsel; Will Emmons, Professional Staff Member;

27    Brendan Belair, Minority Chief of Staff; Jon Ferro, Minority

28    Parliamentarian; Carlton Davis, Minority Chief Oversight

29    Counsel; Ashley Callen, Minority Senior Adviser and Oversight

30    Counsel; and Erica Barker, Minority Chief Legislative Clerk.

31

32      Chairman Nadler.  The Judiciary Committee will come to

33   order.

34      Without objection, the chair is authorized to declare

35   recesses of the committee at any time.

36      We welcome everyone to today's hearing on Oversight of

37   the Report by Special Counsel Robert Mueller III:  Former

38   White House Counsel Donald McGahn II.  I will now recognize

39   myself for an opening statement.

40      More than a year ago, White House counsel Don McGahn sat

41   for the first of several interviews with special counsel

42   Robert Mueller.  Over the course of those interviews, he

43   described how the President directed him to have the special

44   counsel fired.  He described how the President ordered him to

45   lie about it.  He described several other obstructive

46   incidents outlined in the special counsel's report.

47      The President, in contrast, refused to be interviewed by

48   the special counsel or even to answer written questions about

49   his attempts to obstruct the investigation.  Instead, to

50   address the allegations spelled out by Mr. McGahn and

51   outlined in the report, President Trump relied on his

52   preferred mode of communication.  He took to Twitter to call

53   Mr. McGahn a liar.  His lawyers went on cable television to

54   do the same, to call Mr. McGahn a liar.

55      There are reports of the President and his lieutenants

56   exerting other kinds of pressure on Mr. McGahn.  In short,

57    the President took it upon himself to intimidate a witness

58    who has a legal obligation to be here today.  This conduct is

59    not remotely acceptable.

60        The White House asserts that Mr. McGahn does not have to

61    appear today because he is entitled to "absolute immunity"

62    from our subpoenas.  We know this argument is wrong, of

63    course, because the executive branch has tried this approach

64    before.  In 2007, President George Bush attempted to invoke a

65    similarly broad and unjustified assertion of executive

66    privilege and asked his former counsel Harriet Miers to

67    ignore a subpoena issued by this committee.  Ms. Miers also

68    did not appear at her scheduled hearing.

69        Judge John Bates, who was appointed by President Bush,

70    slapped down that argument fairly quickly.  "The executive

71    cannot identify a single judicial opinion that recognizes

72    absolute immunity for senior presidential advisers in this or

73    any other context.  That simple, yet critical fact bears

74    repeating.  The asserted absolute immunity claim here is

75    entirely unsupported by the case law," from the judicial

76    decision.

77        In other words, when this committee issues a subpoena,

78    even to a senior presidential adviser, the witness must show

79    up.  Our subpoenas are not optional.  Mr. McGahn has a legal

80    obligation to be here for this scheduled appearance.  If he

81    does not immediately correct his mistake, this committee will

82   have no choice but to enforce the subpoena against him.

83      Mr. McGahn did not appear today because the President

84   prevented it, just as the President has said that he would

85   "fight all subpoenas" issued by Congress as part of his

86   broader efforts to cover up his misconduct.  This

87   stonewalling makes it all the more important to highlight

88   some of the incidents that Mr. McGahn is said to have

89   witnessed.  Let me recount some of them.

90      We know that the President directed Mr. McGahn to

91   prevent then Attorney General Sessions from recusing himself

92   from overseeing the investigation into Russian election

93   interference.  On March 3, 2017, shortly after Attorney

94   General Jeff Sessions did recuse himself from the Russia

95   investigation, the President summoned Mr. McGahn to the Oval

96   Office.  According to the Mueller report, "The President

97   opened the conversation by saying, 'I don't have a lawyer.'"

98      The President told Mr. McGahn that he wished that Roy

99   Cohn was his attorney instead.  Roy Cohn, of course, is known

100  principally as the chief architect of the Army-McCarthy

101  hearings that destroyed so many lives back in 1954, an actual

102  political witch hunt, not the imaginary kind that the

103  President decries.

104     Mr. Cohn served as President Trump's lawyer for a long

105  time, defending the President against Federal discrimination

106  suits before he -- that is, Mr. Cohn -- was ultimately

107    disbarred for unethical practices in 1986.

108        Mr. McGahn refused to follow blindly into unethical

109    behavior.  Mr. McGahn told the President that the Department

110    of Justice ethics officials had weighed in and that

111    Mr. Sessions would not unrecuse himself, and he advised the

112    President not to have any contact with Mr. Sessions on the

113    matter.  Days later, the President did exactly the opposite.

114        He summoned Mr. McGahn and Mr. Sessions to Mar-a-Lago,

115    where the President again "expressed his anger."  He said he

116    wanted Mr. Sessions to act as his fixer.  He said he wanted

117    Mr. Sessions to undo his recusal and to limit the scope of

118    the investigation.  But Mr. Sessions, too, refused the

119    President's orders.

120        On June 17, 2017, the President took his displeasure a

121    step further.  He called Mr. McGahn at home and directed him

122    to order Rod Rosenstein to fire Robert Mueller.  "Mueller has

123    to go," the President barked, "Call me back when you do it."

124        Once again, Mr. McGahn refused.  This time, Mr. McGahn

125    felt the President's behavior was so inappropriate that he

126    said he would rather resign than trigger a constitutional

127    crisis.

128        In early 2018, after press reports described the

129    President's attempt to force Mr. McGahn to remove the special

130    counsel on his behalf, the President repeated his pattern.

131    He summoned Mr. McGahn to his office, and he got angry.

132   "This story doesn't look good.  You need to correct this.

133   You are the White House counsel," President Trump told

134   Mr. McGahn.

135       "What about these notes?  Why do you take notes?" the

136   President said to Mr. McGahn, inquiring why Mr. McGahn had

137   documented their conversation.

138       The President then told Mr. McGahn to tell the American

139   people something that was not true.  He asked him to deny

140   those reports publicly.  Mr. McGahn again refused the

141   President's order.  He refused the President's order to lie

142   to the American people on the President's behalf.  Six months

143   later, the President announced that Mr. McGahn would be

144   leaving the White House.

145       The special counsel found Mr. McGahn to be "a credible

146   witness with no motive to lie or exaggerate, given the

147   position he held in the White House."  That is from the

148   Mueller report.

149       The special counsel also found the following,

150   "Substantial evidence indicates that by June 17, 2017, the

151   President knew his conduct was under investigation by a

152   Federal prosecutor who could present any evidence of Federal

153   crimes to a grand jury.  Substantial evidence indicates that

154   the President's attempts to remove the special counsel were

155   linked to the special counsel's oversight of investigations

156   that involved the President's conduct and, most immediately,

157   to reports that the President was being investigated for

158   potential obstruction of justice.

159        "Substantial evidence indicates --" and these are all

160   quotes from the report.  "Substantial evidence indicates that

161   in repeatedly urging McGahn to dispute that he was ordered to

162   have the special counsel terminated, the President acted for

163   the purpose of influencing McGahn's account in order to

164   deflect or prevent further scrutiny of the President's

165   conduct towards the investigation.  Substantial evidence

166   indicates that the President's efforts to have Sessions limit

167   the scope of the special counsel's investigation to future

168   election interference was intended to prevent further

169   investigative scrutiny of the President and his campaign's

170   conduct."  Those are all quotes from the special counsel's

171   report.

172        I believe that each of these incidents, documented in

173   detail in the Mueller report, constitutes a crime.  But for

174   the Department of Justice's policy of refusing to indict any

175   sitting President, I believe the President would have been

176   indicted and charged with these crimes.

177        I am not alone in this belief.  Over 900 former Federal

178   prosecutors from across the political spectrum whose job was

179   to determine when the elements of a crime have been satisfied

180   have stated -- have agreed that the President committed

181   crimes that would have been charged if he were not the

182    sitting President.  And I believe that the President's

183    conduct since the report was released, with respect to

184    Mr. McGahn's testimony and other information we have sought,

185    has carried this pattern of obstruction and cover-up well

186    beyond the four corners of the Mueller report.

187        The President has declared out loud his intention to

188    cover up this misconduct.  He told Mr. McGahn to commit

189    crimes on his behalf.  He told Mr. McGahn lie about it.

190    After the report came out, the President claimed that

191    Mr. McGahn lied to the special counsel about what happened.

192    Then he directed Mr. McGahn not to come here today so that

193    the public would not hear his testimony and so that we could

194    not question him.

195        President Trump may think he can hide behind his lawyers

196    as he launches a series of baseless legal arguments designed

197    to obstruct our work.  He cannot think these legal arguments

198    will prevail in court, but he can think he can slow us down

199    and run out the clock on the American people.

200        Let me be clear.  This committee will hear Mr. McGahn's

201    testimony, even if we have to go to court to secure it.  We

202    will not allow the President to prevent the American people

203    from hearing from this witness.

204        We will not allow the President to block congressional

205    subpoenas, putting himself and his allies above the law.  We

206    will not allow the President to stop this investigation.  And

207   nothing in these unjustified and unjustifiable legal attacks

208   will stop us from pressing forward with our work on behalf of

209   the American people.  We will hold this President

210   accountable, one way or the other.

211       It is now my pleasure to recognize the ranking member of

212   the Judiciary Committee, the gentleman from Georgia,

213   Mr. Collins, for his opening statement.

214       Mr. Collins.  Thank you, Mr. Chairman, and thank you for

215   all that have gathered here again.

216       Here we go again.  The theater is open, and the

217   summations are coming in.  In fact, right now we are again

218   running over the norms of congressional oversight.  We are

219   dabbing at the edges of running roughshod on the

220   Constitution, asking for things that we don't.

221       But I am glad about one thing.  I am glad that the

222   chairman read into the record today the Mueller report.  I am

223   glad that he quoted, as he said, this is a quote directly

224   from the Mueller report.  I just wish my chairman would

225   actually go read the rest of it that he has been offered to

226   read, which he has chosen not to read.

227       But he did leave out one thing.  He left out something

228   in the Mueller report from just now.  He read McGahn's

229   testimony beautifully, did everything right.  But he left out

230   what he doesn't want to have to come back to and the

231   frustrating thing that has brought us here again and again

232   and again, and that is the conclusions.  There was no

233   collusion.  There was no obstruction charge.  There is

234   nothing here.

235       After 2 years of doing this, we can read it in, you can

236   talk about how you don't like it, you can talk about what you

237   would like to have.  But at the end of the day, it is

238   interesting we will read in the quotes that make the

239   headlines, but we are also not going to read in the bottom

240   line of what was actually concluded.

241       So the Democrats are here trying again.  The Mueller

242   report concluded there was no collusion, no obstruction.

243   Because the report failed to provide damning information

244   against the President, the majority claims we need to dig

245   deeper, deeper than the 2 years of investigation conducted by

246   what is considered a prosecutorial dream team because that

247   probe ended without criminal charges against the President or

248   his family.

249       The special counsel closed up shop without giving

250   Democrats anything to deliver to their base.  Now the

251   Democrats are trying desperately to make something out of

252   nothing, which is why the chairman has again haphazardly

253   subpoenaed today's witness.  That move, though, has actually

254   ensured the witness will not testify.

255       You know, this is becoming a pattern.  The chairman knew

256   this, I believe, when he sent the subpoena last month.  But

257     instead of inviting the witness to testify voluntarily and

258     working with McGahn's counsel to find mutual agreeable time

259     and scope for the testimony, the chairman rushed to maximize

260     headlines by issuing a subpoena.  That subpoena was the third

261     in just 4 months, more subpoenas than the prior chairman

262     issued in 6 years.

263          The chairman had several ways out here.  He took none of

264     them.  The chairman could have invited the witness to testify

265     voluntarily.  That was the practice in the 1990s when the

266     White House counsel testified before Congress.  But the

267     chairman did not do that.  Instead, he launched a subpoena at

268     the witness without any consultation or follow-up with the

269     witness' lawyer.

270          The chairman could have invited the witness to testify

271     behind closed doors, but that would have been politically

272     expedient, and you would not have been here, and the show

273     would not have been as exciting.  A closed-door conversation

274     would not have generated those headlines and everything that

275     we are looking at today.  Even gaveling in today's hearing

276     without a witness is theatrical.

