**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff,*

v.

DONALD F. MCGAHN II,

*Defendant.*

No. 19-cv-2379 (KBJ)

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

I.      **Background**

1.      Defendant Donald F. McGahn II is a former White House Counsel to President Trump.  Decl. of Todd B. Tatelman (Aug. 26, 2019), Ex. C at 1.

2.      McGahn is no longer employed by the Executive Branch.  *See* Jones Day, *Donald F. McGahn II*, https://perma.cc/CC4X-KYDB.

3.      On May 17, 2017, pursuant to Department of Justice ("DOJ") regulations, 28 C.F.R. §§ 600 *et seq*., Robert S. Mueller III was appointed as Special Counsel.  Office of the Deputy Attorney General, Order No. 3915-2017, *Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters* (May 17, 2017) (Special Counsel Appointment Order), https://perma.cc/4C9P-W7KH.

4.       The Special Counsel was charged with investigating the Russian government's efforts to interfere in "the 2016 Presidential election, including "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump," and any other matters "that arose or may arise directly from the investigation." Special Counsel Appointment Order (citing 28 C.F.R. § 600.4); *see* 28 C.F.R. § 600.4 (also referencing "federal crimes committed in the course of, and with intent to interfere with, the Special Counsel's investigation, such as perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses").

5.      In March 2019, DOJ delivered to Congress and made available to the public a redacted Report summarizing the results of the Special Counsel's investigation into Russian interference in the 2016 Presidential election.  Robert S. Mueller III, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* (March 2019) (*Report*), https://perma.cc/DN3N-9UW8.

## II.     The Special Counsel's Report[1]

6.      The Special Counsel's Report states that "[t]he Russian government interfered in the 2016 presidential election in sweeping and systematic fashion." *Report*, Vol. I at 1; *see generally id.* Vol. I.

7.      The Report states that "the Russian government perceived it would benefit from a Trump presidency and worked to secure that outcome." *Report*, Vol. I at 5.

8.      The Report states that the Russian government, through its military intelligence service, the GRU, used hacking to steal information from Hillary Clinton's campaign and the Democratic National Committee. *Report*, Vol. I at 36-49.

9.      The Report states that the Russian-funded Internet Research Agency also used "information warfare" to "sow discord in the U.S. political system," with a "targeted operation that … favored candidate Trump and disparaged candidate Clinton." *Report*, Vol. I at 4; *see also id.* at 14-35.

10.     The Report states that the Trump "Campaign expected it would benefit electorally from information stolen and released through Russian efforts." *Report*, Vol. I at 5.

11.     The Report states that the Trump Campaign "showed interest in" the release of stolen documents "and welcomed their potential to damage candidate Clinton." *Report*, Vol. I at 5.

---

[1] In paragraphs 6-68, the Judiciary Committee does not recount information included in the Report to establish the truth of the matters asserted.  Rather, the Committee relays what the Special Counsel has told Congress and the American people in order to explain the basis for the Committee's investigation.  As necessary for purposes of the record, the Court can take judicial notice of the Report.  *See Cellco Partnership v. FCC*, 357 F.3d 88, 96 (D.C. Cir. 2004) (taking judicial notice of an agency report); *LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham*, 347 F.3d 315, 325 (D.C. Cir. 2003) (same, letter to Congress).

12.     The Report states that the GRU began releasing stolen documents in the summer of 2016.  *See Report*, Vol. I at 40-44.

13.     The Report states that, in "the late summer of 2016," shortly after a phone call, "candidate Trump told [Rick] Gates that more releases of damaging information would be coming."  *Report*, Vol. I at 54.

14.     The Report states that then-candidate Trump publicly encouraged Russia to "find" 30,000 of Hillary Clinton's emails that allegedly were missing.  *Report*, Vol. I at 49.

15.     The Special Counsel has confirmed that then-candidate Trump praised WikiLeaks after it released stolen emails damaging to the Clinton Campaign.  Tatelman Decl., Ex. E at 15.

