**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                     )
COMMITTEE ON THE JUDICIARY,          )
  UNITED STATES HOUSE OF               )
  RESPRESENTATIVES,                        )
                                                     )
                          *Plaintiff*,              )
                                                     )      No. 1:19-cv-2379 (KBJ)
                 v.                                 )
                                                     )
DONALD F. McGAHN, II,                   )
                                                     )
                          *Defendant.*             )
_____)

## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant Donald F. McGahn, II, in his official capacity as former Counsel to the President, hereby moves for summary judgment as to Plaintiffs' claim against him pursuant to Rule 56 of the Federal Rules of Civil Procedure.   The grounds for this motion are (i) that Plaintiff lacks Article III standing to maintain this suit, (ii) that Congress has not conferred statutory jurisdiction over suits of this nature, (iii) that Plaintiff lacks a cause of action, and (iv) that Defendant is absolutely immune from compelled testimony before Congress or its committees concerning his duties as an immediate advisor to the President.

Alternatively, the Court should dismiss this action without prejudice, or stay the case, so that the parties may continue to engage in the process of negotiation and accommodation contemplated by the Constitution in situations such as the case at bar.

The relevant facts, authority, and arguments supporting Defendant's motion are set forth in the accompanying (i) Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion forPartial Summary Judgment, (ii) Declaration of Michael M. Purpura (and exhibits thereto); (iii) Declaration of David F. Lasseter

(and exhibits thereto); (iv) Declaration of Serena M. Orloff (and exhibits thereto); and

(v) Defendant's Statement of Material Facts Not in Dispute.

For the reasons stated therein, Defendant's motion should be granted, and judgment

awarded to Defendant as a matter of law.

Dated:  October 1, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

  _/s/  James J. Gilligan_
JAMES J. GILLIGAN
Special Litigation Counsel

STEVEN A. MYERS (NY Bar No. 4823043)
SERENA M. ORLOFF (CA Bar No. 260888)
ANDREW BERNIE (DC Bar No. 995376)
Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
P.O.  Box 883
Washington, D.C.  20044
Telephone:  (202) 514-3358
Fax:          (202) 616-8470
Email:       james.gilligan@usdoj.gov

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
                                        )
COMMITTEE ON THE JUDICIARY,             )
  UNITED STATES HOUSE OF                )
  REPRESENTATIVES,                      )
                                        )
              *Plaintiff,*               )
                                        )       No. 1:19-cv-2379 (KBJ)
       v.                               )
                                        )
DONALD F. McGAHN, II                    )
                                        )
              *Defendant.*               )
———————————————————— )

## COMBINED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Dated:  October 1, 2019

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

JAMES J. GILLIGAN
Special Litigation Counsel

STEVEN A. MYERS (NY Bar No. 4823043)
SERENA M. ORLOFF (CA Bar No. 260888)
ANDREW BERNIE (DC Bar No. 995376)
Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Tel:      (202) 514-3358
Fax:      (202) 616-8470
E-mail:   james.gilligan@usdoj.gov

*Counsel for Defendant*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 5

    A.    The Special Counsel's Investigation........................................................ 5

    B.    The Committee Launches Its Own Investigation Into the Same Events ................ 7

    C.    The Department of Justice Makes Available to the Committee an All-But Unredacted Version of the Special Counsel's Report, With Only Grand Jury Information Withheld...................................................................... 9

    D.    The Department of Justice Agrees to Make Available to the Committee Interview Reports from the Special Counsel's Investigative File, Including Reports of Interviews With Mr. McGahn ........................................... 11

    E.    The Committee Subpoenas Documents and Testimony from Mr. McGahn ........ 12

    F.    The Parties Reach Accommodations Regarding Mr. McGahn's Documents and the Testimony of Other White House Personnel, But the Committee Refuses To Consider an Interview With Mr. McGahn ......................................... 15

    G.    The Committee Declares an Impasse and Files this Lawsuit .............................. 17

ARGUMENT........................................................................................................... 18

I.    LEGAL STANDARDS ................................................................................. 18

II.    THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER THIS INTER-BRANCH DISPUTE. ...................................................................... 18

    A.    The Court Lacks Jurisdiction under Article III.................................... 18

        1.    This dispute is not of the type traditionally thought capable of resolution through the judicial process.................................. 19

        2.    The Committee fails to state a cognizable injury..................................... 23

        3.    Lawsuits of this kind imperil the Constitution's allocation of power among the Branches of the Federal Government..................................... 27

    B.    The Court Lacks Statutory Subject-Matter Jurisdiction. ...................................... 30

C.  Decisions Suggesting That Inter-Branch Subpoena-Enforcement Suits Are Justiciable Have Been Abrogated by *Raines*, or Were Wrongly Decided........... 33

1.  Cases pre-dating *Raines v. Byrd* are no longer good law. ........................ 33

2.  The two district-court cases post-dating *Raines* were wrongly decided. ................................................................................................. 35

III.  PLAINTIFF LACKS A CAUSE OF ACTION ALLOWING IT TO SUE ..................... 39

IV.  SEPARATION-OF-POWERS CONCERNS REQUIRE THAT THE COURT STAY ITS HAND TO ALLOW THE CONSTITUTIONALLY MANDATED ACCOMMODATION PROCESS TO CONTINUE. ....................................................... 43

V.  DEFENDANT IS ABSOLUTELY IMMUNE FROM COMPELLED CONGRESSIONAL TESTIMONY ABOUT HIS OFFICIAL DUTIES AS COUNSEL TO THE PRESIDENT. ................................................................ 47

A.  Congress May Not Compel the President's Immediate Advisors to Testify About Their Official Duties. ................................................................ 47

B.  The Counsel to the President Is an Immediate Advisor to Whom Testimonial Immunity Applies. .............................................................. 55

C.  Defendant Remains Immune From Compelled Congressional  Testimony About His Duties Even Though He No Longer Serves as Counsel to the President. ................................................................................................. 57

D.  The Committee's Arguments to the Contrary Misread Precedent and Disregard Separation-of-Powers Principles. ......................................... 58

1.  The testimonial immunity of immediate Presidential advisors is supported, not "foreclosed," by *Harlow v. Fitzgerald.* ........................ 58

2.  Absolute testimonial immunity is not inconsistent with the Executive's qualified immunity against evidentiary process.............. 62

3.  Individualized assertions of executive privilege are not a substitute for testimonial immunity.......................................................................... 64

4.  Absolute testimonial immunity for immediate Presidential advisors does not violate the separation of powers. ................................................ 65

CONCLUSION................................................................................................. 70

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ............................................................................................................ 39, 40

*Ali v. Rumsfeld,*
    649 F.3d 762 (D.C. Cir. 2011) ................................................................................................ 42

*Allen v. Wright,*
    468 U.S. 737 (1984) ................................................................................................................. 1

*Arizona State Legislature v. Arizona Indep. Redist. Comm'n,*
    135 S. Ct. 2652 (2015) ..................................................................................................... 19, 25

*Armstrong v. Exceptional Child Center, Inc.,*
    135 S. Ct. 1378 (2015) ..................................................................................................... 40, 42

*Armstrong v. Executive Office of the President,*
    1 F.3d 1274 (D.C. Cir. 1993) .................................................................................................. 51

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,*
    997 F.2d 898 (D.C. Cir. 1993) .................................................................................... 49, 50, 51

*Barenblatt v. United States,*
    360 U.S. 109 (1959) ............................................................................................................... 29

*Barnes v. Kline,*
    759 F.2d 21 (D.C. Cir. 1984), *vacated sub nom,*
    *Burke v. Barnes,* 479 U.S. 361 (1987) .............................................................................. 1, 28

*Bilski v. Kappos,*
    561 U.S. 593 (2010) ............................................................................................................... 32

*Bowsher v. Synar,*
    478 U.S. 714 (1986) ................................................................................................... 29, 50, 51

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ................................................................................................................... 29

*Butz v. Economou,*
    438 U.S. 478 (1978) ............................................................................................................... 61

*C & E Servs. Inc. of Wash v. D.C. Water & Sewer Auth.,*
    310 F.3d 197 (D.C. Cir. 2002) ................................................................................................ 43

*Campbell v. Clinton,*
    52 F. Supp. 2d 34 (D.D.C. 1999), *aff'd,* 203 F.3d 19 (D.C. Cir. 2000) .................................. 28

*Campbell v. Clinton*,
    203 F.3d 19 (D.C. Cir. 2000) ................................................................... 28

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................. 18

*Cheney v. U.S. Dist. Court for the Dist. of Columbia*,
    542 U.S. 367 (2004) .............................................................. 48, 49, 63, 65

*Chenoweth v. Clinton*,
    181 F.3d 112 (D.C. Cir. 1999) ..................................................... 19, 34, 44

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................................. 18

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ............................................................................. 37

*Clinton v. Jones*,
    520 U.S. 681 (1997) ............................................................................. 48

*Coleman v. Miller*,
    307 U.S. 433 (1939) ............................................................................. 25

*Comm. on Oversight & Gov't Reform v. Holder*,
    979 F. Supp. 2d 1 (D.D.C. 2013) ..................................................... *passim*

*Comm. on the Judiciary of the U.S. House of Representatives v. Miers*,
    542 F.3d 909 (D.C. Cir. 2008) ............................................................... 48

*Committee on the Judiciary, U.S. House of Representatives v. Miers*,
    558 F. Supp. 2d 53 (D.D.C. 2008) ................................................... *passim*

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) ............................................................................... 40

*Ctr. for Arms Control & Non-Proliferation v. Pray*,
    531 F.3d 836 (D.C. Cir. 2008) ......................................................... 50, 53

*Ctr. for Biological Diversity v. Kevin McAleenan*,
    2019 WL 4228362 (D.D.C. Sept. 4, 2019) ............................................... 18

*Cummings v. Murphy*,
    321 F. Supp. 3d 92  (D.D.C. 2018), *appeal pending*, No. 18-5305 (D.C. Cir.)............ 26, 28, 36

*Farrington v. Nielsen*,
    297 F. Supp. 3d 52 (D.D.C. 2018) .......................................................... 40

*Gravel v. United States*,
    408 U.S. 606 (1972) ..................................................................... 55, 60, 65

*Grupo Mexicano de Desarrolo, S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999) ................................................................................................ 41

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ................................................................................ 58, 59, 60

*Harrington v. Bush*,
    553 F.2d 190 (D.C. Cir. 1977) ............................................................................ 25

*Howard v. Pritzker*,
    775 F.3d 430 (D.C. Cir. 2015) ............................................................................ 31

*In re Application of the U.S. Senate Permanent Subcomm. on Investigations*,
    655 F.2d 1232 (D.C. Cir. 1981) .............................................................. 32, 33, 42

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ................................................................... *passim*

*INS v. Chadha*,
    462 U.S. 919 (1983) ............................................................................................ 28

*Jesner v. Arab Bank, PLC*,
    138 S. Ct. 1386 (2018) ....................................................................................... 40

*John Doe v. U.S. Parole Comm'n*,
    602 F. App'x 530 (D.C. Cir. 2015) ..................................................................... 43

*Judicial Watch, Inc. v. U.S. Secret Serv.*,
    726 F.3d 208 (D.C. Cir. 2013) ..................................................................... 49, 51

*Keene Corp. v. United States*,
    508 U.S. 200 (1993) ............................................................................................ 32

*Kendall v. United States*,
    37 U.S. 524 (1838) ............................................................................................. 49

*Klay v. Panetta*,
    758 F.3d 369 (D.C. Cir. 2014) ..................................................................... 40, 41

*Loving v. United States*,
    517 U.S. 748 (1996) ............................................................................................ 53

*McGrain v. Daugherty*,
    273 U.S. 135 (1927) ................................................................................ 24, 29, 42

*Mistretta v. United States*,
    488 U.S. 361 (1989) ............................................................................................ 48

*Mitchell v. Pompeo*,
    2019 WL 1440126 (D.D.C. Mar. 31, 2019) ....................................................... 18

v

*Moore v. U.S. House of Representatives*,
   733 F.2d 946 (D.C. Cir. 1984), *abrogated on other grounds*,
   *Raines v. Byrd*, 521 U.S. 811 (1997) ................................................................. 28

*Morrison v. Olson*,
   487 U.S. 654 (1988)........................................................................................ 53

*Myers v. United States*,
   272 U.S. 52 (1926).......................................................................................... 29

*Nat. Res. Def. Council, Inc. v. Hodel*,
   865 F.2d 288 (D.C. Cir. 1988).......................................................................... 69

*Nixon v. Admin. of Gen. Servs.*,
   433 U.S. 425 (1977)................................................................................... 49, 58

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982).................................................................................. *passim*

*Nixon v. Sirica*,
   487 F.2d 700 (D.C. Cir. 1973)..................................................................... 21, 50

*Perez v. Mortg. Bankers Ass'n*,
   135 S. Ct. 1199 (2015).................................................................................... 29

*Printz v. United States*,
   521 U.S. 898 (1997)........................................................................................ 23

*Raines v. Byrd*,
   521 U.S. 811 (1997).................................................................................. *passim*

*Reed v. Cty. Comm'r of Del. Cty., Pa.*,
   277 U.S. 376 (1928)............................................................................ 39, 41, 42

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
   366 F. Supp. 51 (D.D.C. 1973)........................................................................ 30

*Senate Select Committee on Presidential Campaign Activities v. Nixon*,
   498 F.2d 725 (D.C. Cir. 1974)..................................................................... *passim*

*Skelly Oil Co. v. Phillips Petroleum Co.*,
   339 U.S. 667 (1950)........................................................................................ 42

*Springer v. Gov't of Philippine Islands*,
   277 U.S. 189 (1928)........................................................................................ 29

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998).......................................................................................... 34

*Talavera v. Shah*,
  638 F.3d 303 (D.C. Cir. 2011) ........................................................................... 18

*U.S. House of Representatives v. Mnuchin*,
  379 F. Supp. 3d 8 (D.D.C. 2019), *appeal pending*, No. 19-05176 (D.C. Cir.)................. *passim*

*United States v. AT&T*,
  551 F.2d 384 (D.C. Cir. 1976) ...................................................................... *passim*

*United States v. AT&T, Inc.*,
  567 F.2d 121 (D.C. Cir. 1977) ...................................................................... *passim*

*United States v. Nixon*,
  418 U.S 683 (1974)....................................................................................... *passim*

*Va. House of Delegates v. Bethune-Hill*,
  139 S. Ct. 1945 (2019) ............................................................................... 23, 24

*Vander Jagt v. O'Neill, Jr.*,
  699 F.2d 1166 (D.C. Cir. 1982) ......................................................................... 44

*Vt. Agency of Natural Res. v. United States ex rel Stevens*,
  529 U.S. 765 (2000)......................................................................................... 23

*Walker v. Cheney*,
  230 F. Supp. 2d 51 (D.D.C. 2002) ................................................................ *passim*

*Watkins v. United States*,
  354 U.S. 178 (1957)..................................................................................... 24, 27

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990)......................................................................................... 27

*Young v. U.S. ex rel Vuitton et Fils S.A.*,
  481 U.S. 787 (1987)......................................................................................... 29

*Ziglar v. Abbassi*,
  137 S. Ct. 1843 (2017) .......................................................................... 40, 41, 42

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 1............................................................................................. 24

U.S. Const. art. I, § 6............................................................................................. 55

U.S. Const. art. II, § 3........................................................................................... 51

U.S. Const. art. II, § 4........................................................................................... 51

## STATUTES

2 U.S.C. § 192 ........................................................................................................... 31

2 U.S.C. § 288b ......................................................................................................... 42

2 U.S.C. § 288d ......................................................................................................... 42

18 U.S.C. § 2703 ......................................................................................................... 5

28 U.S.C. § 1331 ............................................................................................... *passim*

28 U.S.C. § 1365 ............................................................................................... *passim*

28 U.S.C. § 2201 ....................................................................................................... 42

28 U.S.C. § 2202 ....................................................................................................... 42

## PUBLIC LAWS

Pub. L. No. 93-190, 87 Stat. 736 (Dec. 18, 1973) ................................................... 31

Pub. L. No. 94-574, 90 Stat. 2721 (Oct. 21, 1976) .................................................. 31

Pub. L. No. 96-486, 94 Stat. 2369 (Dec. 1, 1980) ................................................... 31

Pub. L. No. 104-292, 110 Stat. 3459 (Oct. 11, 1996) .............................................. 31

Pub. L. No. 105–119, 111 Stat. 2440 (Nov. 26, 1997) ............................................ 41

## LEGISLATIVE MATERIALS

H.R. Rep. No. 94-1656 (1976) ................................................................................. 32

H.R. Rep.  No. 95-1756 (1978) (Conf. Rep.) ........................................................... 38

H. Res. No. 430, 116th Cong., 1st Sess. (June 11, 2019) ........................................ 36

S. Rep. No. 94-996 (1976) ....................................................................................... 32

S. Rep. No. 95-170 (1977) .................................................................................31, 38

## REGULATIONS

28 C.F.R. § 600.4 ....................................................................................................... 5

28 C.F.R. § 600.9 ....................................................................................................... 9

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 6 ................................................................................................ 11

Fed. R. Civ. P. 56 .............................................................................................. 18

## EXECUTIVE ORDERS

Exec. Order No. 8248 (Sept. 8, 1939), 4 Fed. Reg. 3864 ........................................... 51

## OFFICE OF LEGAL COUNSEL OPINIONS

*Testimonial Immunity Before Cong. of the Former Counsel to the President*,
 43 Op. O.L.C. ___,   Slip. Op. (May 20, 2019) ............................................... *passim*

*Immunity of the Assistant to the President and Dir. of the Office of Political
 Strategy & Outreach from Cong. Subpoena,* 38 Op. O.L.C. ___,
 Slip. Op. at 1-2 (July 15, 2014) ..................................................................... *passim*

*Assertion of Exec. Privilege Over Comms. Regarding EPA's Ozone Air Quality Stds. &
 Cal.'s Greenhouse Gas Waiver*,
 32 Op. O.L.C. 1 (2008) ........................................................................................ 22

*Assertion of Exec. Privilege with Respect to Clemency Decision*,
 23 Op. O.L.C. 1 (1999) .................................................................................... 4, 50

*Assertion of Exec. Privilege Regarding White House Counsel's Office Docs.*,
 20 Op. O.L.C. 2 (1996) ........................................................................................ 21

*History of Refusals by Exec. Branch Officials to Provide Info. Demanded by Congress:
 Part I – Presidential Invocations of Exec. Privilege Vis-À-Vis Congress,*
 6 Op. O.L.C. 751, 753 (1982) .............................................................................. 21

*Assertion of Exec. Privilege in Response to Cong. Subpoena*,
 5 Op. O.L.C. 27 (1981) ........................................................................................ 21

## OTHER AUTHORITIES

3 Hinds, *Precedents of the House of Representatives* ................................................ 21

Archibald Cox, *Executive Privilege*,
 122 U. Pa. L. Rev. 1383 (1974) ...................................................................... 61, 69

Charlie Savage and Nicholas Fandos, *The House v. Trump: Stymied Lawmakers Increasingly Battle in the Courts*, The New York Times (Aug. 13, 2019)............................. 23

Cong. Research Serv., Cong.'s Contempt Power and the Enforcement of Cong. Subpoenas 22-23 (2012),
https://crsreports.congress.gov/product/pdf/RL/RL34097 ...................................................... 33

Harold C. Relyea, *The Executive Office of the President: A Historical, Biographical, and Bibliographical Guide* 6 (Harold C. Relyea, ed. 1997) ............................................................ 51

John R. Steelman & H. Dewayne Kreager, The Exec. Office as Admin. Coordinator, 21 L. & Contemp. Probs. 688 (1956)...................................................................................... 52

Mark J. Rozell, *Exec. Privilege: The Dilemma of Secrecy and Democratic Accountability* (1994)................................................................................................................. 21

Nicholas Fandos, *With Sweeping Document Request, Democrats Launch Broad Trump Corruption Inquiry*, The N.Y. Times, (Mar. 4, 2019),
https:// www.nytimes.com/ 2019/03/04/us/politics/trump-obstruction.html .............................. 8

Report of Special Counsel Robert S. Mueller, III (March 2019)....................................... 5, 6, 7, 8

*The Federalist* No. 51 ........................................................................................................... 1

*The Federalist* No. 58 ......................................................................................................... 69

*The Federalist* No. 78 ......................................................................................................... 20

Tom Wicker, Dwight D. Eisenhower 70 (2002) .......................................................................... 21

U.S. Dep't of Justice, Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017) ............................................................................................................. 5

## **INTRODUCTION**

This case presents several fundamental questions with sweeping implications—only the first of which is whether the Committee on the Judiciary of the House of Representatives (the "Committee") may enlist the courts on its side of a dispute with the Executive Branch.  The Constitution's structure, fundamental principles of Article III jurisdiction, and basic statutory construction all make clear the answer is "no."  Judicial resolution of disputes directly between the Executive Branch and Congress has been virtually unknown in American history, and is inconsistent with the Constitution's fundamental principle that the surest safeguard for liberty was to separately equip co-equal Branches with "the necessary constitutional means and personal motives to resist encroachments of the other."  *The Federalist* No. 51 (James Madison).

