**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff,*

v.

DONALD F. MCGAHN II,

*Defendant.*

No. 19-cv-2379 (KBJ)

## DECLARATION OF MICHAEL M. PURPURA

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.      I serve as Deputy Assistant to the President and Deputy Counsel to the President in the Office of the Counsel to the President (also known as the White House Counsel's Office, or Counsel's Office), a position I have held since January 7, 2019.  I have previously served as an Assistant United States Attorney, Senior Counsel to the Deputy Attorney General, and Associate Counsel to the President under President George W. Bush.  I have also worked in private practice.

2.      Since March 2019 I have been involved in matters relating to efforts by the Committee on the Judiciary of the House of Representatives (the "Committee") to obtain documents, information, and testimony from the White House and certain current and former White House officials, including former White House Counsel Donald F. McGahn II, pertaining to matters described in the *Report on the Investigation Into Russian Interference in the 2016 Presidential Election* issued by Special Counsel Robert S. Mueller, III (the "Special Counsel's Report" or "Report").

3.      I make this declaration in support of Defendant's motion for summary judgment and opposition to the Committee's motion for summary judgment in the above-captioned case. The statements made herein are based on my personal knowledge or on information made available to me in the course of performing my responsibilities as Deputy Counsel to the President.

### *The Counsel's Office and the Counsel to the President*

4.      Organizationally, the Counsel's Office is part of the White House Office, which is a component of the Executive Office of the President ("EOP"). EOP is comprised of a number of offices and agencies the function of which is to provide the President with the support he needs to perform his constitutionally assigned functions and govern effectively. The components making up the EOP include, among others, the National Security Council, the Office of Management and Budget, the Council of Economic Advisers, the Office of the Vice President, and, as noted, the White House Office.

5.      The White House Office consists of the President's immediate staff, whose sole function is to advise and assist the President in the performance of his duties. The White House Office also has various subcomponents. Among these are the Office of the Chief of Staff, the Office of Legislative Affairs, the Office of Presidential Personnel, the Office of Communications, and the Counsel's Office.

6.      The Counsel to the President (also known as the White House Counsel) is an immediate advisor to the President who advises the President on all aspects of Presidential activity, including the exercise of Presidential power in the realm of domestic and foreign policy, national security, and military affairs; defending the constitutional prerogatives of the Presidency in matters involving the Legislative and Judicial Branches; the legislative process, including signature or veto of specific bills presented for Presidential approval; the selection, vetting, and confirmation of

individuals appointed to Senate-confirmed positions in the Executive Branch and the Judiciary; and coordination with Executive Branch agencies on issues of legal significance to the President and his Administration.  In undertaking these responsibilities, the White House Counsel interacts frequently with the President himself, as well as with senior White House and Executive Branch officials.

7.      Reflecting the extraordinary scope, sensitivity, and importance of the Counsel's responsibilities, the Counsel to the President carries the rank within the White House Office of Assistant to the President.  Assistants to the President are the most senior ranking officials in the White House.  From January 20, 2017 to October 17, 2018, the position of Counsel to the President was held by Mr. McGahn.

### *The Committee Demands Information from Mr. McGahn and Other Former White House Officials*

8.      On March 4, 2019, the Committee sent correspondence to 81 individuals, entities, and Federal Government agencies, including Mr. McGahn and several other current and former White House officials.  These letters attached document requests seeking, among other things, information on a broad range of subjects and events involving the President, conversations with his advisors, actions concerning his Cabinet, and the President's exercise of core functions assigned to him under Article II of the Constitution.

9.      The Committee's March 4 letter to Mr. McGahn sought documents and communications regarding, among other things: (i) the President's communications with former National Security Advisor Michael Flynn, (ii) the termination of former FBI Director James Comey, (iii) discussions between Mr. McGahn and the President regarding the recusal of former Attorney General Jeff Sessions from investigations related to the 2016 presidential campaign, (iv) any possible termination of Mr. Sessions, Deputy Attorney General Rod Rosenstein, or Special

Counsel Robert Mueller from their positions, (v) discussions pertaining to certain FBI officials, (vii) any communications regarding possible pardons for specific individuals, (vii) communications regarding various Justice Department investigations, and (viii) the "contents of meetings between President Trump and Vladimir Putin" on four dates, as well as many other topics. The Committee asked Mr. McGahn to provide these documents by March 18. A true and correct copy of the March 4 document requests is attached as Exhibit A.

10.     On March 18, Mr. McGahn's attorney, William Burck, forwarded the March 4 document requests to the Counsel's Office.

11.     On April 22, 2019, the Committee issued a subpoena to Mr. McGahn demanding production of many of the same documents and communications outlined in the March 4 request, as well as several new categories of information, including "[a]ny documents referenced in the [Special Counsel's] Report" and all "[c]ommunications with the Executive Office of the President regarding" the March 4 requests. The subpoena instructed Mr. McGahn to provide these documents by May 7 and to appear and testify before the Committee on May 21, 2019. A true and correct copy of the subpoena is attached as Exhibit B.

12.     On April 23, Mr. McGahn's attorney, Mr. Burck, forwarded the Committee's subpoena to the Counsel's Office.

13.     On May 7, Counsel to the President Pat Cipollone sent Mr. Burck a letter directing Mr. McGahn, at the instruction of Acting White House Chief of Staff Mick Mulvaney, not to produce any White House documents to the Committee because the requested information implicates significant Executive Branch confidentiality interests. Mr. Cipollone also notified the Committee by letter that Mr. Mulvaney had instructed Mr. McGahn not to produce any White House documents to the Committee and requested that, "[b]ecause Mr. McGahn does not have the

legal right to disclose these documents to third parties, I would ask the Committee to direct any request for such records to the White House, the appropriate legal custodian." True and correct copies of the May 7 correspondence are attached as Exhibit C.

14.     On May 15, 2019, Mr. Cipollone sent a twelve page letter to the Committee elaborating on the institutional interests discussed in the May 7 letter and related legal issues. A true and correct copy of Mr. Cipollone's letter is attached as Exhibit D.  At the outset, Mr. Cipollone emphasized the White House's willingness to work to "accommodate Congress's legitimate requests for information while at the same time respecting the separation of powers and the constitutional prerogatives of the President." Ex. D at 1.  He observed, however, that the Administration had cooperated extensively with the Special Counsel's investigation and gone out of its way to make the Special Counsel's "report available to Congress and the public with minimal redactions." *Id.* at 2.  Mr. Cipollone emphasized that this, itself, was "an extraordinary accommodation in light of long-standing Department of Justice policies regarding the confidentiality of investigations that do not result in prosecution." *Id.*  As yet a further accommodation, "the President did not assert executive privilege over any part of the Special Counsel's report," even though he could have done so. *Id.* Nevertheless, Mr. Cipollone emphasized again that he would continue to "work with the Committee through the constitutionally mandated accommodation process to provide the Committee with information it can properly seek" and explained that it "would greatly advance … that process if the Committee were to narrow the sweeping scope of" its requests and articulate a specific legislative purpose for each one. *Id.* at 4.

15.     On May 20, 2019, Mr. Cipollone sent Mr. Burck a letter notifying him that the Department of Justice's Office of Legal Counsel ("OLC") had advised that Mr. McGahn, as

Counsel to the President and one of the President's most senior advisors, is absolutely immune

from compelled testimony before Congress or its committees regarding his duties in office. Mr.

Cipollone's letter attached a 15-page OLC opinion explaining that absolute immunity of the

President's immediate advisors is a function of the Constitution's separation of powers, is

necessary to protect the independence and autonomy of the Presidency, and is essential to the

confidentiality required for the effective performance of the President's constitutionally assigned

functions. The OLC opinion also explained that Mr. McGahn retained immunity from compelled

congressional testimony about his duties as Counsel even though he no longer holds that position.

Mr. Cipollone also sent a letter to the Committee to notify it of the determination that Mr. McGahn

is immune from compelled testimony, and that he had been instructed by the White House not to

appear for testimony at the Committee's May 21, 2019, hearing. True and correct copies of the

May 20 correspondence are attached as Exhibit E.

### *The White House and the Committee Reach an Accommodation Regarding Documents Sought from Mr. McGahn, but the Committee Refuses to Consider a Transcribed Interview in Lieu of Testimony*

16.     On June 17, 2019, Mr. Barry Berke, an outside consultant for the Committee,

contacted me by e-mail asking for a telephone call to discuss "our subpoenas and the issues that

have been raised." I responded to Mr. Berke's request that same day, and that afternoon I, along

with Deputy Counsel to the President Patrick Philbin, spoke by telephone with Mr. Berke and his

colleague, Mr. Norman Eisen, also a consultant to the Committee. Between June 17 and July 17,

2019, Mr. Philbin and I spoke with Mr. Berke and Mr. Eisen approximately eight times, in person

and by telephone, in an effort to reach an accommodation regarding the McGahn subpoena.

17.     During these conversations, Mr. Philbin and I made clear that the immunity of

immediate Presidential advisors (such as the Counsel) from compelled testimony before Congress

is a longstanding principle of the highest institutional importance to the Executive Branch (as is explained in the OLC opinion). We discussed the fact that we are unaware of any instance in which a Counsel to the President has testified at a committee hearing in response to a subpoena, and emphasized that any agreement to permit Mr. McGahn to testify under any circumstances would represent a significant concession by the White House and break from longstanding precedent. We stated, however, that we were willing to try to reach an accommodation, and discussed several possibilities to that end.

18.     For example, we discussed the possibility of the Committee sending written interrogatories to Mr. McGahn, as it had agreed to do with former Deputy Counsel to the President Annie Donaldson Talley. Alternatively, we discussed the idea of the Committee sending a list of questions to Mr. McGahn in advance of his testimony, or of limiting the Committee's questioning to the information attributed to Mr. McGahn in the Special Counsel's Report. Mr. Philbin and I also offered to consider allowing Mr. McGahn to appear for a private interview rather than for public testimony, subject to appropriate conditions that the parties would have to negotiate. We believed that the private interview format would satisfy the Committee's stated desire to obtain information from Mr. McGahn.

19.     Mr. Berke and Mr. Eisen stated that the Committee was not willing to consider anything other than testimony at a public hearing.

20.     Notwithstanding our failure in July to come to terms under which the Committee could secure Mr. McGahn's testimony, the White House remains prepared to continue discussions with the Committee, and to explore possibilities for a mutually agreeable accommodation that will allow the Committee to question Mr. McGahn about matters of concern to it. Discussions at this

point, of course, would have to take into account any changed circumstances related to developments that have occurred since July.

21.     Despite the parties' inability in July to reach an accommodation for Mr. McGahn's testimony, we were able to achieve an agreement regarding the documents the Committee had subpoenaed from Mr. McGahn.  Mr. Philbin and I proposed that the White House, after reviewing responsive documents in Mr. McGahn's possession for privilege, would begin making responsive, non-privileged documents (or portions of documents) available for review by the Committee.  We conditioned this offer on agreement that the Committee's review of Mr. McGahn's documents would occur subject to the same terms and conditions regarding access to the documents and dissemination of information contained in the documents set forth in a separate accommodation that the Committee had reached with the Department of Justice concerning documents subpoenaed from the Attorney General.  The Committee subsequently agreed to this proposal.  On August 23 and September 4, 2019, I confirmed that we were ready to begin making the McGahn documents available to the Committee as soon as the Committee and the Justice Department resolved a disagreement that had arisen in the meantime about certain terms of their arrangement, which, by our agreement, also apply to the McGahn documents.  I have not heard back from the Committee since that time regarding access to Mr. McGahn's documents.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October ___, 2019.

MICHAEL M. PURPURA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, <br><br> *Plaintiff,* <br><br> v. <br><br> DONALD F. MCGAHN II, <br><br> *Defendant.* | No. 19-cv-2379 (KBJ) |

## INDEX OF EXHIBITS TO DECLARATION OF MICHAEL M. PURPURA

| Exhibit | Document |
|---|---|
| A. | Letter to former Counsel to the President, Donald McGahn, from House Judiciary Committee Chairman Jerrold Nadler, dated March 4, 2019. |
| B. | Subpoena issued by House Judiciary Committee to Donald McGahn, dated April 22, 2019. |
| C. | Letter to William Burck, Esq. from Counsel to the President, Pat Cipollone, dated May 7, 2019. |
| D. | Letter to House Judiciary Committee Chairman Nadler from Counsel to the President, Pat Cipollone, dated May 15, 2019. |
| E. | Letter to William Burck, Esq. from Counsel to the President, Pat Cipollone, dated May 20, 2019. |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, | |
| *Plaintiff,* | No. 19-cv-2379 (KBJ) |
| v. | |
| DONALD F. MCGAHN II, | |
| *Defendant.* | |

# EXHIBIT A

JERROLD NADLER, New York
CHAIRMAN

DOUG COLLINS, Georgia
RANKING MINORITY MEMBER

# U.S. House of Representatives

## Committee on the Judiciary

### Washington, DC 20515–6216

#### One Hundred Sixteenth Congress

March 4, 2019

Donald McGahn, Esq.
c/o William A. Burck, Esq.
Quinn Emanuel Urquhart & Sullivan
1300 I Street NW
Suite 900
Washington, D.C. 20005

Dear Mr. McGahn,

The House Judiciary Committee is investigating a number of actions that threaten our nation's longstanding commitment to the rule of law, including allegations of obstruction of justice, public corruption, and other abuses of power.  As part of that work, I write to request that you provide the documents set forth in the attached Document Requests no later than March 18, 2019.

This is a critical time for our nation.  President Trump and his administration face wide-ranging allegations of misconduct that strike at the heart of our constitutional order.  Congress has a constitutional duty to serve as a check and balance against any such excesses.  We have an obligation to investigate evidence of abuses of executive power, public corruption, and acts of obstruction designed to undermine both our laws and the credibility of the agencies that enforce those laws.  We are also responsible for passing laws to address, and prevent the recurrence, of any such misconduct.

Under the Rules of the House of Representatives, the Committee's jurisdiction includes the judiciary and judicial proceedings, civil liberties, criminal law enforcement, and questions of constitutional law.  The Committee is the main oversight authority for the Department of Justice, including its component agencies, its personnel, and its law enforcement activities.  The Committee has also played a historic role as the primary forum for hearings on the abuse of executive power.

Given this charge, over the course of our investigation, the Committee is determined to ask critical questions, gather all of the relevant information, judiciously assess the evidence, and present our findings to the American people, whatever those findings may be.

