**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

                         *Plaintiff,*

    v.

DONALD F. MCGAHN II,

                         *Defendant.*

No. 19-cv-2379 (KBJ)

## DECLARATION OF SERENA M. ORLOFF

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.    I am a Trial Attorney with the Department of Justice, Federal Programs Branch, and serve as counsel for Defendant in this case.

2.    I make this declaration in support of Defendant's motion for summary judgment and opposition to Plaintiff's motion for partial summary judgment.

3.    Attached as Exhibit A is a true and correct copy of an opinion prepared by the Department of Justice's Office of Legal Counsel, entitled *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. ___, Slip. Op. (May 20, 2019).

4.    Attached as Exhibit B is a true and correct copy of the following excerpt of the Congressional Record, 106 Cong. Rec. 17,308-13 (1960) (cited in Defendant's accompanying memorandum of points and authorities as the "1960 House Memo").

5.    Attached as Exhibit C is a true and correct excerpt of a hearing transcript in *Trump v. Comm. on Ways and Means*, No. 19-cv-2173 (CJN) (D.D.C. July 29, 2019).

6.    Attached as Exhibit D is a true and correct copy of S. Rep. No. 94-996 (1976).

7.      Attached as Exhibit E is a true and correct copy of an opinion prepared by the Department of Justice's Office of Legal Counsel, entitled *Immunity of the Assistant to the President and Director of the Office of Political Strategy & Outreach from Cong. Subpoena*, 38 Op. O.L.C. ___, Slip. Op. at 1-2 (July 15, 2014).

8.      Attached as Exhibit F are true and correct copies of filings in *Committee on the Judiciary of the U.S. House of Representatives v. Miers*, No. 1:08-cv-0409 (JDB) (D.D.C), ECF Nos. 68 and 68-1.

9.      Attached as Exhibit G is a true and correct copy of John R. Steelman & H. Dewayne Kreager, The Exec. Office as Admin. Coordinator, 21 L. & Contemp. Probs. 688 (1956).

10.      Attached as Exhibit H is a true and correct copy of the following report prepared by the White House Transition Project: Mary Anne Borrelli *et al.*, Baker Inst. for Pub. Policy, The White House Counsel (2017).

11.      Attached as Exhibit I is a true and correct copy of the following news article: Kyle Cheney, *Nadler: Impeachment timetable doesn't hinge on Don McGahn*, Politico (Sept. 9, 2019).

Executed on October __1__, 2019.

SERENA M. ORLOFF

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, <br><br> *Plaintiff,* <br><br> v. <br><br> DONALD F. MCGAHN II, <br><br> *Defendant.* | No. 19-cv-2379 (KBJ) |

### INDEX OF EXHIBITS TO DECLARATION OF SERENA M. ORLOFF

| Exhibit | Document |
|---------|----------|
| A. | *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. ___, Slip. Op. (May 20, 2019) |
| B. | Congressional Record, 106 Cong. Rec. 17,308-13 (1960) |
| C. | *Trump v. Comm. on Ways and Means*, No. 19-cv-2173 (CJN) (D.D.C. July 29, 2019) |
| D. | S. Rep. No. 94-996 (1976) |
| E. | *Immunity of the Assistant to the President and Director of the Office of Political Strategy & Outreach from Cong. Subpoena*, 38 Op. O.L.C. ___, Slip. Op. at 1-2 (July 15, 2014) |
| F. | *Committee on the Judiciary of the U.S. House of Representatives v. Miers*, No. 1:08-cv-0409 (JDB) (D.D.C.), ECF Nos. 68 and 68-1 |
| G. | John R. Steelman & H. Dewayne Kreager, The Exec. Office as Admin. Coordinator, 21 L. & Contemp. Probs. 688 (1956) |
| H. | Report prepared by the White House Transition Project, Mary Anne Borrelli *et al.*, Baker Inst. for Pub. Policy, The White House Counsel (2017) |
| I. | Kyle Cheney, *Nadler: Impeachment timetable doesn't hinge on Don McGahn*, Politico (Sept. 9, 2019) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff,*

v.                                        No. 19-cv-2379 (KBJ)

DONALD F. MCGAHN II,

*Defendant.*

# EXHIBIT A



**U.S. Department of Justice**

Office of Legal Counsel

Office of the Assistant Attorney General          *Washington, D.C.  20530*

May 20, 2019

## MEMORANDUM FOR PAT A. CIPOLLONE
## COUNSEL TO THE PRESIDENT

*Re: Testimonial Immunity Before Congress of
the Former Counsel to the President*

On April 22, 2019, the Committee on the Judiciary of the House of Representatives subpoenaed Donald F. McGahn II, the former Counsel to the President, to testify about matters described in the report of Special Counsel Robert S. Mueller, III.  You have asked whether Mr. McGahn is legally required to appear.

We provide the same answer that the Department of Justice has repeatedly provided for nearly five decades:  Congress may not constitutionally compel the President's senior advisers to testify about their official duties.  This testimonial immunity is rooted in the constitutional separation of powers and derives from the President's independence from Congress.  As Attorney General Janet Reno explained, "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999) ("Reno Opinion").  Yet Congress may no more summon the President to a congressional committee room than the President may command Members of Congress to appear at the White House.  *See* Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 2 (July 29, 1982) ("Olson Memorandum").

Although the White House has opposed sending senior advisers to testify for almost as long as there has been an Executive Office of the President, Assistant Attorney General William Rehnquist first described the legal basis for immunity in a 1971 memorandum.  *See* Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971) ("Rehnquist Memorandum").  The Rehnquist Memorandum has been consistently reaffirmed by administrations of both political parties, most recently during the Obama Administration.  *See, e.g.*, *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. __, *1 & n.1 (July 15, 2014) ("*Immunity of the Assistant to the President*").

We believe that these established principles apply to bar the Committee from compelling Mr. McGahn to testify. The Counsel to the President clearly qualifies as a senior adviser entitled to testimonial immunity. Attorney General Reno reached that conclusion in her 1999 opinion, and this Office has made the same determination on at least three other occasions. We have also recognized that the immunity continues to apply after the Counsel leaves the White House. *See Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192 (2007) ("*Immunity of the Former Counsel*").

The Chairman of the Committee has suggested that the justification for Mr. McGahn's testimonial immunity is undermined by the President's decision not to assert executive privilege over the redacted version of the Special Counsel's report that the Attorney General released last month. *See, e.g.*, Letter for Donald F. McGahn II, from Jerrold Nadler, Chairman, Committee on the Judiciary, U.S. House of Representatives at 1 (May 17, 2019) ("Nadler Letter"). But the question whether an adviser need comply with a subpoena purporting to require an appearance is different from the question whether the adviser's testimony would itself address privileged matters. Therefore, the public disclosure of the Special Counsel's report does not have any legal bearing upon the force of the congressional subpoena. For these reasons, and consistent with nearly 50 years of executive branch precedent, we conclude that Mr. McGahn is not legally required to appear and testify before the Committee.

# I.

Since the 1970s, this Office has consistently advised that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee" on matters related to their official duties. Memorandum for All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice, from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Executive Privilege* at 5 (May 23, 1977) ("Harmon Memorandum"); *see also* Rehnquist Memorandum at 7 ("The President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis—should be deemed absolutely immune from testimonial compulsion by a congressional committee."). Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations.[1]

---

[1] *See Immunity of the Assistant to the President*, 38 Op. O.L.C. at *1; Letter for Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel at 1–2 (Aug. 1, 2007) ("Bradbury Letter"); *Immunity of the Former Counsel*, 31 Op. O.L.C. at 191; Reno Opinion, 23 Op. O.L.C. at 4; *Immunity of the Counsel to the President from Compelled Congressional Testimony*, 20 Op. O.L.C. 308, 308 (1996) ("*Immunity of the Counsel to the President*"); Letter for Jack Brooks, Chairman, Committee on the Judiciary, U.S. House of Representatives, from Nicholas E. Calio, Assistant to the President for Legislative Affairs at 1 (June 16, 1992) ("Calio Letter"); Olson Memorandum at 2; Memorandum for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Demand for Deposition of Counsel to the President Fred F. Fielding* at 2 (July 23, 1982) ("*Congressional Demand for Deposition of Counsel*"); Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Testimony by Presidential Assistants* at 1 (Apr. 14, 1981); Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Dual-Purpose Presidential Advisers* at 5 (Aug. 11, 1977); Harmon Memorandum at 5; Letter to Phillip E. Areeda, Counsel to the President,

This testimonial immunity is distinct from, and broader than, executive privilege. Like executive privilege, the immunity protects confidentiality within the Executive Branch and the candid advice that the Supreme Court has acknowledged is essential to presidential decision-making. *See United States v. Nixon*, 418 U.S. 683, 705 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."). But the immunity extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself. In this regard, the President's immediate advisers are constitutionally distinct from the heads of executive departments and agencies, whose offices are created by acts of Congress, whose appointments require the Senate's advice and consent, and whose responsibilities entail the administration of federal statutes. Those officers can and do testify before Congress. The President's immediate advisers, however, exercise no statutory authority and instead act solely to advise and assist the President. Their independence from Congress reflects that of the President.

## A.

The President stands at the head of a co-equal branch of government. Yet allowing Congress to subpoena the President to appear and testify would "promote a perception that the President is subordinate to Congress, contrary to the Constitution's separation of governmental powers into equal and coordinate branches." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *3. As Assistant Attorney General Theodore Olson explained in 1982: "The President is a separate branch of government. He may not compel congressmen to appear before him. As a matter of separation of powers, Congress may not compel him to appear before it." Olson Memorandum at 2. The President's immediate advisers are an extension of the President and are likewise entitled to absolute immunity from compelled congressional testimony.

In 2014, our most recent opinion on the topic described the bases for this immunity in detail. "For the President's absolute immunity to be fully meaningful," we explained, "and for these separation of powers principles to be adequately protected, the President's immediate advisers must likewise have absolute immunity from congressional compulsion to testify about matters that occur during the course of discharging their official duties." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *2. The demands of the office require the President to rely on senior advisers who serve "as the President's alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Id.* at *3 (quoting Reno Opinion, 23 Op. O.L.C. at 5); *see also In re Sealed*

---

from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 25, 1974) (enclosing a memorandum, hereinafter "Scalia Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, *Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters* at 6 (Dec. 21, 1972) ("Cramton Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, *Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee* at 1 (Mar. 15, 1972) ("Erickson Memorandum"); Rehnquist Memorandum at 7.

*Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) ("The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers.").

There are dozens of congressional committee and subcommittees with the authority to conduct hearings and subpoena witnesses. Recognizing a congressional authority to compel the President's immediate advisers to appear and testify at the times and places of their choosing would interfere directly with the President's ability to faithfully discharge his responsibilities. It would allow congressional committees to "wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *3. And in the case of the President's current advisers, preparing for such examinations would force them to divert time and attention from their duties to the President at the whim of congressional committees. This "would risk significant congressional encroachment on, and interference with, the President's prerogatives and his ability to discharge his duties with the advice and assistance of his closest advisers," ultimately subordinating senior presidential advisers to Congress rather than the President. *Id.*; *see also Loving v. United States*, 517 U.S. 748, 757 (1996) ("Even when a branch does not arrogate power to itself . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties.").

The immunity of senior presidential advisers also protects the Executive Branch's strong interests in confidentiality as well as the President's ability to obtain sound and candid advice. As the Supreme Court has recognized, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708. While a senior presidential adviser, like other executive officials, could rely on executive privilege to decline to answer specific questions at a hearing, the privilege is insufficient to ameliorate several threats that compelled testimony poses to the independence and candor of executive councils.

First, compelled congressional testimony "create[s] an inherent and substantial risk of inadvertent or coerced disclosure of confidential information," despite the availability of claims of executive privilege with respect to the specific questions asked during such testimony. *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *4. As we explained in 2014, senior presidential advisers

> could be asked, under the express or implied threat of contempt of Congress, a wide range of unanticipated and hostile questions about highly sensitive deliberations and communications. In the heat of the moment, without the opportunity for careful reflection, the adviser might have difficulty confining his remarks to those that do not reveal such sensitive information. Or the adviser could be reluctant to repeatedly invoke executive privilege, even though validly applicable, for fear of the congressional and media condemnation she or the President might endure.

*Id.*; *see also Congressional Demand for Deposition of Counsel*, *supra* note 1, at 2 ("A witness before a Congressional committee may be asked—under threat of contempt—a wide range of unanticipated questions about highly sensitive deliberations and thought processes. He therefore

may be unable to confine his remarks only to those which do not impair the deliberative process.").

Second, even "[t]he prospect of compelled interrogation by a potentially hostile congressional committee about confidential communications with the President or among the President's immediate staff could chill presidential advisers from providing unpopular advice or from fully examining an issue with the President or others." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at*4. This is true whether or not the President might ultimately assert executive privilege over the testimony in question, given the adviser's uncertainty over whether a particular matter will become the subject of future congressional inquiry and whether the President would choose to incur the political costs associated with invoking the privilege.

Finally, given the frequency with which the testimony of a senior presidential adviser—whose sole and daily responsibility is to advise and assist the President—would fall within the scope of executive privilege, compelling the adviser's appearance is not likely to promote any valid legislative interests. Coercing senior presidential advisers into situations where they must repeatedly decline to provide answers, citing executive privilege, would be inefficient and contrary to good-faith governance. The President's immediate advisers, if compelled to testify, are unlikely to answer many of the Members' questions, suggesting that the hearing itself will not serve any legitimate purpose for the Committee.

**B.**

The Executive Branch's position on testimonial immunity reflects historical practices dating back nearly to the 1939 establishment of the Executive Office of the President. As Assistant Attorney General Antonin Scalia explained in a 1974 memorandum, "at least since the Truman Administration," presidential advisers "have appeared before congressional committees only where the inquiry related to their own private affairs or where they had received Presidential permission." Scalia Memorandum, *supra* note 1, at 6. Although Presidents have occasionally permitted such testimony, the long-standing policy has been to decline invitations for voluntary appearances and to resist congressional subpoenas for involuntary ones.

In surveying the history through 1971, Assistant Attorney General Rehnquist described the earliest application of the policy to be inconclusive and at times inconsistent. *See* Rehnquist Memorandum at 4–6. But even when senior presidential advisers did appear, those appearances were frequently accompanied by a claim of legal privilege not to do so. Assistant Attorney General Rehnquist thus described the claim as an absolute testimonial immunity for the President's immediate advisers, *see id.* at 7, and this Office has reaffirmed and expanded upon that conclusion in the decades since. The following examples, while not exhaustive, demonstrate the strong historical foundation for the Executive Branch's position that Congress may not compel the President's senior advisers to appear and testify.

In 1944, during the Administration of Franklin D. Roosevelt, a subcommittee of the Senate Committee on Agriculture and Forestry subpoenaed Jonathan Daniels, an Administrative Assistant to President Roosevelt, to testify about his reported attempts to compel the resignation of the Rural Electrification Administrator. *See Administration of the Rural Electrification Act: Hearing on S. 197 Before a Subcomm. of the S. Comm. on Agric. and Forestry*, 78th Cong., pt. 3,

at 611–28, 629 (1944). Mr. Daniels appeared at the hearing but advised that he could not answer questions that would concern his confidential relationship with the President. *Id.* After the hearing ended with the subcommittee threatening contempt, Mr. Daniels wrote to the subcommittee and reiterated his belief that the subcommittee could not compel his testimony. *See id.* at 740. However, he stated that the President had determined that his testimony would not be contrary to the public interest and that he therefore was willing to appear in the future. *See id.*; *see also id.* at 695–740. *The New York Times* reported that "[w]ith Daniels' agreement to testify disappeared the possibility of using his previous defiance as the first test of the division between executive and legislative power before the Senate." *Daniels to Answer Senators' Queries: President Agrees*, N.Y. Times, Mar. 5, 1944, at 1.

The first outright refusal of a presidential adviser to appear apparently occurred during the Truman Administration, in 1948, when a special subcommittee of the House Committee on Education and Labor twice subpoenaed John R. Steelman, an Assistant to the President, to testify about his communications with President Truman regarding administration of the Taft-Hartley Act during a strike. *See Investigation of GSI Strike: Hearing Before a Special Subcomm. of the H. Comm. on Educ. and Labor*, 80th Cong. 347–53 (1948). Mr. Steelman declined to comply and returned the subpoenas with a letter stating: "[I]n each instance the President directed me, in view of my duties as his Assistant, not to appear before your subcommittee." H.R. Rep. No. 80-1595, at 3 (1948).

During the Eisenhower Administration, in 1955, a subcommittee of the Senate Committee on the Judiciary invited the President's Chief of Staff, Sherman Adams, to testify about a contract between the Atomic Energy Commission and two power companies. He declined, citing in part his "official and confidential relationship with the President." *Power Policy, Dixon-Yates Contract: Hearing Before the Subcomm. on Antitrust and Monopoly of the S. Comm. on the Judiciary*, 84th Cong., pt. 2, at 675–76, 779 (1955). Later, in 1958, Mr. Adams testified, with President Eisenhower's approval, before a House subcommittee concerning allegations of impropriety relating to his relationship with a New England industrialist. *Investigation of Regulatory Commissions and Agencies: Hearing Before a Subcomm. of the H. Comm. on Interstate and Foreign Commerce*, 85th Cong., pt. 10, at 3712–40 (1958).

During the Administration of President Lyndon B. Johnson, in 1968, the Senate Committee on the Judiciary requested the testimony of Associate Special Counsel to the President W. DeVier Pierson to testify concerning the nomination of Associate Justice Abe Fortas to be Chief Justice of the United States. The inquiry concerned whether Justice Fortas had inappropriately participated in developing certain legislation. Mr. Pierson responded that "[i]t has been firmly established, as a matter of principle and precedents, that members of the President's immediate staff shall not appear before a Congressional committee to testify with respect to the performance of their duties on behalf of the President." *Nominations of Abe Fortas and Homer Thornberry: Hearing Before the S. Comm. on the Judiciary*, 90th Cong., pt. 2, at 1348 (1968). He continued: "This limitation, which has been recognized by the Congress as well as the Executive, is fundamental to our system of government. I must, therefore, respectfully decline the invitation to testify in these hearings." *Id.*

In 1972, during the Nixon Administration, the Senate Committee on the Judiciary invited Peter M. Flanigan, an Assistant to the President, to testify. This Office advised that Mr. Flanigan

occupied "a close and confidential relationship with the President and share[d] the President's immunity from congressional process." Erickson Memorandum, *supra* note 1, at 1. Our disposition was clear: "[I]t has been firmly established that members of the President's immediate staff may not appear before a congressional committee to testify with respect to the performance of their duties." *Id.*[2]

In 1979, during the Carter Administration, Special Assistant to the President Sarah Weddington was invited to testify before the Senate Human Resources Committee as part of a hearing on "Women in the Coming Decade." At the instruction of the Counsel to President, she declined to appear, explaining that "it is White House policy for personal aides to the President to decline invitations to testify before Congressional committees." Letter for Harrison A. Williams, U.S. Senate, from Sarah Weddington, Special Assistant to the President at 1 (Jan. 31, 1979) ("Weddington Letter"). She offered, however, to meet informally with committee members or staff to discuss related programs and proposals. *Id.* at 2.

In 1980, the Subcommittee on Investigations of the House Committee on Armed Services requested the testimony of Deputy Assistant to the President for National Security Affairs David Aaron concerning leaks to *The Washington Post*. President Carter directed Mr. Aaron not to appear. The Counsel to the President, Lloyd N. Cutler, explained that "Congress has always respected the privilege of the President to decline requests that the President himself or his immediate White House advisors appear to testify before Congressional committees," instead provided a sworn affidavit by Mr. Aaron denying the allegations, and offered to make Mr. Aaron available for an interview or deposition under oath. Letter for Samuel S. Stratton, Chairman, Subcommittee on Investigation of the Committee on Armed Services, U.S. House of Representatives, from Lloyd N. Cutler, Counsel to the President at 1–2 (Sept. 30, 1980).

In 1982, during the Reagan Administration, the Senate Labor and Human Resources Committee sought the testimony of Counsel to the President Fred F. Fielding concerning allegations of corruption against Secretary of Labor Raymond Donovan. Mr. Fielding declined to appear and testify. *See* Olson Memorandum at 1–4 (explaining the legal basis for that decision). Deputy Attorney General Edward C. Schmults notified the Committee that, "[a]s an institutional matter, the President cannot permit his Counsel to provide sworn testimony to the Legislative Branch regarding the performance of his duties," but offered to arrange for written responses to a reasonable number of written inquiries. Letter for Orrin G. Hatch, Chairman, Committee on Labor and Human Resources, U.S. Senate, from Edward C. Schmults, Deputy Attorney General at 2–3 (Apr. 19, 1983) ("Schmults Letter").

In 1992, during the George H.W. Bush Administration, the House Committee on the Judiciary requested that C. Boyden Gray, Counsel to the President, and Nicholas Rostow,

---

[2] In connection with the Watergate investigations, President Nixon reached an agreement with the Senate's Watergate Select Committee to authorize current and former White House officials to appear voluntarily and under oath before the committee in closed session. *See* Remarks Announcing Procedures and Developments in Connection With the Watergate Investigations (Apr. 17, 1973), *Pub. Papers of Pres. Richard Nixon* 298, 298–99 (1973). President Nixon later determined that he would not claim executive privilege over the subject matters of the testimony and would allow the witnesses to testify in open hearings. *See* Statements About the Watergate Investigations (May 22, 1973), *Pub. Papers of Pres. Richard Nixon* at 547, 554 (1973). He therefore waived the testimonial immunity to authorize those appearances.

Special Assistant to the President and a Senior Director for Legal Affairs at the National Security Council, testify concerning Bush Administration policies towards Iraq prior to the first Gulf War. The White House declined, citing "the longstanding practice of the Executive Branch to decline requests for testimony by members of the President's personal staff." Calio Letter, *supra* note 1, at 1.

In 1999, President Clinton directed Counsel to the President Beth Nolan not to appear in response to a subpoena from the House Committee on Government Reform and Oversight concerning a clemency decision. President Clinton relied on an opinion from Attorney General Reno that concluded that "the Counsel serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony" on matters related to the performance of official duties. Reno Opinion, 23 Op. O.L.C. at 4.

In 2007, during the George W. Bush Administration, the House Committee on the Judiciary subpoenaed former Counsel to the President Harriet Miers to testify about the Department of Justice's decision to request the resignation of certain United States Attorneys. President Bush directed Ms. Miers not to testify after this Office concluded that she was "immune from compelled congressional testimony about matters . . . that arose during her tenure as Counsel to the President and that relate to her official duties in that capacity." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 193.

Also in 2007, the Senate Committee on the Judiciary subpoenaed the testimony of Karl Rove, the Deputy White House Chief of Staff, on the same subject. This Office confirmed that Mr. Rove was "immune from compelled congressional testimony about matters (such as the U.S. Attorney resignations) that arose during his tenure as an immediate presidential adviser and that relate to his official duties in that capacity." Bradbury Letter, *supra* note 1, at 1–2. In 2008, a subcommittee of the House Committee on the Judiciary also subpoenaed Mr. Rove, and he was again directed not to testify. *See* Letter for Robert D. Luskin, Patton Boggs LLP, from Fred F. Fielding, Counsel to the President at 1 (July 9, 2008).

In 2014, during the Obama Administration, the House Committee on Oversight and Government Reform issued a subpoena to David Simas to testify about matters related to his official responsibilities as Assistant to the President and Director of the Office of Political Strategy and Outreach. In particular, the committee requested testimony regarding "the role and function of the White House Office of Political Strategy and Outreach" and the question "whether the White House [was] taking adequate steps to ensure that political activity by Administration officials complies with relevant statutes, including the Hatch Act." *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *1 (internal quotation marks omitted). This Office concluded that Mr. Simas was "immune from compulsion to testify before the [c]ommittee on these matters," *id.*, and he declined to testify.

The foregoing historical record demonstrates that the immunity of senior presidential advisers from congressional testimony is long-standing and has been repeatedly asserted against the requests of Congress. These examples do not indicate that senior presidential advisers have always declined to testify before Congress. The practice of asserting testimonial immunity—just like the practice of asserting executive privilege—has long reflected the "spirit of dynamic compromise" that reflects the "efficient and effective functioning" of the political branches of

government. *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). Presidents have occasionally made senior advisers available to accommodate congressional requests, even while defending their legal authority to decline such requests. But these accommodations between the political branches do not compromise the underlying immunity of the President or his senior presidential advisers from compelled congressional testimony. Nor do they nullify the many instances where Presidents have successfully asserted immunity and affirmatively directed their immediate aides not to testify before Congress.

## C.

While the Executive Branch has asserted for 75 years that senior presidential advisers may decline to testify before Congress, and has formally asserted an immunity for nearly 50 years, neither the Supreme Court nor any court of appeals has specifically addressed the question. This is because disputes over congressional demands for information from the Executive Branch are inherently political, and the historical practice has been to resolve such questions in the political arena. When such conflicts have arisen, Congress has either acceded to the President's claims of immunity or the Executive Branch has accommodated the congressional interest in some fashion. Only one district court has ever addressed the testimonial immunity of the President's senior advisers, and that decision did not come until 2008. *See Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008). Although the district court held that presidential advisers were not entitled to absolute immunity from compelled congressional testimony, the court of appeals stayed that decision pending appeal, and the parties settled without any appellate decision on the merits.

Nonetheless, this Office has recognized that the Executive Branch's long-standing position is consistent with related Supreme Court precedent. *See Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5. In *Gravel v. United States*, 408 U.S. 606 (1972), the Court held that legislative aides share in the constitutional immunity enjoyed by Members of Congress under the Speech or Debate Clause. *Id.* at 616–17. The Court reasoned that the Clause "was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch," and "protect[ion] . . . against prosecutions that directly impinge upon or threaten the legislative process." *Id.* at 616. Because "it is literally impossible . . . for Members of Congress to perform their legislative tasks without the help of aides and assistants," the Court recognized that such aides "must be treated as the [Members'] alter egos." *Id.* at 616–17. For purposes of immunity, the Court concluded, Members of Congress and their aides should be "treated as one." *Id.* at 616 (internal quotation marks omitted). The same logic applies with respect to the President and his senior advisers. The failure to recognize the extension of the President's immunity from compelled congressional testimony to senior advisers would call into question the well-established extension of derivative immunity to congressional staffers.

It is true that in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Court declined to extend *Gravel*'s alter-ego reasoning to a civil suit for damages against senior presidential advisers, and instead concluded that such advisers are entitled only to qualified immunity in those civil actions. *Id.* at 810–11, 813–15. *Harlow* thus distinguished the President's immediate advisers from the President himself, whom the Court held (in another decision issued the same day) to be absolutely immune from civil suits based on official acts. *See Nixon v. Fitzgerald*, 457 U.S. 731,

749 (1982). Yet we have previously declined to extend *Harlow* to the context of testimonial immunity because the prospect of compelled congressional testimony raises separation of powers concerns that are not present in a civil damages lawsuit brought by a private party. *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5–7. Compelled congressional testimony "threatens to subject presidential advisers to coercion and harassment, create a heightened impression of presidential subordination to Congress, and cause public disclosure of confidential presidential communications in a way that the careful development of evidence through a judicially monitored [proceeding] does not." *Id.* at *6. In a private lawsuit, the court "acts as a disinterested arbiter of a private dispute, not as a party in interest to the very lawsuit it adjudicates," and it "is charged with impartially administering procedural rules designed to protect witnesses from irrelevant, argumentative, harassing, cumulative, privileged, and other problematic questions." *Id.* By contrast, congressional hearings involving the President's immediate advisers contain none of those assurances, and they threaten the President's autonomy and ability to receive sound and candid advice in a way that private civil damages suits do not. *Cf.* Archibald Cox, *Executive Privilege*, 122 U. Pa. L. Rev. 1383, 1429 (1974) (stating that as compared to a civil action, "[t]he need to protect aides and subordinates from reprisals on Capitol Hill and in the media of public debate is a thousand-fold greater in the case of congressional hearings, which are often the preserves of individual Senators and Congressmen not all of whom are invariably characterized by judicious self-restraint").

We recognize that in *Miers*, a federal district court read *Harlow* to imply that senior presidential advisers do not enjoy absolute immunity from congressionally compelled testimony. *See Miers*, 558 F. Supp. 2d at 100–03. But we believe that the court did not adequately consider the different and heightened separation of powers concerns bearing upon the testimony of the President's immediate advisers before Congress. Moreover, the district court's decision was stayed pending appeal. *See Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 910–11 (D.C. Cir. 2008) (per curiam). The case settled and the appeal was dismissed before any further action by the court of appeals. *Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, No. 08-5357, 2009 WL 3568649, at *1 (D.C. Cir. Oct. 14, 2009). For the reasons set forth above, and in greater detail in our 2014 opinion, *Immunity of the Assistant to the President*, 38 Op. O.L.C. at *5–9, we respectfully disagree with the district court's conclusion in *Miers* and adhere to this Office's long-established position that the President's immediate advisers are absolutely immune from compelled congressional testimony.

## II.

Having reaffirmed the existence of the testimonial immunity of the President's immediate advisers, we now consider its application to Mr. McGahn, the former Counsel to the President. Plainly, the Counsel to the President qualifies as an immediate adviser to the President. As Attorney General Reno recognized, "the Counsel serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony." Reno Opinion, 23 Op. O.L.C. at 4. Indeed, we have recognized the Counsel's immunity from congressional testimony on multiple occasions. *See, e.g.*, *Immunity of the Former Counsel*, 31 Op. O.L.C. at 192 ("[T]he Counsel to the President 'serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony.'" (quoting Reno Opinion, 23 Op. O.L.C. at 4)); *Immunity of the Counsel to the President*, 20 Op. O.L.C. at 309 ("There is no question that the Counsel to the President falls within Assistant Attorney General Rehnquist's description of

the type of Presidential advisers who are immune from testimonial compulsion."); *Congressional Demand for Deposition of Counsel*, supra note 1, at 2 ("I believe the Counsel to the President possesses an absolute privilege not to testify with regard to any matters relating to his official duties as legal adviser to the President.").

In addition, we have recognized that testimonial immunity continues after the tenure of a particular Counsel to the President. As we explained in 2007, "[s]eparation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 192–93. The Supreme Court has explicitly recognized this principle in the context of executive privilege. The privilege must outlast the tenure of a particular President because, absent a guarantee of lasting confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (adopting the view of the Solicitor General); *see also United States v. Johnson*, 383 U.S. 169 (1966) (applying the Speech or Debate Clause to a former Member of Congress).

In concluding that the former Counsel to the President retained her testimonial immunity, we relied upon the actions of former President Truman, who explained his own refusal to appear and testify before the House Committee on Un-American Activities in the following terms: "[I]f the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President." *Immunity of the Former Counsel*, 31 Op. O.L.C. at 193 (quoting *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14 (reprinting Nov. 12, 1953 letter by President Truman)). It is "just as important to the independence of the Executive that the actions of the President should not be subjected to the questioning by the Congress after he has completed his term of office as that his actions should not be questioned while he is serving as President." *Id.* (quoting *Text of Address by Truman Explaining to Nation His Actions in the White Case*, N.Y. Times, Nov. 17, 1953, at 26). Because the immunity of senior presidential advisers derives from the immunity of the President, this same logic extends to them as well.

Our 2007 conclusion in *Immunity of the Former Counsel* was consistent with the analysis of the immunity interests of former officials during the George H.W. Bush and Nixon Administrations. *See* Letter for Arthur B. Culvahouse, O'Melveny & Myers, from C. Boyden Gray, Counsel to the President at 1 (June 17, 1992) ("[I]t is long-standing White House policy not to assent to formal testimony to Congressional committees by former White House officials about matters occurring during their White House service."). It is true that the President does not have the same need for the daily advice and assistance of his former advisers, as with his current advisers, yet the confidentiality interests associated with the advisers' former role remain just as strong. *See* Cramton Memorandum, *supra* note 1, at 5–6 ("If advice from a staff member were protected from congressional and public scrutiny only for so long as the staff member remained employed in the White House, the protection would be significantly reduced. It would only be a question of time when staff turnovers or a change in administration would remove the shield.").

Even more significantly, the risk to the separation of powers and to the President's autonomy posed by a former adviser's testimony on official matters continues after the conclusion of that adviser's tenure. *See id.* at 6 ("[T]he same considerations that were persuasive to former President Truman would apply to justify a refusal to appear by such a former staff member, if the scope of his testimony is to be limited to his activities while serving in that capacity."). Accordingly, consistent with our prior precedents, we find no material distinction between the compelled congressional testimony of current and former senior advisers to the President. Mr. McGahn's departure as Counsel to the President does not alter his immunity from compelled congressional testimony on matters related to his service to the President.

### III.

In this instance, the Committee seeks to question Mr. McGahn concerning matters addressed in the report of Special Counsel Robert S. Mueller, III, on the Investigation into Russian Interference in the 2016 Presidential Election. The Chairman of the Committee has suggested that the White House's voluntary cooperation with this investigation and the President's decision not to assert executive privilege over the Special Counsel's report may undermine any claim that Mr. McGahn is immune from compelled testimony. Nadler Letter at 1. However, the concept of immunity is distinct from, and broader than, the question whether executive privilege would protect a witness's response to any particular question. *See* Rehnquist Memorandum at 4 (recognizing the "distinction between a claim of absolute immunity from even being sworn as a witness, and a right to claim privilege in answer certain questions in the course of one's testimony as a witness").[3] The President does not waive an adviser's immunity from compelled congressional testimony by authorizing disclosure of any particular information. To the contrary, Presidents have frequently authorized aides to share information as an accommodation to Congress, notwithstanding claims of immunity.

The immunity from compelled congressional testimony implicates fundamental separation of powers principles that are separate from the confidentiality of specific information. *See supra* Part I.A. The constitutional interest in protecting the autonomy and independence of the Presidency remains the same no matter whether the compelled testimony from a presidential adviser would implicate public or potentially privileged matters. The President does not waive his own immunity from compelled congressional testimony by making public statements on a given subject. It follows then that the derivative immunity of senior presidential advisers is not waived either.

Were the rule otherwise, Presidents could not offer partial accommodations to Congress without waiving all privileges or immunities bearing upon the subject. Such a rule would severely hinder the "spirit of dynamic compromise" and "implicit constitutional mandate to seek optimal accommodation" that currently facilitates resolution of inter-branch disputes over information. *Am. Tel. & Tel. Co.*, 567 F.2d at 127. And such a rule would stand in marked

---

[3] The Reno Opinion described the testimonial immunity as "a separate legal basis that would support a claim of executive privilege for the entirety of the Counsel's testimony, thereby eliminating any need for her to appear at the hearing." 23 Op. O.L.C. at 4. We think that the Rehnquist Memorandum's distinction between an immunity and a privilege reflects the more precise formulation, but the distinction appears to be merely a semantic one.

contrast to many instances of historical practice in which senior advisers declined to testify before Congress, but instead offered accommodations through informal meetings or written responses. *See, e.g.*, Schmults Letter at 2–3; Weddington Letter at 1–2. Yet no one has viewed such accommodations, or the testimony of other executive advisers on similar subjects, to constitute a general waiver of immunity.

The Chairman's suggestion that Mr. McGahn can no longer claim immunity appears to be based upon the assumption that the President waived executive privilege by authorizing Mr. McGahn and his senior aides to cooperate with the Special Counsel's investigation. But the question of privilege is distinct from the issue of immunity. And in any event, the premise of the Committee's position is incorrect. The sharing of information between one arm of the Executive Branch and another does not compromise the President's interest in confidentiality. Indeed, in *Nixon v. Administrator of General Services*, the Supreme Court rejected a separation of powers objection to the disclosure of presumptively confidential information because "[t]he Executive Branch remains in full control of the Presidential materials, and . . . the materials can be released only when release is not barred by some applicable privilege inherent in that branch." 433 U.S. at 444. Information that was shared with the Special Counsel was shared *within* the Executive Branch. Such voluntary sharing does not waive confidentiality or the underlying privilege.

This conclusion is consistent with past assertions of executive privilege. In *Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7 (2008), Attorney General Michael Mukasey advised that the President could assert executive privilege against Congress over memoranda recording interviews of White House witnesses with Department of Justice investigators. *Id.* at 9–13. As he explained, "[w]ere future presidents, vice presidents or White House staff to perceive that such voluntary cooperation would create records that would likely be made available to Congress (and then possibly disclosed publicly outside of judicial proceedings such as a trial), there would be an unacceptable risk that such knowledge could adversely impact their willingness to cooperate fully and candidly in a voluntary interview." *Id.* at 11. Implicit in that explanation was the understanding that the White House's voluntary cooperation with the Department's investigation did not constitute a waiver of privilege against third parties outside the Executive Branch. So, too, the White House's voluntary cooperation with the Special Counsel's investigation did not effect a waiver of privilege, much less a waiver of testimonial immunity.

In contrast with the White House's cooperation with the Special Counsel, the Attorney General's public release of a redacted version of the Special Counsel's report (with the President's consent) does extinguish the Executive Branch's confidentiality interests in the precise information that has already been revealed. But, as the D.C. Circuit has held, the "release of a document only waives [executive] privileges for the document or information specifically released, and not for related materials." *In re Sealed Case*, 121 F.3d at 741; *see id.* ("[An] all-or-nothing approach has not been adopted with regard to executive privileges generally, or to the deliberative process privilege in particular."). As Assistant Attorney General Scalia explained, the purposes underlying executive privilege "would be jeopardized if harmful information had to be disclosed merely because the President permitted the release of related information that could be revealed safely." Scalia Memorandum, *supra* note 1, at 6–7. Such a result "would have the effect of requiring the concealment of much information which would be released, merely because it was connected with sensitive information." *Id.* at 7.

Thus, the public disclosure of particular information does not waive the Executive Branch's confidentiality interests over the subject matters involved in the prior disclosure. *See, e.g., Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 8 (2007) (opinion of Acting Attorney General Paul Clement) ("The Department[ of Justice]'s accommodation with respect to some White House-Department communications does not constitute a waiver and does not preclude the President from asserting executive privilege with respect to White House materials or testimony concerning such communications."). Consequently, the public disclosure of the Special Counsel's report did not constitute a general waiver concerning Mr. McGahn's communications with the President on those subjects or on any other subjects. And in any event, as discussed above, the disclosure's impact on executive privilege does not ultimately bear on Mr. McGahn's underlying immunity from compelled testimony.

## IV.

Because Congress may not constitutionally compel Mr. McGahn to testify about his official duties, the President may lawfully direct him not to appear in response to the House Judiciary Committee's subpoena. Should the President provide that direction, Mr. McGahn may not constitutionally be penalized, civilly or criminally, for following it.

The Department of Justice has long recognized "that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("*Prosecution for Contempt*"); *see also Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. 350, 356 (1995) ("[T]he criminal contempt of Congress statute does not apply to the President or presidential subordinates who assert executive privilege."). As Assistant Attorney General Olson explained, "the Constitution does not permit Congress to make it a crime for an official to assist the President in asserting a constitutional privilege that is an integral part of the President's responsibilities under the Constitution." *Prosecution for Contempt*, 8 Op. O.L.C. at 140. To do so "would be to deter the President from asserting executive privilege and to make it difficult for him to enlist the aid of his subordinates in the process," thereby "burden[ing] and immeasurably impair[ing] the President's ability to fulfill his constitutional duties." *Id.* at 134, 137. Assistant Attorney General Walter Dellinger adhered to that reasoning in 1995, recounting that the "application of the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress." *Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. at 356.

This Office has further confirmed that the same "principles . . . similarly shield a current or former senior adviser to the President from prosecution for lawfully invoking his or her immunity from compelled congressional testimony." *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68 (2008). Subjecting a senior presidential adviser to prosecution for asserting a good-faith claim of testimonial immunity would equally impose upon the President "'the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to exercise a responsibility he found necessary to the performance of his

14

constitutional duty.'" *Id.* (quoting *Prosecution for Contempt*, 8 Op. O.L.C. at 136).  In sum, "'[t]o seek criminal punishment for those who have acted to aid the President's performance of his duty would be . . . inconsistent with the Constitution.'" *Id.* at 69 (quoting *Prosecution for Contempt*, 8 Op. O.L.C. at 142).

We similarly believe that Congress could not lawfully exercise any inherent contempt authority against Mr. McGahn for asserting immunity.  The constitutional separation of powers bars Congress from exercising its inherent contempt power in the face of a presidential assertion of executive privilege.  An attempt to exercise inherent contempt powers in such a circumstance would be without precedent and "would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions." *Prosecution for Contempt*, 8 Op. O.L.C. at 136.  This is so because, as Assistant Attorney General Olson concluded, "the same reasoning that suggests that the [criminal contempt] statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well." *Id.* at 140 n.42.  Congress may not impede the President's ability to carry out his constitutionally assigned functions by "arrest[ing], bring[ing] to trial, and punish[ing] an executive official who asserted a Presidential claim of executive privilege." *Id.*  The same rationale applies equally to an exercise of inherent contempt powers against a senior aide who has complied with a presidential direction that he not provide testimony to a congressional committee.

## V.

The immunity of the President's immediate advisers from compelled congressional testimony on matters related to their official responsibilities has long been recognized and arises from the fundamental workings of the separation of powers.  This immunity applies to the former White House Counsel.  Accordingly, Mr. McGahn is not legally required to appear and testify about matters related to his official duties as Counsel to the President.

Please let us know if we may be of further assistance.

STEVEN A. ENGEL
*Assistant Attorney General*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

               *Plaintiff,*

     v.

DONALD F. MCGAHN II,

               *Defendant.*

No. 19-cv-2379 (KBJ)

# EXHIBIT B

Mr. ROGERS. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Colorado?

There was no objection.

Mr. ROGERS of Colorado. Mr. Speaker, in pursuance of my colloquy with the gentleman from New Jersey [Mr. RODINO], I submit the following brief for the RECORD:

Subject: Unavailability of declaratory judgment in New York Port Authority matter.

### INTRODUCTION

In connection with an inquiry into the activities of the Port of New York Authority by Subcommittee No. 5 of the House Committee on the Judiciary (hereinafter "Committee" and "Subcommittee"), certain officers and directors of the port authority refused to comply with subpenas issued and served upon them by order of the subcommittee.[1] It has been suggested by certain officials of New York and New Jersey and by the General Counsel of the port authority, and may yet be further suggested by others, that the serious constitutional issues involved in this inquiry should be resolved by a competent judicial tribunal prior to the institution of contempt proceedings.[2] The attorney general of New Jersey specifically recommended a suit for a declaratory judgment:

"I recommend that * * * the procedure followed should be an action by way of declaratory judgment brought by this committee or some other agency of the Federal Government to determine what are the boundary lines between the matters properly exclusively within the domain of the States and what are the matters which Congress can ferret out and investigate."[3]

This memorandum is directed to the question whether the Declaratory Judgment Act[4] might have been invoked in the manner and for the purpose suggested by the attorney general of New Jersey. Since that suggestion implies that the committee should have initiated the proceeding, the principal query is whether the committee or its members might maintain such an action under the Declaratory Judgment Act. It may in addition be instructive to determine whether the port authority might have sought such relief.[5]

---

[1] See inquiry before Subcommittee No. 5 of the House Committee on the Judiciary, "Return of Subpenas—Port of New York Authority Inquiry," 86th Cong., 2d sess. (1960) (hereinafter cited as "Inquiry").

[2] Statement of Louis J. Lefkowitz, attorney general of New York, Inquiry, 56, 58 ("I am reasonably satisfied that * * * there must and should be a way where * * * this important question can be tested before a tribunal which can have decision to do it"); statement of D. C. Furman, attorney general of New Jersey, Inquiry, 59, 60; statement of Sidney Goldstein, General Counsel of Port of New York Authority, Inquiry, 61, 68.

[3] Inquiry, 60.

[4] 28 U.S.C. 2201 (1958). The act provides: In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of final judgment or decree and shall be reviewable as such.

[5] The record does not reveal that the port authority has instituted any action for a declaratory judgment although committee counsel invited their general counsel to file action to test the validity of the subpenas.

### I. ACTION INITIATED BY COMMITTEE

A. Does the committee, or do its members, collectively or separately, have authority to sue under the Declaratory Judgment Act?

The earnest suggestion that the committee might obtain a declaration of rights from a competent tribunal hardly gets off the ground, for under the doctrine of *Reed* v. *Board of County Commissioners of Delaware County, Pennsylvania* (277 U.S. 376 (1927)), neither the committee nor its members nor representatives are empowered to seek judicial relief without an explicit authorization from Congress. Such authorization has not been granted to the committee, to its chairman, nor to any of its members. In *Reed*, the Senate of the 69th Congress had by resolution created a special committee to investigate methods employed in influencing nominations for the office of U.S. Senator.[6] In 1927, the Senate, by further resolution, authorized the special committee to take and preserve certain ballot boxes, ballots, and other records used in connection with a senatorial election then subject to contest.[7] On behalf of the committee, its counsel, Mr. South, demanded possession of the boxes, ballots, and records, then in the custody of the commissioners and certain other officers of the county. The demand was refused, and the Senators constituting the special committee, together with South, brought suit in a U.S. district court to obtain possession of the material under section 24 of the Judicial Code.[8] The district court dismissed the suit for lack of jurisdiction,[9] and the court of appeals affirmed per curiam.[10]

The Supreme Court, in affirming the decree dismissing the suit, held that neither the special committee, nor "its members, collectively or separately," possessed the authority to invoke the power of the Judicial Department and hence, were not persons "authorized by law to sue" under section 24 of the Judicial Code. The plaintiffs had pointed to no act of Congress authorizing them to sue. R.S. 101–104,[11] it was noted, had been passed to facilitate congressional investigation, but these provisions embodied no license conferring upon the Federal courts jurisdiction over a suit by the committee. Hence, the Court decided, the suit could be maintained only if authority therefor could be gleaned from the enabling resolutions,[12] a process which proved fruitless:

"The power is not specifically granted by either resolution * * *. The Resolutions are

---

[6] S. Res. 195, 69th Cong., 1st sess. (1926).

[7] S. Res. 324, 69th Cong., 2d sess. (1927).

[8] 36 Stat. 1091 (1911), vested original jurisdiction in Federal district courts of all suits of a civil nature "brought by the United States, or by any officer authorized by law to sue." The present provision, 62 Stat. 933 (1948), 28 U.S.C. 1345 (1958), confers on the district courts jurisdiction for "all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by act of Congress."

[9] 21 F. 2d 144 (E.D. Pa., 1927).

[10] 21 F. 2d 1018 (3d Cir., 1927).

[11] 2 U.S.C. 191–194 (1958) deal with the admission of oaths to witnesses (sec. 191), the refusal of witnesses to testify or produce documents (sec. 192), privileges of witnesses (sec. 193), and certification of failure to testify (sec. 194). Section 194 now provides that where a witness fails to produce required documents and such failure is reported to either House, the case must be certified to the appropriate U.S. Attorney, who must bring the matter to the attention of a grand jury. Thus, the statute establishes a well-defined procedural route for raising questions involved in a committee's assertion of its powers.

[12] Resolution 195 empowered the special committee to "require by subpena or otherwise the attendance of witnesses, the pro-

to be construed having regard to the power possessed and customarily exerted by the Senate. * * * It has been customary for the Senate * * * and the House as well * * * to rely on its own power to compel * * * production of evidence, in investigations made by it or through its committees. * * * Petitioners have not called attention to any action of the Senate and we know of none that supports the construction for which they contend. In the absence of some definite indication of that purpose, the Senate may not reasonably be held to have intended to depart from its established usage. Authority to exert the powers of the Senate to compel production of evidence differs widely from authority to invoke judicial power for that purpose."[13]

With respect to its authority to invoke the power of the Judiciary, the present Committee is in much the same position as the special committee in *Reed*. There is no new act of Congress which would provide such authority,[14] and the resolutions under which the Committee operates are couched in language even more restricted, for these purposes, than that of the resolutions involved in *Reed*.[15] Hence, it is clear that the doctrine of *Reed* v. *Board, supra*, applies to the Committee and that it or its members are not "authorized by act of Congress to sue" under 28 U.S.C. 1345.[16]

It follows that the committee and subcommittee lack capacity and authority to seek a declaration of rights under the Declaratory Judgment Act. Judicial authorities are in agreement that that act did not expand the scope of Federal jurisdiction and did not provide a new peg upon which litigants, otherwise lacking a basis for Federal jurisdiction, might hang their hats. As Judge Fee of the ninth circuit observed: "The Declaratory Judgment Act merely enlarges the range of remedies available in Federal courts. It does not afford an independent basis for Federal jurisdiction."[17] Thus, in *Mashunkashey* v. *U.S.*, an action for a declaratory judgment by the United States as guardian of certain Indians, the court pointed out that the act created no new rights and that the right of the Government to maintain the action must be found "in the general law."[18] In the case of this committee, the "general law," (in other words, the law outside the Declaratory Judgment Act), is as declared by the highest court of the land in *Reed* v. *Board, supra*. Neither the committee nor any of its members therefore have capacity to sue

---

duction of books, papers, and documents, and to do such other acts as may be necessary in the matter of said investigation."

[13] 277 U.S. at 388, 389.

[14] Since 1927, the Legislative Reorganization Act of 1946, 60 Stat. 812, has been enacted. Secs. 133 and 134 of that act, 60 Stat. 831–2, set forth committee procedures and powers. No power to sue or be sued in any court is granted.

[15] H. Res. 27, 86th Cong., 1st sess., as amended by H. Res. 530, 86th Cong., 2d sess. (set forth in Inquiry 13, 14), which directs the Committee on the Judiciary, acting as a whole or by subcommittee, to conduct investigations relating to, inter alia, activities and operations of interstate commerce, provides: "For the purposes of carrying out this resolution the committee or subcommittee is authorized to * * * require by subpena * * * the production of such books * * * as it deems necessary." Note that this resolution omits the broad clause of the resolution involved in *Reed* permitting the special committee there "to do such other acts as may be necessary." See also House rule XI(1).

[16] See note 8, supra.

[17] *Fletes-Mora* v. *Brownell*, 231 F. 2d 579 (9th Cir., 1955). See also *Atlantic Meat Co.* v. *R.F.C.*, 166 F. 2d 51 (1st Cir., 1948).

[18] 131 F. 2d 288 (10th Cir., 1942), cert. den., 318 U.S. 764.

under the Declaratory Judgment Act, and the suggestion by the attorney general of New Jersey that it might have done so lacks merit as a matter of law.[19]

II. HAS CONGRESS POWER TO CONFER UPON THE COURTS JURISDICTION TO RENDER DECLARATORY JUDGMENTS CONCERNING THE AUTHORITY OF CONGRESSIONAL INVESTIGATING COMMITTEES?

Since it becomes clear that under *Reed v. Board, supra,* the committee presently lacks authority to sue for a declaratory judgment, further discussion of the suggestion of the attorney general of New Jersey would seem superfluous. But in the interests of preparing a thorough response to proponents of the declaratory judgment suggestion, it may be appropriate to speculate as to whether Congress might validly grant such authority to the committee should it choose to do so.[20] This question was left open by the Supreme Court in Reed, although it intimated that one House of Congress alone would not have power to invest its committees with the power of suit.[21] The district court in the Reed case, however, touched upon the question when it held that Congress lacked power to confer upon the district courts jurisdiction to determine the authority of the special committee, when the limits of that authority could be subsequently adjusted by the Senate alone.[22] The district court cited the ancient precedent of *Hayburn's Case,*[23] which had held that Congress could not assign to the courts any but judicial duties, and the landmark case, *Muskrat v. U.S.*[24] which had followed it. In Muskrat, the court had denied Congress power to confer jurisdiction upon the Court of Claims over suits to determine the constitutional validity of certain prior acts of Congress, such suits not involving a "case" or "controversy" within the meaning of the Constitution.[25]

Whether a congressional grant to a committee of power to seek a declaratory judgment concerning its authority would be valid under Muskrat is open to serious question. The Muskrat court saw in the statute before it an attempt to cast it in a role which it has stoutly resolved to avoid, that of an "adviser" on constitutional matters.

[19] The suggestion that "some other" agency of the United States might seek a declaratory judgment in the port authority inquiry fails for the same reason. No agency now possesses such authority and the committee is no more authorized to direct "some other agency" to invoke the Declaratory Judgment Act on its behalf than it is to sue itself. Compare 2 U.S.C. sec. 194 which expressly authorizes the committee to take steps leading to the institution of proceedings by the attorney general. Nor, for the same reason, is any member of the Committee authorized to importune State officials to bring suit in the State courts in order to raise the constitutional issues involved in the inquiry.

[20] As a matter of policy, such a grant might be unwise. The present contempt provisions in title 2 of the United States Code were designed to expedite congressional investigations by deterring contumacy. Once the mechanics for a declaratory judgment were provided, reluctant witnesses would apply pressure for such action. If a committee chose not to seek such a judgment, an unsympathetic press might chastise it for being "unreasonable" in failing to "amicably" settle differences. Even if such suits were entertained by the courts, delays in obtaining a judgment might be interminable. In brief, serious disruption of the process by which Congress informs itself would take place.

[21] 277 U.S. 388.

[22] 21 F. 2d. 144, 151, 152.

[23] 2 U.S. (2 Dall.) 409 (1792).

[24] 219 U.S. 346 (1910).

[25] Art. IV, sec. 2.

Quite likely, congressional authorization to the committee to follow the procedures suggested by the attorney general of New Jersey would appear to the court a bold attempt to place it in just such a role vis-a-vis the grave constitutional issue raised in the port authority investigation.[26]

Moreover, one is compelled to wonder just when a "case" or "controversy" comes into play in connection with the movement leading up to a conviction for contempt of Congress for refusal to comply with a subpena.[27] Surely not before the subpena has been issued and the recipient has voiced his disinclination to honor it. But even then the controversy is still "inchoate," for the person subpenaed may decide to comply without benefit of sanction. Once there is a formal refusal to comply, the subcommittee, committee, or Congress may refrain from instructing the Attorney General to institute contempt proceedings. At any rate, at this stage there seems little to be gained by raising the legal questions in a declaratory judgment rather than the contempt proceeding.[28]

It is thus difficult to conjure up a fixed notion of the "timing" of such a suit. Its status as a "case" or "controversy" would rest on shaky foundation. Hence, in view of Muskrat, the power of Congress to provide the necessary authorization for a declaratory judgment proceeding at the behest of the committee, *Reed v. Board, supra,* is subject to serious doubt.

III. EVEN IF CONGRESS COULD AUTHORIZE THE COMMITTEE TO SUE FOR A DECLARATORY JUDGMENT, WOULD THE COURTS BE LIKELY TO ENTERTAIN SUCH A SUIT ON ITS MERITS?

Even granting, for the sake of argument, that Congress possessed the bare power to authorize the committees to sue for a declaratory judgment in connection with the port authority inquiry, it does not follow that a Federal court would entertain such a suit on its merits. For such a suit would be far from an ordinary "garden variety"

[26] See the text of the attorney general's suggestion and the unprecedently broad scope of the judicial determination which he envisages, supra, p. 1.

[27] See R.S. 192–194, discussed supra, note 11.

[28] In addition, while purgation of contempt by compliance with the request of the congressional committee is no defense to a prosecution for contempt of Congress, *U.S. v. Brewster,* 154 F. Supp. 126 (D.C. 1957), reversed on other grounds, 225 F. 2d 899 (C.A.D.C., 1958), certiorari denied, 358 U.S. 842; Cf.. *Clark v. U.S.,* 289 U.S. 1, 19 (1932); *Sawyer v. Dollar,* 190 F. 2d 623 (C.A.D.C. 1951), vacated as moot, 344 U.S. 806 (1952) (Government officials and others adjudged guilty of civil contempt of court, under 18 U.S.C. 401, could purge themselves of such contempt by withdrawing contumacious advice and instructions), there is always the possibility that compliance with the subpena will result in suspension of sentence. This possibility must certainly be borne in mind in connection with the peculiar circumstances of the port authority inquiry where officers who refused to comply with the subpena claimed to be acting pursuant to orders of Governors of New Jersey and New York. Cf. *Sawyer v. Dollar, supra* (Government officials were acting on advice of Department of Justice in refusing to comply with Court order). Hence, questions of the scope of the committee's jurisdiction over the port authority may, after all, be resolved against the noncomplying port authority officers without imposition of sanctions. In effect, the contempt procedure, followed by the committee, would fulfill the role of the declaratory judgment proceeding suggested by the attorney general of New Jersey.

action for a declaratory judgment;[29] it would seek resolution of "grave questions of constitutional propriety."[30] The Supreme Court, which is loathe to decide constitutional issues unless absolutely necessary[31] and, as has been seen, scorns attempts to foist upon it constitutional litigation through nonadversary, "friendly" proceedings,[32a] cannot be expected to warmly embrace this proposed suit for declaratory judgment requesting determination of novel and fundamental questions of Federal jurisdiction. It is well known that the court has developed a complicated system of judicial machinery by which it limits constitutional decision whenever possible. The tenets of this code of judicial self-restraint were painstakingly summarized by Mr. Justice Brandeis concurring in *Ashwander v. T.V.A.*[32] The suggestion of the attorney general of New Jersey appears to violate a good number of them.

In the first place, for reasons already stated, plaintiff in such a suit would seek adjudication of constitutional issues before decision thereon is absolutely necessary.[31] Even after the refusal of those subpenaed persons to produce the requested documents, the necessity for a judicial decision does not arise until the House finally decides to certify the matter to a U.S. attorney and trial is begun.[33] Only then does resolution of the constitutional issues become a matter of "last resort," rendering such decision "legitimate."[34]

Second, the proceeding is implicitly a request for "advice" in a "friendly" suit, a kind of request which the court has steadfastly denied.[37] Indeed, the Attorney General of New Jersey could hardly have chosen an epithet less likely to inspire the court with confidence in the "adversary" nature of such a suit than his description of it as "a reasonable approach by reasonable men."[39] It would be surprising if the court did not view this as a challenge to find some grounds of "nonjusticiability."

Third, it does not require extensive citation to discover that the type of suit sug-

[29] *American Machine & Metal, Inc. v. DeBothezat Impeller Co.,* 166 Fed. 2, 535 (2d Cir.) (1948). (Action for declaratory judgment nor involving constitutional issues "justiciable" for purposes of Declaratory Judgment Act when plaintiff must make an irrevocable decision which may place him at the peril of legal damages.)

[30] See letter of June 25, 1960, from Nelson Rockefeller, Governor of New York, to S. Sloan Colt, Inquiry 39.

[31] See e.g., *Burton v. United States,* 196 U.S. 283, 295 (1905) ("It is not the habit of the court to decide questions of constitutional nature unless absolutely necessary to a decision of a case."); cf. *Blair v. United States,* 250 U.S. 273, 279. (1919.)

[32] *Muskrat v. United States,* 219 U.S. 346 (1910).

[32a] 297 U.S. 288, 341 (1936).

[33] Cf. Brandeis rule 1, Ashvander, supra note 33, at 347.

[34] Even if a court did decide the issues in declaratory judgment proceeding, adverse to the port authority, the House (or independent reasons might decide not to certify the matter to the Attorney General. Cf. *Reed v. Board,* 21 F. 2d 144 (1927); supra, pp. 5 and 6. Moreover, in Federal courts, a declaration of the validity of penal legislation may not be obtained without a threat of official prosecution. See *Halco Products v. McNutt,* 137 F. 2d 881 (D.C. Cir. 1943); cf. *San Francisco Lodge v. Forrestal,* 58 F. Supp. 466 (N.D. Cal. 1944).

[37] *Chicago & Grand Trunk Ry. v. Wellman,* 143 U.S. 339, 345 (1892).

[38] See Brandeis rule 1, Ashvander, supra, note 33, at 346; *Muskrat v. United States, supra,* note 32.

[39] Inquiry 60.

gested here simply does not ring true. In constitutional litigation the plaintiff is attacking the constitutional validity of some statute or action, the operation of which will cause injury to him. Indeed, one of the Court's basic "justiciability" rules has it that standing to raise constitutional issues necessarily involves an element of prejudice to the challenger-plaintiff.[39] Thus, in *Massachusetts v. Mallon*,[40] the Supreme Court refused to consider the merits of a suit brought by Massachusetts on its own behalf and that of its citizens attacking the validity of a Federal enactment, because that State was not prejudiced by the statute in its own right and could not claim standing as a benevolent parent of its citizens. The instant situation is an a fortiori case. Here, it is suggested that the committee, as plaintiff, institute a declaratory judgment proceeding, to defend, not attack, the constitutional validity of its own authority, in order to protect, not itself, but officers of an association which it is investigating, from the peril of a contempt action which it would set in motion. The committee thus would not only be unable to show that it might be injured from the operation of what it was attacking, it could not even show that it was attacking anything. Hence, the committee or "some other agency" of the Federal Government would lack standing to sue for a declaration of its authority to proceed with the port authority investigation.

Fourth, it is suggested that a judicial determination of "what are the boundary lines between the matters properly exclusively within the domain of the States and what are the matters which Congress can ferret out and investigate" as requested. The very terms of this "recommendation" are so broad as to convince the Court that it was being asked to decide an "abstract," vague and ill-defined question of constitutional law, a request which the Court has consistently turned down.[41]

Finally, the declaratory judgment action has not engendered the enthusiasm of the Court as a vehicle for constitutional litigation. Even prior to 1934, the year the Declaratory Judgment Act was passed, the Court was resisting attempts to obtain its advice on broad, abstract questions of constitutional interpretation through suits for declaration of rights. Thus, in *New Jersey v. Sargent*[42] a bill by a State for a judicial declaration against Federal officers that certain parts of the Federal Power Act were unconstitutional was rejected as not justiciable. After reviewing a long line of "justiciability" cases, including Muskrat, supra, the Court declared: "On reading the present bill we are brought to the conclusion * * * that its real purpose is to obtain a judicial declaration * * * that Congress exceeded its own authority."[43]

With the advent of the Declaratory Judgment Act, the Court was alert to warn that the new i medy had not opened the door for advisory opinions or altered the "justiciability" rules. Significantly, one of the early cases was brought by the United States against West Virginia, in which the Federal Government sought, inter alia, a declaration of its right to control and use a certain stream.[44] The United States did not even attempt to sustain its bill under

the Declaratory Judgment Act, so that the Court had merely to note that the Act "does not purport to alter the character of controversies which are the subject of the judicial power under the Constitution."[45] In dismissing the bill, the Court further characterized the suit not as one seeking protection against the invasion of any property right but merely an attempt to gain an authoritative resolution of a "difference of opinion between the officials of the two governments * * * whether there is power and authority in the Federal Government to control [the navigation of the rivers]."[46] In this context, it should be borne in mind that neither Congress nor the United States can claim any "invasion" of its rights from the action of the port authority. The port authority is not threatening to take any affirmative action. On the contrary, it is merely threatening to refrain from doing something which the committee wants it to do in order that the committee may execute its legitimate functions. The logical legal procedure for the committee to follow, in this case, is not to seek a declaration of rights but to seek a judicial remedy which will vindicate the authority of the committee.[47]

Finally, the Court put the matter to rest in the Ashwander case, supra, declaring:

"The act of June 14, 1934, providing for declaratory judgments, does not attempt to change the essential requisites for the exercise of judicial power. By its terms, it applies to 'cases of actual controversy,' a phrase which must be taken to connote a controversy of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts."[48]

IV. SUIT BY PORT AUTHORITY FOR DECLARATORY JUDGMENT

It may be suggested that another mode of securing a declaratory judgment in the port authority matter would be for the port authority to bring suit for such relief. Although the attorney general of New Jersey did not recommend such a course of action at the outset, one wonders why the authority or the officers served with the subpenas did not even attempt to institute proceedings, if the declaratory judgment seemed to them such a marvelous panacea. The port authority has capacity to sue,[49] and, moreover, it would seem to have some standing to raise constitutional issues since it could claim that it would be prejudiced by the action of the committee which it would challenge as invalid.[50] However, a suit by the port authority would meet several effective roadblocks.

1. *Legislative immunity*

A suit by the port authority may fall for want of a proper defendant. A suit by the committee

and/or its members as defendants might be rejected under the doctrine that legislators are to be free from civil process for what they do or say in legislative proceedings. U.S. Constitution, article I, section 6;[51] *Tenney v. Brandhove*, 341 U.S. 367 (1951); see *Kilbourn v. Thompson*, 103 U.S. 168 (1880).

In *Tenney v. Brandhove*, supra, the plaintiff brought a civil action against Tenney and other members of a committee of the California legislature investigating un-American activities. The action was based on 8 U.S.C. 43, 47(3) imposing civil liability on persons who, under color of law, deprive another of his constitutional rights of freedom of speech and petition. Brandhove alleged that the committee had denied him due process, and he sought damages in the amount of $10,000. The Supreme Court held that no cause of action against the committee and its members could be based on the statute by virtue of the doctrine of legislative immunity.

However, the Court pointed out that it was not holding that Congress could act outside its legislative role and defined the judicial function vis-a-vis congressional activity as follows: "The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province."[52] Mr. Justice Black, concurring, thought that "today's decision indicates that there is a point at which a legislator's conduct so far exceeds the bounds of legislative power that he may be held personally liable under the Civil Rights Act."[53] At the same time, Black pointed out that Court, in denying the committee's amenability to suit, had not held its conduct legal. He suggested that the plaintiff Brandhove might still have plenty of room to contest the constitutionality of the committee's action in a proceeding instituted by the committee to fine or imprison him.

An older case, *Kilbourn v. Thompson*, 103 U.S. 168 (1880) strongly indicates that, notwithstanding any doubts about *Tenney v. Brandhove*, supra, neither the committee nor its members could be subjected to a suit by the port authority, even assuming arguendo, that the Court felt that the committee was exceeding its legislative jurisdiction in investigating the port authority. In Kilbourn, the plaintiff, who has been imprisoned by order of the House for contempt in refusing to supply one of its committees with certain material, brought suit to recover damages against the Sergeant at Arms, who had executed the imprisonment, and certain Members of the House, who had caused him to be brought before that body. The Supreme Court was convinced that the House resolution authorizing the investigation in which Kilbourn was asked to testify was in excess of the power conferred upon the House by the Constitution, and that the House and its committee were acting beyond their authority in requiring Kilbourn to testify and ordering him to prison.[54] It held that the Sergeant at Arms was liable, his having acted pursuant to the orders of the House being no defense. However, the Court refused to hold the defendant Members of the House liable. As to them, the protections of article I, section 6 of the Constitution, the immunity provision,[55] applied. The Court noted that these defendant Members had initiated the

[39] Brandeis rule 5, *Ashvander*, supra note 33, 347; See *Columbus & Greenville, Ry. v. Miller*, 283 U.S. 96, 101 (1931) (constitutional guaranty does not extend to the mere interest of an official, as such, who has not been injured).

[40] 262 U.S. 447 (1923).

[41] See *United States v. West Virginia*, 295 U.S. 463, 474, 475 (1934).

[42] 269 U.S. 328 (1926).

[43] Id. at 334.

[44] *United States v. West Virginia*, supra, note 41.

[45] 295 U.S. at 475.

[46] Id. at 475.

[47] Although civil, rather than criminal, contempt is normally the procedural route followed by the Courts when enforcement of a request rather than vindication of authority is the objective, there is no "civil" contempt of the House under the statute, 2 U.S.C. 192, 194. However, the same effect is achieved where, after conviction is upheld by all appellate courts, defendants purge their contempt by complying with the subcommittee's order and the Court then suspends sentence. This was the procedure followed in *U.S. v. Goldfine*, D.C., Dist. of Colum., Dem. No. 1158–58 (1959). *Accord Coffman v. Breeze, Corp.* 323 U.S. 316 (1945); *Electric Bond & Share Co. v. SEC.*, 303 U.S. 419, 443 (1938). See also *Public Service Commission v. Wycoff Co.*, 344 U.S. 237 (1952).

[49] Port authority compact.

[50] Compare discussion of committee's standing to sue, above.

[51] Art. I, sec. 6, of the Constitution, provides: "The * * * representatives * * * shall in all cases * * * be privileged from arrest during their attendance of the sessions of their respective Houses * * * and for any speech or debate in either House, they shall not be questioned in any other place."

[52] 341 U.S. at 378.

[53] Id. at 379.

[54] 103 U.S. at 192–196.

[55] See supra, note 51.

proceedings under which the plaintiff was arrested and had reported his refusal to testify to the House. In deciding that congressional immunity protected the Members, the Court in effect suggested that article I, section 6 might extend to all the official legislative acts in connection with the matter. Moreover, the protection was afforded even though, as the Court had observed, the acts were done in pursuance of legislative investigation which the House was not constitutionally authorized to conduct.[56] Thus, *Kilbourn v. Thompson, supra,* seems weighty precedent against a suit by the port authority. Certainly *Tenney v. Brandhove, supra,* did not purport to overrule Kilbourn.

The case most nearly in point, *Fishler v. McCarthy,* 117 F. Supp. 643 (S.D.N.Y.), 1954, affirmed, 218 F. 2d 164 (2d Cir., 1954), fully supports the position that a declaratory judgment action by the port authority would be dismissed as contrary to fundamental principles of constitutional government. In Fishler, plaintiffs were or had been employees of the Department of the Army. They were subpenaed to appear before the Permanent Subcommittee on Investigations of the Senate Committee on Government Operations in connection with an inquiry it was conducting. At the hearings before the Subcommittee the plaintiffs, then still under subpena, were asked to produce certain documents. They refused and were directed to comply by December 7, 1953. On December 8, 1953, they brought suit to enjoin Senator McCarthy as chairman of the subcommittee from forcing them to produce the documents. The complaint also sought a declaratory judgment declaring "the rights, powers, and duties of the plaintiffs herein, and with respect to the defendant herein, and with respect to plaintiff's obligations to the Department of the Army." In addition, the complaint sought to quash or modify the demand and subpena previously served on plaintiffs. The *district court per Judge Irving Kaufman* refused a motion for an injunction pendente lite and granted a cross motion to dismiss the action.

After noting that there were defects in venue and jurisdiction, Judge Kaufman concluded that the nature of the relief sought compelled dismissal of the complaint. "It is entirely clear," he wrote, "that neither this nor any other court may prescribe the subjects of congressional investigation. Were a court empowered to limit in advance the subjects of congressional investigations, violence would be done to the principle of separation of powers upon which our entire political system is based." (648) He then quoted from Justice Brandeis to emphasize the dangers to free government arising from judicial disregard of the doctrine of separation of powers by encroachment upon the powers of the legislature.

The court then suggested how the question of congressional authority might properly be presented:

"Of course the courts may require the performance of a purely ministerial act by a member of another branch of the Government. *Noble v. Union River Logging R. Co.,* 1892, 147 U.S. 165, 13 S. Ct. 271, 37 L. Ed. 123. And if the plaintiffs in fact refuse to comply with the subpena (which is not the case presented here) and are cited for contempt,

or comply and are faced with prosecution for violating military regulations, a justiciable controversy may then exist for determination. But, as I have indicated, it is quite clear that the question presented here has not 'ripened' for litigation, and restraints upon the defendant, if any, are at this time within the province of the Congress which established the subcommittee" (at 649).

Finally, as to the effect of the Declaratory Judgment Act, the Court declared:

"(T)he very first clause of the Declaratory Judgment Act limits its application to 'case(s) of actual controvers(ies) within its (the Court's) jurisdiction.' 28 U.S.C. 2201, and this controversy is beyond the jurisdiction of this Court because it seeks to enjoin the operation of a committee of another branch of the Government. There is no taking of property or infliction of punishment now before this Court. There is at best an allegation that the ramifications of the legislative act, once completed, may injure the plaintiffs. It would, as we have observed, be entirely proper for a court to consider the validity of the legislative act when and if its effect was in fact to injure the plaintiffs, as, for example, by prosecution for contempt. But the legislature cannot be compelled to submit to the prior approval and censorship of the judiciary before it may ask questions or inspect documents through its investigating subcommittees, or even before it enacts legislation, *New Orleans Water-Works Co. v. City of New Orleans,* 1896, 164 U.S. 471, 17 S. Ct. 161, 41 L. Ed. 518; *Hearst v. Black,* 1936, 66 App. D.C. 313, 87 F. 2d 68; *Alpers v. City and County of San Francisco,* C.C.N.D. Cal. 1887, 32 F. 503 any more than the judiciary can be compelled by the legislature to submit its rulings or decisions for legislative approval" (at 649, 650).

It is obvious that this case is clearly in point and that it disposes of any suggestion that the port authority might sue Mr. CELLER for a declaratory judgment in connection with the port authority inquiry.

### 2. Doctrine of separation of powers

Lower Federal courts have stoutly resisted attempts by litigants to seek their aid in curbing the actions of congressional committees through suits for injunctions on yet another ground, the doctrine that courts should not prematurely enjoin legislative action, even though unconstitutional. Thus, in *Hearst v. Black,* 87 F. 2d 68 (D.C. Cir., 1936), a publisher brought suit to enjoin a special Senate committee and the FCC from copying and using certain telegraphic messages in the possession of telegraph companies sent to him by his employees in the conduct of his business. The committee had subpenaed the messages from the companies and had asked the assistance of the FCC in securing compliance with the subpenas. The district court refused to grant the injunction, and the Court of Appeals affirmed. While deeming the action of the FCC illegal in making the contents of the messages available to the committee, the court held that it could not restrain the committee from using them. The court said:

"We are, therefore, of the opinion that the court below was right in assuming jurisdiction as to the commission, and if the bill had been filed while the trespass was in process it would have been the duty of the lower court by order on the commission or the telegraph companies or the agents of the committee to enjoin the acts complained of." [57]

In delivering itself of this dictum, the court in no way inferred that the members of the committee could be enjoined. The "agents" of the committee are not its members. Cf. *Kilbourn v. Thompson, supra.*

On the contrary, the court held that it had no power to enjoin action of the congressional committee and inferred that this would be so even if the committee were acting ultra vires the Constitution:

"The prayer of the bill is that the committee be restrained from keeping the messages or making any use of them or disclosing their contents. In other words, that if we find that the method adopted to obtain the telegrams was an invasion of appellant's legal rights, we should say to the committee and to the Senate that the contents could not be disclosed or used in the exercise by the Senate of its legitimate functions. We know of no case in which it has been held that a court of equity has authority to do any of these things. On the contrary, the universal rule, so far as we know it, is that the legislative discretion in discharge of its constitutional functions, whether rightfully or wrongfully exercised, is not a subject for judicial interference." [58]

The court relied upon the doctrine of separation of powers, and quoted several Federal court decisions for the proposition that the Judiciary lacks power to enjoin the enactment of even unconstitutional measures.[59]

In *Mins v. McCarthy,* 209 F. 2d 307 (D.C. Cir., 1953) the Court of Appeals held per curiam that where a committee of the Congress has issued a subpena ad testificandum to a witness to appear at a hearing, without defining the questions to be asked, "the judicial branch of Government should not enjoin in advance the holding of the hearing or suspend the subpena."

More recently in *Methodist Federation for Social Action v. Eastland,* 141 F. Supp. 729 (D.C. 1956), a three-judge court, including Judges Edgerton and Prettyman, dismissed a complaint in an action by a religious social action organization against members of the Senate Internal Security Subcommittee and others seeking a declaration that a certain congressional resolution directing publication of a certain Senate Document was unconstitutional, and an order enjoining defendants from printing and distributing the document. The court held that it lacked power to prevent the publication, since the document was ordered printed pursuant to resolution of both House and Senate, even if the document falsely declared that the organization was a communist front. It deemed article I, section 6, of the Constitution applicable. It also cited and relied upon the Hearst case, supra, in deciding that a judgment for the plaintiff would invade the constitutional doctrine of separation of powers. As to the members of the Senate subcommittee, the complaint was dismissed for lack of jurisdiction; as to the other defendants, the Public Printer and Superintendent of Documents, was dismissed for failure to state a claim on which relief could be granted.

Thus, it seems reasonably clear that the doctrine of legislative immunity or the doctrine of separation of powers, contained in the Constitution and the precedents discussed above would lead a court to dismiss a suit brought by the port authority against the committee, subcommittee, or members thereof on the grounds of congressional immunity.

### Waiver of Immunity

It may be, although it has not yet been, suggested by adherents of the port authority that members of the committee might facilitate a declaratory judgment action by the

---

[56] The Court could not resist the temptation to offer a gratuitous remark: "It is not necessary to decide here that there may not be things done in the one House or in the other, of an extraordinary character, for which the Members who take part in the act may be held legally responsible." However, Mr. Justice Miller, who wrote the opinion, indicated that he was thinking in terms of such extremes as the House setting itself up to mete out capital punishment, as the French Assembly had done during the French Revolution (103 U.S. at 204, 205).

[57] 87 F. 2d at 71.

[58] Id. at 71.

[59] *McChord v. Louisville Ry.,* 183 U.S. 483 (1902); *New Orleans Waterworks Co. v. New Orleans,* 164 U.S. 471 (1896); *Alpers v. San Francisco,* 32 F. 503 (C.C. —) (not within competence of court to enjoin exercise of legislative power by legislative body, even though legislative action threatened may be unconstitutional).

port authority by waiving their immunity provided by article I, section 6, of the Constitution. It is submitted that this suggestion lacks merit.

In the first place, the congressional immunity doctrine is not the sole legal bar to a suit by the port authority, if it is a bar at all. In *Hurst v. Black, supra,* the Court in dismissing the action relied primarily on the doctrine that Judiciary lacks power to enjoin congressional activity under the doctrine of constitutional separation of powers. Application of this doctrine by a court is, of course, beyond the power of any member of the committee to control.

Second, it is very doubtful whether a Congressman could independently waive his immunity in order to open the way for a suit of this nature. It is well known that Representatives must secure the authorization of the House to even appear in a judicial proceeding when served with process. It would seem then that a resolution of the House, if not an act of Congress, would be required to authorize a Member of Congress to waive his immunity.⁶⁰ Carrying the matter even one step further, it is not even clear that Congress could constitutionally authorize a waiver of immunity. The Constitution provides that Senators and Representatives "shall not be questioned in any other place" for "any speech or debate in either House." Notwithstanding this provision, can one House of Congress provide that a Representative shall be so questioned?

Third, even if a waiver could be successfully executed, a court might feel that such a waiver of immunity had been motivated by a desire to obtain from the court an "advisory" opinion on the constitutional issues involved. It therefore might exercise its discretion to dismiss the suit on grounds of "justiciability."

### 3. Other objections

Assuming, for the sake of argument, that the port authority managed to get its foot in the door of a court in a declaratory judgment suit against the members of the committee, its troubles would not be over. It would still have to secure a decision from the lower court and it would ultimately have to convince the Supreme Court to take the case up on its merits. The same principles of "justiciability," which have been discussed in this memorandum in outlining the problems of a suit by the committeee, would obtain in a suit by the port authority. It is true that the port authority might have "standing" to raise the constitutional issues involved, where the committee did not possess such standing, because the port authority could show that it would be prejudiced by operation of the committee's action. However, the port authority would still have to show that constitutional adjudication was necessary as a last resort, that the suit was not one for "advice," that "abstract questions" were not being pressed, and that the suit was truly "adverse." As has been suggested earlier, any attempt by the committee to "cooperate" in such a suit (might not only be deemed collusive) it might also convince the Supreme Court that premature "advice" on broad constitutional questions was being asked.

### CONCLUSIONS

When all is said and done, one is still left with the question: if the port authority thought there was any possibility for a successful action for a declaratory judgment, why did it not bring such a suit itself? It at least could have established the applicability of the doctrine of congressional immu-

nity to its case; perhaps it might have somehow succeeded in gaining a decision of a lower Federal court. While, as has been stressed in this memorandum, the rules of "justiciability" of the Supreme Court may well have blocked such a suit, those rules, after all, are informal rules of practice, and one cannot predict with certainty their application. Instead, the port authority has self-righteously proposed that the committee should initiate declaratory judgment proceedings and has insinuated that it was the committee's fault that such proceedings could not be implemented. It has been the purpose of this memorandum to determine whether this suggestion had any legal merit and whether the committee might have, if it so choose, instituted or implemented such an action.

One is left with some doubt as to whether this suggestion was preceded by grave and considerable reflection.

1. The committee presently lacks authority to sue for any judicial judgment, whether declaratory or otherwise (*Reed v. Board of Commissioners of Delaware County, supra*).

2. This proposition alone should dispose of the suggestion. But, in an effort to explore all possibilities, it has also been demonstrated that grave doubt exists even as to whether Congress might constitutionally authorize the committee to seek such a declaratory judgment at this state of the port authority inquiry. It is not clear at what stage a "case" or "controversy" exists, and Congress cannot ask the courts to take jurisdiction over a matter which does not involve a "case" or "controversy" (*Muskrat v. United States*).

3. Putting that question aside, this memorandum further strongly suggests that even if the committee was legally authorized to seek a declaratory judgment, the Supreme Court, whose decision of course would ultimately be sought, would reject such a suit on its merits by applying one or a number of the rules of justiciability, which the Court keeps on hand to avoid unnecessary constitutional decision. Concurring opinion in *Ashwander v. TVA, supra*.

In this connection, it is noted that the committee appears to lack standing to sue, for it cannot claim that it was being injured by the assertion of its own authority, *Massachusetts v. Mellon, supra*. The suit moreover seems to involve many elements of a nonadversary, friendly, request for advice, which the Court so firmly rejects. Finally, constitutional decision on the issues is not absolutely necessary until the House decides to cite for contempt.

Therefore, it is submitted that the suggestion the committee might institute and maintain a declaratory judgment proceeding lacks merit as a matter of law, as well as being fundamentally deficient as a matter of policy. For the Supreme Court's attempt to limit decision on constitutional questions is not a matter of caprice or indolence. It is an integral, and a highly desirable tenet of constitutional government. To interfere with that policy of the Supreme Court or to take a position adverse to it should not be the function of the Judiciary Committee of the House of Representatives.

4. Furthermore, the port authority cannot maintain a suit against the members of the committee because under the doctrine of congressional immunity, and/or the doctrine of separation of powers, no court would have jurisdiction over such a suit. *Tenney v. Brandhove, supra; Kilbourn v. Thompson, supra; Hearst v. Black, supra; Mins v. McCarthy, supra; Methodist Federation v. Eastland, supra; Fisher v. McCarthy, supra.*

In view of the foregoing considerations and authorities, it is concluded that there is no legal merit in the suggestion that a suit for declaratory judgment might be brought in connection with the port authority inquiry.

### ADDENDUM

In suggesting the declaratory judgment proceeding, the attorney general of New Jersey may have been inspired by a New Jersey case in which he, as deputy attorney general of New Jersey, participated on brief for plaintiff-appellant. *Morss v. Forbes,* 24 N.J. 341, 132 A. 2d 1 (1957). There, a New Jersey county prosecutor was served with a subpena duces tecum issued by a committee of the State legislature requiring him to produce certain records. He refused to do so and instituted an action in the State courts against members of the committee for an injunction and declaratory judgment. The lower court (superior court, chancery division) assumed jurisdiction and decided against plaintiff. On appeal by the plaintiff, the Supreme Court of New Jersey declined to pass on the jurisdictional aspects of the case and determined to render a decision on the merits since the defendant committee members had withdrawn their objections to the jurisdiction and joined in the petition that the constitutionality of certain challenged State statutes be tested. However, the court warned that it was by no means opening its doors to such suits on a regular basis:

"We shall therefore adjudicate the validity of the last-cited statute, but this is by no means to be considered precedent establishing a procedure whereby anyone who feels he might be 'put upon' by the subpena or questions of a legislative committee can turn to the courts for a declaratory judgment vindicating his surmise." (132 A.2d 6.)

In view of this language, it is highly doubtful that even the New Jersey Supreme Court, before which the attorney general of New Jersey practices, would take jurisdiction over a suit for a declaratory judgment brought by the port authority against members of the committee, assuming that somehow venue and service in New Jersey could be obtained. Such a suit, as distinguished from the action in *Morss v. Forbes, supra,* would involve a challenge to the validity of the action of Congress, not the New Jersey Legislature, and would call for resolution of Federal constitutional issues. Moreover, as has been pointed out, the Federal courts and in particular the Supreme Court of the United States, have generally established far stricter standards of justiciability than the State courts. Hence, *Morss v. Forbes, supra,* would hardly convince the Federal courts to abandon their normal attitude as expressed, for example, in *Fishler v. McCarthy,* toward a suit seeking to nip congressional action in the bud.

The SPEAKER. The time of the gentleman from New Jersey [Mr. RODINO] has expired.

Mr. GROSS. Mr. Speaker, despite all the charges that have been leveled against the Port of New York Authority I have yet to hear an acceptable answer to my question as to why the Legislature of New York or the Legislature of New Jersey, or both, have taken no action.

And if the legislatures have failed it is difficult to believe that the Justice Departments of either or both of the two States and their attorneys general have been completely remiss in their duties and responsibilities.

It is my contention that the Judiciary Committee of the House of Representatives should have insisted that the legislative bodies of the two States, together with their justice departments, take forthright action to correct any wrongdoing that exists in the administration of the Port of New York Authority be-

---

⁶⁰ See 7 Cannon's Precedents, sec. 2162 (1936).

fore calling upon all the Members of the House of Representatives to support such drastic action as the citing of certain officials for contempt.

It should be remembered that Congress granted the compact; it did not create the authority.

It should also be kept clearly in mind that Congress has granted many other compacts throughout the Nation. Does this action open the door to further invasions by Congress of other State administrations of authorities growing out of federally sanctioned compacts?

Mr. Speaker, it is difficult for me to believe that the States of New York and New Jersey are so irresponsible that it is necessary for the Federal Government to move in and put their public affairs in order.

It is difficult for me to believe that the citizens of those two States are so lacking in their sense of public responsibility that they would not insist that their officials resolve their difficulties in this respect.

To vote for these contempt citations is, in my opinion, an indictment not only of the public officials of the States of New York and New Jersey, but also an indictment of the millions of citizens.

I refuse to believe, without the benefit of documented evidence, that the Port of New York Authority is in the nature of a supergovernment which cannot be held accountable by the governments and the people of two great States.

I cannot and will not support the contempt citations until convincing evidence is provided that these States are incompetent through their governments to manage their own affairs.

Mr. CELLER. Mr. Speaker, I move the previous question.

The previous question was ordered.

The SPEAKER. The question is on the resolution.

The question was taken; and upon a division (demanded by Mr. LINDSAY) there were—ayes 190, noes 60.

So the resolution was agreed to.

A motion to reconsider was laid on the table.

### MESSAGE FROM THE SENATE

A message from the Senate by Mr. Carrell, one of its clerks, announced that the Senate disagrees to the amendment of the House to the bill (S. 2633) entitled "An act to amend the Foreign Service Act of 1946, as amended, and for other purposes," requests a conference with the House on the disagreeing votes of the two Houses thereon, and appoints Mr. FULBRIGHT, Mr. SPARKMAN, Mr. MANSFIELD, Mr. HICKENLOOPER, and Mr. CAPEHART to be the conferees on the part of the Senate.

### AMENDMENT OF FOREIGN SERVICE ACT OF 1946

Mr. HAYS. Mr. Speaker, I ask unanimous consent to take from the Speaker's table the bill (S. 2633) to amend the Foreign Service Act of 1946, as amended, and for other purposes, with a House amendment thereto, insist on the House amendment, and agree to the conference asked by the Senate.

The Clerk read the title of the bill.

The SPEAKER. Is there objection to the request of the gentleman from Ohio? The Chair hears none, and appoints the following conferees: Mr. HAYS, Mrs. KELLY, Mr. FARBSTEIN, Mr. BENTLEY, and Mrs. BOLTON.

### PROCEEDINGS AGAINST S. SLOAN COLT

Mr. CELLER. Mr. Speaker, I send to the desk a privileged report (Rept. No. 2120) from the Committee on the Judiciary in relation to the conduct of S. Sloan Colt.

The SPEAKER. The Clerk will read the report.

The Clerk read as follows:

PROCEEDINGS AGAINST S. SLOAN COLT

Subcommittee No. 5 of the Committee on the Judiciary, as created and authorized by the House of Representatives through the enactment of Public Law 601, section 121, of the 79th Congress, and under House Resolution 27 and House Resolution 530, both of the 86th Congress, caused to be issued a subpena duces tecum to S. Sloan Colt, chairman, board of commissioners of the Port of New York Authority, 111 Eighth Avenue, New York, N.Y. The subpena directed S. Sloan Colt to be and appear before Subcommittee No. 5 of the Committee on the Judiciary, at 10 a.m. on June 29, 1960, in their chamber in the city of Washington, and to bring with him from the files of the Port of New York Authority certain specified documents, and to testify touching matters of inquiry committed to the subcommittee.

The subpena was duly served as appears by the return made thereon by counsel for the committee who was duly authorized to serve the subpena.

S. Sloan Colt, pursuant to the subpena duly served upon him, appeared before Subcommittee No. 5 of the Committee on the Judiciary on June 29, 1960, to give testimony as required by Public Law 601, section 121, of the 79th Congress, and by House Resolutions 27 and 530 of the 86th Congress. However, S. Sloan Colt, having appeared as a witness and having complied in part with the subpena duces tecum served upon him by bringing with him part of the documents demanded therein, (1) failed and refused to produce certain other documents in compliance with the subpena duces tecum, which documents are pertinent to the subject matter under inquiry, and (2) failed and refused to produce certain documents as ordered by the subcommittee, which documents are pertinent to the subject matter under inquiry.

At those proceedings the subcommittee chairman explained in detail the authority for the subcommittee's inquiry, the purpose of the inquiry, and its scope. The subcommittee also gave to the witness a lengthy and detailed explanation of the pertinence to its inquiry of each category of documents demanded in the subpena served upon the witness. Notwithstanding these explanations and notwithstanding a direction by the subcommittee to produce the documents required by the subpena, S. Sloan Colt contumaciously refused to produce the following categories of documents under his control and custody:

(1) Internal financial reports, including budgetary analyses, postclosing trial balances, and internal audits; and management and financial reports prepared by outside consultants;

(2) All agenda of meetings of the board of commissioners and of its committees; all reports to the commissioners by members of the executive staff; and

(3) All communications in the files of the Port of New York Authority and in the files of any of its officers and employees including correspondence, interoffice and other memorandums, and reports relating to:

(a) The negotiation, execution, and performance of construction contracts; negotiation, execution, and performance of insurance contracts, policies, and arrangements; and negotiation, execution, and performance of the public relations contracts, policies, and arrangements;

(b) The acquisition, transfer, and leasing of real estate;

(c) The negotiation and issuance of revenue bonds;

(d) The policies of the authority with respect to the development of rail transportation.

The subcommittee was thereby deprived by S. Sloan Colt of information and evidence pertinent to matters of inquiry committed to it under House Resolutions 27 and 530, 86th Congress. His persistent and illegal refusal to supply the documents as ordered deprived the subcommittee of necessary and pertinent evidence and places him in contempt of the House of Representatives.

Incorporated herein as appendix I is the record of the proceedings before Subcommittee No. 5 of the Committee on the Judiciary on the return of the subpena duces tecum served upon S. Sloan Colt and others. The record of proceedings contains, with respect to Mr. Colt:

(1) The full text of the subpena duces tecum (appendix, pp. 21–22);

(2) The return of service of the subpena by counsel for the committee, set forth in words and figures (appendix, p. 26);

(3) The failure and refusal of the witness to produce documents required by the subpena issued to and served upon him (appendix, pp. 23–25);

(4) The explanation given to the witness as to the authority for, purpose and scope of, the subcommittee's inquiry (appendix, pp. 1–20);

(5) The explanation given the witness of the pertinence of each category of requested documents (appendix, pp. 48–52);

(6) The subcommittee's direction to the witness to produce the required documents (appendix, pp. 52–53);

(7) The failure and refusal of the witness to produce the documents pursuant to direction (appendix, pp. 53–54);

(8) The ruling of the chairman that the witness is in default (appendix, p. 55).

OTHER PERTINENT COMMITTEE PROCEEDINGS

At the organizational meeting of the Committee on the Judiciary for the 86th Congress, held on the 27th day of January 1959, Subcommittee No. 5 was appointed and authorized to act upon matters referred to it by the chairman. On June 8, 1960, at an executive session of Subcommittee No. 5 of the Committee on the Judiciary, at which Chairman Emanuel Celler, Peter W. Rodino, Jr., Byron G. Rogers, Lester Holtzman, Herman Toll, William M. McCulloch, and George Meader were present, Subcommittee No. 5 formally instituted an inquiry into the activities and operations of the Port of New York Authority under the interstate compacts approved by Congress in 1921 and 1922. At that meeting the subcommittee also unanimously resolved to request the following specified items from the files of the Port of New York Authority by letter and to subpena the same documents from the appropriate officials in the event this information was not voluntarily supplied:

(1) All bylaws, organization manuals, rules, and regulations;

(2) Annual financial reports; internal financial reports, including budgetary analyses, postclosing trial balances, and internal

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff,*

v.

DONALD F. MCGAHN II,

*Defendant.*

No. 19-cv-2379 (KBJ)

# EXHIBIT C

```
 1               IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3    Donald J. Trump,              ) Civil Action
                                    ) No. 19-CV-2173
 4                   Plaintiff,     )
                                    ) MOTION HEARING
 5    vs.                           )
                                    ) Washington, DC
 6    Committee on Ways and Means,  ) July 29, 2019
      et al.,                       ) Time:  4:00 p.m.
 7                                  )
                     Defendants.    )
 8    _____

 9               TRANSCRIPT OF MOTION HEARING
                         HELD BEFORE
10         THE HONORABLE JUDGE CARL J. NICHOLS
                  UNITED STATES DISTRICT JUDGE
11    _____

12                   A P P E A R A N C E S

13    For the Plaintiff:      William S. Consovoy
                              CONSOVOY McCARTHY, PLLC
14                            1600 Wilson Blvd.
                              Suite 700
15                            Arlington, VA 22209
                              (703) 243-9423
16                            Email: Will@consovoymccarthy.com

17    For Defendant
         U.S. House of Rep.:  Douglas N. Letter
18                            Brooks McKinly Hanner
                              Josephine T. Morse
19                            Megan Barbero
                              Todd Barry Tatelman
20                            Sally Clouse
                              U.S. HOUSE OF REPRESENTATIVES
21                            Office of General Counsel
                              219 Cannon House Office Building
22                            Washington, DC 20515
                              (202) 225-9700
23                            Email: Douglas.letter@mail.house.gov
                              Email: Brooks.hanner@mail.house.gov
24                            Email: Jodie.morse@mail.house.gov
                              Email: Megan.barbero@mail.house.gov
25                            Email: Todd.tatelman@mail.house.gov
                              Email: Sarah.clouse@mail.house.gov
```

```
1    For Defendants
       James and Schmidt:      Andrew Stuart Amer (By Phone)
2                              OFFICE OF NEW YORK ATTORNEY GENERAL
                               28 Liberty Street
3                              New York, NY 10005
                               (212) 416-6127
4                              Email: Andrew.amer@ag.ny.gov

5    _____

6    Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
                               Official Court Reporter
7                              United States Courthouse, Room 6523
                               333 Constitution Avenue, NW
8                              Washington, DC  20001
                               202-354-3267
9
                                    *   *   *
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    would be happy to do so.

2                    THE COURT:   Thank you.

3                    MR. CONSOVOY:   Thank you for your time, Your Honor.

4                    THE COURT:   Mr. Letter, do you want to respond very

5    briefly?

6                    MR. LETTER:   Thank you, Your Honor.   I just want to

7    redirect your attention.   I said it before, but just to make

8    sure, the most recent case in this circuit is *Rangel*, 2015,

9    Judge Henderson, Judge Tatel, and I think it was Judge Wilkins,

10   and they make quite clear that it's the type of act, it's not

11   looking into the purpose.   And I know that language is in

12   *Eastland,* but if you look at what *Eastland* did, the

13   Court there, seems to me, is much more -- the whole doctrine is

14   much more consistent with this.   And as I say, because

15   otherwise what you would be doing is what Mr. Consovoy is

16   asking here, which is, I think, totally inconsistent with what

17   the framers intended.

18                   The House would be hauled into court against its will

19   and a decision, a legal decision would be made that the House

20   did not seek and does not want.   If the House wants a court

21   ruling on that, it will take steps and then it could be heard.

22                   But I cannot emphasize enough the framers did not

23   intend judiciary to be able to haul Congress into court and

24   issue a decision against it that Congress does not seek or

25   want.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff,*

v.

DONALD F. MCGAHN II,

*Defendant.*

No. 19-cv-2379 (KBJ)

# EXHIBIT D

| 94TH CONGRESS 2d Session | SENATE | REPORT No. 94–996 |
|---|---|---|

# JUDICIAL REVIEW OF AGENCY ACTION

---

## REPORT

OF THE

## SENATE COMMITTEE ON THE JUDICIARY

ON

## S. 800

PROCEDURE FOR JUDICIAL REVIEW OF CERTAIN ADMINISTRA-
TIVE AGENCY ACTION, AND FOR OTHER PURPOSES



JUNE 26 (legislative day, JUNE 18), 1976.—Ordered to be printed

---

U.S. GOVERNMENT PRINTING OFFICE

57–010    WASHINGTON : 1976

## COMMITTEE ON THE JUDICIARY

JAMES O. EASTLAND, Mississippi, *Chairman*

| | |
|---|---|
| JOHN L. McCLELLAN, Arkansas | ROMAN L. HRUSKA, Nebraska |
| PHILIP A. HART, Michigan | HIRAM L. FONG, Hawaii |
| EDWARD M. KENNEDY, Massachusetts | HUGH SCOTT, Pennsylvania |
| BIRCH BAYH, Indiana | STROM THURMOND, South Carolina |
| QUENTIN N. BURDICK, North Dakota | CHARLES McC. MATHIAS, JR., Maryland |
| ROBERT C. BYRD, West Virginia | WILLIAM L. SCOTT, Virginia |
| JOHN V. TUNNEY, California | |
| JAMES ABOUREZK, South Dakota | |

FRANCIS C. ROSENBERGER, *Chief Counsel and Staff Director*

---

SUBCOMMITTEE ON ADMINISTRATIVE PRACTICE AND PROCEDURE

EDWARD M. KENNEDY, Massachusetts, *Chairman*

| | |
|---|---|
| PHILIP A. HART, Michigan | STROM THURMOND, South Carolina |
| BIRCH BAYH, Indiana | CHARLES McC. MATHIAS, JR., Maryland |
| QUENTIN N. BURDICK, North Dakota | HUGH SCOTT, Pennsylvania |
| JOHN V. TUNNEY, California | |

THOMAS M. SUSMAN, *Chief Counsel*
WILLIAM A. COATES, *Minority Counsel*

(II)

| 94TH CONGRESS<br>2d Session | } | SENATE | { | REPORT<br>No. 94–996 |
|---|---|---|---|---|

# JUDICIAL REVIEW OF AGENCY ACTION

JUNE 26 (legislative day, JUNE 18, 1976.—Ordered to be printed

Mr. Kennedy, from the Committee on Judiciary, submitted the following

## REPORT

[To accompany S. 800]

The Committee on the Judiciary, to which was referred the bill S. 800, to amend chapter 7 of title 5, United States Code, with respect to procedure for judicial review of certain administrative agency action, and for other purposes, having considered the same, reports favorably thereon with amendments, and recommends that the bill as amended do pass.

### AMENDMENTS

The committee has amended the bill, as follows:

On page 2, line 8, strike the period and insert a comma and the following:

"provided, the any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance."

On page 2, delete line 12 and insert in lieu thereof the following:

"other statute that grants consent to suit expressly or impliedly".

On page 2, line 22, delete the word "of" and insert in lieu thereof the word "or".

On page 3, strike lines 4 through 13, and the caption appearing between lines 13 and 14, and add in lieu thereof the following:

Sec. 2. Section 1331(a) of title 28, United States Code, is amended by striking the final period and inserting a comma and adding thereafter the following:

"except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.".

(1)

On page 4, delete line 5 and insert in lieu thereof the following:

"cedures and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party."

These amendments, which are consistent with recommendations of the Department of Justice, are explained below in the Discussion section of this report.

## PURPOSE AND SUMMARY

The purpose of S. 800 is to remove three technical barriers to consideration on the merits of a citizen's complaint against the Federal Government, its agencies or employees.

First, S. 800 would eliminate the defense of sovereign immunity in Federal court actions for specific relief claiming unlawful action by a Federal agency, officer, or employee.

Second, S. 800 would eliminate the required minimum $10,000 jurisdictional amount-in-controversy in a narrow category of Federal question cases brought in United States district courts.

Finally, S. 800 would remedy certain technical problems in the law concerning the naming of the United States, its agencies, or employees as parties defendant in actions challenging Federal administrative action.

Section 1 would amend section 702 of title 5, United States Code, to eliminate the defense of sovereign immunity with respect to any action in a court of the United States seeking relief other than money damages and based on the assertion of unlawful official action by a Federal officer or employee. The amendment would not affect other limitations on judicial review—such as that plaintiff lacks standing to challenge the agency action, that the action is not ripe for review, or that the action is committed to unreviewable agency discretion. Nor would the amendment confer authority to grant relief where another statute provides a form of relief which is expressly or impliedly exclusive. Section 1 would also amend section 703 of title 5, United States Code, to permit the plaintiff in actions for nonstatutory review of administrative action to name the United States, the agency, or the appropriate officer as defendant. This is intended to eliminate technical problems arising from a plaintiff's failure to name the proper Government officer as a defendant.

Section 2 would amend section 1331(a), of title 28, United States Code, the general "Federal question" provision, to eliminate the requirement that there be at least $10,000 in controversy where the jurisdiction of the United States district court is invoked on the ground that the matter arises under Federal law and the suit is against the United States, any agency thereof, or any officer or employee thereof in his official capacity. This would eliminate an obstacle to judicial review in situations where the right asserted cannot be valued in dollars and cents.

Section 3 would amend section 1391(e) of title 28, United States Code, the section governing venue of actions against Federal officers and agencies. The amendment allows a plaintiff to utilize that section's broad venue and extra-territorial service of process in actions against Federal defendants, despite the presence in the suit of a non-Federal defendant.

## BACKGROUND OF THE BILL

S. 800 would implement Recommendations 68–7, 69–1, and 70–1 of the Administrative Conference of the United States.[1] The bill is also supported by a wide range of organizations and agencies, including the American Bar Association,[2] the Federal Bar Association,[3] the Environmental Defense Fund,[4] the Judicial Conference of the United States,[5] and the Department of Justice.[6]

A previous version of the bill was introduced as S. 3568 by Senator Edward Kennedy during the 91st Congress. Hearings were held on this bill on June 3, 1970;[7] six witnesses representing the Administrative Conference of the United States, the American Bar Association, and the Department of Justice were heard. The bill was reported favorably by the subcommittee, but no action was taken by the committee.

S. 800 was introduced by Senator Kennedy for himself and Senator Charles McC. Mathias on February 22, 1975.[8] Hearings were held on S. 800 and related bills by the Subcommittee on Administrative Practice and Procedure on April 28 and May 3, 1976.[9] A number of witnesses were heard on the legislation, and the Department of Justice subsequently submitted detailed views on S. 800.[10]

## DISCUSSION

### A. SOVEREIGN IMMUNITY

#### 1. Need for reform

The doctrine of sovereign immunity probably descended from the tenet of medieval English law that the "King can do no wrong." Yet even today, 200 years after the American revolution, the doctrine stands as a barrier to the redress of just grievances against the United States Government. To the extent that this obsolete immunity doctrine prevents the orderly, rational review of actions of Federal officers, it is inconsistent with the principles of accountable and responsive Government.

Congress has made great strides toward establishing monetary liability on the part of the Government for wrongs committed against its citizens by passing the Tucker Act of 1875, 28 U.S.C. sections 1346, 1491, and the Federal Tort Claims Act of 1946, 28 U.S.C. section

---

[1] See exhibit A, below, for text of the Conference recommendations.

[2] See statements of William Warfield Ross, Esq. and Francis M. Gregory, Jr., Esq.; American Bar Association, in Hearings before the Subcommittee on Administrative Practice and Procedure on "Bills to Amend the Administrative Procedure Act," April 28, May 3, 1976, 94th Cong., 2d sess. (1976) (hereinafter cited as "1976 Hearings").

[3] See statement of Donald A. Rago, Esq., Federal Bar Association, 1976 Hearings.

[4] See statement of Jacqueline Warren, Esq., Environmental Defense Fund, 1976 Hearings.

[5] See letter from William E. Foley, Deputy Director, Administrative Office of the United States Courts, Nov. 3, 1970, exhibit B, below (hereinafter cited as "Foley letter"), supporting earlier version of bill. S. 3538.

[6] See letter from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, May 10, 1976, exhibit C, below (hereinafter cited as "Scalia letter").

[7] Hearings before the Subcommittee on Administrative Practice and Procedure, Senate Committee on the Judiciary, on "Sovereign Immunity," June 3, 1970, 91st Cong., 2d sess. (1970) (hereinafter cited as "1970 Hearings").

The bill was reintroduced by Senator Kennedy in the 92d Congress as S. 598, and section 1 was incorporated in title III of S. 1421, introduced by Senator Kennedy in the 93d Congress. No action was taken on these measures.

[8] 121 Cong. Rec. 2416 (daily ed.). Section 1 of S. 800 is also embodied in S. 2407, introduced by Senator Dale Bumpers on September 24, 1975.

[9] 1976 Hearings.

[10] Scalia letter, exhibit C, below.

1346(b).[11] S. 800 would strengthen this accountability by withdrawing the defense of sovereign immunity in actions seeking relief other than money damages, such as an injunction, declaratory judgment, or writ of mandamus. Since S. 800 would be limited only to actions of this type for specific relief, the recovery of money damages contained in the Federal Tort Claims Act and the Tucker Act governing contract actions would be unaffected.

It is now generally accepted that courts can make a useful contribution to the administration of Government by reviewing the legality of official conduct which adversely affects private persons. This acceptance of judicial review is reflected not only in court decisions but in the many statutes in which Congress has provided a special procedure for reviewing particular administrative activity. For years almost every regulatory statute enacted by Congress has contained provisions authorizing Federal courts to review the legality of administrative action that has adversely affected private citizens.

Unfortunately, these special statutes do not cover many of the functions performed by the older executive departments, such as the Departments of State, Defense, Treasury, Justice, Interior, and Agriculture. In addition, there are omissions and gaps in the application of special review statutes. In these instances, judicial review is available, if at all, through so-called "nonstatutory review" actions in United States district courts.

These actions usually take the form of a suit for injunctive, declaratory or mandamus relief against a named Federal officer on the theory he is exceeding his legal authority. That such actions are against the officer and not against the Government for whom he is acting is a legal fiction developed by the courts to mitigate the injustice caused by strict application of the sovereign immunity doctrine. As Richard K. Berg, executive secretary of the Administration Conference of the United States noted:

> * * * if this fiction were logical, easy to apply and did substantial justice, perhaps there would be no problem. But it does not. On the contrary, it has set lawyers and courts to chasing conceptual will-o'-the-wisps.[12]

Thus, judges who are not familiar with the history of the fiction and its purpose attempt to make determinations whether the suit is actually directed at the Government rather than the named defendant. This practice in turn raises a number of complex questions involving the relationship between the official and his employer—the Government. If it is found that the Government is the actual defendant, and

---

[11] At the state level, the trend has also been toward the reduction or elimination of the sovereign immunity defense. For example, 21 states and the District of Columbia have by judicial decision overturned, in varying degrees, the sovereign immunity defense to tort actions. (Alaska, Arizona, Arkansas, California, Colorado, Florida, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Nebraska, Nevada, New Jersey, Pennsylvania, Rhode Island, West Virginia, and Wisconsin.) Approximately ten other states (Connecticut, Delaware, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Washington and Wyoming) have constitutional provisions which enable the legislature to prescribe the manner and venue in which a suit against the sovereign may be brought. The jurisdictions of Iowa, New York, Oregon, and Utah have ended by statute the sovereign immunity defense to tort actions. Furthermore, the state of Montana has completely abrogated the doctrine by constitutional amendment. For further discussion, see Hjort *The Passing of Sovereign Immunity in Montana: The King is Dead* 34 Montana L. Rev. 283 (1973). *To Catch the Elusive Conscience of the King: The Status of the Doctrine of Sovereign Immunity in Alabama*, 26 Alabama L. Rev. 463 (1974).

[12] 1976 Hearings, testimony of Richard K. Berg.

5

there is no specific statute authorizing judicial review, the suit is dismissed on the basis of sovereign immunity.

Dean Roger Cramton of Cornell Law School, a former chairman of the Administrative Conference and Assistant Attorney General and a leading scholar on sovereign immunity, has described the effect of these wispy fictions on the judicial process:

> The basic problem with the sovereign immunity doctrine is that it has developed by fits and starts through a series of fictions. The resulting patchwork is an intricate, complex and not altogether logical body of law. The basic issue—balancing the public interest in preventing undue judicial interference with ongoing governmental programs against the desire to provide judicial review to individuals claiming that Government has harmed or threatens to harm them—is obscured rather than assisted by the doctrine of sovereign immunity in its present form.[13]

Representing the Department of Justice, which supports S. 800, Assistant Attorney General Antonin Scalia wrote:

> No one can read the significant Supreme Court cases on sovereign immunity, from *United States* v. *Lee*, 106 U.S. 196 (1882) to *Malone* v. *Bowdoin*, 369 U.S. 643 (1962), *Dugan* v. *Rank*, 372 U.S. 609 (1963) and *Hawaii* v. *Gordon*, 373 U.S. 57 (1963) (per curiam), without concluding that the field is a mass of confusion; and if he ventures beyond that to attempt some reconciliation of the courts of appeals decisions, he will find confusion compounded. Accepting the elimination of the doctrine of sovereign immunity is not, then, a case of exchanging the certain for the uncertain, or the known for the unknown.[14]

The doctrinal confusion caused by sovereign immunity has been highlighted in recent courts of appeals decisions. In *Schlafly* v. *Volpe*, 495 F.2d 273 (7th Cir. 1974), the court described sovereign immunity as:

> one of the more ill-defined aspects of federal jurisdiction. Perhaps the only irrefutable statement that can be made regarding this doctrine is that it appears to offer something for everyone.[15]

The court then reviewed the leading Supreme Court cases and pertinent courts of appeals decisions in reversing in part a district court dismissal of a suit challenging the legality of suspended Federal highway funding. The court held that the Federal Government had waived sovereign immunity, in any event, the ultra vires exception to the doctrine rendered it inapplicable.

Writing of the doctrine's exceptions, the *Schlafly* court noted:

> In anticipation of the government's cry that the sovereign cannot be sued without consent, complaints are drawn with

---

[13] Report of the Committee on Judicial Review of the Administrative Conference of the United States. 1 *Recommendations and Reports of the Administrative Conference* 191, 194 (1969) (hereinafter cited as "ACUS Reports").
[14] Scalia letter, exhibit C, below.
[15] 495 F.2d at p. 277.

6

a covetous eye on the doctrine's 'exceptions,' only to be confronted with assertions that the facts present an 'exception to the exception,' or 'qualify' the exceptions, or that entertainment of the plaintiff's claim would create an 'intolerable burden on governmental functions, requiring use of the doctrine despite its otherwise applicable exceptions.'[16]

In *Littell* v. *Morton*, 445 F.2d 1207 (1971), the Court of Appeals for the Fourth Circuit reversed a district court dismissal of a suit on sovereign immunity grounds. The suit by an attorney for an Indian tribe sought review of the Secretary of the Interior's review disallowing his claim for compensation for services. The court's opinion frankly recognized the problems in applying sovereign immunity:

It must be recognized at the outset that an effort to establish logical consistency in the decisions dealing with sovereign immunity is bound to be frustrating. The authorities are not reconcilable, and there are conceptual conflicts in the various holdings with which an intermediate appellate court must grapple. Our task is magnified because we have been unable to find any case in which the Supreme Court has sought to reconcile the notion of sovereign immunity with the fundamental concept of the APA that a person adversely affected by administrative action is presumptively entitled to judicial review of its correctness.[17]

As Judge MacKinnon noted in *Knox Hill Tenants Council* v. *Washington*, 448 F.2d 1045 (D.C. Cir. 1971):

The result of course is a condition of hopeless confusion in judicial opinions, and an invitation to Government attorneys to assert the applicability of the doctrine whenever the opportunity reasonably presents itself. A federal trial court is faced with a thankless task whenever it is called upon to decide whether the doctrine is applicable in a particular case.[18]

The doctrinal confusion is such that the courts are divided on the fundamental question of whether or not sovereign immunity bars actions for equitable relief. For example, in *American Federation of Government Employees, Local 1858* v. *Callaway*, 398 F. Supp. 176 (N.D. Ala. 1975), the court said:

It is a well-recognized principle that the doctrine of sovereign immunity bars suits against government agencies or officials for monetary damages, but does not bar suits for injunctive or declaratory relief.[19]

On the other hand, in *Penn* v. *Schlesinger*, 490 F.2d 700 (5th Cir. 1974), the court held that:

A declaratory judgment (against the sovereign), if equivalent to a claim for injunctive relief, would be * * * barred by the doctrine of sovereign immunity.[20]

---

[16] 495 F.2d at p. 277 (citations omitted).
[17] 445 F.2d at pp. 1211–12.
[18] 448 F.2d at p. 1059.
[19] 398 F. Supp. at p. 191.
[20] 490 F.2d at p. 704.

One area where misunderstanding of the sovereign immunity doctrine has perpetuated considerable confusion and injustice is that of employment discrimination or discharge suits against Federal officers. Reviewing these cases, one commentator noted that:

> Several federal courts of appeals, covering states where federal employment discrimination is greatest, have held that sovereign immunity prevented them from banning employment discrimination by federal officials, thus ignoring or misapplying the recognized exception to the doctrine of ultra vires or unconstitutional action by Federal officers.[21]

The consensus in the administrative law community among scholars and practitioners is strong with regard to the elimination of sovereign immunity.[22] Professor Cramton summarizes it well when he notes that "the application of the doctrine of sovereign immunity to actions challenging the legality of Federal conduct is totally erratic, haphazard, unpredictable, unfair, inconsistent, and, in some situations, unjust."[23] To Professor Kenneth Culp Davis, enactment of S. 800 is "urgent" in order to remove "the unnecessary injustice caused by sovereign immunity."[24]

The application of sovereign immunity is so illogical that one cannot predict in what case the injustice is likely to occur. More probably than not, an average person with a less experienced attorney will be thrown out of court by the sovereign immunity doctrine while the wealthy corporation with expensive, experienced counsel will be able to sidestep the doctrine. The fact remains that the injustice of sovereign immunity may occur in any case, with respect to any form of government conduct, unless there is a specific statute allowing judicial review.

Perhaps the only situation under recent case law, other than suits for damages where it was fairly predictable—and intended by Congress—that a court would uphold a claim of sovereign immunity, involved disputed title to real property.[25] The results in these cases were so obviously unjust that in 1972 Congress enacted legislation to permit

[21] Abernathy, *Sovereign Immunity in a Constitutional Government: The Federal Employment Discrimination Cases,* 10 Howard Civ. Rights-Civ. Lib. L. Rev., pp. 322, 326–27, 367 (1975); See also *Bramblett v. Desobry,* 490 F.2d 405 (6th Cir. 1974) (suit by discharged employee of non-appropriated fund activity against commanding officer, alleging "arbitrary," "capricious," and "unconstitutional" action, dismissed because the "United States, as sovereign, is immune").

[22] *See e.g.,* K. C. Davis, Administrative Law Treatise ch. 27 (1958, Supp. 1965); Cramton, *Nonstatutory Review of Federal Administrative Action: The Need for Statutory Reform of Sovereign Imunity, Subject Matter Jurisdiction, and Parties Defendant,* 68 Mich. L.Rev. 389 (1970); Scalia, *Sovereign Immunity and Nonstatutory Review of Federal Administrative Action: Some Conclusions from the Public-Lands Cases,* 68 Mich.L.Rev. 867 (1970); Currie, *The Federal Courts and the American Law Institute* (pt. II), 36 U.Chi.L. Rev. 268 (1969); Byse, *Proposed Reforms in Federal "Nonstatutory" Judicial Review: Sovereign Immunity, Indispensable Parties, Mandamus,* 75 Harv.L.Rev. 1479 (1962); Carrow, *Sovereign Immunity in Administrative Law—A New Diagnosis,* 9 J.Pub.L. 1 (1960); Abernathy, *Sovereign Immunity in a Constitutional Government: The Federal Employment Discrimination Cases,* 10 Harvard Civ. Rights-Civ. Lib.L.Rev. 322 (1975).

[23] 1970 Hearings at p. 46.

[24] Letter from Kenneth Culp Davis, to Senator Edward M. Kennedy, Apr. 12, 1976, 1976 Hearings (hereinafter cited as "Davis letter").

[25] *See Malone v. Bowdoin,* 369 U.S. 643 (1962); *Gardner v. Harris,* 391 F.2d 885 (5th Cir. 1968).

actions to quiet title to be brought against the United States. 28 U.S.C. sections 1346(f), 1402(d), 2409(a).[26]

Just as there is little reason why the United States as a landowner should be treated any differently from other landowners in an action to quiet title, so too has the time now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity.

The importance of ameliorating the effect of the sovereign immunity doctrine in other areas besides quiet title actions is emphasized by the number and variety of cases in which the defense is still raised. The doctrine has been invoked in hundreds of cases each year concerning agricultural regulations, governmental employment, tax investigations, postal-rate matters, administration of labor legislation, control of subversive activities, food and drug regulation, and administration of Federal grant-in-aid programs.[27]

In each instance, the sovereign immunity doctrine distracts the court's attention from the basic issue concerning the availability or scope of judicial review and diverts it toward sophistry and semantics. Sovereign immunity beclouds the real issue whether a governmental activity should be subject to judicial review, and, if so, what form of relief is appropriate. Its elimination as proposed in S. 800, in the words of Richard K. Berg, executive secretary, Administrative Conference, "would be a major step in rationalizing the law of judicial review of agency action. It might not change many outcomes, but it would force the courts to ask and to answer the right questions." [28] Where S. 800 would change the outcome of a suit, the committee believes that the result would be justified. For, as Senator Kennedy observed that:

> A review of the cases—as confused as they are—reveals one certain conclusion: Where sovereign immunity has been held to be a bar to suit, and where no other defenses * * * would have been applicable, unjust or irrational decisions have resulted.[29]

The committee does not believe that the partial elimination of sovereign immunity, as a barrier to nonstatutory review of Federal administrative action, will create undue interference with administrative action. Rather, it will be a safety-valve to ensure greater fairness and accountability in the administrative machinery of the Government.

---

[26] The Senate Committee on Interior and Insular Affairs commented on the sovereign immunity doctrine in its report on this legislation :
    Because of the common law doctrine of "sovereign immunity," the United States cannot now be sued in a land title action without giving its express consent. Grave inequity often has resulted to private citizens who are thereby excluded, without benefit of a recourse to the courts, from lands they have reason to believe are rightfully theirs. * * * [T]he committee believes this principle is not appropriate where the courts are established, not for the convenience of the sovereign, but to serve the people.
S. Rept. 92–575, 92d Cong., 1st sess., at p. 1.
[27] See 1970 Hearings; authorities cited at note 22, *supra.*
[28] 1976 Hearings, testimony of Richard K. Berg.
[29] 1970 Hearings at p. 3

Other methods found in the substantial and growing body of law governing availability, timing, and scope of judicial review provide a much more rational basis for controlling unnecessary judicial interference in administrative decisions than does the defense of sovereign immunity. Thus, a case is unreviewable if it involves actions "committed to agency discretion by law." Other defenses include (1) statutory preclusion; (2) lack of ripeness; (3) failure to exhaust administrative remedies; and (4) lack of standing. The availability of these defenses—all of which provide a sounder substantive basis to control court review on the merits than the confusing doctrine of sovereign immunity—indicates that the policy against indiscriminate judicial interference with Government action would not be abandoned by eliminating the defense of sovereign immunity.

The committee is also convinced that modification of sovereign immunity will not overwhelm Federal courts and government lawyers with a flood of litigation. Apparently, the Judicial Conference of the United States shares this view, since it has endorsed identical legislation in the past.[30]

The application of sovereign immunity is so unpredictable in the present state of the law that it seldom deters the bringing of a suit though it may affect the result or induce an error which requires correction at the appellate level. Rather, the usual economic costs of bringing suit and the defenses cited above will operate to prevent inundation of the courts.[31]

More positively, any increase in litigation on the merits is likely to be offset by a decrease in litigation on the question of sovereign immunity. At present, sovereign immunity depletes rather than saves judicial resources by raising an additional, complex issue which requires considerable judicial time and effort to resolve or circumvent. When the issue is the basis of decision in the first instance, it invites appeals and further litigation on the matter.[32]

The elimination of the vexing and difficult preliminary question of sovereign immunity in a large number of cases would probably provide a net savings of time and money to the Federal Government even if a few more cases did proceed to a determination on the merits of the legality of Federal administrative action.

Wholly apart, however, from a possible, slight increase in caseload, the time has finally come when the injustice and inconsistency resulting from the unpredictable application of the sovereign immunity doctrine should be remedied.

For as Government programs grow, and agency activities continue to pervade every aspect of life, judicial review of the administrative actions of Government officials becomes more and more important. Only if citizens are provided with access to judicial remedies against Government officials and agencies will we realize a government truly under law. The enactment of section one of S. 800—the partial elimination of the sovereign immunity defense in actions for equitable relief—is an important step toward this goal.

---

[30] Foley letter, exhibit B, below.
[31] See 1976 Hearings, testimony of Ralph Nader, Public Citizen, Inc.
[32] See 1970 Hearings at p. 54.

### 2. Amendment of 5 U.S.C. Section 702

The portion of S. 800 that modifies the doctrine of sovereign immunity adds three new sentences to the existing language of 5 U.S.C. section 702, which deals with the right to judicial review of Federal administrative action.[33]

#### a. Partial Elimination of Sovereign Immunity

The first of the additional sentences provides that claims challenging official action or nonaction, and seeking relief other than money damages, should not be barred by sovereign immunity. The explicit exclusion of monetary relief makes it clear that sovereign immunity is abolished only in actions for specific relief (injunction, declaratory judgment, mandatory relief, etc.) Thus, limitations on the recovery of money damages contained in the Federal Tort Claims Act, the Tucker Act, or similar statutes are unaffected. The consent to suit is also limited to claims in courts of the United States; hence, the United States remains immune from suit in state courts.

Since the amendment is to be added to 5 U.S.C. section 702, it will be applicable only to functions falling within the definition of "agency" in 5 U.S.C. section 701. Section 701(b)(1) defines "agency" very broadly as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency" except for a list of exempt agencies or functions: Congress, Federal courts, governments of territories or of the District of Columbia, mediation boards, courts-martial and certain other military, wartime and emergency functions.

The proposed amendment will also not affect the operation of the rule that review is not available "to the extent that * * * statutes preclude review * * * or * * * agency action is committed to agency discretion by law." 5 U.S.C. section 701(a). The case law concerning these two categories of review is thus untouched by the proposed amendment. The amendment *would* apply to bar the assertion of sovereign immunity and force the court to articulate the true rationale for a decision not to grant relief.

---

[33] Some Federal courts of appeals have held that 5 U.S.C. section 702 (1970) ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.") constitutes a general waiver of sovereign immunity in actions seeking judicial review of Federal administrative action. See, e.g., *Kingsbrook Jewish Medical Center* v. *Richardson*, 486 F.2d 663, 668 (2d Cir. 1973) ; *Scanwell Laboratories* v. *Shaffer*, 424 F.2d 859, 874 (D.C. Cir. 1970) ; *Estrada* v. *Ahrens*, 296 F.2d 690 (5th Cir. 1961). *But cf. Colson* v. *Hickel*, 428 F.2d 1046 (5th Cir. 1970). In clear conflict, however, other circuits have held that the APA does not constitute a waiver of sovereign immunity. See *Cyrus* v. *United States*, 226 F.2d 416 (1st Cir. 1955) ; *Littell* v. *Morton*, 445 F.2d 1207 (4th Cir. 1971) ; *Twin Cities Chippewa Tribal Council* v. *Minnesota Chippewa Tribe*, 370 F.2d 529, 532 (8th Cir. 1967) ; *State of Washington* v. *Udall*, 417 F.2d 1310 (9th Cir. 1969) ; *Motah* v. *United States*, 402 F.2d 1 (10th Cir. 1968). The Supreme Court has yet to resolve the circuit conflict regarding the impact of section 702 of the APA on the sovereign immunity doctrine. For general discussion, see *Littell* v. *Morton*, 445 F.2d 1207, 1212 (4th Cir. 1971) ; *Schlafly* v. *Volpe*, 495 F.2d 273, 280–82 (7th Cir. 1974).

On this problem Professor Davis notes that:

"As a matter of history, Congress clearly did not intend the APA to waive sovereign immunity. But judges of federal courts of appeals have such a strong sense of justice that five courts of appeals have held that the APA constitutes a waiver of sovereign immunity. I can imagine that all the judges who have so held are somewhat uncomfortable in so holding, but their choice is between treating plaintiffs unjustly or straining the historical materials. Congress should relieve our good judges from such an unnecessary dilemma.

". . . The case law as a whole is somewhat complex and confused. Congress should simplify and clarify it by amending the APA in accordance with the [sovereign immunity] proposal of the Administrative Conference and the American Bar Association." Davis letter, 1976 Hearings.

### b. Effect on the United States

Actions challenging official conduct are intrinsically against the United States and are now treated as such for all practical purposes. Thus, for example, the defense of Federal administrative action is conducted by the Department of Justice or, in some cases, by agency counsel. The second new sentence of section 702 allows the plaintiff to name the United States as a defendant in such actions and permits the entering of a decree against the United States.

At the request of the Department of Justice, the provision has been amended to provide that any mandatory or injunctive decree shall specify the Federal officer or officers by name or title and their successors in office, personally responsible for compliance. The purpose of this amendment is to assure clear definition of the particular individuals who will be personally responsible for compliance with the court decree.

### c. Law Other Than Sovereign Immunity Unchanged

S. 800 is not intended to affect or change defenses other than sovereign immunity. All other than the law of sovereign immunity remain unchanged. This intent is made clear by clause (1) of the third new sentence added to section 702:

> Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground.

These grounds include, but are not limited to, the following: (1) extraordinary relief should not be granted because of the hardship to the defendant or to the public ("balancing the equities") or because the plaintiff has an adequate remedy at law; (2) action committed to agency discretion; (3) express or implied preclusion of judicial review; (4) standing; (5) ripeness; (6) failure to exhaust administrative remedies; and (7) an exclusive alternative remedy.

Special doctrines favoring the United States as a litigant, such as the inapplicability of statutes of limitations to claims asserted by the United States, are unaffected. Statutory or rule provisions denying authority for injunctive relief (e.g., the Anti-Injunction Act, 26 U.S.C. section 7421, and 28 U.S.C. section 2201, prohibiting injunctive and declaratory relief against collection of federal taxes) and other matters (e.g., Rule 13(d), dealing with counterclaims against the United States) also remain unchanged. It should be noted in particular that 5 U.S.C. section 701(a) is unchanged and remains applicable.

### d. Where Congress Has Provided an Exclusive Remedy

Likewise, the amendment to 5 U.S.C. section 702 is not intended to permit suit in circumstances where statutes forbid or limit the relief sought. Clause (2) of the third new sentence added to section 702 contains a second proviso concerned with situations in which Congress has consented to suit and the remedy provided is intended

12

to be the exclusive remedy. For example, in the Court of Claims Act,[34] Congress created a damage remedy for contract claims with jurisdiction limited to the Court of Claims except in suits for less than $10,000. The measure is intended to foreclose specific performance of government contracts. In the terms of the proviso, a statute granting consent to suit, i.e., the Tucker Act, "impliedly forbids" relief other than the remedy provided by the Act. Thus, the partial abolition of sovereign immunity brought about by this bill does not change existing limitations on specific relief, if any, derived from statutes dealing with such matters as government contracts, as well as patent infringement, tort claims, and tax claims.[35]

The language of clause (2) of the proviso directs attention to particular statutes and the decisions interpreting them. If a statute "grants consent to suit" with respect to a particular subject matter, specific relief may be obtained only if Congress has not intended that provision for relief to be exclusive.

Clause (2) of the proviso does not withdraw specific relief in any situation in which it is now available. It merely provides that new authority to grant specific relief is not conferred when Congress has dealt in particularity with a claim and intended a specified remedy to be the exclusive remedy.

Clause (2) of the proviso, at the request of the Department of Justice,[36] has been amended to read as follows:

Nothing herein * * * (2) confers authority to grant relief if any other statute that grants consent to suit [for money damages] *expressly or impliedly* forbids the relief which is sought. (Emphasis added.)

This language makes clear that the committee's intent to preclude other remedies will be followed with respect to all statutes which grant consent to suit and prescribe particular remedies. The proviso as amended also emphasizes that the requisite intent can be implied as well as expressed.

### B. JURISDICTIONAL AMOUNT

#### 1. *Need for Reform*

An anomaly in Federal jurisdiction prevents an otherwise competent United States district court from hearing certain cases seeking "nonstatutory" review of Federal administrative action, absent the jurisdictional amount in controversy required by 28 U.S.C. section 1331, the general "Federal question" provision. These cases "arise under" the Federal Constitution or Federal statutes, and the committee believes they are appropriate matters for the exercise of Federal judicial power regardless of the monetary amount involved.

The chief congressional purpose behind the amount-in-controversy requirement was to reduce case congestion in the Federal courts by

---

[34] February 24, 1855, 10 Stat. 612.
[35] *See, e.g.,* The Anti-Injunction Act, 26 U.S.C., section 7421, prohibiting suit "for the purpose of restricting the assessment or collection of any tax * * *" *Cf. Bob Jones University v. Simon, et al.,* 416 U.S. 725 (1974) (action to enjoin revocation of letter ruling declaring qualification for tax-exempt status held to be within and barred by the Act).
[36] *See* Scalia letter, exhibit C, below.

setting a figure "not so high as to convert the Federal courts into courts of big business nor so low as to fritter away their time in the trial of petty controversies." [37]

Yet Congress has substantially lessened the importance of the amount-in-controversy requirement with respect to section 1331 by passing many statutes that confer Federal question jurisdiction without such a requirement. In *Lynch* v. *Household Finance Corp.*, 405 U.S. 538 (1972), the Court noted:

> A series of particular statutes grant jurisdiction without regard to the amount in controversy in virtually all areas that otherwise would fall under the general Federal question statute. Such special statutes cover: admiralty, maritime, and prize cases, 28 U.S.C. section 1333; bankruptcy matters and proceedings, 28 U.S.C. section 1334; review of orders of the Interstate Commerce Commission, 28 U.S.C. section 1336; cases arising under any Act of Congress regulating commerce, 28 U.S.C. section 1337; patent, copyright, and trademark cases, 28 U.S.C. section 1338; postal matters, 28 U.S.C. section 1339; internal revenue and custom duties actions, 28 U.S.C. section 1340; election disputes, 28 U.S.C. section 1344; cases in which the United States is a party, 28 U.S.C. sections 1345, 1346, 1347, 1348, 1349, 1358, and 1361; certain tort actions by aliens, 28 U.S.C. section 1350; actions on bonds executed under Federal law, 28 U.S.C. section 1352; cases involving Indian allotments, 28 U.S.C. section 1353; and injuries under Federal law, 28 U.S.C. section 1357. [38]

On the other hand, there are a significant number of situations involving "nonstatutory" review in which a plaintiff must still ground his action on section 1331 and, therefore, must establish that "the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs." In some of these cases the jurisdictional amount requirement cannot be met because it is impossible to place a monetary value on the right asserted by the plaintiff.[39]

In other cases, the plaintiff's claim that he is entitled to a Federal grant or benefit such as Federal employment [40] or welfare [41] may be assigned a monetary value, but the amount in controversy may be $10,000 or less.

The resulting denial to litigants of a Federal forum for Federal claims considered incapable of dollars and cents valuation or too small in monetary amount and not permitted to be aggregated has been described as "an unfortunate gap in the statutory jurisdiction of the Federal courts." [42]

---

[37] S. Rept. 1830, 85th Cong., 2d sess., pp. 3099, 3101 (1958).
[38] 405 U.S. at p. 549.
[39] How can one value, for example, an individual's claim that he is entitled to remain free from continuous police surveillance, *Giancana* v. *Johnson*, 335 F.2d 366 (7th Cir. 1964), *cert. denied*, 379 U.S. 100 (1965), or military service, *Oestereich* v. *Selective Service System Local Board No. 11*, 393 U.S. 233 (1968), or to distribute political leaflets, *Goldsmith* v. *Sutherland*, 426 F.2d 1395 (6th Cir. 1970), *cert. denied*, 400 U.S. 960 (1970)? *See also* cases cited in Wright, Miller and Cooper, 13 Federal Practice and Procedure, section 3561 (1975).
[40] *See, e.g., Fischler* v. *McCarthy*, 177 F. Supp. 643 (S.D. N.Y. 1954), *aff'd on other grounds*, 218 F.2d 164 (2d Cir. 1954).
[41] *See, e.g., Randall* v. *Goldmark*, 495 F.2d 356 (1st Cir. 1974), *cert. denied*, 419 U.S. 879 (1975).
[42] *Wolff* v. *Selective Service Local Board No. 16*, 372 F.2d 817, 826 (2d Cir. 1967).

### *2. Amendment to 28 U.S.C. 1331*

Section 2 of S. 800 would end the requirement of 28 U.S.C. section 1331 that more than $10,000 be in controversy in order for a Federal court to have jurisdiction of a Federal question case brought against the United States, an agency thereof, or an officer or employee thereof in his official capacity.

As introduced, the bill would have eliminated the minimum jurisdictional amount for all Federal question cases, regardless of whether the defendant was a private party, a state official or agency, or the Federal Government. Some concern was voiced by members of the committee that this broad elimination of the jurisdictional amount may possibly result in an unforeseeable increase of the caseload of the Federal courts. The committee adopted an amendment to narrow the scope of the provision accordingly, so that—consistent with the overall objectives of the bill—no jurisdictional amount requirement will apply to cases against the Federal Government, a Federal agency, or any official or employee where the plaintiff alleges that the official or employee has acted in his official capacity or under color of law. The committee has concluded not that a broader elimination of the requirement is inappropriate or would result in any added workload for Federal courts, but simply that it was unnecessary to achieve the purposes of the bill.

Like section 1 of S. 800, however, the partial elimination of sovereign immunity, the grant of subject matter jurisdiction without a required jurisdictional amount would not affect other limitations on the availability or scope of judicial review of Federal questions, including, for example, lack of standing, ripeness, or exhaustion of administrative remedies.

The factors relevant to the question whether a Federal court should be available to a litigant seeking protection of a Federal right have little, if any, correlation with the minimum jurisdictional amount. Thus, as Assistant Attorney General Scalia concluded:

> . . . the existence of monetary damages in cases involving agency action is an erratic factor to begin with, not necessarily related to either the private or public importance of the issue involved . . . the 'amount in controversy' provision of section 1331 is seen to have a very limited and virtually irrational application, at least as applied to judicial review of administrative action.[43]

Instead, the important considerations include whether there is need for a specialized Federal tribunal or whether there are defects in the state judicial system that might substantially impair consideration of the plaintiff's claim.[44] These factors have special force in cases in which specific relief is sought against a Federal officer because state courts generally are powerless to restrain or direct a Federal officer's action which is taken under color of Federal law.[45] The denial of a

---

[43] Scalia letter, exhibit C, below.
[44] *See* Wechsler, *Federal Jurisdiction and the Revision of the Judicial Code*, 13 Law and Contemp. Prob. 216, 225–26 (1948).
[45] *See* Arnold, *The Power of State Courts to Enjoin Federal Officers*, 73 Yale L.J. 1385 (1964).

Federal forum for lack of the jurisdictional amount may therefore be a denial of any remedy whatsoever.[46] Justice clearly requires elimination of this deficiency.

### 3. Impact on Federal caseload

According to leading authorities, elimination of the amount-in-controversy requirement in Federal question cases, even in strictly private litigation, will have no measurable impact on the caseload of the Federal courts.[47] S. 800, as amended, would only eliminate the statutory requirement in suits against the United States, its agencies, or officers or employees.

Presently, the jurisdictional amount requirement is applicable, where aggrieved private persons are seeking nonstatutory review of Federal administrative actions in suits brought against Federal officers or agencies. This category provides the only significant instances in which the jurisdictional amount requirement of 28 U.S.C. section 1331 is an effective limitation, either because the right cannot be valued or it is worth less than $10,000 and there is no special statute applicable without an amount-in-controversy provision.[48] Yet even in this situation, the limitation can be circumvented if the plaintiff brings his action in the District of Columbia or if he can cast his action in the form of a mandamus proceeding under 28 U.S.C. section 1361, the Mandamus and Venue Act of 1962.

The resulting situation is hardly a logical or defensible one. In 1962 Congress, disturbed by the inability of litigants to obtain mandamus relief in local courts distributed around the country, conferred such jurisdiction on all district courts without regard to the amount in controversy. The more traditional exercise of injunctive or declaratory authority, however, remains subject to the requirement of a minimum jurisdictional amount whenever no special Federal question statute is available—except in the District of Columbia. The same arguments that supported the Mandamus and Venue Act of 1962— the expense and inconvenience of forcing litigants from all over the country to bring their claims to a District of Columbia court—support the elimination of the remaining anachronism in injunction suits against Federal officers: the jurisdictional amount in controversy.

The number of additional cases that will be brought in Federal courts if section 1331 is amended to eliminate the jurisdictional amount requirement is likely to be quite small. According to Professor Wright:

> There is no risk that ending the amount in controversy requirement for federal question cases would open the federal

---

[46] "In *Fox* v. *Hillside Realty Corp.*, 79 F.Supp. 832 (D.-N.Y. 1948), a federal action challenging a rent increase allowed by federal officials was dismissed for lack of the jurisdictional amount. A subsequent suit in state court was unsuccessful because the state courts held that they lacked power to pass on the action of the federal officials. *Fox* v. *34 Hillside Realty Corp.*, 87 N.Y.S.2d 351 (1949) *aff'd.*, 95 N.Y.S.2d 598, 276 App.Div. 994 (1950)." Wright, Miller and Cooper, 13 Federal Practice and Procedure, section 3561, at p. 393, n. 21.

[47] *Id.*, C. Wright, Law of Federal Courts, p. 107 (2d ed. 1970) ; 1970 Hearings at pp. 53-54 Wright, Miller and Cooper, 13 Federal Practice and Procedure, section 3561 (1975).

[48] The amount-in-controversy requirement in this category of cases was reaffirmed in dictum in *Lynch* v. *Household Finance Corp.* 405 U.S. 538, 547 (1972) ("in suits against federal officials for alleged deprivations of constitutional rights, it is necessary to satisfy the amount-in-controversy requirement for federal jurisdiction"). The significance of this dictum, however, was recently questioned in Earnest, *supra* note 49, at pp. 561-62.

courts to unpredictable numbers of unknowable kinds of cases. The terrain is well marked. The cases affected are those in which federal action is challenged and in which state action is challenged on grounds that do not come within section 1343(3). These are important cases for which a federal forum is especially appropriate.[49]

Elimination of the amount in controversy is not likely in itself to increase even the number of suits against Federal officers since some courts are already adopting a very lax interpretation of the requirement in such cases.[50] But elimination of the requisite jurisdictional amount will eliminate a technical barrier to judicial relief which many courts are avoiding or circumventing altogether in order to avoid injustice.[51] Professor Davis noted in connection with the elimination of the sovereign immunity defense in equitable actions, "Congress should relieve our good judges from such an unnecessary dilemma."[52] It should enact S. 800 and thus eliminate the jurisdictional amount-in-controversy requirement in all Federal question cases where the suit is against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

As with the partial elimination of the sovereign immunity defense, the partial elimination of the jurisdictional amount requirement in Federal question cases is likely to result in a more efficient use of judicial resources, with courts and counsel no longer having to waste time and energy on the question of amounts in controversy.

Caseloads and efficiency aside, a larger issue remains. For as Professor Wright has written:

> We do nothing to encourage confidence in our judicial system or in the ability of persons with substantial grievances to obtain redress through lawful processes when we close the courthouse door to those who cannot produce $10,000 as a ticket of admission.[53]

### C. PARTIES DEFENDANT

#### 1. Naming the Proper Parties Defendant

The size and complexity of the Federal Government, coupled with the intricate and technical law concerning official capacity and parties

---

[49] 1970 Hearings at p. 259. More recently, Professor Wright has described as "rare and insignificant" some of the cases to which the amount requirement remains applicable. Thus, "a municipality cannot be sued under the civil rights provisions of 42 U.S.C.A. section 1983 and 28 U.S.C.A. section 1343(3) and thus a suit against a municipality on the basis of the Federal Constitution or laws must be brought under 28 U.S.C.A. section 1331 and more than $10,000 must be in controversy. *Calvin* v. *Conlisk*, 367 F.Supp. 476 (D. Ill. 1973). It remains an open question whether a suit challenging a state statute on the ground that it is inconsistent with a Federal statute may be brought without regard to amount in controversy under 28 U.S.C.A. section 1343(3). *Hagans* v. *Lavine*, 415 U.S. 528, 533 n. 5 (1974)." Wright, Miller and Cooper, 13 Federal Practice and Procedure, section 3561, at p. 392, n. 17 (1975.)

[50] See Earnest, *supra* note 49; letter from Roger Cramton, May 24, 1976, 1976 Hearings.

[51] *Id.* Such avoidance, however, abdicates a court's constitutional and statutory duties "to ensure that each case before it falls within the limited jurisdictional power of the Federal Practice and Procedure, section 3561, at pp. 395–96, calling on the Congress rather jurisdictional amount, especially in the lower courts, and fosters arbitrary and haphazard application of jurisdictional standards." *Id.* at p. 585. *See also* Wright, Miller and Cooper, 13 Federal practice and Procedure, section 3561, at pp. 395–96, calling on the Congress rather than the courts to fill in the "unfortunate gap in the statutory jurisdiction of the Federal courts."

[52] Davis letter, 1976 Hearings.

[53] 1970 Hearings at p. 254.

17

defendant, has given rise to numerous cases in which a plaintiff's claim has been dismissed because the wrong defendant was named or served.[54]

Nor is the current practice of naming the head of an agency as defendant always an accurate description of the actual parties involved in a dispute. Rather, this practice often leads to delay and technical deficiencies in suits for judicial review.[55]

The unsatisfactory state of the law of parties defendant has been recognized for some time and several attempts have been made by Congress to cure the deficiencies.[56]

Despite these attempts, problems persist involving parties defendant in actions for judicial review. In the committee's view the ends of justice are not served when government attorneys advance highly technical rules in order to prevent a determination on the merits of what may be just claims.

When an instrumentality of the United States is the real defendant, the plaintiff should have the option of naming as defendant the United States, the agency by its official title, appropriate officers, or any combination of them. The outcome of the case should not turn on the plaintiff's choice. S. 800 accomplishes this objective by including a new sentence between the first and last sentences of section 703 of title 5 to provide the plaintiff with this option in judicial review actions, providing no special statutory review proceeding is applicable.

### 2. Joinder of Third Persons

A related problem concerns joinder of third persons as parties defendant. When section 1391(e) of title 28, which governs venue of actions against Federal officers and agencies, was enacted in 1962, its broadened venue and extra-territorial service of process were limited to judicial review actions "in which *each* defendant is an officer or employee of the United States or an agency thereof." (emphasis added.)

This language can be interpreted to prevent a plaintiff from joining non-Federal third persons as defendants in actions under section 1391(e). For example, in *Chase Savings & Loan Association v. Federal Home Loan Bank Board*, 269 F. Supp. 965 (E.D. Pa. 1967), the court dismissed an action which had joined the Federal board and a local bank on the ground of improper venue. The court in *Town of East Haven v. Eastern Airlines*, 282 F. Supp. 507 (D. Conn. 1968), also dismissed an action on the same grounds but not before criticizing the requirements of section 1391(e).

More recent cases, cognizant of the awkwardness and inconvenience of the section, have held to the contrary. In *Green v. Laird*, 357

---

[54] *See, e.g., Clegg v. Treasury Department,* et al. —— F. Supp. —— (D. Mass. 1976), 38 Pike and Fisher Ad. L. 2d 229 (March 16, 1976), (action against the Treasury Department and the Secret Service for allegedly failing to provide Secret Service protection to plaintiff as a presidential candidate dismissed for lack of jurisdiction based in part on misjoinder and failure to name the correct parties defendant).

[55] See statement of Francis M. Gregory, Jr., vice chairman, Committee on Judicial Review, Section of Administrative Law, American Bar Association, 1976 Hearings.

[56] First, Congress in 1962 amended section 1391(e) of Title 28 in order to allow broadened venue and extra-territorial service of process in suits against Federal officers and thus to circumvent the formerly troublesome requirement that superior officers be joined as parties defendant. Second, Rule 25(d) of the Federal Rules of Civil Procedure was amended in 1961 to provide for the automatic substitution of superior officers in office. That rule also states that "any misnomer not affecting the substantial rights of the parties shall be disregarded" and that the officer may be "described as a party by his official title rather than by name." Third, Rule 15(c) of the Federal Rules was amended in 1966 to deal with the plaintiff's failure to name any appropriate officer or agency as defendant.

F.Supp. 227 (N.D. Ill. 1973), for example, the court held that an inter-pretation of section 1391(e) which excludes non-Federal defendants is inconsistent with the congressional intent.[57]

There is no functional justification for this limitation on joinder. Moreover, it prevents relief in some situations in which the Federal courts can make a special contribution.[58]

Section 3 of S. 800 amends 1391(e) of title 28 to make it clear that a plaintiff may use the section's provisions for broad venue and extra-territorial service of process against Government defendants, despite the presence in the action of a non-Federal defendant.

The amendment substitutes the word "a" for the word "each," and adds a new sentence permitting joinder of non-Federal defendants who can be served in accordance with normal rules governing service of process. Other objections to such joinder, stemming from the discre-tion vested in the trial judge under the Federal Rules of Civil Pro-cedure to control the dimensions of the law suit and to protect par-ticular parties, would be unaffected.

The Department of Justice has objected that section 3, as intro-duced, "would permit any plaintiff to obtain venue against any private defendant by simply joining as a party to the action a Federal official over whom venue may be obtained under 28 U.S.C. section 1391(e)."[59] To avoid any hardship or unfair disadvantage to private defendants that might result from subjecting them to plaintiff's broadened choice of venue under section 1391(e) as amended, the committee has amended the pertinent sentence of section 3 of S. 800 to read as follows:

> Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Pro-cedure *and with such other venue requirements as would be applicable if the United States or one of its officers, employees or agencies were not a party.* (emphasis added.)

In effect, this will mean that a private defendant can only be sued in a venue where he could have been sued if the Government had not been a party. As a practical matter, it will usually mean that the plaintiff will have to bring suit in the district where the defendant resides rather than in his own district.

## CONCLUSION

The committee believes that the subjects of this bill are long overdue for reform. S. 800 does not contain new or radical proposals. Rather, it contains limited, modest, and reasonable reforms in a carefully

---

[57] See also *Macias* v. *Finch*, 324 F.Supp. 1252, 1254–55 (N.D. Cal. 1970) : *People of Saipan* v. *Dept. of the Interior*, 356 F.Supp. 645, 651 (D. Hawaii (1973), *modified on other grounds*, 502 F.2d 90 (9th Cir. 1974).

[58] "In many public land controversies, for example, three parties are involved—the official, a successful applicant, and an unsuccessful one. Effective relief cannot be obtained in an action in which the United States or its officer is not involved ; but if the Govern-ment is named as defendant, 1391(e) prevents the joinder of the private person as a defendant, and that person cannot be joined as a plaintiff because his interest is adverse to that of the plaintiff. Another common type of situation in which the limitation is troublesome is that in which the specific relief is sought against Federal and state officers who are cooperating in a regulatory or enforcement program.

"There are no sound reasons why the general principle that control party joinder in Federal courts should not be applicable in these situations." Statement of Roger Cranton, 1970 Hearings at p. 39.

[59] Scalia letter, exhibit C, below.

drafted, thoroughly examined bill—nearly identical to the bill reported out of the Subcommittee on Administrative Practice and Procedure in 1970.

Its principal provision, the partial elimination of sovereign immunity as a defense to actions for equitable relief, has the support of the most eminent scholars and practitioners of administrative law, as well as the Judicial Conference of the United States and the Department of Justice.

The partial elimination of sovereign immunity will facilitate nonstatutory judicial review of Federal administrative action without affecting the existing pattern of statutory remedies, without disturbing the established law of judicial review, without exposing the Government to new liability for money damages, and without upsetting congressional judgments that a particular remedy in a given situation should be the exclusive remedy.

Like sovereign immunity, other anachronisms in the law of judicial review such as the jurisdictional amount in controversy and the naming and joinder of parties defendant have outlived their usefulness, continue to cause confusion and injustice, and are overdue for elimination or reform.

The adoption of S. 800, therefore, will make a substantial contribution to both administrative justice and judicial efficiency by promoting rationality in a complex and intricate field of Federal law. By removing artificial and outmoded barriers to judicial review of official action, S. 800 will also help restore public confidence in the responsiveness and accountability of the Federal Government.

For these reasons, the committee reports the bill, as amended, with the recommendation that it be adopted.

### Cost

The committee does not believe that enactment of S. 800, which is procedural in nature and clarifies the jurisdiction of Federal courts while marginally expanding it, will require additional appropriation of funds to either the judiciary or the agencies. The committee expects that any slightly expanded caseload will be more than compensated for by the bill's elimination of outmoded jurisdictional obstacles which currently consume needless amounts of judicial and Justice Department litigating energies.

### Changes in Existing Law

In compliance with subsection (4) of rule XXIX of the Standing Rules of the Senate, changes in existing law made by the bill as reported are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman) :

### 5 U.S.C. 702

#### § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of

a relevant statute, is entitled to judicial review thereof. *An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States, provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief or any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.*

5 U.S.C. 703

### § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injuction or habeas corpus, in a court of competent jurisdiction. *If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.* Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

28 U.S.C. 31

### § 1331. Federal questions

(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States[.] *except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.*

(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interests and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

28 U.S.C. 1331(c)

(e) A civil action in which [each] *a* defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, *or the United States*, may, except as otherwise provided by law, be brought in any judicial district in which[:] (1) a defendant in the action resides, or (2) the cause of action arose, or (3) any real property involved in the action is situated, or (4) the plantiff resides if no real property is involved in the action. *Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees or agencies were not a party.*

# EXHIBITS

## EXHIBIT A

### RECOMMENDATIONS OF THE ADMINISTRATIVE CONFERENCE OF THE UNITED STATES

#### RECOMMENDATION No. 68–7—ELIMINATION OF JURISDICTIONAL AMOUNT REQUIREMENT IN JUDICIAL REVIEW

Title 28 of the United States Code should be amended to eliminate any requirement of a minimum jurisdictional amount before United States district courts may exercise original jurisdiction over any action in which the plaintiff alleges that he has been injured or threatened with injury by an officer or employee of the United States or any agency thereof, acting under color of Federal law. This amendment is not to affect other limitations on the availability or scope of judicial review of Federal administrative action.

(*Adopted December 10–11, 1968*)

#### RECOMMENDATION No. 69–1—STATUTORY REFORM OF THE SOVEREIGN IMMUNITY DOCTRINE

The technical legal defense of sovereign immunity, which the Government may still use in some instances to block suits against it by its citizens regardless of the merit of their claims, has become in large measure unacceptable. Many years ago the United States by statute accepted legal responsibility for contractual liability and for various types of misconduct by its employees. The "doctrine of sovereign immunity" should be similarly limited where it blocks the right of citizens to challenge in courts the legality of acts of governmental administrators. To this end the Administrative Procedure Act should be amended.

##### RECOMMENDATION

1. Section 702 of Title 5, United States Code (formerly section 10(a) of the Administrative Procedure Act), should be amended by adding the following at the end of the section:

An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States. Nothing herein (1) affects other limitations on judicial review or

(22)

the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

2. Section 703 of Title 5, United States Code (formerly section 10(b) of the Administrative Procedure Act), should be amended by adding the following sentence after the first full sentence:

If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.

(*Adopted October 21–22, 1969*)

### RECOMMENDATION No. 70–1—PARTIES DEFENDANT

The size and complexity of the Federal Government, coupled with the intricate and technical law concerning official capacity and parties defendant, have given rise to innumerable cases in which a plaintiff's claim has been dismissed because the United States or one of its agencies or officers lacked capacity to be sued, was improperly identified, or could not be joined as a defendant. The ends of justice are not served when dismissal on these technical grounds prevents a determination on the merits of what may be just claims. Three attempts to cure the deficiencies of the law of parties defendant have achieved only partial success and further changes are required to eliminate remaining technicalities concerning the identification, naming, capacity, and joinder of parties defendant in actions challenging federal administrative action.

#### RECOMMENDATION

1. The Federal Rules of Civil Procedure contain liberal provisions for substitution of parties and for amendment of pleadings and correction of defects as to parties defendant. The Department of Justice should instruct its lawyers and United States Attorneys to call the attention of the court to these provisions in cases involving technical defects with respect to the naming of parties defendant in any situation in which the plaintiff's complaint provides fair notice of the nature of the claim and the summons and complaint were properly served on a United States Attorney, the Attorney General, or an officer or agency which would have been a proper party if named. The Department of Justice should be responsible for determining who within our complex federal establishment is responsible for the alleged wrong and should take the initiative in seeking correction of pleadings or adding of proper parties. Since the Department of Justice has acquiesced in the substance of this recommendation, it would also be appropriate for the Department of Justice and the Administrative Conference of the United States to seek an amendment of the Federal Rules of Civil Procedure to provide that the Attorney General shall have the responsibility to correct such deficiencies.

2. Congress should enact legislation:

(a) Amending section 703 of title 5 to allow the plaintiff to name as defendant in judicial review proceedings the United States, the agency by its official title, the appropriate officer, or any combination of them.

(b) Amending section 1391 (e) of title 28 to include within its coverage actions challenging federal administrative action in which the United States is named as a party defendant, without affecting special venue provisions which govern other types of actions against the United States.

(c) Amending section 1391 (e) of title 28 to allow a plaintiff to utilize that section's broadened venue and extraterritorial service of process in actions in which nonfederal defendants who can be served in accordance with the normal rules governing service of process are joined with federal defendants.

(*Adopted June 2–3, 1970*)

## EXHIBIT B

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS,
*Washington, D.C., November 3, 1970.*

Hon. EDWARD M. KENNEDY,
*Committee on the Judiciary,*
*U.S. Senate,*
*Washington, D.C.*

DEAR SENATOR KENNEDY: This is in further reference to your letter of May 1, 1970, to the Chief Justice requesting the views of the Judicial Conference on S. 3568,* relating to judicial review of administrative action and containing sections relating to venue and parties defendant.

The Judicial Conference of the United States met on October 29 and 30, 1970, and voted its approval in principle of S. 3568 and specifically endorsed Section 2 of the bill relating to the jurisdictional amount requirement and Section 3 providing for suit in the same judicial districts in which the federal official or agency may be sued.

Sincerely,

WILLIAM E. FOLEY,
*Deputy Director.*

## EXHIBIT C

DEPARTMENT OF JUSTICE,
*Washington, D.C., May 10, 1976.*

Hon. EDWARD M. KENNEDY,
*Chairman, Subcommittee on Administrative Practice and Procedure*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: This is in response to your request at my testimony before your Subcommittee on April 28, 1976 that I submit the written views of the Department of Justice on S. 800, a bill "[t]o amend chapter 7, title 5, United States Code, with respect to procedure for judicial review of certain administrative agency action, and for other purposes."

### SECTION 1—SOVEREIGN IMMUNITY

Section 1 of S. 800 would amend 5 U.S.C. 702 to eliminate the defense of sovereign immunity of the United States in actions in United States

---

*Reintroduced on Feb. 22, 1975 as S. 800. *See* 121 Cong. Rec. 2416 (daily ed.).

courts, seeking relief other than money damages. The Department has in the past opposed such a change,

In light of the tenacious and well reasoned support of this proposal by such knowledgeable and responsible organizations as the Administrative Conference of the United States and the American Bar Association, we have reconsidered that opposition, and are now prepared to endorse the concept in principle, and to support the text of S. 800, with two small but important changes and a number of caveats concerning its proper interpretation. The arguments in favor of this aspect of S. 800 have been described in testimony presented by others before your Subcommittee. Foremost among them, in my view, is the failure of the criteria for sovereign immunity, as they have been expressed in a long and bewildering series of Supreme Court decisions, to bear any necessary relationship to the real factors which should determine when the Government requires special protection which ordinary litigants would not be accorded.

The main argument against S. 800 is one that can be made against most statutes which seek to make a change in encrusted principles of the common law: the difficulty of obtaining complete assurance that no untoward result will be produced. The Department of Justice has been unable to identify any, assuming that the modifications and interpretations proposed in this letter are accepted. We are sure, however, that the Committee will give careful consideration to the submissions of other agencies on this point with respect to their particular areas of activity.

It should also be pointed out that the status quo itself is not without uncertainty. No one can read the significant Supreme Court cases on sovereign immunity, from *United States* v. *Lee*, 106 U.S. 196 (1882) to *Malone* v. *Bowdoin*, 369 U.S. 643 (1962), *Dugan* v. *Rank*, 372 U.S. 609 (1963) and *Hawaii* v. *Gordon*, 373 U.S. 57 (1963) (per curiam), without concluding that the field is a mass of confusion; and if he ventures beyond that to attempt some reconciliation of the courts of appeals decisions, he will find confusion compounded. Accepting the elimination of the doctrine of sovereign immunity is not, then, a case of exchanging the certain for the uncertain, or the known for the unknown.

Indeed, if the present bill is properly understood and properly applied by the courts, it is likely to produce a more stable and predictable system of immunity from suit than the present doctrine of sovereign immunity can ever attain—because it will be a system directly and honestly based upon relevant governmental factors rather than upon a medieval concept whose real vitality is long since gone and which we have tried vainly to convert to rational modern use. It is not the intent of the Department nor, as I understand it, the intent of the drafters of this bill, that all of the cases which have heretofore been disposed of on the basis of sovereign immunity would in the future be entertained and adjudicated by the courts. To the contrary, one of the very premises of the proposal is the fact that many (indeed, I would say most) of the cases disposed of on the basis of sovereign immunity could have been decided the same way on other legal grounds, such as: lack of standing; lack of ripeness; availability of an alternative remedy in another court; express or implied statutory preclusion of judicial review; commission of the matter by law to

agency discretion; privileged nature of the defendant's conduct; failure to exhaust administrative remedies; discretionary power to refuse equitable relief;[1] and the "political question" doctrine.[2] As stated in the Administrative Conference Report:

> The essential and sound policy underlying sovereign immunity—that courts should not engage in indiscriminate interference with governmental programs—is not abandoned merely because an artificial and outmoded doctrine is abolished. The same basic policy is inherent in the body of law that governs the availability and scope of judicial review. The doctrine of sovereign immunity is unnecessary to prevent courts from (a) entering fields which the Constitution or Congress has delegated to the executive, and (b) displacing executive or administrative judgment. (1 *ACUS Reports* at 225.)

In addition to the common law doctrines which afford certain governmental processes needed protection, it is also an important factor in our support for the bill that the waiver of immunity, since it is made via § 702, will only apply to claims relating to improper official action; and will be subject to the other limitations of the Administrative Procedure Act, including that which renders review unavailable "to the extent that—(1) statutes preclude judicial review, or, (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). They also include the requirement that "the form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter," where such a proceeding exists and is not inadequate. 5 U.S.C. § 703. These features were considered of great importance by the Administrative Conference Committee which originally drafted this legislative proposal, and they are important elements of the Department's support for the bill.

In one respect, the proposed § 702 differs from the version recommended by the Administrative Conference, and we believe the change is undesirable. Clause (2) of the last sentence, as proposed by the Administrative Conference, would have provided that nothing in the legislation confers authority to grant relief "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." This has been changed to read: "if any other statute granting consent to suit *for money damages* forbids the relief which is sought." (emphasis added). The underscored phrase and the elimination of the phrase "expressly or impliedly" could be interpreted to limit the disclaimer in such a fashion as to raise serious questions concerning the scope of the new reviewability which would be created. We see no reason why a congressional intent to preclude other remedies should be honored only with respect to statutes for money damages, and otherwise ignored. Nor do we believe it should be left in any doubt that the requisite intent need not be express (which, in a prior system which assumed the existence of sovereign immunity, would be extremely rare) but can be found from all the circumstances normally

[1] See the cases on each of these points cited in the Report of the Commission on Judicial Review of the Administrative Conference of the United States. 1 *Recommendations and Reports of the Administrative Conference* (hereinafter "ACUS Reports") 191, 222–23.
[2] See, e.g., *C. & S. Air Lines v. Waterman Corp.*, 333 U.S. 103 (1948).

available to assess legislative will. Because existing statutes have been enacted against the backdrop of sovereign immunity, this will probably mean that in most if not all cases where statutory remedies already exist, these remedies will be exclusive; that is no distortion, but simply an accurate reflection of the legislative intent in these particular areas in which the Congress has focused on the issue of relief. It would be unwise to upset these specific determinations by a general provision of this sort, without considering them individually, or even knowing precisely what they are. In the many areas where Congress has not acted, however, and when its action is not addressed to the type of grievance which the plaintiff seeks to assert, suit would be allowed. The Department of Justice strongly urges that the Administrative Conference's original and well considered recommendation on this point be reinstated.

Our second disagreement with the text of section 1 of the bill relates to the next to the last sentence of the revised § 702, which provides that "the United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States." This was part of the original Administrative Conference proposal. Its purpose was to eliminate the "technicalities of the law of parties defendant" and to assure the "binding effect of judgments" against the United States. (See 1 *ACUS Reports* 220–22.)

We have no quarrel with these objectives, nor with the text of the provision insofar as it provides for the initial naming of the United States. The provision for the entering of a judgment or decree against the United States, however, is inadvisable without some modification. In order to assure that the binding effect of a judgment will not lapse with the departure of the Federal officer who happens to have been named, it seems to us unnecessary to leave to the Justice Department— or perhaps to the Government as a whole—the task of deciding what individual has personal responsibility (presumably under pain of contempt) for compliance with a court's mandatory decree. Leaving the matter thus unspecified is either unfair to the individual who may be responsible or else destructive of the enforceability of the decree. We suggest that all the values sought to be achieved by this provision can be preserved, and the foregoing difficulty eliminated, by adding to the sentence in question the following proviso:

> provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.

In connection with this provision, I may also note our understanding that the ability to name the United States in the initial pleading does not alter the degree of specificity with which the plaintiff must plead and establish his case. For example, where the plaintiff knows that particular officers of a particular agency caused the wrong alleged, he cannot merely plead that it was caused by unspecified officers of the United States, leaving it to the Department of Justice to circularize the entire Government in order to respond to the complaint. Such a pleading would be subject to a motion for more definite statement under Rule 12(e) of the Federal Rules of Civil Procedure.

With the revisions suggested above, the Department supports enact-
ment of section 1 of S. 800.

### SECTION 2—AMOUNT IN CONTROVERSY

Section 2 of S. 800 would amend 28 U.S.C. section 1331 to eliminate
the requirement that there be at least $10,000 in controversy, and thus
provide federal court jurisdiction over all civil cases raising "federal
questions" regardless of the monetary amount involved.

The Department of Justice has in the past supported removal of
the "amount in controversy" requirement in cases alleging unconstitu-
tional action by federal agents. The Administrative Conference of the
United States has recommended the somewhat broader approach of
eliminating the requirement with respect to cases in which the plain-
tiff alleges that he has been injured or threatened with injury by an
officer or employee of the United States, or an agency thereof, "acting
under color of Federal law." Conference Recommendation 68–7. Vir-
tually all of the additional ground covered by the Conference pro-
posal would be encompassed by existing law if section 10 of the APA,
5 U.S.C. §§ 701–03, were established to be an independent grant
of jurisdiction. This is presently the law of the District of Columbia
Circuit, *Pickus* v. *United States Board of Parole*, 507 F.2d 1107 (D.C.
Cir. 1974), though it is not universally accepted. Moreover, the juris-
dictional amount requirement can be avoided if suit can be cast in the
form of an action "in the nature of mandamus," so as to qualify under
the Mandamus and Venue Act of 1962, 28 U.S.C. § 1361. *See* Re-
port of the Committee on Judicial Review of the Administrative
Conference, 1 *ACUS Reports* 170, 176–77. When these means of avoid-
ing the requirement are added to the fact that the existence of mone-
tary damage in cases involving agency action is an erratic factor to
begin with, not necessarily related to either the private or public im-
portance of the issue involved, the "amount in controversy" provision
of § 1331 is seen to have a very limited and virtually irrational
application, at least as applied to judicial review of administrative
action. The Department therefore supports the Administrative Con-
ference recommendation.

The amendment contained in S. 800, however, would go beyond the
Conference proposal, and would remove the "amount in controversy"
requirement not merely in suits for review of federal agency action
but in all federal question cases. We do not know the volume and the
character of cases which this further extension would add to federal
court dockets. The Administrative Conference Committee report of
course did not address the point, and we know of no other study which
does. It is conceivable that the small volume of such cases, or their
relatively high importance, renders the extension unobjectionable. If
the Subcommittee has reliable information on the point, we will be
pleased to examine it and provide our further views. Absent such data,
however, we think it advisable to adhere to the carefully considered
Administrative Conference recommendation, which would limit sec-
tion 2 to the important category of suits seeking review of agency
action.

### SECTION 3—VENUE

Section 3 of S. 800 would amend 28 U.S.C. § 1391(e) to permit additional persons to be joined as parties in actions against the United States, its agencies, officers or employees, "without regard to other venue requirements." Presently, 28 U.S.C. § 1391(e), which grants venue not merely in the defendant's district but in the plaintiff's district, where the cause of action arose or where real property which it involves is situated, applies to a civil action in which "each defendant" is an officer or employee of the United States or any agency thereof. The amendment proposed would make the presence of a single federal defendant sufficient.

While the question must be regarded as still open, the limitation on joinder set forth in § 1391(e) has been held by some courts to apply only to those individuals as to whom that section itself is the sole basis of venue. That is, additional defendants may be joined so long as an independent basis of venue with respect to them exists. *See National Resources Defense Council, Inc.* v. *Tennessee Valley Authority*, 459 F.2d 255, 257 n. 3 (2d Cir. 1972). If the effect of the present proposal were merely to codify this interpretation of § 1391(e), the Department would support it. However, the amendment as written goes much further. It would permit any plaintiff to obtain venue against any private defendant by simply joining as a party to the action a federal official over whom venue may be obtained under 28 U.S.C. § 1391(e). The Department sees no reason why the facilitation of suits against the Government should lead to the imposition of hardships against non-Government defendants which the ordinary venue rules are designed to avoid. *See Town of East Haven* v. *Eastern Airlines*, 282 F. Supp. 507, 510–11 (D. Conn. 1968). We may note, incidentally, that the portion of the Administrative Conference Committee report which was the origin of this proposal did not address the point we have here raised, and indeed in all except its last sentence discussed the problem as though the only issue were permitting the joinder of persons as to whom independent grounds of venue existed. *See* 1 *ACUS Reports* 431–32.

The Department's objection would be met if the final phrase of section 3, "without regard to other venue requirements," were replaced by: "and such other venue requirements as would be applicable if the United States or one of its officers, employees or agencies were not a party."

For the reasons stated above, the Department of Justice recommends enactment of this legislation with the suggested amendments.

The Office of Management and Budget has advised that there is no objection to the submission of this report from the standpoint of the Administration's program.

Sincerely,

ANTONIN SCALIA,
*Assistant Attorney General, Office of Legal Counsel.*

O

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, |
| *Plaintiff,* |
| v. |
| DONALD F. MCGAHN II, |
| *Defendant.* |

No. 19-cv-2379 (KBJ)

# EXHIBIT E

# Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach From Congressional Subpoena

The Assistant to the President and Director of the Office of Political Strategy and Outreach ("OPSO") is immune from the House Committee on Oversight and Government Reform's subpoena to compel him to testify about matters concerning his service to the President in the OPSO.

July 15, 2014

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked whether Assistant to the President and Director of the Office of Political Strategy and Outreach ("OPSO") David Simas is legally required to appear to testify at a congressional hearing scheduled for July 16, 2014, in response to a subpoena issued to Mr. Simas by the House Committee on Oversight and Government Reform on July 10, 2014. We understand that the Committee seeks testimony about "whether the White House is taking adequate steps to ensure that political activity by Administration officials complies with relevant statutes, including the Hatch Act," and about "the role and function of the White House Office of Political Strategy and Outreach." Letter for David Simas from the Hon. Darrell Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives (July 3, 2014) ("Invitation Letter"). For the reasons set forth below, we believe that Mr. Simas is immune from compulsion to testify before the Committee on these matters, and therefore is not required to appear to testify in response to this subpoena.

## I.

### A.

The Executive Branch's longstanding position, reaffirmed by numerous Administrations of both political parties, is that the President's immediate advisers are absolutely immune from congressional testimonial process. *See, e.g.*, Memorandum for the Hon. John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* at 7 (Feb. 5, 1971) ("Rehnquist Memorandum").[1] This immunity is rooted in the constitutional separation of powers, and in

---

[1] *See also* Letter to Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel (Aug. 1, 2007); *Immunity of Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. __ (July 10, 2007) ("Bradbury Memorandum"), *available at* http://www.justice.gov/olc.opinions.htm; *Assertion of Execu-*

the immunity of the President himself from congressional compulsion to testify. As this Office has previously observed, "[t]he President is the head of one of the independent Branches of the federal government. If a congressional committee could force the President's appearance" to testify before it, "fundamental separation of powers principles—including the President's independence and autonomy from Congress—would be threatened." *Immunity of Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. __, at *2 (July 10, 2007) ("*Bradbury Memorandum*"), *available at* http://justice.gov/olc/opinions.htm. In the words of one President, "[t]he doctrine [of separation of powers] would be shattered, and the President, contrary to our fundamental theory of constitutional government, would become a mere arm of the Legislative Branch of the Government if he would feel during his term of office that his every act might be subject to official inquiry and possible distortion for political purpose." Texts of Truman Letter and Velde Reply, N.Y. Times, Nov. 13, 1953, at 14 (reprinting November 11, 1953 letter by President Truman). Thus, just as the President "may not compel congressmen to appear before him," "[a]s a matter of separation of powers, Congress may not compel him to appear before it." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) ("*Assertion of Executive Privilege*") (quoting Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 2 (July 29, 1982)).

For the President's absolute immunity to be fully meaningful, and for these separation of powers principles to be adequately protected, the President's immediate advisers must likewise have absolute immunity from congressional compulsion to testify about matters that occur during the course of discharging their official duties. "Given the numerous demands of his office, the President must rely upon senior advisers" to do his job. Bradbury Memorandum at *2. The President's immediate advisers—those trusted members of the President's inner circle "who customarily meet with the President on a regular or frequent basis," Rehnquist Memorandum at 7, and upon whom the President relies directly for candid and sound advice—are in many ways an extension of the President himself.

---

tive Privilege with Respect to Clemency Decision, 23 Op. O.L.C. 1 (1999); *Immunity of the Counsel to the President from Compelled Congressional Testimony*, 20 Op. O.L.C. 308 (1996); Memorandum to Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel (July 29, 1982); Letter for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Demand for Deposition of Counsel to the President Fred F. Fielding* (July 23, 1982); Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Testimony by Presidential Assistants* (Apr. 14, 1981); Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Dual-Purpose Presidential Advisers* (Aug. 11, 1977); Memorandum for the Hon. John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, *Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee* (Mar. 15, 1972).

They "function[] as the President's alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities," including supervising the Executive Branch and developing policy. *Assertion of Executive Privilege*, 23 Op. O.L.C. at 5; *see also Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982) (the Constitution "establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity," including "the enforcement of federal law" and the "management of the Executive Branch"); *In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) ("The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers."). "Given the close working relationship that the President must have with his immediate advisors as he discharges his constitutionally assigned duties," "[s]ubjecting [those advisors] to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Assertion of Executive Privilege*, 23 Op. O.L.C. at 5.

In particular, a congressional power to compel the testimony of the President's immediate advisers would interfere with the President's discharge of his constitutional functions and damage the separation of powers in at least two important respects. First, such a power would threaten the President's "independence and autonomy from Congress." Bradbury Memorandum at *2; *cf. Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 370, 385 (2004) (citing the President's need for autonomy and confidentiality in holding that courts must consider constraints imposed by the separation of powers in fashioning the timing and scope of discovery directed at high-level presidential advisers who "give advice and make recommendations to the President"). Absent immunity for a President's closest advisers, congressional committees could wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain. Such efforts would risk significant congressional encroachment on, and interference with, the President's prerogatives and his ability to discharge his duties with the advice and assistance of his closest advisers. They also would promote a perception that the President is subordinate to Congress, contrary to the Constitution's separation of governmental powers into equal and coordinate branches.

Second, a congressional power to subpoena the President's closest advisers to testify about matters that occur during the course of discharging their official duties would threaten executive branch confidentiality, which is necessary (among other things) to ensure that the President can obtain the type of sound and candid advice that is essential to the effective discharge of his constitutional duties. The Supreme Court has recognized "the necessity for protection of the public interest

in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." *United States v. Nixon*, 418 U.S. 683, 708 (1974). "A President and those who assist him," the Court has explained, "must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Id.* The prospect of compelled interrogation by a potentially hostile congressional committee about confidential communications with the President or among the President's immediate staff could chill presidential advisers from providing unpopular advice or from fully examining an issue with the President or others.

To be sure, the President's advisers could invoke executive privilege to decline to answer specific questions if they were required to testify. *See, e.g.*, Rehnquist Memorandum at 8 & n.4. But the ability to assert executive privilege during live testimony in response to hostile questioning would not remove the threat to the confidentiality of presidential communications. An immediate presidential adviser could be asked, under the express or implied threat of contempt of Congress, a wide range of unanticipated and hostile questions about highly sensitive deliberations and communications. In the heat of the moment, without the opportunity for careful reflection, the adviser might have difficulty confining his remarks to those that do not reveal such sensitive information. Or the adviser could be reluctant to repeatedly invoke executive privilege, even though validly applicable, for fear of the congressional and media condemnation she or the President might endure. These concerns are heightened because, in a hearing before a congressional committee, there is no judge or other neutral magistrate to whom a witness can turn for protection against questions seeking confidential and privileged information. The committee not only poses the questions to the witness, but also rules on any objections to its own questions according to procedures it establishes. The pressure of compelled live testimony about White House activities in a public congressional hearing would thus create an inherent and substantial risk of inadvertent or coerced disclosure of confidential information relating to presidential decisionmaking—thereby ultimately threatening the President's ability to receive candid and carefully considered advice from his immediate advisers. To guard against these harms to the President's ability to discharge his constitutional functions and to the separation of powers, immediate presidential advisers must have absolute immunity from congressional compulsion to testify about matters that occurred during the course of the adviser's discharge of official duties.[2]

---

[2] A number of senior presidential advisers have voluntarily testified before Congress as an accommodation to a congressional committee's legitimate interest in investigating certain activities of the Executive Branch. These instances of voluntary testimony do not undermine the Executive Branch's long-established position on absolute immunity. Unlike compelled testimony, voluntary testimony by a senior presidential adviser represents an affirmative exercise of presidential autonomy. It reflects a decision by the President and his immediate advisers that the benefit of providing such testimony as an accommodation to a committee's interests outweighs the potential for harassment and harm to Executive Branch confidentiality. Such testimony, moreover, may be provided on terms negotiated to

**B.**

This longstanding Executive Branch position is consistent with relevant Supreme Court case law. The Court has not yet considered whether Congress may secure the testimony of an immediate presidential adviser through compulsory process. But in an analogous context, the Court did conclude that legislative aides are entitled to immunity under the Speech or Debate Clause that is co-extensive with the immunity afforded Members of Congress themselves. *See Gravel v. United States*, 408 U.S. 606 (1972). "It is literally impossible," the Court explained, "for Members of Congress to perform their legislative tasks without the help of aides and assistants." *Id.* at 616. Legislative aides must therefore "be treated as . . . alter egos" of the Members they serve. As a result, they must be granted the same immunity as those Members in order to preserve "the central role of the Speech or Debate Clause," which is "to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." *Id.* at 617.

The Court's reasoning in *Gravel* supports the position that the President's immediate advisers must share his absolute immunity from congressional compulsion to testify. As noted above, the President's immediate advisers are his "alter egos," allowing him to fulfill the myriad responsibilities of his office in a way it would be "literally impossible" for him to do alone. A congressional power to compel their testimony would (as we have discussed) undermine the President's independence, create the appearance that the President is subordinate to Congress, and impair the President's ability to receive sound and candid advice, thereby hindering his ability to carry out the functions entrusted to him by the Constitution. Subjecting immediate presidential advisers to congressional testimonial process would thus "diminish[] and frustrate[]" the purpose of the President's own absolute immunity from such process—just as in *Gravel*, denying "Speech or Debate" immunity to legislative aides would have "diminished and frustrated" the protections granted to Members of Congress under that clause. *Gravel*, 408 U.S. at 617.

To be sure, in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Court rejected a claim of absolute immunity made by senior presidential advisers. But it did so in the context of a civil suit against those advisers for money damages. In our view, *Harlow*'s holding that presidential advisers are generally entitled to only qualified immunity in suits for money damages should not be extended to the context of congressional subpoenas for the testimony of immediate presidential advisers, because the separation of powers concerns that underlie the need for absolute immunity from congressional testimonial compulsion are not present to the same

---

focus and limit the scope of the questioning. Because voluntary testimony represents an exercise of presidential autonomy rather than legally required compliance with congressional will, it does not implicate the separation of powers in the same manner, or to anything like the same extent, as compelled testimony.

degree in civil lawsuits brought by third parties. *But see Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 100–02 (D.D.C. 2008) (reading *Harlow* to preclude absolute immunity for senior presidential advisers from compulsion to testify before Congress).

As explained above, subjecting an immediate presidential adviser to Congress's subpoena power would threaten the President's autonomy and his ability to receive sound and candid advice. Both of these prospective harms would raise acute concerns related to the separation of powers. A suit for damages brought by a private party does not raise comparable separation of powers concerns. It is true that such a suit involves a judicially supervised inquiry into the actions of presidential advisers, and that the threat of financial liability from such a suit may chill the conduct of those advisers. *See Harlow*, 457 U.S. at 814; *Miers*, 558 F. Supp. 2d at 101–02. But, in civil damages actions, the Judiciary acts as a disinterested arbiter of a private dispute, not as a party in interest to the very lawsuit it adjudicates. Indeed, the court is charged with impartially administering procedural rules designed to protect witnesses from irrelevant, argumentative, harassing, cumulative, privileged, and other problematic questions. *Cf., e.g.*, Fed. R. Civ. P. 26(b); Fed. R. Evid. 103. And mechanisms exist to eliminate unmeritorious claims. *See, e.g.*, Fed. R. Civ. P. 12(b), (c), (e), (f); Fed. R. Civ. P. 56. In contrast, in the congressional context (as noted earlier), the subpoenaing committee is both the interested party and the presiding authority, asking questions that further its own interests, and setting the rules for the proceeding and judging whether a witness has failed to comply with those rules. In part for these reasons, a congressional proceeding threatens to subject presidential advisers to coercion and harassment, create a heightened impression of presidential subordination to Congress, and cause public disclosure of confidential presidential communications in a way that the careful development of evidence through the judicially monitored application of the Federal Rules of Civil Procedure does not.

*Harlow* also contains a discussion of *Gravel*, in which the Court rejected the defendants' argument that, as "alter egos" of the President, they should be entitled to absolute immunity from civil claims for damages, derivative of the absolute immunity afforded the President. But we do not think *Harlow*'s discussion undermines the relevance of *Gravel* to the issue of immunity from congressional compulsion to testify. In *Harlow*, the Court conceded that the defendants' claim of absolute immunity based on *Gravel* was "not without force," but concluded that the argument would "sweep[] too far," because it would imply that Cabinet officials too should enjoy derivative absolute immunity, and the Court had already decided (in *Butz v. Economou*, 438 U.S. 478 (1978)) that Cabinet officials—"Presidential subordinates some of whose essential roles are acknowledged by the Constitution itself"—were entitled to only qualified immunity. *Harlow*, 457 U.S. at 810.

Given the dissimilarities between civil suits for damages and compelled congressional testimony just discussed, it is doubtful that this discussion in *Harlow* (or the holding in *Butz*) bears much on the question of whether immediate presidential advisers have absolute immunity from congressional compulsion to testify. Further, even if it is appropriate to harmonize the immunity afforded Cabinet officials and presidential advisers in the context of suits for damages, the same is not true in the context of compelled congressional testimony. This is because the prospect of compelled congressional testimony by a President's immediate advisers would, as a general matter, be significantly more damaging to the separation of powers than the prospect of compelled testimony by a Cabinet official. As a Department head, a Cabinet officer is confirmed by the Senate, and her authority and functions are generally established by statute. It may be a significant part of her regular duties to testify before Congress about the implementation of laws that Congress has passed. *Cf.* Rehnquist Memorandum at 8–9. By contrast, an immediate presidential adviser is appointed solely by the President, without Senate confirmation, and his role is to advise and assist the President in the performance of the President's constitutionally assigned functions. The separation of powers concerns identified above—the threats to both the independence of the presidency and the President's ability to obtain candid and sound advice—are significantly more acute in the case of close personal advisers than high-ranking Executive Branch officials who do not function as the President's "alter egos." *Cf. Harlow*, 457 U.S. at 828 (Burger, C.J., dissenting) (faulting the Court majority for "fail[ing] to distinguish the role of a President or his 'elbow aides' from the role of Cabinet officers, who are department heads rather than 'alter egos,'" and stating that "[i]t would be in no sense inconsistent to hold that a President's personal aides have greater immunity than Cabinet officers"); *id.* at 810 n.14 (majority) (acknowledging Chief Justice Burger's argument and noting that "it is impossible to generalize about the role of 'offices' in an individual President's administration" because some individuals have served simultaneously in both presidential advisory and Cabinet positions).[3]

Similarly, in *United States v. Nixon*, the Supreme Court expressly distinguished the privilege issues arising in criminal cases from the privilege issues that would

---

[3] The *Harlow* Court also observed that civil suits for money damages against presidential advisers "generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself." 457 U.S. at 811 n.17. This observation is consistent with *Nixon v. Fitzgerald*, a decided the same day as *Harlow*, in which the Court held that the President "is entitled to absolute immunity from damages liability predicated on his official acts." 457 U.S. 731, 749 (1982). This logic too suggests that the President's immediate advisers should be absolutely immune from congressional compulsion to testify, because (as we have explained) compelling immediate presidential advisers to testify before Congress would risk serious harm to the separation of powers that is closely related to the harm that would be caused by compelling the President himself to appear, and because absolute immunity for the President's immediate advisers is necessary to render the President's own immunity fully meaningful.

arise in the context of compelled congressional testimony. In *Nixon*, the Court held that the President could assert only a qualified, rather than an absolute, privilege to resist a subpoena for tape recordings and documents issued in the course of a criminal proceeding brought against certain third parties. 418 U.S. 683; *see also Sealed Case*, 121 F. 3d at 753–57 (presidential communications privilege may be overcome by need for information in a grand jury investigation). But the Court made clear that it was "not . . . concerned with the balance between the President's . . . confidentiality interest and congressional demands for information." *Nixon*, 418 U.S. at 712 n.19; *see also id.* ("We address only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials."); *Sealed Case*, 121 F.3d at 753 (recognizing that the unique "constitutional considerations" in the "congressional-executive context" render limitations on executive privilege in the judicial context inapposite). Particularly in light of this explicit statement, we do not believe *Nixon* casts doubt on the President's—and by extension his immediate advisers'—immunity from congressional compulsion to testify. As with liability for private suits for damages, requiring the President to comply with a third-party subpoena in a criminal case is very different from—and has very different separation of powers implications than—requiring him to comply with a congressional subpoena for testimony. This is so in at least two respects.

First, as the Court explained in *Cheney*, "the need for information in the criminal context is" particularly weighty "because 'our historic[al] commitment to the rule of law . . . is nowhere more profoundly manifest than in our view that the twofold aim of [criminal justice] is that guilt not escape or innocence suffer.'" 542 U.S. at 384 (quoting *United States v. Nixon*, 418 U.S. at 708–09) (internal quotation marks omitted) (alterations in original)). Outside the criminal context, "the need for information . . . does not share the [same] urgency or significance." *Id*. Comparing the informational need of congressional committees with that of grand juries, for instance, the en banc Court of Appeals for the D.C. Circuit explained that "while factfinding by a legislative committee is undeniably a part of its task, legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events. . . . In contrast, the responsibility of the grand jury turns entirely on its ability to determine whether there is probable cause to believe that certain named individuals did or did not commit specific crimes." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir. 1974) (en banc).

Second, the potentially harmful effect on the President's ability to carry out his duties and on the separation of powers is more serious in the context of subpoenaed congressional testimony than in the context of compulsory judicial process in a criminal case. As in the civil context, the criminal justice system imposes "various constraints, albeit imperfect, to filter out insubstantial legal claims" and minimize the damage to the President's ability to discharge his duties, such as

prosecutorial discretion (with its attendant ethical constraints) and Federal Rule of Criminal Procedure 17. *Cheney*, 542 U.S. at 386. Congress is not subject to such constraints. And, of course, a criminal subpoena does not raise the prospect of the President (or one of his immediate advisers) being summoned at Congress's will to appear before it to respond to a hearing conducted entirely on the terms and in the manner Congress chooses.

Two lower-court cases also bear mention. In *Senate Select Committee*, the Court of Appeals for the D.C. Circuit addressed a President's obligation to comply with a congressional subpoena, and concluded that the President could not assert a generalized claim of executive privilege to absolutely immunize himself from turning over certain tape recordings of presidential conversations. 498 F.2d 725. Again, we do not believe this holding undermines our conclusion that the President and his immediate advisers are absolutely immune from congressional compulsion to testify. In our view, Congress summoning a President to appear before it would suggest, far more than Congress compelling a President to turn over evidence, an Executive subordinate to the Legislature. In addition, when Congress issues a subpoena for documents, the Executive Branch may take time to review the request and object to any demands that encroach on privileged areas. Any documents that are produced may be redacted where necessary. By contrast (and as already discussed), a witness testifying before Congress may, in the heat of the moment and under pressure, inadvertently reveal information that should remain confidential.

Finally, in *Committee on Judiciary v. Miers*, the District Court for the District of Columbia considered a question very similar to the one raised here, and concluded that a former Counsel to the President was not entitled to absolute immunity from congressional compulsion to testify. 558 F. Supp. 2d at 99. The court's analysis relied heavily on *Harlow*, *Harlow*'s discussion of *Gravel*, and *Nixon*. *See* 558 F. Supp. 2d at 99–105. For the reasons set forth above, we believe those cases do not undermine the Executive Branch's longstanding position that the President's immediate advisers are immune from congressional compulsion to testify. We therefore respectfully disagree with the *Miers* court's analysis and conclusion, and adhere to the Executive Branch's longstanding view that the President's immediate advisers have absolute immunity from congressional compulsion to testify.

## C.

Applying this longstanding view, we believe that Mr. Simas has such immunity. We understand that Mr. Simas spends the majority of his time advising or preparing advice for the President. He is a member of a group of the President's closest advisers who regularly meet with the President, as often as several times a week. In addition, Mr. Simas frequently meets with the President alone and with other advisers, at the President's or Mr. Simas's request. *See* Rehnquist Memoran-

dum at 7 (President's "immediate advisers" are "those who customarily meet with the President on a regular or frequent basis"). Mr. Simas is responsible for advising the President on such matters as what policy issues warrant his attention. He also advises the President on how his policies are being received, and on how to shape policy to align it with the needs and desires of the American public. Mr. Simas thus plays a crucial role in deciding how best to formulate and communicate the President's agenda across a wide range of policy issues. In these respects, Mr. Simas's duties are comparable to those of other immediate advisers who we have previously recognized are entitled to absolute immunity from congressional compulsion to testify. *See, e.g.*, Letter to Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel (Aug. 1, 2007) (immunity of President Bush adviser Karl Rove); Bradbury Memorandum (immunity of Counsel to President Bush Harriet Miers). Consistent with these precedents, we likewise conclude that Mr. Simas has absolute immunity from compulsion to testify before Congress about his service to the President in the Office of Political Strategy and Outreach.

## II.

For the reasons discussed above, we believe that Mr. Simas is entitled to immunity that is "absolute and may not be overborne by [the Committee's] competing interests." *Assertion of Executive Privilege*, 23 Op. O.L.C. at 4. But even if Mr. Simas were only entitled to qualified immunity, which could be overcome by a sufficient showing of compelling need, we would conclude that the Committee had not made the requisite showing.

### A.

No court has yet considered the standard that would be used to determine whether a congressional committee's interests overrode an immediate presidential adviser's immunity from congressional compulsion to testify, assuming that immunity were qualified rather than absolute. But two decisions of the Court of Appeals for the D.C. Circuit suggest possible standards. In *Senate Select Committee*, in the context of a presidential assertion of executive privilege against a congressional subpoena for tape recordings of conversations between the President and his Counsel, the court held that the Committee could overcome the assertion only by showing that "the subpoenaed evidence is demonstrably critical to the responsible fulfillment of [its] functions." 498 F.2d at 731; *see also McGrain v. Daugherty*, 273 U.S. 135, 176 (1927) (congressional oversight power may be used only to "obtain information in aid of the legislative function"). And in *Sealed Case*, the court held that "in order to overcome a claim of presidential privilege raised against a grand jury subpoena, it is necessary to specifically demonstrate why it is likely that the evidence contained in presidential communications is

important to the ongoing grand jury investigation and why this evidence is not available from another source." 121 F.3d at 757. (To be "important" to an investigation, "the evidence sought must be directly relevant to issues that are expected to be central to the trial." *Id.* at 754.)

In our view, *Senate Select Committee* would provide the more appropriate standard for assessing whether a congressional committee's assertion of need had overcome an immediate presidential adviser's qualified testimonial immunity. As explained above, judicial proceedings—including criminal proceedings—differ in fundamental ways from congressional hearings. Because the *Senate Select Committee* standard was articulated in the congressional oversight context, and because it seeks to preserve the President's prerogatives while recognizing Congress's legitimate interest in information crucial to its legislative function, we believe it would be an appropriate standard for evaluating whether an immediate presidential adviser's qualified testimonial immunity has been overcome.

In applying this standard, it would be important to bear in mind the "implicit constitutional mandate" that the coordinate branches of government "seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation." *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). Through this accommodation process, which has been followed for decades, the political branches strive to avoid the "constitutional confrontation" that erupts when the President must make an assertion of privilege, or when an immediate presidential adviser's testimonial immunity must be invoked. *See Cheney*, 542 U.S. at 389–90 (quoting *United States v. Nixon*, 418 U.S. at 692); *see also id.* ("[C]onstitutional confrontation between the two branches should be avoided whenever possible.") (quotation marks omitted). Accordingly, before an immediate presidential adviser's compelled testimony could be deemed demonstrably critical to the responsible fulfillment of a congressional committee's legislative function, a congressional committee would, at a minimum, need to demonstrate why information available to it from other sources was inadequate to meet its legitimate needs. *See Senate Select Committee*, 498 F.2d at 732–33 (noting that, in light of the President's public release of partially redacted transcripts of the subpoenaed tapes, the court had asked the Select Committee to state "in what specific respects the [publicly available] transcripts . . . are deficient in meeting [its] need," and then finding that the Committee "points to no specific legislative decisions that cannot responsibly be made without access to materials uniquely contained in the tapes").

## B.

The Committee has not shown that Mr. Simas's testimony is demonstrably critical to the responsible fulfillment of its legislative function. The Committee's investigation began with a broad request for "all documents and communications, including e-mails, related or referring to the Office of Political Strategy and

Outreach or the reopening of the Office of Political Affairs," along with a request that White House officials brief Committee staff. Letter for Denis McDonough, White House Chief of Staff, from the Hon. Darrell E. Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives at 4 (Mar. 18, 2014). Over the course of letters exchanged during the next three months, the White House explained that the Office engages only in activities that are permissible under the Hatch Act, and that the White House has taken steps to ensure that OPSO staff are trained in Hatch Act compliance. In response to those letters, the Committee reiterated its broad request for documents, but did not articulate particular unanswered questions or identify incidents in which OPSO staff may have violated the Hatch Act or related statutes. *See* Letter for the Hon. Darrell E. Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives, from Kathryn H. Ruemmler, Counsel to the President (Mar. 26, 2014); Letter for Denis McDonough, White House Chief of Staff, from the Hon. Darrell E. Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives at 1 & n.5 (May 27, 2014); Letter for the Hon. Darrell E. Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives, from W. Neil Eggleston, Counsel to the President at 1–2 (June 13, 2014).

On July 3, 2014, the Committee requested Mr. Simas's testimony at a public hearing to understand "whether the White House is taking adequate steps to ensure that political activity by Administration officials complies with relevant statutes, including the Hatch Act," and to understand "the role and function of the White House Office of Political Strategy and Outreach." Invitation Letter. The Committee did not, however, identify any specific unanswered questions that Mr. Simas's testimony was necessary to answer. The White House responded with a letter providing additional information about White House efforts to ensure that OPSO was operating in a manner consistent with applicable statutes, and explaining that the activities cited by the Committee did not violate those statutes. *See* Letter for the Hon. Darrell E. Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives, from W. Neil Eggleston, Counsel to the President (July 10, 2014). At that time, the White House also provided various documents reflecting its efforts to ensure that OPSO staff comply with relevant laws, including materials on the Hatch Act used in a mandatory training for all staff assigned to OPSO, e-mail correspondence demonstrating that OPSO staff were directed to read critical reports issued by the Office of Special Counsel and the Committee regarding the activities of the previous Administration's Office of Political Affairs, documentation of a meeting between lawyers from the White House Counsel's Office and the Office of Special Counsel concerning compliance with the Hatch Act, and a memorandum sent to all White House staff from the President's Counsel reminding them of the law governing political activity by federal employees. *See id.* at 3. Finally, the White House Counsel's Office offered

*Response to Congressional Subpoena Issued to Assistant to the President*

to brief the Committee to address any outstanding questions regarding OPSO's activities. *See id.*

After receiving these responses, the Committee, on Friday, July 11, 2014, subpoenaed Mr. Simas to testify at a public hearing on Wednesday, July 16. At the same time, the Committee indicated that it would accept the White House Counsel's Office's offer to brief the Committee, and would determine after the briefing whether to withdraw the subpoena for Mr. Simas's testimony. *See* Letter for W. Neil Eggleston, Counsel to the President, from the Hon. Darrell E. Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives (July 11, 2014). The White House provided that briefing on Tuesday, July 15, the day before the hearing was to occur. Following the briefing, the Committee indicated that Mr. Simas's testimony remained necessary. It explained that, during the briefing, White House staff "declined to discuss compliance with the Committee's document requests or even describe the process and identify relevant officials involved in the decision to reopen the White House political office." Letter for W. Neil Eggleston, Counsel to the President, from the Hon. Darrell E. Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives at 1 (July 15, 2014).

The Committee has not adequately explained why, despite the information it has already received concerning OPSO's activities and the White House's efforts to ensure compliance with relevant statutes, it requires Mr. Simas's public testimony in order to satisfy the legitimate aims of its oversight investigation. Although the Committee has now indicated that it needs additional information on two specific topics, it has not explained why it must obtain that information from Mr. Simas at a Committee hearing. And to the extent that the Committee has other "outstanding questions for Mr. Simas," *id.* at 2, the Committee has not identified them, let alone explained why he must answer them at a public hearing. At this point, it is not evident that further efforts at accommodation would be futile, and hence that compelling an immediate presidential adviser to testify before Congress is a justifiable next step. Because the Committee has not explained why (and it is not otherwise clear that) Mr. Simas's live testimony is "demonstrably critical" to the responsible fulfillment of the Committee's functions, we conclude that the Committee has not met the standard that would apply for overcoming Mr. Simas's immunity from congressional compulsion to testify, assuming that immunity were qualified rather than absolute.[4]

---

[4] Even if it were appropriate to apply the *Sealed Case* standard for overcoming qualified executive privilege in the context of congressional testimonial immunity, Mr. Simas's testimonial immunity would not have been overcome here. For the reasons set forth in the text, we do not believe that the Committee could show that the testimony it demands from Mr. Simas is directly relevant to issues that are central to the Committee's investigation *and* that the information that would be obtained through that testimony is not available from another source.

### III.

For the foregoing reasons, we conclude that Mr. Simas is immune from the House Committee on Oversight and Government Reform's subpoena to compel him to testify about matters concerning his service to the President in the Office of Political Strategy and Outreach.

KARL R. THOMPSON
*Acting Assistant Attorney General*
*Office of Legal Counsel*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, | |
| *Plaintiff,* | No. 19-cv-2379 (KBJ) |
| v. | |
| DONALD F. MCGAHN II, | |
| *Defendant.* | |

# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
COMMITTEE ON THE JUDICIARY,    )
UNITED STATES HOUSE    )
OF REPRESENTATIVES,    )
)    **Case No. 1:08-cv-00409 (JDB)**
*Plaintiff,*    )
)
v.    )
)
HARRIET MIERS, *et al.*,    )
)
)
*Defendants.*    )
_____)

## UNOPPOSED MOTION FOR VOLUNTARY DISMISSAL
## BY PLAINTIFF COMMITTEE ON THE JUDICIARY,
## UNITED STATES HOUSE OF REPREESENTATIVES

In light of the implementation of the settlement agreement between the parties in this matter - including the production and public release of documents and the completion of on-the-record interviews of Harriet Miers and Karl Rove in connection with the forced resignations of certain U.S. Attorneys during the administration of President George W. Bush and other matters - Plaintiff Committee on the Judiciary of the U.S. House of Representatives ("Committee") voluntarily moves this Court for an order dismissing the Complaint with prejudice. Consistent with the parties' written agreement, the Committee urges the Court to leave in place its opinion of July 31, 2008, which led to the settlement.

## BACKGROUND

On July 31, 2008, this Court issued a memorandum opinion and order rejecting the claims by defendants Harriet Miers and Josh Bolten of absolute immunity from congressional subpoenas; denying defendants' motion to dismiss; granting partial summary judgment to the

Committee; declaring that Harriett Miers is "legally required" to testify pursuant to a duly issued congressional subpoena from the Committee; and requiring Ms. Miers and Mr. Bolten to produce all non-privileged documents requested by the subpoenas and to provide to the Committee a description of any documents withheld on the basis of executive privilege. 558 F. Supp. 2d 53, 108 (D.D.C. 2008). Defendants took an interlocutory appeal of that decision to the U.S. Court of Appeals for the D.C. Circuit, and after this Court denied a stay pending appeal, a panel of the D.C. Circuit stayed this Court's order pending appeal. *See* 542 F.3d 909 (D.C. Cir. 2008).

During the pendency of the appeal, the parties agreed to resolve the dispute, as memorialized in an Agreement Concerning Accommodation (the "Agreement," attached to Letter from Gregory B. Craig, Counsel to the President, to the Hon. John Conyers, Chairman, Committee on the Judiciary, U.S. House of Representatives, and Emmet T. Flood, Counsel for President George W. Bush (Mar. 4, 2009), attached as Exhibit A). The Agreement provided, among other things, that Ms. Miers and Karl Rove would be made available for on-the-record interviews by the Committee regarding certain specified issues in connection with the forced removal of certain U.S. Attorneys and related matters; that the Committee would be provided with access to certain, specified documents; and that following the completion of the "last interview," copies of the interview transcripts and of documents provided to the Committee could be made public.

At the same time, the Committee entered into a separate Litigation Agreement with the Department of Justice as counsel for the defendants in their official capacities. *See* March 5, 2009 Letter from Irvin B. Nathan, General Counsel of the U.S. House of Representatives to Michael Hertz, Acting Assistant Attorney General for the Civil Division, U.S. Department of Justice, and responsive letter of March 5, 2009 from Mr. Hertz to Mr. Nathan (collectively, the

"Litigation Agreement," attached as Ex. B). The Litigation Agreement provided that "upon satisfactory completion of all of the terms set forth in" the Agreement, the "Department of Justice on behalf of the defendants-appellants . . . will move to dismiss the pending appeal with prejudice, and appellee will consent to that dismissal; once the U.S. Court of Appeals for the D.C. Circuit has dismissed the appeal with prejudice, the Committee will move in the U.S. District Court for the District of Columbia to dismiss its complaint with prejudice." Ex. B at 1. Pursuant to the Agreement, the parties jointly moved for a stay of briefing in the D.C. Circuit pending the implementation of the Agreement, and the Court of Appeals stayed the appeal. *See* Order, Case No. 08-5357 (D.C. Cir. Mar. 5, 2009).

After the appeal was stayed, and in accordance with the Agreement's terms, the Committee conducted the transcribed interviews of Ms. Miers (on June 15, 2009) and Mr. Rove (on July 7 and July 30, 2009) regarding the resignation of certain U.S. attorneys and related matters, and the Committee was provided with access to certain documents as contemplated by the Agreement.[1] Pursuant to the Agreement, the Committee on August 11, 2009 made available to the public the transcripts of the Rove and Miers interviews (which their counsel had been provided the opportunity to review for accuracy), as well as documents produced by the defendants.[2]

On October 8, 2009, the Department of Justice moved the D.C. Circuit to dismiss the appeal with prejudice, noting that the Agreement "has now been implemented." *Unopposed Motion for Voluntary Dismissal,* Case No. 08-5357 (D.C. Cir. Oct. 8. 2009). On October 14,

---

[1] These on-the-record interviews were subject to the proscriptions of 18 U.S.C. § 1001 that apply to witnesses in an investigation by a congressional committee.

[2] *See* http://judiciary.house.gov/news/090811.html (announcement of release on Committee's website of Rove and Miers interview transcripts, and of over 5,400 pages of Bush administration documents, and link to electronic copies of those materials).

2009, the Court of Appeals entered an order granting the Department's motion and dismissing the appeal.  Order, Case No. 08-5357 (D.C. Cir. Oct. 14, 2009), *certified copy docketed in this action,* Oct. 19, 2009.

## UNOPPOSED PROPOSED RELIEF

In accordance with the terms of the above-described Litigation Agreement, *see* Ex. B, the Committee now moves this Court to dismiss the Complaint with prejudice.  John Tyler of the Department of Justice has authorized us to state that the Department concurs in the request for a dismissal of the Complaint with prejudice.

In dismissing the Complaint, it would be inappropriate for the Court to vacate its July 31, 2008 memorandum opinion.  As reflected in the Litigation Agreement, while the Department of Justice purports to disagree with the Court's July 31, 2008 opinion, the Department will not seek vacatur of the opinion on mootness or related grounds, *see* Ex. B; the Committee urges the Court not to vacate its opinion.  Vacatur would, in any event, be improper because the mootness of this case is "by reason of the losing part[ies] having entered into a settlement of the underlying controversy," and "th[ose] part[ies] 'ha[ve] voluntarily forfeited [their] legal remedy by the ordinary processes of appeal,'" and "'thereby surrender[ed] [their] claim[s] for equitable remedy of vacatur'" of this Court's opinion.  *Mahoney v. Babbit*, 113 F.3d 219, 221 (D.C. Cir. 1997) (quoting *U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994)).

## CONCLUSION

For the foregoing reasons, the Committee requests that the Court dismiss the Complaint in this action with prejudice.  A proposed order is attached.

Respectfully submitted,

/s/ Irvin B. Nathan
IRVIN B. NATHAN, D.C. Bar # 90449
General Counsel
KERRY W. KIRCHER, D.C. Bar # 386816
Deputy General Counsel
ARIEL B. WALDMAN, D.C. Bar # 474429
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

Counsel for Plaintiff Committee on the Judiciary
of the U.S. House of Representatives

Dated: October 22, 2009

<u>CERTIFICATE OF SERVICE</u>

On October 22, 2009, I caused a copy of the *Unopposed Motion for Voluntary Dismissal by Plaintiff Committee on the Judiciary, United States House of Representatives* to be filed with the Court and served on counsel for all parties through the Court's ECF/CM system.


<u>/s/ Ariel B. Waldman</u>
Ariel B. Waldman

# Exhibit A

## Case No. 1:08-cv-00409

THE WHITE HOUSE

WASHINGTON

March 4, 2009

Dear Chairman Conyers and Mr. Flood:

I have enclosed with this letter an Agreement Concerning Accommodation (the "Agreement") that outlines a plan to resolve a dispute that arose during President Bush's Administration concerning the enforcement of Committee subpoenas. Both the Bush Administration and the House Judiciary Committee have confirmed to me orally and in writing that they have accepted the terms of the enclosed Agreement. Both the Bush Administration and the Committee also have committed to work in good faith to resolve any issues or questions that may arise during the execution of the Agreement. My Office will continue to work with both parties to implement the Agreement.

President Obama is pleased that the parties have agreed to resolve this matter amicably, and he appreciates the work of the Committee, its staff, and the former Bush Administration.

Please contact me with any questions.

Sincerely,

Gregory B. Craig
Counsel to the President

Enclosure

Hon. John Conyers Jr.
Chairman, Committee on the Judiciary
U.S. House of Representatives

Emmet T. Flood, Esq.
Counsel for President George W. Bush

# Agreement Concerning Accommodation

*Committee on the Judiciary, US House of Representatives v. Harriet Miers et al.*
Civil Action No. 08-0409 (JDB)

This document describes the terms of an accommodation agreement between the Bush Administration and the House Judiciary Committee to resolve the U.S. Attorneys matter finally. The parties agree in good faith to resolve any outstanding questions with a view toward ending the entire matter between the parties. The Obama Administration and the House Judiciary Committee will execute a separate agreement concerning the final disposition of the ongoing litigation.

Interviews

- The House Judiciary Committee (the "Committee") will interview Karl Rove and Harriet Miers, but there will be no additional interviewees / witnesses (subject to the one exception below). The interviews will be conducted as soon as possible, consistent with needed preparation time and the availability of the witnesses and their counsel. After the conclusion of the interviews, the Committee reserves its right to seek public testimony from Mr. Rove and Ms. Miers.

    o The Committee has no current intention to seek interviews of any additional former Bush White House personnel. However, if information comes to light necessitating an interview from former Bush White House official William Kelley, the interview will be conducted pursuant to the terms of this agreement.

- Transcripts of interviews will be created and promptly provided to all involved parties.

- The scope of the interviews will be limited to: (1) facts relating to the evaluation of, decision to dismiss, or decision to replace the former U.S. Attorneys in question; the alleged decisions to retain certain U.S. Attorneys; and any allegations of selective prosecution related thereto; and (2) testimony or representations made by Department of Justice officials to Congress on the U.S. Attorneys matter. For the period beginning on March 9, 2007 (the date of the Committee's first written demand for information from the White House), interviews will not include the content of conversations involving: (i) Mr. Rove and members of the White House Counsel's office; or (ii) Ms. Miers and members of the White House Counsel's office. In the case of Mr. Rove, the interview also will include facts relating to the prosecution of Alabama governor Don Siegelman.

- As to official privileges, counsel will direct witnesses not to respond to questions only when questions relate to communications to or from the President or when questions are outside the scope of questioning set forth above.

- The following counsel may attend the interviews: counsel for the interviewee, Committee majority, Committee minority, the President, and the former President.

- Interviewees will be allowed a reasonable period of time to review relevant documents in advance of the interview.

- Reasonable logistical details (*e.g.*, venue, time limitation, etc.) will be set in advance.

Documents

- With the exception of 4 pages of particularly sensitive privileged material (which will be described for Committee staff by a representative of the former President), Committee staff (majority and minority) will be allowed to review the documents for the period December 2004 through March 8, 2007. Documents subpoenaed by the Committee from Harriet Miers will be treated in the same manner.

- The foregoing documents will be provided to Committee staff (majority and minority) at a reasonable time in advance of the interviews.

- As to documents post-dating March 8, 2007, the following will be made available for Committee review only and a copy will not be produced to the Committee:

    - The final draft of the Scudder Memorandum;

    - Any factual chronology prepared by the Department of Justice Office of Legal Counsel in the possession of the White House; and

    - Any documents showing White House inputs or edits to Congressional testimony of Department of Justice officials on the subject of the U.S. Attorneys matter.

    Copies of the aforementioned documents will be made available for the Committee's use during interviews conducted pursuant to this agreement. The Committee will return and will not retain any such copies at the conclusion of the respective interviews.

- In addition, the former Administration will conduct a timely review to identify: (1) any documents sent to/from White House personnel to/from third parties other than Department of Justice personnel; and (2) any documents referenced in the aforementioned Scudder Memorandum or OLC chronologies shown to the Committee. The former Administration will consider making some or all of the above material available to the Committee (in the same manner as the other post-March 8, 2007 documents described above). This process will be completed and the issue resolved prior to the interviews described in this agreement.

- Documents and their contents will remain confidential through the time of completion of the last interview. At that time, copies of documents provided to the Committee and/or contents of documents reviewed by the Committee may be made public. The transcripts discussed above may be made public after the completion of the last interview and after counsel has had a reasonable opportunity to review them for accuracy. No document or part of any document and no description or partial description of any document shall be disclosed to any other person until after the completion of the last interview.

<u>Litigation</u>

- The existing litigation will be stayed or the briefing schedule extended in such a way as to serve as the equivalent of a stay until at least the completion of the interviews.

- The Committee retains its rights to challenge any assertion of privilege over questions and documents for the period December 2004 through March 8, 2007.

- The Committee will not argue that this accommodation operates as a bar or waiver of the current or former Administration's existing rights, including but not limited to the right to argue jurisdictional objections, claims of immunity, or claims of executive privilege

# Exhibit B

## Case No. 1:08-cv-00409

IRVIN B. NATHAN
GENERAL COUNSEL

KERRY W. KIRCHER
DEPUTY GENERAL COUNSEL

CHRISTINE DAVENPORT
ASSISTANT COUNSEL

JOHN D. FILAMOR
ASSISTANT COUNSEL

RICHARD A. KAPLAN
ASSISTANT COUNSEL

KATHERINE E. McCARRON
ASSISTANT COUNSEL

U.S. HOUSE OF REPRESENTATIVES
OFFICE OF THE GENERAL COUNSEL
219 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6532
(202) 225-9700
FAX: (202) 226-1360

March 5, 2009

**VIA E-MAIL and HAND DELIVERY**

The Honorable Michael F. Hertz
Acting Assistant Attorney General
 for the Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Re: <u>Committee on the Judiciary, U.S. House of Representatives v. Harriet Miers, et al.</u>

Dear Mr. Hertz:

This letter memorializes our agreement regarding the disposition of the above-referenced litigation between the Committee on the Judiciary of the U.S. House of Representatives ("Committee") and former White House Counsel Harriet Miers and former White House Chief of Staff Joshua Bolten. As you are aware, on or about March 4, 2009, the Committee and the Bush Administration entered into an agreement – as set forth in the attached Memorandum – which contemplates the interviews of Ms. Miers and Karl Rove as well as the production of certain documents to the Committee, among other things. The understandings set forth in this letter are meant to complement that accommodation agreement.

Upon completion of the process set forth in the attached Memorandum, the Committee and the Obama Administration, including the Department of Justice, as counsel of record for the defendants-appellants Ms. Miers and Mr. Bolten in their official capacities, hereby agree to the following actions promptly upon satisfactory completion of all of the terms set forth in the attached Memorandum:

1. The Department of Justice on behalf of the defendants-appellants in the above-referenced matter will move to dismiss the pending appeal with prejudice, and appellee will consent to that dismissal; once the U.S. Court of Appeals for the D.C. Circuit has dismissed the appeal with prejudice, the Committee will move in the U.S. District Court for the District of Columbia to dismiss its complaint with prejudice.

2. The Executive Branch disagrees with the district court's decision in this case, but the Department of Justice on behalf of the defendants-appellants has decided not to move to vacate or set aside on the ground of mootness or any related doctrine

the district court's decision of July 31, 2008, in the above-referenced litigation, if the complaint is dismissed pursuant to the above paragraph.

This agreement will not be modified, except upon a writing signed by counsel for the Committee and the Department of Justice.

Please indicate your acceptance of the terms and conditions outlined herein by return letter. Thank you for your courtesy and attention.

Sincerely,

Irvin B. Nathan
Litigation Counsel for the
Committee on the Judiciary of the
U.S. House of Representatives

Enclosure

cc: Gregory B. Craig
Counsel to the President

Perry Apelbaum
Chief Counsel, Committee on the Judiciary



**U.S. Department of Justice**

Civil Division

---

*Office of the Assistant Attorney General*          *Washington, D.C. 20530*

March 5, 2009

Irvin B. Nathan, Esquire
General Counsel
U.S. House of Representatives
Washington, D.C. 20515

     Re:    <u>Committee on the Judiciary, U.S. House of Representatives v. Harriet Miers, et al.</u>

Dear Mr. Nathan:

    I am in receipt of your letter of this date regarding the disposition of the above-referenced litigation. The Department of Justice, on behalf of the defendants, hereby accepts the terms of the agreement set forth in that letter.

                    Sincerely,

                    Michael F. Hertz
                    Acting Assistant Attorney General

cc:    Gregory B. Craig
       Counsel to the President

       Perry H. Apelbaum
       Chief Counsel, Committee on the Judiciary

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff,*

v.

DONALD F. MCGAHN II,

*Defendant.*

No. 19-cv-2379 (KBJ)

# EXHIBIT G

# THE EXECUTIVE OFFICE AS ADMINISTRATIVE COORDINATOR

JOHN R. STEELMAN* AND H. DEWAYNE KREAGER†

The Executive Office of the President is the formal title given to the President's personal staff and personal staff agencies.[1] Their purpose, of course, is to provide assistance of the most intimate sort to the President in carrying out the responsibilities of his office. Accordingly, the role of the Executive Office is determined by the very nature of the President's job, and, always, by the personality and work habits of the incumbent chief executive.

The President of the United States, in terms of his constitutional powers, plus the accumulation of statutory authority vested in his office by a succession of Congresses, is probably the most powerful single individual in the world today. And when the President succeeds in marshalling the full power of his office, he is virtually irresistible. Every President since the First World War, at one time or another, has exercised the full measure of this power—legal and political. Similarly, no President in that same period has been able to avoid completely the frustration of being unable to bring that full power to bear on occasion in some crucial situation.

The President is two personalities. He is a private individual in his own right who has few opportunities to exercise the privileges of privacy; and a public official of superlative rank who simultaneously wears five executive hats, all of which label him with power and none of which permit him privacy. He is at once the head of the executive branch of the Government, the Commander-in-Chief of the Armed Services, the leader of his political party, the ceremonial head of the State, and his country's decision-making spokesman in the critical do-or-die arena of world politics.

Since the subject of this discussion is the role of the Executive Office in relation-

* A.B. 1922, Henderson Brown College, A.M. 1924, Vanderbilt University; Ph.D. 1928, University of North Carolina. Dr. Steelman was the first to occupy the top White House staff post, The Assistant to the President, which he filled for nearly seven years under President Truman. His Executive Office roles, filled simultaneously with his White House post, have included: Director of the Office of War Mobilization and Reconversion, 1946; Acting Chairman of the National Security Resources Board, 1948-50; and Acting Director of the Office of Defense Mobilization, 1952. Director of the U. S. Conciliation Service, 1937-44. He is now an Industrial Consultant in Washington, D. C., and publisher of a chain of local newspapers in Maryland.

† A.B. 1934, A.M. 1935, State College of Washington; graduate assistant in government, 1935-36, Duke University; Ph.D. 1947, Harvard University. A sixteen-year career public servant, Dr. Kreager served six years in the Executive Office of the President: Executive Secretary of the National Security Resources Board, 1948-50; Executive Officer of the Office of Defense Mobilization and Executive Secretary of the President's National Advisory Board on Mobilization Policy, 1951-53. Since 1953, associated with Dr. Steelman as a Washington Industrial Consultant.

[1] 53 STAT. 561 (1939), 5 U. S. C. §§ 133-133r, 133t note (1952); Exec. Order No. 8248, Sept. 8, 1939, 3 C. F. R. 576 (Cum. Supp. 1943). The Executive Office includes currently the White House Office, Bureau of the Budget, Council of Economic Advisers, National Security Council (including the Central Intelligence Agency and Operations Coordinating Board), Office of Defense Mobilization, and the President's Advisory Board on Government Organization.

ship to the President's job as head of the executive branch of the Government, it is important to note that, for all the symbols of power, real and psychological, and for all the tremendous sources of strength which are his to tap within the executive branch of the government and his own official family, his power is generally effective only so long as he does not have to use it.

While a rule of thumb to the effect that a President's authority within his own branch of the government is good only so long as he does not have to use it is not always true, it is of sufficient importance in critical official family situations to serve as a point of departure for this inquiry. Child psychologists who teach psychological persuasion rather than woodshed practicality are Johnny-come-latelys compared to generations of Presidents and presidential assistants who have learned the hard way, that patience and connivance are often better than direct use of the presidential razor strap in dealing with the executive family.[2]  In carrying out the President's job as chief executive, "coordination" is often a much better attitude than "direction." Seldom does the President direct. More often he persuades, sometimes in person, more frequently through his key assistants. Generally, his so-called directives, most of them embodied in Executive Orders, are the product of painstaking weeks of coordinative effort undertaken by his principal staff assistants among his executive subordinates in order to achieve a general meeting of minds before his signature is ever placed upon what in the process has become largely an inoffensive document.

This is not to suggest that knuckles are not sometimes rapped in the process. They are, seldom by the President, but almost always by key assistants who exercise the threat rather than the actuality of presidential power. This leads to the conclusion that there is a considerable amount of art mixed up with the science of running the executive branch of the Government. Effectiveness is much more dependent upon the personal skills of the President and individual top associates than upon forceful application of presidential authority or on the hierarchy of a formal organization chart.

### Presidential Authority and Its Limitations

No President has ever completely avoided the often disastrous reaction against his administration or against him personally as a result of his direct use of executive authority as the boss of the executive branch. Franklin D. Roosevelt's ambivalent settlement of the historic 1943 dispute between Vice President Henry Wallace and Commerce Secretary Jesse Jones, over handling of the Government's wartime procurement programs abroad, is a Washington legend. In that dramatic executive action, Mr. Roosevelt fired the Vice President from his job as Chairman of the Board of Economic Warfare and displaced Secretary Jones as Chairman of the Reconstruction Finance Corporation, a role that put him in charge of the purse

[2] By "executive family" is meant primarily the members of the cabinet and heads of other government agencies, plus key staff members in the White House Office and the agencies of the Executive Office of the President.

strings that controlled the procurement policy programs developed by Wallace's organization. Many of the personal wounds suffered in that battle have never healed. In addition, the administrative headaches resulting from the considerable number of staff resignations in both agencies following the President's action, created an administrative crisis that required months to resolve.

As an administrator, Franklin D. Roosevelt was often criticized for his inability to fire subordinates, for his tendency to solve organizational problems in the executive branch by permitting an existing official or agency to die on the vine while he created a parallel entity to take over the functions thus ignored. Duplications, particularly in the areas of labor, public works, and social welfare, were common in the organizational façade of the Roosevelt administration. Oddly, on closer examination, this "inability" must be counted a real ability on the part of the Depression and Second World War President frequently to resolve problems by ignoring them. This was a subconscious recognition of the basic management principle that little problems become big problems when an important official recognizes them and thereby lends them the importance of his personal prestige.

Many teachers of executive management, efficiency experts of the industrial school, will disapprove the idea of an executive who fails to grasp each problem firmly and forcefully as it arises. In terms of cold statistical efficiency, in the command decision structure of military organization, in the profit-directed practicality of an industrial corporation, or in the pragmatic realism of an authoritarian society, resort to finesse rather than direct action could be a weakness. But the President is neither a statistic nor a box in an organization chart. His effective strength lies in his ability to be human and, above all, in his capacity for being President of all of the people most of the time. Within the framework of American democratic society, with the President standing alone as a man in a fishbowl, with the President's every word and act capable either of supporting or weakening his administration, the techniques of compromise and coordination rather than coercion have special virtues. The very government he commands is founded upon the principles of the right of men to disagree and the achievement of progress through effective compromise. His job is to lead, not to demand. Any public official of importance, the President most of all, must remain *persona grata* not only to the public, but to his official associates if he is to retain his ability for leadership.

Franklin D. Roosevelt's ability to beat a strategic political retreat on occasion, his willingness to accept a partial program rather than a full program in order to avoid losing an entire objective, represents the master touch in politics. He used the same technique in his relationships with his official executive branch family, a subtle mixture of cajolery, coercion, and coordination, seasoned with overtones from his popular public personality, to keep the gigantic machinery of public administration moving in a desired direction. Some professional management experts and students of public administration may quarrel with FDR's techniques as an administrator, but they cannot deny results in terms of his ability to survive on the

rough and tumble political scene, or the enormous impact of the programs born in his tenure which are now a permanent part of the structure of American government.

From the administration of President Harry S. Truman, perhaps the best known example of the negative results that can stem from direct use of presidential authority lies in the famous steel industry seizure case of May, 1952. That action provided a dramatic and practical example of the difference between the "real" authority and the "legal" authority vested in the President. From the moment the Government took over supervision of the steel industry in order to avoid a strike deemed disastrous to the Korean War effort, there was no question concerning the President's practical authority to take over the steel industry and keep it operating under government jurisdiction. The industry was seized, and it stayed seized until the Supreme Court made a legal determination on June 2, 1952, to the effect that the President's act of seizing the industry was unconstitutional.[3] The President's efforts were a sincere attempt to serve the public interest, and no other President has tried to look more objectively at the public interest or stood more in respect and humility before it. The net loss to the American system of government in this case lies in the fact that it did result in a Supreme Court decision placing a specific limitation upon the powers of the Presidency. The same loss would have resulted had the Court's decision been to support the President's action, thereby giving the imprimatur of the Supreme Court to unlimited coercive action by a future President.

Within the framework of the rigid structure of American government, with elected public officials serving definite and limited terms of office, the ability to respond effectively to national need and public demand (the two cannot always be the same) frequently rests only in the flexible powers of the Presidency. When national emergency demands action and there is no precedent to follow, only the President can move quickly to avoid crisis. In a practical sense, the power of the President to act in the national interest is limited only by the extent of action that public opinion permits him to take. Frequently the technique used, rather than the action taken, is the controlling factor on public opinion. Were we to build up a body of court decisions that specifically restrict the powers of the President to act in time of emergency, the value of flexible leadership vested in the office could be lost, with a corresponding real danger to the survival of the American system of goverment.

President Eisenhower and his new team also learned, and bitterly, the embarrassment inherent in direct exercise of executive authority in the process of the now famous Dixon-Yates case. When the President permitted himself to become personally identified with the decision to award the Government's contract for power needs to the Dixon-Yates combination, the matter became a national issue. Here was a relatively routine problem which achieved major status because it became identified with an important—the most important—public official. It can be demonstrated that this use of presidential authority actually cost the Republican Party

[3] Youngstown Sheet and Tube Co. v. Sawyer, 343 U. S. 579 (1952).

control of the Senate in the Eighty-fourth Congress. In the months preceding the 1954 congressional elections, neither side had been able to make an issue of the public power question. Suddenly, the President's Dixon-Yates decision dramatized the struggle between the public and private power forces. What had been an absent issue became very much present when accorded the white heat of publicity attendant upon its personal identification with the President. It is reasonable to conclude that reaction to the Dixon-Yates decision influenced enough votes in power-conscious Oregon to swing the narrow margin in favor of the Democratic candidate.

Old experienced hands, with years of seasoning behind them in the White House or in the Executive Office of the President, were astonished at President Eisenhower's direct participation in the Dixon-Yates case. It was not the decision itself that was so unusual, but the fact that the President's administrative team had caused or permitted him to become identified personally with the matter. It could be argued that given a few months more time, the administration would have been able to effect sufficient new appointments to both the Atomic Energy Commission and the Board of the Tennessee Valley Authority to arrange for the desired decision to be taken at that lower level without directly involving the President. Here is another classic example of a case in which full use of the President's personal executive powers defeated rather than achieved a basic objective of an administration. It was not the nature of the decision that was so important, but the mere fact that it was the President who made it.

The above examples, drawn from the last three administrations, cannot be said to deny the effectiveness of direct use of the President's management authority within the executive branch in all situations, but they, and many others like them, have created the atmosphere within which the staff of the Executive Office of the President works. Necessarily, the staff acquires an acute awareness of the extreme vulnerability to public opinion of both the President and his office. A protective attitude toward both is the inevitable result. Staffs seek to effectuate management decisions, whenever possible, at levels short of the President himself. This technique has the double advantage of keeping him out of controversial situations and also reducing demands upon his time. When actual use of the President's personal authority becomes unavoidable, the objective is to make every effort to insure that his signature is placed only on documents that represent completed staff work, implying that areas of potential conflict have been resolved.

The staff job of the Executive Office agencies, while largely one of coordination between the office of the Presidency and the key officials of the executive departments and agencies who are his subordinates, also frequently involves a careful sounding of public or political reaction in advance of presidential action. But the objectives of this study are limited to the management of the executive branch and do not include the political or public relations aspects of his office.

### ORGANIZATION DIFFERENCES IN THE EXECUTIVE OFFICE

Technically, as a brief glance at the appropriate pages in any recent *Con-*

*gressional Directory* will show,[4] the Executive Office of the President includes everything and everyone attached to the Presidency other than the President himself and his Army, Navy, and Air Force Aides.[5] Thus, the White House Office per se is a part of the Executive Office. In practice, however, official Washington—the Congress, the executive departments and agencies, the press—draws a rather clear line of distinction between the White House Office and the rest of the agencies that comprise the Executive Office. While organizational fact does not make such a distinction, operational practice has led to an unofficial reality in which there are essentially two recognized organization entities serving the President: the White House staff *and* the Executive Office of the President.

Traditionally, the agencies of the Executive Office—for example, the current Bureau of the Budget, Office of Defense Mobilization, and Council of Economic Advisers, and several now nonexistent agencies[6]—have each had a single head. This single-executive organizational structure, providing one official through whom communications are maintained with the President, lends itself to the "agency concept" of such bodies. Such organization stands in contrast with the traditional structure of the White House Office, within which each key member has functioned normally on an informal basis of direct relationship with the President. This character of relationship within the White House Office and the Executive Office was common to both the Roosevelt and Truman administrations. Senior status accrued to certain individuals whose higher rank was generally recognized, but for all intents and purposes, the White House Office functioned as a group of senior staff assistants who had direct access to, and operated directly through, the person of the President himself.

The Eisenhower administration, through conversion of the top White House position, The Assistant to the President,[7] to that of a chief of staff, has brought about more of an "agency" status to the White House Office than has characterized that body in the past. In any organization, public or private, the group closest to the top executive evolves in a schematic pattern that most fits the wishes and past administrative experience of the man at the top. President Eisenhower's military background undoubtedly accounts for the creation of the chief of staff approach to operation of the White House Office. Whether this change in organization continues in the future depends entirely, of course, upon the preferences and the personality of the next incumbent of the Presidency.

The difference between the White House Office and the Executive Office of

---

[4] For instance, CONGRESSIONAL DIRECTORY 379-83 (1956).

[5] The White House Residence staff is not included.

[6] Among the no-longer-existing agencies: National Security Resources Board, National Resources Planning Board, Office of the Director for Mutual Security, and the Office for Emergency Management.

[7] The position of "The Assistant to the President" came into being formally under President Truman and was occupied throughout his terms of office by Dr. John R. Steelman. Essentially, the position is the outgrowth of assignments made to the succession of Directors of the Office of War Mobilization, later the Office of War Mobilization and Reconversion, James F. Byrnes, Fred Vinson, John W. Snyder, and John R. Steelman.

the President assumes some degree of geographical confirmation in the sense that their offices are physically separated. During the Truman administration, the old State-War-Navy Building, directly across West Executive Avenue from the west wing of the White House, was renamed the Executive Office Building and taken over to house the Executive Office agencies. Actually, several members of the White House Office are located in the latter building, but the assumption within Washington bureaucracy is that such officials are "camping out" simply because there is not enough room to provide them with suitable offices in either the west or the east wings of the White House itself.[8]

The President's White House Office staff—The Assistant to the President, his chief counsel, his appointments, press and correspondence secretaries, his legislative aide, the cabinet secretary, the six anonymous administrative assistants to the President, and other high ranking special assistants—is identified both with the President as an individual and with the office of the President as an organizational entity. With infrequent exceptions, it is from this staff that key officials are selected to accompany the President on his travels, both business and vacation. When members of the White House staff speak publicly, they do so only as spokesmen for the President, not in terms of their personal positions. Veteran members of the White House press corps recognize this close association with the person of the President and generally accord members of the White House Office immunity from direct quotation in the press. The fact of the White House Office staff as a part of the Presidency receives its highest recognition in the traditional treatment accorded it by the Congress, which seldom seeks to require members of the President's staff to testify before congressional committees. Exceptions to this rule are rare.

In contrast, the personnel of the other agencies of the Executive Office of the President are regarded as staff to the office of the Presidency rather than to the President personally. This comparison draws a rather fine line, for, as in all organizations, there are key members of the Executive Office organization who, by virtue of their competence and their personable qualities in the President's opinion, achieve a more personal relationship. However, if we are to explore effectively the role of the Executive Office as a coordinating medium in the operation of the executive branch of the government, this impersonal characteristic must be seen and understood. Members of the staffs of agencies in the Executive Office do testify frequently before congressional committees in terms of their official positions, and in so doing, they are not regarded as committing the President. They make speeches in their own right. They are often quoted directly in the press and, in fact, operate their own press relations staffs apart from the White House press office to handle official news releases relating to operations of their agencies. Heads of Executive Office agencies function much as do heads of major government departments or

---

[8] For example, W. Averell Harriman, while Special Assistant to President Truman in the White House, had his offices in the Executive Office Building in conjunction with his headquarters staff for the Mutual Security Program. Numerous Special Assistants to President Eisenhower have been officed in the Executive Office Building.

independent agencies, except that their actions, within the executive branch, are manifestations supporting or stemming from the authority of the office of the Presidency. From time to time the President may see fit to delegate actual executive authority over segments of the executive branch to the head of an Executive Office agency. Such was the case in the creation of the Office of Defense Mobilization at the time of the Korean War. But the complete control of the President over the proffer or withdrawal of such authority is never in doubt.[9]

Congressional inroads on the President's right to absolute control over the appointment of his key staff assistants is the object of frequent expert criticism.[10] Within his White House Office staff, this right has never been questioned. Appointments are made independently of any senatorial approval. Within the Executive Office, the reverse is frequently true, for there the heads of staff agencies, albeit part of the President's official staff organization, are sometimes subjected to senatorial approval,[11] a factor which diminishes the finality of the President's authority over such subordinates.

Another important difference is the matter of tenure of office in the White House as contrasted to the Executive Office. Invariably, the top White House staff leaves when the President goes out of office, most often as of the date of the inauguration of a new administration, and never later than the period necessary to "assist in the transition of one administration to the other." While it is customary for heads of other Executive Office agencies to submit resignations to coincide with the termination of a presidential term of office, these resignations are not always accepted. Actually, key members of the staffs of Executive Office agencies, other than the White House Office, tend to stay on.[12] This is a most important factor in the continuity of government and is a principal ingredient in the growing strength and prestige that has accrued to Executive Office agencies over the years. It is true that staff mortality was exceedingly high in the Council of Economic Advisers after January 20, 1953, but this situation did not apply in the Bureau of the Budget, the Office of Defense Mobilization, or the National Security Council. For the most part, within the Executive Office, the continuity of interagency coordination, in terms of permanency

[9] A notable exception to direct presidential authority over the head of an Executive Office agency, and, for that reason, a direct intervention by the Congress in presidential prerogatives, is the statutory grant of authority to the Director of the Bureau of the Budget regarding quarterly allocations to the departments and agencies of annual appropriations. See Budget and Accounting Procedures Act, 1950, 64 STAT. 765 (1950), 31 U. S. C. § 665 (1952). While a confirmation by the Congress of a previous Executive Order, the statutory enactment does now prevent the President from altering the assignment.

[10] Notably the Commission on Organization of the Executive Branch of the Government (Hoover Commission). See the Report entitled "General Management of the Executive Branch," Feb. 1949, Recommendation No. 3: "The President should not be prevented by statute from reorganizing the President's Office and from transferring functions and personnel from one part of it to another"; and Recommendation No. 4: "The head of each staff agency in the President's Office should be appointed by the President without confirmation by the Senate except the Civil Service Commission." *Id.* at 15-16.

[11] The Director of the Office of Defense Mobilization requires senatorial approval. 64 STAT. 816 (1950), as amended, 65 STAT. 139 (1951), 50 U. S. C. App. § 2153(b) (1952).

[12] For example, James S. Lay, Jr., has been Executive Secretary of the National Security Council under both the Truman and Eisenhower administrations. This continuity is also true for several of the Assistant Directors in the Bureau of the Budget and the Office of Defense Mobilization.

of tenure for key Executive Office personnel, continued through the shift from the Truman to the Eisenhower administration. However, under the military staff concept of the Eisenhower administration, the Executive Office agencies do not play as weighty a role in the operation of the executive branch as under the Truman administration. Nevertheless, the expert knowledge and experience of staff are still there to be tapped as needed.

## HISTORY OF THE EXECUTIVE OFFICE

Historically, the Executive Office of the President as a formal organization dates only from September 1939.[13] Like most formal organizations, rather than being created, it evolved. This evolution grew out of the growing demands upon the job of the Presidency, the incredible pyramiding of responsibility of the chief executive in a modern industrial world in which all aspects of government are constantly reaching more and more into the lives of individual citizens and further and further afield into the international political arena. Meanwhile, until 1939, the "executive suite" at 1600 Pennsylvania Avenue, had not been enlarged to cope with these growing responsibilities.

The first serious consideration, in modern times, of the problems of managing the executive branch came in 1921 from the discussions that resulted in the Budget and Accounting Act of that year.[14] The great concern at the time was the growing complexity of the Government's fiscal management problems, a direct result of expansion in the scope and nature of American government occurring during the First World War. The 1921 act made two significant contributions to better management: it created the General Accounting Office, as an agency of the Congress, to do a post-audit function for the Congress in checking on the performance of the executive branch, a role never truly filled by that agency; and it set up within the Department of the Treasury a Bureau of the Budget, with a Director appointed by and responsible to the President, whose primary function was that of assembling and codifying the annual budget requests of the many separate agencies so that the President, as chief executive, could present to the Congress a single administrative budget. Obviously, the primary concern of the Congress in the 1921 act was its own convenience, the President's office, per se, receiving little actual attention.

The new budget office in the Treasury was a move in the right direction, for in the process of providing convenience to the Congress through the submission of a single coordinated budget, it also provided (not by design) the President with a management arm through which he could take an advanced and detailed look at what his ambitious cabinet subordinates were planning to do. But the difference in governmental tempo between 1921 and 1939, at which time the Executive Office was actually created, requires some understanding. The memory of a Washington elder statesman, long prominent in the art and science of public management, helps us in this regard. He recalls an afternoon spent at the White House on a social call to

[13] Reorganization Plan No. 1 of 1939, 53 STAT. 561 (1939), 5 U. S. C. §§ 133, 133r, 133t note (1952), Exec. Order No. 8248, 3 C. F. R. 576 (Cum. Supp. 1943).
[14] Budget and Accounting Act of 1921, 42 STAT. 20 (1921), 31 U. S. C. §§ 11-16 (1952).

President Coolidge in the latter's second term, when the only official business trans-
acted was for the President to select from a group of recent photographs of his person
those he wanted printed.  By the late thirties, President Roosevelt's New Deal, the
war against depression, had so magnified the complexities of executive management
that the President simply did not have time to do many of the important tasks ex-
pected of him.  Prior to 1939, the growing demands of the White House for addi-
tional personnel had been met largely through the ruse of borrowing personnel from
the executive departments, which were required to keep such loaned personnel on
their own payrolls.  A notable example was the post of Under Secretary of the
Interior, which, by custom, had come to be regarded as the position held by the man
who actually filled the full-time role of the President's chief liaison officer with the
Congress.

The quiet afternoon example cited above from the days of the Coolidge admin-
istration notwithstanding, the complaints of Presidents over the excessive burdens of
their office are not limited to the post-Second World War era.[15]  Two factors com-
bined during the depression years to concentrate attention on the organization of
the President's own office.  First, the complex social and economic programs of the
New Deal, which created many new programs and new agencies, with a consequent
increase in the number of officials reporting directly to the President.  Second, the
depression, which simultaneously decreased employment opportunities in private
industry and established the federal government as the nation's principal employer,
brought into government ranks many experienced managers from private business.
How best to manage the then dominant executive branch became a favorite Wash-
ington luncheon and dinner conversation topic.

Late in his first term of office, President Franklin D. Roosevelt appointed a
President's Committee on Administrative Management to make a study and to report
to him on the organizational changes required to provide for more effective co-
ordination and direction of the executive branch.  The resulting report,[16] submitted

[15] See President Franklin D. Roosevelt's letter of Jan. 12, 1937, transmitting to Congress the Report
of the President's Committee on Administrative Management: "I am not the first President to report
to the Congress that antiquated machinery stands in the way of effective administration and of adequate
control by the Congress.  Theodore Roosevelt, William H. Taft, Woodrow Wilson, and Herbert Hoover
made repeated but not wholly successful efforts to deal with the problem."  And ". . . they say, what
has been common knowledge for 20 years, that the President cannot adequately handle his responsi-
bilities; that he is overworked; that it is humanly impossible, under the system which we have, for
him to carry out his constitutional duty as Chief Executive, because he is overwhelmed with minor
details and needless contacts arising directly from the bad organization and equipment of the Government.
I can testify to this.  With my predecessors who have said the same thing over and over again, I
plead guilty."  REPORT OF THE PRESIDENT'S COMMITTEE ON ADMINISTRATIVE MANAGEMENT [hereinafter
cited BROWNLOW REPORT] iii, iv (1937).

[16] BROWNLOW REPORT, op. cit. supra note 15.  Members of the Committee were: Louis Brownlow,
Chairman, Charles E. Merriam, and Luther Gulick.  The Report was submitted to the President on Jan.
8, 1937, transmitted to the Congress five days later, but required nearly two years for fruition of its
principal recommendations regarding reorganization of the President's office, through the medium of the
Reorganization Plan No. 1 of 1939.

See also Somers, The President as Administrator, 283 ANNALS 104, 106 (1952): "The Committee's
signal contribution was its sharp portrayal of the Presidency as the pivot of federal administration, all
other aspects being secondary."

to the President and the Congress in January 1937, is one of the most remarkable public management documents ever written. Called the "Brownlow Report," after its chairman, Louis J. Brownlow, the document is now out of print, but still serves as a bible on administrative management in schools of public administration. Less extensive in its coverage, and now less well known than the more current and equally outstanding reports of the first Hoover Commission,[17] beginning in 1949, the Brownlow study limited its attention to the so-called administrative management facets of the government—specifically: personnel, fiscal, and planning.

A direct result of the Brownlow study was the creation of the Executive Office of the President, providing, for the first time, a comprehensive organizational framework within which staff could be provided on a flexible basis to augment the growing demands of the President's job. At the outset, the Office included the Bureau of the Budget by transfer from the Treasury Department, the National Resources Planning Board, and an enlarged White House staff. Also, at this time, 1939, the six Administrative Assistants to the President positions were created,[18] to be filled, as FDR liked to phrase it, "by young men of great competence with a passion for anonymity." Time has proven that actual anonymity in the White House staff is a rare virtue, but the value of this additional and continuing staff assistance to the President has been proven again and again in the seventeen years these posts have been in existence. Less prominent today than during the Roosevelt and Truman administrations, the six Administrative Assistants to the President have tended to become submerged in what has become the largest White House staff ever assembled. While filled from time to time by professionals with specialized assignments,[19] for the most part, the "anonymity boys" have been general staff men who filled a variety of assignments as the President's problems demanded. Specialization in these posts has tended to follow a grouping of responsibilities for relationships with certain areas of governmental programs rather than in terms of the pre-service technical specialty of the appointee himself.

### THE INCREASING SIZE OF THE WHITE HOUSE OFFICE

The growth in size of the White House Office between the Truman and the Eisenhower administration presents a remarkable example of how the organization around the President tends to evolve haphazardly out of need rather than in accordance with any predetermined plan. In March 1951, at the peak of the Korean War emergency, the *Congressional Directory* listed only fourteen names and positions deemed to be of sufficient prominence in the White House Office to have such publication.[20] The latest *Directory,* January 1956, lists no less than thirty-nine, almost

---

[17] Reference is here made to the REPORTS OF THE FIRST COMMISSION ON REORGANIZATION OF THE EXECUTIVE BRANCH OF THE GOVERNMENT (1949).

[18] The idea for the six Administrative Assistants to the President stems from the BROWNLOW REPORT, *op. cit. supra* note 15, at 5.

[19] For example, Gabriel Hauge, economic adviser to President Eisenhower, currently fills one of the Administrative Assistant positions.

[20] Congressional Directory, Mar. 1951, pp. 337-38.

three times the Truman total.[21]  Other than his regular staff, in 1951 President Truman had only one Special Assistant, W. Averell Harriman, who, in addition to his responsibilities as head of the mutual security program, also served the President as a Special Assistant over a broad range of foreign economic matters.

There are now seven Special Assistants to the President.[22]  This is an item of fundamental importance in Executive Office organization, for appointments of this rank invariably result from gaps in the cabinet approach to administration which require creation of super-administrators who can operate for the President at a level that involves the normal responsibilities of two or more of the heads of the regular departments or agencies.  The conclusion is rather obvious—the size of the White House and Executive Office staffs and, above all, the rank of White House staff members, grows in direct relationship to the inability of the more rigid cabinet system to meet growing complexities in the management of governmental programs.  The White House staff now comes closer to governing the country than ever before.

While the Eisenhower administration has more presidential attachés of super rank than ever before, and while they seem to stay in their positions longer, perhaps the most powerful Executive Office post was the creation of President Truman.  This was the appointment of a Director of Defense Mobilization, as head of the Office of Defense Mobilization, a temporary emergency action in December 1950, resulting from the need for an immediate presidential deputy of cabinet rank to control, for the President, the many departments and agencies involved in the Korean mobilization effort.[23]  The position continues, but the nature of the job has changed, as we shall note later.  Meantime, the Director of Defense Mobilization is not a member of the White House staff.  He is an agency executive in his own right and heads a separate organization within the framework of the Executive Office of the President.  His direct staff relationship to the President notwithstanding, the Director of Defense Mobilization is not regarded in Washington governmental folklore as being "White House."  The Congress and the press treat him much as they would the head of any other independent governmental department or agency.

The rapid growth of the White House staff under President Eisenhower is particularly interesting because it has resulted in contradiction of a pre-inauguration commitment to return to constitutional cabinet government and eliminate the coterie around the President.[24]  Perhaps no administration has ever come into office with a greater consciousness of management in all of its scientific ramifications.  The command-decision military background of the President, with its undertones of general staff organization, combined with the "executive suite" background of many of the key officials in a businessman's administration, make this possible.  There is little question but that the administration was sincere in its intention to make govern-

[21] *Id*,. Jan. 1956, pp. 379-81.          [22] *Id*. at 381.
[23] Exec. Order No. 10193, 3 C. F. R. 156 (1950 Supp.).
[24] See ROBERT J. DONOVAN, EISENHOWER: THE INSIDE STORY 65 (1956): "President Eisenhower applies greater formality of procedure in the Cabinet than has been adhered to in the past."  Actually, Donovan's book devotes very little attention to the internal operations of the staff around the President.

ment more efficient by emphasizing a return to autonomous cabinet executives and eliminating the White House gang. It is to their credit, perhaps, that a few years in office have taught them that this cannot be done. The end result has been the appointment of super-executives at the White House level, of adequate prestige personally and position officially to permit them to intervene authoritatively in matters involving even members of the cabinet.

### COMPETITION IN THE CABINET STRUCTURE

Contrary to the neatly stereotyped symmetrical outlines in the organization of the executive branch of the government contained in high school Civics books, the executive branch is not one big happy family. It never has been such under any President. It is too big, too complex, and too human ever to be anything but a fractious free-for-all. This would seem to be a perfectly normal situation, however, in a democratic society which justly prides itself on the promotion of independent thought and seeks to progress through the processes of compromise. Washington's governmental halls are lined with the ghosts of cabinet officers who have come into office with a determination to create efficiency by cutting down both on personnel and on program, only to depart at the end of their terms leaving a bigger and more complex department than they inherited in the first place. With expenditures for nondefense programs now higher for the federal budget in 1957[26] than ever before, this situation continues under the present administration and seems to prove that the trend to bigger government has no relationship to the political party that happens to be in control of the executive branch.

Cabinet officers have special interests to serve within the framework of bureaucracy itself. Some, like the Secretaries of Agriculture, Labor, Commerce, and Interior have a vast political constituency of their own, inside and outside the Government. Any cabinet officer is at least in part a prisoner of his job. His effectiveness depends not so much upon what he gives his staff as what his staff gives him. The average cabinet official comes to his job with a conception of his relationships that regards his ties to the President as primary, his ties to his department as secondary. Essentially, the natural reaction is to regard himself as a part of the President farmed out to hold jurisdiction over a specific segment of the executive branch. Neither Republicans nor Democrats in cabinet jobs differ in the speed with which this concept is quickly changed. The Secretary becomes most often a pleader for a specific cause.

A minor case illustrates the situation quite well. In 1949, the National Security Resources Board, a part of the Executive Office, had a quarter of a million dollars to allocate to the established departments and agencies for preparation of a comprehensive series of raw material and industrial facility studies that could serve as a basic encyclopedia of statistical data for future mobilization planning projects. Since 1949, a recession period, was also a year in which both the administration and the

---

[26] For a more detailed discussion, see Kreager, *The Federal Budget for 1957*, 13 ILL. BUS. REV. 6 (1956).

Congress were seeking to cut government expenditures, largely, as is usual, through personnel reductions in the executive agencies, a vast amount of interdepartmental competition ensued.  For any department, capture of a part of the NSRB funds, small as they were, insured retention of some staff at least until a next and possibly more lenient year.  For a study of copper, no less than four agencies, Commerce, the Tariff Commission, and two agencies of the Interior Department, competed.  This was a problem for Executive Office adjudication, for cabinet officers, plagued as they are by loyalties to their own departments, are in no position to compromise their interests without losing face among their subordinates.  At the same time, intense rivalry resulted between Commerce and Interior as to which should do the six studies related to the steel industry.  The result was an Executive Office engineered compromise, now generally regarded as controlling, to the effect that Interior is responsible for steel from the iron mine to the production of pig iron, but once pig metal enters the picture, the Commerce Department takes over.  This seems a simple enough problem to the uninitiated, but actually it is a very troublesome one in the internal operation of the executive branch.  To assume that the President himself would have the time to resolve such a minor jurisdictional problem, allowing for the time that would be required for him to become thoroughly informed as to both sides of the argument, would be absurd.  The settlement was worked out at staff level in the National Security Resources Board, an Executive Office agency.

The solution to such daily operational problems is not as simple as the above brief narrative would suggest.  The mere existence of an Executive Office agency is not enough in itself automatically to produce decisions that permit the wheels of administration to move.  The decisions are the product of a coordination process in which the prestige of every agency and every official involved is protected, if possible, and the imprimatur of presidential authority is used only as an implied threat hovering in the background of the Executive Office agency's manipulations.

The basic ingredient is system.  The NSRB, technically headed by a seven-man cabinet-level board, with a chairman who also served as the full-time head of the agency, was in no position to compromise interagency problems at the Board level.  Early experience had proven that a cabinet-level board, like the cabinet itself, is not a medium through which decisions can be made; but it also proved that such a group can serve as an effective medium through which, by careful attention to the niceties of official protocol, an executive close to the President and in the difficult position of calling his shots among his nominal superiors, can maintain good personal and official relationships with those key officials.  As is normal in any governmental organization, below the board level the NSRB senior staff formed interagency liaison relationships, based on the principle that a good staff man can keep his boss well advised only if he knows what other bosses of similar level are thinking about, struggling with, and planning or hoping to do.  This mutually dependent interagency staff relationship is a common thing, and a healthy thing, for without it, much of the continuity and coordination required to keep a vast governmental

structure functioning smoothly could not be accomplished. Sometimes it even becomes desirable to formalize, openly, this type of mutually dependent interagency staff relationship.[26]

Logic can be applied to the compromise of a competitive bureaucratic situation when the "face" of the negotiators is not involved. An informal NSRB interdepartmental staff group actually worked out the solution to the competitive struggle over the materials surveys, which put their bosses in the position of accepting a staff recommendation, thereby protecting them from the necessity of making an original policy determination that could prejudice their position in their own organizations. Obviously, even the coordination process requires a focal point or a spearhead. Only the staff of the President (the Executive Office) can provide this, for that staff enjoys the peculiar advantage of operating under the cloak of the boss who is the boss of everybody else's boss. Sometimes heads fall or pressure is applied, but more often the time worn adage of good staff organization prevails—reasonable men, reasonably assembled, can usually reach reasonable solutions to legitimate problems.

While the President's job requires him to tackle daily the world's toughest management assignment, the very nature of his responsibility demands that he provide broad positive leadership toward over-all national objectives. Before he can make a policy decision, he must have adequate and continuing information covering all major facets of the situation facing him. Cabinet members and agency heads, by virtue of their specific and limited responsibilities, cannot make these broad determinations. It is from the cabinet and agency heads that the President must expect to receive the varied and often conflicting recommendations which need to be carefully sifted and balanced off against the administration's national or international objectives before a decision can be made. No board (*e.g.,* cabinet in this case) can make decisions in the face of intramembership conflicts of jurisdiction, when the man in the chair controls the board rather than the board controlling the chair. It is naïve to assume otherwise.

Then who does the sifting? There are occasions in which a cabinet officer can perform this task. For example, President Truman assigned to Secretary of Commerce Charles Sawyer the task of being the administration spokesman on the St. Lawrence waterway project, and the Secretary and his staff to a large extent did the sifting on interagency relationships to that assignment. But most of the time, the sifting is done for the President within the framework of his own White House Staff or Executive Office.

The President needs advice and guidance on matters of national policy from every possible angle of public importance. His staff normally is organized to do this. There is always at least one, generally the Director of the Bureau of the Budget, who must look at a proposal with the cold hard facts of cost constantly before him. It is not his job to judge political implications or impact upon foreign or domestic policy. Another, currently the Director of Defense Mobilization, should be concerned not

---

[26] The interagency senior staff of the National Security Council is a good example.

at all with cost, but always with the implications for national security, economic and military, uppermost in his mind. A third source, the National Security Council, may be equally concerned with national security but primarily from the approach that thinks in terms of the hard statistical facts of military supremacy rather than the more elusive factors of domestic economic well-being. The latter is the province of the Council of Economic Advisers. Another may look at a policy proposal from the standpoint of impact on government organization. Ofttimes, the President is his own political adviser, but he may call in his political party national chairman to help weigh the political implications inherent in a variety of possible decisions and their probable impact on the voting public in a forthcoming election. More often than not, personality factors within the executive family itself have to be considered. Any decision a President might make involving jurisdictional assignments in the management of natural resources, for example, would be sure to please and displease simultaneously one or more of the Secretaries of Agriculture, Interior, and Commerce, and possibly several of the regulatory agencies. A too-quick decision by a President can make a cabinet position untenable to an incumbent, and a resignation might follow, creating embarrassment to the administration. If anyone, anywhere, knows that it is impossible to please everyone all the time, even within the official executive family of the United States Government, it is the President.

Sometimes the sifters themselves have to be sifted, and the Assistant to the President or the President's chief counsel frequently fills this role. Other times, the President may call in a personal friend for unofficial advice on a particular problem. At times, special presidential advisory boards, complete with official certificates of presidential appointment, may be set up on a continuing basis to provide a forum wherein policy problems can be worked over from all angles, not for decision purposes, but just to insure that no significant aspect is overlooked. President Truman created his National Advisory Board on Mobilization Policy, a highly controversial bipartisan body composed of labor, industry, agriculture, and "public" members, just for this purpose.[27] President Eisenhower has made even more frequent use of the public-advisory-board technique to keep the sifting process a little farther away from the President's office and to insure more comprehensive consideration of all possible angles of public interest. Such presidential advisory boards are serviced, staff-wise, from the ranks of the Executive Office agencies.

Sometimes temporary Executive Office agencies are created to provide an intervening level for settlement of disputes, to keep such adjudication processes away from the President and his chief assistants, or at least to hold them up long enough to permit resolution of the problem at a higher level. At the time the Office of Defense Mobilization was created, to which was assigned jurisdiction over both the emergency production control and emergency stabilization control programs, the Economic Stabilization Agency was used for this specific purpose. It provided an intermediate level between the Office of Price Stabilization and the Wage Stabiliza-

[27] Exec. Order No. 10224, 3 C. F. R. 418 (1951 Supp.)

tion Board, on the one hand, and the President and the Director of Defense Mobilization on the other. As a result, appeals from decisions of the wage and price operating agencies were handled by the Economic Stabilizer, and only appeals from his decisions were allowed to crowd the time of the Defense Mobilizer. Thus, the President became involved only as a final court of appeal on issues of outstanding importance.

But no one, absolutely no one but the President himself, can make the final decision on matters of basic policy, either as to substance or organization structure. In the current enthusiasm for relieving the President of some of the burdens of his office, this fact is too often overlooked. It would be wrong to imply that any degree of effectiveness in the organization and functioning of the President's staff could free him from the tasks of the ultimate responsibility vested in his office. Any decision made by a subordinate in the executive branch, even under the clearest possible delegation of authority from the President, is always subject to appeal and review by the President if it goes awry. His staff can only assist him in approaching the problem; they cannot remove from his shoulders the weight of his final responsibility.

### THE OFFICE OF DEFENSE MOBILIZATION

The evolution of the powers and authority of the Director of Defense Mobilization offers a case example of how the Executive Office structure permits flexibility to meet an administrative need. In December 1950, when President Truman signed the Executive Order creating the Office of Defense Mobilization, he handed to the new Director, Charles E. Wilson,[28] the broadest grant of power ever held by anyone other than the President himself.[29] Possibly no other legal act of either the Congress or the President ever came so close to the actual creation of an Assistant President. Mr. Wilson held in his hands the authority that literally gave him jurisdiction over the entire enomomy of the nation, subject only to the President's power of approval or right to withdraw the grant of authority.

Existence of such broad overriding operational authority within the person of an agency head in the Executive Office of the President violates the tradition that the Executive Office coordinates rather than commands. However, the fact that this can be done in an emergency suggests the convenience that the Executive Office structure lends to a President when necessity demands that he delegate some of his problems and authority and finds himself in a position where the inter-departmental nature of such problems makes it impractical to delegate them to a single cabinet head. Unfortunately, the appearance of a "czar" in the midst of the President's own staff agencies does create problems of conflict among his own staff. As a result, White House staff members may find themselves acting as a buffer between the President and a "czar" on his own staff. As a matter of practice, however, delegation

---

[28] The reference is to Charles Edward Wilson, at the time President of the General Electric Company, and the former Executive Vice-Chairman of the War Production Board during World War II.

[29] Exec. Order No. 10193, 3 C. F. R. 156 (1950 Supp.). Based on authority granted the President under the Defense Production Act of 1950, 64 STAT. 798 (1950), 50 U. S. C. App. §§ 2061-66 (1952).

of overriding operational authority, openly and without reservation other than appeal to the President himself, is a temporary expedient used only in periods of emergency.

The justification for the unusual delegation of authority to the Defense Mobilizer grew out of compounding emergency problems: a hot war in Korea that threatened to become hotter, the realization that the United States had become committed indefinitely to world leadership in a long cold-war against the spread of Communism, and the hard fact that the economy of the country had to be rebuilt on a mobilization basis that would permit this democracy to exist on a semiwar footing for an indefinite period of years. Serious shortages in critical and strategic raw materials, actual inadequacies in vast areas of industrial production facilities, imbalances in the nation's economic system that required governmental imposition of direct and indirect stablization controls, lags in production of military end items, all combined to emphasize the temporary need for a mobilization "czar" who could move rapidly and decisively to redirect the country's production machinery and, at the same time, handle the inevitable organizational conflicts that would result in the bureaucratic structure of the government itself.

On March 31, 1952, when Mr. Wilson resigned and returned to private life, sufficient improvement in the critical economic problems related to the mobilization effort had been achieved to permit some relaxation in the dominant role of the Office of Defense Mobilization. In the late spring and summer of 1952, the Assistant to the President, Dr. John R. Steelman, doubled in brass as Acting Mobilizer during a time in which emphasis began to shift from a build-up of controls to the development of an orderly approach to the removal of controls. This process was continued during the final months of the Truman administration by Mobilizer Henry H. Fowler and reached actual decontrol in many items in the spring of 1953 after the Republicans came in.

The present director of Defense Mobilization, Arthur S. Flemming, who took over after inauguration day, has completed the transition of ODM from an operating command agency to a staff agency. Dr. Flemming has conceived his role as Defense Mobilizer as being that of the President's chief staff assistant for the coordination of the mobilization activities of the various departments and agencies, an approach that fits neatly into the current administration's general staff ideas for running the President's Office. The transition from a super-agency, with powers to direct and control, to a staff agency functioning in the medium of coordination was completed in April 1953, when the operating production agency, Defense Production Administration, and the permanent planning agency, the National Security Resources Board, were consolidated into the Office of Defense Mobilization, which became a permanent entity within the framework of the Executive Office of the President.[30]

ODM retains certain important policy authority within the economic mobilization

[30] Reorganization Plan No. 3 of 1953, 63 STAT. 203, 5 U. S. C. § 1332 (1952). 3 C. F. R. 134 (1953 Supp.).

sphere, but it now operates primarily to codify and coordinate the recommendations and determinations of the departments most involved in the operation of the mobilization program, principally the Departments of Defense, Commerce, and Interior. While there are those who would like a more aggressive point of mobilization control short of the President, the transition of this Executive Office agency from a command to a staff role has been a normal process, resulting from the constant procedure of adjusting organization to public need. In this process, changes have been influenced probably very little by the politics inherent in the shift from the administration of one major party to that of the other.

A major organizational problem in post-war mobilization, starting with the original National Security Resources Board in 1947 and running through to the present Office of Defense Mobilization, has been the complication of mixing the cabinet into the functions of the President's own Executive Office staff. In creating the National Security Resources Board, the Congress provided for the appointment, by the President, of a board per se. This has been a cabinet-level board from the beginning.[31] The mixing of cabinet members, semiautonomous heads of executive departments in their own right, and advisers to the President in their specialized areas of responsibility, into the operation of an Executive Office agency has worked badly from the start. The original Board, including in its membership some cabinet members of great experience in actual mobilization operations during the Second World War,[32] moved to intervene in the operation of the Board's staff organization from the beginning. They were resisted by both the President and his staff. The President's position prevailed, and the Board per se, later transferred intact as the Defense Mobilization Board after the creation of the Office of Defense Mobilization, became, primarily, an informal high-level medium through which the Chairman (NSRB) or the Director (ODM) could maintain effective liaison with top government officials, who enjoyed, for the most part, closer official relationships with the President than they did. Under Truman, this cabinet-level Board, superimposed on an Executive Office agency created in large part to coordinate cabinet officers, never became a decision making body. From time to time it made recommendations to the President, but the latter always made his own decisions.

Under Eisenhower, the position of the Defense Mobilization Board changed abruptly. Overnight it became an actual, decision making body, if not by charter, then certainly in fact, for a DMB recommendation to the President now invariably receives presidential approval. This intrusion of the cabinet into the functions of what would normally be presidential staff tends to reduce the prestige and effectiveness of

[31] The National Security Resources Board was created under Sec. 103, National Security Act of 1947, 61 STAT. 499 (1947), as amended, 64 STAT. 1280 (1950). 50 U. S. C. App. § 404 (1952). Regular membership on the National Security Resources Board, per se, and its successor, the Defense Mobilization Board, has included the Secretaries of State, Treasury, Defense, Interior, Agriculture, Commerce, Labor, plus the Chairman of the Board of Governors of the Federal Reserve System.

[32] Particularly Secretary of Defense James Forrestal and Secretary of the Interior Julius Krug, who, as Secretary of the Navy and War Production Board Chairman, respectively, during World War II, became acknowledged experts in the finer details of mobilization programming.

the agency as a personal arm of the President and cuts down on the number of effective eyes and ears he has available to help him. The development in respect to the Defense Mobilization Board is a manifestation of the current administration's desire to return governmental power to the cabinet level, a fact not entirely contradicted by the creation of the largest super-staff at the White House level ever assembled. The situation becomes one of a cabinet taking over the President's regular staff, but in turn being superseded on many matters by a super-general staff at the White House level.

### THE BUREAU OF THE BUDGET

The agency whose functions and operations lend themselves best to an understanding of the staff nature of the Executive Office of the President as an administrative coordinator is the Bureau of the Budget. As previously noted, it was the transfer of the Bureau from the Treasury to the White House in 1939 that marked the formal beginning of the Executive Office of the President as we know it today. Originally set up to do a budget review and codification job, the Budget Bureau has become, in fact, the chief staff arm of the President in the management of the executive branch.[33] The budgetary process is the sole medium through which the multitude of governmental activities and program and the agencies they support can be reviewed annually in their entirety and in relationship to a coordinated program for the promotion of the welfare and security of the nation and its people. The federal budgetary process is now said to occupy fifteen months out of each year, a figure of speech used to illustrate the fact that completion of the budget for one given fiscal year often overlaps by several months the beginning of the process for the budget to apply in the ensuing year. With federal expenditures now a major sustaining factor in the economy of the nation, and a basic ingredient in the management of the economy of the country, the budget becomes a key factor in the determination of all fiscal policies. Broad policy or program statements in even such important documents as the President's State of the Union Message or Economic Message are one thing, but the dollars and cents figures in the budget are another as far as proving the actual extent to which such statements of policy may see realization in practice.

Since the presentation of the budget requires detailed examination into the programs and organization of every government department and agency, the Bureau has acquired important management and organization staff functions. Through its statistical standards staff, it exerts control over the assignment and nature of the multitude of publications issued by federal agencies, and reduces duplication and conflicts between the agencies as to the content of publications and the staff required to produce them. Through its legislative reference service, it becomes the focal point within the executive branch for the review of bills pending before the

[33] The most recent comprehensive treatment of the Bureau of the Budget will be found in ARTHUR SMITHIES, THE BUDGETARY PROCESS IN THE UNITED STATES particularly cc. II, IV, V, VIII, and X (1955).

Congress and for the assembly and submission of a unified administration position on such bills. This little-publicized feature of the Bureau of the Budget is perhaps the single most important ingredient in a unified approach by the executive branch agencies to matters pending before the legislature. Without it, the President would be hard put to keep up with the ideas generated by the hierarchy he normally is supposed to command.

The greatest asset to the Bureau of the Budget, however, has been its personnel. Over the years, it has acquired an unusually competent staff of specialists who represent, in the combination of all their fields of specialization, a comprehensive knowledge of the vast ramifications of the federal government. This continuing competence in the knowledge of day-to-day government operations is available for each succeeding President to tap. Not the least among attractions that have lured able young men into the Bureau is that it offers one of the best stepping stones to advancement in a professional public service career. Many a budget review officer has moved out into a top executive position in one of the agencies he has been handling on a staff budget assignment.

In less than twenty years, the Bureau has become an effective comptrollership operation, not unlike those common to effective management in big private industry. During the Truman administration, the Budget Director had regular daily access to the President and kept him constantly posted on the internal administrative management of the executive branch. Simultaneously, key Budget Bureau staff members worked in staff harness with specialists in the White House office. The relationship was continuous, professional in character, and personally informal.

The end result of the growth of the Bureau of the Budget was that it acquired not only enormous prestige within the ranks of government, but also exerted a vast amount of power—power of the most fundamental sort, control over the availability of funds to develop programs and to employ people. For this reason, its popularity has never paralleled its prestige or its power, but this does not in any way lessen its effectiveness.

## CONCLUSION

At the beginning of this inquiry into the role of the Executive Office of the President, a careful distinction was drawn between the status of the White House Office and that of the other Executive Office agencies. The nature of the differences has been further altered by the changes in organizational emphasis between the Truman and Eisenhower administrations. The small Truman White House staff was balanced by a more extensive delegation of responsibility to other Executive Office agencies. At present, the application of the military general staff concept to the structure of the President's White House organization has resulted in a very large White House staff which has tended to remove from the permanent Executive Office agencies some of the influence and effectiveness they previously enjoyed. A case in point is the Bureau of the Budget. Long the dominant point of influence

in the control over the preparation of expenditure estimates, it actually influenced very little the final budget figures for the federal budget for 1957. The point of control had shifted across the street to the general staff in the White House. Similarly, influence once exercised in the Office of Defense Mobilization has shifted to points of origin in Defense, Commerce, Interior and other agencies.[34]

Space limitations do not permit detailed examination of the role of the National Security Council, itself a coordinating medium for the agencies and officials most involved in national defense on the military and diplomatic fields, or of the Council of Economic Advisers, a staff and advisory agency in the strictest sense.

Even after twenty years of concentrated attention on the organization of the President's office and its staff components and the role of that staff in the management of the executive branch, management technicians have only just begun the study of that tremendously important segment of our public administration structure. So long as Presidents and the public in general are concerned over the excessive burdens imposed upon the occupant of the world's toughest job, so long shall we continue to try to improve the situation by additions and changes in the staff organization that surrounds him. Since Presidents are, after all, human beings, and thus subject to the variations in personality and skills that are usual to all members of the human race, then the most important consideration in organizing the Executive Office or carrying out its mission is to keep it flexible. Flexibility is necessary to adjust to the personality of individual Presidents, to adapt organization to the urgencies of a constant parade of government problems and new public responsibilities, and to insure continuity in staff around the highest point of governmental leadership—which point must arbitrarily be changed from time to time under the dictates of our political system.

The White House Office and the Executive Office, as organizations, do not lend themselves to precision organization planning. If such were true, then only one President in the history of the United States could have been right—and you take your choice. The personality of each President, and the political, economic, and social demands of his term of office, will combine to dictate the structure and character of the group around him that assists him, minute by minute, in carrying out the overwhelming burdens of his office. To date, we must admit, even allowing for continuing faults, that flexibility has prevailed and that organizational structure through all its changes, has at least satisfied the desires, if not the needs, of each President—and who better has the right to determine what his needs shall be?

[34] This discussion of the role of the Executive Office of the President has not been intended as an inquiry into the faults or virtues of any particular administration in the operation of the President's own staff organization. Rather, it has been intended as an examination of the organizational climate within which the Executive Office must function, and the demands and motivations that limit or guide its actions—as a unit and as individuals within that unit.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff,*

v.

DONALD F. MCGAHN II,

*Defendant.*

No. 19-cv-2379 (KBJ)

# EXHIBIT H





*SMOOTHING THE PEACEFUL TRANSFER OF DEMOCRATIC POWER*

# Report 2017—29

# THE WHITE HOUSE COUNSEL

MaryAnne Borrelli,        *Connecticut College*
Karen Hult,               *Virginia Polytechnic Institute*
Nancy Kassop,             *State University of New York–New Paltz*
Kathryn Dunn Tenpas,      *Brookings Institution*

*Funded by the*


*Smoothing the Peaceful Transfer of Democratic Power*

# WHO WE ARE & WHAT WE DO

**The White House Transition Project.** Established in 1999 to provide information to incoming White House staff members so that they can hit the ground running, The White House Transition Project includes a group of presidency scholars from across the country who participate in writing essays about past transitions and the inner workings of key White House offices. Since its creation, it has participated in the 2001, 2009 and now the 2017 presidential transitions with the primary goal of streamlining the process and enhancing the understanding of White House operations. WHTP maintains an important, international dimension by consulting with foreign governments and organizations interested in improving governmental transitions. http://whitehousetransitionproject.org

**Rice University's James A. Baker III Institute for Public Policy.** Founded in 1993 on the campus of Rice University, the Baker Institute has twenty programs that focus on a broad range of issues including energy, health, conflict resolution, science and technology, tax and expenditure policy and Latin America and China studies. With an eye toward educating and engaging the next generation of leaders, the Baker Institute collaborates with experts from academia, government, the media, business, and nongovernmental and private organizations. http://bakerinstitute.org

**The Moody Foundation.** Chartered in 1942 by William Lewis Moody, Jr., a successful businessman from Galveston, Texas, the Moody Foundation makes a difference for the people of Texas. The Foundation makes grants for projects focusing on the arts, humanities, religion, education, social services, community development, and health. In addition, the Moody Foundation has contributed to the building of many universities, hospitals, museums, and libraries across Texas. http://moodyf.org

© The White House Transition Project, 2001-2017

*For the White House Transition Project*
Martha Joynt Kumar, *Director*     Terry Sullivan, *Exec. Director*
(202) 285-3537          (919) 593-2124
http://whitehousetransitionproject.org

*For the Baker Institute*
Mark P. Jones, *Senior Fellow*
(713) 348-2107
http://BakerInstitute.org

# TABLE OF CONTENTS

WHO WE ARE & WHAT WE DO ................................................................. 2

EXECUTIVE SUMMARY ........................................................................ 5

INTRODUCTION .............................................................................. 13

OVERVIEW ................................................................................. 14

   *Roles and Responsibilities, the Presidential Term, and Saying "No"*     16

   *Law, Politics, and Policy*     17

   *Justification for the Continued Existence of the Counsel's Office*     19

FUNCTIONS OF THE WHITE HOUSE COUNSEL'S OFFICE ........................................ 21

   *1. Advising on the exercise of presidential powers and defending the president's constitutional prerogatives*     21

      Advising on Executive Privilege     22

      Advising on War Powers     23

      Advising on Presidential Disability and Succession     25

      The Limits of Advocacy     26

   *2. Overseeing Presidential Nominations and Appointments to the Executive and Judicial Branches*     27

      Participating in the Selection of Presidential Nominees and Appointees to the Executive Branch     27

      Participating in the Selection of Presidential Nominees to the Judicial Branch 27

      Supervising the Vetting and Clearance Process     29

      Preparing the Nominee for the Confirmation Hearing     30

   *3. Advising on Presidential Actions Relating to the Legislative Process*     31

   *4. Educating White House Staffers about Ethics Rules and Records Management and Monitoring for Adherence*     32

      Orienting New White House Staff and Executive Branch Officers     33

      Monitoring and Educating Staffers during Campaigns     33

      Reviewing Investigations and Associated Proceedings     34

   *5. Handling Department, Agency, and White House Staff Contacts with the Department of Justice*     34

      Monitoring Contacts with the Department of Justice     35

      Requesting OLC Legal Opinions     36

PRINCIPAL RELATIONSHIPS IN THE EXECUTIVE BRANCH ...................................... 38

   *The White House*     38

      The President     38

      The White House Counsel and Presidential Privileges     40

      The Chief of Staff     47

      The White House Staff     48

The Office of the Vice President                                                        49
*Departments and Agencies*                                                          *51*

   The Department of Justice                                             51
   Other Executive Branch Departments and Agencies                        55

ORGANIZATION AND OPERATIONS ............................................................ 56
*Internal Division of Labor*                                                        *57*

   Deputy Counsels                                                        58
   Immediate Support Staff                                                59
   Special Counsels                                                       59
   Other Work                                                             59
*Rhythms of Quadrennial Governance*                                                 *60*

   First Year                                                             60
   Annual Cycles                                                          61
   Electoral Cycles                                                       61
   Final Year                                                             62
   More Regular Tasks                                                     62
   Crises / Scandals / Unexpected Events                                  63
*The Counsel's Daily Schedule*                                                       *64*

*Turnover: Counsel and Deputy Counsel*                                               *66*

APPENDICES ......................................................................... 68
*Appendix 1. Functions of the Office of White House Counsel*                         *68*

*Appendix 2. Counsels and Deputy Counsels, 1969–2016*                                *70*

REFERENCES......................................................................... 71

ADDITIONAL READING ................................................................. 74

*For the White House Transition Project*
Martha Joynt Kumar, *Director*      Terry Sullivan, *Exec. Director*
(202) 285-3537                 (919) 593-2124
http://whitehousetransitionproject.org

*For the Baker Institute*
Mark P. Jones, *Senior Fellow*
(713) 348-2107
http://BakerInstitute.org



**THE WHITE HOUSE TRANSITION PROJECT**
**1997—2017**



RICE UNIVERSITY'S
**BAKER INSTITUTE**
FOR PUBLIC POLICY

## Report 2017—29

# THE WHITE HOUSE COUNSEL

MaryAnne Borrelli,      *Connecticut College*
Karen Hult,      *Virginia Polytechnic Institute*
Nancy Kassop,      *State University of New York–New Paltz*
Kathryn Dunn Tenpas,      *Brookings Institution*

## EXECUTIVE SUMMARY

As the burdens of the presidency have grown, so have the responsibilities of what is often called "the president's lawyer" but is more accurately described as the "lawyer for the office of the presidency." The myriad tasks of this complex office include: *monitoring* ethics matters; *coordinating* the president's message and agenda within the executive branch units; *negotiating* on the president's behalf with Congress and other vectors; *recommending* actions to the president; *protecting* the constitutional prerogatives of the presidency; and *translating* or *interpreting* the law in its broadest context to the president and throughout the executive branch.

The Counsel's Office is the channel through which most paper and people must pass on the way to the president, and, equally, through which all outputs from the Oval Office must be monitored and evaluated. The pace of the work is incessant, and the pressure to ensure against errors of substance or judgment, unrelenting. The Office exists in a fishbowl, is subject to searing public criticism when it makes the slightest misstep, and yet prompts intense loyalty among those who have been privileged to serve in it.

Observations and thoughtful insights gained from interviews with former Counsels have yielded the following advice and suggestions:



*Funded by the* **MOODY FOUNDATION**

*Smoothing the Peaceful Transfer of Democratic Power*

## 1. UNDERSTAND THE ROLE OF THE COUNSEL AS THE LAWYER FOR THE OFFICE OF THE PRESIDENCY, NOT AS THE PRESIDENT'S PERSONAL LAWYER

> So if I had any advice for a president choosing a counsel, I would not choose an ordinary lawyer, no matter how smart or learned. I would choose a lawyer with some political savvy who has demonstrated that he has political sensitivity, because he can really foul things up if he doesn't... The important point to remember here... is that the White House counsel is, in my view, not entitled to represent the president as an individual. (Wallison interview, p. 19)

Peter Wallison, White House Counsel for President Reagan (1986-1987), offered the advice above: key for him, and for any Counsel, is understanding the difference between the role of a lawyer for a private individual, as opposed to the lawyer for the institution of the presidency. Wallison minced no words here in suggesting the challenge for the Counsel: "Now, I will say this: it is very hard to make this judgment" (Wallison interview, p. 19). Perhaps, one way to think about this is that the president is a person who is the temporary occupant of a governmental office. Along with that office come constitutional authority and responsibilities. It is these unique features of the office – and how its elected occupant chooses to use that authority and carry out those responsibilities - that the White House Counsel should be dedicated to represent.

## 2. NAME THE COUNSEL AS EARLY AS POSSIBLE, PREPARE TO ENTER AN EMPTY OFFICE, AND MEET WITH THE OUTGOING COUNSEL

The president-elect (or, even better, the presidential nominee) should appoint the Counsel at the earliest possible time, since this position is key to shepherding the nomination and confirmation processes for all other presidential appointments.

According to C. Boyden Gray, Counsel for President George H.W. Bush:

> I can't emphasize enough the difficulty of absorbing all you have to absorb... It is absolutely bewildering. And if people don't understand it they're going to get into trouble again and again and again. (Gray interview)

> Bush asked me to go to work for him two weeks before he was elected and he said, "I should have asked you two months ago." The White House Counsel's Office -- you asked [about] the people who shovel the most papers around and deliver them. The volume of paper that goes through the White House Counsel's Office is ten times the other offices combined . . . because of all the forms and the other nomination papers. (Gray interview)

Most former Counsels have remarked about the lack of any institutional memory. There are a few folders, letters, and memos that have been left behind on such matters as war powers, and presidential disability and succession. A. B. Culvahouse talked about twenty to twenty-five binders that he left for C. Boyden Gray as the next incoming Counsel (Culvahouse interview). Generally, however, there is little paper in the Office when a new Counsel enters. Bernard Nussbaum recalled:

> When you walk into the White House at the beginning of an administration, it is empty. It is an amazing thing. All of the files are gone. Even the secretaries are gone (except one - Linda Tripp was my secretary for a year). Nobody knew what to expect. The Democrats were stunned. This

> was the first time in a generation (since 1968) that they were in power (with the exception of Carter). Nobody knows anything. But the minute you walk into the office, the phones are ringing. It's as if the ten biggest litigation cases in your life are going on simultaneously. I got a call from the State Department on the first day - and there were no lawyers over there, either. I went to the office straight from the inauguration, and went to work right away, doing executive orders on that first day. (Nussbaum interview)

Daniel Meltzer, Principal Deputy in the Obama Counsel's Office, put it starkly: "There are no files, no manual, no records, no people with institutional memory" (Stern 2009).

Gray remembers that the only materials left behind when he took over were "Folders that lay out some of the statutory—the [inaudible] [Anti-]Deficiency Act, the Ethics in Government Act, the Hatch Act, the Presidential Records Act, all of these" (Gray interview). Also, Counsels have mentioned that there are folders in the office with information about the Twenty-Fifth Amendment and about the War Powers Resolution. But beyond the folders mentioned here, there seems to be little else left in the office for a new Counsel to consult as reference.

Clearly, this is a matter that future Counsels may wish to modify. As Lloyd Cutler said, "This is an area [lack of institutional memory] where there could be a very substantial improvement" (Cutler interview, p. 17).[1]

Especially because of the lack of materials available to the new Counsel, many former Counsels have discussed the importance of meeting with their predecessor prior to taking over. Noted C. Boyden Gray:

> I don't think Bernie Nussbaum spent as much as an hour with me. Vince Foster spent a little more time with John Schmitz [the deputy counsel]. But I spent maybe ten or fifteen hours with A. B. Culvahouse. I had been in the White House already for eight years and I still felt I didn't understand what I was doing...[I]t is enormously difficult to come in cold and understand all the statutes that apply...all the rules about travel...It's just very, very difficult. (Gray interview)

In contrast, at the end of the George W. Bush administration, National Security Assistant Stephen Hadley and Counsel Fred Fielding briefed incoming Counsel Gregory Craig on the CIA interrogation program of suspected terrorists. (Kumar, 2015, p. 183).

---

[1] Until 1999, the National Security Council (NSC) staff retained records from one presidential administration to another, effectively building a "continuing archive on every pending [foreign policy] problem" (Cutler interview, p. 22) from the Truman administration onward. When court rulings during the Clinton administration declared that the NSC was subject to the Presidential Records Act, NSC staffers began copying the documents that they deemed essential to on-going governance. In October 2000, the files were still being duplicated and the National Archives and Records Administration (NARA) was still working with the National Security Council staff to determine where the original files would be deposited. Members of the White House Counsel's office, therefore, may wish to consult with the NSC staff to determine the status of this process. They should also note that NARA makes provision for expedited processing of documents requested by White House policy-makers. At the end of the George W. Bush presidency, Kumar reports that the NSC staff "left behind a set of documents that would be useful to the new team," including "a complete set of national security presidential directives with an index... [and] the 'summary of conclusions' from all National Security Council meetings and all the Principal Committee meetings." (Kumar, 2015, pp. 187-88)

*Smoothing the Peaceful Transfer of Democratic Power*

### 3. EXPECT A STEEP LEARNING CURVE, THE UNPREDICTABILITY OF EVENTS, DEADLINES DICTATED BY THE MEDIA, AND KNOW WHERE TO GO FOR INFORMATION

Because the Counsel's responsibilities cover such broad territory, many have commented on the simply overwhelming nature of the materials that need to be mastered. The job entails a steep learning curve at the beginning, knowing where the "landmines" are, being sufficiently flexible to be able to switch gears immediately and respond to breaking crises, and working with incomplete information in a 24/7, instantaneous electronic media environment. As Clinton Counsel Charles Ruff observed, "It's a job for which no training or experience exists for the crosscurrents of legal, political and constitutional issues" (Oliphant, 2000, p. 4).

In particular,

> The incoming White House Counsel should interview previous White House Counsel and be thoroughly immersed on all of the landmines that he or she is going to face...[The landmines are] all over the place. They're all over the place. (Gray interview)

At the same time, one must always be prepared for the unexpected. Clinton Counsel Abner Mikva remarked: "there are those kinds of crises and the crisis management of walking in every morning, no matter what you have on your list of things to do, that isn't what you're going to spend your time on because something happens in between" (Mikva interview, p. 8).

The demands of the media can be a special problem for those coming to the White House from private practice.

> It's this terrible dilemma. If you're a lawyer, you want to have all the facts. And usually you want to have all the facts before you give advice to someone about what to do about it. In the White House, you have to act on the basis of what information you can get some time before the six o'clock news because if you don't have a White House position and the news is "the White House is divided and can't make up its mind," some opposition senator will go on the air and use up the space and tell you what was done wrong. So, you have to adjust to that; you have to operate on the basis of hunch and experience. (Cutler interview, p.10)

As Counsel, Cutler also said, "You're acting on the basis of not enough information and there's always this gnawing fear that you've gotten something wrong or you've said something you shouldn't have said" (Cutler interview, p. 23).

Having ready access to information, and knowing how and where to get it, as well as who has it, are clearly the most critical, practical components of the job. A. B. Culvahouse, Lloyd Cutler and C. Boyden Gray emphasize the importance for a Counsel to "make sure you're part of the process. You cannot recognize the problems or deal with the problems unless you see them in their inception" (Culvahouse in Quade, 1988, p. 37). Speaking anonymously, one Deputy Counsel offered the following advice:

> [Y]ou will get every possible issue thrown at you, and there is no way you could have technical, legal expertise on all of them. Thus, the key quality to doing the Counsel's job well is to establish good personal relations with people throughout government, and to know where to go and whom to ask when you need specific information to do your job effectively.

Moreover, Fielding emphasized that an incoming Counsel should "trust what you are hearing" from your predecessor. "Trust that it is being given in the sense that it was

*Smoothing the Peaceful Transfer of Democratic Power*

intended to be given, and not to mislead or for any political shadings. Trust in that confidence. Don't hesitate to call on people who have held that job, even if they are of the other party. If someone says they are trying to help you, they *are* trying to help you" (Fielding interview).

### 4. MAINTAIN GOOD RELATIONS WITH THE OFFICE OF LEGAL COUNSEL IN THE DEPARTMENT OF JUSTICE

As a unit within the White House staff, the Counsel's Office is the place where the president will turn first for trusted legal advice. As so many former Counsels have reiterated throughout this report, the Counsel's advice will be on stronger footing when the views of the Office of Legal Counsel in the Department of Justice are sought: OLC operates on precedent, where the Counsel's Office is under no such obligation nor does it even have any authoritative record of past legal advice from Counsels to presidents. (See more on OLC in the section "Law, Politics, and Policy.")

### 5. DIVIDE THE COUNSEL'S OFFICE WHEN SCANDALS ARISE

When scandals arise, previous Counsels have walled off or isolated "scandal management" from the routine office tasks. Typically, "Special Counsels" have been appointed to work exclusively on the crisis, along with additional staff members who are specifically tasked to that purpose. A. B. Culvahouse recalled, for example, that Reagan Chief of Staff Howard Baker "told me to focus on Iran-contra and get a separate staff up and running to handle that and let my deputy handle the more routine stuff" (Culvahouse interview). Clinton Chief of Staff Leon Panetta explained the value of separating scandals from other tasks:

> What you don't want to do is consume the general counsel's operation by that scandal. What you want to do is make sure that that's pulled out of the normal operation so that there is a separate focus on that. So you can basically say that crisis is being handled, these are people that are involved with it and it doesn't tie up the rest of the operation. (Panetta interview, p. 29)

### 6. MONITOR PRESSURES ON THE PRESIDENT CLOSELY IN THE LAST YEAR OF THE TERM

A. B. Culvahouse has cautioned Counsels to beware of the strong pressures on a president to, for example, grant pardons, commute sentences, issue rules and regulations in the last year of office. "Never forget that your most important contribution is what you *don't* let happen in the last year of a presidency. That last year is a dangerous time" (Culvahouse, Duke panel transcript, emphasis in original). In a similar vein, Lloyd Cutler has said,

> When a president is up for re-election, there are all sorts of temptations, things a president wants to do that may be legally questionable but that he wants to do to get re-elected. For a White House Counsel, those are the hardest calls to make. You should tell a White House Counsel to leave before that last year of a president's first term. (Cutler, Duke panel transcript)

*Smoothing the Peaceful Transfer of Democratic Power*

## 7. UNDERSTAND THE IMPACT OF THE LOSS OF GOVERNMENT ATTORNEY-CLIENT PRIVILEGE, AND NOTE THE CONTINUING SIGNIFICANCE OF ISSUES OF EXECUTIVE PRIVILEGE AND OTHER PRESIDENTIAL PREROGATIVES

The existing skepticism surrounding the Counsel's Office has been further heightened by the dark implications many observers see from the loss of government attorney-client privilege, as a consequence of unsuccessful litigation by the Clinton administration. There is now even less reason for a president to use a White House Counsel for strictly legal purposes. Rather, presidents seem likely to turn to private counsel more often, especially when legal matters are unclear as to whether they involve "the president" or "the presidency." All of the Counsels interviewed for this project reacted strongly to these court decisions: some decried the choice to litigate matters of privilege at all (Gray), rather than to seek accommodation with the source of the demand for testimony and documents, while others (such as Cutler, Nussbaum, and Mikva) lamented the very real and damaging consequences of these decisions.

The fallout from these rulings on presidential privilege and, more generally, from the hostile and polarized political atmosphere caused by the independent counsel statute of the late 1980s and 1990s, has been considerable. Both Mikva and Ruff, for example, recall that they took no notes, kept nothing in writing.

> We just never put anything in writing. At least I did[n't]. All the habits I learned as a good litigator where I took detailed notes about what was going on I threw out the window. (Mikva interview, p. 1)

> We did not take notes. We were subject to subpoena. People were very careful not to put things down in writing. (Ruff, as quoted in Oliphant, 2000, p. 2)

Future White House Counsels should study carefully the body of court opinions on presidential privileges. The District Court and D.C. Circuit Court of Appeals rulings in the matter of Bruce Lindsey's grand jury testimony are the key ones that deal with government attorney-client privilege and executive privilege.[2]

## 8. RECOGNIZE THE DIFFICULT POLITICAL ENVIRONMENT FOR THE JUDICIAL APPOINTMENT PROCESS

One word of caution for the next Counsel is a warning about how poisoned the process for judicial appointments has become. Speculation abounds that there may be anywhere from one to four Supreme Court vacancies sometime during the next president's term of office, vacancies that will fall directly into the Counsel's lap. The experience of getting federal judicial nominees through the confirmation process, beginning with the George H. W. Bush administration and continuing to the present day, has become a torturous one, with historic delays and much ill will. There does not

---

[2] *In re Sealed Case* (Bruce R. Lindsey) (Grand Jury Testimony), 5 F. Supp. 2d, 21 (D.D.C. 1998); *In re: Bruce Lindsey* (Grand Jury Testimony), 158 F. 3d 1263 (D.C. Cir. 1998).

appear to be reason for optimism that this confrontational relationship will change in the near future, especially if conditions of divided government persist.

### 9. Prepare Executive Orders to be Ready to Go on Day One, but Don't Overpromise

It has become standard practice for recent presidents to have a package of executive orders ready to be issued on the president's first day in office. Some orders may institute a policy that was integral to the president's campaign promises (e.g., Obama and "transparency," as well as a commitment to close the prison at Guantanamo Bay – both were among the executive orders issued on January 21, 2009), while others may explicitly turn back executive orders of a predecessor (as with Obama's order to override George W. Bush's executive order changing the procedures in the Presidential Records Act). Keep in mind the advice from Obama Counsel Gregory Craig to consult with stakeholders when developing these orders: people on the Hill, interest groups, and relevant departments and agencies. There should be no surprises. (Craig interview) It is helpful, for continuity, if the person tasked during the transition with developing these executive orders is the prospective, incoming Counsel.

### 10. Recognize the Changed Nature of National Security Threats

Throughout this report, there are repeated references to the changed nature and increased complexity of the national security environment that has faced post-9/11 presidents. The Counsel, as the president's legal advisor within the White House, has had a whole range of new responsibilities (e.g., developing and implementing the legal rules and criteria for authorizing the president to order targeted killings by drone strikes) added to the tasks of the office, as a result of these developments. Recent Counsels have addressed the need for expertise in national security law by delegating that specific policy area to a trusted Deputy and an Associate Counsel. This seems an effective model to follow, with the Counsel in continual (daily) consultation with these two staff members, to keep the Counsel apprised of all information that could require legal advice to the president on any potential threats to the nation's security.





*SMOOTHING THE PEACEFUL TRANSFER OF DEMOCRATIC POWER*

## Report 2017—29

# THE WHITE HOUSE COUNSEL

MaryAnne Borrelli,          *Connecticut College*
Karen Hult,                 *Virginia Polytechnic Institute*
Nancy Kassop,               *State University of New York–New Paltz*
Kathryn Dunn Tenpas,        *Brookings Institution*

## INTRODUCTION

The White House Counsel's Office is at the hub of all presidential activity. Its mandate is to be watchful for and attentive to legal issues that may arise in policy and political contexts in which the president plays a role. To fulfill this responsibility, it monitors and coordinates the presidency's interactions with other players in and out of government. Often called "the president's lawyer," the Counsel's Office serves, more accurately, as the "lawyer for the office of the presidency," with tasks that extend well beyond exclusively legal ones. These have developed over time, depending on the needs of different presidents, on the relationship between a president and a Counsel, and on contemporary political conditions. The Office carries out many routine tasks, such as vetting all presidential appointments and advising on the application of ethics regulations to White House staff and executive branch officials, but it also operates as a "command center" when crises or scandals erupt. Thus, the more sharply polarized political atmosphere in recent years has led to greater responsibility and demands, as



*Funded by the* MOODY FOUNDATION

well as heightened political pressure and visibility, on the traditionally low-profile
Counsel's Office. The high-stakes quality of its work has led to a common sentiment
among Counsels and their staff that there is "zero tolerance" for error in this office.

In sum, the Counsel's Office might be characterized as a monitor, a coordinator, a
negotiator, a recommender, and a translator: it *monitors* ethics matters, it *coordinates* the
president's message and agenda with other executive branch units, it *negotiates* with a
whole host of actors on the president's behalf (not the least of which is Congress), it
*recommends* myriad actions to the president, and it *translates* or interprets the law
(whether it is the Constitution, federal rules and regulations, treaties or legislation) for
all executive branch officials. Past Counsels have lamented that there is no job
description for this office, but any description of it would acknowledge its all-consuming
and all-inclusive nature of reviewing almost everything that goes in and out of the
president's office.

It may be instructive for incoming Counsels and their staff to consider the words
of Fred Fielding, a three-time "veteran" in the Counsel's Office, having served as an
associate and a deputy in the Nixon White House Counsel's Office, and then twice as
Counsel, in the beginning of the Reagan administration (1981-1986) and at the end of
the George W. Bush administration (2007-2009):

> The Counsel's Office is a strange thing to a lawyer, especially, if you have been in private practice.
> In private practice, you have a problem, you sit around a table, you talk about the problem with
> other people, you do extensive research, you have precedents you can deal with, and you
> have...time.
>
> But here, you don't have any of those luxuries, and so, your decisions have to be made very
> rapidly, and they have to be made with an added input that lawyers don't usually have to worry
> about – and that is, with the real-life political implications of the decision you are making.
> (Fielding interview)[3]

# OVERVIEW

The White House Counsel's Office sits at the intersection of law, politics, and
policy. It is charged with reconciling these three, without sacrificing too much of any
one.

- The White House Counsel's Office advises on the exercise of presidential
  powers and actions; defends presidential prerogatives; oversees executive and
  judicial appointments and nominations; educates and monitors White House
  staff adherence to federal ethics and records management law; and handles

---

[3] Fielding offered an illustration when he advised President Reagan during the PATCO strike in 1981
that it would be legal for the president to fire the nation's air traffic controllers and to order striker
replacements. President Reagan asked Fielding if he was doing the right thing. Fielding replied, "Yes,
Mr. President, you are doing the right thing . . . unless there is a crash within the first 48 hours."
Fielding explained that if there had been a crash, "it would not have mattered how right we were."
(Fielding interview)

White House, departmental, and agency contacts with the Department of Justice.

- The work of the White House Counsel is as strategic as it is substantive. By participating in decision-making processes, the White House Counsel anticipates problems or provides more effective solutions.

The most important contribution of the White House Counsel may well be telling the president "no." To do this effectively, the Counsel must understand the limits of the advocacy provided by the office.

- The White House Counsel protects presidential powers and constitutional prerogatives, providing legal counsel to the office of the presidency, not to the individual president.

- As the presidential term advances, the interventions practiced by the White House Counsel will alter and may focus more on preventing than facilitating White House actions.

- The loss of government attorney-client privilege has significantly altered practices and procedures within the Counsel's office, making it even more critical that incoming Counsels consult with their predecessors.

- The Office of Legal Counsel in the Department of Justice is a critical and supportive resource for the White House Counsel.

The White House Counsel's Office must be prepared for close scrutiny and constant criticism, as it protects presidential prerogatives and contributes to presidential policy-making.

- The breadth and number of the Counsel's responsibilities ensure that the forces at work on the entire White House Office – the quick start, the lack of records and institutional memory, the need to make decisions with limited information, the tight deadlines and goal displacement – will be felt with even greater force in the Counsel's Office.

- Congressional and media oversight will be continuous and critical, because the Counsel's Office has responsibilities pertaining to decisions and processes that have become intensely polarized and partisan.

- The Counsel must be prepared for scandal, both procedurally and substantively, or these events will overwhelm (and potentially sideline) the office.

The most dramatic change to the Counsel's Office, beginning in the George W. Bush administration, has been the increased attention to an irrevocably altered national security environment since the advent of 9/11. These changes are reflected in a revised structure of the office, which now includes a Deputy Counsel designated with the exclusive responsibility for advising the president on national security matters. Mary DeRosa, who served as Legal Adviser to the National Security Council (NSC) in the

Clinton administration (as Deputy Legal Adviser from 1997-2000, and as Legal Adviser from 2000-2001) as well as Legal Adviser to the NSC in the Obama administration (2009-2011) offered a succinct description of the effect of this change:

> I never met the president in the Clinton administration, was never in meetings with the president. In the Obama administration, I was in the president's office on Day One, and met with him regularly after that. There was just no comparison between the two administrations as to the level of attention to national security legal issues. (DeRosa interview)

## ROLES AND RESPONSIBILITIES, THE PRESIDENTIAL TERM, AND SAYING "NO"

In simple terms, the Counsel's Office performs five basic categories of functions: (1) advising on the exercise of presidential powers and defending the president's constitutional prerogatives; (2) overseeing presidential nominations and appointments to the executive and judicial branches; (3) advising on presidential actions relating to the legislative process; (4) educating White House staffers about ethics rules and records management and monitoring adherence to those rules; and (5) handling department, agency and White House staff contacts with the Department of Justice (see "Functions" section). In undertaking these responsibilities, the Counsel's Office interacts regularly with, among others, the president, the Chief of Staff and the chief's office, the Vice President's office, the White House Office of Presidential Personnel, the Press Secretary, the White House Office of Legislative Affairs, the Attorney General, the Office of Management and Budget (on the legislative process), the general counsels of the departments and agencies, and most especially, the Office of Legal Counsel in the Department of Justice (see "Relationships" section). In addition to the Counsel, the Office, in recent years, has consisted of up to three Deputy Counsels, a varying number of Associate, Assistant and Special Counsels, and support staff. The Obama administration has included a Principal Deputy Counsel, in addition to the Deputy Counsels: in this model, Deputies have been designated to oversee specific responsibilities (e.g., national security, economic policy, and ethics). Tasks are apportioned to the remaining positions in various ways, depending on the Counsel's choices, though most Counsels expect all Office members to share the ongoing vetting for presidential appointments (see "Organization and Operations" section).[4]

Certain responsibilities within the Office are central at the very start of an administration (e.g., vetting for initial nominations and shepherding the appointment process through the Senate), while others are more cyclical (e.g., the annual budget, the State of the Union message), and still others follow the election calendar (e.g., determining whether presidential travel and other activities are partisan/electoral/campaign or governmental ones). See "Organization and Operations.") There is, of course, the always unpredictable (but almost inevitable) flurry of scandals and crises, in which all eyes turn to the Counsel's Office for guidance and

---

[4] For an example of the breakdown by position and responsibilities within the Counsel's Office at the start of the Obama administration, see: https://www.whitehouse.gov/the-press-office/obama-announces-key-additions-office-white-house-counsel.

answers. Watergate, Iran-contra, Whitewater, the Clinton impeachment, the FBI files, White House Travel Office matters, the firing of the nine U.S. Attorneys, the response to congressional investigations after the 2006 Democratic take-over of Congress, and the response to concerns about Secretary of State Clinton's private e-mail server, all were managed from the Counsel's Office, in settings that usually separated scandal management from the routine work of the Office, so as to permit ongoing operations to continue with minimal distraction. Among the more regular tasks that occur throughout an administration are such jobs as directing the judicial nomination process for all federal judges, reviewing legislative proposals (the president's, those from departments and agencies, and bills Congress has passed that need the Counsel's recommendation for presidential signature or veto), editing and clearing presidential statements and speeches, writing executive orders, and determining the application of executive privilege (see both "Relationships " and "Organization and Operations" sections). More recently, remaining constantly attentive to the unpredictable national security environment has become the official task of the Deputy Counsel with a dedicated responsibility for national security: this Deputy Counsel keeps the Counsel informed on an ongoing basis.

Perhaps, the most challenging task for the Counsel is being the one who has the duty to tell the president "no," especially when it comes to defending the constitutional powers and prerogatives of the presidency. Lloyd Cutler, Counsel for both Presidents Carter and Clinton, noted that the Counsel is

> always on the cutting edge of problems, and you're giving this mixture of legal and policy advice all the time... clearly, you want somebody who has his own established reputation...someone who is willing to stand up to the president, to say, "No, Mr. President, you shouldn't do that for these reasons." There is a great tendency among all presidential staffs to be very sycophantic, very sycophantic. It's almost impossible to avoid: "This man is the President of the United States and you want to stay in his good graces..." Even when he is about to do something dumb; you don't tell him that. You find some way to put it in a very diplomatic manner. (Cutler interview, p. 3)

Even more vivid is the description by David Gergen of the typical way that Reagan administration Counsel Fred Fielding would offer advice to White House staff members, saying, for example, "David, it would be technically okay for you to take the following course of action...But can I advise you as a friend and as someone who wants to be respected that there is a much wiser way to proceed? You won't find it as convenient and you may not achieve everything you want, but at the end of the day, you can sleep at night and your honor will be intact" (Allen, 2007).

## LAW, POLITICS, AND POLICY

Sitting at the intersection of law, politics, and policy, the Counsel's Office confronts the difficult and delicate task of trying to reconcile all three of these without sacrificing too much of any one. It is the distinctive challenge of the Counsel's Office to advise the president to take actions that are both legally sound and politically astute. A 1994 article in Legal Times warned of the pitfalls:

> Because a sound legal decision can be a political disaster, the presidential counsel constantly sacrifices legal ground for political advantage. (Bendavid, 1994, p. 13)

For example, A. B. Culvahouse recalled his experience upon arriving at the White House as Counsel and having to implement President Reagan's earlier decision to turn over his personal diaries to investigators during the Iran-contra scandal.

> Ronald Reagan's decision to turn over his diary—that sits at the core of the presidency. ...You're setting up precedents and ceding a little power. But politically, President Reagan wanted to get it behind him. (Bendavid, 1994, p. 13)

Nonetheless, Culvahouse added, the Counsel is "the last and in some cases the only protector of the President's constitutional privileges. Almost everyone else is willing to give those away in part inch by inch and bit by bit in order to win the issue of the day, to achieve compromise on today's thorny issue. So a lot of what I did was stand in the way of that process" (Culvahouse interview).

Similarly, upon President Obama's announcement in April 2014 of the departure of then-Counsel Kathryn Ruemmler, Chief of Staff Denis McDonough commented:

> The thing that strikes me that she takes a particular interest in is the absolute need for defending the president's equities – obviously, for this president, but for the institution and the next president, too – to protect the space of the president to get candid advice to make tough decisions. She is not afraid to take on a lot of criticism for that. (Savage 2014)

Because of this blend of legal, political and policy elements, the most essential function a Counsel can perform for a president is to act as an "early warning system" for potential legal trouble spots before they erupt. For this role, a Counsel must keep his or her "antennae" constantly attuned. Being at the right meetings at the right time and knowing which people have information and/or the necessary technical knowledge and expertise in specific policy or legal areas are the keys to insuring the best service in this part of the position. C. Boyden Gray, Counsel for President George H.W. Bush, commented: "As Culvahouse said -- I used to say that the meetings I was invited to, I shouldn't go to. . . . It's the meetings I wasn't invited to that I'd go to" (Gray interview). Lloyd Cutler noted that

> . . . the White House Counsel will learn by going to the staff meetings, et cetera, that something is about to be done that has buried within it a legal issue which the people who are advocating it either haven't recognized or push under the rug. He says, "Wait a minute. We've got to check this out," and goes to the Office of Legal Counsel and alerts them and gets their opinion. But for the existence of the White House Counsel, the Office of Legal Counsel would never have learned about the problem until it was too late. (Cutler interview, p. 3)

One other crucial part of the job where the legal overlaps with the policy and the political—and which can spell disaster for Counsels who disregard this—is knowing when to go to the Office of Legal Counsel for guidance on prevailing legal interpretations and opinions on the scope of presidential authority. It is then up to the White House Counsel to sift through these legal opinions, and to bring into play the operative policy and political considerations in order to offer the president his or her best recommendation on a course of presidential action. Lloyd Cutler described how this process works:

> They [OLC staffers] are where the president has to go or the president's counsel has to go to get an opinion on whether something may properly be done or not. For example, if you wish to invoke an executive privilege not to produce documents or something, the routine now is you go to the Office of Legal Counsel and you get their opinion that there is a valid basis for asserting executive privilege in this case. ...You're able to say [to the judge who is going to examine these documents] the Office of Legal Counsel says we have a valid basis historically for asserting executive privilege here. (Cutler interview, p. 3)

C. Boyden Gray underscored the critical importance of OLC's relationship to the Counsel's Office:

> They [OLC] were the memory...We paid attention to what they did. [Vincent] Foster never conferred with them. When they [the Clinton Counsel's Office] filed briefs on executive privilege, they had the criminal division, the civil division and some other division signing on the brief; OLC wasn't on the brief... In some ways they [OLC] told us not to do things but that was helpful. They said no to us... I can give you a million examples. They would have said to Vince Foster, "Don't go in and argue without thinking about it." They would have prevented the whole healthcare debacle [referring to the Clinton Counsel's Office's position that Hillary Rodham Clinton was a government official for FACA purposes] ... [T]he ripple effect of that one decision is hard to exaggerate: it's hard to calculate. (Gray interview)

In addition, Gray continued,

> ...OLC has this long institutional memory of how to deal with Congress in situations like this [referring to the Clinton Counsel's Office's agreement to permit the president to give grand jury testimony to Independent Counsel Ken Starr] and they would have said, "Hey, have you thought about [this]?" (Gray interview)

During the Obama administration, however, a vigorous debate emerged among legal scholars, all of whom had served at some point previously in executive branch legal positions, over the role of OLC vis-à-vis other executive branch legal offices, especially on national security issues. Former George W. Bush administration OLC official Jack Goldsmith spearheaded the debate, opining on OLC's diminished influence, or what he described as "the decline of OLC" (Goldsmith, Lawfare, October and November 2015; also, Morrison 2011). (See a more extended discussion of this debate under "Departments and Agencies.")

### JUSTIFICATION FOR THE CONTINUED EXISTENCE OF THE COUNSEL'S OFFICE

If one dates the origins of the Counsel's office back to Sam Rosenman in the Franklin Roosevelt administration, it has existed in its present form for more than seventy years.[5] It is an office that surfaces to the public only in times of controversy. Some have questioned its very existence, especially in light of its inherent tension between law and politics and the potential for an uneasy relationship with the Department of Justice. Presidential scholar Bradley Patterson, Jr. explains one line of criticism about the office that its detractors think that it offers a way for presidents to

---

[5] As noted below, as a White House unit focusing on legal matters, the Counsel's Office can be traced to the Nixon administration.

'"shop around' for the legal advice they prefer—resulting in inconsistencies in the administration's judgments" (Patterson, 2008, p. 66).

In a conference at Duke University Law School in September 1999, a distinguished panel of former White House Counsels and Attorneys General was asked by moderator Walter Dellinger to consider whether the White House Counsel's Office should be abolished. Their answers were illuminating, based on reflections from their own experiences as government lawyers from each party who had served in recent administrations. Former Attorney General Benjamin Civiletti was the only panel member who was opposed to maintaining the Counsel's Office, stating that "the White House Counsel's Office is an abomination, structurally inefficient, lots of potential for conflict because of its political nature. If the president has a trusted person who can give him confidential advice, keep that person out of government" (Notes on file with Kassop).

The discussion began with questions about when and why a president needs a White House Counsel, as contrasted with a president's need for an attorney general. Lloyd Cutler remarked:

> A president needs two lawyers that he trusts implicitly: one as attorney general and one as White House Counsel. The AG is busy running a huge department, travels a lot, often is out of town. The White House Counsel is more like an inside general counsel of a major corporation that identifies legal issues that are about to develop, and discusses them with the AG, in advance." Later, he added, "The Justice Department is so big, it needs a good White House Counsel. DOJ needs someone at the White House. DOJ couldn't do without us." (Notes on file with Kassop)

Another key topic this panel addressed was whether it was proper for the Attorney General to inform the White House Counsel when a senior White House official or a major contributor to the president's campaign was under criminal investigation. All panel members agreed that it was necessary for the president to know when these circumstances arose, and that the Attorney General or Deputy Attorney General could tell the White House Counsel, who should then inform the president, to insure that the president would not associate further with the person under criminal inquiry.

Finally, when asked for advice to give to the next White House Counsel, A. B. Culvahouse, counsel to President Reagan, offered that a Counsel should "assume no policy responsibility (don't make the White House Counsel the 'czar' of anything) – that would undermine his role as an honest broker and his relationship with the agencies." Cutler, on the other hand, responded that "there are many instances where the White House Counsel *should* have substantive policy positions, e.g., on vetoes, on Supreme Court briefs from the Solicitor General's office, and on issues such as affirmative action" (Notes on file with Kassop).

Thus, despite skepticism over how such an office can exist comfortably balancing among law, policy, and politics, those who have served in it and those who have worked in close association with it agree that the president requires someone who can sift through political and policy options with an understanding of the law and who can advise the president as to what the law will and will not permit. That is not a job the Attorney General has the time to perform, and therefore, the need for an official with

legal expertise within the confines of the White House staff can be satisfied by the exercise of responsibilities performed by the Counsel's Office.

The following sections will provide more detailed information on the functions of the Office, the relationships it maintains with other governmental units, and its organization and routine operations. A final section on lessons learned from prior Counsels will close with some practical advice and cautions for its future occupants.

## FUNCTIONS OF THE WHITE HOUSE COUNSEL'S OFFICE

Although the White House Counsel's Office has assumed different tasks in different administrations, the broader contours of its responsibilities began to take shape under Counsel John Dean in the Nixon administration, and have been largely consistent since the Ford years. These responsibilities generally fall into the following categories. (For a summary, see Appendix 1.)

1. Advising on the exercise of presidential powers and defending the president's constitutional prerogatives;

2. Overseeing presidential nominations and appointments to the executive and judicial branches;

3. Advising on presidential actions relating to the legislative process;

4. Educating White House staffers about ethics rules and records management and monitoring adherence; and

5. Handling department, agency, and White House staff contacts with the Department of Justice.

### 1. ADVISING ON THE EXERCISE OF PRESIDENTIAL POWERS AND DEFENDING THE PRESIDENT'S CONSTITUTIONAL PREROGATIVES

Counsel tasks related to presidential powers include routine reviewing and/or drafting of executive orders; reviewing all pardon and commutation recommendations; reviewing requests for federal disaster relief; reviewing CIA-drafted intelligence findings and approving covert operation proposals; interpreting treaties and executive agreements (the primary responsibility for this task rests with the State Department Legal Adviser, although the Counsel's Office may weigh in here); examining all presidential statements for consistency and compliance with legal standards, and in anticipation of legal challenges; and participating in editing the State of the Union address. Tasks that have consistently related to the defense of a president's constitutional prerogatives are fewer in number. These have generally focused on issues related to executive privilege, war powers, and presidential disability or succession.

Drafting and reviewing executive orders (and other types of executive "actions," e.g., memoranda, guidance, proclamations, policy directives) is an important task

performed by the Counsel's Office. (For a discussion of the distinction between executive orders and memoranda, see Korte 2014)

Obama Counsel Gregory Craig offered advice about the process of developing executive orders:

> I remember talking to Walt Dellinger...who said to me, when we talked about executive orders, "Be careful to do exactly that. Talk to your political stakeholders on the Hill. There are interest groups that care, if you can talk to them. If you have a chance to talk to the people that are in the departments and the bureaucracies, do that, so that when the executive order comes out, there's going to be a minimum of surprise. (Craig interview)

The responsibilities associated with presidential powers are highly volatile. The present Washington political environment is notable for partisanship, polarization, and confrontation. Presidential actions and decisions are subjected to extraordinary scrutiny, and a twenty-four hour news cycle accelerates the pace of decision-making, and increases the likelihood and swiftness of critical reaction. For these reasons, any distinction between the "routine" and the more "crisis-laden" exercise of a president's constitutional powers is essentially artificial. At any time, political events may transform an otherwise routine exercise of presidential powers into an extraordinary undertaking. As Clinton Counsel Bernard Nussbaum concluded, "Small (and not so small) policy and political problems grow into legal problems. It was my job to make sure that these political and policy brushfires didn't become conflagrations" (Nussbaum interview). Consequently, a White House Counsel must be well informed about political developments throughout the White House and the executive branch.

### Advising on Executive Privilege

Issues relating to the president's constitutional prerogatives require both awareness of politics and attentiveness to precedents. These two requirements are most critical during the intensely sensitive clashes that can result when Congress, a court, or an independent counsel (exercising prosecutorial functions) demands information (documents or testimony) from a sitting president, who refuses to accede to such demands.

Despite the primacy of high-stakes politics in these stand-offs between the branches, some degree of political accommodation, rather than a purely "legal" answer, is more often the ultimate outcome of such conflicts. Although presidents are fiercely protective of their prerogatives, they may also recognize the practical need to find some compromise to break the political logjam. White House Counsels often find themselves caught in the cross-hairs, where their best legal judgment about the appropriate presidential response is often overridden by more forceful political considerations from influential political advisors. Former Counsels Robert Lipshutz (Carter) and Abner Mikva (Clinton) explain below:

> Once we began to understand it, we decided to negotiate when the problem came up. As a result, I don't think we ever had a showdown on [executive privilege]. For instance, if a committee wanted certain documents and certain information we would try to figure out everything we could properly give to them and sit down with them – either I would, [Assistant to the President

for Congressional Relations] Frank Moore would, or someone else would – and try to negotiate on disclosing everything we possibly could. I don't think we had any confrontations of any serious consequence on the whole executive privilege issue as a result of that. (Lipshutz interview, p. 17)

I think this President operated on the premise pretty much and I certainly did that whatever the legal consequences or legal parameters were of executive privilege, if Congress really wanted something, politically it almost was impossible to deny it. The more you stood on privilege, the more you pointed to precedents, the more you showed these are the things that the President didn't turn over, the more they could make political hay out of it. As I say, we operated on the premise that you could resist and you could maybe negotiate but that, by and large, if Congress really wanted anything you have to give [it] to them, therefore, better act forthcoming. (Mikva interview, p. 4)

I think the worst rap they put on this administration was that they have stonewalled on anything with the exception of Monica – obviously it was stonewalled. (Mikva interview, p. 4)

A more detailed discussion of executive privilege, specifically referencing court decisions in this area, can be found in the "Relationships " section.

### *Advising on War Powers*

Congress passed the War Powers Resolution (WPR) in 1973 over President Nixon's veto, in the wake of the Vietnam conflict. With that conflict as its fresh frame of reference, the resolution was intended to provide a set of procedures that would reassert Congress's constitutional role into the war-making process and that would promote joint determination between the president and Congress over future decisions to use military force.

Almost all presidents, from Nixon forward, have proclaimed that the resolution intrudes on their constitutional authority, and, at the very least, all have resented the requirements imposed on them by the WPR's consultation, notice and reporting provisions. For over forty years, the two branches have tussled mightily over how to faithfully implement this resolution, with sufficient blame for the law's failure to be attributed equally to the president and Congress. The president's approach has been to follow, *in practice*, most of the resolution's requirements without specifically acknowledging the legal obligation to do so: it might best be characterized as action by the president that is "consistent with but not pursuant to" the law's requirements. Many presidents have remarked that a formal congressional authorization to use force would be helpful as a show of political support – but not strictly necessary under the Constitution. And, so, the "tussle" continues, with no definitive conclusion but with forty-plus years of continued practice and precedent that have been ingrained in our history.[6]

The Counsel has the responsibility to draft the letters that the president sends to notify Congress whenever he takes military action. Typically, precedent is followed

---

[6] For further explanation, see: https://www.loc.gov/law/help/war-powers.php; and https://www.lawfareblog.com/obama-wpr-letters-2009-2015-0.

very closely, with past letters serving as models for correspondence. Clinton Counsel Abner Mikva notes:

> . . . the War Powers Act discussions were very desultory. I think I saw my role and most of the lawyers involved in the process saw their role and the political people saw their role as trying to make sure that we did the minimum necessary to comply with the notice provisions and other provisions the act required of us so we didn't give Congress a free hit. (Mikva interview, p. 11)

All letters end with a standard statement, such as: "I am providing this report as part of my efforts to keep the Congress fully informed, consistent with the War Powers Resolution. I appreciate the support of the Congress in this action." These letters are "boilerplate," and provide Congress with a minimum of information, simply, as A. B. Culvahouse put it, "in the interest of comity... There is a real kabuki dance that was done. You sent a notice up to the Hill while protesting all the time that you're not providing notice" (Culvahouse interview). Like a kabuki dance, the war powers dialogue is often quite ceremonial, lacking a clear beginning or ending, and revealing much about the competition for political power.[7]

   Once again, it is important to note the extraordinary developments that a post-9/11 world has imposed on a president's conduct of military affairs. Both the George W. Bush and Obama administrations have confronted security challenges of an unprecedented nature. Military operations now include remotely controlled targeted killings through drone strikes and dramatically increased use of covert operations to ferret out terrorist suspects, along with enhanced surveillance capabilities used on both foreign as well as domestic soil. Decisions by the president to undertake all of these types of operations require participation by legal advisors from across the national security policy-making community. Thus, under both Bush and Obama, the structure of legal advice coming from the Counsel's Office on national security matters changed. The Bush administration was the first to "dual-hat" the position of Legal Adviser to the National Security Assistant (and to the National Security Council) by having that lawyer report, also, to the White House Counsel. The Obama administration took that change one step further by making that person, still "dual-hatted" in reporting to both the NSC/National Security Assistant and to the White House Counsel, a Deputy Counsel in the Counsel's Office at the level of Deputy Assistant to the President. That Deputy Counsel for National Security Affairs headed the "lawyers group" of legal advisers or general counsels from all of the participating national security policy-making units (e.g., Defense, State, Justice, Joint Chiefs of Staff, office of the Director of National Intelligence, and the CIA), convening that group for regular (at least, weekly) meetings. (DeRosa interview)

   Among recent Counsels, there has been a debate over whether this new structure is a better model than having separate legal advisors for national security, one reporting exclusively to the Counsel, and a different legal adviser reporting separately to the president's National Security Assistant. Obama Counsel Robert Bauer initiated a

---

[7] https://www.whitehouse.gov/the-press-office/2011/03/21/letter-president-regarding-commencement-operations-libya. See this URL for the full letter President Obama sent to Congress on the commencement of U.S. operations in Libya in 2011 in support of U.N.S.C. Resolution 1973.

discussion about the relative merits of each model: his preference would have been to maintain two separate lines of reporting with two separate legal advisers. However, he inherited the "dual-hat" structure from Counsel Gregory Craig, and because Bauer had confidence in the Deputies for national security who served under him (Mary DeRosa and then Avril Haines), he chose not to disturb that structure. Deputy Counsel Mary DeRosa explained that she found the dual-hat structure more advantageous to the Counsel's Office than the alternative, because it permitted the Deputy Counsel to have greater access to more information that flowed from the close relationship to the National Security Council staff. (Bauer interview; DeRosa interview)

Perhaps, the final and ultimate point to make here is simply that what constitutes "war powers" today has changed considerably from 1973, and the president's need for swift but effectively reasoned legal advice on these complex matters consequently has been ratcheted up to an unprecedented level. This may be the area of responsibility within the Counsel's Office where the need is greatest for an incoming Counsel to consult extensively with former Counsels and Deputy Counsels.

### *Advising on Presidential Disability and Succession*

George H.W. Bush Counsel C. Boyden Gray observed that the Counsel's Office is singularly responsible for designing decision-making procedures for presidential disability and succession.

> There's a Twenty-fifth Amendment, that's all – we didn't inherit much on that but we did develop a big decision tree which worked when [President Bush] had his thyroid problem and I think has worked since. That was a big contribution to the Counsel's Office, the work that we did to put that all together.... I don't think we involved anybody outside the White House but I sat down and did it with the Chief of Staff ... [and] the White House doctor.... What happens: If X then go to Y; if Z then go back to A. It's just a decision tree on how to handle disability and it worked like a charm faultlessly, perfectly when he went into the hospital. (Gray interview)

Reagan Counsel A. B. Culvahouse has commented on this recurring issue of temporary presidential medical incapacity:[8]

> This is an area where the lack of an institutional memory is atrocious. The White House should not have to re-invent a process each time the POTUS [President of the United States] has surgery. We did the same thing when President Reagan had surgery (I think for skin cancer) in '87/'88.

Reagan and G.W. Bush Counsel Fred Fielding was present in the White House Situation Room during the tense episode following the assassination attempt on President Reagan in March 1981 (and, also for the polyp surgery Culvahouse referred to above). Fielding provides a vivid account of his experience in trying to explain the provisions of the 25th Amendment to White House staff and Cabinet members assembled in that room (see Fielding 2010), but also explains the reluctance of President Reagan to formally invoke the 25th Amendment and to transfer power temporarily to the vice president. The process that they used might be characterized as identical to the

---

[8] Personal communication A. B. Culvahouse to Martha Joynt Kumar, White House Interview Program, October 9, 2000.

approach that has come to be used for presidential compliance with the War Powers Resolution: "consistent with but not pursuant to." President Reagan followed, in practice, the procedures required under the 25th Amendment without actually invoking it. He was resistant to setting a precedent, out of a fear that it would force a future president to follow it although he might wish to not do so. (Fielding interview, p. 25; and Fielding 2010) President George W. Bush did officially invoke and use the provisions of the 25th Amendment during his colonoscopy, temporarily transferring power to Vice President Cheney while the president was under sedation, and taking back his power once he was awake and alert. (Kassop 2005)

The very first order of business that the Counsel undertakes with the newly-inaugurated president and spouse and the new vice president is to meet with them to advise them of the 25th Amendment's provisions and to discuss any of their preferences as to how potential episodes of temporarily disability should be handled. (Fielding interview)

### The Limits of Advocacy

Complicating the Counsel's work as a protector of presidential powers and constitutional prerogatives is the lack of clarity associated with the Counsel's responsibilities as an advocate. The White House Counsel provides legal counsel to the office of the presidency, not to the individual president. As such, the Counsel's Office protects the powers of the office within the constitutional order of separated powers. Determining whether the office or the individual is under attack, however, may be difficult.

> In fact, when I was first introduced to this job by Fred Fielding he said to me, "You are counsel to the office of the presidency. You are not counsel to the President." I absorbed that and thought I understood what it all meant. However, in practice, it's not a very useful guide, because you really don't know -- when issues like Whitewater come up -- whether you're representing the President or the presidency. For example, counsel can certainly be confronted with a lot of noise created by the President's political opponents, even if they are allegations concerning the President's own personal conduct. But as soon as it becomes clear -- and there's no bright line here -- that this isn't just noise by political opponents, but in fact relates to the President's personal conduct, then the President should have his own lawyer. (Wallison interview, pp. 20-21)

Identifying and drawing these distinctions, however, often has generated controversy. For instance, Clinton Counsel Bernard Nussbaum was widely viewed as failing to make this distinction between advocacy on behalf of the office and on behalf of an individual president. For his part, Nussbaum wrote in his resignation letter that he left "as a result of controversy generated by those who do not understand, nor wish to understand, the role and obligations of a lawyer, even one acting as White House Counsel" (as reported in Marcus and Devroy, 1994).

## 2. OVERSEEING PRESIDENTIAL NOMINATIONS AND APPOINTMENTS TO THE EXECUTIVE AND JUDICIAL BRANCHES

### Participating in the Selection of Presidential Nominees and Appointees to the Executive Branch

The White House's role in the appointments process involves two steps: generation of names of nominees, and vetting and clearance. White House Counsel advising about presidential nominees and appointees to the executive branch has typically focused on nominations to the top Justice Department positions and to the general counsel positions in the departments and agencies. Bernard Nussbaum bluntly stated that his office "appointed the Attorney General, head of the FBI, Justice Department officials (Dellinger—I sent him over to OLC from the White House Counsel's Office)" (Nussbaum interview).

The Counsel's Office undertakes extensive vetting of all presidential appointees: each president nominates approximately 1,400 people to Senate-confirmed (PAS) positions in the executive branch. The Counsel works in close coordination with the Office of Presidential Personnel and the Office of Government Ethics. The crush of nominees is most evident at the start of an administration, but delays at both ends of the process – selection by the president and confirmation by the Senate – can also result in an uneven flow and pace of nominations. Typically, the clearance responsibility is shared widely throughout the Counsel's Office among most of its members, and some Counsels have brought in detailees from other agencies to work for a six-month period exclusively on clearance, to help to manage the workload of the office.

For nominees, the process can be grueling, lengthy, highly intrusive and uncertain. In recent years, an increasing number of nominees have sought the advice of tax lawyers and accountants to assist in completing the myriad forms required of them. (Carter 2013; Eisen interview) A Washington tax lawyer in private practice, who has represented political nominees requiring Senate confirmation and has helped them navigate the vetting process, has described the current nomination process as "weaponizing" government ethics: that in a politicized environment, an intense focus on ethics has "become part of the political battle" (Rizzi interview).

### Participating in the Selection of Presidential Nominees to the Judicial Branch

The extent to which the Counsel's Office has been involved in the judicial appointment process has varied across administrations. (Goldman, Slotnick and Schiavoni, 2013; Goldman, Slotnick, Gryski, and Schiavoni, 2005, 2007; Goldman, Slotnick, Gryski, Zuk, and Schiavoni, 2003) In several recent administrations, however, the White House Counsel oversaw the process from start to finish: the Counsel chaired the judicial selection committee, supervised the vetting and clearance process, and prepared the nominee for confirmation. Obama Counsel Robert Bauer delegated

primary responsibility for overseeing judicial nominations to an associate Counsel (Susan Davies), who led the judicial nominations team.

In every administration, the judicial nomination process required the careful coordination of several White House offices (Counsel and Legislative Affairs), consultation with the Office of Legal Policy (OLP) in the Justice Department, and extended negotiations with U.S. senators. Reagan Counsel Fred Fielding notes that the judicial nominations process became centralized in the White House during the Reagan administration (he attributed this change to the fact that Reagan's experiences as governor with the selection of state judges had been unsatisfactory [Fielding interview]). It has remained that way ever since. Most specifically, the process of generating names as well as preliminary vetting of nominees for lower court vacancies occurs in the White House Counsel's Office, and then moves to the Justice Department. (See Slotnick, Goldman and Schiavoni 2015 for a thorough description of each step in the process.)

The selection process routinely varies for district, circuit, and Supreme Court nominations. Senators tend to be more involved in nominations to the U.S. district courts than they are in nominations to the courts of appeals or, especially, to the U.S. Supreme Court. Partisanship, though, plays an important role in determining the amount of influence that each player will have in the process.

> Unlike the Supreme Court, with courts of appeals and district courts you had to deal with the local Republican, in our case, senators if there were senators. If there weren't senators, the governors, congressmen and congresswomen. District courts, I seldom got involved. The Justice Department had a lot of protracted negotiations … about whether this was an appropriate person and so forth or was this a person who shared the President's judicial philosophy. Courts of appeal I would more often get involved. There would be disputes between the senators and the Justice Department. There would be disputes between maybe two Republican senators from the same state, between the governor and the more senior congressman or congresswoman. (Culvahouse interview)

The selection process itself has shifted from being centered in the Justice Department to being firmly ensconced in the White House, albeit with the status of the attorney general always a factor. In the Carter years, Counsel Robert Lipshutz recalled that the Department of Justice believed that judicial selection was its distinctive responsibility.

> [White House involvement in judicial appointments] was a struggle within the Justice Department because, number one, the White House was stepping into what many, particularly career people, and even Griffin [Bell, the Attorney General] too, felt should be strictly their prerogative and that is helping the President pick the judges. (Lipshutz interview, p. 8)

During the Reagan administration, White House involvement in lower court nominations increased, as noted above, and has been centralized in the White House ever since. In the Reagan years, there had been a judicial selection committee chaired by the Counsel, which typically included members of the Counsel's Office and the Department of Justice. In the Clinton administration, it also included representatives from the First Lady's Office and the Office of Legislative Affairs. Under George W. Bush, the judicial selection meetings continued on a weekly basis; convened by the White House Counsel, and they included the chief of staff, the director of the personnel office, the assistant for legislative affairs, and the attorney general and relevant assistant

attorneys general. The Counsel also held a second weekly meeting to discuss judicial strategy; at these sessions, "decisions are made about the timing for sending requests for confirmation to the Senate and about issues that may be foreseen about the confirmation process itself" (Patterson, 2008, p. 70).

By the Clinton years, such involvement had become routine, although the Justice Department continued to participate in the process. Members of the Clinton Counsel's Office were invited to the personal interviews with prospective lower federal court nominees, which were conducted by senior officials in the DOJ's Office of Legal Policy. Counsel staff also contacted senators about possible nominees, working with senior members and staffers of the Senate Judiciary Committee. Clinton Counsel Nussbaum confirmed that:

> The judicial selection process is centered in the White House office. A lot of other White House Counsel's Offices did not have the breadth and authority we had (maybe because of Foster and his access to the First Lady). We had special responsibility for Court of Appeals and Supreme Court appointments. (Nussbaum interview)

Recent research by judicial politics scholars has laid bare the full story of lower court appointments during the Obama administration.[9] Scholars have provided detailed statistics on the first six years of the Obama administration's judicial appointments record, and chronicled the effect of the Senate's "unprecedented level of obstruction and delay" in confirmation of lower court judges (Goldman, Slotnick and Schiavoni 2013) – followed by the stunning impact of the invocation of the "nuclear option" or elimination of the filibuster for Senate confirmation votes on lower court nominees after November 21, 2013. Lower court judicial appointments will be a major part of the Obama administration's legacy, noted, principally for its dramatically increased diversity of the federal bench.

### *Supervising the Vetting and Clearance Process*

The Counsel's participation in the nomination and appointment process has minimally and consistently involved the Office in supervising the vetting and clearance process (FBI, IRS, 278 forms and financial disclosure forms) for all presidential nominees to the executive and judicial branches. The time and resources consumed by these reviews is extraordinary. (See the "Rhythms" section on this work over the course of an administration.)

> Well, the FBI thing takes roughly three months although you can speed it up. You can do an expedite and do it in a week if someone has been through it before. I think we did Cheney over a long weekend. But if you're starting from scratch with somebody, normally it's three to four months depending on how old they are. If they're twenty-one, it won't take that long. If they're fifty-one, they have a whole life to go through especially if they've traveled. So it takes three months, average. It can take people three months just to fill out the forms so you really have to

---

9 Three articles are especially helpful and instructive about the step-by-step processes of selection and confirmation and about the pitfalls that inevitably await those involved in this critical responsibility of every administration. (See Slotnick, Goldman and Schiavoni 2015; Goldman, Slotnick and Schiavoni 2011; and Goldman, Slotnick and Schiavoni 2013)

hammer people and say, "The FBI can't start until they know where you live and that means filling out the form." (Gray interview)

When the background checks were complete – or even while they were progressing – decisions had to be made about whether to proceed with the nomination or appointment. In each administration, White House Counsels noted that different standards were applied to appointments than to nominations, and to nominations for less visible and more visible positions.

> [Y]ou'd have some people that you might never send up to the Hill for confirmation, but because they were strong allies of the President, supporters and/or were people that had a lot to offer, you might appoint them to the President's Foreign Intelligence Advisory Board rather than nominate them to be undersecretary of defense because the President has unilateral appointment authority. Maybe they go to a Schedule C position in OMB or DAS [Deputy Assistant Secretary], Treasury or whatever. You were pretty darn pure about cabinet people, deputy secretar[ies]. We were awfully pure about State, Defense, Treasury, Justice. ... You make different calls about whether or not the person had access to classified information, whether or not they had grant contract awarding authority. Different people are suited for different things. Take a look at the [Senate] committee. There were some committees that would take no prisoners and others – the finance committee, I think, was pretty terrific about exercising discretion, where youthful indiscretions ... were not disenfranchising if the person was a great Treasury securities expert. (Culvahouse interview)

Then, when the nominations were sent to the Senate, negotiations had to be conducted about the legislators' access to the reports.

> How much of the FBI files do they get to see[?] We conduct the search; we do the FBI for our benefit not for their benefit.... That was subject to enormous negotiation.... Huge fights over that.... You have to negotiate them one by one.... [O]nce you concede to one committee, you can't cut back for another committee; they're going to demand the same treatment. But it's got to be renegotiated and reinvented every time. (Gray interview)

### *Preparing the Nominee for the Confirmation Hearing*

Beyond vetting the nominees, the Counsel's Office sometimes prepared them for the confirmation hearings. This preparation could take the form of "murder boards."

> We [the Reagan administration] did a lot of murder boards, not just for judicial nominees but for a lot of people. I probably did fifty murder boards in my twenty-two months.... You get a bunch of lawyers and legislative types pretending to be senators and acting like horse's rear ends.... You can have too many [people on a murder board]. To me, there is an art to running a murder board. I've seen some where too many people are trying to impress the nominee, which is not what you want to do. What you want to do is anticipate questions, to make it more difficult for him or her than it is going to be in fact, and hit all of the areas that he or she is going to be questioned about. Supreme Court nominees are very difficult because the hearings go on forever and ever. In my view, there should be four or five questioners, max. There should be an understanding that a good enough answer is good enough. We're not striving for perfection here – we're striving for B-plus – and that you don't critique during the first two hours. You only critique on breaks thereafter.... This person already is the President's nominee. It's too late [to educate them to policy positions]. The object is to get them confirmed and make sure they're not so immobilized with promises and commitments that they can't exercise discretion with a full range of options. (Culvahouse interview)

Although the G. W. Bush administration did not employ murder boards, scholar Brad Patterson reports that the screening process remained "intense" (Patterson, 2008, p. 69). Similarly, participants in the Obama administration report "constant coordination" and interaction between the Counsel's Office and the Office of Legal Policy in the Justice Department over lower court nominations (Goldman et al., 2013, p. 16).

### 3. ADVISING ON PRESIDENTIAL ACTIONS RELATING TO THE LEGISLATIVE PROCESS

In recent presidential administrations, tasks in this category have included reviewing legislative proposals; reviewing bills presented for signature or veto, and drafting signing statements and veto messages; reviewing State and Defense Department authorizations and appropriations proposals; drafting budget rescissions and deferrals; participating in the negotiations associated with Senate treaty hearings; and being involved in legislative negotiations concerning policy, document requests (see also executive privilege, above), treaties, and nominations.

Congressional negotiations are a daily fact of life for the White House staff and, therefore, for the White House Counsel's Office.

> Well, to begin with there is hardly anything the president can do without the cooperation of the Congress. Most of his programs require congressional approval. The budget requires congressional action. Congress is always slow and we go through these continued crises of shutting down the government and continuing resolutions, et cetera. Getting Congress to move is very, very important. (Cutler interview, p. 26)

The extent to which the Counsel's Office has been involved in these policy negotiations has varied within and across administrations. Two Counsels who were deeply engaged in policy-making were Lloyd Cutler and C. Boyden Gray.

> Well, you had a lot of dealings with Congress because both the members and their staffs would call you up about things they were particularly interested in that they wanted you to take up with the President, or get a decision favorable to their constituent or whatever. I was used to a considerable extent to do what you might call lobbying Congress, although I'm not a lobbyist myself in the normal sense of the word. (Cutler interview, p. 12)

> The question is whether you take the lead or just participate in negotiations. I basically had to lead all the negotiations with the civil rights groups and the Congress on the Civil Rights Bill. I was sitting at the center of the table. I did not lead but I was a participant in all the negotiations down in [George] Mitchell's conference room in the Senate -- endless, endless meetings on the Clean Air Act. They would go until two, three, four in the morning sometimes. I wasn't leading those, but I was there. (Gray interview)

At a minimum, however, Counsels have routinely been consulted about legislative matters. The resultant advising has typically involved as much politicking as it did lawyering. For example, the Reagan and Bush administrations seized upon signing statements, which are drafted by the Counsel's Office, as opportunities for statutory interpretation by the executive. These administrations used signing statements to urge courts to give the same legal weight to the "executive intent" of legislation as courts have

traditionally given to its legislative intent. Accordingly, the Counsel's Office became deeply involved in the associated political and policy debates.

### 4. Educating White House Staffers about Ethics Rules and Records Management and Monitoring for Adherence

Among the tasks in this category are distinguishing between White House expenses and campaign expenses; reviewing presidential travel; approving requests for appointments with the president, monitoring these for propriety, seemliness, legality, and executive privilege issues; responding to document requests and subpoenas directed to the president and to other White House and executive branch officials by congressional committees, prosecutors and independent counsels; and serving as the ethics officer for the White House staff and executive branch political appointees. Past Counsels stress that this work is essential to a president's early success, because it allows an administration to put its people in place, to establish responsible procedures, and to advance its policy initiatives.

Perhaps the most prominent of the newer demands confronting the Counsel's Office is the intensified scrutiny of ethical matters within a presidential administration. This has generated a need for a central coordinator, alert to potential problems and able to take pre-emptive (or corrective) action. This issue arena is one of the many that draws the Counsel's Office closer to other White House units, and that obliges it to develop constructive relationships with Congress and various other political actors.

Ethics laws, to quote C. Boyden Gray, "are quite complicated and obscure and overworked and ought to be deregulated" (Gray interview). The White House Counsel's Office is needed to explain these laws to political appointees and to the members of the White House staff. This role is needed particularly at the outset of an individual's service in the White House or executive branch, throughout the campaign season, and during investigations. (See "Rhythms.")

The Obama administration tackled head-on the need for central coordination of ethics matters by appointing, at the outset, a Special Counsel, Norm Eisen, with responsibility for ethics, government reform, FOIA, and open government initiatives. Eisen had worked on the 2008-09 Obama transition team, during which time he prepared an executive order that was released on the president's first full day in office, which contained strict restrictions on lobbying and gifts that applied to all executive branch officials. [10]

According to Eisen, "the first rule in compliance is 'tone at the top'" (Eisen interview). He noted that since, as a presidential candidate, Obama had campaigned on a pledge of "transparency," issuing the ethics executive order as one of his first official acts signaled the seriousness of that commitment. (Eisen interview) Implementation of the lobbying and gift bans has included some waivers for executive branch officials, to

---

[10] See Executive Order 13490 – Ethics Commitments, https://www.whitehouse.gov/the_press_office/ExecutiveOrder-EthicsCommitments.

which there has been mixed reaction (Eilperin 2015), raising such concerns as a) that highly qualified individuals will be disqualified from executive branch appointment because of prior positions in the private sector, b) that lobbying for a corporation may not be the equivalent to lobbying for a non-profit organization, yet both are treated equally under the restrictions, and c) that some waivers were issued, to comply strictly with the requirements, for what seemed trivial purposes. Still, Counsel Robert Bauer noted in a *Washington Post* article that "Any administration now is going to have to implement a similar policy or explain why it won't..." (Eilperin 2015)

### *Orienting New White House Staff and Executive Branch Officers*

Federal ethics statutes and regulations are typically more stringent than those enacted in the states. Likewise, the standards for the legislative and executive branches are different, creating the need for former Congress members and staffers to be carefully briefed.

> At the beginning of my tenure, we circulated [an ethics] memo that had all the details. Everyone who was going to be appointed by the President would get this memo, everyone on the White House staff got this memo. It was a memo from me and it laid out in detail what all the rules were. But then I also would meet with groups of people who were about to enter on to their jobs, in some cases they already had entered on to the jobs, maybe thirty at a time.... All through the administration anyone who was going to be appointed to a job [was affected]. And I would go through what the rules were and then I would give them a little lecture about how important it was to abide by these rules and how the President was trusting them to abide by these rules; that every time something happens, at no matter what level of an agency, it is always the President's responsibility that it happened. "You've been appointed by Ronald Reagan. I will vouch for his honesty and his integrity and his desire to do things the right way. So you owe him a responsibility to act in the most ethical possible way. If there's ever a question you should check with your Counsel or you can check with me and I'll be happy to provide you with any advice that you need on these questions." (Wallison interview, p. 22)

These orientation sessions would be reprised when an individual left the White House. For example, the Counsel staff would review the Presidential Records Act and would "remind everyone that these are presidential documents; you're not walking out of the White House with them; these are things that become part of the permanent record" (Brady interview, p. 7).

### *Monitoring and Educating Staffers during Campaigns*

The need to educate and monitor staffers is particularly acute during the campaign seasons, both congressional and presidential. Then, the Counsel's Office staff has been called upon to provide general briefings and to circulate a more general memo about campaign activities. Changes in the associated laws may create an even greater need for this information. Clinton Counsel Mikva notes that:

> [W]e had two very active ethicists in the Office. One of them was Beth Nolan and the other was Cheryl Mills. Both of them, that was their field. Beth was in charge of ethics in the White House and Cheryl was her deputy. So the driving force was that the Hatch Act had just been amended and it has caused some changes. It now allowed people to get more involved than they had been

previously. As I recall, it was Beth probably who said we really need to get a memo out to everybody telling them what they can and can't do and not to overread the Hatch Act changes thinking they can do more than they should. (Mikva interview, p. 13)

## Reviewing Investigations and Associated Proceedings

As is suggested by the Counsel's role in responding to document requests and subpoenas directed to members of the White House staff and other executive branch officials, many Counsels have had to oversee investigations. Whether conducted in the past by Independent Counsels or by congressional committees or federal prosecutors, these proceedings have consumed much of the Counsel's resources.

> My first job [in the Clinton administration], which occupied the bulk of my time really, was to look in to the so-called White House – Treasury relationship having to do with the RFC in reference to the Justice Department of the whole Whitewater matter.... Then I had to look into the Espy case; I had to look into the Cisneros case, et cetera.... A lot of [developing ethics rules for the White House staff] was done in collaboration with the so-called Office of Legal Ethics, which is an independent quasi-Executive Branch agency, and which has the responsibility under the various ethics statutes to write regulations, give opinions as to what you can and cannot do. Now every department has an ethics officer so there is frequent consultation with the ethics officers. But a lot of that came up in this Whitewater, Treasury, White House contact investigation. (Cutler interview, p. 15)

Bernard Nussbaum has described Washington as practicing a "culture of investigation" (Nussbaum interview). That environment is not likely to change in the near future. Although the Independent Counsel statute expired in 1999, investigations continued to have profound implications for the Counsel and the Counsel's Office (e.g., Fielding handled requests from Congress in 2007 for the testimony of former George W. Bush Counsel Harriet Miers and Chief of Staff Josh Bolten in the investigation of the firing of the nine U.S. Attorneys).

## 5. Handling Department, Agency, and White House Staff Contacts with the Department of Justice

The relations between the Justice Department and the Counsel's Office often are quite close. On occasion, for example, DOJ appointees and Counsel staffers have been recruited to and from one another's offices. This occurred in the case of Clinton Counsel Beth Nolan, who was the Assistant Attorney General-designate in the Office of Legal Counsel. Similarly, Clinton Solicitor General Walter Dellinger previously served as an Associate Counsel and as Assistant Attorney General for the OLC. In the George W. Bush administration, the first Deputy White House Counsel, Timothy E. Flanigan, had directed the OLC in the first Bush administration.

That pattern of a rich web of relationships continued in the Obama administration as well. There was considerable "trafficking" of lawyers between the Counsel's Office and the Department of Justice (e.g., Bauer brought Kathryn Ruemmler and Donald Verrilli from Justice into the Counsel's Office), and an additional benefit was that many who worked in these two offices had known one another in prior circumstances, either as fellow students in law school or in previous private practice. Trevor Morrison, who

worked in OLC during the Clinton administration, and then, in the Counsel's Office for the first year of the Obama administration, commented that "personal relationships matter": it meant that when a Counsel from the White House needed to consult with a lawyer in OLC with whom there had been a prior relationship, a level of trust and confidence already existed between the two, rather than needing to be created anew. (Morrison interview) Similarly, Robert Bauer commented on the value of prior relationships more generally, here referring to key members of the White House staff (not the OLC):

> It was hugely helpful to me that I knew every single member of the senior staff. I had worked with David Axelrod. I'd worked with Jim Messina. I'd worked with Rahm Emanuel...I knew them all... I knew Robert Gibbs. I knew Bill Burton. I'd worked with them on the campaign. I'd known them for years. And, so, it was enormously helpful to me... there was both comfort with me but also came with that a certain amount of trust and authority...they had confidence in my judgment...Because you want the people you're working with to come to you with their questions, to tell you the truth, when they do, right? (Bauer interview)

### *Monitoring Contacts with the Department of Justice*

The Counsel's Office functions as a gatekeeper for *all* contacts between the White House and the Department of Justice.

> ... all requests for OLC opinions had to go through me, all communications with the department had to go through my office.... [T]here were certain exceptions but no one could call over to the Deputy Attorney General and the solicitor general directly; they had to go through me. My typical point of contact was the Deputy Attorney General for everything except OLC opinions, then, I would call the head of OLC. (Culvahouse interview)

The White House Counsel's oversight is meant to ensure that communications between the White House and the Justice Department are properly conducted. Any effort to influence the legal judgments of the Department in ongoing cases would generate significant difficulties for an administration. Reagan Counsel A. B. Culvahouse noted, for instance, that departmental statements of administrative policy were routinely reviewed *unless* Justice was issuing them. Contacts with the DOJ, in brief, have serious implications for presidential power and for policy development, and therefore are carefully supervised.

There is a tradition that each new attorney general issues a memo to the department that explains that all contact with the White House must go through either the attorney general or the deputy attorney general (with the exception that communications between the Counsel for National Security Affairs and other White House national security units are not subject to these limitations).[11] Similarly, the White House Counsel issues a comparable memo, instructing all White House staff that any communication with the Department of Justice must go exclusively through the Counsel's Office.

---

[11] See a typical memo, issued in 2007 by Attorney General Mukasey:
https://www.justice.gov/sites/default/files/ag/legacy/2008/04/15/ag-121907.pdf.

### Requesting OLC Legal Opinions

The resources of the OLC—including its institutional memory—render this office an invaluable source of legal expertise for the White House Counsel. Quite simply, the Counsel's Office cannot provide all the information and the advising that an administration needs.

> OLC is the single most important legal office in the government. More important really in terms of scholarship and memory and research – White House Counsel's Office doesn't really have the staff to do all [that] and they shouldn't. It should be done in OLC…. [T]he White House doesn't go to court without the department…. OLC was a huge problem for us in the sense that they were putting on a brake. We were free to ignore their advice but you knew you did so at your peril because if you got into trouble you wouldn't have them there backing you up, you wouldn't have the institution backing you up. So you did it at your risk; you did it at your risk…. You're best able to avoid the landmines if … you restore the rightful place of the Office of Legal Counsel. When in doubt, ask them and they'll tell you where the landmines are. (Gray interview)

Several other Counsels echoed Gray's description of the OLC as a formidable ally and a significant check on the White House. However, precisely because of the similarities in their responsibilities, the relationship between the White House Counsel and the OLC can be highly competitive. Both are recognized as legal experts immersed in politics and policy. Exacerbating matters, the jurisdictions of their offices, having evolved through practice, are blurred and lack strict bureaucratic rationality.

Yet, to an even larger extent, this competitive relationship reflects differences between the organizations. The White House Counsel's Office is a "staff" unit, and its head serves at the pleasure of the president, while the Office of Legal Counsel in the Justice Department is a statutory office, accountable to Congress; the OLC was created in 1950, but Congress originally designated its responsibilities to the attorney general in 1789. The White House Counsel is appointed by the president and does not require Senate confirmation. In contrast, there are three categories of Justice Department personnel: a) presidential appointees who are subject to Senate confirmation, b) presidential nominees who are free of Senate confirmation, and c) careerists. As such, Department officials have numerous and crosscutting loyalties. Further, while the president's claim to executive privilege in regard to communications with the White House Counsel has been delimited in recent years, any possibility of the president successfully making such a claim in regard to the OLC may have been sacrificed in the Reagan administration. Reagan Counsel Peter Wallison recounts:

> … it had to do with a request by the Senate Judiciary Committee for all of William Rehnquist's files when he was head of the Office of Legal Counsel at the Justice Department…. I thought that was simply harassment and I thought they were trying to create the kind of issue they could use to stop the nomination. I and the person who was then head of the Office of Legal Counsel in the Justice Department both felt this was a good executive privilege claim because the Office of Legal Counsel is the lawyer for the entire government, and in effect for the President, and everyone discloses everything to them to get rulings about legal issues. The whole underpinning of the attorney/client privilege, which is part of the executive privilege, is to get people to disclose all relevant information so you can give them the right advice. I thought, if there was ever a case, this was it. So I sent a memo to the President saying I thought he ought to claim executive privilege in this case, but Meese did not like at all that idea. We debated it in front of the President

and the President decided he wouldn't claim it.... [I]t turned out not to be as serious a problem
as I thought, except that it creates a precedent. In the future, if someone wants the files of the
Office of Legal Counsel, they are more likely to get them because this precedent exists. The result
of that is that some people aren't going to go to the Office of Legal Counsel for advice if they
have to disclose things that they don't want turned over to a Senate committee. (Wallison
interview, pp. 15-16)

Requesting a legal interpretation from the OLC, therefore, is clearly a strategic
undertaking. If the Counsel does not involve the OLC—or, having received the OLC's
interpretation, proceeds to set it aside—the White House is isolated and will lack support
for its actions. Politically, this is risky and even dangerous. C. Boyden Gray, for
example, unequivocally concluded that the White House should never go to court
without Justice's support. At the same time, the OLC is staffed by experts who cannot
claim executive privilege and, in any event, have allegiances that extend beyond the
White House.

On the practical side, people in the Counsel's Office and in OLC may engage in
"informal" discussions, without committing to paper any official legal advice. At the
very least, they may have *initial* conversations where certain proposed actions by the
president are ruled out orally by OLC as legally unjustifiable, prior to proceeding to a
discussion of a different course of proposed presidential action, which may generate a
formal, written OLC opinion.

Of primary significance, however, is the belief by OLC lawyers that because they
are carrying out the statutory authority lodged initially in the Attorney General in 1789
to "give his advice and opinion on all questions of law when required by the President
of the United States" ("An Act to Establish the Judicial Courts of the United States"
1789), they are under an obligation to give "the best, as opposed to a merely colorable,
view of the law to his (their) client" (Moss 2000). Thus, a debate has emerged between
OLC and the Counsel's Office over the *standard* of legal interpretation that each feels
obliged to give to the president. OLC takes a strict view that it is bound to give only the
"best" view of the law: the Counsel's Office, under Robert Bauer, for example, believed
that it is not realistic to label any view "the best," and, at least, on those national security
issues that are characterized as "exigent circumstances," the Counsel owed it to the
president to give him "a reasonable, plausible legal analysis (that) might require some
adjustment in the policymaker's preferences, but that fundamentally permits the policy
to be implemented the way it was designed" (Bauer interview). Thus, Bauer's view was
that the legal advice that the Counsel provided to the president needed to be reasonable
and credible, though not necessarily conforming to any ideal "best" view of the law.

The second area of debate between the Counsel's Office and OLC, as mentioned
above in the "Law, Politics, and Policy" section, is whether OLC's legal interpretation
a) is the final and authoritative one with which the Counsel feels bound to advance to
the president – or to dismiss it at its peril (as described earlier by C. Boyden Gray), or
b) is simply one interpretation among other competing legal opinions from other
executive branch units. This debate burst into the open when the *New York Times*
reported the disagreement over the legal position the administration should take on the
applicability of the War Powers Resolution to U.S. operations in Libya in April 2011.

(Savage 2011) Obama Deputy Counsel Mary DeRosa explained that the Libya/WPR incident was an aberration, and that OLC continues to maintain its traditional role as "the last word":

> In national security cases, OLC enters the legal advising process at an earlier stage than in other policy areas, as it listens and contributes to the discussion of the lawyers group: this earlier participation actually serves to strengthen OLC's role, rather than watering it down. In the vast majority of cases, the lawyers group position is a consensus position, and OLC is part of that consensus. OLC will not be asked for formal opinions on all issues, but at the end of the day, if there is disagreement among the lawyers, OLC is still "the last word," and its view will be transmitted to the president, who always has the authority to reject it, but will do so very rarely. (DeRosa interview)

Obama Counsel Bob Bauer stressed that OLC was informed and included throughout the legal advising process in the Libya incident. The key for him was the following:

> I was not going to lock the President out of options by saying, "It's OLC's decision." Because I didn't think it *was* OLC's decision. I thought that OLC should be consulted, and I thought they should be fairly represented to the President. And all the legal views from every corner of the government that had an interest in the outcome *were* fairly represented in this process...But I was completely comfortable, as White House Counsel taking a position on this that was other than the position that, "Well, we have to let OLC decide"... because I didn't think that was actually the best way to serve the President's interests in those circumstances. (Bauer interview)

## PRINCIPAL RELATIONSHIPS IN THE EXECUTIVE BRANCH

Depending on the course of politics and policy in a presidential administration, the White House Counsel will interact with most of the executive branch departments and agencies. Likewise, given its functions, the Office could—and often does—interact with every White House unit. At the very least, the Counsel's Office will communicate with the general counsels throughout the executive branch, and will also process the paperwork associated with every presidential nominee or appointee. Having acknowledged the extent and scope of the Office's network, this section highlights the offices and departments with which past Counsels were in most frequent contact.

### THE WHITE HOUSE

Within the White House, the Counsel's principal relationship—and greatest source of influence—has been either the president or the Chief of Staff. To whom the Counsel reports frequently has been a product of individual Counsels' past professional relationships, and this authority relationship has been clearly established at the time of appointment. This clarity is essential, if the president wishes to avoid destructive competition between two offices that are crucial to the success of the administration and its policy agenda.

### The President

In electing to have the White House Counsel report directly to the president, presidents often have appointed individuals who were their longstanding friends or professional colleagues. Counsels with this profile included the following individuals:

- Ford Counsel Philip Buchen, a former classmate and law firm partner of the President;

- Carter Counsel Robert Lipshutz, a longtime friend and former attorney for the president;

- H.W. Bush Counsel C. Boyden Gray, who worked for George Bush throughout his twelve-year tenure in the White House;

- Clinton Counsel Bernard Nussbaum, who had hired Hillary Rodham Clinton to work on the Nixon impeachment investigations and remained a good friend of the Clintons throughout the intervening years; and

- George W. Bush Counsel Alberto Gonzales, a friend of and former counsel to Governor Bush.

Even with the advantage of a prior relationship with the president, Counsels have faced various challenges to their position and their influence. Some have found that prior relationships were insufficient guarantees of influence.

> I talked to Hillary about some of these things [policy and political problems]. She agreed with me about the Independent Counsel, but she folded on me. She just came in and said, "The President wants to get on with his agenda." There was trust and confidence between the First Lady and me, but she was torn between me and her husband. I had only a few friends in the White House, including the First Lady. (Nussbaum interview)

The White House staff is likely to include a number of longtime presidential colleagues, all of whom may compete for access to the Oval Office.

Of course, even if the Counsel is able to sustain a close relationship with the president, there is no guarantee that the president will seek or follow advice. President Ford's decision to pardon former President Richard Nixon, arguably the most significant legal decision of his administration, was made without any consultation. Counsel Philip Buchen provided only *post hoc* support and legal reasoning.

Two administrations have recruited Counsels to raise the profile and significantly re-establish the Counsel's Office within the Washington community (see, too, "Turnover" in Organization and Operations). President Jimmy Carter appointed Lloyd Cutler to meet these needs; President Bill Clinton named Cutler, and then former Congressman and U.S. Court of Appeals Judge Abner Mikva and former U.S. Attorney and D.C. Corporation Counsel Charles Ruff; President George W. Bush turned to former Reagan White House counsel Fred Fielding. Cutler, in particular, has publicly stressed that he entered office with a promise of direct communication with the president. He claimed to have held President Carter to that commitment.

> When I was asked by the President [Carter] to take this job, it was a mid-life crisis of his administration, the so-called "malaise" period. I said, "What kind of a role do you want me to play?" I knew him, but I didn't know him that well. He said, "I want you to play sort of a Clark Clifford role." I got that in writing and, of course, Clifford was so venerable and such a great

storyteller, everybody thought that Harry Truman never made a move without consulting Clark Clifford. And every time I got left out of a meeting I would go to Jordan or I would go to the President and I would say, "I think that Harry Truman would have wanted Clark Clifford in this meeting." I was older than all the rest of them so nobody could gainsay me.... In theory I had the same deal with President Clinton but I didn't have the time to really capitalize on it. (Cutler interview, p. 8)

## *The White House Counsel and Presidential Privileges*

The issue of confidentiality in the president's communications with the White House Counsel is a matter of intense concern. Of the various legal privileges that a president or a Counsel *might* claim—executive privilege, government attorney-client privilege, work product protection, deliberative process protection, and common interest doctrine—the two that are most salient are executive privilege and government attorney-client privilege.

The courts view these two as clearly distinct. Executive privilege refers to the constitutionally-based protection of confidentiality of a president's communications with any government officer when the chief executive seeks advice on the exercise of official governmental duties. (See the Wallison interview, p. 18, for a good explanation of the basis for executive privilege and how it may apply.) Its purpose is to promote candid and frank discussions between a president and his advisors. Government attorney-client privilege is a variant of the common-law attorney-client privilege, but with the following crucial distinctions:

1. the client is the Office of the President of the United States; and

2. the advice being rendered by a government attorney to the president is "for the purpose of securing primarily either

(i) an opinion on law, or

(ii) legal services, or

(iii) assistance in some legal proceeding."[12] "

Because the White House Counsel's Office is in the unique position of providing *both* political and legal advice to the president, navigating the shoals of presidential privileges is an especially tricky venture. Judicial acceptance of a privilege claim is determined by many factors, such as the following:

- whether the nature of the conversation is political or legal;
- whether the person communicating with the president is doing so in either a legal or political capacity;
- whether the request for presidential communications comes from the courts, Congress or an Independent Counsel;

---

[12] *In re Sealed Case*, 737 F. 2d at 98-99 [quoting *U.S. v. United Shoe Machinery Corp.*, 89 F. Supp. 357, 358-59 [D. Mass. 1950]] in *In re: Bruce Lindsey* [Grand Jury Testimony], 158 F. 3d 1263 [D.C. Cir. 1998].

- whether the information is needed in a civil or criminal proceeding;
- whether the sufficiency of the asserted public interest in confidentiality outweighs the strength of the need for the information by another institution; and
- whether the requested information is available from an alternative source.

Varying combinations of these factors will produce different judicial outcomes, making for complex and unpredictable results.

The Clinton administration was embroiled in numerous legal controversies where it vigorously asserted a whole host of privilege claims, and it found little comfort in the federal court decisions in these cases. Legal scholars and commentators have reacted critically to that administration's decision to litigate. In contrast, most other White Houses found ways to assert such claims, but ultimately chose to resolve these conflicts through compromise, thus preserving the existence of the privilege. In essence, the Clinton administration forced the issue into the judicial process, and the courts ruled against it, narrowing considerably any maneuverability for such claims in the future.

The impact of these rulings on government attorney-client privilege and on the White House Counsel's Office's relations with the president, in particular, was especially damaging. In July 1998, the United States Court of Appeals for the District of Columbia ruled that Deputy Counsel Bruce Lindsey was not protected by government attorney-client privilege from testifying before a federal grand jury about conversations with the president about possible criminal conduct by the president and other government officials. The Court said:

> With respect to investigations of federal criminal offenses, and especially offenses committed by those in government, government attorneys stand in a far different position from members of the private bar. Their duty is not to defend clients against criminal charges and it is not to protect wrongdoers from public exposure...Unlike a private practitioner, the loyalties of a government lawyer therefore cannot and must not lie solely with his or her client agency. (*In re: Bruce Lindsey* [Grand Jury Testimony], 158 F. 3d 1263 [D.C. Cir. 1998])

In reaction, Counsel Charles Ruff commented:

> The practical result of the court's decision is that the president and all other government officials will be less likely to receive full and frank advice about their official obligations and duties from government attorneys. (Marcus, 1998, p. 1)

Thus, the Counsel's Office suffered a severe blow from this decision, and its ramifications will profoundly affect the next Counsel. In one sense, the specific circumstances of this case, where a Deputy Counsel was subpoenaed to testify in federal court about possible criminal behavior by a president, were so idiosyncratic as to be unlikely to recur very often. Yet to Bush Counsel C. Boyden Gray, the most unfortunate aspect was that the privilege was lost in a case concerning the president's personal behavior, rather than his official duties or matters of national security, where assertions of presidential privilege are treated more deferentially by the courts.[13] Gray

---

[13] In a comparable context, see the contrast between *Clinton v. Jones* (520 U.S. 681 [1997]) (no presidential immunity from civil liability for personal conduct) and *Nixon v. Fitzgerald* (457 U.S. 731 [1982]) (absolute presidential immunity from civil liability for acts taken in an official capacity). See

called this "the weakest possible case," which produced "rulings that reduce the leverage future presidents will have in cases when it really matters" (Strobel, 1998, p. 10).

Executive privilege in the years since the end of the Clinton administration has taken some different turns. It has arisen in circumstances that are far different than those of the Clinton years, including: 1) Vice President Cheney's refusal to provide information about his National Energy Policy Development Group to the General Accountability Office administrator and to government watchdog groups, Judicial Watch and the Sierra Club; 2) requests for top White House officials to testify before national commissions; 3) demands by congressional committees for documents and testimony from judicial nominees and other candidates requiring Senate confirmation, along with requests for senior White House officials to testify before congressional investigating committees; and 4) revising the law pertaining to access to presidential records (see Baker, 2005, p. A6). White House action on all of these fronts has been exceptionally strong and consistent in its mission to protect presidential communications. Most would judge that the results of its efforts have been largely successful.

The Bush administration made no secret of its intention to be aggressive in its protection of presidential prerogatives, and to be especially protective of executive privilege. It stated openly that it believed that previous administrations had relented too easily when faced with requests for confidential White House communications, and that this reluctance to push this concept to the limits had seriously weakened protection for the office and for the use of executive privilege by future occupants. It criticized the Reagan administration for succumbing too quickly to demands for presidential documents; on the other hand, it noted that the Clinton administration took its claims of executive privilege to court, and lost on all counts. Thus, under both administrations, protection for executive privilege had diminished.

---

also *U.S. v. Nixon* (418 U.S. 684 [1974]) for special consideration of privilege claims based on national security

*National Commissions.* The G. W. Bush administration permitted National Security Assistant Condoleezza Rice to provide sworn testimony before the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission") in a public hearing on April 8, 2004 after lengthy negotiations produced an agreement that would allow her to testify, but with an acknowledgement that this would not create a precedent. It would have been constitutionally tenable, though not politically palatable, for the president to insist that she not testify, since the topic under inquiry was the most extraordinarily sensitive, national security matter and would invariably involve her conversations with the president. Whether it created a precedent for the future, despite protestations to the contrary, remains to be seen until the next time a similar situation arises.

*Demands from Government Agencies and Independent Groups.* Vice President Cheney put up strong resistance to efforts from the GAO and from independent groups to compel him to release records from his energy task force meetings. He won the round with GAO Comptroller David Walker in December 2002 when District Court Judge John D. Bates ruled that the GAO lacked standing to sue the vice president for refusing to turn over the records (see *Walker v. Cheney*, 230 F. Supp.2d 51 [D.D.C. 2002]). In February 2003, the case ended when the GAO decided not to appeal the ruling. The case did not reach the point where Vice President Cheney needed to actually claim executive privilege, rather, he won the court battle more on procedural grounds rather than on substantive ones.

The second case filed against Vice President Cheney requesting access to his task force records came from Judicial Watch and the Sierra Club. Similarly to the district court ruling in the GAO case, the U.S. Supreme Court ruled in June 2004 largely on procedural grounds but with language that was clearly deferential to the executive branch, noting that "special considerations control when the Executive Branch's interest in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated" (see *Cheney et al. v. U.S. District Court*, 542 U.S. 367 [2004]). At issue in the case was the question of whether the D.C. Circuit Court of Appeals had the authority to issue a writ of mandamus against the District Court, as requested by the Vice President, which would order the District Court to halt the discovery process in the suit by the two groups against the Vice President.

Without reaching the substantive question of executive privilege, the Supreme Court ruled that the Court of Appeals did have the discretion to grant a mandamus petition, but that it had misinterpreted the scope of protection afforded to presidential immunity from judicial process in *U.S. v. Nixon* (418 U.S. 683 [1974]), and that the protection in civil suits here was broader than that in criminal proceedings, as in *Nixon*. The Court remanded the case to the Court of Appeals for further action, reminding it of "the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract from the energetic performance of its constitutional duties" (*Cheney et al. v. U.S. District Court*).

In a unanimous ruling in May 2005, the Court of Appeals dismissed the lawsuit altogether, thus sparing Vice President Cheney from having to disclose the details of

internal government meetings under federal open meetings laws. The decision contained language that bolstered the executive branch's protection of confidentiality, despite the fact that no specific claim of executive privilege was actually presented in the case: "The president must be free to seek confidential information from many sources, both inside the government and outside" (see *In Re: Cheney*, No. 02-5354 [2005]). The decision was viewed predictably by opposing sides: the administration was cheered by the strong affirmation of the principle of executive branch confidentiality, while open government advocates saw it as a setback to its efforts to make government accountable and transparent.

   *Demands from Congress: The Senate Confirmation Process and Oversight Investigations.* A number of Bush administration nominations faced demands from Senate committees for documents from prior executive branch positions held by specific nominees. There was an unusually high number of these confrontations during the Bush years because there was a pattern of selecting nominees who had held previous sensitive positions in either the current Bush or Reagan administrations. It could be – or should have been - expected that these nominees would be asked by Senate committees during the confirmation process to discuss their prior work and to produce some of it as evidence of their professional competence. When the White House balked at these requests and claimed that the Senate was overstepping its bounds, a clash between the branches ensued. What makes this especially noteworthy is the frequency of such interchanges.

   The administration faced this issue of Senate demands for documents from judicial nominees at least four times: with Miguel Estrada on his nomination to the D.C. Circuit Court of Appeals, and with Harriet Miers, John Roberts and Samuel Alito on their nominations to the U.S. Supreme Court. The administration allowed the Estrada and Miers nominations to be withdrawn rather than to relinquish the papers, while it managed to reach some accommodation with the Judiciary Committee on the Roberts and Alito selections. Estrada, Roberts and Alito all had some combination of prior work at either the Department of Justice (in either the Solicitor General's office or in the Office of Legal Counsel) or in the White House Counsel's office in the Reagan administration. Miers was the sitting White House Counsel at the time of her nomination to the Supreme Court. In all of these cases, it was predictable that there would be inter-branch clashes, given the already politically charged environment of Senate confirmations and the uncommon ingredient that each of these nominees had worked in executive branch offices that claimed some degree of confidentiality from having to disclose their work-product to a coordinate branch of government.

   A similar pattern evolved with the nominations of sitting White House advisors to other executive branch positions, raising the issue of high-profile officials already serving in non-Senate confirmed positions in the White House who would now face public scrutiny in open Senate confirmation hearings where, as with the judicial nominations, the Senate committees would expect to question the nominees and have access to their records as a basis for judging their professional fitness. Among those included were National Security Assistant Condoleezza Rice, on her nomination as Secretary of State

and White House Counsel Alberto Gonzales, on his nomination as Attorney General. The record here was successful on both, although the confirmation hearings were exceptionally testy, leaving some bitterness on both sides that would come back to haunt these two new Cabinet members in subsequent Hill appearances.

As the Bush administration headed towards the end of its tenure, there were executive privilege battles still underway.

The most serious of these conflicts arose out of congressional efforts to find the facts about the Justice Department firing of nine United States attorneys in late 2006. Both houses of Congress instituted inquiries into this matter in 2007 through their respective Judiciary Committees, requesting documents and/or testimony from Alberto Gonzales (then-Attorney General), Harriet Miers (former White House Counsel), Sara Taylor (former White House political director), Josh Bolten (White House chief of staff), Karl Rove (then-Deputy White House chief of staff and former Director of the Office of Political Affairs), William Kelley (then-Deputy White House Counsel), and J. Scott Jennings (then-Deputy Assistant to the President in the Office of Political Affairs). The only witness to appear was Taylor, who testified before the Senate committee in July 2007, but refused to answer questions that she thought were protected by privilege.

This matter spawned three claims of executive privilege by President Bush in an effort to quash congressional attempts to demand White House communications and testimony about internal decision-making processes, contempt citations against Miers, Bolten and Rove, and a lawsuit initiated by the full House to force compliance with its subpoenas. That suit resulted in two federal court decisions. The District Court ordered Miers and Bolten to appear before the House Judiciary Committee and to provide the subpoenaed documents (*Committee on the Judiciary of the U.S. House of Representatives v. Miers et al.* [No. 2008-0864, 7/31/08], while the D.C. Circuit Court of Appeals granted a temporary stay in this dispute (*Committee on the Judiciary of the U.S. House of Representatives v. Miers et al.* [No. 08-5357, 10/6/08]).

In the District Court opinion, Judge Bates (a George W. Bush appointee) used strong language to cast doubt on the administration's arguments. He rejected its theory of absolute immunity that maintained that the communications of close presidential advisors (and former advisors) were categorically privileged, and that Congress had no legitimate interest in inquiring about why the nine prosecutors were dismissed. He stated:

> The executive's current claim of absolute immunity from compelled Congressional process for senior presidential aides is without any support in the case law. ... At bottom, the Executive's interest in "autonomy" rests upon a discredited notion of executive power and privilege. As the D.C. Circuit and the Supreme Court have made abundantly clear, it is the judiciary (and not the executive branch itself) that is the ultimate arbiter of executive privilege. Permitting the Executive to determine the limits of its own privilege would impermissibly transform the presumptive privilege into an absolute one, yet that is what the Executive seeks through its assertion of Ms. Miers's absolute immunity from compulsory process. That proposition is untenable and cannot be justified by appeals to Presidential autonomy. (*Committee on the Judiciary of the U.S. House of Representatives v. Miers et al.* [No. 2008-0864, 7/31/08], p.86).

He ruled that Congress, indeed, has a legitimate and an important interest in inquiry here because the House Judiciary Committee is specifically charged with oversight of the Department of Justice.

After the White House lost its effort to ask for a stay of the District Court's ruling, it appealed to the D.C. Circuit Court of Appeals, which, in a per curiam opinion on October 6, 2008, granted the administration the temporary delay it requested while the appeal from the District Court was pending. The appeals court recognized that "The present dispute is of potentially great significance for the balance of power between the Legislative and Executive Branches. But the Committee recognizes that, even if expedited, this controversy will not be fully and finally resolved by the Judicial Branch – including resolution by a panel and possible rehearing by this court en banc and by the Supreme Court – before the 110th Congress ends on January 3, 2009." Once the 110th House ceased to exist, the subpoenas expired, and the case became moot.

The potential continuation of this case into the next administration prompted scholars to consider novel questions that it could raise. For example, could a former president still claim executive privilege on behalf of former aides? And if he did, wouldn't it be up to the incumbent president to decide whether such claims are in the best interest of the institution of the presidency (Froomkin, 8/1/08)? Judge Bates noted in his opinion that "A former President may still assert executive privilege, but the claim necessarily has less force, particularly when the sitting President does not support the claim of privilege" (*Committee on the Judiciary of the U.S. House of Representatives v. Miers et al.* [No. 2008-0864, 7/31/08).

One additional development of note here was Attorney General Mukasey's September 30, 2008 appointment of a special prosecutor, Nora Dannehy, to investigate the firing of the U.S. attorneys to determine if there was White House involvement, if the firings were politically motivated, and if there is sufficient evidence to bring criminal charges against those responsible for the decisions to dismiss the attorneys. Mukasey agreed to appoint a prosecutor on the recommendation of an internal Justice Department report that cited frustration in its own inquiry because two key witnesses, Miers and Rove, were uncooperative. The prosecutor had subpoena power which the internal department probe did not. Within days of the prosecutor's appointment, the Department of Justice issued a statement that the White House would cooperate fully with the prosecutor (The *BLT*, 10/1/08).[14] This episode ended with the submission of Dannehy's report to Attorney General Eric Holder in July 2010, concluding that there was "insufficient evidence" to file charges against any former Bush administration official for the firing of the U.S attorneys. (Leopold 2010)

The final contribution of the Bush administration to post-Clinton executive privilege controversies may be the one with the longest shelf-life, since it began in

---

[14] An interesting side note is the letter sent to the Department of Justice from Deputy White House Counsel Emmet Flood that detailed the documents that the White House did and did not release to the Department for its internal inquiry. It withheld internal documents about the firings but did not assert privilege, since the Department of Justice is part of the executive branch. Flood noted, however, that the documents were "covered by the deliberative process and/or presidential communications component of executive privilege in the event of a demand for them by Congress" (The *BLT*, 10/1/08)

November 2001 and ended only when the Obama administration took office and issued an executive order in January 2009 that overrode the Bush executive order from seven years earlier. This is the matter of public access to presidential records. President George W. Bush issued an executive order on November 1, 2001 titled "Executive Order 13233: Further Implementation of the Presidential Records Act" that purported to "provide for an orderly process, so that information can be shared" (Fleischer, White House Briefing, 11/1/01). Critics saw in the revised procedures real potential for indefinite delay in the release of records, along with other objections (e.g., diminution of the archivist's role, expanding the authority of former presidents to withhold records, authorizing presidential assistants or relatives to make privilege claims, and extending the right, for the first time, to the Vice President to make privilege claims).

The controlling authority for public release of presidential records was the Presidential Records Act of 1978 (PRA), along with an executive order from the Reagan administration issued in 1989. The underlying principle was public ownership of presidential papers, with access and release pursuant to regulations established ultimately by the National Archives and Records Administration (NARA).

Scholars and other groups mobilized on two fronts to challenge the order: they testified in Congress and sued in federal courts. The case in the courts was filed immediately by the American Historical Association, the National Security Archive, and other professional groups, seeking injunctive and declaratory relief, asking the court to find that "the order was an impermissible exercise of the executive power" (*AHA v. NARA*, No. 01-2447, 10/1/07). These critics viewed President Bush's effort to revise Reagan's executive order as, instead, a *repeal* of the PRA and replacement of it with a new executive order whose provisions ran counter to the spirit and the law of the PRA. District Judge Colleen Kollar-Kotelly dismissed the case on jurisdictional grounds in a decision on March 28, 2004, but the plaintiffs filed a motion to "alter or amend" the judgment, and the court agreed in September 2005 to reconsider its earlier ruling. On October 1, 2007, Judge Kollar-Kotelly struck down the section of the EO that permits a former president to indefinitely delay the release of White House records, ruling that it is contrary to the PRA. The court did not reach the objections to the EO that relate to claims of privilege, holding that they were not yet ripe for judgment because no incumbent or former president or former vice president had actually asserted a privilege claim to any document at issue at that time.

On January 21, 2009, President Barack Obama issued Executive Order 13489 – Presidential Records overriding former President Bush's order, and restoring the former procedures and provisions of the Presidential Records Act of 1978.[15]

### The Chief of Staff

The alternative authority relationship, in which the Counsel reports to the Chief of Staff, was chosen in the Reagan administration. Reagan's White House Counsels had previously been professional colleagues of the Chief of Staff. Still, a change in the Chief

---

[15] https://www.whitehouse.gov/the_press_office/ExecutiveOrderPresidentialRecords.

of Staff did not necessarily result in the appointment of a new White House Counsel. The Reagan Counsels left office for a variety of personal and institutional reasons: Fred Fielding, because he "was ready to go out into the real world"(Wallison interview, p. 1); and Peter Wallison, because of pressures generated by Iran-contra (Wallison interview, p. 15). A. B. Culvahouse, the third and final Reagan Counsel, served two Chiefs of Staff: Howard Baker and Kenneth Duberstein.

Although reporting to the president through the Chief of Staff might appear to be a disadvantage, Culvahouse argues otherwise.

> [Howard Baker] is my mentor and my friend. He was my ace in the hole in the White House. I think to the extent I was an effective White House Counsel is because he gave me a lot of support as did the President. But people did not try to go around me or over me very frequently and never very successfully. (Culvahouse interview)

Still, the Reagan White House Counsels presided over an office that was widely seen as being focused more on law than on policy.

> In the Reagan White House, the Counsel's Office was viewed as sort of an additional final check. Unlike I think some other White House Counsel's Offices, we didn't really have a policy agenda. We felt like we were to be honest brokers as well as lawyers. (Culvahouse interview)

It seems, therefore, that the expectation that the Counsel relates to the Chief of Staff, rather than directly with the president, contributed to effecting a significant change in the orientation of this office.

### The White House Staff

The White House Counsel's Office is in contact with virtually every unit in the White House. The consequent dialogues and negotiations add immeasurably to the Office's workload. Tight deadlines compound the difficulties.

> Everything else [apart from Iran-contra] there were lots of cooks, lots of principals and lots of lawyers, and sometimes just trying to reach a decision or trying to force a decision in a timely way tended to be a lot of what I did. For right or wrong, we have to get an answer to this question and get it today. . . . The timing was forced by your own judgment or sometimes you'd have deadlines. Sometimes you'd have the ranking Republican on the committee calling up and saying if you don't tell us what you think the committee is going to go forward tomorrow regardless. (Culvahouse interview)

The scarcest resource is always time, obliging the Counsel to exercise careful judgment in determining which meetings to attend and in allocating staff. (See "Organization and Operations" for a more detailed discussion of these issues.)

Past Counsels have stressed that their participation in domestic and foreign policy-making may facilitate decision-making and avert difficulties. Notably, the Counsel has chaired the War Powers Committee in some administrations and, in a number of White Houses, including George W. Bush's, has regularly attended the meetings of senior domestic policy-makers. In particular, speechwriting and legislative advising draws the Counsel's Office into contact with a wide range of other White House units. This circumstance has prevailed since the Eisenhower administration.

> [I]t is our judgment that Counsel to the President should have, in addition to his other functions, the responsibility of coordinating the development of the proposed legislative program for the President. After the legislative program has been approved by the President it should be the function of Counsel to coordinate the content of the State of the Union message, the Budget Message, and Economic Report, as well as special legislative messages to make sure they comport with the President's program.
>
> This part of the Counsel's job during the Eisenhower Administration worked exceedingly well during those eight years.... This function ... will require that Counsel to the President work very closely with the Director of the Office of Management and Budget, the Secretaries of the various departments, and also the General Counsels of the various departments. He will also have to work very closely with the President's Press Secretary, the President's Assistant in charge of Congressional Relations, the Chairman of the Council of Economic Advisors, and the President's Assistant in charge of preparing Presidential messages. (Memo, Eisenhower Special Counsel Gerald Morgan and Associate Special Counsel Edward McCabe to Ford White House Counsel Philip Buchen, 2 October 1974)

The following list provides examples of the units with which the Counsel's Office has predictably and consistently established strong relationships.

- Communications Office, regarding presidential speeches, travel, and campaign expenses. This relationship may be especially close during the campaign seasons, when travel expenses and contacts are subject to strict legal standards.

- Legislative Affairs, regarding legislation, nominations, and confirmations. Some White House Counsels have participated directly in legislative negotiations, even communicating directly with Senators about judicial appointments.

- Personnel Office, regarding appointments and clearances. This responsibility also causes the White House Counsel's Office to consult regularly with the FBI and the ABA. C. Boyden Gray noted that the relationship between these two offices was so close that his assistant married the director of the Office of Presidential Personnel. (Gray interview)

- Office of Political Affairs, regarding travel and campaign expenses.

- Press Office, regarding presidential press conferences. In some administrations, the Counsel's Office has also prepared presidential statements about federal court rulings that affect the presidency or the executive branch.

- Office of Management and Budget, regarding budget proposals, rescissions, and deferrals.

- National Security Council staff, regarding foreign policy.

### *The Office of the Vice President*

As the office of the Vice President has increased dramatically in stature, functions and influence during the last thirty years, the office of Counsel to the Vice President also has undergone a change in profile and, thus, a change, or at least a deepening, in its relationship to the office of White House Counsel. Analysts credit Walter Mondale with the expanded role of this office, as he negotiated the outlines of his responsibilities with

President Carter at the time of Carter's selection of Mondale as his running mate. Mondale made clear that he wanted to be a "roving minister" (one without a specific policy portfolio), and that he expected to have "a seat at the table," advising the president on all major issues. Al Gore had a similar arrangement with President Clinton, with a special focus on the "reinventing government" initiative and on overseeing technology policy.

But, the most dramatic advance in vice presidential influence came with Vice President Dick Cheney's eight years in office during the George W. Bush administration, and it was accompanied by the equally stunning transformation of the office of Counsel to the Vice President. The redefinition of the office of the Vice President under Cheney seems likely to be one of the chief legacies of the Bush presidency. *Washington Post* reporter Barton Gellman in his book, *Angler: The Cheney Vice Presidency* (2008), quotes former Vice President Quayle as saying that Cheney had the understanding from Bush that he would be a "surrogate chief of staff" (Gellman, 2008, p. 58). According to Gellman, Cheney had an "unseen hand" and an operative role in every major policy decision, both domestic and foreign, including the most sensitive, high-profile issues of national security, the economy, the environment, and interpretations of law.

 Whether the change in role of the vice president's office can be attributed primarily to Dick Cheney's forceful personality, policy command and personal political network (and thus revert back to a more modest form with subsequent vice presidents) or whether the actual structure and function of the office have changed in longer term ways is not yet known. But few would deny that the vice-presidency under Cheney was profoundly more influential than that of its other predecessors.

The increased scope of the substantive responsibilities of the Vice President demanded that the office of Counsel to the Vice President would be in the loop on all of these policy discussions and decisions. It is for this reason that the office of Counsel to the Vice President, at least under the Bush administration, operated in close tandem with the White House Counsel's office to an unprecedented degree. In his book, *The Terror Presidency: Law and Judgment Inside the Bush Administration* (2007), former OLC head Jack Goldsmith confirms this changed role of the Vice President's Counsel. Referring to the Bush administration, he says: ". . . in no previous administration was the Vice President's Counsel so integrated into the operations of the powerful Counsel's Office. This changed in the Bush II presidency, when the Vice President's small office fused into the President's operating structures. The new arrangement reflected Vice President Cheney's enormous influence on President Bush" (Goldsmith, 76). He further noted that the Vice President's Counsel under Cheney was "an altogether different type of Vice President's Counsel, one who received all of the important government documents that went to Alberto Gonzales, and was always in the room when Gonzales was discussing an important legal issue" (Goldsmith, 2007, p. 76).

Cheney's choice of David Addington as his Counsel, and later as his Chief of Staff, was pivotal in the re-conceptualization of both offices – that of the Vice President and that of Counsel to the Vice President, because Addington shared Cheney's penchant for an invigorated vice presidency (and presidency), and thus both offices simultaneously

increased in power and function. Here, too, the sheer force of Addington's personality and intellect may suggest that this redefined view of the office of Counsel to the Vice President may reflect the expectations only of the George W. Bush administration. It is a choice that a Vice President will need to make between a more traditional model of Vice President and Counsel to that office and the model of those two offices under Cheney and Addington. In either scenario, it seems clear that a stronger connection between the two Counsel offices, Vice President and White House, has been forged and might be expected to continue, although the personalities and relevant professional expertise of the players remain important contributors.

## DEPARTMENTS AND AGENCIES

Perhaps the most distinctive contribution of the White House Counsel's Office to the wider White House staff comes through its consultations with the Department of Justice, and more specifically with the Office of Legal Counsel. The White House Counsel, as discussed in the "Functions " section above, properly serves as the gatekeeper for all White House communications with the Department of Justice.

### The Department of Justice

The extent and nature of a White House Counsel's contact with the Department of Justice has been particularly influenced by three factors:

1. The extent of the president's judicial agenda, including judicial nominations;

2. The strength of the president's relationship with the Attorney General; and

3. The relative activism of the White House Counsel and the Attorney General as policy-makers.

A larger judicial agenda creates the need for more contacts with the Justice Department. Similarly, a strong presidential relationship with an activist Attorney General may establish a line of communication that is more exclusive of the White House Counsel.

All of the Justice Department contacts, however, are made in a political environment that is highly suspicious of White House–Justice Department associations. Close relationships between Presidents and Attorneys General in the Nixon and Reagan administrations, for example, injured the credibility of both of these offices. This, in its turn, hampered the officeholders' ability to implement their policy decisions. Likewise, past executive privilege decisions may discourage presidents from contacting the Justice Department, because those communications have even less protection than do those with White House aides.

*The Attorney General*. The Attorney General and the White House Counsel appear, at first glance, to share similar advisory roles and jurisdictions. Notwithstanding differences in accountability (the Attorney General is subject to Senate confirmation) and circumstances (executive branch department vs. White House staff), the distinctive contributions of the White House Counsel and the Attorney General have more often been negotiated through practice than by invoking abstract principles. Conflict has occurred frequently, and presidential libraries contain numerous memoranda of understanding between attorneys general and White House Counsels.

White House Counsels and Attorneys General, however, have rarely been equals within an administration. Presidents have tended to name either an Attorney General *or* a White House Counsel with whom they were well-acquainted. The selections have, more often than not, been connected to the judicial agenda of the president: a longer judicial agenda has generally coincided with the nomination of a presidential colleague to the Attorney General's office.

The appointment of a close presidential colleague to the White House Counsel's Office, however, may allow the Office to enter into more substantive policy discussions. Though C. Boyden Gray hedges his comments with a series of qualifiers, he acknowledges that he did influence the direction of several key legislative negotiations:

> [President Bush] kept drawing me into the Civil Rights Bill in 1990-1991. I didn't really want to do that because it was very difficult politically, but he kept yanking me back into it.... But I would say that civil rights was legal policy, not necessarily part of the Counsel's Office historically any more than the ADA [Americans with Disabilities Act] was. I did very little on the ADA act.... I had a lot to do in the prior administration about teeing it up for then-Vice President Bush to make it a campaign promise during the '88 campaign. But I spent very little time on it once we got in the White House.... I was involved very little, maybe ten or twenty hours worth. It was very little. The hours I spent were very important, it turned out, but I was not involved in the day-to-day negotiation of the language or the lobbying.

> I had to have permission to work on the Clean Air Act. I wanted to work on it because I had an interest in it but it was something that [Chief of Staff John] Sununu was wary about and the President was a little nervous about because of the time it would take from other responsibilities. Again, I could only do it because I had discharged my other obligations. I think at the end of the day people were appreciative of my being involved in it. (Gray interview)

*The Office of Legal Counsel (OLC)*. If the White House Counsel and the Attorney General regularly vie for the president's attention, the White House Counsel's Office and the Office of Legal Counsel are even more frequently competitors in legal interpretation. Though cooperative relationships have been established – doubtless facilitated by the exchange of personnel between the offices – they tend to jockey for advantage within an administration. (See "Functions ", especially item 5 on White House Counsel–Justice Department relations, for an extended discussion of these practices.)

> I doubt there was very much communication directly with the Office of Legal Counsel that didn't go through White House Counsel's Office. In fact, as I've said many times in forums that have talked about this issue, the real conflict between offices, inherent conflict, is between the White House Counsel's Office and the Office of Legal Counsel at the Justice Department because

the White House Counsel's Office is growing and growing and is acquiring more and more capabilities to do that kind of research and analysis that the Office of Legal Counsel does and it does it for the president. But there is a real tendency on the part of cabinet officers also to come to the White House Counsel's Office and ask for advice about legal issues. ... [M]ost of the time the Office of Legal Counsel at the Justice Department never hears about it. It just goes on. But when the White House has a constitutional question that's really the point at which this becomes quite sensitive because that is an area that the Office of Legal Counsel has traditionally handled for the White House. But if the White House staff is large enough and they consider themselves strong enough and smart enough, they can handle those things too and advise the President on constitutional issues. The White House staff always wins over the agencies and his Cabinet, always, because they're closer to the president. So they have first cut, if you will, on any issue that comes up to the presidential level. If there's a constitutional question about the president's power, if they want, they can make that decision on their own without consulting the OLC. Whenever you get a situation like that, where some group has the first opportunity and doesn't even have to inform the other group, over time, that first group is going to grow larger and larger and more competent, and eventually freeze the second group out completely. For this reason, eventually, the White House Counsel's Office will freeze out the Office of Legal Counsel. I think that's the long-time trend. (Wallison interview, pp. 17-18)

On this same point, C. Boyden Gray has stressed that the ambitions of the White House Counsel's Office (in Wallison's words, above, "large enough . . . strong enough . . . smart enough") can endanger an administration. Gray advises re-establishing the OLC as an influential legal commentator, concluding that the advantages gained from the OLC's insights far outweigh any disadvantages resulting from its sometimes critical stance.

Traditionally, OLC has labored under the radar screen, as an office of highly trained legal professionals whose responsibility is to provide authoritative legal opinions to guide the actions of the president and executive branch agencies. Former White House Counsels of both political parties have remarked how critical it is for the Counsel to seek OLC's opinion on constitutional questions, and to treat that opinion with respect and deference, even when it means telling the president that there is no constitutional authority to do what he proposes (see, for example, earlier comments by Cutler and Gray).

During the years of the George W. Bush administration, some have suggested that there was a different twist in this relationship. Rather than a contentious or wary relationship between the two offices, they instead operated as close, cooperative allies, resulting in outcomes that sometimes were unhelpful to both. The attacks of September 11, 2001 thrust OLC into the prime role of providing legal analyses to the White House Counsel's office on the extraordinary new set of anti-terrorism policies the president was contemplating. Beginning almost immediately thereafter, OLC produced controversial legal opinions interpreting the scope of the president's authority under the Commander-in-Chief clause and determining the applicability of domestic statutes and obligations under the Geneva Conventions relating to torture and domestic spying.

The central role of OLC was revealed when, in June 2004, some of these memos were leaked to the public and disseminated widely. The spotlight on this office was, indeed, atypical and unwelcome, but the greater issue is the institutional impact of an OLC that was compliant with, rather than skeptical of, a president's desired policies and

unorthodox theories of the office. This coordinated approach between OLC and the White House Counsel's Office resulted in considerable damage to the professional reputations of both, but especially to OLC, because it had previously guarded its historically uncompromising tradition of independence jealously and with justifiable pride. Of greatest significance, however, is that an OLC that gave the White House Counsel's office the uncritical legal advice it wanted to hear and carry back to the president, rather than a strictly honest appraisal of the law that outlined the applicable legal restraints on executive power, acted inappropriately as an advocate for the president's policy goals. In the end, such action by OLC did both the Counsel's Office and the president a disservice when these policies came under withering public criticism and judicial challenge. The concern for the politicization of OLC in the G.W. Bush administration resulted in congressional hearings and proposed legislation to more closely oversee its work (e.g., The OLC Reporting Act, S.3501, which would have required the Attorney General to report to Congress when the Department of Justice concludes that the executive branch is not bound by a statute).

This decline in trust and reputation of OLC suggests that current and future White House Counsels should be attentive to those who are appointed to serve in OLC and to the quality of advice they receive from OLC. As a response to public criticism of OLC during the G. W. Bush administration, a group of fourteen former OLC attorneys who had served in the Clinton administration released a document on December 21, 2004, "Principles to Guide the Office of Legal Counsel," to offer an explanation of the traditional conduct of the office, and to urge a return to these principles. First among their ten guidelines was: "When providing legal advice to guide contemplated executive branch action, OLC should provide an accurate and honest appraisal of applicable law, even if that advice will constrain the administration's pursuit of desired policies. The advocacy model of lawyering, in which lawyers craft merely plausible legal arguments to support their clients' desired actions, inadequately promotes the President's constitutional obligation to ensure the legality of executive action."[16] (This statement makes unambiguously clear the connection between OLC and the Counsel's Office and the crucial, *constitutional* significance of accurate, unvarnished legal advice from the former to the latter.)

---

[16] See http://www.acslaw.org/files/2004%20programs_OLC%20principles_white%20paper.pdf.

*Office of the Solicitor General*. The function of the Solicitor General in the Department of Justice is to serve as the attorney for the United States government in cases before the federal courts. This includes: 1) authorizing the civil cases to be appealed from the district courts to the circuit courts, and deciding which cases to appeal to the Supreme Court, when the federal government is a losing party in either of the two lower court levels; 2) representing the federal government, through legal briefs and oral arguments, in all cases where it is a party, and 3) submitting amicus curiae briefs in those cases where the United States is not a party but has an interest. (Salokar 1992)

The Counsel needs to maintain a relationship with the Solicitor General, although this is delicate terrain for both to navigate. In similar fashion as with the Office of Legal Counsel, the Solicitor General and the White House Counsel come into this relationship from very different vantage points. The Solicitor General's official responsibility is authorized by statute and by Department of Justice regulations: the White House Counsel acts here only as a "staff" member whose role is to represent to the Solicitor General the president's interest in any pending cases. Obama administration Counsels Craig and Bauer noted that it was important for the Counsel to maintain contact with the Solicitor General and to stay informed about cases in which the president or the administration more broadly had an interest. In referring to relations with the Solicitor General's office, Gregory Craig recalls:

> We had to deal ourselves in… and I think we were much less aggressive than we should have been at the very beginning. I think the White House Counsel has got to be there and talking to the SG about what's going on in that office. (Craig interview)

Obama Counsel Bob Bauer noted that he met with the Solicitor General every two weeks, and he offered the following comments, when asked if the Solicitor General solicited his advice on upcoming Supreme Court cases: "Yes, I solicited the SG to solicit my advice!" On a more serious note, he explained that "the SG, like the Department of Justice, that's a relationship you have to be a little careful about. You express views, where it's appropriate to express views about upcoming cases, the ones where the administration clearly has an interest in having its position appropriately, you know, represented…But there is also the SG as lawyers who represent the interests of the executive branch over time, you have to respect that" (Bauer interview).

*Other Executive Branch Departments and Agencies*

With the notable exception of the Justice Department, the White House Counsel typically communicates with the executive branch departments and agencies through the general counsels.

> We used to have more or less monthly meetings of all the General Counsels of the departments and the executive branch. It's a little more difficult to meet with the General Counsels of the so-called independent agencies, as you know, but we do meet even with them on some matters…. Typically a lot of it would be show and tell, what we're doing and what that General Counsel thought was a problem that would go to the White House. A lot of it has to do with the ground rules for executive privilege and turning documents over to Congress which we don't think

should be turned over to Congress but which the department under the thumb of Congress always wants to turn over without ever consulting the president, whose privilege it is not to provide them. (Cutler interview)

C. Boyden Gray noted that the White House Counsel's Office is "supposed to be the lead focal point for all of [the General Counsels'] dealings with the White House. . . . They come to you. We tried to have meetings on a regular basis but it degenerated after a while because you saw them all so much anyway" (Gray interview). He added that exceptions to this rule occurred, in most departments and agencies, only when the secretary or the agency chief executive had issues to discuss with the White House Counsel. Occasionally, Gray said, he would speak with the deputy secretary. Communications with the independent regulatory agencies were handled with special care and circumspection.

The Justice Department, however, was the standard exception. The White House Counsel and the Attorney General typically were in daily communication with one another.

## ORGANIZATION AND OPERATIONS

The internal organization of the White House Counsel's Office has changed considerably since John Dean established the unit in the Nixon White House. Dean was the first Counsel whose duties primarily focused on "lawyering," and he was the first as well to seek out new legal responsibilities and draw them into a separate office in the White House.

Since the 1970s, the size of the Office of White House Counsel has expanded from two or three attorneys to more than 40 lawyers at times during the Clinton administration. The counsel's office during George W. Bush's presidency at times had more than 35 staffers (Patterson, 2008, p. 67); after the Democrats took over Congress in the 2006 elections, triggering investigations into range of issues, the office increased in size to a total of 22 lawyers (Baker 2007). The Counsel's Office during the Obama administration has ranged from 24 to a high of 35 lawyers.

Some former Counsels attribute this growth to the increasingly hostile Washington environment faced by recent presidents and the mounting scrutiny of their appointees. Lloyd Cutler recalls, for example: "In Carter's day, when I came in, including myself, there were six lawyers. Twenty-five years later, under [Bill] Clinton, there are probably forty lawyers, fifty lawyers. Part of that is dealing with the attacks on the President and these enormous vetting responsibilities that descend on the White House counsel" (Cutler interview, p. 5). Similarly, John Tuck, an aide to Chief of Staff Howard Baker in the Reagan White House, recalled "a whole huge shadow Counsel's Office" that developed following the Iran-contra revelations. (Baker interview).

Although presidents from FDR through Richard Nixon had aides with the titles of "Special Counsel" or "Counsel," such staffers typically had more wide-ranging policy responsibilities. The origin of the title "Special Counsel" can be traced back to Samuel Rosenman, the FDR speechwriter who oversaw much domestic policy during World

War II. Rosenman served as a justice on the New York State Supreme Court until FDR finally persuaded him to move to Washington to work full-time for the President in the early 1940s. "Special Counsel" was viewed as an appropriate title for the lawyer and former judge. Later aides with the title (for example, Clark Clifford and Charles Murphy in the Truman administration, Theodore Sorensen under Kennedy, Harry McPherson in the Johnson White House, and John Ehrlichman in the first year of the Nixon administration) also were lawyers and typically participated in policy development and speechwriting. The Eisenhower White House to some extent was an exception: Gerald Morgan, as Special Counsel, and Edward McCabe, an Associate Special Counsel, worked on tasks quite similar to some of those in the contemporary Counsel's Office.

## *INTERNAL DIVISION OF LABOR*

The Counsel's Office has been structured internally in numerous ways. Typically, however, the White House Counsel, as a senior presidential advisor, participates in myriad activities and issues, many of which cannot be predicted or planned for. Indeed, the Counsel's time often is consumed almost completely in handling crises or unexpected demands. Thus, Reagan Counsel Peter Wallison remembered:

> At least politics and crises are the two things that you know will be around when you take the job. One of the reasons you need a capable staff with clear lines of authority and responsibility, is that at some point you are going to be completely consumed with something, and that means your office has to function without you. So you need a really good and capable deputy, which I had [in] Jay Stephens, and you need very good lawyers, and then they have to know what their areas of responsibility are so that they don't have to keep coming to you for the allocation of assignments. (Wallison interview, p. 25)

Obama Counsels Gregory Craig and Bob Bauer emphasized their priorities for hiring members of the Office: Craig looked for people that had "really great legal skills...intellect and performance capacity, proven performance... [and] political skills...having worked in the world of politics, either in the campaign or on the Hill or in the Clinton White House or in some Washington DC experience." Finally, "collegiality was really vital... because we had a team system throughout" (Craig interview). For his part, Bauer "wanted senior appellate, trial and DOJ experience. Just practical experience plus excellent working relationships with DOJ" (Bauer interview). Both Craig and Bauer operated the office with a "team" structure: both delegated areas of responsibility to deputies and teams of staffers. This structure permitted the Counsel to spend time where it was most needed. Yet key to the success of this arrangement was the deep confidence that both Craig and Bauer expressed for their Office colleagues. For example, Bauer said,

> There were meetings that they (Mary DeRosa and Caroline Krass [an Associate Counsel who worked alongside DeRosa on national security]) attended, including meetings with the president. They met with me twice a week, they made decisions about when I needed to intervene, and I did. . . . I didn't attempt to put myself in the company of people at, say, the Deputies level, who were deeply immersed in these issues and experienced in them in a way that I was not. (Bauer interview)

Bauer noted the following about his meetings with Counsel Office staff members:

I met twice a week with the national security team, once a week with the White House legal issues, at least twice a week with the nominations team, and these were set, scheduled…I met with each of the component parts of the White House Counsel's Office, and then, we had one weekly meeting …with everybody. (Bauer interview)

## Deputy Counsels

Counsel offices beginning with John Dean's all have included at least one Deputy Counsel on their staffs. (For occupants of this position, see Appendix 2.)

A Deputy Counsel routinely serves as the primary overseer of workflow within the Office as well as a substitute for the Counsel. The Deputy also may perform other tasks at the direction of the Counsel.

James Castello was the deputy who really was my person [alter ego], and managed the staff, and was at the second meeting I couldn't be at if I was at the first one. [He] probably had the most to do with the legislative agenda. He met regularly with the legislative office and made sure that there weren't any surprises on the Hill that the President didn't know about or [that] what was going up as our core legislation didn't have any pitfalls in it. (Mikva interview, p. 16)

Such deputies typically are charged with assuring that the Counsel sees only the highest priority items. On personnel issues, for instance, Reagan Counsel A. B. Culvahouse stated:

. . . I clearly was the principal advisor to the President . . . within the White House on the vetting process which included not only the people to be nominated by the President but also people who would be appointed by the President even if they did not require Senate confirmation as well as anyone who would get a White House staff badge. Even the Park Service people who pruned the plants would come through the White House Counsel's Office. I never saw their files or anything, unless there was a problem. So the default rule was if there was a problem certified as such by my deputy then it would be put on my desk. So I saw 10 per cent of the files roughly. (Culvahouse interview)

Likewise, C. Boyden Gray noted: "My deputy [inaudible] read far more forms than I did but if there were problems with any high-ranking person it got kicked up to me and then I would have to deal with it, either deal with it with the President, or deal with the cabinet officer if it was one of his top people" (Gray interview).

In the Clinton White House, long-time presidential confidante Bruce Lindsey served for much of the administration as a "Deputy Counsel for Special Projects." According to Abner Mikva, besides a host of other activities,

. . . there was always a special project he was involved in, either for the President or because the President would indicate to me or [Chief of Staff] Leon [Panetta] that he wanted somebody that could really use his clout effectively. For instance, Bruce was the point man on the baseball strike. … I don't think I said Bruce, go do the baseball strike… It was known that we needed somebody who could go in there and say, "The President really thinks this ought to be done, or that ought to be done, and nobody could do that like Bruce. So he spent a lot of time on things like that. (Mikva interview, pp. 12-13)

Throughout the George W. Bush and Obama presidencies, White House Counsels relied on Deputy Counsels. Obama Counsel Gregory Craig appointed one Principal Deputy, Daniel Meltzer, and three Deputies, each with designated areas of responsibility: Mary DeRosa for national security, Neal Wolin for economic affairs (the

first time a Deputy was assigned for that policy area, reflecting the Obama administration's taking office soon after the financial crisis of 2008), and Cassandra Butts, who oversaw the appointments process.

### Immediate Support Staff

In addition, the Counsel's immediate staff (often an administrative assistant and an executive secretary) usually is responsible for assuring that external deadlines are met and internal work is parceled out appropriately. A. B. Culvahouse, for example, reported having "three non-attorney people who worked for me: an executive assistant, an administrative assistant and an executive secretary. The first two spent most of their time assigning out projects and making sure the work was done and the deadlines were observed" (Culvahouse interview).

### Special Counsels

In recent White Houses, aides with the title of "Special Counsel" have on occasion appeared in the Counsel's Office. Typically, these are staffers assigned to handle short-term or "crisis" situations that may involve congressional or other investigations, such as the Iran-contra or Whitewater affairs. Most observers attribute the swelling of the Counsel's Office over the course of an administration to such crises and the heightened external scrutiny of administrations.

As noted previously, Norm Eisen was selected by Obama Counsels Craig and Bauer to serve as Special Counsel for ethics, charged with interpreting and monitoring ethics legislation and additional ethics rules issued by an administration for staffers in the White House Office and Executive Office of the President, and, on occasion, for cabinet officials and other presidential appointees.

### Other Work

Moreover, given the range of diverse responsibilities that have come to be lodged in the Office of White House Counsel, some substantive division of labor usually appears. For instance, a Deputy Counsel and one or more other members of the Office participated in judicial selection in the Carter, Reagan, Bush, and Clinton administrations. Although presidents have always paid most attention to nominations to the U.S. Supreme Court, recent White Houses also have focused on nominations to the U.S. Courts of Appeals and, to a somewhat lesser extent, the U.S. District Courts.

Similarly, after the initial flurry of "vetting" for nominations and appointments at the beginning of an administration, typically one Assistant or Associate Counsel and a Security Assistant or Clearance Counsel (and staff) in the Office handle FBI and financial disclosure reports on nominees to executive branch openings (see, e.g., Wallison interview, pp. 9-11). The lawyer also is responsible for taking the confidential reports to Capitol Hill to the chairs and ranking minority members of the appropriate Senate committees, with potentially problematic allegations flagged. In the second term

Clinton White House, a "Senior Counsel" was among those handling these responsibilities.

Other tasks that commonly have been assigned to particular lawyers in the Counsel's Office have included interpreting and monitoring compliance with ethics legislation, Presidential travel, and the distinctions between "official" and "political" events and funding also have received specialized scrutiny. Moreover, Reagan Counsel A. B. Culvahouse recalled:

> Someone in my office would have reviewed and approved anything that the President said, signed or issued his name to -- from the ridiculous declaring next week national dairy goat week which is the kind of thing that happens all the time, to pretty important things, veto messages, signing statements. And we would not only review it for form and legality but if it were legislation we would also have a recommendation: should the president sign, should he veto, should he let it become law without his signature. . . . We would approve scheduling requests. If people were coming in to see the President, we would get a list of the attendees and look at them for propriety and seemliness and should the President see someone who ten years ago had been convicted of something. (Culvahouse interview)

Still other attorneys in the Counsel's Office focus on issues of international trade and transportation, defense and national security policy (to support the Counsel's role as chair of the War Powers Committee), and government regulation. As noted earlier, another primary responsibility of the Office is to protect presidential prerogatives, frequently on matters involving executive privilege, the issuance of executive orders, or interpretation of legislation.

## RHYTHMS OF QUADRENNIAL GOVERNANCE

Over the course of a presidential term, the activities, demands, and emphases of the Counsel's Office typically follow common patterns. The first year is both demanding and somewhat distinctive. After that, the work of the Counsel's Office—like much of the rest of the administration—to a significant extent reflects the presidency's efforts to respond to external deadlines. Other tasks arise more routinely throughout an administration.

### First Year

A major task that begins well before Inauguration Day and continues through most of the first year is vetting for nominations and appointments. C. Boyden Gray remembered: "for the first year that's all you do, is read FBI reports and ABA reports. It's not much fun. Financial disclosure reports. It's not much fun" (Gray interview).

During this early period as well, the Counsel's Office seeks to assure that all White House staffers and political appointees are informed of the ethics statutes, executive orders, and other administration rules under which they must work. Gray described his approach to handling the task: "My rule of thumb was: 'If it's fun, stop! If it feels good, stop! If you're having fun, you're doing something wrong!' That's the way I summed up all the rules" (Gray interview).

At the outset, too, the Counsel's Office needs to give White House staffers instructions on how to keep their files. Phillip Brady recalled that in the Bush administration, the Counsel (Boyden Gray) and Deputy Counsel (John Schmitz) "... tried to be very careful to ensure all new employees were given a Counsel's Office memo that would articulate what [were] presidential documents and what needed to be preserved, and that sort of thing" (Brady interview, p. 7).

The initial weeks and months of a new administration also bring numerous other demands. Chief among them: the president's budget must be submitted by February 2nd, the economic report is due at about the same time, and the legislative agenda, congressional messages, and bills must be drafted and sent to Congress. The Counsel's Office is involved in all of these activities.

## Annual Cycles

The following are important yearly responsibilities that require the Office's engagement: preparation of the president's budget, and drafting of the State of the Union address and the Economic Report of the President. Although the Counsel's Office is not the central player in any of these, it does perform the pivotal role of ensuring that the processes and the officials involved act in accordance with prevailing legal and ethical guidelines.

## Electoral Cycles

As the mid-term congressional elections or a presidential re-election campaign approaches, the Counsel's Office faces other tasks. The Office may well be besieged with requests for advice from other White House staffers and from political appointees throughout the executive branch about the sorts of partisan and electoral activities in which they and their aides are legally permitted to engage. In most administrations, the Counsel and staff try to anticipate such requests and related problems by sending out written guidelines and holding information sessions.

Clinton Counsel Abner Mikva remembered the memo he wrote to White House staffers and other political appointees for the 1996 presidential campaign:

> The idea came from the fact that that kind of the same memo had been written every four years since anybody could remember. I think we even had a copy of the memo that not Gray but one of the predecessors had sent out—maybe Fielding; it may have been Fielding—sent out during his [tenure]. (Mikva interview, p. 13)

Moreover, as elections approach,

> . . . the president becomes more involved in direct politics which raises questions about . . . how much of his time would be devoted to it, who pays for it, all those things. That becomes much more important every two years. Whether the President is running for election or not, usually he's out doing things, raising funds or otherwise supporting candidates, which require you to make these kinds of allocations in the best possible way to avoid charges of wrongdoing. (Wallison interview, p. 24)

Mikva noted that in retrospect, "None of us saw fit to raise a warning flag for the President."

> I had seen what goes on in state politics. I'd been a state legislator for ten years. I know governors in Illinois pick up the phone when they're sitting in the governor's office and lean on people to give money to their campaign and the party. It's just a fact of life and I suspect it goes on in most states. I'm sure it went on in Arkansas. I think this government came in to the White House not very sensitive to the fact that the White House and the federal government is a different place. So I should have warned the President. (Mikva interview, pp. 13-14)

Indeed, Lloyd Cutler has remarked,

> When a president is up for re-election, there are all sorts of temptations, things a president wants to do that may be legally questionable but that he wants to do to get re-elected. For a White House Counsel, those are the hardest calls to make. You should tell a White House Counsel to leave before that last year of a president's first term. (Cutler, Duke panel transcript)

The presidential electoral cycle also can influence submission of judicial nominations to the Senate. Former Deputy Counsel Phillip Brady noted: "Well, there's the four-year calendar, and as you're getting closer and closer to the presidential election, you're going to have less receptivity (in the Senate) to confirming people for lifetime appointments" (Brady interview, p. 4).

### *Final Year*

The last year of a presidency can be "dangerous" (Culvahouse, Duke panel transcript). This is a time when requests for pardons, commutations, executive orders, and other presidential actions may be likely to reach fever pitch. It also is a time when presidents may be especially responsive to those who have supported and worked with them for numerous years, and the president makes appointments to boards and commissions.

### *More Regular Tasks*

Many of the other tasks handled by the Counsel's Office are performed throughout an administration. Reagan Counsel A. B. Culvahouse recalled, for example, that this included the judicial selection committee, which met "every two weeks and more frequently if—basically the idea was to get people's nominations up as soon as possible so if the FBI was able to process background checks and all the materials were in we sometimes would meet every week" (Culvahouse interview). Executive orders also need to be drafted throughout an administration.

In contrast, Culvahouse continued:

> Congress tends to work in fits and starts. . . . The legislative agenda can be heavy or it can be light. There were also Statements of Administration policy that we would review. If it was a statement of Justice Department policy, we would not review it. Sometimes we would say, "This should not come out of the White House; the Justice Department or the State Department should issue this." Sometimes we would be involved in deciding who ought to comment on the bill, and who ought to testify. If it was going to be a Statement of Administration policy, which is in effect attributed to the President, we would look at those carefully. Those would be in effect a letter

> that would say here's what the Administration thinks about S-332, the omnibus such and such act. (Culvahouse interview)

Other legislative decisions to which the Counsel's Office responds are more routine:

> There was even someone who handled the disease-of-the-week. Congress passes all of these little bills all the time, establishing that a certain week, for example, will be cystic fibrosis week, and a presidential proclamation is required. So somebody has to read what Congress said and then prepare the proclamation. When there was all this talk about testing urine and blood for drugs, I had someone handle that, and he was our fluids man. It was pretty informal but yet I knew what each of the people in the Office would be handling. So I could always bring that person in. (Wallison interview, p. 12)

In addition, throughout an administration, new individuals must be nominated for and appointed to positions throughout the executive branch. After the first year, "The nomination process was fairly continuous... So every week there would be nominations to be processed, people to be vetted, ethics agreements to be looked at" (Wallison interview, p. 9). Informing new hires about ethics regulations also had to continue.

Meanwhile, questions about presidential travel continually arise. In the Reagan White House, for example, "Alan Raul . . . was in charge of presidential travel. That was a big and difficult issue because of what had to be paid for by private funds, by political funds or by government funds. So they were constantly, the people in the political office and in the travel office, they were constantly calling Alan for advice on that subject" (Wallison interview, p. 23).

### Crises / Scandals / Unexpected Events

Counsels, of course, find themselves (and their staffs) handling unexpected situations and, on occasion, crises, at least as seen from the administration's perspective. As chair of the War Powers Committee, the Counsel has responsibilities whenever U.S. troops are (or may become) involved in hostilities.

Lloyd Cutler, who served as Counsel for both Presidents Jimmy Carter and Bill Clinton, observed that the job has become more driven by scandal and congressional efforts to probe more deeply into administrations:

> We were doing executive privilege in the Carter days; we were doing it in the Clinton days. We had demands from congressional committees for White House documents and agency documents; drafts of legal opinions, for example, were so much more pervasive. Mostly, it's the difference that when I worked for Carter while we did have the Billy Carter problem and a few others, Hamilton Jordan's alleged drug violations—which turned out to be entirely untrue, while we had a couple of those, most of what I did was substantive. . . . In Clinton's time I had the same understanding that I could be in on all these things but I had to put in so much of my own daily effort, and my staff did, on the investigations of the President, Whitewater, et cetera, that I had no time. . . . I would say working for Carter—which was a year and a half—not more than 20 per cent [of the Counsel's work] was what I call playing defense. Under Clinton it was closer to 80 per cent. (Cutler interview, p. 6)

A scandal of one sort or another also is likely to occur at some point during an administration. In the words of Peter Wallison:

. . . you can always count on . . . some kind of big scandal. It's like that; something is going to happen. When I took that office, I assumed there was going to be a blizzard. What I didn't realize was that there would be a hundred-year snow in the form of Iran-Contra. You don't know those things in advance. The last six months was virtually all Iran-Contra. I couldn't escape it. (Wallison interview, p. 24)

## The Counsel's Daily Schedule

Although there certainly is no "typical day" for a White House Counsel and the larger Office, some daily routines can be identified. For the Counsel, most days involve a stream of meetings, including meetings of the White House senior staff, meetings with the Counsel staff, participation in discussions of policy initiatives and major speeches, and weekly or bi-weekly sessions on judicial nominations. President Bush's Counsel, C. Boyden Gray, pithily summarized the job as "Meetings all day long. Meetings, meetings, meetings" (Gray interview). When surprises or crises occur, of course, the Counsel is typically on call.

Peter Wallison, for example, remembers:

I would usually arrive at the White House about seven in the morning. The staff meeting was at eight; that is, the senior staff meeting was at eight. So I would come in; I'd read the newspapers.... to see if there was anything in the newspapers, anything I hadn't already heard on the radio coming in in the morning or before I went to bed the night before. ... In most cases, I would then go to the staff meeting at eight o'clock. Sometimes I would go down to [Chief of Staff Donald] Regan's office in advance of the staff meeting and I would raise a subject that I saw in the papers or heard about, something like that, that I thought he might want to talk about at the staff meeting or that he might not want to talk about at the staff meeting or he might have to have an answer if the question comes up at the staff meeting about what I thought. ... I would get ten, fifteen minutes with him about something before the staff meeting started. That was fairly rare. Then we'd go in the staff meeting. ... Then after the staff meeting ... every morning I would have my own staff meeting. ... And I would review with them the things that came up at the senior staff meeting that would relate to the things that they were doing. So they would each get directions about what were the issues the White House was dealing with today and what they were going to hear from their clients. (Wallison interview, p. 23)

A. B. Culvahouse's recollections are similar:

We'd have a senior staff meeting which was twenty-five people in the Roosevelt Room every morning at 7:30. Then we'd have a meeting in [Chief of Staff Howard] Baker's office that was never on the schedule but which everyone knew about of six people. Howard [Baker], [Deputy Chief of Staff Kenneth] Duberstein, [Press Secretary Marlin] Fitzwater, [National Security Assistant Colin] Powell, me, [Assistant to the President for Communications Thomas] Griscom and Dan Crippen. ...It was basically referred to as the "real meeting." ...[The first meeting was about] what was going to happen, what was coming up, sort of broadly defined. But it was not a secure meeting because if you talked about anything really interesting it would find its way to the press. (Culvahouse interview; cf. interview with Baker)

Culvahouse also had a daily staff meeting "at least early on, during the Iran-Contra investigations, and then I would meet with the other staff at least twice a week" (Culvahouse interview).

After meeting with the Counsel staff, in Peter Wallison's words, the Counsel "would start to handle the crises of the day, whatever they happened to be. Mostly that's what you did. William French Smith was once asked what it was like to be Attorney

General and he said, "It's one damn thing after another." And that's basically what it's like to be White House Counsel: "It's one damn thing after another" (Wallison interview, p. 23).

Obama Counsel Bob Bauer introduced a novel approach to his Counsel's Office staff meetings.

> At 9:00 AM, I met with my chief of staff and my Deputies for one hour, and we had an agenda, and we just marched through that agenda, and it was decidedly divided into two parts, and this is a big challenge for the White House Counsel. The first part was, "What's immediately ahead? What have we committed to do? What's the day-to-day traffic?"
>
> The second part is "What are we not thinking about that is three to six to nine months to a year down the road that we're not working on right now because we're so swept up in the excitement of the day?" (Bauer interview)

Often, at least for contemporary Counsels, the days and weeks can be long ones. Some recall six-day weeks and weekdays of more than twelve hours, especially when crises arise. Taking over in the aftermath of the Iran-Contra revelations, A. B. Culvahouse reported:

> I'd try to get in by 7:15 so I could read the President's intelligence daily brief and get a briefing particularly on the Iran-Contra investigations, anything that had changed since the night before. I tended to leave probably 10-ish. Then I'd work like from 8:00 to 6:00 on Saturday. I worked every Sunday for the first while and then after about six months I tried to keep Sundays free for my family ... Of course you have the secure telephone at home which quickly became the blankity-blank White House phone because it would ring at all hours of the day and night. It had a unique ring. (Culvahouse interview)

In the scandal-plagued Clinton administration, "being on Clinton's legal team, with its 18-hour workdays and constant pressure, burned people out. [Special Counsel Jane] Sherburne recalls working in her windowless office day after day, never seeing daylight" (Oliphant, 2000, p. 5). Clinton's third Counsel, Abner Mikva, commented on the physical demands:

> I came in at sixty-nine and I was actually seventy by the time I left, and the physical schedule was just more than I could handle. I would come in at six-thirty in the morning and leave at nine at night. I was the first one out of the White House! They were all still doing scheduling meetings and all kinds of things. I'd never served a president younger than I was, and I realized that maybe if I'd had the personal relationship with him beforehand, which I didn't, maybe I could have played the nice graybeard that would be called in once in a while to consult. But to run the kind of schedule that the rest of the senior staff was running - and that he had every reason to expect out of a White House Counsel - was way beyond me. I walked out totally exhausted. It turned out I had pneumonia. I didn't realize that until after I left. (Mikva interview, p. 17)

With some understatement, Jonathan Turley, a George Washington University law professor, remarked: "This was not a job to envy. Every[one] in the Clinton administration seemed to age before our eyes"(Oliphant, 2000, p. 4).

Under less harried circumstances in the Reagan administration, Peter Wallison recalled:

> I didn't make a habit of it, I don't think, of being in on Saturdays. When Iran-Contra started, I did; I would go in Saturdays and Sundays. But before that it was a pretty easy job actually except for the constant pressures. It didn't involve my having to work very late most of the time. As a

lawyer I was used to working twelve hours a day. I would always work twelve hours a day no matter when I got to the office. A tough day was sixteen hours but twelve hours was a pretty ordinary day. I doubt I left before seven many times; I probably left at eight. I don't have a distinct recollection of this but I do know that I wasn't seeing my family all that much during this time. (Wallison interview, p. 32)

The more striking memory may be the constant pressure. Wallison also observed:

In the White House you never get away from the tension and the pressure of the job. You can go home but you turn on the television or you listen to the radio or you look at a newspaper, there are things that you are working on or you know about, or you know that are constantly coming at you. So, even though you don't even recognize it, you're constantly at work and constantly under pressure. It can be extremely wearing, for that reason. As I say, you don't recognize it. You don't know that you are always at work. You don't realize it, but you are, because your mind is constantly occupied with what is going on in your office. . . . When you're in the White House you've got every possible opponent, in effect; all the political opponents are at you all the time. When you're in the Treasury Department or even when you're working for the Vice President—I had left that out—the pressure is much less. . . . Everyone, however, has an interest in what the White House is doing, so you have a legion of opponents. (Wallison interview, pp. 26-27)

Nonetheless, C. Boyden Gray has commented that, despite the "never-ending pressure . . . some of it is unnecessary. I can say that looking back on it; perhaps I'm not sure I felt that way at the time. There are meetings that you don't have to attend, stuff you don't have to do. You have to discipline yourself just to walk away from it and go to the gym and work out. You can find time. I found time" (Gray interview). And, Mikva recalled, serving as Counsel was "exciting. You're at the point of some very important decisions. Whether you're making them or not, you're involved in the decisional process. You're dealing with interesting people, interesting situations. There just was not a single boring moment that I had" (Mikva interview, p. 17).

## Turnover: Counsel and Deputy Counsel

Given the demands on the Counsel as well as the often unforgiving nature of Washington, it is scarcely surprising that relatively few Counsels stay in the position for more than two years. Only Philip Buchen (Ford) and C. Boyden Gray (Bush) stayed through their administrations. Fred Fielding worked even longer as Counsel to Ronald Reagan, serving from January 1981 until February 1986. (See Appendix 2.)

In recent presidencies, Counsels have departed for a variety of reasons. Some, such as John Dean, became directly involved in administration scandals. Others—J. Fred Buzhardt, Peter Wallison—departed after the president or chief of staff who brought them to the White House was forced out. Gregory Craig left in the first year of the Obama administration, hampered by his strong support for closing the prison on Guantanamo and by his difficult relationship with Chief of Staff Rahm Emanuel. Still other Counsels joined the White House staff explicitly on a temporary basis, to help handle political or policy crises. In Democratic administrations, such figures have tended to be well respected, "old Washington hands" themselves (like Lloyd Cutler, Abner Mikva, and Charles Ruff). Fred Fielding was the Republican counterpart in the George W. Bush administration. In the Reagan administration, by contrast, the new Counsel,

A. B. Culvahouse, was a trusted associate of the incoming Chief of Staff, Howard Baker, who himself fit this same profile.

When a Counsel has left the White House, his or her deputies have often departed within several months. One exception has been Clinton aide Bruce Lindsey, who was lodged in the Counsel's Office (typically as a "Deputy Counsel to the President for Special Projects") from 1993 through 2000, working under multiple Counsels (and always with a second Deputy Counsel).

In addition, there has been somewhat higher turnover among Deputies than among Counsels. Typically, Deputy Counsels leave to pursue other opportunities both in and outside the administration. Over the period from 1971 through 2008, no Deputy Counsel has succeeded a Counsel, although at least one (Cheryl Mills) turned down the job when it was offered to her. Clinton's sixth Counsel, Beth Nolan, served as an Associate Counsel in the first term. Deputy Counsels Cheryl Mills and William P. Marshall served as Associate Counsels (Mills under Nussbaum, Cutler, Mikva, and Quinn, and Marshall under Ruff) before being named Deputies. In the Obama administration, however, Kathryn Ruemmler served as Deputy to Counsel Bob Bauer, and she succeeded Bauer as Counsel when he departed in June 2011.

# Appendices

## *Appendix 1. Functions of the Office of White House Counsel*

1. *Advise on the exercise of presidential powers and defend the president's constitutional prerogatives*

   o   Review (and, in unusual cases, draft) executive orders

   o   Review all recommendations for pardoning and commutation

   o   Review requests for federal disaster relief

   o   Review CIA drafted intelligence findings and approve covert action proposals

   o   Interpret treaties and executive agreements

   o   Review all presidential statements and speeches for consistency and compliance with legal standards, and in anticipation of legal challenges

   o   Participate in editing the State of the Union address

   o   Advance recommendations about executive privilege

   o   Chair the president's War Powers Committee

   o   Manage the processes associated with presidential disability or succession

2. *Oversee presidential nominations and appointments to the executive and judicial branches*

   o   Participate in the selection of nominees for the top Justice Department positions participate in the selection of General Counsel nominees throughout the executive branch and in the NSC staff

   o   Chair the joint White House–Department of Justice judicial selection committee

   o   Supervise the vetting and clearance process (FBI, IRS, 278 forms, and financial disclosure forms) for all presidential nominees and appointees to the executive and judicial branches

   o   Negotiate Senate access to the FBI reports on each nominee

   o   Conduct "murder boards" to prepare nominees for Senate confirmation hearings

3. *Advise on presidential actions relating to the legislative process*

- o  Review legislative proposals from the president, Executive Office of the President, and executive departments and agencies

- o  Review bills presented for signature or veto, prepare signing statements and veto messages

- o  Review State and Defense Department authorizations and appropriations proposals

- o  Draft budget rescissions and deferrals

- o  Participate in negotiations associated with Senate treaty hearings

- o  Participate in legislative negotiations concerning policy, document requests, treaties, and nominations

4. *Educate White House staffers about ethics rules and records management and monitor for adherence*

- o  Distinguish between government expenses and campaign expenses

- o  Review presidential travel

- o  Approve requests for appointments with the president, monitoring those for propriety, seemliness, legality, and executive privilege issues

- o  Respond to document requests and subpoenas, directed to the president and to other White House and executive branch officials, by Congressional committees and Independent Counsels

- o  Serve as the ethics officer for the White House staff and senior executive branch appointees

5. *Handle department, agency, and White House staff contacts with the Department of Justice*

- o  Conduct all consultations with the Office of Legal Counsel and other Justice Department offices

- o  Request OLC legal opinions on matters of constitutional law

- o  Consult with and coordinate department and agency General Counsels

*Smoothing the Peaceful Transfer of Democratic Power*

## Appendix 2. Counsels & Deputy Counsels, 1969–2016

| President | Counsels | Dates | Deputies | Dates |
|---|---|---|---|---|
| Obama | Neil Eggleston | 5/14– | Mark Aziz | 5/14– |
|  |  |  | Michael Bosworth | 5/14– |
|  |  |  | Christopher Fonzone | 5/14– |
|  | Kathryn Ruemmler | 6/11–5/14 | Caroline Cheng* | 1/13–12/13 |
|  | Robert Bauer | 12/09–6/11 | Caroline Cheng | 12/09–6/11 |
|  |  |  | Kathryn Ruemmler | 12/09–6/11 |
|  | Gregory Craig | 1/09–12/09 | Daniel Meltzer* | 1/09–1/10 |
|  |  |  | Mary DeRosa | 1/09–6/11 |
|  |  |  | Neal Wolin | 1/09–12/09 |
|  |  |  | Cassandra Butts | 1/09–1/10 |
| W. Bush | Fred Fielding | 2/07 | J. Michael Farren | 2/07–10/08 |
|  |  |  | Emmet Flood | 10/08–1/09 |
|  |  |  | William Burck | 10/08–1/09 |
|  | Harriet Miers | 11/04–1/07 | William K. Kelley | 3/05–3/07 |
|  | Alberto Gonzales | 1/01–11/04 | David G. Leitch | 12/02– |
|  |  |  | Timothy E. Flanigan | 11/04 |
|  |  |  |  | 1/01–11/02 |
| Clinton | Beth Nolan | 8/99–1/01 | Bruce R. Lindsey | 1/93–1/01 |
|  |  |  | William P. Marshall | 12/99–1/01 |
|  | Charles F. C. Ruff | 2/97–8/99 | Cheryl Mills | /96–8/99 |
|  | John (Jack) Quinn | 11/95–2/97 | Kathleen Wallman | /96– |
|  | Abner Mikva | 9/94–11/95 | James Castello | 3/95– |
|  | Lloyd Cutler | 3/94–9/94 |  |  |
|  | Bernard Nussbaum | 1/93–3/94 | Joel I. Klein | 7/93–3/95 |
|  |  |  | Vincent W. Foster | 1/93–7/93 |
| H. W. Bush | C. Boyden Gray | 1/89–1/93 | John P. Schmitz | 1/89–1/93 |
| Reagan | A. B. Culvahouse | 1/87–1/89 | Phillip D. Brady | /88–1/89 |
|  |  |  | Jay B. Stephens | /86– /87 |
|  | Peter Wallison | 4/86– |  |  |
|  | Fred Fielding | 1/81–2/86 | Richard A. Hauser | 1/81– |
|  |  |  | Herbert E. Ellingwood | 1/81– |
| Carter | Lloyd Cutler | 10/79–1/81 | Michael Cardozo | 10/79–1/81 |
|  |  |  | Joseph Onek | 9/79–1/81 |
|  | Robert J. Lipshutz | 1/77–8/79 | Margaret A. McKenna | 1/77–12/79 |
| Ford | Philip W. Buchen | 8/74–1/77 | Edward C. Schmults | 10/75–1/77 |
|  |  |  | Roderick Hills | 4/75–10/75 |
|  |  |  | Philip Areeda | 10/74–2/75 |
| Nixon | J. Fred Buzhardt | 1/74–8/74 | Fred Fielding | 5/73– |
|  | Leonard Garment | 5/73–1/74 |  | 1/74** |

*Note*: Dates are approximate.

\* Principal deputy
\*\*On Counsel staff since 10/70

# REFERENCES

## INTERVIEWS (WHITE HOUSE INTERVIEW PROGRAM)

Baker, Howard, with John Tuck. By Martha Joynt Kumar. Washington, D.C. 12 November 1999.

Bauer, Robert. By Nancy Kassop and Katie Dunn Tenpas. Washington, D.C. 5 July 2016.

Brady, Phillip. By Martha Joynt Kumar. Washington, D.C. 17 August 1999.

Culvahouse, A. B. By Martha Joynt Kumar. Washington, D.C. 15 September 1999.

Craig, Gregory. By Nancy Kassop and Katie Dunn Tenpas. Washington, D.C. 6 July 2016.

Cutler, Lloyd C. By Martha Joynt Kumar with Nancy Kassop. Washington, D.C. 8 July 1999.

DeRosa, Mary. By Nancy Kassop. Washington, D.C. 13 September 2016.

Eisen, Norman. By Nancy Kassop and Katie Dunn Tenpas. Washington, D.C. 5 July 2016.

Fielding, Fred. By Nancy Kassop and Katie Dunn Tenpas. Washington, D.C. 13 September 2016.

Gray, C. Boyden. By Martha Joynt Kumar with Nancy Kassop. Washington, D.C. 4 October 1999.

Mikva, Abner. By Martha Joynt Kumar with Terry Sullivan. Chicago, Ill. 26 April 2000.

Morrison, Trevor. By Nancy Kassop. New York. 21 August 2015. (personal notes on file with Kassop)

Nussbaum, Bernard C. By Martha Joynt Kumar with Nancy Kassop. 9 November 1999. (personal notes on file with Kassop)

Rizzi, Robert. By Martha Joynt Kumar. Washington, D.C. 4 August 2016.

Panetta, Leon. By Martha Joynt Kumar. Monterey Bay, CA. 4 May 2000.

Wallison, Peter. By Martha Joynt Kumar. Washington, D.C. 27 January 2000.

## COURT CASES

*AHA v. NARA* (No. 01-2447, October 1, 2007).

*Cheney et al. v. U.S. District Court*, 542 U.S. 367 [2004].

*Citizens for Responsibility and Ethics in Washington et al. v. Richard Cheney et al*. (No. 2008-1548).

*Clinton v. Jones*, 520 U.S. 681, 1997.

*Committee on the Judiciary of the U.S. House of Representatives v. Miers et al.*, No. 2008-0864, July 31, 2008.

*Committee on the Judiciary of the U.S. House of Representatives v. Miers et al.*, No. 08-5357, October 6, 2008.

*In re Sealed Case* (Bruce R. Lindsey) (Grand Jury Testimony), 5 F. Supp. 2d, 21 (D.D.C. 1998).

*In re: Bruce Lindsey* (Grand Jury Testimony), 158 F. 3d 1263 (D.C. Cir. 1998).
http://laws/findlaw.com/dc/983060d.html
*Nixon v. Fitzgerald*, 457 U.S. 731, 1982.
*U.S. v. Nixon*, 418 U.S. 684, 1974.
*U.S. v. United Shoe Machinery Corp.*, 89 F. Supp. 357, 358-59 [D. Mass. 1950].
*Walker v. Cheney,* 230 F. Supp.2d 51 [D.D.C. 2002].


## OTHER REFERENCES

Allen, Mike. "Bush Picks a Replacement for Harriet Miers." *Time*, January 8, 2007.
"An Act to Establish the Judicial Courts of the United States, ch. 20, Sec. 35, 1 Stat. 73, 92-93 (1789); codified in 28 U.S.C. Secs. 511, 512 (1988).
Baker, Peter. "Besieged White House Reinforces Counsel's Office." *Washington Post,* June 9, 2007, p. A4.
Baker, Peter. "Privilege at Stake with Nominees: Bush Aims to Reassert Presidential Power in Debate over Roberts, Bolton." *Washington Post,* August 2, 2005, p. A6
Bendavid, Naftali. "Keeping the President's Counsel." *Legal Times* (14 March 1994): 1, 20-21.
The BLT: The Blog of *Legal Times*. "White House Vows Cooperation with Prosecutor Investigating U.S. Attorney Firings." October 1, 2008.
http://legaltimes.typepad.com/blt/2008/10/white-house-vow.html.
Carey, Maeve P., and Michael Greene. "Presidential Appointments to Full-Time Positions in Executive Departments During the 111th Congress, 2009-2010." Congressional Research Service Report R43648. July 15, 2014.
https://www.fas.org/sgp/crs/misc/R43638.pdf.
Carter, Terry. "Federal Nominees Turn to Law Firms to Play Vetting Game." *ABA Journal*. November 1, 2013.
Civiletti, Benjamin. Comments. Duke University Law School. "Should the White House Counsel's Office Be Abolished?" Panel at conference "The Constitution under Clinton: A Critical Assessment," 23-25 September 1999.
Culvahouse, A. B. Comments. Duke University Law School. "Should the White House Counsel's Office Be Abolished?" Panel at conference "The Constitution under Clinton: A Critical Assessment," 23-25 September 1999.
Cutler, Lloyd. Comments. Duke University Law School. "Should the White House Counsel's Office Be Abolished?" Panel at conference "The Constitution under Clinton: A Critical Assessment," 23-25 September 1999.
Eilperin, Juliet. "Obama Promised to Curb the Influence of Lobbyists. Has He Succeeded?" *Washington Post*, March 22, 2015.
https://www.washingtonpost.com/politics/obama-promised-to-curb-the-influence-of-lobbyists-has-he-succeeded/2015/03/22/e9ec766e-ab03-11e4-abe8-e1ef60ca26de_story.html
Executive Order 12667, 54 FR 3403 (January 16, 1989).
Executive Order 13233 - "Further Implementation of the Presidential Records Act," 66 F.R. 56025 (November 1, 2001).

Executive Order 13489 – "Presidential Records." January 21, 2009. https://www.whitehouse.gov/the_press_office/ExecutiveOrderPresidentialRecords

Executive Order 13490, "Ethics Commitments by Executive Branch Personnel." January 21, 2009. https://www.whitehouse.gov/the_press_office/ExecutiveOrder-EthicsCommitments

Froomkin, Dan. "Contempt for the Law." *Washington Post*, January 17, 2008.

Froomkin, Dan. "Waiting For Rove." *Washington Post*, August 1, 2008.

Froomkin, Dan. "Waxman Ain't Buying." *Washington Post*, January 18, 2008.

Goldman, Sheldon, Elliot Slotnick, Gerard Gryski, Garry Zuk, and Sara Schiavoni. "W. Bush: Remaking the Judiciary: Like Father Like Son?" *Judicature* 86 (May-June 2003): 282-309.

Goldman, Sheldon, Elliot Slotnick, Gerard Gryski, and Sara Schiavoni. "W. Bush's Judiciary: First Term Record." *Judicature* 88 (May-June 2005): 244-75.

Goldman, Sheldon, Elliot Slotnick, Gerard Gryski, and Sara Schiavoni. "W. Bush's Judiciary during the 109th Congress: Picking Judges in a Time of Turmoil." *Judicature* 90 (May-June 2007); 252-83.

Goldsmith, Jack. *The Terror Presidency: Law and Judgment inside the Bush Administration*. New York: W. W. Norton, 2007.

———. "The Decline of OLC." *Lawfare*, October 28, 2015.

———. "More on the Decline of OLC." *Lawfare*, November 3, 2015.

Korte, Gregory. "Obama Issues 'Executive Orders by Another Name.'" *USA Today*, December 17, 2014. http://www.usatoday.com/story/news/politics/2014/12/16/obama-presidential-memoranda-executive-orders/20191805/

Lee, Christopher. "Cheney Is Told to Keep Official Records." *Washington Post* (September 21, 2008): A5.

Leopold, Jason. "Special Prosecutor Finds 'Insufficient Evidence' to File Charges over U.S. Attorney Firings," *Truthout*, July 22, 2010. http://truth-out.org/archive/component/k2/item/90839:special-prosecutor-finds-insufficient-evidence-to-file-charges-over-us-attorney-firings

Marcus, Ruth. "Court Rejects Privilege Claim." *Washington Post* (July 28, 1998): A1.

Marcus, Ruth, and Ann Devroy. "Nussbaum Quits White House Post." *Washington Post* (March 6, 1994): A1.

Morgan, Gerald, and Edward McCabe to Philip Buchen. 2 October 1974. Memo, "Functions to be Performed by the Office of Counsel to the President." "Office Organization and Functions (1)." Buchen Counsel's Office Files, Box 100, Ford Presidential Library.

Morrison, Trevor. "Book Review: Constitutional Alarmism: *The Decline and Fall of the American Republic*" by Bruce Ackerman. *Harvard Law Review*, Vol. 124:1688 (2011).

Moss, Randy. "Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel." 52 *Administrative Law Review* 1303. 2000.

Nussbaum, Bernard. Comments. Duke University Law School. "Should the White House Counsel's Office Be Abolished?" Panel at conference "The Constitution under Clinton: A Critical Assessment," 23-25 September 1999.

"Obama Announces Key Additions to the Office of the White House Counsel." Office of the Press Secretary. 28 January 2009. https://www.whitehouse.gov/the-press-office/obama-announces-key-additions-office-white-house-counsel.

Oliphant, Jim. "Losing Privilege: A Scandal-Scarred Legacy for Future Presidents: White House Counsel without a Shield." *Legal Times* (March 10, 2000): 1-7. http://www.lawnewsnetwork.com/stories/A18273-2000Mar9.html 3 April 2000.

Patterson, Bradley H. "The 'Just-Us' Department: The Counsel to the President." Chapter 6, *To Serve the President: Continuity and Innovation in the White House Staff*, pp. 66-81.Washington, D.C.: Brookings Institution, 2008.

The Presidential Records Act (PRA) of 1978, 44 U.S.C. ß2201-2207. http://www.archives.gov/about/laws/index.html#presrec

"Principles to Guide the Office of Legal Counsel," December 21, 2004. http://www.acslaw.org/files/2004%20programs_OLC%20principles_white%20paper.pdf.

Quade, Vicki. "The President Is His Only Client." *Barrister* 15 (Winter/Spring 1988): 4-7, 34-37.

Savage, Charlie. "Two Top Lawyers Lost to Obama in Libya War Policy Debate. *New York Times* (June 17, 2011). http://www.nytimes.com/2011/06/18/world/africa/18powers.html

———. "Departing White House Counsel Held Powerful Sway." *New York Times* (April 6, 2014).

Salokar, Rebecca Mae. *The Solicitor General: The Politics of Law*. Philadelphia: Temple University Press, 1992.

Strobel, Warren P. "Clinton Court Losses Seen Weakening 'Imperial Presidency.'" *Washington Times* (August 5, 1998): 10.

# ADDITIONAL READING

## *ARTICLES*

Culvahouse, Arthur B., Jr. "Has Attorney-Client Privilege Departed the White House?" *NYU Annual Survey of American Law*, Vol. 63 (2007): 139.

Cutler, Lloyd. "The Role of the Counsel to the President of the U.S." T*he Record of the Bar Association of the City of New York*, Vol. 35, No. 8 (November 1980): pp. 470-480.

Fielding, Fred F.  "An Eyewitness Account of Executive 'Inability.'" *Fordham Law Review*, Vol. 79 (2010): 823.

Forde, Michael K. "The White House Counsel and Whitewater: Government Lawyers and the Scope of Privileged Communications." *Yale Law and Policy Review*, Vol. 16, No. 109 (1997): pp. 109-167.

Gibson, Tobias T.  "Office of Legal Counsel: Inner Workings and Impact." *Law & Courts* 18 (Spring 2008): 7-12.
http://www1.law.nyu.edu/lawcourts/pubs/newsletter/spring08.pdf.

Kassop, Nancy. "The Law: When Law and Politics Collide: Presidents and the Use of the Twenty-Fifth Amendment." *Presidential Studies Quarterly* 35 (March 2005): 147-65.

Lund, Nelson. "Lawyers and the Defense of the Presidency." *Brigham Young University Law Review*, Vol. 17 (1995): pp. 17-98.

Lund, Nelson. "The President as Client and the Ethics of the President's Lawyers." *Law and Contemporary Problems*, Vol. 61, No. 2 (Spring 1998): pp. 65-81.
http://www.law.duke.edu/journals/61LCPLund.

McArdle, Elaine. "Stories from the West Wing." *Harvard Law Bulletin*, Winter 2011.
http://today.law.harvard.edu/feature/stories-from-the-west-wing/.

Moore, W. John. "The True Believers." *National Journal*, Vol. 23, Nos. 33-34 (August 17, 1991): pp. 2018-2022.

Paulsen, Michael Stokes. "Hell, Handbaskets, and Government Lawyers: The Duty of Loyalty and Its Limits." *Law and Contemporary Problems*, Vol. 61, No. 1 (Winter 1998): pp. 83-106.
http://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1072&context=lcp.

———. "Who "Owns" the Government's Attorney-Client Privilege?" *Minnesota Law Review*, Vol. 83 (December 1998): pp. 473-521.

Quade, Vicki. "The President Is His Only Client." *Barrister Magazine*, American Bar Association, Vol. 15, No. 1 (Winter/Spring 1988): pp. 4-7, 34-37.

Rabkin, Jeremy. "At the President's Side: The Role of the White House Counsel in Constitutional Policy." *Law and Contemporary Problems*, Vol. 56, No. 4 (1993): pp. 63-98.

Stern, Seth. "Executive Counsel: Meet the President's New Lawyers – And *Their* New Lawyers." *Harvard Law Bulletin*, Summer 2009.
http://today.law.harvard.edu/feature/executive-counsel-meet-the-presidents-new-lawyers-and-their-new-laywers/.

Wang, Jennifer. "Raising the Stakes at the White House: Legal and Ethical Duties of the White House." *Georgetown Journal of Legal Ethics*, Vol. 8 (1994): pp. 118-35.


## NEWS ARTICLES

Barnes, James A. "Changing Lawyers." *National Journal*, Vol. 29, No. 6 (February 8, 1997): pp. 284-285.

———. "How Clinton's Team Spins the Hearings." *National Journal*, Vol. 29, No. 30 (July 26, 1998): p. 1521.

Bauman, Gregory C. "Keeping Presidential Privileges Intact." *Legal Times*, August 10, 1998, p. 14.

———. "Of Presidents and Precedents." *Legal Times*, August 17, 1998, p. 1.

Bendavid, Naftali. "Keeping the President's Counsel." *Legal Times*, January 10, 1994, pp. 1, 20-21.

———. "Whitewater Meets the Washington Legal Culture: Cutler's Task: Mixing Politics, Fealty and Law." *Legal Times*, March 14, 1994, p. 1.

Borger, Gloria. "The First Client's Privilege." *U.S. News and World Report*, May 26, 1997, p. 31.

Kornhauser, Anne. "Boyden Gray: Not Just George Bush's Lawyer." *Legal Times*, November 12, 1990, pp. 1, 18-19.

Marcus, Ruth. "Court Rejects Privilege Claim." *Washington Post*, July 28, 1998, p. 1.

Oliphant, Jim. "Losing Privilege: A Scandal-Scarred Legacy for Future Presidents: White House Counsels without a Shield." *Legal Times*, March 10, 2000. http://www.lawnewsnetwork.com/stories/A18273-2000Mar9.html.

Rice, Paul R. "Should We Make Bruce Lindsey Talk? Drawing the Parallels between the Governmental and the Corporate Attorney-Client Privilege." *Legal Times*, July 6, 1998, p. 17.

Rosen, Jeffrey. "How to Isolate a President." *New York Times*, July 30, 1998, p. 21.

Schmidt, Robert. "'Special' Role Leaves Counsel Some Private Space." *Legal Times*, March 14, 1994, pp. 8-9.

Simendinger, Alexis. "Everything an Aide Needs to Know." *National Journal*, Vol. 29, No. 39 (1987): p. 1897.

Stewart, David O.  "The President's Lawyer." *ABA Journal*, Vol. 72 (April 1, 1986): pp. 59-61.

Strobel, Warren P. "Clinton Court Losses Seen Weakening 'Imperial Presidency,'" *Washington Times*, August 5, 1998, p. 10.

Taylor, Stuart, Jr. "Me and Lloyd." *Legal Times*, March 14, 1994, pp. 18, 20.

———, and Daniel Klaidman. "A Troubling Legal Legacy." *Newsweek*, August 24, 1998, p. 25.

## *Books*

Bell, Griffin B. *Taking Care of the Law*. New York: William Morrow and Company, Inc., 1982, esp. pp. 37-39.

Clayton, Cornell W., ed. *Government Lawyers: The Federal Legal Bureaucracy and Presidential Politics*. Lawrence: University Press of Kansas, 1995, esp. Chapters 5, 8 and 9.

Clifford, Clark, and Richard Holbrooke, Counsel to the President. *A Memoir.* New York: Random House, 1991.

Dean, John W., III. *Blind Ambition: The White House Years*. New York: Simon and Schuster, 1976.

Gellman, Barton. *Angler: The Cheney Vice Presidency*. New York: Penguin Press, 2008.

Kumar, Martha Joynt. *Before the Oath: How George W. Bush and Barack Obama Managed a Transfer of Power*. Baltimore: Johns Hopkins University Press, 2015.

*Lloyd N. Cutler and the Evolving Role of the White House Counsel: Proceedings of the Lloyd N. Cutler Conference on the White House Counsel*. Miller Center of Public Affairs and the University of Virginia School of Law, November 10-11, 2006, Charlottesville, Virginia. Charlottesville: University of Virginia, 2008.

Patterson, Bradley H., Jr. *To Serve the President: Continuity and Innovation in the White House Staff*. Washington, D.C.: Brookings Institution Press, 2008, esp. Chapter 6, "The 'Just-Us' Department: The Counsel to the President."

———. *The White House Staff :Inside the West Wing and Beyond*. Washington, DC: Brookings Institution Press, 2000, esp. Chapter 6, "The 'Just-Us' Department: The Counsel to the President."

Roberts, Robert N., and Marion T. Doss, Jr. *From Watergate to Whitewater: The Public Integrity War*. Westport, CT: Praeger Publishers, 1997, esp. pp. 97-99.

Strine, James Michael. "The Office of Legal Counsel: Legal Professionals in a Political System." Ph.D. diss., Johns Hopkins University, 1992, esp. Chapters 2, 4 and 5.

Walden, Gregory S. *On Best Behavior: The Clinton Administration and Ethics in Government*. Indianapolis, IN: Hudson Institute, 1996.

## CONGRESSIONAL HEARINGS

"Hearings Relating to Madison Guaranty S&L and the Whitewater Development Corporation—Washington, D.C. Phase," Hearings before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate, 103rd Congress, 2nd session, Vol. IV, August 3, 4, 5, 1994, esp. pp. 466-515 (testimony of Bernard W. Nussbaum).

## COURT DECISIONS

*Clinton v. Jones*, 520 U.S. 681 (1997).

*In re: Bruce R. Lindsey* (Grand Jury Testimony), 158 F. 3d 1263 (D.C. Cir. 1998). http://laws.findlaw.com/dc/983060d.html.

*In re Sealed Case* (Bruce R. Lindsey) (Grand Jury Testimony), 5 F. Supp. 2d, 21 (D.D.C. 1998).

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982).

*U.S. v. Nixon*, 418 U.S. 684 (1974).

## ARTICLES AND BOOKS ON THE FEDERAL JUDICIAL SELECTION PROCESS

Allison, Garland W. "Delay in Senate Confirmation of Federal Judicial Nominees." *Judicature* 80 (July-August 1996): 8-15.

Gerhardt, Michael J. "Toward a Comprehensive Understanding of the Federal Appointments Process." *Harvard Journal of Law and Public Policy* 21 (Spring 1988): 467-539.

Goldman, Sheldon. *Picking Federal Judges: Lower Court Selection from Roosevelt through Reagan*. New Haven, CT: Yale University Press, 1997.

———, and Elliot Slotnick. "Clinton's First Term Judiciary: Many Bridges to Cross." *Judicature* 80 (May-June 1997): 254-273.

———, and Elliot Slotnick. "Clinton's Second-Term Judiciary: Picking Judges under Fire." *Judicature* 82 (May-June 1999): 265-284.

———, Elliot Slotnick, and Sara Schiavoni. "Obama's Judiciary at Midterm: The Confirmation Drama Continues." *Judicature* 94: 6 (May-June 2011): 262-301.

———, Elliot Slotnick, and Sara Schiavoni. "Obama's First-Term Judiciary: Picking Judges in the Minefield of Obstructionism." *Judicature* 97: 1 (July-August 2013): 7-47.

Hartley, Roger E., and Lisa M. Holmes. "Increasing Senate Scrutiny of Lower Federal Court Nominees." *Judicature* 80 (May-June 1997): 274-278.

Miller Commission on the Selection of Federal Judges. *Report*. Miller Center Commission, No. 7. Charlottesville, VA: White Burkett Miller Center of Public Affairs, 1996. http://www.virginia.edu/~miller/commissions/commission7.htm.

Renzin, Lee. "Advice, Consent and Inaction." *Judicature* 82 (January-February 1999): 166-174.

Slotnick, Elliot, Sheldon Goldman, and Sara Schiavoni. "Writing the Book of Judges." *Journal of Law and Courts* (Fall 2015): 331-367.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, | |
| *Plaintiff,* | No. 19-cv-2379 (KBJ) |
| v. | |
| DONALD F. MCGAHN II, | |
| *Defendant.* | |

# EXHIBIT I

POLITICO

# POLITICO





House Judiciary Chairman Jerry Nadler. | Cengiz Yar/Getty Images

To give you the best possible experience, this site uses cookies. If you continue browsing, you accept our use of cookies. You can review our privacy policy to find out more about the cookies we use.

**Accept**

CONGRESS

# Nadler: Impeachment timetable doesn't hinge on Don McGahn

By **KYLE CHENEY** | 09/09/2019 08:06 PM EDT

Democrats could move forward with articles of impeachment against President Donald Trump even if they never secure testimony from former White House counsel Don McGahn, House Judiciary Chairman Jerry Nadler said on Monday.

"Yes, we can," Nadler said, when asked whether it would be possible to advance articles of impeachment through his committee even if the former top White House lawyer — and crucial witness to alleged obstruction of justice by Trump — dodged a subpoena for public testimony.

"McGahn … is relevant to one potential article of impeachment, which is obstruction of justice," Nadler said, adding: "On the other hand, there's a lot of testimony we have without McGahn. Second of all, there are other possible articles of impeachment to which McGahn is irrelevant."

Nadler's comments were notable as his committee prepares to embrace procedures that it says will help expedite Democrats' investigation of whether to bring articles of impeachment against Trump. Though the committee has been trying to collect evidence on several episodes of potential obstruction — first laid out by special counsel Robert Mueller — lawmakers are also eyeing allegations that Trump paid hush money to silence two women who have accused him of affairs, that he is using his luxury resorts to profit off his government service and that he was seeking a business deal in Russia while campaigning in 2016.

McGahn has, in many ways, been viewed as a linchpin of the Judiciary Committee's probe. He was Mueller's chief witness to allegations of obstruction by Trump, describing multiple attempts and orders by the president to constrain or fire the special counsel. But so far, McGahn has refused to cooperate with a Judiciary Committee subpoena to testify, blocked by Trump's claim that his former aide is "absolutely immune" from congressional inquiry.

The matter is being litigated in U.S. District Court in Washington, a process expected to take at least two months to resolve, not counting appeals or delays.

But Nadler's comments open up the possibility that the committee could decide that it has a critical mass of evidence without McGahn's direct testimony.

To give you the best possible experience, this site uses cookies. If you continue browsing, you accept our use of cookies. You can review our privacy policy to find out more about the cookies we use.

**Accept**      ✕

Nadler declined to say whether he had a timetable to finish the committee's work on potential impeachment, especially given the approaching 2020 election.

"I can't do that," he said. "We're going to do it as rapidly as possible.

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

RSS

Site Map

Terms of Service

Privacy Policy

_____

To give you the best possible experience, this site uses cookies. If you continue browsing, you accept our use of cookies. You can review our privacy policy to find out more about the cookies we use.

© 2019 POLITICO LLC

**Accept**