**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff*,

v.

DONALD F. MCGAHN II,

*Defendant*.

No. 19-cv-2379 (KBJ)

**PLAINTIFF'S REPLY IN SUPPORT OF ITS
MOTION FOR EXPEDITED PARTIAL SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 5

I.   This Court Has Jurisdiction over This Case ..................................................................... 5

    A.  The Committee Has Article III Standing ..................................................................... 6

        1.  The Committee Has Suffered Injury in Fact ......................................................... 6

        2.  McGahn's Arguments Against Standing Are Meritless ........................................ 11

    B.  This Court Has Federal Question Jurisdiction Under 28 U.S.C. § 1331 ....................... 21

    C.  The Committee Is Entitled to Seek Judicial Enforcement of Its Subpoena ................... 29

        1.  The Committee Can Seek Relief Directly Under Article I ..................................... 29

        2.  The Committee Can Invoke the Federal Courts' Traditional Equity Powers ......... 32

        3.  The Committee Can Obtain Declaratory Relief ..................................................... 35

II.  Because the Executive Branch Has Made Clear that Accommodation Is Impossible, This
    Court Should Not Dismiss or Stay this Action ................................................................. 37

III. McGahn's Refusal to Comply with the Judiciary Committee's Subpoena Is Unlawful ........ 42

    A.  The Executive Branch's Absolute Immunity Theory Is Unsupported in Law ............... 42

    B.  The Executive Branch's Absolute Immunity Claim Violates Fundamental Separation-of-
        Powers Principles ....................................................................................................... 43

        1.  The Asserted Executive Branch Interests Purportedly Protected by Absolute
            Immunity for Presidential Advisors Are Minimal ................................................. 44

        2.  The Committee's Interests in Faithfully Performing Its Constitutional Functions
            Far Outweigh the Executive Branch's Interests in Absolute Immunity ................. 57

CONCLUSION ....................................................................................................................... 65

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Abbott Labs. v Gardner,*
    387 U.S. 136 (1967)...................................................................................23, 27

*Aetna Life Ins. Co. v. Haworth,*
    300 U.S. 227 (1937).........................................................................................36

*Alexander v. Sandoval,*
    532 U.S. 275 (2001).........................................................................................32

*Ali v. Rumsfeld,*
    649 F.3d 762 (D.C. Cir. 2011).........................................................................37

*Allen v. Wright,*
    468 U.S. 737 (1984).........................................................................................15

*Anderson v. Dunn,*
    19 U.S. (6 Wheat.) 204 (1821).............................................................19, 29, 30

*Arizona State Legis. v. Arizona Indep. Redist. Comm'n,*
    135 S. Ct. 2652 (2015) .........................................................................6, 12, 13

*Armstrong v. Exceptional Child Ctr., Inc.,*
    135 S. Ct. 1378 (2015).................................................................................32, 33

*Bowsher v. Synar,*
    478 U.S. 714 (1986).........................................................................................14

*Buckley v. Valeo,*
    424 U.S. 1 (1976).................................................................................17, 49, 51

*Butz v. Economou,*
    438 U.S. 478 (1978).........................................................................................48

*California v. Green,*
    399 U.S. 149 (1970).........................................................................................62

*Campbell v. Clinton,*
    203 F.3d 19 (D.C. Cir. 2000)...........................................................................13

*Carroll v. Safford,*
    44 U.S. (3 How.) 441 (1845) ......................................................................33, 34

*C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.,*
   310 F.3d 197 (D.C. Cir. 2002) ...........................................................................37

*Chapman v. United States,*
   5 App. D.C. 122 (1895) ......................................................................................60

*Chenoweth v. Clinton,*
   181 F.3d 112 (D.C. Cir. 1999) .....................................................................13, 40

*Clinton v. Jones,*
   520 U.S. 681 (1997) ....................................................................................49, 51

*Coffman v. Breeze Corp.,*
   323 U.S. 316 (1945) ...........................................................................................36

*Cohens v. Virginia,*
   19 U.S. (6 Wheat.) 264 (1821) .....................................................................14, 41

*Colorado River Water Conserv. Dist. v. United States,*
   424 U.S. 800 (1976) ...........................................................................................21

* *Comm. on the Judiciary v. Miers,*
   558 F. Supp. 2d 53 (D.D.C 2008) ................................................................. *passim*

* *Comm. on Oversight & Gov't Reform v. Holder,*
   979 F. Supp. 2d 1 (D.D.C. 2013) .................................................................. *passim*

*Connecticut Nat'l Bank v. Germain,*
   503 U.S. 249 (1992).....................................................................................27, 28

*Cummings v. Murphy,*
   321 F. Supp. 3d 92 (D.D.C. 2018) ...............................................................13, 14

*Davis v. Passman,*
   442 U.S. 228 (1979)............................................................................................32

*Davis v. U.S. Sentencing Comm'n,*
   716 F.3d 660 (D.C. Cir. 2013) .....................................................................30, 36

*Deakins v. Monaghan,*
   484 U.S. 193 (1988).....................................................................................37, 41

*Dellums v. Powell,*
   561 F.2d 242 (D.C. Cir. 1977) ...........................................................................53

*Eastland v. U.S. Servicemen's Fund*,
  421 U.S. 491 (1975) ............................................................................................. 7, 33

*EEOC v. Lutheran Social Servs.*,
  186 F.3d 959 (D.C. Cir. 1999) .................................................................................. 24

*Ex Parte Young*,
  209 U.S. 123 (1908) .................................................................................................. 32

*Forrester v. White*,
  484 U.S. 219 (1988) .................................................................................................. 45

*Freedom from Religion Found., Inc. v. Geithner*,
  644 F.3d 836 (9th Cir. 2011) .................................................................................... 22

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010) .................................................................................................. 32

*Gonzaga Univ. v. Doe*,
  536 U.S. 273 (2002) .................................................................................................. 32

*Gravel v. United States*,
  408 U.S. 606 (1972) ............................................................................................ 45, 46

*Grupo Mexicano de Desarrolo, S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) .................................................................................................. 33

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ......................................................................................... *passim*

*Hinck v. United States*,
  550 U.S. 501 (2007) .................................................................................................. 23

*In re App. of the U.S. Senate Perm. Subcomm. on Investigation*,
  655 F.2d 1232 (D.C. Cir. 1981) ........................................................................... 11, 28

*In re Kessler*,
  100 F.3d 1015 (D.C. Cir. 1996) ........................................................................... 44, 45

*In re Report & Recommendation of June 5, 1972 Grand Jury*,
  370 F. Supp. 1219 (D.D.C. 1974) ............................................................................. 59

*In re Request for Access to Grand Jury Materials Grand Jury No. 81-1, Miami*,
  833 F.2d 1438 (11th Cir. 1987) ............................................................................. 6, 39

*In re Sealed Case,*
 121 F.3d 729 (D.C. Cir. 1997) ......................................................................15

*INS v. Chadha,*
 462 U.S. 919 (1983) ......................................................................................14

*Jesner v. Arab Bank, PLC,*
 138 S. Ct. 1386 (2018) ..................................................................................34

*Jurney v. MacCracken,*
 294 U.S. 125 (1935) ................................................................................18, 19

*Loving v. United States,*
 517 U.S. 748 (1996) ......................................................................................49

*Marshall v. Gordon,*
 243 U.S. 521 (1917) ......................................................................................30

*McGrain v. Daugherty,*
 273 U.S. 135 (1927) .............................................................................. *passim*

*Medellin v. Texas,*
 552 U.S. 491 (2008) ......................................................................................42

*Medtronic, Inc. v. Mirowski Family Ventures, LLC,*
 571 U.S. 191 (2014) ......................................................................................36

*Milner v. Dep't of Navy,*
 562 U.S. 562 (2011) ......................................................................................24

*Mims v. Arrow Financial Servs., LLC,*
 565 U.S. 368 (2012) ................................................................................21, 24

*Mistretta v. United States,*
 488 U.S. 361 (1989) ........................................................................49, 50, 51

*Morrison v. Olson,*
 487 U.S. 654 (1988) ......................................................................................14

*Myers v. United States,*
 272 U.S. 52 (1926) ........................................................................................42

*Nixon v. Adm'r of Gen. Servs.,*
 433 U.S. 425 (1977) ........................................................................43, 44, 49

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982)..........................................................................................44, 45, 60

\* *Nixon v. Sirica*,
    487 F.2d 700 (D.C. Cir. 1973)................................................................................53, 59

*Nixon v. United States*,
    506 U.S. 224 (1993)......................................................................................................6

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014)....................................................................................................56

*Poller v. Columbia Broad. Sys., Inc.*,
    368 U.S. 464 (1962)....................................................................................................62

*Raines v. Byrd*,
    521 U.S. 811 (1997)..................................................................................................5, 12

*Reed v. County Commissioners of Delaware County, PA*,
    277 U.S. 376 (1928)....................................................................................................30

*Schilling v. Rogers*,
    363 U.S. 666 (1960)....................................................................................................36

*Senate Perm. Subcomm. on Investigation v. Ferrer*,
    199 F. Supp. 3d 125 (D.D.C. 2016).............................................................................11

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
    366 F. Supp. 51 (D.D.C. 1973)...................................................................................25

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
    498 F.2d 725 (D.C. Cir. 1974)........................................................................8, 9, 25, 53

*Shelby Cty., Ala. v. Lynch*,
    799 F.3d 1173 (D.C. Cir. 2015)...................................................................................36

*Skelly Oil Co. v. Phillips Petroleum Co.*,
    339 U.S. 667 (1950)................................................................................................36, 37

*State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*,
    137 S. Ct. 436 (2016)..................................................................................................24

*Sun Oil Co. v. United States*,
    514 F.2d 1020 (Ct. Cl. 1975)......................................................................................53

\* *Trump v. Mazars USA, LLP*,
   -- F. 3d --, No. 19-5142, 2019 WL 5089748 (D.C. Cir. Oct. 11, 2019) ........................ *passim*

*United States v. Am. Tel. & Tel. Co.*,
   551 F.2d 384 (D.C. Cir. 1976) ...................................................................... *passim*

*United States v. Am. Tel. & Tel. Co.*,
   567 F.2d 121 (D.C. Cir. 1977) ............................................................2, 8, 14, 40

*United States v. Burr*,
   25 F. Cas. 30 (C.C.D. Va. 1807) ...............................................................15

*United States v. ICC*,
   337 U.S. 426 (1949) ...................................................................................15

\* *United States v. Nixon*,
   418 U.S. 683 (1974) .............................................................................. *passim*

*U.S. House of Representatives v. Mnuchin*,
   379 F. Supp. 3d 8 (D.D.C. 2019) ...........................................................6, 17

*U.S. House of Representatives v. Dep't of Commerce*,
   11 F. Supp. 2d 76 (D.D.C. 1998) ..............................................................10

*Vander Jagt v. O'Neill, Jr.*,
   699 F.2d 1166 (D.C. Cir. 1982) ............................................................40, 41

*Verizon Maryland, Inc. v. Public Service Comm'n of Maryland*,
   535 U.S. 635 (2002) ...............................................................................23, 24

*Virginia House of Delegates v. Bethune-Hill*,
   139 S. Ct. 1945 (2019) ................................................................................13

*Walker v. Cheney*,
   230 F. Supp. 2d 51 (D.D.C. 2002) ............................................................13

*Watkins v. United States*,
   354 U.S. 178 (1957) ............................................................................. *passim*

*Whitman v. American Trucking Ass'n*,
   531 U.S. 457 (2001) ...................................................................................27

*Winstead v. J.C. Penney Co.*,
   933 F.2d 576 (7th Cir. 1991) .....................................................................28

*Wood v. United States,*
    16 Pet. 342 (1842) .................................................................................27

*Young v. United States ex rel. Vuitton et Fils S.A.,*
    481 U.S. 787 (1987) ...............................................................................64

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) .............................................................18, 42, 50

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017) ...........................................................................34

*Zivotofsky v. Clinton,*
    566 U.S. 189 (2012) ...............................................................................14

**U.S. Constitution and Statutes**

U.S. Const., Art. I, § 1 .........................................................................7

U.S. Const., Art. I, § 2 ................................................................. *passim*

U.S. Const., Art. I, § 5 .........................................................................8

U.S. Const., Art. I, § 6 .......................................................................19

U.S. Const., Art. II, § 2 ...............................................................55, 64

U.S. Const., Art. II, § 3 .....................................................................17

U.S. Const., Art. II, § 4 .....................................................................52

2 U.S.C. § 288d ..................................................................................35

28 U.S.C. § 1331 ........................................................................ *passim*

28 U.S.C. § 1337 ................................................................................27

28 U.S.C. § 1338 ................................................................................27

28 U.S.C. § 1343 ................................................................................28

28 U.S.C. § 1365 ........................................................................ *passim*

28 U.S.C. § 1366 ................................................................................24

28 U.S.C. § 2201 ...................................................................29, 35, 36

28 U.S.C. § 2202 ........................................................................................................29

Pub. L. No. 93-190, 87 Stat. 736 (1973)....................................................................25

Pub. L. No. 94-574, 90 Stat. 2721 (1976)..................................................................25

Pub. L. No. 96-486, 94 Stat. 2369 (1980)..................................................................26

Pub. L. No. 104-130, 110 Stat. 1200 (1996)..............................................................35

Pub. L. No. 105-119, 111 Stat. 2440 (1997)..............................................................35

**Rules of the U.S. House of Representatives, 116th Cong.**

House Rule X.1 .............................................................................................................7

House Rule X.2 .............................................................................................................7

House Rule XI.1 ............................................................................................................7

House Rule XI.2 ............................................................................................................7

**Legislative Authorities**

H. Res. 430, 116th Cong. (2019) ...........................................................................14, 31

H. Rep. No. 95-1756 (1978) .......................................................................................23

S. Res. 262, 70th Cong. (1928).................................................................................31

S. Rep. No. 95-170 (1977).....................................................................................27, 29

*Jefferson's Manual*, H. Doc. No. 115-177 (2019) ..................................................7, 59

*Riddick's Senate Procedure: Precedents and Practices* (1992) ................................59

U.S. Congress, House Committee on Armed Services, *Inquiry into the Alleged Involvement of the Central Intelligence Agency in the Watergate and Ellsberg Matters*, hearings, 94th Cong., 1st sess. (Washington: GPO, 1975).............................................55, 56

U.S. Congress, House Committee on Banking, Finance, and Urban Affairs, *White House Contacts with Treasury/RTC Officials About "Whitewater"-Related Matters*, hearings, 103rd Cong., 2nd sess. (Washington: GPO, 1994) ..................................................55

U.S. Congress, House Committee on Government Reform, *Controversial Pardon of International Fugitive Marc Rich,* hearings, 107th Cong., 1st sess. (Washington: GPO, 2001) .........................................................................56

U.S. Congress, House Committee on Government Reform and Oversight, *White House Compliance with Committee Subpoenas*, hearings, 105th Cong., 1st sess. (Washington: GPO, 1998) ......................................................................56

U.S. Congress, Senate Committee on the Judiciary, *Inquiry into the Matter of Billy Carter and Libya*, hearings, 96th Cong., 2nd sess. (Washington: GPO, 1981)........................................55

U.S. Congress, Senate Committee on the Judiciary, *Nomination of Robert H. Bork to be Associate Justice of the Supreme Court of the U.S.*, hearings, 100th Congress, 1st sess. (Washington: GPO, 1987) ......................................................................55

U.S. Congress, Senate Select Committee on Presidential Campaign Activities, *Presidential Campaign Activities of 1972*, hearings, 93rd Cong., 1st sess. (Washington: GPO, 1973) ......56

U.S. Congress, Senate Select Committee on Secret Military Assistance to Iran and the Nicaraguan Opposition and the House Select Committee to Investigate Covert Arms Transactions with Iran, *Iran-Contra Investigation: Joint Hearings Before the House Select Committee to Investigate Covert Arms Transactions with Iran and the Senate Select Committee on Secret Military Assistance to Iran and the Nicaraguan Oppositions*, 100th Cong., 1st sess. (Washington: GPO, 1987)..............................................................56

U.S. Congress, Senate Special Committee to Investigate the Whitewater Development Corporation and Related Matters, *Investigation of Whitewater Development Corporation and Related Matters, Vol. II.*, hearings, 104th Cong., 1st sess. (Washington: GPO, 1997) ...........55

## Other Authorities

*A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (2000) ..........................................................................................60

Carl Beck, *Contempt of Congress* (1959) ...................................................................18

Charles L. Black, *Impeachment: A Handbook* (1998) .................................................59

*Debates in the Several State Conventions on the Adoption of the Federal Constitution* (John Elliot ed., 1836).............................................................................................59

The Federalist No. 47 (J. Cooke ed., 1961) .................................................................51

Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* (2017) ...................................................................................18

*Pardon of Richard M. Nixon, and Related Matters: Hearing Before the Subcomm. on Criminal Justice of the H. Comm. on the Judiciary*, 93d Cong. 90 (1974)............................................55

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101 (1984) ........................................................................10, 19, 29

*Records of the Federal Convention of 1787* (Max Farrand, ed., 1911) (July 20, 1787)...................

*Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68 (1986) ...........................................................................10, 22, 28

Robert S. Mueller III, *Report on the Investigation into Russian Interference in the 2016 Presidential Election* (Mar. 2019) ............................................................48, 50, 60

Sonia Mittal, *OLC's Day in Court: Judicial Deference to the Office of Legal Counsel*, 9 Harv. L. & Pol'y Rev. 211 (2015) ......................................................................43

Todd Garvey, Cong. Research Serv., RL34097, *Congress's Contempt Power and the Enforcement of Congressional Subpoenas: Law, History, Practice, and Procedure* (2017) .........................................................................18

## INTRODUCTION

The U.S. House of Representatives is conducting an inquiry to determine whether to impeach the President.  As part of that inquiry, and in order to consider relevant legislation and to conduct necessary oversight, the Committee on the Judiciary (Committee) has issued a subpoena to Donald McGahn, former Counsel to the President, to testify.  Without any basis in law, the President has directed McGahn to disobey the Committee's subpoena, and the Committee has brought suit to enforce that subpoena.  In response, McGahn erroneously argues that this Court cannot hear the Committee's case and that, if the Court were to reach the merits, he is absolutely immune from Congressional process.

