**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                            )
COMMITTEE ON THE JUDICIARY,                 )
   UNITED STATES HOUSE OF                    )
   REPRESENTATIVES,                          )
                                            )
                    *Plaintiff*,             )
                                            )        No.  19-cv-2379 (KBJ)
             v.                             )
                                            )
DONALD F. McGAHN, II,                       )
                                            )
                    *Defendant.*            )
_____)

**REPLY BRIEF IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Dated:  October 25, 2019

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

JAMES J. GILLIGAN
Special Litigation Counsel

STEVEN A. MYERS (NY Bar No. 4823043)
SERENA M. ORLOFF (CA Bar No. 260888)
ANDREW BERNIE (DC Bar No. 995376)
Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Tel:       (202) 514-3358
Fax:       (202) 616-8470
E-mail:    james.gilligan@usdoj.gov

*Counsel for Defendant*

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................iii

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 4

I.  THE COURT LACKS SUBJECT-MATTER JURISDICTION. ........................................ 4

    A.  The Court Lacks Jurisdiction under Article III.......................................................... 4

        1.  This dispute is not of the type traditionally thought
            capable of resolution through the judicial process....................................... 4

        2.  The Committee fails to state a cognizable injury........................................ 8

        3.  Lawsuits of this kind imperil the constitution's allocation
            of power among the branches of the federal government.......................... 11

        4.  Defendant's argument is consistent with D.C. Circuit precedent............. 13

    B.  The Court Lacks Statutory Subject Matter Jurisdiction........................................ 14

II.  THE COMMITTEE LACKS A CAUSE OF ACTION TO ENFORCE ITS
    SUBPOENA. ............................................................................................................. 20

    A.  The Committee Lacks an Implied Cause of Action Under the  Constitution. ...... 20

    B.  The Committee Cannot Invoke the Federal Courts' Traditional
        Equity Powers. .................................................................................................... 25

    C.  The Declaratory Judgment Act Does Not Provide a Cause of Action.................. 26

III.  THE ACCOMMODATION PROCESS IS NOT AT AN IMPASSE, AND THE
     COURT SHOULD STAY ITS HAND TO ALLOW THAT PROCESS
     TO PROCEED............................................................................................................ 27

IV.  THE COMMITTEE OFFERS NO PERSUASIVE ARGUMENT AGAINST
     DEFENDANT'S ASSERTION OF TESTIMONIAL IMMUNITY. ............................... 30

    A.  Testimonial Immunity Applies to Immediate Presidential Advisors To
        Protect the Autonomy and Effective Functioning of the Presidency Itself. ........ 32

    B.  Compelled Testimony by Immediate Presidential Advisors Would Threaten
        the Autonomy and Effective Functioning of the Presidency................................ 37

**PAGE**

C.     The Testimonial Immunity of the President's Immediate Advisors Does Not Impair the Performance of Congress's Article I Functions. .......................... 41

CONCLUSION ........................................................................................................................ 45

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Alexander v. Sandoval*,
532 U.S. 273 (2001).................................................................................. 20, 23, 27

*Anderson v. Dunn*,
19 U.S. (6 Wheat) 204 (1821)............................................................ 11, 21, 22, 23

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
135 S. Ct. 2652 (2015)......................................................................................... 8

*Armstrong v. Bush*,
924 F.2d 282 (D.C. Cir. 1991)............................................................................. 18

*Armstrong v. Exceptional Child Ctr., Inc.*,
135 S. Ct. 1378 (2015)......................................................................................... 26

*Barnes v. Kline*,
759 F.2d 21 (D.C. Cir. 1984)................................................................................ 8

*Blumenthal v. Drudge*,
186 F.R.D. 236 (D.D.C. 1999).............................................................................. 32

*Bond v. United States*,
564 U.S. 211 (2011).............................................................................................. 5

*Bowsher v. Synar*,
478 U.S. 714 (1986)............................................................................................. 9

*Buckley v. Valeo*,
424 U.S. 1 (1976)................................................................................................. 12

*C & E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*,
310 F.3d 197 (D.C. Cir. 2002)............................................................................. 27

*Campbell v. Clinton*,
203 F.3d 19 (D.C. Cir. 2000)........................................................................... 10, 11

*Carroll v. Safford*,
44 U.S. (3 How.) 441 (1845)............................................................................... 26

*Cheney v. U.S. Dist. Court for the Dist. of Columbia*,
542 U.S. 367 (2004)........................................................................................ 40, 41

PAGE(S)

*Chenoweth v. Clinton,*
181 F.3d 112 (D.C. Cir. 1999) ................................................................ 14

*Clinton v. City of New York,*
524 U.S. 417 (1998) ................................................................ 6

*Coleman v. Miller,*
307 U.S. 433 (1939) ................................................................ 10

*Committee on the Judiciary v. Miers,*
542 F.3d 909 (D.C. Cir. 2008) ................................................................ 3

*Committee on Judiciary, U.S. House of Representatives v. Miers,*
558 F. Supp. 2d 53 (D.D.C. 2008) ................................................ 24, 37, 43

*Conn. Nat'l Bank v. Germain,*
503 U.S. 249 (1992) ................................................................ 15

*Elgin v. Dep't of Treasury,*
567 U.S. 1 (2012) ................................................................ 18

*FEC v. Akins,*
524 U.S. 11 (1998) ................................................................ 9, 10

*Forrester v. White,*
484 U.S. 219 (1988) ................................................................ 33

*Gonzaga Univ. v. Doe,*
536 U.S. 274 (2002) ................................................................ 20

*Gravel v. United States,*
408 U.S. 606 (1972) ................................................................ 33, 41

*Grupo Mexicano de Desarrolo, S.A. v. All. Bond Fund., Inc.,*
527 U.S. 308 (1999) ................................................................ 25, 26

*\*Harlow v. Fitzgerald,*
457 U.S. 800 (1982) ................................................................ 33, 34, 35

*Howard v. Pritzker,*
775 F.3d 430 (D.C. Cir. 2015) ................................................................ 15

*In re Application of the U.S. Senate Permanent Subcomm. on Investigations,*
655 F.2d 1232 (D.C. Cir. 1981) ................................................................ 22

**PAGE(S)**

*In re Kessler,*
    101 F.3d 1015 (D.C. Cir. 1996) ........................................................................ 32

*In re Request for Access to Grand Jury Materials,*
    833 F.2d 1438 (11th. Cir. 1987) ....................................................................... 29

*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997) .................................................................... 36, 40

*In re Surface Min. Regulation Litig.,*
    627 F.2d 1346 (D.C. Cir. 1980) ........................................................................ 15

*INS v. Chadha,*
    462 U.S. 919 (1983) ............................................................................... 5, 8, 43

*Jesner v. Arab Bank, PLC,*
    138 S. Ct. 1386 (2018) ............................................................................. 23, 26

*Loving v. United States,*
    517 U.S. 748 (1996) ......................................................................................... 12

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) ............................................................................ 5

*Marshall v. Gordon,*
    243 U.S. 521 (1917) ................................................................................... 21, 22

*McGrain v. Daugherty,*
    273 U.S. 135 (1927) ......................................................................................... 9

*Mims v. Arrow Financial Services, LLC,*
    565 U.S. 368 (2012) ......................................................................................... 19

*Mistretta v. United States,*
    488 U.S. 361 (1989) ......................................................................................... 25

*Nat. Res. Def. Council, Inc. v. Hodel,*
    865 F.2d 288 (D.C. Cir. 1988) ......................................................................... 43

*Nixon v. Admin. of Gen. Servs.,*
    433 U.S. 425 (1977) ......................................................................................... 42

*\*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ........................................................................... 32, 36, 40

PAGE(S)

*Nixon v. Sirica*,
    487 F.2d 700 (1973) ............................................................................................... 43

*Printz v. United States*,
    521 U.S. 898 (1997) ................................................................................................. 7

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989) ................................................................................................. 9

*\*Raines v. Byrd*,
    521 U.S. 811 (1997) ........................................................................................ *passim*

*\*Reed v. Cty. Comm'rs of Del. Cty., Pa.*,
    277 U.S. 376 (1928) ................................................................................ 7, 12, 20, 21

*Senate Select Committee on Presidential Campaign Activities v. Nixon*,
    498 F.2d 725 (D.C. Cir. 1974) ........................................................................ 13, 36

*Skelly Oil Co. v. Phillips Petroleum Co.*,
    339 U.S. 667 (1950) ............................................................................................... 27

*Springer v. Gov't of Philippine Islands*,
    277 U.S. 189 (1928) ............................................................................................... 12

*Tafflin v. Levitt*,
    493 U.S. 455 (1990) ............................................................................................... 19

*Thunder Basin Coal v. Reich*,
    510 U.S. 200 (1994) ............................................................................................... 18

*Tobin v. United States*,
    306 F.2d 270 (D.C. Cir. 1962) ............................................................................. 24

*Trump v. Mazars USA, LLP*,
    No. 19-5142, 2019 WL 5089748 (D.C. Cir. Oct. 11, 2019) ............................. 13, 19

*U.S. Dep't of Commerce v. U.S. House of Reps.*,
    525 U.S. 316 (1999) ............................................................................................... 12

*U.S. House of Reps. v. Mnuchin*,
    379 F. Supp. 3d 8 (D.D.C. 2019) ................................................................... 11, 24

*United States v. AT&T*,
    567 F.2d 121 (D.C. Cir. 1977) ........................................................................ 27, 28

PAGE(S)

*United States v. AT& T, Inc.*,
    551 F.2d 384 (D.C. Cir 1976) ........................................................................... *passim*

*United States v. Chen*,
    99 F.3d 1495 (9th Cir. 1996) ................................................................................. 32

*United States v. Nixon*,
    418 U.S. 683 (1974) ............................................................................. 6, 39, 40, 42

*Verizon Maryland, Inc. v. Public Service Commission of Maryland*,
    535 U.S. 635 (2002) ................................................................................................ 19

*Virginia House of Delegates v. Bethune-Hill*,
    139 S. Ct. 1945 (2019) ........................................................................................ 9, 10

*Walker v. Cheney*,
    230 F. Supp. 2d 51 (D.D.C. 2002) ......................................................................... 14

*Walpin v. Corp. for Nat'l & Cmty. Serv.*,
    718 F. Supp. 2d 18 (D.D.C. 2010) .......................................................................... 27

*Watkins v. United States*,
    354 U.S. 178 (1957) .................................................................................................. 9

*Waxman v. Thompson*,
    2006 WL 8432224 (C.D. Cal. July 24, 2006) ..................................................... 9, 10

*Yates v. United States*,
    135 S. Ct. 1074 (2015) ............................................................................................ 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................................................ 12

*Ziglar v. Abbasi*,
    137 S. Ct.  (2017) ....................................................................................... 23, 24, 25

*Zivotofsky v. Clinton*,
    566 U.S. 189 (2012) .................................................................................................. 5

**PAGE(S)**

**STATUTES**

2 U.S.C. § 192 .................................................................................................. 17

18 U.S.C. § 1512 ............................................................................................... 16

18 U.S.C. § 1519 ............................................................................................... 16

28 U.S.C. § 1331 ......................................................................................... 15, 27

*28 U.S.C. § 1365 ...................................................................................... 2, 14, 15

28 U.S.C. § 1366 ............................................................................................... 18

28 U.S.C. § 2201 ............................................................................................... 26

Pub. L. No. 104-292, 110 Stat. 3459 (Oct. 11, 1996) .................................... 16

**OTHER LEGISLATIVE MATERIALS**

H.R. Rep. No. 95-1756 ................................................................................ 14, 18

H.R. Rep. No. 100-433 ...................................................................................... 37

S. Rep. No. 95-170............................................................................................ 17

**OTHER AUTHORITIES**

*Cong. Requests for Information Regarding Decisions Made Under the Indep.
    Counsel Act*, 10 U.S. Op. O.L.C. 68, 83, 86, 88 (1986) .......................... 14

*Controversial Pardon of International Fugitive Marc Rich:  Hearing Before the Comm.
    on Gov. Reform,* 107th Cong. 309 (2001)................................................ 38

Curtis A. Bradley & Trevor W. Morrison, *Historical Gloss and the Separation of Powers*,
    126 Harv. L. Rev. 411 (2012) .................................................................. 25

*Immunity of the Assistant to the President and Dir. of the Office of Political Strategy
    & Outreach from Cong. Subpoena,* 38 Op. O.L.C.        ,
    Slip. Op. at 1-2 (July 15, 2014)........................................................ 36, 37, 39

Letter from the Justices to George Washington (Aug. 8, 1793), *reprinted in
    Hart & Wechsler's The Federal Courts and the Federal System* 79
    (Richard H. Fallon et al. eds., 5th ed. 2003) ............................................ 6

**PAGE(S)**

*Prosecution for Contempt of Cong. of an Exec. Branch Official Who Has
    Asserted a Claim of  Exec. Privilege*, 8 U.S. Op. O.L.C. 101 (1984)...................................... 14

*Testimonial Immunity Before Cong. of the Former Counsel to the President*,
    43 Op. O.L.C. ___, Slip. Op. (May 20, 2019) .................................................................. *passim*

## **INTRODUCTION**

Plaintiff Committee on the Judiciary ("Committee") asks this Court to play umpire in an inter-branch dispute over a House Committee's authority to compel testimony from a former Counsel to the President.  The Committee brings that request pursuant to its view that components of Congress are entitled to invoke the jurisdiction of Article III courts to compel the disclosure of information from any source within the Executive Branch, including, as here, the President's immediate advisors.  The Committee's claimed authority to accomplish through litigation what it is unable or unwilling to accomplish through the political process contravenes more than 200 years of constitutional tradition, and is deeply inconsistent with the Constitution's allocation of powers among all three branches.  Entertaining such efforts would plunge the courts into the middle of the most heated political battles of any given moment, and would scramble the separation of powers— to the detriment of all three branches, but to the especial detriment of our apolitical judiciary.  That is "obviously not the regime that has obtained under our Constitution to date," *Raines v. Byrd*, 521 U.S. 811, 828 (1997), and the Court should decline to erect it now.

