```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2     _____

3     Committee on the Judiciary of    ) Civil Action
      the U.S. House of                ) No. 1:19-cv-02379-KBJ
4     Representatives,                 )
                                       )
5                        Plaintiff,    )
                                       ) **Motion Hearing**
6     vs.                              )
                                       )
7     Donald F. McGahn, II,            ) Washington, D.C.
                                       ) October 31, 2019
8                        Defendant.    ) Time:  2:00 p.m.
9     _____

              Transcript of **Motion Hearing**
10                       Held Before
            The Honorable Ketanji Brown Jackson
11               United States District Judge
12    _____

                  A P P E A R A N C E S
13
      For the Plaintiff:     Douglas N. Letter
14                           Megan Barbero
                             Sophia Brill
15                           Adam A. Grogg
                             U.S. HOUSE OF REPRESENTATIVES
16                           Office of General Counsel
                             219 Cannon House Office Building
17                           Washington, D.C. 20515

18                           Annie L. Owens
                             GEORGETOWN UNIVERSITY LAW OFFICE
19                           Institute for Constitutional Advocacy
                             and Protection
20                           600 New Jersey Avenue, Northwest
                             Washington, D.C. 20001
21

22

23

24

25
```

```
 1     For the Defendant:        James M. Burnham
                                 Andrew M. Bernie
 2                               Cristen C. Handley
                                 Steven A. Myers
 3                               Serena M. Schultz Orloff
                                 U.S. DEPARTMENT OF JUSTICE
 4                               Civil Division
                                 Federal Programs Branch
 5                               P.O. Box 883
                                 Washington, D.C. 20044
 6     _____

 7     Court Reporter:           Nancy J. Meyer, Official Court Reporter
                                 Registered Merit Reporter
 8                               Certified Realtime Reporter
                                 United States Courthouse, Room 6509
 9                               333 Constitution Avenue, Northwest
                                 Washington, D.C. 20001
10                               (202) 354-3118

11     _____

12                     P R O C E E D I N G S

13             THE COURTROOM DEPUTY:  Your Honor, we're in Civil

14     Action 19-2379, Committee of the Judiciary of the U.S. House of

15     Representatives vs. Donald F. McGahn.

16             Can I have counsel please approach the podium and

17     identify yourself for the record, please.

18             MR. LETTER:  Good morning, Your Honor.  I'm Douglas

19     Letter.  I'm the General Counsel of the U.S. House of

20     Representatives.  As I believe we notified you, Assistant

21     General Counsel Megan -- Associate General Counsel Megan

22     Barbero will be -- she and I will be dividing argument time

23     today.  Ms. Barbero will be handling the jurisdictional issues,

24     and I'll be handling the merits issues.

25             In addition at counsel table, we have Adam Grogg from
```

1      the Office of General Counsel; Annie Owens from the Georgetown

2      Institute of Constitutional Advocacy and Protection; and Sophia

3      Brill from the Judicial Committee Staff.

4              And just, Your Honor, in a couple of hours, we have a

5      hearing in front of Judge Leon down the hall.  I just wanted to

6      alert you.  So Mr. Tatelman and then Ms. Morse will be getting

7      up and walking out.  I just didn't want you to feel insulted.

8              THE COURT:  Well, no.  Thank you.  I am aware, and I

9      actually planned to address it just by saying I hope you-all

10     had sort of figured it out because I -- it was not my intention

11     to truncate or change this hearing in any way.

12             MR. LETTER:  And we are happy to stay as long as you

13     have questions for us.  As I said, Mr. Tatelman and Ms. Morse

14     will be getting up and leaving, but no disrespect.

15             THE COURT:  All right.  Thank you.

16             MR. LETTER:  Thank you.

17             THE COURT:  Welcome to all of you.

18             MR. BURNHAM:  Good afternoon, Your Honor.  James

19     Burnham on behalf of the United States and Mr. McGahn.  With me

20     at counsel table, I have Serena Orloff, Andrew Bernie, Cristen

21     Handley, and Steven Myers.  And as with -- as like the House,

22     we have a few folks who will be going down the hall in two

23     hours, but we're yours all night.

24             THE COURT:  Wonderful.  Well, it's close by, so that

25     works out well.

1      Good afternoon.  This Court has scheduled this

2  hearing to give the parties in this matter the opportunity to

3  provide argument and hopefully insight with respect to the

4  pending dispositive motions, which are the parties'

5  cross-motions for summary judgment with respect to the House

6  Judiciary Committee's legal action to enforce a subpoena that

7  the Committee issued this past spring to former White House

8  Counsel Donald F. McGahn II.

9      The subpoena at issue required Mr. McGahn to testify

10  before the Committee on May 21st, 2019.  However, at the

11  direction of the Executive Branch, Mr. McGahn did not appear on

12  that date.

13      The Department of Justice is here representing the

14  Executive Branch.  That is correct; right?  You are the

15  Department of Justice?  I just want to make sure.

16      MR. BURNHAM:  As far as I know, ma'am, yes.

17      THE COURT:  All right.  Thank you.  There's so many

18  moving parts and people.

19      The Department of Justice is representing the

20  Executive Branch and its position that Mr. McGahn is absolutely

21  immune from compelled congressional testimony with respect to

22  the matters occurring during his service as a senior adviser to

23  the President.

24      That is the core legal issue that this case presents,

25  and the parties have opted to proceed on cross-motions for

1    summary judgment in lieu of litigating a preliminary injunction

2    that the Judiciary Committee previously filed with respect to

3    the claims in its complaint.

4          The issue has been fully briefed.  I am familiar with

5    the arguments that you make in your briefs regarding why

6    summary judgment should be granted in your favor; but for the

7    purpose of today's hearing, you should feel free to restate

8    them and to provide as much background detail as you deem

9    necessary in order to illuminate the issues.

10         And, of course, because the purpose of this hearing

11   is for the Court to get the information that it needs in order

12   to rule on these motions, I will be asking you clarifying

13   questions.  I will try not to interrupt you too much, but I

14   hope we can engage in a discussion of the issues.

15         As far as the procedure we will follow, it's not my

16   practice to impose time limits.  I find them distracting.  I

17   really just want to engage with you-all and focus on your legal

18   arguments.

19         I think what we will do -- and the Committee's

20   proposal in terms of splitting its argument is similar to what

21   I had hoped we would do.  That is, I'd like to have essentially

22   two rounds of argument that address separately the two major

23   categories of legal issues that these cross-motions present.

24         The first category are the various threshold

25   arguments concerning standing, jurisdiction, cause of action,

1    separation of powers and the like, each of which might prevent

2    this Court from reaching the merits of the Judiciary

3    Committee's claim that this Court should declare the subpoena

4    enforceable.

5            To this end, I think I'll have counsel for the

6    Judiciary Committee go first.  Is that you, Ms. Shapiro -- no,

7    sorry.  Ms. --

8            MS. BARBERO:  Barbero.

9            THE COURT:  Ms. Barbero?

10           MS. BARBERO:  Correct.

11           THE COURT:  So many names.

12           All right.  Let me just continue to explain.  I'll

13   have you up first to give us an overview of the case and segue

14   into your arguments concerning this first category of issues.

15   You can lay out the circumstances of this dispute, the claim

16   that's brought in the complaint, and why the Committee believes

17   it has standing, why this Court has subject matter

18   jurisdiction, what is the cause of action, and why the

19   separation-of-powers principles should not compel the Court to

20   abstain from rendering judgment in this dispute.  Then we'll

21   have counsel for DOJ to respond with respect to those issues,

22   in effect providing the agency summary judgment arguments with

23   respect to those threshold concerns.

24           I'll then give you-all, the counsel for the House,

25   the opportunity to respond and entertain any replies with

1    respect to those issues before we move on to the next category,

2    which is the Department of Justice's argument that Mr. McGahn

3    is absolutely immune from having to respond to the Judiciary

4    Committee's subpoena.

5          With that basket of issues, the merits issues, I will

6    have DOJ take the lead, and then the Committee can respond.

7    All right?

8          So now it's your turn.  Thank you.

9          MS. BARBERO:  Thank you, Your Honor.  May it please

10   the Court.  Megan Barbero, on behalf of the House Judiciary

11   Committee.  And as Your Honor laid out, I will be addressing

12   the threshold issues of standing, justiciability, subject

13   matter jurisdiction, and cause of action.  And unless the Court

14   has a different preference, I would plan to start with

15   standing, but I'm happy to entertain any questions.

16         THE COURT:  That's fine.  Let me just ask Mr. Letter,

17   or anyone else, if you wanted to just put the claims on the

18   table generally, or shall we just jump right into those issues?

19         MR. LETTER:  Your Honor, I think we'd like to just

20   jump into those issues.  But as Ms. Barbero said, we're at your

21   service.  So whatever you wish is what we'll do.

22         THE COURT:  Well, that's fine.  Ms. Barbero, we'll

23   have you begin.

24         MS. BARBERO:  Excellent.  Thank you, Your Honor.

25         The -- before I jump into the threshold issues, I do

1    want to emphasize that with respect to the claims the House

2    judicial committee is bringing here, we are not asking the

3    Court to tread any new ground.  This ground is well familiar to

4    the Court from both the *Miers* and *Holder* decisions, which are

5    on all fours with this case.  And we would urge the Court to

6    reach the same conclusion here that Judge Bates and

7    Judge Berman Jackson reached in those decisions, relying on

8    established Supreme Court and D.C. Circuit --

9            THE COURT:  And there haven't been any intervening

10   decisions as far as the House knows that relate to the same

11   issues?

12           MS. BARBERO:  There have been intervening decisions

13   that relate to the same issues, but they don't change the

14   outcome in those cases, and we can talk through those

15   intervening decisions.

16           THE COURT:  All right.

17           MS. BARBERO:  But none of them should change the

18   ultimate decision that this Court reaches on any of those

19   threshold issues.

20           Now, Your Honor, if we could start with standing.

21           THE COURT:  All right.

22           MS. BARBERO:  The -- the Committee here is asserting

23   its Article I interest in obtaining information that it needs

24   in order to conduct both an impeachment investigation under its

25   Article I authority and also its legislative and oversight

1   responsibilities.  And as the Supreme Court has long made

2   clear, the Committee and the House need information in order to

3   act wisely and effectively in carrying out their Article I

4   duties.

5          Now, Your Honor, the department relies very heavily

6   on *Raines* to argue that the Committee lacks standing here, but

7   this case is distinguishable from *Raines*.

8          THE COURT:  All right.  Before you get into their

9   arguments, tell me why you have a redressable injury-in-fact?

10          MS. BARBERO:  Your Honor, we have a concrete and

11   particularized injury because the Committee needs information

12   from Mr. McGahn, who was a key witness to the -- the

13   allegations of obstruction of justice by the President in the

14   Mueller Report.  Mr. McGahn witnessed and can provide testimony

15   to the Committee in response to its subpoena on some of the key

16   events underlying the Mueller Report that the Committee is

17   investigating, including the removal of National Security

18   Advisor Michael Flynn.  He was a key witness as well to

19   President Trump's efforts to shut down the FBI's Russia

20   investigation by attempting to influence and remove FBI

21   Director James Comey.

22          President Trump, according to the Mueller Report,

23   enlisted Mr. McGahn to pressure the Attorney General both not

24   to recuse himself and then to unrecuse himself.  And after

25   Special Counsel Mueller was appointed, Mr. McGahn was asked by

1      the President to have Mr. Mueller step down because of alleged

2      conflicts of interest.  And then the President has disputed

3      Mr. McGahn's report of that incident and discredited him.

4                  THE COURT:  All right.  So I -- I understand.  I

5      mean, you lay this all out in your brief, his sort of relevance

6      to the overall process because he can provide such information.

7      I'm curious about your initial statement, which was that the

8      Committee needs information from him, and I want to understand

9      the extent to which your need for the information is relevant

10     to the analysis with respect to injury.  In other words, I

11     understand the -- your opponent's argument in part to be that

12     you have a very lengthy Special Counsel Report, and in that

13     report there's a lot of information.

14                 And so to what extent does your injury-in-fact

15     contention turn on your, quote/unquote, need for the

16     information at issue?

17                 MS. BARBERO:  Your Honor, the injury-in-fact is the

18     deprivation of information to which the Committee and the House

19     are entitled.  And I want to be entirely clear about that.  But

20     it does relate in some respects to the need for information,

21     surely.  And the Committee does require Mr. McGahn to come in

22     and testify so that they can have a live witness, test his

23     credibility, ask him about the statements that he made to

24     Special Counsel Mueller that are underlying the Mueller Report,

25     talk to him about the President's attempt to discredit him, and

1    judge for themselves, which is what the Constitution empowers

2    the Committee to do, particularly when it's conducting an

3    impeachment investigation.  And the Committee is entitled to

4    and should have all of the information, including from the key

5    witness, to the facts underlying the obstruction of justice

6    charges, and -- and --

7         THE COURT:  And the Committee is injured by its

8    failure to get such information?

9         MS. BARBERO:  Absolutely, Your Honor.  Absolutely.

10   And the injury that it suffers is not only to the impeachment

11   investigation, but also, as we've laid out in the brief -- and

12   Your Honor is well-familiar with the arguments to its

13   legislative and oversight priorities, including oversight of

14   the FBI and DOJ.  And by having Mr. McGahn come in as a live

15   witness, with the ability to cross-examine him, the Committee

16   can get information that will inform both the impeachment

17   inquiry and also its legislative and oversight priorities.

18        THE COURT:  All right.  Well, let me ask you this --

19   and it might be skipping ahead, and I don't mind if Mr. Letter

20   wants to jump up if I'm touching the merits.

21        Is it your position that Mr. McGahn would have to

22   answer every question that is put to him if he were to appear,

23   or is it your view that he could, in select instances, invoke

24   some sort of executive privilege not to actually answer certain

25   questions?

1          MS. BARBERO:  Your Honor, we expect that Mr. McGahn

2     would invoke executive privilege.  Now, there would be

3     questions about whether it was a valid invocation of the

4     executive privilege.  But what we're here on today is the

5     request that he be made to come in and testify pursuant to the

6     subpoena on the absolute immunity claim.

7          THE COURT:  So I do appreciate the fact that

8     ultimately there would be likely a dispute about the validity

9     of any invocation, but I guess I'm just trying to understand

10    whether your opposition to this absolute immunity proposition

11    carries with it the argument that if a person is required to

12    come in by Congress, they must answer every question.  If there

13    is -- let me put it another way.  If there is a valid privilege

14    to be asserted with respect to a particular question, are you

15    saying he would not be allowed to do that?

16         MR. LETTER:  We are not saying that, Your Honor.

17    And -- and remember, as Ms. Barbero said, we expect that

18    executive privilege would be asserted; and, indeed, remember,

19    it would be asserted by the President.  The President is the

20    only one who can assert it.  It won't be Mr. McGahn asserting

21    it.

22         So it might very well be that the President would

23    have given direction to Mr. McGahn or -- or, presumably, it

24    will be justice department counsel there who would say the

25    following things are covered by executive privilege.

1          What happens then is those are subject to rulings by

2     the chairman of the Committee.  So this would be then a hearing

3     before the -- a hearing or some other format before the -- the

4     Judiciary Committee.

5          THE COURT:  So in this way, am I to understand that

6     absolute immunity and executive privilege are different things?

7     Yes?  They're --

8          MR. LETTER:  Absolutely.

9          THE COURT:  -- sort of interwoven at times throughout

10    the brief, but they're actually different?

11         MR. LETTER:  Absolutely, Your Honor.  And, indeed,

12    just to get into this a little bit, remember absolute immunity,

13    they're -- they're claiming that he doesn't even have to show

14    up at all, answer no questions.  Executive privilege -- and is

15    that the President says -- is expected to say, Well, that

16    question is a problem.  These 27 are fine, but that one is a

17    problem, et cetera.

18         And so they're -- they're very different.  And,

19    indeed, one of the things that we have argued on the merits is

20    if you buy the Justice Department's absolute immunity argument,

21    it sort of undermines in this area the purpose of executive

22    privilege and why the Supreme Court has said executive

23    privilege is not an absolute privilege.

24         THE COURT:  All right.  We'll get into the merits,

25    but thank you.  I just wanted to clarify that.

 1              MR. LETTER:  Thank you, Your Honor.

 2              THE COURT:  And so as Ms. Barbero was pointing out,

 3    this is really today about absolute immunity, testimonial

 4    immunity.

 5              MS. BARBERO:  Correct.  And on the standing issue,

 6    the D.C. Circuit in *AT&T* 1 held that the House had standing --

 7    Article III standing to assert its interest in compliance with

 8    one of its subpoenas in a case that is very similar in terms of

 9    the informational interest that the Committee and the House had

10    there.  And the D.C. Circuit held --

11              THE COURT:  Very similar or the same?  Isn't this the

12    same case for the purpose of that?

13              MS. BARBERO:  It is the same -- the information, of

14    course, is different --

15              THE COURT:  Correct.

16              MS. BARBERO:  -- is all that I meant.  But the

17    interest is the same, yes.

18              THE COURT:  I see.

19              MS. BARBERO:  The informational interest is the same.

20              But -- but there is binding D.C. Circuit precedent

21    from *AT&T* 1 holding that the House has standing, again, to come

22    into Court; Article III standing to ensure compliance with a

23    subpoena issued in connection with its legislative and

24    oversight responsibilities under Article I.

25              Now, in terms of the standing analysis, this is a

1   concrete and particularized injury here, just as it was in

2   *AT&T* 1 and in *Miers* and the *Holder* cases.  This isn't an

3   abstract political dispute.  It is the Committee asserting a

4   very specific interest, as we've walked through, in getting

5   information from Mr. McGahn that is relevant and important to

6   the impeachment inquiry and also its legislative and oversight

7   priorities.

8          THE COURT:  All right.  But the Executive suggests

9   that it is a political dispute.  In fact, they weave separation

10  of powers throughout many of their different arguments in this

11  way.  So maybe you can say a little bit about why you think

12  they're wrong with respect to the political nature of this.

13         MS. BARBERO:  Well, Your Honor, the fact that there

14  is a political dispute between the Executive and Legislative

15  branches does not mean that the claim is not justiciable in

16  this Court.  We know that from *AT&T* 2 where the D.C. Circuit

17  very clearly recognized that that case involved -- the Court

18  characterized that case as a clash between the Executive and

19  Legislative branches and yet went on to resolve the merits of

20  that dispute and the subpoena enforcement context.

21         We know going back to *United States v. Nixon* that the

22  Supreme Court has said that in cases involving executive

23  privilege claims, that it is the duty of the Court to say what

24  the law is.  And that is true even when there are political

25  clashes where, as the Supreme Court said in *Zivotofsky*, the

1    Court may well -- may gladly avoid those issues, and yet it

2    cannot do so in a case where there's standing and the court

3    door should otherwise be open to get relief.

4             THE COURT:  All right.  But what is your response to

5    the argument that there have been disputes of this nature

6    concerning access information with respect to the Executive

7    Branch versus the Legislative Branch for centuries and there's

8    only been a handful of times, apparently, that the courts have

9    been utilized in order to resolve those disputes?  Doesn't that

10   sort of cut against this notion that this is the kind of

11   dispute that is ordinarily handled by the courts?

12            MS. BARBERO:  A few responses, Your Honor.  First, I

13   would commend to Your Honor's attention Judge Bates's decision

14   in the *Miers* case, which addresses at length this very

15   argument.  But it is -- as a -- as a first principle, we know

16   when we cited the *U.S. v. Burr* case from 1807, the courts have

17   long adjudicated subpoena enforcement cases, including where

18   the subpoenas were directed at high-level Executive Branch

19   officials.  It is also the case that the courts have

20   adjudicated separation-of-powers disputes, including --

21   involving removal in *Humphrey's Executor* and *INS v. Chadha*.

22            And then to the point of whether Congress has

23   alternative remedies that it could use, which generally means

24   that Congress doesn't come to court, it is -- we know from --

25            THE COURT:  Is that a standing principle?  I was a

1    little confused.  I'm going to ask counsel to try to explain to

2    me why the fact that you may have some other options at your

3    disposal means anything with respect to whether or not you have

4    standing to proceed.

5           MS. BARBERO:  It does not mean anything with respect

6    to standing, Your Honor.  That's clear.  We know that to be

7    true from *AT&T* 1, which is binding D.C. Circuit precedent.  It

8    was true there that it was -- there was a political dispute.

9    It was also true that there had not been an extensive history

10   of Congress coming to the courts to seek enforcement of its

11   subpoenas; but when Congress did -- when the House Committee

12   did come to court, the D.C. Circuit said absolutely there's

13   standing, there's an injury, it's enforcement in the court;

14   that we know that was true in both *Miers* and *Holder.*

15           And the fact that there are alternative remedies that

16   may be available doesn't undermine the injury that the

17   Committee is suffering and seeking redress in this Court.  If

18   you take -- for example, thinking about a different context, if

19   you had an ordinary business dispute, say a trade secret

20   dispute or unfair competition between two businesses, it may

21   well be the case that those businesses have other means

22   of affecting each other, even doing harm to each other in the

23   marketplace, through advertising, you know, underselling to --

24   to customers, all of those things; but it doesn't mean that if

25   there's an injury suffered from unfair competition or violation

1      of trade secret law that the competitor can't come into court.

2             And the same principle applies here.  It's true that

3      Congress has -- and the House has other mechanisms that it

4      could use in order to, for example, punish somebody who

5      receives a subpoena and refuses to comply.  But, again, as the

6      D.C. Circuit recognized in *AT&T* 2 -- and this principle comes

7      through in *Miers* -- the courts have long understood that it is

8      preferable in many respects for the House to come in and seek a

9      declaration and injunction from an Article III court rather

10     than to, for example, send the Sergeant at Arms out to arrest

11     somebody and have the same dispute about the validity of the

12     subpoena teed up where you have a habeas case because the

13     Sergeant at Arms has taken somebody into custody --

14             THE COURT:  Well, it doesn't impact the sort of

15     separation-of-powers concerns.  But let me take you to a

16     slightly different direction.  And, again, I'm suddenly worried

17     that I'm breaking down my own divide between the merits and

18     these threshold issues.

19             But opposing counsel and -- and the Executive points

20     to a long string of OLC opinions that appear to take the

21     position that it's the long-standing policy of the

22     Executive Branch to decline invitations for voluntary

23     appearances and to resist congressional subpoenas.  What that

24     suggests to me, and this goes to the very first point, which is

25     that I should focus on *Miers* and the *Holder* case.

1          What I'm trying to understand is whether those cases

2     are somehow an outlier, because the traditional position had

3     been presidential aides either do not volunteer or they are not

4     able to be compelled.  Is that a question that I'm supposed to

5     be asking Mr. Letter?

6          MS. BARBERO:  Well, I will certainly let Mr. Letter

7     address the issues to the extent there's more to say, but I

8     would point out, at least at the outset, that in the 1984 OLC

9     opinion and again in 1986, OLC very clearly recognized that

10    Congress could use the civil enforcement remedy; and, in fact,

11    that would -- would be a remedy that was available to the House

12    or to Congress because OLC concluded that the U.S. attorney

13    could not be compelled to prosecute a -- an Executive Branch

14    official if there was a valid claim of executive privilege.

15         THE COURT:  I see.  So in the context of a case in

16    which one of the other options was actually tried, they said,

17    No, no, no, can't do this one --

18         MS. BARBERO:  Exactly.

19         THE COURT:  -- but civil enforcement --

20         MS. BARBERO:  But don't worry because civil

21    enforcement would be available to the House.  And at that time,

22    of course, you had the *AT&T* 1 and 2 decisions on the books, so

23    we knew that the House both had standing and that there was

24    subject matter jurisdiction under 1331 for the House to come to

25    court and seek civil enforcement of its subpoena actions.  And

1      I believe that those are referenced in a footnote at least in

2      the '84 opinion.

3                  THE COURT:  All right.  Well --

4                  MS. BARBERO:  But if there's more to --

5                  THE COURT:  When Mr. Letter comes, he can address

6      that point.

7                  Let me ask about jurisdiction, since you brought it

8      up.  Is it your position that the court has jurisdiction under

9      1331?  And what do you make of what appears to be a reversal by

10     the other side with respect to this issue?

11                 MS. BARBERO:  Your Honor, the Court does have

12     jurisdiction under 1331.  I would start first with the plain

13     language of 1331, which I -- doesn't get much, if any, traction

14     from the department.  But the plain language of the statute

15     says the district court shall have original jurisdiction of all

16     civil actions arising under the Constitution, laws, or treaties

17     of the United States.

18                 It is indisputable this case arises under the

19     Constitution, and there's jurisdiction for this Court to hear

20     this case under 1331.