277          The cameras love a spectacle, and the majority loves the

278     chance to rant against the administration.  I just am glad

279     today to see that we don't have chicken on the dais.

280          The chairman orchestrated today's confrontation when he

281     could have avoided it because he is more interested in the

282    fight than the fact finding.  Take the Mueller report, which

283    we have already heard quoted from.  More than 99 percent the

284    Justice Department has offered to the chairman.  For an

285    entire month, the chairman refused to take a look at it.

286        The Attorney General who volunteered to testify before

287    the committee, the chairman changed the rules for the first

288    time in the committee's 200-year history, thus blocking

289    General Barr from testifying.

290        I cannot emphasize this enough.  The track record

291    demonstrates he does not actually want information.  He wants

292    the fight, but not the truth.  The closer he actually comes

293    to obtaining information, the further we run from it.

294        The Democrats claim to need today's witness to

295    investigate obstruction of justice, but that investigation

296    was already done.  Robert Mueller spent 2 years running it

297    and then closed it.  We are not a prosecutorial body, but a

298    legislative body that does have valid congressional

299    oversight.  But let us talk about that Mueller report for

300    just a second.  It is really interesting to me that the

301    Mueller report was actually -- within 24 hours of coming out,

302    the chairman and the majority subpoenaed for all of the

303    documents.

304        In fact, we have a legal subpoena that asked the

305    Attorney General to provide documents he cannot legally

306    provide.  That has been covered in this committee for the

307    last 2 weeks exhaustively, and even the panel that was with

308    us last week agreed that the subpoena asked the Attorney

309    General to do something illegal by exposing 6(e) information.

310    That was his own witnesses said that last week.

311         But you know what is interesting to me is that we have

312    subpoenaed the documents.  We have subpoenaed that we want

313    underlying documents.  We have subpoenaed stuff that we can't

314    get.  But you know the one thing we seem to avoid is

315    Mr. Mueller himself, the one who wrote it.

316         We have asked since April about Mr. Mueller coming.  But

317    every time we seem to get close to Mueller, Mueller just gets

318    pushed on a little bit.  Hadn't seen a subpoena here, and

319    this is what is really amazing.  We will get back to

320    subpoenas in a moment.

321         But just think about that.  You wanted the work of the

322    author, but you don't want to talk to the author.  Keep that

323    pinned for just a moment.  When we look at this, 99 percent

324    of the information is at the Democrats' fingertips, and it is

325    the Mueller report the Attorney General offered to Speaker

326    Pelosi, Chairman Nadler, and others to have seen it, but they

327    refuse.

328         So don't be fooled.  The majority wants the fight.  They

329    want the drama.  He does not actually want the information he

330    claims to be seeking.  After the administration made volumes

331    of information available to this committee, the chairman

332  issued overbroad subpoenas and now harangues the

333  administration for being unable to comply with those

334  subpoenas.

335      In fact, it is the Democrats who are not engaging in the

336  accommodation process, abruptly cutting off negotiations,

337  rejecting olive branches by the administration.  This is what

338  -- I want to come back to something my chairman just said a

339  moment ago.  His quote was in his opening statements that our

340  subpoenas are not optional.

341      Well, we found out a lot about subpoenas over the last

342  month or so in this committee.  I found out that subpoenas

343  maybe now are not optional.  Let us add to the list.

344  Subpoenas are also a discussion starter.  A subpoena is to

345  give us better standing in court.  Not my quotes, the

346  chairman's quotes.

347      So what is it?  Is a subpoena the legal document that we

348  have talked about all along in here and the forceful document

349  that all attorneys in this country actually use, or is it a

350  discussion starter?  Is it to help our standing in court, or

351  is it we don't want it ignored?

352      At this time, it is amazing to me that the accommodation

353  process -- and we talk about the committee, and the chairman

354  forcefully talked about our oversight.  I agree with the

355  chairman on this point.  This committee and all committees in

356  Congress have oversight responsibility, but it is also the

357    sacred responsibility of the chairman and the majority to use

358    it properly and to not headlong rush into subpoenas when you

359    don't get what you want.

360        That is all we have seen in 5 months here.  When we

361    don't get what we want, we subpoena.  The first one was the

362    Acting Attorney General.  We subpoenaed, and then we backed

363    off.  We caved.  Then everything else has become a race to

364    get a headline.  The accommodation process, not happening.

365    The accommodation process, never here.

366        So don't be fooled.  You may have come wanting -- you

367    may have an opinion that says everything is wrong today with

368    the Mueller report and the President is guilty, but don't

369    undercut congressional oversight because you can't wait.

370    That is the problem we have right now.

371        And so the question is, are we tearing at the fabric of

372    congressional oversight?  It was really interesting to hear

373    some of that last week.  When you have a committee that has

374    issued subpoenas that ask the Attorney General to do

375    something illegal, when you have the subpoenas when no

376    accommodation process has been put in place, when you have

377    contempt issues that have been in part with no process and no

378    time going through, I just submit to you this.

379        Whatever your opinion on the Mueller report, great.

380    Glad you have it.  But you didn't get it here today, and you

381    are not getting it from this committee because this committee

382    undoubtedly doesn't like the author or want to talk to the

383    author of the report.  They just want to talk about the

384    report and make innuendo and attack the President at the

385    middle of the day when this committee, who has charge of

386    immigration, who has charge of intellectual property, who we

387    have touched none of with a crisis at the border.

388        We have an admission that the economy is good, jobs are

389    happening, unemployment is at its lowest rate.  I guess at

390    the end of the day, we can't find something that the Mueller

391    report lets them hang their I-word, "impeachment," on, which

392    they can't even agree on, because the President is continuing

393    to do his job.  And we are here again with the circus in full

394    force.

395        With that, I yield back.

396        Mr. Cohen.  Mr. Chairman?  Mr. Chairman?

397        Mr. Chabot.  Mr. Chairman?

398        Chairman Nadler.  Thank you, Mr. Collins.  Who seeks

399    recognition?

400        Mr. Cohen.  Move to strike the last word.

401        Chairman Nadler.  The gentleman from Tennessee?

402        Mr. Cohen.  Move to adjourn.

403        Chairman Nadler.  Motion is made to adjourn.

404        Mr. Chabot.  Mr. Chairman?  Mr. Chairman?

405        Chairman Nadler.  Motion to adjourn is not debatable.

406        All in favor?

407      Opposed?

408      Mr. Chabot.  Recorded vote.

409      Chairman Nadler.  Do I hear a request for a recorded

410  vote?

411      Mr. Chabot.  Request for recorded vote.

412      Chairman Nadler.  The clerk will call the roll on the

413  motion to adjourn.

414      Ms. Strasser.  Mr. Nadler?

415      Chairman Nadler.  Aye.

416      Ms. Strasser.  Mr. Nadler votes aye.

417      Ms. Lofgren?

418      Ms. Lofgren.  Aye.

419      Ms. Strasser.  Ms. Lofgren votes aye.

420      Ms. Jackson Lee?

421      Ms. Jackson Lee.  Aye.

422      Ms. Strasser.  Ms. Jackson Lee votes aye.

423      Mr. Cohen?

424      Mr. Cohen.  Aye.

425      Ms. Strasser.  Mr. Cohen votes aye.

426      Mr. Johnson of Georgia?

427      Mr. Johnson of Georgia.  Aye.

428      Ms. Strasser.  Mr. Johnson of Georgia votes aye.

429      Mr. Deutch?

430      Ms. Bass?

431      Ms. Bass.  Aye.

432        Ms. Strasser.  Ms. Bass votes aye.

433        Mr. Richmond?

434        Mr. Richmond.  Aye.

435        Ms. Strasser.  Mr. Richmond votes aye.

436        Mr. Jeffries?

437        Mr. Cicilline?

438        Mr. Cicilline.  Aye.

439        Ms. Strasser.  Mr. Cicilline votes aye.

440        Mr. Swalwell?

441        Mr. Lieu?

442        Mr. Lieu.  Aye.

443        Ms. Strasser.  Mr. Lieu votes aye.

444        Mr. Raskin?

445        Mr. Raskin.  Aye.

446        Ms. Strasser.  Mr. Raskin votes aye.

447        Ms. Jayapal?

448        Ms. Jayapal.  Aye.

449        Ms. Strasser.  Ms. Jayapal votes aye.

450        Mrs. Demings?

451        Mrs. Demings.  Aye.

452        Ms. Strasser.  Mrs. Demings votes aye.

453        Mr. Correa?

454        Mr. Correa.  Aye.

455        Ms. Strasser.  Mr. Correa votes aye.

456        Ms. Scanlon?

457        Ms. Scanlon.   Aye.

458        Ms. Strasser.   Ms. Scanlon votes aye.

459        Ms. Garcia?

460        Ms. Garcia.   Aye.

461        Ms. Strasser.   Ms. Garcia votes aye.

462        Mr. Neguse?

463        Mr. Neguse.   Aye.

464        Ms. Strasser.   Mr. Neguse votes aye.

465        Mrs. McBath?

466        Mrs. McBath.   Aye.

467        Ms. Strasser.   Mrs. McBath votes aye.

468        Mr. Stanton?

469        Mr. Stanton.   Aye.

470        Ms. Strasser.   Mr. Stanton votes aye.

471        Ms. Dean?

472        Ms. Dean.   Aye.

473        Ms. Strasser.   Ms. Dean votes aye.

474        Ms. Mucarsel-Powell?

475        Ms. Mucarsel-Powell.   Aye.

476        Ms. Strasser.   Ms. Mucarsel-Powell votes aye.

477        Ms. Escobar?

478        Ms. Escobar.   Aye.

479        Ms. Strasser.   Ms. Escobar votes aye.

480        Mr. Collins?

481        Mr. Collins.   No.

482        Ms. Strasser.  Mr. Collins votes no.

483        Mr. Sensenbrenner?

484        Mr. Chabot?

485        Mr. Chabot.  No.  And this is disgraceful.

486        Ms. Strasser.  Mr. Chabot votes no.

487        Mr. Gohmert?

488        Mr. Gohmert.  No.

489        Ms. Strasser.  Mr. Gohmert votes no.

490        Mr. Jordan?

491        Mr. Jordan.  No.

492        Ms. Strasser.  Mr. Jordan votes no.

493        Mr. Buck?

494        Mr. Buck.  No.

495        Ms. Strasser.  Mr. Buck votes no.

496        Mr. Ratcliffe?

497        Mr. Ratcliffe.  No.

498        Ms. Strasser.  Mr. Ratcliffe votes no.

499        Mrs. Roby?

500        Mr. Gaetz?

501        Mr. Gaetz.  No.

502        Ms. Strasser.  Mr. Gaetz votes no.

503        Mr. Johnson of Louisiana?

504        Mr. Johnson of Louisiana.  No.

505        Ms. Strasser.  Mr. Johnson of Louisiana votes no.

506        Mr. Biggs?

507        Mr. McClintock?

508        Mr. McClintock.  No.

509        Ms. Strasser.  Mr. McClintock votes no.

510        Mrs. Lesko?

511        Mr. Reschenthaler?

512        Mr. Reschenthaler.  No.

513        Ms. Strasser.  Mr. Reschenthaler votes no.

514        Mr. Cline?

515        Mr. Cline.  No.

516        Ms. Strasser.  Mr. Cline votes no.

517        Mr. Armstrong?

518        Mr. Armstrong.  No.

519        Ms. Strasser.  Mr. Armstrong votes no.

520        Mr. Steube?

521        Mr. Steube.  No.

522        Ms. Strasser.  Mr. Steube votes no.

523        Chairman Nadler.  Is there anyone who wishes to vote who

524   hasn't voted?

525        [No response.]

526        Chairman Nadler.  The clerk will report.

527        Ms. Strasser.  Mr. Chairman, there are 21 ayes and 13

528   noes.

529        Chairman Nadler.  There are 21 ayes and 13 noes.  The

530   motion to adjourn is adopted, and the hearing is adjourned.

531        [Whereupon, at 10:27 a.m., the committee was adjourned.]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

                    *Plaintiff,*

      v.