16.     The Report describes "a series of contacts between Trump Campaign officials and individuals with ties to the Russian government."  *Report*, Vol. I at 5.

17.     The Report states that, in June 2016, top Trump Campaign officials "met in Trump Tower with a Russian attorney expecting to receive derogatory information about Hillary Clinton from the Russian government."  *Report*, Vol. I at 110; *see id.*, Vol. I at 110-23.

18.     The Report states that the June 2016 meeting was arranged in response to an email to Donald Trump Jr., which characterized the offer of such information as "part of Russia and its government's support for Mr. Trump."  *Report*, Vol. I at 110; *see id.*, Vol. I at 110-14.

19.     The Report states that Donald Trump Jr. "immediately responded" to that email offer, *Report*, Vol. I at 110, stating, "'if it's what you say I love it especially later in the summer,'" *id.*, Vol. I at 113.

20.     The Report states that, in July 2016, Trump Campaign Chairman Paul Manafort offered "private briefings" on the campaign to Russian oligarch Oleg Deripaska.  *Report*, Vol. I at 137; *see id.*, Vol. I at 131-32.

21.     The Report states that, during the 2016 Presidential campaign, Manafort caused internal campaign polling data to be shared with Konstantin Kilimnik.  *Report*, Vol. I at 135-37.

22.     The Report states that Kilimnik is a Russian national with "ties to Russian intelligence." *Report*, Vol. I at 129, 133; *see id.*, Vol. I at 132-34.

23.     The Report describes "multiple acts by the President that were capable of exerting undue influence over law enforcement investigations, including the" Special Counsel's own investigations into Russian interference and obstruction.  *Report*, Vol. II at 157; *see generally id.*, Vol. II.

24.     The Report states that, "[d]uring the presidential transition, incoming National Security Advisor Michael Flynn had two phone calls with the Russian Ambassador to the United States about the Russian response to U.S. sanctions imposed because of Russia's election interference." *Report*, Vol. II at 24; *see also id.*, Vol. II at 24-26.

25.     The Report states that, "[a]fter the press reported on Flynn's contacts with the Russian Ambassador, Flynn lied to incoming Administration officials by saying he had not discussed sanctions on the calls.  The officials publicly repeated those lies in press interviews." *Report*, Vol. II at 24; *see also id.*, Vol. II at 29-30.

26.     The Report states that "[t]he FBI, which previously was investigating Flynn for other matters, interviewed him about the calls in the first week after the inauguration, and Flynn told similar lies to the FBI." *Report*, Vol. II at 24; *see also id.*, Vol. II at 30.

27.     The Report states, "[t]he public statements of incoming Administration officials denying that Flynn and [Russian Ambassador Sergey] Kislyak had discussed sanctions alarmed senior [DOJ] officials, who were aware that the statements were not true." *Report*, Vol. II at 29-31.

28.     The Report states that "[o]n January 26, 2017," DOJ officials warned then-White House Counsel Donald McGahn II that Flynn was "in a potentially compromised position because the Russians would know that he lied." *Report*, Vol. II at 31.

29.     The Report states that McGahn immediately notified the President of what he had been told, explained that the FBI previously had questioned Flynn about his communications with the Russian Ambassador, and discussed the crime of making false statements to the FBI. *Report*, Vol. II at 31-32.

30.     The Report states that, weeks later, after the news media reported on Flynn's conversations with the Russian Ambassador, President Trump terminated Flynn. *Report*, Vol. II at 36-38.

31.     The Report states that the President believed that terminating Flynn would "end the 'whole Russia thing.'" *Report*, Vol. II at 47.

32.     The Report states that the day after Flynn's resignation, President Trump suggested to Chris Christie, "[n]ow that we fired Flynn, the Russia thing is over." *Report*, Vol. II at 38.

33.     The Report states that McGahn was aware of—and counseled against—multiple attempts by President Trump to discuss with then-FBI Director James Comey his handling of the FBI's Russia investigation. *See, e.g.*, *Report*, Vol. II at 59 ("[T]he President told senior advisors, including McGahn … , that he had reached out to Comey twice in recent weeks. The President acknowledged that McGahn would not approve of the outreach to Comey because McGahn had previously cautioned the President that he should not talk to Comey directly to prevent any perception that the White House was interfering with investigations."); *see id.*, Vol. II at 59-60.