It is no surprise that the Founders rejected judicial supervision of political disputes between the elected branches, *see Raines v. Byrd*, 521 U.S. 811, 828 (1997); *Barnes v. Kline*, 759 F.2d 21, 54-57 (D.C. Cir. 1984) (Bork, J., dissenting), given that placing one branch in the role of superintending disputes between the other two would upend this careful balance.  Using judicial power to "plunge[ ]" the courts "into . . . bitter political battle[s] being waged" between the political branches, *Raines*, 521 U.S. at 827, would also "damage . . . public confidence that is vital to the functioning of the judicial branch," *id.* at 833, and ultimately diminish "[t]he irreplaceable value of the [judicial] power . . . [to protect] the constitutional rights and liberties of individual citizens," *id.* at 829.  Given these "overriding and time-honored concern[s] about keeping the Judiciary's power within its proper constitutional sphere," *id.* at 820, this Court should reject the Committee's attempt to invoke its authority as fundamentally "[in]consistent with [our] system of separated powers," *Allen v. Wright*, 468 U.S. 737, 752 (1984), for at least the four following reasons.

*First*, this dispute does not present a "Case[]" or "Controvers[y]" under Article III.  The Committee's claim that its ability to make legislative judgments has been impaired is too abstract

and amorphous to constitute a legally cognizable injury, and the dispute at issue is not one traditionally thought to be capable of resolution through civil litigation.  There is no constitutional or statutory basis for a Committee of the House of Representatives to take on the role of enforcing its subpoenas in the federal courts.  If Congress is dissatisfied with the Executive Branch's response to a subpoena, its recourse is the constitutionally mandated accommodation process and the tools the Constitution furnishes—chiefly legislation and appropriation—rather than the deployment of lawyers wielding the Federal Rules of Civil Procedure.

*Second,* the Court lacks statutory jurisdiction.  Congress has enacted a statute conferring subject-matter jurisdiction over certain subpoena-enforcement actions brought by the Senate and its committees.  It has not enacted any comparable provision conferring subject-matter jurisdiction for subpoena-enforcement suits brought by committees of the House of Representatives.  There is thus no source of statutory jurisdiction for this suit.  The Committee cannot overcome the clear implication of that specific grant of statutory jurisdiction for *other* Congress-initiated suits by retreating to the general grant of federal question jurisdiction in 28 U.S.C. § 1331.

*Third*, even if this dispute were justiciable, the Committee fails to state a claim on which relief can be granted.  The sole claim asserted in the Complaint—for enforcement of a subpoena under Article I—is insufficient because Congress has not created a cause of action that would authorize the Committee to enforce a congressional subpoena through a civil lawsuit.  Indeed, where Congress has intended to create a cause of action in comparable circumstances, it has done so expressly and with carefully delineated limitations, as it has done for civil enforcement of subpoenas issued by committees of the Senate in particularized situations.  While Congress has repeatedly *considered* whether to provide a similar cause of action for the House of Representatives or its committees, it has never done so.

*Fourth,* even if the obstacles to adjudicating the Committee's claim could be surmounted, the Court should refrain from resolving this case so the parties can continue the process of negotiation and mutual accommodation through which the elected Branches have resolved their disputes over access to information for more than 200 years.   In the weeks preceding the Committee's initiation of this lawsuit, the Committee and the White House Counsel's Office engaged in repeated meetings and discussions to explore terms on which the Committee could secure testimony from Mr. McGahn regarding his duties as Counsel to the President.   The Counsel's Office offered to consider a private interview of Mr. McGahn, subject to mutually agreeable terms, in lieu of public testimony.  Thus far the Committee has rejected that suggestion, insisting instead that Mr. McGahn be questioned at a public hearing.  But if the Committee is truly interested in obtaining testimony from Mr. McGahn as expeditiously as possible, the potential remains for a compromise that would achieve that objective.  As in *United States v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976), before moving on to address the "nerve-center constitutional questions" presented by the Committee—questions that could "tilt the scales" and upend the Constitution's allocation of power among all three Branches—the Court should first stay its hand and allow the parties to pursue what further potential remains for resolution of their differences.

Should this Court reach the merits, it is clear that Defendant is entitled to summary judgment.  Just as Congress must be independent from the President and the Courts independent from both, the President must maintain his basic independence and autonomy from Congress to perform his constitutionally assigned functions.  He also requires the assistance of aides, some of whom are so integral to the President's duties that they possess the same immunity from compelled congressional testimony as the President himself.   As Attorney General Reno stressed when advising President Clinton that the Counsel to the President is immune from compelled congressional testimony, "[s]ubjecting a senior presidential advisor to the congressional subpoena

3

power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999).

Were it otherwise, Congress could invade the President's autonomy and confidentiality by regularly summoning the President's closest advisors to interrogate them about the President's thinking, or influence his decision-making, on sensitive or controversial matters. Recourse to executive privilege is at best an uncertain refuge when close presidential advisors are haled before congressional committees and are subjected to persistent, probing, even haranguing interrogation seeking confidential information. Nor is the immunity somehow lost because Defendant McGahn no longer serves as Counsel to the President: the Committee seeks to compel his testimony solely in relation to his responsibilities as the President's Counsel and close advisor. The protection for Presidential autonomy and confidentiality would be just as impermissibly and irreparably impaired if his immediate advisors could be summoned to publicly account for the advice and assistance they gave to the President the moment they left office.

Ultimately, the seriousness of the separation-of-powers issues that underlie the immunity question underscores the importance of the threshold jurisdictional issues in this case. How the courts resolve these basic questions of inter-branch litigation and inter-branch testimonial immunity will have profound implications for our system of government that will long outlive the political controversies of today, the political identities of the parties, and the immediate merits of this dispute. Resolving these questions in the Committee's favor would be a precarious step toward what "is obviously not the regime that has obtained under our Constitution to date." *Raines*, 521 U.S. at 828. The Court should not take that step unless the law clearly requires doing so, which it does not. For these reasons and those set forth below, Plaintiff's motion for summary judgment should be denied, and Defendant's motion for summary judgment should be granted.

## BACKGROUND

### A.    The Special Counsel's Investigation

On May 17, 2017, the Acting Attorney General appointed Robert Mueller as a Special Counsel to lead an investigation, launched by the FBI in July 2016, into "whether individuals associated with the" campaign of now-President Donald J. Trump "were coordinating with the Russian government in interference activities" regarding the 2016 election.  Report of Special Counsel Robert S. Mueller, III ("Report"), Vol. I at 13 (March 2019).  The appointment order provided broad authority for Mr. Mueller to investigate and prosecute "(i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump"; "(ii) any matters that arose or may arise from the investigation"; and (iii) secondary offenses committed in connection with the investigation, such as perjury, obstruction of justice, destruction of evidence, and others arising under 28 C.F.R. § 600.4(a).  *See* U.S. Dep't of Justice, Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017).

To carry out his responsibilities, the Special Counsel assembled an Office that, at its high point, consisted of 19 attorneys assisted by "approximately 40 FBI agents, intelligence analysts, forensic accountants … and [other] professional staff assigned by the FBI to assist the Special Counsel's investigation."  Report Vol. I at 13.  During the nearly two years in which it performed its work, the Special Counsel's Office issued more than 2,800 grand jury subpoenas; executed nearly 500 search-and-seizure warrants; obtained more than 230 orders for communication records under 18 U.S.C. § 2703(d) and almost 50 orders authorizing use of pen registers; and interviewed approximately 500 witnesses, including almost 80 before the grand jury.  *Id.*

To aid its investigation, the Office also requested and obtained from the White House more than 1.4 million documents, including electronic communications such as e-mails and text

messages, and the White House's agreement to allow numerous interviews of current and former White House personnel. *Id.* at Vol. II at 12.  These witnesses included Mr. McGahn, who sat for more than thirty hours of interviews with the Special Counsel's Office, as well as former Deputy White House Counsel Annie Donaldson Talley, former Assistant to the President Hope Hicks, former White House Chief of Staff Reince Priebus, former White House Chief Strategist Steve Bannon, former White House Press Secretary Sean Spicer, former National Security Advisor Michael Flynn, former Deputy National Security Advisor K.T. McFarland, then-Deputy Assistant to the President John A. Eisenberg, former Deputy White House Counsel Uttam Dhillon, former Staff Secretary Rob Porter, former Deputy Chief of Staff Rick Dearborn, former White House Chief of Staff John Kelly, and Senior Advisor Stephen Miller.  The accounts of these witnesses were memorialized in FBI reports of interviews known as "FD-302s."

The Office also interviewed numerous other witnesses, "obtained documents on a voluntary basis when possible, and used legal process where appropriate." *Id.* at 12-13.  These witnesses included Secretary of State Mike Pompeo, former FBI Director James Comey, James Rybicki, former Attorney General Jeff Sessions, former Deputy Attorney General Sally Yates, former FBI Deputy Director Andrew McCabe, former Director of National Intelligence Daniel Coats, the former Director and Deputy Director of the National Security Agency, Mr. Flynn's attorney, and former New Jersey Governor Chris Christie.  The Special Counsel's Office concluded that the "significant body of evidence" generated from these investigative techniques was "sufficient . . . to understand relevant events." *Id.* at 13.

On March 22, 2019, after a nearly two-year investigation, the Special Counsel produced to the Attorney General a 448-page confidential report explaining his prosecution and declination decisions and "describ[ing] the investigation's main factual results."  Report Vol. I at 13.  The Report consists of two volumes.  In Volume I, the Special Counsel concluded that, although the

Russian government attempted to interfere in the 2016 election through extensive social media and computer-intrusion operations, the evidence "did not establish that members of the Trump Campaign conspired or coordinated with the Russian government in [these] election interference activities." *Id.* at 2. Volume II of the Report is devoted to the separate question whether any of the President's actions toward the Russia investigation constituted obstruction of justice. The investigation described in Volume II "focused on a series of actions by the President that related to the Russian-interference investigations, including the President's conduct towards the law enforcement officials overseeing the investigations and the witnesses to relevant events." Report Vol. II at 3. *See id.* at 3-6 (setting forth overview of these actions and events) & *id.* at 15-156 (exhaustively discussing these events). Much of the discussion pertaining to these issues is derived from interviews with numerous then-current and former White House officials, and other Government officials, including five voluntary interviews with Mr. McGahn, whom the White House agreed to make available to the Special Counsel's Office for its investigation.

Ultimately, the Special Counsel's Office determined that the "evidence we obtained about the President's actions and intent presents difficult issues." The Special Counsel's Report laid out the evidence in more than one hundred pages of detailed analysis, which it extensively annotated with citations to specific evidentiary sources. *See, e.g.*, *id.* at Vol. II at 60-61, 74-77, 87-90, 97-98, 105-07, 111-13, 118-20, 130-33, 153-56 (setting forth detailed analysis of elements of obstruction in respect to each category of events). The Attorney General and Deputy Attorney General subsequently determined that this evidence was insufficient under the federal principles of prosecution to establish that the President committed an obstruction-of-justice offense.

## B. The Committee Launches Its Own Investigation Into the Same Events

While the Special Counsel was conducting his investigation, Congress began investigations of its own regarding the same subject matter. In January 2017 three committees,

the Senate Judiciary Committee, the Senate Select Committee on Intelligence, and the House Permanent Select Committee on Intelligence, announced that they would conduct, or were already conducting, inquiries into the 2016 election.  Report Vol. I at 1, 8.  Numerous witnesses provided evidence in these investigations throughout 2017 and 2018.  *See* https://www.justsecurity.org/ 62240/congressional-russia-investigations-document-clearinghouse/#IIHOGR

In addition to these inquiries, the Plaintiff Committee announced on March 4, 2019, that it was investigating "a number of" unspecified actions that it claimed "threaten our nation's longstanding commitment to the rule of law" and issued 81 letters to individuals, entities, and government agencies seeking a sweeping amount of material relating to the President, his Administration, his family members, his businesses, and the 2016 election.  *See* https://judiciary.house.gov/story-type/letter/house-judiciary-committee-document-requests-3419. Among these letters was one issued to Mr. McGahn, from whom the Committee requested information on roughly two dozen topics relating to the Special Counsel's investigation, including the President's communications with National Security Advisor Michael Flynn, the termination of FBI Director James Comey, and "any possible termination" of former Attorney General Sessions, Deputy Attorney General Rod Rosenstein, and Special Counsel Mueller from their positions. Declaration of Michael M. Purpura, Deputy Counsel to the President ("Purpura Decl.")  (Exh. A at Document Requests).[1]   The Committee also requested extensive "documents from Annie Donaldson, Mr. McGahn's deputy who took exhaustive notes detailing Mr. Trump's behavior in the West Wing in real time."  *See supra* n.1.  Other recipients included David J. Pecker, Allen Weisselberg, Alan Garten, Mr. Sessions, Thomas J. Barrack Jr., Michael Cohen, Jared Kushner, Donald Trump, Jr., and Eric Trump.  The Committee stated nothing about the scope or factual

---

[1] *See also* Nicholas Fandos, *With Sweeping Document Request, Democrats Launch Broad Trump Corruption Inquiry*, The N.Y. Times (Mar. 4, 2019).

underpinnings of this investigation other than that it was generally investigating "allegations of obstruction of justice, public corruption, and other [unspecified] abuses of power." Purpura Decl., Exh. A at 1.

On March 18, 2019, Mr. McGahn, through his lawyer, responded to the Committee Chairman, Representative Jerrold Nadler.  Mr. McGahn's counsel explained that the March 4 document requests had been forwarded to the Trump Campaign and the White House because they "concern the period during which [Mr. McGahn] was outside counsel to the Trump Campaign and Transition and served as Counsel to the President in the White House," and thus that the "Campaign and the White House are the appropriate authorities to decide the scope of access to these documents, including whether a claim of executive, attorney-client and/or attorney work product privilege would protect such information from disclosure."  Compl. for Decl. & Inj. Relief ("Compl.") (ECF No. 1), Exh. S.

### C. The Department of Justice Makes Available to the Committee an All-But Unredacted Version of the Special Counsel's Report, With Only Grand Jury Information Withheld

Four days later, on March 22, 2019, Attorney General Barr wrote to Chairman Nadler and other members of Congress pursuant to 28 C.F.R. § 600.9(a)(3), explaining that the Special Counsel's Office had concluded its investigation and that he anticipated being able to "advise you of the Special Counsel's principal conclusions as soon as this weekend."  Declaration of David F. Lasseter ("Lasseter Decl.") (filed herewith), Exh. A.  On March 24, the Attorney General sent the same members a four-page letter describing the Special Counsel's principal conclusions and noting that, although Justice Department regulations "contemplate that the Special Counsel's report will be a 'confidential report,'" he was mindful of the strong public interest in the matter and intended "to release as much of the Special Counsel's report as [possible] consistent with applicable law, regulations, and Departmental policies."  *Id.* Exh. B.

The next day, on March 25, Chairman Nadler and several of his colleagues wrote the Attorney General demanding the full report and all underlying evidence "no later than April 2" (one week later) and that the Attorney General appear before the Committee to testify about the Report. *Id.* Exh. C.  The Attorney General responded on March 29 that he was working with the Special Counsel to identify and redact four narrow categories of legally protected information, after which he expected to release the report by mid-April.  He also agreed to "testify publicly [before Congress] on behalf of the Department shortly after the … report is made public" and noted his availability to do so.  *Id.* Exh. D.  On April 1, Mr. Nadler and his colleagues responded that the Committee would issue a subpoena to the Attorney General unless the Report and full investigative file were produced to Congress the next day and demanded that the Attorney General "appear before the . . . Committee as soon as possible[.]"  *Id.* Exh. E.

On April 18, the Attorney General wrote again to Chairman Nadler and announced that he was releasing the Special Counsel's Report to the public "subject only to those redactions required by law or compelling law enforcement, national security, or personal privacy interests." Specifically, four categories of information were redacted:  (1) protected grand-jury information, (2) sensitive investigative techniques, (3) information that could harm ongoing law enforcement matters, and (4) information that would unduly infringe upon the personal privacy and reputational interests of peripheral third parties.  The Attorney General explained that each redaction was clearly marked with the reason for withholding.  He further noted that, although "the President could have asserted [Executive] privilege" over significant portions of the Report, the President had declined to do so, such that no information was redacted on those grounds.  *Id.* Exh. F.