To that end, I respectfully ask that you produce the documents set forth in the Document Requests. As you will see, I have limited the initial production to materials that have already been produced in other proceedings to reduce the burden on you and so that they may be provided to us by March 18. My staff will work with you on a mutually agreeable schedule for the production of the remainder of the documents in Schedule A.

Thank you for your prompt attention to these requests.

Sincerely,

Jerrold Nadler
Chairman
House Committee on the Judiciary

cc:     Honorable Doug Collins, Ranking Member, House Committee on the Judiciary

Donald McGahn

# DOCUMENT REQUESTS

Please produce the documents set forth in Schedule A, provided, however, that in order to facilitate production of documents on an expedited basis, you may limit your production at this time to documents you furnished at any time after November 8, 2016 to: (a) the Special Counsel's Office established by Department of Justice Order No. 3915-2017 (May 17, 2017); (b) the United States Attorney's Office for the Southern District of New York ("SDNY"); (c) any other federal or state regulatory and/or law enforcement agency; (d) any congressional committee; or (e) in civil or other litigation. This includes but is not limited to documents that were voluntarily provided, produced under compulsion, or seized. Instructions for producing documents appear in Schedule B, and definitions appear in Schedule C.

## <u>SCHEDULE A</u>

1) All documents relating to the following:

   a) Communications between you and President Donald Trump on or about January 26-27, 2017, relating to Michael Flynn's statements to the FBI about his contacts with Sergey Kislyak.

   b) The resignation or termination of Michael Flynn, including but not limited to the discussion of Sean Spicer's February 14, 2017 public statements about Flynn's resignation.

   c) President Trump's contacts with James Comey on or about January 27, 2017, February 14, 2017, March 30, 2017, and April 11, 2017.

   d) Communications involving one or more of the following individuals on or about May 8-9, 2017 relating to the possible termination of James Comey: you, President Trump, Vice President Pence, Reince Priebus, Stephen Bannon, Jared Kushner, Stephen Miller, Jeff Sessions, and/or Rod Rosenstein. Such communications include, but are not limited to, all draft termination letters and related documents and all documents relating to the May 9, 2017 Rosenstein memorandum to Sessions entitled "Restoring Public Confidence in the FBI."

   e) The May 9, 2017 termination of James Comey, including but not limited to the reasons for the termination.

   f) Meetings or discussions in or around May 2017 involving the FBI and/or the DOJ relating to the termination of James Comey, including but not limited to those involving Rosenstein and Andrew McCabe at which any of the following were discussed: obstruction of justice, surreptitious recording of the President, or the 25th Amendment.

   g) Communications by President Trump or anyone acting on his behalf relating to Jeff Sessions's recusal from any investigation related to the 2016 Presidential campaign. This includes, but is not limited to: (i) any attempts to block Sessions from recusing himself in

1

or around March 2017; (ii) any attempts to cause Sessions to reverse his recusal decision; (iii) any criticism of Sessions's March 2, 2017 recusal decision; and (iv) any attempts to limit, hide, or prevent a written ethics opinion related to Sessions's recusal decision.

h) The actual or possible resignation or termination of:

   i) Jeff Sessions, including but not limited to any discussion involving President Trump regarding Sessions's possible resignation or firing on or about May 17, 2017, July 2017, and November 2018;

   ii) Rod Rosenstein, including but not limited to any discussion involving President Trump regarding Rosenstein's possible resignation or firing throughout 2018;

   iii) Robert Mueller, including but not limited to any discussion involving President Trump regarding Mueller's firing on or around June 2017, or any conversation in which President Trump stated, in words or substance, that he wanted the Mueller investigation shut down, restrained, or otherwise limited in or around December 2017.

i) The June 9, 2016 Trump Tower meeting attended by Donald Trump Jr., Paul Manafort, Jared Kushner, Natalia Veselnitskaya, Rob Goldstone, and Rinat Akhmetshin (the "Trump Tower meeting"), including but not limited to all documents relating to the July 8, 2017 statement released in the name of Donald Trump Jr.

j) Discussions or efforts to discipline, reassign, terminate, encourage or force to resign, demote, or otherwise affect the job status of any of the following: Andrew McCabe, Jim Rybicki, Bill Priestap, Jim Baker, Peter Strzok, Lisa Page, and/or Bruce Ohr.

k) Possible pardons for Paul Manafort, Michael Flynn, or Michael Cohen.

l) Communications between Matthew Whitaker and President Trump or between Whitaker and any other White House personnel regarding any of the following: (a) the SDNY Investigations; (b) the recusal of U.S. Attorney Geoffrey Berman from the SDNY Investigations; (c) the reassignment or potential reassignment of SDNY personnel from the SDNY Investigations; or (d) Special Counsel Mueller's investigation.

m) Michael Cohen's statements to the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence relating to the timing of the Trump Organization's efforts to develop a property in Moscow. This includes but is not limited to drafts of such statements and communications about such drafts or final statements.

2) All documents relating to the following:

a) The June 9, 2016 Trump Tower meeting, including but not limited to contacts or communications about the meeting involving one or more of the following individuals:

Donald Trump Jr., Natalia Veselnitskaya, Donald Trump, Paul Manafort, Jared Kushner, Emin Agalarov, Aras Agalarov, Goldstone, and/or Rinat Akhmetshin.

b) The "Republican Platform 2016" provisions relating to Russia and Ukraine, including, but not limited to, the exclusion of language related to providing lethal defensive weapons to Ukraine and the inclusion of language about providing "appropriate assistance" to the armed forces of Ukraine.

c) Discussions or attempts to provide or receive election information, campaign data, or campaign communications with, to, or from foreign entities or individuals in connection with the 2016 U.S. Presidential primary or general elections. This includes, but is not limited to, voter data, polling information, political ad targeting, voter registration rolls, social media data, and campaign or party e-mails.

d) Discussions of United States imposed sanctions or potential sanctions against the Russian Federation from June 16, 2015 to January 20, 2017 (including but not limited to the sanctions imposed pursuant to the Magnitsky Act) involving one or more of the following individuals: Donald Trump, the Trump Campaign, the Trump Organization, Paul Manafort, Rick Gates, Michael Cohen, Michael Flynn, Jeff Sessions, Jared Kushner, Thomas Bossert, Roger Stone, Jerome Corsi, George Papadopoulos, Carter Page, Konstantin Kilimnik, K.T. McFarland, and/or Erik Prince.

e) Any contacts, direct or indirect, from January 1, 2015 to January 20, 2017 between or involving the Russian Federation and its officials, agents, intermediaries, and/or instrumentalities and any of the following: Donald Trump, the Trump Campaign, the Trump Organization, Paul Manafort, Rick Gates, Michael Cohen, Michael Flynn, Jeff Sessions, Jared Kushner, Thomas Bossert, Roger Stone, Jerome Corsi, George Papadopoulos, Carter Page, Konstantin Kilimnik, K.T. McFarland, and/or Erik Prince.

f) Any contacts, direct or indirect, from January 1, 2016 to the present between or involving Wikileaks and its officials, agents, intermediaries, and/or instrumentalities.

g) The contents of meetings between President Trump and Vladimir Putin on July 7, 2017, November 11, 2017, July 16, 2018, and November 30, 2018.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, | |
| *Plaintiff,* | |
| v. | No. 19-cv-2379 (KBJ) |
| DONALD F. MCGAHN II, | |
| *Defendant.* | |

# EXHIBIT B

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

To Donald F. McGahn II

You are hereby commanded to be and appear before the
Committee on the Judiciary

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 2138 Rayburn House Office Building, Washington, D.C., 20515

Date: May 7, 2019                                    Time: 10:00am

☐ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:_____

Date:_____ (and continuing until completed)   Time:_____

☑ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:  2141 Rayburn House Office Building, Washington, D.C., 20515

Date: May 21, 2019                                   Time: 10:00am

To any authorized staff member or the U.S. Marshals Service

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 22      day of April                , 20 19 .

_Jerrold Nadler_
*Chairman or Authorized Member*

Attest:
_____
*Clerk*

## PROOF OF SERVICE

Subpoena for

    Donald F. McGahn II

Address  c/o William A. Burck, Esq., Quinn, Emanuel, Urquhart, & Sullivan, LLP

  1300 I Street NW, Suite 900, Washington, DC, 20005

before the  Committee on the Judiciary

*U.S. House of Representatives*
*116th Congress*

---

Served by (print name)  Aaron Hiller

Title  Deputy Chief Counsel, House Judiciary Committee

Manner of service  Electronic

Date  April 22, 2019

Signature of Server

Address  2138 Rayburn House Office Building

Washington, D.C. 20515

## SCHEDULE

In accordance with the attached Definitions and Instructions, you are hereby required to produce all documents and communications in your possession, custody or control referring or relating to:

1. Statements by Michael Flynn to the Federal Bureau of Investigation regarding contacts with Sergey Kislyak.

2. The Federal Bureau of Investigation and Department of Justice's investigation of Michael Flynn.

3. Meetings with Department of Justice officials or employees relating to Michael Flynn and underlying evidence relating to Michael Flynn.

4. The resignation or termination of Michael Flynn.

5. Sean Spicer's February 14, 2017 public statements about Michael Flynn's resignation.

6. President Trump's contacts with James Comey on or about January 27, 2017, February 14, 2017, March 30, 2017, and April 11, 2017.

7. The termination of James Comey, including but not limited to any documents or communications relating to draft termination letters, White House Counsel memoranda, or the May 9, 2017 Rod Rosenstein memorandum to Jeff Sessions entitled "Restoring Public Confidence in the FBI."

8. Meetings or communications involving Federal Bureau of Investigation or Department of Justice officials or employees relating to the resignation or termination of James Comey.

9. Jeff Sessions's recusal from any matters arising from the campaigns for President of the United States.

10. Reversing or attempting to reverse Jeff Sessions's recusal from any matters.

11. The resignation or termination, whether contemplated or actual, of Jeff Sessions.

12. The resignation or termination, whether contemplated or actual, of Rod Rosenstein.

13. The resignation or termination, whether contemplated or actual, of Special Counsel Robert Mueller.

14. Your resignation or termination, whether contemplated or actual.

15. The appointment of Special Counsel Robert Mueller.

16. Alleged conflicts of interest on the part of Special Counsel Robert Mueller or other employees of the Special Counsel's Office.

17. Public statements and/or requests to correct the record or deny reports that President Trump asked for Special Counsel Robert Mueller to be removed as Special Counsel.

18. Memoranda directing White House officials or employees to avoid direct contact or communication with the Department of Justice or Jeff Sessions.

19. Meetings or communications with Dana Boente or other Department of Justice officials or employees relating to whether the President was being investigated by the Department of Justice or Federal Bureau of Investigation.

20. Meetings or communications with Department of Justice officials or employees relating to James Comey's testimony before Congress.

21. The President maintaining possession of Jeff Sessions's resignation letter.

22. Communications about Special Counsel Mueller's investigation, including but not limited to whether any action taken, proposed or discussed by President Trump or anyone acting on his behalf may constitute obstruction of justice or any violation of law.

23. President Trump's exposure in the Special Counsel Investigation relating to "other contacts," "calls," or "ask re Flynn" as mentioned in Volume II, page 82 of the Report.

24. Statements or communications relating to press reports that President Trump was under investigation.

25. Paul Manafort's cooperation with the Special Counsel's Office.

26. The June 9, 2016 Trump Tower meeting.

27. The July 8, 2017 statement and related statements released in the name of Donald Trump Jr. regarding the Trump Tower meeting.

28. Prosecuting or investigating James Comey or Hillary Clinton.

29. Presidential pardons, whether possible or actual, for Paul Manafort, Michael Flynn, Michael Cohen, Rick Gates, Roger Stone, individuals associated with the Trump Campaign, or individuals involved in matters before the U.S. Attorney's Office for the Southern District of New York.

30. Selecting Jeff Sessions's replacement through a recess appointment or appointing an Acting Attorney General under the Federal Vacancies Reform Act.

31. The SDNY Investigations, the recusal of U.S. Attorney Geoffrey Berman from the SDNY Investigations, or the reassignment or potential reassignment of SDNY employees from the SDNY Investigations.

32. Statements by Michael Cohen or White House officials to the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence regarding the timing of the Trump Organization's efforts to develop a property in Moscow, including but not limited to drafts of such statements and communications about such drafts or final statements.

33. Any payment, or potential payment, to any person or entity by Michael Cohen, Essential Consultants LLC, or American Media Inc. ("AMI") for the benefit of Donald Trump or the Trump Campaign, including but not limited to any documents relating to the reimbursement of Cohen, Essential Consultants LLC, or AMI for any such payments, and any documents relating to the omission or inclusion of information about liabilities associated with such payments on Donald Trump's Public Financial Disclosure Reports (OGE Form 278e) filed in 2017 and 2018.

34. Communications relating to United States imposed sanctions or potential sanctions against the Russian Federation from June 16, 2015 to October 18, 2018, including but not limited to the sanctions imposed pursuant to the Magnitsky Act.

35. Communications with the Executive Office of the President regarding your response to the March 4, 2019 document request by the House Committee on the Judiciary.

36. Any documents referenced in the Report.

## **DEFINITIONS**

As used in this subpoena, the following terms shall be interpreted in accordance with these definitions:

1. "58th Presidential Inaugural Committee" means the entity registered under FEC ID # C00629584 as well as its parent companies, subsidiary companies, affiliated entities, agents, officials, and instrumentalities.

2. "And," and "or," shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this subpoena any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

3. "Any" includes "all," and "all" includes "any."

4. "Communication(s)" means the transmittal of information by any means, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email, text message, instant message, MMS or SMS message, encrypted message, message application, social media, or otherwise.

5. "Employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

6. "Document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, interoffice and intra-office communications, call records, electronic mail ("e-mail"), instant messages, calendars, contracts, cables, notations of any type of conversation, telephone call, meeting or other communication, bulletins, printed matter, computer printouts, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, power point presentations, spreadsheets, and work sheets. The term "document" includes all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments to the foregoing, as well as any attachments or appendices thereto.

7. "Documents in your possession, custody or control" means (a) documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, or representatives acting on your behalf; (b) documents that you have a legal right to obtain, that you have a right to copy, or to which you have access; and (c) documents that have been placed in the possession, custody, or control of any third party. **This includes but is not limited to documents that are or were held by your attorneys.**

8. "Each" shall be construed to include "every," and "every" shall be construed to include "each."