McGahn claims that Congress, the House, and its committees may not vindicate their rights and powers to investigate and obtain information by bringing suit.  Rather, McGahn asserts, Congress must depend on the discretion of the Executive Branch to assist in such a situation.  McGahn's position is not limited to Congressional requests for information directed to Executive Branch employees; under McGahn's view, the House could do nothing on its own, even if its subpoenas were routinely disregarded by private parties.  That position, if accepted, would drastically impair Congress's ability to inform itself and fulfill its constitutional functions.  Unsurprisingly, it has been rejected by the D.C. Circuit, by several judges in this District, and by the Department of Justice's own Office of Legal Counsel (OLC).  This Court should likewise reject McGahn's radically cramped view of Congressional authority.

McGahn fundamentally fails to recognize that the Congressional power to obtain information, long acknowledged as essential to Congress's Article I authorities, resides in each House of Congress, and each House's authorized committees, *separately*.  *See, e.g.*, *Trump v. Mazars USA, LLP*, -- F. 3d --, No. 19-5142, 2019 WL 5089748, at *7 (D.C. Cir. Oct. 11, 2019) ("once a committee has been delegated '[t]he power of Congress to conduct investigations,' that

constitutional authority 'is broad'" (quoting *Watkins v. United States*, 354 U.S. 178, 187

(1957))).  By this suit, the Committee is simply seeking to ensure that the House's own authority,

which it exercises by constitutional assignment, is not hindered.  When that power is obstructed

by a refusal to comply with lawful demands for information, as it is here, the House and its

committees are empowered to seek judicial review.

Accordingly, adjudicating this dispute would not violate, but rather would vindicate, the

Constitution's separation of powers.  The Committee is not attempting to undermine the

Executive Branch's power to enforce the law.  Rather, the Committee is seeking to protect

interests—the fundamental Article I power to obtain information necessary to impeachment,

legislation, and oversight—that belong to the House (and, by delegation, to the Committee) as a

body, separately from the Senate and the Executive Branch.  In arguing to the contrary, McGahn

primarily presses an argument that the D.C. Circuit conclusively rejected over 40 years ago when

it acknowledged that "[t]he simple fact of a conflict between the legislative and executive

branches over a congressional subpoena does not preclude judicial resolution."  *United States v.*

*Am. Tel. & Tel. Co.* (*AT&T II*), 567 F.2d 121, 126 (D.C. Cir. 1977).

Much more recently, in adjudicating—and upholding—the validity of a Congressional

subpoena seeking information from a third party "that concerns the President of the United

States," *Mazars*, 2019 WL 5089748, at *26, the D.C. Circuit reiterated that that principle still

holds, *see id.* at *24 (quoting *AT&T II*, 567 F.2d at 126).  As the Circuit elaborated,

> disputes between Congress and the President are a recurring plot in our national
> story.  And that is precisely what the Framers intended.  As Justice Brandeis
> wrote, "the doctrine of the separation of powers was adopted not to promote
> efficiency but to preclude the exercise of arbitrary power."  *Myers v. United*
> *States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting).  "The purpose," he
> explained, "was not to avoid friction, but, by means of the inevitable friction

> incident to the distribution of the governmental powers among three departments,
> to save the people from autocracy." *Id.*

*Mazars*, 2019 WL 5089748, at *26 (alterations omitted). Here, moreover, the parties' dispute is

not only amenable to adjudication; it is in urgent need of judicial resolution. Contrary to

McGahn's claim, there is no basis for abstention in this case to promote a possible compromise.

The President has stated that the Executive Branch will not "participate in" the House's ongoing

impeachment inquiry,[1] and has declared that McGahn is *absolutely* immune from Congressional

process. The parties are currently at an impasse that can only be resolved by the courts.

On the merits, McGahn's absolute immunity claim lacks legal support and rests on a

faulty separation-of-powers analysis. McGahn can cite no case law recognizing his sweeping

argument that close advisors to the President are absolutely immune from being compelled to

testify before Congress. He also can cite no authority empowering the President to direct a

private citizen not to comply with a Congressional subpoena. Rather, McGahn's theory hinges

on the contention that Congressional subpoenas to Presidential advisors violate separation-of-

powers principles because compelling such advisors to testify impermissibly encroaches on

Executive Branch authority.

McGahn's argument gets it exactly backwards: it is the Executive's assertion of absolute

immunity—blocking Congress from receiving information crucial to the performance of its

Article I impeachment, legislative, and oversight powers—that impairs Congress's authority and

violates the separation of powers. Under the balancing test that traditionally applies to

separation-of-powers disputes, the Committee's need for McGahn's testimony in furtherance of

these core constitutional functions far outweighs the Executive Branch's purported interests in a

---

[1] Letter from White House Counsel Pat A. Cipollone to Speaker Nancy Pelosi at 2 (Oct. 8, 2019), https://perma.cc/68H3-5XTE (Cipollone Letter).

blanket prohibition on compelled Congressional testimony for Presidential advisors.  The Executive Branch interests that McGahn claims justify absolute immunity either lack merit or are adequately addressed by the assertion of executive privilege on a question-by-question basis under *United States v. Nixon*, 418 U.S. 683 (1974).  By contrast, crediting the Executive Branch's absolute immunity theory would gravely impair the Committee's ability to obtain all of the relevant information it needs to consider articles of impeachment against the President and carry out its other Article I functions.

In sum, McGahn may not, as he contends, simply reject with impunity the Committee's constitutionally grounded subpoena.  McGahn presents his position as encouraging the Court not to take sides in an inter-branch contest.  But his position, if accepted, *would* require the Court to side definitively with the Executive Branch—and on issues with far broader implications than the immediate dispute over McGahn's testimony, as important as it is to the Committee's impeachment inquiry.  If McGahn's justiciability arguments were adopted, then Congress, the House, the Senate, and their committees would be irreparably disabled from vindicating their powers to obtain information vital to considering articles of impeachment and legislation and conducting oversight of the Executive Branch.  If McGahn's merits arguments were adopted, then the President would become the final arbiter of which information Congress is entitled to obtain and consider in carrying out its Article I functions.  McGahn's absolute immunity theory would also empower the President to block the House from reviewing evidence important to an impeachment inquiry into the President's own conduct, placing the President—who, according to OLC, cannot be criminally prosecuted while in office—above the law.

This Court should reject the Executive Branch's effort to relieve McGahn of his legal obligation to comply with the Committee's subpoena.  The Court should deny McGahn's motion

for summary judgment, grant the Committee's motion for partial summary judgment, declare that McGahn's failure to comply with the Committee's subpoena is unlawful, and order McGahn to comply.[2]  All of McGahn's arguments asserting that this Court lacks authority to adjudicate this dispute have been rejected by every court that has considered them.  This Court should reject them as well.  On the merits, the only court to address the claim that Executive Branch advisors are absolutely immune from Congressional process has likewise rejected it, and this Court, again, should do the same.

## ARGUMENT

### I.    This Court Has Jurisdiction over This Case

McGahn's argument that this Court lacks jurisdiction to enforce the Committee's subpoena is contrary to precedent that he cannot overcome.  The D.C. Circuit has recognized that the House of Representatives may sue to enforce a subpoena, and several judges in this District have squarely—and correctly—held that courts have jurisdiction over such suits brought by the House and its committees.  OLC has likewise recognized that Congress may turn to the federal courts to enforce its subpoenas.

Against this authority, McGahn relies on an inapposite Supreme Court decision, *Raines v. Byrd*, 521 U.S. 811 (1997), and on generalized concerns about separation of powers if Congress were able to secure enforcement of its subpoenas by turning to the Judiciary.  Both arguments are misguided for the same fundamental reason:  they ignore that the injury here is to a power

---

[2] *See* Pl.'s Mem. in Supp. of Its Mot. for Prelim. Inj., or, in the Alt., for Exped. Partial Summ. J. (Aug. 26, 2019), ECF No. 22-1 (Pl.'s Mot.); Def.'s Combined Mem. (Oct. 1, 2019), ECF No. 32 (Def.'s Opp'n).  While the Committee has moved for partial summary judgment, seeking a ruling on its challenge to McGahn's claim of absolute immunity and reserving its Complaint's executive privilege claim, *see* Pl.'s Mot. at 19 & n.15; Minute Order (Sept. 3, 2019) ("Plaintiff's … Motion will be treated as a Motion for Expedited *Partial* Summary Judgment" (emphasis added)), McGahn has purported to move for full summary judgment, *e.g.*, Def.'s Opp'n at 3, and yet has not addressed the Committee's executive privilege claim.  For the reasons stated below, McGahn is not entitled to summary judgment at all, and he certainly is not entitled to summary judgment on a claim that he has not contested.

that the House and its authorized committees have *as a body*, and that the House enjoys *separately* from the Senate and the Executive Branch.  Unlike the individual legislators who sued in *Raines*, Plaintiff is a standing committee of the House exercising authority delegated to it by the House.  As another judge of this Court recognized recently, "the investigatory power is one of the few under the Constitution that *each* House of Congress may exercise individually," and "[i]t is perhaps for this reason that the House's power to investigate has been enforced with periodic help from federal courts."  *U.S. House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8, 16-17 (D.D.C. 2019), *appeal pending*, No. 19-5176 (D.C. Cir.).

### A.      The Committee Has Article III Standing

To establish its standing, the Committee must show that it has suffered a "concrete and particularized" injury "fairly traceable to the challenged action" and "redressable by a favorable ruling."  *Arizona State Legis. v. Arizona Indep. Redist. Comm'n*, 135 S. Ct. 2652, 2663 (2015) (quotation marks omitted).  Those requirements are satisfied here.  In refusing to comply with the Committee's subpoena, McGahn has inflicted institutional injuries on the Committee by preventing it from carrying out the House's constitutionally assigned responsibilities.

### 1.      The Committee Has Suffered Injury in Fact

Article I assigns the "sole Power of Impeachment" to the House.  U.S. Const., Art. I, § 2, cl. 5; *see Nixon v. United States*, 506 U.S. 224, 236 (1993) (concerning the impeachment of Judge Walter Nixon) ("[T]he whole of the impeachment power is divided between the two legislative bodies, with the House given the right to accuse and the Senate given the right to judge."); *In re Request for Access to Grand Jury Materials Grand Jury No. 81-1, Miami*, 833 F.2d 1438, 1445-46 (11th Cir. 1987) ("Only the House may decide whether to investigate, impeach, and prosecute public officials upon allegations that they have committed high crimes or misdemeanors in office.  These powers are in the sole domain of the House … .").  Article I also

6

vests Congress with "[a]ll legislative Powers," U.S. Const., Art. I, § 1, and endows each House

of Congress with investigative power that each may delegate to committees and subcommittees,

*see, e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 505 (1975); *Watkins*, 354 U.S. at

187-88; *McGrain v. Daugherty*, 273 U.S. 135, 175, 177 (1927).

Pursuant to its authority to "determine the Rules of its Proceedings," U.S. Const., Art. I,

§ 5, cl. 2, the House has empowered the Judiciary Committee to "conduct at any time such

investigations and studies as it considers necessary or appropriate in the exercise of its

responsibilities," House Rule XI.1(b)(1); *see also* House Rule XI.2(m)(1)(B) (authorizing the

Committee to subpoena documents). The Committee's investigative power extends over

impeachments, *see, e.g.*, *Jefferson's Manual* §§ 605, 730, H. Doc. No. 115-177, at 324, 475

(2019); legislation concerning criminal law, the judiciary, and "[s]ubversive activities affecting

the internal security of the United States," House Rule X.1(l); and, for "general oversight

responsibilities," the Department of Justice (DOJ) and the Federal Bureau of Investigation (FBI),

House Rule X.2(a), (b)(1)(B). *See* Pl.'s Mot. at 10-12. Exercising these authorities, on the basis

of the events described in the Mueller Report, the Committee is investigating whether to

recommend articles of impeachment against the President, whether to amend or create new

federal laws, and whether DOJ and the FBI are discharging their duties properly and with the

requisite independence. *See id.* at 12-14. Notably, McGahn has not challenged the validity of

the Committee's investigation or questioned the Committee's purposes in pursuing it. *Cf.*

*Mazars*, 2019 WL 5089748, *1, 8-14 (addressing, and rejecting, the President's challenge to the

validity of a Congressional investigation).

The Committee's investigatory powers are well-established. "The investigative authority

of the [House] Judiciary Committee with respect to presidential conduct has an express

constitutional source." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498

F.2d 725, 732 (D.C. Cir. 1974) (citing the Impeachment Clause, U.S. Const., Art. I, § 2, cl. 5).

And the Committee's investigative authority with respect to its Article I legislative and oversight

powers "'encompasses inquiries concerning the administration of existing laws as well as

proposed or possibly needed statutes,' 'it includes surveys of defects in our social, economic or

political system … ,' and 'it comprehends probes into departments of the Federal Government to

expose corruption, inefficiency or waste.'" *Mazars*, 2019 WL 5089748, at *7 (alterations

omitted) (quoting *Watkins*, 354 U.S. at 187).  Yet McGahn—the most important fact witness in

the Committee's investigation—is obstructing the Committee's investigatory powers.  *See* Pl.'s

Mot. at 14-15.  His refusal to comply with the Committee's subpoena has deprived the

Committee of information to which it is constitutionally entitled.  Accordingly, McGahn's

refusal, by itself, establishes the Committee's institutional injury sufficient for standing.

Given the palpable injury that results when key witnesses defy Congressional subpoenas,

it is not surprising that courts have uniformly concluded that the House and its committees may

sue to obtain information to which they are entitled.  More than four decades ago, the D.C.

Circuit rejected a nonjusticiability challenge to a dispute between the Legislative and Executive

Branches over a Congressional subpoena and held that the House could intervene to vindicate the

subpoena because "[i]t is clear that the House as a whole has standing to assert its investigatory

power." *United States v. Am. Tel. & Tel. Co.* (*AT&T I*), 551 F.2d 384, 391 (D.C. Cir. 1976);[3] *see*

*also AT&T II*, 567 F.2d at 134 (affirming that the House "has … threshold legal standing").  The

*AT&T I* court also noted that the D.C. Circuit had previously reached the merits of a similar

---

[3] Although the named intervenor was an individual legislator, the chairman of the relevant House committee, the D.C. Circuit noted that he had been authorized by the House to intervene on behalf of the House and the committee.  *AT&T I*, 551 F.2d at 391.

dispute, without suggesting any justiciability problems, in *Senate Select Committee*, 498 F.2d 725.  As the *AT&T I* court held, "*Senate Select Committee* establishes, at a minimum, that the mere fact that there is a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution of the conflict."  551 F.2d at 390.

As the Committee has emphasized, *see* Pl.'s Mot. at 21-22 & n.17, several judges of this Court, facing similar cases in which the House or a House committee claimed to have been deprived of information to which it was legally entitled, have ruled that courts have Article III jurisdiction to resolve such disputes.  In *Committee on the Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C 2008), Judge Bates held that a House committee had standing to seek enforcement of its subpoena directed to Executive Branch officials who had refused to comply on the ground of supposed absolute immunity.  After reviewing the precedents described above, the court held that the committee had standing because, as in *AT&T I*, "a House subcommittee had issued a valid subpoena in connection with an investigation and DOJ was seeking to invalidate it.  The injury to the House was evident: the validity and efficacy of that particular subpoena was in jeopardy, as was the utility of the subcommittee's investigation."  *Id.* at 70.

Judge Berman Jackson similarly concluded that a House committee had standing to seek enforcement of a subpoena.  *See Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 20 (D.D.C. 2013) ("This case falls squarely under *AT&T I*" for standing purposes.).  As in *Miers*, the *Holder* court "reject[ed] the notion that merely hearing this dispute between the branches would undermine the foundation of our government, or that it would lead to the abandonment of all negotiation and accommodation in the future."  *Id.* at 11.  Rather, the court stressed, "[t]o give the [Executive Branch] the final word" in all subpoena disputes between the Executive and Legislative Branches "would elevate and fortify the executive branch at the

expense of the other institutions that are supposed to be its equal, and do more damage to the balance envisioned by the Framers than a judicial ruling on the narrow privilege question posed by the complaint." *Id*. at 12.[4]

The conclusion that a Congressional committee may sue to enforce a subpoena is also supported by formal opinions of the Executive Branch.  In two opinions, OLC has stated that Congress or its committees may sue to enforce Congressional subpoenas—and in part for that reason, concluded that DOJ ordinarily should not prosecute for contempt of Congress any Executive Branch officials who refuse such subpoenas on the ground of executive privilege because a civil suit brought by Congress would provide a superior vehicle for resolving inter-branch disputes.  As Assistant Attorney General Theodore Olson explained,

> Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function … .  A civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents … .  Congress would be able to vindicate a legitimate desire to obtain documents [in such a civil suit] … .  There is little doubt that … Congress may authorize civil enforcement of its subpoenas and grant jurisdiction to the courts to entertain such cases.

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 137 & n.36 (1984).  A subsequent OLC opinion by Assistant Attorney General Charles Cooper agreed.  *See Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 83, 86, 88 (1986); *see Miers*, 558 F. Supp. 2d at 75-77, 96 (addressing the Olson and Cooper OLC opinions).