*First*, this inter-branch dispute lies far afield of the Court's subject-matter jurisdiction.  As a threshold matter, it presents no Article III case or controversy.  While federal courts are of course capable of answering separation-of-powers questions, the mere presence of such a question does not itself create a justiciable controversy where one does not otherwise exist. "The irreplaceable value of the [judicial] power" is to protect "the constitutional rights and liberties of individual citizens," *id.* at 829, and a case or controversy does not arise simply because the political branches disagree about the scope of their respective powers.  As Justices Souter and Ginsburg explained in *Raines*, the requirement that an injured private party invoke a court's jurisdiction is essential to "place[ ] the Judiciary at some remove from the political forces," and to "allow[ ] the courts some greater separation in the time between the political resolution and the judicial review." *Id.* at 834

(Souter, J. concurring).  Direct litigation between Congress and the Executive Branch is foreign to Article III and its history, and the dispute here entails no constitutionally cognizable injury.  The Committee thus lacks standing, and the case should be dismissed.

The Court also lacks statutory jurisdiction.  Even if Congress could grant federal courts subject matter jurisdiction to enforce its informational demands to the Executive Branch, Congress has nowhere attempted to confer jurisdiction upon the courts to enforce subpoenas issued by the House of Representatives.  While the Committee attempts to muddy the historical record, this much is clear: Congressional suits to enforce subpoenas were unheard of throughout most of American history, and when in 1978 Congress for the first time enacted a statute conferring jurisdiction for certain subpoena-enforcement actions brought by the Senate and its committees, it did not enact a comparable provision for the House or its committees.  Instead, it continued to substantively modify the statute conferring jurisdiction for Senate subpoena-enforcement suits as late as 1996, long after it had amended the general federal-question statute to remove the amount-in-controversy requirement for all cases arising under federal law.  The Committee does not seriously dispute that its interpretation of the general federal-question statute—as providing plenary jurisdiction over suits of this kind—would render 28 U.S.C. § 1365(a) completely superfluous, make meaningless that provision's explicit limitations on enforcing subpoenas to Executive Branch officials, and mean that the 1996 amendments to that provision were a pointless exercise.  The jurisdictional statutes must be read in harmony and the Committee's reading is implausible, to say the least.  Even if such suits were potentially constitutionally cognizable, the Court should not permit the Committee to end-run the careful limits on federal jurisdiction over subpoena-enforcement suits that Congress itself erected.

*Second*, the Committee lacks a cause of action.  Congress knows how to create a cause of action for informational disputes, and it has not done so here.  The Committee may not circumvent

that decision by inviting the Court to find an implied judicial remedy arising directly under Article I, because such a remedy is not essential to the preservation of Congress's express powers; indeed, as the Committee essentially concedes, Congress has operated successfully for more than 200 years without such a cause of action.  Nor can the Committee rely on the "traditional" powers of the courts of equity, because there is no tradition of federal courts directly enforcing congressional subpoenas.  Rather, when Congress seeks information from the Executive Branch, the time-honored mechanisms for enforcement of those inquiries are the accommodation process backed by the powers the Constitution actually confers on Congress in Article I, as well as any inherent authority that Congress possesses itself, and the criminal contempt statute.

*Third*, the Court should not adjudicate this case, even if empowered to do so, unless and until the parties exhaust the constitutionally mandated negotiation and accommodation process. The Committee's arguments to the contrary are legally and factually unsupported.  As the Court of Appeals recognized in *United States v. AT&T, Inc.*, 551 F.2d 384 (D.C. Cir 1976) ("*AT&T I*"), the resolution of informational disputes between the elected branches through the accommodation process is the overwhelming historical norm rather than the rare exception.  And the Committee's surprising assertion that the parties have reached an impasse over Mr. McGahn's testimony does not square with the facts.  Since October 8, 2019, the parties have spoken no less than five times about possible terms and conditions under which the Committee could obtain an interview with Mr. McGahn.  The Court should not short-circuit the parties' ongoing negotiations when, left to their own devices, the parties still might reach an agreement that eliminates the need, and therefore any justification, for resolving the issues of "potentially great significance for the balance of power between the Legislative and Executive Branches" presented by this case. *Comm. on the Judiciary v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (granting stay pending appeal).

*Fourth*, even if the Court were to reach the merits of this case, Defendant would be entitled to summary judgment because Mr. McGahn is absolutely immune from congressional process seeking testimony about matters concerning his duties as Counsel to the President.  As Defendant established in his opening brief, fundamental separation-of-powers principles that protect the autonomy and confidentiality essential to the effective performance of the President's constitutionally assigned duties require that the President's immediate advisors be extended the same immunity from congressional testimonial compulsion that the President himself enjoys. Acknowledging as much does not ignore the unique constitutional status of the President, as the Committee argues, but recognizes that the testimonial immunity of the President's immediate advisors is necessary to preserve the autonomy and effective functioning of the Presidency itself. The Committee's remaining arguments—that the testimonial immunity of close personal advisors is not, in fact, essential to preserving Presidential autonomy and independence, and that testimonial immunity impermissibly impairs the functions of the Legislative Branch—misapprehend precedent, overstate the reach and impact of the immunity claimed, and, at bottom, fail to appreciate the transcendent separation-of-powers concerns underlying the parties' dispute.

## ARGUMENT

### I.   THE COURT LACKS SUBJECT-MATTER JURISDICTION.

#### A.   The Court Lacks Jurisdiction under Article III.

##### 1.   This dispute is not of the type traditionally thought capable of resolution through the judicial process.

Defendant's motion demonstrated that the Committee lacks standing because the dispute at issue is not of the kind "traditionally deemed capable of redress through the judicial process." *Raines*, 521 U.S. at 818-19; *see* Combined Mem. in Supp. of Def.'s Mot. for Summ. J. & in Opp. to Pl.'s Mot. for Summ. J., ECF No. 32 ("Def.'s Mem.-Opp.") at 19.  Since the Founding, Congress and the Executive Branch have clashed over access to information, but for nearly two centuries,

Congress never attempted to resolve those impasses through civil litigation, instead of through its own powers under Article I and the accommodation process mandated by the Constitution. *See id.* at 20-23. The Committee's effort to pull the courts into these disputes fail.

First, the Committee contends that "the fact that a case may implicate separation-of-powers questions does not render it nonjusticiable." Pl.'s Reply in Supp. of Its Mot. for Summ. J. & Opp. to Def.'s Cross-Mot for Summ. J., ECF No. 38 ("Pl.'s Opp.-Reply") at 14 (citing *Zivotofsky v. Clinton*, 566 U.S. 189, 196-97 (2012)). Of course. But federal courts resolve separation-of-powers disputes only in the context of cases that *also* involve the "the constitutional rights and liberties of individual citizens," *Raines*, 521 U.S. at 829; *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to inquire how the executive, or executive officers, perform duties in which they have a discretion."); *Bond v. United States*, 564 U.S. 211, 222-23 (2011) (providing examples). For example, in *Zivotofsky*, the Supreme Court held that a political dispute between the branches did not preclude jurisdiction under the political-question doctrine, but jurisdiction was possible only because an injured private party brought the suit; the State Department was "sued by an American who invoked the statute." 566 U.S. at 191. Similarly, when the Supreme Court decided the constitutionality of the legislative veto in *INS v. Chadha*, 462 U.S. 919 (1983), it did so not because the Executive sued Congress seeking a declaration that the legislative veto is unconstitutional, but because an individual seeking review of his own deportation order brought a claim challenging that order's compatibility with the separation of powers. *Id.* at 927-28.

Thus, while the presence of a separation-of-powers question may not *preclude* jurisdiction, it also does not *provide* it. There might be "nothing irrational about a system" that allows the political branches to sue each other whenever they disagree about their respective powers, but "it is obviously not the regime that has obtained under our Constitution to date." *Raines*, 521 U.S. at

828.[1]  And for good reason, as "[d]eciding a suit to vindicate an interest outside the Government raises no specter of judicial readiness to enlist on one side of a political tug-of-war." *Id.* at 833-34 (Souter, J. concurring).

It is thus beside the point that "[t]he legal issues presented here are . . . within the competence of an Article III court to decide."  Pl.'s Opp.-Reply at 15.  For as long as the federal courts have existed, they have refused to decide cases that they are otherwise equipped to decide when those cases do not present cognizable cases or controversies.  *See, e.g.*, Letter from the Justices to George Washington (Aug. 8, 1793), *reprinted in Hart & Wechsler's The Federal Courts and the Federal System* 79 (Richard H. Fallon et al. eds., 5th ed. 2003).  For example, as Defendant has noted, *see* Def.'s Mem.-Opp. at 36-37, the Supreme Court was obviously capable in *Raines* of deciding the constitutionality of the Line Item Veto Act—it did so the very next term in *Clinton v. City of New York*, 524 U.S. 417 (1998)—but it refused to do so in *Raines* because it is not the judiciary's role to provide an "amorphous general supervision of the operations of government." 521 U.S. at 829.

Second, the Committee asserts that, "since nearly the beginning of the Republic, each House of Congress has acted separately and without the intervention of the Executive Branch to enforce its subpoenas—by arresting and detaining contemnors, including contumacious Executive Branch officials."  Pl.'s Opp.-Reply at 16-17; *accord id.* at 17-18 (describing how the House has "exercised its power of contempt to arrest, detain, and try individuals").  That history only undermines the Committee here.  When the House historically enforced its demands for

---

[1] The Committee's invocation of *United States v. Nixon*, 418 U.S. 683 (1974), misses the mark for the same reason.  *See* Pl.'s Opp.-Reply at 14-15.  As Defendant has explained, that case involved the enforcement of a trial subpoena arising in the course of an ordinary criminal prosecution.  It therefore implicated "the constitutional rights and liberties of individual citizens," *Raines*, 521 U.S. at 829, that fell squarely "within the traditional scope of Art. III power," *Nixon*, 418 U.S. at 697; *see* Def.'s Mem.-Opp. at 37-38.

information, it did so *without the intervention of the Judicial Branch.*  As the Supreme Court has noted, it has long "been customary for [Congress] to rely on its own power to compel attendance of witnesses and production of evidence in investigations made by it or through its committees." *Reed v. Cty. Comm'rs of Del. Cty., Pa.*, 277 U.S. 376, 388 (1928).  In stark contrast, for nearly two hundred years after the founding, it appears to have been universally understood that Congress, a house of Congress, or a congressional committee, could not sue the Executive Branch directly. *See Raines*, 521 U.S. at 826-29.  The House's authority to issue compulsory process enforceable by *its own* Sergeant at Arms simply says nothing about whether the House may *separately* enlist the Judiciary as its enforcer against the Executive.  *See Reed*, 277 U.S. at 389 ("Authority to exert the powers of the Senate to compel production of evidence differs widely from authority to invoke judicial power for that purpose").  Indeed, if anything, the fact that Congress traditionally resorted to the difficult process of either directly arresting contemnors or persuading the Executive to pursue a criminal contempt action—eschewing the "highly attractive" and easier path of filing a civil suit on its own—strongly suggests that "the power was thought not to exist." *Printz v. United States*, 521 U.S. 898, 905 (1997).

Finally, the Committee offers the policy argument that "a civil enforcement action like this one is more practical and desirable than the alternatives," including the House exercising its inherent contempt power or making a referral to the Department of Justice for prosecution.  *See* Pl.'s Opp.-Reply at 19.  To be sure, it would raise grave constitutional issues for the House to try to use inherent contempt authority against an Executive Branch official, or for the House to try to compel the Executive Branch to criminally prosecute an Executive officer.  But Congress has plenty of other tools, including the constitutionally mandated negotiation and accommodation process, and the threat of legislative reprisals backing that process.  The fact that the Committee finds those tools impracticable, or lacks the political will to fully deploy them, cannot justify

creating a new civil-enforcement-through-litigation power with no constitutional basis. *See Chadha*, 462 U.S. at 959 ("[T]he Framers ranked other values higher than efficiency.").