21                 The department relies almost exclusively on a

22     different jurisdictional provision that relates to Senate

23     subpoenas and says nothing about House subpoenas to argue that

24     1331 should somehow be displaced with respect to House

25     subpoenas.

1          THE COURT:  Why are they wrong about that?

2          MS. BARBERO:  They are wrong about that because when

3     Section 1365 was enacted in 1978, it was enacted against the

4     backdrop of the D.C. Circuit's decision in *AT&T* 1 in 1976 where

5     the D.C. Circuit had held that there was jurisdiction for House

6     subpoenas under 1331.  And Section 1365 was doing some

7     additional work because there was still an amount in

8     controversy requirement in place in Section 1331 at that time

9     with respect to suits against private parties.  It had been

10    removed for suits regarding the United States or its officers

11    but not for private parties.

12          The Senate was concerned that its subpoenas against

13    private parties wouldn't satisfy the jurisdictional amount in

14    controversy.

15          THE COURT:  Under 1331?

16          MS. BARBERO:  Under 1331 at that time.  That was in

17    place in 1331 until 1980.  So when 1365 was enacted, it was not

18    superfluous.  It was doing work.  The Senate wanted it in place

19    to address a specific concern.  The legislative history makes

20    absolutely clear that House subpoenas were not covered by that

21    separate section.

22          So that's the history in terms of 1365.  And it's

23    hard to understand why the department thinks that a statute

24    that says nothing about House subpoenas could somehow imply

25    leave to appeal jurisdiction under 1331 for House subpoenas,

1    when we know from *Mims* and other cases that the Supreme Court

2    has been very cautious about doing that with respect to

3    jurisdictional statutes.

4         THE COURT:  Am I to take anything from, in addition

5    to the analysis that you put forward, the fact that it appears

6    as though the department made no such argument before

7    Judge Bates in the *Miers* case?  I'm trying to -- I don't know

8    whether they're somehow estopped from making it now.  My

9    colleague Chief Judge Howell would suggest that they are,

10   but -- and I will certainly ask them.  But what is your

11   position as to whether or not they can even make a different

12   jurisdictional point than they previously did?

13        MS. BARBERO:  Your Honor, we haven't argued estoppel,

14   in part because it's a jurisdictional question.  But it is true

15   that in *Miers* the department conceded, which, frankly, it well

16   should have given the *AT&T* decision that there was jurisdiction

17   under 1331 for House subpoenas, but we haven't urged an

18   estoppel argument here.

19        In the Chief Judge Howell case, which involves

20   Rule 6(e), it was -- we did urge judicial estoppel.  She did

21   express concern about the department's change in position; but,

22   again, that wasn't a jurisdictional provision.

23        THE COURT:  Understood.

24        MS. BARBERO:  And if I may just briefly address,

25   because the department relies extensively on the 1996

1    amendments, to 1365.

2              THE COURT:  Yes.

3              MS. BARBERO:  Those were clarifying amendments.  They

4    were addressing a specific concern that, as we've talked about,

5    there was the -- the carve-out in 1365 for suits involving

6    private parties to eliminate the amount in controversy.  And

7    the concern was that if it was a United States official who was

8    asserting a private privilege and not an official privilege,

9    that there might be a question about whether that was covered.

10   The statute was amended in 1996 to make clear that that would

11   be -- that the Senate could bring an enforcement action in that

12   scenario.

13             And there's -- again, the legislative history is very

14   clear.  It's not intended to cover the House.  And we know that

15   there are all sorts of jurisdictional provisions that overlap.

16   There are redundancies in jurisdictional provisions.  It would

17   be very strange for the -- for Congress in 1996 to have thought

18   that it needed to remove 1365 entirely rather than making that

19   clarifying change so that there could be no question that those

20   types of subpoenas were also enforceable and there was subject

21   matter jurisdiction under 1365.  So --

22             THE COURT:  So you just think this is sort of an

23   unintended consequence?  They weren't trying to say anything

24   with respect to the House --

25             MS. BARBERO:  That is absolutely true.

1          THE COURT:  -- and its subpoena authority?

2          MS. BARBERO:  And that is clear from the legislative

3     history.  And we know, you know, that there are plenty of

4     redundancies in these jurisdictional statutes.  And it's really

5     neither here nor there with respect to House subpoenas that

6     were never covered by Section 1365 where there was governing

7     D.C. Circuit law from 1976 making perfectly clear that there

8     was jurisdiction under 1331.  And that's a conclusion -- even

9     though the department didn't contest jurisdiction in the *Miers*

10    case, Judge Bates did conclude, because it's a jurisdictional

11    provision, that there was jurisdiction under 1331.  And

12    Judge Berman Jackson did the same thing in the *Holder* case and

13    reached the same conclusion.  And we would urge the Court to do

14    so here as well.

15         THE COURT:  All right.  Can you say a little bit

16    about cause of action?  Because they also contend that there's

17    no cause of action for the House to proceed in this court.

18         MS. BARBERO:  The House has a cause of action that

19    derives from Article I of the Constitution.  As we talked about

20    at the outset, the House is exercising its Article I

21    impeachment authority.  The House has the sole power of

22    impeachment under Article I and also exercising its legislative

23    and oversight authority.  And we -- we know that the House is

24    entitled to information and compulsory process in order to

25    obtain information that it needs to exercise its Article I

1    functions wisely and effectively.

2              THE COURT:  So is that an implied cause of action, or

3    is it actually express on the -- you know, the -- the text of

4    Article I?

5              MS. BARBERO:  It's -- it's challenging when the cause

6    of action derives from the Constitution because the

7    Constitution, unlike statutes, doesn't have express language in

8    it saying this person aggrieved by this action can come to this

9    court to sue.  But the Supreme Court has made perfectly clear

10   that notwithstanding the lack of that type of express language

11   in the Constitution, somebody aggrieved by unconstitutional

12   action by a federal official in a proper case -- this is the

13   language in *Armstrong v. Exceptional Child Services* -- that --

14   that in a proper case, the court sitting in equity can give a

15   party the ability to sue to seek a remedy for constitutional

16   violation.  That's exactly what's going on here.

17             THE COURT:  And it's the equity piece that gets us

18   out of *Bivens* and that issue?

19             MS. BARBERO:  It's the equity piece that

20   distinguishes this.  The department, again, relies heavily on

21   *Abassi*, which is a *Bivens* case about a damages remedy.  And the

22   Supreme Court's analysis in the damages cases is very different

23   because the court is looking to the federal fisc and concerns

24   about indemnification and payment of federal funds.  And in

25   that context, the court has said it may be better left to

1    Congress in the majority of cases to consider these types of

2    issues relating to the federal fisc and decide whether to

3    impose that type of damages liability on the government and

4    individual officers.

5            THE COURT:  But I suppose the department says we have

6    those -- we have analogous concerns that arise under the

7    separation-of-powers clause or principles.  In other words,

8    fine, you know.  With respect to *Bivens*, the Supreme Court was

9    not willing to allow for people to be able to sue directly

10   under the Constitution for money damages because of -- excuse

11   me -- these kinds of concerns.  And I guess you could read

12   their separation-of-powers principles' arguments to include the

13   thought that perhaps the same kind of limitation on cause of

14   action exists with respect even to equity circumstances insofar

15   as we're talking about suits against the President.  And you

16   can cut it even finer; right?  Suits against presidential aides

17   who are actively supporting the Executive in this way and that

18   the legislature should not be allowed to do this in the same

19   way that people can't bring private actions for money damages

20   against government officials directly under the Constitution.

21           MS. BARBERO:  A few responses, Your Honor.  This is

22   an issue that Judge Berman Jackson grappled with and

23   Judge Bates grappled with in *Miers* and *Holder*.  And we know

24   that the fact that there's separation-of-powers concerns in the

25   case doesn't mean that the court can't imply a cause of action.

1    And, in fact, if the court were to close the courthouse doors,

2    even sitting in equity to Congress to be able to come in and

3    seek a remedy when Congress is suffering a violation of its

4    rights under Article I, would certainly tilt the scales in

5    favor of the Executive Branch.  So it's hard to avoid the

6    separation-of-powers concerns and issues here, regardless which

7    way the court comes out.

8         But we know, for example, from *Free Enterprise Fund*,

9    among other cases -- *Free Enterprise Fund* was a

10   separation-of-powers case in the sense that it involved removal

11   protections and a claim brought under the appointments clause

12   for the removal of the tenure protection for members of the

13   PCAOB.  And there was no express cause of action that's a

14   structural constitutional claim.  And yet the Supreme Court

15   decided it on the merits, notwithstanding that there was an

16   entirely separate remedial scheme that had been set up through

17   the administrative system.

18        And the Court said, No, the litigants there didn't

19   have to go through that system for a variety of reasons.  But

20   the point being there was a cause of action directly under the

21   appointments clause for those litigants to come into court and

22   raise what were at bottom separation-of-powers claims.  And we

23   know from, you know, a host of cases -- I mentioned *INS v.*

24   *Chadha* before, *Humphrey's Executor.*  The courts do resolve

25   these types of issues that raise constitutional claims, even

1      those involving the separation of powers.  The Supreme Court

2      just a couple weeks ago granted cert in the *Seila Law v. CFPB*

3      case, which is another case involving removal and tenure

4      protections.

5                   And, again, going back to the language of

6      *Marbury v. Madison*, which is quoted by the Supreme Court in

7      *United States v. Nixon,* where the court resolved these

8      executive privilege claims, it's the duty of the court to say

9      what the law is.

10                  THE COURT:  All right.  Well, let me just ask you

11     another cause-of-action-type question.  I'm interested in the

12     fact that it appears as though your first response with respect

13     to my cause-of-action claim was the fact that you believed

14     there is a cause of action directly under Article I for the

15     House to proceed in this way.

16                  Looking at *Miers*, for example, Judge Bates seemed to

17     analyze the Declaratory Judgment Act, seemed to suggest that

18     the Declaratory Judgment Act provided a cause of action as sort

19     of the initial argument.  Are you relying at all on the

20     Declaratory Judgment Act?  Are you -- what is -- what is its

21     role with respect to cause of action?

22                  MS. BARBERO:  We are absolutely relying on the

23     Declaratory Judgment Act, Your Honor.  The reason I started

24     with the Constitution is that the rights -- the authority of

25     the House derives from Article I of the Constitution.  Those

1    are the substantive rights.  And the Declaratory Judgment Act

2    is a mechanism for the House to come into court and get a

3    remedy and is to provide relief for the violation of those

4    constitutional rights.

5           Now, there's some question about how exactly these

6    provisions work together.  I don't think that there's perfect

7    clarity in the law on this question, but what we --

8           THE COURT:  Perhaps that's why I asked it.

9           MS. BARBERO:  It's a very astute question; and as you

10   can tell, the answer is challenging.  But it is -- what is

11   clear is whether it's through the Declaratory Judgment Act,

12   providing a remedy for violation of the constitutional rights

13   accorded to the House by Article I or implying a cause of

14   action directly under Article I or the court's exercise of its

15   equitable authority through the reasoning in *Armstrong* and

16   other cases, what's clear is that through some combination of

17   those things, there's -- there's no question that -- that the

18   House is entitled to come to court and obtain a remedy for the

19   violation of its constitutional rights that's occurring when

20   Mr. McGahn refuses to comply with the House subpoena that's

21   duly issued, authorized by the House, and his testimony is

22   important and necessary to ongoing, urgent investigations that

23   the House is conducting.

24          And that was the result reached.  As Your Honor noted

25   in *Miers*, Judge Bates looked both to the Declaratory Judgment

1    Act and also Article I of the Constitution, and Judge Berman

2    Jackson focused on the Declaratory Judgment Act.  Again,

3    this -- the point here is that this -- there is -- the Court

4    can -- I think the words of *Armstrong* provide the ability to

5    sue, which is what the House is requesting and entitled to,

6    given its rights and authority under Article I.

7              THE COURT:  All right.  I think I understand your

8    argument, at least with respect to this part.

9              MS. BARBERO:  Okay.

10             THE COURT:  Is there anything else that you would

11   like to add on these threshold issues?

12             MS. BARBERO:  I think I have made all the points I

13   needed to make.  If Your Honor has no further questions, I'll

14   wait for rebuttal.

15             THE COURT:  Thank you.

16             Sir, Mr. Burnham.

17             MR. BURNHAM:  Yes, ma'am.

18             THE COURT:  Do I have it correct?

19             MR. BURNHAM:  Yes, Your Honor.  That's right.

20             THE COURT:  Excellent.  Thank you.

21             MR. BURNHAM:  Good afternoon.

22             THE COURT:  Good afternoon.  You might -- I know that

23   you probably have a full presentation, and I do want you to be

24   able to get it in, but you might start where your counterpart

25   started because I do have an overarching concern, which is that

1      I am not analyzing this on a blank slate, that we do have prior

2      precedents from this very jurisdiction, courts that appear to

3      have addressed similar, if not identical issues.

4              MR. BURNHAM:  Sure.

5              THE COURT:  And so I'm trying to understand.  And

6      I've been really grappling with this, how today's case differs

7      from, let's say, *Miers*.  And then what is your real argument in

8      light of that?  Are you suggesting that it is different or that

9      Judge Bates was just wrong?

10             MR. BURNHAM:  Well, both, Your Honor.  So maybe I

11     could -- why don't I start, obviously, with Your Honor's

12     question and then kind of back out to where I was going.

13             THE COURT:  And I promise I'll let you do it.

14             MR. BURNHAM:  No, no, of course.  Of course.  So --

15     so for one thing, I think it would probably be the most helpful

16     to start with *AT&T* because that's the only case that's even

17     arguably binding on this Court.

18             And so I think for a number of reasons, *AT&T* is

19     not -- is not relevant here.  The main reason I would say that

20     is there's just been a sea of change in the law since *AT&T* was

21     decided in 1976.  *AT&T* predates *Raines*.  It was back when this

22     court -- not this specific court, but when the D.C. Circuit had

23     held legislators could sue the Executive Branch over all kinds

24     of things, different disputes.

25             As the D.C. Circuit put it in *Chenoweth*, after the

1      1970s, quote, "The Supreme Court began to place greater

2      emphasis upon the separation-of-powers concerns underlying the

3      Article III standing requirement."  That's at 114 in *Chenoweth*.

4                  THE COURT:  Okay.

5                  MR. BURNHAM:  The line in *AT&T* that the Committee

6      relies on is truly just one line with no analysis at all.  It

7      just says the House can sue.  It's not clear to me that that

8      issue was even presented to the Court.

9                  THE COURT:  Right.  I want to put a pin in that

10     because --

11                 MR. BURNHAM:  Yes, Your Honor.

12                 THE COURT:  -- I am trying to understand, because my

13     understanding -- and I think we're talking about *AT&T* 1, are

14     we?

15                 MR. BURNHAM:  Yes, Your Honor, the 1976.  Yes, ma'am.

16                 THE COURT:  Is that the case in which the Executive

17     sued?

18                 MR. BURNHAM:  Yes.  Yes.

19                 THE COURT:  So is it your argument that the Executive

20     would have standing but somehow the House wouldn't?

21                 MR. BURNHAM:  Well, so -- so that is not my argument

22     today, but I do think it is -- the Executive has a much better

23     claim to standing than the Committee does because --

24                 THE COURT:  To unilateral standing, to be able to sue

25     to try to prevent the enforcement of a subpoena under

1    circumstances in which they would argue that the issuer of the

2    subpoena would not have?

3              MR. BURNHAM:  To sue a private party.  I think it's

4    very important to understand that in that case, the

5    Executive Branch did not sue the Committee.  The

6    Executive Branch sued a private company that it had privity

7    with, that it had a contract with about -- the case was about

8    basically the 1976 version of national security.

9              THE COURT:  I understand.  But didn't the Committee

10   intervene?  Maybe I have the wrong case.

11             MR. BURNHAM:  No.  They did intervene, Your Honor,

12   but I actually think it would have been a very different case

13   if the Executive Branch had sued Congress directly.

14             And so because the Executive Branch was suing a

15   private party, you had the rights and obligations of a private

16   entity in the case, which distinguishes it from this case where

17   there are no -- where it's just an executive-congressional

18   dispute.

19             On the statutory jurisdiction side, there's also 28

20   U.S.C. 1345, which gives -- which gives jurisdiction -- subject

21   matter jurisdiction for cases on behalf of the United States,

22   and that's something that only the Executive Branch can claim.

23             The final point -- but just to be clear, Your Honor,

24   I don't think you need to reach any of this because --

25             THE COURT:  Yes.

1          MR. BURNHAM:  -- I think *AT&T* is -- it has been

2     abrogated by *Raines* and all those other cases.

3          THE COURT:  You say *AT&T* is ancient history.  I get

4     it.

5          MR. BURNHAM:  Yes.

6          THE COURT:  *AT&T* is probably the -- according to you,

7     the only binding precedent.  I totally understand that.

8          MR. BURNHAM:  Yes.

9          THE COURT:  Nevertheless --

10          MR. BURNHAM:  Right.

11          THE COURT:  -- in order to have consistency in the

12     law, wouldn't you agree with me that I can't just ignore *Miers*

13     and --

14          MR. BURNHAM:  Yes.

15          THE COURT:  -- *Holder;* right?  So fine.  They're not

16     binding, and I can disagree, but I would have to distinguish

17     them in some way or say I disagree.

18          MR. BURNHAM:  Oh, yes, absolutely.

19          THE COURT:  So my initial question to you --

20          MR. BURNHAM:  Yes.

21          THE COURT:  -- do you have a basis for me to say

22     either of those things?

23          MR. BURNHAM:  Right.  So on -- on *Miers*, I think

24     primarily the decision is incorrect.  But a basis on which I

25     think the Court could easily distinguish it if he didn't want

1    to say that it was incorrect -- the most -- the simplest one I

2    actually think is subject matter jurisdiction.

3              So you had a colloquy with my friend Ms. Barbero

4    about whether the Executive Branch raised 1331 in that case.

5    And the answer is that the Executive did not.  And -- but I

6    actually think that helps our position here.  It does not hurt

7    it.  The -- the fact that the Executive Branch did not raise

8    that jurisdictional argument means that Judge Bates never had a

9    chance to consider it with adversarial briefing.  Of course, we

10   can't waive a basis for a subject matter jurisdiction.

11   Jurisdiction is not waivable.  So -- so there's no way that --

12             THE COURT:  You're speaking so fast, and I'm totally

13   trying -- I'm really trying to follow what you're saying.

14             MR. BURNHAM:  I appreciate you telling me.

15             THE COURT:  No, no.  You're an excellent advocate,

16   but I'm just trying to latch on --

17             MR. BURNHAM:  Thank you.  My mom is actually in the

18   audience, so I appreciate your saying that.

19             THE COURT:  He's very good.

20             MR. BURNHAM:  Yes, Your Honor.

21             THE COURT:  But let me just unpack a little bit.

22             MR. BURNHAM:  Sure.

23             THE COURT:  Okay.  So you say the Executive did not

24   make a 1331 objection; in other words, you did not say that

25   that is not a basis for jurisdiction.  You conceded in the

1    words of Judge Bates that it is a basis of jurisdiction?

2              MR. BURNHAM:  Yeah, and I take your -- I don't

3    remember how he put it, but yes.

4              THE COURT:  I think he says that -- and I can find

5    it, but I don't want to take the time -- that -- that the

6    Executive concedes that 1331 is a basis for jurisdiction.

7              MR. BURNHAM:  Right.

8              THE COURT:  So fine.  At least at that point, you

9    weren't willing to argue the point.  So I -- I perhaps agree

10   with your counsel -- your opposing counsel to the extent that

11   she says I shouldn't take too much from the -- from what

12   appears to be a change.

13             I want to know why Judge Bates, who then goes on to

14   find that 1331 is an acceptable basis, why is he wrong about

15   that?

16             MR. BURNHAM:  Absolutely, Your Honor.  So turning to

17   the statutory jurisdiction argument.  As the Court knows, we

18   read statutes together.  And so the Court has to read all the

19   jurisdictional statutes in the U.S. Code in harmony.  It

20   doesn't -- they're not -- they're not in isolation from each

21   other.  And so the Court has to take 1331 and 1365 and read

22   them together.

23             And if you read the two of them together, it's

24   impossible to escape the -- the reality that as the Committee

25   reads 1331, 1365 is a meaningless provision.  But not only

1    that.  This is much more than it's rendered superfluous.

2              THE COURT:  Let's not leave that too soon.

3              MR. BURNHAM:  Sure.

4              THE COURT:  I thought 1365 was addressed to the

5    Senate, that it was enacted in response to a particular prior

6    D.C. Circuit opinion that it was doing work, as Ms. Barbero

7    said, that was specific to that circumstance.  So it isn't

8    clear to me that it actually was intended to say anything about

9    the House's subpoena authority under 1331.

10             MR. BURNHAM:  Right.  So I -- I think I disagree with

11   some of the premises in the question, Your Honor.  Actually,

12   may I put the statute on the ELMO?

13             THE COURT:  Sure.

14             MR. BURNHAM:  I think it would be helpful to actually

15   see the text, if I may.

16             THE COURT:  Great.

17             MR. BURNHAM:  Let me see if can zoom this out.

18             THE COURT:  There we go.

19             MR. BURNHAM:  There we go.  Okay.  So a couple of

20   things, Your Honor.  So -- so, first, as the Committee reads

21   1331 -- and I don't think they would disagree with this -- the

22   Senate has the authority to go into court and has subject

23   matter jurisdiction under 1331 too.  So I don't think anyone

24   disagrees that the statute is unnecessary for the Senate, as

25   for the House, if they're right about 1331.  But let's put that

1       aside for a second.

2              The statute has very clear limitations on the

3       jurisdiction it gives the Senate.  And not only would the

4       statute be irrelevant, those limitations would be overridden

5       for the Senate as they read 1331.  Now, you're probably

6       wondering why I have part of this in yellow.  The reason that I

7       have part of it in yellow is that's what Congress added in

8       1996.  So let's put aside the confusing chronology about what

9       happened in the late '70s, which I'm happy to explain why I

10      actually don't think it means what the Committee thinks.  Just

11      set that aside.

12             The Congress passed -- the House passed, the Senate

13      passed, and the President signed the yellow language.  That is

14      not a clarifying amendment.  That is an amendment that is meant

15      to very carefully carve out the ability of the Senate to sue

16      the Executive Branch, to do exactly what the Committee is

17      trying to do here with 1331.  They -- if the -- if the

18      Committee is right about what 1331 means, then the careful

19      limitations built into this duly enacted legislation are

20      irrelevant.  They're overridden.  The fact that this says the

21      Senate can't sue us, cannot sue the Executive Branch, is

22      meaningless.  That is much more than the superfluousness --

23             THE COURT:  I'm sorry.  Is that because you're

24      suggesting that the House could just proceed under 1331 and

25      ignore this?

```
1              MR. BURNHAM:  The Senate, yes, Your Honor.  Right.

2     Yes --

3              THE COURT:  But --

4              MR. BURNHAM:  -- as they understand it.

5              THE COURT:  But that is not typically how we

6     reconcile statutes or how we think about things, I think.  In

7     other words, there is a preexisting font of jurisdiction,

8     right, 1331?  It is broad in nature.  It says all, you know,

9     cases or whatever arising under the Constitution.

10             MR. BURNHAM:  Right.

11             THE COURT:  So as -- as a first cut, are you in

12    agreement that absent this statute you could sue the Senate --

13             MR. BURNHAM:  I have one argument --

14             THE COURT:  -- under 1331?

15             MR. BURNHAM:  I would have one argument left; but,

16    again, I don't -- I think it's much weaker than my current

17    argument, which is that, just given the history, if Congress

18    wanted to upend 200 years of constitutional history and allow

19    interbranch litigation, it would need to do so in a more direct

20    way than just the general grant of jurisdiction in 1331 under

21    constitutional avoidance and other --

22             THE COURT:  But there's like as many -- I don't know

23    what you mean.  I mean, there are, like, a lot of cases that

24    involve interbranch jurisdiction.  And so --

25             MR. BURNHAM:  No, not --
```

1          THE COURT:  -- that argument would --

2          MR. BURNHAM:  No, no, not like this, Your Honor.

3          THE COURT:  Okay.

4          MR. BURNHAM:  So there are plenty of cases that

5     present separation-of-powers questions.  There are like three

6     cases, and they're all in this court -- three and a half,

7     because we won one recently in front of Judge McFadden where

8     the CoW of the House has sued the Executive Branch directly.

9     That is a novelty.  That did not exist until 2008 in the *Miers*

10    case.

11         And so -- and here's the -- another way of making the

12    same point.  Your Honor --

13         THE COURT:  But wait.  Why are you even suggesting

14    that that's occurring here?  The House is suing Don McGahn.

15    You've swept in; right?  He's a private person out in the

16    world, and the House is saying, We'd like information from him.