DONALD F. MCGAHN II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

                    *Defendant.*

Case No. 1:19-cv-2379 (KBJ)

# Exhibit Z

JERROLD NADLER, New York
CHAIRMAN

DOUG COLLINS, Georgia
RANKING MINORITY MEMBER

# U.S. House of Representatives
## Committee on the Judiciary
### Washington, DC 20515–6216
### One Hundred Sixteenth Congress

May 31, 2019

Donald F. McGahn II, Esq.
c/o William A. Burck, Esq.
Quinn Emanuel Urquhart & Sullivan
1300 I St. NW
Suite 9000
Washington, D.C. 20005

Mr. Pat Cipollone
Counsel to the President
The White House
1600 Pennsylvania Ave, N.W.
Washington, D.C. 20002

Dear Mr. McGahn and Mr. Cipollone:

  I write to follow up on the Committee's prior correspondence to Donald F. McGahn II and/or his counsel dated May 7, 2019, May 17, 2019, and May 20, 2019 (all of which are attached), regarding the Judiciary Committee's April 22, 2019 subpoena to Mr. McGahn.

  First, with respect to the production of documents, counsel for Mr. McGahn informed us on May 7, 2019 that he would not produce documents in his possession responsive to the Committee's subpoena. The stated reason for the failure to produce responsive documents was that the White House directed that such materials be withheld "'because they implicate significant Executive Branch confidentiality interests and executive privilege.'" As explained in the Committee's May 7 letter to Mr. McGahn's counsel, the Committee does not consider a direction by the White House to be a proper or legitimate assertion of any legal privilege. Moreover, the Committee disputes that any valid claim of privilege exists as to documents provided by the White House to Mr. McGahn and/or his counsel. Finally, as the May 7 letter made clear, regardless of the White House's direction, the Committee's subpoena to Mr. McGahn obligates him to produce a log as to any documents in his possession, custody, or control that are being withheld on the grounds of privilege.

  We have not yet received such a log, which was due on May 7. To facilitate the resolution of this dispute regarding the log, the Committee is prepared to accept a modified log

that sets forth only the author, recipient(s), and the general subject matter of the record being withheld, as well as the basis for the assertion of the privilege. That is the minimum amount of information that has been accepted by the federal courts.[1] We request that Mr. McGahn produce a modified log not later than June 7, 2019, as well as any documents responsive to the subpoena for which no claim of privilege is being asserted.

Turning to Mr. McGahn's testimony, for all the reasons explained in the Committee's May 7, May 17, and May 20 letters, it was unlawful for Mr. McGahn to fail to appear altogether before the Committee on May 21. He, like any other witness, "must appear before the Committee to provide testimony, and invoke executive privilege where appropriate."[2] In addition, the Committee intends to inquire about certain events that postdate Mr. McGahn's time at the White House, such as the President's public statements regarding Mr. McGahn and the White House's communications with and requests of Mr. McGahn or his counsel. The Committee views these subjects as not subject to any possible claim of privilege. Nevertheless, the Committee remains willing to discuss any reasonable accommodation(s) that would facilitate Mr. McGahn's appearance before the Committee, including limiting the testimony to the specific events detailed in the Special Counsel's report, identifying with greater specificity the precise areas of intended inquiry, and agreeing to the presence of White House counsel during any testimony, so that Mr. McGahn may consult regarding the assertion of executive privilege. Please let us know whether you are willing to engage in such accommodation discussions by no later than June 7.

Sincerely,

Jerrold Nadler
Chairman
House Committee on the Judiciary

cc:     The Hon. Doug Collins
        Ranking Member, House Committee on the Judiciary

Enclosures

---

[1] *Comm. on Oversight & Gov't Reform v. Holder*, No. CV 12-1332 (ABJ), 2014 WL 12662665, at *2 (D.D.C. Aug. 20, 2014), *modified*, No. CV 12-1332 (ABJ), 2014 WL 12662666 (D.D.C. Sept. 9, 2014) (citing *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 107 (D.D.C. 2008)).

[2] *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 107 (D.D.C. 2008). *See also U.S. v. Bryan*, 339 U.S. 323, 331 (1950) ("persons summoned as witnesses by competent authority have certain minimum duties and obligations which are necessary concessions to the public interest in the orderly operation of legislative and judicial machinery").

JERROLD NADLER, New York
  CHAIRMAN

ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR., Georgia
TED DEUTCH, Florida
KAREN BASS, California
CEDRIC L. RICHMOND, Louisiana
HAKEEM S. JEFFRIES, New York
DAVID CICILLINE, Rhode Island
ERIC SWALWELL, California
TED LIEU, California
JAMIE RASKIN, Maryland
PRAMILA JAYAPAL, Washington
VAL DEMINGS, Florida
LOU CORREA, California
MARY GAY SCANLON, Pennsylvania
SYLVIA GARCIA, Texas
JOSEPH NEGUSE, Colorado
LUCY McBATH, Georgia
GREG STANTON, Arizona
MADELEINE DEAN, Pennsylvania
DEBBIE MUCARSEL-POWELL, Florida
VERONICA ESCOBAR, Texas

ONE HUNDRED SIXTEENTH CONGRESS

# Congress of the United States
## House of Representatives
COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515-6216

(202) 225-3951

http://www.house.gov/judiciary

DOUG COLLINS, Georgia
  RANKING MEMBER

F. JAMES SENSENBRENNER, JR., Wisconsin
STEVE CHABOT, Ohio
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio
KEN BUCK, Colorado
JOHN RATCLIFFE, Texas
MARTHA ROBY, Alabama
MATT GAETZ, Florida
MIKE JOHNSON, Louisiana
ANDY BIGGS, Arizona
TOM McCLINTOCK, California
DEBBIE LESKO, Arizona
GUY RESCHENTHALER, Pennsylvania
BEN CLINE, Virginia
KELLY ARMSTRONG, Alabama
GREG STEUBE, Florida

May 7, 2019

William A. Burck, Esq.
Quinn Emanuel Urquhart & Sullivan
1300 I St. NW
Suite 9000
Washington, D.C. 20005

Dear Mr. Burck:

On Monday, April 22, the House Committee on the Judiciary served a subpoena on your client, former White House Counsel Donald F. McGahn II, compelling the production of documents in Mr. McGahn's possession or control by May 7, and his testimony on May 21, 2019. We write in response to your letter received this morning regarding that subpoena.

As an initial matter, regarding the subpoenaed documents, the White House Counsel's letter did not actually *invoke* executive privilege, but rather merely suggested at the 11th hour – without providing any supporting authority – that all requested documents "*implicate* significant Executive Branch confidential interests and executive privilege."[1] This blanket suggestion of potential privilege is entirely insufficient. As the district court for the District of Columbia held in *Committee on the Judiciary v. Miers*, a subpoena recipient is "not excused from compliance with [a] Committee's subpoena by virtue of a claim of executive privilege that *may ultimately be made*."[2] Nor can a "blanket assertion of privilege over all records generated after a particular date . . . pass muster," without a "showing . . . that any of the individual records satisf[y] the prerequisites for the application of the privilege."[3]

Even if the President were to properly invoke privilege, any claim of executive privilege has been waived as to documents that the White House voluntarily disclosed to Mr. McGahn and

---

[1] Letter to Chairman Nadler from Pat A. Cipollone (May 7, 2019) (*emphasis added*).

[2] Mem. Op., *Comm. on Judiciary v. Miers*, No. 08-cv-0409-JDB (D.D.C. Jul. 31, 2008), at 91 (emphasis added).

[3] *Committee on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008).

his counsel. The D.C. Circuit expressly held in *In re Sealed Case (Espy)* that the White House "waive[s] its claims of privilege in regard to specific documents that it voluntarily reveal[s] to third parties outside the White House."[4] In *Espy*, as is the case here, the disclosure at issue was to the attorney for a former government official.[5] Thus, given that there has been neither an actual assertion of executive privilege, nor an individualized showing that the privilege would apply to the subpoenaed records, the Committee continues to insist upon compliance with the subpoena.

As to Mr. McGahn's own document production obligations, the subpoena plainly directs that your client must provide a privilege log containing specific information for any document in his possession or control that "is withheld in full or in part on any basis," including on "the basis of a privilege asserted by or on behalf of the White House, or at the request of the White House."[6] As the instructions also make clear, any "objections or claims of privilege are waived if you fail to provide an explanation of why full compliance is not possible and a log identifying with specificity the ground(s) for withholding each withheld document prior to the request compliance date."[7] In accordance with the requirements laid out in our subpoena, we expect a full privilege log specifying each document withheld, the asserted basis for so doing and the other information demanded, to be provided forthwith.

Turning to the other requirement of the subpoena – that Mr. McGahn appear before the Committee to provide testimony in two weeks – I fully expect that the Committee will hold Mr. McGahn in contempt if he fails to appear before the Committee, unless the White House secures a court order directing otherwise.[8] Further, even if Mr. McGahn is authorized by court order to invoke executive privilege as to certain testimony, he still is required by law to "appear before the Committee to provide testimony, and invoke executive privilege where appropriate."[9]

Consistent with the rules of the House of Representatives, and as the Supreme Court has admonished, "[a] subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase. If that were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity."[10] And the Supreme Court has "often iterated the

---

[4] *In re Sealed Case*, 121 F.3d 729, 741-42 (D.C. Cir. 1997).

[5] *See id.*

[6] Subpoena by Authority of the House of Representatives of the United States of America to Donald F. McGahn for documents and testimony, signed by Representative Jerrold Nadler, April 22, 2019.

[7] *Id.*

[8] *See, e.g., United States v. Bryan*, 339 U.S. 323, 332 (1950) (reasoning that a party cannot fail to comply with a subpoena absent a "return of the writ" providing reasons for non-compliance, because to "deny the Committee the opportunity to consider the objection or remedy it is in itself a contempt of its authority and an obstruction of its processes").

[9] *Miers*, 558 F. Supp. 2d 53, 106 (D.D.C. 2008).

[10] *Bryan*, 339 U.S. at 331.

importance of this public duty, which every person within the jurisdiction of the Government is bound to perform when properly summoned."[11]

As I am sure you are aware, the President recently declared that he is "fighting *all* the subpoenas" issued by Congress, evidently without regard to whether he has any legal basis to do so.[12] To be clear, a letter from the White House in service of the President's apparent goal of blocking or delaying testimony that the President believes would be politically damaging is not a basis for Mr. McGahn to violate his legal obligation to appear before the Committee. Rather, if the President wishes to block Mr. McGahn's appearance in the face of a duly issued subpoena, the burden rests with the White House to file an action in court to attempt to do so.

Moreover, with regard to Mr. McGahn's testimonial obligations, there is no valid executive privilege invocation that could be asserted in good faith regarding the subject of the Special Counsel's investigation and report. President Trump had the opportunity to assert executive privilege over Mr. McGahn's interviews with the Special Counsel and, for strategic reasons, "declined to assert any privilege over Mr. McGahn's testimony," allowing Mr. McGahn to answer the Special Counsel's questions "fulsomely and honestly."[13] Thereafter, the White House made the same strategic decision with regard to publication of the report itself not to assert executive privilege over *any* portion of the report, including portions describing Mr. McGahn's communications with the President and other senior officials in extensive detail.[14] As the D.C. Circuit has already recognized, publication of such information "waives [] privileges for the document or information specifically released."[15]

The President and his personal counsel have also routinely commented publicly regarding the President's communications with Mr. McGahn, and the content of Mr. McGahn's testimony to the Special Counsel. By way of example, on April 25, shortly after the Report was released, President Trump denied a central event described by Mr. McGahn, tweeting, "I never told the White House Counsel Don McGahn to fire Robert Mueller."[16] As has long been recognized, no person   not even the President   can employ privilege as both a sword and a shield, selectively cherry picking which information to tout publicly in his defense, and which information to deliberately withhold from the American people.[17]

---

[11] *Id.*

[12] Charlie Savage, *Trump Vows Stonewall of 'All' House Subpoenas*, N.Y. Times, Apr. 24, 2019 (emphasis added).

[13] Michael S. Schmidt & Maggie Haberman, *White House Counsel, Don McGahn, Has Cooperated Extensively in Mueller Inquiry*, N.Y. TIMES, Aug. 18, 2018.

[14] Attorney General Barr Press Conference on April 18, 2019 (the President confirmed that "he would not assert privilege over the Special Counsel's report . . . [and] no material has been redacted based on executive privilege.").

[15] *In re Sealed Case*, 121 F.3d. at 741.

[16] Donald J. Trump (@realDonaldTrump), Twitter (Apr. 25, 2019, 4:47 AM).