34.     The Report states that McGahn participated in several meetings regarding the termination of Comey during which the President was encouraged not to justify Comey's firing by referencing the Russia investigation.  *Report*, Vol. II at 67-69.

35.     The Report states that, "[i]n an effort to slow down the decision-making process, McGahn told the President that DOJ leadership was currently discussing Comey's status and suggested that White House Counsel's Office attorneys should talk with [Attorney General Jeff] Sessions and Rod Rosenstein, who had recently been confirmed as the Deputy Attorney General. McGahn said that previously scheduled meetings with Sessions and Rosenstein that day would be an opportunity to find out what they thought about firing Comey." *Report*, Vol. II at 66.

36.     The Report states that Rosenstein ultimately drafted a memorandum that justified Comey's termination on the ground that Comey had mishandled the investigation into Hillary Clinton's use of a private email server.  *Report*, Vol. II at 68 n.440.

37.     The Report states that the White House Counsel's Office was of the view that the President's original letter terminating Comey, which included reference to the FBI's Russia investigation, *Report*, Vol. II at 65, should "'not see the light of day' and that it would be better to offer '*no other rationales*' for the firing than what was" set forth by DOJ, *id.*, Vol. II at 68 (alterations omitted).

38.     The Report states that "[s]ubstantial evidence indicates that the catalyst for the President's decision to fire Comey" was actually "Comey's unwillingness to publicly state that the President was not personally under investigation, despite the President's repeated requests that Comey make such an announcement." *Report*, Vol. II at 75.

39.     The Report states that other evidence indicates that the President fired Comey
because he "wanted to protect himself from an investigation into his campaign." *Report*, Vol. II
at 76; *see id.*, Vol. II at 76-77.

40.     The Report states that, in March 2017, the President learned that then-Attorney
General Sessions, because of his participation in the Trump Campaign, was considering recusing
himself in light of DOJ regulations stating that "no employee shall participate in a criminal
investigation or prosecution if he has a personal or political relationship with … [a]ny person or
organization substantially involved in the conduct that is the subject of the investigation or
prosecution." *Report*, Vol. II at 48-50; *see id.* Vol II at 50 n.286 (quoting 28 C.F.R. § 45.2); *see
also* Tatelman Decl., Ex. F (citing 28 C.F.R. § 45.2).

41.     The Report states that McGahn "tr[ied] on behalf of the President to avert
Sessions's recusal" by speaking to Sessions, "Sessions's personal counsel, Sessions's chief of
staff," and "Senate Majority Leader Mitch McConnell." *Report*, Vol. II at 49.

42.     The Report states that, "[s]hortly after Sessions announced his recusal, the White
House Counsel's Office directed that Sessions should not be contacted about the matter."
*Report*, Vol. II at 50.

43.     The Report states that "[t]he President expressed anger at McGahn about the
recusal and brought up Roy Cohn, stating that he wished Cohn was his attorney." *Report*, Vol. II
at 50.

44.     The Report states that, after the Special Counsel was appointed, the President
became angry at Sessions, saying, "This is terrible Jeff.  It's all because you recused. … I
appointed you and you recused yourself.  You left me on an island.  I can't do anything."
*Report*, Vol. II at 63 (quotation marks omitted).

45.     The Report states that Sessions recalled that, after his recusal, "the President pulled him aside to speak to him alone and suggested that Sessions should 'unrecuse' from the Russia investigation." *Report*, Vol. II at 51.

46.     The Report states that "[l]ater in 2017, the President continued to urge Sessions to reverse his recusal from campaign-related investigations and considered replacing him with an Attorney General who would not be recused." *Report*, Vol. II at 107; *see id.*, Vol. II at 107-11.

47.     The Report states that, after Sessions recused, "[t]he President wanted McGahn to talk to Sessions about the recusal, but McGahn told the President that DOJ ethics officials had weighed in on Sessions's decision to recuse." *Report*, Vol. II at 51.