The Attorney General's April 18 letter also addressed the Committee's "Interest in viewing an unredacted version of the report."  The Attorney General agreed to "make available for review by you and [certain other Members of Congress] a version of the report with all redactions removed

except those relating to grand-jury information," which "[i]n light of the law and governing judicial precedent, I do not believe . . . I have discretion to disclose[.]"  Attorney General Barr also again agreed to testify before the Committee to answer any questions they had about the Report.  *Id.* Exh. F.  The same day, Assistant Attorney General Stephen Boyd sent a letter inviting Chairman Nadler to a secure location to view the Report with all redactions removed except those required by Federal Rule of Criminal Procedure 6(e) for grand-jury material.  *Id.* Exh. G.

> ### D.     The Department of Justice Agrees to Make Available to the Committee Interview Reports from the Special Counsel's Investigative File, Including Reports of Interviews With Mr. McGahn

The same day, the Committee issued a subpoena directing the Attorney General to produce the "complete and unredacted version of the report," and all materials obtained or created by the Special Counsel's office, by May 1, 2019.  Lasseter Decl. Exh. H.  On May 1, Assistant Attorney General Boyd responded, noting that the Committee was demanding "millions of pages of classified and unclassified documents, bearing upon more than two dozen criminal cases and investigations, many of which are ongoing," and that many of the demanded documents could not be "lawfully provide[d]" consistent with Federal Rule of Criminal Procedure 6(e).  *Id.* Exh. I at 1.

Mr. Boyd further observed that the Attorney General's offer to make a less redacted version of the Report available would "permit [the Committee] to review . . . 99.9% of Volume II, which discusses the investigation of the President's actions," but that, "[f]or reasons integral to our law enforcement responsibilities, the Department's practice is to . . .  abide by fundamental principles of privacy and due process and refrain from publicly assessing the information that was assembled regarding individuals who were investigated but not prosecuted."  *Id.* Mr. Boyd stated that "[a]llowing your Committee to use Justice Department investigative files to re-investigate the same matters that the Department has investigated" would threaten this principle and set a dangerous precedent.  *Id.* at 2.  Nevertheless, Mr. Boyd offered that "[i]f and when the Committee

has completed its review of the Special Counsel's report and has identified particularized and legitimate needs for information that are not satisfied by the report itself, we will be prepared to engage further with the Committee and to respond to your specific requests for information" to the extent "consistent with long-standing Department obligations." *Id.* at 4.

Although on May 3, 2019, the Committee responded with a threat to hold the Attorney General in contempt, Mr. Boyd nevertheless reaffirmed the Justice Department's continued willingness to attempt to negotiate an acceptable accommodation of the parties' respective interests. *Id.* Exh. J.  After further communications, on May 24, 2019, at Mr. Boyd's request, the Committee sent a list of specific materials referenced in Volume II of the Special Counsel's Report that, if produced, would be deemed to satisfy the Committee's subpoena. *Id.* Exhs. K, L.  The list included (i) certain FBI interview reports (FD 302s) of statements given by firsthand witnesses to relevant events, (ii) notes taken by certain witnesses and relied on by the Special Counsel's Office, and (iii) a number of White House memoranda and communications specifically cited in the Report. *Id.* Exh. L at 4-5.  Among the requested interview reports were the reports of all five interviews conducted with Mr. McGahn. *Id.* at 4.  The Department of Justice agreed in part to this proposal, undertaking to permit inspection of scores of FBI interview reports, subject to certain terms and conditions, including redaction of privileged information.  Lasseter Decl. ¶ 3.  The Department has begun making these materials available to the Committee for inspection. *Id.*

### E.    The Committee Subpoenas Documents and Testimony from Mr. McGahn

Nevertheless, as these negotiations were proceeding, the Committee separately issued a subpoena to Mr. McGahn on April 22, seeking documents in his possession pertaining to nearly thirty subjects addressed by the Special Counsel's report (many overlapping with those contained in the March 4 document request) and purporting to compel Mr. McGahn to testify before the Committee on May 21.  Compl. Exh. U; Purpura Decl. ¶ 11 & Exh. B.  On May 7, the Counsel to

the President, Pat Cipollone, sent a letter to Mr. McGahn's counsel with instructions that he should not produce any White House documents to the Committee, because the decision whether to produce such records belonged to the White House, and because of the significant Executive Branch confidentiality interests and privileges implicated.  *Id.* ¶ 13 & Exh. C.  Both Mr. Cipollone and Mr. McGahn, through his personal counsel, notified the Committee of the White House's instruction.  Compl. Exh. JJ; Purpura Decl. ¶ 13 & Exh. C.  Mr. McGahn stated further that, in light of the White House's concerns about Executive privilege, he intended to "maintain the status quo unless and until the Committee and the Executive Branch can reach an accommodation." Compl. Exh. JJ.  The same day, Chairman Nadler wrote to Mr. McGahn's counsel that Mr. McGahn was legally obligated to respond to the subpoena, arguing that the documents sought could not be privileged because the Committee intended to "focus on the very topics covered in the Special Counsel's Report."  Compl. Exh. II.

On May 15, Mr. Cipollone addressed these assertions in a twelve-page letter to the Committee.  Compl. Exh. V; Purpura Decl. ¶ 14 & Exh. D.  Mr. Cipollone first emphasized the Administration's desire "to accommodate Congress's legitimate requests for information while at the same time respecting the separation of powers and the constitutional prerogatives of the President."  Purpura Decl. Exh. D at 2.  He noted that in the five months since the 116th Congress had convened, the Administration had provided hundreds of responses to congressional information requests, produced tens of thousands of pages of documents to Congress, provided testimony at congressional hearings more than 100 times, and provided hundreds of congressional briefings.  *Id.*  The Administration had also acceded to Committee requests to see the Special Counsel's report to the full extent permitted by law, an "extraordinary accommodation in light of long-standing Department of Justice policies regarding the confidentiality of investigations that do not result in prosecution."  *Id.* at 3.   As a further accommodation, "the President did not assert

executive privilege over any part of the Special Counsel's report," although he could have done so.  *Id.* at 2.  Mr. Cipollone emphasized the Administration's willingness to continue to work with the Committee to provide it with information it can properly seek.  *Id.* at 12.  The Committee did not respond directly to Mr. Cipollone's May 15 letter but instead sent a May 17, 2019, letter to Mr. McGahn directing him to appear to testify before the Committee on May 21 "or the Committee will proceed to hold you in contempt."  Compl. Exh. W.

On May 20, the Department of Justice Office of Legal Counsel (OLC) issued a 15-page opinion, in response to an inquiry from Mr. Cipollone, as to whether Mr. McGahn is legally required to testify in response to the Committee's subpoena.  *Testimonial Immunity Before Cong. of the Former Counsel to the President*, 43 Op. O.L.C. ___, Slip. Op. (May 20, 2019) ("*Testimonial Immunity of the Former Counsel*") (Decl. of Serena M. Orloff ("Orloff Decl.") (filed herewith) Exh. A).  Providing "the same answer that the Department of Justice has repeatedly provided for nearly five decades," OLC concluded that "Congress may not constitutionally compel the President's senior advisors to testify about their official duties."  *Id.* at 1.  OLC explained that this testimonial immunity "is rooted in the constitutional separation of powers," and derives from both the independence and autonomy of the President as the head of a co-equal Branch of Government, and the confidentiality required for the effective performance of the President's constitutionally assigned functions.  *Id.*

Based on this opinion, Mr. Cipollone sent correspondence to Mr. McGahn's counsel instructing Mr. McGahn that he should not to appear before the Committee.  Purpura Decl. ¶ 15 & Exh. E.   Both Mr. Cipollone and Mr. McGahn's attorney notified the Committee of the

---

[2] As Mr. Cipollone further explained, the Committee's requests sought "core Executive Branch communications squarely covered by the Executive Privilege, including (i) confidential communications between the President and his advisors, (ii) confidential deliberations among Executive Branch officials, (iii) information relating to law enforcement investigations, and (iv) confidential communications between the President and foreign leaders.  Compl. Exh. V at 4.

determination that Mr. McGahn is immune from compelled congressional testimony, and of the instruction that he not appear at the Committee's May 21, 2019, hearing. *Id.* ¶ 15 & Exh. E; *see also* Compl. Exh. X. Counsel for Mr. McGahn explained that in light of this instruction Mr. McGahn would "honor his ethical and legal obligations as a former senior lawyer and senior advisor to the President" and "decline to appear" at the May 21 hearing. Compl. Exh. X.

### F. The Parties Reach Accommodation Regarding the McGahn Documents and the Committee Obtains Testimony from Other White House Personnel, But the Committee Refuses To Consider an Interview With Mr. McGahn

Approximately one month after Mr. McGahn declined to appear at the May 21 hearing, on June 17, 2019, Mr. Barry Berke, an outside consultant to the Committee, sent an e-mail to Deputy Counsel to the President Michael Purpura requesting a telephone call to discuss "[the Committee's] subpoenas and the issues that have been raised." Purpura Decl. ¶ 16. Mr. Purpura responded that he was available to speak that afternoon and a telephone call was held that same day. *Id.* Thereafter, between June 17 and July 17, 2019, representatives of the Committee and the Counsel's Office spoke or met in-person on approximately eight occasions, in an effort to reach an accommodation regarding the McGahn subpoena. *Id.*

During these conversations the Counsel's Office made clear the institutional importance to the Executive Branch of the immunity protecting the President's immediate advisors from compelled testimony before Congress. *Id.* ¶ 17. Nevertheless, the Counsel's Office stated that it was prepared to try to reach an accommodation concerning Mr. McGahn's testimony, *id.*, and made several proposals to allow the Committee to obtain the information it said it required from Mr. McGahn, such as providing answers to written interrogatories. *Id.* ¶ 18. The Counsel's Office also offered to consider allowing Mr. McGahn to appear for a private interview, subject to appropriate conditions, as an alternative to appearing at a public hearing, *id.*, an approach that could satisfy the Committee's desire to secure testimony from Mr. McGahn.

The Committee, however, rejected the suggestion of a private interview of Mr. McGahn. *Id.* ¶ 19. The Committee's representatives explained that the Committee was not willing to consider any option other than testimony at a public hearing. *Id.*

Although the parties were unable as of July 17 to reach an accommodation for Mr. McGahn's testimony, they reached agreement concerning the documents the Committee had subpoenaed from him. Specifically, it was agreed that the Counsel's Office would review the responsive documents in Mr. McGahn's possession for privilege, and thereafter make the non-privileged documents (or portions of documents) available for the Committee's review. *Id.* ¶ 21. The Counsel's Office advised the Committee in late August and again in early September that the McGahn documents are ready for review, pending resolution of a related disagreement with the Justice Department concerning review of documents from the Special Counsel's files. *Id.*

The Committee has also obtained testimony from two other former members of the White House staff, Hope Hicks, former Assistant to the President and Director of the White House Office of Communications, and Annie Donaldson Talley, former Deputy Assistant and Deputy Counsel to the President, pursuant to subpoenas issued May 21, 2019. *See* Compl. Exhs. AA, BB. Although the White House asserted absolute immunity against testimony by Ms. Hicks concerning her duties as an immediate advisor to the President, *id.* Exh. CC, she appeared before the Committee and testified for nearly eight hours on matters of interest to the Committee that did not concern her duties as a Presidential advisor on June 19, 2019, *see id.* Exh. EE. It was agreed that Ms. Talley would first respond to written interrogatories, and afterward make herself available for testimony if necessary. *See id.* Exhs. FF, HH. On July 5, 2019, Ms. Talley provided written responses to the Committee's nearly 300 questions, with the exception of those to which the Counsel's Office objected (in accordance with the parties' agreement) on the basis of the Executive Branch's constitutionally based interests in confidentiality. *Id.*

G.      **The Committee Declares an Impasse and Files this Lawsuit**

On August 7, 2019, the Committee filed this lawsuit asserting a single claim, purportedly arising under "Article I of the Constitution," for enforcement of the subpoena insofar as it directed Mr. McGahn to appear before the Committee and "testify as to matters and information discussed in the Special Counsel's Report and any other matters and information over which executive privilege has been raised or is not asserted."  Compl. ¶¶ 52, 53.  The Complaint acknowledges that the parties reached an agreement regarding the subpoena's demand for documents, but asserts that the parties are at an "impasse" regarding McGahn's testimony because he "continues to refuse to testify *publicly*[.]"  Compl. ¶ 109 (emphasis added).  The Complaint contends that this refusal "hamper[s]" the Committee "in determining whether to recommend articles of impeachment against the President," *id.* ¶ 100; "deprives [it] of information urgently needed to conduct oversight" of the Department of Justice, *id.* ¶ 101; and impedes its ability "to fully assess potential remedial legislation relating to the" conduct described in the Special Counsel's Report.  *Id.* ¶ 101-102.  The Committee seeks, *inter alia*, a declaration that Mr. McGahn's failure to testify before the Committee is without legal justification, and an injunction ordering him to "appear and testify forthwith before the Committee."  *Id*. Prayer for Relief ¶ A.[3]

## ARGUMENT

I.      **LEGAL STANDARDS**

Federal Rule of Civil Procedure 56 requires a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The "evidence is

---

[3] On August 26, 2019, the Committee moved for a preliminary injunction or, in the alternative, expedited partial summary judgment.  ECF No. 22.  The Committee subsequently agreed its motion should be treated as a motion for partial summary judgment governed by an agreed-upon expedited briefing schedule.  *See* ECF No. 28 and Minute Order dated Sept. 3, 2019.

to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party," *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011), but the question whether the Constitution grants the Executive or Legislative Branches "the power to act in a certain way is a pure question of law." *Ctr. for Biological Diversity v. Kevin McAleenan*, 2019 WL 4228362, at *8 (D.D.C. Sept. 4, 2019). Where the parties file cross-motions for summary judgment, "each [party] must carry its own burden under the applicable legal standard." *Mitchell v. Pompeo*, 2019 WL 1440126, at *4 (D.D.C. Mar. 31, 2019).

## II. THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER THIS INTER-BRANCH DISPUTE.

The exertion of Federal judicial power to declare victors in inter-branch disputes of this nature would be inconsistent with the limits of Article III and the separation-of-powers principles underpinning those limits. In addition, even if Article III permitted judicial resolution of this action, Congress has not enacted a statute granting district courts subject-matter jurisdiction over such suits. The Court should therefore dismiss this case for lack of subject-matter jurisdiction.

### A. The Court Lacks Jurisdiction under Article III.

Article III requires that the Committee "establish that [it] ha[s] standing to sue." *Raines*, 521 U.S. at 818. "Article III's standing requirements are 'built on separation-of-powers principles' and serve 'to prevent the judicial process from being used to usurp the power of the political branches.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). To have standing, a plaintiff must allege a "*personal injury*" that is "legally and judicially cognizable," and the dispute must be one "traditionally thought to be capable of resolution through the judicial process." *Raines*, 521 U.S. at 818-19.

In this case, as in *Raines*, "the italicized words" are "key ones." *Id.* at 819. Like the plaintiffs in *Raines*, the Committee has not brought this suit to vindicate some "private right" (like lost wages) "to which [it] *personally* [is] entitled." *Id.* at 812, 821. Instead, it has come to court

18

solely to vindicate an asserted "institutional injury" to the House as a whole at the hands of the Executive Branch, *id.*; *accord id.* at 829. In assessing whether that sort of "institutional injury" suffices to supply standing in the circumstances of this case, the Court must consider historical practice as well as the implications of adjudicating the suit for the separation of powers established by the Constitution. *See id.* at 819-20, 826-29; *see also Chenoweth v. Clinton*, 181 F.3d 112, 116 (D.C. Cir. 1999) (*Raines* "require[s] us to merge our separation of powers and standing analyses"). As courts have recognized, the balance of powers among the branches is imperiled when one political branch asks the Judiciary to take its side in a dispute with the other. *See, e.g.*, *United States v. AT&T, Inc.*, 567 F.2d 121, 123 (D.C. Cir. 1977) ("*AT&T II*") (explaining that courts should "avoid [judicial] resolution[s]" of inter-Branch disputes "that might disturb the balance of power between the [political] branches and inaccurately reflect their true needs"); *U.S. House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8, 12 (D.D.C. 2019) ("*Raines* and *Arizona State Legislature* [*v. Arizona Indep. Redist. Comm'n*, 135 S. Ct. 2652 (2015)] caution federal courts to consider the underlying separation-of-powers implications of finding standing when one political branch of the Federal Government sues another."), appeal pending, No. 19-05176 (D.C. Cir.).

### 1. This dispute is not of the type traditionally thought capable of resolution through the judicial process.

The Committee lacks standing foremost because centuries of historical practice show that the injury the Committee claims is not one traditionally deemed capable of redress through the judicial process. *See Raines*, 521 U.S. at 819. Since the Founding, the Executive and Congress have clashed over Congress's access to Executive Branch information. For nearly that entire period, the courts refused to referee that "political turf war," *see U.S. House of Representatives*, 379 F. Supp. 3d at 10, recognizing that to preserve the independence and autonomy of all three co-equal branches, the political branches must do battle in the political arena, not appeal to the Judiciary as a superior branch of government for a definitive resolution. "The 'complete

independence' of the Judiciary is 'peculiarly essential' under our Constitutional structure, and this independence requires that the courts 'take no active resolution whatever' in political fights between the other branches." *See id.* (quoting *The Federalist* No. 78 (Alexander Hamilton))).

*Raines* underscores the importance of historical practice in determining whether a dispute is capable of judicial resolution.  In *Raines*, six Members of Congress brought suit seeking to declare the Line Item Veto Act unconstitutional.  521 U.S. at 814-16.  The plaintiffs contended that the Act had injured them by "alter[ing] the legal and practical effect of [their] votes" and by "divest[ing] [them] of their constitutional role in the repeal of legislation." *Id.* at 816.  The Court held that the legislators lacked a judicially cognizable injury, *id.* at 818, 829-30, and critical to its analysis was the absence of any "historical practice" supporting adjudication of such a suit, *id.* at 826.  "It is evident from several episodes in our history," the Court observed, "that in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power." *Id.*  The fact that past Congresses never resorted to the courts to resolve these and other inter-branch disputes underscored that the suit was not one "traditionally thought to be capable of resolution through the judicial process." *Id.* at 819.  *Raines* thus teaches that in evaluating whether a suit between the political Branches is justiciable, a federal court must evaluate whether such a suit is consistent with historical practice.  *See, e.g.*, *U.S. House of Representatives*, 379 F. Supp. 3d at 15 ("[c]onsider[ing] first historical practice and precedent").