9. "Government" shall include any government's present and former agencies, branches, units, divisions, subdivisions, districts, public corporations, employees, elected and appointed officials, ambassadors, diplomats, emissaries, authorities, agents, assignees, and instrumentalities. This includes, but is not limited to, any government-controlled business entities, entities in which the government has a financial interest, and any person acting or purporting to act on the government's behalf.

10. "Including" shall be construed broadly to mean "including, but not limited to."

11. "Person" or "persons" means natural persons, firms, partnerships, associations, corporations, subsidiaries, division, departments, joint ventures proprietorships, syndicates, or other legal business or government entities, and all subsidiaries, affiliates, divisions, departments, branches, or other units, thereof.

12. "Referenced" means cited, quoted, mentioned, described, alluded to, contained, incorporated, reproduced, or identified in any manner whatsoever.

13. "Relating to" shall mean discussing, describing, reflecting, containing, analyzing, studying, reporting, commenting, evidencing, constituting, comprising, showing, setting forth, considering, recommending, concerning, or pertinent to that subject in any manner whatsoever.

14. "The Russian Federation" shall include the Government of the Russian Federation, as the term "Government" is defined above.

15. "Special Counsel's Office" means the office created pursuant to Department of Justice Order No. 3915-17 issued by the Acting Attorney General on May 17, 2017 appointing Robert S. Mueller III as Special Counsel, and its employees.

16. "Special Counsel's Investigation" means the investigation conducted by the Special Counsel's Office pursuant to Department of Justice Order No. 3915-17 issued by the Acting Attorney General on May 17, 2017.

17. "SDNY Investigations" shall include any investigation or prosecution conducted by the U.S. Attorney's Office for the Southern District of New York relating to: (i) Michael Cohen; (ii) the Trump Organization; (iii) the Trump Campaign; and (iv) the 58th Presidential Inaugural Committee.

18. "The Report" means the complete and unredacted version of the report submitted on or about March 22, 2019 by Special Counsel Robert Mueller, pursuant to his authority under 28 C.F.R. § 600.8(c), entitled, "Report on the Investigation into Russian Interference in the 2016 Presidential Election."

19. "Trump Campaign" for purposes of this subpoena shall include Donald J. Trump for President, Inc., as well as its parent companies, subsidiary companies, affiliated entities, agents, officials, and instrumentalities.

20. The "Trump Organization" for purposes of this subpoena shall include the Trump Organization, Inc., The Trump Organization LLC, and their parent companies, subsidiary companies, affiliated entities, agents, officials, and instrumentalities.

21. The "Trump Tower Meeting" for purposes of this subpoena shall reference the June 9, 2016 Trump Tower meeting attended by the following Donald Trump Jr., Paul Manafort, Kushner, Natalia Veselnitskaya, Rob Goldstone, and Rinat Akhmetshin.

## INSTRUCTIONS

1. In complying with this subpoena, you should produce all responsive documents in unredacted form that are in your possession, custody, or control or otherwise available to you, regardless of whether the documents are possessed directly by you. If a document is referenced in the Report in part, you should produce it in full in a complete and unredacted form.

2. Documents responsive to the subpoena should not be destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee.

3. In the event that a document is withheld in full or in part on any basis, including a claim of privilege, you should provide a log containing the following information concerning every such document: (i) the reason the document is not being produced; (ii) the type of document; (iii) the general subject matter; (iv) the date, author, addressee, and any other recipient(s); (v) the relationship of the author and addressee to each other; and (vi) any other description necessary to identify the document and to explain the basis for not producing the document. If a claimed privilege applies to only a portion of any document, that portion only should be withheld and the remainder of the document should be produced. As used herein, "claim of privilege" includes, but is not limited to, any claim that a document either may or must be withheld from production pursuant to any law, statute, rule, policy or regulation.

4. In the event that a document is withheld in full or in part on the basis of a privilege asserted by or on behalf of the White House, or at the request of the White House, please also include the following information in your privilege log:

    a. The date on which you or any attorney representing you received the document or any copy thereof from the White House, received access to that document from the White House, or removed that document or any copy thereof from the White House;

    b. The name of the person or persons who provided the document to you or your attorney;

    c. The name of any lawyer or other agent or third party outside the White House who, to your knowledge, reviewed the document.

    d. You should log each responsive document as to which you have directed us to the White House, and each document that was previously in your attorneys' possession, custody or control.

5. Any objections or claims of privilege are waived if you fail to provide an explanation of why full compliance is not possible and a log identifying with specificity the ground(s) for withholding each withheld document prior to the request compliance date.

6. In complying with the request, be apprised that (unless otherwise determined by the Committee) the Committee does not recognize: any purported non-disclosure privileges associated with the common law including, but not limited to the deliberative-process privilege, the attorney-client privilege, and attorney work product protections; any purported privileges or protections from disclosure under the Freedom of Information Act; or any purported contractual privileges, such as non-disclosure agreements.

7. Any assertion of any such non-constitutional legal bases for withholding documents or other materials, shall be of no legal force and effect and shall not provide a justification for such withholding or refusal, unless and only to the extent that the Committee has consented to recognize the assertion as valid.

8. Pursuant to 5 U.S.C. § 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

9. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

10. If any document responsive to this subpoena was, but no longer is, in your possession, custody, or control, or has been placed into the possession, custody, or control of any third party and cannot be provided in response to this subpoena, you should identify the document (stating its date, author, subject and recipients) and explain the circumstances under which the document ceased to be in your possession, custody, or control, or was placed in the possession, custody, or control of a third party, including, but not limited to (a) how the document was disposed of; (b) the name, current address, and telephone number of the person who currently has possession, custody, or control over the document; (c) the date of disposition; and (d) the name, current address, and telephone number of each person who authorized said disposition or who had or has knowledge of said disposition.

11. If any document responsive to this subpoena cannot be located, describe with particularity the efforts made to locate the document and the specific reason for its disappearance, destruction or unavailability.

12. In the event that any entity, organization, or individual named in the subpoena has been, or is currently, known by any other name, the subpoena should be read also to include such other names under that alternative identification.

13. All documents should be produced with Bates numbers affixed. The Bates numbers must be unique, sequential, fixed-length numbers and must begin with a prefix referencing the name of the producing party (e.g., ABCD-000001). This format must remain consistent across all productions. The number of digits in the numeric portion of the format should not change in subsequent productions, nor should spaces, hyphens, or other separators be added or deleted. All documents should be Bates-stamped sequentially and produced sequentially.

14. Documents produced pursuant to this subpoena should be produced in the order in which they appear in your files and should not be rearranged. Any documents that are stapled, clipped, or otherwise fastened together should not be separated. Documents produced in response to this subpoena should be produced together with copies of file labels, dividers, or identifying markers with which they were associated when this subpoena was issued. Indicate the office or division and person from whose files each document was produced.

15. Responsive documents must be produced regardless of whether any other person or entity possesses non-identical or identical copies of the same document.

16. Produce electronic documents as created or stored electronically in their original electronic format. Documents produced in electronic format should be organized, identified, and indexed electronically, in a manner comparable to the organization structure called for in Instruction 13 above.

17. Data may be produced on CD, DVD, memory stick, USB thumb drive, hard drive, or via secure file transfer, using the media requiring the least number of deliverables. Label all media with the following:

    a.  Production date;

    b.  Bates range;

    c.  Disk number (1 of X), as applicable.

18. If a date or other descriptive detail set forth in this subpoena referring to a document, communication, meeting, or other event is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the subpoena, you should produce all documents which would be responsive as if the date or other descriptive detail were correct.

19. The subpoena is continuing in nature and applies to any newly discovered document, regardless of the date of its creation. Any document not produced because it has not been located or discovered by the return date should be produced immediately upon location or discovery subsequent thereto.

20. Two sets of each production shall be delivered, one set to the Majority Staff and one set to the Minority Staff. Production sets shall be delivered to the Majority Staff in Room 2138 of the Rayburn House Office Building and the Minority Staff in Room 2142 of the Rayburn House Office Building. You should consult with Committee Majority Staff regarding the method of delivery prior to sending any materials.

21. If compliance with the subpoena cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production. In the event that any responsive documents or other materials contain classified information, please immediately contact Committee staff to discuss how to proceed.

22. Upon completion of the document production, please submit a written certification, signed by you or by counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control which reasonably could contain responsive documents; (2) documents responsive to the subpoena have not been destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee since the date of receiving the Committee's subpoena or in anticipation of receiving the Committee's subpoena, and (3) all documents identified during the search that are responsive have been produced to the Committee, identified in a log provided to the Committee, or otherwise identified as provided herein.

23. A cover letter should be included with each production including the following information:

a. List of each piece of media (hard drive, thumb drive, DVD or CD) included in the production by the unique number assigned to it, and readily apparent on the physical media;

b. List of fields in the order in which they are listed in the metadata load file;

c. The paragraph(s) and/or clause(s) in the Committee's subpoena to which each document responds;

d. Time zone in which emails were standardized during conversion (email collections only);

e. Total page count and bates range for the entire production, including both hard copy and electronic documents.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, | |
| *Plaintiff,* | No. 19-cv-2379 (KBJ) |
| v. | |
| DONALD F. MCGAHN II, | |
| *Defendant.* | |

# EXHIBIT C

# THE WHITE HOUSE

### WASHINGTON

May 7, 2019

Mr. William A. Burck
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005

Dear Mr. Burck:

I write per your request in reference to a subpoena issued to your client, Donald F. McGahn II, by the Committee on the Judiciary of the United States House of Representatives (the "Committee") on April 22, 2019.   That subpoena requests the production of documents by 10:00 a.m. on Tuesday, May 7.

The subpoena seeks certain White House records provided to Mr. McGahn while he was Counsel to the President that are related to Special Counsel Robert S. Mueller, III's investigation. As you know, the White House provided these records to Mr. McGahn in connection with its cooperation with the Special Counsel's investigation and with the clear understanding that the records remain subject to the control of the White House for all purposes.   The White House records remain legally protected from disclosure under longstanding constitutional principles, because they implicate significant Executive Branch confidentiality interests and executive privilege.

For these reasons, the Acting Chief of Staff to the President, Mick Mulvaney, directs Mr. McGahn not to produce these White House records in response to the Committee's April 22 subpoena. The Department of Justice is aware of and concurs with this legal position. My Office will respond to the Committee concerning its interest in the records.

Thank you for your attention to this matter. Please do not hesitate to contact me or Mike Purpura if you have any questions.

Sincerely,

Pat A. Cipollone
*Counsel to the President*

# THE WHITE HOUSE

### WASHINGTON

May 7, 2019

The Honorable Jerrold Nadler
Chairman
Committee on the Judiciary
United States House of Representatives
Washington, D.C. 20515

Dear Chairman Nadler:

I write in reference to a subpoena issued by the Committee on the Judiciary (the "Committee") to Donald F. McGahn II on April 22, 2019, which requests the production of documents by 10:00 a.m. on Tuesday, May 7.

The subpoena seeks certain White House records provided to Mr. McGahn while he was Counsel to the President that are related to Special Counsel Robert S. Mueller, III's investigation. The White House provided these records to Mr. McGahn in connection with its cooperation with the Special Counsel's investigation and with the clear understanding that the records remain subject to the control of the White House for all purposes. The White House records remain legally protected from disclosure under longstanding constitutional principles, because they implicate significant Executive Branch confidentiality interests and executive privilege.

Because Mr. McGahn does not have the legal right to disclose these documents to third parties, I would ask the Committee to direct any request for such records to the White House, the appropriate legal custodian. The Acting Chief of Staff to the President, Mick Mulvaney, has directed Mr. McGahn not to produce these White House records in response to the Committee's April 22 subpoena. The Department of Justice is aware of and concurs with this legal position. My Office will respond to the Committee concerning its interest in the records.

Please do not hesitate to contact me directly if you have any questions or would like to discuss this matter.

Sincerely,

Pat A. Cipollone
*Counsel to the President*

cc:  The Honorable Doug Collins, Ranking Member

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, <br><br> *Plaintiff,* <br><br> v. <br><br> DONALD F. MCGAHN II, <br><br> *Defendant.* | No. 19-cv-2379 (KBJ) |

# EXHIBIT D

**THE WHITE HOUSE**

WASHINGTON

May 15, 2019

The Honorable Jerrold Nadler
Chairman
Committee on the Judiciary
United States House of Representatives
Washington, D.C. 20515

Dear Chairman Nadler:

I write in response to your letter of March 4, 2019. As I have previously stated, we will work in good faith to accommodate Congress's legitimate requests for information while at the same time respecting the separation of powers and the constitutional prerogatives of the President. Our approach is guided by long-standing precedent and a desire to seek accommodation and cooperation where possible, consistent with mutual respect for the constitutional roles of each branch of government.

Since the 116th Congress convened on January 3, 2019, this Administration has gone to great lengths to respond to congressional information requests. Indeed, in under five months, the Administration has provided hundreds of responses to congressional requests and produced tens of thousands of pages of documents to Congress. Administration officials have testified at congressional hearings well over 100 times, and they have provided hundreds of briefings to congressional committees and individual members of the House and Senate. Your recent assertion that the Administration is acting in "blanket defiance of Congress's constitutionally mandated duties" is demonstrably false. Statement of Chairman Jerrold Nadler (May 7, 2019). Similarly, your claim that "virtually all document requests are going unsatisfied" is contradicted by the facts. Statement of Chairman Jerrold Nadler (May 8, 2019).

The Administration's significant efforts to accommodate Congress's information requests extend to the House Committee on the Judiciary's current investigation. As you know, the Special Counsel's Office recently concluded its investigation into the subjects discussed in your March 4 letter. By any measure, the investigation was exhaustive. Indeed, the evidence considered by the Special Counsel's Office was derived from approximately 2,800 subpoenas, 500 executed search warrants, 230 orders for communication records, and 500 witness interviews. Report of Special Counsel Robert S. Mueller, III, Vol. I at 13 (Mar. 2019); Letter from William P. Barr, Attorney General, to Chairman Lindsey Graham, Chairman Jerrold Nadler, Ranking Member Dianne Feinstein, and Ranking Member Doug Collins 1 (Mar. 24, 2019) (hereinafter Mar. 24, 2019 Barr Letter). Media reports indicate that the Special Counsel's investigation could cost taxpayers "up to $35 million." John Haltiwanger, *The Mueller investigation could cost up to $35 million once all the expense reports are in*, Business Insider (Mar. 25, 2019).