---

[4] *See also U.S. House of Representatives v. Dep't of Commerce*, 11 F. Supp. 2d 76, 86 (D.D.C. 1998) (three-judge district court) (concluding that the House had standing to challenge the Department of Commerce's decision to use statistical sampling in the Census because "[t]he inability to receive information which a person is entitled to by law is sufficiently concrete and particular to satisfy constitutional standing requirements").

### 2. McGahn's Arguments Against Standing Are Meritless

Against this authority, McGahn makes four arguments, all of which have correctly been rejected before.

#### a. Raines *and similar cases are inapposite*

According to McGahn, *Raines* establishes that neither Congress nor any of its component bodies may sue to enforce a Congressional subpoena because such a suit seeks only to vindicate abstract notions of political power rather than concrete and particularized interests. But the rationale of *Raines* has no application here. That case rested squarely on the fact that it involved *individual legislators*—neither the House nor the Senate as a whole, nor any of their authorized committees—who were seeking to advance an interest that neither body of Congress had endorsed or authorized (and indeed, which both definitively opposed). As Judges Bates and Berman Jackson both recognized, *Raines* does not address a situation in which either the House or one of its committees seeks to vindicate its legal entitlements to information. *See Miers*, 558 F. Supp. 2d at 69-71; *Holder*, 979 F. Supp. 2d at 13-14.

McGahn's argument, if accepted, would have sweeping consequences far beyond this case. Not only would it preclude Congressional enforcement of subpoenas directed to Executive Branch officials, but it also would preclude Congressional enforcement of subpoenas directed *to private individuals and entities*.[5] That result would drastically undermine Congress's power to investigate and would encourage refusals to comply with Congressional subpoenas, for it would force Congress to rely on the willingness of the Executive Branch to prosecute private

---

[5] Under McGahn's theory, 28 U.S.C. § 1365, which authorizes the Senate to seek judicial enforcement of subpoenas against private parties in certain circumstances, would be unconstitutional because the Senate would lack Article III standing. But that provision has been used on several occasions to secure enforcement. *See In re App. of the U.S. Senate Perm. Subcomm. on Investigation*, 655 F.2d 1232 (D.C. Cir. 1981); *Senate Perm. Subcomm. on Investigation v. Ferrer*, 199 F. Supp. 3d 125 (D.D.C. 2016), *vacated as moot*, 856 F.3d 1080 (D.C. Cir. 2017).

individuals for contempt of Congress—with no guarantee that the Executive would necessarily find Congress's subpoenas worthy of enforcement.

In any event, McGahn's arguments find no footing in *Raines*. The Supreme Court has emphasized that *Raines* held "specifically and only" that "six *individual Members* of Congress lacked standing to challenge the Line Item Veto Act." *Arizona State Legis.*, 135 S. Ct. at 2664; *see Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 n.4 (2019) ("*Raines* held that *individual Members* of Congress lacked standing to challenge the Line Item Veto Act." (emphasis added)). As the *Raines* Court explained, the Line Item Veto Act worked no injury to those Members' right or power to vote in favor of or against any legislation:

> In the vote on the Act, their votes were given full effect. They simply lost that vote. Nor can they allege that the Act will nullify their votes in the future … . In the future, a majority of Senators and Congressmen can pass or reject appropriations bills; the Act has no effect on this process.

521 U.S. at 824 (footnote omitted). The Court also held that, to the extent that the Members were arguing that the Act impaired Congress's institutional role in the lawmaking process, they were not the proper parties to make that claim, which would belong by its nature only to the body as a whole. Such an injury, the Court explained, was not personal to individual lawmakers, but was "widely dispersed." *Id.* at 829. As the Court later explained its holding,

> [t]he "institutional injury" at issue, we reasoned, scarcely zeroed in on any individual Member … . "[W]idely dispersed," the alleged injury "necessarily impacted all Members of Congress and both Houses … equally." None of the plaintiffs, therefore, could tenably claim a "personal stake" in the suit.

*Arizona State Legis.*, 135 S. Ct. at 2664 (quoting *Raines*, 521 U.S. at 821, 829-30).

The Supreme Court's decision in *Arizona State Legislature* puts to rest any notion that a legislative body (as opposed to its individual members) lacks standing to redress an injury done to its rights and powers. *Arizona State Legislature* held that a state legislature had standing to challenge the constitutionality of a state initiative that displaced its role in the Congressional

12

redistricting process.  In contrast to the individual legislators who lacked standing in *Raines*, the legislature was "an institutional plaintiff asserting an institutional injury" that the federal courts were competent to hear.  *Arizona State Legis.*, 135 S. Ct. at 2664.  "Put another way, the Members [in *Raines*] had suffered no injury that granted them *individual* standing because the actual injury was incurred by the *institution*."  *Miers*, 558 F. Supp. 2d at 69; *see Holder*, 979 F. Supp. 2d at 14.  Here, by contrast, as in *Arizona State Legislature*, *Miers*, and *Holder*, the injury has been incurred by the very institution that has brought suit.

*Bethune-Hill* further confirms the Committee's standing.  There, the Supreme Court held that "a single House of a bicameral [state] legislature lacks capacity to assert interests belonging to the legislature *as a whole*"—in particular, the interest in sustaining the constitutionality of its redistricting plan.  139 S. Ct. at 1953-54 (emphasis added).  But this case involves an injury to interests held by each body of Congress and its committees *separately*—the constitutional power to investigate and gather facts.  This case, moreover, involves an injury to an interest held by the House *alone*:  the "sole Power of Impeachment."  U.S. Const., Art. I, § 2, cl. 5.  Accordingly, unlike in *Bethune-Hill*, in this case there is no "mismatch between the body seeking to litigate and the body to which the [C]onstitution[] … assign[s] … authority."  139 S. Ct. at 1953.

McGahn's reliance on other post-*Raines* decisions is flawed for the same reason:  most were lawsuits by individual legislators, just as in *Raines*, and none involved a subpoena enforcement action brought by a Congressional committee.  *See Chenoweth v. Clinton*, 181 F.3d 112, 115 (D.C. Cir. 1999); *Campbell v. Clinton*, 203 F.3d 19, 21 (D.C. Cir. 2000); *Cummings v. Murphy*, 321 F. Supp. 3d 92 (D.D.C. 2018), *appeal pending*, No. 18-5305 (D.C. Cir.).  *Walker v. Cheney* is even farther afield:  in that case, the Comptroller General claimed to be suing only "in order to aid Congress," but Congress had given no indication it desired such aid.  230 F. Supp.

2d 51, 66 (D.D.C. 2002) (quotation marks omitted).  Those cases all fall within "the

impermissible category of an *individual* plaintiff asserting an institutional injury."  *Cummings*,

321 F. Supp. 3d at 106 (emphasis added) (quoting *Miers*, 558 F. Supp. 2d at 71).  In this case, by

contrast, the *Committee* has suffered institutional injury—rejection of a valid subpoena.  And the

Committee has been authorized, pursuant to valid action by the House, to sue to redress that

injury to its powers to investigate impeachment and potential legislation, and to conduct

oversight.  *See* H. Res. 430, 116th Cong. (2019).

### b.  *This case presents issues amenable to judicial resolution*

McGahn argues that, because this case arises in the setting of an inter-branch conflict, it

is not amenable to judicial resolution.  Def.'s Opp'n at 19-23.  But the fact that a case may

implicate separation-of-powers questions does not render it nonjusticiable.  *See Zivotofsky v.*

*Clinton*, 566 U.S. 189, 196-97 (2012) (reversing D.C. Circuit's affirmance of district court's

dismissal on political question grounds of inter-branch dispute over recognition of foreign

capital, explaining "the Judiciary has a responsibility to decide cases properly before it, even

those it "would gladly avoid" (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821))).

In numerous cases, of course, the courts have resolved questions of separation of powers.  *See,*

*e.g.*, *Morrison v. Olson*, 487 U.S. 654 (1988); *Bowsher v. Synar*, 478 U.S. 714, (1986); *INS v.*

*Chadha*, 462 U.S. 919 (1983); *see also AT&T II*, 567 F.2d at 126 n.13 (collecting cases).

That McGahn's argument is incorrect is forcefully demonstrated by *United States v.*

*Nixon*, 418 U.S. 683, a case where the Supreme Court resolved and rejected executive-privilege

objections to a subpoena.  The Court rejected President Nixon's characterization of the dispute as

a nonjusticiable political question and emphasized that, "[w]hatever the correct answer [to the

privilege questions] on the merits, these issues are 'of a type which are traditionally justiciable.'"

*Id.* at 697 (quoting *United States v. ICC*, 337 U.S. 426, 430 (1949)); *see also United States v.*

*Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (Marshall, C.J.) (resolving privilege questions raised by subpoena to the President).

The legal issues presented here are equally within the competence of an Article III court to decide, as the judges in *Senate Select Committee*, *AT&T*, *Miers*, and *Holder* all correctly concluded.  First, the Committee has alleged that McGahn has failed to comply with his "unremitting obligation" to respond to the Committee's subpoena.  *Watkins*, 354 U.S. at 187. McGahn questions (incorrectly, as explained below) the existence of a cause of action for the Committee to enforce its constitutional right, but he has not disputed that a court can resolve the legal issues presented.  Second, the Committee has sought enforcement of its subpoenas, "which is a routine and quintessential judicial task."  *Miers*, 558 F. Supp. 2d at 71; *see Holder*, 979 F. Supp. 2d at 22.  "[F]ederal precedent dating back as far as 1807 contemplates that even the Executive is bound to comply with duly issued subpoenas."  *Miers*, 558 F. Supp. 2d at 72.  A subpoena enforcement dispute has thus been "traditionally thought to be capable of resolution through the judicial process."  *Holder*, 979 F. Supp. 2d at 4 (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)) ("[T]he narrow legal question posed by the complaint is precisely the sort of crisp legal issue that courts are well-equipped to address and routinely called upon to resolve.").

The merits of this case also present issues that federal courts have regularly resolved. Federal courts, including the Supreme Court, have frequently decided claims of executive privilege in the face of a subpoena.  *See, e.g.*, *Nixon*, 418 U.S. 683; *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997).  In short, there is nothing about this dispute that makes it categorically unsuitable for judicial resolution.  As nearly a half-century of precedent shows, when Congress and the Executive Branch are at an impasse because the Executive has adamantly rejected a Congressional subpoena, Article III courts may decide whether that subpoena is valid.

McGahn also appears to suggest that, to accept the Committee's claim of institutional injury, this Court would have to decide *how much* injury the Committee had suffered and *to what extent* its legislative function had been impaired, and that those questions are abstract and not susceptible to judicial resolution.  Def.'s Opp'n at 25-27.  No authority supports that proposition, which, if accepted, would render all Congressional subpoenas—indeed, all subpoenas of any kind—unenforceable in court.  The Committee's issuance of a subpoena for information reflects its determination that the information is relevant to its constitutional functions.  When a party refuses to comply with that subpoena, those functions are, by definition, impaired; *that subpoena* is annulled by the refusal, and the Committee's authority to issue the subpoena is placed in question in a concrete and particularized dispute that this Court may resolve—just as the Court may resolve whether a subpoena issued by a grand jury or by an administrative agency is valid. As the court in *Miers* explained in the course of rejecting a virtually identical argument, when the Executive Branch refuses to comply with a Congressional subpoena, "the validity and efficacy of that particular subpoena [is] in jeopardy, as [is] the utility of the [C]ommittee's investigation."  558 F. Supp. 2d at 70.

> c.  *Adjudication of this dispute will not violate separation of powers*

McGahn argues that adjudicating this dispute will undermine the separation of powers. Def.'s Opp'n at 27-30; *see also id.* at 19-23.  But the Committee is not trying to displace the Executive Branch's role in executing the laws; it is not "usurp[ing] the [Executive Branch's] constitutionally designated functions."  *Mazars*, 2019 WL 5089748, at *7.  Rather, the Committee is seeking to protect rights and powers of the House.  McGahn's historical survey overlooks that, since nearly the beginning of the Republic, each House of Congress has acted separately and without the intervention of the Executive Branch to enforce its subpoenas—often

by arresting and detaining contemnors, including contumacious Executive Branch officials.  This lawsuit represents a far more modest approach.

The power to investigate, and to secure by compulsory process any information relevant to an investigation, belongs to each House of Congress (and its committees) acting independently from the other and from the Executive Branch.  In *McGrain*, the Supreme Court comprehensively reviewed Congress's repeated exercise of the power to obtain information by compulsory process and concluded that that power, rooted in Article I, belongs to the House and Senate separately and is essential to their constitutional authority to conduct oversight of the Executive Branch.  273 U.S. at 165-68; *see Mnuchin*, 379 F. Supp. 3d at 16-17.

McGahn's reliance on cases such as *Buckley v. Valeo*, 424 U.S. 1 (1976), and *Bowsher v. Synar*, 478 U.S. 714, is therefore misplaced.  *See* Def.'s Opp'n at 29 n.7.  In those cases, the Supreme Court made clear that Congress may not appropriate to itself the power to execute federal laws, for that power falls to the President, to whom "the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'"  *Buckley*, 424 U.S. at 136 (quoting U.S. Const., Art. II, § 3).  But the enforcement of a subpoena to vindicate the House's power to investigate is not the enforcement of federal law or the "execution" of the law within the meaning of Article II.  It is, rather, the exercise of a power that the House and Senate possess independently of each other and of the President.

McGahn's position that the power to enforce a Congressional subpoena belongs exclusively to the Executive Branch cannot be squared with history.  Although Congressional lawsuits to enforce subpoenas may date only to 1974—not an inconsiderable pedigree by itself— action by the Houses of Congress to vindicate their inherent powers, taken separately and without the assistance of the Executive Branch, is nearly as old as the Republic.  In 1795, the

House exercised its power of contempt to arrest, detain, and try individuals accused of offering bribes to Representatives; the Senate followed shortly thereafter.[6]  That contempt power was quickly extended to the power to secure compliance with Congressional subpoenas, including subpoenas directed to Executive Branch officials who refused to provide a House committee information it had requested.[7]  The Congressional contempt power exists independent of, and was not displaced by, its authorization to the Executive Branch to bring prosecutions for contempt of Congress.  *See Jurney v. MacCracken*, 294 U.S. 125, 151 (1935).  Thus, the House and Senate exercised their power to arrest and detain for contempt long after they had also authorized Executive Branch prosecutions of individuals for contempt of Congress in 1857.  *See id.*; *McGrain*, 273 U.S. at 165.[8]

This history shows that the House has long secured compliance with its power to investigate by using its own Sergeant at Arms to arrest and detain contemnors, without employing law enforcement officers of the Executive Branch.  Under McGahn's view of Congressional authority, however, the exercise of that power would be unconstitutional because it would constitute execution of the laws, which only the Executive Branch may undertake.  But Congress's power to vindicate its authority by arresting contemnors has been unquestioned since

---

[6] *See generally* Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 172-73 (2017); Todd Garvey, Cong. Research Serv., RL34097, *Congress's Contempt Power and the Enforcement of Congressional Subpoenas: Law, History, Practice, and Procedure* 4-6 (2017).

[7] Chafetz, *supra* note 6, at 174-79.  In 1879, for example, "the House of Representatives actually had its sergeant arrest an executive-branch officer for contempt."  *Id.* at 176.  That arrest took place after the United States' Minister to China refused to produce books and records to a House committee; the House's Sergeant at Arms arrested the minister and brought him before the House.  *Id.* at 176-77.  The House again arrested an Executive Branch official in 1916.  *See id.* at 177-78.

[8] As one study observes, "until the twentieth century Congress was reluctant to use the statutory provisions of 1857 and continued to punish persons summarily."  Carl Beck, *Contempt of Congress* 7 (1959); *see id.* at App. A, Nos. 16, 24, 31, 33, 34, 35, 36, 58, 59, 60, 66, 67, 74, 78, 81, 92, 93, 98 (providing summaries of instances between 1858 and 1943 in which the House or Senate used its contempt power to arrest or detain individuals for failing to testify or provide documents to a committee).  McGahn is incorrect to rely on Justice Scalia's separate opinion in *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987), *see* Def.'s Opp'n at 29 n.7:  the *Young* Court held that Article III courts possess inherent authority to punish out-of-court contempts, and *rejected* Justice Scalia's argument that only the Executive Branch may do so, *see* 481 U.S. at 797-801.

the Supreme Court upheld it 200 years ago, in *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204 (1821).

In doing so, the Court stressed that failing to recognize the House's power would lead "to the

total annihilation of the power of the House of Representatives to guard itself from contempts."

*Id.* at 228; *see Jurney*, 294 U.S. at 147-50 (upholding exercise of contempt power for refusal to

testify or produce documents to Senate); *McGrain*, 273 U.S. at 174 (same).

Both the courts and OLC have concluded that a civil enforcement action like this one is

more practical and desirable than the alternatives—an exercise of the House's inherent contempt

power to arrest those individuals or a criminal prosecution of the resisting officials for contempt

of Congress.  As to the former, the *Miers* court stressed that the prospect of "a stand-off between

the Sergeant-at-Arms and executive branch law enforcement officials concerning taking [an

Executive Branch official] into custody and detaining him … should be avoided, and there is no

need to run the risk of such mischief when a civil action can resolve the same issue in an orderly

fashion."  558 F. Supp. 2d at 92.  As to the latter possibility, not only is it unlikely that the

Executive Branch would ever prosecute an official for resisting a Congressional subpoena on the

advice of the Department of Justice, but OLC has suggested that doing so may very well be

unconstitutional.  *See Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 133-34.