### 2. The Committee fails to state a cognizable injury.

In addition to being incompatible with the separation of powers, the Committee's suit is not justiciable because the Committee fails to identify an injury that is sufficiently "concrete and particularized" to satisfy Article III. *Raines*, 521 U.S. at 819. The Committee's arguments to the contrary are wrong.

First, the Committee argues that *Raines* is irrelevant because it involved only individual legislators. *See* Pl.'s Opp.-Reply at 11. To the contrary, *Raines* emphasized at the outset that a "key" requirement of Article III is a "*personal injury*," 521 U.S. at 818-19, which is absent when a plaintiff that is not itself a sovereign entity sues based on alleged impairment of a "political power," *see id.* at 821; *see also Barnes v. Kline*, 759 F.2d 21, 69 (D.C. Cir. 1984) (Bork, J., dissenting) ("[I]f Congress may sue under these circumstances, it should follow that a congressional plaintiff may sue whenever he plausibly alleges an actual impairment of his lawmaking powers. The harm, in each case, is of the same kind—an injury to lawmaking powers."). The Committee ignores that *Raines* focused on the historical absence of inter-branch suits between *Congress itself* and *the President himself*, rather than individual members of the legislative and executive branches. 521 U.S. at 826-29. Although the Supreme Court has in very narrow circumstances allowed sub-components of a *state* government to sue, it has expressly admonished that its holding does not extend to the *federal* government given the heightened separation-of-powers concerns presented. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2665 n.12 (2015) (noting that the case before it "does not touch or concern the question whether Congress has standing to bring a suit against the President" because "[t]here is no federal analogue to Arizona's initiative power" and "a suit between Congress and

the President would raise separation-of-powers concerns"); *see also Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019) (concerning the standing of state legislative body).[2]

Second, the Committee's assertion of informational injury fails. According to the Committee, Defendant's refusal to comply with its subpoena "has deprived the Committee of information to which it is constitutionally entitled" and therefore "by itself[ ] establishes the Committee's institutional injury sufficient for standing." Pl.'s Opp.-Reply at 8. But while Congress may generally grant *private parties* a right to certain information, *see FEC v. Akins*, 524 U.S. 11, 21 (1998); *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989), the information sought here "is not claimed in any private capacity," *Raines*, 521 U.S. at 821. *See also Waxman v. Thompson*, 2006 WL 8432224, at *5 (C.D. Cal. July 24, 2006) ("Where *private plaintiffs* assert the violation of a statute that confers a right to obtain information on 'any person,' the Supreme Court has held that deprivation of the right to access constitutes an injury in-fact." (emphasis added)). Congress cannot grant to itself, or any of its members, institutional powers it does not possess under the Constitution. *See Bowsher v. Synar*, 478 U.S. 714, 726 (1986) ("Congress cannot grant to an officer under its control what it does not possess."). And though an "implied" power "to secure needed information" is an "attribute of [Congress's] power to legislate," *McGrain v. Daugherty*, 273 U.S. 135, 161, 175 (1927), that power is an "auxiliary" one which exists only as "necessary and appropriate to make [Congress's] express powers effective," *id.* at 173. *See also Watkins v. United States*, 354 U.S. 178, 187 (1957) (holding that "[i]nvestigations conducted solely for the personal aggrandizement" of Members of Congress would be "indefensible."). It follows that, unless the Committee's asserted deprivation of information

---

[2] The Committee is also incorrect when it asserts that Defendant's reading of *Raines* necessarily requires the Court to hold that Congress cannot enforce subpoenas against private parties. *See* Pl.'s Opp.-Reply at 11 & n.5. This Court can rest on *Raines*'s focus on the historical absence of inter-branch suits without determining whether the House would be able to bring suit against private parties.

causes a cognizable institutional injury, there is no standing.   The Committee's theory of informational injury is thus coterminous with, and redundant of, its theory of institutional injury.

Third, the Committee fares no better with its theory that Defendant has "inflicted institutional injuries on the Committee by preventing it from carrying out the House's constitutionally assigned responsibilities."   Pl.'s Opp.-Reply at 6. While the Committee characterizes Defendant as challenging "how much injury the Committee ha[s] suffered," *id.* at 16 (emphasis omitted), Defendant's point is actually that "abstract dilution of institutional legislative power" at the hands of the Executive Branch is insufficiently "concrete and particularized" to sustain standing—period.   *Raines*, 521 U.S. at 819, 821, 825-26.   *Raines* holds that reduced effectiveness of a particular vote is not a cognizable injury for purposes of Article III, and it follows *a fortiori* that lack of access to information that might inform a particular vote is also not a sufficiently concrete and particularized injury to confer standing.   *See Waxman*, 2006 WL 8432224, at *7 ("Because plaintiffs do not claim that defendant's failure to produce the requested documents nullified their votes, and assert only that they have been required to vote and legislate without full access to information, *Coleman* provides no basis for a finding that plaintiffs have standing to sue.").[3]

---

[3] The Committee relatedly suggests that "[w]hen a party refuses to comply with [a] subpoena . . . that subpoena is annulled by the refusal." Pl.'s Opp.-Reply at 16. To the extent the Committee means to invoke the "vote nullification" doctrine of *Coleman v. Miller*, 307 U.S. 433 (1939), that attempt fails:  at most, nullification in this context could mean a failure to treat an allegedly duly authorized subpoena as not having been issued at all, not mere failure to comply with it after the fact. *See Raines*, 521 U.S. at 823 (explaining "vote nullification" under *Coleman*); *Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000) ("[*Raines*] did not suggest that the President 'nullifies' a congressional vote and thus legislators have standing whenever the government does something Congress voted against, still less that congressmen would have standing anytime a President allegedly acts in excess of statutory authority."); *see also Bethune-Hill*, 139 S. Ct. at 1954 (rejecting *Coleman* nullification theory).  And in any case, *Coleman*'s vote nullification theory is inapplicable to federal legislators. *See* Def.'s Mem.-Opp. at 25 n.5.

### 3.     Lawsuits of this kind imperil the Constitution's allocation of power among the branches of the federal government.

Lawsuits of this nature threaten the Constitution's allocation of powers in at least three ways.  First, such lawsuits threaten the independence of the judiciary.  It is not the role of federal courts to provide "amorphous general supervision of the operations of government."  *Raines*, 521 U.S. at 829.  Rather, the courts' limited role—resolving disputes involving injured *individuals*— has "maintained public esteem for the federal courts and has permitted the peaceful coexistence of the countermajoritarian implications of judicial review and the democratic principles upon which our Federal Government in the final analysis rests."  *Raines*, 521 U.S. at 829; *id.* at 833 (Souter, J. concurring) ("Intervention in such a controversy would risk damaging the public confidence that is vital to the functioning of the Judicial Branch … by embroiling the federal courts in a power contest nearly at the height of its political tension."); *see also U.S. House of Reps. v. Mnuchin*, 379 F. Supp. 3d 8, 10-11 (D.D.C. 2019) ("The 'complete independence' of the Judiciary is 'peculiarly essential' under our Constitutional structure, and this independence requires that the courts 'take no active resolution whatever' in political fights between the other branches." (quoting The Federalist No. 78 (Alexander Hamilton))).  To avoid entangling federal courts in *political* disputes, Congress checks the Executive Branch using *political* tools, not civil litigation. "Congress has several political arrows in its quiver to counter perceived threats to its sphere of power," *id.* at 22, and the Committee's fear that dismissing this lawsuit would "damage the allocation of powers in the Constitution," Pl.'s Opp.-Reply at 20, or even "lead 'to the total annihilation of the power of the House of Representatives to guard itself from contempts,'" *id.* at 19 (quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat) 204 (1821)), is thus greatly overblown.   *See also, e.g., Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000) (describing Congress's political tools).

Second, it would disturb the balance of powers among the Branches to allow Congress to initiate judicial proceedings against the Executive Branch to compel compliance with a legal

obligation.   *See* Def.'s Mem.-Opp. at 29.   While the Committee contends that "[t]he power to investigate, and to secure by compulsory process any information relevant to an investigation, belongs to each House of Congress (and its committees) acting independently from the other and from the Executive Branch," Pl.'s Opp.-Reply at 17, that is the power to use their *own* processes to compel compliance with their subpoenas.   *See Reed*, 277 U.S. at 388.   In contrast, the "power to seek judicial relief . . . cannot possibly be regarded as . . . in aid of the legislative function." *Buckley v. Valeo*, 424 U.S. 1, 138 (1976); *see also Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928).   That is why the House previously has disclaimed any power to bring "suit under the myriad of general laws authorizing aggrieved persons to challenge agency action" and dismissed as "speculative" the possibility that it would attempt "to afford itself broad standing to challenge the lawfulness of Executive conduct."   Brief for U.S. House of Representatives at 17, 22 & n.25, *U.S. Dep't of Commerce v. U.S. House of Reps.*, 525 U.S. 316 (1999), No. 98-404, 1998 WL 767637 (1998).

The Committee responds that Defendant's arguments would "force Congress to rely on the willingness of the Executive Branch to prosecute private individuals for contempt of Congress." Pl.'s Opp.-Reply at 11-12.   That aspect of the separation of powers is no more surprising than the corresponding aspect that the Executive Branch is forced to rely on the willingness of Congress to appropriate funds and pass substantive legislation authorizing the Executive Branch to take many actions to protect itself.   Indeed, far from a bug in the system, it is the central feature of our constitutional structure that each branch must depend on the others to perform those tasks exclusively vested in them.   *See Loving v. United States*, 517 U.S. 748, 756 (1996) (the Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity") (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635 (1952) (Jackson, J., concurring)).   Congress has numerous political tools it can use to persuade the

Executive Branch to bring particular prosecutions pursuant to its law-enforcement powers under Article II, just as the Executive Branch has numerous political tools it can use to persuade Congress to pass particular laws under Article I.  As a matter of legal authority, however, Congress can no more bring its own litigation than the Executive can enact its own legislation.

Third, permitting the House to file lawsuits against the Executive Branch would especially disrupt the balance of powers given the Committee's categorical claim that it is immune from the very sort of suit it has brought here.  *See* Def.'s Mem.-Opp. at 29-30.  The Committee explicitly embraces that interpretation, citing the Speech and Debate Clause to contend that "the Constitution is neither silent nor even-handed on this question."  Pl.'s Opp.-Reply at 19.  Thus, the Committee is openly demanding that this Court empower it to bring its political disputes with the Executive Branch into court when it pleases, but bar the Executive Branch from responding in kind.  Such a lopsided interpretation would unquestionably disrupt the allocation of powers laid out in the Constitution.[4]

### 4.    Defendant's argument is consistent with D.C. Circuit precedent.

Finally, notwithstanding all of the reasons why lawsuits of this kind are not justiciable, the Committee contends that the "D.C. Circuit has recognized that the House of Representatives may sue to enforce a subpoena."  Opp. at 5; *see also id.* at 8-9.  That is wrong.  *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc), did not address the latent jurisdictional issues, and *United States v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976) ("*AT&T I*"), involved a lawsuit brought by the Executive Branch against a private telephone

---

[4] The Committee observes that "the President himself has initiated suits in his personal capacity to enjoin compliance with Congressional subpoenas."  Pl.'s Opp.-Reply at 20 (citing *Trump v. Mazars USA, LLP*, No. 19-5142, 2019 WL 5089748 (D.C. Cir. Oct. 11, 2019)).  *Mazars*, however, involves a determination of the legal obligations of a private company to disclose information pursuant to a congressional subpoena, and so the case involves the assertion and "adjudication of individual rights" that is absent in the Committee's suit here.

company, not a lawsuit brought by Congress against the Executive Branch. 551 F.2d at 384. Each case hinged on an adjudication of individual rights that is absent here. And while in *AT&T I* the House was permitted to appeal, Defendant's motion explained that by the time the D.C. Circuit did so, the district court had quashed the subpoena, and thus *AT&T I* did not hold that the House has standing to challenge mere non-compliance with a still-extant subpoena. *See* Def.'s Mem.-Opp. at 34. The Committee offers no response. Particularly in light of the intervening decision in *Raines*, *AT&T I* should not be extended to the situation here.[5]

### B.      The Court Lacks Statutory Subject Matter Jurisdiction.

In addition to the absence of Article III jurisdiction, the Court also lacks statutory jurisdiction, for a simple reason: 28 U.S.C. § 1365(a), first enacted in 1978, "confers jurisdiction on the courts to enforce Congressional subpoenas" in limited circumstances, H.R. Rep. No. 95-1756, at 80 (1978), but it does so *only* for certain subpoena-enforcement actions brought by the Senate and its committees. By contrast, Congress has deliberately chosen not to enact a comparable statute for the House and its committees. Mem. at 30-33.[6] Moreover, § 1365 excludes from its jurisdictional grant any action to enforce a "subpoena or order issued to an officer or

---

[5] Although the Office of Legal Counsel previously suggested that Congress might be able to enforce subpoenas against the Executive Branch through civil litigation in the 1980s, *see Prosecution for Contempt of Cong. of an Exec. Branch Official Who Has Asserted a Claim of Exec. Privilege*, 8 U.S. Op. O.L.C. 101, 105 n.6, 137 (1984); *Response to Cong.Requests for Information Regarding Decisions Made Under the Indep. Counsel Act*, 10 U.S. Op. O.L.C. 68, 83, 86, 88 (1986), *see* Pl's Opp.-Reply at 10, these opinions were issued prior to the decision in *Raines*, at a time when the D.C. Circuit accepted a theory of legislator standing that permitted judicial resolution of inter-branch disputes. In light of *Raines*, judicial resolution of inter-branch disputes of this kind is not permissible, as the D.C. Circuit has since recognized, *see Chenoweth v. Clinton*, 181 F.3d 112, 114 (D.C. Cir. 1999), and as the Department of Justice has consistently contended, beginning with its briefs in *Walker v. Cheney*, 230 F. Supp. 2d 51 (D.D.C. 2002).