17    And when he says, I can't show, I'm not showing; the House

18    says, You need to come to court, and we're going to decide

19    whether or not you have to show up.

20         I don't understand what you mean by that, in this

21    case, the House is suing the Executive directly.

22         MR. BURNHAM:  Well, the House is suing Mr. McGahn in

23    his capacity as a former Executive Branch official from the --

24         THE COURT:  He's a former -- I'm sorry.  I cut him

25    off.  Go ahead.

1          The House is suing Mr. McGahn in his capacity as a

2     former Executive Branch official.  But -- but doesn't that

3     sweep so broadly?  In other words, for the rest of Mr. McGahn's

4     life, if anybody wants to ask him anything about his capacity

5     as a -- his work as a former Executive Branch official, they

6     are not suing him, they're suing the Executive, is your point?

7          MR. BURNHAM:  I think it would be extraordinary if

8     the House were unable to sue Mr. Cipollone because he is the

9     current White House counsel, but as soon as he retires, then

10    all of a sudden he's fair game for interbranch enforcement of

11    subpoenas.  And so I just don't think --

12         THE COURT:  Wait.  Let's not even leave that.  This

13    is so interesting.

14         MR. BURNHAM:  I agree.

15         THE COURT:  No, really, because I was -- as I was

16    thinking about this, I was trying to understand what is the

17    Executive's position.  I see almost every day, as we all do,

18    people who were former Executive Branch officials giving all

19    kinds of information to the media.  People are out there

20    talking.  People are saying things.

21         MR. BURNHAM:  Unfortunately, that's correct.

22         THE COURT:  Yes.  Well, so there's not -- we don't

23    live in a world in which your status as a former Executive

24    Branch official somehow shields you from the -- you know,

25    giving information or prevents you from giving information.

```
1    Like, we understand that people do that even under
2    circumstances in which they could not have done so, perhaps, if
3    they were in -- still in the White House.  So this distinction
4    that you're now suddenly trying to draw between, you know, Oh,
5    isn't it odd that a person who couldn't do it today can do it
6    when he's a former branch official doesn't seem to hold because
7    that happens all the time; right?
8              MR. BURNHAM:  So -- so I think -- I don't disagree
9    that there are many contexts in which one's status as a former
10   might change things about the way one lives one's life and what
11   immunities we have --
12             THE COURT:  And the ability to provide information.
13             MR. BURNHAM:  Well, I do disagree with that,
14   Your Honor, because the President -- I mean, we can get to the
15   merits soon or whenever you like.  But the President owns the
16   privilege here.  So he is the owner of Mr. McGahn's absolute
17   immunity from compulsion, and he is the owner of any subject
18   matter executive privilege over information in Mr. McGahn's
19   head.  It's the President's.  And so the House has only sued
20   Mr. McGahn to get his -- to get him in his capacity as the
21   President's former adviser.
22             THE COURT:  Yet -- yet, for some reason, the
23   President doesn't own it with respect to the people who are
24   talking on, you know, MSNBC all the time.
25             MR. BURNHAM:  No.  I think he does.
```

1          THE COURT:  Okay.

2          MR. BURNHAM:  I mean, who did Mr. McGahn -- I mean, I

3     don't -- we don't have a position on all the different

4     permutations.  But the President owns the privilege as to

5     former officials with the same vigor with which he owns it to

6     current officials.  And so I don't think the people on TV -- I

7     mean, I don't know exactly which people Your Honor is referring

8     to.  But that information is still the President's information.

9          The only other point I would make --

10         THE COURT:  So he could sue to prevent people from --

11    who are former officials from talking about things?

12         MR. BURNHAM:  We have not taken a position on that,

13    Your Honor.

14         THE COURT:  Okay.

15         MR. BURNHAM:  But we definitely -- I'm definitely not

16    disclaiming that.  I think another way to make the same point,

17    as a practical matter, the Committee recognizes all of this,

18    which is why they served the U.S. Attorney with this lawsuit,

19    because they understand, just like we understand, that what

20    we're fighting about is the White House counsel and whether he

21    can testify, not about Mr. McGahn talking about what --

22    whatever he's doing now in his private practice or all of that.

23         THE COURT:  All right.  So -- so that brings me back

24    to the original question, because as I read the *Miers* case,

25    there the parties were suing over Ms. Miers's capacity as

```
 1    former White House counsel to be called in to testify.  And yet
 2    my colleague Judge Bates disagreed with respect to what looks
 3    to me to be similar, if not identical, arguments being made
 4    about jurisdiction and standing and all of these other issues.
 5            MR. BURNHAM:  Right.
 6            THE COURT:  So you say he's wrong with respect to
 7    jurisdiction --
 8            MR. BURNHAM:  Yes, Your Honor.
 9            THE COURT:  -- even though you didn't contest it in
10    the context of that case, and I'll leave -- you know, leave
11    that alone.  Fine.  You can take that litigation position
12    there.  But today you say that based on the text of this
13    statute, which does not apply to the House -- do you concede
14    that much?
15            MR. BURNHAM:  Yes, but I think that's bad for them,
16    not helpful to them, because it shows that Congress only has
17    gone through the process of bicameralism and presentment to
18    give the Senate the ability to go to court.  It has never even
19    done that for the House.  And there's legislative history for
20    this provision that we quoted --
21            THE COURT:  That only assumes that we don't have 1331
22    and it doesn't apply.
23            MR. BURNHAM:  But, Your Honor, if they're right about
24    that, then this was an empty exercise for the Senate.  There
25    was no reason to pass the statute.  Ms. Barbero's explanation
```

1    doesn't make sense because they -- if that was correct, then

2    they wouldn't have amended the statute in 1996 to make clear

3    that they could go after executive officials when they're

4    asserting private privileges and not public ones.

5          THE COURT:  Well, here's what happens in the reality

6    of legislation, as I'm sure that you are aware; that at times,

7    legislative officers who are looking at real world

8    circumstances will enact statutes in response to those

9    circumstances.  So even though you may well have jurisdiction

10   under 1331, if it turns out that a court interprets it and, you

11   know, says, Oh, but there's the -- there's the monetary

12   provision in the statute at that point, and so, therefore, you

13   don't have jurisdiction, the legislature will come in and try

14   to address that.

15         MR. BURNHAM:  Right.

16         THE COURT:  Then if they overcorrect so that now

17   people are saying, Oh, we can sue you about everything, the

18   legislature will come in and address that.  They legislate

19   against the backdrop of developments --

20         MR. BURNHAM:  Sure.

21         THE COURT:  -- but that doesn't mean that in so doing

22   they're saying anything about your original ability to bring

23   claims of this nature or the Court's ability to address claims

24   of this nature.

25         MR. BURNHAM:  So I don't -- I don't disagree with

1    Your Honor as a sort of real politique matter of how Congress

2    operates.  As a legal matter, the Court does have to read all

3    of the U.S. Code statutes together.  But to take on that point,

4    I think, more directly, that may be true, but this statute

5    contains limitations on --

6              THE COURT:  I understand, but they're the limitations

7    on the Senate.

8              MR. BURNHAM:  But, Your Honor --

9              THE COURT:  And it's so odd that suddenly we're

10   reasoning about what Congress's intention is with respect to

11   the House based on what they've done over a period of time with

12   respect to the Senate in this narrow context.

13             MR. BURNHAM:  But I don't find it odd at all because

14   Ms. Barbero's interpretation of 1331 would override the

15   limitations in 1365.  There is no basis to think that the

16   Senate and the House have different authority under 1331 to

17   bring their subpoena enforcement actions into court.  There's

18   no indication anywhere in the legislative history for either

19   provision or in the U.S. Code to think that 1331 somehow gives

20   the House superior rights to those it gives the Senate.  So if

21   they are right about 1331 for themselves, then it must also be

22   the same for the Senate.  Now, fine.  Maybe we say the fact

23   that it makes the statute superfluous doesn't matter because

24   Congress --

25             THE COURT:  Well, let me ask you this:  Just drawing

1    on the point that you just made, is it your point that at the

2    end of the day when this statute applies to the Senate, the

3    Senate could not bring the kind of enforcement action that the

4    House is bringing today?

5                MR. BURNHAM:  That's correct, Your Honor.

6                THE COURT:  Could not?

7                MR. BURNHAM:  Because the statute specifically carves

8    it out.

9                THE COURT:  All right.

10               MR. BURNHAM:  The statute very clearly says -- and

11   the highlighted part is not this part, but -- I mean, I'll

12   paraphrase it because it's written in sort of cumbersome terms.

13   But it essentially says that they can enforce their subpoenas

14   except against officers of the Executive Branch asserting

15   official privileges.  The 96th Amendment says when executive

16   officers assert personal privileges -- so let's say the

17   Committee wanted Mr. McGahn, and he said, you know, I don't

18   know.  It's too burdensome to make me fly here because I live

19   in Honolulu now or something.  This statute wouldn't protect

20   him from that.  This statute would only protect him to the

21   extent he was asserting an official -- or the President was

22   asserting an official privilege to block the testimony.

23               THE COURT:  Doesn't that just beg the question?

24               MR. BURNHAM:  What --

25               THE COURT:  I mean, the question is whether or not

1     the privilege is valid, whether or not --

2              MR. BURNHAM:  Oh --

3              THE COURT:  The merits question is whether or not the

4     President can assert an absolute immunity for Mr. McGahn.

5              MR. BURNHAM:  No, Your Honor.  The draft of the

6     statute was actually very careful to avoid just that

7     implication.  They say the assertion of which has been

8     authorized by the Executive Branch of the federal government.

9     So the statutes' jurisdiction grant depends on whether the

10    President has authorized, not whether it's valid, because I

11    think when they wrote this, everyone wanted to be very careful

12    not to give jurisdiction over precisely what the House

13    Judiciary Committee is trying to get this Court to do today.

14             THE COURT:  Well, of course, that's just -- I mean, I

15    will -- I will run down the rabbit hole in my chambers in

16    trying to sort out what it was you were going to say.  My

17    initial reaction is that you might run into constitutional

18    problems by interpreting the statute in that way, because to

19    the extent that as the, you know, plaintiffs in this case

20    indicate, there is actually a right of the House Judiciary

21    Committee to seek the information at issue and to enforce any

22    subpoenas related to it.  Interpreting a statute of Congress to

23    divest them of that right seems to me to create some

24    constitutional concerns.

25             MR. BURNHAM:  No.  Your Honor, there is no case that

1    suggests that the constitutional rights can be enforced in

2    court absent the statutory grant of jurisdiction.  No one -- I

3    don't think the Committee is suggesting that, and I don't think

4    there's any support for that.  So all Your Honor would be doing

5    is interpreting Congress's own statutory grants.  Congress is

6    the master, I mean, ultimately of what statutory jurisdiction

7    the courts possess.  All that I am suggesting is that they have

8    not gone through the basic process of -- through bicameralism

9    and presentment, giving the courts jurisdiction over the kind

10   of dispute they have brought to you.  You heard what I said.

11          THE COURT:  Yes, I did hear what you said, but let me

12   ask you this question:  Does this -- so you're suggesting that

13   this statutory change, perhaps what's in the highlight, because

14   it occurred after *AT&T*, this Court cannot rely on *AT&T*'s

15   conclusion that there is jurisdiction?

16          MR. BURNHAM:  No, Your Honor.  I think the main

17   problem with *AT&T* is *Raines v. Byrd* and -- and the Supreme

18   Court's decision in this area.

19          THE COURT:  Except those are easily distinguished,

20   right, because *Raines* was talking about individual legislators.

21   It was not talking about a duly authorized committee of the

22   House exercising its Article I authority.

23          MR. BURNHAM:  No.  I mean -- well, that was -- that

24   was for the plaintiffs in the case.  But the language that the

25   Supreme Court used in its decision was much broader than that.

1    The Supreme Court was talking about two different things that a

2    plaintiff has to show in order to be able to come into court, a

3    particularized injury that's -- and then that that injury is

4    amenable to judicial resolution.

5             THE COURT:  But you've switched to standing.  I'm

6    talking jurisdiction; right?

7             MR. BURNHAM:  Oh, sorry.  But *AT&T* is a standing --

8             THE COURT:  Did *AT&T* speak to jurisdiction?

9             MR. BURNHAM:  I mean --

10            THE COURT:  I guess it had to, right, if --

11            MR. BURNHAM:  Not expressly, Your Honor.  So it's --

12   to the extent that it addresses jurisdiction, it's in a

13   drive-by.  And the Supreme Court has said many times that

14   courts are not bound by drive-by jurisdictional holdings.  So I

15   don't think *AT&T* is in any sense binding on the jurisdictional

16   question.  It does say, to be sure, that the House has standing

17   to -- I mean, I forget the exact quote.  I can find it.

18            That the House as a whole has standing to assert its

19   investigatory power, but it doesn't get into the question

20   presented here at all.  And I do think that it's another

21   problem with using that case for the jurisdictional point, in

22   addition to the fact that it just doesn't address it, is that

23   the Executive Branch has its own jurisdictional grant at 1345

24   for actions brought on behalf of the United States.  And so

25   it's just not -- that case was initiated by us.

1              THE COURT:  I -- I sort of recall that the

2      Supreme Court doesn't like it when we reason by implications.

3      So the fact that we have a statute somewhere that gives the

4      Executive Branch the authority but not the Legislative Branch,

5      that's supposed to mean, I guess, that the Legislative Branch

6      doesn't have the authority.  I thought that kind of legal

7      reasoning, especially in the area of jurisdiction, is

8      disfavored.

9              MR. BURNHAM:  The Supreme Court has said many times

10     that we read statutes in harmony with others to make sense.

11     And so I think -- I'm not making am implication point.  I think

12     I'm just saying if you put 1365 and 1331 next to each other,

13     there's no way that you can read 1331 the way the Committee

14     does and 1365 makes any sense whatsoever, both because 1365

15     becomes pointless.  There's no need for it.  And because the

16     limitations in it become overridden but --

17             THE COURT:  But don't we have redundancies in

18     jurisdictional statutes all the time, and in looking at any one

19     of them, you could say, Oh, you don't need this because you

20     have could had that?

21             MR. BURNHAM:  Right.  That -- that is true, but my

22     argument is much stronger than that because of the limitations

23     in 1365.  So it would be as though 1331 said what it says and

24     then had another provision at the end that said except when the

25     suit is against the Executive Branch for a duly authorized

1    privilege, which is only a slight paraphrase of what 1365 says.

2    I don't think anyone would think that in that circumstance the

3    limitation was invalid because it's inconsistent with the broad

4    grant at the beginning of the provision.  All the real -- all

5    the real --

6            THE COURT:  The question is not whether it's invalid.

7    The question is:  To whom does it apply?  And to the extent

8    that you're talking -- it seems to me that if Congress wanted

9    to, it could make special circumstances for the Senate; that

10   notwithstanding a broad grant of jurisdiction that would

11   apply -- excuse me -- that would apply equally to both the

12   Senate and the House, right, at the outset, it could very well

13   go on to legislate a more narrow set of constraints for the

14   Senate, couldn't it?

15           MR. BURNHAM:  Sure, but that's not the provision that

16   they passed, Your Honor, because the provision they passed says

17   nothing about 1331 or about how this is a preexisting thing.

18           THE COURT:  But does that help you or hurt you?  I

19   think that hurts you.

20           MR. BURNHAM:  I have inferred that from your

21   question, but --

22           THE COURT:  The fact that it doesn't relate back to

23   1331 and say here's what we're trying to do with respect to

24   limiting the use of 1331 under these circumstances --

25           MR. BURNHAM:  Right.

1          THE COURT:  -- is -- is a problem, isn't it?

2          MR. BURNHAM:  So I don't think so.  I don't know that

3     there's much -- I mean, I can make the same points again.  All

4     I would say is that in deciding the question, I -- I would just

5     encourage the Court to look at the provisions together and read

6     them in harmony rather than read them as sort of independent

7     floating things in the universe that don't relate to each

8     other, because it is our respectful submission that that's how

9     statutory interpretation generally works.

10         THE COURT:  All right.  So is it your -- moving to

11    sort of standing and the other aspects of this --

12         MR. BURNHAM:  Yes, Your Honor.

13         THE COURT:  -- is it your -- I sensed throughout your

14    briefing that separation of powers was a big thrust here in

15    terms of why you think that the Court, you know, either

16    these -- that the claim is non-justiciable or that the Court

17    should stay its hand or whatnot.

18         At least with respect to standing, help me to

19    understand why separation of powers has anything to do with it.

20         MR. BURNHAM:  Sure.  So if I could just take a half a

21    step back from the very narrow doctrinal point for just two

22    seconds.

23         THE COURT:  Sure.

24         MR. BURNHAM:  So if you read *Raines v. Byrd*, what the

25    Court was saying is that the -- for all -- the sake of all

1    three branches, the two political branches have not been in

2    court for the great majority of our nation's history.  And the

3    way Justice Souter explained this, and with Justice Ginsberg,

4    in his separate concurrence, he said that's because, quote,

5    "Intervention," meaning by the courts -- "Intervention in such

6    a controversy would risk damaging the public confidence that is

7    vital to the functioning of the judicial branch by embroiling

8    the federal courts in a power contest nearly at the height of

9    its political tension."  And that's at page 833 from

10   *Raines v. Byrd*.

11        The point they were making is that courts exist to

12   resolve private rights and obligations, to protect individual

13   liberty, not to, as in Europe -- some European countries and

14   some other places decide the metes and bounds of constitutional

15   authority, as the other two branches have.  *Raines* is a great

16   illustration of this, both from what it says --

17        THE COURT:  I don't understand that.  I really

18   thought that that was exactly what the court was supposed to

19   do.  In other words, I thought that -- that the court's role in

20   this constitutional scheme of balances and -- checks and

21   balances and separation of powers was to decide what the law

22   is.

23        And so to the extent that the Constitution is the law

24   and the parties are squabbling about the boundaries of what

25   each one could do, I thought that was precisely what the

1    judiciary's role is.

2              MR. BURNHAM:  But only when there's a proper case or

3    controversy before the court, which is why the President cannot

4    send the court a letter asking for an advisory opinion and why

5    Mr. Letter couldn't just come in here on his own and ask the

6    court what it thinks about his subpoena.

7              THE COURT:  So what is improper -- what is not a case

8    in controversy about this dispute?

9              MR. BURNHAM:  There's no one in this dispute with a

10   private stake -- with a judicially cognizable stake in the

11   outcome.  And so --

12             THE COURT:  What do you mean?  I've heard many, many,

13   many iterations of the stake that the House says it has,

14   including the one that Judge Bates points out, which is -- sort

15   of indicated it's the stake in its enforcement of its own

16   right, its power --

17             MR. BURNHAM:  Right.

18             THE COURT:  -- to -- a power of inquiry, says

19   Judge Bates from the Supreme Court, right, that the House has

20   that power and that it's being diluted or, you know, eliminated

21   or whatever under this circumstance if they're not allowed to

22   compel testimony.

23             MR. BURNHAM:  No, I understand --

24             THE COURT:  Also -- also --

25             MR. BURNHAM:  Yes, Your Honor.

1          THE COURT:  -- they say, We have a stake in the

2     information that we would actually garner under these

3     circumstances, given the Special Counsel's Report, et cetera.

4          How is that not a concrete interest in this kind of

5     dispute?  Are you saying it's not just because they are the

6     House as opposed to some sort of private party or what?

7          MR. BURNHAM:  Well, sort of.  I mean, what I'm saying

8     is that the House's institutional interest in enforcing its

9     subpoena, in making sure that its votes have the proper effect,

10    is precisely what the court rejected in *Raines*.  The way *Raines*

11    put it, *Raines* drew a direct contradistinction between a,

12    quote, "loss of political power," which is all this case is

13    about, and a, quote, "loss of any private right."

14         THE COURT:  But *Raines* was not the House.  *Raines* was

15    not seeking enforcement of the House's authority, its power of

16    inquiry.  *Raines* was individual legislators who were making

17    some claim about their loss of power in the overall dynamic.

18         MR. BURNHAM:  Right.

19         THE COURT:  So it's distinguishable, I think, in that

20    way.

21         MR. BURNHAM:  Well, not its reason -- I'm sorry,

22    Your Honor.  I didn't mean to --

23         THE COURT:  But it's not the reasoning that's the

24    problem.  It's the -- whether or not you're actually

25    identifying an injury-in-fact or a cognizable interest.  And

1    what I'm saying is that the interests are different in *Raines*

2    and in this case.

3              MR. BURNHAM:  Right.  What I'm saying, Your Honor, is

4    that they're not under the way the court decided the case.  So

5    one of the plaintiffs in *Raines*, I think, was

6    Senator Orrin Hatch.  Senator Hatch's interest in his vote

7    having full effect is no different in kind than the Committee's

8    interest in having its subpoena have effect.  And that's why

9    with the court -- the way the court decided *Raines* is it didn't

10   say because this is one legislator, not the House, he loses,

11   good-bye, you're done.  What it said is this person loses

12   because all he has is an institutional stake in the outcome,

13   not a personal one.

14             THE COURT:  All right.  So help me to understand why

15   you are suggesting that the House is different with respect to

16   its ability to enforce its subpoenas and get information than a

17   private party would be.  The thing that concerns a little bit

18   about your argument is that I don't think you'd be saying the

19   same thing if we were talking about litigation as between

20   private individuals, where people can issue subpoenas and they

21   can also come to court if the person who receives the subpoena

22   doesn't provide the information that they say they are seeking

23   to compel; right?  I get these all the time.

24             MR. BURNHAM:  Sure.

25             THE COURT:  Why is the House worse off?  What about

1       this overall thing makes it so that even though we know that

2       there is an interest in information --

3                   MR. BURNHAM:  Sure.

4                   THE COURT:  -- that could be enforced by court -- in

5       court, that there's an interest that can be protected by

6       subpoena, that private people do this all the time, but somehow

7       the House doesn't get to do it when it's seeking information?

8       I don't -- I don't understand that.

9                   MR. BURNHAM:  So not to go back to our last rabbit

10      hole, one difference is the House has never bothered to pass a

11      statute giving it the authority to do any of this.  It has

12      never given itself statutory jurisdiction.  It has never given

13      itself a cause of action.  It has never done any of that, not

14      at any point in American history, not during Andrew Johnson's

15      administration when they could override vetoes, not when they

16      gave it to the Senate.  But to answer -- putting that aside for

17      a second --

18                  THE COURT:  But then that assumes, of course, that

19      you -- obviously, you don't read Article I to be that font of

20      authority.  I get it.

21                  MR. BURNHAM:  Yes.  Right.  That's fair.  So that

22      assumes that -- and we can talk about that in a second, but --

23      sorry.  On the constitutional side -- sorry.

24                  THE COURT:  That's all right.

25                  MR. BURNHAM:  Okay.  The other -- but the other basic

1      difference is that the House doesn't execute the laws.  So the

2      House can -- has two means of enforcing subpoenas.  And, in

3      fact, the D.C. Circuit put it this way in *Chenoweth* -- wait.

4      Where is that?  Well, anyway, they historically have two ways

5      of enforcing subpoenas:  contempt referrals to the Executive

6      Branch for prosecution and then their inherent contempt powers,

7      which date back to the framing.

8              And one of the Supreme Court decisions -- or the D.C.

9      Circuit decisions from the '80s makes that precise point.  And

10     so in that respect, they are no worse off than anybody else

11     because they have perfectly available tools to enforce

12     subpoenas.

13             THE COURT:  No, no.  I'm talking about this tool.

14     All right?

15             MR. BURNHAM:  Right.

16             THE COURT:  Regardless of whether or not there are

17     other things that they can do -- and we'll talk about that

18     argument, I think, in a bit --

19             MR. BURNHAM:  Right.

20             THE COURT:  -- they want to do this:  They want to

21     come into court.  They want to -- excuse me.  They want to be

22     able to issue a subpoena --

23             MR. BURNHAM:  Right.

24             THE COURT:  -- get the information directly from the

25     person.  And if the person doesn't give them the information,

1    come into court and say, Please enforce my subpoena --

2              MR. BURNHAM:  Right.

3              THE COURT:  -- right?  We know, whether it's by

4    statute or some other authority, that private people can do

5    that in our courts all the time --

6              MR. BURNHAM:  Right.

7              THE COURT:  -- and they do.

8              What I don't understand is your argument -- and I

9    think it may be rooted in separation of powers.  That's why it

10   came to me as we were talking about that.

11             Why can't the House operate in the same way that

12   others do with respect to their power to go into court?

13             MR. BURNHAM:  Right.

14             THE COURT:  And why can't this Court hear their

15   dispute just like it would anybody else's?