[17] *See, e.g., Nixon v. Sirica*, 487 F.2d 700, 717-18 (D.C. Cir. 1973) (considering public statements by President Nixon to be a factor undermining the White House claimed need for confidentiality in related conversations).

Lastly, this Committee is currently engaged in an investigation into alleged obstruction of justice, public corruption and other abuses of power by the President and his administration. Even in its redacted form, the Special Counsel's report offers substantial evidence and analysis that the President did, in fact, engage in multiple acts of obstruction.  Mr. McGahn provided critical information that appears throughout Volume II of the Special Counsel's report, detailing incidents in which, *inter alia*, the President: sought to stop former Attorney General Sessions from recusing himself from the Russia investigation and then to have Sessions reverse his recusal decision[18]; directed Mr. McGahn to have Special Counsel Mueller fired[19]; directed Mr. McGahn to deny that attempted firing[20]; and sought to curtail the scope of the Special Counsel's investigation.[21]  Where, as here, there is substantial evidence indicating that the President engaged in such misconduct, the public interest in the "fair administration of justice" outweighs the President's "generalized interest in confidentiality."[22]

For all these reasons, Mr. McGahn is required to appear and provide testimony before the Committee absent a court order authorizing non-compliance, as well as provide a privilege log for any documents withheld.  Otherwise, the Committee will have no choice but to resort to contempt proceedings to ensure that it has access to the information it requires to fulfill its constitutionally mandated duties.

Sincerely,

Jerrold Nadler
Chairman
House Committee on the Judiciary

cc:    Doug Collins
       Ranking Member
       House Committee on the Judiciary

---

[18] Special Counsel Robert S. Mueller III, *Report on the Investigation Into Russian Interference in the 2016 Presidential Election*, Vol. II, at 48-51, 107-11 (hereinafter "Mueller Report").
[19] *Id.* Vol. II, at 77-87.
[20] *Id.* Vol. II, at 90-94.
[21] *Id.* Vol. II, at 113-18.
[22] *United States v. Nixon*, 418 U.S. 683, 713 (1974).

JERROLD NADLER, New York
CHAIRMAN

DOUG COLLINS, Georgia
RANKING MINORITY MEMBER

# U.S. House of Representatives
## Committee on the Judiciary
### Washington, DC 20515–6216
#### One Hundred Sixteenth Congress
May 17, 2019

Donald F. McGahn II, Esq.
c/o William A. Burck, Esq.
Quinn Emanuel Urquhart & Sullivan
1300 I St. NW
Suite 9000
Washington, D.C. 20005

Dear Mr. McGahn:

  The Committee on the Judiciary will hold a hearing on "Oversight of the Report by Special Counsel Robert S. Mueller, III: Former White House Counsel Donald F. McGahn, II," on May 21, 2019 at 10:00 a.m., in Room 2141 of the Rayburn House Office Building. As you know, your presence is required pursuant to the subpoena the Committee served on you compelling your testimony for that date.[1]

  On May 7, 2019, I wrote to your counsel and made clear that, absent a court order directing otherwise, you must appear or the Committee will proceed to hold you in contempt.[2] We have received no information indicating that any such order has been sought, much less obtained. In fact, the Committee has not even been provided a Department of Justice, Office of Legal Counsel (OLC) opinion articulating a legitimate legal basis that prevents you from providing testimony about the subject matters disclosed in the Special Counsel's report. This is not surprising given that you have already discussed these subjects at length as part of an investigation for which the President expressly waived privilege, has publicly commented on, and even has disputed not only your account of the relevant events but also your good faith.

  As I have previously stated, the Committee intends to focus on the very topics covered in the Special Counsel's Report. For that reason, there can be no valid assertion of executive privilege given that President Trump "declined to assert any privilege over Mr. McGahn's testimony,"[3] or over any portion of the Report itself.[4]

---

[1] Subpoena by Authority of the House of Representatives of the United States of America to Donald F. McGahn for documents and testimony, signed by Representative Jerrold Nadler, April 22, 2019. Enclosed please find additional information related to your testimony.

[2] Letter to William A. Burck from Chairman Jerrold Nadler (May 7, 2019).

[3] Michael S. Schmidt & Maggie Haberman, *White House Counsel, Don McGahn, Has Cooperated Extensively in Mueller Inquiry*, N.Y. TIMES, Aug. 18, 2018.

[4] *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) (holding that publication of information "waives [] privileges for the document or information specifically release[d].").

Moreover, the subject of your testimony is critical to this Committee's ongoing investigative, oversight, and legislative efforts.[5] Since the Committee's last letter, the President on May 11, 2019, tweeted: "I was NOT going to fire Bob Mueller, and did not fire Bob Mueller. . . . Actually, Don McGahn had a much better chance of being fired than Mueller. Never a big fan!" The President's personal attorney, Rudolph Guiliani, likewise previously stated in an interview that your accounting of events "can't be taken at face value" and "could be the product of an inaccurate recollection or could be the product of something else."[6] Your testimony regarding these events—which the President and his counsel now unequivocally dispute—is thus critical to the Committee's ongoing investigation. In addition, the Committee is committed to providing you the opportunity to address the scurrilous allegations by the President and his counsel that you were not truthful or accurate in your interviews with the Special Counsel.

For all these reasons, the Committee looks forward to your testimony on May 21. To be clear, even if the President—supported by an OLC Opinion   invokes executive privilege over your testimony, and you decide to abide by that improper assertion, you are still required under the law and the penalty of contempt to "appear before the Committee to provide testimony, and invoke executive privilege where appropriate."[7]

Sincerely,

Jerrold Nadler
Chairman
House Committee on the Judiciary

cc:   Doug Collins
       Ranking Member
       House Committee on the Judiciary

---

[5] The Committee's need for this information is indisputably of the highest order, including fulfilling its constitutionally mandated legislative and oversight duties relating to election security, and investigating allegations of *Presidential* obstruction of justice. *See* Resolution Recommending that the House of Representatives Find William P. Barr, Attorney General, U.S. Department of Justice, In Contempt of Congress for Refusal to Comply with a Subpoena Duly Issued by the Committee on the Judiciary, Committee on the Judiciary, House, 116th Cong. 1. (2019).

[6] Michael S. Schmidt and Maggie Haberman, *Giuliani Attacks McGahn's Account to Mueller*, N.Y. TIMES, Apr. 19, 2019.

[7] *See* Mem. Op., *Comm. on Judiciary v. Miers*, No. 08-cv-0409-JDB (D.D.C. Jul. 31, 2008), at 106.

JERROLD NADLER, New York
CHAIRMAN

DOUG COLLINS, Georgia
RANKING MINORITY MEMBER

# 𝔘.𝔖. 𝔥ouse of Representatives
## Committee on the Judiciary

𝔚ashington, 𝔇𝔠 20515–6216
One Hundred Sixteenth Congress

May 20, 2019

Donald F. McGahn II, Esq.
c/o William A. Burck, Esq.
Quinn Emanuel Urquhart & Sullivan
1300 I St. NW
Suite 9000
Washington, D.C. 20005

Dear Mr. McGahn:

As you know, your presence is required tomorrow morning for a hearing before the Committee on the Judiciary pursuant to a subpoena compelling your testimony.[1] This afternoon, White House Counsel Pat Cipollone informed me that President Trump has ordered you not to testify.[2] President Trump's order—which seeks to block a former official from informing a coequal branch of government about his own misconduct—is unprecedented and, contrary to the letter received from your counsel this evening, does not excuse your obligation to appear before the Committee.

*First*, although the Justice Department's Office of Legal Counsel (OLC) has produced an opinion purporting to excuse you from testifying, that opinion has no support in relevant case law, and its arguments have been flatly rejected by the courts. As Judge Bates previously explained, the notion that a former White House Counsel is "absolutely immune" from a congressional subpoena has been "virtually foreclosed by the Supreme Court," which held several decades ago that senior White House aides do not enjoy such immunity even from civil damages suits.[3] OLC's most recent opinion—which relies almost entirely on its own prior opinions—offers no persuasive reasoning for distinguishing Judge Bates's ruling or relevant Supreme Court case law.[4]

---

[1] Subpoena by Authority of the House of Representatives of the United States of America to Donald F. McGahn for documents and testimony, signed by Representative Jerrold Nadler, April 22, 2019.

[2] Letter to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary from Pat Cipollone, White House Counsel (May 20, 2019).

[3] *Comm. on the Judiciary, U.S. House of Reps. v. Miers*, 558 F. Supp. 2d 53, 100 (D.D.C. 2008) (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)).

[4] *See* Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, *Testimonial Immunity Before Congress of the Former Counsel to the President* (May 20, 2019) ("Engel Op.").

*Second*, the Justice Department's own longstanding policy is that "executive privilege. . . should not be invoked to conceal evidence of wrongdoing or criminality on the part of executive officers."[5] Tellingly, the Department's opinion ignores that policy entirely. Yet as I have already made clear, the Committee plans to ask you about instances in which the President took actions or ordered you to take actions that may constitute criminal offenses, including obstruction of justice. Despite the Department's apparent efforts to catalogue every instance in which a White House aide has refused to testify before Congress, the Department can cite no example where Congress planned to ask that White House aide about possible crimes committed by the President. Perhaps that is because   until now   no President would have engaged in such a transparent effort to block his own former aides from testifying about the President's misconduct.

*Third*, in addition to the President not asserting executive privilege with respect to your account of the relevant events that was published in the Special Counsel's report, the President himself has already called your credibility into question. He tweeted less than 10 days ago that he "was NOT going to fire Bob Mueller," denying a central event that you described to Special Counsel Mueller under penalty of felony. At the same time, he has asked you to state publicly that he did not engage in obstruction of justice.[6] In attacking your credibility and asking you to make public comments about these events, the President has not only further waived any possible privilege with regard to your testimony; he has also created substantial concerns about acts of witness intimidation and further obstruction of Congress's ongoing investigations. Because these incidents post-date your service as White House Counsel and occurred while you were a private citizen, the Committee is plainly entitled to ask you about them without raising even potential privilege issues.

*Fourth*, nowhere in OLC's 15-page opinion or in Mr. Cipollone's letter to me is there mention of President Trump actually invoking executive privilege. OLC's opinion deals exclusively with your purported "immunity" from testimony and concludes (erroneously) that you are "not legally required to appear and testify."[7] Mr. Cipollone's letter to me reiterates that conclusion and states that "the President has directed Mr. McGahn not to appear" at tomorrow's hearing.[8] But   in marked contrast to the letter sent by the White House to former White House Counsel Harriet Miers (which itself was rejected as improper by the court)   Mr. Cipollone's

---

[5] Robert B. Shanks, *Congressional Subpoenas of Department of Justice Investigative Files*, 8 Op. O.L.C. 252, 267 (1984).

[6] Michael S. Schmidt, *White House Asked McGahn to Declare Trump Never Obstructed Justice*, N.Y. Times, May 10, 2019.

[7] Engel Op. at 15.

[8] Letter to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary from Pat Cipollone, White House Counsel (May 20, 2019).

letter does not state that President Trump has asserted executive privilege with respect to your testimony, nor could he.[9] At most, the Department's conclusions regarding your "immunity" (even if accepted as correct, which they are not) mean that the decision whether to comply with the Committee's lawful subpoena rests solely in your hands.

*Fifth*, contrary to the reference in your counsel's letter, there has been no suggestion by President Trump or by anyone speaking on his behalf that attorney-client privilege poses an obstacle to your testimony. In fact, any invocation of attorney-client privilege in these circumstances is foreclosed by the D.C. Circuit case law, which makes clear that the privilege is inapplicable with respect to White House attorneys where the investigation relates to criminal wrongdoing.[10]

Finally, the Justice Department has no place informing you about the potential remedies that Congress may pursue in the exercise of its own Article I powers.[11] The Committee has made clear that you risk serious consequences if you do not appear tomorrow. As the district court already held with respect to Ms. Miers, you are "not excused from compliance with the Committee's subpoena by virtue of a claim of executive privilege that may ultimately be made."[12] Instead, you "must appear before the Committee to provide testimony, and invoke executive privilege where appropriate."[13] Should you fail to do so, the Committee is prepared to use all enforcement mechanisms at its disposal.