48.     The Report states that, in one conversation with McGahn, President Trump "pushed back on the DOJ contacts policy" and suggested that the President should be able to talk to his Attorney General about "'who to investigate.'" *Report*, Vol. II at 51.

49.     The Report states that "at least one purpose of the President's conduct toward Sessions was to have Sessions assume control over the Russia investigation and supervise it in a way that would restrict its scope" and "shield the President from the ongoing Russia investigation." *Report*, Vol. II at 112, 113.

50.     The Report states that, after the Special Counsel took over the Russia investigation and President Trump learned that he was being personally investigated for obstruction of justice, the President "called McGahn and directed him to have the Special Counsel removed because of asserted conflicts of interest." *Report*, Vol. II at 78; *see id.*, Vol. II at 84-87.

51.     The Report states that, after receiving those calls, McGahn "recalled feeling trapped because he did not plan to follow the President's directive but did not know what he would say the next time the President called." *Report*, Vol. II at 86.

52.     The Report states that McGahn had earlier advised the President that pressing the claim that the Special Counsel had conflicts of interest "would look like still trying to meddle in the investigation and knocking out Mueller would be another fact used to claim obstruction of justice." *Report*, Vol. II at 81-82 (alterations and quotation marks omitted).

53.     The Report states that, in response to the President's direction to have the Special Counsel removed, McGahn "decided he had to resign," *Report*, Vol. II at 86, but ultimately did not do so then, *see id.*, Vol. II at 87.

54.     The Report states that "[s]ubstantial evidence indicates that the President's attempts to remove the Special Counsel were linked to the Special Counsel's oversight of investigations that involved the President's conduct," including "potential obstruction of justice." *Report*, Vol. II at 89.

55.     The Report states that President Trump subsequently engaged in "repeated efforts to get McGahn to create a record denying that the President had directed him to remove the Special Counsel." *Report*, Vol. II at 118.

56.     The Report states that, after news broke in January 2018 that the President had ordered McGahn to fire Mueller, President Trump "sought to have McGahn deny that he had been directed to remove the Special Counsel." *Report*, Vol. II at 113; *see generally id.*, Vol. II at 113-18.

57.     The Report states that, in February 2018, a White House aide informed McGahn that the President had ordered McGahn "to write a letter [to the file] to dispute that he was ever

ordered to terminate the Special Counsel" and "suggested that McGahn would be fired if he did not write the letter." *Report*, Vol II. at 116; *see id.*, Vol. II at 115-16.

58.     The Report states that, in a meeting in the Oval Office, the President directed McGahn to "correct" a news story which stated that the president had ordered McGahn to have DOJ fire the Special Counsel. *Report*, Vol. II at 116-17.

59.      The Report states that "[e]ach time he was approached" about reports that the President had ordered McGahn to fire the Special Counsel, "McGahn responded that he would not refute the press accounts because they were accurate in reporting on the President's effort to have the Special Counsel removed." *Report*, Vol. II at 113.

60.     The Report states that the President asked McGahn "why he had told Special Counsel's Office investigators that the President had told him to have the Special Counsel removed" and "McGahn responded that he had to and that his conversations with the President were not protected by attorney-client privilege." *Report*, Vol. II at 117.

61.     The Report states, "The President then asked, 'What about these notes? Why do you take notes?  Lawyers don't take notes.  I never had a lawyer who took notes.'  McGahn responded that he keeps notes because he is a 'real lawyer' and explained that notes create a record and are not a bad thing.  The President said, 'I've had a lot of great lawyers, like Roy Cohn.  He did not take notes.'" *Report*, Vol. II at 117.

62.     The Report states that "[s]ubstantial evidence indicates that in repeatedly urging McGahn to dispute that he was ordered to have the Special Counsel terminated, the President acted for the purpose of influencing McGahn's account in order to deflect or prevent further scrutiny of the President's conduct towards the investigation." *Report*, Vol. II at 120.