With respect to litigation concerning Congress's access to information held by the Executive Branch, the history is clear:  for two hundred years after the Founding, such suits simply did not exist, even though disputes between the Legislative and Executive Branches over congressional requests for information have arisen since the beginning of the Republic.  In 1792, President Washington clashed with the House of Representatives over records relating to a failed

military expedition, *see Nixon v. Sirica*, 487 F.2d 700, 733-34 (D.C. Cir. 1973) (MacKinnon, J., concurring in part and dissenting in part); in a separate matter two years later, President Washington responded to a Senate request for documents by withholding "those particulars which, in [his] judgment, for public considerations, ought not to be communicated," *History of Refusals by Exec. Branch Officials to Provide Info. Demanded by Congress: Part I – Presidential Invocations of Exec. Privilege Vis-À-Vis Congress*, 6 Op. O.L.C. 751, 753 (1982). In 1796, President Washington refused to provide the House of Representatives certain documents relating to the negotiation of a treaty with Great Britain. Mark J. Rozell, *Exec. Privilege: The Dilemma of Secrecy and Democratic Accountability* 34-35 (1994).

President Jackson also withheld information in certain contexts, *id.* at 38, as did President Tyler, at which point "the House vigorously asserted and President Tyler as vigorously denied the right of the House to all papers in possession of the Executive relating to subjects over which the jurisdiction of the House extended." 3 Hinds, *Precedents of the House of Representatives* § 1884. In 1886, during the administration of President Cleveland, the Attorney General refused a demand for all papers relating to the removal of a U.S. Attorney. *Id.* § 1894. Similar disputes arose throughout the Twentieth Century, including during the administrations of Presidents Eisenhower, *see, e.g.*, Tom Wicker, *Dwight D. Eisenhower* 70 (2002); Reagan, *see Assertion of Exec. Privilege in Response to Cong. Subpoena*, 5 Op. O.L.C. 27 (1981); Clinton, *see Assertion of Exec. Privilege Regarding White House Counsel's Office Docs.*, 20 Op. O.L.C. 2 (1996); and George W. Bush, *see Assertion of Exec. Privilege Over Comms. Regarding EPA's Ozone Air Quality Stds. & Cal.'s Greenhouse Gas Waiver*, 32 Op. O.L.C. 1 (2008).

Of particular pertinence here, clashes between the two political Branches over congressional attempts to obtain testimony from close Presidential advisors date back at least to the Administration of Franklin Roosevelt, and "[t]he first outright refusal of a presidential adviser

to appear apparently occurred during the Truman Administration, in 1948," when a House subcommittee twice subpoenaed an Assistant to the President "to testify about his communications with President Truman regarding administration of the Taft-Hartley Act during a strike." *Testimonial Immunity Before Cong. of the Former Counsel to the President*, at 7-8.   In 1968, the Johnson Administration refused a request by the Senate Judiciary Committee for testimony by an Associate Special Counsel to the President concerning the nomination of Associate Justice Abe Fortas to be Chief Justice of the United States.   *Id.* at 9.   Similar disputes over congressional demands for testimony by senior Presidential advisors have arisen in every Administration since. Each Administration took the position, as a matter of policy or principle, that the President's immediate advisors should not appear and give testimony before Congress concerning their official duties; and in each instance the matter was resolved, one way or another, without judicial intervention, until the decision in *Committee on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008).   *Id.* at 9-12.

While these disputes are commonplace in our constitutional history, for nearly two hundred years the Legislative Branch never sought to invoke the power of the Judiciary to decide which side should prevail in a political battle with the Executive.   Indeed, even outside the context of disputes between the two political Branches, the House itself has questioned whether its demands for information are ever justiciable:   the House Judiciary Committee observed, in the midst of a 1960 dispute with the New York Port Authority over access to information, that "[w]hether a congressional grant to a committee of power to seek a declaratory judgment concerning [the validity of a subpoena] would be valid . . . is open to serious question" because it would position the court as "an 'advisor' on constitutional matters" regarding the committee's authority.   106 Cong. Rec. 17,308-13 (daily ed. August 23, 1960)) ("1960 House Memo") (Orloff Decl. Exh. B). Thus, until the last decade, the House understood that it needed to resolve its disputes with the

Executive Branch over access to information using the tools furnished by the Constitution. "In the end, given that the Article I and Article II Branches have been involved in disputes over documents for more than two hundred years, what is most striking about the historical record is the paucity of evidence that the instant lawsuit is 'of the sort traditionally amenable to, and resolved by, the judicial process.'" *Walker v. Cheney*, 230 F. Supp. 2d 51, 73-74 (D.D.C. 2002) (quoting *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774 (2000)); *cf. Printz v. United States*, 521 U.S. 898, 905 (1997) (if "earlier Congresses avoided use of this highly attractive power, we would have reason to believe that the power was thought not to exist."). This Court should not permit the Committee to supplant the centuries-old process of political negotiation and accommodation with zero-sum litigation in federal court.[4]

### 2. The Committee fails to state a cognizable injury.

The Committee also lacks standing because the abstract injury it has asserted is not "legally and judicially cognizable," as Article III requires. *Raines*, 521 U.S. at 819; *see also Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 (2019). In *Raines,* the Court stressed that, under Article III, the plaintiff's injury must be "personal," to ensure "that he has a 'personal stake' in the alleged dispute." 521 U.S. at 819. Yet in *Raines*, the injuries asserted—alteration of the legal and practical effect of the plaintiffs' votes in Congress—constituted a form of institutional injury, "a loss of political power, not loss of any private right," which was "not claimed in any private capacity but solely because they [were] Members of Congress." *Id.* at 821. As *Raines* explained, that sort of institutional injury, stemming exclusively from the plaintiffs' status as Members of Congress, is generally not cognizable when asserted by individual federal legislators. *Id.*

---

[4] That concern is not hypothetical. As the New York Times recently reported, "the House [of Representatives] is going to court at a tempo never seen before," a trend that "could change [the constitutional order] in a way that . . . legal scholars view as dangerous" and "heighten politicization of the judiciary." Charlie Savage and Nicholas Fandos, *The House v. Trump: Stymied Lawmakers Increasingly Battle in the Courts*, The N.Y. Times (Aug. 13, 2019).

That alone forecloses the Committee from establishing standing based on its asserted institutional injuries, but the Committee's attempt to show a "concrete and particularized" injury, *Raines*, 521 U.S. at 819, fails regardless.  The Committee initially claims that Mr. McGahn's failure to comply with its subpoena for his testimony deprives it of "information to which it is entitled."  Pl.'s Mem. in Supp. of Its Mot. for Prelim. Inj., or, in the Alternative, Expedited Partial Summ. J. ("Pl.'s Mem.") (ECF No. 22-1) at 22, 37.  But the Committee cannot rely on a theory of "informational injury," because Congress has no cognizable institutional interest in obtaining information for its own sake.  The "legislative Powers" that the Constitution grants to Congress, U.S. Const. art. I, § 1, do not include a "'general' power to inquire into private affairs and compel disclosures." *McGrain v. Daugherty*, 273 U.S. 135, 173 (1927).  Though an "implied" power "to secure needed information" is an "attribute of [Congress's] power to legislate," *id.* at 161, 175, the power is an "auxiliary" one that exists only as "necessary and appropriate to make [Congress's] express powers effective," *id.* at 173.  "[T]here is no congressional power to expose for the sake of exposure," *Watkins v. United States*, 354 U.S. 178, 200 (1957).  "No [congressional] inquiry is an end in itself." *Id.* at 187.

Lacking a freestanding right to information, to establish standing the Committee must rely on an injury to one or more of its express legislative functions.  *See Bethune-Hill*, 139 S. Ct. at 1954 (legislative body lacked standing because the challenged action "does not alter [its] . . . role" in the legislative process).  The sole injury arguably stated by the Committee is a theoretical impairment of the House's ability to evaluate proposed articles of impeachment; proposed legislation concerning election security, campaign finance, and other issues; and the adequacy of safeguards to protect the integrity of investigatory matters referred by the Special Counsel to other components of the Department of Justice (a matter purportedly implicating the Committee's "oversight" responsibilities).  Pl.'s Mem. at 12-14, 37; *see also Walker*, 230 F. Supp. 2d at 67.

These asserted harms are similarly deficient.   As the Supreme Court held in *Raines*, "abstract dilution of institutional legislative power" is insufficiently "concrete and particularized" to sustain standing.   521 U.S. at 819, 821, 825-26.   The legislator plaintiffs in *Raines* alleged that the Line Item Veto Act had injured them by "alter[ing] the legal and practical effect of [their] votes" and "divest[ing] [them] of their constitutional role in the repeal of legislation." *Id.* at 816. The Court rejected that argument and further rejected the plaintiffs' reliance on *Coleman v. Miller*, 307 U.S. 433 (1939), holding that *Coleman* stands at most for the proposition that "[state] legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been *completely nullified*." *Raines*, 521 U.S. at 823 (emphasis added).[5]   The *Raines* Court held that the "abstract dilution of institutional legislative power" attributable to the Line Item Veto Act fell well short of the absolute "vote nullification" necessary to satisfy Article III's injury-in-fact requirement. *Id.* at 825-26, 830.

Here, the Committee alleges that Mr. McGahn's failure to testify has impeded its ability to assess the necessity and appropriateness of articles of impeachment, legislation of one kind or another, and unspecified legislative "oversight" of Federal law-enforcement investigations.   The Committee's claim, then, is not even that the effectiveness of its Members' votes has been impaired, but that the Executive has to some unspecified degree impaired the ability of its Members

---

[5] The *Raines* plaintiffs were differently situated from the plaintiffs in *Coleman* because they were *federal* legislators, meaning that their suit would present "separation-of-powers concerns . . . not present in *Coleman*." 521 U.S. at 824 n.8.   Thus, the Court expressly reserved the question whether *Coleman* would "ha[ve] [any] applicability to a similar suit brought by federal legislators." *Id.*; *see also Arizona St. Legislature*, 135 S. Ct. at 2665 n.12 (noting that the standing issue presented in state legislature's suit did not "touch on or concern the question whether Congress has standing to bring a suit against the President"); *Harrington v. Bush*, 553 F.2d 190, 204 n.67 (D.C. Cir. 1977) ("A separation of powers issue arises as soon as the *Coleman* holding is extended to United States legislators.").

to formulate sound legislative judgments.  That assertion of injury falls at least one step short of even the claimed dilution of legislative power that *Raines* rejected as insufficiently concrete.

In that same regard, *Walker v. Cheney*, *supra*, bears significant resemblance to this case. In *Walker*, the Comptroller General, exercising his "broad authority to carry out investigations and evaluations for the benefit of Congress," brought suit to compel the release of documents concerning the composition and conduct of the Vice President's National Energy Policy Development Group.  230 F. Supp. 2d at 53-55.  Applying the analysis required by *Raines*, *Walker* concluded that "[t]he institutional injury [the Comptroller] suffer[ed] . . . [was] insufficient to confer standing."  *Id.* at 66.  Because the Comptroller sought the records at issue to "assist Congress in determining whether and to what extent future legislation, relating . . . to national energy policy or openness in government, may be appropriate," and in "conducting oversight of the executive branch's administration of existing laws," the Comptroller's alleged harm—at most an impairment of Congress's general interests in lawmaking and oversight—was "too vague and amorphous."  It thus represented no more than an "abstract dilution of institutional legislative power," as in *Raines*.  *Id.* at 67-68; *accord Cummings v. Murphy*, 321 F. Supp. 3d 92 107-113 (D.D.C. 2018), *appeal pending*, No. 18-5305 (D.C. Cir.).

The same analysis applies here.  The Committee says it seeks Mr. McGahn's testimony in order to "assess[ ] the need for and merits" of proposed articles of impeachment, future legislative changes, and oversight of pending law-enforcement investigations.  *Walker*, 230 F. Supp. 2d at 67; *accord Cummings*, 321 F. Supp. 3d at 108 (noting that "Plaintiffs tie their injury directly to their constitutional duties as legislators"); *see* Pl.'s Mem. at 15, 17, 19, 27, 34, 37, 41.  In so doing, it invokes authority delegated to it as Congress's agent so it might gather information, for Congress's benefit, to "assist Congress in the discharge of its [Article I] functions."  *Walker*, 230 F. Supp. 2d at 67; *see also Watkins*, 354 U.S. at 200.  Yet, although the Committee characterizes Mr. McGahn's

testimony as "crucial," "vital," and "immensely important," Pl.'s Mem. at 2, 14, 42, it does not explain with any specificity how his testimony will assist the Committee in evaluating the proposed articles of impeachment, legislation, or oversight issues of stated concern to its investigation.  It does not explain what particular pieces of information it expects to obtain exclusively from Mr. McGahn's testimony that might make a difference to its consideration of these matters.  If the Committee wants to "entangle the Court 'in a power contest'" over compelled testimony by the President's inner circle of White House advisors, *House of Representatives*, 379 F. Supp. 3d at 22 (quoting *Raines*, 521 U.S. at 833), it must demonstrate, at a minimum, that concrete harm to the House's Article I functions is at stake.  Just as in *Walker* and *Cummings*, the abstract injury the Committee asserts is insufficiently "'distinct and palpable'" to confer standing. *Walker*, 230 F. Supp. 2d at 67-68 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

### 3.   Lawsuits of this kind imperil the Constitution's allocation of power among the Branches of the Federal Government.

The historical absence of congressional lawsuits seeking Executive Branch information is no coincidence.  "[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers."  *Raines*, 521 U.S. at 820 (internal quotation marks omitted); *see also U.S. House of Representatives*, 379 F. Supp. 3d at 22.  Suits of this kind threaten the separation of powers and its system of checks and balances that has served the Nation well for 230 years.

The Supreme Court made clear in *Raines* that our Constitutional system contemplates a "restricted role for Article III courts," which is to protect "'the constitutional rights and liberties of individual citizens and minority groups against oppressive or discriminatory government action.'" 521 U.S. at 828-29 (citation omitted).  "'It is this role, not some amorphous general supervision of the operations of government, that has maintained public esteem for the federal courts and has permitted the peaceful coexistence of the countermajoritarian implications of judicial review and the democratic principles upon which our Federal Government in the final

analysis rests.'" *Id.* Were it otherwise, the federal courts would have long ago become "not the last but the first resort," *Barnes*, 759 F.2d at 53 (Bork, J., dissenting), *vacated sub nom. Burke v. Barnes*, 479 U.S. 361 (1987), such that "the system of checks and balances" meant to govern the relations between the political Branches would have been "replaced by a system of judicial refereeship," *Moore v. U.S. House of Representatives*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring in result), *abrogated on other grounds by Raines*, 521 U.S. 811.[6]

Judicial resolution of disputes between the political branches might sometimes be more expedient than "political struggle and compromise," *Barnes*, 759 F.2d at 55 (Bork, J., dissenting), but the Framers who designed our government of separated powers "ranked other values higher than efficiency," *INS v. Chadha*, 462 U.S. 919, 959 (1983). Indeed, political struggle and compromise are defining features of our tripartite system of government, not defects to be removed. *See Cummings*, 321 F. Supp. 3d at 117 ("[T]he fact that a political remedy is hard to achieve does not automatically swing open the door to the federal courts."). The process of negotiation and accommodation protects the political branches from excessive judicial interference and the Judiciary from the undue politicization and risk to its long-term independence that would result from "repeated use of [its] power to negate the actions of the representative branches." *Walker*, 230 F. Supp. 2d at 65.

The Framers designed the Constitution to empower the political branches to resolve their differences themselves. *See Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000); *AT&T II*, 567 F.2d at 127. That is why the Constitution provides Congress with numerous powerful political

---

[6] The opinions of Judge Bork in *Barnes* and then-Judge Scalia in *Moore* have been cited as early expressions, prior to *Raines*, of the "view[ ] that the role of the judiciary is properly limited to the adjudication of individual rights." *Walker*, 230 F. Supp. 2d at 72 n.18). Indeed, one court in this district has explained that, "[f]or all intents and purposes, the strict legislative standing analysis suggested by Justice Scalia in [*Moore*], now more closely reflects the state of the law." *Campbell v. Clinton*, 52 F. Supp. 2d 34, 40 (D.D.C. 1999), *aff'd*, 203 F.3d 19 (D.C. Cir. 2000).

tools that it can wield in disputes with the Executive.  It can legislate change within the Executive

Branch, *see McGrain*, 273 U.S. at 173-74, slash budgets in areas of concern, *see Barenblatt v.*

*United States*, 360 U.S. 109, 111 (1959), or make a case to the people to redress any perceived

institutional injury done to it by Executive Branch at the ballot box, *see id.* at 132-33.  The

availability of these remedies underscores why courts should not intervene in ways that would

unsettle the allocation of powers between the political branches.  *See U.S. House of*

*Representatives*, 379 F. Supp. 3d at 22 ("Congress has several political arrows in its quiver to

counter perceived threats to its sphere of power.").[7]

Moreover, if a committee of Congress could sue the Executive Branch basis on a claimed

loss of power in a political dispute, then there is little question that the Executive Branch would

be equally entitled to sue Congress.  *See Raines*, 521 U.S. at 828.  Yet the House has vociferously

contended that allowing suits against it "at the behest of the President" would "rais[e] glaring

separation of powers concerns," and is "precisely what the Framers of the Constitution wished to

guard against."  *Trump v. Comm. on Ways & Means*, No. 1:19-cv-2173, ECF No. 22, at 3 (D.D.C.

July 30, 2019); *see also id.,* Hr'g Tr. at 47 (D.D.C. July 29, 2019) (Orloff Exh. C) (counsel for the

Committee: "I cannot emphasize enough that the framers did not intend [the] judiciary to be able

to haul Congress into court and issue a decision against it.").  Thus, as the House sees things, it

---

[7] As the Supreme Court has observed, the "power to seek judicial relief . . . cannot possibly
be regarded as . . . in aid of the legislative function." *Buckley v. Valeo*, 424 U.S. 1, 138 (1976);
*see also Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928) ("Legislative power, as
distinguished from executive power, is the authority to make laws, but not to enforce them[.]"
(citing *Myers v. United States*, 272 U.S. 52 (1926))); *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481
U.S. 787, 817 (1987) (Scalia, J., concurring) (Congress's "dependen[ce] on the Executive . . . for
enforcement of the laws it enacts" is "a carefully designed and critical element of our system of
Government").  Congress "cannot grant to an officer under its control"—or to an organ such as a
committee—"[power] it does not possess" itself.  *Bowsher v. Synar*, 478 U.S. 714, 726 (1986);
*Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1224 (2015) (similar).  Any other conclusion
would invite Congress to use the courts, rather than its Article I tools, to resolve disagreements
with the Executive Branch at the expense of the Constitution's carefully wrought framework.  *See,*
*e.g.*, *House of Representatives*, 379 F. Supp. 3d at 22.

may enlist the Judiciary in its attacks on the Executive Branch, but "glaring separation of powers concerns," which the House "cannot emphasize enough," forbid the Executive Branch from doing the same in return. That is not the law: permitting judicial resolution of these disputes only when Congress is the plaintiff would distort the balance of powers by furnishing Congress (and apparently only Congress) with a new weapon for resolving inter-Branch conflict.