The Honorable Jerrold Nadler
Page 2

On April 18, 2019, the Attorney General went well beyond what is required by law and made the Special Counsel's report available to Congress and the public with minimal redactions. This was an extraordinary accommodation in light of long-standing Department of Justice policies regarding the confidentiality of investigations that do not result in prosecution. The report powerfully demonstrates that the Special Counsel found no evidence that any Americans—including any member of the President's campaign—conspired or coordinated with Russia to interfere with the 2016 election. The Attorney General and then-Deputy Attorney General also

"concluded that the evidence developed by the Special Counsel is not sufficient to establish that the President committed an obstruction-of-justice offense." Remarks of Attorney General William P. Barr (Apr. 18, 2019); *see also* Mar. 24, 2019 Barr Letter at 3.

In the interest of transparency, the President did not assert executive privilege over any part of the Special Counsel's report released on April 18, 2019, even though—as the Attorney General correctly stated—"he would have been well within his rights to do so." Remarks of Attorney General William P. Barr (Apr. 18, 2019); *see also* Letter from Emmet T. Flood, Special Counsel to the President, to William P. Barr, Attorney General 3-4 (Apr. 19, 2019) (hereinafter Flood Letter) (the President's decision not to assert executive privilege over any of the presumptively privileged portions of the Special Counsel's report "is not a waiver of executive privilege for any other material or for any other purpose"). Accordingly, the only redactions in the report were made by the Department of Justice (with the assistance of the Special Counsel's Office and the intelligence community) to protect sensitive information that is safeguarded by law, court orders, or long-standing Department of Justice policy regarding open investigations. Remarks of Attorney General William P. Barr (Apr. 18, 2019).

Moreover, the Attorney General indicated that he would "make available to a bipartisan group of leaders from several Congressional committees a version of the report with all redactions removed except those relating to grand-jury information," which the Department of Justice is prohibited by law from disclosing under Rule 6(e) of the Federal Rules of Criminal Procedure. *Id.* (explaining that "these members of Congress will be able to see all of the redacted material for themselves—with the limited exception of that which, by law, cannot be shared"). He also offered to testify voluntarily at a public hearing and to answer questions from all members of the Committee. You refused even to review the less redacted version of the report before declaring that it was inadequate, and you rejected the Attorney General's offer to testify unless he agreed to unprecedented conditions. Instead, you issued a subpoena to the Attorney General demanding not only the "complete and unredacted report," but also "[a]ll documents referenced in the Report" and "[a]ll documents obtained and investigation materials created by the Special Counsel's Office." Subpoena to William P. Barr, Attorney General (Apr. 18, 2019). Thus, the subpoena's plain language covers grand-jury information that the Committee knows the Attorney General cannot provide without violating the law. *See id.*

Even though the Committee had rebuffed a good faith offer to accommodate Congress's interests by disclosing the entire report—except for grand-jury information—to congressional leadership, the Department of Justice proposed further accommodations, including offers "to expand the number of staff members who may review the minimally redacted report; to allow Members of Congress who have reviewed the minimally redacted report to discuss the material freely among themselves; and to allow Members to take and retain their notes following their

The Honorable Jerrold Nadler
Page 3

review." Letter from Stephen E. Boyd, Assistant Attorney General, to Chairman Jerrold Nadler 1 (May 7, 2019). The Committee summarily rejected these additional accommodations, abruptly terminated ongoing negotiations, and prematurely voted to recommend that the Attorney General be held in contempt of Congress—a mere *19 days* after the Committee served its subpoena on the Attorney General. *Id*; Letter from Stephen E. Boyd, Assistant Attorney General, to Chairman Jerrold Nadler 1 (May 8, 2019).

In other words, the Committee rushed to vote on contempt for failing to provide 100% and immediate compliance with a subpoena that seeks *millions of pages* of documents from a prosecutor's files. Moreover, the Committee—for the first time in American history—has voted to recommend that the Attorney General be held in contempt because he *refused to violate the law* by turning over grand-jury materials that he may not lawfully disclose. The Committee took these drastic actions in under three weeks without making any reasonable attempt to engage in the constitutionally mandated accommodation process to narrow its requests.

Lost in the Committee's legally indefensible rush to recommend a contempt citation is the reality that the Committee has not articulated any proper legislative purpose for pursuing inquiries that duplicate matters that were the subject of the Special Counsel's inquiry. Congressional investigations are intended to obtain information to aid in evaluating potential legislation, not to harass political opponents or to pursue an unauthorized "do-over" of exhaustive law enforcement investigations conducted by the Department of Justice.

Under the circumstances, the appropriate course is for the Committee to discontinue the inquiry discussed in the March 4 letter. Unfortunately, it appears that you have already decided to press ahead with a duplicative investigation, including by issuing subpoenas, to replow the same ground the Special Counsel has already covered. I ask that you reconsider that approach. With the Special Counsel's investigation behind us, the President and his team stand ready to work with the Committee cooperatively to advance a legislative agenda for the benefit of the American people.

If the Committee continues to pursue its inquiry, the requests in the Committee's March 4 letter suffer from numerous legal defects and reflect little, if any, respect for the legitimate interests of the Executive Branch or for the accommodation process that governs congressional requests for information from the Executive. The Executive Branch interests at stake are not new and have been uniformly recognized and respected by the President's predecessors—from President Washington to President Obama. The principal legal flaws in the Committee's requests are summarized here and discussed in greater detail below.

- *First*, the letter implicates all four components of executive privilege, seeking core Executive Branch communications that are not subject to disclosure under settled legal principles. This includes (i) confidential communications between the President and his advisors; (ii) confidential deliberations among Executive Branch officials; (iii) information relating to law enforcement investigations; and (iv) confidential communications between the President and foreign leaders. The President's decision to cooperate with the Special Counsel's investigation and not to assert executive privilege over any of the presumptively privileged portions of the Special Counsel's report, as released on April 18, 2019, "is not

The Honorable Jerrold Nadler
Page 4

> a waiver of executive privilege for any other material or for any other purpose." Flood Letter at 3-4.

- *Second*, the letter requests information about functions that the Constitution assigns exclusively to the Executive, which are traditionally deemed beyond the reach of congressional oversight.

- *Third*, it appears that the Committee's inquiry is designed, not to further a legitimate legislative purpose, but rather to conduct a pseudo law enforcement investigation on matters that were already the subject of the Special Counsel's long-running investigation and are outside the constitutional authority of the legislative branch. The only purpose for this duplication seems to be harassing and seeking to embarrass political opponents after an exhaustive two-year investigation by the Department of Justice did not reach the conclusion that some members of the Committee apparently would have preferred. That, of course, is not a permissible purpose for demanding confidential information from the Executive.

- *Finally*, when the requests are evaluated in light of these cumulative defects showing no regard for the legitimate interests of the Executive Branch—combined with the sweeping scope of the requests—it becomes apparent that they bear no relation to any articulated goal of legitimate congressional oversight. Instead, they amount to little more than an unprecedented effort to interfere with the President's ability to perform his constitutional duties. As a result, the requests raise serious concerns of violating the separation of powers enshrined in the Constitution.

As I have repeatedly made clear, we respect the authority of Congress to make legitimate requests for information to aid it in the task of legislating and will work with the Committee through the constitutionally mandated accommodation process to provide the Committee with information it can properly seek. It would greatly advance the first step in that process if the Committee were to narrow the sweeping scope of the requests in the letter and articulate the legislative purpose and legal support for each of the disparate requests it wishes to pursue, including by addressing each of the legal deficiencies that I raise in this letter.

Finally, I reiterate my concern that the Committee has sent letters directly to current and former White House officials, including several individuals who served in the Office of the White House Counsel. As I have consistently emphasized in my correspondence with other committees, any contact with current or former White House officials should be through the Office of the White House Counsel, so that we may ensure appropriate accommodation of the Committee's informational needs while protecting the important constitutional interests of the Executive. As a matter of basic courtesy and respect for a co-equal branch of our government, I request that you direct your staff to work through my office to request information from current or former White House officials. Prior administrations have made the same request. *See, e.g.*, Letter from Kathryn H. Ruemmler, Counsel to President Obama, to Chairman Fred Upton, Chairman Cliff Stearns, Chairman Joseph R. Pitts, and Vice Chairman Michael C. Burgess, M.D. (Nov. 14, 2011) ("[A]ny requests from Committee or Committee staff to speak with current or former White House officials about their official responsibilities at the White House should be directed to the Office of the White

The Honorable Jerrold Nadler
Page 5

House Counsel."). Consulting with my office will ensure that the Committee efficiently obtains access to the information and individuals to which it is entitled and that any disclosure of privileged information to Congress is properly authorized.

## I.     The Committee's Requests Unreasonably Target Matters at the Core of Well-Settled Executive Branch Confidentiality Interests.

It has long been recognized that robust confidentiality protections are essential for the proper functioning of the Executive Branch.    Those protections are firmly rooted in the Constitution and can be overcome by Congress, if at all, only in limited circumstances. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc) (requiring a showing that confidential Executive Branch documents are "demonstrably critical to the responsible fulfillment of the Committee's functions"). The importance of defending this constitutionally based protection for the Executive Branch has been consistently recognized by administrations of both political parties.  For example, in response to congressional requests for documents, the Obama Administration strenuously argued that, "[a]s courts have long recognized, the Executive Branch's role in enforcing the law requires that some materials remain confidential so that the Executive's proper functioning under the Constitution is preserved and protected." Mem. in Supp. of Def.'s Mot. for Summ. J. 14, *Comm. on Oversight & Gov't Reform v. Holder*, No. 12-cv-1332, 2014 WL 12662665 (D.D.C. Aug. 20, 2014); *see also* Letter from W. Neil Eggleston, Counsel to President Obama, to Chairman Darrell E. Issa (July 15, 2014) (highlighting the need to "preserv[e] the President's independence and autonomy, as well as his ability to obtain candid advice and counsel to aid him in the discharge of his constitutional duties").  As the Obama Administration rightly explained—contrary to the assertions in your March 4 letter—even "a claim of 'misconduct' does not invalidate" these protections. Mem. in Supp. of Def.'s Mot. for Summ. J. 36, *Comm. on Oversight & Gov't Reform*, 2014 WL 12662665; *see also Senate Select Comm.*, 498 F.2d at 732-33.  These rules apply regardless of who occupies the Oval Office or controls the majority in the House or Senate.

Despite bipartisan recognition of the Executive Branch's need to maintain confidentiality with regard to certain kinds of communications, the Committee's requests target four categories of Executive Branch information that are plainly protected from disclosure to Congress.  I address each category in turn here and request that the Committee clarify what information it is actually seeking and the justification for pursuing such information.  A clear statement of the Committee's needs will enable us to explore developing an appropriate accommodation.

*First*, many of the requests in the letter expressly seek documents involving communications between the President and his most senior advisors.  For instance, Request 1(a) seeks communications between the President and the Counsel to the President; Request 1(d) seeks communications involving the President, Vice President, White House Chief of Staff, and other senior advisors to the President; and Request 1(*l*) seeks communications between the President and the Acting Attorney General.  The President has a constitutionally grounded interest in being able to consult with his advisors in a confidential manner. *See Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach From Congressional Subpoena*, 38 Op. O.L.C. __, at *6 (July 15, 2014) ("[S]ubjecting an immediate presidential adviser to Congress's subpoena power would threaten the President's autonomy and his ability to

The Honorable Jerrold Nadler
Page 6

receive sound and candid advice."); Letter from W. Neil Eggleston, Counsel to President Obama, to Chairman Jason Chaffetz (May 16, 2016) (noting the importance of the President's "ability to receive candid advice and counsel in the discharge of his constitutional duties.").

The courts have limited Congress's ability to seek disclosure of presidential communications, and for good reason. Informed decisionmaking requires the candid exchange of ideas, and "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *United States v. Nixon*, 418 U.S. 683, 705 (1974). As a result, the Supreme Court has long recognized the Executive's interest in the confidentiality of decisionmaking as a central component of the constitutional separation of powers:

> A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. . . . The [presidential communications] privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.

*Id.* at 708. Accordingly, we ask that the Committee articulate the legislative purpose that justifies the Committee's extraordinary requests seeking disclosure of presidential communications.

*Second*, the Committee requests documents exposing internal predecisional deliberations. For example, numerous requests seek documents reflecting internal discussions concerning the development of public statements, Executive Branch personnel decisions, and the exercise of various Executive powers. *See* Letter Schedule A. But congressional needs generally do not override the Executive Branch's confidentiality interests with respect to documents that are predecisional and deliberative, even if they do not involve communications with the President. Protections ensuring that the deliberative process can remain confidential apply to the entire Executive Branch and cover documents that reflect "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated"—precisely the types of documents requested by the Committee. *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). This position has been consistently recognized by administrations of both political parties. *See Assertion of Executive Privilege Over Documents Generated in Response to Congressional Investigation into Operation Fast and Furious*, 36 Op. O.L.C. __, at *3 (June 19, 2012) ("The threat of compelled disclosure of confidential Executive Branch deliberative material can discourage robust and candid deliberations . . . ."); *Assertion of Executive Privilege Over Communications Regarding EPA's Ozone Air Quality Standards and California's Greenhouse Gas Waiver Request*, 32 Op. O.L.C. 1, 2 (2008) ("Documents generated for the purpose of assisting the President in making a decision are protected" and these protections also "encompass[] Executive Branch deliberative communications that do not implicate presidential decisionmaking"); *Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996) ("The Supreme Court has expressly (and unanimously) recognized that the Constitution gives the President the power to protect the confidentiality of White House communications.").

The Honorable Jerrold Nadler
Page 7

*Third*, the Executive Branch has a compelling interest in protecting materials associated with law enforcement investigations. The Committee's requests acknowledge the existence of related law enforcement investigations and expressly seek "documents [the White House] furnished" as part of those investigations. *See* Letter Document Requests. It is well settled that the Executive Branch has authority to withhold from Congress documents from law enforcement files in order "to preserve the integrity and independence of criminal investigations and prosecutions"—including "documents related to a closed criminal investigation." *Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7, 10 (2008).

The Committee has no legitimate role in collecting law enforcement materials with the aim of simply duplicating a law enforcement inquiry because it does not like either (i) the conclusions reached by the Department of Justice or (ii) the confidential nature of the investigation, which limits the Committee's ability to access information that is protected from disclosure under existing law. Permitting congressional committees to demand the duplication of information in law enforcement files every time a high-profile and politically charged investigation was underway would irredeemably undermine the integrity and independence of actual law enforcement investigations. *See id.* Mere "exposure" is not a legitimate use of congressional investigative authority. *Watkins v. United States*, 354 U.S. 178, 200 (1957) ("We have no doubt that there is no congressional power to expose for the sake of exposure."). In addition, even after an investigation is completed, congressional access to investigative files raises both "a general concern about the prospect of committees of Congress obtaining confidential records from Justice Department criminal investigative files for the purpose of addressing highly politicized issues in public committee hearings" and, in the current context, a "[m]ore specific[] . . . concern[]" that access would "significantly impair the Department's ability to conduct future law enforcement investigations that would benefit from full White House cooperation." *Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. at 10-11.