Finally, McGahn's argument that, if a committee of Congress has standing to vindicate

the Executive Branch's injury to the committee's Article I powers, "then there is little question

that the Executive Branch would be equally entitled to sue Congress," Def.'s Opp'n at 29,

ignores that the Constitution is neither silent nor even-handed on this question, *see* U.S. Const.,

Art. I, § 6, cl. 1 ("for any Speech or Debate in either House, [Senators and Representatives] shall

not be questioned in any other place").  In any event, as *Miers* points out, the Executive Branch

*has* "invoked the aid of the federal judiciary" to "challenge[] the validity of a congressional

19

subpoena," albeit not by suing Congress. *See* 558 F. Supp. 2d at 96 (collecting cases). Indeed,

the President himself has initiated suits in his personal capacity to enjoin compliance with

Congressional subpoenas, and the Department of Justice has supported aspects of his claims

without objecting to the courts' jurisdiction to hear those cases. *See, e.g.*, *Mazars*, 2019 WL

5089748 (suit initiated by the President to enjoin his accounting firm from complying with a

Congressional subpoena); *id.* at *13 (describing arguments made by the Department of Justice in

support of the President).

In sum, it is McGahn's standing arguments that would damage the allocation of powers

in the Constitution. *See Miers*, 558 F. Supp. 2d at 95 ("[A] decision to foreclose access to the

courts, as the Executive urges, would tilt the balance in favor of the Executive here, the very

mischief the Executive purports to fear."); *cf. Mazars*, 2019 WL 5089748, at *20 ("A proposition

that so strips Congress of its power to legislate would enforce only the Executive's arrogation of

power, not the separation of powers."). Accepting McGahn's position would severely

undermine Congress's ability to inform itself and to conduct oversight of the Executive Branch,

and would damage the power of factfinding that is integral to Congress's exercise of its

constitutional functions—including the House's "sole Power of Impeachment." U.S. Const., Art.

I, § 2, cl. 5.[9]

---

[9] McGahn quotes a story in the *New York Times* to support his suggestion that recognizing the ability of Congressional committees to sue will open the floodgates and thus upset the separation of powers. Def.'s Opp'n at 23 n.4. As that article notes, if there has been a recent increase in litigation by Congressional committees seeking to enforce subpoenas, "the surge in litigation is a consequence of Mr. Trump's norm-busting presidency." Charlie Savage & Nicholas Fandos, *The House v. Trump: Stymied Lawmakers Increasingly Battle in the Court*, N.Y. Times (Aug. 13, 2019), https://perma.cc/86B2-KRY5. The article goes on: "Kerry W. Kircher, who served as House counsel under Republican speakers between 2011 and 2016, said many of the House's lawsuits were justified, regardless of politics, to ensure that Mr. Trump's vow to defy 'all' of its subpoenas did not set a precedent." *Id.*

### B.    This Court Has Federal Question Jurisdiction Under 28 U.S.C. § 1331

This Court has statutory subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.  *See*
Pl.'s Mot. at 21.  The Committee's claim seeks to vindicate the Committee's rights and powers
under Article I, including with regard to impeachment.  *See* Compl. ¶¶ 96-114.  Under Section
1331's text, therefore, this "civil action[] arise[s] under the Constitution."  28 U.S.C. § 1331.
McGahn argues that by enacting and amending a separate statute, 28 U.S.C. § 1365 (previously
codified at 28 U.S.C. § 1364), which authorizes federal court jurisdiction over certain subpoena-
enforcement suits brought by the *Senate*, Congress excluded suits to enforce Congressional
subpoenas from jurisdiction under Section 1331.  *See* Def.'s Opp'n at 30-33.  As an initial
matter, this argument is surprising given that McGahn's assertions concerning standing, if
accepted, would lead to the conclusion that Section 1365 is unconstitutional.  More importantly,
McGahn faces an uphill struggle; the type of argument he presents is disfavored.  *See Mims v.
Arrow Financial Servs., LLC*, 565 U.S. 368, 383 (2012) ("[J]urisdiction conferred by 28 U.S.C.
§ 1331 should hold firm against 'mere implication flowing from subsequent legislation.'"
(quoting *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 808 (1976))); *id.*
at 379 ("Divestment of district court jurisdiction should be found no more readily than
divestment of state court jurisdiction, given the longstanding and explicit grant of federal
question jurisdiction in 28 U.S.C. § 1331." (alterations and quotation marks omitted)).  In any
event, McGahn's argument fails for at least four reasons.

*First*, McGahn's argument cannot be reconciled with binding Circuit law.  The D.C.
Circuit has held that Section 1331 provides district courts with jurisdiction to adjudicate the
validity of a subpoena issued by a House committee.  In *AT&T*, a House subcommittee issued a
subpoena to AT&T for documents related to national security wiretaps undertaken at the request
of the FBI.  When AT&T indicated it would comply, the Justice Department filed suit to prohibit

21

AT&T from doing so, and the chairman of the House subcommittee intervened as a defendant. *AT&T I*, 551 F.2d at 387.  The D.C. Circuit concluded it had subject-matter jurisdiction under Section 1331 because "[t]he Executive brought the suit claiming that its constitutional powers with respect to national security and foreign affairs included the right to prevent transmission of the request letters to Congress.  The action therefore arises under the Constitution of the United States."  *Id.* at 389.[10]

This case presents the identical type of legal question as in *AT&T*:  whether a Congressional subpoena can be enforced under the Constitution.  Although in this case the parties' positions are reversed—the Executive Branch is the defendant rather than the plaintiff— that fact is of no consequence to the question of statutory subject-matter jurisdiction, for the controversy "arises under" federal law regardless of the posture of the litigants.[11]  As the *Miers* court explained in finding subject-matter jurisdiction under Section 1331 over an action to enforce a Congressional subpoena, "[t]he Executive's posture in [*AT&T*] … mirrors that of the Committee here in asking the Court to declare its subpoena valid."  *Miers*, 558 F. Supp. 2d at 75;[12] *accord Holder*, 979 F. Supp. 2d at 17 (similar).

*Second*, nothing about Section 1365 warrants the conclusion that it divests courts of the jurisdiction they would otherwise have under Section 1331.  By its terms, Section 1365 does not apply to the House.  *See* 28 U.S.C. § 1365.  The Section 1365 legislation removed a reference to

---

[10] *Cf. Mazars*, 2019 WL 5089748 (addressing the merits of a challenge to the constitutionality of a Congressional subpoena in a suit brought by the President, in his personal capacity, against a Congressional committee as defendant-intervenor, without addressing or questioning the President's assertion that the district court had jurisdiction under Section 1331).

[11] *See, e.g.*, *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011) ("in federal-question cases, the identity of the parties is irrelevant and the district court's jurisdiction is grounded in the federal question(s) raised by the plaintiff"); *Response to Congressional Requests for Information*, 10 Op. O.L.C. at 88 ("The rationale used by the Department in [*AT&T I*] would appear to apply equally to suits filed by a House of Congress seeking enforcement of its subpoena against executive privilege claims.").

[12] In *Miers*, the Department of Justice acknowledged that the court possessed statutory jurisdiction under 28 U.S.C. § 1331 in a subpoena-enforcement action brought by a House committee.  *See* 558 F. Supp. 2d at 64 n.8.

the House because the House committees had not had an opportunity to review the issues, and

not because Congress intended to deny courts jurisdiction over House subpoena enforcement

actions.  *See* H. Rep. No. 95-1756, at 80 (1978).  Accordingly, McGahn's argument that "the

specific provisions addressing federal subject-matter jurisdiction over congressional suits for

information control over the general federal question statute," Def.'s Opp'n at 31, is inapposite;

as the *Holder* court found, for House subpoena enforcement actions, there is no specific

provision that could control over the general.  *See* 979 F. Supp. 2d at 19 (Although "'in most

contexts, a precisely drawn, detailed statute pre-empts more general remedies,' … here, the

defense is asking the court draw inferences from the *absence* of a precisely drawn, detailed

statute."  (some internal quotation marks omitted) (quoting *Hinck v. United States*, 550 U.S. 501,

506 (2007)).

The Supreme Court has rejected an argument's like McGahn's before.  In *Verizon*

*Maryland, Inc. v. Public Service Commission of Maryland*, although the plaintiff's claim—that

the determination of a state commission violated federal law—presented a federal question under

Section 1331, the court below had held that a separate statute "strip[ped] this jurisdiction" by

"mak[ing] *some other* actions by state commissions reviewable in federal court."  535 U.S. 635,

642-43 (2002).  The Supreme Court reversed, holding that "[t]he mere fact that some acts are

made reviewable should not suffice to support an implication of exclusion as to others."  *Id.*

(quoting *Abbott Labs. v Gardner*, 387 U.S. 136, 141 (1967)).  The Court reviewed the statute in

question, *see id.* at 643-44, and observed that "none of [its] other provisions … evince[d] any

intent to preclude federal review of a commission determination," *id.* at 644 (noting, by contrast,

that a separate provision of the act explicitly stripped *state* courts of jurisdiction over certain

maters—and therefore that "where otherwise applicable jurisdiction was meant to be excluded, it

was excluded expressly"). That fact "reinforce[d] the conclusion that [the statute's] silence on the subject leaves the jurisdictional grant of § 1331 untouched." *Id.*

So, too, here. The Committee's claim presents a federal question under Section 1331, and as explained above, nothing in Section 1365—which "merely makes *some other* [subpoena enforcement] actions … reviewable in federal court," *id.* at 643—"displays any intent to withdraw federal jurisdiction under § 1331," *id.* at 644. This Court should "not presume that [Section 1365] means what it neither says nor fairly implies." *Id.*; *see also Mims*, 565 U.S. at 379 ("Divestment of district court jurisdiction should be found no more readily than divestment of state court jurisdiction, given the longstanding and explicit grant of federal question jurisdiction in 28 U.S.C. § 1331." (quotation marks and alterations omitted)).

That is particularly so given that the next provision of the U.S. Code, Section 1366, clearly *does* strip federal courts of federal question jurisdiction when the federal law in question "appli[es] exclusively to the District of Columbia," 28 U.S.C. § 1366, confirming that "Congress knows how to withdraw jurisdiction expressly when that is its purpose," *EEOC v. Lutheran Social Servs.*, 186 F.3d 959, 962 (D.C. Cir. 1999) (quotation marks omitted). Thus, because Section 1331's text "is plain and unambiguous," and because nothing in Section 1365 disturbs this Court's jurisdiction under Section 1331, [this Court] need not accept [McGahn's] invitation to consider the legislative history" or his other arguments. *State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 137 S. Ct. 436, 444 (2016); *see, e.g.*, *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011) ("Legislative history … is meant to clear up ambiguity, not create it.").

*Third*, even if the Court had reason to look behind the statutes' plain text, the history of Sections 1365 and 1331 does not support McGahn's theory that Congress intended to preclude district courts from taking jurisdiction over House subpoena-enforcement actions. In 1973, the

Senate Select Committee on Presidential Campaign Activities brought a civil action to enforce

subpoenas issued to President Nixon.  Judge Sirica held that the court lacked subject-matter

jurisdiction because he could not assign a dollar value to the Committee's claim and, therefore,

the Committee could not meet Section 1331's $10,000 amount-in-controversy requirement that

was in effect at the time.  *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*,

366 F. Supp. 51, 60-61 (D.D.C. 1973).  In response, Congress enacted a statute conferring

"jurisdiction on the District Court for the District of Columbia in any civil action that the [Senate

Select] Committee theretofore or thereafter brought 'to enforce or secure a declaration

concerning the validity of any subpoena'" against Executive Branch officials, including the

President, regardless of the amount in controversy.  *See Senate Select Comm.*, 498 F.2d at 727

(citing Pub. L. No. 93-190, 87 Stat. 736 (1973)).  The D.C. Circuit proceeded to consider the

merits of the subpoena-enforcement dispute.  *See id.*

In 1976, Congress sought to enact a permanent fix to the jurisdictional issue identified by

Judge Sirica, and it eliminated Section 1331's $10,000 amount-in-controversy requirement for

"any such action brought against the United States, any agency thereof, or any officer or

employee thereof in his official capacity."  Pub. L. No. 94-574, 90 Stat. 2721 (1976); *see AT&T

I*, 551 F.2d at 389 n.7.  That amendment, however, did not remove the amount-in-controversy

requirement in Section 1331 for actions arising under federal law brought against *private* parties.

By 1978, therefore, when Congress enacted Section 1365 as part of the Ethics in Government

Act, district courts already had subject-matter jurisdiction under Section 1331 to hear suits

brought by the House or Senate to enforce subpoenas directed at federal agencies or officials

acting in their official capacity.  What Section 1365 did, when it was enacted in 1978, was to

remove the amount-in-controversy requirement with respect to Senate subpoena-enforcement

actions against *private* individuals and entities, which still existed at that time.  Congress later removed the amount-in-controversy requirement from Section 1331, rendering the entire jurisdictional-amount issue moot for all Congressional subpoena-enforcement actions, whether the subpoenas came from the House or Senate or were directed to governmental or private respondents.  *See* Pub. L. No. 96-486, § 2(a), 94 Stat. 2369 (1980).

McGahn notes that Section 1365, as enacted in 1978, excluded Senate subpoena-enforcement actions against Executive Branch officials, and suggests that Section 1365 represented a choice by Congress to preclude jurisdiction over such subpoena-enforcement actions under Section 1331.  Def.'s Opp'n at 30-31.  But there was no reason for Congress to bring enforcement actions against Executive Branch officials within the reach of Section 1365, for such actions already fell within Section 1331 after 1976, when the amount-in-controversy for actions against federal officials was removed.  Congress was not required to use Section 1365 as a vehicle to fill a gap that did not exist.  *See Holder*, 979 F. Supp. 2d at 18 ("[A]t the time that section 1365 was enacted … it was not necessary to remedy any lack of jurisdiction for actions brought against a federal officer acting in his official capacity.").

McGahn quotes a sentence from the 1978 Act's legislative history that "a future statute" might be needed to "specifically give the courts jurisdiction to hear a civil legal action brought by Congress to enforce a subpoena against an executive branch official."  Def.'s Opp'n at 32 (alteration omitted).[13]  But a later passage from the same report states that the exception for Executive Branch officials "is not intended to be a congressional finding that the federal courts do not now have the authority to hear a civil action to enforce a subpoena against an officer or

---

[13] McGahn erroneously attributes that quote to the legislative history of the 1976 amendments to Section 1331.  Def.'s Opp'n at 32.  In fact, it comes from the history of Section 1365, enacted in 1978.  *See* S. Rep. No. 95-170, at 89 (1977).  The statement thus provides no support for Congressional intent with respect to the 1976 amendments.

employee of the federal government."  S. Rep. No. 95-170, at 91-92 (1977); *see Holder*, 979 F.

Supp. 2d at 19.  Moreover, even if the Court were inclined to credit McGahn's view of the

legislative history, the Supreme Court's observation in *Abbott Laboratories* applies with equal

force here:  "The right to review is too important to be excluded on such slender and

indeterminate evidence of legislative intent."  387 U.S. at 141.

McGahn also makes much of the fact that Congress made a minor clarifying amendment

to Section 1365 in 1996, long after it had repealed the amount-in-controversy requirement from

Section 1331 for all federal-question cases.  According to McGahn, "[i]f § 1331 already

conferred plenary jurisdiction for suits by Congress seeking to enforce demands for

information … then § 1365 and its 1996 amendments would all be entirely superfluous."  Def.'s

Opp'n at 31.  But McGahn points to nothing to indicate that Congress considered the effect of

the 1996 amendment on Section 1331, and certainly nothing to suggest that Congress at that time

questioned either its prior statement (when it enacted Section 1365) that the exception in Section

1365 carving out subpoena actions against Executive Branch officials was not intended to

resolve whether courts already had jurisdiction over such actions, or the D.C. Circuit's

jurisdictional ruling in *AT&T*.  Congress "does not hide elephants in mouseholes."  *Whitman v.

American Trucking Ass'n*, 531 U.S. 457, 468 (2001).

Regardless, "[r]edundancies across statutes are not unusual events in drafting, and so long

as there is no 'positive repugnancy' between two laws, a court must give effect to both."

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) (quoting *Wood v. United States*,

16 Pet. 342, 363 (1842)).[14]  Although Sections 1331 and 1365 overlap, they "do not pose an

---

[14] Redundancies among jurisdictional provisions are not uncommon.  When Congress removed the amount-in-controversy requirement from Section 1331, it effectively rendered redundant several other provisions, including 28 U.S.C. § 1337 (jurisdiction over commerce and antitrust cases), § 1338 (jurisdiction over patent and trademark

either-or proposition." *Id.* Section 1331's reach is much broader than Section 1365's, as this case demonstrates. Section 1365, however, includes requirements not contained in Section 1331. For example, Section 1365(b) establishes a procedure in which the district court, upon application by the Senate or an authorized committee or subcommittee, issues an order to the party refusing to comply with the Senate subpoena. 28 U.S.C. § 1365(b). It also provides a mechanism pursuant to which the district court's jurisdiction is maintained despite adjournment of the Senate at the end of a Congress. *Id.* Accordingly, because "giving effect to both [Sections 1365 and 1331] would not render one or the other wholly superfluous," Section 1365 should not be read as precluding "by negative implication" courts from exercising jurisdiction under Section 1331 over House subpoena enforcement actions. *Connecticut Nat'l Bank*, 503 U.S. at 253.[15]

*Fourth*, and finally, the Executive Branch has acknowledged that Congress can sue to enforce its subpoenas under Section 1331. In 1986, OLC concluded that the legislative history of Section 1365 counseled against any argument that its authority "provides the exclusive route for either House to bring a civil action to enforce its subpoenas, and thus, that no route exists for civil enforcement against an executive branch officer." *Response to Congressional Requests for Information*, 10 Op. O.L.C. at 87 n.31. OLC observed that the legislative history "specifically

---

cases), and § 1343 (jurisdiction over civil rights cases). But Congress was not required to repeal those provisions to eliminate any redundancies—as Judge Posner has pointedly observed. *See Winstead v. J.C. Penney Co.*, 933 F.2d 576, 580 (7th Cir. 1991) ("The legal mind craves an orderly legal universe—a seamless web of rationality—in which every word in a statute or in a contract or in a judicial opinion has a unique and indispensable function and in which there are no gaps and no redundancies. Yet there are loads of gaps and redundancies in the law.").