[6] The Committee characterizes Defendant's statutory-jurisdiction argument as "surprising given that McGahn's assertions concerning standing, if accepted, would lead to the conclusion that Section 1365 is unconstitutional." Pl.'s Mem.-Opp. at 21. But that is not surprising at all. Federal courts may exercise jurisdiction only if Article III supplies jurisdiction *and* if Congress has conferred jurisdiction by statute. *See* Def.'s Mem.-Opp. at 30. There is no inconsistency in

employee of the executive branch of the Federal Government acting within his or her official capacity" when the refusal to comply is based on "a governmental privilege or objection the assertion of which has been authorized by the executive branch of the Federal Government." 28 U.S.C. § 1365(a).  No statute provides jurisdiction over the civil enforcement of subpoenas by *either* House of Congress in such circumstances.

The Committee nonetheless asserts that it may seek enforcement of its demands for information under the general federal-question statute, 28 U.S.C. § 1331.  Pl.'s Opp.-Reply at 21-29.  But it is a basic precept that "[s]pecific terms prevail over the general in the same or another statute which otherwise might be controlling."  *Howard v. Pritzker*, 775 F.3d 430, 441 (D.C. Cir. 2015).  There is no question that § 1365(a) is more specific on the subject of jurisdiction for subpoena enforcement than § 1331.  And under the canon against surplusage, "effect must be given, if possible, to every word, clause and sentence of a statute . . . so that no part will be inoperative or superfluous, void or insignificant."  *In re Surface Min. Regulation Litig.*, 627 F.2d 1346, 1376 (D.C. Cir. 1980).  The Committee cannot seriously dispute that its interpretation of § 1331 makes § 1365(a) superfluous and its limitations meaningless.[7]

The Committee counters that "[r]edundancies across statutes are not unusual events in drafting," Pl.'s Opp.-Reply at 27 (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253

---

arguing that this inter-branch suit fails at both stops—(1) it does not present a case or controversy under Article III and (2) *even if it did*, Congress has only sought to provide statutory jurisdiction for a narrow range of such suits.

[7] The Committee argues, *see* Pl.'s Opp.-Reply at 28, that § 1365 is not rendered superfluous because, in addition to authorizing district courts to issue orders compelling compliance with certain Senate subpoenas under subsection (a), it also provides, in subsection (b), that any action, contempt proceeding, or sanction imposed pursuant to § 1365(b) does not abate upon adjournment of the Senate if the relevant Senate body certifies a continuing interest in the material.  28 U.S.C. § 1365(b).  But the Committee never even attempts to establish that § 1365(b) confers powers that a court exercising jurisdiction under § 1331 would otherwise lack.  Moreover, regardless of whether the remedial provisions in § *1365(b)* would be superfluous if § 1331 were available, the threshold jurisdictional grant in § *1365(a)* still would be.

(1992)), but the Committee's interpretation entails far more than mere "redundancies." Rather, the Committee's construction renders a separate jurisdictional statute superfluous and subsumes it within a general jurisdictional grant—even though Congress amended that separate statute *long after* it amended § 1331 to remove the amount-in-controversy requirement for all federal-question cases. *See* Def.'s Mem.-Opp. at 31. Whether or not the 1996 amendments were the "minor clarifying" measure the Committee claims (Pl.'s Opp.-Reply at 27),[8] the Committee provides no explanation whatsoever why Congress in 1996 would have substantively amended § 1365 to expand the set of government officials that the Senate could sue, if the Senate already could have sued those very officials under § 1331 as it stood going back to 1976. *See Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (plurality opinion) (noting that "[t]he Government acknowledges that, under its reading, [18 U.S.C.] § 1519 and [18 U.S.C.] § 1512(c)(1) 'significantly overlap'" and "[n]owhere does the Government explain what independent function § 1512(c)(1) would serve if the Government is right about the sweeping scope of § 1519"). The Committee states that "[w]hen Congress removed the amount-in-controversy requirement from Section 1331, it effectively rendered redundant several other provisions," and that "Congress was not required to repeal those provisions to eliminate any redundancies." Pl.'s Opp.-Reply at 27 n.14. But again, Congress did not merely *fail to repeal* § 1365(a)—it *substantively amended* that provision and it did so *after* the amendments to § 1331, which would have made no sense whatsoever if § 1331 independently supplied jurisdiction.

---

[8] This characterization is debatable at best. The 1996 amendments delineated the circumstances in which § 1365(a) confers jurisdiction for Senate subpoena-enforcement actions against executive officials (providing that the statute would confer jurisdiction in cases in which an executive official's refusal to comply was based upon a personal privilege). *See* Pub. L. No. 104-292, § 4, 110 Stat. 3459 (Oct. 11, 1996). Even assuming that this amendment was merely "clarifying"—in the sense that it did not change Congress's understanding of existing law—it cannot reasonably be characterized as "minor." Certainly it is not the sort of action Congress would have taken if it understood § 1365(a) at that time as redundant.

Although the 1996 amendment is dispositive, there are additional flaws with the Committee's argument that § 1365 was enacted when Congress had not yet eliminated the amount-in-controversy requirement for all federal-question claims. *See* Pl.'s Opp.-Reply at 24-26. For example, while the Committee contends that the removal of the amount-in-controversy requirement from § 1331 in 1976 sufficed to permit Congress to enforce its subpoenas against the Executive Branch, the Committee cites absolutely nothing in the legislative history of § 1331 suggesting that the amount-in-controversy requirement was lifted with congressional subpoenas in mind. Similarly, the Committee points to nothing in § 1365's legislative history suggesting that Congress viewed the 1976 change to § 1331 as sufficient to provide courts with jurisdiction over congressional subpoena-enforcement actions. Indeed, the legislative history of § 1365 strongly suggests that Congress did *not* believe § 1331 conferred such authority. S. Rep. No. 95-170, at 16 (1977) ("Presently, Congress can seek to enforce a subp[o]ena only by use of criminal [contempt] proceedings [under 2 U.S.C. § 192] or by the impractical procedure of conducting its own trial before the bar of the House of Representatives or the Senate."); *id.* at 89 (recognizing that "a future statute" might be needed to "specifically give the courts jurisdiction to hear a civil legal action brought by Congress to enforce a subp[o]ena against an executive branch official").[9]

Relatedly, the Committee observes that "Section 1365 does not apply to the House" and that "[t]he Section 1365 legislation removed a reference to the House because the House committees had not had an opportunity to review the issues, and not because Congress intended to

_____

[9] The Committee, *see* Pl.'s Opp.-Reply at 26-27, points to a later passage from this report, stating that the provision's exception for Executive branch officials "is not intended to be a congressional finding that the federal courts do not now have the authority to hear a civil action to enforce a subpoena against an officer or employee of the federal government." S. Rep. No. 95-170, at 91-92 (1977). But the very next sentence of the report states, "However, if the federal courts do not now have this authority, this statute does not confer it." S. Rep. No. 95-170, at 92 (1977). This sentence, along with the passages quoted above, belie the Committee's assertion that Congress enacted § 1365 with the understanding that enforcement actions against Executive Branch officials "already fell within Section 1331." Pl.'s Opp.-Reply at 26.

deny courts jurisdiction over House subpoena enforcement actions." Pl.'s Opp.-Reply at 22-23 (citing H.R. Rep. No. 95-1756, at 80 (1978)). But the Committee does not point to anything in the Conference Report suggesting that the House or the Senate believed such authority already existed. And the Conference Report indicates (or at least strongly suggests) that they did not. *See* H.R. Rep. No. 95-1756, at 80 (1978) ("The appropriate committees in the House also have not considered the Senate's proposal to *confer* jurisdiction on the courts to enforce subp[o]enas of House and Senate committees. The Senate has twice voted to *confer* such jurisdiction on the courts and desires at this time to *confer* jurisdiction on the courts to enforce Senate subp[o]enas.") (emphases added).

Citing 28 U.S.C. § 1366, the Committee also observes that Congress in the past has expressly carved out certain categories of cases from § 1331. Pl.'s Opp.-Reply at 24. But the single provision cited by the Committee for this proposition, initially added as part of a bill reorganizing the District of Columbia's courts and addressing other District-specific matters, has nothing to do with congressional subpoenas and sheds no light on any issue in this lawsuit. *Id.*[10] And more fundamentally, there is nothing unusual about Congress implicitly precluding jurisdiction in a wide variety of cases. *See, e.g.*, *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) (setting forth a framework for determining when a statutory scheme channeling claims to court of appeals forecloses district court litigation); *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) (extending framework to constitutional claims); *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) (implied preclusion of review under the Presidential Records Act). The fact that Congress has also

---

[10] Among other differences, the canon against surplusage also distinguishes the Committee's reliance on § 1366, which strips federal courts of federal-question jurisdiction when the federal law in question "appli[es] exclusively to the District of Columbia." Notably, absent this provision, laws applicable exclusively to the District presumably would be cognizable under § 1331. By contrast, as previously discussed, the Committee's interpretation of § 1331 renders both § 1365(a) in general and the 1996 amendments in particular utterly superfluous.

chosen to preclude § 1331 jurisdiction expressly—in a different provision, at a different time, and in a very different context—does not shed any light on the jurisdictional issues here.[11]

Finally, the Committee argues that, notwithstanding all of this, the D.C. Circuit's decision in *AT&T I* establishes statutory jurisdiction here as a matter of binding circuit law. Pl.'s Opp.-Reply at 21-22. It does not. Although *AT&T I* concerned the legal duty of a House subpoena recipient, the case involved a suit brought by the Executive Branch against a private party, *see* 551 F.2d at 385, not a suit brought by Congress seeking Executive Branch information. No specific jurisdictional statute delineated particular circumstances in which the Executive could bring a suit such as that in *AT&T I*. But the Congressional subpoena-enforcement suit at issue here is governed by the specific jurisdictional limitations that Congress itself has enacted in § 1365.[12] Moreover, *AT&T I* predated the 1996 amendments to § 1365(a) which, as discussed above, compel the conclusion that § 1331 does not apply to lawsuits brought by Congress seeking Executive Branch information. For similar reasons, the Committee's reliance (Pl.'s Opp.-Reply at 28-29) on an OLC opinion that long predates the 1996 amendments is unpersuasive.

---

[11] Relatedly, the Committee cites *Mims v. Arrow Financial Services, LLC*, 565 U.S. 368, 383 (2012), for the proposition that "the type of argument [the government] presents is disfavored." Opp. at 21. In *Arrow*, the Supreme Court held that language providing that a plaintiff may bring certain federal statutory claims in state court did not impliedly strip federal courts of jurisdiction under § 1331. That holding is consistent with the longstanding presumption that federal and state courts have concurrent jurisdiction over suits arising under federal law, *see, e.g.*, *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990)—a presumption that is irrelevant to Defendant's argument here. *Arrow* did not present a question, like this case, where Congress amended a specific *federal* jurisdictional provision long after removing the amount-in-controversy requirement from § 1331. The Committee's reliance on *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002), Pl.'s Opp.-Reply at 23, is similarly misplaced. Among other differences, in *Verizon* the relevant provision did "not even mention subject-matter jurisdiction," and, in a separate part of the same statutory section, "where otherwise applicable jurisdiction was meant to be excluded, it was excluded expressly." 535 U.S. at 644

[12] The Committee references the D.C. Circuit's recent decision in *Mazars*, 2019 WL 5089748, *see* Pl.'s Opp.-Reply at 22 n.10, but that case—involving an action brought by the President seeking to clarify the obligations of Mazars with respect to a congressional subpoena—is likewise far afield. Indeed, the parties in *Mazars* did not even raise, nor did the D.C. Circuit address, the jurisdictional issues discussed here.