16             MR. BURNHAM:  So there's two -- two reasons.  The

17   first is specific to this case because of the presence of the

18   Executive Branch.  The branches can't sue each other.

19             THE COURT:  Why not?

20             MR. BURNHAM:  Because it has happened before in

21   our --

22             THE COURT:  It doesn't mean it can't be done.

23             MR. BURNHAM:  But I think the Constitution structure

24   is very clear that the branches have certain tools they're

25   supposed to use for interbranch combat, and litigation in

1      federal court is not one of them.

2              THE COURT:  But this is not interbranch combat in the

3      sense of political question; right?  This is the same dispute

4      that the private party -- let's say we have a little schematic

5      and we just cross out House and Executive and we put Bob and

6      Mary; right?

7              MR. BURNHAM:  Yes.

8              THE COURT:  And so now the nature of the dispute does

9      not change.  I have a subpoena.  I am seeking to compel

10     information, and I'm coming to federal court.

11             MR. BURNHAM:  Right.  So Bob and Mary have been suing

12     each other from the beginning, and the Constitution gives the

13     courts jurisdiction over disputes between Bob and Mary -- or at

14     least presuppose that the Congress will grant them statutory

15     jurisdiction.

16             It's different for the House.  Suing the Executive in

17     particular because that's -- interbranch litigation is just not

18     the way the Constitution is --

19             THE COURT:  But I haven't seen a case nor did

20     Judge Bates --

21             MR. BURNHAM:  *Raines*.

22             THE COURT:  -- that suggests this.

23             MR. BURNHAM:  Sure.  *Raines*.  So what *Raines* says --

24             THE COURT:  But *Raines* is not House v. Executive.

25     *Raines* is individual legislators vs. -- right -- Executive.

1          MR. BURNHAM:  Yes, but what the opinion says -- and I

2     do think the court is bound by the reasoning of *Raines*, not

3     just the direct holding about the parties.  It goes through two

4     pages of historical examples of interbranch suits that it says

5     could not -- did not actually happen.  They go through Andrew

6     Johnson and the Tenure of Office Act.  That's at pages 826 to

7     827.  They talk about *INS v. Chadha*, which, as Your Honor will

8     recall, is about the one House legislative veto.  And what the

9     court says in *Raines* is that if the Committee's position -- or

10    there, the Congressman's position, were correct, the Attorney

11    General could have simply sued the House.

12         THE COURT:  But you keep skipping over the crucial

13    piece.  You want -- you want to sort of do away with the

14    difference between the Committee and individual legislators.

15    But you, when you're talking about injury and you're talking

16    about separation of powers, it matters.  It matters whether

17    you're actually assessing the House versus an individual member

18    of the House; right?

19         MR. BURNHAM:  Right.  But it doesn't matter.  If you

20    look at the examples the court provided, the Supreme Court's

21    analysis didn't say that *INS v. Chadha* came out differently

22    because it was only a few congressman.  The Supreme Court said

23    institutions of the federal government cannot sue each other.

24         THE COURT:  So what does checks and balances mean?

25         MR. BURNHAM:  It means --

1              THE COURT:  How -- how can -- how can the legislature

2       actually exercise oversight with respect to the Executive

3       unless it has some ability to enforce its inquiries, its

4       commandments with respect to give me information.  I don't --

5       you're saying -- you're saying there is really not the ability

6       to come to court.  They can do these other things?

7              MR. BURNHAM:  Right.

8              THE COURT:  Is that your answer?

9              MR. BURNHAM:  So -- yes, and let me just give you --

10             THE COURT:  But why -- why would the other things

11      eliminate the separation-of-powers problem?

12             MR. BURNHAM:  Right.

13             THE COURT:  Right.  Your counsel says it makes it

14      worse, in fact, to have the legislature sending the Sergeant at

15      Arms to arrest people.

16             MR. BURNHAM:  I'm sorry.  Who said that?

17             THE COURT:  Opposing counsel.

18             MR. BURNHAM:  My -- oh, yes.  I -- I disagree.

19             THE COURT:  Sorry.  I'm so bad with names.  I don't

20      want to mess it up, so now I'm just --

21             MR. BURNHAM:  Yes.

22             THE COURT:  Ms. Barbero says -- says he's talking

23      about separation of powers, he's suggesting don't come into

24      court because there are other alternatives.  When you look at

25      the other alternatives, they're actually worse from the

1    separation of powers.

2              MR. BURNHAM:  So -- if you'll permit me, I have three

3    answers to this, Your Honor.  So the first is just I really --

4    I really want to stress the historical part because I think

5    it's really important.  There have been informational disputes

6    between Congress and the president since George Washington.

7    There was a fight with President John Tyler about the right of

8    the House to papers in the Executive's possession about

9    jurisdiction over land.

10             There was a fight with President Tyler in 1842.

11   There was a fight with Grover Cleveland about papers related

12   to, what do you know, the removal of the United States

13   attorney.  There was a fight -- there were fights with

14   Presidents Jefferson, Jackson, Tyler, Polk, Buchanan, Grant,

15   Cleveland, Coolidge, Hoover, Franklin Roosevelt, and Truman.

16   This is all gathered in the concurrence in the D.C. Circuit's

17   decision in *Nixon v. Sirica.*  Reagan, Clinton, none of those

18   went to court.  It wasn't until the *Miers* case that the House

19   decided it would try to go court.  And --

20             THE COURT:  And the implication or the takeaway from

21   that is what?

22             MR. BURNHAM:  That the Constitution functions just

23   fine without the interbranch litigation that the House is

24   claiming is so necessary to prevent bad effects here.  That

25   affects --

1          THE COURT:  I'm not talking about necessary; right?

2     I'm not talking about whether or not they have to do this.  The

3     question is whether or not they get to do this.

4          MR. BURNHAM:  No, I --

5          THE COURT:  Whether they are permitted --

6          MR. BURNHAM:  Right.

7          THE COURT:  -- to choose this option rather than the

8     others, and so your litany of examples in which other

9     administrations and other government, you know, circumstances

10    chose what's behind Door No. 1 doesn't tell me whether or not

11    the law permits them to follow this course of action.

12         MR. BURNHAM:  Right.  So -- so there's a -- a very

13    famous Sherlock Holmes book about the dog that did not bark.  I

14    don't remember exactly how he set it up, but the point is that

15    for 200 years, this dog did not bark.  And I think the natural

16    inference is that the dog does not exist.

17         Your Honor also asked about other tools the House

18    had -- has, how the House is supposed to get the information

19    that it needs.  They have the power to appropriate.  They have

20    the power to withhold appropriations.  They have the power to

21    legislate.  They have the power to refuse to consent to --

22         THE COURT:  And because they have those other powers,

23    you would like for me to infer that they don't have the power

24    to come to court?

25         MR. BURNHAM:  I think the constitutional structure,

1    particularly as understood by the Supreme Court in *Raines*,

2    makes quite clear they don't have the power to come to court.

3              THE COURT:  And so there is no circumstance, in your

4    view, in which -- is this particular to them trying to get

5    information from the Executive Branch or is -- are you taking

6    the position that there is no circumstance under which the

7    House or a -- you know, a committee --

8              MR. BURNHAM:  Sure.

9              THE COURT:  -- of the House or the Senate or

10   whomever --

11             MR. BURNHAM:  Sure.

12             THE COURT:  -- could ever come to court suing

13   directly, as you say, the Executive Branch for anything?

14             MR. BURNHAM:  So I -- I hate to take a position

15   broader than what's presented before the Court, but it's hard

16   for me to think of an example of that.  The Court doesn't need

17   to conclude that broadly.  You know, one thing that might

18   illustrate this point, actually, that comes from *Raines*.  So

19   *Raines v. Byrd* was about the line-item veto, and the Court

20   declined to resolve the constitutionality of the line-item veto

21   because there was no justiciable case.  The very next term, the

22   Court decided whether the line-item veto was constitutional in

23   *Clinton v. New York*.

24             One of the points the House makes is that the

25   presence of a separation-of-powers question doesn't oust the

1   Court's jurisdiction.  That's obviously correct.

2          THE COURT:  Well, I guess my question is --

3          MR. BURNHAM:  Sure.

4          THE COURT:  -- why are you continuing to fashion this

5   as a, quote/unquote, separation-of-powers question?  I don't

6   understand it.

7          MR. BURNHAM:  Right.

8          THE COURT:  The question that the Court is being

9   asked is the same question that this Court is being asked all

10  the time with respect to other parties.  So your suggestion is

11  just because the House is one of the parties, somehow that

12  transforms this into a nonjusticiable political question and

13  I've never seen that principle in the law.

14         MR. BURNHAM:  Right.  So I guess I would say that the

15  Courts have said, quite a few times actually, that standing

16  analysis is a separation-of-powers analysis.  So the

17  D.C. Circuit's decision in *Chenoweth* is a good example where

18  they said after the '70s, after *AT&T* 1, quote, "The Supreme

19  Court began to place greater emphasis upon the

20  separation-of-powers concerns underlying the Article III

21  standing requirement."

22         I don't think there's any question that Article --

23         THE COURT:  What are the -- help me -- I guess I'm

24  back to my initial question.  What are the separation-of-powers

25  concerns that underlie the Article III standing analysis?

1              MR. BURNHAM:  Well, the courts -- I mean, they --

2      they go to all three branches.  So the Executive Branch has the

3      power to execute the laws.  If you look at the Supreme Court's

4      decision in *Buckley v. Valeo,* what that decision says -- sorry.

5      I'll get the exact quote -- "The powers of judicial relief is

6      authority that cannot possibly be regarded as merely in aid of

7      the legislative function of Congress."  And that's at page 138

8      of the Court's opinion.  The power to go to court is an

9      executive power.  It's a power to execute the laws.  It's one

10     that the Executive Branch possesses, not Congress.

11             I think this case is much easier than that because

12     interbranch litigation presents its own --

13             THE COURT:  So the House can never go to court?  Is

14     that --

15             MR. BURNHAM:  I think as a general proposition that

16     is correct.  I don't want to say categorically because there

17     may be something I'm not thinking of, but as a general

18     proposition, I believe that is correct, Your Honor.

19             And so that is why it's a separation-of-powers

20     perspective as between us, but as for the Court itself, the

21     Article III is very clear that the judicial power is limited to

22     cases in controversies.  That's a really important limitation.

23     It's a limitation that protects the courts from being drawn

24     into the political process.

25             THE COURT:  But here's -- this -- and I don't want to

1    beat a dead horse.  So we'll move on in a second, but if these

2    people were private parties, this could be a case in

3    controversy.  I see them all the time.  The -- the case and the

4    controversy is I have issued a subpoena, the person to whom I

5    have issued the subpoena says I'm not going to give you

6    documents or testimony.  Judge, please adjudicate this dispute;

7    right?  No one -- and I think you're not saying that that's not

8    a case in controversy if it arises between private parties.

9              MR. BURNHAM:  If there's a statute, yes, I agree.  If

10   there's statutory jurisdiction and a cause of action and all of

11   that, I agree.

12             THE COURT:  And all of those other circumstances?

13             MR. BURNHAM:  Yes.  Yes.

14             THE COURT:  So assuming that there's a cause of

15   action --

16             MR. BURNHAM:  Yes.

17             THE COURT:  -- right -- for this purpose, it somehow

18   is not a case in controversy, you are suggesting, if the party

19   that issues the subpoena is the House?

20             MR. BURNHAM:  That's correct, because the House both

21   does not have a -- a personal stake in the outcome, it only has

22   an institutional one.  And because even if I'm wrong about

23   that, this sort of dispute is not the one traditionally thought

24   resolvable through the judicial process.  It's one that's left

25   to the political process for the political branches to resolve.

```
1                    THE COURT:  What -- but how would the political
2       process answer this dispute?  This is -- this -- so you're
3       suggesting that this is not even a question of law; right?
4       Because the political process does not answer questions of law.
5       The courts do.  So the question:  Who -- who is right; right?
6       The -- the subpoena issuer or the subpoena recipient, when
7       there's a dispute, you're suggesting is not a question of law?
8                    MR. BURNHAM:  I wouldn't say it's -- I wouldn't put
9       it like that, Your Honor.  I would just say it's not --
10                   THE COURT:  No, because if you put it that like then
11      you'd be wrong.  So tell me -- what do you mean about this
12      being a political question rather than a legal question?
13                   MR. BURNHAM:  Well, I just -- I didn't -- I didn't
14      say it was a political question.  So what I said is that it's
15      something that the political branches have to resolve between
16      themselves.
17                   THE COURT:  And how do they go about doing that?
18                   MR. BURNHAM:  I think they're doing that right now.
19      There's --
20                   THE COURT:  I've got a notice from both sides that
21      say we're at an impasse.  We're not --
22                   MR. BURNHAM:  Sure.
23                   THE COURT:  So --
24                   MR. BURNHAM:  But the House has political tools they
25      have not used if they really care about this information.  I
```

```
 1    mean, one of the --

 2              THE COURT:  Political tools that heighten the

 3    separation-of-powers concerns, not --

 4              MR. BURNHAM:  No, Your Honor.

 5              THE COURT:  -- not limit them?

 6              MR. BURNHAM:  No, no, no.  Fierce combat between the

 7    political branches is not a concern.  That's a design.  That's

 8    a feature.  The Constitution works best when the political

 9    branches are doing fierce battle.  That's the whole point.

10              THE COURT:  You mean fierce battle like sending the

11    Sergeant at Arms to arrest Mr. McGahn?

12              MR. BURNHAM:  I really have serious doubts about the

13    constitutionality of them trying to do that.  It's only

14    happened once or twice in history.

15              THE COURT:  You mean serious combat like bringing

16    criminal indictments, which I understand OLC has said is not an

17    option?

18              MR. BURNHAM:  Well, that's -- I don't know what

19    that -- I'm sorry.  What does that have to --

20              THE COURT:  In other words, you're saying they have

21    tools --

22              MR. BURNHAM:  Yes.

23              THE COURT:  -- that they haven't employed yet.

24              MR. BURNHAM:  Like the appropriations power.

25              THE COURT:  What do you mean?
```

1          MR. BURNHAM:  Well, they fund the government.  They

2     fund the justice department.  They fund the White House.  They

3     fund the judiciary.  The House hasn't done anything with its

4     appropriations power at all to try to enforce the informational

5     demands it's made on the Executive.

6          THE COURT:  And so --

7          MR. BURNHAM:  The reason for that, I think, is that

8     they don't have the political support or the political will to

9     do it.  But that's a good -- that's a feature.  If the House --

10    if Congress doesn't care enough to use the tools that it has,

11    running to the courts is not something the Constitution

12    contemplated.

13         THE COURT:  Except this question is -- I -- can you

14    show me a case in which this question -- in other words --

15    well, let me -- let me just say this and we'll move on.  What I

16    found kind of striking about your argument is at times you

17    suggest that it will be an augmentation of the power of the

18    judiciary if the Court were to entertain this kind of dispute.

19    It seems to me that requiring the judiciary to make value

20    judgments about what other options the House could have had and

21    could have exercised is actually the thing that augments the

22    power of the judiciary.

23         MR. BURNHAM:  Sure.

24         THE COURT:  The judiciary is limited because if they

25    bring a case in controversy that I have jurisdiction to review

1    and they have standing to bring, I don't ask, Why, Mr. Letter,

2    are you bringing -- you know, in court?  Couldn't you have done

3    a bunch of other things?

4              MR. BURNHAM:  Right.

5              THE COURT:  You're suggesting that I do that, and

6    what I don't understand is why that doesn't upset the balance

7    of power by giving the judiciary more power in this than it

8    otherwise would have.

9              MR. BURNHAM:  Right.  So I didn't -- if I suggested

10   that, Your Honor, I apologize.  I didn't mean to.  I was just

11   trying to answer the question about -- I thought Your Honor had

12   asked what are they supposed to do if they can't go to court,

13   and I was telling Your Honor other things that the Constitution

14   provides.

15             THE COURT:  Right.  And prior to that -- prior to

16   that, the only reason why we're talking about that is that you

17   were suggesting that as long as there are other things that

18   they could have done --

19             MR. BURNHAM:  Oh --

20             THE COURT:  -- they shouldn't be bringing a case in

21   court --

22             MR. BURNHAM:  No.

23             THE COURT:  -- which would require me to stay my hand

24   whenever I look out into the universe and think, Oh, there are

25   other things that you could do.  And that seems to me to make

1    the judiciary more powerful in this overall balance than not.

2              MR. BURNHAM:  I apologize, Your Honor.  I didn't mean

3    to make that argument, and I am not making that argument.

4              THE COURT:  Okay.  All right.

5              MR. BURNHAM:  I'm making the argument that the

6    Constitution does not allow this.  That they do not allow the

7    House and the Executive Branch to sue each other in court,

8    one toward them-us or us-them, that there's no statutory grant

9    of jurisdiction, even if I'm wrong about that, and that they --

10   that exists to allow the suit and there's no cause of action

11   that allows them to come into court.

12             I'm not suggesting, and I did not mean to suggest,

13   that the Court should engage in some sort of political analysis

14   about whether there's other steps the House should take before

15   its suit is ripe or something like that.  We did have an

16   accommodation argument.  We've withdrawn that argument.  So I

17   don't -- I think you can take that off the table.  My argument

18   is a formal argument this kind of lawsuit can't be here.  I

19   think that's clear from *Raines*, and if you -- don't take my

20   word for it.  Justice Souter's concurrence in *Raines*, I think,

21   is very helpful.

22             So how I would suggest the Court think about this

23   issue, what Justice Souter says is it is very important that

24   the Court be perceived as nonpolitical actors.  I think we can

25   all agree with that.  And so when you wait for a suit that

1    involves a private person, it creates some distance between the

2    judiciary and whatever the heated political battle of the day

3    is.  And that is a point that applies just as much to House --

4    House Committee, House of Representatives versus Executive as

5    it does to three or four legislators versus the Executive.

6              THE COURT:  So your point is the judiciary is

7    permitted to say or has the authority under our constitutional

8    scheme to say what the law is, but not insofar as the dispute

9    involves the other branches of government.  I cannot -- I

10   should not or cannot say what the law is in a dispute between

11   the other branches of law.

12             MR. BURNHAM:  I would say it like this, Your Honor:

13   You can't say what the law is unless you have a case or a

14   controversy before you, and part of the case in controversy

15   requirement is that there be someone with proper standing with

16   the private -- a private stake in the dispute, and this is not

17   that.  So you absolutely have that authority in any case or

18   controversy under Article III.  This just isn't one; and,

19   therefore, the Court doesn't have --

20             THE COURT:  And it can never be one because the way

21   you've defined case in controversy is you have to have a

22   private stake.  You can't be the House.

23             MR. BURNHAM:  Right.

24             THE COURT:  So, again, it reduces to if you're the

25   House and if you're suing to protect an interest that you say

1    you have, you're suing the Executive, and the question, I

2    think, in this case as in, you know, the kinds of cases that

3    I'm talking about is does the Constitution give me, the House,

4    the right to issue a subpoena and the right to go to court to

5    enforce that subpoena; right?

6              MR. BURNHAM:  Right.

7              THE COURT:  Ordinarily a question of law, but you're

8    suggesting that if I'm the House because the judiciary is not

9    allowed to answer questions of law as between two different

10   branches of government, there's nothing that this court can do.

11   They can't be in court, too bad.  Is that -- is that the sort

12   of thrust of your argument?

13             MR. BURNHAM:  Yeah, I think -- I think that's fair.

14             THE COURT:  All right.  All right.  I think I

15   understand it.

16             MR. BURNHAM:  If I could -- I have -- I have one more

17   issue on the threshold stuff that I just want -- if you'll

18   permit me just two minutes.

19             THE COURT:  Yes.  Yes.

20             MR. BURNHAM:  The cause of action -- just because we

21   haven't had a chance to chat about it.

22             THE COURT:  Yes, please.  Thank you.

23             MR. BURNHAM:  Your Honor asked me a few times about

24   Judge Bates's opinion and Judge -- the other Judge Jackson's --

25   there's Judge Berman Jackson's opinion.

1          THE COURT:  Yes.

2          MR. BURNHAM:  The Supreme Court has two decisions

3    that came after those that I think are relevant on cause of

4    action.  And those are *Ziglar v. Abbassi* and *Jesner v. Arab*

5    *Bank*.

6          As the Court well knows, the Supreme Court has held

7    since *Alexander v. Sandoval* and before that the, quote, "rights

8    of action to enforce federal law must be created by Congress."

9          What *Ziglar* tells is that, quote, "When a party seeks

10   to assert an implied cause of action under the Constitution

11   itself, just as when a party seeks to an applied cause of

12   action under a federal statute, separation-of-powers principles

13   are or should be central to the analysis."

14         THE COURT:  Was that a damages case or --

15         MR. BURNHAM:  It is a *Bivens* case, Your Honor, but

16   that general principle, I think, applies with the same force

17   here where we've got a separation, very substantial separation,

18   of powers overlaid of the case.  Those decisions both postdate

19   *Miers* and the Fast and Furious case because that was the

20   subject matter, but what is -- the *Holder* case before

21   Judge Berman Jackson.  And so I just -- I think those, *Ziglar*

22   and *Jesner* --

23         THE COURT:  It's so peculiar.  I just -- I'm really

24   trying to wrap my mind around your argument, because separation

25   of powers and checks and balances, which has traditionally been

 1   considered a part of the separation-of-powers principles, would

 2   seem to require exactly the opposite result.  That, in other

 3   words, not only are we in a world in which we have --

 4            MR. BURNHAM:  Right.

 5            THE COURT:  -- coequal branches doing their own

 6   things --

 7            MR. BURNHAM:  Right.

 8            THE COURT:  -- but they also have the ability to

 9   check one another.

10            MR. BURNHAM:  Right.

11            THE COURT:  And so what I don't understand from your,

12   you know, continued invocation of separation-of-powers

13   principles is this notion that the judiciary can't play its

14   traditional role in deciding what the law is as between these

15   other branches.

16            MR. BURNHAM:  So I think if we're -- if we're talking

17   about tradition, then I think I clearly prevail since there's

18   been no example of this prior to 2008.  And so as the

19   traditional -- I mean, there's never been a subpoena lawsuit

20   before *Miers*.

21            THE COURT:  Well, I don't -- I don't mean tradition

22   in the narrow sense.

23            MR. BURNHAM:  Okay.

24            THE COURT:  What I'm saying -- surely you do not

25   disagree that the judiciary can say what the law is.

1              MR. BURNHAM:  No.

2              THE COURT:  That's -- that's really traditional.

3              MR. BURNHAM:  No.  That's *Marbury v. Madison*.

4              THE COURT:  Okay.  All right.

5              MR. BURNHAM:  I'm with you on that.  Yes, ma'am.

6              THE COURT:  So what is supposed to happen when there

7      are disputes as between the other two branches with respect to

8      questions of law?  You're suddenly suggesting that

9      separation-of-powers principles prevents the judiciary; right?

10     Out of respect for separation of powers, the judiciary is not

11     going to answer what the law is when the Executive and the

12     legislature dispute; right?  I mean, that's basically what

13     you're saying; whereas I had understood the whole system is

14     such that that's precisely --

15             MR. BURNHAM:  Right.

16             THE COURT:  -- what the judiciary is supposed to be

17     called upon.

18             MR. BURNHAM:  Right.  So you've -- more or less have

19     described my constitutional argument.

20             THE COURT:  Yes.

21             MR. BURNHAM:  The argument I'm actually hoping to

22     press upon Your Honor now is a much, much narrower one, Which

23     is before the Court jumps into these big constitutional

24     questions between the House of Representatives and the

25     Executive Branch, Congress has to at least go through the

1     process of giving it, the House, a cause of action --

2          THE COURT:  Why?  The Constitution itself sets the

3     system in this way.  We're not talking about a vacuum.

4          MR. BURNHAM:  No, but it doesn't, Your Honor, because

5     if that were true, then these cases would have been permissible

6     all the way back to the beginning.

7          THE COURT:  No, they -- they -- they possibly could

8     have been.  Nobody's say- -- you don't have a Supreme Court

9     case that says way back in the beginning what my conception of

10    the way in which this works is wrong.  You just have the fact

11    that nobody made this argument before.

12         MR. BURNHAM:  Well --

13         THE COURT:  Okay.

14         MR. BURNHAM:  I do have a D.C. Circuit case.  So the

15    application of *Senate Permanent Subcommittee* case which is at

16    655 F.2d 1232, the Court said, and I quote, "Prior to 1978,

17    Congress only had two means of enforcing compliance with its

18    subpoenas, a statutory criminal contempt mechanism and the

19    inherent congressional contempt power."  That's a direct quote.

20         The thing since 1978 they're referring to is

21    Section 1365, which I showed Your Honor a little while ago,

22    which has a corresponding provision at 2 U.S.C. --

23         THE COURT:  I'm sorry.  I was waiting for the quote

24    to say something about separation of powers.