Sincerely,

Jerrold Nadler
Chairman
House Committee on the Judiciary

cc:     The Hon. Doug Collins
        Ranking Member, House Committee on the Judiciary

---

[9] *See* Letter to George T. Manning, Esq. from Fred F. Fielding, Counsel to the President (July 9, 2007), attached as Exhibit 20 in *Miers*, No. 08-409, 558 F. Supp. 2d 53 (D.D.C); *see also Miers*, 558 F. Supp. 2d at 62 (White House Counsel informed Miers that President Bush "had decided to assert executive privilege over the substance of Ms. Miers's testimony").

[10] *In re Lindsey*, 158 F.3d 1263, 1271-78 (D.C. Cir. 1998).
[11] *See* Engel Op. at 15

[12] *Miers*, 558 F. Supp. 2d at 106.

[13] *Id.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,
2138 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

v.

Case No. 1:19 cv-2379 (KBJ)

DONALD F. MCGAHN, II,
51 Louisiana Avenue, N.W.
Washington, D.C. 20001,

*Defendant.*

# Exhibit MM

J5m2tru1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
DONALD J. TRUMP, et al.,

                    Plaintiffs,              New York, N.Y.

            v.                               19 Civ. 3826(ER)

DEUTSCHE BANK, AG, et al.,

                    Defendants,

COMMITTEE ON FINANCIAL SERVICES
OF THE U.S. HOUSE OF
REPRESENTATIVES,

                    Intervenor Defendant,

PERMAMENT SELECT COMMITTEE ON
INTELLIGENCE OF THE U.S. HOUSE OF
REPRESENTATIVES,

                    Intervenor Defendant.
------------------------------------x       Conference

                                            May 22, 2019
                                            2:30 p.m.

Before:

                      HON. EDGARDO RAMOS,

                                            District Judge


                          APPEARANCES


CONSOVOY McCARTHY, PLLC
     Attorneys for Plaintiffs
BY:  PATRICK STRAWBRIDGE
     CAMERON T. NORRIS


MUKASEY FRENCHMAN & SKLAROFF, LLP
     Attorneys for Trump Business Entity Plaintiffs
BY:  MARC L. MUKASEY

J5m2tru1

APPEARANCES
(continued)

AKIN GUMP STRAUSS HAUER & FELD, LLP
     Attorneys for Defendant Deutsche Bank, AG
BY:  RAPHAEL A. PROBER
     STEVEN R. ROSS


MURPHY & McGONIGLE, PC
     Attorneys for Defendant Capital One Financial Corp.
BY:  JAMES A. MURPHY
     STEVEN D. FELDMAN


OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
     Attorneys for Intervenor Defendants
BY:  DOUGLAS N. LETTER


ALSO PRESENT:

DANIEL S. NOBLE, Senior Counsel for Investigations
                 U.S. House of Representatives
                 Permanent Select Committee
                 on Intelligence


JENNIFER L. READ, Senior Counsel
                  U.S. House of Representatives
                  Committee on Financial Services

1      Again, I think his argument is because it's so broad, that

2      shows it's illegitimate.

3              THE COURT:  He said, I think no less than twice, that

4      he was willing to sit down and have a reasonable discussion

5      about limiting the subpoenas.

6              MR. LETTER:  Fine.  If you are going to order that,

7      your Honor, I hope you'll order that that be done extremely

8      fast because I'm fairly sure it will be evident immediately

9      that it is not a serious endeavor.  Thank you.

10             THE COURT:  Thank you.  So we're going to take ten

11     minutes, and then I'll come out and give you my decision.

12             (Recess)

13             THE COURT:  Everyone, please be seated.  Now, I'm

14     going to read this.  It's approximately 25 pages, and if

15     history is any guide, it's going to take me about 40, 45

16     minutes to read or so.  I won't chain you to your chairs, but

17     if any of you wish to leave before I finish reading, I would

18     just ask that you do so as unobtrusively as possible.

19             On April 15, 2019, two subcommittees of the United

20     States House of Representatives issued subpoenas to Deutsche

21     Bank and Capital One Financial Corporation.  The subpoenas seek

22     financial and account information concerning President

23     Donald J. Trump, his children, members of their immediate

24     family, and several entities associated with his family.

25             Two weeks later, plaintiffs filed the above-captioned

1    suit, claiming that the subpoenas violate the United States

2    Constitution and the Right to Financial Privacy Act, the

3    "RFPA".  Plaintiffs also moved for a preliminary injunction

4    that would prohibit the Committees from enforcing the subpoenas

5    and prohibit the banks from complying with the subpoenas until

6    the resolution of this lawsuit. This bench ruling addresses

7    that motion.

8         The question presented in plaintiffs' motion is

9    straightforward:  Does the Committees' subpoenas violate the

10   Constitution or the RFPA?  After reviewing the parties' briefs

11   and hearing from them today, the Court is convinced that the

12   answer is no.  Accordingly, I will not enjoin enforcement of

13   the subpoenas.

14        The Court begins by addressing two preliminary

15   matters: the applicable standard for a preliminary injunction,

16   and the Committees' request for consolidation.

17        The Court begins with the applicable standard of

18   review. "A plaintiff seeking a preliminary injunction must

19   establish that he is likely to succeed on the merits, that he

20   is likely to suffer irreparable harm in the absence of

21   preliminary relief, that the balance of equities tips in his

22   favor, and that an injunction is in the public interest."

23   *Winter v. National Resources Defense Council, Inc.*, 555

24   U.S. 7.

25        In this circuit, if a plaintiff does not establish a

1    likelihood of success on the merits, a preliminary injunction,

2    nonetheless, may issue if the plaintiff shows that there exists

3    sufficiently serious questions going to the merits to make them

4    a fair ground for litigation and a balance of hardships tipping

5    decidedly toward the plaintiff.  Citing *Citigroup Glob. Mkts.,*

6    *Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d

7    30.  It is not enough that the question be substantial,

8    however.

9         Regardless of whether the plaintiff opts to show

10   likelihood of success on the merits or sufficiently serious

11   question going to the merits, the plaintiff always must

12   demonstrate that irreparable harm is likely, absent the

13   injunction.  At all times, the Court remains mindful that

14   preliminary injunction is an extraordinary and drastic remedy,

15   and it is never awarded as of right.  *Munaf v. Geren*, 553 U.S.

16   674.

17        Next, the Court denies committees' request for

18   consolidation. In their opposing papers, the committees asked

19   the Court to consolidate this hearing with a trial on the

20   merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil

21   Procedure.  Plaintiffs opposed consolidation on the ground that

22   consolidation would violate their rights to due process.

23   Ultimately, the Court concludes that any decision to

24   consolidate is of little consequence here.  The Committees are

25   not prejudiced by the denial of a consolidation, given that the

1     Court will not enjoin them from enforcing their subpoenas.

2             Conversely, if the Court chooses to consolidate

3     the preliminary injunction hearing with a trial on the merits,

4     there is a slight risk that plaintiffs will be prejudiced,

5     notwithstanding that Plaintiffs have yet to adequately explain

6     what further discovery, briefing, witnesses, and time is needed

7     before they will be ready for a trial on the merits.

8             In any event, to ensure that plaintiffs are not

9     prejudiced, the Court will deny the committees' application for

10    consolidation.  Should this matter ultimately proceed to the

11    merits, however, the Court appreciates the urgency with which

12    matters concerning two coordinate branches of government should

13    proceed, and the limited universe of facts that may be subject

14    to discovery.

15            Turning to the merits of plaintiffs' motion.  The

16    Court finds that while plaintiffs have shown that they will

17    suffer irreparable harm, absent a preliminary injunction, they

18    are unlikely to succeed on the merits of their claims, that the

19    questions presented in their motion are not sufficiently

20    serious in light of Supreme Court precedent and the plain text

21    of the Right to Financial Privacy Act, the balance of hardships

22    and equities, in conjunction with consideration of the public

23    interest, do not weigh in their favor.  Consequently, the Court

24    concludes that a preliminary injunction is inappropriate.

25            The Court begins with whether Plaintiffs have

1    demonstrated a likelihood of irreparable harm absent an

2    injunction, because if there is not a likelihood of irreparable

3    harm, then the Court need not grapple with the constitutional

4    and statutory issues in this case.

5          Plaintiffs allege that if this Court does not

6    intervene to preserve the status quo, there will

7    be no way to unring the bell once the banks give Congress the

8    requested information.

9          The Court agrees.  In this circuit, it is well settled

10   that individuals whose financial records

11   are subpoenaed possess a privacy interest in their personal

12   financial affairs that gives them standing to move to quash a

13   subpoena served on a non-party financial institution, which is

14   why all parties appear to agree that plaintiffs have standing

15   to challenge subpoenas that were issued to them directly.

16   Citing *Arias-Zeballos v. Tan*, reported at 2007 WL 210112.

17         In this case, the inevitable impingement of the

18   same privacy interests that suffice to confer standing to

19   plaintiffs also suffice to demonstrate a likelihood of

20   irreparable harm.  Courts in this circuit have recognized that

21   the disclosure of private, confidential information is the

22   quintessential type of irreparable harm that cannot be

23   compensated or undone by money damages.  Citing, *Airbnb, Inc.*

24   *v. City of New York*, report at 2019 WL 91990.

25         It is true that some courts outside of this circuit

have questioned whether the mere disclosure of information,

absent evidence of misuse or unauthorized disclosure by the

receiving party automatically constitutes irreparable

injury.  See, e.g., *Baker DC v. National Labor Relations Bd.*,

102 F. Supp. 3d 194, from the District of D.C.  The Court is of

the opinion, however, that plaintiffs possess strong privacy

interests in their financial information such that unwanted

disclosure may properly constitute irreparable injury, without

an additional showing of likelihood of misuse or unauthorized

disclosure by the recipient.

The committees disagree and proffer two arguments why

the Court should find that plaintiffs have failed to show a

likelihood of irreparable harm.  Neither argument is

persuasive, and in fact, in oral argument, I understood them to

concede that the Trump organization and Trump family members

would suffer irreparable harm.

First, the committees contended that plaintiffs have

provided no actual evidence of their potential injury, but the

very act of disclosure to Congress is itself the injury that is

both inevitable, absent an injunction, and irreparable.

The Committees attempt to differentiate between

disclosure to Congress and disclosure to the public, arguing

that the former is somehow not a cognizable injury.  The Court

is unpersuaded.  Here, plaintiffs have an interest in keeping

their records private from everyone, including congresspersons,

1    and that interest necessarily will be impinged by the

2    records' disclosure to the committees.  In any event, the

3    committees have not committed one way or the other to keeping

4    plaintiffs' records confidential from the public once received.

5         Accordingly, the Court finds that plaintiffs have

6    shown a likelihood of irreparable harm absent an injunction.

7         The Court begins with the statutory claim, because

8    there is no need to address plaintiffs' constitutional claim if

9    the committees are bound by the RFPA and have, in fact,

10   violated it.

11        Plaintiffs contend that the committees issued the

12   challenged subpoenas in violation of the requirements of the

13   RFPA.  The RFPA provides that no government authority may have

14   access to or obtain copies of information containing the

15   financial records of any customer from a financial institution

16   unless certain notification and certification requirements are

17   met.

18        Plaintiffs argue that Congress is a government

19   authority for purposes of the RFPA and that, as government

20   authorities, the committees failed to act in accordance with

21   the RFPA before issuing the challenged subpoenas.

22        The Court disagrees.  The Committees have provided

23   sound arguments why the RFPA does not apply to Congress.

24        First, as mentioned above, the RFPA applies to

25   government authorities.  While plaintiffs urge the Court to

1    resort to Black Law's Dictionary to define this statutory term,

2    it is unnecessary.  Congress expressly defined the term

3    "government authority" in RFPA.  Pursuant to that statute,

4    "government authority" means any agency or department of the

5    United States, or any officer or agent thereof.

6            Thus, if Congress is not an agency or department of

7    the United States, then the statute does not apply to Congress.

8    The Court finds the Supreme Court's reasoning in *Hubbard v.*

9    *United States*, reported at 514 U.S. 695 controlling here.

10   There, the Court explored the reach of 18 U.S.C. 1001, a

11   statute criminalizing knowingly false representations made in

12   any matter within the jurisdiction of any department or agency

13   of the United States.

14           The question presented was whether 1001 applies

15   to false statements in judicial proceedings.  The Court held

16   that it didn't and instead generally only refers to the

17   Executive Branch.  The Court held that it didn't unless the

18   context of the statute strongly suggests that the phrase was

19   intended to describe more than just the Executive Branch.