63.     The Report states that "a traditional prosecution or declination decision entails a binary determination to initiate or decline a prosecution, but we determined not to make a traditional prosecutorial judgment."  *Report*, Vol. II at 1.

64.     Explaining this decision, the Report states that "[t]he Office of Legal Counsel (OLC) has issued an opinion finding that 'the indictment or criminal prosecution of a sitting President would impermissibly undermine the capacity of the executive branch to perform its constitutionally assigned functions' in violation of 'the constitutional separation of powers.' Given the role of the Special Counsel as an attorney in the DOJ and the framework of the Special Counsel regulations, … this Office accepted OLC's legal conclusion for the purpose of exercising prosecutorial jurisdiction."  *Report*, Vol. II at 1 (citations omitted).

65.     The Report states, "apart from OLC's constitutional view, we recognized that a federal criminal accusation against a sitting President would place burdens on the President's capacity to govern and potentially preempt constitutional processes for addressing presidential misconduct."  *Report*, Vol. II at 1.

66.     The Report states that if the Special Counsel's Office "had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, [it] would so state."  *Report*, Vol. II at 2.

67.     The Report states that the President did not sit for an interview with the Special Counsel's Office.   *Report*, App. C at C-1-2.

68.     The Report states that the Special Counsel's Office informed the President, by counsel, that an interview with him was "vital to [the] investigation."  *Report*, App. C at C-1 (quotation marks omitted).

### III.     The President's Reaction To The Special Counsel's Report[2]

69.     On April 19, 2019, President Trump stated that the "Crazy Mueller Report" is "fabricated & totally untrue" and "Watch out for people that take so-called 'notes.'"  Donald J. Trump (@realDonaldTrump), Twitter (April 19, 2019, 4:53 AM), https://perma.cc/38VZ-QMD2.

70.     On April 19, 2019, the President's private attorney, Rudolph Giuliani, told the press that McGahn's account "can't be taken at face value," saying that his statements "could be the product of an inaccurate recollection or could be the product of something else."  Michael S. Schmidt & Maggie Haberman, *Giuliani Attacks McGahn's Account to Mueller*, N.Y. Times (Apr. 19, 2019), https://perma.cc/4TA5-SCYQ.

71.     On April 25, 2019, President Trump stated, "I never told then White House Counsel Don McGahn to fire Robert Mueller."  Donald J. Trump (@realDonaldTrump), Twitter (April 25, 2019, 4:47 AM), https://perma.cc/CLP3-RU9H.

72.     On May 11, 2019, President Trump stated that he "was NOT going to fire Bob Mueller" and that, "Actually, lawyer Don McGahn had a much better chance of being fired than Mueller.  Never a big fan!"  Donald J. Trump (@realDonaldTrump), Twitter (May 11, 2019, 3:39 PM), https://perma.cc/6GHX-4ZPU.

73.     In a June 12, 2019, interview, when asked about McGahn's account that he was ordered to fire Special Counsel Mueller, the President stated, "I don't care what he says.  It doesn't matter.  That was to show everyone what a good counsel he was."  *Transcript: ABC*

---

[2] The Judiciary Committee does not rely on the statements in paragraphs 69-74 to establish the truth of the matters asserted, but instead to demonstrate what the President and his counsel have said after the release of the Special Counsel's Report.

*News' George Stephanopoulos' Exclusive Interview with President Trump*, ABC News (June 16, 2019) (Stephanopoulos Interview), https://perma.cc/3WL3-G8J9.

74.     In that same June 12, 2019, interview, when asked why McGahn "would … lie under oath," President Trump responded, "[b]ecause he wanted to make … himself look like a good lawyer."  Stephanopoulos Interview.

**IV.     The Judiciary Committee's Investigation**

75.     On March 4, 2019, the Judiciary Committee opened an investigation into "threats to the rule of law," encompassing alleged obstruction of justice, public corruption, and other abuses of power by President Trump, his associates, and members of his administration.  Press Release, H. Comm. on the Judiciary, *House Judiciary Committee Unveils Investigation Into Threats Against the Rule of Law* (Mar. 4, 2019), https://perma.cc/MPM8-3MAA.