## B.     The Court Lacks Statutory Subject-Matter Jurisdiction.

Even if the Committee's suit presented a justiciable case or controversy under Article III, that would not end the Court's jurisdictional analysis. While Article III sets the Constitutional outer bounds of permissible Federal-court jurisdiction, lower federal courts may exercise only the jurisdiction that Congress confers on them by statute. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 366 F. Supp. 51, 55 & n.5 (D.D.C. 1973) (it is "settled that federal courts may assume only that portion of the Article III judicial power which Congress, by statute, entrusts to them" (citing cases)). Regardless of what the Constitution might theoretically allow, no act of Congress confers jurisdiction to hear this inter-Branch conflict.

The Committee points to a single supposed statutory basis for subject-matter jurisdiction: the federal-question statute, 28 U.S.C. § 1331. But that general jurisdictional statute does not apply to this sort of extraordinary inter-Branch litigation. Rather, Congress has elsewhere enacted particular provisions purporting to provide subject-matter jurisdiction over certain informational disputes between Congress and the Executive Branch, and those statutes do not apply here.

Most notably, 28 U.S.C. § 1365 purports to create jurisdiction over certain Senate subpoena enforcement actions, but excludes cases concerning "any subp[o]ena or order issued to an officer or employee of the executive branch of the Federal Government acting within his or her official capacity, . . . if the refusal to comply is based on . . . a governmental privilege or objection the assertion of which has been authorized by the executive branch of the Federal Government." *See*

*also* Pub. L. No. 93-190, 87 Stat. 736 (Dec. 18, 1973) (jurisdiction for the Senate Select Committee investigating the Watergate scandal to judicially enforce its subpoenas).   In 1996, Congress amended 28 U.S.C. § 1365 to add language providing that the statute would confer jurisdiction in cases in which an executive official's refusal to comply was based upon a *personal* privilege.  *See* Pub. L. No. 104-292, § 4, 110 Stat. 3459 (Oct. 11, 1996).

Congress enacted that amendment some twenty years *after* it had amended 28 U.S.C. § 1331 to eliminate the amount-in-controversy requirement for suits against the government and government officials, *see* Pub. L. No. 94-574, 90 Stat. 2721 (Oct. 21, 1976), and some sixteen years *after* it had amended § 1331 to remove the amount-in-controversy requirement for all federal question cases, *see* Pub. L. No. 96-486, § 2(a), 94 Stat. 2369 (Dec. 1, 1980).  If § 1331 already conferred plenary jurisdiction for suits by Congress seeking to enforce demands for information— as the Committee claims—then § 1365 and its 1996 amendments would all be entirely superfluous.

But this provision and its amendments were not superfluous, of course, because the specific provisions addressing federal subject-matter jurisdiction over congressional suits for information control over the general federal question statute.  *See, e.g.*, *Howard v. Pritzker*, 775 F.3d 430, 441 (D.C. Cir. 2015) ("[S]pecific terms prevail over the general in the same or another statute which otherwise might be controlling." (citation omitted)).   Indeed, in a 1977 Senate Report—issued the year after Congress removed the amount-in-controversy requirement from § 1331 for actions brought against the United States and its officials—Congress freely acknowledged that it still lacked general authority to enforce subpoenas via civil actions filed in district court.  *See* S. Rep. No. 95-170, at 16 (1977) ("Presently, Congress can seek to enforce a subp[o]ena only by use of criminal [contempt] proceedings [under 2 U.S.C. § 192] or by the impractical procedure of conducting its own trial before the bar of the House of Representatives or the Senate.").

Nor is that surprising:  the 1976 removal of an amount-in-controversy requirement was not intended to vest the courts with plenary authority to hear disputes between Congress and the Executive Branch; rather, it was meant to remove a "technical barrier[] to the consideration on the merits of *citizens'* complaints against the Federal Government," H.R. Rep. No. 94-1656, at 3 (1976) (emphasis added), which had precluded "aggrieved *private* persons" from bringing their claims, *id* at 15 (emphasis added); *see also* S. Rep. No. 94-996, at 2, 15 (Orloff Exh. D).  Neither of the reports accompanying the legislation suggested it dealt with congressional subpoena-enforcement actions.  Indeed, the Senate report recognized that "a future statute" might be needed to "specifically give the courts jurisdiction to hear a civil legal action brought by Congress to enforce a subp[o]ena against an executive branch official."  *Id.* at 89; *see also In re Application of the U.S. Senate Permanent Subcomm. on Investigations*, 655 F.2d 1232, 1238 (D.C. Cir. 1981) ("Prior to 1978 Congress had only two means of enforcing compliance with its subpoenas: a statutory criminal contempt mechanism and the inherent congressional contempt power." (footnotes omitted)).

In providing jurisdiction over some congressional subpoena-enforcement actions but not others, Congress has confirmed that a specific grant of jurisdiction is necessary before an organ of Congress can bring this sort of suit.  *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) ("Congress has the constitutional authority to define the jurisdiction of the lower federal courts, . . . and, once the lines are drawn, limits upon federal jurisdiction . . . must be neither disregarded nor evaded." (citations omitted)).  Reading the general federal question statute to authorize this suit would render pointless both 28 U.S.C. § 1365 and the precise limitations therein, a result that cannot be squared with "the canon against interpreting any statutory provision in a manner that would render another provision superfluous."  *Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010).

Because this case falls outside the bounds of the carefully drawn jurisdictional regime Congress has created, the Court lacks statutory subject-matter jurisdiction. *See In re Application of the U.S. Senate Permanent Subcomm.*, 655 F.2d at 1238 & n.28 (explaining that the Act creating jurisdiction § 1365 is "relatively simple" and "does not . . . include civil enforcement of subpoenas by the House of Representatives"); Cong. Research Serv., Cong.'s Contempt Power and the Enforcement of Cong. Subpoenas 22-23 (2012), https://crsreports.congress.gov/product/pdf/RL/RL34097 ("Although the Senate has existing statutory authority to pursue such an action, there is no corresponding provision applicable to the House.").

### C.   Decisions Suggesting That Inter-Branch Subpoena-Enforcement Suits Are Justiciable Have Been Abrogated by *Raines*, or Were Wrongly Decided.

Notwithstanding the above, certain decisions have suggested that suits like this one are justiciable. To the extent those decisions predate *Raines*, they are no longer good law. And those decisions post-dating *Raines* were, with respect, wrongly decided.

### 1.   Cases pre-dating *Raines v. Byrd* are no longer good law.

Prior to the Supreme Court's decision in *Raines*, the D.C. Circuit occasionally suggested that Congress might have standing to seek judicial enforcement of subpoenas against the Executive Branch. *See U.S. House of Representatives*, 379 F. Supp. 3d at 17 (noting this case law). The Committee cites these cases as support for its standing to bring this action, Pl.'s Mem. at 21-22, 24, but following *Raines* these passing references are no longer good law.

In particular, in *United States v. AT&T, Inc.*, 551 F.2d 384 (D.C. Cir. 1976) ("*AT&T I*"), the Executive Branch brought suit against a private telephone company to prevent the release of national-security information subpoenaed by a House subcommittee, and the House, by resolution, designated the subcommittee chairman to intervene on behalf of the House and appeal the judgment. *Id.* at 391. The Court of Appeals opined in a single sentence, without citation, that "the House as a whole has standing to assert its investigatory power, and can designate a member to act

on its behalf." *Id.* And in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc), the Court of Appeals reached the merits of a Senate committee suit against the President to compel the production of tape recordings, without addressing, much less deciding, whether the Senate committee had standing. *Id.* at 729-32. Neither case discusses the jurisdictional limits imposed by Article III, and the Supreme Court has made clear that "drive-by jurisdictional rulings of this sort … have no precedential effect." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998).

Moreover, to the extent *AT&T I* and *Senate Select Committee* suggest that Congress has standing to sue the Executive Branch, those decisions do not survive *Raines*. As the D.C. Circuit has recognized, the permissive doctrine of legislative standing that prevailed at the time of *AT&T I* and *Senate Select Committee* has been jettisoned by *Raines* and its progeny, which "place greater emphasis upon the separation of powers concerns underlying the Article III standing requirement." *Chenoweth*, 181 F.3d at 114. Like the broader doctrine of legislative standing that *Raines* explicitly repudiated, cases such as *AT&T I* and *Senate Select Committee* are now "untenable" as authority for Congress's standing to sue the Executive Branch. *Id.* at 115.

But even if *AT&T I* survived *Raines*, it is distinguishable. Although the court characterized the case as a "clash of the powers of the legislative and executive branches," the suit was brought by the Executive Branch against a private entity concerning the latter's "legal duty" as the recipient of a congressional subpoena. 551 F.2d at 389. That decision thus did not hold that courts have jurisdiction over congressional subpoena enforcement actions brought against Executive Branch officials. Moreover, in *AT&T I*, by the time the D.C. Circuit commented on the House's standing, the district court had quashed the subpoena. *See id.* at 385. Thus, *AT&T I* involved "at most," *Raines*, 521 U.S. at 823, whether the House could appeal from a district court order invalidating its request for information in a case that was otherwise properly in court. That decision should not

be extended to this much different factual context, especially in light of *Raines* and *Bethune-Hill*. *Cf. Raines*, 521 U.S. at 823-26 (narrowly construing *Coleman*).[8]

>    **2.      The two district-court cases post-dating *Raines* were wrongly decided.**

Following *Raines*, neither the D.C. Circuit nor the Supreme Court has suggested that Congress has standing to sue the Executive Branch to enforce information demands (or otherwise), or that courts have subject-matter jurisdiction to hear such suits.   Yet twice in the past eleven years, courts in this district have held such disputes justiciable, over the objections of administrations of both parties.   *See Miers*, 558 F. Supp. 2d at 53; *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013).   The Committee leans heavily on these two decisions as support for its position that this Court may exercise jurisdiction over this dispute.   But both cases were, with respect, wrongly decided.   This Court should not repeat their errors.

>    1.      In *Miers*, the House Committee on the Judiciary asked the court to declare, *inter alia*, "that [a] former White House Counsel … must comply with a subpoena and appear before the Committee to testify regarding an [oversight] investigation . . . ."   558 F. Supp. 2d at 55. Denying the Executive Branch's motion to dismiss, the Court held that "this lawsuit involves a basic judicial task—subpoena enforcement—with which federal courts are very familiar."   *Id.* at 56.   *See* Pl.'s Mem. at 25 (citing *Holder*, 979 F. Supp. 2d at 4, for a similar proposition).   The Court read *AT&T I* as "establish[ing] that the committee has standing to enforce its duly issued subpoena through a civil suit," *id.* at 68, and declined to read *Raines* as abrogating *AT&T I*.   The court interpreted *Raines* as a decision solely about the standing of "individual" Members, such that

---

[8]   As the Committee observes, Pl.'s Mem. at 21, the D.C. Circuit also noted in *AT&T I* that jurisdiction existed under § 1331.   For the reasons stated above, the procedural posture of *AT&T I* makes it inapposite: it was a suit brought by the Executive against a private party, not a suit brought by Congress against the Executive Branch that can be heard, if at all, only under the specific jurisdictional provisions that Congress has enacted to govern such disputes.   The decision also long predated the 1996 amendments to § 1365, which further confirmed that that § 1331 would not apply to lawsuits brought by Congress against the Executive Branch.

a suit by the institution as a whole, or by an individual authorized by the institution, would be justiciable. *See id.* at 69-70. The *Miers* court also held that because the dispute concerned enforcement of a subpoena, the "asserted interest[s] [were] more concrete than the situation in *Raines*, where the purported injury was wholly hypothetical." *Id.* at 70.

The *Miers* court erred in key respects. First, while the House had formally authorized the lawsuit in *Miers* (as it has done here, H. Res. 430, 116th Cong., 1st Sess. (June 11, 2019)), for the reasons discussed in § II.A, above, such authorization is insufficient to overcome the constitutional infirmities inherent in suits of this kind. *See Raines*, 521 U.S. at 811 n.3 ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."); *Cummings*, 321 F. Supp. 3d at 115 ("None of this is meant to suggest that authorization [by the full House] to sue, by itself, is enough to confer standing."). Second, the *Miers* court suggested that the issuance of a subpoena made the dispute more concrete than the dispute in *Raines*, *see* 558 F. Supp. 2d at 70, but formalities of process cannot alter the abstract nature, and hence the insufficiency, of the Committee's claimed injury.

Finally, the "deeply rooted" authority for courts to enforce civil, administrative, and grand jury subpoenas, *Miers*, 558 F. Supp. 2d at 71—that is, executive and judicial subpoenas—does not mean that *Congress* can enlist the Judiciary's aid against the Executive simply by issuing something called a "subpoena." As a threshold matter, it ignores fundamental separation-of-powers concerns to suggest that because courts are familiar with enforcing "subpoenas," they are thus well-suited to mediate disputes over information between Congress and the Executive, which have no established legal framework. More fundamentally, supposed judicial familiarity with a general "task" is hardly the touchstone of a justiciable case or controversy under Article III. There was no suggestion in *Raines* that the Supreme Court was unfamiliar with the task of adjudicating the constitutionality of an act of Congress—indeed, the *very next term* it held the Line Item Veto

Act unconstitutional in *Clinton v. City of New York*, a suit by private parties who had suffered concrete and particularized injuries to their personal interests.  524 U.S. 417, 429-36 (1998).  But the Court refused to reach that same issue in *Raines*, because that inter-branch dispute was not one "traditionally thought to be capable of resolution through the judicial process."  521 U.S. at 819.  The *Miers* court should have done the same.

2.      In *Holder*, the House sought judicial enforcement of a subpoena calling for the Attorney General to produce certain records relating to the Fast and Furious gunwalking operation.  Denying the Attorney General's motion to dismiss, the Court held that "Article III of the U.S. Constitution does not bar the federal courts from exercising their jurisdiction under the circumstances presented in this case."  979 F. Supp. 2d at 10.  The Court explained that the case before it "involves the application of a specific privilege to a specific set of records responsive to a specific request, and the lawsuit does not invite the Court to engage in the broad oversight of either of the other two branches."  *Id.*at 14.  The Court further held that statutory subject-matter jurisdiction was available under 28 U.S.C. § 1331, reasoning that "the chronology of events surrounding the enactment of section 1365 reveals that the jurisdictional gap it was meant to cure was not a lack of jurisdiction over actions like this one."  *Id.* at 18.

In reaching this result, the *Holder* court largely followed "the reasons set forth in *Miers*," 979 F. Supp. 2d at 4, and so that decision can no more be reconciled with *Raines* than can *Miers* itself.  In addition, *Holder* relied heavily on *United States v. Nixon*, 418 U.S 683 (1974), but that case involved the enforcement of a *trial* subpoena arising "in the regular course of a federal criminal prosecution."  *Id.* at 697.  Thus, although the issues raised in *Nixon* implicated separation-of-powers concerns, at bottom the case involved the compulsion of evidence necessary to a criminal prosecution of a citizen—a matter implicating "the constitutional rights and liberties of individual citizens," *Raines*, 521 U.S. at 829, that fell squarely "within the traditional scope of Art.

37

III power," *Nixon*, 418 U.S. at 697. *Nixon* does not suggest that federal courts may also entertain civil suits between co-equal branches concerning the scope of their respective powers.

The *Holder* court also erred in finding jurisdiction under § 1331. The court acknowledged that when Congress enacted § 1365 in 1978, it had already removed the amount-in-controversy requirement from § 1331 for suits against the United States, 979 F. Supp. 2d at 18-19, but the court then failed to grapple with the necessary implications of that chronology—*i.e.*, that Congress must have understood § 1331 did not already provide jurisdiction over subpoena-enforcement suits, or else § 1365 would have been entirely unnecessary. *Holder* also ignores the 1996 amendment to § 1365, a revision that would be inexplicable if Congress thought § 1331 already granted federal courts plenary jurisdiction to entertain congressional subpoena enforcement actions against the Executive Branch. *See supra* at 30-32.

The *Holder* court also pointed to a Senate report that it characterized as standing for the proposition that the enactment of § 1365 "'is not intended to be a congressional finding that the federal courts do not now have the authority to hear a civil action to enforce a subp[o]ena against an officer or employee of the Federal government.'" 979 F. Supp. 2d at 19 (quoting S. Rep. No. 95-170 at 91-92)). The Senate Report, however, described a Senate bill that would have conferred jurisdiction to enforce subpoenas issued by either the Senate *or* the House. *See* S. Rep. No. 95-170 at 91 (Senate bill creates jurisdiction "over any civil action brought on behalf of Congress, a House of Congress or a committee of Congress to enforce a subp[o]ena or order issued by that entity."). But although the Senate bill would have created jurisdiction to enforce subpoenas issued by *both* houses of Congress, the House bill did not include such a jurisdictional grant for *either* House of Congress. In conference, the two houses compromised by agreeing that only the Senate would be given jurisdiction to enforce its subpoenas. *See* H.R. Rep. No. 95-1756 at 80 (1978) (Conf. Rep.) ("The appropriate committees in the House also have not considered the Senate's

proposal to confer jurisdiction on the courts to enforce subp[o]enas of House and Senate committees.  The Senate has twice voted to confer such jurisdiction on the courts and desires at this time to confer jurisdiction on the courts to enforce Senate subp[o]enas.").  The *Holder* court's reading of § 1331 renders this careful and well-documented compromise entirely superfluous.

\* \* \*

Article III's time-honored concerns about preserving the vigor of the judicial power within its proper constitutional sphere preclude the exercise of Federal judicial power to intervene in conflicts between the political Branches.  And even if that Constitutional bar did not exist, Congress itself has yet to enact legislation permitting a federal court to hear this case.

## III.    PLAINTIFF LACKS A CAUSE OF ACTION ALLOWING IT TO SUE.

Even if all other obstacles to hearing this case could be overcome, the Committee still would not have a cause of action to enforce a subpoena for Mr. McGahn's testimony.  "[R]ights of action to enforce federal law must be created by Congress," *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), and this case is no exception.  To the contrary, the Supreme Court held in *Reed v. Cty. Comm'r of Del. Cty., Pa.*, 277 U.S. 376, 388-89 (1928), that a committee's power to issue subpoenas does not itself include the power to bring suit to enforce a subpoena in federal court.  It is thus insufficient for the Committee to point to Congress's implicit power to conduct investigations, or to issue subpoenas in pursuit thereof; the Committee must also show that Congress has authorized a cause of action to litigate the Committee's claimed right to compel Mr. McGahn's testimony.  The Committee identifies no such law.