The Committee's demand for materials associated with law enforcement investigations is particularly unwarranted here, where the Committee already has access to the Special Counsel's report, as released on April 18, 2019. Any additional materials are thus not "demonstrably critical" to the Committee's work. *Senate Select Comm.*, 498 F.2d at 731.

*Fourth*, the Committee is seeking documents concerning communications between the President and a foreign leader. *See* Request 4(k). As I recently explained in response to similar requests from other House committees, it is settled law that the Constitution entrusts the conduct of foreign relations exclusively to the Executive Branch, as it makes the President "the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936); *see also Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948) ("The President also possesses in his own right certain powers conferred by the Constitution on him as . . . the Nation's organ in foreign affairs."); Letter from Pat A. Cipollone, Counsel to the President, to Chairman Elijah E. Cummings, Chairman Eliot Engel, and Chairman Adam B. Schiff (Mar. 21, 2019) (same). In keeping with Supreme Court precedent, the Executive Branch has consistently taken the position, across administrations of both political parties, that the President has exclusive authority to conduct diplomacy with foreign nations. *See, e.g., Assertion of Executive Privilege for Documents Concerning Conduct of Foreign*

The Honorable Jerrold Nadler
Page 8

*Affairs with Respect to Haiti*, 20 Op. O.L.C. 5, 7 (1996) ("[T]he conduct of foreign affairs is an exclusive prerogative of the executive branch."); *Bill to Relocate United States Embassy from Tel Aviv to Jerusalem*, 19 Op. O.L.C. 123, 124 (1995) ("It is well settled that the Constitution vests the President with the exclusive authority to conduct the Nation's diplomatic relations with other States."); *Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248, 256 (1989) ("The President has the responsibility, under the Constitution, to determine the form and manner in which the United States will maintain relations with foreign nations.").

The President must be free to engage in discussions with foreign leaders without fear that those communications will be disclosed and used as fodder for partisan political purposes. And foreign leaders must be assured of this as well. No foreign leader would engage in private conversations with the President, or the President's senior advisors, if such conversations were subject to public disclosure (or disclosure to committees of Congress). Indeed, President George Washington made this point when he declined a House committee's request for copies of documents relating to the negotiation of the Jay Treaty with Great Britain. *See History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751, 753 (1982) (noting that President Washington sent a letter to Congress stating, "[t]o admit, then, a right in the House of Representatives to demand, and to have, as a matter of course, all the papers respecting a negotiation with a foreign Power, would be to establish a dangerous precedent"). This Administration intends to adhere to the same confidentiality principles that have governed American diplomacy for well over 200 years.

## II.   The Committee Has No Authority to Inquire into the President's Discharge of Duties Assigned Exclusively to the Executive by the Constitution.

The Committee's requests repeatedly run afoul of the Constitution by encroaching upon authorities that the Constitution assigns exclusively to the Executive Branch. These requests have no legitimate legislative purpose and exceed Congress's limited authority. The Supreme Court explained decades ago that "[s]ince Congress may only investigate into those areas in which it may potentially legislate or appropriate, it cannot inquire into matters which are within the exclusive province of one of the other branches of the Government." *Barenblatt v. United States*, 360 U.S. 109, 111-12 (1959).

For example, the Committee has announced its intention to investigate "the pardon power." *See* March 4, 2019 Press Release. But the pardon power is exclusively in the province of the Executive. The power "flows from the Constitution alone, not from any legislative enactments, and . . . it cannot be modified, abridged, or diminished by the Congress." *Schick v. Reed*, 419 U.S. 256, 266 (1974); *see also Ex parte Garland*, 71 U.S. 333, 380 (1866) ("This power of the President is not subject to legislative control. Congress can neither limit the effect of his pardon, nor exclude from its exercise any class of offenders. The benign prerogative of mercy reposed in him cannot be fettered by any legislative restrictions."). Thus, Congress's oversight authority does not extend to the President's pardon power. *See Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 3-4 (1999) ("[I]t appears that Congress' oversight authority does not extend to the process employed in connection with a particular clemency decision, to the materials generated or the discussions that took place as part of that process, or to the advice or views the President received in connection with a clemency decision.").

The Honorable Jerrold Nadler
Page 9

Similarly, the Committee's plan to "investigate" "other presidential authorities," *see* March 4, 2019 Press Release, plainly crosses the line to inquire into functions exclusively assigned to the President, including communications between the President and foreign leaders (e.g., Request 4(k)) and presidential personnel decisions (e.g., Requests 1(b), 1(d), 1(e), 1(f), 1(h)). *See Curtiss-Wright Export Corp.*, 299 U.S. at 320 ("[T]he President [is] the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress."); *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) ("Article II . . . gives [the President] the flexibility to organize his advisors and seek advice from them as he wishes."). Because Congress lacks authority in these areas of exclusive presidential authority, there is no legitimate legislative purpose for the Committee's information requests. *See Barenblatt*, 360 U.S. at 111-12.

## III. The Committee's Efforts to Conduct a Law Enforcement Investigation for the Purpose of Embarrassing, Harassing, or Punishing Political Opponents are Improper.

As presently framed, the Committee's inquiries transparently amount to little more than an attempt to duplicate—and supplant—law enforcement inquiries, and apparently to do so simply because the *actual* law enforcement investigations conducted by the Department of Justice did not reach a conclusion favored by some members of the Committee. That is not a proper legislative purpose. As you know, the Committee is not a law enforcement agency. Thus, the Committee cannot justify its inquiry simply by asserting that it is searching for possible evidence of its false claims of "obstruction of justice" or—more vaguely—that it is launching an investigation into nonexistent purported "threats against the rule of law." *See* March 4, 2019 Press Release. Pursuing investigations into alleged violations of the criminal code is indisputably a "function[] of the executive and judicial departments of government." *Watkins*, 354 U.S. at 187 (explaining that Congress is not "a law enforcement or trial agency"); *see also Quinn v. United States*, 349 U.S. 155, 161 (1955) (Congress's "power to investigate must not be confused with any of the powers of law enforcement; those powers are assigned under our Constitution to the Executive and the Judiciary"). The Department of Justice—not the Committee on the Judiciary—is the appropriate authority to conduct law enforcement investigations.

Nor can the Committee justify its requests simply by asserting that it intends to *expose* for the sake of exposure. *See* Letter at 1 (pledging to "present our findings to the American people, whatever those findings may be"). The Supreme Court long ago made clear that congressional investigations premised on that purported authority are an abuse of power because "there is no congressional power to expose for the sake of exposure," and there is no "general power to expose where the predominant result can only be an invasion of the private rights of individuals." *Watkins*, 354 U.S. at 200; *see also Quinn*, 349 U.S. at 161 (congressional investigations "cannot be used to inquire into private affairs unrelated to a valid legislative purpose"). As then-Attorney General Eric Holder explained during the Obama Administration, "Congress's legislative function does not imply a freestanding authority to gather information for the sole purpose of informing 'the American people.'" *Congressional Investigation into Operation Fast and Furious*, 36 Op. O.L.C. __, at *7 (internal quotation marks omitted). To the contrary, the "only informing function" of Congress "is that of informing itself about subjects susceptible to legislation, not that of informing

The Honorable Jerrold Nadler
Page 10

the public." *Id.* (internal quotation marks omitted).   Moreover, it is well settled that "[i]nvestigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Watkins*, 354 U.S. at 187.

Instead, the Committee's inquiries must be tied to a valid legislative purpose—that is, they must be tied to evaluating or formulating potential legislation on some subject within the Committee's authority.   As then-Attorney General Holder explained in articulating the Obama Administration's position, congressional information requests "must be in furtherance of Congress's legitimate *legislative* responsibilities" because "[c]ongressional oversight of Executive Branch actions is justifiable only as a means of facilitating the legislative task of enacting, amending, or repealing laws." *Congressional Investigation into Operation Fast and Furious*, 36 Op. O.L.C. __, at *5 (alteration and emphasis in original).   And it is critical to the constitutionally mandated accommodation process that the Committee articulate its legislative purpose.   Only with that purpose in mind can this office evaluate in good faith the Committee's need for information, formulate potential accommodations to address the Committee's need for information, and evaluate, in light of the Executive's constitutionally based interests in preserving confidentiality, what information is "demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm.*, 498 F.2d at 731.

In addition, even if the Committee were to attempt to articulate a legitimate legislative purpose for some of its inquiries, the authority of congressional committees to explore in detail any particular case of alleged wrongdoing is limited.   In restricting the scope of legitimate congressional oversight, the U.S. Court of Appeals for the District of Columbia Circuit has explained that "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events." *Id.* at 732.   To the extent the Committee's current press statements and list of inquiries suggest a probe akin to that undertaken by the Executive Branch, I respectfully submit that they reflect a misunderstanding of the Committee's legitimate functions.   Under settled law, it is not the Committee's legislative function to conduct a detailed inquiry into a particular event or series of events in order to reconstruct a precise picture of the facts.   *Id.*   Thus, demands for such detail will rarely be "demonstrably critical to the responsible fulfillment of the Committee's functions." *See id.* at 731.

I also find it particularly disturbing that the Committee is not only improperly setting out to duplicate law enforcement investigations when some Committee members disagree with the conclusions of these investigations without articulating any properly defined legislative purpose, but it is doing so having already announced a predetermined conclusion. *See, e.g.*, Interview with Chairman Jerrold Nadler, ABC's "This Week" (Mar. 3, 2019).   In contrast, the Department of Justice reached its conclusions after the Special Counsel exhaustively conducted an investigation for nearly two years.   The Attorney General, who previously served as Attorney General and is one of the nation's most respected lawyers, and the then-Deputy Attorney General, a career public servant who has spent nearly thirty years as a federal prosecutor, reviewed the Special Counsel's report and made decisions based on the evidence, Department of Justice guidelines, and their collective experience. *See* Remarks of Attorney General William P. Barr (Apr. 18, 2019); Mar. 24, 2019 Barr Letter 1, 3.   The White House will not participate in the Committee's "investigation"

The Honorable Jerrold Nadler
Page 11

that brushes aside the conclusions of the Department of Justice after a two-year-long effort in favor of political theater pre-ordained to reach a preconceived and false result.

## IV.    The Committee's Sweeping Document Requests, Unmoored from Any Properly Defined Legislative Purpose, Violate the Separation of Powers.

Overall, the March 4 letter must be understood in light of the cumulative effect of the numerous defects outlined above. Viewed in that light, the sweeping requests spelled out in the letter in their current form run afoul of the constitutional principle that a co-equal branch of government cannot abuse its role under the Constitution by undertaking actions that amount to "an unwarranted impairment of another branch in the performance of its constitutional duties." *Cheney v. United States Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 390 (2004); *see also Loving v. United States*, 517 U.S. 748, 757 (1996) ("Even when a branch does not arrogate power to itself, . . . the separation-of-powers doctrine requires that a branch not impair another branch in the performance of its constitutional duties."); *Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch*, 9 Op. O.L.C. 60, 62 (1985) ("Congress' power of inquiry must not be permitted to negate the President's constitutional responsibility for managing and controlling affairs committed to the Executive Branch.").

The Supreme Court has applied this broad separation of powers principle to document requests that affect the functioning of the Executive. In *Cheney*, plaintiffs in civil litigation served overly broad discovery requests on a presidential task force chaired by the Vice President. 542 U.S. at 372, 387. The Court held that the defendants were not required to undertake the burden associated with responding to such requests before the requests were properly limited based on separation-of-powers concerns. *Id.* at 388. In reaching its conclusion, the Court noted that "special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Id.* at 385. The Court further noted that "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery," and that "the Executive's constitutional responsibilities and status [are] factors counseling judicial deference and restraint in the conduct of litigation against it." *Id.* (alteration in original) (internal quotation marks and citations omitted). Accordingly, the Court remanded the case to the U.S. Court of Appeals for the District of Columbia Circuit to determine whether the discovery orders were improper because they constituted an "unwarranted impairment" of the Executive Branch. *Id.* at 390, 392.

Under the principle applied in *Cheney*, the Committee's sweeping document requests violate the separation of powers. The nearly thirty document requests in the letter (some with multiple subparts) are not only incredibly voluminous, but also breathtaking in scope, covering a sweeping array of events, communications, topics, time periods, and individuals. The Committee's requests do not come close to reflecting restraint in volume and scope, as required under *Cheney*—particularly when those requests are directed at the President. As outlined above, the requests repeatedly and directly target documents at the core of each of the four recognized components of executive privilege. Based on the sheer number and scope of the Committee's requests, it is clear that the Committee is trying to unduly burden the Office of the President so as

The Honorable Jerrold Nadler
Page 12

to impair the President's ability to carry out his constitutional duties.  The Constitution does not permit Congress to undermine the President in this manner.

*          *          *

As the Supreme Court has recognized, "[t]he power of the Congress to conduct investigations is inherent in the legislative process," but this "power of inquiry . . . is not unlimited." *Watkins*, 354 U.S. at 187.  Indeed, "[n]o inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress." *Id.*  We respect Congress and its authority to seek information to aid it in considering legislation, and we stand ready to work to accommodate all congressional committees that have a legitimate legislative interest in seeking information.  We do not believe the investigation discussed in the March 4 letter is a legitimate exercise of oversight authority, particularly now that the Special Counsel's Office of the Department of Justice has completed its work.  As discussed, it seeks information that directly implicates core separation of powers and Executive Branch confidentiality interests.   Our responsibility to the constitutionally based prerogatives of the Executive Branch, our obligation to protect those prerogatives for all future occupants of the Office of the Presidency, and our respect for the rule of law require that we resist the overbroad demands in the Committee's letter.

As I have said numerous times, my office will work with the Committee through the constitutionally mandated accommodation process to provide the Committee with materials it can properly request.  If the Committee intends to continue its inquiry, it would greatly advance that process if the Committee were to narrow the scope of the requests in the March 4 letter and articulate the legislative purpose and legal basis supporting each of the remaining requests.

Thank you for your attention to the important issues discussed above.  I welcome the opportunity to discuss any of these points.