[15] McGahn cites dictum from a 1981 D.C. Circuit decision that, "[p]rior to 1978 [when Section 1365 was enacted] Congress had only two means of enforcing compliance with its subpoenas: a statutory criminal contempt mechanism and the inherent congressional contempt power." *In re App. of U.S. Senate Perm. Subcomm.*, 655 F.2d at 1238; *see* Def.'s Opp'n at 32. McGahn also cites a similar statement from the legislative history of Section 1365. S. Rep. No. 95-170, at 16 ("Presently, Congress can seek to enforce a subp[o]ena only by use of criminal proceedings or by the impractical procedure of conducting its own trial before the bar of the House of Representatives or the Senate."); *see* Def.'s Opp'n at 31. Those statements, however, simply reflect that Congress did not have broad authority to seek judicial enforcement of its subpoenas because Section 1331, at the relevant time, still contained an amount-in-controversy requirement for suits against private parties. Indeed, the D.C. Circuit case McGahn cites involved a subpoena issued by a Senate subcommittee to a private individual, not a government official, thus requiring invocation of Section 1365 (then Section 1364).

notes that the jurisdictional exception for executive branch subpoenas 'is not intended to be a Congressional finding that the Federal courts do not now have the authority to hear a civil action to enforce a subpoena against an officer or employee of the Federal Government,' but rather was intended specifically to provide the Senate with a less drastic remedy than criminal contempt for refusals by *private* citizens to comply with subpoenas, and to avoid reliance on the Department of Justice to enforce such subpoenas." *Id.* (emphasis added) (citing S. Rep. 95-170, at 91-92 (1977). Accordingly, OLC wrote, "although the civil enforcement route has not been tried by the House, it would appear to be a viable option." *Id.* at 88; *accord Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 137 & n.36. OLC was correct.

### C.   The Committee Is Entitled to Seek Judicial Enforcement of Its Subpoena

McGahn argues that, because Congress has not created a specific section of the United States Code authorizing Congressional enforcement of subpoenas, Congress has no means by which it can vindicate its constitutional authority to secure information through compulsory process. *See* Def.'s Opp'n at 39-43. That argument was correctly rejected in *Miers* and *Holder*. As those courts recognized, Congress has several sources of authority on which it can draw to obtain judicial enforcement of its subpoenas—Article I itself, the courts' traditional equitable power to enjoin unlawful governmental action, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

### 1.   The Committee Can Seek Relief Directly Under Article I

Just as Article I provides each House of Congress an implied power to issue compulsory process in furtherance of its investigations, *see, e.g.*, *McGrain*, 273 U.S. at 175, so too it grants each House of Congress a right to seek judicial redress of conduct that interferes with the discharge of its legislative functions. To hold otherwise would hamstring Congress's right of "self-preservation" that the Supreme Court recognized in *Anderson v. Dunn*, 19 U.S. 204, 230

(1821).  *See supra* pp. 18-19 (discussing feasibility problems with the only alternatives, inherent

contempt and criminal prosecution).  *Anderson* acknowledged that the Constitution does not

expressly grant Congress the right to punish contempt by non-Members, but it noted that "[t]here

is not in the whole of [the Constitution], a grant of powers which does not draw after it others,

not expressed, but vital to their exercise."  19 U.S. at 225-26.  A century later, in *Marshall v.*

*Gordon*, 243 U.S. 521 (1917), the Court reaffirmed Congress's right to punish contempt and

explained that the contempt power is "but a force implied to bring into existence the conditions

to which constitutional limitations apply ….  [I]t rests solely upon the right of self-preservation

to enable the public powers given to be exerted."  *Id.* at 541-42.

As Judge Bates discussed in detail in *Miers*, 558 F. Supp. 2d at 88-94, the same logic

counsels in favor of recognizing that Congress possesses an implied power to enforce its

subpoenas in civil actions.  If Congress has the power to arrest and detain a contumacious

subpoena recipient, then Congress can take the more modest route of applying to the courts for

relief.  Moreover, "the judiciary is clearly discernible as the primary means through which

constitutional rights may be enforced, and consequently, at least in the absence of a textually

demonstrable constitutional commitment of an issue to a coordinate political department," courts

"presume that justiciable constitutional rights are to be enforced through the courts."  *Miers*, 558

F. Supp. 2d at 88 (alterations and quotation marks omitted) (quoting *Davis v. Passman*, 442 U.S.

228, 241 (1979)).  Indeed, courts have readily exercised jurisdiction in instances where

contumacious subpoena recipients were detained by Congress and filed habeas suits requiring the

courts to determine the validity of the underlying subpoena.  *See, e.g.*, *McGrain*, 273 U.S. at 154.

McGahn contends that *Reed v. County Commissioners of Delaware County, PA*, 277 U.S.

376 (1928), held that Congress's Article I power to compel the production of evidence does not

support an Article I right to seek a judicial remedy for noncompliance.  Def.'s Opp'n at 39.  *Reed*

held no such thing.  In that case, a Senate committee filed suit to enforce a subpoena for ballot

boxes following a disputed Senatorial election.  The question presented was whether the federal

courts had *subject matter* jurisdiction to hear the case under 28 U.S.C. § 41(1), which then

provided the district courts with jurisdiction "of all suits of a civil nature, at common law or in

equity, brought by the United States, or by *any officer thereof authorized by law to sue*."  277

U.S. at 386 (emphasis added).  The Court determined that, absent an empowering action by the

full Senate, the Committee had not been "authorized by law to sue" on behalf of "the United

States" within the meaning of Section 41(1).  *Id.* at 389.  But in this case, the House *has*

authorized the Committee to sue.  *See* H. Res. 430, 116th Cong.  *Reed* said nothing to suggest

that, in such a circumstance, a Congressional committee could not invoke Article I to seek

judicial enforcement of its subpoenas.  In fact, one day after *Reed* was decided, the Senate passed

a resolution authorizing the committee to file suit.  *See* S. Res. 262, 70th Cong. (1928).  Given

that the only action the Senate took in *Reed*'s wake was to authorize the Committee to sue, as

was required for jurisdiction under Section 41(1), the Senate plainly understood itself already to

have a cause of action.

In contending that it would be improper for the Court to imply a right of action under

Article I because "it is up to Congress to create federal causes of action," McGahn primarily

relies on decisions addressing whether *private* parties have the right to resort to federal court to

enforce federal *statutes*.  Def.'s Opp'n at 40 (quotation marks omitted).  Those decisions are

inapposite.  In enacting federal statutes, Congress has the authority to determine the scope of any

right, benefit, or privilege that it may bestow on private parties, as well as the mechanisms

through which such rights, benefits, or privileges may be enforced.  Consequently, when a

private plaintiff seeks to enforce a federal right in court, courts must determine whether Congress intended to create private rights at all and, if so, whether it intended to allow private plaintiffs to enforce those rights.  A key factor in the latter analysis is whether Congress chose to protect the rights through means other than private litigation—for instance, through agency enforcement. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 286-90 (2001); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287-89 (2002).  Those decisions shed no light on whether the Houses of Congress have a cause of action to enforce their *constitutional* right to compel testimony and the production of documents.  *See Miers*, 558 F. Supp. 2d at 88 ("[T]he question of who may enforce a *statutory* right is fundamentally different from the question of who may enforce a right that is protected by the Constitution."  (quoting *Davis*, 442 U.S. at 241)).

### 2.    The Committee Can Invoke the Federal Courts' Traditional Equity Powers

Contrary to McGahn's argument, *see* Def.'s Opp'n at 40-42, the Committee can also look to the long-established equitable powers of the federal courts to grant relief against unlawful conduct by Executive Branch officials—one of the historic functions of courts of equity—even in the absence of a statutory cause of action.  *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384-85 (2015) (recognizing "[t]he power of federal courts of equity to enjoin unlawful executive action"); *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (plaintiffs entitled to seek injunctive relief against government action that allegedly violated Appointments Clause and separation-of-powers principles, even absent statutory cause of action); *see also Ex Parte Young*, 209 U.S. 123, 149, 165, 167 (1908).

Executive Branch officials are constitutionally obligated to comply with Congressional subpoenas absent a lawful excuse.  The Houses of Congress possess a "power of inquiry … as penetrating and far-reaching as the potential power to enact and appropriate under the

Constitution." *Eastland*, 421 U.S. at 504 & n.15 (quotation marks omitted).  In recognizing

Congress's right to use compulsory process to vindicate its power to investigate, the Supreme

Court emphasized that all citizens have an "unremitting obligation" to testify and produce

documents in response to a valid subpoena.  *Watkins*, 354 U.S. at 187.  Here, the Committee

alleges that McGahn has unlawfully failed to comply with a subpoena issued in aid of the

Committee's legitimate impeachment, legislative, and oversight activities, and the Committee

seeks only declaratory and injunctive relief.  *See* Pl.'s Mot. at 12-16; *see also* Compl. ¶¶ 57-68,

96-114; *id.*, Prayer for Relief.  The Committee has the right to seek, and this Court has the power

to grant, such relief.

McGahn argues that courts' equitable powers may be exercised only when "the 'relief …

requested was traditionally accorded by courts of equity,'" Def.'s Opp'n at 41 (quoting *Grupo*

*Mexicano de Desarrolo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)), and that suits

like the Committee's "have no historical pedigree whatsoever, much less a strong tradition in

equity," *id.*  McGahn's focus on the historical practice of Congressional subpoena-enforcement

suits is far too narrow; none of McGahn's cases suggests that a plaintiff must be able to point to

a precisely similar case in historic equity practice.[16]  What matters is that federal courts of equity

have traditionally accorded declaratory and injunctive relief when Executive officials act

contrary to federal law.  *See Exceptional Child Ctr.*, 135 S. Ct. at 1384-85 ("[t]he ability to sue to

enjoin unconstitutional actions by state and federal officers is the creation of courts of equity,

and reflects a long history of judicial review of illegal executive action"); *see, e.g., Carroll v.*

---

[16] This case is thus unlike *Grupo Mexicano*, where the equitable relief ordered by the district court—a preliminary injunction preventing the transfer of assets in an action for money damages—had been "specifically disclaimed by longstanding judicial precedent."  527 U.S. at 322; *see id.* at 321 (describing the "well-established general rule that a judgment establishing the debt was necessary before a court of equity would interfere with the debtor's use of his property").

*Safford*, 44 U.S. (3 How.) 441, 463 (1845) ("[W]e entertain no doubt, that, in a proper case, relief may be given in a court of equity … to prevent an injurious act by a public officer, for which the law might give no adequate redress.").

McGahn invokes the statement in *Ziglar v. Abbasi* that "judicially inferring a cause of action that goes beyond 'traditional equitable powers' is a 'significant step under separation-of-powers principles.'"  Def.'s Opp'n at 41 (quoting 137 S. Ct. 1843, 1856 (2017)).  That observation has no application here.  *Abbasi* considered whether to recognize an implied *damages* remedy for violations of the plaintiffs' constitutional rights.  Damages were not traditionally available in courts of equity.  And in fact, the Court noted that, "[w]hen determining whether traditional equitable powers [*i.e.*, declaratory and injunctive relief] suffice to give necessary constitutional protection—*or whether, in addition*, a damages remedy is necessary— there are a number of economic and governmental concerns to consider."  137 S. Ct. at 1856 (emphasis added).  *Abbasi* thus recognizes that courts possess traditional equitable powers to enforce the Constitution.

McGahn's reliance on *Jesner v. Arab Bank, PLC*, is similarly misplaced.  Def.'s Opp'n at 40 (citing 138 S. Ct. 1386, 1402 (2018)).  Like *Abbasi*, at issue in *Jesner* was whether to imply a private cause of action for *damages*.  138 S. Ct. at 1402 ("[I]f there are sound reasons to think Congress might doubt the efficacy or necessity of a *damages remedy*, ... courts must refrain from creating the remedy in order to respect the role of Congress."  (emphasis added)).  The Court was additionally reluctant to imply a damages remedy under the Alien Tort Statute given "foreign-policy concerns," which it concluded were best addressed by the political branches.  *Id.* at 1402-03.  Those concerns have no application here.

Finally, McGahn recycles his argument that 28 U.S.C. § 1365, which authorizes *Senate* committees to sue to enforce their subpoenas in certain circumstances, displaces federal courts' traditional equitable powers to afford similar relief to *House* committees.  *See* Def.'s Opp'n at 41-42.  But as explained above, Section 1365 says nothing about House subpoenas, and its enactment history shows that it was directed to a specific problem with no bearing on courts' broader authority to afford relief when a respondent refuses to comply with a House subpoena.  Nothing indicates Congress intended Section 1365 to displace courts' historic equity powers.[17]

### 3.      The Committee Can Obtain Declaratory Relief

The Declaratory Judgment Act also supplies the Committee with a basis to seek a judicial declaration regarding the validity of its subpoenas.  Under the Act, the Committee may seek a declaration of its "rights and other legal relations" because it has shown that there is an "actual controversy" and that this Court has jurisdiction, and because it has filed an "appropriate pleading," 28 U.S.C. § 2201, *i.e.*, its Complaint.  *See Miers*, 558 F. Supp. 2d at 78; *Holder*, 979 F. Supp. 2d at 22-23.

McGahn contends that the Declaratory Judgment Act does not provide a "cause of action" and that the Act only enlarges the remedies available for claims otherwise properly in federal court.  Def.'s Opp'n at 42-43.  That argument misstates the Act's function.  Although the Act does not create substantive rights, it does provide a mechanism for plaintiffs to seek a declaration vindicating rights guaranteed elsewhere—here, in Article I of the Constitution.  The Act states that a court may declare parties' "rights" and "legal relations" in a case involving an

---

[17] McGahn also points to two other occasions when Congress specifically authorized actions by legislators and the Houses of Congress.  Def.'s Opp'n at 41.  Those provisions were necessary to make any appeals "reviewable … directly [by] the Supreme Court."  Pub. L. No. 105-119, § 209(e)(1), 111 Stat. 2440 (1997) (Census methodologies); *accord* Pub. L. No. 104-130, § 3(b), 110 Stat. 1200 (1996) (Line Item Veto Act).  They have no bearing here.  *See also Miers*, 558 F. Supp. 2d at 86-87 (rejecting McGahn's argument concerning 2 U.S.C. § 288d).

"actual controversy" and within the court's jurisdiction, "*whether or not further relief is or could be sought.*"  28 U.S.C. § 2201(a) (emphasis added); *see Miers*, 558 F. Supp. 2d at 80.

The Supreme Court has never expressed doubt that a party meeting the Declaratory Judgment Act's requirements is entitled to seek declaratory relief.  It has emphasized only two limitations.  First, the Act does not provide district courts with an independent source of *jurisdiction. Schilling v. Rogers*, 363 U.S. 666, 677 (1960) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)).  Second, the Act may be invoked only when there is an actual, immediate controversy; it cannot be used to "secur[e] an advisory opinion in a controversy which has not arisen."  *Coffman v. Breeze Corp.*, 323 U.S. 316, 324 (1945).  Here, there is undoubtedly an actual and immediate controversy between the Committee and McGahn.[18]  And in similar cases, Judge Bates and Judge Berman Jackson concluded that the Act provides a basis to adjudicate the Committee's "rights" with respect to a subpoena issued to an executive official.  *See Miers*, 558 F. Supp. 2d at 78-88; *Holder*, 979 F. Supp. 2d at 22-24.

McGahn relies on statements from D.C. Circuit decisions suggesting that the Declaratory Judgment Act does not provide a "cause of action."  Def.'s Opp'n at 42-43.  But those cases, understood in context, go no further than reaffirming that the Act is not itself a source of substantive rights and may not be used to circumvent other limits that Congress has placed on

---

[18] The Supreme Court has often acknowledged that the Declaratory Judgment Act may provide a basis for a plaintiff's entry into court.  *See Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937) (Act permits insurance company to seek judicial declaration that several of defendant's policies had lapsed and that insurer was responsible only for minimum payment); *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191 (2014) (Act permits licensee to sue patentee and seek declaration that its products were not infringing).  The D.C. Circuit has likewise recognized that the Act enables a plaintiff to enter court to seek a declaration regarding its "rights" and "legal relations."  *See, e.g., Shelby Cty., Ala. v. Lynch*, 799 F.3d 1173, 1183 (D.C. Cir. 2015) (28 U.S.C. § 1331 and the Act provided "adequate authorization for any attack on the [Voting Rights Act's] constitutionality."); *Davis v. U.S. Sentencing Comm'n*, 716 F.3d 660, 666 (D.C. Cir. 2013) (prisoner could seek declaration that his sentence violated Equal Protection Clause).

district courts' authority.[19]  Those decisions do not undermine the long-settled understanding that the Act provides a mechanism for the courts to resolve the legal rights and obligations of parties, as long as those rights and obligations are established elsewhere.  Here, those rights and obligations are established in Article I.

## II.  Because the Executive Branch Has Made Clear that Accommodation Is Impossible, This Court Should Not Dismiss or Stay this Action

Unable to establish that this Court lacks jurisdiction, McGahn urges the Court not to entertain the Committee's lawsuit until the parties have had a chance to pursue a compromise. The Court should reject McGahn's invitation.  The D.C. Circuit has countenanced such abstention—which constitutes a narrow exception to federal courts' "virtually unflagging obligation to exercise their jurisdiction," *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988) (quotation marks omitted)—only in the rare circumstance when the record "demonstrates the proximity of the parties to a workable compromise," *AT&T I*, 551 F.2d at 386.  Here, the nature of the Executive Branch's argument—that McGahn is *absolutely* immune from Congressional process—confirms that no such compromise is possible.  Even if that were not the case, the President has adamantly "reject[ed]" the House's impeachment inquiry and declared that he "and his Administration cannot participate in [it] … under [present] circumstances."  Cipollone Letter at 2.  In so doing, the President has ruled out accommodating the Committee's request.  No further discussion will resolve an impasse dictated by the President himself.