II.     **THE COMMITTEE LACKS A CAUSE OF ACTION TO ENFORCE ITS SUBPOENA.**

    A.     **The Committee Lacks an Implied Cause of Action Under the Constitution.**

Even if the Court possessed jurisdiction to hear this case, the Committee lacks a cause of action to enforce a subpoena against the Executive Branch.  The Committee does not contest, nor could it, that a plaintiff seeking to enforce a substantive right in federal court must also possess a procedural right of action to sue.  *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 274, 284 (2002); *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  The Committee instead contends (again) that, because each House of Congress possesses an implied power to *issue* subpoenas, so too must each House possess an implied right of action under the Constitution to *sue in federal district court* to enforce those subpoenas.  Neither precedent nor general principles support this claim.

The Supreme Court has time and again rejected the contention that the existence of a substantive right presumes a judicial remedy.  Indeed, as noted above, the Supreme Court expressly has held that a congressional committee's "[a]uthority to exert the powers of the Senate to compel production of evidence *differs widely* from authority to invoke judicial power to that purpose." *Reed*, 277 U.S. at 389 (emphasis added).  And in concluding that the Senate committee in *Reed* could not bring a lawsuit to enforce its subpoenas, the Court emphasized that there was no "*act of Congress* authoriz[ing] the committee or its members, collectively or separately, to sue." *Id.* at 388 (emphasis added).

The Committee attempts to distinguish *Reed* by arguing that the case concerned only whether the Committee satisfied a prerequisite of the specific jurisdictional statute invoked in that case, which the Committee suggests could have been remedied simply by a resolution authorizing suit.  But that misses the point.  The Court's enforcement of the requirement in the jurisdictional statute in *Reed*—that the plaintiff be "authorized by law" to bring suit—makes clear that the

Committee's power to issue congressional subpoenas does not automatically confer authority to enforce those subpoenas directly in federal court.  In fact, the *Reed* Court held that the committee could not bring suit even though it was expressly authorized not only to issue subpoenas but also "to do such other acts as may be necessary in the matter of [its] investigation."  *Id.* at 386-87. Thus, while the *Reed* Court's scrutiny of the Senate resolutions at issue in that case confirms that authorization of the full House would be *necessary* for the Committee to represent the interests of the full House in any litigation, it does not suggest that such authorization is *sufficient*.  *See id.* at 388 (finding no express authorization "even if it be assumed that the Senate alone may give that authority").  The Committee still needs a cause of action.[13]

Nor do the Committee's cited cases suggest otherwise.  The Committee relies on *Anderson v. Dunn*, 19 U.S. 204, 230 (1821) and *Marshall v. Gordon*, 243 U.S. 521 (1917), for the proposition that it has "the right to seek judicial redress of conduct that interferes with the discharge of its legislative functions."  Pl.'s Opp.- Reply at 29.  These cases, however, merely held that each House of Congress possesses certain contempt powers, *see Anderson*, 19 U.S. at 230; *Marshall*, 243 U.S. at 533.  They did not consider whether a single house of Congress, much less a lone congressional committee, can decline to exercise those powers and instead bring a civil lawsuit simply because it believes that route to be more "modest."  Pl.'s Opp.-Reply at 30.  Indeed, those cases make clear that a power may not be implied in Congress's favor under Article I unless "*essential* to the execution of some other and substantive authority expressly conferred."  *Marshall*, 243 U.S. at

---

[13] It is thus irrelevant that, after *Reed* was decided, the Senate issued a resolution purporting to authorize Senate committees to bring lawsuits.  Pl.'s Opp-Reply at 31.  Indeed, the resolution—passed by only one House of Congress and not presented to the President—was plainly insufficient to satisfy the "authorized by law" requirement at issue in *Reed*.  *See, e.g.*, *Anderson v. Dunn*, 19 U.S. 204, 213 (1821) (the Constitution does not authorize "one House separately, to pass . . . laws").  And whether the Senate understood itself to have a cause of action, as a result of that resolution or otherwise, is irrelevant to whether it actually possessed one as a matter of law.

541 (emphasis added); *see also Anderson*, 19 U.S. at 215 ("*Necessity . . . is the criterion, of the incident.*" (emphasis in original)).

Yet as the Committee essentially concedes (by framing this suit as simply a more "modest" alternative to Congress's other enforcement mechanisms), a right to enforce subpoenas directly in court is *not* essential to Congress's Article I powers.  Pl.'s Opp.-Reply at 30.  As discussed above, for more than 200 years since the Founding, Congress has operated without such a right, and instead has satisfied its need for information using its own compulsive power, the criminal contempt statute, and—as against the Executive Branch—the constitutionally prescribed accommodation process backed by the express powers conferred under Article I.  *See* Def.'s Mem.-Opp. at 20-23; *see also Marshall*, 243 U.S. at 544 (discussing inherent contempt power and "judicial proceedings under the general criminal law" as Congress's mechanisms to enforce compliance with subpoenas); *In re Application of the U.S. Senate Permanent Subcomm. on Investigations*, 655 F.2d 1232, 1238 (D.C. Cir. 1981) ("Prior to 1978 Congress had only two means of enforcing compliance with its subpoenas: a statutory criminal contempt mechanism and the inherent congressional contempt power.").  In light of this history, the Committee simply cannot show that the ability to enforce its subpoenas in court is so essential to "self-preservation" as to give rise to an implied judicial remedy under Article I.  Moreover, even if it were, there still would be no need for an "implied" right of action because Congress could create one expressly.  Yet Congress has repeatedly declined to take that action with respect to House subpoenas.  *See* Def.'s Mem.-Opp. at 41-42; *see also Marshall*, 243 U.S. at 454 (relying on custom and "congressional action in enacting legislation" to reject assertion of implied power under Article I).[14]

---

[14] Implying a right of action in Congress's favor is thus particularly unwarranted because—of all the parties that come before a court—Congress is uniquely positioned to remedy any want of an enforcement mechanism to the extent permissible under the Constitution.  *See Dunn*, 19 U.S. at 215 (rejecting assertion of an implied legislative power because, among other things, "if the existing remedies be insufficient, an act of Congress may be made to supply the deficiency").

Nor do general principles support an implied right to sue emanating from Article I.  The Supreme Court has emphatically rejected the notion that "it [is] a proper judicial function 'to provide such remedies as are necessary to make effective'" a substantive right and instead "adopted a far more cautious course before finding implied causes of action."  *Ziglar v. Abbasi*, 137 S. Ct. 1873, 1855 (2017) (citing *Sandoval*, 532 U.S. 275 (2001)).  The Committee attempts to distinguish this case law by claiming that it is only about "whether *private* parties may resort to federal court to enforce federal *statutes*."  *See* Pl.'s Opp.-Reply at 31 (emphasis in original).  But it is unclear why, if Congress could go to court to enforce its Article I powers, a committee thereof would *not* have to meet at least the same standards for recognizing implied rights of action that apply to suits by private litigants.  That is especially true considering that, of all possible litigants, Congress is the least in need of a court to imply a right of action in its favor.

As to the Committee's contention that the presumption against implied rights of action pertains only to enforcement of "federal statutes," the Committee is wrong.  *Abbasi* involved the enforcement of constitutional rights, 137 U.S. at 1853, and *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018), addressed rights arising under international law.  And while the Supreme Court in *Abbasi* noted that "[t]he decision to recognize an implied cause of action under a statute involves *somewhat* different considerations than when the question is whether to recognize an implied cause of action to enforce a provision of the Constitution itself," it concluded that the inquiry is "similar." *Abbasi*, 137 S. Ct. at 1856 (emphasis added).  Key to that inquiry are "separation-of-powers principles." *Id.*; *see also Jesner*, 138 S. Ct. at 1398 ("litigation [that] implicates serious separation-of-powers and [other] concerns[] . . . must be 'subject to vigilant doorkeeping.'" (internal quotation marks and citations omitted)).  The Committee cannot credibly suggest that such separation-of-powers concerns are not squarely presented by a struggle between the Executive Branch and Congress over access to information, particularly given that the political branches have historically

23

resolved those struggles through the accommodation process, backed by each side's express powers under the Constitution, not through litigation.

The Committee also seeks to distinguish *Abbasi* and *Jesner* because they concerned claims for damages rather than the equitable relief the Committee seeks here, Pl.'s Opp.-Reply at 52, but that is not a meaningful distinction. The Supreme Court held that *whenever* "'a host of considerations . . . must be weighed and appraised'" before determining whether "the public interest would be served" by a judicial remedy, those considerations "should be committed to 'those who write the laws' rather than 'those who interpret them.'" *Abbasi*, 137 S. Ct. at 1857 (citation omitted). That principle is not limited to damages claims, and it is squarely applicable here. Congress has never said, or even suggested, that it *wants* the courts to opine on the scope of the House's power of inquiry through a civil lawsuit, thereby bypassing the accommodation process and inviting zero-sum outcomes that may not serve the public interest. Indeed, Congress has repeatedly *declined* to take the step of creating the judicial vehicle that the Committee asserts here, even when invited to do so by the D.C. Circuit in *Tobin v. United States*, 306 F.2d 270, 276 (D.C. Cir. 1962). Thus, the fact that each House has a right to *issue subpoenas* does not remotely mean that Congress as a whole would have intended individual Houses to sue to enforce them (let alone individual committees). In these circumstances, the long tradition of accommodation between the branches, as well as the fact that the "House retains the institutional tools necessary to remedy any harm caused to this power by the Administration's actions," *U.S. House of Reps.*, 379 F. Supp. 3d at 20, counsels against finding an implied cause of action here.

Finally, the Committee argues that the Court should find an implied cause of action because another judge of this Court did so in *Committee on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 88 (D.D.C. 2008). But *Miers* predated the Supreme Court's decisions in *Abbasi* and *Jesner*, which expressly rejected the notion that a court is permitted to "authorize a remedy under general

principles of federal jurisdiction" to vindicate constitutional rights simply because that remedy is

not foreclosed "in 'explicit' terms." *Abbasi*, 137 S. Ct. at 1854.  The conclusion in *Miers* that "the

judiciary is clearly discernible as the primary means through which constitutional rights may be

enforced, . . . at least in the absence of a textually demonstrable constitutional commitment of an

issue to a coordinate political department," Pl.'s Opp.-Reply at 30  (quoting *Miers*, 558 F. Supp.

2d at 88), cannot be squared with that decision.  *See Abbasi*, 137 S. Ct. at 1857 (noting that such

reasoning represents "a different approach to recognizing implied causes of action than [the

Court] follows now").

**B.      The Committee Cannot Invoke the Federal Courts' Traditional
         Equity Powers.**

The Committee similarly cannot invoke the federal courts' equity jurisdiction, as this is not

a context where the "relief . . . requested . . . was traditionally accorded by courts of equity."  *Grupo*

*Mexicano de Desarrollo, S.A. v. All. Bond Fund., Inc.*, 527 U.S. 308, 319 (1999).  In determining

whether "traditional equitable powers" apply, particularly in a context where "separation-of-

powers principles" are central, *Ziglar*, 137 S. Ct. at 1857, historical context matters.  *See, e.g.*,

*Grupo Mexicano*, 527 U.S. at 327-29 (observing that the equitable powers of the federal courts do

"not include the power to create remedies previously unknown to equity jurisprudence" and

concluding, based on a historical analysis, that no cause of action existed because "the English

courts of equity did not actually exercise" the power asserted); *Mistretta v. United States*, 488 U.S.

361, 401 (1989) (noting that "traditional ways of conducting government . . . give meaning to the

Constitution"); *see generally*, Curtis A. Bradley & Trevor W. Morrison, *Historical Gloss and the*

*Separation of Powers*, 126 HARV. L. REV. 411 (2012).  Here—as the Committee concedes—there

simply is no historical tradition of the courts adjudicating suits by the House to enforce subpoenas;

rather, the "history shows that the House has long secured compliance with its power to investigate

by using its *own* Sergeant at Arms to arrest and detain contemnors,"  Pl.'s Reply at 18 (emphasis

added).  And with respect to disputes between the Executive and Congress, accommodation is the tradition—not litigation.  *See* Def.'s Mem.-Opp. at 20-23.

The Committee therefore resorts to an expansive framing, arguing that the proper inquiry is whether "federal courts of equity have traditionally accorded declaratory [or] injunctive relief when Executive officials act contrary to or in excess of federal law" in general, rather than in "precisely similar" cases.  Pl.'s Opp.-Reply at 33.  But *Grupo Mexicano* flatly forecloses analysis at such a high level of generality, as the Supreme Court there carefully distinguished between suits by a creditor to retain a debtor's assets *pre*-judgment versus *post*-judgment.  527 U.S. 308, 330-32 (1999).  In all events, the Committee cannot seriously argue that allowing a *component of Congress* to invoke the courts' equitable power to enforce alleged informational rights against the Executive Branch where Congress itself has declined to create a cause of action is interchangeable with, for example, an action by a private party to "prevent an injurious act by a public officer."  *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) (citing *Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845)); *see also id.* at 1385 ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations.").  In the latter circumstance, the court is acting to *protect* individual liberty from incursions by the coercive power of the state; in the former, it is aggrandizing the coercive power of one branch of government that already possesses its own constitutional powers and remedies.  Equating the two would mean disregarding the separation-of-powers principles underlying the cause-of-action requirement and abdicating the "vigilant doorkeeping" they demand.  *See Jesner*, 138 S. Ct. at 1398.