25         MR. BURNHAM:  No, Your Honor.  It's by cause of

1     action.  I'm sorry.  So there's no mechanism -- the -- the

2     quote -- the court said they only had two ways to enforce their

3     request -- their subpoenas.  Only two.

4                THE COURT:  As a matter of cause of action --

5                MR. BURNHAM:  In general, but I -- the Court -- I

6     mean, it's a general proposition.  I'm -- I think it's most

7     relevant for Your Honor's purposes on the statutory questions

8     because those are the narrowest questions.

9                And in 1978 what the Court was referring to was the

10    enactment of the 1365, which I showed you -- Your Honor before,

11    and 2 U.S.C. 288d, which is the cause of action for the Senate

12    committee to enforce its subpoenas.  So the point -- the point

13    I'm trying to make is that the D.C. Circuit has already told us

14    that there hasn't been an ability to just go to court to

15    enforce subpoenas prior to 1978, and the only thing that

16    happened in 1978 was Congress went through the step I'm

17    suggesting the House should have to go through and gave a cause

18    of action to the Senate and gave jurisdiction -- subject matter

19    jurisdiction to the Senate.

20               THE COURT:  All right.

21               MR. BURNHAM:  It hasn't done that for the House.

22               The only other point I'd like to make on this -- and

23    I know -- I appreciate your indulgence because I know I've been

24    standing here for a while is --

25               THE COURT:  You're the one who's standing.

1          MR. BURNHAM:  Well, yes, that's true.  But I do

2     appreciate it, nonetheless.

3          We've talked a little bit about the Supreme Court's

4     decision in *Armstrong* --

5          THE COURT:  Yes.

6          MR. BURNHAM:  -- implied actions of equity.  If the

7     House wants to go down the implied actions of equity path, they

8     have to take the bitter with the sweet, and the Supreme Court's

9     decision in -- and I'll say this one slowly -- *Grupo Mexicano*

10    *de Desarrolo* -- I don't know how to say that word -- *v.*

11    *Alliance Bond Fund,* which is 527 U.S. 308.  Page 319 says that

12    the equitable powers may only be exercised when, quote, the

13    relief requested was traditionally accorded by courts of

14    equity.  And, of course, there is no tradition at all, as we've

15    talked about -- whether -- whether that's dispositive on its

16    own or not --

17         THE COURT:  I guess -- I guess I'm just a little

18    concerned because I keep -- I keep having the sense of you

19    zooming in and zooming out on different arguments; right?

20         MR. BURNHAM:  Sorry.

21         THE COURT:  So, yes, traditionally courts of equity,

22    as I've said many times, resolves subpoena disputes.

23    Traditionally that is -- do you -- do you dispute that?

24         MR. BURNHAM:  No, of course not, Your Honor.

25         THE COURT:  Okay.  So why doesn't that answer that

1    very question that you -- very issue that you just brought up.

2          MR. BURNHAM:  So the House made a similar point.  So

3    I've actually, thankfully, had a chance to think about that.

4    If you actually look at *Grupo*, the level of generalities is

5    extremely low, at which the Court looks at what has

6    traditionally happened in a court of equity.  So that case was

7    distinguishing between suits by a creditor to retain a debtor's

8    assets prejudgment and suits by a creditor to retain --

9    restrain the assets postjudgment.  In other words, the Court

10   said one had happened at equity and one hadn't.  The one that

11   hadn't is out.  I think that just saying subpoenas were

12   enforced at equity is far too high a level of generality, much

13   different than *Grupo*.  You have to look at what kind of

14   subpoenas and in this case --

15         THE COURT:  Right.  Again, that doesn't extend to the

16   parties bringing it.  Your entire argument seems to rest in

17   this respect on the House's identity as the House.  And I

18   understand because it is --

19         MR. BURNHAM:  That's true.

20         THE COURT:  -- implicating separation of powers,

21   principles that you keep trying to insert, and I keep trying to

22   understand whether that actually makes any difference.

23         MR. BURNHAM:  Right.

24         THE COURT:  To the extent you're talking about is

25   this the kind of thing that the Court did, I suppose we could

1    look at the subpoena itself, determine whether or not they're

2    asking for documents and testimony.  At that level of, you

3    know, narrowness, this is, in fact, the kind of thing that

4    courts have traditionally looked at and enforced in equity.

5    The question is whether --

6                MR. BURNHAM:  Right.

7                THE COURT:  -- you are -- you appear to be wanting me

8    to carry that same principle to who is bringing the suit.  It's

9    not the nature of the action.

10               MR. BURNHAM:  Right.

11               THE COURT:  It's the fact that it's the House that's

12   bringing the action.  And I don't know whether any of these

13   cases actually captured that principle.

14               MR. BURNHAM:  Right.  So I guess all I would say is

15   that the nature of the subpoena -- the issuing authority is

16   part of what the subpoena is.  A grand jury --

17               THE COURT:  Says who?  That doesn't --

18               MR. BURNHAM:  All subpoenas --

19               THE COURT:  That's not -- we're talking what is the

20   nature of the -- of -- what is the Court being asked to do in

21   terms of its authority to rule on this question relative to

22   what is being asked; right?

23               MR. BURNHAM:  Right.

24               THE COURT:  Does it have the power to grant this kind

25   of relief, and what is the claim that's being made about the

1    person's entitlement to this relief.  The House says we have --

2    and this is the merits question that we haven't even gotten to

3    yet.  We have under Article I the ability to -- to issue a

4    subpoena and to enforce it in federal court.

5              MR. BURNHAM:  Uh-huh.

6              THE COURT:  You obviously disagree.

7              MR. BURNHAM:  Right.  Right.

8              THE COURT:  Those kinds of questions arise in the

9    federal courts all the time.

10             MR. BURNHAM:  Right.  I just -- I just think given

11   the way Your Honor has framed what they're claiming proves my

12   point because there is zero tradition in equity of the House

13   enforcing subpoenas that it has the implied power to issue

14   under Article I in the courts of equity.

15             THE COURT:  But that's the merits question.

16             MR. BURNHAM:  No, no.

17             THE COURT:  You have to assume -- when we talk about

18   these threshold issues precisely why I separated them out --

19             MR. BURNHAM:  Right.

20             THE COURT:  -- is that you actually have to assume

21   that they are correct about the merits when you evaluate the

22   jurisdiction, the standing, or whatever; all right?

23             MR. BURNHAM:  Of course.

24             THE COURT:  So assuming that they do have the

25   authority to issue a subpoena, that they do have the authority

1    to come to court, the question is for -- for this purpose

2    whether or not that kind of lawsuit, one in which a person is

3    coming to court seeking to enforce the system, is something

4    that this Court has traditionally handled.

5              MR. BURNHAM:  Right.  So -- I don't think -- I

6    think -- I think you understand my position.

7              THE COURT:  Yes.

8              MR. BURNHAM:  All I -- all I would say is that the

9    nature of the subpoena is part of that evaluation, and so I

10   think -- I think --

11             THE COURT:  And the nature of the subpoena in your

12   view includes who is bringing it?

13             MR. BURNHAM:  The basis of authority for the

14   subpoena.

15             THE COURT:  I see.

16             MR. BURNHAM:  17(c) subpoenas, grand jury subpoenas,

17   civil subpoenas.  They're all a little different.  I'm not a

18   master of the law about all of them, but I think they all have

19   different legal restrictions and different rules.

20             And all I'm saying is a House subpoena is its own

21   type of subpoena, and that is the thing that has not

22   traditionally been enforced in the courts of equity.  And I

23   would respectfully submit that *Grupo Mexicano* says -- stands

24   for the proposition that you need to look at that at a fairly

25   specific level of generality rather than a high one, but I

1    think you understand.

2              THE COURT:  All right.  Thank you.

3              MR. BURNHAM:  Thank you, Your Honor.

4              THE COURT:  Ms. Barbero, I've given you a lot to

5    think about, maybe not much time, because I do want to move on

6    to the merits, but I will let you respond.

7              MS. BARBERO:  Thank you, Your Honor, and I will keep

8    it brief.

9              I just have three points I wanted to make.  The first

10   are clarifications about both *AT&T* 1 and *AT&T* 2.  I think my

11   friend Mr. Burnham mistakenly represented that there was not a

12   holding on jurisdiction under Section 1331 in *AT&T* 1.  If you

13   look at page 389 of that decision, the Court says, We -- we

14   find subject matter jurisdiction under 28 U.S.C. 1331, and then

15   goes on to analyze why given that the United States had

16   represented there were national security interests at stake,

17   and footnote 7 also discusses the alternative basis for

18   jurisdiction that the United States had brought.  The Court

19   found that there was some question about that because Congress

20   was the real party in interest on the other side of the

21   subpoena but says there is jurisdiction under 1331.

22             THE COURT:  So it's not a drive-by?

23             MS. BARBERO:  It is absolutely not a drive-by ruling.

24             THE COURT:  All right.

25             MS. BARBERO:  And with respect to *AT&T* 2, Your Honor,

1    that -- the D.C. Circuit's decision there answers a lot of

2    these questions about the fact that this is in some respects a

3    conflict between the Legislative and Executive Branch, and, of

4    course, the House -- the Judiciary Committee has sued

5    Mr. McGahn, not the Executive Branch.

6              But, regardless, the D.C. Circuit said the simple

7    fact of a conflict between the Legislative and Executive

8    Branches over a congressional subpoena does not preclude

9    judicial resolution.  That's at page 126 of that decision and

10   note 13 where the Court --

11             THE COURT:  So tell me whether that opinion --

12   because Mr. Burnham really focuses on *Raines*, is that predating

13   *Raines*?

14             MS. BARBERO:  That predates *Raines*.  And *Raines* is my

15   second point, because the analysis in *Raines* does not change

16   the D.C. Circuit's holding in *AT&T* at all with respect to the

17   House's standing.  *Raines*, as Your Honor well knows, is a case

18   about individual legislators, and what the Supreme Court said

19   is if you are an individual member of Congress, you do not have

20   standing to assert an institutional injury.  So the -- the

21   injury being asserted in *Raines* was a diminution of the

22   legislative power through the Line Item Veto Act, and the

23   individual members who sued said we've lost some of our

24   legislative authority.

25             What the Supreme Court said in *Raines* -- and I would,

1   again, commend Your Honor's attention to Judge Berman Jackson's

2   decision where she discussed the exact argument and says that

3   the department in making it is ignoring the final paragraph in

4   *Raines* where the holding is.  The holding in that case is that

5   if you are an individual member, you do not have standing.

6   That is, you do not have a concrete and particularized injury

7   in the institutional interest in legislative power of Congress,

8   but we know that it's not true, the legislators -- or

9   legislatures can never sue, because the Supreme Court in

10  Arizona -- in *Arizona State Legislature* said that the -- the

11  legislature there could sue to enforce an institutional injury

12  because unlike the plaintiffs in *Raines*, it was an

13  institutional plaintiff.

14          THE COURT:  So you really focus -- and I guess

15  Judge Berman Jackson focuses -- on the fact that these were

16  individual legislators.  Mr. Burnham says that's not really the

17  point.  We have to follow the analysis.  The analysis speaks

18  more broadly to this notion of the clash between these branches

19  as being something that cannot be vindicated in that way.

20          MS. BARBERO:  But we know from the Supreme Court's

21  more recent decisions, including *Arizona State Legislature* and

22  *Bethune-Hill* that the issue in *Raines* was really -- in the

23  words of the Supreme Court just recently in the *Bethune-Hill*

24  case, the issue was the match.

25          In *Raines* there wasn't a match between the plaintiffs

1    and the injury.  That is not true in this case, and it wasn't

2    true in *AT&T* 1 when the D.C. Circuit held that there was

3    standing for the House to intervene.  In that case the House

4    was asserting an interest in its Article I authority to issue a

5    subpoena and have it responded to.  The same is true here.

6         This is a subpoena issued with a House resolution

7    authorizing this lawsuit.  It's an institutional plaintiff, and

8    the match is a perfect match between the injury and the

9    plaintiff.  So there is standing here.  It's distinguishable

10   from *Raines*, and *Raines* doesn't undermine the D.C. Circuit

11   analysis in *AT&T*.

12        THE COURT:  So can you speak to the point I kept

13   going round and round with Mr. Burnham on, which is -- he says

14   for centuries now it appears as though, up until *Miers*, the

15   House never attempted to enforce its rights in this way in

16   federal court and that the Court should draw from that that

17   there is no dog.  I loved that quote; right?  The dog didn't

18   bite for all those years.  So now why isn't he right about

19   that?

20        I mean, it seems to me, he says, that if this was

21   something that was totally authorized, that it was accepted as

22   how people interpreted the Constitution, that given that we

23   know there had been these kinds of disputes so that can't be

24   the answer -- right -- that there are no disputes of this

25   nature.  They happen all the time, and it wasn't until the

1    *Miers* case that the House sought to sue.  What am I to take

2    from that.

3             MS. BARBERO:  A few answers, Your Honor.  One is we

4    know from *Senate Select Committee v. Nixon* that the Senate had

5    sought to enforce subpoenas long before *Miers*, but even taking

6    a step further back than that, we -- the -- the Supreme Court

7    has long implied from Article I authority that the House --

8    applied from the express authority in Article I that's vested

9    in the House additional implied authority to take other actions

10   including holding, nonmembers in contempt.  And all of this

11   shows that the fact that the House has various mechanisms that

12   it can use to exercise and ensure compliance with its -- both

13   its Article I authority and its subpoena doesn't mean that it

14   doesn't have the remedy to come into court.

15            The fact that it hadn't been done doesn't mean it

16   couldn't have been done, and as OLC itself has recognized, some

17   of these other mechanisms, these political mechanisms

18   including -- Mr. Burnham mentioned appropriations.  We have

19   inherent contempt, referral for criminal prosecution.  Those

20   aren't aimed at the injury that is being sought -- solving the

21   injury that is being suffered by the House in this case, which

22   is an informational injury.

23            The fact that, you know, Congress could in theory

24   defund parts of the Executive Branch through the appropriations

25   process doesn't get the information from Mr. McGahn for the

1    House to use in its impeachment inquiry.

2              THE COURT:  Well, theoretically it does if Mr. McGahn

3    is neutral and he's only not giving you the information because

4    the Executive Branch is preventing him; right?  I mean, I

5    suppose, theoretically, that the exercise of congressional

6    appropriations authority could indirectly at least get at that

7    problem.

8              MS. BARBERO:  Your Honor, the appropriations process

9    is a slow one, and we very much appreciate Your Honor's

10   willingness to expedited this case, to expedited the hearing,

11   and, we hope, to issue an expedited decision.  That is not the

12   kind of timeline that appropriations -- an appropriations

13   remedy would work on to get the information needed for urgent

14   investigations that the committee's conducting.

15             And in addition to that, as the D.C. Circuit again --

16   and I know I keep going back to *AT&T*, but in *AT&T* 2 at page

17   126, the Court recognizes where a dispute consists of a clash

18   of authority between two branches, judicial abstention does not

19   lead to ordinary resolution of the dispute.  Now, all of these

20   other mechanisms that could be used and historically at times

21   have been used, they're creating more problems than they're

22   solving in terms of getting the information that's needed for

23   the Committee.  That's --

24             THE COURT:  I understand that argument.  Are there

25   other arguments that you wanted to make?

1              MS. BARBERO:  The last point I wanted to make,

2     Your Honor, is about Section 1365.  And the point only being

3     that although Mr. Burnham and the department now appear to be

4     taking the position that Section 1365 does not displace Section

5     1331 jurisdiction for Senate subpoenas, Congress could not have

6     known that that was the position at the department or any

7     subpoena recipient would have taken.

8              So when Congress enacted -- or revised and clarified

9     1365 in 1996, it wasn't operating against the -- the known

10    backdrop, that 1331 would cover Senate subpoenas.  So it was

11    perfectly reasonable for Congress at that point to make a fix

12    to address a specific problem.

13             THE COURT:  Let me see if I understand what you're

14    saying.  That Congress -- that -- at the time that these

15    amendments were enacted, it was understood that 1331 does not

16    apply to Senate subpoenas?

17             MS. BARBERO:  No.  I'm sorry.

18             THE COURT:  It's possible that I've mixed it up.

19             MS. BARBERO:  No, it's all very confusing with 1331

20    and 1365.  But at the time 1365 was enacted, it was clear that

21    1331 applied to House subpoenas.

22             I was looking forward to the 1996 amendments, which

23    Mr. Burnham relied on extensively, to make just the simple

24    point that although Mr. Burnham has now said that 1331 would

25    cover Senate subpoenas and, therefore, 1365 or parts of it are

1    superfluous, of course, Congress is entitled to take a belt and

2    suspenders approach and could reasonably be concerned that the

3    department or another subpoena recipient would be making the

4    argument that if they hadn't made that change to 1365, to

5    make -- to make clear that it applied where a federal official

6    asserted a personal privilege, that someone might come in and

7    say, Oh, no, you're only covered by 1365 because the specific

8    governs the general, you could have amended it, you didn't,

9    and, therefore, we're not going to respond to the subpoena.

10          So the fact that Congress wanted to address that

11   specific problem with respect to Senate subpoenas in 1996 is

12   really not neither nor there for House subpoenas.

13          THE COURT:  Okay.  I think I understand.

14          Here's what I'd like to do.  Maybe we'll take a

15   15-minute break, and then we'll come back.  And when we're

16   back, we'll have Mr. Burnham begin.  If you have any other

17   issues you want to raise with respect to this part of the

18   argument, you're welcome, but I would like to get to the actual

19   merits.

20          All right.  Fifteen minutes.  Thank you.

21          (Recess taken.)

22          THE COURT:  All right.  We are continuing.

23          Mr. Burnham.

24          MR. BURNHAM:  Hello again, Your Honor.

25          THE COURT:  Hello.

 1            MR. BURNHAM:  So just two very quick things, if I

 2      may, and then I'll address the merits.

 3            I do not want to get back into the statutory

 4      jurisdiction argument, unless, of course the Court would like

 5      to.  I did just want to clarify one point.

 6            If I at some point said something that sounded like

 7      we were conceding 1331, covered Senate subpoenas, at some

 8      point, I did not mean to concede that; we don't think that.

 9      And so I just wanted to make that clear.

10            THE COURT:  So, in your view, 1365 was the beginning

11      of statutory authorization for the juris- -- and

12      jurisdiction --

13            MR. BURNHAM:  Right.

14            THE COURT:  -- with respect to this kind of --

15            MR. BURNHAM:  Yes, Your Honor.

16            THE COURT:  -- authority?

17            MR. BURNHAM:  That's correct.

18            I did make the point that it is a more difficult

19      textual argument if we only had 1331 on its own, but I don't

20      think 1331 would apply anyway.

21            In the *Senate Select Committee* case which Your Honor,

22      I am sure, is familiar with -- it's in the briefs, from the

23      '70s -- just didn't address jurisdiction at all.  It wasn't in

24      the case.  I said that about another case, though, which was

25      *AT&T* 1; and Ms. Barbero was right, and I was wrong.  *AT&T* 1

1    does address jurisdiction.  And so I apologize.

2            THE COURT:  And why am I not bound by that

3    conclusion?

4            MR. BURNHAM:  The same -- all of the same points

5    *Raines* --

6            THE COURT:  Because it was before *Raines*?

7            MR. BURNHAM:  Right.

8            THE COURT:  So you think *Raines* abrogates that --

9            MR. BURNHAM:  As the D.C. Circuit recognized in

10   *Chenoweth*, the law has just totally changed since the '70s.

11           It's also not clear, to me at least -- I just don't

12   know -- whether that was actually contested in that case.

13   Mr. Letter might know and maybe will tell us when he stands up.

14   But if it wasn't, I would suggest it is a drive-by

15   jurisdictional holding of the sort that the Supreme Court

16   explained in *Steel Co.* you're not bound by.  But if I'm wrong

17   about that, then I win for different reasons.

18           THE COURT:  All right.

19           MR. BURNHAM:  So, Your Honor, just turning to the

20   merits.

21           THE COURT:  Yes.

22           MR. BURNHAM:  So, in a nutshell, just as Congress

23   must be independent from the President and the courts

24   independent from both, the President must maintain his basic

25   independence and autonomy from Congress.

```
1              The Supreme Court made clear in Nixon vs. Fitzgerald
2      that the President occupies a, quote, "unique position" in the
3      constitutional scheme.  And so I think -- just as Congress
4      could not circumvent a constitutional bar on subpoenaing a
5      judge or a Supreme Court justice to come testify before
6      Congress by simply subpoenaing the law clerks, Congress cannot
7      circumvent the constitutional bar on subpoenaing the President
8      by trying to subpoena his closest aides inside the White House.
9              THE COURT:  So wait.  I'm sorry.  Can you start with
10     this notion of whether there is, in fact, a constitutional bar
11     to subpoenaing the President?
12             MR. BURNHAM:  Sure.  Yes.
13             THE COURT:  I mean, I get your question -- or your
14     argument with respect to what can be done to the aides as
15     opposed to the President, but I'm not totally clear --
16             MR. BURNHAM:  Sure.
17             THE COURT:  -- on the basis for your argument that
18     the President himself would be immune to some sort of compelled
19     testimony.
20             MR. BURNHAM:  By Congress at least.
21             I don't think we need to address the separate
22     difficult question about, like, a grand jury subpoena or
23     something like that, because they are -- they are different.
24     So -- but --
25             THE COURT:  But different -- I mean, why?  Why are
```

1   they different?

2              MR. BURNHAM:  There is just different interests.

3              So in the *United States v. Nixon* case, which the

4   House relies on in a variety of ways -- you know, the Supreme

5   Court was really clear in that case that it was driven by the

6   unique nature of a criminal proceeding.  In that case, it was a

7   17(c) subpoena for a criminal trial involving private

8   individual -- private defendants --

9              THE COURT:  But how is that relevant with respect to

10  the argument that you're making; right?  It's still an --

11             MR. BURNHAM:  Just that they're different.

12             THE COURT:  -- intrusion on the independence of the

13  President in the way that you've articulated it.

14             MR. BURNHAM:  So that's exactly right.

15             All I was saying is the Supreme Court has already

16  recognized that criminal -- the criminal process and the

17  congressional process are different and that there's different

18  considerations for each.  That's -- that's all I'm saying.

19             In terms of the President's immunity I think that's

20  very clear.  It's also, by the way, not contested in this case.

21             THE COURT:  But it wasn't clear in *Nixon*, and you

22  can't fall back on the differences that you've just pointed

23  out; right?

24             MR. BURNHAM:  Different *Nixon*.  So the *Nixon v.*

25  *Fitzgerald* -- which is the case --

1          THE COURT:  Okay.

2          MR. BURNHAM:  -- I think that's really the -- the

3    most useful case on this point when it comes to the President's

4    immunity from testimonial compulsion.

5          *Nixon* is that -- the *Nixon v. Fitzgerald*, not -- not

6    the Watergate tapes *Nixon*, but the other *Nixon* -- is very clear

7    that the President is, quote, "entitled to absolute immunity

8    from damages liability predicated on his official acts."

9    That's because he has a unique status under the Constitution

10   that distinguishes him from other executive officials.

11         It makes very clear that the courts just cannot --

12   just like a prosecutor has absolute immunity for his official

13   conduct, the President can't be sued for things he does in

14   office.

15         THE COURT:  Yes, but that's in damages.

16         MR. BURNHAM:  Right.

17         THE COURT:  And there are all kinds of reasons why

18   you would say that a president couldn't be sued in damages.

19         MR. BURNHAM:  Right.

20         THE COURT:  What is unclear to me is in light of the

21   other *Nixon* with respect to the presidential tapes and the

22   Supreme Court's conclusion that President Nixon had to turn

23   them over.  I -- I hear you, that there is a difference with

24   respect to it being a congressional subpoena, but in terms --

25   excuse me -- with respect to it being a criminal process.

```
 1              MR. BURNHAM:  Yes, Your Honor.

 2              THE COURT:  But is that really a relevant difference

 3     when we're just talking about whether or not the President can

 4     be required constitutionally --

 5              MR. BURNHAM:  Right.

 6              THE COURT:  -- to provide information in this way?

 7              MR. BURNHAM:  Well, so -- so I -- it may be that I

 8     misunderstand the question.

 9              But I -- I think there's a fairly obvious difference

10     between a subpoena compelling the President to turn over

11     documents and a subpoena requiring the President himself to

12     come and testify in Congress.

13              THE COURT:  Why?

14              MR. BURNHAM:  Because the President has -- is the --

15     is the head of the Executive Branch.  He has -- he's the only

16     member of the government who is himself a branch of government.

17     And the notion, I think, that Congress could make the President

18     come testify in Congress whenever it wanted or even at any

19     point is just inconsistent with his status as an independent

20     constitutional officer.

21              THE COURT:  All right.  But clearly only insofar as

22     he's actually acting as that person.

23              So what I guess I'm trying to understand -- and I'm

24     getting a little inarticulate --

25              MR. BURNHAM:  We've been here for a while.
```

1           THE COURT:  -- surely your argument is not that a

2      prior president retains that same absolute immunity.