20   In so holding, the Court expressly overruled its prior decision

21   in *United States v. Bramblett*, which held that the phrase

22   "department," as used in 1001, referred to the

23   executive, judicial, and legislative branches of government.

24           Of course, the RFPA arises in a different title of the

25   United States Code, but the Supreme Court's interpretation in

Hubbard wasn't limited to any particular statutory provision.
Rather, the Court found that a straightforward interpretation
of the phrase "department or agency" leads inexorably to the
conclusion that the phrase only covers the Executive Branch.

Moreover, as detailed in the Committees' papers, the
structure and context of the RFPA makes clear that Congress did
not believe it was binding itself to the RFPA.  More on this
point need not be said. Congress is not bound by the RFPA.

Plaintiffs are also unlikely to succeed on the merits
of their constitutional claim.  Turning to plaintiffs' claim
that the committees' subpoenas violate the Constitution, the
Court concludes that plaintiffs are unlikely to succeed on the
merits.

As today's argument and the parties' moving papers
make clear, plaintiffs challenge the committees'
subpoenas on four principal grounds: the committees' subpoenas
are not supported by a legitimate legislative purpose; the
committees' subpoenas are really an unlawful exercise
of law-enforcement power; the committees' subpoenas are overly
broad; and finally, the committees' motives in issuing the
subpoenas render the subpoenas unlawful, as they seek
exposure for the sake of exposure.

The Court addresses and rejects, each argument in
turn, and begins by setting forth the legal principles guiding
its analysis.

1          A review of the relevant case law makes clear that the

2     Committees' investigative power is broad, yet not unlimited.

3     Article 1 of the United States Constitution vests Congress with

4     all legislative powers.  While Article 1 does not expressly

5     refer to Congress' investigative powers, Congress' authority

6     to investigate matters related to contemplated legislation is

7     beyond debate.

8          As the Supreme Court has explained, there can be no

9     doubt as to the power of Congress, by itself or through its

10    committees, to investigate matters and conditions relating to

11    contemplated legislation.  This power, deeply rooted in

12    American and English institutions, is indeed co-extensive with

13    the power to legislate.  Without the power to investigate,

14    including of course the authority to compel testimony, either

15    through its own processes or through judicial trial, Congress

16    could be seriously handicapped in its efforts to exercise its

17    constitutional function wisely and effectively.  Citing *Quinn*

18    *v. United States*, 349 U.S. 155.

19         So too is the committees' general authority to issue

20    subpoenas well settled, given that committee members serve as

21    the representatives of the parent assembly in collecting

22    information for a legislative purpose and their function is to

23    act as the eyes and ears of the Congress in obtaining facts

24    upon which the full legislature can act.  *Watkins v. United*

25    *States*, 354 U.S. 178.

1          As alluded to in the quotes recited, congressional

2     investigations must be in furtherance of a legislative purpose.

3     As the Supreme Court has explained, an essential premise in

4     this situation is that the House or Senate shall have

5     instructed the committee members on what they are to do with

6     the power delegated to them.  It is the responsibility of the

7     Congress, in the first instance, to ensure that compulsory

8     process is used only in furtherance of a legislative

9     purpose.  That requires that the instructions of an

10    investigating committee spell out that group's jurisdiction and

11    purpose with sufficient particularity.  Those instructions are

12    embodied in the authorizing resolution.  That document is the

13    committee's charter.  Citing *Watkins* again.

14          However, that Congress must investigate in

15    furtherance of a legislative purpose does not mean that the

16    Congress is constrained to investigations in furtherance of

17    contemplated legislation in the form of a bill or statute.

18    Congress performs may different functions attendant to its

19    legislative function under the Constitution.

20          Congress' power also includes a more general informing

21    function, that is, the power of the Congress to inquire into

22    and publicize corruption, maladministration or inefficiency in

23    agencies of the Government.  Again citing *Watkins*.

24          Put simply, the power of the Congress to conduct

25    investigations is inherent in the legislative process.  That

1   power is broad.  It encompasses inquiries concerning the

2   administration of existing laws, as well as proposed or

3   possibly needed statutes.  It includes surveys of defects in

4   our social, economic or political system for the purpose of

5   enabling Congress to remedy them.  It comprehends probes into

6   departments of the Federal Government to expose corruption,

7   inefficiency or waste.  Citing *Watkins*.

8        While broad, Congress' investigative powers are not

9   unlimited.  Rather, its powers are subject to several

10  limitations, five of which will be mentioned now.

11       First, the subject of any inquiry must be one on which

12  legislation could be had.  Citing *Eastland*, 421 U.S. at 504.

13  This means that, in determining the constitutionality of

14  requests for information, pursuant to a congressional

15  investigation, a court must first determine whether an

16  investigation is related to a valid legislative purpose, for

17  Congress may not constitutionally require an individual to

18  disclose his political relationships or other private affairs

19  except in relation to such a purpose.  Citing *Barenblatt v.*

20  *United States*, 360 U.S. 109.

21       Second, the Bill of Rights is applicable to

22  congressional investigations as to all forms

23  of governmental action, and serves to limit Congress'

24  investigative powers.

25       Third, while the public is entitled to be informed

1      concerning the workings of its government, the Supreme Court

2      has made clear that this entitlement cannot be inflated into a

3      general power to expose, where the predominant result can only

4      be an invasion of the private rights of individuals.

5              Fourth, since Congress may only investigate into those

6      areas in which it may potentially legislate or appropriate, it

7      cannot inquire into matters which are within the exclusive

8      province of one of the other branches of the Government.

9      Lacking the judicial power given to the Judiciary, it cannot

10     inquire into matters that are exclusively the concern of the

11     Judiciary.  Neither can it supplant the Executive in what

12     exclusively belongs to the Executive.  Citing *Barenblatt*.

13             Fifth, and finally, when analyzing the investigative

14     boundaries of congressional subcommittees, such as the

15     committees here, the committees' investigative boundaries are

16     defined by its source.  Citing *Eastland*.  Thus, with respect to

17     the committees, their powers are further restricted to the

18     missions delegated to them, i.e., to acquire certain data

19     to be used by the House or the Senate in coping with a problem

20     that falls within its legislative sphere and, consequently, no

21     witness can be compelled to make disclosures on matters

22     outside that area.

23             Among other sources to consider in ascertaining a

24     subcommittee's boundaries in a given investigation, courts may

25     consider the congressional resolutions authorizing the

investigation, the committee's jurisdictional statements, and

statements of the members of the committee.  *Shelton v. United*

*States*, 404 F.2d 1292.

The committees' subpoenas have a legitimate

legislative purpose.  Plaintiffs argue that the committees'

subpoenas lack a legitimate legislative purpose.  The Court

disagrees.

The Committee of Financial Services and the Permanent

Select Committee on Intelligence issued substantively identical

subpoenas for records to Deutsche Bank on April 15.  That same

day, the Committee of Financial Services issued a similar

subpoena to Capital One Financial Corporation.  The committees,

through their subpoenas, seek financial records and account

information related to Plaintiffs that mostly date back to

2010.  However, with respect to some records, such as, for

example, documents related to account applications,

opening documents, know your customer, due diligence,

et cetera, revealing financial relationships between plaintiffs

and any foreign individuals, entities, or governments, there is

no time limitation.

In analyzing whether the committees acted within their

constitutional boundaries, the Court first looks to each

committee's respective jurisdiction.  With respect to the

Committee on Financial Services, according to Rule X of the

Rules of the House of Representatives for the

1    116th Congress, the Committee on Financial Services enjoys

2    jurisdiction over matters relating to, among other subjects,

3    banks and banking, including deposit insurance and federal

4    monetary policy, insurance generally, international finance,

5    and international financial and monetary organizations.

6            According to Rule X, as a standing committee, the

7    Committee on Financial Services is also charged with general

8    oversight responsibilities to assist the House of

9    Representatives in its analysis, appraisal, and evaluation of,

10   among other subjects, the application, administration,

11   execution, and effectiveness of federal laws; and, importantly,

12   conditions and circumstances that may indicate the necessity or

13   desirability of enacting new or additional legislation.

14           The Committee on Financial Services contends that it

15   is investigating whether existing policies and programs at

16   financial institutions are adequate to ensure the safety and

17   soundness of lending practices, and the prevention of loan

18   fraud.

19           It points the Court to news sources reporting that

20   financial institutions have issued more than $1 trillion in

21   large corporate loans, called leveraged loans, to heavily

22   indebted companies that may be unable to repay those

23   loans.  It contends that it's investigating the lending

24   practices of financial institutions, including Deutsche Bank,

25   for loans issued to the Trump family and companies controlled

1    by President Trump.

2           Citing news sources reporting that over the years,

3    Deutsche Bank has provided more than $2 billion in loans to

4    President Trump, despite concerns raised by senior bank

5    officials regarding some of the loans.  It contends that it's

6    investigating industry-wide compliance with banking statutes

7    and regulations, particularly anti-money laundering policies.

8           Importantly, it points to House Resolutions

9    originating in the committee and predating the subpoenas, that

10   support its representations to the Court.  For example, House

11   Resolution 206, introduced by Chairwoman Maxine Waters on

12   March 8, 2019, and passed by a floor vote on March 13, 2019,

13   the House expressed that money laundering and other financial

14   crimes are serious threats to our national and economic

15   security, and resolved to acknowledge that the lack of sunlight

16   and transparency in financial transactions poses a threat

17   to our country; to support efforts to close money laundering

18   loopholes; to encourage transparency; to detect and deter

19   financial crimes; and to urge financial institutions to comply

20   with various anti-money laundering laws and regulations.

21          The Committee on Financial Services believes that the

22   challenged subpoenas further its investigations bearing upon

23   the integrity of the U.S. financial system and the national

24   security, including bank fraud, money laundering, foreign

25   influence in the U.S. political process, and the

1    counterintelligence risks posed by foreign powers' use of

2    financial leverage.

3         It maintains that the banks' lending practices,

4    including loans made to plaintiffs, are an important piece to

5    that investigation, as the subpoenas seek records relating to

6    individuals and entities, including plaintiffs, that may have

7    served as conduits for illicit funds or may not have

8    been properly underwritten, and the public record establishes

9    that they serve as a useful case study for the broader problems

10   being examined by the committee.

11        Based on the aforementioned, the Court concludes that

12   this committee's investigation and attendant subpoenas are in

13   furtherance of a legitimate legislative purpose, plainly

14   related to the subjects on which legislation can be had.

15        With respect to the Permanent Select Committee on

16   Intelligence, according to Rule X, this committee enjoys

17   jurisdiction over matters relating to, among other subjects,

18   intelligence and intelligence-related activities of all other

19   departments and agencies of the government, and the

20   organization or reorganization of a department or agency of the

21   government, to the extent that the organization or

22   reorganization relates to a function or activity involving

23   intelligence or intelligence-related activities.

24        The Permanent Select Committee is also charged with

25   special oversight functions.  Specifically, the Committee is

charged with, among other responsibilities, reviewing and

studying on a continuing basis laws, programs, and activities

of the intelligence community.

The Intelligence Committee contends that it is

currently investigating efforts by Russia and other foreign

powers to influence the U.S. political process during and since

the 2016 election, including financial leverage that foreign

actors may have over President Trump, his family, and his

business, and the related counterintelligence, national

security, and legislative implications.

Moreover, the Committee contends that it is evaluating

whether the structure, legal authorities, policies, and

resources of the U.S. Government's intelligence,

counterintelligence, and law enforcement elements are adequate

to combat such threats to national security.  The Intelligence

Committee justifies its subpoena on the ground that its

investigation requires an understanding of Mr. Trump's complex

financial arrangements, including how those arrangements

intersect with Russia and other foreign governments and

entities.

The Committee further argues that this inquiry is, by

definition, not limited to Mr. Trump's time in office and,

given the closely held nature of the Trump Organization, must

include his close family members.  Among other items, the

Intelligence Committee points to a press release by its

1   Chairman, dated February 6, 2019, in which Chairman Schiff

2   stated that the Intelligence Committee would conduct a rigorous

3   investigation into efforts by Russia and other foreign entities

4   to influence the U.S. political process during and since the

5   2016 U.S. election; and that the Committee would work to

6   fulfill its responsibility to provide the American people with

7   a comprehensive accounting of what happened, and what the

8   United States must do to protect itself from future

9   interference and malign influence operations.