76.     The Committee has stated that the purpose of its investigation, among other things, is to consider "whether any of the conduct described in the Special Counsel's Report warrants the Committee in taking any further steps under Congress' Article I power," including approval of "articles of impeachment."  H. Rep. No. 116-105, at 13.

77.     Articles of impeachment against the President have been introduced and referred to the Committee during the present Congress.  *See* 165 Cong. Rec. H211 (daily ed. Jan. 3, 2019) (referral to the Judiciary Committee of H. Res. 13, 116th Cong. (2019), impeaching President Trump).

78.     The Chairman has stated that the referred articles of impeachment are "under consideration as part of the Committee's investigation."  Tatelman Decl., Ex. P at 3; Ex. O at 4.

79.     The Judiciary Committee has also stated that it is "considering whether the conduct uncovered may warrant amending or creating new federal authorities, including among

other things, relating to election security, campaign finance, misuse of electronic data, and the types of obstructive conduct that the Mueller Report describes."  H. Rep. No. 116-105, at 13 (2019).

80.    The Chairman stated that there is "a non-exclusive list of possible legislative responses that fall within the Judiciary Committee's jurisdiction," Tatelman Decl., Ex. P at 4, including to address improper interference in law enforcement investigations, *see id.* at 4-5; to "protect the integrity and independence of future special counsel investigations," *id.* at 5; *see id.* at 5-6; to increase transparency regarding Presidential pardons, *see id.* at 6-7; to curtail the influence of foreign governments over candidates for federal office, *see id.* at 7-8; and to expedite procedures for Congress to enforce its subpoenas, *see id.* at 8.

81.    Bills related to some of the issues identified above have been introduced in the House and referred to the Judiciary Committee for consideration.  *See, e.g.*, Special Counsel Independence and Integrity Act, H.R. 197, 116th Cong. (2019); Presidential Pardon Transparency Act, H.R. 1348, 116th Cong. (2019); Security from Political Interference in Justice Act, H.R. 3380, 116th Cong. (2019); No President is Above the Law Act, H.R. 2678, 116th Cong. (2019); Congressional Subpoena Compliance and Enforcement Act of 2019, H.R. 3732, 116th Cong. (2019).

82.    Recent hearings demonstrate that the Judiciary Committee is investigating whether there are proper safeguards to protect pending law enforcement investigations against improper interference, and how best to prevent inappropriate political considerations from influencing DOJ's decision-making concerning new investigations.  *See, e.g.*, *Lessons from the Mueller Report: Presidential Obstruction and Other Crimes: Hearing Before the Comm. on the Judiciary*, 116th Cong. (2019), https://perma.cc/UYV9-F76E; *Oversight of the U.S. Department*

*of Justice: Report by Special Counsel Robert S. Mueller, III on the Investigation Into Russian*

*Interference in the 2016 Presidential Election; and Related Matters: Hearing Before the Comm.*

*on the Judiciary*, 116th Cong. (2019), https://perma.cc/YS85-GNZ9.

83.     On March 4, 2019, the Judiciary Committee issued voluntary document requests to McGahn.  Tatelman Decl., Ex. R.

84.     On April 3, 2019, having not received a response to its voluntary requests, the Judiciary Committee adopted a Resolution authorizing the issuance of subpoenas in connection with its investigation, including to McGahn.  Tatelman Decl., Ex. T at 18-19, 72.

85.     On April 22, 2019, still having not received a response to the voluntary requests, the Judiciary Committee issued a subpoena *ad testificandum* to McGahn with a return date for McGahn's testimony of May 21, 2019.  Tatelman Decl., Ex. U.

86.     One day after the McGahn subpoena was issued, President Trump stated, "I don't want people testifying to a party, because that is what they're doing if they do this."  Robert Costa et al., *Trump Says He Is Opposed to White House Aides Testifying to Congress*, Wash. Post (Apr. 23, 2019), https://perma.cc/FL3H-TUXL.