The Committee's Complaint asserts a single claim for relief, styled "Article I of the Constitution."  Compl. ¶¶ 106-114.  It asserts simply that "Mr. McGahn has violated and continues to violate his legal obligations by refusing to appear before the Judiciary Committee as required

by [its] subpoena," without reference to any statute purporting to provide the Committee with a cause of action to enforce its subpoena in court.  *See* Compl. ¶¶ 106-114.

To the extent the Committee claims that a right to sue the Executive Branch to enforce a congressional subpoena can be implied directly under Article I of the Constitution, *see* Compl. ¶ 11, that is plainly wrong.  As has long been recognized, "it is up to Congress to create federal causes of action." *Farrington v. Nielsen*, 297 F. Supp. 3d 52, 63 (D.D.C. 2018) (citing *Sandoval*, 532 U.S. at 286).  Even in suits brought by private parties, the Supreme Court has made clear that implied rights of action are strongly disfavored.  *See, e.g.*, *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1402 (2018) ("[T]his Court has recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases.").

A court's reluctance to imply such a right under the Constitution should be even greater, *see Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 67-70 (2001), and greater still where the Judiciary is asked to imply a cause of action for the benefit of one political Branch against the other.  The Supreme Court recently emphasized that where "litigation implicates serious separation-of-powers … concerns," recognizing a right to bring such litigation must be "subject to vigilant doorkeeping." *Jesner*, 138 S. Ct. at 1398; *Klay v. Panetta*, 758 F.3d 369, 373, 376 (D.C. Cir. 2014) (noting the Supreme Court's "shift toward disfavoring judicially implied causes of action" in light of separation-of-powers concerns).  As it was put in *Ziglar v. Abbassi*, 137 S. Ct. 1843, 1857 (2017):

> When a party seeks to assert an implied cause of action under the Constitution itself, just as when a party seeks to assert an implied cause of action under a federal statute, separation-of-powers principles are or should be central to the analysis.  The question concerning the creation of a cause of action is 'who should decide' [and] . . . [t]he answer *most often will be Congress*."  [emphasis added]

Nor can the Committee rely on "[t]he power of federal courts of equity to enjoin unlawful executive action," *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1384-85 (2015), as the vehicle for bringing a civil lawsuit to force the disclosure of information held by the

Executive Branch.  Courts' equitable powers may be exercised only when "the 'relief … requested was traditionally accorded by courts of equity." *Grupo Mexicano de Desarrolo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).  Inter-branch informational suits such as this have no historical pedigree whatsoever, much less a strong tradition in equity.  *See Reed*, 277 U.S. at 389 ("Authority to exert the powers of [Congress] to compel production of evidence differs widely from authority to invoke judicial power for that purpose.").  Thus, while the power of Congress to conduct investigations ancillary to the exercise of its Article I powers is unquestioned, it simply does not follow that Congress has the right to enforce that power by bringing suit, let alone suits against a co-equal Branch, without a statutory basis.  *See also Abbasi*, 137 S. Ct. at 1856 (judicially inferring a cause of action that goes beyond "traditional equitable powers" is a "significant step under separation-of-powers principles").

That is all the more so because "Congress has [had] specific occasion to consider the matter . . . [and] the proper way to remedy" the alleged wrong.  *Abbasi*, 137 S. Ct. at 1856.  Where there are grounds to conclude that Congress's failure to provide a cause of action is "more than mere oversight," *id.* at 1862, courts should "refrain from creating [a] remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Id.* at 1858; *see also Klay*, 758 F.3d at 376 (courts should hesitate to infer a cause of action in light of separation of powers concerns where "Congress has been 'no idle bystander to th[e] debate'").

As discussed above, Congress knows how to enact causes of action for legislators, and it has done so on certain occasions, such as the right of action for "either House of Congress" to challenge census methodologies, *see* Pub. L. No. 105–119, § 209, 111 Stat.  2440, 2482 (1997), or the cause of action it enacted purporting to authorize Members of Congress to challenge the Line Item Veto Act, *see Raines*, 521 U.S. at 815-16.  Congress also has had "specific occasion to consider," *Abbasi*, 137 S. Ct. at 1856, whether its committees should be authorized to enforce their

subpoenas through a civil lawsuit.  In 1978, Congress gave express statutory authority to the Senate

Legal Counsel to institute civil proceedings to enforce a subpoena when directed by the full Senate

to do so, 2 U.S.C. §§ 288b(b), 288d, and later amended the pertinent jurisdictional statute,

28 U.S.C. 1365(b), in 1996.  Yet no such legislation authorizes subpoena-enforcement lawsuits

brought by committees of the House of the Representatives.  Because it is accordingly clear that

the absence of an express cause of action to bring this suit is "more than mere oversight," *Abassi,*

137 S. Ct. at 1862, the Court may not imply a cause of action here.  *Armstrong*, 135 S. Ct. at 1385

("The power of federal courts of equity to enjoin unlawful executive action is subject to express

and implied statutory limitations.").[9]

Nor can the Committee rely on the Declaratory Judgment Act, 28 U.S.C. § 2201, to enforce

its demands for Mr. McGahn's testimony in the absence of a cause of action.  *See* Compl. ¶ 12

(citing 28 U.S.C. §§ 2201, 2202), Prayer for Relief ¶ A.  The Declaratory Judgment Act does not

itself "provide a cause of action."  *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011).  Were it

otherwise, the D.C. Circuit could not have said, in *In re Application of the Permanent

Subcommittee*, that "[p]rior to 1978" (when 2 U.S.C. §§ 288b and 288d were enacted) Congress

had only the criminal contempt statute, and its inherent contempt power, with which to enforce its

subpoenas. 655 F.2d at 1238.

Rather, the Declaratory Judgment Act simply "enlarge[s] the range of remedies available

in the federal courts" for cases that already can be litigated there.  *Skelly Oil Co. v. Phillips

Petroleum Co.*, 339 U.S. 667, 671 (1950).  A "cause of action," by contrast, confers the legal

---

[9] The contrary holdings in *Miers* and *Holder* predated the Supreme Court's decisions in *Jesner* and *Abbasi*, and cannot be reconciled with the Supreme Court's teachings in those cases. Moreover, while *Miers* and *Holder* emphasized the recognition in *McGrain*, 273 U.S. at 175, that Congress possesses an auxiliary power of inquiry under the Constitution, *Holder*, 979 F. Supp. 2d at 22; *Miers*, 558 F. Supp. 2d at 75, that reliance was in error.  The mere existence of Congress's limited power of inquiry is not to be confused with the power to enforce that authority through a civil lawsuit.  *See Reed*, 277 U.S. at 389.

authority allowing a plaintiff to "'*enforce in court* the . . . rights and obligations' identified in his complaint" and is "'analytically distinct and prior to the question of what relief, if any, [he] may be entitled to receive." *John Doe v. U.S. Parole Comm'n*, 602 F. App'x 530, 532 (D.C. Cir. 2015) (citations omitted).  As this Circuit has long held, "the availability of relief" under the Declaratory Judgment Act "presupposes the existence of a judicially remediable right.'" *C & E Servs., Inc. of Wash. v. D.C.  Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002).  There being none here, the Act, on its own, offers no separate vehicle for bringing this case into court.

* * *

In sum, this matter is not properly before the Court.  It is not a "Case[ ]" or "Controvers[y]" under Article III; no act of Congress confers statutory jurisdiction to hear this case; there is no cause of action entitling the Committee to bring this case; and in all events, the constitutionally contemplated accommodation process should be allowed to complete its course before the federal courts intervene in this politically charged dispute between the elected Branches.  For any and all of those reasons, the Court should enter judgment for Defendant.

## IV.   SEPARATION-OF-POWERS CONCERNS REQUIRE THAT THE COURT STAY ITS HAND TO ALLOW THE CONSTITUTIONALLY MANDATED ACCOMMODATION PROCESS TO CONTINUE.

Even if this Court had Article III jurisdiction over this suit; even if Congress had conferred subject-matter jurisdiction on the courts over disputes of this kind; and even if the Committee had a cause of action, the Court should not proceed adjudicate this dispute now, given the acute separation-of-powers concerns presented by judicial intervention in political disputes between the elected branches.  At a minimum, the Court should decline to referee this dispute until the parties have exhausted the potential for compromise in the constitutionally contemplated processes of negotiation and mutual accommodation.

Courts have declined to decide suits filed by legislators attempting "to bring . . . essentially political dispute[s] into a judicial forum." *Chenoweth*, 181 F.3d at 114; *see also Vander Jagt v. O'Neill, Jr.*, 699 F.2d 1166, 1174-75 (D.C. Cir. 1982) (dismissing case out of "proper respect for the political branches and a disinclination to intervene unnecessarily in their disputes") (internal quotation omitted).  This principle applies to inter-branch informational disputes.  *See AT&T I*, 551 F.2d at 394 ("a judicial suggestion of compromise rather than historic confrontation" is most "suitab[le]" to resolution of an inter-Branch dispute over access to national-security information); *AT&T II*, 567 F.2d at 130.

The accommodation process represents more "than the mere degree to which ordinary parties are willing to compromise."  *Id.* at 130.  The D.C. Circuit has made clear that the respect for the accommodation process extends much further than typical notions of equitable restraint. Because "[t]he Constitution contemplates such accommodation," "[n]egotiation between the two branches should thus be viewed as a dynamic process affirmatively furthering the constitutional scheme."  *Id.*  "Under this view . . . each branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation."  *Id.* at 127.  This has thus been the dominant approach to conflicts between the political Branches over congressional requests for information from the Executive Branch.  *See AT&T I*, 551 F.2d at 394.

The record as a whole makes clear that the Committee brought this suit despite the availability of substantial amounts of public information concerning the same subjects on which it seeks Mr. McGahn's testimony, including (i) access to the Special Counsel's Report, redacted only for grand jury information, not privilege; (ii) production of scores of FBI reports of interviews conducted by the Special Counsel's Office (to include Mr. McGahn's); (iii) non-privileged documents subpoenaed from Mr. McGahn; and (iv) the testimony of other former high-ranking

White House personnel, Ms. Hicks and Ms. Talley.  *See supra* at 9-17.  Most crucially, the Committee filed suit despite the stated willingness of the Counsel's Office to consider an interview of Mr. McGahn, subject to appropriate terms, Purpura Decl. ¶ 18, a potential compromise that would allow the Committee to obtain testimony from Mr. McGahn himself.

Whatever it says about the Committee's true objectives that it rejected the idea of obtaining the information it claims so urgently to need via an interview, instead of a public hearing, it would be premature to conclude that the potential for accommodation and compromise had been exhausted when the Committee brought suit.  When the Committee filed its complaint on August 7, 2019, the parties had only recently been in the midst of discussing terms on which the Committee potentially could obtain (and perhaps could already have obtained) Mr. McGahn's testimony.  Purpura Decl. ¶¶ 16-18.  The Administration remains ready to continue those negotiations, taking into account changed circumstances since July.  *See id.* ¶ 20.

Facing the Committee's appeals for a judicial resolution of this dispute "that might disturb the balance of power between the two branches and inaccurately reflect their true needs," *AT&T II*, 567 F.2d at 123, this Court should not accept the idea that the parties have already reached the point of impasse, when the makings of a workable compromise for securing Mr. McGahn's testimony are in plain sight.  Indeed, *AT&T* presented a situation where litigation ensued after negotiations between the Executive and Legislative Branches had "broke[n] down," *AT&T I*, 551 F.2d at 387, yet the court refused to "select[ ] a victor," or "tilt the scales," when the political branches' "long history of settlement of disputes that seemed irreconcilable" gave reason to believe that "[a] compromise worked out between [them] [was] most likely to meet their essential needs and the country's constitutional balance."  *Id.* at 394.  Instead, the Court dispatched the parties "to attempt to negotiate a settlement" of their differences, *id.* at 395, negotiations which did not

succeed in resolving their dispute, but which "did narrow the gap between the parties and provide a more informed basis for further judicial consideration."  *AT&T II*, 567 F.2d at 130.

The Committee claims that efforts "to reach an accommodation to secure Mr. McGahn's testimony … ended in a stalemate necessitating judicial intervention," because "the White House declined all of the proposed accommodations offered by the Committee."  Pl.'s Mem. at 16, 18. But the Committee's one-sided recounting of the parties' negotiations omits reference to the key avenue, suggested by the White House, by which an accommodation might be reached—exploring the possibility of an interview, on appropriate terms, that would give the Committee what it claims to need most, the testimony of Mr. McGahn.  Purpura Decl. ¶ 18.  The Administration remains willing to pursue discussions with the Committee for a possible interview with Mr. McGahn, taking into account developments since the parties last discussed the issue in July.  *Id.* ¶ 20.  Thus, the Committee's position in this case reduces to the startling proposition that this Court should decide difficult and potentially far-reaching questions concerning the separation of powers—a decision that could disturb the Constitution's allocation of power among all three Branches—in order to vindicate the Committee's claimed right to question Mr. McGahn in a hearing room, instead of a conference room.

That is not an objective, we submit, for which the Court should place the Constitution's fundamental balance of power among the Branches at risk.  Even if this Court concludes that it has jurisdiction to entertain this suit, that the Committee has stated a claim on which relief can be granted, and that the Committee has a cause of action, the Court should still dismiss (without prejudice)—or at the very least, stay—this action so the parties can continue the accommodation process and perhaps obviate the need for this suit.

V.    **DEFENDANT IS ABSOLUTELY IMMUNE FROM COMPELLED CONGRESSIONAL TESTIMONY ABOUT HIS OFFICIAL DUTIES AS COUNSEL TO THE PRESIDENT.**

Should this Court proceed to the merits, Mr. McGahn is entitled to judgment as a matter of law, because he is immune from process seeking to compel him to testify before Congress, or its committees, about his official duties as an immediate advisor and Counsel to the President. Fundamental separation-of-powers principles protect both the independence and autonomy of the Presidency, and the confidentiality essential to the President's effective performance of his myriad critical functions under the Constitution.  It follows from these principles that the President's immediate advisors—those White House advisors with whom the President customarily meets on a regular or frequent basis—must be extended the same absolute immunity from testimonial compulsion by Congress as is the President himself.

A.    **Congress May Not Compel the President's Immediate Advisors to Testify About Their Official Duties.**

The longstanding view of the Executive Branch, reaffirmed by administrations of both political parties for nearly five decades, is that the President's immediate advisors are absolutely immune from compelled testimony before committees of Congress.  *See Testimonial Immunity of the Former Counsel to the President*, at 3 & n.1; *Immunity of the Assistant to the President and Dir. of the Office of Political Strategy & Outreach from Cong. Subpoena*, 38 Op. O.L.C. ___, Slip. Op. at 1-2 (July 15, 2014) ("*Immunity of the Assistant to the President*") (Orloff Exh. E).  That view comes with a strong historical pedigree.  Although, as the Committee observes, Presidents from time to time have voluntarily made senior advisors available for testimony before Congress in the spirit of accommodation and compromise (even while asserting their legal authority not to do so), *see Testimonial Immunity of the Former Counsel*, at 7-12 (surveying historical practice); Pl.'s Mem. at 33 n.19, it remains the case today that at no time in the Nation's history has a senior

advisor to the President given public testimony before Congress pursuant to a subpoena enforced by an Article III court.[10]

The testimonial immunity of the President's immediate advisors is not simply a matter of unbroken tradition.  It flows directly from essential separation-of-powers principles that safeguard the independence and autonomy of the Presidency within our system of government, as well as the confidentiality without which the President could not effectively carry out the many vital functions for which he is constitutionally responsible as head of the Executive Branch.   While the Branches of the Federal Government need not be "entirely separate and distinct," each "[must remain] entirely free from the control or coercive influence, direct or indirect, of either of the others." *Mistretta v. United States*, 488 U.S. 361, 380 (1989) (alteration in original; citation omitted); *accord Nixon v. Fitzgerald*, 457 U.S. 731, 760-61 (1982) ("The essential purpose of the separation of powers is to allow for independent functioning of each coequal branch of government within its assigned sphere of responsibility, free from the risk of control, interference, or intimidation by other branches.").  The Supreme Court thus has been "vigilan[t]" to ensure that exertions of power by one Branch do not "undermine the authority and independence of one or another coordinate Branch," *Mistretta*, 488 U.S. at 383-83, or "impair another [Branch] in the performance of its constitutional duties," *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 382 (2004) (quoting *Clinton v. Jones*, 520 U.S. 681, 701 (1997)).

The testimonial immunity of the President and his advisors arises, in particular, out of the respect that separation-of-powers principles demand for the President's "unique position in the

---

[10]  *Miers* is not to the contrary.  The district court's order declaring that Ms. Miers was legally required to testify pursuant to the Judiciary Committee's subpoena was stayed pending appeal by the D.C. Circuit.  *Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 910-11 (D.C. Cir. 2008).  Soon thereafter the case settled and was voluntarily dismissed, pursuant to an agreement providing for a transcribed interview of Ms. Miers by the Committee, not testimony at a public hearing.  *See* Unopposed Mot. for Voluntary Dismissal, No. 1:08-cv-0409 (JDB) (D.D.C.), ECF Nos. 68 & 68-1 (Orloff Exh. F).

constitutional scheme" as "the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Fitzgerald*, 457 U.S. at 749-50; *see also Cheney*, 542 U.S. at 382.  The same respect is owed for the "singularly unique role under Art. II of a President's communications and activities, related to the performance of duties under that Article," *United States v. Nixon*, 418 U.S. at 715.  "[S]pecial considerations control when the [Presidency's] interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Cheney*, 542 U.S. at 385; *see also Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 226 (D.C. Cir. 2013) (same).

Owing to the President's unique status as the single individual in whom all authority of a separate, co-equal Branch of the Federal Government is vested, the Constitution's separation of powers protects the President from congressional encroachments on the independence and autonomy of his office.  *See Kendall v. United States*, 37 U.S. 524, 610 (1838) ("[A]s far as [the President's] powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power."); *see Cheney*, 542 U.S. at 385.  The President is also "entitled to confidentiality in the performance of his 'responsibilities' and 'his office,' and 'in the process of shaping policies and making decisions.'" *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) ("*AAPS*") (quoting *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 449 (1977) ("*Nixon v. GSA*").  Both the Supreme Court and the D.C. Circuit have emphasized the manifest importance "to the operation of Government" of allowing the President to keep his communications confidential and the "constitutional underpinnings" of that authority in the separation of powers. *United States v. Nixon*, 418 U.S. at 705-06, 708; *In re Sealed Case*, 121 F.3d 729, 742 (D.C. Cir. 1997) (reaffirming the "great public interest in preserving the confidentiality of conversations that take place in the President's performance of his official duties because such confidentiality is

49

needed to protect the effectiveness of the executive decision-making process") (internal quotation marks omitted) (quoting *Nixon v. Sirica*, 487 F.2d at 717); *AAPS*, 997 F.2d at 909-10 (acknowledging the President's "great need to receive advice confidentially" from those in "operational proximity" to him "as an important condition to the exercise of executive power"); *see also Ctr. for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836, 843 (D.C. Cir. 2008).