Sincerely,

Pat A. Cipollone
*Counsel to the President*

cc:  The Honorable Doug Collins, Ranking Member

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff,*

v.

DONALD F. MCGAHN II,

*Defendant.*

No. 19-cv-2379 (KBJ)

# EXHIBIT E

# THE WHITE HOUSE

WASHINGTON

May 20, 2019

Mr. William A. Burck
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005

Dear Mr. Burck:

I write in response to your request regarding the subpoena issued to your client, Donald F. McGahn II, by the Committee on the Judiciary of the United States House of Representatives (the "Committee") on April 22, 2019. My previous letter, dated May 7, 2019, conveyed Acting Chief of Staff to the President Mick Mulvaney's direction to Mr. McGahn that he not produce the White House records sought by the subpoena because they remain subject to the control of the White House and implicate significant Executive Branch confidentiality interests and executive privilege. The subpoena also directs Mr. McGahn to appear to testify before the Committee at 10:00 a.m. on Tuesday, May 21, 2019.

The Department of Justice (the "Department") has advised me that Mr. McGahn is absolutely immune from compelled congressional testimony with respect to matters occurring during his service as a senior adviser to the President. *See* Memorandum for Pat A. Cipollone, Counsel to the President, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, *Re: Testimonial Immunity Before Congress of the Former Counsel to the President* (May 20, 2019). The Department has long taken the position—across administrations of both political parties—that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee." *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 191 (2007) (quoting *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) (opinion of Attorney General Janet Reno)); *Immunity of the Counsel to the President from Compelled Congressional Testimony*, 20 Op. O.L.C. 308, 308 (1996). That immunity arises from the President's position as head of the Executive Branch and from Mr. McGahn's former position as a senior adviser to the President, specifically Counsel to the President.

There is no question that the position of Counsel to the President falls within the scope of the immunity. The three previous opinions cited above directly addressed the immunity of the Counsel to the President: Harriet Miers was a former Counsel to President George W. Bush, Beth Nolan was the current Counsel to President Clinton, and Jack Quinn was the current Counsel to President Clinton. Accordingly, Mr. McGahn cannot be compelled to appear before the Committee because "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. at 5. The constitutional immunity of current and former senior advisers to the President exists to protect the institution of

Mr. William A. Burck
Page 2

the Presidency and, as stated by Attorney General Reno, "may not be overborne by competing congressional interests." *Id.*

Because of this constitutional immunity, and in order to protect the prerogatives of the Office of the Presidency, the President directs Mr. McGahn not to appear at the Committee's scheduled hearing on Tuesday, May 21, 2019. This long-standing principle is firmly rooted in the Constitution's separation of powers and protects the core functions of the Presidency, and we are adhering to this well-established precedent in order to ensure that future Presidents can effectively execute the responsibilities of the Office of the Presidency. I attach the legal opinion provided by the Department of Justice for your review.

Thank you for your attention to this matter. Please do not hesitate to contact me or Mike Purpura if you have any questions.

Sincerely,

Pat A. Cipollone
*Counsel to the President*



**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the Assistant Attorney General          *Washington, D.C. 20530*

May 20, 2019

### MEMORANDUM FOR PAT A. CIPOLLONE
### COUNSEL TO THE PRESIDENT

*Re: Testimonial Immunity Before Congress of
the Former Counsel to the President*

On April 22, 2019, the Committee on the Judiciary of the House of Representatives subpoenaed Donald F. McGahn II, the former Counsel to the President, to testify about matters described in the report of Special Counsel Robert S. Mueller, III.  You have asked whether Mr. McGahn is legally required to appear.

We provide the same answer that the Department of Justice has repeatedly provided for nearly five decades:  Congress may not constitutionally compel the President's senior advisers to testify about their official duties.  This testimonial immunity is rooted in the constitutional separation of powers and derives from the President's independence from Congress.  As Attorney General Janet Reno explained, "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999) ("Reno Opinion").  Yet Congress may no more summon the President to a congressional committee room than the President may command Members of Congress to appear at the White House.  *See* Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 2 (July 29, 1982) ("Olson Memorandum").

Although the White House has opposed sending senior advisers to testify for almost as long as there has been an Executive Office of the President, Assistant Attorney General William Rehnquist first described the legal basis for immunity in a 1971 memorandum.  *See* Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971) ("Rehnquist Memorandum").  The Rehnquist Memorandum has been consistently reaffirmed by administrations of both political parties, most recently during the Obama Administration.  *See, e.g.*, *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. __, *1 & n.1 (July 15, 2014) ("*Immunity of the Assistant to the President*").

We believe that these established principles apply to bar the Committee from compelling Mr. McGahn to testify. The Counsel to the President clearly qualifies as a senior adviser entitled to testimonial immunity. Attorney General Reno reached that conclusion in her 1999 opinion, and this Office has made the same determination on at least three other occasions. We have also recognized that the immunity continues to apply after the Counsel leaves the White House. *See Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007) (*"Immunity of the Former Counsel"*).

The Chairman of the Committee has suggested that the justification for Mr. McGahn's testimonial immunity is undermined by the President's decision not to assert executive privilege over the redacted version of the Special Counsel's report that the Attorney General released last month. *See, e.g.*, Letter for Donald F. McGahn II, from Jerrold Nadler, Chairman, Committee on the Judiciary, U.S. House of Representatives at 1 (May 17, 2019) ("Nadler Letter"). But the question whether an adviser need comply with a subpoena purporting to require an appearance is different from the question whether the adviser's testimony would itself address privileged matters. Therefore, the public disclosure of the Special Counsel's report does not have any legal bearing upon the force of the congressional subpoena. For these reasons, and consistent with nearly 50 years of executive branch precedent, we conclude that Mr. McGahn is not legally required to appear and testify before the Committee.

## I.

Since the 1970s, this Office has consistently advised that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee" on matters related to their official duties. Memorandum for All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice, from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Executive Privilege* at 5 (May 23, 1977) ("Harmon Memorandum"); *see also* Rehnquist Memorandum at 7 ("The President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis—should be deemed absolutely immune from testimonial compulsion by a congressional committee."). Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations.[1]

---

[1] *See Immunity of the Assistant to the President*, 38 Op. O.L.C. at *1; Letter for Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel at 1–2 (Aug. 1, 2007) ("Bradbury Letter"); *Immunity of the Former Counsel*, 31 Op. O.L.C. at 191; Reno Opinion, 23 Op. O.L.C. at 4; *Immunity of the Counsel to the President from Compelled Congressional Testimony*, 20 Op. O.L.C. 308, 308 (1996) (*"Immunity of the Counsel to the President"*); Letter for Jack Brooks, Chairman, Committee on the Judiciary, U.S. House of Representatives, from Nicholas E. Calio, Assistant to the President for Legislative Affairs at 1 (June 16, 1992) ("Calio Letter"); Olson Memorandum at 2; Memorandum for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Demand for Deposition of Counsel to the President Fred F. Fielding* at 2 (July 23, 1982) (*"Congressional Demand for Deposition of Counsel"*); Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Testimony by Presidential Assistants* at 1 (Apr. 14, 1981); Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Dual-Purpose Presidential Advisers* at 5 (Aug. 11, 1977); Harmon Memorandum at 5; Letter to Phillip E. Areeda, Counsel to the President,

This testimonial immunity is distinct from, and broader than, executive privilege. Like executive privilege, the immunity protects confidentiality within the Executive Branch and the candid advice that the Supreme Court has acknowledged is essential to presidential decision-making. *See United States v. Nixon*, 418 U.S. 683, 705 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."). But the immunity extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself. In this regard, the President's immediate advisers are constitutionally distinct from the heads of executive departments and agencies, whose offices are created by acts of Congress, whose appointments require the Senate's advice and consent, and whose responsibilities entail the administration of federal statutes. Those officers can and do testify before Congress. The President's immediate advisers, however, exercise no statutory authority and instead act solely to advise and assist the President. Their independence from Congress reflects that of the President.

## A.

The President stands at the head of a co-equal branch of government. Yet allowing Congress to subpoena the President to appear and testify would "promote a perception that the President is subordinate to Congress, contrary to the Constitution's separation of governmental powers into equal and coordinate branches." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *3. As Assistant Attorney General Theodore Olson explained in 1982: "The President is a separate branch of government. He may not compel congressmen to appear before him. As a matter of separation of powers, Congress may not compel him to appear before it." Olson Memorandum at 2. The President's immediate advisers are an extension of the President and are likewise entitled to absolute immunity from compelled congressional testimony.

In 2014, our most recent opinion on the topic described the bases for this immunity in detail. "For the President's absolute immunity to be fully meaningful," we explained, "and for these separation of powers principles to be adequately protected, the President's immediate advisers must likewise have absolute immunity from congressional compulsion to testify about matters that occur during the course of discharging their official duties." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *2. The demands of the office require the President to rely on senior advisers who serve "as the President's alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Id.* at *3 (quoting Reno Opinion, 23 Op. O.L.C. at 5); *see also In re Sealed*

---

from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 25, 1974) (enclosing a memorandum, hereinafter "Scalia Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, *Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters* at 6 (Dec. 21, 1972) ("Cramton Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, *Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee* at 1 (Mar. 15, 1972) ("Erickson Memorandum"); Rehnquist Memorandum at 7.

*Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) ("The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers.").

There are dozens of congressional committee and subcommittees with the authority to conduct hearings and subpoena witnesses.  Recognizing a congressional authority to compel the President's immediate advisers to appear and testify at the times and places of their choosing would interfere directly with the President's ability to faithfully discharge his responsibilities.  It would allow congressional committees to "wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *3.  And in the case of the President's current advisers, preparing for such examinations would force them to divert time and attention from their duties to the President at the whim of congressional committees.  This "would risk significant congressional encroachment on, and interference with, the President's prerogatives and his ability to discharge his duties with the advice and assistance of his closest advisers," ultimately subordinating senior presidential advisers to Congress rather than the President.  *Id.*; *see also Loving v. United States*, 517 U.S. 748, 757 (1996) ("Even when a branch does not arrogate power to itself . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties.").

The immunity of senior presidential advisers also protects the Executive Branch's strong interests in confidentiality as well as the President's ability to obtain sound and candid advice.  As the Supreme Court has recognized, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708.  While a senior presidential adviser, like other executive officials, could rely on executive privilege to decline to answer specific questions at a hearing, the privilege is insufficient to ameliorate several threats that compelled testimony poses to the independence and candor of executive councils.

First, compelled congressional testimony "create[s] an inherent and substantial risk of inadvertent or coerced disclosure of confidential information," despite the availability of claims of executive privilege with respect to the specific questions asked during such testimony. *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *4.  As we explained in 2014, senior presidential advisers

> could be asked, under the express or implied threat of contempt of Congress, a wide range of unanticipated and hostile questions about highly sensitive deliberations and communications.  In the heat of the moment, without the opportunity for careful reflection, the adviser might have difficulty confining his remarks to those that do not reveal such sensitive information.  Or the adviser could be reluctant to repeatedly invoke executive privilege, even though validly applicable, for fear of the congressional and media condemnation she or the President might endure.

*Id.*; *see also Congressional Demand for Deposition of Counsel*, *supra* note 1, at 2 ("A witness before a Congressional committee may be asked—under threat of contempt—a wide range of unanticipated questions about highly sensitive deliberations and thought processes.  He therefore

may be unable to confine his remarks only to those which do not impair the deliberative process.").

Second, even "[t]he prospect of compelled interrogation by a potentially hostile congressional committee about confidential communications with the President or among the President's immediate staff could chill presidential advisers from providing unpopular advice or from fully examining an issue with the President or others." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at*4. This is true whether or not the President might ultimately assert executive privilege over the testimony in question, given the adviser's uncertainty over whether a particular matter will become the subject of future congressional inquiry and whether the President would choose to incur the political costs associated with invoking the privilege.

Finally, given the frequency with which the testimony of a senior presidential adviser—whose sole and daily responsibility is to advise and assist the President—would fall within the scope of executive privilege, compelling the adviser's appearance is not likely to promote any valid legislative interests. Coercing senior presidential advisers into situations where they must repeatedly decline to provide answers, citing executive privilege, would be inefficient and contrary to good-faith governance. The President's immediate advisers, if compelled to testify, are unlikely to answer many of the Members' questions, suggesting that the hearing itself will not serve any legitimate purpose for the Committee.

## B.

The Executive Branch's position on testimonial immunity reflects historical practices dating back nearly to the 1939 establishment of the Executive Office of the President. As Assistant Attorney General Antonin Scalia explained in a 1974 memorandum, "at least since the Truman Administration," presidential advisers "have appeared before congressional committees only where the inquiry related to their own private affairs or where they had received Presidential permission." Scalia Memorandum, *supra* note 1, at 6. Although Presidents have occasionally permitted such testimony, the long-standing policy has been to decline invitations for voluntary appearances and to resist congressional subpoenas for involuntary ones.

In surveying the history through 1971, Assistant Attorney General Rehnquist described the earliest application of the policy to be inconclusive and at times inconsistent. *See* Rehnquist Memorandum at 4–6. But even when senior presidential advisers did appear, those appearances were frequently accompanied by a claim of legal privilege not to do so. Assistant Attorney General Rehnquist thus described the claim as an absolute testimonial immunity for the President's immediate advisers, *see id.* at 7, and this Office has reaffirmed and expanded upon that conclusion in the decades since. The following examples, while not exhaustive, demonstrate the strong historical foundation for the Executive Branch's position that Congress may not compel the President's senior advisers to appear and testify.

In 1944, during the Administration of Franklin D. Roosevelt, a subcommittee of the Senate Committee on Agriculture and Forestry subpoenaed Jonathan Daniels, an Administrative Assistant to President Roosevelt, to testify about his reported attempts to compel the resignation of the Rural Electrification Administrator. *See Administration of the Rural Electrification Act: Hearing on S. 197 Before a Subcomm. of the S. Comm. on Agric. and Forestry*, 78th Cong., pt. 3,

at 611–28, 629 (1944). Mr. Daniels appeared at the hearing but advised that he could not answer questions that would concern his confidential relationship with the President. *Id.* After the hearing ended with the subcommittee threatening contempt, Mr. Daniels wrote to the subcommittee and reiterated his belief that the subcommittee could not compel his testimony. *See id.* at 740. However, he stated that the President had determined that his testimony would not be contrary to the public interest and that he therefore was willing to appear in the future. *See id.*; *see also id.* at 695–740. *The New York Times* reported that "[w]ith Daniels' agreement to testify disappeared the possibility of using his previous defiance as the first test of the division between executive and legislative power before the Senate." *Daniels to Answer Senators' Queries: President Agrees*, N.Y. Times, Mar. 5, 1944, at 1.