---

[19] *See Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011) (stating that the Declaratory Judgment Act does not provide a "cause of action," after court had already rejected plaintiffs' claims pertaining to each of the substantive rights asserted); *C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201-02 (D.C. Cir. 2002) (explaining federal courts may not declare a plaintiff's rights under a federal statute when Congress intended the statute to be enforced through other means, such as through a judicially unreviewable administrative hearing). McGahn also cites *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950), but that decision states only that the Act does not expand courts' *jurisdiction*, *see id.* at 671-72.

McGahn suggests that the Committee can resort to other sources for the information that it needs.  Def.'s Opp'n at 44-45.  But the Committee has determined that McGahn—not Hope Hicks, and not Annie Donaldson Talley, *see id.* at 45—is the most critical fact witness in its investigation.  Pl.'s Mot. at 2; *see id.* at 5-10 (recounting five instances in which McGahn was involved in, or a witness to, attempts by the President to thwart law enforcement investigations); *id.* at 14-16 (summarizing why McGahn's testimony is critical).  It is not for McGahn to countermand the Committee's determination.  *Cf. Mazars*, 2019 WL 5089748, at *7 ("Congress may subpoena … that information which is reasonably relevant to its legitimate investigation." (quotation marks omitted)).

McGahn repeatedly suggests—albeit in carefully guarded language—the willingness of the White House "Counsel's Office to *consider* an interview" of him by the Committee, "subject to appropriate terms," and identifies such an interview as "a *potential* compromise that would allow the Committee to obtain testimony from [him]" without enforcement of the Committee's subpoena.  Def.'s Opp'n at 45 (emphasis added); *see id.* at 46 ("*exploring* the *possibility* of an interview, *on appropriate terms*" (emphasis added)).  Upon learning, from McGahn's filing, that the Executive Branch was "ready to continue those negotiations," *id.* at 45, the Committee pursued them in earnest through a series of discussions with the White House.  During those conversations, the Committee offered a variety of accommodations—including a non-public, closed-door interview—to address issues raised by the Executive Branch.  However, despite these ongoing efforts, the parties currently remain at an impasse.  The Committee will update the Court of any relevant further developments regarding an interview.

Other alternatives McGahn identifies are plainly inadequate.  As a legal matter, accepting McGahn's suggestion that this Court should confine the Committee to the materials the

Executive Branch has gathered and produced in the course of its own investigations—FBI-302 reports of interviews and the Mueller Report—would "violate separation of powers principles." *In re Request*, 833 F.2d at 1445 (during the impeachment of Judge Hastings, rejecting the argument that "the Committee must rely on the report and record forwarded to it by the Judicial Conference unless it can show that the report and record are insufficient" in light of "the investigatory power of the House in impeachment proceedings").

As a factual matter, while McGahn refers to the "production of scores of FBI reports of interviews conducted by the Special Counsel's Office (*to* include McGahn's)," Def.'s Opp'n at 44 (emphasis added), as the emphasized word reveals, the Department of Justice has not produced the FBI-302 reports from McGahn's interviews.  Indeed, DOJ has produced fewer than half of the interview reports that the Committee has requested, and many of those that it has produced are heavily redacted, without adequate explanation.[20]  Moreover, citing the White House's recent letter declaring that the Trump Administration will not cooperate with the House's impeachment inquiry, DOJ has raised substantial doubts about whether it will produce any more FBI-302 reports to the Committee.  *See* Second Decl. of Bradley Weinsheimer ¶ 6, *In re App.* (Oct. 11, 2019), ECF No. 40-1 (suggesting that, "[t]o the extent the Committee now believes future productions [of reports] are part of [an] impeachment inquiry," DOJ's production plans may change (citing Cipollone Letter)); *see also* Resp. of the Comm. at 3-5, *In re App.* (Oct. 16, 2019), ECF No. 41.

The case on which McGahn principally relies in arguing that this Court should abstain, *AT&T*, in fact demonstrates the impropriety of abstention here.  In *AT&T I*, the D.C. Circuit

---

[20] *See* DOJ's Supp. Sub., *In re App. of the Comm. on the Judiciary, U.S. House of Representatives, for an Order Authorizing the Release of Certain Grand Jury Materials*, No. 19-gj-48 (BAH) (D.D.C. Oct. 8, 2019) (*In re App.*), ECF No. 37; Resp. of the Comm., *In re App.* (Oct. 9, 2019), ECF No. 39.

refrained from resolving an inter-branch conflict over a House committee's subpoena for documents concerning warrantless national security wiretaps, but only after highlighting "the proximity of the parties to a workable compromise," 551 F.2d at 386—so much so that the court was able to "suggest the outlines of a possible settlement which may meet the mutual needs of the congressional and executive parties," *id.* at 385.  The parties had "c[o]me close to success" because they had already agreed on the documents the Committee would be permitted to review; the remaining gap concerned only "the means of verifying the accuracy and candor of the classifications and generic descriptions" in those documents.  *Id.* at 386-87.  When the D.C. Circuit considered the dispute a second time, it decided several threshold legal issues but refrained from reaching the ultimate question because "[n]egotiation ha[d] narrowed … the gap between the parties."  *AT&T II*, 567 F.2d at 123.

*AT&T* offers several lessons for this case.  First, if the parties are close enough that this Court can propose a workable compromise, it may refrain from resolving the dispute, but if "the parties reach an impasse," the Court must "enter an order disposing of" the matter.  *AT&T I*, 551 F.2d at 385.  Second, if the parties are close to a compromise, then the Court should proceed, as the D.C. Circuit did in *AT&T II*, to resolve threshold justiciability questions to give the parties further guidance in their interactions.  But the situation here contrasts starkly with that in *AT&T*.  Indeed, McGahn has not just refused to testify; the White House has proclaimed that he is absolutely immune from doing so, and has declared that it will not participate in the House's impeachment inquiry.  The parties' present impasse is definitive.

McGahn's reliance on *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999), and *Vander Jagt v. O'Neill, Jr.*, 699 F.2d 1166 (D.C. Cir. 1982), is particularly misplaced.  Def.'s Opp'n at 44.  Those cases, unlike this one, involved suits by individual legislators, not a committee acting

under the authority of the House.  *See supra* pp. 13-14 (discussing *Chenoweth*).  In *Vander Jagt*, individual Republican members of the House sued the Democratic leadership for allegedly diluting the power of House Republicans.  The court concluded, without denying its own jurisdiction, that it would decline to adjudicate the case because it would be a "startlingly unattractive idea, given our respect for a coequal branch of government, for us to tell the Speaker of the House of Representatives how many Democrats, and perhaps even which Democrats, he is to appoint to the standing committees, and perhaps to each such committee."  699 F.2d at 1176 (alterations and quotation marks omitted).  No similar situation is presented here; indeed, *denying* jurisdiction over this case would infringe on the House's Article I powers.

Facing a similar claim of absolute immunity, the *Miers* court, consistent with the framework established in *AT&T I*, rejected the argument that the "federal judiciary should not enter into this dispute between the political branches."  558 F. Supp. 2d at 95.  The court's decision in *Miers* in fact *facilitated* the parties' ability to reach a workable agreement:  after the court rejected the Executive Branch's contention that former White House Counsel Harriet Miers was absolutely immune from testifying before Congress, the parties agreed to a transcribed interview.  *See* Def.'s Opp'n at 48 n.10.  This Court should likewise abide by its "virtually unflagging obligation to exercise [its] jurisdiction," *Deakins*, 484 U.S. at 203, and reach the merits of this case.  *See Cohens*, 19 U.S. (6 Wheat.) at 404 ("[W]e must decide [a case] if it be brought before us.").

III.     **McGahn's Refusal to Comply with the Judiciary Committee's Subpoena Is Unlawful**

A.     **The Executive Branch's Absolute Immunity Theory Is Unsupported in Law**

As the Judiciary Committee established in its opening brief, McGahn is legally obligated to testify before the Committee pursuant to a duly issued subpoena. *See* Pl.'s Mot. at 27-36. McGahn is unable to cite any judicial precedent to the contrary.

McGahn has not responded to—and therefore has conceded—the Committee's argument that, even apart from the absence of support in case law for the Executive's absolute immunity claim, no authority allows the President to direct McGahn, a private citizen, to disobey a Congressional subpoena. *See id.* at 26-27; *see also* Def.'s Statement of Material Facts Not in Dispute ¶ 4 (Oct. 1, 2019), ECF No. 32-1 ("On May 20, 2019, the President … directed McGahn not to appear at the May 21 hearing."). "The President's authority to act … 'must stem either from an act of Congress or from the Constitution itself,'" *Medellin v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)), and McGahn can point to no such authority for the President's order in this case. The OLC opinion on which McGahn primarily relies asserts that "[b]ecause Congress may not constitutionally compel Mr. McGahn to testify about his official duties, the President may lawfully direct him not to appear." Decl. of Todd B. Tatelman (Aug. 26, 2019), ECF No. 22-3, Ex. C at 14. That does not follow. OLC's (incorrect) position—that *Congress* lacks authority to compel McGahn's testimony—does not establish that the *President* has affirmative authority to order McGahn not to testify. And although it is true that, by virtue of his role as head of the Executive Branch, the President has the constitutional responsibility to "direct[] the action to be taken by his executive subordinates," *Myers v. United States*, 272 U.S. 52, 134 (1926), neither the Constitution nor any statute grants the President general authority to direct the conduct of private citizens who are not

42

his subordinates—much less to direct them to defy a command from a coequal branch of government.

Moreover, McGahn has done nothing to refute that "the asserted absolute immunity claim here is entirely unsupported by existing case law," as another judge of this Court recognized in indistinguishable circumstances. *Miers*, 558 F. Supp. 2d at 99. That "simple yet critical fact," *id.*, should weigh heavily here. Instead, the Executive Branch position that McGahn has adopted in this lawsuit primarily relies on the Executive's own OLC opinions, including the one issued to justify McGahn's defiance of the subpoena in this case. OLC opinions, however, are not law, are not binding outside the Executive Branch, and are not entitled to judicial deference. *See* Sonia Mittal, *OLC's Day in Court: Judicial Deference to the Office of Legal Counsel*, 9 Harv. L. & Pol'y Rev. 211, 212 (2015) ("[T]he [Supreme] Court has consistently resisted according OLC opinions deference under established deference regimes.").

### B. The Executive Branch's Absolute Immunity Claim Violates Fundamental Separation-of-Powers Principles

Lacking affirmative legal support for the Executive Branch's absolute immunity theory, McGahn contends that a former Presidential advisor's compelled appearance before Congress violates constitutional separation-of-powers principles. But the opposite is true: the Executive's categorical position that Presidential advisors may never be compelled to testify before Congress does grave damage to the House's capacity to carry out its core Article I functions, including its impeachment inquiry into the President's actions, as well as its consideration of related remedial legislation and performance of oversight. The Executive's position, which McGahn advances here, considerably overstates the burden on the Executive Branch and fails properly to take into account the overriding injury to the House's constitutional role that withholding McGahn's testimony would inflict.

Where, as here, one Branch of government claims that another has impermissibly interfered with its exercise of constitutional authority, a balancing test applies.  First, a court must determine "the extent to which [the asserted burden] prevents the [first] Branch from accomplishing its constitutionally assigned functions."  *Nixon v. Adm'r of Gen. Servs.* (*Nixon v. GSA*), 433 U.S. 425, 443 (1977).  Second, if the "potential for disruption is present," a court must assess "whether that impact is justified by an overriding need to promote objectives within the constitutional authority of [the other Branch]."  *Id.*; *see Nixon*, 418 U.S. at 706-07 (balancing interests of the Judicial Branch and Executive Branch in rejecting Executive's absolute privilege assertion).  Under this balancing test, the Executive's assertion of absolute immunity fails, because any effect on Executive interests is minimal and is significantly outweighed by the harm the absolute immunity claim would inflict on the House's exercise of its core Article I functions.

### 1. The Asserted Executive Branch Interests Purportedly Protected by Absolute Immunity for Presidential Advisors Are Minimal

#### a. *Presidential Advisors Are Constitutionally Different from the President and Do Not Share Any Immunity He May Enjoy*

At the heart of McGahn's position is a faulty premise:  that because "the President himself is absolutely immune from testimonial compulsion by Congress," his "immediate advisors must share in his absolute immunity."  Def.'s Opp'n at 50, 55.  McGahn contends that such derivative immunity is necessary for the President's interests "to be adequately protected."  *Id.* at 51.  This argument, however, ignores the "constitutional distinction between the President himself and subordinate officers in the executive branch."  *In re Kessler*, 100 F.3d 1015, 1017 (D.C. Cir. 1996).

To the extent the President enjoys any form of immunity, it flows from his "unique status under the Constitution," which "distinguishes him from other executive officials."  *Nixon v.*

*Fitzgerald* (*Fitzgerald*), 457 U.S. 731, 750 (1982).[21]  When the Supreme Court has recognized

Presidential immunity in other contexts, it has relied on the attributes unique to the President's

position as the head of the Executive Branch—attributes not shared by other Executive officials,

even the President's closest advisors.  *See Kessler*, 100 F.3d at 1017 ("[F]or purposes of

separation of powers, the President stands in an entirely different position than other members of

the executive branch.").

　　For example, in *Fitzgerald*, the Supreme Court held that the President is immune from

civil damages liability arising from his official actions "[b]ecause of the singular importance of

the President's duties."  457 U.S. at 751; *see Harlow v. Fitzgerald* (*Harlow*), 457 U.S. 800, 811

n.17 (1982) ("[T]he recognition of absolute immunity for all of a President's acts in office

derives in principal part from factors unique to his constitutional responsibilities and station.").

In particular, the Court emphasized that the "diversion of his energies by concern with private

lawsuits would raise unique risks to the effective functioning of government."  *Fitzgerald*, 457

U.S. at 751.

　　It is precisely because "[t]his immunity … is based on the President's 'unique position in

the constitutional scheme'" that "it does not extend indiscriminately to the President's personal

aides."  *Forrester v. White*, 484 U.S. 219, 225 (1988) (quoting *Fitzgerald*, 457 U.S. at 749).  The

President employs dozens of close advisors, none of whom is indispensable to the functioning of

the Executive Branch in the same manner as the President.  Accordingly, requiring the

President's advisors to testify before Congress would not have similar ramifications for "the

effective functioning of government."  *Fitzgerald*, 457 U.S. at 751.

---

[21] Although McGahn asserts that the Committee "does not dispute" the proposition that the President is immune from testimonial compulsion, Def.'s Opp'n at 50, the Committee has made no such concession.  Rather, it is merely assuming *arguendo* that the President is entitled to the immunity McGahn claims. *See* Pl.'s Mot. at 29 ("to dispense with this argument this Court need not address the scope of the President's theoretical immunity").

For these reasons, the Supreme Court rejected a categorical extension to Presidential advisors of the President's immunity from civil damages suits. *Harlow*, 457 U.S. at 811 n.17 ("Suits against other officials—including Presidential aides—generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself."). In doing so, the *Harlow* Court rejected the very argument that McGahn makes in this case, *see* Def.'s Opp'n at 55, 58-60, that *Gravel v. United States*, 408 U.S. 606 (1972), "dictates the conclusion that the President's immediate advisors must share in his absolute immunity from compelled congressional testimony," Def.'s Opp'n at 55.

McGahn concedes that *Harlow* forecloses blanket immunity for Presidential aides. *Id*. at 59. He nonetheless points to language suggesting that immunity from civil damages suits could apply to an exceedingly narrow category of "aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy" when necessary "to protect the unhesitating performance of functions vital to the national interest." *Id.* at 60 (quoting *Harlow*, 457 U.S. at 812). But the Committee does not seek to question McGahn on such topics, and he was not performing sensitive national security or foreign affairs functions when he was witnessing the President's attempts to obstruct the Russia investigation. As further explained below, McGahn does not fall within the limited possible exception the Court left open in *Harlow*.

**i.** As an initial matter, no court has extended Presidential immunity to such aides even in the civil damages context. And no court has even suggested that such immunity applies in the context of compelled testimony before Congress, particularly where, as here, Congress has weighty and constitutionally rooted interests in investigating Presidential misconduct and corruption. *See infra* Section III.B.2. Moreover, the scope of the Executive Branch's theory— that absolute immunity applies to all "White House advisors with whom the President

customarily meets on a regular or frequent basis," Def.'s Opp'n at 47—far exceeds the potential

exception described in *Harlow*. In just the past year, in addition to citing this theory to justify

immunity for McGahn, the Executive Branch has asserted that "absolute immunity" bars

Congress from obtaining testimony from a former staff secretary (Rob Porter); a former

communications director (Hope Hicks); a former deputy chief of staff (Rick Dearborn); and a

"senior counselor to the President" (Kellyanne Conway).[22] But *Harlow* made clear that absolute

immunity cannot be justified by the "mere fact of high station." 457 U.S. at 812. Indeed, the

Supreme Court in *Harlow* refused to extend immunity to a "Counselor to the President, a

position accorded Cabinet status," *id.* at 802 n.1, and a Deputy Assistant to the President who

"worked from an office immediately adjacent to the oval office," giving him "almost daily

contact with the President," *id.* at 804 & n.6.

McGahn likewise is not entitled to absolute immunity under *Harlow*. *See Miers*, 558 F.