**C.      The Declaratory Judgment Act Does Not Provide a Cause of Action.**

The Committee is also wrong to assert that the Declaratory Judgment Act, 28 U.S.C. § 2201, permits it to proceed in this case absent a clear right of action.  The Committee's argument boils down to the assertion that it may invoke the Declaratory Judgment Act because it has "rights

guaranteed elsewhere." Pl.'s Opp.-Reply at 35. But the existence of *rights* is not the question; the question is whether the Committee has a *judicial remedy* guaranteed elsewhere. *See Walpin v. Corp. for Nat'l & Cmty. Serv.*, 718 F. Supp. 2d 18, 24 (D.D.C. 2010); *C & E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) (the right must already be "judicially remediable"). Indeed, were that not the standard, the Declaratory Judgment Act would, in essence, act as a universal cause of action—which is emphatically not the law. *See, e.g.*, *Sandoval*, 532 U.S. at 286.[15]

## III. THE ACCOMMODATION PROCESS IS NOT AT AN IMPASSE, AND THE COURT SHOULD STAY ITS HAND TO ALLOW THAT PROCESS TO PROCEED.

As Defendant has set forth, "[t]he Constitution contemplates" a process of negotiation and mutual accommodation in inter-branch disputes like this one, *United States v. AT&T*, 567 F.2d 121, 130 (D.C. Cir. 1977) ("*AT&T II*"), the unquestioned process for resolving conflicts between the political branches over congressional requests for information for more than two centuries. *See* Def.'s Mem.-Opp. at 44. That longstanding tradition establishes that judicial intervention in sensitive inter-branch disputes of this nature should be a remedy of last resort. And as Defendant has explained, such a remedy is not warranted here because the Committee has not shown that further efforts at accommodation are futile. On the contrary, the parties were able to reach an agreement to satisfy the Committee's demand for documents in Mr. McGahn's possession, and—notwithstanding this lawsuit—the White House has remained open to discussions regarding a

---

[15] Moreover, even the Committee concedes that the Declaratory Judgment Act does not supply jurisdiction, Pl.'s Opp.-Reply at 36, and it therefore seeks to invoke the jurisdictional grant of 28 U.S.C. § 1331. But under *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950), where jurisdiction rests on § 1331, a plaintiff must show that a non-declaratory judgment action could have been brought. *See id.* at 671-72 (with respect to "the power of the inferior federal courts to entertain litigation within the restricted area to which the Constitution and Acts of Congress confine them," the Declaratory Judgment Act simply allows a plaintiff to pursue a recognition of rights in lieu of an "immediately enforceable remedy like money damages or an injunction"). The Committee fails to show that such a non-declaratory-judgment suit could be brought.

mutually agreeable compromise to permit the Committee to obtain Mr. McGahn's testimony. *Id.* at 43-46; *see also* Decl. of Michael M. Purpura, ECF No. 32-3 ("Purpura Decl.") ¶¶ 20-21.  The Court accordingly should not proceed to the merits of the Committee's claims until the Committee has earnestly explored and exhausted the potential for such a compromise through the accommodation process.

The Committee makes several arguments otherwise, but none withstands scrutiny.  First, notwithstanding its own acknowledgment that the political branches' informational disputes "traditionally . . . have been settled through the accommodations process," Pl.'s Opp.-Reply at 57, the Committee contends that resort to the accommodation process is appropriate only "in the rare circumstance when the record 'demonstrates the proximity of the parties to a compromise.'"  Pl.'s Opp.-Reply at 37 (quoting *AT&T I*, 551 F.2d at 385).  But the D.C. Circuit merely observed in *AT&T I* that the parties had taken meaningful steps towards a compromise; it nowhere suggested that a court may only stay judicial resolution when the parties are *already* near an agreement. Indeed, a rule that opened the courthouse doors whenever the parties were not in "proximity . . . to a compromise" would *reduce* incentives to find common ground, thereby frustrating the principles underlying the constitutionally mandated accommodation process.[16]

Second, the Committee cites an October 8, 2019, letter from the Counsel to the President to the Speaker of the House, regarding a different congressional inquiry, and suggests that this letter shows that "the President has ruled out accommodating the Committee's request."  Pl.'s Opp.-Reply at 37.  But the Committee is wrong.  Indeed, far from the "impasse" announced in the

---

[16]  Similarly, the authorities cited by the Committee for the proposition that the Court has an "unflagging obligation to exercise [its] jurisdiction," Pl.'s Opp.-Reply at 41, do not involve the "nerve-center constitutional questions," *AT&T I*, 551 F.2d at 394, at issue in a dispute between the political branches and therefore are inapposite.  *See AT&T II*, 567 F.2d at 130 ("resolution of conflict between the coordinate branches in these situations must be regarded as an opportunity for a constructive modus vivendi" reflecting "the compromises achieved through negotiation," rather than zero-sum outcomes).

Committee's reply brief, *id.*, discussions between the Committee and the Counsel's Office remain ongoing, and the distance between the parties has *narrowed* in the weeks since Defendant filed his opening brief.  Specifically, on October 4, 2019, the parties re-opened discussions about the possibility of a private interview with Mr. McGahn, which is a marked change from the Committee's prior position that it would not consider anything other than public testimony. Purpura Decl. ¶ 19.  Since then, the parties have spoken on five additional occasions, on October 8, 11, 15, 21, and 24 (both before *and after* the Committee filed its opposition-reply), about the possible terms and conditions on which a Committee interview of Mr. McGahn might take place. Although the Speaker of the House has announced publicly that, in her view, the House has now commenced an impeachment inquiry—which, as stated in the Counsel's October 8 letter, implicates very different issues for the Executive Branch than routine legislative oversight—the Administration remains open to continued discussion of a possible Committee interview, under appropriate terms and conditions, of Mr. McGahn.  Thus, the Committee's contention that the parties are "at an impasse" is manifestly incorrect.

The Committee also dismisses the other information that the Administration has agreed to provide as a "plainly inadequate" substitute for Mr. McGahn's testimony.  Pl.'s Opp.-Reply, at 38. But as it concedes, the process of making that information available to the Committee (including the FBI reports of interviews of Mr. McGahn) is not yet complete, *id.* at 39, and thus it is unclear how the Committee can know now that such information will be inadequate.[17]  In any event, the point of accommodation is not whether a congressional committee gets every piece of paper or

---

[17]  The Committee takes issue with an argument Defendant has not made when it remarks that "confin[ing] the Committee to the materials the Executive Branch has gathered and produced in the course of its own investigations . . . would 'violate separation of powers principles.'"  Pl.'s Opp.-Reply at 38-39 (quoting *In re Request for Access to Grand Jury Materials*, 833 F.2d 1438, 1445 (11th. Cir. 1987)).  The accommodation process is not confining.  The Committee is free during the parties' negotiations to pursue any information it desires, and to invoke its express Article I powers to persuade the Executive Branch to provide it.

witness it demands, but whether it is possible to satisfy the needs and interests of both Congress and the Executive Branch, even if neither side is wholly satisfied with the outcome.  In light of that purpose, negotiations pertaining to Mr. McGahn simply cannot be analyzed in a vacuum; they are part and parcel of a larger accommodations process encompassing information from a number of other sources, all of which go toward fulfilling the Committee's stated purpose.  The Committee may find that process of give-and-take inconvenient or frustrating, but its mere dissatisfaction does not mean the process is not functioning as contemplated by the Constitution.

Finally, the Committee contends that the Court should not stay its hand because, in *Miers*, a judicial decision "*facilitated* the parties' ability to reach a workable agreement."  Pl.'s Opp.-Reply at 41.  But the parties are already working toward a potential agreement of the kind reached in *Miers*—a Committee interview in lieu of public hearing testimony.  *See* Def.'s Mem.-Opp. at 48 n.10.  A decision by the Court now would simply short-circuit the accommodation process and lead to premature resolution of "nerve-center" constitutional questions.  *See AT&T I*, 551 F.2d at 394.  For all of these reasons, the Court should not adjudicate the merits of this controversy until the parties have exhausted the accommodation process such that it is clear that this Court's intervention, and a decision on the weighty and far-reaching constitutional issues presented by this case, *see Miers*, 542 F.3d at 911, is actually necessary.

## IV.   THE COMMITTEE OFFERS NO PERSUASIVE ARGUMENT AGAINST DEFENDANT'S ASSERTION OF TESTIMONIAL IMMUNITY.

Even if the Court had jurisdiction, and the Committee a cause of action, judgment still must be rendered for Defendant as a matter of law, because Mr. McGahn is immune from compelled congressional testimony about matters concerning his duties as Counsel to the President.  Def.'s Mem.-Opp. at 47-57.  Fundamental separation-of-powers principles that prevent one branch of the federal government from undermining the authority or functions of another, and that protect the autonomy and effective functioning of the Presidency, in particular, *see id.* at 48-50, require that

the President's immediate advisors—those with whom he meets on a regular or frequent basis, and who assist him in the performance of his constitutionally assigned duties—must enjoy the same immunity from congressional testimonial compulsion as does the President himself, *id.* at 51.

Absent immunity, congressional committees could wield compulsory testimonial process against the President's immediate advisors as a means of supervising the President's actions, of harassing advisors so as to influence their official conduct (or the President's), and of retaliating against the President for actions with which the committee or its members disagree.   Thus, compelling immediate Presidential advisors to testify before Congress would risk significant congressional encroachment on and interference with the President's discharge of his duties, while creating the perception—and reality—of Presidential subordination to the Legislative Branch.   *Id.* at 52-53.   In addition, compelling immediate Presidential advisors to submit to interrogation by congressional committees would create unacceptable risks of coerced or inadvertent disclosures of confidential Presidential communications, which could deter Presidential advisors from sharing unpopular advice or discussing controversial matters with the President.   Thus, the President would be deprived of the full and frank advice essential to informed and effective discharge of his myriad sensitive and vital duties as the chief constitutional officer of the Executive Branch.   *Id.* at 53-54. Mr. McGahn, as Counsel to the President, qualifies as an immediate Presidential advisor to whom absolute testimonial immunity about matters concerning his duties in office applies.   *Id.* at 56-57.

The Committee's arguments to the contrary do not endure close analysis.[18]

---

[18] The Committee prefaces its arguments with a curious assertion that "no authority allows the President to direct McGahn, a private citizen, to disobey a Congressional subpoena."   Pl.'s Opp.-Reply at 42.   This is a non-issue.   The Committee has no authority to compel Mr. McGahn to testify because he is absolutely immune from congressional testimonial process.   Thus, regardless of the President's directive, the Committee is not legally entitled to the relief it seeks—an order requiring Mr. McGahn "to appear and testify before the Committee."   Compl., Prayer for Relief, ¶ A.2.   The Committee is also wrong, in any event, that a President cannot instruct a former advisor to refrain from testifying before Congress about matters concerning his official duties while in office.   It is well established in analogous contexts that ex-employees—including government

### A.   Testimonial Immunity Applies to Immediate Presidential Advisors To Protect the Autonomy and Effective Functioning of the Presidency Itself.

**1.**   The Committee first argues that because the President is "distinct" from and "stands in an entirely different position" than other Executive Branch officials, the testimonial immunity that he enjoys by virtue of his "'unique status under the Constitution'" does not extend to his immediate advisors.  Pl.'s Opp.-Reply at 44-45 (quoting *In re Kessler*, 101 F.3d 1015, 1017 (D.C. Cir. 1996) and *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982)).  While the Committee's premise is correct, the conclusion it reaches is not.

Just as the President himself must be immune from compelled congressional testimony to protect the autonomy of his office, and the confidentiality of its communications, *see* Def.'s Mem.-Opp. at 48-49, so too must his immediate advisors be immune.  Otherwise, compelled interrogation of his close advisors at the whim of congressional committees, on terms and conditions unilaterally determined by them, would just as effectively undermine the President's independence as head of a co-equal branch of Government as would compelling the President himself to appear and testify before committees of Congress.  *See id.* at 52-53.  So too, it would thwart the guarantee of confidentiality required for the effective performance of his many vital functions.  *Id.*  It is therefore insufficient to observe, as the Committee does, that the President is constitutionally distinct from "journeyman level" officials such as "assistant secretar[ies]" or an FDA Commissioner, *see Kessler*, 101 F.3d at 1017-18 (cited by Pl.'s Opp.-Reply at 44-45).  The President's immediate advisors perform unique functions, essential to the effective discharge of

---

employees—are obligated when directed to preserve, for example, the confidentiality of privileged information.  *See Blumenthal v. Drudge*, 186 F.R.D. 236, 241-242 (D.D.C. 1999) (noting that plaintiff, a former Presidential advisor, "ha[s] an obligation to preserve the presidential communications privilege long enough for the President to invoke it if he so desires"); *see also United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) (former employees must keep their former employers' confidences).  The same principle applies here, and it was therefore perfectly appropriate for the President to instruct Mr. McGahn that he should rely on the immunity attaching to him, and refrain from testifying until the dispute with the Committee is resolved.

the President's own constitutionally assigned duties, that differ from those of other Executive Branch officials. Def.'s Mem.-Opp. at 51-52; *see Harlow v. Fitzgerald*, 457 U.S. 800, 807-08, 810-11 (1982) (discussing the Supreme Court's "functional approach" to questions of immunity). Thus, testimonial immunity is extended to this core group of advisors not in disregard of the President's unique constitutional status, but as a necessary means of supporting it.