3           MR. BURNHAM:  As to his official capacity, that

4      would -- I'm sure that would be my argument.

5           So if the -- if the House subpoenaed President Obama

6      to come and testify about --

7           THE COURT:  Yes.

8           MR. BURNHAM:  -- you know, his Libya policy or

9      something, he would certainly be welcome to come if he wanted.

10     But we would certainly argue that he can't be compelled by the

11     House to testify in his capacity as a former president about

12     things he did as president.

13          THE COURT:  Right.  But you keep add- -- you're

14     adding in content now.  I am not adding in content because I

15     didn't understand your original argument --

16          MR. BURNHAM:  Right.

17          THE COURT:  -- to relate to what he was being called

18     to testify to.

19          The original argument on absolute immunity is the

20     President is the head of the branch; he's very busy; he can't

21     be called down.  And I'm saying, fine for a sitting president.

22     What about the former president?

23          MR. BURNHAM:  Right.  So I think -- I think it is --

24     it is a different case, but I don't think it's a -- a

25     difference that matters from a constitutional perspective.

1              THE COURT:  Why not?

2              MR. BURNHAM:  Because I think the President's unique

3    role in the constitutional order, just as a coordinate branch

4    of government to Congress, gives him an immunity from being

5    compelled by Congress to come talk to it.

6              THE COURT:  And you have a Supreme Court case that

7    says that?

8              MR. BURNHAM:  Well, there's -- the closest case I

9    think in any direction is *Nixon v. Fitzgerald,* which says that

10   the president is immune forever -- as a former president, as a

11   current president -- from civil damage liability -- for

12   anything he does or she does as president.

13             THE COURT:  All right.  And you don't think that it

14   matters that I'm not talking about civil damages liability?

15             I'm talking about whether or not a former president

16   has the ability or has -- has absolute immunity from ever being

17   called to talk to Congress by subpoena.

18             MR. BURNHAM:  About his presidential stuff, yes.

19             THE COURT:  Now, this calls into question another

20   sort of -- calls into focus another question that I had, which

21   is:  Do you agree with Mr. Letter that there's a difference

22   between absolute immunity and executive privilege?

23             MR. BURNHAM:  So, you know, I think I would say that

24   the absolute testimonial immunity is a -- is a species of

25   executive privilege.

1          THE COURT:  A broader species; right?

2          MR. BURNHAM:  It's just different.  It's an immunity

3    from being -- from testimony as opposed to a -- an immunity

4    that protects certain information.  I'm not sure the semantic

5    difference make a big difference.  I mean, they are both

6    constitutional --

7          THE COURT:  But that's not what OLC has said, so I'm

8    trying to understand --

9          MR. BURNHAM:  I didn't mean to disagree with OLC.

10   Sorry.  They don't always get it right.

11         THE COURT:  It's an OLC opinion that pretty clearly

12   says that absolute immunity is different from -- and I'm not

13   going to be able to put my hands on it, but when I do I will

14   let you know.

15         Absolute immunity is different from executive

16   privilege, that absolute immunity protects individual's

17   testimonials --

18         MR. BURNHAM:  Yes.

19         THE COURT:  -- from even coming before --

20         MR. BURNHAM:  Yes.  I agree with everything you're

21   saying.

22         THE COURT:  Okay.

23         MR. BURNHAM:  I didn't mean to -- I didn't mean to

24   suggest I don't agree with what you have just said.

25         THE COURT:  Okay.  So I guess what I don't understand

1    is why -- if the concern is that when a person appears before

2    Congress they're going to divulge information that's sensitive,

3    they're going to talk about the nature of their work in a way

4    that's going to be problematic, why couldn't they just assert

5    executive privilege in that context?  I don't understand why

6    they get an absolute immunity to coming to talk to Congress

7    about anything.

8              MR. BURNHAM:  Right.

9              So I think for most Executive Branch officials, what

10   Your Honor has just described is sufficient, which is why

11   cabinet officers, lower-ranking White House aides, other sorts

12   of people don't get the absolute immunity.

13             When we're talking about people, though -- the very

14   small group of aides that are sort of the alter ego of the

15   President -- those people do get it because there's just too

16   much risk that in this sort of hurly-burly, aggressive

17   questioning -- some of the House Judiciary Committee's private

18   counselors here in the courtroom -- they are very good

19   questioners -- that things will just kind of happen where the

20   privilege assertions won't be able to protect the information

21   that --

22             THE COURT:  But that happens in every case.  In every

23   single case where testimony is compelled, somebody could say

24   something they shouldn't have said.

25             MR. BURNHAM:  Right.  And I think --

1          THE COURT:  So I don't see that as a basis for

2     saying, I don't have to show up.

3          I mean, there are obviously questions that Mr. McGahn

4     could answer that don't implicate some executive privilege.

5     And so it's unclear to me that he should be able to argue that

6     because I might make a mistake and answer something that I

7     shouldn't have, I get to say that I don't have to show up at

8     all.

9          MR. BURNHAM:  So I -- I understand that's -- that's

10     the Committee's counter-argument.

11          I guess what I'm saying is that for Mr. McGahn, the

12     range of questions that would not be covered by executive

13     privilege is exceedingly small.  And all of the things they

14     want him to come talk about are clearly things that are going

15     to implicate and be covered by executive privilege.  It's his

16     conversations with the President and, you know, what happened

17     between him and the President and all of the different

18     incidents in the Mueller Report.

19          THE COURT:  So you are suggesting there is no

20     daylight between executive privilege and absolute testimonial

21     immunity?

22          MR. BURNHAM:  I guess -- I don't mean to.

23          I mean, I guess I would say the fact that, basically,

24     everything that Mr. McGahn knows that they're interested in --

25     not that he knows generally -- would be covered by executive

1    privilege is one of the reasons, among several, why absolute

2    immunity is a constitutionally sound principle that protects

3    him from having to go testify in the first place.

4            I note there are other reasons that --

5            THE COURT:  So it's only presidential aides who have

6    information that would otherwise be covered by executive

7    privilege that get absolute immunity?

8            MR. BURNHAM:  It's presidential aides that can

9    rightly be considered to be alter egos of the President.  So

10   *Harlow v. Fitzgerald* --

11           THE COURT:  Yes.  But the President himself doesn't

12   get absolute immunity.

13           Didn't Bill Clinton have to testify in the *Paula*

14   *Jones* case?

15           MR. BURNHAM:  Not about -- not about his duties as

16   president.

17           So Bill Clinton -- in that case, the Supreme Court

18   said the things that he had done before he was president, he

19   could be compelled to give a deposition about that.

20           It would be a very different case if he had been --

21   if there had been compelled testimony about things that

22   happened while he was president.

23           THE COURT:  But only a very different case insofar as

24   he could make executive privilege assertions with respect to

25   those things if he was being questioned.  It doesn't seem to be

```
 1      a different case from the standpoint of his ability to say, I

 2      don't have to show up.

 3                  MR. BURNHAM:  Right.

 4                  THE COURT:  It seems to me that the "I don't have to

 5      show up" is actually resting on something different than the

 6      person's contending that what you're asking me about I don't

 7      have to talk about.

 8                  MR. BURNHAM:  I agree completely with what you're

 9      saying, Your Honor; I do.  I think that's right.

10                  All I'm saying is that one of the reasons why the

11      President's alter egos have the same immunity he has -- now, we

12      should table for a second if you don't think the President has

13      absolute immunity, then that is a serious problem for my

14      argument because my argument is a purely derivative argument.

15                  So if Your Honor --

16                  THE COURT:  Well, I just wanted to start there.

17                  MR. BURNHAM:  Right.

18                  THE COURT:  I wanted to test the proposition because

19      I do appreciate --

20                  MR. BURNHAM:  Right.

21                  THE COURT:  -- that you are making an argument that

22      the alter egos, as you call them --

23                  MR. BURNHAM:  Right.

24                  THE COURT:  -- should have the same authority as the

25      President -- and, you know, I don't know if that's the case or
```

1    not, at least for now.

2           But assuming that's the case, I'd like to try to

3    understand what is the basis of your contention that the

4    President would not have to respond in any way to a

5    congressional subpoena of this nature.

6           MR. BURNHAM:  Were it directed at him personally?

7           THE COURT:  Were it directed at him personally.

8           MR. BURNHAM:  So I think *Nixon v. Fitzgerald*

9    rightly -- the reasoning of that case rightly stands for that

10   proposition.  I also think it's --

11          THE COURT:  But is that because the President is a

12   sitting president, he's busy; he shouldn't have to -- he

13   shouldn't have to spend time -- take time away from his, you

14   know, duties to focus on this; is that the reason?

15          MR. BURNHAM:  That's part of it.  But I also think

16   it's because the Constitution recognizes the President should

17   be independent from Congress.

18          THE COURT:  But there's also checks and balances, and

19   that's what I don't understand.

20          Here we're back at the same conversation.  Yes, he's

21   independent to a point --

22          MR. BURNHAM:  Right.

23          THE COURT:  -- but there's also the ability for the

24   Congress, I think -- maybe in the constitutional design -- to

25   have some oversight with respect to the Executive Branch, to

1    ask some questions; isn't it?

2          MR. BURNHAM:  You should -- yes, certainly, as a

3    general proposition.

4          THE COURT:  So it's not totally independent in the

5    sense that you could never question, you know, what's happening

6    in the Oval Office or whatever.

7          MR. BURNHAM:  Well, I didn't mean to suggest that.

8          I was just saying that I don't think -- again, I

9    think there's a reason the Committee hasn't even argued this,

10   because it's never been thought, in the history of the

11   republic, that Congress could demand the President personally

12   come to Congress whenever it wants to talk to it about whatever

13   it wants to talk about -- even one House of Congress, which is

14   not even the President's constitutional equal; it's just half

15   of Congress.  Congress, of course, is his constitutional equal,

16   but the House is not.

17         And the Constitution even provides that the President

18   shall, quote, "from time to time give to the Congress

19   information of the State of the Union."  That's in Article --

20   Article II, Section 3.

21         THE COURT:  All right.  So you conceptualize the

22   cases -- and I admit that this is rare, right, doesn't happen

23   all the time.  But there seems to be some precedent for this

24   notion that a president who says, I hear you, Congress.  You're

25   asking me for information.  I say, Too bad.  Right?  And that's

1    President Nixon.  That's President Clinton.

2            It wasn't Congress in that situation.  But to the

3    extent the president was being compelled to offer information,

4    he was saying, I don't want to do it.  I'm not going to do it.

5    There's some precedent for the Supreme Court saying you have

6    to.

7            And what I'm trying to do is understand what your

8    argument is in light of those precedents.  Is it that that's a

9    different situation and, if so, how?

10           MR. BURNHAM:  Well, two points.

11           The Supreme Court -- the only Supreme Court case, I

12   think, in this area -- there's also the *Cheney* case, but that's

13   not really the same -- is the *United States v. Nixon* case which

14   is in the criminal context.  And if you read the Court's

15   opinion, it's very clear that its analysis is being driven by

16   the unique features of the criminal process, so that's one

17   difference.

18           THE COURT:  All right.  But it implicates judicial

19   authority.  In your --

20           MR. BURNHAM:  Yes.

21           THE COURT:  In your separation-of-powers analysis,

22   right, all three branches are supposed to be, quote/unquote,

23   independent?

24           MR. BURNHAM:  Right.

25           THE COURT:  And yet, in that case, somehow the

1    criminal justice process, judicial authority could require the

2    President to turn over information that he otherwise did not

3    want to turn over?

4              MR. BURNHAM:  Right.  So that brings me to my second

5    point.

6              And to be clear, I'm not rejecting the notion that

7    the President is amenable to judicial compulsion ever about

8    anything in any context.  I'm just saying that the House cannot

9    compel the President to personally testify, which brings me to

10   my second point; which is that a subpoena testificandum is just

11   a totally different animal than a subpoena for documents.

12             Requiring the President to personally appear in

13   Congress would -- in a way that I think is very inconsistent

14   with the constitutional structure -- suggest that he personally

15   is subservient to Congress.  And there is actually quite a bit

16   of law that says that not even a Court has the power to

17   directly compel the President personally to do something in his

18   discretionary functions.

19             THE COURT:  When you say "personally," are you just

20   saying as a person --

21             MR. BURNHAM:  Yes, ma'am.

22             THE COURT:  -- or do you mean in his personal

23   capacity?

24             MR. BURNHAM:  I'm sorry.  I mean as a person.  Like

25   as a -- as a human --

1          THE COURT:  As a human.

2          MR. BURNHAM:  -- but I mean in his official capacity.

3          THE COURT:  But in his official capacity --

4          MR. BURNHAM:  Yes, Your Honor.

5          THE COURT:  -- he cannot be compelled to testify is

6     your argument?

7          MR. BURNHAM:  Yes.  And, again, I don't even

8     understand that to be disputed --

9          THE COURT:  All right.  And that rests on a

10    distinction that you're drawing between the *United States v.*

11    *Nixon* case and today's circumstances because you don't dispute

12    that the Supreme Court in the *United States v. Nixon* said that

13    he can be compelled to turn over the tapes?

14          MR. BURNHAM:  In certain circumstances, yes.

15          THE COURT:  And the circumstances are?

16          MR. BURNHAM:  Well, in that case there was -- I mean,

17    there was pressing need.  There was a 17(c) subpoena for a

18    criminal trial that was about to happen, so there were the

19    rights -- the Sixth Amendment rights of the defendants were

20    implicated.  I mean, it's a fairly multi-factored test.  And

21    they also recognized in that case that executive privilege

22    was -- was a basis to resist turning it over; that it just

23    didn't protect the specific information at issue in that case.

24    So it --

25          THE COURT:  All right.  So moving to aides.

 1              MR. BURNHAM:  Okay.

 2              THE COURT:  Let's assume, as you've posited, that the

 3     President himself would be absolutely immune from responding to

 4     the subpoena that the House has put forward in this case.

 5              Why is a former aide of the president in a similar

 6     situation?

 7              MR. BURNHAM:  Well, much -- we had a similar version

 8     of this conversation the last time I was here.  I don't think

 9     the status as a current or former matters.

10              THE COURT:  Why not?

11              MR. BURNHAM:  Because the House is only interested in

12     Mr. McGahn for things he did in his official capacity as the

13     White House counsel.  And I think it would just be

14     extraordinary if a testimonial immunity that he possessed as

15     the current counsel were lost as a former counsel because that

16     immunity is not for the benefit of Mr. McGahn, it's for the

17     benefit of the President.  And the President, of course, is

18     still the President.

19              And so the President is the one who invokes that

20     immunity.  He's the one who owns that immunity.  And I don't

21     think the President should lose that -- it doesn't make sense

22     to me that the President would lose that immunity just because

23     the person has decided they want to go back into private --

24              THE COURT:  But it depends on what immunity you're

25     talking about.

1          Again, this kind of gets to my other point.  You

2    continue to, in my view, conflate executive privilege with

3    testimonial immunity.  So I don't understand the world, I

4    think --

5               MR. BURNHAM:  Right.

6               THE COURT:  -- in which the President owns the

7    absolute testimonial immunity; right?  The ability to -- the

8    President says and owns the ability to prevent people from even

9    showing up.

10          The President might own the ability to prevent them

11   from saying things that implicate his executive functions in

12   the context of whatever, but do you have a case that suggests

13   that absolute testimonial immunity as -- set aside -- you know,

14   as distinguished from executive privilege --

15              MR. BURNHAM:  Sure.

16              THE COURT:  -- is the kind of thing that the

17   President owns?

18              MR. BURNHAM:  Maybe I can answer your question this

19   way.  If it exists -- which I think is obviously a big question

20   that we're here to talk about -- then it clearly belongs to the

21   President.

22              THE COURT:  What is the "it"?  I'm sorry.

23              MR. BURNHAM:  The absolute immunity.

24          So if there is testimonial immunity for aides, as a

25   proposition, that is an immunity that derives from the

1    President's status as President under the Constitution.  And I

2    don't think there's any question -- I don't even think --

3    again, I don't think Mr. Letter would dispute this.

4            THE COURT:  But if it arises only because of your

5    status as being in the White House, being a part of the

6    relationship with the President, it seems odd to me that it

7    survives your exit.

8            MR. BURNHAM:  Right.

9            THE COURT:  If it only arises because -- I get a

10   world, I think, in which while you are aiding the President on

11   a day-to-day basis, you're in the Oval Office, you're back and

12   forth, you have all of these responsibilities.  You can say,

13   you know, I'm too busy to come down there to talk to you,

14   Congress; and that is a reasonable thought.

15           You can say, if I came down and talked to you right

16   now, perhaps I would risk divulging confidential information

17   that I know right now because we're in the midst of some policy

18   dispute or debate.

19           What I don't understand is why those same reasons for

20   allowing you to say "I'm not going to show up" still pertain to

21   the person who is many years out, who is not under those same

22   circumstances, and who still, I think, retains the ability to

23   press the executive privilege if asked about something

24   sensitive from his time in the White House.

25           MR. BURNHAM:  Right.  So I think it might be

1    helpful -- I have three cases I'd like to commend to Your Honor

2    that -- I apologize they're not in the briefs because we didn't

3    delve quite into the issue that you've just asked about, which

4    is the former-current thing as much --

5          THE COURT:  Yes.

6          MR. BURNHAM:  So *Gravel* is the Supreme Court case.

7    That is in our briefs.  That's where we analogize too for

8    the -- here the three that I'd like to commend, Your Honor, the

9    first is *Minpeco, S.A. v. Conticommodity Services.*  It's at 844

10   F.2d 856, D.C. Circuit (1988), relying on a Ninth Circuit case

11   that it cites.  The quote that I'd like to commend to

12   Your Honor is, quote, "Any questioning about legislative acts,

13   even in the situation of someone no longer a member of

14   Congress, would interfere by having a chilling effect on

15   congressional freedom of speech," end quote.  And it's talking

16   about speech or debate there.

17          The other two cases --

18          THE COURT:  Can you explain why that's the case?

19   Why is that the case?  Why is it -- again, in this -- this --

20   and I'm probably thinking about this in not the right way,

21   but --

22          MR. BURNHAM:  If it means I lose, then I agree.

23          THE COURT:  Why is there a chilling effect with

24   respect to testimony of a former official many years out

25   related to some conduct -- related to his time in the

1  White House -- again, he's not going to testify about things to

2  which executive privilege legitimately applies.

3          MR. BURNHAM:  Right.  So I've got some -- I'll tell

4  you the other cases in a minute.

5          But I've got four practical answers, I think.  First

6  of all, that quote I just read is just from the D.C. Circuit.

7  So I didn't --

8          THE COURT:  Okay.

9          MR. BURNHAM:  That's what they said.  The four

10  practical answers, I think, all of which apply equally to

11  currents and formers, the White House staff are the most easily

12  identifiable targets for Congress for sort of harassment, for

13  making them come to the Hill all the time.

14          THE COURT:  But that hasn't happened in the 10 or 11

15  years since *Miers*, has it?

16          MR. BURNHAM:  Well, I think that's in large part

17  because *Miers* is a D.D.C. case that was stayed by the

18  D.C. Circuit.

19          THE COURT:  No, but that's the state of the law.  The

20  D.C. Circuit has not -- in other words --

21          MR. BURNHAM:  Right.

22          THE COURT:  -- as far as everybody involved is

23  concerned, since the D.C. Circuit hasn't taken it up, since the

24  Supreme Court hasn't spoken to it, we have a very thorough

25  opinion that essentially says Harriet Miers has to testify.  So

```
1    as far as the parties who are negotiating and thinking about
2    this and determining whether -- and Congress in determining
3    whether or not to issue its subpoenas, it appeared to have the
4    green light from Judge Bates.
5             So if your parade of horribles in terms of a thousand
6    subpoenas and nobody could get any work done is going to
7    happen, it would have happened in this decade.
8             MR. BURNHAM:  Oh, I -- I -- totally -- I'm sorry,
9    Your Honor.  I was --
10            THE COURT:  You totally disagree?
11            MR. BURNHAM:  I totally disagree.
12            THE COURT:  Tell me why.
13            MR. BURNHAM:  Because Miers is a one District Court
14   opinion that was stayed by the D.C. Circuit and then settled.
15            I think if the House were to prevail on the notion
16   that they could subpoena White House aides, that those
17   subpoenas were all enforceable in court and that were upheld by
18   the D.C. Circuit or, dare I say, the Supreme Court, we would
19   see a proliferation of subpoenas to an extraordinary degree --
20            THE COURT:  But I can't --
21            MR. BURNHAM:  -- because --
22            THE COURT:  Let me tell you why I disagree.
23            MR. BURNHAM:  Sure.
24            THE COURT:  Because while that may be true in terms
25   of the status of the opinion in terms of its lack of binding
```

1    nature stayed by the D.C. Circuit or whatever, it was, as

2    you've said many times, the only real statement of the law with

3    respect to what is going on in this case.

4              MR. BURNHAM:  Right.

5              THE COURT:  So over the past decade, as far as the

6    House was concerned, that was the only thing they had to go on

7    as to whether or not they were okay with -- as far as the

8    subpoenas are concerned.

9              Now, they could have been wrong.  You could have, you

10   know, responded forcefully, had they done what you're talking

11   about, but the question right now is:  Is it true that if the

12   state of the law is as *Miers* set it out to be, we're going to

13   see a slew of subpoenas.  And I'm saying we don't have to

14   speculate because the state of law from the House's perspective

15   has been as *Miers* set it out to be for the last decade.

16             MR. BURNHAM:  Right.  But we've -- we've been here

17   now for a few hours.  We filed very lengthy briefs disputing --

18   we don't agree that *Miers* is correct.

19             THE COURT:  No, but it doesn't matter about -- listen

20   to me.  It doesn't matter --

21             MR. BURNHAM:  Yes, Your Honor.

22             THE COURT:  It doesn't matter about whether or not

23   *Miers* is correct.  For the purpose of this question, we're

24   trying to evaluate what the House is likely to do --

25             MR. BURNHAM:  Right.

```
1          THE COURT:  -- if they believe Miers is correct.  If
2     they believe the state of the law is as Miers set it out to be,
3     would they bring a slew of subpoenas?  And what I'm suggesting
4     to you is that Miers is all there was --
5          MR. BURNHAM:  Right.
6          THE COURT:  -- from 2008 on.  And we haven't seen the
7     slew of subpoenas that you're now suggesting would come if the
8     House believed that Miers was the law.
9          MR. BURNHAM:  Okay.  Yes, I understand your point,
10    Your Honor.  I guess I would just say that I think the House
11    recognizes there's substantial litigation risk to that view
12    because it hasn't been adopted yet by a binding -- by either
13    the D.C. Circuit or the Supreme Court.
14         THE COURT:  So you say they're still constrained even
15    though that was --
16         MR. BURNHAM:  Yes, Your Honor.
17         THE COURT:  -- that was the last word on this?
18         MR. BURNHAM:  Exactly.  That's exactly my point,
19    Your Honor, is just that they -- they recognize that, you know,
20    that's not the last word on the matter.  And so the
21    practical --
22         THE COURT:  I appreciate the suggestion that if I
23    were to say the same thing, all these --
24         MR. BURNHAM:  I was trying to avoid --
25         THE COURT:  Sorry.  Go ahead.
```

```
1              MR. BURNHAM:  We also forget the other

2    Judge Jackson's opinion, which is the second opinion that goes

3    with it.  So we should give her credit as well.

4              My point is that I do think, though, there would be

5    more if this litigation progresses and that becomes the sort of

6    binding law on everything.

7              The other points I would make is the presidential

8    subordination to Congress point, which we've sort of talked

9    about a little.  Former aides, current aides, I think that risk

10   is the same.  So if every White House aide who leaves the

11   White House then immediately moves into the House Judiciary

12   Committee hearing room to spend the rest of his life with

13   Mr. Letter talking about everything that happened in the

14   White House or invoking privilege against it, that would

15   suggest that the President is subordinate to Congress.

16             THE COURT:  Oh, I'm sorry.  So you're saying, first

17   of all, it would chill somehow the President's ability to get

18   people to work for him or people to -- to talk about things?

19             MR. BURNHAM:  Both, Your Honor.

20             THE COURT:  Okay.  And then it would -- what is this

21   point now, the second?

22             MR. BURNHAM:  The point is just that same risk.

23             THE COURT:  It suggests that the President is

24   subordinate to Congress?

25             MR. BURNHAM:  Right.  Yes, Your Honor.
```

1          THE COURT:  All right.

2          MR. BURNHAM:  That's right.

3          All right.  And then the other point you've

4     already -- you've already touched on, and then the inadvertent

5     disclosure of information point.  Those are the four practical

6     points.