10        In this press release, Chairman Schiff further stated

11   that the committee also plans to develop legislation and policy

12   reforms to ensure the U.S. government is better positioned to

13   counter future efforts to undermine our political process and

14   national security.

15        Based on the aforementioned, the Court concludes that

16   this Committee's investigation and attendant subpoena is in

17   furtherance of a legitimate legislative purpose, plainly

18   related to subjects on which legislation can be had.

19        Plaintiffs contend that the committees' purported

20   agendas are solely focused on oversight and transparency,

21   which, in a vacuum, are not legitimate legislative purposes

22   that can justify subpoenaing a private citizen.  But Congress'

23   investigative power is not judged in a vacuum.  As explained in

24   *Barenblatt*, the congressional power of inquiry, its range and

25   scope, and an individual's duty in relation to it, must be

viewed in proper perspective.  The power and the right of

resistance to it are to be judged in the concrete, not on the

basis of abstractions.

And here, the Committees seek financial information

pertinent to specific areas of investigation on which

legislation could be had.  As the D.C. Circuit recognized in

*Shelton*, in deciding whether the purpose is within the

legislative function, the mere assertion of a need to consider

remedial legislation may not alone justify an investigation

accompanied with compulsory process, but when the purpose

asserted is supported by references to specific problems which

in the past have been or which in the future could be the

subjects of appropriate legislation, then a court cannot say

that a committee of the Congress exceeds its broad power when

it seeks information in such areas.

Simply put, the committees' subpoenas all are in

furtherance of facially legitimate legislative purposes.

Next, and relatedly, plaintiffs contend that the

committees' subpoenas as "outrageously broad," given the

information the committees seek long predates the President's

election to office, reaches well beyond the transactions

associated with foreign parties, and encompasses reams of

account records for entities, individuals, children, and

spouses, who have never even been implicated in any probe.

Plaintiffs contend that the financial conduct of

private citizens years before they were anywhere near public

office, has nothing to do with government oversight.

The Court finds Plaintiffs' contention unpersuasive.

Based on the cases cited by the parties in their papers, they

seem to agree that so long as the requested information in the

subpoenas are pertinent to legitimate legislative purposes of

the committees, the subpoenas are not overly broad, and the

Court need not conduct a line-by-line review of the information

requested.

The Supreme Court has previously concluded that where

the records called for by a subpoena were not plainly

incompetent or irrelevant to any lawful purpose of a

subcommittee in the discharge of its duties, but, on the

contrary, were reasonably relevant to the inquiry, then such

records are, in fact, pertinent.  Citing *McPhaul v. United

States*, reported at 364 U.S. 372.

As noted by Judge Mehta in his opinion earlier this

week, the standard adopted by the Supreme Court is a forgiving

one.  Here, as mentioned earlier, the committees' subpoenas

seek plaintiffs' financial information mostly dating back to

2010.  The committees contend that this information is

necessary to investigate serious and urgent questions

concerning the safety of banking practices, money laundering in

the financial sector, foreign influence in the U.S. political

process, and the threat of foreign financial leverage,

1    including over the President, his family, and his business.

2         In light of the scope of the committees'

3    investigations, the Court finds the committees' requests for

4    information, while undeniably broad, is clearly pertinent to

5    the committees' legitimate legislative purposes.  Consequently,

6    the Court will not engage in a line-by-line review of the

7    subpoenas' requests, merely because some requests may be more

8    pertinent than others.

9         As the Supreme Court has made clear, the wisdom of

10   congressional approach or methodology is not open to judicial

11   veto, nor is the legitimacy of a congressional inquiry to be

12   defined by what it produces. The very nature of the

13   investigative function, like any research, is that it takes the

14   searchers up some blind alleys and into nonproductive

15   enterprises.  To be a valid legislative inquiry, there need be

16   no predictable end result.  Citing *Eastland*.

17        Next, the plaintiffs challenge the subpoenas on the

18   ground that the committees have never identified a single piece

19   of legislation within their respective jurisdictions that they

20   are considering.  While that argument may be true as far as it

21   goes, it is also irrelevant.  Congress need not issue proposed

22   legislation prior to the start of an investigation; it need not

23   pass a bill; and it need not have particular legislation in

24   mind when conducting a legitimate, lawful investigation in aid

25   of its legislative function.

1          As the Supreme Court noted in Watkins, most of

2     instances of use of compulsory process by the first Congress

3     concerned matters affecting the qualification or integrity of

4     their members or came about in inquiries dealing with suspected

5     corruption or mismanagement of government officials.  There was

6     very little use of the power of compulsory process in early

7     years to enable the Congress to obtain facts pertinent to the

8     enactment of new statutes or the administration of existing

9     laws.

10          As explained by the Second Circuit, it is immaterial

11     that in the past a particular committee has proposed but little

12     legislation. Information gained by a committee might well aid

13     Congress in performing its legislative duties, in deciding that

14     the public welfare required the passage of new statutes or

15     changes in existing ones, or that it did not.

16     United States v. Josephson, 165 F.2d 82.

17          Again, as stated earlier, and quoting the Supreme

18     Court in Eastland, the subject of the congressional

19     inquiry simply must be one "on which legislation could be had."

20          Accordingly, plaintiffs' argument on this point fails.

21          Next, the Committees contend that, at best, the

22     Committees seek these documents so they can conduct

23     law-enforcement activities that the Supreme Court has held are

24     reserved to the other branches.  The Court disagrees.  The

25     Supreme Court has made clear that the power to investigate

should not be confused with any of the powers of law

enforcement.  Those powers are assigned under our Constitution

to the Executive and the Judiciary.  *Quinn v. United States*,

349 U.S. 155.

However, the Supreme Court has also made clear that a

congressional investigation is not transformed into the invalid

exercise of law enforcement authority merely because the

investigation might possibly disclose crime or wrongdoing.

Citing McGrain.

Similarly, the Supreme Court has recognized that while

it may be conceded that Congress is without authority to compel

disclosures for the purpose of aiding the prosecution of

pending suits, the authority of Congress, directly or through

its committees, to require pertinent

disclosures in aid of its own constitutional power is not

abridged because the information sought to be elicited may also

be of use in such suits.  Citing *Sinclair*, 279 U.S. at 295.

The Supreme Court has clearly acknowledged that many

powers of government overlap.  Thus, in determining whether a

congressional investigation has morphed into an impermissible

law enforcement investigation, the critical inquiry is whether

Congress has exercised an exclusive power of the Judiciary or

Executive.

For example, in *Barenblatt v. United States*, the

Supreme Court affirmed an individual's conviction for contempt

of Congress arising from his refusal to answer questions

posited to him by a subcommittee of the House of

Representatives.  In so holding, the Supreme Court noted that

whereas "Congress may only investigate into those areas

in which it may potentially legislate or appropriate, it cannot

inquire into matters which are within the exclusive province of

one of the other branches of the Government."

Similarly, in *Kilbourn*, the Supreme Court limited

congressional investigative power to situations where "[1] the

investigation which the committee was directed to make was

judicial in character; and [2] could only be properly and

successfully made by a court of justice; and [3] related to a

matter wherein relief or redress could be had only by a

judicial proceeding."

Likewise, in *Tenney v. Brandhove*, the Supreme Court

stated that in order "to find that a committee's investigation

has exceeded the bounds of legislative power it must be obvious

that there was a usurpation of functions exclusively vested in

the Judiciary or the Executive."

Here, however, it is not obvious that the committees

usurped any powers exclusively vested in the Judiciary or the

Executive when it issued the challenged subpoenas.  There is

nothing here to suggest that the sole function of the

challenged subpoenas is to amass evidence either to prosecute

plaintiffs, civilly or criminally.  On the contrary, the

committees have provided ample justification establishing

clear, legitimate legislative purposes for the information

requested in the subpoenas.

Accordingly, contrary to plaintiffs' protestations,

the Court finds that the committees' investigations and

attendant subpoenas do not constitute impermissible law

enforcement activities.

Finally, plaintiffs contend that regardless of whether

the challenged subpoenas further legitimate legislative

purposes, this Court should, nonetheless, enjoin the banks from

complying with them because the committees really want to

collect and expose the financial documents of the President and

his children and grandchildren for the sake of exposure.

In response, the committees contend that plaintiffs'

contention is unsupported by anything other than political

rhetoric and press statements, and note that even if plaintiffs

had provided some basis to question the committees' motives,

the Court should not look behind the legitimate legislative

purpose of the investigations.

The Court agrees with the committees.  The committees'

alleged ulterior motives, even if such exist, are insufficient

to vitiate their subpoena powers.  In their papers, plaintiffs

quote *Watkins* for the notion that there is no congressional

power to expose for the sake of exposure.  That much is true.

Had plaintiffs read further, however, they would

realize that the propriety of legislative motives is not a

question left to the courts.  As the Supreme Court explained in

the same paragraph relied upon by plaintiffs:  We have no doubt

that there is no congressional power to expose for the sake of

exposure.  The public is, of course, entitled to be informed

concerning the workings of its government.  That cannot be

inflated into a general power to expose, where the predominant

result can only be an invasion of the private rights

of individuals.

        But a solution to our problem is not to be found in

testing the motives of committee members for this purpose.

Such is not our function.  Their motives alone would not

vitiate any investigation which had been instituted by a

House of Congress if that assembly's legislative purpose is

being served.

        Put simply, even in the face of investigations in

which the predominant result is exposure of an individual's

privacy, courts generally lack authority to halt an

investigation otherwise supported by a facially legitimate

legislative purpose.

        The Supreme Court has repeated this over and over

again. See, e.g., *Eastland*, at 508 ("Our cases make clear that

in determining the legitimacy of a congressional act, we do not

look to the motives alleged to have prompted it."); *Sonzinsky*

*v. United States*, 300 U.S. 506 ("Inquiry into the hidden

1    motives which may move Congress to exercise a power

2    constitutionally conferred upon it is beyond the competency of

3    courts."); *Smith v. Kansas City Title & Tr. Co.*, 255 U.S. 180,

4    ("Nothing is better settled by the decisions of this court than

5    that, when Congress acts within the limits of its

6    constitutional authority, it is not the province of the

7    judicial branch of the government to question

8    its motives."); and *United States v. O'Brien*, 391 U.S. 367,

9    ("It is a familiar principle of constitutional law that this

10   Court will not strike down an otherwise constitutional statute

11   on the basis of an alleged illicit legislative motive.").

12         Of course, it is true that abuses of the investigative

13   process may imperceptibly lead to abridgment of protected

14   freedoms.  Citing *Watkins*.  But this danger, too, has been

15   addressed thoroughly by the Supreme Court in prior decisions.

16   The Supreme Court has detailed the remedy for all left

17   uncomfortable with the idea of a congressional committee

18   probing through the financial history of an individual on

19   grounds, pretextual, even if technically legal.

20         In *Barenblatt*, the Supreme Court said:  "It is, of

21   course, true that if there be no authority in the judiciary to

22   restrain a lawful exercise of power by another department of

23   the government, where a wrong motive or purpose has impelled to

24   the exertion of the power, that abuses of a power conferred may

25   be temporarily effectual.  The remedy for this, however,

1    lies not in the abuse by the judicial authority of its

2    functions, but in the people upon whom, after all, under our

3    institutions, reliance must be placed for the correction of

4    abuses committed in the exercise of a lawful power."

5            In other words, the correction of abuses committed in

6    the exercise of a lawful power is a matter left to voters, not

7    judges.  Moreover, the propriety of making plaintiffs' finances

8    a subject of the committees' investigation is a subject on

9    which the scope of the Court's inquiry is narrow.  Citing

10   *Eastland*.

11           The wisdom of this approach is beyond reproach.  As

12   explained by the Supreme Court, inquiries into congressional

13   motives or purposes are a hazardous matter.  Citing *O'Brien*,

14   391 U.S. at 383.  And in times of political passion, dishonest

15   or vindictive motives are readily attributed to legislative

16   conduct and as readily believed.