87.     Two days after the McGahn subpoena was issued, President Trump stated, "[w]e're fighting all the subpoenas."  *Remarks by President Trump Before Marine One Departure*, White House (Apr. 24, 2019), https://perma.cc/W7VZ-FZ3T.

88.     On May 20, 2019, the afternoon before McGahn's scheduled appearance, the White House Counsel informed the Judiciary Committee by letter that the President had "directed" McGahn not to comply with the subpoena.  Tatelman Decl., Ex. B at 2.

89.     The White House Counsel's letter stated that OLC had advised that "McGahn is absolutely immune from compelled congressional testimony with respect to matters occurring during his service as a senior advisor to the President."  Tatelman Decl., Ex. B at 1.

90.     The letter enclosed an OLC opinion.  Tatelman Decl., Ex. C.

91.     Also on May 20, 2019, private counsel for McGahn stated to the Judiciary Committee that McGahn "finds himself facing contradictory instructions from two co-equal branches of government" and would refuse to appear at the next day's hearing.  Tatelman Decl., Ex. X at 1.

92.     On May 21, 2019, the Judiciary Committee convened for its scheduled hearing. Tatelman Decl., Ex. Y.

93.     McGahn did not appear at the hearing.  Tatelman Decl., Ex. Y.

94.     During his opening statement at the May 21, 2019 hearing, the Chairman reiterated McGahn's legal obligation to appear, and stated that if McGahn did not "immediately correct his mistake, th[e] committee will have no choice but to enforce the subpoena against him."  Tatelman Decl., Ex. Y, at 4-5 (lines 80-82).

95.     On May 31, 2019, the Chairman wrote a letter to both McGahn and the White House Counsel, in which he presented an offer to discuss reasonable accommodations for McGahn's testimony by June 7, 2019.  Tatelman Decl., Ex. Z at 2.

96.     Neither McGahn nor the White House responded to the May 31 letter.  Decl. of Barry H. Berke ¶ 7 (Aug. 26, 2019).

97.     Beginning in June 2019, the Judiciary Committee convened a series of hearings with the stated intention of discussing the specific evidence of Presidential obstruction

documented in the Report and constitutional processes for addressing Presidential misconduct. *See, e.g.*, Tatelman Decl., Ex. O at 4.

98.     From June to mid-July 2019, the Judiciary Committee and the White House Counsel's Office had a series of discussions about a compromise regarding McGahn's testimony. Berke Decl. ¶¶ 8-14.

99.     During those discussions, the Judiciary Committee offered, in exchange for McGahn's prompt public testimony, to limit McGahn's testimony to matters that overlap with the Special Counsel's Report.  Berke Decl. ¶ 13.

100.    The Judiciary Committee also agreed to allow McGahn to appear voluntarily and to consider any other reasonable accommodations.  Berke Decl. ¶ 13.

101.    On July 17, 2019, the White House declined all of the proposed accommodations for McGahn's public testimony.  Berke Decl. ¶ 14.

102.    On July 18, 2019, the Judiciary Committee again contacted McGahn's private counsel to discuss potential accommodations and avoid the need for litigation.  Berke Decl. ¶ 15.

103.    On July 26, 2019, McGahn's counsel rejected all accommodation efforts for public testimony and confirmed that McGahn would continue to refuse to appear.  Berke Decl. ¶ 16.

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (D.C. Bar No. 253492)
   *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
   *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854)
   *Associate General Counsel*
Josephine Morse (D.C. Bar No. 1531317)
   *Associate General Counsel*
Adam A. Grogg (D.C. Bar No. 1552438)
   *Assistant General Counsel*
Sarah E. Clouse (MA Bar No. 688187)
   *Attorney*
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

Annie L. Owens (D.C. Bar No. 976604)
Joshua A. Geltzer (D.C. Bar No. 1018768)
Seth Wayne (D.C. Bar No. 888273455)
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, D.C. 20001
Telephone: (202) 662-9042
ao700@georgetown.edu

*Counsel for Plaintiff Committee on the Judiciary of
the U.S. House of Representatives*

August 26, 2019