For these reasons of autonomy, and confidentiality, the President himself is absolutely immune from testimonial compulsion by Congress or its committees—a proposition that the Committee does not dispute. A committee of Congress could not, consistent with the separation of powers, hale the President before it and compel him to testify under oath, any more than the President may "compel congressmen to appear before him." *See Assertion of Exec. Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) (Opinion of Attorney General Reno) Not once in the Nation's history has a current or former President submitted to congressional testimonial compulsion.

If the President could be summoned by Congress to testify regarding his official actions, "fundamental separation of powers principles—including the President's independence and autonomy from Congress—would be threatened." *Immunity of the Assistant to the President*, at 2 (citation omitted). "[A]llowing Congress to subpoena the President to appear and testify would 'promote a perception'—and, eventually, the expectation—"that the President is subordinate to Congress, contrary to the Constitution's separation of governmental powers into equal and coordinate branches." *Testimonial Immunity of the Former Counsel* at 4 (citation omitted). The President would no longer be the head of "a separate and wholly independent Executive Branch," *Bowsher* , 478 U.S. at 722, but rather a subordinate answering to superiors.[11]

---

[11] The Constitution recognizes only a limited Presidential obligation to report to Congress, providing that the President shall "from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary

The President's immediate advisors—the trusted inner circle who customarily meet with him on a regular or frequent basis—are an extension of the President himself and are thus shielded by this same immunity. *Immunity of the Assistant to the President* at 2. For the President's immunity to be effective, and for the underlying separation-of-powers principles to be adequately protected, his immediate advisors must also be free from compelled congressional testimony. "The demands of the office require the President to rely on senior advisers who serve as [his] alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Testimonial Immunity of the Former Counsel* at 5 (internal quotation marks and citations omitted). *See also In re Sealed Case*, 121 F.3d at 750 ("The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers."); *AAPS*, 997 F.2d at 909 (noting importance of the President's ability to consult confidentially with his advisors "to the exercise of executive power"). Presidents have long relied on this nucleus of confidential White House advisors, even more than their Cabinets, to obtain advice and assistance.[12] As a result, unique among Executive Branch

---

and expedient." U.S. Const. art. II, § 3. The Framers plainly did not contemplate that Congress, like the British Parliament, would possess the authority to demand that the Chief Executive appear and answer questions at any time suitable to the Legislature. "[U]nlike parliamentary systems, the President, under Article II, is responsible not to the Congress but to the people." *Bowsher*, 478 U.S. at 721 (citing U.S. Const. art. II, § 4).

[12] Harold C. Relyea, *The Executive Office of the President: A Historical, Biographical, and Bibliographical Guide* 6 (Harold C. Relyea, ed. 1997). Upon enactment of the Reorganization Act of 1939, one of the components of the newly created Executive Office of the President was the "White House Office," also known as the "Office of the President," which was intended "to serve the President in an intimate capacity in the performance of the many detailed activities incident to his immediate office." 4 Fed. Reg. 3864, Exec. Order No. 8248 (Sept. 8, 1939). The President's advisers within the Office of the President – including the Counsel to the President – continue to serve in this capacity. *See Judicial Watch*, 726 F.3d at 216 (the staff and units within the Executive Office of the President whose "sole function is to advise and assist the President" are referred to collectively as the "Office of the President"); *Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1295 (D.C. Cir. 1993). *See also* Purpura Decl. ¶¶ 4-5.

personnel, the President's immediate advisers "provide assistance of the most intimate sort to the President in carrying out the responsibilities of his office." John R. Steelman & H. Dewayne Kreager, The Exec. Office as Admin. Coordinator, 21 L. & Contemp. Probs. 688, 689 (1956) (Orloff Exh. G).

Because Congress cannot compel the appearance of the President himself, the President's most intimate advisors would become the next most "easily identifiable target[s]" for congressional inquiry, *see Fitzgerald*, 457 U.S. at 753, were they not immune from congressional process. Authorizing dozens of congressional committees to compel the President's immediate advisers to appear and testify at the times and places of the committees' choosing would allow those committees to "wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." *Testimonial Immunity of the Former Counsel*, at 5 (citation omitted). Congress could also attempt to exert undue influence over the President's decision-making by exposing, through questions posed, matters that are sensitive and ongoing, or by demanding that his advisors justify or explain Executive actions and decisions. And, in the case of the President's current advisers, preparing for such probing inquiries and examinations would force them to divert substantial time and attention from their duties to the President at the whim of congressional committees. Just as Congress could not circumvent the constitutional bar on compelling sitting Article III judges to testify by subpoenaing current or former clerks to testify about their work on cases coming before them, it cannot circumvent the President's immunity by summoning his closest aides to testify about their duties.

Subordinating immediate Presidential advisors to public interrogation "would risk significant congressional encroachment on, and interference with, the President's prerogatives and his ability to discharge his duties with the advice and assistance of his closest advisers," *id.*, as

well as promote a perception of Presidential subordination to Congress.  *Immunity of the Assistant to the President* at 3.  Thus, "[g]iven the close working relationship that the President must have with his immediate advisors as he discharges his constitutionally assigned duties," "[s]ubjecting [those advisors] to the congressional subpoena power would be"—in terms of its consequences for Presidential autonomy and independence, and the intended balance of constitutional power between the elected branches—"akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions."  *Id.* (alterations in original; citation omitted).  Allowing Congress to exert such authority and influence over the President's conduct of his duties and responsibilities by wielding testimonial power over his closest advisors would clearly violate the separation of powers.  *See Loving v. United States*, 517 U.S. 748, 757 (1996) ("[T]he separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties."); *Ctr. for Arms Control*, 531 F.3d at 843 ("When the Legislature purports to affect the prerogatives of the President *or his subordinates*, we must ask whether it 'impermissibly undermines the powers of the Executive Branch, or . . . prevent[s] [it] from accomplishing its constitutionally assigned functions.'")  (emphasis added) (quoting *Morrison v. Olson*, 487 U.S. 654, 685 (1988)).

In addition to protecting the independence and autonomy of the Presidency, the Constitution accords the President's immediate advisors testimonial immunity to ensure that the President can obtain sound and candid advice.  "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately."  *United States v. Nixon*, 418 U.S. at 708.  Allowing Congress to interrogate the President's most senior advisors could jeopardize his constitutionally protected interests in obtaining the sort of frank counsel that is possible only in a confidential setting.

Compelled congressional testimony would "create an inherent and substantial risk of inadvertent or coerced disclosure of confidential information." *Immunity of the Assistant to the President*, at 4. Given the nature of the relationship between the President and his close advisors, a committee's examination of those advisors almost certainly would include "a wide range of unanticipated and hostile questions about highly sensitive deliberations," *Testimonial Immunity of the Former Counsel*, at 6, seeking to gain insight into the President's thinking or future decisions. Asserting Executive privilege on a question-by-question basis could not adequately safeguard against that risk. Under intense public questioning by highly adversarial, even coercive committee members, a President's advisors might succumb to demands to reveal details of sensitive matters discussed with him. *Id.* Without time for reflection, a witness "may be unable to confine [his or her] remarks only to those which do not impair the deliberative process." *Id.*

Even the mere knowledge that they could be subjects "of compelled interrogation by a potentially hostile congressional committee about confidential communications with the President … could chill presidential advisers from providing unpopular advice or from fully examining an issue with the President or others." *Id.* (internal quotation marks and citation omitted). *See also In re Sealed Case*, 121 F.3d at 750 ("If presidential advisers must assume they will be held to account publicly for all approaches that were advanced, considered but ultimately rejected, they will almost inevitably be inclined to avoid serious considerations of novel or controversial approaches to presidential problems."). The resulting detriment to "the effectiveness of the executive decision-making process," *id.* at 742, would also undermine the Constitutional objectives that the separation of powers is meant to promote.

Although neither the Supreme Court nor the D.C. Circuit has yet considered whether Congress may subject the President's immediate advisors to compulsory testimonial process, the same considerations led the Supreme Court to extend to congressional aides the same immunity

that is afforded to Members of Congress themselves under the Speech and Debate Clause, U.S.

Const., art. I, § 6, cl. 1, even though the Clause makes no reference whatsoever to legislative aides.

*Gravel v. United States*, 408 U.S. 606, 616-17 (1972).  The Court reasoned in *Gravel* that

> it is literally impossible, in view of the complexities of the modern legislative process … for Members of Congress to perform their legislative tasks without the help of aides and assistants; that the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos; and that if they are not so recognized, the central role of the Speech or Debate Clause— to prevent intimidation of legislators by the Executive and … a possibly hostile judiciary…—will inevitably be diminished and frustrated.  [*Id.*]

The logic employed in *Gravel* also dictates the conclusion that the President's immediate

advisors must share in his absolute immunity from compelled congressional testimony.   Because

the President's immediate advisors are his "alter egos," whose function is to carry out on his behalf

the countless responsibilities of his office that "it is literally impossible" for him to perform alone,

408 U.S. at 616-17, the power to compel their testimony before committees of Congress would, as

discussed above, risk significant Legislative encroachment on and interference with Presidential

decision-making, create a perception (and expectation) of Presidential subjugation to the

Legislature, and reduce the President's access to sound and candid advice.   The resulting

impairment of the President's "ability to carry out the functions entrusted to him by the

Constitution" would "'diminish[ ] and frustrate[ ]' the purpose of the President's own absolute

immunity from such process," *Immunity of the Assistant to the President* at 5 (quoting *Gravel*, 408

U.S. at 617), and violate the Constitutional separation of powers.

## B.  The Counsel to the President Is an Immediate Advisor to Whom Testimonial Immunity Applies.

Once the testimonial immunity of the President's immediate advisors is acknowledged, it

is not necessary to ascertain for purposes of this case just how wide or narrow is the circle of

Presidential aides who may be considered his "immediate" advisors.   The Committee does not

dispute that the Counsel to the President qualifies as an immediate advisor to the President. *See Testimonial Immunity of Former Counsel* at 14-15 (citations omitted). Nor could it.

The Counsel to the President is the senior-most lawyer in the White House and his office is thus "at the hub of all presidential activity." Mary Anne Borrelli et al., Baker Inst. for Pub. Policy, "The White House Counsel," 13 (2017), http://whitehousetransitionproject.org/wp-content/uploads/2016/03/WHTP2017-29-Counsel.pdf (Orloff Exh. H). The Counsel's "mandate is to be watchful for and attentive to the legal issues that may arise in policy and political contexts in which the [P]resident plays a role," and to that end to "monitor[ ] and coordinate[ ] the [P]residency's interaction with other players" in and out of the Executive Branch. *Id.*

Thus the Counsel is responsible for myriad tasks touching "on all aspects of Presidential activity." *See* Purpura Decl. ¶ 6. These include drafting and/or reviewing Executive Orders and other Presidential memoranda, proclamations, and policy directives; reviewing pardon requests; interpreting treaties; and review and advice concerning proposed covert and military operations such as terrorist surveillance and drone strikes. *Id.* at 21, 24. The Counsel's Office is intimately involved in the selection and vetting of nearly 1,500 Presidential nominees to Senate-confirmed positions in the Executive Branch, as well as judicial nominees, and in assisting them through the confirmation process. *Id.* at 27-31. The Counsel's Office also reviews legislative proposals, and bills presented for Presidential signature or veto, and is routinely involved in negotiations with the Legislative Branch concerning matter of policy, requests for information, and nominations. *Id.* at 31. The Counsel serves, in addition, as a gatekeeper for contacts between the White House and the Department of Justice, *id.* at 35, and oversees the White House's response to document requests and subpoenas served by committees of Congress, *id.* at 34. To perform these many functions on the President's behalf, the Counsel interacts regularly with the President, the White House Chief

of Staff (and his Office), the Vice President's Office, virtually every unit in the White House, and most Executive Branch departments and agencies.  *Id.* at 16, 38, 48-49, 55-56.

Clearly, the role of the Counsel is to provide advice and assistance to the President and to carry out "responsibilities of utmost discretion and sensitivity" on his behalf in all realms of domestic, military, and foreign affairs.  *Fitzgerald*, 457 U.S. at 749-50.  There are few persons, if any, within a President's inner circle of advisors in whom the President must place greater trust and confidence in order to discharge his constitutionally assigned responsibilities effectively.

**C.    Defendant Remains Immune From Compelled Congressional Testimony About His Duties Even Though He No Longer Serves as Counsel to the President.**

Mr. McGahn also retains his testimonial immunity as an immediate Presidential advisor even though he has left office.  The same separation-of-powers principles that confer his immunity dictate that former advisors remain immune from compelled congressional testimony about official matters that occurred during their tenure.

While a President no longer depends on the daily advice and assistance of a former advisor, the risk to Presidential autonomy posed by compelling that advisor to testify a committee hearing continues even after the conclusion of the advisor's time in office.  *Testimonial Immunity of the Former Counsel*, at 16.  The public spectacle of haling former advisors to a sitting President before a committee of Congress could just as effectively promote a perception of Executive subservience to the Legislature as would haling current aides.   And if the immunity dissipated as soon as Presidential advisors left office, the knowledge that they could be publicly subjected to politically hostile and accusatory questioning by legislators on account of advice they may have given to the President, or actions taken on his behalf, would surely exert influence over their conduct in office, and could adversely affect the quality and candor of the counsel they offered him.   The

effectiveness of the Executive decision-making process could be substantially impaired, and the purpose of extending testimonial immunity in the first place would be eviscerated.

The confidentiality interests in the advice furnished by former advisors also remain just as strong, and the protection afforded to those interests by testimonial immunity would be just as weakened if the immunity evaporated with staff turnover.  *See id.* at 16 (citation omitted).  As the Supreme Court has  observed, "[t]he confidentiality necessary" to a President's receipt of "full and frank submissions of facts and opinions" from his advisors "cannot be measured by the few months or years between the submission of the information and the end of the President's tenure."  *See Nixon v. GSA*, 433 U.S. at 449-50.  Nor can the confidentiality required be measured by the few months or years of an advisor's term in office, either.

The Constitutional interests safeguarding the autonomy and confidentiality of the Presidency continue to immunize Mr. McGahn from Legislative process seeking testimony about his official duties, even though he no longer serves as the President's Counsel and close advisor.

> ### D.     The Committee's Arguments to the Contrary Misread Precedent and Disregard Separation-of-Powers Principles.

The Committee disputes the testimonial immunity of the President's immediate advisors as unsupported in the law, contrary to precedent, and an impediment to Congress's fulfillment of its Constitutional functions.  Pl.'s Mem. at 27.  Both the Committee and, respectfully, the principal decision on which it relies—the stayed district court decision in *Miers*—misconstrue precedent and fail to properly analyze the fundamental separation-of-powers principles discussed above.

> #### 1.     The testimonial immunity of immediate Presidential advisors is supported, not "foreclosed," by *Harlow v. Fitzgerald.*

Citing *Miers*, the Committee argues first that reliance on *Gravel's* extension of Speech and Debate Clause immunity to Legislative aides as precedent for the testimonial immunity of Presidential advisors is "virtually foreclosed" by *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).  Pl.'s

Mem. at 28-29.  According to the Committee, *Harlow*, in "h[olding] that Presidential aides … are not absolutely immune from civil damages liability based on their official acts," "declined to extend *Gravel's* 'alter ego' concept to Presidential advisors."  *Id.* at 29; *see also Miers,* 558 F. Supp. 2d at 100-02.  But the Committee and *Miers* both misread *Harlow* and draw exactly the wrong conclusion from the Supreme Court's decision.

The issue presented in *Harlow* was whether "*every* Presidential subordinate based in the White House" was entitled to absolute immunity from suit for damages, 457 U.S. at 809 (emphasis added), and the Court decided only "that Presidential aides, like Members of the Cabinet, *generally* are entitled only to a qualified immunity, *id.* (emphasis added).  *See also id.* at 811 ("The *undifferentiated extension* of absolute 'derivative' immunity to the President's aides . . . could not be reconciled with the 'functional' approach that has characterized the [Court's] immunity decisions.") (emphasis added).  But an "undifferentiated extension" of absolute immunity to "every Presidential subordinate based in the White House" is not what is claimed here.  Absolute testimonial immunity is limited to the President's *immediate* advisors, the members of the trusted inner circle with whom the President customarily meets on a *regular or frequent basis*, who "assist him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities."  *Testimonial Immunity of the Former Counsel*, at 5.  That small circle of close aides excludes the vast majority of "Presidential subordinate[s] based in the White House."  *Harlow*, 457 U.S. at 809.

*Harlow*, once properly understood, supports the extension of absolute testimonial immunity to the President's immediate advisors, and it points to *Gravel* as precedent for doing so. Far from "explicitly and definitively reject[ing]" absolute immunity for the President's advisors, Pl.'s Mem. at 29 (quoting *Miers*, 558 F. Supp. 2d at 101), the Court in *Harlow* acknowledged that

"[f]or aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy, absolute immunity might well be justified to protect the unhesitating performance of functions vital to the national interest." 457 U.S. at 812.  That conclusion was consistent, as the Court noted, with its "functional approach" to questions of immunity.  *See Harlow*, 457 U.S. at 807 ("For officials whose special functions require[ ] complete protection from suit, we have recognized the defense of 'absolute immunity.'"); *Fitzgerald*, 457 U.S. at 747, 749-50 (same). Notably, the Court also cited *Gravel* as support for the conclusion that "some aides are assigned to act as Presidential 'alter egos' in the exercise of functions for which absolute immunity is essential for the conduct of the public business." *Id.* at 812 n.19 (citing *Gravel*, 408 U.S. at 616-17, 620).  Indeed, the Court left open the door for the *Harlow* petitioners, on remand, to make a showing that the functions of their respective offices required an exemption from liability "of absolute scope." *Id.* at 813.

That showing has been made in this case.  Mr. McGahn, as Counsel to the President, was responsible for providing advice and assistance directly to the President in connection with countless Presidential duties concerning the appropriate use of Executive power, national security, foreign affairs, Presidential appointments, and Legislative relations.  *See supra* at 60.  The "vital functions" of the Counsel as the President's alter ego require "unhesitating performance," for which absolute immunity against compelled congressional testimony is a necessary guarantee. *Harlow*, 457 U.S. at 812.  Regardless of which of the President's other advisors satisfy this test, the White House Counsel surely does.