The first outright refusal of a presidential adviser to appear apparently occurred during the Truman Administration, in 1948, when a special subcommittee of the House Committee on Education and Labor twice subpoenaed John R. Steelman, an Assistant to the President, to testify about his communications with President Truman regarding administration of the Taft-Hartley Act during a strike. *See Investigation of GSI Strike: Hearing Before a Special Subcomm. of the H. Comm. on Educ. and Labor*, 80th Cong. 347–53 (1948). Mr. Steelman declined to comply and returned the subpoenas with a letter stating: "[I]n each instance the President directed me, in view of my duties as his Assistant, not to appear before your subcommittee." H.R. Rep. No. 80-1595, at 3 (1948).

During the Eisenhower Administration, in 1955, a subcommittee of the Senate Committee on the Judiciary invited the President's Chief of Staff, Sherman Adams, to testify about a contract between the Atomic Energy Commission and two power companies. He declined, citing in part his "official and confidential relationship with the President." *Power Policy, Dixon-Yates Contract: Hearing Before the Subcomm. on Antitrust and Monopoly of the S. Comm. on the Judiciary*, 84th Cong., pt. 2, at 675–76, 779 (1955). Later, in 1958, Mr. Adams testified, with President Eisenhower's approval, before a House subcommittee concerning allegations of impropriety relating to his relationship with a New England industrialist. *Investigation of Regulatory Commissions and Agencies: Hearing Before a Subcomm. of the H. Comm. on Interstate and Foreign Commerce*, 85th Cong., pt. 10, at 3712–40 (1958).

During the Administration of President Lyndon B. Johnson, in 1968, the Senate Committee on the Judiciary requested the testimony of Associate Special Counsel to the President W. DeVier Pierson to testify concerning the nomination of Associate Justice Abe Fortas to be Chief Justice of the United States. The inquiry concerned whether Justice Fortas had inappropriately participated in developing certain legislation. Mr. Pierson responded that "[i]t has been firmly established, as a matter of principle and precedents, that members of the President's immediate staff shall not appear before a Congressional committee to testify with respect to the performance of their duties on behalf of the President." *Nominations of Abe Fortas and Homer Thornberry: Hearing Before the S. Comm. on the Judiciary*, 90th Cong., pt. 2, at 1348 (1968). He continued: "This limitation, which has been recognized by the Congress as well as the Executive, is fundamental to our system of government. I must, therefore, respectfully decline the invitation to testify in these hearings." *Id.*

In 1972, during the Nixon Administration, the Senate Committee on the Judiciary invited Peter M. Flanigan, an Assistant to the President, to testify. This Office advised that Mr. Flanigan

occupied "a close and confidential relationship with the President and share[d] the President's immunity from congressional process." Erickson Memorandum, *supra* note 1, at 1. Our disposition was clear: "[I]t has been firmly established that members of the President's immediate staff may not appear before a congressional committee to testify with respect to the performance of their duties." *Id.*[2]

In 1979, during the Carter Administration, Special Assistant to the President Sarah Weddington was invited to testify before the Senate Human Resources Committee as part of a hearing on "Women in the Coming Decade." At the instruction of the Counsel to President, she declined to appear, explaining that "it is White House policy for personal aides to the President to decline invitations to testify before Congressional committees." Letter for Harrison A. Williams, U.S. Senate, from Sarah Weddington, Special Assistant to the President at 1 (Jan. 31, 1979) ("Weddington Letter"). She offered, however, to meet informally with committee members or staff to discuss related programs and proposals. *Id.* at 2.

In 1980, the Subcommittee on Investigations of the House Committee on Armed Services requested the testimony of Deputy Assistant to the President for National Security Affairs David Aaron concerning leaks to *The Washington Post*. President Carter directed Mr. Aaron not to appear. The Counsel to the President, Lloyd N. Cutler, explained that "Congress has always respected the privilege of the President to decline requests that the President himself or his immediate White House advisors appear to testify before Congressional committees," instead provided a sworn affidavit by Mr. Aaron denying the allegations, and offered to make Mr. Aaron available for an interview or deposition under oath. Letter for Samuel S. Stratton, Chairman, Subcommittee on Investigation of the Committee on Armed Services, U.S. House of Representatives, from Lloyd N. Cutler, Counsel to the President at 1–2 (Sept. 30, 1980).

In 1982, during the Reagan Administration, the Senate Labor and Human Resources Committee sought the testimony of Counsel to the President Fred F. Fielding concerning allegations of corruption against Secretary of Labor Raymond Donovan. Mr. Fielding declined to appear and testify. *See* Olson Memorandum at 1–4 (explaining the legal basis for that decision). Deputy Attorney General Edward C. Schmults notified the Committee that, "[a]s an institutional matter, the President cannot permit his Counsel to provide sworn testimony to the Legislative Branch regarding the performance of his duties," but offered to arrange for written responses to a reasonable number of written inquiries. Letter for Orrin G. Hatch, Chairman, Committee on Labor and Human Resources, U.S. Senate, from Edward C. Schmults, Deputy Attorney General at 2–3 (Apr. 19, 1983) ("Schmults Letter").

In 1992, during the George H.W. Bush Administration, the House Committee on the Judiciary requested that C. Boyden Gray, Counsel to the President, and Nicholas Rostow,

---

[2] In connection with the Watergate investigations, President Nixon reached an agreement with the Senate's Watergate Select Committee to authorize current and former White House officials to appear voluntarily and under oath before the committee in closed session. *See* Remarks Announcing Procedures and Developments in Connection With the Watergate Investigations (Apr. 17, 1973), *Pub. Papers of Pres. Richard Nixon* 298, 298–99 (1973). President Nixon later determined that he would not claim executive privilege over the subject matters of the testimony and would allow the witnesses to testify in open hearings. *See* Statements About the Watergate Investigations (May 22, 1973), *Pub. Papers of Pres. Richard Nixon* at 547, 554 (1973). He therefore waived the testimonial immunity to authorize those appearances.

Special Assistant to the President and a Senior Director for Legal Affairs at the National Security Council, testify concerning Bush Administration policies towards Iraq prior to the first Gulf War. The White House declined, citing "the longstanding practice of the Executive Branch to decline requests for testimony by members of the President's personal staff." Calio Letter, *supra* note 1, at 1.

In 1999, President Clinton directed Counsel to the President Beth Nolan not to appear in response to a subpoena from the House Committee on Government Reform and Oversight concerning a clemency decision. President Clinton relied on an opinion from Attorney General Reno that concluded that "the Counsel serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony" on matters related to the performance of official duties. Reno Opinion, 23 Op. O.L.C. at 4.

In 2007, during the George W. Bush Administration, the House Committee on the Judiciary subpoenaed former Counsel to the President Harriet Miers to testify about the Department of Justice's decision to request the resignation of certain United States Attorneys. President Bush directed Ms. Miers not to testify after this Office concluded that she was "immune from compelled congressional testimony about matters . . . that arose during her tenure as Counsel to the President and that relate to her official duties in that capacity." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 193.

Also in 2007, the Senate Committee on the Judiciary subpoenaed the testimony of Karl Rove, the Deputy White House Chief of Staff, on the same subject. This Office confirmed that Mr. Rove was "immune from compelled congressional testimony about matters (such as the U.S. Attorney resignations) that arose during his tenure as an immediate presidential adviser and that relate to his official duties in that capacity." Bradbury Letter, *supra* note 1, at 1–2. In 2008, a subcommittee of the House Committee on the Judiciary also subpoenaed Mr. Rove, and he was again directed not to testify. *See* Letter for Robert D. Luskin, Patton Boggs LLP, from Fred F. Fielding, Counsel to the President at 1 (July 9, 2008).

In 2014, during the Obama Administration, the House Committee on Oversight and Government Reform issued a subpoena to David Simas to testify about matters related to his official responsibilities as Assistant to the President and Director of the Office of Political Strategy and Outreach. In particular, the committee requested testimony regarding "the role and function of the White House Office of Political Strategy and Outreach" and the question "whether the White House [was] taking adequate steps to ensure that political activity by Administration officials complies with relevant statutes, including the Hatch Act." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *1 (internal quotation marks omitted). This Office concluded that Mr. Simas was "immune from compulsion to testify before the [c]ommittee on these matters," *id.*, and he declined to testify.

The foregoing historical record demonstrates that the immunity of senior presidential advisers from congressional testimony is long-standing and has been repeatedly asserted against the requests of Congress. These examples do not indicate that senior presidential advisers have always declined to testify before Congress. The practice of asserting testimonial immunity—just like the practice of asserting executive privilege—has long reflected the "spirit of dynamic compromise" that reflects the "efficient and effective functioning" of the political branches of

government. *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). Presidents have occasionally made senior advisers available to accommodate congressional requests, even while defending their legal authority to decline such requests. But these accommodations between the political branches do not compromise the underlying immunity of the President or his senior presidential advisers from compelled congressional testimony. Nor do they nullify the many instances where Presidents have successfully asserted immunity and affirmatively directed their immediate aides not to testify before Congress.

**C.**

While the Executive Branch has asserted for 75 years that senior presidential advisers may decline to testify before Congress, and has formally asserted an immunity for nearly 50 years, neither the Supreme Court nor any court of appeals has specifically addressed the question. This is because disputes over congressional demands for information from the Executive Branch are inherently political, and the historical practice has been to resolve such questions in the political arena. When such conflicts have arisen, Congress has either acceded to the President's claims of immunity or the Executive Branch has accommodated the congressional interest in some fashion. Only one district court has ever addressed the testimonial immunity of the President's senior advisers, and that decision did not come until 2008. *See Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008). Although the district court held that presidential advisers were not entitled to absolute immunity from compelled congressional testimony, the court of appeals stayed that decision pending appeal, and the parties settled without any appellate decision on the merits.

Nonetheless, this Office has recognized that the Executive Branch's long-standing position is consistent with related Supreme Court precedent. *See Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5. In *Gravel v. United States*, 408 U.S. 606 (1972), the Court held that legislative aides share in the constitutional immunity enjoyed by Members of Congress under the Speech or Debate Clause. *Id.* at 616–17. The Court reasoned that the Clause "was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch," and "protect[ion] . . . against prosecutions that directly impinge upon or threaten the legislative process." *Id.* at 616. Because "it is literally impossible . . . for Members of Congress to perform their legislative tasks without the help of aides and assistants," the Court recognized that such aides "must be treated as the [Members'] alter egos." *Id.* at 616–17. For purposes of immunity, the Court concluded, Members of Congress and their aides should be "treated as one." *Id.* at 616 (internal quotation marks omitted). The same logic applies with respect to the President and his senior advisers. The failure to recognize the extension of the President's immunity from compelled congressional testimony to senior advisers would call into question the well-established extension of derivative immunity to congressional staffers.

It is true that in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Court declined to extend *Gravel*'s alter-ego reasoning to a civil suit for damages against senior presidential advisers, and instead concluded that such advisers are entitled only to qualified immunity in those civil actions. *Id.* at 810–11, 813–15. *Harlow* thus distinguished the President's immediate advisers from the President himself, whom the Court held (in another decision issued the same day) to be absolutely immune from civil suits based on official acts. *See Nixon v. Fitzgerald*, 457 U.S. 731,

9

749 (1982). Yet we have previously declined to extend *Harlow* to the context of testimonial immunity because the prospect of compelled congressional testimony raises separation of powers concerns that are not present in a civil damages lawsuit brought by a private party. *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5–7. Compelled congressional testimony "threatens to subject presidential advisers to coercion and harassment, create a heightened impression of presidential subordination to Congress, and cause public disclosure of confidential presidential communications in a way that the careful development of evidence through a judicially monitored [proceeding] does not." *Id.* at *6. In a private lawsuit, the court "acts as a disinterested arbiter of a private dispute, not as a party in interest to the very lawsuit it adjudicates," and it "is charged with impartially administering procedural rules designed to protect witnesses from irrelevant, argumentative, harassing, cumulative, privileged, and other problematic questions." *Id.* By contrast, congressional hearings involving the President's immediate advisers contain none of those assurances, and they threaten the President's autonomy and ability to receive sound and candid advice in a way that private civil damages suits do not. *Cf.* Archibald Cox, *Executive Privilege*, 122 U. Pa. L. Rev. 1383, 1429 (1974) (stating that as compared to a civil action, "[t]he need to protect aides and subordinates from reprisals on Capitol Hill and in the media of public debate is a thousand-fold greater in the case of congressional hearings, which are often the preserves of individual Senators and Congressmen not all of whom are invariably characterized by judicious self-restraint").

We recognize that in *Miers*, a federal district court read *Harlow* to imply that senior presidential advisers do not enjoy absolute immunity from congressionally compelled testimony. *See Miers*, 558 F. Supp. 2d at 100–03. But we believe that the court did not adequately consider the different and heightened separation of powers concerns bearing upon the testimony of the President's immediate advisers before Congress. Moreover, the district court's decision was stayed pending appeal. *See Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 910–11 (D.C. Cir. 2008) (per curiam). The case settled and the appeal was dismissed before any further action by the court of appeals. *Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, No. 08-5357, 2009 WL 3568649, at *1 (D.C. Cir. Oct. 14, 2009). For the reasons set forth above, and in greater detail in our 2014 opinion, *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5–9, we respectfully disagree with the district court's conclusion in *Miers* and adhere to this Office's long-established position that the President's immediate advisers are absolutely immune from compelled congressional testimony.

## II.

Having reaffirmed the existence of the testimonial immunity of the President's immediate advisers, we now consider its application to Mr. McGahn, the former Counsel to the President. Plainly, the Counsel to the President qualifies as an immediate adviser to the President. As Attorney General Reno recognized, "the Counsel serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony." Reno Opinion, 23 Op. O.L.C. at 4. Indeed, we have recognized the Counsel's immunity from congressional testimony on multiple occasions. *See, e.g.*, *Immunity of the Former Counsel*, 31 Op. O.L.C. at 192 ("[T]he Counsel to the President 'serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony.'" (quoting Reno Opinion, 23 Op. O.L.C. at 4)); *Immunity of the Counsel to the President*, 20 Op. O.L.C. at 309 ("There is no question that the Counsel to the President falls within Assistant Attorney General Rehnquist's description of

the type of Presidential advisers who are immune from testimonial compulsion."); *Congressional Demand for Deposition of Counsel*, supra note 1, at 2 ("I believe the Counsel to the President possesses an absolute privilege not to testify with regard to any matters relating to his official duties as legal adviser to the President.").