Supp. 2d at 101 (rejecting similar argument to extend immunity to White House Counsel Harriet

Miers). In *Harlow*, the Supreme Court stated that for a Presidential advisor to share in the

President's immunity, he "first must show that the responsibilities of his office embraced a

function so sensitive as to require a total shield from liability," and "then must demonstrate that

he was discharging the protected function when performing the act for which" he is being

questioned. 457 U.S. at 813. Here, McGahn has asserted only that he provided "advice and

assistance directly to the President in connection with countless Presidential duties concerning

the appropriate use of Executive power, national security, foreign affairs, Presidential

---

[22] *See* Press Release, Comm. on the Judiciary, Nadler Statement on White House Obstruction of Dearborn, Porter & Lewandowski Testimony (Sept. 16, 2019), https://perma.cc/BV8E-KDKN; Letter from White House Counsel Pat A. Cipollone, to Chairman Cummings, House Comm. on Oversight and Reform (July 15, 2019), https://perma.cc/9QDG-66ST (asserting "absolute immunity" as to Conway); Letter from White House Counsel Pat A. Cipollone, to Chairman Nadler (June 18, 2019), https://perma.cc/N5YB-2D4G (same, with respect to Hicks).

appointments, and Legislative relations." Def.'s Opp'n at 60.  But merely advising the President

is insufficient under *Harlow* to support a claim of absolute immunity, and McGahn offers no

details about the functions he performed that would establish that they were more sensitive than

the functions at issue in *Harlow*.  *Cf.* 457 U.S. at 812 ("The burden of justifying absolute

immunity rests on the official asserting the claim.").

    **ii.**  Even if McGahn's job description were sufficient to satisfy *Harlow*'s first prong, the

Committee does not wish to question McGahn on issues related to his advice on sensitive issues

such as national security and foreign affairs.  Rather, the Committee wishes to question McGahn

because, according to the Mueller Report,[23] he was a percipient witness to several attempts by

the President to thwart the Russia investigation and conceal his obstructive conduct from the

public, and because the President publicly has sought to cast doubt on McGahn's credibility.  *See*

Pl.'s Mot. at 5-10, 14-16.  McGahn has not argued that he was performing sensitive national

security or foreign policy functions when he was witnessing or participating in those events, and

for good reason—he was not.  Accordingly, extending absolute immunity to McGahn in this case

is not "justified to protect the unhesitating performance of functions vital to the national

interest."  *Harlow*, 457 U.S. at 812.  To the contrary, the House's constitutional impeachment

function requires that the Committee have access to all relevant information, whether inculpatory

or exculpatory, related to potential misconduct by the President.  *See id.* at 808 (an official

claiming immunity "must bear the burden of showing that public policy requires an exemption"

(quoting *Butz v. Economou*, 438 U.S. 478, 506 (1978))).

---

[23] *See* Robert S. Mueller III, *Report on the Investigation Into Russian Interference In The 2016 Presidential Election* (Mar. 2019), https://perma.cc/DN3N-9UW8 (*Report*).

> b. *Compelled Testimony from Presidential Advisors Does Not Impermissibly Encroach on Executive Branch Prerogatives*

McGahn erroneously asserts that compelling Presidential advisors to testify before Congress impermissibly "encroaches" on Executive authority. *See* Def.'s Opp'n at 49, 52, 55, 64. This argument is contrary to the Supreme Court's recognition that "our constitutional system imposes upon the Branches a degree of overlapping responsibility." *Mistretta v. United States*, 488 U.S. 361, 381 (1989) (quoting *Buckley*, 424 U.S. at 121); *see Nixon v. GSA*, 433 U.S. at 443 (rejecting the "archaic view of the separation of powers as requiring three airtight departments of government" (quotation marks omitted)). Only when one branch "impair[s] another in the performance of its constitutional duties" or "intrudes upon the central prerogatives of another" will its conduct rise to the level of an impermissible encroachment. *Loving v. United States*, 517 U.S. 748, 757 (1996); *see Clinton v. Jones*, 520 U.S. 681, 701 (1997). The Committee's mere request for information from McGahn does neither.

**i.** McGahn first asserts that Congressional questioning would interfere with the President's "ability to discharge his duties with the advice and assistance of his closest advisers." Def.'s Opp'n at 52. To the extent the McGahn is claiming that pulling Presidential advisors away from their duties to testify before Congress would disrupt the President's ability to perform his Article II functions, those concerns are not present in the case of *former* advisors like McGahn, who resigned from the White House a year ago. The President no longer relies on McGahn's counsel, and testifying before Congress will not take McGahn away from the business of advising the President or otherwise impede his ability to facilitate Executive Branch functions, as he no longer has any.

**ii.** McGahn next claims that compelling a Presidential advisor's testimony would allow Congress to "exert undue influence over the President's decision-making" by "demanding that

his advisors justify or explain Executive actions or decisions." Def.'s Opp'n at 52.  Congress's

ability to question White House advisors—subject to assertions of qualified executive privilege,

where appropriate—would not impair the Executive Branch in the performance of its assigned

constitutional functions.  *See Loving*, 517 U.S. at 757.  Executive Branch officials frequently

testify before Congress in routine oversight matters and often are called upon to explain or

justify Executive Branch actions without harm to the Executive's institutional interests.[24]  Far

from an encroachment on the Executive, such transparency is a display of the "autonomy but

reciprocity" among the branches that the Constitution envisions.  *Mistretta*, 488 U.S. at 381

(quoting *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring)).

The Executive Branch's interests in withholding testimony are particularly diminished

here, where the Committee seeks to question McGahn about Presidential abuse of power or

"'corrupt' official action"—conduct that may constitute impeachable offenses.  *Report*, Vol. II at

174 (discussing *Nixon v. GSA* and related cases and concluding that a "preclusion of 'corrupt'

official action is not a major intrusion on Article II powers").  Although the Constitution grants

the President a wide range of Executive authority, it does not grant him the power to abuse that

authority or carry out Executive functions in a corrupt fashion.  Furthermore, if such conduct

occurred, the Committee's exposure of it protects, rather than violates, constitutional principles.

McGahn cannot explain how Congress's ability to question him about Presidential misconduct,

---

[24] McGahn attempts to distinguish between Cabinet-level officials and White House advisors on the ground that the heads of Executive departments are responsible for enforcing Congress's federal laws and "may rightly be called to account to Congress for the performance of their actions."  Def.'s Opp'n at 61 n.14.  But many Cabinet members over the years, such as Alexander Hamilton, William H. Seward, and Robert F. Kennedy, served as extremely close advisors to Presidents.  Indeed, Henry Kissinger served as Secretary of State and National Security Advisor simultaneously during the Nixon Administration.  Dep't of State, *Biographies of the Secretaries of State: Henry A. (Heinz Alfred) Kissinger (1923-)*, https://perma.cc/AG8N-F4KV.  At any rate, the harm claimed here by McGahn is that Congress could "exert undue influence" by requiring explanation or justification of "Executive actions or decisions."  Def.'s Opp'n at 52.  McGahn does not explain why requiring Presidential advisors to testify regarding such matters would harm Executive interests more than similar testimony from Cabinet members.

including potential obstruction of justice, would have an impermissibly coercive effect on the President's performance of his legitimate Article II functions.

**iii.**   In addition, McGahn claims that a Presidential advisor's appearance before Congress would injure the Executive Branch because it would "promote a perception of Presidential subordination to Congress."  Def.'s Opp'n at 53.  But the exercise of Congress's constitutional impeachment and oversight functions does not render the Executive subordinate to Congress; it instead reflects the checks and balances intended by the Framers in adopting a system of separated powers.  *See Jones*, 520 U.S. at 703 ("As Madison explained, separation of powers does not mean that the branch 'ought to have no *partial agency* in, or no *controul* over the acts of each other.'"  (quoting The Federalist No. 47, at 325-26 (J. Cooke ed., 1961)); *Nixon*, 418 U.S. at 707 ("In designing the structure of our Government and dividing and allocating the sovereign power among three coequal branches, the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence.").  Indeed, McGahn's contention is no more true in this context than it was in *Nixon*, in which an Article III court compelled the Executive Branch to disclose information necessary to aid in its Article III functions.  418 U.S. at 714.  Such compulsion of necessary information from a separate Branch did not create a perception of subordination, but rather reflected the proper operation of the three Branches.  *See Mistretta*, 488 U.S. at 381 ("Madison recognized that our constitutional system imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence the absence of which 'would preclude the establishment of a Nation capable of governing itself effectively.'"  (quoting *Buckley*, 424 U.S. at 121)).

McGahn's claim is especially mistaken in the context of an impeachment.  As noted above, the Constitution assigns "the sole Power of Impeachment" to the House, U.S. Const., Art. I, § 2, cl. 5, and "the sole Power to try all Impeachments" to the Senate, *id.*, Art. I, § 3, cl. 6; *see also id.*, Art. II, § 4 ("The President … shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.").  Moreover, to the extent that a perception of subordination can have separation-of-powers implications, the President's order that McGahn ignore the Committee's subpoena creates an even more harmful perception:  that the President is above the law and that Congress's acquisition of facts from former White House advisors can be thwarted by the President's own direction.[25]

**iv.**  Finally, McGahn asserts that "compulsory testimonial process" could be used "to harass or retaliate against the President's immediate advisors in an effort to improperly influence or interfere with Presidential decision-making."  Def.'s Opp'n at 64.  Crucially, McGahn does not allege that the subpoena issued to him is intended to harass or retaliate, only that it is a hypothetical danger absent immunity.  Here, the Committee is conducting a time-sensitive impeachment inquiry into the President's behavior, and it seeks crucial testimony from McGahn—*the* key witness, as the Mueller Report made clear—in furtherance of its investigation.  McGahn's hypothetical concern that such harassment could occur in some future case does not support a sweeping recognition of absolute immunity from all subpoenas.  As the Supreme Court

---

[25] In the debate over whether to include an impeachment power in the Constitution, proponents argued that a remedy was needed for, among other things, a President "who has practised corruption & by that means procured his appointment in the first instance," 2 *Records of the Federal Convention of 1787* (*Farrand's Records*) at 65 (Max Farrand, ed., 1911) (July 20, 1787) (George Mason); "defending the Community agst the … perfidy of the" President, *id.* (James Madison); a President who "betray[s] his trust to foreign powers," *id.* at 66; a President who "abus[es] his power … particularly in time of war when the military force, and in some respects the public money will be in his hands," *id.* at 67 (Edmund Randolph); and a President who "may be bribed by a greater interest to betray his trust," *id.* at 68 (Gouverneur Morris).

has made clear, "every reasonable indulgence of legality must be accorded to the actions of a coordinate branch of our government." *Watkins*, 354 U.S. at 204.

### c. The Availability of Qualified Executive Privilege Sufficiently Protects Executive Branch Confidentiality Interests

McGahn's remaining arguments reduce to generalized concerns about confidentiality, which the Supreme Court has long held are properly addressed through the case-by-case assertion of a qualified privilege rather than an absolute immunity from process. *Nixon*, 418 U.S. 683; *see Miers*, 558 F. Supp. 2d at 103 ("[A] claim of absolute immunity from compulsory process cannot be erected by the Executive as a surrogate for the claim of absolute executive privilege already firmly rejected by the courts.").[26]

McGahn repeatedly claims that absolute immunity is necessary to protect "the President's constitutionally protected interests in confidentiality" and his ability to "obtain sound and candid advice." Def.'s Opp'n at 64, 53; *see id.* at 47, 48-54, 57-58, 62-64. As the Committee explained in its opening brief, however, *see* Pl.'s Mot. at 29-33, the Supreme Court in *Nixon* made clear that when the ground asserted for privilege over information "is based only on the generalized interest in confidentiality, it … must yield to the demonstrated, specific need for evidence," 418 U.S. at 713; *see Sirica*, 487 F.2d at 715 (The President's interest in confidentiality "is an argument for recognizing Executive privilege … , not for making the Executive the judge of its own privilege.").

There is no merit to McGahn's contention that *Nixon* applies only to requests for documents (or, in that case, tape recordings) and not witness testimony. Def.'s Opp'n at 62. In

---

[26] *See also Senate Select Comm.*, 498 F.2d at 731 (no absolute privilege in response to Congressional subpoena); *Nixon v. Sirica*, 487 F.2d 700, 715 (D.C. Cir. 1973) (no absolute privilege in response to grand jury subpoena); *Dellums v. Powell*, 561 F.2d 242, 244, 245-49 (D.C. Cir. 1977) (no absolute privilege in civil litigation); *Sun Oil Co. v. United States*, 514 F.2d 1020, 1024 (Ct. Cl. 1975) (same).

rejecting the President's absolute privilege theory in favor of a qualified privilege, the Supreme

Court considered at length the very interests that the Executive Branch now claims can be

protected only through absolute immunity.  *See Nixon*, 418 U.S. at 711 (qualified, rather than

absolute, privilege satisfies "a President's generalized interest in confidentiality"); *id.* at 708

(qualified, rather than absolute, privilege is sufficient to protect "the public interest in candid,

objective, and even blunt or harsh opinions in Presidential decisionmaking").  If disclosure of the

material at issue in *Nixon*—tape recordings of the President's candid Oval Office conversations

with his closest advisors—did not unduly threaten the President's interest in confidentiality, then

no greater threat is posed by disclosure of a Presidential advisor's after-the-fact description of

such conversations.  Here, just as in *Nixon*, "neither the doctrine of separation of powers, nor the

need for confidentiality of high-level communications, without more, can sustain an absolute,

unqualified privilege of immunity from judicial process under all circumstances."  *Id.* at 706.

Nonetheless, McGahn argues that executive privilege is insufficient to protect Executive

confidentiality interests because a Presidential advisor, under questioning from Congress, "might

inadvertently reveal sensitive information."  Def.'s Opp'n at 64.  This concern is misguided.  The

White House may work with the Committee to reach accommodations necessary to safeguard

privileged or classified information.  Indeed, officials such as the directors of National

Intelligence, the Central Intelligence Agency, the National Security Agency, and the FBI

regularly testify in open sessions of Congress without divulging the Nation's most sensitive

secrets, despite testifying on the very topics that those secrets encompass.

> **d.  *Presidential Advisors Have Testified Before Congress Throughout History Without the Consequences the Executive Suggests***

Although McGahn describes the "testimonial immunity of the President's immediate

advisors" as an "unbroken tradition," Def.'s Opp'n at 48, history shows the opposite.  Contrary

to McGahn's account, three sitting Presidents and scores of top White House advisors have testified before Congress.

Presidents Abraham Lincoln, Woodrow Wilson, and Gerald Ford all testified before Congress while in office.[27]  President Ford testified before the House to explain his personal decision-making process regarding his exercise of the pardon power, an authority assigned solely to the President in Article II of the Constitution.  *Pardon of Richard M. Nixon, and Related Matters: Hearing Before the Subcomm. on Criminal Justice of the H. Comm. on the Judiciary*, 93d Cong. 90 (1974) (statement of President Ford); *see* U.S. Const., Art. II, § 2, cl. 1.

Many close Presidential advisors, including sitting and former White House Counsels, have testified before Congress in the past, particularly when Presidential misconduct was at issue.  For example, in 1973 and 1974, former White House Counsel Chuck Colson testified before Congress multiple times regarding Watergate.[28]  In 1980, then-White House Counsel Lloyd Cutler testified before the Senate to address alleged influence-peddling on behalf of Libya by President Carter's brother.[29]  In 1994, Cutler again appeared before Congress to discuss issues related to Whitewater.[30]  In 1995, former White House Counsel Bernard Nussbaum also appeared before the Senate to discuss Whitewater.[31]  In 1997, then-White House Counsel

---

[27] *See* U.S. Senate, *Sitting Presidents & Vice Presidents Who Have Testified Before Congressional Committees*, https://perma.cc/J2HH-X5WG.

[28] U.S. Congress, House Committee on Armed Services, *Inquiry into the Alleged Involvement of the Central Intelligence Agency in the Watergate and Ellsberg Matters*, hearings, 94th Cong., 1st sess. (Washington: GPO, 1975), pp. 586ff, 1053ff.

[29] U.S. Congress, Senate Committee on the Judiciary, *Inquiry into the Matter of Billy Carter and Libya*, hearings, 96th Cong., 2nd sess. (Washington: GPO, 1981), p. 1195ff; U.S. Congress, Senate Committee on the Judiciary, *Nomination of Robert H. Bork to be Associate Justice of the Supreme Court of the U.S.*, hearings, 100th Cong., 1st sess. (Washington: GPO, 1987), p. 2158ff.

[30] U.S. Congress, House Committee on Banking, Finance, and Urban Affairs, *White House Contacts with Treasury/RTC Officials About "Whitewater"-Related Matters*, part 1, hearings, 103rd Cong., 2nd sess. (Washington: GPO, 1994), p. 12ff.

[31] U.S. Congress, Senate Special Committee to Investigate the Whitewater Development Corporation and Related Matters, *Investigation of Whitewater Development Corporation and Related Matters, Vol. II.*, hearings, 104th Cong., 1st sess. (Washington: GPO, 1997), pp. 1201ff., 1326ff.