By the same token, the Committee is misguided when it invokes *Harlow's* holding that the President's absolute immunity from suit "'does not extend indiscriminately to [his] personal aides.'" Pl.'s Opp.-Reply at 45 (quoting *Forrester v. White*, 484 U.S. 219, 225 (1988)). As explained previously, Defendant does not argue that testimonial immunity extends "indiscriminately" to all Presidential subordinates who work in the White House. Def.'s Mem.-Opp. at 59. Rather, it applies exclusively to the members of the trusted inner circle with whom the President customarily meets on a regular or frequent basis, whose special function is to "assist him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Id.* at 59 (citing *Testimonial Immunity Before Cong. of the Former Counsel to the President*, 43 Op. O.L.C. ___, Slip. Op. (May 20, 2019) ("*Testimonial Immunity of the Former Counsel*") (Decl. of Serena M. Orloff ("Orloff Decl.") Exh. A) at 5).[19]

**2.** As the Committee now belatedly acknowledges, *Harlow* held that "[f]or aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy, absolute immunity might well be justified to protect the unhesitating performance of functions vital to the

---

[19] It is also beside the point that no single individual who serves for a time as a Presidential advisor "is indispensable to the functioning of the Executive Branch in the same manner as the President." Pl.'s Opp.-Reply at 45. As a whole the President's immediate advisors are no less indispensable to the President than legislative aides are to Members of Congress. *Cf. Gravel v. United States*, 408 U.S. 606, 616-17 (1972). And the testimonial immunity of these immediate advisors is necessary to preserve the autonomy and confidentiality that are essential to the effective functioning of the Presidency.

national interest."  457 U.S. at 812; *see also* Pl.'s Opp.-Reply at 46.  The Committee nevertheless disputes that *Harlow* supports a claim of immunity for Mr. McGahn.  *Id.*  The reasons given by the Committee for its disagreement, however, are not well taken.

First, the Committee argues that Defendant's theory of immunity would include White House officials, other than the Counsel to the President, who (in the Committee's view) do not fall within the scope of *Harlow's* exception.  Pl.'s Opp.-Reply at 46-47.  But whether or not the other officials identified by the Committee would qualify for absolute testimonial immunity is a matter that would have to be determined on a case-by-case basis, and is irrelevant for purposes here.  The only question that must be decided in this case is whether Mr. McGahn, by virtue of the functions he performed as Counsel to the President, is entitled to testimonial immunity.  As Defendant has shown, he is.  Def.'s Mem.-Opp. at 55-57.

Second, the Committee maintains that the claim of immunity for Mr. McGahn must be rejected because Defendant has offered no details to establish that his job duties were more sensitive than those of the two petitioning White House officials in *Harlow*, Pl.'s Opp.-Reply at 48, to whom (in the Committee's telling) the Court "refused to extend [absolute] immunity," *id*. at 47.  This argument is based on a patent misreading of the Supreme Court's decision.  While as a general matter *Harlow* rejected "[t]he undifferentiated extension of absolute 'derivative' immunity to the President's aides," 457 U.S. at 811, it did *not* reject the specific immunity claims of the petitioning White House officials in that case.  Rather, the Court stated that it "[could] not conclude on the record before [it]" whether either had made the requisite showing that "the functions of his office" required absolute immunity, and expressly "[did] not . . . foreclose the possibility that petitioners, on remand, could satisfy the standards properly applicable to their claims."  *Id.* at 813.  *See also* Def.'s Mem.-Opp. at 60.  Moreover, the Court's opinion includes no detailed discussion or analysis of the functions performed by the *Harlow* petitioners against which the functions performed by

Mr. McGahn, *see id.* at 56-57, could be compared.  Thus, no argument can be made that Mr. McGahn's claim of immunity should be denied on the basis of a simple comparison between his duties and those of the *Harlow* petitioners.

Third, the Committee argues that Mr. McGahn is not entitled to immunity under *Harlow's* exception because it does not wish to question him about "sensitive national security or foreign policy functions." Pl.'s Opp.-Reply at 48; *see also id.* at 46.  This argument is based on yet another misreading of *Harlow*.  The Court in *Harlow* did not hold that absolute immunity is limited exclusively to Presidential aides whose duties involve the performance of national security or foreign policy functions.  Rather, *Harlow* explained that absolute immunity might well be justified for "aides entrusted with discretionary authority *in such sensitive areas as* national security or foreign policy." 457 U.S. at 812 (emphasis added).  Thus, *Harlow* gave national security and foreign policy only as examples of the "sensitive areas" of responsibility for which absolute immunity may be necessary, not as an exhaustive list. *Id.*  As Defendant has discussed, the Counsel to the President, in addition to his participation in certain national security matters, is responsible for numerous sensitive and discretionary tasks concerning, for example, the preparation of Executive Orders and other Presidential policy directives, the selection and vetting of judicial nominees and nominees for Senate-confirmed positions in the Executive Branch, and the formation of legislative policy.  Def.'s Mem.-Opp. at 56-57.  The "unhesitating performance" of these and numerous other functions performed by the Counsel is vital to the functioning of the Presidency and of the national government more generally.

Moreover, whether or not the Committee purports at this time to be interested in questioning Mr. McGahn about "sensitive areas" of responsibility entrusted to him is irrelevant for purposes of testimonial immunity.  Once a Presidential aide appears before a committee to give testimony, that aide can be subjected "to a wide range of unanticipated questions about highly

sensitive deliberations and communications," regardless of what the committee may have said beforehand about the intended topics of examination.  *Testimonial Immunity of the Former Counsel*, at 6 (quoting *Immunity of the Assistant to the President and Dir. of the Office of Political Strategy & Outreach from Cong. Subpoena*, 38 Op. O.L.C. ___, Slip. Op. at 1-2 (July 15, 2014) ("*Immunity of the Assistant to the President*") (Orloff Decl. Exh. E) at 4).  Testimonial immunity is a necessary safeguard against that risk.[20]

In addition to the Committee's multiple mischaracterizations of what *Harlow* says and holds, the Committee also errs by assuming that *Harlow's* analysis of official immunity from suits for damages necessarily sets the outer bounds of testimonial immunity for immediate Presidential aides.  As the Committee acknowledges, Pl.'s Opp.-Reply at 44, in each case in which it is claimed that one branch of the Federal Government has impermissibly encroached upon the independence or autonomy of another, a court "must balance the constitutional weight of the interest to be served" by the actions of the first branch "against the dangers of intrusion on the authority and functions" of the second.  *Nixon v. Fitzgerald*, 457 U.S. at 754 (citations omitted).  And for reasons Defendant has already explained, "the separation of powers concerns that underlie the need for absolute immunity from congressional testimonial compulsion are not present to the same degree in civil lawsuits brought by third parties."  Def.'s Mem.-Opp. at 61 (quoting *Immunity of the*

---

[20]  To the extent the Committee means to suggest that Mr. McGahn should be denied immunity because it wishes to question him about "potential misconduct by the President," Pl.'s Opp.-Reply at 48, the suggestion lacks merit.  In *Senate Select Committee*, the D.C. Circuit rejected the argument that the "presumption of privilege" attaching to tape recordings of conversations between the President and one of his aides was defeated by the President's alleged involvement in "criminal conduct."  498 F.2d at 731; *see also In re Sealed Case*, 121 F.3d 729, 746 (D.C. Cir. 1997) (observing that a party seeking to overcome the presidential communications privilege "seemingly must always provide a focused demonstration of need, even when there are allegations of misconduct by high-level officials") (discussing both *Senate Select Committee* and *United States v. Nixon*).  If allegations of Presidential misconduct are insufficient to overcome the qualified privilege for presidential communications, then *a fortiori* they are insufficient to overcome the absolute testimonial immunity of the Counsel to the President.

*Assistant to the President*, at 5-6).  The scope of the testimonial immunity applied to immediate Presidential advisors accordingly must take into account the greater threat to Presidential autonomy and confidentiality posed by congressional demands for their testimony.  Thus, while *Harlow* provides support for absolute immunity from compelled congressional testimony for immediate Presidential advisors, as Defendant has set forth, *see* Def.'s Mem.-Opp. at 59-60, it does not define the limits of that immunity.

### B.    Compelled Testimony by Immediate Presidential Advisors Would Threaten the Autonomy and Effective Functioning of the Presidency.

The Committee next takes the position that the testimonial immunity of the President's immediate advisors is unnecessary to protect the Presidency's autonomy and independence, or to preserve the confidentiality that is essential to its effective functioning.  Pl.'s Opp.-Reply at 49-57.  However, the points raised by the Committee in support of this conclusion either misconstrue, or fail to take into account altogether, the separation-of-powers concerns that transcend the particular political dispute underlying this case.

**1.**  The Committee first asserts that "Executive Branch officials frequently testify before Congress … without harm to the Executive's institutional interests."  Pl.'s Opp.-Reply at 50.  But only a few of the examples cited by the Committee, *see id.* at 54-57, involved testimony for which Presidential advisors had been served with subpoenas (none occurring before 1973), *see id.* at 56-57 (citing *Miers*, 558 F. Supp. 2d at 102), and, as the Committee necessarily acknowledges, "none of these examples involved a *judicially enforced Congressional* subpoena," *id.* at 57.[21]

---

[21] The senior Presidential advisors who have testified before Congress after being served with subpoenas, *see* Pl.'s Opp.-Reply at 56, did so, for the most part, under agreements reached between the Executive Branch and Congress.  *See Testimonial Immunity of the Former Counsel*, at 9 n.12 (describing accommodation between President Nixon and the Senate Watergate Select Committee for voluntary closed-session and later public testimony by John Dean, H.R. Haldeman, and John Ehrlichman); *Iran-Contra Investigation: Joint Hearings Before the House Select Committee to Investigate Covert Arms Transactions with Iran and the Senate Select Committee on Secret Military Assistance to Iran and the Nicaraguan Oppositions*, H.R. Rep. No. 100-433 (1987)

The Committee tries to explain away this uncomfortable fact as simply reflecting that disputes over the testimony of close Presidential advisors "have been settled through the accommodations process." *Id.* That is true, of course. *See Testimonial Immunity of the Former Counsel*, at 12 ("Presidents have occasionally made senior advisers available to accommodate congressional requests, even while defending their legal authority to decline such requests."). But the lesson this history teaches about the fundamental difference between accommodation and subjugation is apparently lost on the Committee. The political branches' "long history of settlement of disputes that seemed irreconcilable" demonstrates that "compromise worked out between the branches," not compulsion, remains the approach "most likely to meet [the political branches'] essential needs and the country's constitutional balance." *AT&T I*, 551 F.2d at 394. Abandoning the tradition of mutual accommodation in favor of compelled public interrogation of Presidential advisors at the command of congressional committees, on terms entirely of the committees' choosing, would place power in the hands of Congress to exert authority and influence over the President's conduct of his duties that the Constitution did not intend Congress to wield. It would undermine the confidentiality necessary to the effective functioning of the Presidency, *see* Def.'s Mem.-Opp. at 52-54, and it would forever alter the balance of power between the elected branches that has served the country well for over 200 years.

**2.** The Committee next argues that the interest in protecting Presidential autonomy is "diminished here," and that compelling Mr. McGahn to testify would be consistent with the "proper operation of the three Branches" as intended by the Framers, because the Committee seeks

---

(preface) (noting that President Reagan waived executive privilege and ordered unrestricted cooperation with the special Iran/Contra Committee before which Oliver North and John Poindexter testified). Beth Nolan and John Podesta, senior aides to President Clinton, were called to testify about the Marc Rich pardon after President Clinton had already left office, a scenario that raises fewer separation-of-powers concerns than testimony by an immediate advisor to a sitting President. *See Controversial Pardon of International Fugitive Marc Rich: Hearing Before the Comm. on Gov. Reform,* 107th Cong. 309 (2001).

testimony regarding alleged "Presidential abuse of power" in furtherance of its impeachment function.  Pl.'s Opp.-Reply at 50, 51.  As noted *supra*, n. 20, under *Senate Select Committee* that argument would be insufficient to overcome even a qualified evidentiary privilege, but more fundamentally, the argument fails to see the forest for the trees (actually, a single tree).  The absolute testimonial immunity extended to Presidential advisors does not turn on the particular topics about which a committee states beforehand it wishes to inquire.  The immunity arises from separation-of-powers principles concerning the proper allocation of power and influence between the Executive and Legislative Branches that transcend the political turmoils of any given moment.