7          THE COURT:  All right.  So give me the other two

8     cases and then explain why *Gravel's* -- why *Harlow* didn't sort

9     of say that the *Gravel* analysis is not applicable in this

10    context.

11         MR. BURNHAM:  Yes.  So the other cases -- and I'll

12    just give you the citations.  They're both D.D.C. cases,

13    Judge Sullivan and Judge Kollar-Kotelly.  Judge Sullivan's is

14    *Chang vs. United States*, F -- I'm sorry, Your Honor --

15    512 F. Supp. 2d 62, 2007 case, and another is *Williams v.*

16    *Johnson*, 597 F. Supp. 2d 107, 2009 case.

17         Those are both speech or debate cases, but they say

18    the immunity follows aides after they leave the office.  To

19    answer your question directly about *Harlow, Harlow*, I think,

20    actually helps us.  Here's a sentence I'd like to quote to

21    Your Honor from *Harlow*.  Quote, "We fairly may assume that some

22    aides are assigned to act as presidential alter egos in the

23    exercise of functions for which absolute immunity is essential

24    for the conduct of the public business."  That's at page 812,

25    note 19.

1              *Harlow* is a case about whether everyone in the

2     White House has absolute immunity from civil suits, and they

3     said they don't.  Everyone from the -- you know, the

4     lowest-level aide to the Chief of Staff.  There's not a

5     categorical immunity, but *Harlow* expressly recognizes that

6     there are some aides --

7              THE COURT:  Doesn't it talk about national security?

8     Aren't those the particular ones that really could

9     potentially -- I mean, it doesn't actually pass on whether they

10    even get it, but don't they say --

11             MR. BURNHAM:  They assume it.

12             THE COURT:  -- potentially the national security type

13    of --

14             MR. BURNHAM:  And foreign affairs.

15             Your Honor, White House counsel is the most central

16    aide in the White House.  I mean, this is someone who advises

17    the President about every legal issue implicated by the

18    presidency, which is basically every legal issue there is:

19    national security, foreign affairs, presidential privilege, all

20    the topics in the Mueller Report, as we've all read.  I mean,

21    this is -- this is -- it is hard to imagine a more sensitive

22    position, I think, in the White House than the White House

23    counsel.

24             THE COURT:  All right.  But fine.

25             MR. BURNHAM:  So if there's an immunity, I would say

1    it clearly covers that.

2              THE COURT:  It clearly covers, blanketly, folks who

3    are in the sensitive positions.  Does -- does the subpoena that

4    is being issued have to relate to the area of sensitivity or

5    no?

6              MR. BURNHAM:  No.  If the -- it is -- it attaches to

7    the person, not to the topic.

8              THE COURT:  Ah.  So this raises my hypothetical.  So

9    I have a Congress who's very, very interested in the

10   infrastructure inside the White House.  They've heard there's a

11   vermin issue, there's, you know, terrible curtains, and they're

12   really thinking about appropriating money for the interior

13   design of the White House, but they want more information;

14   right?  They want to know, like, what is it really like to be a

15   person who works in the White House, and they'd like to talk to

16   everybody, including the White House counsel.

17             My question, I guess, is whether absolute immunity

18   prevents a former White House counsel who says, I don't care

19   what you want to talk about, I'm not going -- right -- from

20   responding to that subpoena?

21             MR. BURNHAM:  So there actually is a very serious

22   problem with flies in the White House.

23             THE COURT:  Good hypo.

24             MR. BURNHAM:  It's a great hypo.

25             And I think if the House were interested in helping

1    with the fly problem, the President would probably allow his

2    most sensitive aides to go testify about the flies, but I guess

3    the answer to your question would be yes, because if the person

4    has testimonial immunity and the President has asserted it, not

5    the person -- it's the President's to assert -- then, yes, they

6    wouldn't be able to compel the person.

7          THE COURT:  So why doesn't in this world the

8    President actually suddenly have a superior authority -- you're

9    so worried about the President being seen as being sort of

10   subordinate to the legislature.  What you've just suggested is

11   that the President of the United States, not the -- not the

12   judiciary, gets to decide when privileges are appropriate, when

13   people can testify or not, and that doesn't seem to me to be

14   sort of in the purview of the executive under our

15   constitutional scheme.

16         MR. BURNHAM:  Well, so -- so I guess I would say that

17   *Nixon v. Fitzgerald* has already told us that people who work in

18   the -- I'm sorry -- that the President is immune from courts,

19   from anybody from being held to account in civil actions.  And

20   so I don't think it's hard to reason from that that the

21   President has a similar immunity as to Congress.  And then all

22   I'm saying is not that he gets to decide, but just that certain

23   aides derive the same immunity that he possesses.

24         THE COURT:  But he does get to decide, right, because

25   you've told me many times that he's the one who gets to decide

1    whether or not a person can talk about the fly problem to

2    Congress.

3              MR. BURNHAM:  Whether to assert the immunity.  I

4    don't think he decides whether the immunity applies.  So the

5    immunity has -- has a scope that is definite, and it only

6    applies to people who can rightly be -- in the words of *Harlow*,

7    be considered his alter egos.  That is not up to him, who is in

8    that group.

9              What is up to him is whether someone in that group,

10   whether to assert it.  The analogy that I like is I -- I -- I

11   think it is probably the case that the Congress could also not

12   compel Supreme Court Justices to come testify.  I don't think

13   Congress could force the Chief Justice to come testify about

14   his decision in a case.

15             I think, similarly, Congress could not subpoena the

16   Chief Justice's law clerks, current or former, to come tell it

17   about, you know, *Citizens United*, which is very controversial,

18   and what all the Justices did in *Citizens United* and who said

19   what to who.  I think the same immunity that the Chief Justice

20   would possess --

21             THE COURT:  Isn't the absolute immunity of judicial

22   officials in that way established and recognized?  What I'm

23   trying to understand -- you're sort of deriving it from all

24   kinds of things with respect to the executive.  So where --

25   where is the similarly established proposition that the

1    executive cannot be compelled?

2         MR. BURNHAM:  So I actually don't know that

3    there's -- there may be a case about the courts.

4         THE COURT:  About judicial immunity, I think it's

5    absolute immunity for the judiciary.

6         MR. BURNHAM:  Oh, yes.  Civil damages matter, that's

7    very well established.  I actually don't think it's been tested

8    whether the Congress can send a testimonial subpoena to the

9    Chief Justice.

10         THE COURT:  I see.

11         MR. BURNHAM:  I don't think that's come up yet, but I

12    would -- I certainly don't think there's any reason to -- to

13    not think the same immunity would apply there that applies --

14         THE COURT:  But, of course, if it isn't already

15    established, then we're just reasoning from nothing.  I mean,

16    fine.

17         MR. BURNHAM:  We analogize is that the civil

18    damages -- I think we would analogize to the civil damages.

19         THE COURT:  To the civil damages.

20         MR. BURNHAM:  Right.

21         THE COURT:  Okay.

22         MR. BURNHAM:  The same move I'm making here, because

23    I say *Nixon v. Fitzgerald* says no civil damages; ergo, no

24    testimony or compulsion; ergo, alter egos under the *Gravel*

25    assessment.  I'm just saying the same chain of logic would

1      apply to the courts.  And I think it's just a useful analogy

2      because, obviously, judges work more with law clerks than they

3      work as presidents with White House counsel.

4              There's certain positions that are so sensitive, that

5      are so essential to the execution of the job, to doing the job,

6      that the same immunities that apply to the principal should

7      apply to the aide.  That's all I was --

8              THE COURT:  And even former aides.  Because you don't

9      think that's a difference.

10             MR. BURNHAM:  I think that would have the same

11     negative effects, just like former clerks would.  So as soon as

12     the clerkship ends in July, after the term is over, if

13     everybody then immediately had to go to the House Judiciary and

14     explain to the congressmen, you know, answer hundreds of

15     questions what had just happened in that Supreme Court term, I

16     think it's easy to see how that would totally distort the

17     ability of the Supreme Court to function as an institution.

18             I don't think this is any different from that.  And

19     so that, I think, is just a helpful analogy to think through

20     why current/former really isn't as important of a distinction

21     as it --

22             THE COURT:  All right.  But help me to understand how

23     that same reasoning was not -- was not persuasive to the

24     Supreme Court with respect to *United States v. Nixon*.  One

25     would -- one would imagine that having to turn over actual

1     tapes of actual conversations in the White House would be a

2     similar sort of chilling effect on the President's ability to

3     function in the White House.  So apparently the Supreme Court

4     was not fazed by that concern.

5            MR. BURNHAM:  So the Supreme Court was very clear

6     that that was a decision about the needs of the criminal

7     process in the criminal justice system in federal court.

8     Another case that I think is a really good read that I highly

9     commend to Your Honor is the *In re Sealed Case* in the

10    D.C. Circuit.

11           THE COURT:  So -- I'm sorry.  So is this --

12           MR. BURNHAM:  I'd like to answer your --

13           THE COURT:  Yeah.  You keep going back to that, and

14    I'm just -- so you're subjugating the fact -- do you agree with

15    me that there would be a similar chilling effect on the

16    operations of the President if they knew that tapes, actual

17    transcriptions or whatever of the business of the White House

18    could be used even in a subsequent criminal proceeding?

19           MR. BURNHAM:  All right.  So I think that's less

20    invasive for this reason:  Presidents don't have to create

21    tapes.  I suspect after the Nixon administration they have

22    stopped creating tapes.  And there's no -- they don't

23    need tapes.  The President created that evidence on his own for

24    whatever reason.  They do need close aides.  So this immunity

25    is essential because there's no way to be President --

```
 1              THE COURT:  You're fighting my hypothetical.

 2              MR. BURNHAM:  I don't mean to.

 3              THE COURT:  The hypothetical is the world in which,

 4      for whatever reason, the business of the White House is

 5      transcribed --

 6              MR. BURNHAM:  Right.

 7              THE COURT:  -- every day, every conversation, every

 8      person.  It's taped.  Every day, every -- the question is:

 9      Under what circumstance can someone compel the White House to

10      provide that information after the fact, after it's there?

11              Regardless of how it was created, now we have this

12      actual, you know, recitation of what is going on in the

13      White House.  And your argument before seemed to suggest that

14      if compulsion could happen with respect to the release of that

15      information, then we'd have this terrible chilling effect on

16      the operations of the White House.  I don't know if that

17      argument was made in *Nixon*, but I think it's a pretty good one.

18      So I'm sure the Supreme Court considered it, and yet they still

19      said, Too bad.  You have to give the tapes.

20              MR. BURNHAM:  Right.

21              THE COURT:  So I -- I guess I'm just trying to

22      understand.

23              MR. BURNHAM:  So I -- I think there's a different

24      constellation of interests presented by the question about --

25      of whether Congress can bring people over to testify versus
```

1    whether evidence that exists in the White House can be used for

2    a criminal case or even -- even subpoenaed by Congress.

3            I also think that -- I don't mean to fight the

4    hypothetical, but I think if Congress tried to mandate that

5    everything in the White House be transcribed and taped, that

6    would clearly be unconstitutional, and so I guess my point is

7    just there's antecedent choice in *Nixon,* which is the choice to

8    make tapes.  That is not a real choice when it comes to aides,

9    because no president can be president without aides.  And I

10   don't think we would want -- I mean, that's just part of -- you

11   have to have aides to be president.  You can't do it on your

12   own.

13           The only other point I wanted to make is just to

14   commend to Your honor Judge Wald's decision in *In re Sealed*.

15           THE COURT:  Wald?

16           MR. BURNHAM:  Judge Wald, D.C. Circuit.

17           THE COURT:  Pat Wald?

18           MR. BURNHAM:  Pat, yes.  121 F.3d 729.  She actually

19   says in that decision on page 753 that *Nixon* -- the *United*

20   *States v. Nixon* did not alter the, quote, "scope of the

21   privilege and the congressional executive context," end quote.

22   So she makes the same distinction I've been trying to draw.

23           THE COURT:  Of course, the question is what is the

24   scope of the -- whether absolute immunity is included in the

25   privilege.

 1             MR. BURNHAM:  No question.  My only point is that

 2     *Nixon* is a watershed case for executive privilege.  I don't

 3     think it is rightly one that can be read *a fortiori* under the

 4     congressional context given how contingent -- dependent it was

 5     on the criminal stuff and under that -- that case.

 6             But unless you have more, Your Honor, I think --

 7             THE COURT:  Let me give Mr. Letter the opportunity

 8     and you'll come again.

 9             MR. BURNHAM:  Thank you.

10             THE COURT:  All right.  Sorry, sir.  At long last.

11     It's 5:00 o'clock.  Halloween.  I'm so sorry.

12             MR. LETTER:  Thank you, Your Honor.

13             I brought candy with me if anybody wants any, and I

14     do have a fun costume at home, but --

15             THE COURT:  Hopefully you'll get a chance to wear it.

16             MR. LETTER:  Maybe.

17             Your Honor, should we do, like, a seventh inning

18     stretch here and sort of --

19             THE COURT:  Sure.  Whatever works for you.

20             MR. LETTER:  Okay.  I get -- I think we have to sing,

21     then "God Bless America."  I'm not sure.

22             Your Honor, I have argued in court in the last

23     several months quite often against the Trump administration,

24     and on several indications I've said this, and it's so

25     applicable here too.  What my friend Mr. Burnham here is

1    arguing with the justice department, arguing on behalf of the

2    Trump administration is this is what they wish the law were.

3    It is not what the law is.

4           And then, in addition, I want to set a theme that I'm

5    going to come back to.  They're talking about -- this ties in

6    with -- they're talking about a hypothetical case, which is

7    quite different from this one, and that's why some of what

8    Mr. Burnham is arguing is wrong, but I'll come back to that.

9           I -- *Harlow* demonstrates, establishes that the

10   position that Mr. Burnham is arguing is not the law now.  Maybe

11   he will get a chance with -- the solicitor general will get a

12   chance to try to convince the current Supreme Court to come out

13   differently.

14          THE COURT:  But he says -- he reads *Harlow* to stand

15   for the mere proposition that not everybody in the White House

16   gets immunity.

17          MR. LETTER:  Not everybody in the White House.

18   Remember, the court decision talked about people who were very

19   close to the President.  Very close to the President.  It's

20   right there in the opinion.  So -- and -- and *Nixon v.*

21   *Fitzgerald* makes quite clear that they -- privilege that the

22   Court is talking about is personal to the president because he

23   is the president.  He is unique.  There's no doubt about that.

24          THE COURT:  All right.  So you -- as I hear you now

25   arguing it, you would push back even on this idea that there --

1    that the alter egos would get any immunity that the President

2    had.

3              MR. LETTER:  Absolutely, and that's what *Fitzgerald*

4    holds -- that's what *Harlow* holds.

5              THE COURT:  *Harlow* holds.

6              MR. LETTER:  Because, Your Honor, the President is

7    unique.  That's what fits.

8              THE COURT:  What about the speech and debate clause

9    cases?

10             MR. LETTER:  That -- that's a completely different

11   provision that is provided for.  In the Constitution itself the

12   framers had a very specific point there.  They wanted to make

13   sure that what happened in England to members of parliament

14   would not happen here.  And so, no, there is no speech or

15   debate clause covering the Executive Branch.  There is none.

16             So this is a very unique privilege, very unique

17   immunity that the framers themselves created.  And if I may go

18   back for a moment.  Mr. Burnham was saying, well, you know,

19   if the Congress can sue the President, then obviously the

20   President can sue Congress.  No.  The framers said no, you

21   can't do that.

22             Again, apparently the Trump administration would wish

23   this were different.  Apparently they would like a different

24   Constitution than the one we have, but that is not the one we

25   have.

1        THE COURT:  All right.  But Mr. Burnham points to

2   several cases in which he suggests that -- you know, sort of

3   read together that there really is no ability -- whether it's

4   because of the individual and coequal nature of the branches or

5   whatnot -- that there really is no ability for Congress to

6   compel testimony from the President or his alter egos.  Why is

7   he wrong about that?  I mean, is it -- and, again, I would --

8   I'm still trying to grapple with whether there is a distinction

9   between absolute immunity and executive privilege in this

10   context.

11        MR. LETTER:  And there absolutely is, Your Honor,

12   because, again -- I just used the word absolute.  Remember, as

13   you and I talked in the beginning, absolute immunity says, for

14   example, the House couldn't do what you were talking about, and

15   Mr. Burnham said that the House couldn't decide.  You know

16   what?  Security in the White House has been a problem and we

17   need to do something about that or we think we might, so we

18   need to investigate this.

19        Mr. Burnham is saying no can do.  Just absolutely

20   not.  Executive privilege, remember, instead is things that

21   are -- would go to undermining the ability of the -- the

22   Executive Branch to function.  *Nixon v. GSA*, we cite that in

23   our opinion -- in our brief.  The Supreme Court has said the

24   separation of powers, it's -- it's not the -- the Constitution

25   is not what Mr. Burnham thinks it is.  There are not very rigid

1    lines between the branches.  The Supreme Court has made clear

2    in cases like *Nixon v. GSA, Mistretta* that there is lots of

3    hydraulic pressure, there is overlap, and so there are areas

4    where the Court has -- the Supreme Court has said --

5              THE COURT:  But let me ask you this:  If -- if

6    Mr. Burnham's idea of who gets executive -- excuse me -- who

7    gets absolute immunity applies only to those folks who would

8    have the ability to assert executive privilege with respect to

9    almost everything they're being asked about -- because there's

10   a reason, as your co-counsel pointed out -- there's perhaps

11   even a good reason -- for the House to be asking these kinds of

12   questions.  We know what it is they're interested in.

13             Mr. Burnham says, okay, absolute immunity applies to

14   those people within the White House who would be able to answer

15   those questions.  Why then doesn't the distinction, any

16   purported distinction, between absolute immunity and executive

17   privilege collapse under those circumstances?

18             MR. LETTER:  Several responses, Your Honor.  First,

19   remember, the Supreme Court has made clear executive privilege

20   is not absolute; right?  It can be overridden.  It has been

21   overridden.  Absolute immunity, my understanding is it's

22   absolute.  Well, again, that's not the law.  It -- it may be

23   what Mr. Trump wants the law to be.  It's not the law.  And so

24   executive privilege can be overridden.  We know that.

25             Second -- and, remember, I start out by saying

1    Mr. Burnham is arguing about a case that's not this one.  We

2    have a situation where an enormous amount of what we want to

3    talk to Mr. McGahn about has already -- he's already clearly

4    waived executive privilege.  Mr. -- the President --

5    President Trump told Mr. McGahn, Feel free to go talk to

6    somebody who can indict you.  Go ahead, talk to them, and

7    answer his questions, et cetera.  Go talk to the prosecutor.

8           THE COURT:  Is the waiver really relevant, though, if

9    they are separate concepts?  Why does it matter?

10          MR. LETTER:  It is relevant because Mr. Burnham is

11   saying we need absolute immunity because we -- we can't have

12   alter egos to the President answering questions.  What I'm

13   saying is, Oh, yes, we can.  President Trump already authorized

14   Mr. McGahn to talk to somebody -- a prosecutor who can indict

15   him.  President Trump has -- and then President Trump said,

16   Release the Mueller Report.  The Mueller Report has all sorts

17   of very interesting information in it showing obstruction of

18   justice, demonstrating and quoting, talking about what

19   Mr. McGahn did and said, and then the President says he's a

20   liar.

21          So we're not anywhere close to absolute immunity.

22   We're in a situation where the President has told Mr. McGahn,

23   Go ahead.  Reveal what goes on and what went on inside the

24   White House.  Feel free to do that.

25          THE COURT:  One of the OLC opinions, the one from

1    which I didn't respond to Mr. Burnham to tell him which one,

2    and I still haven't been able to find it really quickly, but

3    one of them talks about -- maybe it's the most recent one, the

4    May 2014 one.  Talks about the difference -- the fact that the

5    person may be asked questions to which they have no ability to

6    claim privilege, says this opinion, is a different question or

7    different issue than whether or not they have to show up at

8    all.

9           And, again, I understand that if the basis for them

10   not having to show up is I'm the President of the United States

11   or his Chief of Staff, I'm in the Oval Office.  I'm really,

12   really busy.  I don't have time to talk to you, Congress;

13   right?  If that's the basis for the absolute immunity, then it

14   is, true, I think, that whether or not they could actually

15   answer the questions as opposed to asserting the privilege, you

16   know, doesn't really matter.  So I'm trying to understand

17   the -- the impact of the waiver, alleged waiver, on this issue

18   of absolute immunity.

19          MR. LETTER:  Two points, Your Honor.  First, if I

20   may, again, this -- we're talking about a hypothetical case,

21   remember?  Everything you have said might be grounds for why a

22   current White House counsel couldn't be -- shouldn't be called

23   before Congress because that person is really busy and the

24   President needs him or her every moment, even when they're on

25   the golf course.  They need the White House counsel next to

1    them to tell them, you know, if -- if the ball goes in the

2    rough, how -- you know, can you move it, et cetera.  We

3    understand that.  And that may or may not be correct.  But this

4    is a former White House counsel.

5          We -- we absolutely cannot lose sight of that because

6    of the very point you're making.  Mr. McGahn is in the private

7    practice of law.  I'm not saying this negatively.  He's in

8    private practice of law earning a profit.  Obviously he can

9    take some time to come, like any other citizen, and respond to

10   subpoenas issued by the House.

11         And so Mr. Burnham is saying, well, but that might

12   disclose secrets of the President.  That might be, but, again,

13   that means the OLC opinion is out, and I don't have to tell

14   you, but I will.  As you well know, OLC opinions are

15   interesting.  They're binding on the -- the Executive Branch.

16   They're certainly not binding on you, and they're not binding

17   on Congress, and they're often wrong, as shown by the fact that

18   they often contradict each other, withdraw prior opinions

19   and --

20         THE COURT:  I understand.  I'm just trying to decide

21   who is saying what about the distinct nature or not of

22   testimonial immunity and executive privilege.

23         MR. LETTER:  Right.  And this is then getting to my

24   next point, which is -- and I think directly answering you --

25   is -- the point about waiver is Mr. Burnham is saying absolute

1      immunity is essential to protect the sanctity of, you know,

2      presidential discussions, et cetera.  But we know that's not

3      true because any number of White House counsel have testified

4      in Congress.  And, again --

5                   THE COURT:  Voluntarily, though; right?

6                   MR. LETTER ATTORNEY:  Yes.  And -- and I'll tell you

7      why that doesn't matter.  That doesn't matter because, remember

8      here, there's -- there's no statute --

9                   THE COURT:  Mr. Burnham says if the President let's

10     you, then fine.

11                  MR. LETTER:  And here's why it's important that we

12     even understand voluntarily why this is fine.  The -- the

13     Supreme Court has made clear that the way our government

14     operates help defines the Constitution.  The *Mistretta* case.  I

15     think it said more recently in *Noel Canning* case.  So we know

16     that is true.  Supreme Court has instructed you that that is a

17     way of helping to construe the Constitution.

18                  So we know from conduct of Presidents going back to

19     Washington that they are willing, often quite unhappily,

20     grumbling, to have -- to answer questions from Congress.

21     Abraham Lincoln testified in Congress.  Woodrow Wilson did,

22     Gerry Ford did, but that was all voluntary.  It was because,

23     unlike President Trump, they were not stonewalling everything.

24     They understood that the way our government works --

25                  THE COURT:  No, I understand.  But here's the

1    problem, Mr. Letter.  What I'm -- what I'm really trying to get

2    at is what is the legal basis for any of these arguments.  So I

3    understand that people may have behaved in a certain way

4    historically, one way or the other; right?

5            Mr. Burnham has a string of -- of circumstances in

6    which people sought -- which the House sought to enforce its

7    subpoenas in other ways.  You have a string of circumstances in

8    which people voluntarily submitted themselves for testimony.

9    Fine, fine, fine.  The question is to what extent when the

10   President seeks to invoke privilege, is there a legal basis for

11   him to say neither I nor any of my close aides needs to

12   respond -- "respond" -- at all to a subpoena of Congress.

13   Period.  Full stop.  You cannot go.  I cannot go.  You cannot

14   go.  Is that lawful?  And if not, why not?

15           MR. LETTER:  Let's put aside the President

16   personally.  Okay.  We don't know what the law is.  To my

17   knowledge, we don't know.  But as to presidential aides, we do

18   know the law, and the answer is, you noted, Mr. Burnham did not

19   have a single case.  He couldn't point to anything in the

20   Constitution.  He couldn't point to a single case.  He just

21   said, Well, it's part of the separation of powers.