17           Thus, as the Court stated in *Barenblatt*, so long as

18   Congress acts in pursuance of its constitutional power, the

19   Judiciary lacks authority to intervene on the basis of the

20   motives which spurred the exercise of that power.  Accordingly,

21   the Court finds that the committees' alleged ulterior motives,

22   assuming they exist, do not vitiate the legitimate legislative

23   purposes supporting the challenged subpoenas.

24           At bottom, the committees' power to issue and enforce

25   the subpoenas at issue is well settled.  What's more, it is

1    appropriate to observe that just as the Constitution forbids

2    the Congress to enter fields reserved to the Executive and

3    Judiciary, it imposes on the Judiciary the reciprocal duty of

4    not lightly interfering with Congress's exercise of its

5    legitimate powers.  Citing *Hutcheson*, 369 U.S. at 622.

6           Having been satisfied that the committees have

7    exercised their legitimate powers in issuing the challenged

8    subpoenas, the Court concludes that plaintiffs are highly

9    unlikely to succeed on the merits of their constitutional

10   claim, a conclusion that weighs against preliminary injunctive

11   relief.

12          The Court now turns to whether they have, nonetheless,

13   shown sufficiently serious questions going to the

14   merits of their claim, along with a balance of hardships tipped

15   decidedly in their favor.

16          To begin, the Court notes that, based on the facts of

17   this particular case, it is uncertain whether plaintiffs may

18   show entitlement to injunctive relief merely by showing serious

19   questions going to the merits.

20          The Second Circuit has explained that where the moving

21   party seeks to stay government action taken in the public

22   interest pursuant to a statutory or regulatory scheme, the

23   district court should not apply the less rigorous "serious

24   questions" standard and should not grant the injunction unless

25   the moving party establishes, along with irreparable injury, a

J5MPTRU2

likelihood that he will succeed on the merits of his claim.

Citing *Citigroup*, 598 F.3d at 35.

This exception reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.

Here, of course -- let me read ahead -- plaintiffs contend that they have identified several serious questions warranting preservation of the status quo because if the Court accepts the committees' view of the law, then Congress can issue a subpoena on any matter, at any time, for any reason, to any person, and there is basically nothing a federal court can do about it.

But, as previously explained, that is not the case. There are several limits to the Committees' power to investigate in aid of its legislative functions.

Plaintiffs similarly point out that the question whether the RFPA applies to Congress is one that this Court will be the first in the country to decide.  But, while that may be true, plaintiffs' statutory argument fails to rise to the level of "serious," as the plain text and structure of the RFPA, along with binding Supreme Court precedent interpreting substantively identical language, strongly undercut their proposed interpretation of the statute.

1          Finally, plaintiffs urge the Court to go the way of

2     the Court of Appeals in *Eastland* by staying this case pending a

3     decision on the merits.  In *Eastland*, the Court of Appeals

4     stayed enforcement of a congressional subpoena directing a bank

5     to produce the financial records of an organization.  While the

6     ultimate question decided in *Eastland* is the same presented

7     here, that is, whether a congressional subpoena issued to a

8     third party was a product of legitimate legislative activity, a

9     question, by the way, answered in the affirmative by the

10    Supreme Court, the procedural postures differ greatly,

11    warranting a different result here.

12         Central to the Court of Appeals' decision to grant a

13    stay in *Eastland*, aside from its determination that

14    irreparable harm was likely to befall plaintiffs absent

15    intervention, was its determination that serious constitutional

16    questions were presented by this litigation, which require more

17    time than is presently available for proper consideration.

18    Citing 488 F.2d at 1256.

19         The challenged subpoena in that case was issued on

20    May 28, 1970, with a return date of June 4.  The organization

21    sued to enjoin compliance with the subpoena on June 1.  The

22    district court denied the injunction on June 1.  Thus, while

23    the record is unclear as to when the organization noted an

24    appeal, at most, the Court of Appeals had two days to review

25    the merits of plaintiff's arguments before the return date was

1    to take effect.

2              Indeed, the Court of Appeals noted that the decisive

3    element in their decision to stay the case was that, absent a

4    stay, the case would be mooted on the same morning that their

5    decision issued.  Consequently, with only, at most, two days to

6    have reviewed plaintiff's application, a stay was a prudent

7    move by the Court of Appeals.

8              Here, plaintiffs first filed suit on April 29, 2019.

9    So the Court had the case before it for roughly three weeks, as

10   compared with, at most, two days in *Eastland*; and, while the

11   instant motion remains pending, the committees have agreed not

12   to enforce the subpoenas.  So the Court had the benefit of the

13   time necessary to thoroughly consider the merits of

14   plaintiffs' motion.  As well, I should note, the thorough

15   opinion of Judge Mehta of the D.C. District Court.

16   Consequently, the Court of Appeals' actions in *Eastland* has

17   little bearing here.

18             Moreover, the biggest difference between the

19   circumstances before this Court and the Court of

20   appeals in *Eastland* is clear.  The Court of Appeals in *Eastland*

21   did not have the benefit of the Supreme Court's opinion in

22   *Eastland*, which reversed the Court of Appeals in an

23   eight-to-one decision, laying out the same framework the Court

24   uses today to resolve this case.

25             So, while the question at the heart of this case

concerning the extent congressional power may have been an open

and serious one before, it is not nearly so serious today.

Of course, use of congressional subpoena power to receive from

a third party a sitting President's financial records will

always be serious in that the outcome will have serious

political ramifications.

          In the context of judicial interpretation, however,

the word "serious" relates to a question that is both serious

and open to reasonable debate.  Otherwise, every complaint

challenging the power of one of the three coordinate branches

of government would result in preliminary relief, regardless of

whether established law renders the complaint unmeritorious.

Indeed, every litigant that comes before the Court seeks relief

that is she considers serious.  That cannot be the law.

          Whereas, here, a subdivision of Congress acts

plainly within its constitutional authority, preliminary

injunctive relief will not issue simply because the plaintiff

challenges that authority.  More is required to demonstrate

entitlement to extraordinary and drastic relief in the form of

a preliminary injunction.

          The Court concludes that plaintiffs have not raised

any serious questions going to the merits.  As the above

analysis makes clear, the Supreme Court has likely foreclosed

the path plaintiffs ask this Court to travel.  It is well

settled that the committees possessed the power to issue

and enforce subpoenas of the type challenged by Plaintiffs, and it is also plain, based on standard constructions of statutory interpretation and prior Supreme Court cases, that the RFPA is no hurdle to the committees' efforts to obtain the financial information sought.

Accordingly, the Court finds that the statutory questions in this case are not sufficiently serious in light of the governing law.  In any event, as explained below, plaintiffs have failed to demonstrate that the balance of the hardships weighs in their favor.  Accordingly, even if the questions were sufficiently serious, injunctive relief remains unwarranted.

The Court finds that Plaintiffs have also failed to establish that the balance of equities and hardships, along with the public interest, favor a preliminary injunction. These factors merge when the Government is the opposing party. Citing *Nken*, 556 U.S. at 435.

The Court has found that the committees' subpoenas are likely lawful.  Thus, delaying what is likely lawful legislative activity is inequitable.  With respect to the balance of hardships, plaintiffs compare the irreparable harm that they are likely to suffer with what they maintain is the committees' sole potential hardship, namely, some delay before receiving the documents if the committees activities are deemed lawful.

1          Plaintiffs maintain that courts have consistently held

2     that such harm is given little weight.  But here, the

3     committees have alleged a pressing need for the subpoenaed

4     documents to further their investigation, and it is not the

5     role of the Court or plaintiffs to second guess that need,

6     especially in light of the Court's conclusions that the

7     requested documents are pertinent to what is likely a lawful

8     congressional investigation.

9          What's more, because the House of Representatives is

10    not a "continuing body," see *Eastland*, 421 U.S. at 512, any

11    delay in the proceedings may result in irreparable harm to the

12    committees.  Thus, the Court finds that the balance of

13    hardships and equities do not tip in plaintiffs' favor, much

14    less decidedly in their favor, as the standard in this circuit

15    requires.

16         Turning to the public interest, plaintiffs contend

17    that this factor weighs strongly in favor of preserving the

18    status quo because applying the law in a way that violates the

19    Constitution is never in the public's interest and no public

20    interest in advanced by allowing the committees to

21    enforce illegal subpoenas.  These rationales, of course,

22    presupposes the subpoenas' illegality.

23         Here, the Court has already determined that there is a

24    strong likelihood that the committees actions are lawful, and

25    courts have long recognized a clear public interest in

J5MPTRU2

maximizing the effectiveness of the investigatory powers of

Congress.  See e.g. *Exxon Corp. v. F.T.C.*, 589 F.2d 582.

And, in the committees' words, "Plaintiffs' contrary

argument ignores the clear and compelling public

interest in expeditious and unimpeded Congressional

investigations into core aspects of the financial and election

systems that touch every member of the public."

The Court agrees and, therefore, finds that the public

interest weighs strongly against a preliminary injunction.

As the Supreme Court noted in *Watkins*, "it is

unquestionably the duty of all citizens to cooperate with the

Congress in its efforts to obtain the facts needed for

legislative action. It is their unremitting obligation to

respond to subpoenas, to respect the dignity of the Congress

and its committees, and to testify fully with respect to

matters within the province of proper investigation."

Here, the Court finds that the challenged subpoenas

fall within the province of proper congressional investigation.

Accordingly, the Court will not enjoin the committees' efforts

to enforce the subpoenas.

Finally, Plaintiffs contend that the Court should

issue an injunction to preserve the status quo because refusing

to do so may otherwise moot their right to appeal, a classic

form of irreparable harm.

The Court is unpersuaded.  Plaintiffs will have ample

1   time to appeal the Court's decision before it takes effect.

2   The committees have already agreed to

3   suspend enforcement of the subpoenas until seven days following

4   resolution of plaintiffs' motion for preliminary injunction.

5         Once the Court's decision is entered on the docket,

6   plaintiffs may immediately appeal the decision to the Court of

7   Appeals, pursuant to 28 U.S.C. Section 1292(a)(1).  Moreover,

8   plaintiffs are free to ask the Court of Appeals for a stay

9   pending review of this Court's decision, which the Court of

10  Appeals will have discretion to grant, if warranted.

11  Plaintiffs need not reinvent the wheel in applying for a stay,

12  given the substantial overlap between factors justifying a stay

13  and preliminary injunction.  See e.g. *Nken v. Holder*, 556 U.S.

14  418.

15        Plaintiffs simply can, likely will, and almost

16  certainly must, proffer the same arguments raised here.

17  Indeed, the Court takes judicial notice that plaintiffs filed a

18  notice of appeal the following morning after the D.C. district

19  court ruled against them in that case earlier this week.  Thus,

20  contrary to plaintiffs' arguments, refusal to issue an

21  injunction here would not moot plaintiffs' right to an appeal.

22        For the reasons set forth above, plaintiffs' motion

23  for a preliminary injunction is denied.  That constitutes the

24  opinion of the Court.

25        And with that, Mr. Strawbridge, is there anything else

1    that we need to do today?

2          MR. STRAWBRIDGE:  Yes, your Honor.  This may just be

3    pro forma, in light of your Honor's opinion.  I do believe we

4    are required to request a stay of the district court pending

5    appeal.  That result may be preordained, but I want to put on

6    the record that we are requesting a stay.  I don't know if the

7    Court desires or wants briefing on that, or if it would like to

8    make the ruling clear now.

9          THE COURT:  That application is denied.

10          MR. STRAWBRIDGE:  All right.  Then I also take it that

11    no administrative stay?  The Court of Appeals' own

12    administrative stay is appropriate at this time?

13          THE COURT:  That is correct.

14          MR. STRAWBRIDGE:  Thank you, your Honor.

15          THE COURT:  Mr. Letter?

16          MR. LETTER:  I have nothing further, your Honor,

17    unless you have any questions.

18          THE COURT:  I don't.  What do the parties expect to be

19    their next steps?  Mr. Strawbridge, I assume there will be an

20    appeal?

21          MR. STRAWBRIDGE:  Obviously, I haven't had a chance to

22    talk to anybody yet, but that's probably a safe bet.  We will,

23    obviously, confer with our client and take appropriate action

24    as quickly as we can.

25          THE COURT:  We will put a short order on the docket as

J5MPTRU2

1    soon as practicable.

2              MR. STRAWBRIDGE:  Okay.  Thank you.

3              THE COURT:  Thank you, folks.  Unless there is

4    anything else, we are adjourned.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25