Moreover, it should not be overlooked that *Harlow* arose in the context of a civil suit for money damages.  *See* 457 U.S at 802.  The immunity analysis here, however, must also take into account the greater threat to the President's autonomy and confidentiality that is posed by congressional demands for the testimony of immediate Presidential advisors.  *See Fitzgerald*, 457

U.S. at 754 (in each case where separation-of-powers concerns are raised, "a court … must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch"); *United States v. Nixon*, 418 U.S. at 711-12; *In re Sealed Case*, 121 F.3d at 742.

"[T]he separation of powers concerns that underlie the need for absolute immunity from congressional testimonial compulsion are not present to the same degree in civil lawsuits brought by third parties," in which courts, acting as neutral arbiters applying impartial procedural rules, offer assurances against irrelevant, argumentative, harassing, and other abusive forms of questioning and inquiry that cannot be counted on at congressional hearings. *Immunity of the Assistant to the President*, at 5-6;[13] *see also Testimonial Immunity of the Former Counsel*, at 13-14 (citing Archibald Cox, *Executive Privilege*, 122 U. Pa. L. Rev. 1383, 1429 (1974) (as compared to civil litigation "[t]he need to protect aides and subordinates from reprisals … is a thousand-fold greater in the case of congressional hearings, which are often the preserves of individual Senators and Congressmen not all of whom are invariably characterized by judicious self-restraint").[14]

---

[13] As OLC observed, in congressional inquiries into Executive Branch activities, which, unlike damages suits against Presidential advisors, are common, "subpoenaing committee[s] [are] both … interested part[ies] and the presiding authorit[ies], asking [the] questions … setting the rules for the proceeding[s] and judging whether witness[es] ha[ve] failed to comply with [them]," heightening risks that presidential advisors will be subjected "to coercion and harassment," that a perception of Presidential subordination will develop, and that confidential Presidential communications may be disclosed. *Immunity of the Assistant to the President*, at 6.

[14] In reaching the conclusion that Presidential aides generally are entitled only to qualified immunity from suit, the *Harlow* Court also reasoned that blanket extension of absolute immunity to all White House aides could not be reconciled with the Court's holding in *Butz v. Economou*, 438 U.S. 478 (1978), that Members of the Cabinet enjoy only qualified immunity from suit. 457 U.S. at 808-09. But for purposes of testimonial immunity, the President's immediate advisors are distinguishable in all pertinent respects from Members of the Cabinet. The heads of Executive departments are entrusted with responsibility for the enforcement of Federal laws enacted by Congress and the administration of Federal agencies created by Congress, and rightly may be called to account to Congress for their performance in office. The President's immediate advisors, however, exercise no administrative or enforcement authority of their own, and instead act solely to advise and assist the President in the performance of his duties. No equivalent justification lies for calling them to account to Congress for the manner in which they perform that unique function.

### 2. Absolute testimonial immunity is not inconsistent with the Executive's qualified immunity against evidentiary process.

The Committee next maintains that recognizing the testimonial immunity of the President's immediate advisors contravenes precedent holding that the President can be compelled to respond to *document* subpoenas, and that Presidential communications enjoy only a qualified protection from discovery. The Committee principally relies for this argument on *U.S v. Nixon*, *Senate Select Committee,* and *Nixon v. Sirica*, *see* Pl.'s Mem. at 29-32, all of which concerned subpoenas to the President for tape recordings and documents concerning meetings and conversations of his with others, but not testimony. The Courts in these cases, therefore, did not confront demands that the President or his immediate advisors appear before committees of Congress and subject themselves to questioning on terms and in a manner wholly of Congress's choosing.

Thus, in balancing "the constitutional weight of the interests served" by disclosure against "the dangers of intrusion on the authority and functions of the Executive Branch," *Fitzgerald*, 457 U.S. at 754, these Courts did not have to take into account the principal threats to Presidential autonomy and confidentiality that compelled congressional testimony by the President or his immediate advisors would pose—potential congressional harassment, coercion, and undue influence on Executive decision-making, perceived subordination of the President to the Legislature, and heightened risk that the confidentiality of sensitive information, and hence the caliber of Executive deliberations and decision-making, will be compromised. *See supra* at 50-54. Because the courts in these cases did not have to consider the separation-of-powers issues implicated here, they simply do not speak to the immunity at issue.

The case on which the Committee most heavily relies, *U.S. v. Nixon*, makes clear for additional reasons that it does not control. *Nixon* concerned a criminal trial subpoena for tapes and other documents memorializing Presidential conversations and meetings. 418 U.S. at 687-88. In holding that the President was entitled only to a qualified privilege against the production of these

materials, the Court stressed that it was "address[ing] only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in *criminal trials*," and not the need for evidence in civil litigation, or the conflict between the President's "confidentiality interest and congressional demands for information." *Id.* at 712 n.19 (emphasis added). The Court emphasized that an absolute privilege to "withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts." *Id.* at 712-13; *see also id.* at 708-09 ("The need to develop all relevant facts in the [criminal justice] system is both fundamental and comprehensive.").

Noting this express limitation on the scope of *Nixon's* holding, both the Supreme Court and the D.C. Circuit have held, in turn, that the balance struck in that case does not dictate the outcome of the separation-of-powers calculus in other contexts. In *Cheney*, the Court explained that because "the need for information in the criminal context is 'much weightier'" than in civil actions, civil discovery requests "d[o] not share the urgency or significance of the criminal subpoena requests in *Nixon.*" 542 U.S. at 384. Similarly, in *In re Sealed Case*, the D.C. Circuit, after noting the limits of *Nixon's* holding, 121 F.3d at 743, underscored that its decision on the scope of the Presidential communications privilege in judicial proceedings in no way affected "the scope of the privilege in the congressional-executive context," where "the institutional needs of Congress and the President [must] be balanced," *id.* at 753.[15]

---

[15]     *In re Sealed Case* also explains at length why the privilege for Presidential communications must include communications by and among Presidential advisors conducted or prepared in the course of formulating advice for the President, because restricting the privilege just to those communications directly involving the President "would indeed impede effective functioning of the Presidency." 121 F.3d at 748-52. Thus, *In re Sealed Case* endorses by example the rationale for extending the President's testimonial immunity to his immediate advisors.

### 3.     Individualized assertions of executive privilege are not a substitute for testimonial immunity.

The Committee suggests at several turns that the separation-of-powers concerns to which compelled congressional testimony of the President's immediate advisors would give rise can be addressed "through a case-specific assertion of executive privilege and weighing of competing interests" on a "question-by-question basis."  Pl.'s Mem. at 32-33, 42.  But that simply is not so. First, the option of invoking executive privilege offers no protection against the potential use of compulsory testimonial process to harass or retaliate against the President's immediate advisors in an effort to improperly influence or interfere with Presidential decision-making, thus encroaching on the autonomy of the Executive Branch.  *Immunity of the Assistant to the President*, at 3.

Second, reliance on executive privilege to decline to answer specific questions at a committee hearing would be insufficient even to eliminate threats to the President's constitutionally protected interests in confidentiality, as discussed above.  Presidential advisors could be asked "a wide range of unanticipated and hostile questions" about highly delicate matters, and "[i]n the heat of the moment, without opportunity for careful reflection," might inadvertently reveal sensitive information.  *Testimonial Immunity of the Former Counsel* at 6.  "[E]ven the prospect of compelled interrogation by a potentially hostile congressional committee about communications with the President … could chill presidential advisers from providing unpopular advice or from fully examining an issue," *id.*, thus impeding the flow of information and advice that the President requires for sound decision-making and effective governance.[16]

What is more, given the predictable frequency with which questions posed to immediate Presidential advisors would intrude on matters falling within the scope of executive privilege, each

---

[16]  *See also Senate Select Committee*, 498 F.2d at 729-30 (observing that the guarantee of confidentiality necessary to the Presidential decision-making process could be threatened even by case-by-case judicial weighing of the claimed need for confidentiality against countervailing public interests of the moment).

appearance by a senior Presidential advisor could entail scores of individual claims of privilege, presumably to be resolved, at least in the Committee's estimation, by the federal courts via yet more suits litigating those privilege invocations.  That vision of recurrent inter-Branch litigation over claims of executive privilege is at war with the Supreme Court's stern admonition in *Cheney* that the "constitutional confrontation[s] between the … branches" occasioned by assertions of executive privilege "should be avoided whenever possible."  542 U.S. at 389-90.

### 4. Absolute testimonial immunity for immediate Presidential advisors does not violate the separation of powers.

Finally, the Committee attempts to turn the tables by arguing that absolute testimonial immunity for immediate Presidential advisors itself threatens the separation of powers by "impeding Congress' access to information important for its impeachment, legislative, and oversight functions," and in doing so "places the President above the law."  Pl.'s Mem. at 3, 34-36.  The over-the-top claim that extending the President's unquestioned testimonial immunity to his closest aides places him "above the law" is "rhetorically chilling but wholly unjustified." *Fitzgerald*, 457 U.S. at 758 & n.41; *see also Cheney*, 542 U.S. at 382 (respect for the "unique position" occupied by the Office of the President in the Constitutional scheme does not mean that the President is "above the law").  Congress has ample political tools other than compulsion via civil litigation to obtain the testimony of immediate Presidential aides, and, as the record here shows, the White House sought to reach an accommodation of the Committee's desire to hear from Mr. McGahn.  Recognizing that the Committee cannot forcibly compel his testimony does not place the President "above the law" any more than speech-and-debate immunity for congressional staff allows Members of Congress to "stand above the law."  *Gravel*, 408 U.S. at 615.

The Committee also maintains throughout its brief that Mr. McGahn's testimony regarding events described in the Special Counsel's Report is "crucial," "vital," and "immensely important," Pl.'s Mem. at 2, 15, 42, and that the failure to obtain his testimony "hamper[s]," "hinders," and

"imperils" the Committee's impeachment inquiry, its consideration of proposed legislation, and its plans for "oversight" of pending criminal investigations, *id.* at 3, 9, 37-40. These appeals fail to resonate, however, when considered in light of the accommodations the Executive Branch already has made (and offered to make) to the Committee, the alternative sources of relevant information at its disposal, and the public statements of Committee Chairman Nadler.

First, the Committee has had access to the Special Counsel Report itself, which already describes in painstaking detail the events concerning which the Committee would have Mr. McGahn's testimony, and includes, as the Committee itself observes, more than 160 references to statements made by Mr. McGahn. Pl.'s Mem. at 14. The Department of Justice has made public a minimally redacted version of the Report, from which has been withheld only grand jury information, sensitive information concerning national security and ongoing law-enforcement investigations, and information about peripheral individuals. Lasseter Decl. Exh. F at 3. No information was withheld from the Report on the basis of Executive privilege. *Id.* The Chairman and Ranking Member of the Committee have been given full access to the Report, with the sole exception of minimal redactions of protected grand jury information. *Id.* at 4. That grand jury information comprises only a tiny percentage (1.5 percent) of the Report overall, and a miniscule fraction—one-tenth of one percent—of Volume II. *Id.* Exh. I at 1. Redactions for grand jury information appear on only five pages in Volume II, none appears in paragraphs discussing Mr. McGahn, and the redactions were so surgically made that the surrounding text still provides a clear picture of the events reported. *See* Report at Vol. II at 13, 18, 46, 97, & 105.

Second, the Department of Justice has agreed in addition to provide to the Committee (and has already begun to produce for inspection), scores of appropriately redacted FBI interview reports referenced in Volume II of the Report. Lasseter Decl. ¶ 3. The reports to be produced include the reports of interviews (five in all) conducted with Mr. McGahn. And as the Committee

furtively acknowledges, *see* Pl.'s Mem. at 17 n.12, the White House has reached an accommodation with the Committee for the production of the documents sought in its April 22, 2019, subpoena to Mr. McGahn.  Purpura Decl. ¶ 21.

Third, the Committee has obtained the testimony of two former Presidential aides to whom it issued subpoenas, Hope Hicks, former Assistant to the President and Director of Strategic Communications, and Annie Donaldson Talley, former Chief of Staff to Mr. McGahn and Deputy Counsel to the President.  The Committee questioned Ms. Hicks, in a transcribed interview, concerning events described in the Special Counsel's Report that occurred prior to Ms. Hicks' service in the White House.  *See* Compl. Exh. EE.  The Committee also obtained testimony through answers to written questions from Ms. Donaldson Talley.  Compl. Exhs. FF, HH.

Given the wealth of information that the Executive Branch already has made available to the Committee concerning the events described in Volume II of the Special Counsel's Report, it comes as no surprise that Chairman Nadler recently stated the Committee could move forward with articles of impeachment even if it never secured Mr. McGahn's testimony.  *See* Kyle Cheney, *Nadler: Impeachment timetable doesn't hinge on Don McGahn*, Politico (Sept. 9, 2019) (Orloff Decl. Exh. I).  According to the Chairman, "[T]here's a lot of testimony [the Committee] has without McGahn," and "there are other possible articles of impeachment to which McGahn is irrelevant."  *Id.*  It is also unsurprising, therefore, that despite claims by the Committee that Mr. McGahn is the "single most important witness" in its investigation, Pl.'s Mem. at 36, *see also id.* at 14, and that its "need" for his testimony is "urgent," *id.* at 3, the Committee has identified no specific facts or information, available exclusively from Mr. McGahn, that it needs to carry out the Committee's asserted impeachment, legislative, and oversight functions.  The most the Committee has to say is that Mr. McGahn's testimony is "particularly important" because the

President has disputed Mr. McGahn's version of events as reported in Volume II.  Pl.'s Mem. at 15-16.  But any such dispute would remain whether Mr. McGahn testifies or not.[17]

Certainly the Committee offers no explanation why achieving any of its stated objective requires that Mr. McGahn appear at a Committee hearing rather than a committee interview, as the White House is prepared to consider.  Under appropriate terms and conditions to mitigate Executive Branch institutional concerns regarding congressional testimony by immediate Presidential aides, an interview of Mr. McGahn—which the Committee conceivably could have conducted months ago had it been willing even to consider the idea when the White House raised it, *see* Purpura Decl.  ¶¶ 18-19—would furnish the Committee with just as much information from Mr. McGahn as would public testimony.[18]

---

[17]  Plaintiff suggests that its need for Mr. McGahn's testimony must be considered at its "zenith" simply because the Committee is investigating allegations of Presidential misconduct and evaluating whether to recommend articles of impeachment. Pl.'s Mem. at 34.  But that statement of purpose says nothing about whether Mr. McGahn's testimony, in particular, is necessary to the achievement of the Committee's stated objectives.

[18]  The discussion above also goes to show that even if immediate Presidential advisors enjoyed only a form of qualified testimonial immunity, then Defendant still would be entitled to judgment as a matter of law.  Although no court has considered what showing by Congress would be necessary to overcome an assertion of qualified testimonial immunity by a Presidential advisor, the D.C. Circuit's decision in *Senate Select Committee* suggests a possible approach.  The Court of Appeals held there that the plaintiff committee could overcome the President's assertion of Executive privilege against a subpoena for tape recordings of his conversations with his Counsel only by showing that "the subpoenaed evidence is demonstrably critical to the fulfillment of [its investigatory] functions." 498 F.2d at 731.  Noting that the President had already released redacted transcripts of the taped conversations at issue, the Court of Appeals declined to enforce the committee's subpoena, because the Committee could neither state in specific terms why the transcripts were "deficient" for its needs, nor point to any "specific legislative decisions that [could] not responsibly be made" without access to the tapes. *Id.* at 732-33.  Given the more varied and serious threats that compelled congressional testimony of immediate Presidential advisors poses to the autonomy and effective functioning of the Presidency, the standard articulated and applied in *Senate Select Committee* represents the least that the Committee here should be required to meet, under a hypothetical form of qualified immunity, before a court compelled Mr. McGahn to testify about his official duties as Counsel.  The Committee, having offered not a word in support of its summary judgment motion to explain why the other sources of information available to it are "deficient" in meeting its stated needs, or why the decisions with which it has been tasked "cannot responsibly be made" unless it has access to public testimony from Mr. McGahn, 498 F.2d at 732-33, fails to meet even that minimally acceptable test.

In short, the circumstances of this case dispel the notion advanced by the Committee that testimonial immunity for the President's immediate advisors would deprive Congress of information essential to its legislative, oversight, or impeachment functions.  As discussed *supra*, at 28-29, the Constitution already furnishes Congress with a variety of potent means other than compulsory process—including powers of legislation, appropriation, and confirmation—through which it can work its will on the Executive.  *See Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 319 (D.C. Cir. 1988) ("It scarcely bears more than passing mention that the most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives."); *The Federalist* No. 58 (James Madison) (the "power over the purse may, in fact, be regarded as *the most complete and effectual weapon* with which any constitution can arm the immediate representatives of the people, for obtaining *a redress of every grievance*, and for carrying into effect every just and salutary measure") (emphasis added).

And as both the record here and history confirm, the political Branches traditionally have been capable of resolving their differences over access to information and testimony—even testimony by the President's immediate advisors—through the accommodation process.  *See AT&T I*, 551 F.2d at 394 ("The legislative and executive branches have a long history of settlement of disputes that seemed irreconcilable."); *Testimonial Immunity of the Former Counsel*, at 7-12; Cox, *Executive Privilege*, 122 U. Pa. L. Rev. at 1431 (noting that history "contains little evidence that the nation has suffered from the want of legal power to compel the President to satisfy the demands of Congress to information in the Executive Branch. *Congress has powerful political weapons*.") (emphasis added).  In light of this history, and the record herein, the Committee's arguments furnish no basis on which to conclude that compulsory process for the testimony of the President's immediate advisors is imperative to the functions of the Legislative Branch.

## **CONCLUSION**

For the reasons stated above, Plaintiff's motion for summary judgment should be denied,

Defendant's motion for summary judgment granted, and judgment entered for Defendant as a

matter of law.

Dated:  October 1, 2019

                                        Respectfully submitted,

                                        JOSEPH H. HUNT
                                        Assistant Attorney General

                                        JAMES M. BURNHAM
                                        Deputy Assistant Attorney General

                                        ELIZABETH J. SHAPIRO
                                        Deputy Director


                                         */s/  James Gilligan*
                                        JAMES J. GILLIGAN
                                        Special Litigation Counsel

                                        SERENA M. ORLOFF (CA Bar No. 260888)
                                        STEVEN A. MYERS (NY Bar No. 4823043)
                                        ANDREW BERNIE (DC Bar No. 995376)
                                        Trial Attorneys

                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        P.O.  Box 883
                                        Washington, D.C.  20044
                                        Telephone:  (202) 514-3358
                                        Fax:          (202) 616-8470
                                        Email:       james.gilligan@usdoj.gov

                                        *Attorneys for Defendant*