In addition, we have recognized that testimonial immunity continues after the tenure of a particular Counsel to the President. As we explained in 2007, "[s]eparation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 192–93. The Supreme Court has explicitly recognized this principle in the context of executive privilege. The privilege must outlast the tenure of a particular President because, absent a guarantee of lasting confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (adopting the view of the Solicitor General); *see also United States v. Johnson*, 383 U.S. 169 (1966) (applying the Speech or Debate Clause to a former Member of Congress).

In concluding that the former Counsel to the President retained her testimonial immunity, we relied upon the actions of former President Truman, who explained his own refusal to appear and testify before the House Committee on Un-American Activities in the following terms: "[I]f the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 193 (quoting *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14 (reprinting Nov. 12, 1953 letter by President Truman)). It is "just as important to the independence of the Executive that the actions of the President should not be subjected to the questioning by the Congress after he has completed his term of office as that his actions should not be questioned while he is serving as President." *Id.* (quoting *Text of Address by Truman Explaining to Nation His Actions in the White Case*, N.Y. Times, Nov. 17, 1953, at 26). Because the immunity of senior presidential advisers derives from the immunity of the President, this same logic extends to them as well.

Our 2007 conclusion in *Immunity of the Former Counsel* was consistent with the analysis of the immunity interests of former officials during the George H.W. Bush and Nixon Administrations. *See* Letter for Arthur B. Culvahouse, O'Melveny & Myers, from C. Boyden Gray, Counsel to the President at 1 (June 17, 1992) ("[I]t is long-standing White House policy not to assent to formal testimony to Congressional committees by former White House officials about matters occurring during their White House service."). It is true that the President does not have the same need for the daily advice and assistance of his former advisers, as with his current advisers, yet the confidentiality interests associated with the advisers' former role remain just as strong. *See* Cramton Memorandum, *supra* note 1, at 5–6 ("If advice from a staff member were protected from congressional and public scrutiny only for so long as the staff member remained employed in the White House, the protection would be significantly reduced. It would only be a question of time when staff turnovers or a change in administration would remove the shield.").

Even more significantly, the risk to the separation of powers and to the President's autonomy posed by a former adviser's testimony on official matters continues after the conclusion of that adviser's tenure. *See id.* at 6 ("[T]he same considerations that were persuasive to former President Truman would apply to justify a refusal to appear by such a former staff member, if the scope of his testimony is to be limited to his activities while serving in that capacity."). Accordingly, consistent with our prior precedents, we find no material distinction between the compelled congressional testimony of current and former senior advisers to the President. Mr. McGahn's departure as Counsel to the President does not alter his immunity from compelled congressional testimony on matters related to his service to the President.

## III.

In this instance, the Committee seeks to question Mr. McGahn concerning matters addressed in the report of Special Counsel Robert S. Mueller, III, on the Investigation into Russian Interference in the 2016 Presidential Election. The Chairman of the Committee has suggested that the White House's voluntary cooperation with this investigation and the President's decision not to assert executive privilege over the Special Counsel's report may undermine any claim that Mr. McGahn is immune from compelled congressional testimony. Nadler Letter at 1. However, the concept of immunity is distinct from, and broader than, the question whether executive privilege would protect a witness's response to any particular question. *See* Rehnquist Memorandum at 4 (recognizing the "distinction between a claim of absolute immunity from even being sworn as a witness, and a right to claim privilege in answer certain questions in the course of one's testimony as a witness").[3] The President does not waive an adviser's immunity from compelled congressional testimony by authorizing disclosure of any particular information. To the contrary, Presidents have frequently authorized aides to share information as an accommodation to Congress, notwithstanding claims of immunity.

The immunity from compelled congressional testimony implicates fundamental separation of powers principles that are separate from the confidentiality of specific information. *See supra* Part I.A. The constitutional interest in protecting the autonomy and independence of the Presidency remains the same no matter whether the compelled testimony from a presidential adviser would implicate public or potentially privileged matters. The President does not waive his own immunity from compelled congressional testimony by making public statements on a given subject. It follows then that the derivative immunity of senior presidential advisers is not waived either.

Were the rule otherwise, Presidents could not offer partial accommodations to Congress without waiving all privileges or immunities bearing upon the subject. Such a rule would severely hinder the "spirit of dynamic compromise" and "implicit constitutional mandate to seek optimal accommodation" that currently facilitates resolution of inter-branch disputes over information. *Am. Tel. & Tel. Co.*, 567 F.2d at 127. And such a rule would stand in marked

---

[3] The Reno Opinion described the testimonial immunity as "a separate legal basis that would support a claim of executive privilege for the entirety of the Counsel's testimony, thereby eliminating any need for her to appear at the hearing." 23 Op. O.L.C. at 4. We think that the Rehnquist Memorandum's distinction between an immunity and a privilege reflects the more precise formulation, but the distinction appears to be merely a semantic one.

contrast to many instances of historical practice in which senior advisers declined to testify before Congress, but instead offered accommodations through informal meetings or written responses. *See, e.g.*, Schmults Letter at 2–3; Weddington Letter at 1–2. Yet no one has viewed such accommodations, or the testimony of other executive advisers on similar subjects, to constitute a general waiver of immunity.

The Chairman's suggestion that Mr. McGahn can no longer claim immunity appears to be based upon the assumption that the President waived executive privilege by authorizing Mr. McGahn and his senior aides to cooperate with the Special Counsel's investigation. But the question of privilege is distinct from the issue of immunity. And in any event, the premise of the Committee's position is incorrect. The sharing of information between one arm of the Executive Branch and another does not compromise the President's interest in confidentiality. Indeed, in *Nixon v. Administrator of General Services*, the Supreme Court rejected a separation of powers objection to the disclosure of presumptively confidential information because "[t]he Executive Branch remains in full control of the Presidential materials, and . . . the materials can be released only when release is not barred by some applicable privilege inherent in that branch." 433 U.S. at 444. Information that was shared with the Special Counsel was shared *within* the Executive Branch. Such voluntary sharing does not waive confidentiality or the underlying privilege.

This conclusion is consistent with past assertions of executive privilege. In *Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7 (2008), Attorney General Michael Mukasey advised that the President could assert executive privilege against Congress over memoranda recording interviews of White House witnesses with Department of Justice investigators. *Id.* at 9–13. As he explained, "[w]ere future presidents, vice presidents or White House staff to perceive that such voluntary cooperation would create records that would likely be made available to Congress (and then possibly disclosed publicly outside of judicial proceedings such as a trial), there would be an unacceptable risk that such knowledge could adversely impact their willingness to cooperate fully and candidly in a voluntary interview." *Id.* at 11. Implicit in that explanation was the understanding that the White House's voluntary cooperation with the Department's investigation did not constitute a waiver of privilege against third parties outside the Executive Branch. So, too, the White House's voluntary cooperation with the Special Counsel's investigation did not effect a waiver of privilege, much less a waiver of testimonial immunity.

In contrast with the White House's cooperation with the Special Counsel, the Attorney General's public release of a redacted version of the Special Counsel's report (with the President's consent) does extinguish the Executive Branch's confidentiality interests in the precise information that has already been revealed. But, as the D.C. Circuit has held, the "release of a document only waives [executive] privileges for the document or information specifically released, and not for related materials." *In re Sealed Case*, 121 F.3d at 741; *see id.* ("[An] all-or-nothing approach has not been adopted with regard to executive privileges generally, or to the deliberative process privilege in particular."). As Assistant Attorney General Scalia explained, the purposes underlying executive privilege "would be jeopardized if harmful information had to be disclosed merely because the President permitted the release of related information that could be revealed safely." Scalia Memorandum, *supra* note 1, at 6–7. Such a result "would have the effect of requiring the concealment of much information which would be released, merely because it was connected with sensitive information." *Id.* at 7.

Thus, the public disclosure of particular information does not waive the Executive Branch's confidentiality interests over the subject matters involved in the prior disclosure. *See, e.g.*, *Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 8 (2007) (opinion of Acting Attorney General Paul Clement) ("The Department[ of Justice]'s accommodation with respect to some White House-Department communications does not constitute a waiver and does not preclude the President from asserting executive privilege with respect to White House materials or testimony concerning such communications."). Consequently, the public disclosure of the Special Counsel's report did not constitute a general waiver concerning Mr. McGahn's communications with the President on those subjects or on any other subjects. And in any event, as discussed above, the disclosure's impact on executive privilege does not ultimately bear on Mr. McGahn's underlying immunity from compelled testimony.

## IV.

Because Congress may not constitutionally compel Mr. McGahn to testify about his official duties, the President may lawfully direct him not to appear in response to the House Judiciary Committee's subpoena. Should the President provide that direction, Mr. McGahn may not constitutionally be penalized, civilly or criminally, for following it.

The Department of Justice has long recognized "that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("*Prosecution for Contempt*"); *see also Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. 350, 356 (1995) ("[T]he criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege."). As Assistant Attorney General Olson explained, "the Constitution does not permit Congress to make it a crime for an official to assist the President in asserting a constitutional privilege that is an integral part of the President's responsibilities under the Constitution." *Prosecution for Contempt*, 8 Op. O.L.C. at 140. To do so "would be to deter the President from asserting executive privilege and to make it difficult for him to enlist the aid of his subordinates in the process," thereby "burden[ing] and immeasurably impair[ing] the President's ability to fulfill his constitutional duties." *Id.* at 134, 137. Assistant Attorney General Walter Dellinger adhered to that reasoning in 1995, recounting that the "application of the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress." *Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. at 356.

This Office has further confirmed that the same "principles . . . similarly shield a current or former senior adviser to the President from prosecution for lawfully invoking his or her immunity from compelled congressional testimony." *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68 (2008). Subjecting a senior presidential adviser to prosecution for asserting a good-faith claim of testimonial immunity would equally impose upon the President "'the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to exercise a responsibility he found necessary to the performance of his

constitutional duty.'" *Id.* (quoting *Prosecution for Contempt*, 8 Op. O.L.C. at 136).  In sum, "'[t]o seek criminal punishment for those who have acted to aid the President's performance of his duty would be . . . inconsistent with the Constitution.'"  *Id.* at 69 (quoting *Prosecution for Contempt*, 8 Op. O.L.C. at 142).

We similarly believe that Congress could not lawfully exercise any inherent contempt authority against Mr. McGahn for asserting immunity.  The constitutional separation of powers bars Congress from exercising its inherent contempt power in the face of a presidential assertion of executive privilege.  An attempt to exercise inherent contempt powers in such a circumstance would be without precedent and "would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions."  *Prosecution for Contempt*, 8 Op. O.L.C. at 136.  This is so because, as Assistant Attorney General Olson concluded, "the same reasoning that suggests that the [criminal contempt] statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well."  *Id.* at 140 n.42.  Congress may not impede the President's ability to carry out his constitutionally assigned functions by "arrest[ing], bring[ing] to trial, and punish[ing] an executive official who asserted a Presidential claim of executive privilege."  *Id.*  The same rationale applies equally to an exercise of inherent contempt powers against a senior aide who has complied with a presidential direction that he not provide testimony to a congressional committee.

## V.

The immunity of the President's immediate advisers from compelled congressional testimony on matters related to their official responsibilities has long been recognized and arises from the fundamental workings of the separation of powers.  This immunity applies to the former White House Counsel.  Accordingly, Mr. McGahn is not legally required to appear and testify about matters related to his official duties as Counsel to the President.

Please let us know if we may be of further assistance.

STEVEN A. ENGEL
*Assistant Attorney General*

# THE WHITE HOUSE

## WASHINGTON

May 20, 2019

The Honorable Jerrold Nadler
Chairman
Committee on the Judiciary
United States House of Representatives
Washington, D.C. 20515

Dear Chairman Nadler:

I write in further reference to the subpoena issued by the Committee on the Judiciary of the United States House of Representatives (the "Committee") to Donald F. McGahn II on April 22, 2019. My previous letter, dated May 7, 2019, informed you that Acting Chief of Staff to the President Mick Mulvaney had directed Mr. McGahn not to produce the White House records sought by the subpoena because they remain subject to the control of the White House and implicate significant Executive Branch confidentiality interests and executive privilege. Accordingly, I asked that the Committee direct any request for such records to the White House. The subpoena also directs Mr. McGahn to appear to testify before the Committee at 10:00 a.m. on Tuesday, May 21, 2019.

The Department of Justice (the "Department") has advised me that Mr. McGahn is absolutely immune from compelled congressional testimony with respect to matters occurring during his service as a senior adviser to the President. *See* Memorandum for Pat A. Cipollone, Counsel to the President, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, *Re: Testimonial Immunity Before Congress of the Former Counsel to the President* (May 20, 2019). The Department has long taken the position—across administrations of both political parties—that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee." *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 191 (2007) (quoting *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) (opinion of Attorney General Janet Reno)); *Immunity of the Counsel to the President from Compelled Congressional Testimony*, 20 Op. O.L.C. 308, 308 (1996). That immunity arises from the President's position as head of the Executive Branch and from Mr. McGahn's former position as a senior adviser to the President, specifically Counsel to the President.

There is no question that the position of Counsel to the President falls within the scope of the immunity. The three previous opinions cited above directly addressed the immunity of Counsel to the President: Harriet Miers was a former Counsel to President George W. Bush, Beth Nolan was the current Counsel to President Clinton, and Jack Quinn was the current Counsel to President Clinton. Accordingly, Mr. McGahn cannot be compelled to appear before the Committee because "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance

The Honorable Jerrold Nadler
Page 2

of his constitutionally assigned executive functions." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. at 5. The constitutional immunity of current and former senior advisers to the President exists to protect the institution of the Presidency and, as stated by Attorney General Reno, "may not be overborne by competing congressional interests." *Id.*

Because of this constitutional immunity, and in order to protect the prerogatives of the Office of the Presidency, the President has directed Mr. McGahn not to appear at the Committee's scheduled hearing on Tuesday, May 21, 2019. This long-standing principle is firmly rooted in the Constitution's separation of powers and protects the core functions of the Presidency, and we are adhering to this well-established precedent in order to ensure that future Presidents can effectively execute the responsibilities of the Office of the Presidency. I attach the legal opinion provided by the Department of Justice for the Committee's review.

Please do not hesitate to contact me directly if you have any questions or would like to discuss this matter.

Sincerely,

Pat A. Cipollone
Counsel to the President


cc: The Honorable Doug Collins, Ranking Member