Charles Ruff testified before the House about White House compliance with Congressional subpoenas related to allegations of campaign-finance violations.[32]  In 2001, former White House Counsel Jack Quinn testified before the House about President Clinton's pardon of Marc Rich.[33]

In addition, many Presidential advisors, including White House Counsels and national security officials, have testified under compulsion.  *See Miers*, 558 F. Supp. 2d at 102 ("[S]enior advisors to the President have often testified before Congress subject to various subpoenas dating back to 1973.").  During Watergate, former White House Counsel John Dean, former Chief of Staff H.R. Haldeman, and former Chief Advisor to the President for Domestic Affairs John Ehrlichman testified before Congress under subpoena.[34]  In 1987, former National Security Advisor Oliver North and former Assistant to the President for National Security Affairs John Poindexter testified under subpoena about Iran-Contra.[35]  And in 2001, former White House Counsel Beth Nolan and former Chief of Staff John Podesta appeared before Congress pursuant to a subpoena to testify about President Clinton's pardon of Marc Rich.[36]

As this non-exhaustive list of examples shows, there is a well-established history of Presidential advisors, including White House Counsels, testifying before Congress without in any way imperiling the President's ability to fulfill his Article II functions.  *Cf. NLRB v. Noel*

---

[32] U.S. Congress, House Committee on Government Reform and Oversight, *White House Compliance with Committee Subpoenas*, hearings, 105th Cong., 1st sess. (Washington: GPO, 1998), p. 219ff.

[33] U.S. Congress, House Committee on Government Reform, *Controversial Pardon of International Fugitive Marc Rich,* hearings, 107th Congress, 1st sess. (Washington: GPO, 2001), p. 309ff.

[34] U.S. Congress, House Committee on Armed Services, *Inquiry into the Alleged Involvement of the Central Intelligence Agency in the Watergate and Ellsberg Matters,* hearings, 94th Congress, 1st sess. (Washington: GPO, 1975), p. 867ff; U.S. Congress, Senate Select Committee on Presidential Campaign Activities, *Presidential Campaign Activities of 1972,* hearings, 93rd Cong., 1st sess. (Washington: GPO, 1973), pp. 75ff, 911ff.

[35] U.S. Congress, Senate Select Committee on Secret Military Assistance to Iran and the Nicaraguan Opposition and the House Select Committee to Investigate Covert Arms Transactions with Iran*, Iran-Contra Investigation: Joint Hearings Before the House Select Committee to Investigate Covert Arms Transactions with Iran and the Senate Select Committee on Secret Military Assistance to Iran and the Nicaraguan Oppositions*, 100th Cong., 1st sess. (Washington: GPO, 1987), p. 1ff.

[36] U.S. Congress, House Committee on Government Reform, *Controversial Pardon of International Fugitive Marc Rich,* hearings, 107th Cong., 1st sess. (Washington: GPO, 2001), p. 309ff.

*Canning*, 573 U.S. 513, 524 (2014) (looking to history to inform consideration of separation of powers claim); *Mazars*, 2019 WL 5089748, at *16 (same, noting that "a court would be foolish to ignore th[e] branches' prior pattern of conflict" or "cooperation" in deciding a separation of powers claim).  Although the Executive Branch attempts to downplay the significance of advisors' voluntary appearances, the frequency with which senior White House advisors have testified before Congress illustrates that, notwithstanding the Executive Branch's assertions about absolute immunity, its practice has often been not to stand in the way of these advisors' testimony, particularly during significant Congressional investigations of Presidential misconduct.  Moreover, many of the same purported risks that the Executive Branch claims undergird its absolute immunity theory—such as the purported appearance of subservience, being asked to explain Executive decisions, and threats to confidentiality—are equally present when the testimony is voluntary.  And, contrary to McGahn's suggestion, *see* Def.'s Opp'n at 47-48, the fact that none of these examples involved a *judicially enforced* Congressional subpoena simply means that, traditionally, any disputes have been settled through the accommodations process and have frequently resulted in the provision of testimony from senior Presidential advisors—all apparently without any ill effects.

### 2.  The Committee's Interests in Faithfully Performing Its Constitutional Functions Far Outweigh the Executive Branch's Interests in Absolute Immunity

In contrast to the minimal effect on Executive Branch interests, absolute immunity from compelled Congressional testimony for Presidential advisors would substantially impair the House's ability to carry out its core Article I functions—including its impeachment inquiry into the President, as well as its consideration of related remedial legislation and its conduct of relevant oversight.  *See* Pl.'s Mot. at 34-36.  Accordingly, the Executive's absolute immunity theory cannot stand.

McGahn suggests that, if the Executive's absolute immunity theory is invalid, then he would be entitled to receive qualified testimonial immunity, which would require the Court to weigh the Committee's need for McGahn's testimony against the Executive's need for confidentiality before he could be ordered to testify.  Def.'s Opp'n at 68 n.18.  But that assertion is incorrect:  because the Executive's absolute immunity theory is invalid, McGahn is required to appear before the Committee immediately and accommodate the Executive's confidentiality interests by asserting qualified executive privilege on a question-by-question basis under *Nixon*, 418 U.S. 683, as in any other proceeding.

### a. Absolute Immunity Would Impermissibly Impair the House's Ability to Perform Core Article I Functions

As in *Nixon*, the Executive Branch's claim of absolute immunity "would upset the constitutional balance of 'a workable government' and gravely impair the" functions of a coequal branch of government.  418 U.S. at 707.  In *Nixon*, the Supreme Court rejected the Executive's assertion of absolute privilege over Presidential communications because "[t]he impediment that an absolute, unqualified privilege would place in the way of the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions would plainly conflict with the function of the courts under Art. III."  *Id.*  As the Court explained, withholding crucial evidence would impermissibly impair the Judicial Branch's truth-seeking function, leading to "a partial or speculative presentation of the facts" and threatening "[t]he very integrity of the judicial system and public confidence in the system."  *Id.* at 709.

The Court's reasoning applies equally to the constitutional process for considering impeachment.  Although the Executive Branch dismisses the Committee's subpoena as a mere "civil discovery request," Def.'s Opp'n at 63, that characterization is inaccurate.  In fact, the Committee's subpoena seeks information crucial to "a matter of the most critical moment to the

Nation, an impeachment investigation involving the President of the United States." *In re Report & Recommendation of June 5, 1972 Grand Jury*, 370 F. Supp. 1219, 1230 (D.D.C. 1974). For purposes of separation-of-powers analysis, the House's impeachment function is at least comparable to a criminal proceeding.[37] In exercising its "sole Power of Impeachment," U.S. Const., Art. I, § 2, cl. 5, the House must gather necessary information, determine whether impeachment is warranted, and draft and vote on specific articles of impeachment, *see Jefferson's Manual*, §§ 605-606, H. Doc. No. 115-177, at 324-25. Historically, once the House has adopted articles of impeachment, it has been entrusted with appointing members to serve as impeachment managers during the Senate trial, presenting evidence relevant to the Senate's consideration of whether removal is warranted.[38] Accordingly, similar to a federal court's need for information to carry out its exclusive Article III functions, the House's access to all of the relevant facts during its impeachment inquiry must be paramount to any generalized confidentiality interest. *See Nixon*, 418 U.S. at 711; *Sirica*, 487 F.2d at 715 (D.C. Cir. 1973) (rejecting absolute privilege claim in response to grand jury subpoena); *In re Report & Recommendation*, 370 F. Supp. at 1230 (in the impeachment context, "[i]t would be difficult to

---

[37] *See* 4 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* (*Elliot's Debates*) 44 (John Elliot ed., 1881) (The Impeachment Clause "empowers the House of Representatives, which is the grand inquest of the Union at large, to bring great offenders to justice." (Archibald Maclaine)); 4 *Elliot's Debates* 113 (James Iredell) (The impeachment "power is lodged in those who represent the great body of the people, because the occasion for its exercise will arise from acts of great injury to the community, and the objects of it may be such as cannot be easily reached by an ordinary tribunal." (James Iredell)); *see also* Charles L. Black, *Impeachment: A Handbook* 5-6 (1998) (The Constitution's two-stage impeachment and removal procedure is "analogous, obviously, to the two stages in traditional English and American criminal law—'indictment' (or charge) by the grand jury, and 'trial' by another jury.").

[38] *See* 3 *Farrand's* Records 162 ("With regard to impeachments, the Senate can try none but such as will be brought before them by the [H]ouse of [R]epresentatives." (James Wilson)); *Jefferson's Manual* §§ 607-609, H. Doc. No. 115-177, at 325-29 (role of House impeachment managers); *Riddick's Senate Procedure: Precedents and Practices* 865 (1992), https://perma.cc/474G-N28M ("Once the House of Representatives has voted to impeach an officer of the Government … the Senate is informed that managers on the part of the House of Representatives have been named 'to conduct the impeachment against' such official and that the managers are directed to carry to the Senate the articles agreed upon by the House.").

conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on all the pertinent information").

The need to preserve the integrity of the constitutional process for considering impeachment is particularly acute given that the Executive Branch has opined that a sitting President cannot be criminally prosecuted, making Congress the last line of defense against Presidential misconduct. *See A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 257 (2000). If the President could deprive the Committee of information required for its impeachment inquiry into his own misconduct, the President could potentially thwart his accountability for that conduct. *See Report*, Vol. II, at 176 ("Congress clearly has authority to protect its own … functions against corrupt efforts designed to impede legitimate fact-gathering and lawmaking efforts." (citing *Watkins*, 354 U.S. at 187; *Chapman v. United States*, 5 App. D.C. 122, 130 (1895)).

A President with the power to obstruct his own impeachment through capacious grants of absolute immunity would be a President who is above the law. Quoting the Supreme Court in *Fitzgerald*, McGahn dismisses this characterization as "rhetorically chilling but wholly unjustified." Def.'s Opp'n at 65 (quoting 457 U.S. at 758 n.41). But the *Fitzgerald* Court dismissed the contention that immunizing the President from civil liability placed him "above the law" precisely *because* "[t]he remedy of impeachment demonstrates that the President remains accountable under law for his misdeeds in office." 457 U.S. at 758 n.41; *see also A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. at 257 (it is "the constitutionally specified impeachment process" that "ensures that [this] immunity would not place the President 'above the law'"). Maintaining the integrity of, and public confidence in, the primary method of holding the President accountable for misconduct while in office is the

precise situation in which the Executive's "generalized interest in confidentiality … must yield to" the competing interests of a coequal branch. *Nixon*, 418 U.S. at 713.

In addition, Article I vests Congress with "[a]ll legislative Powers," U.S. Const., Art. I, § 1, cl. 1, and its authority to investigate and conduct oversight extends to any "subject … on which legislation could be had," *McGrain*, 273 U.S. at 177; *see Mazars*, 2019 WL 5089748, at *14. The House requires access to relevant information to carry out these functions as well—so much so that the Supreme Court has recognized that "some means of compulsion are essential [for Houses of Congress] to obtain what is needed." *McGrain*, 273 U.S. at 175. But the Executive Branch's absolute immunity theory impairs the House's ability to carry out these core functions too. *See Miers*, 558 F. Supp. 2d at 103 (absolute immunity "would eviscerate Congress's historical oversight function").

> b.  *The Executive Branch's Assertion of Absolute Immunity Is Impairing the Committee's Ability to Perform Its Article I Functions in This Case*

As the Committee summarized above and detailed at length in its opening brief, McGahn's refusal to testify on absolute immunity grounds is impairing its impeachment investigation and its consideration of legislation and performance of oversight. *See* Pl.'s Mot. at 5-10, 14-16. McGahn is the Committee's most critical fact witness to President Trump's efforts to impede the Special Counsel's investigation and then cover up his misconduct. Among other things, according to the Mueller Report, McGahn witnessed the events leading up to President Trump's firing of National Security Advisor Michael Flynn; President Trump's efforts to shut down the FBI's Russia investigation and his termination of FBI Director James Comey; President Trump's attempts to pressure Attorney General Jeff Sessions not to recuse himself from the Russia investigation despite a conflict of interest, and then later attempts to reverse Sessions's recusal; President Trump's directions to McGahn to fire Special Counsel Mueller; and

President Trump's subsequent efforts to get McGahn to create a false record denying that the President had directed him to remove the Special Counsel.  *See id.* at 5-10.

The Committee has a compelling interest in hearing McGahn's firsthand explanation of these serious incidents and obtaining a more thorough account of the President's efforts to subvert the Russia investigation.  The Committee also wishes to question McGahn about, among other things, the President's demeanor, state of mind, and knowledge of wrongdoing during their interactions.  McGahn's testimony on these topics will help the Committee determine all of the relevant facts, present a full picture of what happened, and decide whether to recommend articles of impeachment.  The Committee is also considering appropriate remedial legislation and conducting related oversight, and its performance of both of these functions requires McGahn's testimony as well.

Obtaining McGahn's testimony is especially important because the President has publicly and repeatedly accused McGahn of lying to the Special Counsel, even while blocking his testimony before the Committee.  *See id.* at 15-16.  Although the Executive Branch contends that "any such dispute would remain whether McGahn testifies or not," Def.'s Opp'n at 68, courts have long recognized that credibility assessments are best made through live testimony and cross-examination—"the greatest legal engine ever invented for the discovery of truth," *California v. Green*, 399 U.S. 149, 158 (1970) (quotation marks omitted); *see, e.g.*, *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962) ("It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised.  Trial by affidavit is no substitute for trial by jury … .").

McGahn erroneously asserts that the Committee already has access to sufficient evidence to carry out its Article I functions without his testimony.  Def.'s Opp'n at 65-68.  However, as

described above, McGahn drastically overstates what the Executive Branch has already provided to the Committee.  Although the Committee has a redacted version of the Mueller Report, the Committee requires the underlying evidence and factual information—including live testimony from the central witness to potential obstruction identified in the Report—to conduct its own independent investigation and reach its own conclusions.  Beyond that, as already noted, the Executive Branch has disclosed only a fraction of the FBI-302 reports documenting interviews with critical witnesses that the Committee has requested, and, in particular, has not turned over any of the five reports documenting interviews with McGahn.  *See supra* p. 39.  In addition, despite the accommodation reached by the parties, at the time of this filing the Executive Branch has yet to disclose the documents that the Committee sought in its subpoena to McGahn.  *See* Pl.'s Mot. at 17 n.12.  Regardless, none of that evidence (even if the Committee had it) is a substitute for McGahn's actual testimony regarding the events he participated in and witnessed, especially given the President's attack on McGahn's credibility.

McGahn also asserts that the Committee does not need his testimony because it had the opportunity to question former Assistant to the President Hope Hicks and former Deputy White House Counsel Annie Donaldson Talley.  Yet, as already stated, it is McGahn, and not Hicks or Talley, who is the Committee's primary witness.  Neither Hicks nor Talley was involved in or witnessed all of the incidents about which the Committee wishes to question McGahn.  Moreover, those witnesses yielded very little useful information given the lengths to which the Executive Branch went to prevent them from answering the Committee's questions.  During the Committee's interview of Hicks, three Executive Branch lawyers asserted Ms. Hicks's "absolute immunity" a total of 155 times.  She was prevented from answering any questions about her service in the Administration—even on matters as basic as the location of her office.  *See* Compl.

(Aug. 7, 2019), Ex. EE, ECF No. 1-31.  An accommodation was reached to give Donaldson

written questions, but she was instructed by the White House Counsel not to answer more than

200 of those questions because the answers would purportedly "implicate constitutionally-based

Executive Branch confidentiality interests."  Compl., Ex. FF, ECF No. 1-32.

> ### c.  The Use of "Political Tools" Will Not Aid the Judiciary Committee in Obtaining McGahn's Testimony

There is no merit to McGahn's claim that "Congress has ample political tools other than

compulsion via civil litigation to obtain the testimony of immediate Presidential aides."  Def.'s

Opp'n at 65.  The "political tools" that the Executive Branch suggests either are not feasible or

cannot be exercised by the House unilaterally (or at all)—and they are no substitute for the

House's ability to exercise its constitutionally assigned impeachment power.  McGahn's

suggestion that the House use the appropriations process to grind the government to a halt over a

subpoena dispute, Def.'s Opp'n at 69, is extraordinary and impractical, *see Miers*, 558 F. Supp.

2d at 93.  McGahn also suggests that withholding consent on Presidential nominations could be

used to coerce Executive Branch testimony, Def.'s Opp'n at 69, but because the advice-and-

consent power lies solely with the Senate, U.S. Const., Art. II, § 2, cl. 2, that tool is obviously

not available to the House.

The other "political tools" to which the Executive Branch points—legislation and the

accommodations process, Def.'s Opp'n at 65, 69—both depend on Executive Branch

cooperation to be effective.  As discussed above, the separation-of-powers doctrine neither

requires nor contemplates that the House rely on a coequal (and, here, adversarial) Branch of

government to exercise its Article I authority.  *Cf. Young*, 481 U.S. at 801 ("If the Judiciary were

completely dependent on the Executive Branch to redress direct affronts to its authority, it would

be powerless to protect itself if that Branch declined [to do so].").  At any rate, the Committee's

efforts at accommodations for McGahn's testimony have resulted in an impasse, and it is unrealistic to believe that the President would sign a bill mandating adverse consequences on the Executive Branch for withholding this same testimony.  Accordingly, far from facilitating the Committee's efforts to obtain McGahn's testimony, the Executive Branch's suggestions would inevitably lead to more stonewalling and delay.

## CONCLUSION

The Judiciary Committee respectfully requests that the Court grant its partial motion for summary judgment, deny McGahn's motion for summary judgment, declare that the Executive Branch's directive that McGahn not appear before the Committee is unlawful, and order McGahn to comply with the Committee's subpoena.

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (DC Bar No. 253492)
   *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
   *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854)
   *Associate General Counsel*
Josephine Morse (DC Bar No. 1531317)
   *Associate General Counsel*
Adam A. Grogg (DC Bar No. 1552438)
   *Assistant General Counsel*
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

Annie L. Owens (DC Bar No. 976604)
Joshua A. Geltzer (DC Bar No. 1018768)
Seth Wayne (DC Bar No. 888273455)
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
Georgetown University Law Center
600 New Jersey Avenue NW

Washington, D.C. 20001
Telephone: (202) 662-9042
ao700@georgetown.edu

*Counsel for Plaintiff, Committee on the Judiciary,*
*United States House of Representatives*

October 16, 2019