The Committee's argument that it has no intention of using its subpoena "'to harass or retaliate against Mr. McGahn in an effort to improperly influence or interfere with Presidential decision-making,'" *id.* at 52 (quoting Def.'s Mem.-Opp. at 64), is equally shortsighted.  Compelling close Presidential advisors to testify before Congress would license committees or individual members thereof, whenever so inclined, to "wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain."  *Testimonial Immunity of the Former Counsel*, at 5 (citation omitted).  Placing that power in a committee's or a member's hands would "would risk significant congressional encroachment on, and interference with, the President's prerogatives and his ability to discharge his duties with the advice and assistance of his closest advisers," *id.*—and promote a perception of Presidential subordination to Congress, *Immunity of the Assistant to the President* at 3—regardless of a committee's stated good intentions in any given instance.

**3.**  The Committee also continues to rely on *Nixon* as support for the argument that "concerns about confidentiality" must be "addressed through the case-by-case assertion of a qualified privilege rather than an absolute immunity from process."  Pl.'s Opp.-Reply at 53-54.

*Nixon* supports no such argument, however, as Defendant already has explained.  Def.'s Mem.-Opp. at 62-63.  *Nixon* expressly stipulated that it "address[ed] only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials," and not the balance "between the [President's] confidentiality interest and congressional demands for information."  418 U.S. at 712 n.19; *see also Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 384 (2004); *In re Sealed Case*, 121 F.3d at 743.[22]  In addition, *Nixon* also concerned a subpoena for documents and tapes, not testimony, and so did not have to take into account "the dangers of intrusion on the authority and functions of the Executive Branch," *Nixon v. Fitzgerald*, 457 U.S. at 754, that are posed by compelled congressional testimony of immediate Presidential advisors.  *See* Def.'s Mem.-Opp. at 62-63.

Thus, a different balance of constitutional interests must be struck here, one recognizing that it is no more tolerable under the separation of powers for committees to compel testimony by immediate Presidential advisors about their official duties than it would be for Executive Branch agencies to subpoena Congressional aides to testify about the legislative deliberations and

---

[22]  The Committee opines that if the disclosure in *Nixon* of tape recordings of the President's Oval Office conversations with his advisors "did not unduly threaten the President's interests in confidentiality, then no greater threat is posed by disclosure of a Presidential advisor's after-the-fact description of such conversations."  Pl.'s Opp.-Reply at 54.  Even accepting that arguable proposition at face value, it overlooks the fact that the President's interests in the confidentiality of communications with his advisors, which *Nixon* described as "fundamental to the operation of Government," 418 U.S. at 708; *see also* Def.'s Mem.-Opp. at 49-50, was pitted against and deemed outweighed by the intrusion on "the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions," *Nixon*, 418 U.S. at 707.  Moreover, the Court found little reason to expect that Presidential advisors would be "moved to temper the candor of their remarks" by the "infrequent occasions" on which they might be disclosed in a criminal trial.  *Id.* at 711-12.  Here, by contrast, not only has the Committee failed to demonstrate a need for the compelled testimony of immediate Presidential advisors to effectively carry out its "basic functions," *id.* at 712-13; *see infra* at 41-44; Def.'s Mem.-Opp. at 65-69, the occasions for compelled testimony before congressional committees would be far more frequent than at criminal trials.  In addition, criminal trials are presided over by judges acting as neutral arbiters applying impartial procedural rules, and thus provide assurances against abusive questioning not present at committee hearings.  *Cf.* Def.'s-Mem.-Opp. at 61.   Thus, greater protection for the confidentiality of the President's communications with his advisors is required here than was necessary in *Nixon*.

decision-making that take place in Members' private offices.  *See Gravel*, 408 U.S at 616-17.  The Committee offers no meaningful response.

Moreover, the theoretical ability to invoke executive privilege during an aide's testimony offers no protection whatsoever against the use of compulsory testimonial process as a tool of harassment or retaliation to interfere with Presidential decision-making, *see* Def.'s Mem.-Opp. at 64; it offers at best a flimsy and uncertain safeguard against disclosures of confidential information during the crucible of a committee hearing, *see id.* (especially considering that the validity of a witness's assertion of privilege will be judged in the first instance by the committee itself); and it would shower the courts with inter-branch disputes over claims of executive privilege, confrontations that the Supreme Court has instructed "should be avoided whenever possible," *Cheney*, 542 U.S. at 389-90; *see* Def.'s Mem.-Opp. at 64-65.

The Committee addresses none of these points.  Instead, it reduces the array of the President's constitutionally based confidentiality interests to a single concern about inadvertent disclosures of sensitive information during an advisor's testimony, and then assures the Court that it could "reach accommodations" with the Executive Branch as "necessary to safeguard privileged or classified information."  Pl.'s Opp.-Reply at 54.  That promise is whimsical, at best, when a committee armed with the power of compulsory testimonial process would have no incentive to accommodate the Executive's confidentiality interests, and instead could subject Presidential advisors, at will, to heated questioning for the very purpose of eliciting unintended disclosures of sensitive information from harried witnesses.  *See* Def.'s Mem.-Opp. at 54, 64.

### C.   The Testimonial Immunity of the President's Immediate Advisors Does Not Impair the Performance of Congress's Article I Functions.

The Committee finally maintains that the testimonial immunity of immediate Presidential advisors "substantially impair[s] the House's ability to carry out its core Article I functions."  Pl.'s Opp.-Reply at 57-65.  None of the arguments raised by the Committee supports this conclusion.

The Committee lays principal reliance for its position, yet again, on *Nixon*.  *See id.* at 58-59.  But now, as before, the balance struck in *Nixon* between the confidentiality required for the informed and effective discharge of the President's constitutional responsibilities, and the "primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions," 418 U.S. at 707, does not fore-ordain the balance required "between the [President's] confidentiality interest[s] and congressional demands for information," *id.* at 712 n.19.  The Committee supposes that the weight to be accorded to the impeachment function "is at least comparable to a criminal prosecution," Pl.'s Opp.-Reply at 59, but the Committee misses the point.  The separation-of-powers analysis turns not simply on the constitutional weight assigned to a particular function performed by one branch, but "focuses on *the extent to which* [the actions of another branch] prevent [the first branch] from accomplishing [that] constitutionally assigned function[ ]."  *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 444 (1977) (emphasis added); *see Nixon*, 418 U.S. at 711-12 ("[W]e must weigh the importance of the general privilege of confidentiality of Presidential communications … against *the inroads* of such a privilege on the fair administration of criminal justice.") (same).

Nixon held that an absolute (rather than qualified) evidentiary privilege for Presidential communications "would gravely impair the role of the courts under Art[icle] III," 418 U.S. at 707, because the availability of compulsory process to secure the production of evidence was "imperative to the function of courts" in criminal trials, *id.* at 709.  The Committee can make no comparable claim that compelled testimony by the President's immediate advisors is "imperative" to the House's functions, including the impeachment function.  Unlike the courts, which have no means of securing testimony or evidence from reluctant parties without compulsory process, Congress has available to it a variety of means, unavailable to the Judicial Branch, by which to elicit the cooperation of the Executive Branch with its investigative efforts.

Among other powers, Congress can withhold certain funds from the Executive Branch, decline to enact legislation, or enact legislation (including appropriations) that the Executive Branch disfavors.  "Congressional control over appropriations and legislation is an excellent guarantee that the executive will not lightly reject a congressional request for information, for it is well aware that such a rejection increases the chance of getting either no legislation or undesired legislation." *Nixon v. Sirica*, 487 F.2d 700, 778 (1973) (Wilkey, J., dissenting); *see Chadha*, 462 U.S. at 955 n.19 ("The Constitution provides Congress with abundant means to oversee and control" Executive Branch agencies.).  *See also* Def.'s Mem.-Opp. at 69 (citing, *inter alia, Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 319 (D.C. Cir. 1988)).[23]

The Committee asserts nonetheless that the President could "thwart his accountability" for impeachable conduct and "eviscerate" Congress's oversight authority "through capacious grants of absolute immunity."  Pl.'s Opp.-Reply at 60-61 (quoting *Miers*, 558 F. Supp. 2d at 103); *see id.* at 52.  The testimonial immunity at issue here is not "capacious," however.  It is strictly limited, as explained, to the core group of advisors with whom the President meets on a regular or frequent basis, and does not include department heads or other agency officials who typically testify before Congress for oversight purposes.  *See* Def.'s Mem.-Opp. at 61 n.14. The occasions on which the testimonial immunity of this small circle of individuals would deprive Congress of information that is critical to its legislative, oversight, or impeachment functions, that is available from no other sources, and which Congress has no other means of securing, would be rare indeed.

---

[23]  The Committee responds that "us[ing] the appropriations power to grind the Government to a halt over a subpoena dispute [would be] extraordinary and impractical," Pl.'s Opp.-Reply at 64, but that is a strawman.  Congress need not grind the appropriations process to a halt in order to cut funding for individual programs or agencies of special interest or concern to the President as a means of pressuring the Executive to comply with its informational demands.  And while Congress ordinarily cannot enact legislation without the President's signature, *see id.*, Congress can, in addition to overriding vetoes, refuse unilaterally to enact legislation the President's desires, or include provisions he disfavors in "must pass" legislation, to compel satisfactory responses to its informational requests.  The Committee's attempt to deprecate the utility of the legislative tools at its disposal is unconvincing.

The Committee's continued efforts to demonstrate that this is one of those rare occasions fall flat. Once again, the Committee asserts repeatedly that Mr. McGahn's testimony is "crucial" and "critical" to its inquiry, Pl.'s Opp.-Reply at 38, 52, 58, 61, and that the failure to obtain his testimony "is impairing its impeachment investigation," *id.* at 61.[24] But, as before, the Committee fails to substantiate these characterizations of Mr. McGahn's importance by pointing to specific facts, obtainable from no other sources than Mr. McGahn, that are "crucial or "critical" to its inquiry. *See* Def.'s Mem.-Opp. at 67. Instead, the Committee simply restates its desire to question Mr. McGahn about his versions of events already thoroughly documented in the Special Counsel's report, because the President has disputed them, because it wants a "firsthand explanation" and even "more thorough account" of the incidents reported, and because it wants Mr. McGahn's subjective impressions of the President's "state of mind." Pl.'s Opp.-Reply at 62. What is missing from the Committee's recitation of these generalities is how the absence of any particular information falling into these categories "gravely damage[s]" or even "substantially impairs" its inquiry. *See id.* at 43, 57. That omission likely reflects Chairman Nadler's own stated conclusion that the Committee could determine whether to recommend articles of impeachment even without Mr. McGahn's testimony. *See* Def.'s Mem.-Opp. at 67 (citing Orloff Decl. Exh. I).[25] But be that

---

[24] Although the Committee insists on the importance of Mr. McGahn's testimony to its inquiry, it is apparently unwilling to make an argument that its need for his testimony would be sufficient to overcome a qualified form of testimonial immunity. *See* Def.'s Mem.-Opp. at 68 n.18. Instead it merely asserts, without citation or explanation, that because (in the Committee's view) Mr. McGahn is not protected by absolute testimonial immunity, then *ipso facto* he enjoys no qualified testimonial immunity either. Pl.'s Opp.-Reply at 58.

[25] The Committee complains that the Executive Branch has not yet made available all of the FBI interview reports and other documents to which it agreed in the accommodation process to give the Committee access, Pl.'s Opp.-Reply at 62-63, but does not dispute (nor could it) that the Executive Branch in fact agreed to make these materials available. Although the Committee points out that two other witnesses, former Assistant to the President Hope Hicks, and former Deputy Counsel to the President Annie Donaldson Talley, did not answer all the questions put to them during their testimony, on grounds (respectively) of immunity and Executive Branch confidentiality concerns, the Committee has not contacted the Counsel's Office to inquire whether further information could be obtained from these witnesses as part of the accommodation process.

as it may, the Committee makes no persuasive case that the testimonial immunity of the President's immediate advisors unduly impairs the functions of the Legislative Branch.

## **CONCLUSION**

For the reasons stated herein, and in Defendant's opening brief, the Committee's motion for summary judgment should be denied, Defendant's summary-judgment motion granted, and judgment entered in Defendant's favor as a matter of law.

Dated:  October 25, 2019

<div style="margin-left:45%">

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director


  _/s/ James J. Gilligan_____
JAMES J. GILLIGAN
Special Litigation Counsel

SERENA M. ORLOFF (CA Bar No. 260888)
STEVEN A. MYERS (NY Bar No. 4823043)
ANDREW BERNIE (DC Bar No. 995376)
Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
P.O.  Box 883
Washington, D.C.  20044
Telephone:  (202) 514-3358
Fax:          (202) 616-8470
Email:       james.gilligan@usdoj.gov

_Counsel for Defendant_

</div>