22           THE COURT:  Well, he tethers them to the President.

23           MR. LETTER:  Yes.

24           THE COURT:  So he suggests we do know.  The President

25   can't go.

1          MR. LETTER:  Right.  And, again, I -- I'm not going

2     to take a position on that.  We don't need to today.

3          THE COURT:  Can we assume -- okay.  Let's assume the

4     President can't go.

5          MR. LETTER:  Correct.

6          THE COURT:  Why isn't he right about his close

7     personal aides?

8          MR. LETTER:  *Harlow* says that's wrong, and *Harlow* --

9     remember, it says, we will overcome immunity, and even, again,

10    with the President, remember, the Supreme Court says we'll

11    overcome executive privilege.  So this notion that's a

12    separation of powers demands that the President always wins is

13    wrong, is absolutely wrong under Supreme Court precedent.  And,

14    again --

15         THE COURT:  Mr. Burnham says, okay, but the only

16    precedents you really have that suggests otherwise are

17    different circumstances.  Civil damages, you know, criminal

18    cases.  That's not this.

19         MR. LETTER:  This is easier than civil damages.

20    Civil damages is -- and as I recall, Judge Bates goes into this

21    in great detail.

22              If you are an adviser to the President and somebody

23    says to you, You need to stay quiet about this and you say,

24    Well, but I'm just about to get hit with civil damages,

25    that's -- that's a very tough thing.  Here all we're saying is

1     you've got to go talk to Congress.

2              THE COURT:  So you're saying because *Harlow* permitted

3     the prospect of civil damages with respect to certain aides in

4     the White House, this is an easier case because we don't -- in

5     terms of chilling effect.

6              MR. LETTER:  Right.

7              THE COURT:  Is that the point?

8              MR. LETTER:  Exactly.  And I would rather rely on my

9     friend, the very, very articulate Judge Bates on that because

10    he says that.  He says it clearly.  Now, remember also, another

11    problem with this -- and, again, this shows how the --

12    President Trump's conception of how the government works, is --

13    is so wrong, is cabinet officials and high-level military

14    people and high-level intelligence community officials testify

15    in Congress all the time.  All the time.  And now maybe you

16    would say, Well, cabinet officials, they're not as close as

17    close White House aides.  Sure, they can be.  Bobby Kennedy.

18    Bobby Kennedy was Attorney General.  So if -- Bobby Kennedy, he

19    could have been called to testify.

20             THE COURT:  But he doesn't work in the White House in

21    the same way, does he --

22             MR. LETTER:  He was --

23             THE COURT:  -- as a presidential -- he's sort of

24    carved out a space that includes a handful of close

25    presidential aides, people with offices next to the Oval Office

1       who are advising the President in this capacity.

2                   MR. LETTER:  Yes.  Again, he made that up.  That --

3       again, it's not in the Constitution.  It's not recognized in a

4       single case.  There's nothing to support it.  And what -- what

5       I'm trying to point out, throwing all of this together, is the

6       Supreme Court has made the decision that contrary to what

7       President Trump thinks, this is not essential for the operation

8       of the Executive Branch.  And, remember, the test --

9                   THE COURT:  By "this" you mean allowing absolute

10      immunity for these aides?

11                  MR. LETTER:  Correct.

12                  THE COURT:  It's not essential?

13                  MR. LETTER:  We know it's not essential.  In fact, we

14      know that absolute executive privilege is not essential.

15      Because you might have to go testify in court, you might have

16      to --

17                  THE COURT:  Well, why doesn't this give the

18      perception, as he says, of the President being subordinate to

19      the legislature?  First of all, is that a real concern?  I kind

20      of, like, haven't really heard it that way before, but

21      assuming -- or maybe let me ask you:  Is there such a thing?

22      We have independent, coequal branches.  If one can be allowed

23      to bring in the head or the alter ego -- alter egos of the

24      head, haul them into their offices and ask questions, don't we

25      have a scenario that implicates the separation of powers

1       insofar as it suggests that the branch of government that can

2       be treated in that way is subordinate to the other?

3                     MR. LETTER:  It definitely can raise that,

4       Your Honor, and that's why we have executive privilege, and

5       that's why the Supreme Court has made clear, executive

6       privilege is not an absolute.  So sometimes the President will

7       win against the judicial branch or against Congress, and

8       sometimes he won't.  So we know for a fact that absolute

9       immunity is not the rule, because sometimes the President

10      loses.  In addition what Mr. Burnham is saying is the President

11      always wins.

12                    The House is engaged in an impeachment inquiry now.

13      And Mr. Burnham is saying it -- if the President wished -- and

14      remember here, the President --

15                    THE COURT:  Can I ask you what the relevance of that

16      is to my circumstances?  Didn't you bring this case prior to

17      the recognition of a formal impeachment inquiry?  So does it

18      have bearing on what I'm doing here?

19                    MR. LETTER:  It most certainly does because we're

20      trying to get Mr. McGahn to come in and testify now.

21                    THE COURT:  As part the impeachment inquiry or some

22      other investigation of the circumstances that gave rise to the

23      Special Counsel?

24                    MR. LETTER:  Originally, some -- as you say, we

25      didn't have -- as I recall, we didn't have a formal impeachment

1    inquiry.  I'm going to look at my associates just one second to

2    make sure I'm right about that.

3              THE COURT:  Sure.  Sure.

4              MR. LETTER:  Fortunately I have Ms. Barbero with me.

5              THE COURT:  Yes.

6              MR. LETTER:  She reminds me that when we brought this

7    suit, the Judiciary Committee was already investigating whether

8    to refer articles of impeachment and was doing so pursuant to a

9    House resolution.

10             THE COURT:  I see.

11             MR. LETTER:  And now the question is should you

12   enforce -- should you say there's no absolute immunity now.

13   And we're engaged in an impeachment investigation right now.

14   And I would think -- I don't think there's any way that the

15   Supreme Court would now say when we're engaged in an

16   impeachment investigation trying to determine if this person

17   should no longer be the President of the United States, that we

18   cannot subpoena people who might have very solid information

19   about whether impeachable offenses have been committed, and the

20   main reason I say that is remember, OLC says the justice

21   department, You cannot prosecute the President.

22             THE COURT:  Well, how can I rely -- I thought OLC

23   opinions were -- fine.  Not really important.

24             MR. LETTER:  Let's, for a moment, say they say -- and

25   the Attorney General thinks they are important.  So the

1      Attorney General says, I'm not prosecuting a sitting president.

2      And so what is -- what does OLC say the answer is?  OLC says

3      the answer is impeachment.  We can impeach.  So you don't need

4      to criminally prosecute presidents.  You can impeach them, and

5      then when they're no longer in office, you can prosecute them.

6      Well, how can the Trump administration on the one hand say you

7      can't criminally prosecute, but don't worry, you can impeach,

8      and then say, but guess what, when you try to come up with the

9      evidence to see whether you can impeach or not, we're going to

10     stonewall you.

11          THE COURT:  All right.  So does my answering the

12     question here turn at all on my evaluation of how much you need

13     this testimony in order to pursue the impeachment

14     investigation?  Does the Court have to engage in some kind of

15     analysis of what it is the aide is likely to say and how

16     important it is to the -- to the legislative function or what?

17          MR. LETTER:  That might be the next phase.  Remember,

18     we're here right now on absolute immunity, and, again, I think

19     that -- that is easy because the Supreme Court already answered

20     that.

21          And so then the next phase is Mr. McGahn comes in.

22     Will the President order that he assert executive privilege?

23     We don't know.  We certainly -- we don't know the answer to

24     that, and, more importantly, I think the first thing, if

25     that -- if Chairman Nadler decides that we're not going to

1    recognize those executive privilege claims or some of them --

2    maybe he'll recognize some, maybe not others -- and at that

3    point if it goes to court, very important will be how can the

4    President claim executive privilege over Mr. McGahn -- these

5    subjects --

6              THE COURT:  That's where -- that's why I was trying

7    to push back on your question -- or your suggestions about

8    waiver; right?

9              MR. LETTER:  Yes.

10             THE COURT:  Because that's where -- I understand that

11   that's where the -- the waiver issue may be implicated, which

12   is why I didn't understand why you suggested that waiver had

13   something to do with the absolute immunity question.

14             MR. LETTER:  And I'm not being very articulate, so

15   I'm going to say the reason it's relevant to absolute immunity

16   is the absolute immunity argument they're making is the

17   President has to be able to have nobody around him talk even

18   after they leave the White House because as an absolute matter

19   they never get questioned by Congress.

20             Remember, absolute immunity they're talking about.

21   So that covers everything.  And we're saying that can't be

22   right because President Trump already told Mr. McGahn it's fine

23   for you to talk about what -- all these private things that you

24   and I talked about.  Go ahead.  Talk to the special prosecutor

25   who can indict you and tell him the truth.  How can you --

1           THE COURT:  I'm not quite sure about that.  I feel

2     like there's something to Mr. Burnham's suggestion that the

3     President gets to invoke it at certain times, and so to the

4     extent that the President gets to invoke absolute immunity,

5     then they're not really making the argument that it

6     automatically attaches to every person who -- you know, every

7     sensitive high-level official who comes through the

8     White House.  It only attaches when the legislature says we

9     would like you to testify and then the President gets to say

10    yes or no.

11          MR. LETTER:  You're right, Your Honor.  What they're

12    saying is the President can say, House of Representatives, I

13    don't want you talking to this official at all.

14          THE COURT:  And why are they wrong about that?  I

15    mean, you're suggesting if the President decides prior to any

16    of this that it's okay for his aide to talk in one

17    circumstance, that somehow he forfeits any ability he might

18    have had to prevent that person from talking to the House, and

19    I don't know that that's necessarily the case.

20          MR. LETTER:  And, again, I'm sorry.  He does -- that

21    doesn't mean the President forfeits.  It means the President

22    can say, Mr. McGahn, when you go testify in the House, don't

23    talk about the following things.  Remember, he could claim

24    executive privilege and say, Don't talk about this; don't talk

25    about that.

1          THE COURT:  Right.  But why couldn't he also -- if

2     they are correct that absolute immunity is a thing -- I mean,

3     you just keep sort of suggesting there is no such thing as

4     absolute immunity, and you may be right.

5          MR. LETTER:  Yes.

6          THE COURT:  I mean, whatever.  I haven't really

7     pinned it down.  That's why we're here.  But you keep

8     suggesting, no such thing as absolute immunity.  Executive

9     privilege is doing all the work.  He still has it in this

10    circumstance.  So I should find they're wrong about absolute

11    immunity's existence.

12         MR. LETTER:  Yes.  Yes.

13         THE COURT:  Assuming for a second that absolute

14    immunity is a thing, my question in the context of this

15    exchange is:  Why is it that if the President has -- if the

16    President owns the absolute immunity and is able to prevent his

17    aides from testifying before Congress, the fact that he said,

18    You know, what?  You can talk to the special master.  You

19    can -- or the Special Counsel.  You can talk to Rachel Maddow.

20    You can do whatever you want, but I don't want you talking to

21    the House.  Why isn't that fine if absolute immunity is a

22    thing?

23         MR. LETTER:  And, again -- and what I'm doing if --

24    if you say to me absolute immunity is a thing and the President

25    can invoke it anytime he wants, I lose.

1            THE COURT:  Your -- no.  But your argument could

2      be -- well, I suppose your argument could be that to the extent

3      they're concerned about the separation of powers, that would

4      seem to elevate the President above all; right?  Because

5      suddenly the President now gets to decide who gets information

6      on -- you know, under what circumstances in a way that that's

7      not what the Constitution envisioned.

8            MR. LETTER:  Absolutely, Your Honor.  You can't have

9      here that the -- the separation of powers means that the

10     President gets to say, Go talk to the special prosecutor.  Go

11     talk to Rachel Maddow.  Do not talk to the House.  That would

12     make no sense at all, and let me -- let me just say one more

13     thing:  The reason this is -- is relevant is it -- there is no

14     constitutional provision, there's no statute, there's no case

15     law that says the President can impose absolute immunity on

16     former -- his former aides; okay?  There is none.

17            So Mr. Burnham has to say, I know that.  He

18     understands that.  And he's saying, But, Judge, please go with

19     me.  Because of the separation of powers, please make a policy

20     decision to create absolute immunity that otherwise doesn't

21     exist because it's not in the Constitution, et cetera.  Please

22     do that.  And you, quite rightly, would say, Why should I?  And

23     he'll say, Because it's essential that the President be able to

24     get advice from counselors who can never be questioned about

25     what they said.  And that would be a reason.

```
 1              The problem with that reason is the Supreme Court
 2    said no.  Sometimes you -- Mr. President, don't go into office
 3    assuming that you are going to be able to say there will be
 4    absolute confidentiality in this White House.
 5              THE COURT:  Yeah, and I understand.  I mean, I think
 6    the other reason is sort of what you said before, which is to
 7    the extent that -- and this may be what you meant about waiver.
 8    To the extent that the President has already said under some
 9    circumstances this very aide, It's fine for you to talk to
10    people, then it undermines any argument that the reason why he
11    needs absolute immunity is that he wants to protect the
12    information; right?  Is that --
13              MR. LETTER:  Bingo.  Your Honor said it more
14    articulately than I did.  I'm sorry.
15              THE COURT:  No, no.  That's fine.
16              MR. LETTER:  I'm sorry I didn't come up with that
17    before.
18              THE COURT:  Are there any arguments that we have not
19    covered?  I am mindful of the time and people's children's
20    Halloween.
21              MR. LETTER:  I'm going to look fast through my notes,
22    and, meanwhile, my colleagues are going to be thinking about
23    this, to see whether there's anything I missed.
24              THE COURT:  So you say that I should not pay any mind
25    or give any weight to the several OLC opinions that maintain
```

1       that presidential aides have absolute immunity.

2               MR. LETTER:  Your Honor, there -- they're

3       interesting.  There are law review articles that are

4       interesting.  I think you should instead look at the -- and,

5       again, I'm sure Mr. Burnham is going to stand up here and say

6       agreed.  OLC opinions are not binding on you at all.  They're

7       interesting, and -- and especially, as I say, because OLC

8       opinions, one President says one thing and the -- the next OLC

9       reverses.  That happens all the time.

10              I worked at the justice department for 40 years,

11      Your Honor, and constantly I was being told by OLC -- I'd say,

12      Well, what about that opinion you issued two years ago?  And

13      they'd say, Oh, we reversed that.  So they're interesting but

14      they're dominated by their -- the fact that they're the

15      President's lawyers.  They're not interested in the interest --

16      protecting the interest of Congress.  And the fact that they're

17      the lawyers for that specific President a lot of times, and

18      that's why they change their minds plenty.  So, again,

19      interesting just like a law review article is interesting, but

20      they're not binding on you and they're certainly not binding on

21      Congress.

22              THE COURT:  All right.

23              MR. LETTER:  My colleagues tell me I covered

24      everything.

25              Thank you very much, Your Honor.

1          THE COURT:  Thank you.

2          Mr. Burnham, I'll let you have the last word.

3          MR. BURNHAM:  Thank you, Your Honor.

4          I just want to make two really quick points.  So the

5     first this is not about --

6          THE COURT:  Wait.  Don't make them quickly, though.

7     We have a court reporter.

8          MR. BURNHAM:  Yes.  I will make two quick points

9     slowly.

10          THE COURT:  Thank you.

11          MR. BURNHAM:  The first is this is not about the

12     Trump administration.  Mr. Letter kept talking about President

13     Trump and the Trump administration.  As Mr. Letter knows, this

14     has been the position of the justice department for decades;

15     that there's absolute immunity for senior White House aides.  I

16     suspect Mr. Letter has made this argument before in his time at

17     the justice department.  So I just want to be clear that this

18     is not some exotic thing that we just cooked up in the last few

19     months.  This has been around for a long time.  There are a lot

20     of OLC opinions.

21          The second point I'd like to make -- and then I'll

22     obviously any answer questions you have.  Never in history,

23     ever, has a senior adviser to the President given testimony in

24     Congress pursuant to a subpoena enforced by an Article III

25     court.  Every prior example has been by agreement.  The closest

1    is *Miers* where it was settled on appeal after Judge Bates's

2    decision was stayed by the Executive Branch and the House after

3    the administration changed, and she gave, I think, a two-hour

4    transcribed interview to the Committee and then the case went

5    away.

6              THE COURT:  But where does -- how does that cut?

7              MR. BURNHAM:  Well, I -- I -- as you would expect --

8              THE COURT:  In other words --

9              MR. BURNHAM:  -- I think it favors me.

10             THE COURT:  Okay.  Please tell me why.  I mean, I

11   understand everybody negotiated, everybody figured it out,

12   nobody wanted to come to court.  Fine.

13             MR. BURNHAM:  Right.

14             THE COURT:  What does that say about whether they

15   can -- and that was the first part of our conversation --

16             MR. BURNHAM:  Right.

17             THE COURT:  -- or whether or not -- if they can't

18   work it out, the President wins because he gets to say, I'm not

19   testifying and I don't want my people to testify and that's the

20   end of the matter.

21             MR. BURNHAM:  Because they're his senior aides, and

22   so he has the right, grounded in Article II, confirmed by

23   *Harlow*, confirmed by *Nixon v. Fitzgerald* to shield those aides

24   with immunity that he himself possesses.  And the history shows

25   that the Congress has been able for 200 and -- I guess it's

1    about 230 years to use its political tools to deal with that

2    always.

3            THE COURT:  But when they deal with it always -- and,

4    again, this --

5            MR. BURNHAM:  Right.

6            THE COURT:  There's something about my distinction

7    that I can't get away from; right?

8            MR. BURNHAM:  Sure.

9            THE COURT:  When they deal with it always, it seems

10   to me that it tends to result in a relinquishment of any

11   argument that these people can't testify; that when they deal

12   with it, the people end up giving the information in some way,

13   shape, or form by agreement.

14           MR. BURNHAM:  Right.  The President --

15           THE COURT:  So the scope -- what I'm trying to

16   evaluate is the scope of the presidential privilege that you

17   say exists.

18           MR. BURNHAM:  Right.

19           THE COURT:  And right now, with respect to the

20   absolute immunity point, you're saying that the President not

21   only has the ability to prevent people from revealing certain

22   things that are sensitive and that would impinge upon the

23   executive privilege in the context of their testimony, but the

24   President also has the ability, you say and these OLC opinions

25   say, to keep people from responding at all, showing up and

1       raising their hand and saying, I can't talk about anything

2       because of executive privilege.  I don't know where that comes

3       from.  That's what I'm trying to really home it on.

4               MR. BURNHAM:  And so I think you understand our

5       arguments.  They're in the briefs.  My -- it comes from

6       Article II.  It comes from the President's unique role in the

7       Constitution, and the history just confirms it because it has

8       never been -- never, ever has the House compelled someone over

9       the President's objection who's a senior aide, like Mr. McGahn

10      was, to testify in Congress.  I think what's really going on,

11      it may be that the House doesn't have sufficient political

12      support to use its political tools to get what it wants and so

13      it's trying --

14              THE COURT:  But -- but -- but --

15              MR. BURNHAM:  -- to use litigation to end-run the

16      process.

17              THE COURT:  Let's -- let's not be so critical of the

18      House, because what I'm worried about is the political

19      implications of the absolute privilege that you're talking

20      about.  So here's the scenario that I'm positing because you

21      keep bringing up, like, political question, political concerns,

22      House doesn't have the political will.

23              If the world was such that the President could not

24      invoke an absolute immunity, but still had executive privilege,

25      then I suppose you would have a circumstance in which there

1    would be some political implications of a person who was a

2    former or current presidential aide coming in to public

3    hearings and pleading executive privilege.  In other words, the

4    President gets to shield himself under your theory of the

5    case -- or your theory of the state of the law from the

6    political implications of his -- his invocation of executive

7    privilege, because by asserting absolute immunity, that person

8    never shows up.

9          There would be presumably some political implications

10   if that person had to show up and actually invoke executive

11   privilege question by question.  And so I don't understand how

12   you can raise the sort of political implications of the House's

13   choices in this without facing up to the political

14   circumstances that arise from the President's being able to

15   assert absolute immunity as opposed to executive privilege on a

16   question-by-question basis.

17         MR. BURNHAM:  Sorry.  I don't mean -- I was not

18   trying to make a point about the political context in sort of

19   the political sense.  What I meant by political tools were

20   Congress has tools it has against the Executive Branch:

21   appropriations, legislation, nominations, et cetera.  The fact

22   that the House may not have sufficient support in Congress to

23   use those tools as effectively as it would like is a feature of

24   the Constitution.

25         To answer your question, I don't know what the

 1    political dynamic would be of the assertions of privilege, and

 2    I don't know that there's any -- I don't think that's relevant

 3    to our argument.  The President's assertion of absolute

 4    immunity is certainly public.  I mean, we're -- this is -- it's

 5    known that he has asserted that.  I don't think -- that wasn't

 6    suggesting that the Court should think about the political

 7    implications.  All I was trying to say is that until, you know,

 8    the modern era, as in the last ten years, the branches have

 9    worked out this issue of absolute immunity betwixt them, and I

10    don't think there's any reason to change that now.  The House

11    is --

12         THE COURT:  Except what do I do with the notices that

13    say that you're in an impasse?  How -- how is this is not like

14    one -- one or more of the cases that you pointed to before

15    where the court sort of laid back and said you guys are

16    almost -- almost got it figured out.  We're not going to be

17    involved.

18         I hear people saying we can't resolve this.  We have

19    this dispute, and so it's unclear to me that it leaves the

20    separation-of-powers issue alone for the Court to not weigh in

21    on this legal dispute.

22         MR. BURNHAM:  Sorry.  I think you should -- if you --

23    well, I don't think you should weigh in for the reasons we

24    talked about the first half.

25         THE COURT:  Yes.

1          MR. BURNHAM:  But I think if you do weigh in, you

2     should recognize the absolute immunity that we've presented.  I

3     think it's well grounded in the Constitution and the Supreme

4     Court's cases, and my only point was that the House has

5     historically respected it, as the most recent OLC opinion

6     documents.  Now, the OLC opinion is only persuasive.

7     Mr. Letter's absolutely right, but it's a very good opinion.

8     And so I would encourage you to read it to see if it persuades

9     you, and then if it does, I would encourage you to agree with

10    it.

11          THE COURT:  Thank you very much.

12          MR. BURNHAM:  Thank you, Your Honor.

13          THE COURT:  Mr. Letter, did you have one more thing

14    you wanted to say?

15          MR. LETTER:  Yes, Your Honor.  The only thing I

16    wanted to say is Mr. Burnham talks about history.  At no point

17    in our history have we had absolute immunity for the President.

18    There is -- because there's no case law recognizing it.  All

19    the case law says no, executive privilege is not absolute.  The

20    case law says there is no such thing as absolute immunity, and

21    somehow the president -- presidents have been able to operate

22    even though at no point in our history have we had it ever

23    established.

24          THE COURT:  Then I should not infer, as Mr. Burnham

25    suggests, that because there's been sort of negotiated

1    resolution of these things that the House has recognized the

2    President's authority in this way?

3              MR. LETTER:  It may very well be here one of the

4    reasons why they can be negotiated so often is because prior

5    presidents have understood they don't have absolute immunity,

6    and as I believe one of your questions said, and my experience

7    in the justice department was, almost always the things would

8    start out as we're not testifying, we're not sending, and

9    almost always as the history shows, they do testify.  As I

10   said, any a number of White House counsel have come up to

11   testify.

12             THE COURT:  All right.  Thank you very much.

13             I am going to take these cross-motions under

14   advisement.  As you've seen from our multi-hour hearing here,

15   you both have given me a lot to think about.  I intend to issue

16   a written ruling.  Let me say a little about the timing of that

17   ruling.  As I mentioned to the parties when I scheduled this

18   hearing, I will be in trial for the next two weeks, which makes

19   it difficult for me to find time to write.  I will do my best.

20             I do understand that -- the need for expedition.  I

21   trust that if you have not heard from me and you need, either

22   side, an expedited ruling, you will bring that to my attention

23   by notice.  We can arrange then for me to get an answer to you,

24   maybe by an oral ruling with an opinion to follow or some such,

25   but you can rest assured I do understand the significance of

1     all of this, and as I said, I will do my best to turn it around

2     as quickly as possible.

3             All right.  Thank you very much.

4             (The proceedings were concluded.)

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, Nancy J. Meyer, Registered Merit Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                        Dated this 1st day of November, 2019.

10

11                       /s/ Nancy J. Meyer
                         Nancy J. Meyer
12                       Official Court Reporter
                         Registered Merit Reporter
13                       Certified Realtime Reporter
                         333 Constitution Avenue Northwest, Room 6509
14                       Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25