APPEAL,TYPE–E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:19–cv–02379–KBJ</u>

COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTATIVES v. MCGAHN II
Assigned to: Judge Ketanji Brown Jackson
Cause: 28:1331 Fed. Question

Date Filed: 08/07/2019
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Plaintiff

**<u>Plaintiff</u>**

**COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTATIVES**

represented by **Seth Wayne**
INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 662–4192
Email: sw1098@georgetown.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Anderson Grogg**
U.S. HOUSE OF REPRESENTATIVES
Office of General Counsel
219 Cannon House Office Building
Washington, DC 20515
(202) 225–9700
Email: adam.grogg@mail.house.gov
*ATTORNEY TO BE NOTICED*

**Annie L. Owens**
GEORGETOWN UNIVERSITY LAW CENTER
Institute for Constitutional Advocacy and Protection
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 662–4036
Email: ao700@georgetown.edu
*ATTORNEY TO BE NOTICED*

**Josephine T. Morse**
U.S. HOUSE OF REPRESENTATIVES
Office of General Counsel
219 Cannon House Office Building
Washington, DC 20515
(202) 225–9700
Email: jodie.morse@mail.house.gov
*ATTORNEY TO BE NOTICED*

**Joshua Geltzer**
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 662–9042
Email: jg1861@law.georgetown.edu
*ATTORNEY TO BE NOTICED*

**Megan Barbero**
U.S. HOUSE OF REPRESENTATIVES
Office of General Counsel
219 Canon House Office Building
Washington, DC 20515
(202) 225–9700
Email: megan.barbero@mail.house.gov
*ATTORNEY TO BE NOTICED*

**Sarah Edith Clouse**
U.S. HOUSE OF REPRESENTATIVES
Office of General Counsel
219 Cannon House Office Building
Washington, DC 20515
(202) 225–9700
Fax: (202) 226–1360
Email: sarah.clouse@mail.house.gov
*ATTORNEY TO BE NOTICED*

**Todd Barry Tatelman**
U.S. HOUSE OF REPRESENTATIVES
Office of General Counsel
219 Cannon House Office Building
Washington, DC 20515
(202) 225–9700
Fax: (202) 226–1360
Email: todd.tatelman@mail.house.gov
*ATTORNEY TO BE NOTICED*

**Douglas N. Letter**
U.S. HOUSE OF REPRESENTATIVES
Office of General Counsel
219 Cannon House Office Building
Washington, DC 20515
(202) 225–9700
Email: douglas.letter@mail.house.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD F. MCGAHN II**                    represented by    **Elizabeth J. Shapiro**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
(202) 514–5302
Fax: (202) 616–8470
Email: Elizabeth.Shapiro@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James J. Gilligan**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Room 11200
Washington, DC 20005
(202) 514–3358
Fax: (202) 616–8470
Email: james.gilligan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven A. Myers**
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
(202) 305–8648
Fax: (202) 616–8470
Email: steven.a.myers@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Marshall Bernie**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
(202) 616–8488
Fax: (202) 616–8470
Email: andrew.m.bernie@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Cristen Cori Handley**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
202–305–2677
Email: Cristen.Handley@usdoj.gov
*ATTORNEY TO BE NOTICED*

**James Mahoney Burnham**
U.S. DEPARTMENT OF JUSTICE
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 353–5049
Email: james.m.burnham@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Serena Maya Schulz Orloff**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
(202) 305–0167
Fax: (202) 616–8470
Email: serena.m.orloff@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 08/07/2019 | 1 | | COMPLAINT against DONALD F. MCGAHN II (Fee Status:Filing Fee Waived) filed by COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTIVES. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG, # 34 Exhibit HH, # 35 Exhibit II, # 36 Exhibit JJ, # 37 Exhibit KK, # 38 Civil Cover Sheet, # 39 Summons)(Letter, Douglas) (Entered: 08/07/2019) |
| 08/07/2019 | 2 | | NOTICE OF RELATED CASE by COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTATIVES. Case related to Case No. 1: 19–gj–00048–BAH. (Letter, Douglas) (Entered: 08/07/2019) |
| 08/07/2019 | 3 | | Consent MOTION for Use of Defendant's Business Address by COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTIVES (Attachments: # 1 Text of Proposed Order)(Letter, Douglas) (Entered: 08/07/2019) |
| 08/07/2019 | | | Case Assigned to Chief Judge Beryl A. Howell. (zeg) (Entered: 08/07/2019) |
| 08/07/2019 | 4 | | SUMMONS (1) Issued Electronically as to DONALD F. MCGAHN II. (Attachment: # 1 Notice and Consent)(zeg) (Entered: 08/07/2019) |
| 08/07/2019 | 5 | | NOTICE of Appearance by Joshua Geltzer on behalf of COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTATIVES (Geltzer, Joshua) (Entered: 08/07/2019) |
| 08/07/2019 | | | MINUTE ORDER (paperless) DIRECTING, upon consideration of the |

| | | |
|---|---|---|
| | | Committee on the Judiciary's 2 Notice of Related Case, and to ensure that this matter is properly assigned, the Committee on the Judiciary to SHOW CAUSE, by noon on August 12, 2019, why this matter should be designated as related, pursuant to D.D.C. Local Civil Rule 40.5(a)(3), to *In re Application of the Committee on the Judiciary, U.S. House of Representatives, for an Order Authorizing the Release of Certain Grand Jury Materials*, 19–gj–48. The defendant may respond by noon on August 13, 2019 expressing his view on whether and, if so, why the cases should be treated as related. Although the Committee on the Judiciary filed 19–gj–48 with a Notice of Related Case to *In re Application for an Order Authorizing the Release of Grand Jury Material Cited, Quoted, or Referenced in the Report of Special Counsel Robert S. Mueller III*, 19–mc–45, both 19–gj–48 and 19–mc–45 were directly assigned to the Chief Judge because both seek the release of grand jury materials. *See* D.D.C. LCrR 6.1 (providing that a "motion or application filed in connection with a grand jury subpoena or other matter occurring before a grand jury . . . shall . . . be assigned to the Chief Judge"). Signed by Chief Judge Beryl A. Howell on August 7, 2019. (lcbah3) (Entered: 08/07/2019) |
| 08/08/2019 | | Set/Reset Deadlines: Committee on the Judiciary's response to Show Cause due by noon on 8/12/2019; defendant may respond by noon on 8/13/2019. (tg) (Entered: 08/08/2019) |
| 08/09/2019 | 6 | NOTICE of Appearance by Cristen Cori Handley on behalf of DONALD F. MCGAHN II (Handley, Cristen) (Entered: 08/09/2019) |
| 08/09/2019 | 7 | NOTICE of Appearance by Elizabeth J. Shapiro on behalf of DONALD F. MCGAHN II (Shapiro, Elizabeth) (Entered: 08/09/2019) |
| 08/09/2019 | 8 | NOTICE of Appearance by Douglas N. Letter on behalf of COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTIVES (Letter, Douglas) (Entered: 08/09/2019) |
| 08/09/2019 | 9 | NOTICE of Appearance by Todd Barry Tatelman on behalf of COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTIVES (Tatelman, Todd) (Entered: 08/09/2019) |
| 08/09/2019 | 10 | NOTICE of Appearance by Megan Barbero on behalf of COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTIVES (Barbero, Megan) (Entered: 08/09/2019) |
| 08/09/2019 | 11 | NOTICE of Appearance by Josephine T. Morse on behalf of COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTIVES (Morse, Josephine) (Entered: 08/09/2019) |
| 08/09/2019 | 12 | NOTICE of Appearance by Sarah Edith Clouse on behalf of COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTIVES (Clouse, Sarah) (Entered: 08/09/2019) |
| 08/12/2019 | 13 | RESPONSE TO ORDER TO SHOW CAUSE by COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTIVES . (Letter, Douglas) (Entered: 08/12/2019) |
| 08/13/2019 | 14 | RESPONSE re 2 Notice of Related Case *Objections to Plaintiff's Response to Order to Show Cause Regarding Related Case Designation* filed by DONALD F. MCGAHN II. (Handley, Cristen) Modified event title on 8/15/2019 (znmw). |

| | | |
|---|---|---|
| | | (Entered: 08/13/2019) |
| 08/14/2019 | 15 | MEMORANDUM OPINION AND ORDER regarding the plaintiff's 13 Response to Order to Show Cause Regarding Related Case Designation, and the defendant's 14 Objection to Plaintiff's Notice of Related Case. Signed by Chief Judge Beryl A. Howell on August 14, 2019. (lcbah3) (Entered: 08/14/2019) |
| 08/14/2019 | 16 | Case randomly reassigned to Judge Ketanji Brown Jackson. Chief Judge Beryl A. Howell is no longer assigned to the case. (rj) (Entered: 08/14/2019) |
| 08/14/2019 | 17 | NOTICE of Appearance by Annie L. Owens on behalf of COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTATIVES (Owens, Annie) (Main Document 17 replaced on 8/14/2019) (zjf). (Entered: 08/14/2019) |
| 08/14/2019 | | MINUTE ORDER granting 3 Consent Motion for Use of Defendant's Business Address. Signed by Judge Ketanji Brown Jackson on 8/14/2019. (lckbj1) (Entered: 08/14/2019) |
| 08/15/2019 | 18 | GENERAL ORDER AND GUIDELINES FOR CIVIL CASES BEFORE JUDGE KETANJI BROWN JACKSON. The Court will hold the parties and counsel responsible for following these directives, and parties and counsel should pay particular attention to the Court's instructions for briefing motions and filing exhibits. Failure to adhere to this Order may, when appropriate, result the imposition of sanctions and/or sua sponte denial of non−conforming motions. Signed by Judge Ketanji Brown Jackson on 8/15/2019. (lckbj1) (Entered: 08/15/2019) |
| 08/21/2019 | 19 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 8/9/2019. Answer due for ALL FEDERAL DEFENDANTS by 10/8/2019. (Letter, Douglas) (Entered: 08/21/2019) |
| 08/21/2019 | 20 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DONALD F. MCGAHN II served on 8/7/2019 (Letter, Douglas) (Entered: 08/21/2019) |
| 08/26/2019 | 21 | NOTICE of Appearance by Adam Anderson Grogg on behalf of COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTATIVES (Grogg, Adam) (Entered: 08/26/2019) |
| 08/26/2019 | 22 | MOTION for Preliminary Injunction *or, in the alternative*, MOTION for Partial Summary Judgment *(expedited)* by COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTATIVES (Attachments: # 1 Memorandum in Support, # 2 Declaration, # 3 Declaration, # 4 Statement of Facts, # 5 Text of Proposed Order)(Letter, Douglas) (Entered: 08/26/2019) |
| 08/27/2019 | 23 | NOTICE of Appearance by James Mahoney Burnham on behalf of All Defendants (Burnham, James) (Entered: 08/27/2019) |
| 08/28/2019 | 24 | GENERAL ORDER AND GUIDELINES REGARDING MOTIONS FOR A PRELIMINARY INJUNCTION. Signed by Judge Ketanji Brown Jackson on 8/28/2019. (lckbj1) (Entered: 08/28/2019) |
| 08/28/2019 | 25 | NOTICE of Appearance by Seth Wayne on behalf of COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTATIVES (Wayne, Seth) (Entered: 08/28/2019) |

| 08/30/2019 | 26 | | NOTICE of Appearance by Steven A. Myers on behalf of DONALD F. MCGAHN II (Myers, Steven) (Entered: 08/30/2019) |
|---|---|---|---|
| 08/30/2019 | 27 | | NOTICE of Appearance by Andrew Marshall Bernie on behalf of DONALD F. MCGAHN II (Bernie, Andrew) (Entered: 08/30/2019) |
| 08/30/2019 | 28 | | PROPOSED BRIEFING SCHEDULE re 22 MOTION for Preliminary Injunction *or, in the alternative* MOTION for Partial Summary Judgment *(expedited) (Joint)* by COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTATIVES. (Letter, Douglas) (Entered: 08/30/2019) |
| 09/03/2019 | | | MINUTE ORDER ADOPTING the Parties' 28 Joint Scheduling Proposal. As discussed during the teleconference that this Court held on 9/3/2019, it is hereby ORDERED that the Plaintiff's 22 Motion will be treated as a Motion for Expedited Partial Summary Judgment, and that the following briefing deadlines are set: Defendant shall file his Opposition and Cross–Motion on or before 10/1/2019 at 3:00 PM; Plaintiff shall file its Reply and Cross–Motion Opposition on or before 10/16/2019; and Defendant shall file his Cross–Motion Reply on or before 10/25/2019. It is FURTHER ORDERED that a Motion Hearing is set for 10/31/2019 at 2:00 PM in Courtroom 17 before Judge Ketanji Brown Jackson. Signed by Judge Ketanji Brown Jackson on 9/3/2019. (lckbj1) (Entered: 09/03/2019) |
| 09/04/2019 | | | Set/Reset Hearings: Motion Hearing set for 10/31/2019 at 02:00 PM in Courtroom 17 before Judge Ketanji Brown Jackson. (zgdf) (Entered: 09/04/2019) |
| 09/10/2019 | 29 | | NOTICE of Appearance by James J. Gilligan on behalf of DONALD F. MCGAHN II (Gilligan, James) (Entered: 09/10/2019) |
| 09/27/2019 | 30 | | NOTICE of Appearance by Serena Maya Schulz Orloff on behalf of DONALD F. MCGAHN II (Orloff, Serena) (Entered: 09/27/2019) |
| 09/27/2019 | 31 | | Consent MOTION for Leave to File Excess Pages by DONALD F. MCGAHN II (Attachments: # 1 Proposed Order)(Orloff, Serena) (Entered: 09/27/2019) |
| 09/30/2019 | | | MINUTE ORDER granting 31 Motion for Leave to File Excess Pages. It is hereby ORDERED that Defendant may file a consolidated opposition to Plaintiff's motion and cross–motion for summary judgment that is no more than 70 pages in length. This Court will entertain motions for leave to file excess pages with respect to the remaining briefs in this case on an as–needed basis. Signed by Judge Ketanji Brown Jackson on 9/30/2019. (lckbj1) (Entered: 09/30/2019) |
| 09/30/2019 | 34 | | LEAVE TO FILE DENIED– Letter. This document is unavailable as the Court denied its filing. "LEAVE TO FILE DENIED" Signed by Judge Ketanji Brown Jackson on 09/30/2019. (jf) (Entered: 10/02/2019) |
| 09/30/2019 | 35 | | LEAVE TO FILE DENIED– Cover Letter. This document is unavailable as the Court denied its filing. "LEAVE TO FILE DENIED" Signed by Judge Ketanji Brown Jackson on 09/30/2019. (jf) (Entered: 10/02/2019) |
| 10/01/2019 | 32 | | MOTION for Summary Judgment by DONALD F. MCGAHN II (Attachments: # 1 Statement of Fact, # 2 Response to Statement of Fact, # 3 Purpura Declaration, # 4 Lassiter Declaration, # 5 Orloff Declaration, # 6 Proposed Order)(Orloff, Serena) (Entered: 10/01/2019) |

| 10/01/2019 | 33 | | RESPONSE re 22 MOTION for Preliminary Injunction *or, in the alternative* MOTION for Partial Summary Judgment *(expedited)* filed by DONALD F. MCGAHN II. (Attachments: # 1 Statement of Fact, # 2 Response to Statement of Fact, # 3 Purpura Declaration, # 4 Lassiter Declaration, # 5 Orloff Declaration, # 6 Proposed Order)(Orloff, Serena) (Entered: 10/01/2019) |
| --- | --- | --- | --- |
| 10/15/2019 | 36 | | Consent MOTION for Leave to File Excess Pages by COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTATIVES (Letter, Douglas) (Entered: 10/15/2019) |
| 10/15/2019 | | | MINUTE ORDER granting 36 Motion for Leave to File Excess Pages. It is hereby ORDERED that Plaintiff may file a consolidated reply in support of its motion and opposition to Defendant's cross–motion that is no more than 65 pages in length. Signed by Judge Ketanji Brown Jackson on 10/15/2019. (jag) (Entered: 10/15/2019) |
| 10/16/2019 | 37 | | Memorandum in opposition to re 32 MOTION for Summary Judgment filed by COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTATIVES. (Attachments: # 1 Statement of Facts (Response to Def.'s Statement of Facts))(Letter, Douglas) (Entered: 10/16/2019) |
| 10/16/2019 | 38 | | REPLY to opposition to motion re 22 MOTION for Preliminary Injunction *or, in the alternative* MOTION for Partial Summary Judgment *(expedited)* filed by COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTATIVES. (Letter, Douglas) (Entered: 10/16/2019) |
| 10/23/2019 | 39 | | Consent MOTION for Leave to File Excess Pages *for reply memorandum due October 25, 2019* by DONALD F. MCGAHN II (Attachments: # 1 Text of Proposed Order)(Myers, Steven) (Entered: 10/23/2019) |
| 10/24/2019 | | | MINUTE ORDER granting 39 Motion for Leave to File Excess Pages. It is hereby ORDERED that Defendant may file a reply in support of its motion that is no more than 45 pages in length. Signed by Judge Ketanji Brown Jackson on 10/24/2019. (jag) (Entered: 10/24/2019) |
| 10/25/2019 | 40 | | REPLY to opposition to motion re 32 MOTION for Summary Judgment filed by DONALD F. MCGAHN II. (Orloff, Serena) (Entered: 10/25/2019) |
| 10/29/2019 | 41 | | NOTICE by COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTATIVES re 37 Memorandum in Opposition, (Letter, Douglas) (Entered: 10/29/2019) |
| 10/30/2019 | 42 | | ENTERED IN ERROR. . . . .NOTICE *of Defendant's Response to Plaintiff's Notice Regarding Status of Accommodation Process, ECF No. 41* by DONALD F. MCGAHN II (Orloff, Serena) Modified on 10/31/2019 (ztd). (Entered: 10/30/2019) |
| 10/31/2019 | | | NOTICE OF ERROR re 42 Notice (Other); emailed to serena.m.orloff@usdoj.gov, cc'd 20 associated attorneys –– The PDF file you docketed contained errors: 1. Incorrect event used, 2. Please refile document, 3. Refile document using the event Response to (non–motion) Document found under Opposition and Replies and link it to doc. 41. (ztd, ) (Entered: 10/31/2019) |
| 10/31/2019 | 43 | | RESPONSE re 41 Notice (Other) *Regarding Status of Accommodation Process* filed by DONALD F. MCGAHN II. (Orloff, Serena) (Entered: 10/31/2019) |

| 10/31/2019 | | | Minute Entry for Motion Hearing held on 10/31/2019 before Judge Ketanji Brown Jackson re 22 MOTION for Preliminary Injunction *or, in the alternative* MOTION for Partial Summary Judgment *(expedited)* 32 MOTION for Summary Judgment. Oral Arguments heard and taken under advisement. Court Reporter Nancy Meyer. (zjch) (Entered: 10/31/2019) |
|---|---|---|---|
| 11/04/2019 | 44 | | TRANSCRIPT OF PROCEEDINGS before Judge Ketanji Brown Jackson held on 10/31/2019; Page Numbers: 1–163. Date of Issuance: 11/01/2019. Court Reporter: Nancy J. Meyer. Telephone Number: (202) 354–3118, Tape Number: N/A. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court report er referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have 21 days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 11/25/2019. Redacted Transcript Deadline set for 12/5/2019. Release of Transcript Restriction set for 2/2/2020.(Meyer, Nancy) (Entered: 11/04/2019) |
| 11/19/2019 | 45 | | NOTICE by COMMITTEE ON THE JUDICIARY OF THE U.S. HOUSE OF REPRESENTATIVES (Letter, Douglas) (Entered: 11/19/2019) |
| 11/19/2019 | | | MINUTE ORDER. This Court held a Motion Hearing on October 31, 2019, during which it noted that either party could file a notice if an expedited ruling on the pending cross–motions for summary judgment became necessary. Having received such a notice from Plaintiff (see ECF No. 45 ), the Court hereby notifies the parties that it will issue its Memorandum Opinion and Order in this matter on or before the close of business on Monday, November 25, 2019, absent unforeseen circumstances. Signed by Judge Ketanji Brown Jackson on 11/19/2019. (jag) (Entered: 11/19/2019) |
| 11/25/2019 | 46 | | MEMORANDUM OPINION GRANTING 22 Plaintiffs Motion for Expedited Partial Summary Judgment, and DENYING 32 Defendants Motion for Summary Judgment. Signed by Judge Ketanji Brown Jackson on 11/25/2019. (jag) (Entered: 11/25/2019) |
| 11/25/2019 | 47 | | ORDER GRANTING 22 Plaintiffs Motion for Expedited Partial Summary Judgment, and DENYING 32 Defendants Motion for Summary Judgment. See attached Order for details. Signed by Judge Ketanji Brown Jackson on 11/25/2019. (jag) (Entered: 11/25/2019) |
| 11/26/2019 | 48 | | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 47 Order, 46 Memorandum & Opinion by DONALD F. MCGAHN II. Fee Status: No Fee Paid. Parties have been notified. (Myers, Steven) (Entered: 11/26/2019) |

| 11/26/2019 | 49 | | MOTION to Stay re 47 Order, 46 Memorandum & Opinion *(Motion for Stay Pending Appeal and for Immediate Administrative Stay)* by DONALD F. MCGAHN II (Attachments: # 1 Text of Proposed Order)(Myers, Steven) (Entered: 11/26/2019) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) | |
| *Plaintiff*, | ) ) ) | |
| v. | ) ) | No. 19-cv-2379 (KBJ) |
| DONALD F. MCGAHN, II | ) ) | |
| *Defendant*, | ) ) ) | |

## **NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Defendant Donald F. McGahn, II, hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from this Court's November 25, 2019, Order, *see* ECF No. 47, as well as its November 25, 2019, Memorandum Opinion, *see* ECF No. 46.

Dated: November 26, 2019                Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

JAMES J. GILLIGAN
Special Litigation Counsel

*/s/ Steven A. Myers*
STEVEN A. MYERS (NY Bar No. 4823043)
SERENA M. ORLOFF (CA Bar No. 260888)
ANDREW BERNIE (DC Bar No. 995376)
Trial Attorneys

United States Department of Justice

Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Tel:       (202) 305-8648
Fax:      (202) 616-8470
E-mail:   steven.a.myers@usdoj.gov

*Counsel for Defendant*

2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 19-cv-2379 (KBJ) |
| DONALD F. MCGAHN II, | ) ) | |
| Defendant. | ) ) ) | |

## TABLE OF CONTENTS

I.     INTRODUCTION...............................................................................................1

II.    BACKGROUND.................................................................................................7

    A.    Factual Background.................................................................................7

    B.    *Committee on Judiciary, U.S. House of Representatives v. Miers* ...........15

    C.    Procedural History ...............................................................................20

III.    LEGAL STANDARDS ...................................................................................23

    A.    Cross-Motions For Summary Judgment Under Federal Rule of Civil Procedure 56 .........................................................................................23

    B.    Common Law Adherence To Precedent.................................................24

    C.    Subpoena-Related Rights, Duties, Privileges, And Immunities...............27

        1.    Subpoenas In Standard Civil Actions...........................................29

        2.    Legislative Subpoenas.................................................................33

IV.    ANALYSIS .....................................................................................................37

    A.    Federal Courts Have The Power To Adjudicate Subpoena-Related Disputes Between Congress And The Executive Branch.........................41

        1.    Federal Courts Routinely Exercise Subject-Matter Jurisdiction Over Subpoena-Enforcement Claims Under 28 U.S.C. § 1331 ...........................................................................41

2.     Separation-Of-Powers Principles Do Not Compel The Conclusion That This Court Lacks Subject-Matter Jurisdiction Over The Instant Dispute ............................................................ 46

    a.     The legal claim at issue here is not non-justiciable ............ 47

    b.     The historical record indicates that the Judiciary has long entertained subpoena-enforcement actions concerning compelled congressional process ...................... 51

    c.     Traditional separation-of-powers principles do not support DOJ's suggestion that the federal courts cannot resolve legal disputes between the other branches of government ...................................................................... 60

B.     House Committees Have The Power To Enforce Their Subpoenas In Federal Court When Executive Branch Officials Do Not Respond As Required ...................................................................................... 66

1.     Defiance Of A Valid Subpoena Indisputably Qualifies As A Cognizable Injury In Fact, And In The Context Of Congressional Investigations, The Harm Is Significant And Substantial ...................................................................... 68

2.     The Constitution Itself Provides A Cause Of Action For A Thwarted House Committee To Proceed In Federal Court ............ 77

3.     There Is No Separation-Of-Powers Impediment To The Judiciary Committee's Seeking To Vindicate Its Rights In Federal Court ............................................................................ 81

C.     The President Does Not Have The Power To Prevent His Aides From Responding To Legislative Subpoenas On The Basis Of Absolute Testimonial Immunity ............................................................ 89

1.     *Miers* Squarely Rejects The Argument Senior-Level Presidential Aides Enjoy Absolute Testimonial Immunity ............ 90

2.     OLC's Long-Held View That Senior-Level Presidential Aides Have Absolute Testimonial Immunity Is Neither Precedential Nor Persuasive ......................................................... 97

3.     There Is No Principled Basis For Concluding That Senior-Level Presidential Aides Should Have Absolute Testimonial Immunity .............................................................. 102

4.     Concluding That Presidential Aides Enjoy Absolute Testimonial Immunity At The President's Discretion Conflicts With Core Constitutional Norms ................................ 113

V.     CONCLUSION ............................................................................... 116

## MEMORANDUM OPINION

## I.     INTRODUCTION

In 2008, in the context of a dispute over whether the Committee on the Judiciary of the House of Representatives ("the Judiciary Committee") had the power to compel former White House Counsel Harriet Miers and then-White House Chief of Staff Joshua Bolten to testify and produce documents in connection with a congressional investigation, the Department of Justice ("DOJ") made three legal contentions of "extraordinary constitutional significance." *Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 55 (D.D.C. 2008) (Bates, J.).  First, DOJ argued that a duly authorized committee of Congress acting on behalf of the House of Representatives cannot invoke judicial process to compel the appearance of senior-level aides of the President for the purpose of receiving sworn testimony. *See id.* at 66–67, 78.  Second, DOJ maintained that a President can demand that his aides (both current and former) ignore a subpoena that Congress issues, on the basis of alleged absolute testimonial immunity. *See id.* at 100.  And, third, DOJ asserted that the federal courts cannot exercise subject-matter jurisdiction over any such subpoena-related stalemate between the Legislature and the Executive branch, on separation of powers grounds. *See id.* at 72–73, 93–94.  The district court that considered these propositions rejected each one in a lengthy opinion that thoroughly explained why the federal courts have subject-matter jurisdiction over such disputes, *see id.* at 64–65; why the Judiciary Committee had standing to sue and a cause of action to proceed in federal court, *see id.* at 65–94; and why the claim that a President's senior-level aides have absolute testimonial immunity is meritless, *see id.* at 99–107.  Most importantly, the *Miers* opinion also persuasively demonstrated that DOJ's conception of the limited power of

both Congress and the federal courts relative to the expansive authority of the President—which, purportedly, includes the power to shield himself and his aides from being questioned about any aspect of their present or former White House work—is not grounded in the Constitution or in any other federal law.  *See id.* at 99, 106–07; *cf. Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 10–11 (D.D.C. 2013).

The more things change, the more they stay the same.  On May 20, 2019, President Donald J. Trump directed former White House Counsel Donald F. McGahn II to decline to appear before the Judiciary Committee in response to a subpoena that the Committee had issued to McGahn in connection with its investigation of Russia's interference into the 2016 presidential election and the Special Counsel's findings of fact concerning potential obstruction of justice by the President.  (*See* Letter from Pat A. Cipollone, Counsel to the President, to William A. Burck (May 20, 2019), Ex. E to Decl. of Michael M. Purpura ("Purpura Decl."), ECF No. 32-3, at 46–47.)[1]  Months of negotiations ensued, which produced no testimony from McGahn, and on August 7, 2019, the Judiciary Committee filed the instant lawsuit.  Invoking Article I of the U.S. Constitution, the Judiciary Committee implores this Court to "[d]eclare that McGahn's refusal to appear before the Committee in response to the subpoena issued to him was without legal justification" (Compl., ECF No. 1, at 53), and it also seeks an "injunction ordering McGahn to appear and testify forthwith before the Committee" (*id.*).

---

[1]  Page number citations to the documents that the parties have filed refer to those that the Court's electronic case filing system automatically assigns.

The Judiciary Committee and DOJ (which is representing McGahn in the instant legal action) have now filed the cross-motions for summary judgment, which are before this Court at present. (*See* Pl.'s Mot. for Prelim. Inj. or, in the alternative, for Expedited Partial Summ. J. ("Pl.'s Mot."), ECF No. 22; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 32.) In its motion, the Judiciary Committee reiterates the basic contention that, having received a subpoena from a duly authorized committee of Congress exercising its investigative powers under Article I of the Constitution, "McGahn is legally obligated to testify" (Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem."), ECF No. 22-1, at 14), and "has no valid interest in defying the Committee's subpoena" (*id.* at 54). In response, DOJ renews its (previously unsuccessful) threshold objections to the standing and right of the Judiciary Committee to seek to enforce its subpoenas to senior-level presidential aides in federal court, and it also robustly denies that federal courts have the authority to exercise subject-matter jurisdiction over subpoena-enforcement claims brought by House committees with respect to such Executive branch officials. (*See* Def.'s Mot. at 32–33, 43, 53); *see also Miers*, 558 F. Supp. 2d at 65–94. DOJ further insists that the Judiciary Committee's claim that McGahn is legally obligated to testify fails on its merits, primarily because DOJ's Office of Legal Counsel ("OLC") has long maintained that present and former senior-level aides to the President, such as McGahn, are absolutely immune from being compelled to testify before Congress if the President orders them not to do so. (*See* Def.'s Mot. at 60–74.)

For the reasons explained in this Memorandum Opinion, as well as those laid out in *Miers*, the Judiciary Committee's motion for partial summary judgment is **GRANTED**, and DOJ's cross-motion for summary judgment is **DENIED**. In short, this

Court agrees with Judge Bates's conclusion that federal courts have subject-matter jurisdiction to resolve legal disputes that arise between the Legislature and the Executive branch concerning the scope of each branch's subpoena-related rights and duties, under section 1331 of Title 28 of the United States Code and the Constitution. *See Miers*, 558 F. Supp. 2d at 64–65. Jurisdiction exists because the Judiciary Committee's claim presents a legal question, and it is "emphatically" the role of the Judiciary to say what the law is. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). It also plainly advances constitutional separation-of-powers principles, rather than subverts them, when a federal court decides the question of whether a legislative subpoena that a duly authorized committee of the House of Representatives has issued to a senior-level aide of the President is valid and enforceable, or, alternatively, is subject to the President's invocation of absolute testimonial immunity. Furthermore, *Miers* was correct to conclude that, given the indisputable Article I power of the House of Representatives to conduct investigations of potential abuses of power and subpoena witnesses to testify at hearings concerning such investigations, the Judiciary Committee has both standing and a cause of action to file an enforcement lawsuit in federal court if the Executive branch blocks a current or former presidential aides' performance of his duty to respond to a legislative subpoena. *See id.* at 65–75, 78–94.

DOJ's arguments to the contrary are rooted in "the Executive's interest in 'autonomy[,]'" and, therefore, "rest[] upon a discredited notion of executive power and privilege." *Id.* at 103. Indeed, when DOJ insists that Presidents can lawfully prevent their senior-level aides from responding to compelled congressional process and that neither the federal courts nor Congress has the power to do anything about it, DOJ

4

promotes a conception of separation-of-powers principles that gets these constitutional commands exactly backwards. In reality, it is a core tenet of this Nation's founding that the powers of a monarch must be split between the branches of the government to prevent tyranny. *See* The Federalist No. 51 (James Madison); *see also Buckley v. Valeo*, 424 U.S. 1, 120 (1976). Thus, when presented with a case or controversy, it is the Judiciary's duty under the Constitution to interpret the law and to declare government overreaches unlawful. Similarly, the House of Representatives has the constitutionally vested responsibility to conduct investigations of suspected abuses of power within the government, and to act to curb those improprieties, if required. Accordingly, DOJ's conceptual claim to unreviewable absolute testimonial immunity on separation-of-powers grounds—essentially, that the Constitution's scheme countenances unassailable Executive branch authority—is baseless, and as such, cannot be sustained.

During the hearing that this Court held regarding the parties' cross-motions for summary judgment, the Court asked DOJ's counsel whether its absolute immunity assertion with respect to McGahn was somehow different than the absolute immunity that former White House Counsel Harriet Miers had claimed, or whether it was DOJ's position that the *Miers* case was simply wrong to conclude that absolute testimonial immunity is not an available legal basis for thwarting compelled congressional process with respect to senior-level presidential aides. Counsel answered "both." (Hr'g Tr., ECF No. 44, at 31:5–10.) Upon review of the motions and the relevant law, however, it is clear to this Court that the correct response to its inquiry is "neither." That is, the United States District Court for the District of Columbia has seen these same facts and

these same legal arguments before, and DOJ has done little to persuade this Court that the case should turn out differently in the end. Instead, this Court concurs with the thrust of *Miers*'s conclusion that, whatever the scope of the President's executive privilege with respect to the information that Congress seeks to compel, and whatever the merits of DOJ's assertion that senior-level aides are the President's "alter egos" for the purpose of invoking an immunity, DOJ has failed to bridge the yawning gap between a presidential aide's right to withhold privileged information in the context of his or her compelled congressional testimony (which no one disputes), and the President's purported power to direct such aides to refuse to show up and be questioned *at all* (which appears only in a string of OLC opinions that do not themselves constitute legal precedents and are manifestly inconsistent with the constitutional jurisprudence of the Supreme Court and the D.C. Circuit in many respects).

Thus—to be crystal clear—what is at issue in this case is solely whether senior-level presidential aides, such as McGahn, are legally required to respond to a subpoena that a committee of Congress has issued, by appearing before the committee for testimony despite any presidential directive prohibiting such a response. The Court distinguishes this issue from the very different question of whether the specific information that high-level presidential aides may be asked to provide in the context of such questioning can be withheld from the committee on the basis of a valid privilege. In other words, "the Court only resolves, and again rejects, the claim by the Executive to absolute immunity from compelled congressional process for senior presidential aides." *Miers*, 558 F. Supp. 2d at 56; *see also id.* (noting that "[t]he specific claims of executive privilege that [a subpoenaed presidential aide] may assert are not addressed—

6

and the Court expresses no view on such claims"). And in reaching this conclusion, "[t]he Court holds only that [McGahn] (and other senior presidential advisors) do not have absolute immunity from compelled congressional process in the context of this particular subpoena dispute." *Id.* at 105–06. Accordingly, just as with Harriet Miers before him, Donald McGahn "must appear before the Committee to provide testimony, and invoke executive privilege where appropriate." *Id.* at 106.

## II.     BACKGROUND

### A.     Factual Background

The material facts that underlie this lawsuit are not in dispute. On March 4, 2019, the Judiciary Committee opened an investigation into allegations that President Trump and his associates had engaged in various forms of misconduct during the lead up to the 2016 presidential election and in the years since. (*See* Pl.'s Stmt. of Material Facts Not in Dispute ("Pl.'s Stmt. of Facts"), ECF No. 22-4, ¶ 75 (citing Press Release, H. Comm. on the Judiciary, *House Judiciary Committee Unveils Investigation Into Threats Against the Rule of Law* (Mar. 4, 2019)); *see also* H.R. Rep. No. 116-105, at 13 (2019) (announcing an investigation into "possible malfeasance, abuse of power, corruption, obstruction of justice, or other misconduct on the part of the President or other members of his Administration").)[2] In its complaint, the Judiciary Committee alleges that one of the driving forces behind its investigation is the separate investigation that Special Counsel Robert S. Mueller III conducted between 2017 and 2019 regarding alleged Russian interference in the 2016 presidential election, the

---

[2] This investigation pre-dates the formal impeachment inquiry that the Speaker of the House announced on September 24, 2019. *See* Press Release, Speaker Nancy Pelosi, *Pelosi Remarks Announcing Impeachment Inquiry* (Sept. 24, 2019), https://www.speaker.gov/newsroom/92419-0.

results of which are memorialized in a 448-page report that the Special Counsel's

Office issued on March 22, 2019. (*See* Compl., ECF No. 1, ¶¶ 1–3 (citing Robert S.

Mueller III, *Report On The Investigation Into Russian Interference In The 2016*

*Presidential Election* (March 2019) ("Mueller Report").) In the complaint, the

Judiciary Committee invokes the Mueller Report when describing the purposes of its

investigation, which allegedly include determining "whether the conduct uncovered

may warrant amending or creating new federal authorities, including among other

things, relating to election security, campaign finance, misuse of electronic data, and

the types of obstructive conduct that the Mueller Report describes"; and "whether any

of the conduct described in the Special Counsel's Report warrants the Committee in

taking any further steps under Congress' Article I powers . . . includ[ing] whether to

approve articles of impeachment with respect to the President or any other

Administration official." (Compl. ¶ 61 (quoting H.R. Rep. No. 116-105, at 13 (internal

quotation marks omitted)).)

The Special Counsel's investigation and findings have been summarized

elsewhere, *see, e.g.*, *In re Application of Comm. on Judiciary, U.S. House of*

*Representatives, for an Order Authorizing Release of Certain Grand Jury Materials*,

No. 19-gj-48, 2019 WL 5485221, at *2–7 (D.D.C. Oct. 25, 2019). In any event, this

Court need not detail them here. It suffices to note that investigators from the Special

Counsel's office interviewed McGahn on several separate occasions—the Mueller

Report indicates that the interviews with McGahn took place on at least five different

dates (*see* Compl. ¶ 94)—and it is also noteworthy that McGahn's statements to those

investigators are specifically mentioned in the Mueller Report multiple times and in

connection with various topics, including the resignation of National Security Advisor

Michael Flynn (*see id.* ¶ 35); the termination of FBI Director James Comey (*see id.* at

65–69); the decision by Attorney General Jefferson B. Sessions III to recuse himself

from overseeing the Special Counsel's investigation (*see id.* ¶ 36); and President

Trump's alleged attempts to remove Special Counsel Mueller (*see id.* ¶ 35). Following

the release of the Mueller Report, President Trump made a number of comments in

which he appeared to call into question the veracity of what McGahn had told the

Special Counsel. (*See* Pl.'s Stmt. of Facts ¶¶ 70–74 (citations omitted).)

On March 4, 2019, in conjunction with the Judiciary Committee's investigation,

Jerrold Nadler, the Chairman of the Judiciary Committee, sent a letter to McGahn

asking that he voluntarily provide the Committee with certain documents delineated in

an attachment to his letter. (*See* Letter from Jerrold Nadler, Chairman H. Comm. on the

Judiciary, to Donald F. McGahn II (Mar. 4, 2019), Ex. R to Decl. of Todd B. Tatelman

("Tatelman Decl."), ECF No. 22-3.) In response to this request, McGahn's private

attorney, William Burck, sent a letter to Chairman Nadler on March 18, 2019,

indicating that Burck had forwarded the document request to the White House and to

the Trump Campaign, because those entities "are the appropriate authorities to decide

the scope of access to these documents, including whether a claim of executive,

attorney-client and/or attorney work product privilege would protect such information

from disclosure." (Letter from William A. Burck to Jerrold Nadler, Chairman H.

Comm. on the Judiciary (Mar. 18, 2019), Ex. S to Compl., ECF No. 1-19.) When the

Judiciary Committee had not received a response to its voluntary document request as

of April 22, 2019, it issued a subpoena *ad testificandum* to McGahn (*see* Subpoena to

Donald F. McGahn II ("Subpoena"), Ex. U to Tatelman Decl., ECF No. 22-3 at 497–508), pursuant to a resolution that the Committee had adopted on April 3, 2019, authorizing the issuance of subpoenas in conjunction with its investigation (*see* Pl.'s Stmt. of Facts ¶ 84). The subpoena instructed McGahn to produce documents pertaining to 36 specific topics, including the FBI's investigation of Michael Flynn, the termination of James Comey, Jeff Sessions's recusal decision, and the Special Counsel's investigation, by no later than May 7, 2019 (*see* Subpoena at 497, 499–501), and it also called for McGahn to appear to testify before the Judiciary Committee on May 21, 2019 (*id.* at 497).

On May 7, 2019, White House Counsel Pat Cipollone sent a letter to Burck in which he relayed instructions to McGahn from the Acting Chief of Staff to the President, Mick Mulvaney. (*See* Letter from Pat A. Cipollone, Counsel to the President, to William A. Burck (May 7, 2019), Ex. C to Purpura Decl., ECF No. 32-3, at 30.) The letter explained that McGahn was "not to produce White House records in response to the Committee's April 22 subpoena" on the grounds that the requested records "remain legally protected from disclosure under longstanding constitutional principles, because they implicate significant Executive Branch confidentiality interests and executive privilege." (*Id.*) Cipollone contemporaneously sent Judiciary Committee Chairman Nadler a letter making the same points about the protected nature of the documents, and informing him of the instructions that the White House had provided to McGahn. (*See* Letter from Pat A. Cipollone, Counsel to the President, to Jerrold Nadler, Chairman H. Comm. on the Judiciary (May 7, 2019), Ex. C to Purpura Decl., ECF No. 32-3, at 31.) Cipollone's letter to Nadler indicated that the White House

Counsel's Office would be making the decision as to whether or not McGahn would respond to the Committee's subpoena. (*See id*. (asserting that the White House Counsel's Office "will respond to the Committee concerning its interest in the records").)

On that same day, Chairman Nadler sent a letter to Burck in which he emphasized that, absent a court order directing otherwise, McGahn must appear before the Committee and testify on May 21, 2019, or the Committee would hold him in contempt. (*See* Letter from Jerrold Nadler, Chairman H. Comm. on the Judiciary, to William A. Burck (May 7, 2019), Ex. II to Compl., ECF No. 1-35, at 3.) Chairman Nadler followed up on May 17, 2019, with a letter to McGahn, via his counsel, reemphasizing that it was the Committee's expectation that he appear, and explaining that, because the Committee intended "to focus on the very topics covered in the Special Counsel's Report . . . there can be no valid assertion of executive privilege given that President Trump declined to assert any privilege over Mr. McGahn's testimony, or over any portion of the Report itself." (*See* Letter from Jerrold Nadler, Chairman H. Comm. on the Judiciary, to Donald F. McGahn II (May 17, 2019), Ex. W to Compl., ECF No. 1-23, at 2 (internal quotation marks and citation omitted).) Nadler closed this letter by stating that "even if the President . . . invokes executive privilege over your testimony, and you decide to abide by that improper assertion, you are still required under the law and the penalty of contempt to 'appear before the Committee to provide testimony, and invoke executive privilege where appropriate.'" (*Id.* at 2 (quoting *Miers*, 558 F. Supp. 2d at 106).)

11

On May 20, 2019, the day before McGahn was to testify before the Committee, Cipollone sent a letter to Burck stating that President Trump was instructing McGahn not to appear at the scheduled hearing.  (*See* Letter from Pat A. Cipollone, Counsel to the President, to William A. Burck (May 20, 2019), Ex. E to Purpura Decl., ECF No. 32-3, at 46–47.)  Cipollone attached to his letter a memorandum from the Office of Legal Counsel which opines that, as a former "senior advisor" to the President, McGahn is protected by "testimonial immunity" and that "Congress may not constitutionally compel [him] to testify about [his] official duties."  (*Id.* at 48.)[3]  Cipollone also sent a letter to Chairman Nadler informing him of the instructions that had been provided to McGahn.  (*See* Letter from Pat A. Cipollone, Counsel to the President, to Jerrold Nadler, Chairman H. Comm. on the Judiciary (May 20, 2019), Ex. 2 to Decl. of Barry H. Berke ("Berke Decl."), ECF No. 22-2, at 21–22.)  That same day, Burck sent a letter to Chairman Nadler informing him of this development and stating that, as a result of the President's instructions, McGahn was "facing contradictory instructions from two co-equal branches of government."  (Letter from William A. Burck to Jerrold Nadler, Chairman H. Comm. on the Judiciary (May 20, 2019), Ex. X to Tatelman Decl., ECF No. 22-3, at 510.)  Burck further explained that he found the OLC's opinion "persuasive" and that, "[u]nder these circumstances, and also conscious of the duties [McGahn], as an attorney, owes to his former client, Mr. McGahn must decline to appear at the hearing tomorrow."  (*Id.*)  Burck concluded his letter by stating that McGahn "remains obligated to maintain the status quo and respect the President's

---

[3]  This memorandum would later be published as an OLC slip opinion.  *See Testimonial Immunity Before Cong. of the Former Counsel to the President*, 43 Op. O.L.C. ___, Slip. Op. (May 20, 2019) ("McGahn OLC Mem.").

instruction[,]" but that if the Committee and Executive were to reach an accommodation, McGahn "would of course comply with that accommodation." (*Id.* at 511.)

Nadler responded immediately to McGahn, via his counsel, with a letter in which he described President Trump's command to McGahn not to appear as "unprecedented" and insufficient "to excuse your obligation to appear before the Committee." (Letter from Jerrold Nadler, Chairman H. Comm. on the Judiciary, to Donald F. McGahn II (May 20, 2019), Ex. Z to Tatelman Decl., ECF No. 22-3, at 544.) In his letter, Nadler noted that the *Miers* case had rejected the contention that a former White House Counsel could refuse to appear in response to a congressional subpoena by virtue of absolute testimonial immunity (*see id.*), and he informed McGahn that it was the Committee's position that McGahn was "'not excused from compliance with the Committee's subpoena by virtue of a claim of executive privilege that may ultimately be made'" (*id.* at 546 (quoting *Miers*, 558 F. Supp. 2d at 106)). Rather, the Committee expected McGahn to appear at the hearing and invoke executive privilege where appropriate, as Judge Bates had ordered former White House Counsel Harriet Miers to do. (*See id.*)

Ultimately, as a result of the White House's invocation of absolute testimonial immunity, McGahn did not appear to testify on May 21 (*see* Pl.'s Stmt. of Facts ¶¶ 91, 93), and on May 31, 2019, Nadler sent a letter to McGahn and Cipollone in which the Committee offered to accept a modified privilege log with respect to subpoenaed documents being withheld on the basis of privilege, and belated production of non-privileged documents. (*See* Letter from Jerrold Nadler, Chairman H. Comm. on the

Judiciary, to Donald F. McGahn II and Pat A. Cipollone, Counsel to the President (May 31, 2019), Ex. Z to Tatelman Decl., ECF No. 22-3, at 536.) Nadler also offered "to discuss any reasonable accommodation(s) that would facilitate Mr. McGahn's appearance before the Committee," and he proposed a number of options "including limiting the testimony to the specific events detailed in the Special Counsel's report, identifying with greater specificity the precise areas of intended inquiry, and agreeing to the presence of White House counsel during any testimony, so that Mr. McGahn may consult regarding the assertion of executive privilege." (*Id.* at 537.) The Judiciary Committee did not receive any response to this letter. (*See* Pl.'s Stmt. of Facts ¶ 96.)

On June 17, 2019, a call took place between representatives of the Judiciary Committee and the White House, during which the Committee once again offered to limit the scope of any testimony from McGahn. (*See* Berke Decl. ¶ 8.) Follow-up calls regarding potential accommodations took place on June 18, 2019, and on June 21, 2019, and there was an in-person meeting on June 25, 2019, but no resolution was reached. (*See id.* ¶¶ 9–11.) During a subsequent call on July 1, 2019, the White House indicated that it "was not willing to accept any accommodation involving Mr. McGahn's public testimony." (*Id.* ¶ 12.) However, the White House did offer "to consider allowing Mr. McGahn to appear for a private interview rather than for public testimony, subject to appropriate conditions that the parties would have to negotiate." (Purpura Decl. ¶ 18.) In response, the Judiciary Committee indicated that it "was not willing to consider anything other than testimony at a public hearing." (*Id.* ¶ 19.) Another call took place on July 12, 2019, during which the Committee reiterated its slate of proposed accommodations, including limiting McGahn's testimony to the Mueller Report and

14

allowing White House counsel to sit behind McGahn during his testimony, and it also offered to negotiate any issues that arose during his testimony. (*See* Berke Decl. ¶ 13.) The White House rejected this proposal during a subsequent call that took place on July 17, 2019 (*see id.* ¶ 14), and, separately, McGahn's counsel reaffirmed that McGahn would continue to comply with the President's directive not to testify (*id.* ¶ 15–16).

Although the White House and the Committee were not able to resolve their differences with respect to McGahn's testimony, they did reach an agreement regarding his production of the subpoenaed documents. (*See* Purpura Decl. ¶ 21.) Under this agreement, the White House would make responsive documents available to the Judiciary Committee after privilege review, subject to certain terms and conditions regarding access to and dissemination of the documents. (*See id.*)[4]

### B. *Committee on Judiciary, U.S. House of Representatives v. Miers*

One who doubts that history repeats itself need look back no further than an investigation that the Judiciary Committee conducted in 2007, with respect to the forced resignation of seven United States Attorneys, to prove the point. In that dispute, the Executive branch likewise refused to comply with voluntary requests, and following an authorizing vote, the Judiciary Committee issued a subpoena to Harriet Miers, former White House Counsel to President George W. Bush. The Judiciary Committee's subpoena required that Miers produce documents and appear before the Committee to give testimony regarding any influence that the White House may have exerted over

---

[4] The White House also initially asserted testimonial immunity with respect to former aide Hope Hicks, (*see* Letter from Pat A. Cipollone, Counsel to the President, to Jerrold Nadler, Chairman H. Comm. on the Judiciary (June 18, 2019), Ex. CC to Compl., ECF No. 1-29), but Hicks ultimately appeared for a voluntary interview, during which White House and OLC objected to her answering numerous questions on the basis of "absolute immunity" (*see, e.g.*, Transcribed Interview of Hope Hicks, H. Comm. on the Judiciary, 116th Cong. (June 19, 2019), Ex. EE to Compl., ECF No. at 12, 15–16).

DOJ's decision to request the resignations of various United States Attorneys, some of whom were in the process of investigating prominent politicians or had rebuffed requests from Republican officials to undertake certain investigations. *Miers*, 558 F. Supp. 2d at 57–63. In response to the Judiciary Committee's subpoena, the Executive branch asserted that all of the documents sought were protected by executive privilege, and, accordingly, the White House informed the Committee that no documents would be forthcoming. *See id.* at 62.[5] With respect Miers's testimony, President Bush initially asserted executive privilege as well, but the White House ultimately took the position that "Miers was absolutely immune from compelled congressional testimony[.]" *Id.* In support of this legal position, the White House proffered an OLC opinion to this effect. *See id.*; *see also Immunity of Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191 (2007).

Thereafter, the Judiciary Committee filed a lawsuit seeking a court order and a declaration that, among other things, "Miers must comply with a subpoena and appear before the Committee to testify[.]" *Miers*, 558 F. Supp. 2d at 55. In response, the Executive branch "moved to dismiss this action in its entirety on the grounds that the Committee lacks standing and a proper cause of action, that disputes of this kind are non-justiciable, and that the Court should exercise its discretion to decline jurisdiction." *Id.* at 55–56. On the merits, the Executive branch asserted that "sound principles of separation of powers and presidential autonomy dictate that the President's closest advisors must be absolutely immune from compelled testimony before Congress[.]" *Id.*

---

[5] The Committee also issued a subpoena seeking the production of documents to then-current White House Chief of Staff Joshua Bolten. *Miers*, 558 F. Supp. 2d at 61.

at 56.  For its part, the Judiciary Committee filed a cross-motion for partial summary judgment that argued that Miers had no legal right to refuse to appear and that there was no legal basis for the assertion of absolute testimonial immunity.  *See id.* at 99.

Judge Bates resolved the parties' contentions in a detailed, 93-page slip opinion that ultimately denied the Executive branch's motion and granted the Committee's motion, thereby requiring Miers to appear and testify.  *Id.* at 108.  At the outset of his opinion, Judge Bates addressed the question of federal question subject-matter jurisdiction under 28 U.S.C. § 1331 (even though both parties conceded its existence) and found that section 1331 was the source of the court's subject-matter jurisdiction over the dispute.  *See id.* 64–65.  Turning to the question of standing, Judge Bates found that a prior decision from the D.C. Circuit—*United States v. AT & T*, 551 F.2d 384 (D.C. Cir. 1976) ("*AT & T I*")—was "on point and establishe[d] that the Committee has standing to enforce its duly issued subpoena through a civil suit."  *Id*. at 68.  Noting that general subpoena enforcement disputes are common in federal courts, Judge Bates further concluded that "this sort of dispute is traditionally amenable to judicial resolution and consequently justiciable[,]" *id.* at 68, 71, and that "courts have entertained subpoena enforcement actions (or motions to quash subpoenas) where the political branches have clashed over congressional subpoenas[,]" *id.* at 71; *see also id*. at 70 (explaining that "the [Supreme] Court has never held that an institution, such as the House of Representatives, cannot file suit to address an institutional harm").

Turning next to the Executive branch's contentions regarding the lack of a cause of action, Judge Bates found that, through the Declaratory Judgment Act, the Judiciary Committee could enforce the House's constitutional "'power of inquiry[,]'" and that the

17

associated "'process to enforce'" that constitutional interest was "'an essential and appropriate auxiliary to the legislative function.'" *Id.* at 75 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927)). Judge Bates also concluded that the Judiciary Committee had a limited "implied cause of action . . . to seek a declaratory judgment concerning the exercise of its subpoena power[,]" which derived from the House's Article I legislative functions. *Id.* at 95.

With respect to whether the court should exercise its equitable discretion and thus decline to decide the parties' dispute based on separation-of-powers concerns, Judge Bates rejected "the contention that judicial intervention in this arena at the request of Congress would be unprecedented in the nation's history[,]" *id.* at 95–96, and also found that, because the Judiciary is the ultimate arbiter when it comes to claims of executive privilege, declining to consider the case would be more harmful to the balance of powers between the three Branches than deciding the case, *see id.* at 96. Judge Bates further dismissed the Executive branch's argument that a ruling would open the floodgates of litigation, noting that the possibility for such litigation has existed since the Nixon era. *See id.*

Having resolved the threshold issues, Judge Bates then turned to the merits of the case. *See id.* at 99. He "reject[ed] the Executive's claim of absolute immunity for senior presidential aides" and began his discussion of such immunity by noting that "[t]he Executive cannot identify a single judicial opinion that recognizes absolute immunity for senior presidential advisors in this or any other context." *Id.* Judge Bates explained that the Supreme Court's decision in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)—in which the Court rejected absolute immunity for Executive aides in the

context of civil lawsuits seeking monetary damages, except possibly where the aides were involved in the areas of national security or foreign policy—"virtually foreclosed" the absolute testimonial immunity argument that the defendants were advancing. *Id.* at 100. And Judge Bates found it telling that "the only authority that the Executive can muster in support of its absolute immunity assertion are two OLC, which he found to be "for the most part[,] conclusory and recursive." *Id.* at 104.[6] Thus, Judge Bates declared that Miers was not immune from compelled congressional process, and therefore, was legally required to "appear before the Committee to provide testimony, and invoke executive privilege where appropriate." *Id.* at 106; *see also id.* at 108.

The coda to the *Miers* case is that the Executive branch appealed Judge Bates's decision, but the parties reached a settlement, and the Executive branch subsequently dismissed its appeal. Notably, as an explicit condition of the settlement agreement, the Executive branch agreed not to request that Judge Bates vacate or set aside his opinion. *See* Letter from Irvin B. Nathan to Michael F. Hertz (Mar. 5, 2009), *Comm. on Judiciary, U.S. House of Representatives v. Miers*, No. 08-cv-0409, ECF No. 68-1, at 8–9 (Oct. 22, 2019). Consequently, the *Miers* Memorandum Opinion and Order remained in effect, and as it turns out, that case represents the only definitive legal ruling on the question of whether senior-level presidential aides are absolutely immune to compelled congressional process between 2008 and the present.

---

[6] Judge Bates went on to consider and reject a claim of qualified immunity for Miers, an argument that is not made in the instant case. *Miers*, 558 F. Supp. 2d at 105.

## C.    Procedural History

Despite *Miers*, the Judiciary Committee and the White House found themselves at a subpoena-related impasse once again, when, on May 20, 2019, President Trump directed Don McGahn not to appear before the Judiciary Committee, as previously described.  The Judiciary Committee filed the instant lawsuit on August 7, 2019, and it asserts a single cause of action: "Article I of the Constitution[.]"  (Compl. at 52.)  Just as in *Miers*, the Committee in the instant case claims that "[t]here is no lawful basis for McGahn's refusal to appear before the Judiciary Committee" (*id.* ¶ 110); that he "enjoys no absolute immunity from appearing before the Judiciary Committee" (*id.* ¶ 111); and that "McGahn has violated . . . his legal obligations by refusing to appear before the Judiciary Committee . . . [and] by refusing to answer questions where there has been no assertion of executive or other privilege or where executive privilege has been waived" (*id.* ¶ 113).  The Committee also alleges that, with respect to McGahn's testimony in particular, "[t]he President has waived executive privilege as to the subpoenaed testimony that relates to matters and information discussed in the [Mueller] Report."  (*Id.* ¶ 112.)  As a remedy for these alleged violation, the Judiciary Committee specifically asks this Court to award the following declaratory and injunctive relief:

1. Declare that McGahn's refusal to appear before the Committee in response to the subpoena issued to him was without legal justification;

2. Issue an injunction ordering McGahn to appear and testify forthwith before the Committee; and

3. Issue an injunction ordering McGahn to testify as to matters and information discussed in the Special Counsel's Report and any other matters and information over which executive privilege has been waived or is not asserted.

(*Id.* at 53.)

On August 26, 2019, almost three weeks after it filed the complaint, the Judiciary Committee filed a motion that requested a preliminary injunction or, alternatively, expedited partial summary judgment. (*See* Pl.'s Mot.) The parties subsequently agreed to have the Court treat this motion as one seeking expedited partial summary judgment. (*See* Min. Order of Sept. 3, 2019.)[7] The Judiciary Committee and DOJ then negotiated a schedule for the briefing of legal issues related to whether this Court has jurisdiction to declare that McGahn's refusal to appear is unlawful and to compel him to appear before the Committee—i.e., the first two prongs of the Committee's request for relief (*see* Def.'s Mot.; Reply in Supp. of Pl.'s Mot. and Opp'n to Def.'s Mot. ("Pl.'s Reply"), ECF No. 37; Reply in Supp. of Def.'s Mot. ("Def.'s Reply"), ECF No. 40))—and the parties also briefed the merits of the question of the validity of DOJ's claim of absolute testimonial immunity. Importantly, the issue of whether McGahn must answer any particular question that the Judiciary Committee poses and/or whether executive privilege applies to the answers McGahn might be compelled to give with respect to questions about the Mueller Report or otherwise (i.e., the third prong of the Committee's request for relief) is not currently before this Court.

In its motion for summary judgment, the Judiciary Committee relies heavily on Judge Bates's decision in *Miers*, and argues that this Court has subject-matter jurisdiction over the claims raised in the complaint by virtue of 28 U.S.C. § 1331. (*See* Pl.'s Mem. at 33).) The Judiciary Committee also asserts that it has standing to bring

---

[7] As mentioned previously, although the Judiciary Committee has named McGahn individually as the sole defendant in this lawsuit, DOJ is representing McGahn in the context of the instant case, and its arguments are made on behalf of the Executive branch.

this lawsuit (*see id.* at 33–35), and that Article I of the Constitution and the Declaratory Judgment Act provide it with the means to vindicate its right to enforce the subpoena (*see id.* at 35–36). The Judiciary Committee further maintains that "[t]his case is justiciable and appropriate for this Court's review" even though it arises from a conflict between the two political branches of the federal government. (*Id.* at 36–37.) With respect to the merits of the contention that McGahn has absolute testimonial immunity, the Judiciary Committee argues that there is no support for such a claim anywhere in the caselaw (*see id.* at 39–45), and that McGahn must instead appear before the Judiciary Committee (*see id.* at 54).

DOJ's cross-motion responds that *Miers* was "wrongly decided" and that "[t]his Court should not repeat [Judge Bates's] errors." (Def.'s Mot. at 48.) It argues, as a threshold matter, that this Court lacks subject-matter jurisdiction over the Judiciary Committee's complaint, both because this type of inter-branch political dispute is not one that courts have traditionally adjudicated in light of separation-of-power principles (*see id.* at 32–33; *see also id.* at 40 (arguing that "[s]uits of this kind threaten the separation of powers and its system of checks and balances that has served the Nation well for 230 years"), and because the Judiciary Committee lacks a cognizable injury for standing purposes (*id.* at 36–37). DOJ further maintains that neither 28 U.S.C. § 1331 nor any other statute vests this Court with statutory subject-matter jurisdiction over the Judiciary Committee's complaint (*see id.* at 43–46), and likewise, that no substantive cause of action exists that allows the Judiciary Committee to sue in federal court to

enforce its subpoena (*see id.* at 52–56).[8]  Regarding the merits of the dispute, DOJ references OLC opinions and contends that the President is absolutely immune from providing compelled testimony to Congress.  *See id.* at 60, 63.  Moreover, as a derivative matter, DOJ argues that the President's immediate advisors—whom DOJ calls his "alter egos"—enjoy this same absolute testimonial immunity.  (*See id.* at 64–66.)  DOJ further maintains that current and former White House Counsels are the kinds of immediate advisors who are covered by this blanket immunity.  (*See id.* at 68–71.)

This Court held a motions hearing on the parties' cross-motions for summary judgment on October 31, 2019.  (*See* Min. Entry of Oct. 31, 2019.)

## III.  LEGAL STANDARDS

### A.  Cross-Motions For Summary Judgment Under Federal Rule of Civil Procedure 56

The Federal Rules of Civil Procedure provide the procedural parameters for the Court's consideration of the motions that the parties have presented in this case. Federal Rule of Civil Procedure 56 requires a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In general, this means that the movant must demonstrate that there are no triable issues of fact in the case, such that the court can determine the outcome as a matter of law.  Thus, in a typical

---

[8]  DOJ's brief also contends that this Court should exercise its equitable discretion to refrain from adjudicating this dispute based on separation-of-powers concerns, and should instead allow the inter-branch accommodation process to play out to its conclusion.  (*See* Def.'s Mem. at 56–57).  However, in response to a Notice that the Judiciary Committee filed on October 29, 2019, notifying the Court that the parties had reached an impasse (*see* ECF No. 41), DOJ expressly withdrew its accommodations argument (*see* Def.'s Resp. to Pl.'s Notice Regarding Status of Accommodation Process ("Def.'s Accommodation Resp.", ECF No. 42, at 2).

23

case, the Rule 56 question is whether the moving party has met its burden of demonstrating the absence of a genuine dispute as to any material fact, or whether there is a genuine issue of fact that will need to be resolved at trial. *See, e.g.*, *Hoyte v. District of Columbia*, No. 13-cv-569, 2019 WL 3779570, at *7 (D.D.C. Aug. 12, 2019) (denying in part cross-motions for summary judgment because there were genuine disputes of material fact and allowing certain claims to "proceed to trial").

The instant matter presents a different scenario. In this case, neither party suggests that there are material questions of fact that must be decided by a jury. Instead, it is understood and undisputed that the question of whether or not the Constitution empowers one of the branches of government "to act in a certain way is a pure question of law[.]" *Ctr. for Biological Diversity v. McAleenan*, No. 18-cv-0655, 2019 WL 4228362, at *8 (D.D.C. Sept. 4, 2019) (quotation marks and citation omitted). In such a circumstance, this Court is not concerned about the evidence pertaining to facts; rather, it must review and resolve the conflict between the parties regarding their respective interpretations of the law. A court reviewing a question of law on cross-motions for summary judgment decides the legal issues presented and grants summary judgment to the party who, based on the court's conclusions, is entitled to judgment as a matter of law.

### B.    Common Law Adherence To Precedent

In addition to applying the Federal Rules of Civil Procedure, this Court also relies on a basic juridical norm that is applicable to the legal issues presented in this case. "Under the principles of the American system, common law jurisprudence serves as the source of background legal principles for judicial interpretation." Andrew C. Spiropoulos, *Just Not Who We Are: A Critique of Common Law Constitutionalism*, 54

24

Vill. L. Rev. 181, 183 (2009).  In this regard, it is clear beyond cavil that judges should "abide by former precedents, where the same points come again in litigation[.]"  1 William Blackstone, Commentaries *69; *see also Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2036 (2014) (noting that following precedent is "a foundation stone of the rule of law").

This "rule of adherence to judicial precedents finds its expression in the doctrine of stare decisis[,]" which is Latin for "to stand by things decided."  *Stare Decisis*, Black's Law Dictionary (11th ed. 2019) (quotation marks and citation omitted).  This doctrine provides that, "'when a point or principle of law has been once officially decided or settled by the ruling of a competent court in a case in which it is directly and necessarily involved,'" then that legal principle "'will no longer be considered as open to examination or to a new ruling by the same tribunal, or by those which are bound to follow its adjudications, unless it be for urgent reasons and in exceptional cases.'"  *Id.* (quoting William M. Lile et al., Brief Making and the Use of Law Books 321 (Roger W. Cooley & Charles Lesley Ames eds., 3d ed. 1914)); *see also Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2409 (2015) (explaining that, under the doctrine of stare decisis, "today's Court should stand by yesterday's decisions").  The vertical form of stare decisis—as between higher and lower courts within the same jurisdiction—is well known and generally accepted, but stare decisis also exists in horizontal form, and applies to courts of equal rank that are within, or outside, the same jurisdiction.  *See* Richard W. Murphy, *Separation of Powers and the Horizontal Force of Precedent*, 78 Notre Dame L. Rev. 1075, 1085–86 (2003).  Notably, however, where a prior on-point precedent is not binding, stare decisis doctrine does not compel a court to follow a prior

decision that it believes erroneous; in that circumstance the later court should confront

the prior case and "correct the error." *Gamble v. United States*, 139 S. Ct. 1960, 1984

(2019) (Thomas, J., concurring); *see also Hart v. Massanari*, 266 F.3d 1155, 1170 (9th

Cir. 2001) (explaining that it would be "bad form to ignore contrary authority by failing

even to acknowledge its existence").  And while the stare decisis doctrine is "not an

inexorable command," it generally is the "preferred course because it promotes the

evenhanded, predictable, and consistent development of legal principles, fosters

reliance on judicial decisions, and contributes to the actual and perceived integrity of

the judicial process." *Payne v. Tennessee*, 501 U.S. 808, 827–28 (1991).

It is interesting to note that the doctrine of stare decisis performs a limiting

function that reflects the foundational principles that undergird the federal

government's tripartite constitutional system.  This is because deciding a legal issue

anew each time that same question is presented, without any reference to what has been

done before, nudges a court outside of its established domain of "say[ing] what the law

is[,]" *Marbury*, 5 U.S. at 177, and into the realm of legislating what the law should be,

*see Gamble*, 139 S. Ct. at 1983 (Thomas, J., concurring) (asserting that "even common-

law judges did not act as legislators, inserting their own preferences into the law as it

developed").  Commentators have noted that such an unconstrained evolution in legal

decision-making can undermine faith in the judicial system by creating the impression

that judges are improperly enforcing their own "private sentiments" rather than working

within a structured system in which similarly situated parties are treated similarly.  1

William Blackstone, Commentaries *69.  It might also result in the Judiciary

improperly enhancing its own powers to the detriment of the other branches.  *See*

Murphy, *supra*, at 1101 (explaining that "[o]ne theme to be found in [the Framers'] remarks is that adherence to precedent forestalls the accumulation of arbitrary power in the courts—which is also a primary function of separation of powers").

### C.   Subpoena-Related Rights, Duties, Privileges, And Immunities

Finally, in analyzing the arguments and issues that have been presented in this case, this Court draws from the well-established substantive legal standards that pertain to subpoenas generally, both those that apply in the context of standard civil cases that involve the issuance of subpoenas by parties seeking information and also those that House committees issue in the course of congressional investigations. As it turns out, a general sense of such subpoena-related standards provides a helpful key to understanding many of this Court's legal conclusions. For example, it is important to understand that subpoenas are creatures of law, that these instruments have particular legal significance, and that court orders are typically provided to enforce them. Such realizations shed substantial light on the reasons why this Court has rejected DOJ's contentions regarding the subpoena dispute at bar.

In Latin, the term "subpoena" means "under penalty." *Subpoena*, Black's Law Dictionary (11th ed. 2019). Simply put, a subpoena is a written mandate (also sometimes known as "a writ") that creates a legally enforceable procedural obligation to produce or provide documents or testimony, and it does so through an appeal to some authoritative body's power to sanction noncompliance. *See* William Mark Ormrod, *The Origins of the* Sub Pena *Writ*, 61 Hist. Research 11, 11, 16 (1988); *see also* Frederic W. Maitland, Equity, also, the Forms of Action at Common Law 5 (1909) (noting that the writ was so named "because it orders the man to appear upon pain of forfeiting a sum of money, *e.g. subpoena centum librarum*"); Oliver Wendell Holmes, *Early English*

*Equity*, 1 L. Quart. Rev. 162, 162 n.2 (1885) (noting that, at common law, the penalty for failing to comply with a subpoena "was usually money, but might be life and limb").[9]  To be properly issued, a subpoena must be imposed by an authorized person or entity.  *See* Arthur R. Miller, 9A Federal Practice and Procedure § 2451 (3d ed.).  In essence, one who has the authority to issue a subpoena possesses the right to obligate another person to provide testimony and/or documents—i.e., the issuer can mandate the performance of another with respect to the production of such information.  *See Universal Airline v. E. Air Lines*, 188 F.2d 993, 999 (D.C. Cir. 1951) (explaining that "[t]he function of the subpoena is to compel" the production of documents or the provision of testimony).  Moreover, because subpoenas operate by compulsion, an authorized issuer of a valid subpoena also has the right to enforce the production obligation that a subpoena creates, consistent with the law.  *See, e.g.*, *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, No. 13-cv-1053, 2019 WL 5864595, at *2 (D.D.C. Nov. 8, 2019); *BuzzFeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347, 364–65 (D.D.C. 2018).

---

[9]  The historical roots of the concept of a "subpoena" go back to the times of ancient Rome and Athens.  "[I]n the Athenian court, the witnesses who were summoned to attend the trial had their choice of three things:  either to swear to the truth of the fact in question, to deny or abjure it, or else to pay a fine of a thousand drachmas."  3 William Blackstone, Commentaries *369.  Later, with respect to old English common law, historians have noted that "[t]he specific use of the *sub pena* clause in writs summoning men before [the Privy] council and Chancery probably . . . developed out of administrative orders used in the first half of the fourteenth century."  William M. Ormrod, *The Origins of the* Sub Pena *Writ*, 61 Historical Research 11, 16 (1988).  Fast forwarding a few decades, to the 1380s, the "writ of *subpoena*" was introduced by John Waltham, Chancellor to King Richard II.  3 William Blackstone, Commentaries *52; *see also* Erasmus Darwin Parker, *The Origin and History of the Chancery Division*, 29 L. Mag. Rev. 164, 170 (1904) (explaining that, before the creation of the writ of subpoena, other writs "threatened punishment for disobedience in indefinite terms," but the writ of subpoena involved "the substitution of a definite for an indefinite penalty").  By the 1450s, "the process by bill and *subpoena* [had] become the daily practice of the court."  3 William Blackstone, Commentaries *53; *see also id.* at *369 (noting that "[t]his compulsory process, to bring in unwilling witnesses, and the additional terrors of an attachment in case of disobedience, [was] of excellent use in the thorough investigation of truth").

Consequently, a valid subpoena carries with it at least two legally recognized rights: (1) the right to direct the performance of another with respect to the production of documents and testimony, and (2) the right to enforce the performance obligation that is so imposed. For his part, the recipient of a valid subpoena has a presumptive duty to perform in accordance with the subpoena's requirements. *See, e.g.*, *GFL Advantage Fund, Ltd. v. Colkitt*, 216 F.R.D. 189, 194–96 (D.D.C. 2003) (granting a motion to compel compliance with a subpoena where the material sought by the subpoena was not privileged and the subpoena was not overbroad or issued for improper purposes). These well-established rights and duties are, of course, what distinguishes a subpoena from the requests for voluntary production of documents, testimony, or tangible things that typically precede a the issuance of a subpoena.

1.     Subpoenas In Standard Civil Actions

In the typical civil case, an attorney acting on behalf of a party and as an officer of the court can secure information for use in an existing federal lawsuit by issuing a subpoena to the custodian of the records or to the person from whom testimony is sought. *See* Fed. R. Civ. P. 45. Although private parties ordinarily do not have the authority to mandate others' performance, with respect to subpoenas the right to compel the recipient to provide documents and/or testimony derives from the Article III power of the court that is presiding over the underlying case. Indeed, the party issues its subpoenas in the name of the court, and typically does so after unsuccessful negotiations over a requested voluntary production. And, ultimately, whatever the status of the negotiations over the requested information, the party's issuance of an enforceable subpoena triggers a legal duty on the part of the recipient to perform in accordance with the subpoena, by providing the requested testimony and/or materials.

These rights and duties operate as a matter of law—that is, in the ordinary course, without a court's intervention—during the pretrial, preparatory phase of a civil case. A subpoena-enforcement legal action only becomes necessary if the recipient refuses to provide documents or testimony despite having received a subpoena. *See* Fed. R. Civ. P. 45(g) (authorizing a court to hold in contempt "a person who, having been served, fails without adequate excuse to obey the subpoena"). In that circumstance, under the Federal Rules of Civil Procedure, the subpoena's issuer can file a separate civil lawsuit in the district court in which compliance has been mandated, *see, e.g.*, *Fairholme Funds*, 2019 WL 5864595, at *2, and in the context of that lawsuit, a federal judge determines various legal issues pertaining to the enforceability of the subpoena and disputed scope of the required response. Common legal issues are those that pertain to the validity of the subpoena—e.g., whether the issuer was actually authorized to issue subpoenas, and whether this particular subpoena contains the necessary terms to give rise to an enforceable duty to perform—and also the extent of the recipient's duty to respond. *See, e.g.*, *Truex v. Allstate Ins. Co.*, No. 05-mc-0439, 2006 WL 241228, at *1 (D.D.C. Jan. 26, 2006) (denying an issuer's motion to compel performance where the subpoena at issue was invalid); *Weiss v. Mentor Corp.*, No. 92-mc-0203, 1992 WL 235889, at *2 (D.D.C. July 10, 1992) (evaluating claim of attorney work product privilege in the context of a motion to compel compliance with a subpoena).

Significantly for present purposes, if a subpoena is valid and the recipient is not otherwise privileged to ignore it, then *some* response is due by ordinary operation of the law. Put another way, as explained above, a valid subpoena ordinarily gives rise to a

legally enforceable duty to perform in the requested manner.  And a court order is the well-established mechanism for the enforcement of that obligation:  if the court finds that the recipient has breached the duty to perform that the subpoena creates, it issues an order that compels the recipient to comply with the subpoena.  *See, e.g.*, *In re Denture Cream Prod. Liab. Litig.*, 292 F.R.D. 120, 129 (D.D.C. 2013) (granting in part motion to compel compliance with a subpoena and requiring the corporations involved to produce business records).  Moreover, in deciding whether the subpoena-enforcement claim at issue is properly before it, the court usually does not inquire as to whether or not the subpoena's issuer had other ways to get the requested information.  Rather, assuming that the subpoena-enforcement claim is properly before it (because a party with standing seeks resolution of the subpoena dispute in the correct venue with respect to an existing federal case), the court that is called upon to review a subpoena-enforcement dispute resolves the legal issues that are raised by the claims presented.

It is also important to recognize that the question of whether or not the recipient of a subpoena has to disclose, or may withhold, the *particular* information that the subpoena requests is entirely distinct from the question of whether the recipient of a subpoena has the legally enforceable duty to perform in response to a subpoena at all.  As a general matter, the disclosure-of-information issue will be determined by the court based on its assessment of whether the documentary information that the subpoena requests, or the answers to the particular questions that a subpoenaed witness will be asked, can be withheld as subject to an applicable privilege, or whether the subpoena is improper for other reasons, such as overbreadth or undue burden.  In standard civil cases, common law privileges such as the attorney-client privilege, the attorney work-

31

product privilege, and the marital privilege are often invoked to withhold subpoenaed information, and the privileged information is omitted from the testimony and/or redacted from the documents at issue. *See, e.g.*, *BuzzFeed, Inc.*, 318 F. Supp. 3d at 361–62 (assessing whether information sought by subpoena was protected by the federal law enforcement privilege); *GFL Advantage Fund*, 216 F.R.D. at 194–95 (evaluating whether subpoenaed materials were covered by the attorney-client privilege); *Weiss*, 1992 WL 235889, at *2 (considering a work-product privilege objection to producing subpoenaed materials). The Constitution establishes other privileges that can attach to prevent certain disclosures. *See, e.g.*, *United States Sec. & Exch. Comm'n v. Brown*, No. 09-cv-1423, 2010 WL 11602637, at *1–2 (D.D.C. Sept. 29, 2010) (evaluating whether production of documents would violate an individual's Fifth Amendment right against self-incrimination).

By contrast, it is relatively rare for the law to recognize an "immunity" to compulsory legal process—i.e., the right of the recipient of a valid subpoena to decline to produce *any* documents or provide *any* testimony. In effect, such an immunity is enormously powerful, because it operates to nullify the legal obligation to perform that a valid subpoena creates. The sole immunity to compulsory process that DOJ specifically identifies in its briefs, outside of the instant context, is the Constitution's Speech and Debate Clause. (*See* Def's Mot. at 68.) Article I provides that, with respect to "any Speech or Debate in either House," any U.S. Senator or Representative "shall not be questioned in any other Place[.]" U.S. Const. art. I, § 6, cl. 1. The Supreme Court has interpreted this provision to immunize members of Congress and their aides from having to appear and to provide testimony regarding "anything generally done in a

32

session of the House by one of its members in relation to the business before it."
*Gravel v. United States*, 408 U.S. 606, 624 (1972) (internal quotation marks and citation omitted).

      2.      Legislative Subpoenas

    Legislative subpoenas that are issued by congressional committees in the course of investigations derive from the Article I authority of the Congress, rather than the Article III auspices of the federal courts. It is reasonably clear that "legislative subpoenas are older than our country itself[,]" *Trump v. Mazars USA, LLP*, 940 F.3d 710, 718 (D.C. Cir. 2019); moreover, and the power of committees of the House of Representatives to conduct investigations that involve issuing subpoenas to witnesses for documents and testimony is similarly well established, *see Watkins v. United States*, 354 U.S. 178, 187–95 (1957); *see also Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 504–05 (1975); *Barenblatt v. United States*, 360 U.S. 109, 111–12 (1959); *Quinn v. United States*, 349 U.S. 155, 160 (1955); *Sinclair v. United States,* 279 U.S. 263, 291 (1929), *overruled on other grounds by United States v. Gaudin*, 515 U.S. 506 (1995).[10] The duty of the recipient of a valid legislative subpoena to respond to that authorized call of action for the good of the country is also indisputable. In this regard, the Supreme Court has stated that "persons summoned as witnesses by competent authority have certain minimum duties and obligations which are necessary concessions to the public interest in the orderly operation of legislative and judicial machinery[,]" *United*

---

[10] Even before the ratification of the Constitution in 1787, "[t]he colonial assemblies, like the House of Commons, very early assumed, usually without question, the right to investigate . . . [and] [t]hese investigations were sometimes conducted by the House itself and sometimes by committees clothed with authority to send for 'persons, papers, and records.'" C. S. Potts, *Power of Legislative Bodies to Punish for Contempt*, 74 U. Pa. L. Rev. 691, 708 (1926).

*States v. Bryan*, 339 U.S. 323, 331 (1950), and has further noted that the Court itself has "often iterated the importance of this public duty, which every person within the jurisdiction of the Government is bound to perform when properly summoned" *id*. Indeed, the Supreme Court has specifically stated, in the most direct and eloquent terms, that "[i]t is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. It is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation." *Watkins*, 354 U.S. at 187–88. Thus, for all intents and purposes, legislative subpoenas give rise to the same rights (i.e., the right to compel the performance of another and the right of enforcement) and the same duties (i.e., the obligation to respond in the absence of a privilege) that exist in the civil action context.

It should come as no surprise that the rights and duties that attach when a duly authorized committee of Congress issues a subpoena are ordinarily reverentially observed, or that subpoena-backed requests for information to be provided to the House in the context of its Article I investigations have traditionally been respected, consistent with core democratic and constitutional norms. *See*, *e.g.*, *Mazars*, 940 F.3d at 721 (noting that, in response to a legislative request for information during the investigation of "the Iran-Contra Affair, including the role of the President," President Ronald Reagan "declined to assert executive privilege, going so far as to furnish relevant excerpts of his personal diaries to Congress" (internal quotation marks and citation omitted)); *see also* Letter from Tobias Lear, Sec'y to the President, to Henry Knox, Sec'y of War (April 4, 1792) (on file with the Library of Congress) (communicating to

34

Secretary Knox that he "will lay before the House of Representatives such papers, from [his] department, as are requested by the enclosed resolution," which empowered a House committee "to inquire into the causes of the failure of the late expedition under Major General St. Clair . . . [and] to call for such persons, papers, and records, as may be necessary to assist their inquiries."). Moreover, when disputes over congressional subpoenas do arise, the conflict is typically resolved through negotiations between House committee representatives and the person or persons to whom the subpoena is directed—a process commonly known as "accommodation"—and, thus, committees of Congress rarely have had to resort to the implementation of enforcement mechanisms. *See Mazars*, 940 F.3d at 721 ("Presidents, too, have often been the subjects of Congress's legislative investigations, though fewer of these have required judicial intervention"); *see*, *e.g.*, *id.* at 721–22 ( "Thanks to a last-minute compromise between the White House and the Senate, the courts were kept out of a dispute" over whether a select committee investigating "the Whitewater land deal and related matters" during the Clinton administration "could subpoena meeting notes taken by President Clinton's former lawyer").

That said, enforcement comes with the territory, as explained above. It is generally accepted that the Legislature has at its disposal additional means of enforcing its subpoenas as compared to those that are available to private parties who impose duties to perform by issuing subpoenas in the context of civil cases. *See Eastland*, 421 U.S. at 504–05. Those additional tools include the power of inherent contempt. *See Watkins*, 354 U.S. at 216 (citing *Anderson v. Dunn*, 19 U.S. 204 (1821)). "[T]he long dormant inherent contempt power permits Congress to rely on its own constitutional

authority to detain and imprison [one who defies a subpoena and is found in contempt] until the individual complies with congressional demands." *See* Todd Garvey, Congressional Research Service, RL 34097, *Congress's Contempt Power and the Enforcement of Congressional Subpoenas: Law, History, Practice, and Procedure* 1 (May 12, 2017); *see also id*. at 10 (explaining that "[u]nder the inherent contempt power[,] the individual is brought before the House or Senate by the Sergeant-at-Arms, tried at the bar of the body, and can be imprisoned or detained in the Capitol or perhaps elsewhere"). Congress can also issue a contempt citation, and then certify this finding to the Executive branch for potential criminal prosecution. *See* 2 U.S.C. §§ 192, 194. DOJ has also traditionally accepted that a committee of Congress can rely on the standard enforcement mechanism that is available to others who issue valid and legally enforceable subpoenas: it can bring a civil action in federal court. *See Response to Cong. Requests for Info. Regarding Decisions Made Under the Indep. Counsel Act*, 10 Op. O.L.C. 68, 87 (1986) ("The most likely route for Congress to take would be to file a civil action seeking enforcement of the subpoena."); *see also Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 137 & n.36 (1984).

Notably, on those occasions when legislative subpoena disputes have been brought to court, the related civil actions involve the same questions about relevance, subpoena validity, the allegedly privileged nature of the material requested, and the purported immunity of the recipient as courts consider in other cases of this kind. *See, e.g.*, *Mazars*, 940 F.3d at 732–40 (assessing whether legislative subpoena was valid and whether documents sought were relevant to the underlying congressional investigation);

*Senate Select Comm. on Ethics v. Packwood*, 845 F. Supp. 17, 21–23 (D.D.C. 1994) (evaluating whether compliance with a legislative subpoena would violate an individual's Fourth and Fifth Amendment rights).

## IV.    ANALYSIS

In this case, the fact that duly authorized committees of Congress have the power to issue enforceable legislative subpoenas pursuant to Congress's authority to conduct oversight investigations under Article I of the Constitution is not in dispute.  That is, DOJ does not appear to challenge the Judiciary Committee's compulsory process power, as a general matter.  Instead, here as in *Miers*, DOJ contends that, nevertheless, the President can selectively block any House committee's exercise of its subpoena-related rights with respect to certain persons who qualify as the President's "alter egos"— namely, current and former senior-level presidential aides—because, in DOJ's view, such persons are absolutely immune from compelled congressional process.  (*See, e.g.*, Def.'s Mot. at 64.)  DOJ argues further that House committees cannot file lawsuits in federal court to seek enforcement of subpoenas that have been issued to aides whom the President has ordered not to testify (*id.* at 52–59), and that, in any event, the federal courts have no subject-matter jurisdiction to review any subpoena-enforcement action that a House committee files if a senior-level presidential aide does not respond as directed (*see id.* at 31–52).

Setting aside the implications of these arguments for the law that governs subpoenas generally (*see supra* Part III.C), it is important to recognize that DOJ's contentions rely on basic assumptions about the relative power of the three branches of the federal government under our constitutional scheme.  Indeed, as DOJ describes it,

37

the Constitution of the United States strictly segregates the power of the federal government and sets its branches in perfect equipoise—i.e., the Legislature, the Executive, and the Judiciary are entirely distinct, completely independent, and unfailingly co-equal (a dynamic that DOJ calls "the separation of powers")—and this constitutional construct is such a driving force behind DOJ's legal analysis that other foundational tenets of the Constitution, as well as the widely accepted common law principles that pertain to subpoenas and subpoena enforcement, are cast aside.

For example, notwithstanding the background fact that federal courts routinely adjudicate subpoena-related disputes in the context of civil actions, DOJ vigorously asserts that federal courts lack subject-matter jurisdiction to adjudicate subpoena-related disputes that arise between Congress and the Executive branch. (*See* Hr'g Tr. at 75:17–18 (DOJ counsel asserting that the federal courts "absolutely have th[e] authority [to say what the law is] in any case or controversy under Article III" but "[t]his just isn't one").) DOJ also insists that, despite the fact that ordinary citizens bring subpoena-enforcement claims in the federal courts all the time, duly authorized committees of the House of Representatives cannot proceed against the Executive branch in court to seek enforcement of subpoenas for testimony and information issued to recalcitrant government officials in the context of congressional investigations. (*See id.* at 74:5–7 ("I'm making the argument that the Constitution does not allow . . . the House and the Executive Branch to sue each other in court[.]").) Meanwhile, says DOJ, the President has the authority to make unilateral determinations regarding whether he and his senior-level aides (both current and former) will respond to, or defy, the subpoenas that authorized House committees issue during constitutionally authorized

investigations of potential wrongdoing within his administration. (*See id.* at 125:3–6 (counsel asserting that "if the person has testimonial immunity, and the President has asserted it, not the person—it's the President's to assert—then, yes, [Congress] wouldn't be able to compel the person").[11]

Unfortunately for DOJ, and as explained fully below, these contentions about the relative power of the federal courts, congressional committees, and the President distort established separation-of-powers principles beyond all recognition. Thus, ultimately, the arguments that DOJ advances to support its claim of absolute testimonial immunity for senior-level presidential aides transgress core constitutional truths (notwithstanding OLC's persistent heralding of these and similar propositions). By contrast, textbook constitutional law readily reveals that, precisely because the Constitution bestows upon the Judiciary the power to demarcate the boundaries of lawful conduct by government officials, the federal courts have subject-matter jurisdiction to entertain subpoena-enforcement disputes concerning legislative subpoenas that have been issued to Executive branch officials. It is similarly well established that, because the Constitution vests the Legislature with the power to investigate potential abuses of official authority—when necessary to hold government officials (up to, and including, the President) accountable, as representatives of the People of the United States—then House committees have both Article III standing and a cause of action to pursue judicial enforcement of their duly authorized and legally enforceable requests for information. What is missing from the Constitution's framework as the Framers envisioned it is the

---

[11] For a similar vantagepoint, see the circumstances described by George Orwell in the acclaimed book *Animal Farm*. *See* George Orwell, *Animal Farm* 141 (Otbe Book Publishing 2018) ("All animals are equal but some animals are more equal than others.") (capitalization altered).

President's purported power to kneecap House investigations of Executive branch operations by demanding that his senior-level aides breach their legal duty to respond to compelled congressional process.

Luckily for this Court, an existing precedent that is on all fours with the instant matter (*Miers*) already systematically dismantles the edifice that DOJ appears to have erected over the years to enshrine the proposition that a President's senior-level aides have absolute immunity with respect to legislative subpoenas that Congress issues in the course of its investigations; *Miers* does this by squarely refuting each of the threshold and merits arguments that DOJ seeks to advance in the instant case. This Court finds *Miers*'s analysis compelling (albeit, admittedly, not controlling) and, consistent with stare decisis principles, the Court adopts Judge Bates's precedential reasoning herein, where referenced in the discussion below. Consequently, the Court cannot accept DOJ's present reliance on carefully curated rhetoric concerning historical accommodations practices. Nor can it abide DOJ's less-than-subtle suggestion that, under our constitutional scheme, the Legislature and the Judiciary are both hopelessly stymied when it comes to addressing alleged abuses by the Executive branch, such that, ultimately, the President wields virtually unchecked power.

Instead, with deference to the Supreme Court's foundational pronouncements of law concerning the intended intersectionality of our separate and co-equal branches of government, *see, e.g.*, *INS v. Chada*, 462 U.S. 919, 951 (1983); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *Marbury*, 5 U.S. at 176–77, this Court reiterates *Miers*'s well-sourced and thoroughly explained bottom-line conclusion: that, as a matter of law, senior-level current and former

40

presidential aides, including White House Counsels, must appear before Congress if compelled by legislative process to do so. This means that such aides cannot defy a congressional subpoena on the basis of absolute testimonial immunity, even if the President for whom they work (or worked) demands that response.

A. **Federal Courts Have The Power To Adjudicate Subpoena-Related Disputes Between Congress And The Executive Branch**

In the *Miers* case, DOJ "concede[d]" that "28 U.S.C. § 1331 provides subject matter jurisdiction" over the Judiciary Committee's subpoena-enforcement lawsuit, a conclusion with which Judge Bates agreed. *Miers*, 558 F. Supp. 2d at 64. *Miers* also rejected DOJ's jurisdictional claim that "this dispute is not one traditionally thought to be amenable to judicial resolution[,]" *id.* at 67, and that, therefore, the House's subpoena-enforcement claim should not be permitted to proceed, *id.* at 71–73. In this regard, the *Miers* opinion stands for the proposition that courts have federal question jurisdiction over subpoena enforcement disputes between the Legislature and the Executive branch, and that such disputes are justiciable, regardless of the fact that the other two branches of government occupy places on the opposite side of the "v" in the case caption. This Court agrees with *Miers*'s analysis and conclusions for the reasons that follow in this section of this Memorandum Opinion, as well as those in Part IV.B.

1. Federal Courts Routinely Exercise Subject-Matter Jurisdiction Over Subpoena-Enforcement Claims Under 28 U.S.C. § 1331

Federal courts are courts of limited jurisdiction, *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), which means that their power to adjudicate legal disputes must be affirmatively established by law. As a general matter, under section 1331 of Title 28 of the United States Code, federal courts have statutory authority to entertain legal claims that arise under the Constitution and the laws of the United States. *See*

41

*Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 (2006) (explaining that "[a] plaintiff properly invokes § 1331 jurisdiction when she pleads a colorable claim 'arising under' the Constitution or laws of the United States") (citation omitted). *Miers* reasoned that a claim by the Judiciary Committee that an Executive branch official "failed to comply with duly issued congressional subpoenas" fits this category, because the House "subpoena power derives implicitly from Article I of the Constitution[.]" *Miers*, 558 F. Supp. 2d at 64. Judge Bates also observed that the D.C. Circuit had addressed the question of the federal courts' statutory subject-matter jurisdiction with respect to a controversy similar to the one at issue in the *Miers* case (and here): a dispute over a House committee's issuance of a subpoena to AT & T concerning certain documents that the company possessed in relation to an FBI wiretapping program. The Circuit had conclusively determined that the federal courts have jurisdiction under 28 U.S.C. § 1331 because of the "fundamental constitutional rights involved[,]" *AT & T I*, 551 F.2d at 389, which was enough for Judge Bates to conclude that claims that the Judiciary Committee made in the *Miers* case "arise[] under the Constitution for purposes of § 1331[,]" *Miers*, 558 F. Supp. 2d at 64.

This conclusion is not at all surprising. Indeed, if electronic searches of popular case databases are any guide, the power of the federal courts to review and resolve subpoena-enforcement claims in standard civil actions is rarely challenged, and federal courts routinely exercise subject-matter jurisdiction over disputes concerning subpoenas that arise in the context of cases in which federal claims are being litigated. *See, e.g.*, *Fairholme Funds*, 2019 WL 5864595, at *2; *BuzzFeed, Inc.*, 318 F. Supp. 3d at 364–65; *Truex*, 2006 WL 241228, at *1; *GFL Advantage Fund*, 216 F.R.D. at 194–96; *Weiss*,

1992 WL 235889, at *2; *see also* Fed. R. Civ. P. 45.  Thus, Courts appear to have determined that these miscellaneous lawsuits that are filed for the purpose of seeking a court order to enforce a subpoena, arise under federal law for the purpose of section 1331 where the underlying case is, itself, federal in nature.  The Court concludes that this same analysis concerning the applicability of section 1331 to the legal claim at issue applies here.  Thus, insofar as the Judiciary Committee's power to issue subpoenas "derives implicitly from Article I of the Constitution," *Miers*, 558 F. Supp. 2d at 64, which it appears that DOJ does not contest, the subpoena-enforcement claim that the Judiciary Committee has brought to this Court for resolution likewise arises under the Constitution for the purpose of section 1331.

As a reminder, DOJ conceded as much in the matter before Judge Bates.  It retreats from that concession now, however, and launches an attack on this Court's statutory subject-matter jurisdiction, by deflecting attention away from the well-accepted scope of a federal court's authority under 28 U.S.C. § 1331 and homing in on another statutory provision:  28 U.S.C. § 1365.  Pointing to that statute, DOJ maintains that the federal courts do not, in fact, have statutory subject-matter jurisdiction to entertain subpoena-enforcement claims brought by committees of the House.  (*See* Def.'s Mot. at 45–46 (asserting that section 1365 establishes federal court "jurisdiction over some congressional subpoena-enforcement actions [i.e., those brought by the Senate] but not others [i.e., those brought by the House]").)  It is interesting to note that DOJ appears to have rejected OLC's internal advice about the viability of this legal argument, for it presses this jurisdictional contention here despite the fact that, according to OLC, "[t]he legislative history of these statutes . . . counsels against th[e]

conclusion" that section 1365 impacts the jurisdiction of federal courts to entertain subpoena-enforcement lawsuits that involve subpoenas issued to Executive branch officials. *Response to Cong. Requests for Info.*, 10 Op. O.L.C. 68, 87 n.31 (1986).

Regardless, another precedential opinion from this district (which concerned whether a different House committee could sue to enforce a legislative subpoena for documents that it had issued to the Attorney General) addressed precisely the same statutory jurisdictional argument that DOJ brings here, and unequivocally rejected it. *See Holder*, 979 F. Supp. 2d 1. In *Holder*, Judge Amy Berman Jackson first noted that section 1365, on its face, did not apply to the dispute before it. *See id.* at 17 (explaining that "section 1365 specifically states that it does not have anything to do with cases involving a legislative effort to enforce a subpoena against an official of the executive branch withholding records on the grounds of a governmental privilege"). She then went on to thoroughly evaluate the "chronology of events surrounding the enactment of section 1365" and ultimately concluded that "the jurisdictional gap that it was meant to cure was not a lack of jurisdiction over actions like this one" but rather problems related to the amount-in-controversy requirements for federal jurisdiction that were in place in the 1970s, which were first identified in a case involving enforcement of a Watergate Senate subpoena, *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 366 F. Supp. 51 (D.D.C. 1973), and follow-on issues related to jurisdiction over suits against officers brought in their personal versus official capacities, *Holder*, 979 F. Supp. 2d. at 18–19; *see also id.* (explaining that the legislative history indicates that the language of section 1365 "'is not intended to be a Congressional finding that the Federal courts do not now have the authority to hear a

44

civil action to enforce a subpoena against an officer or employee of the Federal government'" (alteration omitted) (quoting S. Rep. No. 95-170, at 91–92 (1977)); *Response to Cong. Requests for Info. Regarding Decisions Made Under the Indep. Counsel Act*, 10 Op. O.L.C. at 87 n.31 (noting the same legislative history as support for its conclusion the Legislature likely can enforce subpoenas against Executive branch officials through a civil action).

This Court agrees with Judge Berman Jackson's analysis in this regard, and sees no reason to reach a contrary conclusion. Indeed, "redundancies across statutes[,]" jurisdictional or otherwise, "are not unusual events in drafting[,]" and the Supreme Court has commanded that, in such circumstances, a court "must give effect to both" provisions provided that "there is no 'positive repugnancy' between the two laws[.]" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) (quoting *Wood v. United States*, 16 Pet. 342, 363 (1842)). Indeed, courts must be cautious when evaluating an argument that a subsequently enacted statute, by implication and overlap, limits the scope of jurisdiction that section 1331 confers, *Mims v. Arrow Financial Servs., LLC*, 565 U.S. 368, 383 (2012), particularly because Congress is well-aware of how to expressly strip jurisdiction from federal courts, *see EEOC v. Lutheran Social Servs.*, 186 F.3d 959, 963 (D.C. Cir. 1999); *I.A.M. Nat. Pension Fund Ben. Plan C. v. Stockton TRI Indus.*, 727 F.2d 1204, 1209 (D.C. Cir. 1984). This Court's adoption of holdings of *Miers* and *Holder* is sufficient to explain why the Court rejects DOJ's statutory subject-matter arguments in this case.

2. <u>Separation-Of-Powers Principles Do Not Compel The Conclusion That This Court Lacks Subject-Matter Jurisdiction Over The Instant Dispute</u>

DOJ's primary reason for insisting that the federal courts lack subject-matter jurisdiction to review the Judiciary Committee's subpoena-enforcement claim relates to its views of the Constitution's limits on the exercise of judicial authority. In its briefs, DOJ asserts repeatedly, in various ways and at different points, that it is the Constitution's separation-of-powers principles that preclude this Court's consideration of the instant subpoena-enforcement lawsuit. (*See, e.g.*, Def.'s Mot. at 18–23.) And while it is difficult to ferret out the differences between the various separation-of-powers-related arguments that DOJ makes in this regard, it appears that this battle is being waged on two related fronts. First of all, DOJ insists that "[t]his dispute is not of the type traditionally thought capable of resolution through the judicial process[.]" (Def.'s Mot. at 32 (capitalization altered).) It further maintains that "[l]awsuits of this kind imperil the Constitution's allocation of power among the Branches of the Federal Government." (*Id.* at 40.)[12]

Boiled to bare essence, and much like the absolute testimonial immunity claim that DOJ makes with respect to the merits of the Judiciary Committee's case, these threshold contentions about the limited scope of the Judiciary's power to hear the claim

---

[12] In its opposition and cross-motion brief (ECF No. 32), DOJ also argues that, even if Article III's prerequisites to the Court's subject-matter jurisdiction and the Judiciary Committee's standing are satisfied, a federal court should "stay its hand" with respect to resolving disputes between the Legislature and the Executive branch over congressional subpoenas, due to "the acute separation-of-powers concerns presented by judicial intervention in political disputes between the elected branches." (*Id.* at 56.) As noted previously, DOJ has expressly withdrawn this argument by Notice (*see* Def.'s Accommodation Resp. at 2), conceding that the parties are now at an impasse over whether or not McGahn has a legal duty to appear before the Judiciary Committee for testimony (*id.*). Therefore, this Court has not reached, or ruled upon, the "accommodations" species of DOJ's separation-of-powers argument.

at issue under the Constitution are based on "the Executive's interest in 'autonomy[,]'" *Miers*, 558 F. Supp. 2d at 103, and that interest, in turn, "rests upon a discredited notion of executive power and privilege[,]" *id*., as explained below.  Consequently, none of DOJ's purported constitutional concerns about the exercise of jurisdiction by the federal courts under the circumstances presented here is persuasive.

a.     *The legal claim at issue here is not non-justiciable*

The first of DOJ's assertions has the subtle overtones of a justiciability argument.  For example, DOJ suggests that what is at issue when the other two branches of government look to the Judiciary to resolve inter-branch disputes over the enforceability of a subpoena is a "'political turf war'" (Def.'s Mot. at 32 (quoting *U.S. House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8, 10 (D.D.C. 2019)), and that "to preserve the independence and autonomy of all three co-equal branches, the political branches must do battle in the political arena, not appeal to the Judiciary as a superior branch of government for a definitive resolution" (Def.'s Mot. at 32; *see also id*. at 35 (noting that, "even outside the context of disputes between the political Branches, the House itself has questioned whether its demands for information are ever justiciable"); *id.* at 41 (arguing that "[t]he process of negotiation and accommodation protects the political branches from excessive judicial interference and the Judiciary from the undue politicization and risk to its long-term independence")).  Whatever the scope or scale of the *other* inter-branch disputes that DOJ is referencing with this argument, this assertion is plainly misplaced with respect to the *instant* action, since, as noted above, a subpoena-enforcement dispute is not a "political" battle at all.  Instead, claims regarding the enforceability of a subpoena raise garden-variety legal questions

that the federal courts address routinely and are well-equipped to handle.  *See Miers*, 558 F. Supp. 2d at 71.

Consider the particular claim that the Judiciary Committee makes in the instant action.  Its complaint specifically alleges that, in the course of a congressional investigation, the Committee issued a duly authorized legislative subpoena to former White House Counsel Donald F. McGahn II pursuant to its Article I powers (Compl. ¶ 72), and that "[t]here is no lawful basis for McGahn's refusal to appear" (*id*. ¶ 110). Thus, the Judiciary Committee's pleading presents pure questions of law for the Court's resolution:  in essence, the Committee is asking this Court to determine what the law establishes with respect to its right to compel McGahn's testimony per the subpoena it has issued, and also what the law says about his duty to respond, as the recipient of the Committee's directive.  There is nothing non-justiciable about such legal questions. Indeed, federal courts across the country address these very inquiries in the context of enforcement actions involving private parties all the time.  (*See supra* Part III.C.1.) DOJ's talk of "political turf war[s]" and its soaring protestations about the Committee's claim being not "capable of judicial resolution" (Def.'s Mot. at 32–33) obscure the fact that issues such as whether a particular subpoena is valid and enforceable, and whether and to what extent the recipient of such a subpoena has a legal duty to respond, are straightforward, fully justiciable questions of law.  *See Miers*, 558 F. Supp. 2d at 71.

Notably, the mere fact that a committee of Congress, as opposed to some other litigant, has brought the instant subpoena-enforcement claim at bar has nothing whatsoever to do with whether this Court has subject-matter jurisdiction to entertain it. In general, federal courts assess their subject-matter jurisdiction on the basis of the

48

claims that are presented, not on the identity of the parties. *See Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011) ("[I]n federal-question cases, the identity of the parties is irrelevant and the district court's jurisdiction is grounded in the federal question(s) raised by the plaintiff."); *Teamsters, Chauffeurs, Warehousemen & Helpers, Local 764 v. Greenawalt*, 880 F. Supp. 1076, 1081 (M.D. Pa. 1995) ("Rarely, if ever, does the existence or non-existence of federal question jurisdiction turn on the identity of the parties to the lawsuit."). And the Supreme Court has specifically confirmed that not all legal claims that impact the political branches are properly deemed non-justiciable political questions. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (explaining that, although the legal claim at issue implicated the political status of Jerusalem as the capital of Israel, "Zivotofsky requests that the courts enforce a specific statutory right. To resolve his claim, the Judiciary must decide if Zivotofsky's interpretation of the statute is correct, and whether the statute is constitutional. This is a familiar judicial exercise."); *see also Chada*, 462 U.S. at 942 (explaining that "the presence of constitutional issues with significant political overtones does not automatically invoke the political question doctrine" and that "[r]esolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by the courts because the issue have political implications"). Put another way, for the purpose of evaluating subject-matter jurisdiction, standard legal claims do not automatically transform into non-justiciable policy decisions just because they concern a political entity.

The veritable death-knell with respect to DOJ's present non-justiciability suggestions is the D.C. Circuit's jurisdictional analysis in *AT & T I*, a case that

involved a "clash of the powers of the legislative and executive branches of the United States" under circumstances that are not dissimilar to the subpoena-enforcement conflict at issue here.[13] *AT & T I*, 551 F.2d at 389. The D.C. Circuit specifically acknowledged that, like one of the Watergate cases that had proceeded it, the lawsuit "present[ed] a clash of congressional subpoena power and executive privilege." *Id*. at 390 (referencing *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) and *United States v. Nixon*, 418 U.S. 683 (1974)). The panel nonetheless determined that the federal courts have subject-matter jurisdiction over the conflict under 28 U.S.C. § 1331, and it also expressly noted that the issue presented in the case—i.e., the enforceability of a House subcommittee's subpoena seeking certain documents relating to a warrantless wiretapping program—was a fully justiciable one. *Id.* at 389–91. Significantly for present purposes, the Circuit observed that, "at a minimum, the mere fact that there is a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution of the conflict. *United States v. Nixon* . . . resolved an analogous conflict between the executive and judicial branches and stands for the justiciability of such a case." *Id*. at 390 (citing *United States v. Nixon*, 418 U.S. 683). In the wake of the *AT & T I* decision, DOJ's insistence that the instant dispute over the enforceability of the House's legislative subpoena is not of the type of claim that the federal courts can resolve

---

[13] In *AT & T I*, a House subcommittee had issued a legislative subpoena to a private entity (AT & T) demanding documents that concerned warrantless wiretapping that the company had undertaken at the request of the FBI. *See* 551 F.2d at 385. The Executive branch interceded by directing AT & T—"as an agent of the United States"—to refuse to comply with the subpoena. *Id.* at 387. When it appeared that AT & T would, in fact, comply despite this command from the President, DOJ filed suit against AT & T, and the chairman of the House subcommittee that issued the subpoena was permitted to intervene as a defendant. *Id.*

without doing violence to the Constitution (Def.'s Mot. at 32–33) cannot be sustained.[14]

>   b.   *The historical record indicates that the Judiciary has long entertained subpoena-enforcement actions concerning compelled congressional process*

Pivoting to the second variation of their separation-of-powers argument, DOJ calls upon history and asserts that "centuries of historical practice" (*id.* at 32) plainly demonstrates that the U.S. Constitution does not contemplate that the federal courts have the power to exercise jurisdiction over subpoena-related disputes between the Congress and the Executive branch. (*See id.* at 33 (interpreting *Raines v. Byrd*, 521 U.S. 811 (1997), as having established that "[t]he fact that past Congresses never resorted to the courts to resolve these and other inter-branch disputes underscored that the suit was not one traditionally thought to be capable of resolution through the judicial process." (internal quotation marks omitted)).) While it appears to be true that "for two hundred years after the Founding" lawsuits between the Congress and the Executive branch "did not exist, even though disputes between the Legislative and Executive Branches over congressional requests for information have arisen since the beginning of the Republic" (*id.* at 33), the jurisdictional lesson that DOJ appears to

---

[14] DOJ's effort to minimize the impact of the D.C. Circuit's holding in this regard is unpersuasive. (*See* Tr. at 50:12–16 ("[T]o the extent that [*AT & T I*] addresses jurisdiction, it's in a drive-by. And the Supreme Court has said many times that courts are not bound by drive-by jurisdictional holdings. So I don't think *AT & T* is in any sense binding on the jurisdictional question."). *AT & T*'s jurisdictional and justiciability pronouncements are not drive-by rulings by any stretch of the imagination; indeed, the D.C. Circuit sua sponte raised the issue of jurisdiction under section 1331. *See id.* at n.7 ("We are aware that 28 U.S.C. § 1331 was not alleged as the basis for jurisdiction. Although Fed. R. Civ. P. 8(a)(1) requires plaintiffs to make an allegation of the basis asserted for the district court's jurisdiction, courts are not restricted to the statutory basis alleged if the factual allegations fairly support an alternative basis in a more proper or simple manner."). Thus, unless and until that case is overturned, it is binding precedent in this Circuit. (*See supra* Part III.B.)

have learned from the historical record seems to be at odds with the Supreme Court's own recounting of the relevant facts.

In the case of *Watkins v. United States*, 354 U.S. 178 (1957), Chief Justice Earl Warren tells a detailed and remarkable story of the legislative power of inquiry as it existed in seventeenth century England, and in particular, of Parliament's "broad and varied use of the contempt power" to enforce its own mandates, as well as its reservation unto itself of "absolute and plenary authority over . . . privileges[,]" *id.* at 188. Fatefully, and importantly, the Houses of Parliament expressly decided that "judicial review of the exercise of the contempt power or the assertion of privilege" would be "precluded[,]" *id*. at 188. And apparently as a direct consequence of Parliament's determination "that no court had jurisdiction to consider such questions[,]" the unreviewable contempt power that Parliament had claimed was, predictably, "abused." *Id*. at 188, 189.

Significantly for present purposes, Chief Justice Warren takes care to emphasize that, "[i]n the early days of the United States, there lingered direct knowledge of the evil effects of absolute power[,]" *id.* at 192, and thus, "*[f]rom the very outset the use of contempt power by the legislature was deemed subject to judicial review*[,]" *id*. (emphasis added). This is a much different narrative about the historical understanding of the ability of the courts to entertain claims concerning the enforceability of a legislative subpoena than DOJ offers here. And the Court's acknowledgement that DOJ's particular argument is that the federal courts do not have subject-matter jurisdiction to adjudicate a dispute over a legislative subpoena *at Congress' behest*, and that it has not made direct representations about whether the federal courts historically

52

entertained claims that *private citizens* brought to challenge compelled congressional process, does not diminish that divergence. Regardless, the historical record plainly reflects that, since the Revolution, judicial review has been available to ensure that the use of compulsory congressional process and/or the invocation of a privilege with respect to compelled performance is consistent with the law. *See id*. at 193–94 (discussing *Kilbourne v. Thompson*, 103 U.S. 168 (1881), in which the Supreme Court found, in 1881, that "the House had . . . exceeded the limits of its own authority" when it initiated an inquiry that was judicial, and not legislative, in nature); *see also Mazars*, 940 F.3d at 718–21 (describing at length a series of cases throughout history in which the Supreme Court adjudicated challenges to legislative subpoenas issued by Congress). *Watkins* also touched upon the fact that the Supreme Court had previously considered the competing interests of the Executive and the Legislature with respect to subpoenas pertaining to legislative investigations, and had suggested caution with respect to the merits of claims that the Congress had overstepped its bounds, given "the danger to effective and honest conduct of the Government if the legislature's power to probe corruption in the executive branch were unduly hampered." *Id*. at 194–95 (first citing *McGrain*, 273 U.S. at 194–95, and then *Sinclair*, 279 U.S. at 263). This, too, indicates that the Supreme Court's primary concern about the exercise of judicial authority was that judges might be too aggressive concerning the remedies they ordered with respect to adjudicating challenges to compelled congressional process, not that the federal courts lacked the authority to even entertain such claims.

Consequently, DOJ's present suggestion that the history of our constitutional Republic simply does not contemplate that the other branches of government would

enlist the Judiciary to resolve disputes over the scope of compelled congressional process in the context of legislative investigations—and thus that a federal court oversteps its bounds if it exercises subject-matter jurisdiction over a claim like the one the Judiciary Committee brings here (*see* Def.'s Mot. at 32–36)—seems inconsistent with *Watkins*'s clear assessment that the federal courts of the United States have *always* had to power to review legal claims with respect to subpoena-enforcement actions, and once again, it is well established that subject-matter jurisdiction generally turns on the legal claim being asserted regardless of who makes it. Indeed, the *Watkins* Court specifically noted that federal courts possess a "responsibility placed by the Constitution upon the judiciary to insure that the Congress does not unjustifiably encroach upon an individual's right to privacy nor abridge his liberty of speech, press, religion or assembly[,]" *id.* at 198–99, while at the same time, they must take care to provide "ample scope . . . to the Congress as the sole constitutional depository of legislative power[,]" *id.* at 215; *see also, e.g.*, *id.* at 216. And DOJ does not, and apparently cannot, explain *why* this constitutional duty disappears, or is neutralized, if the subpoena-related dispute arises between branches of government, rather than between Congress and an individual party who contends that the Legislature's compelled congressional process is unlawful.

*Watkins* also seems to explain the dearth of cases during the two-century period in which DOJ says that lawsuits concerning "Congress' access to information held by the Executive Branch . . . did not exist[.]" (Def.'s Mot. at 33.) DOJ lays out a chronology of recorded conflicts between Presidents and the House of Representatives with respect to Congress's access to information between 1792 and 2008 (*see* Def.'s

Mot. at 33–35), and because "for nearly two hundred years the Legislative Branch never sought to invoke the power of the Judiciary to decide which side should prevail in a political battle with the Executive" concerning congressional requests for information (*id.* at 35), DOJ implies that courts must have had the view that their power to adjudicate legal disputes between the branches was unauthorized. It might well be so that courts were not engaged in resolving such conflicts. But *Watkins* suggests a different implication: Congress "so sparingly employed the power to conduct investigations, . . . [that] there [were] few cases *requiring* judicial review of the power." *Watkins*, 354 U.S. at 193 (emphasis added).

To be sure, there was an uptick in Congress' use of its investigative power in the late nineteenth century, and yet, as DOJ emphasizes, "there were [still] very few cases dealing with the investigative power." *Id.* at 194. But that dearth of court decisions hardly establishes that "zero-sum litigation in federal court" had been categorically ruled out as a matter of constitutional law, as DOJ suggests. (Def.'s Mot. at 36.) It is just as logical, and perhaps even more so, to conclude that the Executive branch understood from prior case law the slim odds of successfully resisting the primary tool that the Congress had to check its abuses—a subpoena issued in the context of an authorized investigation—if its challenges were litigated in federal court, and thus, it routinely consented to negotiate the terms of its performance. As the Supreme Court suggested in *Watkins*, even early on in the history of our Nation, there were "several basic premises on which there [was] general agreement" including the fact that "[t]he power of the Congress to conduct investigations is inherent in the legislative process" and that "[t]hat power is broad." *Watkins*, 354 U.S. at 187. Moreover, it was

55

uncontroversial that Congress's investigatory authority "encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes"; that "[i]t includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them"; and that it also "comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste." *Id.* Thus, rather than shedding light on the accepted scope of the federal courts' authority to resolve inter-branch disputes over compelled congressional process, the absence of recorded federal cases concerning the myriad "clashes between the two political Branches over congressional attempts to obtain testimony" that DOJ's brief identifies (Def.'s Mot. at 34) better supports the far less sensational conclusion that, with respect to legislative subpoena fights, the Executive branch wisely picked its battles.

Consequently, and somewhat ironically, DOJ's main historical assertions dovetail in a manner that ultimately counteracts its own conclusions. That is, "[t]he fact that past Congresses never resorted to the courts to resolve" to inter-branch disputes concerning the congressional requests for information (Def.'s Mot. at 33) merely means that, unlike the Judiciary Committee of today, they did not *have* to, because instead of reaching an impasse over the Executive branch's rank refusal to cooperate with congressional investigations, the Executive branch's concerns about the scope and intrusiveness of Congress' requests for information were resolved through "the centuries-old process of political negotiation" (*id.* at 36). *See also Mazars*, 940 F.3d at 721 (explaining that "Presidents, too, have often been the subjects of Congress's legislative interventions," but, in contrast to disputes between House committees and

private-citizen recipients of legislative subpoenas, "fewer of these have required judicial intervention").

Finally, this Court notes that DOJ's contention that the Constitution's separation of powers bars the judiciary from adjudicating disputes between Congress and the Executive concerning the enforceability of legislative subpoenas is an argument that it has not consistently maintained, even in *modern* times.  For example, a review of the publicly available dockets in *Trump v. Committee on Ways & Means, U.S. House of Representatives*, No. 19-cv-2173 (Nichols, J.), *Trump v. Committee on Oversight & Reform of U.S. House of Representatives*, No. 19-cv-1136 (Mehta, J.), and *Trump v. Mazars USA, LLP*, No. 19-5142 (D.C. Cir.), indicates that DOJ stood silent with respect to the jurisdictional question, as President Trump (in his personal capacity) has invoked the authority of the federal courts, on more than one occasion, seeking resolution of a dispute over the enforceability of a legislative subpoena concerning his tax returns.  A lawsuit that asserts that a legislative subpoena should be *quashed* as unlawful is merely the flip side of a lawsuit that argues that a legislative subpoena should be *enforced*. And it is either DOJ's position that the federal courts have jurisdiction to review such subpoena-enforcement claims or that they do not.  By arguing vigorously here that the federal courts have no subject-matter jurisdiction to entertain the Judiciary Committee's subpoena-enforcement action, yet taking no position on the jurisdictional basis for the President's maintenance of lawsuits to prevent Congress from accessing his personal records by legislative subpoena, DOJ implicitly suggests that (much like absolute

57

testimonial immunity) the subject-matter jurisdiction of the federal courts is properly invoked only at the pleasure of the President.[15]

The fact that DOJ has also recently expressly declined to press a jurisdictional argument in another subpoena-enforcement case that is currently pending before the D.C. Circuit is instructive. *See In re Application of Comm. on Judiciary, U.S. House of Representatives, for an Order Authorizing Release of Certain Grand Jury Materials*, No. 19-gj-48, 2019 WL 5485221 (D.D.C. Oct. 25, 2019), *appeal docketed*, No. 19-5288 (D.C. Cir. Oct. 28, 2019) (hereinafter *In re Application for Grand Jury Materials*). Pending on appeal in the D.C. Circuit is a ruling concerning an application that the Judiciary Committee submitted to the Chief Judge of this Court, requesting that grand jury information in DOJ's possession concerning the Mueller Report be released to the Committee, over DOJ's objection. (The Committee had previously sent a subpoena to Attorney General William Barr requesting the information, but that legislative command was ignored.) Chief Judge Howell issued a Memorandum Opinion and Order granting the Committee's request for all of the portions of the Mueller Report that had been redacted to preserve grand jury secrecy and any underlying transcripts or exhibits referenced in the redactions. *Id.* at *38. DOJ proceeded to seek an emergency stay of Chief Judge Howell's ruling in the D.C. Circuit. *See* Emergency Mot. for Stay Pending Appeal ("DOJ Stay Br."), *In re Application of Comm. on Judiciary, U.S. House of*

---

[15] To be fair, in these lawsuits, President Trump argued that the congressional committee subpoenas are unenforceable in his *personal* capacity. But when DOJ was invited file an amicus brief at the appellate level in *Mazars*, it did not raise an objection to the courts' jurisdiction; instead, it emphasized that federal courts "must" determine—after a "searching evaluation"—whether the legislative subpoena ought to be quashed because, for instance, it is "impermissibly attempting to interfere with or harass the Head of the Executive Branch." Amicus Brief of the United States at 1–2, *Trump v. Mazars USA, LLP*, 940 F.3d 710 (D.C. Cir. 2019), 2019 WL 3714770, at *1–2.

*Representatives, for an Order Authorizing Release of Certain Grand Jury Materials*,
No. 19-5288 (D.C. Cir.).

During oral argument, when one of the panelists asked DOJ about the district
court's subject-matter jurisdiction to entertain the House's legal action, DOJ counsel
remarked that, while the Executive branch was "not advancing that argument[,]" it
believed that DOJ "certainly has both standing and jurisdiction" to seek review of the
district court's injunction. Hr'g Tr. at 17:5–9, *In re Application of Comm. on Judiciary,
U.S. House of Representatives, for an Order Authorizing Release of Certain Grand Jury
Materials*, No. 19-5288 (D.C. Cir.). And, indeed, DOJ did not challenge Chief Judge
Howell's jurisdiction to consider the House's application in any of its briefs or during
any of the hearings in front of either the District Court or the Circuit. But if DOJ's
position is that the federal courts have the authority to entertain a legal claim
concerning the House's contested request for allegedly privileged grand jury materials,
how can it be heard to argue, nearly simultaneously, that the instant Court has no
jurisdiction to entertain a legal claim concerning the enforceability of a House
committee's subpoena compelling the testimony of senior-level presidential aides?
Both of these requests for information were made by the Judiciary Committee in the
context of ongoing investigations. *Compare* DOJ Stay Br. at 10, *with In re Application
for Grand Jury Materials*, 2019 WL 5485221, at *28, *and Mazars*, 940 F.3d at 714.
And any differences between the instant case and the case on appeal before the Circuit
appear to relate simply and solely to the merits of the parties' respective legal
arguments regarding the enforceability of the House's mandate that the information be

disclosed.[16]  Such differences have nothing to do with the threshold question of the court's constitutional power to entertain the House's legal claim that it is entitled to access the requested (or subpoenaed) information over the Executive branch's objection; therefore, one would expect that DOJ's jurisdictional position would not vary.

c.    *Traditional separation-of-powers principles do not support DOJ's suggestion that the federal courts cannot resolve legal disputes between the other branches of government*

If the point of DOJ's historical practice arguments is to emphasize that, for centuries, significant inter-branch conflicts have, in fact, been resolved without the need for court involvement (and thereby place its marker on the seemingly radical notion that the federal courts do not have the constitutional authority to resolve *any* direct dispute between the Executive and the Legislature (*see, e.g.*, Hr'g Tr. at 60:18)), then DOJ must contend with, and somehow reconcile, the fact that the federal courts have adjudicated disputes that impact the divergent interests of the other branches of government for centuries. *See, e.g.*, *Ex parte Merryman*, 17 F. Cas. 144, 148 (C.C.D. Md. 1861) (Taney, C.J.) (holding that Congress, and not the President, can suspend the writ of habeas corpus); *see also Bowsher v. Synar*, 478 U.S. 714 (1986) (evaluating whether Congress improperly assigned executive powers to the Comptroller General);

---

[16]  Though the circumstances that have given rise to these two legal actions surely differ, there appear to be only two relevant distinctions between the legal claims that the Judiciary Committee is making in these two cases.  In the *In re Application for Grand Jury Materials* litigation, the Committee's purported right to the materials at issue (grand jury information) arguably derives both from its own Article I authority to conduct investigations pursuant to its impeachment powers, and also from the court's limited authority to make exceptions to grand jury secrecy under Federal Rule of Criminal Procedure 6(e).  See 2019 WL 5485221, at *11.  Rule 6(e) is not a source of authority in the case at bar. In addition, the Committee's grand jury document request concerns materials that are purportedly protected from disclosure under Rule 6(e), while, in the instant case, the President has invoked executive privilege on the grounds that McGahn has absolute testimonial immunity.  Both of these distinctions pertain to the merits issues in these cases, not to the Court's subject-matter jurisdiction.

*Chadha*, 462 U.S. at 919 (considering whether the House could veto an Executive branch deportation order); *Nixon v. Sirica*, 487 F.2d 700, 715 (D.C. Cir. 1973) ("Throughout our history, there have frequently been conflicts between independent organs of the federal government, as well as between the state and federal governments. When such conflicts arise in justiciable cases, our constitutional system provides a means for resolving them—one Supreme Court."). DOJ must also face at least two other inconvenient facts: the widely accepted contentions that (1) the Constitution of the United States empowers each branch of the federal government to be a check upon the others, and (2) the Judiciary's constitutional check is the power to tell the other branches what the law is. *See Chada*, 462 U.S. at 962–63; *Buckley*, 424 U.S. at 121–23; *Marbury*, 5 U.S. at 177. The Supreme Court has never suggested that the Judiciary has the power to perform its constitutionally assigned function *only* when it speaks to private citizens, or when it is called upon to resolve a legal dispute between a private citizen and one of the branches of government. And DOJ's odd idea that federal courts' indisputable power to adjudicate questions of law evaporates if the requested pronouncement of law happens to occur in the context of a dispute *between* branches appears nowhere in the annals of established constitutional law.

To the contrary, the Framers spoke specifically to the importance of maintaining an established rule of law to regulate government conduct—and, thus, to the significance of the judicial function—when they explained why a system that separates the powers of government and includes checks on the exercise of government power is crucial to sustaining a democracy:

61

> [T]he great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others. The provision for defense must in this, as in all other cases, be made commensurate to the danger of the attack. . . . It may be a reflection on human nature, that such devices should be necessary to control the abuses of government. But what is government itself, but the greatest of all reflections on human nature? If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself.

The Federalist No. 51 (James Madison). The Framer's specific reference to providing government officials in each of the separate branches with "the necessary constitutional means and personal motives to resist the encroachments of the others[,]" *id.*, is especially noteworthy, because, here, DOJ's artificial limit on the federal courts' jurisdiction to consider disputes between the branches seemingly *decreases* the incentive for the Legislature or the Executive branch to behave lawfully, rather than bolsters it, by dramatically reducing the potential that a federal court will have occasion to declare conduct that violates the Constitution unlawful. And there can be no doubt that providing the branches with the power to limit each other's behavior, for the protection of the People, was the original intent of the Framers, as evidenced both by the constitutional scheme they adopted and by the remarks they made to explain the separation-of-powers construct. Indeed, far from DOJ's present suggestion that the separation-of-powers construct means that the political branches must resolve their disputes in the political arena and never head to federal court, Federalist No. 51 proceeds to explain that political checks are not the sole solution, and that the branches themselves must also be vested with the power to police the abuses of the others. *See*

62

*id.* ("A dependence on the people is, no doubt, the primary control on the government; but experience has taught mankind the necessity of auxiliary precautions. . . . We see it particularly displayed in all the subordinate distributions of power, where the constant aim is to divide and arrange the several offices in such a manner as that each may be a check on the other that the private interest of every individual may be a sentinel over the public rights.").

Nor is it the case that the separate and co-equal stature of the three branches of government means that the Judiciary cannot comment on the lawfulness of other branches' conduct. *Cf. Ex parte Merryman*, 17 F. Cas. at 148 (holding that, by suspending the writ of habeas corpus, "the president has exercised a power which he does not possess under the Constitution," and sending the ruling to the President "in order that he might perform his constitutional duty, to enforce the laws, by securing obedience"); *see also Marbury*, 5 U.S. at 177. In the seminal case of *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court further observed that, while "the men who met in Philadelphia in the summer of 1787 were practical statesmen, experienced in politics, who viewed the separation of powers as a vital check against tyranny[,] . . . they likewise saw that a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively." *Id.* at 121; *see also Youngstown*, 343 U.S. at 635 (Jackson, J., concurring) ("While the Constitution diffuses power to better secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity."). And where, as here, the Executive branch and the Legislature are at loggerheads over an

63

issue of law that the courts are well-equipped to decide, the notion that the Judiciary loses its established authority to say what the law is seems implausible. It is far more likely that the better view of constitutional separation-of-powers principles is that they deem the exercise of judicial authority with respect to the dispute at issue even *more* important, if not crucial, for the continued functioning of the government.

To the extent that more recent case law could be read to cast doubt on this Court's conclusion that the federal courts have the constitutional power to adjudicate legal disputes between the Legislature and the Executive branch (*see* Def. Mem. at 32–36), it is worth noting that such cases actually comport quite well with the Framers' conceptions of the true separation-of-powers problems discussed above. For example, binding case law rightly indicates that federal courts do overstep the bounds of their authority if they entertain a claim in a dispute between the other branches that does not actually involve a question of law. *See Zivotosfy*, 132 S. Ct. at 1432 (Sotomayor, J., concurring) (explaining that judicial forbearance is required in "circumstances in which a dispute calls for decisionmaking beyond courts' competence"). Likewise, there is a separation-of-powers violation if the Judiciary proceeds when the Constitution itself expressly vests the power in another branch of government to decide the issue in question. *See id.* at 1431 ("When a case would require a court to decide an issue whose resolution is textually committed to a coordinate political department . . . abstention is warranted because the court lacks authority to resolve that issue."); *see also, e.g.*, *Nixon v. United States*, 506 U.S. 224 (1993) (holding that a claim regarding the validity of a Senate impeachment rule was non-justiciable because the Constitution vests the Senate with the sole power to try impeachments). In these narrow circumstances, the Judiciary

plainly transgresses the boundaries of its constitutional authority, either because it has entertained a claim that does not raise a legal issue and thus was never in its province to decide, or because it has undertaken to decide certain claims despite a direct constitutional command to desist. Neither is the case with respect to the subpoena-enforcement claims at issue here, as the Court's previous discussion plainly establishes. (*See supra* Part IV.A.2.a.)[17]

The bottom line is this: even when the question of this Court's constitutional authority to entertain the Judiciary Committee's subpoena-enforcement claim is viewed through the rose-colored lenses of DOJ's separation-of-powers filter, history and past practice plainly support judicial resolution of stalemates between the Legislature and the Executive branch with respect to the rights that the law establishes and the duties that the law imposes. The Framers carefully crafted a constitutional scheme that contained institutional checks over the exercise of the powers they had divided, and thus implicitly endorsed the exercise of authority by the branch that was vested with power to break a legal stalemate (and, indeed, without judicial resolution, how else

---

[17] The Court finds it noteworthy that DOJ does not provide a single authority that actually stands for the proposition that the Constitution is violated *whenever* the federal courts entertain *any* kind of dispute between the Legislature and the Executive branch. (*See* Hr'g Tr. at 60:18.) DOJ's argument in this regard appears to rely the position that the Executive branch would be inappropriately rendered subordinate to the other two branches of government if the Legislature can file suit against the Executive branch in court. (*See id.* 68:1–10.) But in the absence of a case that stands for this proposition, it seems a better view of the Executive's predicament is that, if anything, all of the branches are equal in that all are subordinate *to the law*, and the courts are only the messengers, to the extent that the Judiciary has the power to determine what the law is. *See* Richard H. Fallon, Jr., *Executive Power and the Political Constitution*, 2007 Utah L. Rev. 1, 17 (2007) ("[I]t is arguable that the power to decide cases necessarily implies the power to decide them authoritatively, and authority in some cases depends on executive obedience."). To find otherwise is to flout what is unquestionably the most significant tenet that exists in our system of government: that each branch of the federal government has limited power under the Constitution, and that no one, not even the head of the Executive branch, is above the law. DOJ's insistence that the Judiciary does not have the power to declare the law in the context of an inter-branch legal dispute cannot be easily squared with acceptance of these universal constitutional maxims.

would an impasse between the Legislature and Executive branch concerning compelled congressional process be resolved?). Thus, in this Court's view, rather than demanding forbearance by the courts, separation-of-powers principles instead require the federal courts to proceed to resolve the instant legal impasse so that the other branches of government can function. Put another way, the Framers made clear that the proper functioning of a federal government that is consistent with the preservation of constitutional rights hinges just as much on the intersectionality of the branches as it does on their separation, and it is the assigned role of the Judiciary to exercise the adjudicatory power prescribed to them under the Constitution's framework to address the disputed legal issues that are spawned from the resulting friction. *See Myers v. United States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting) ("The doctrine of the separation of powers was adopted by the convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy.")

**B.    House Committees Have The Power To Enforce Their Subpoenas In Federal Court When Executive Branch Officials Do Not Respond As Required**

For all its talk about the limited authority of the Judiciary and the Legislature under the Constitution, DOJ does not appear to contest the fact that duly authorized committees of Congress have the power under Article I to issue enforceable legislative subpoenas—in the sense that, when a House committee issues an authorized legislative subpoena in the context of a congressional investigation, that act gives rise to a legal

right to compel the recipient's performance.[18]  Consequently, and importantly, the

constitutional arguments that DOJ has made in the context of this case pertain solely to

its view that the Judiciary Committee lacks the authority to enforce its valid legislative

subpoenas *in federal court*.  (*See, e.g.*, Def.'s Mot. at 36–40, 52–56.)  Here, as in *Miers*,

DOJ attempts to shoehorn its emasculating effort to keep House committees from

turning to the courts as a means of vindicating their constitutional interests into various

categories of established legal arguments, some of which overlap substantially with

jurisdictional contentions that the Court has already considered and rejected. (*See, e.g.*,

*id.* at 36–40 (arguing that the Judiciary Committee lacks standing because it has not

articulated a concrete and particularized injury).)

    In the discussion that follows, this Court focuses, in particular, on DOJ's

contention that a House committee does not suffer a cognizable injury for standing

purposes when a subpoenaed Executive branch official fails to appear for the scheduled

testimony (*id*. at 36–40), and that, in any event, such committee has no cause of action

to proceed in federal court (*id.* at 52–56).  As the Court explains, these arguments about

the Judiciary Committee's inability to bring its legal claims in federal court cannot be

reconciled with how the law ordinarily assesses the type of injury that the Judiciary

Committee alleges for standing purposes, or with the fact that filing a lawsuit is the

most common, and least intrusive, means of vindicating the Committee's thwarted

investigation rights.  The Court also rejects DOJ's broader assertion that, even if the

Judiciary Committee has an injury in fact and a cause of action to proceed in federal

---

[18]  Of course, any protestation would be futile, since this broad power of Congress is well established.
*See, e.g.*, *McGrain*, 273 U.S. at 174; *Mazars*, 940 F.3d at 722–23.

court, constitutional separation-of-powers principles prevent the Committee from doing so.

   1.   Defiance Of A Valid Subpoena Indisputably Qualifies As A Cognizable Injury In Fact, And In The Context Of Congressional Investigations, The Harm Is Significant And Substantial

With respect to the Judiciary Committee's alleged lack of Article III standing to bring its subpoena-enforcement claims in federal court, DOJ maintains that "the Committee fails to state a cognizable injury[.]" (Def.'s Mot. at 36.)[19]  In this regard, DOJ insists that the Committee's allegation that "McGahn's failure to comply with its subpoena for his testimony deprives it of 'information to which it is entitled'" is not enough to give rise to Article III standing (*id.* at 37 (quoting Pl.'s Mem. at 22, 37)), because "Congress has no cognizable institutional interest in obtaining information for its own sake" (*id.*).  It also asserts that, other than this non-cognizable "freestanding right to information[,]" the Judiciary Committee has only asserted the kinds of abstract injuries that the Supreme Court has found to be insufficient to support standing in cases like *Raines v. Byrd*, 521 U.S. 811 (1997).  (Def.'s Mot. at 37–38; *see also id.* (declaring that the Judiciary Committee's stake in the instant litigation is "deficient" for standing purposes because "[t]he sole injury arguably stated by the Committee is a theoretical impairment of the House's ability to evaluate proposed articles of impeachment;

---

[19] "Because Article III limits the constitutional role of the federal judiciary to resolving cases and controversies, a showing of standing is an essential and unchanging predicate to any exercise of our jurisdiction." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (internal quotation marks and citations omitted); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) ("To ensure that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society, a plaintiff may not invoke federal-court jurisdiction unless he can show a personal stake in the outcome of the controversy.") (internal quotation marks and citations omitted).  And one of the requirements to demonstrate Article III standing is that "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).

proposed legislation concerning election security, campaign finance, and other issues; and the adequacy of safeguards to protect the integrity of investigatory matters referred by the Special counsel to other components of the Department of Justice (a matter purportedly implicating the Committee's 'oversight' responsibilities)" (citations omitted)).)

The first puzzle that surfaces when one undertakes to assess DOJ's "no cognizable injury" argument is how this contention accounts for the fact that an injury-in-fact for Article III standing purposes is all but *assumed* in the myriad subpoena-enforcement cases that are filed in federal courts with respect to civil actions every day. The harm claimed by a private litigant when his subpoenas are rebuffed, which almost presumptively provides a sufficient stake to support his standing, and the injury that the Judiciary Committee claims here is not different in kind. Yet this Court could not find a single case in which the concreteness or particularity of the injury alleged by a private subpoena issuer was effectively challenged. As far as this Court can tell, no federal judge has ever held that defiance of a valid subpoena does not amount to a concrete and particularized injury in fact; indeed, it appears that no court has ever even *considered* this proposition. And perhaps for good reason: if defiance of duly issued subpoenas does *not* create Article III standing and does not open the doors of the court for enforcement purposes, it is hard to see how the wheels of our system of civil and criminal justice could keep turning.

Consequently, some courts have concluded that even the simple impairment of a prosecutor's right to issue a subpoena in the first place is enough to cause a cognizable injury. *See, e.g.*, *United States v. Colo. Supreme Court*, 87 F.3d 1161, 1165 (10th Cir.

1996) (finding a concrete, particularized, and actual injury where a Colorado ethics rule requires prosecutors to obtain judicial approval of any subpoena that seeks to compel an attorney to testify before a grand jury about a client); *see also United States v. Supreme Court of N.M.*, 839 F.3d 888, 899 (10th Cir. 2016) (reaching the same conclusion with respect to similar New Mexico ethics rule), *cert. denied*, 138 S. Ct. 130 (2017).  And the D.C. Circuit implicitly suggested that interference with an agency's right to compel compliance by subpoena is an injury that must be remedied, at least in the administrative context, when it held that courts "must enforce" an agency's subpoena so long as "'the inquiry is within the authority of the agency, the demand is not too indefinite[,] and the information sought is reasonably relevant.'"  *Resolution Tr. Corp. v. Thornton*, 41 F.3d 1539, 1544 (D.C. Cir. 1994) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)).  If the creation of hurdles to the issuance of prosecutorial subpoenas is a cognizable Article III injury, and if courts have no choice but to recognize Article III standing for those who seek to enforce reasonable administrative subpoenas, it would seem that the law is sufficiently clear that outright defiance of *any* duly issued subpoena, including the subpoena that the Judiciary Committee issued to McGahn, qualifies as a concrete, particularized, and actual injury for standing purposes.

This is not to suggest an equivalence between the harm that a private litigant experiences when his subpoena rights are thwarted, on the one hand, and the harm inflicted on a committee of Congress when a recipient of a legislative subpoena that is issued in the context of a congressional investigation defies its mandates, on the other. While the *nature* of the injury—i.e., the denial of the right to compel performance—is

similarly actual and concrete, the Supreme Court has suggested that the *degree* of harm is an order of magnitude different. This is because, under our constitutional scheme, the Legislature is empowered to issue subpoenas in order to conduct the investigations that are necessary to perform its crucial functions of enacting legislation and overseeing the operations of government, not to further its own private interests. *See Watkins*, 354 U.S. at 187, 200. In this regard, the Supreme Court has long held that Congress *must* be deemed to "possess[] every other power essential to preserve the departments and institutions of the general government from impairment or destruction, whether threatened by force or by corruption." *Burroughs v. United States*, 290 U.S. 534, 545 (1934).

Thus, Article I to the House of Representatives assigns the "sole Power of Impeachment", U.S. Const. art. I, § 2, cl. 5, and it also vests Congress as a whole with "[a]ll legislative Powers," U.S. Const. art. I, § 1. Moreover, it grants to Congress the "power of inquiry[,]" *McGrain*, 273 U.S. at 174, which the House and the Senate may delegate to their respective committees and subcommittees, and this power is an "integral part" of the legislative and impeachment authority. *Eastland*, 421 U.S. at 505; *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 499 (1977). Additionally, the Supreme Court has recognized that "where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it." *McGrain*, 273 U.S. at 175. It specifically observed that "[e]xperience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so

some means of compulsion are essential to obtain what is needed." *Eastland*, 421 U.S. at 504–05.

The law also plainly establishes that one of these means of compulsion—known as "the subpoena power"—"may be exercised by a committee acting . . . on behalf of one of the Houses." *Id.* at 505.[20] And with respect to the duty that a recipient of such a subpoena has to perform as Congress has demanded, the Supreme Court has specifically noted that "[a] subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase." *Bryan*, 339 U.S. at 331. "If that were the case, then, indeed, the great power of testimonial compulsion, *so necessary to the effective functioning of courts and legislatures*, would be a nullity." *Id.* (emphasis added).

For present purposes, all this means is that, when a committee of Congress seeks testimony and records by issuing a valid subpoena in the context of a duly authorized investigation, it has the Constitution's blessing, and ultimately, it is acting not in its own interest, but for the benefit of the People of the United States. If there is fraud or abuse or waste or corruption in the federal government, it is the constitutional duty of Congress to find the facts and, as necessary, take corrective action. Conducting investigations is the means that Congress uses to carry out that constitutional

---

[20] Thus, the "particularized" injury requirement, *Lujan*, 504 U.S. at 560, is satisfied. Pursuant to the House of Representative's authority to "determine the Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2, the House has empowered the Judiciary Committee to "conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities," House Rule XI.1(b)(1). Moreover, the Judiciary Committee has been authorized "to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary." House Rule XI.2(m)(1)(B). The Judiciary Committee alleges that the McGahn subpoena was issued pursuant to this authority. (*See* Compl. ¶¶ 71–72.) Therefore, his defiance of the Committee's subpoena, "affect[s] the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. It is the House of Representative's particular constitutional rights, privileges, and duties that are being denied.

obligation. Thus, blatant defiance of Congress' centuries-old power to compel the performance of witnesses is not an abstract injury, nor is it a mere banal insult to our democracy. It is an affront to the mechanism for curbing abuses of power that the Framers carefully crafted for our protection, and, thereby, recalcitrant witnesses actually undermine the broader interests of the People of the United States. Thus, DOJ's hand-waving over the Judiciary Committee's purported failure to establish a "cognizable" injury for standing purposes (Def.'s Mot. at 36–40) masks the substantial harm that results from an Executive branch official's defiance of a congressional subpoena. But it is hard to imagine a more significant wound than such alleged interference with Congress' ability to detect and deter abuses of power within the Executive branch for the protection of the People of the United States.

Here, the Judiciary Committee has filed a complaint that alleges that the Committee was dutifully attempting to fulfill its constitutional duties when it issued a subpoena to former White House Counsel Donald F. McGahn II. (*See, e.g.*, Compl. ¶ 1.) According to the Committee, it opened an investigation into potential misconduct by President Trump and his associates on March 4, 2019 (*see id.* ¶ 57), and its investigation allegedly took on a new dimension after Special Counsel Robert Mueller issued his report.[21] The Judiciary Committee further alleges that it has not been able to

---

[21] According to the Committee, the Mueller Report found that "'[t]he Russian government interfered in the 2016 presidential election in sweeping and systematic fashion'" (Compl. ¶ 1 (quoting Mueller Report Vol. 1 at 1)); that this interference was "intended to benefit the Trump Presidential campaign" (*id.* ¶ 26 (citing Mueller Report Vol. 1 at 1)); and that President Trump "repeatedly attempted to shut down the investigation into Russia's interference in America's 2016 election and to conceal his own involvement and potential misconduct from the public" (*id.* ¶ 32). The truth or falsity of the Mueller Report's findings and conclusions is immaterial to the present legal action, and neither party suggests otherwise. (*See* Pl.'s Stmt. of Facts at 3 n.1 ("In paragraphs 6-8, the Judiciary Committee does not recount information included in the Report to establish the truth of the matters asserted. Rather, the Committee relays what the Special Counsel has told Congress and the American people in order to explain the basis for the Committee's investigation."); *see also* Def.'s Resp. to Pl.'s Stmt. of Facts,

complete its mission of getting to the bottom of the facts and circumstances that are chronicled in the Mueller Report, partly because McGahn "is the most important fact witness in the [Committee's] consideration of whether to recommend articles of impeachment and its related investigation of misconduct by the President, including acts of obstruction of justice described in the Special Counsel's Report" (*id*. ¶ 97), and McGahn has refused to appear before the Committee to provide his testimony, at President Trump's direction (*see id*. ¶¶ 1, 7.)  Consequently, the Committee requests that this Court "declare that McGahn's refusal to appear before the Committee in response to the subpoena issued to him" is unlawful, and that it "issue an injunction requiring McGahn to appear forthwith before the Committee[.]"  (Compl. at 53.)

With respect to its evaluation of the sufficiency of the Judiciary Committee's injury allegations, this Court must accept these statements of fact as true.  *See Lujan*, 504 U.S. at 561 (explaining that, at the pleading stage, allegations regarding standing are treated in the same manner as all other factual allegations and must be accepted as true).  Furthermore, although a heightened evidentiary standard applies to standing arguments made in the context of cross-motions of summary judgment, *see id.*; *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912–13 (D.C. Cir. 2015), the Judiciary Committee has submitted affidavits and exhibits to substantiate their allegations that McGahn has impeded their investigation (*see* Berke Decl; Tatelman Decl.), and DOJ does not appear to contest that the Muller Report did, in fact, contain the findings that the Judiciary Committee alleges, or that the Committee has, in fact,

---

ECF No. 32-2, ¶¶ 6–68 (maintaining that the Mueller Report itself provides the "complete and accurate statement of its contents" and that the Judiciary Committee's recitation of its contents "is not a material fact under Fed. R. Civ. P. 56(c)").

undertaken an investigation to evaluate the Report's claims (*see* Def.'s Resp. to Pl.'s Stmt. of Facts, ¶¶ 6–68, 75–76).

Moreover, for the purpose of determining whether the Judiciary Committee has alleged a sufficient injury-in-fact to generate a concrete interest in the outcome of this litigation, it is irrelevant that the Committee already has access to many, if not all, of McGahn's sworn statements on this issue (McGahn's interviews are referenced repeatedly in the text of the Mueller Report (*see* Compl. ¶¶ 34–51)), nor does it matter that the Committee might be able to find out what it seeks to get from McGahn in some other fashion (*see, e.g.*, Def.'s Mot. at 79–80). This is because, as a committee of Congress, the Judiciary Committee has the "broad power" under Article I of the Constitution to conduct its investigations however it sees fit, so long as it does not impinge upon the constitutional rights of those it undertakes to question. *Watkins*, 354 U.S. at 198–99. And, here, the Committee avers that, among other things, it wants McGahn to appear in person to testify about the events in question so that the Committee can evaluate his credibility. (*See* Pl.'s Mem. at 27 (asserting that "McGahn's testimony is particularly important because, even as President Trump has directed McGahn to defy the Committee's subpoena, the President has waged an extensive campaign to discredit the Special Counsel's investigation, impugn McGahn's credibility, and deny McGahn's account of the facts" (citation omitted); *see also id.* 27–28; Pl.'s Reply at 60; Hr'g Tr. at 10:21–11:17.) What matters from the standpoint of evaluating the Committee's Article III standing is that the Judiciary Committee has alleged an actual and concrete injury to its right to compel information (like any other similarly situated subpoena-issuing plaintiff), that is traceable to McGahn's defiance at

75

the Executive branch's behest, and that this alleged violation of its interests is fully redressable by an order of this Court that requires McGahn to appear and testify.

Of course, to describe the grave injury that defiance of congressional subpoena inflicts on a committee of Congress (and, by extension, on the People of the United States) is to demonstrate why DOJ's reliance on the *Raines* case is misplaced. (*See* Def.'s Mot. at 36–40.) In *Raines,* six members of Congress who had voted against the Line Item Veto Act filed suit seeking a declaratory judgment that the Act, which was enacted and signed into law, was unconstitutional. *Raines*, 521 U.S. at 814–17. The plaintiffs claimed that they had been injured by the possible future "dilution of institutional legislative power[,]" *id.* at 826, which is a completely different type of injury than the harm to established constitutional investigatory rights at issue here. Moreover, the members of Congress in *Raines* invoked a generalized injury; in fact, they specifically declared that their injury was the "loss of a political power" that affected the entire institution of Congress "not the loss of any private right." *Id*. at 821. And rather than pointing to a concrete harm that resulted from enactment of the legislation, the plaintiffs claimed that the Line Item Veto Act had injured them by "alter[ing] the legal and practical effect of [their] votes." *Id*. at 836 (quotation marks and citation omitted). The Supreme Court's conclusion that there was no standing to sue under those circumstances is, thus, entirely inapposite to the claims that the Judiciary Committee brings today. *See also Mnuchin*, 379 F. Supp. 3d at 17–18 (noting that "informational injuries to Congress arise 'primarily in subpoena enforcement cases,' which hold that the legislature 'has standing to assert its investigatory power.'"

(quoting *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76 (D.D.C. 1998)).[22]

### 2. The Constitution Itself Provides A Cause Of Action For A Thwarted House Committee To Proceed In Federal Court

The next purported barrier to the Judiciary Committee's ability to enforce its subpoenas by filing a legal action in federal court is DOJ's suggestion that the Judiciary Committee lacks a cause of action to do so. It is clear that all litigants who bring their claims to federal court for review must have a right to be there. In this regard, DOJ asserts that, unlike the Federal Rules of Civil Procedure that expressly authorize a person with a pending case to initiate a separate action in the district where compliance with a subpoena is required, *see* Fed. R. Civ. P. 45(g), there is no such provision with respect to the enforcement of legislative subpoenas. (Def.'s Mot. at 43.)

This argument is unavailing because, as Judge Bates recognized in *Miers*, Article I of the Constitution is all the cause that a committee of Congress needs to seek a judicial declaration from the court regarding the validity and enforceability of a subpoena that it has allegedly issued in furtherance of its constitutional power of inquiry. *Miers*, 558 F. Supp. 2d at 94; *see also Holder*, 979 F. Supp. 2d at 22. This is because the Supreme Court has long recognized that the Legislative branch is not only

---

[22] DOJ's appeal to *Walker v. Cheney* is also unavailing. In *Walker*, the Comptroller General requested certain information from the Vice President on behalf of four Senators. 230 F. Supp. 2d at 57–58. The Comptroller General sought to obtain withheld documents in order to "aid Congress in considering proposed legislation." *Id*. at 66–67. But, the district court held, the alleged injury to the House's "general interests in legislating and oversight" was "too vague and amorphous to confer standing." That was because Congress itself had "undertaken no effort to obtain the documents at issue, . . . no committee had requested the documents, and no congressional subpoena ha[d] been issued." *Id*. at 67–68. In addition, "the Comptroller General here has not been expressly authorized by Congress to represent its interests in this lawsuit." *Id*. Hence, "an injury with respect to any congressional right to information remain[ed] wholly conjectural or hypothetical." *Id*. (internal citations and quotations omitted).

vested with the broad power to conduct investigations under Article I of the Constitution, but it also has "an implied right to compel compliance with that investigative power." *Miers*, 558 F. Supp. 2d at 90. Consistent with this Court's observations about the legal significance of subpoena power more generally (*see supra* Part III.C), *Miers* explains that "[t]he exercise of Congress's investigative 'power,' which the Executive concedes that Congress has, creates rights," *Miers*, 558 F. Supp. 2d at 91, and that "by utilizing its power to issue subpoenas and proceed with an investigation via compulsory process, Congress creates a legal right to the responsive information that those subpoenas will yield[,]" *id.*

Importantly, the Supreme Court's analysis of the Legislature's Article I investigative power confirms that a committee of Congress's right to enforce its subpoenas is *intrinsic* to its constitutional authority to conduct investigations in the first place. In *McGrain v. Daugherty*, 273 U.S. 135 (1927), the Supreme Court stated unequivocally that "the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *McGrain*, 273 U.S. at 174. Thus, it is the precedent of this district, as established in both *Miers* and in *Committee on Oversight & Government Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013), that the powers provided to Congress in Article I of the Constitution necessarily include the "right to further an investigation by issuing subpoenas and enforcing them in court[.]" *Holder*, 979 F. Supp. 2d at 22.

Past precedents also dispose of DOJ's contention that just because Article I does not expressly mention the right of a committee of Congress to enforce its subpoena power in court means that the courts are now *implying* that the Constitution contains

such right in a manner that contravenes what the Supreme Court has said about implied causes of action.  The Constitution also does not explicitly convey to Congress the specific right to conduct investigations (i.e., what the Supreme Court calls "the power of inquiry"), and yet, the Supreme Court found that such power is intrinsic to the "legislative Power" that Article I expressly conveys to Congress.  *Anderson v. Dunn*, 19 U.S. 204, 230 (1821).  So it is here.  As explained in *Anderson v. Dunn*, "[t]here is not in the whole of [the Constitution], a grant of powers which does not draw after it others, not expressed, but vital to their exercise[.]" *id.* at 225–26.  And in light of *McGrain*'s conclusion (repeated here for emphasis) that "the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function[,]" *McGrain*, 273 U.S. at 174, DOJ cannot seriously maintain that the power to enforce legislative subpoenas is not among these intrinsic rights.  It also cannot be seriously debated that "'the judiciary is clearly discernible as the primary means through which constitutional rights may be enforced'" *Miers*, 558 F. Supp. 2d at 88 (alternations omitted) (quoting *Davis v. Passman*, 442 U.S. 228, 242 (1979)); *see also Bolling v. Sharpe*, 347 U.S. 497 (1954) (finding that the district court had erred in dismissing a suit seeking equitable relief brought directly under the Fifth Amendment, based on alleged race discrimination in school admissions); *Jacobs v. United States*, 290 U.S. 13, 15 (1933) (permitting a plaintiff to bring suit directly under the Fifth Amendment based on allegations that the United States had taken his property for public use without just compensation).  Thus, DOJ's strident contention that "the [Judiciary] Committee must also show that Congress has authorized a cause of action to litigate the Committee's

79

claimed right to compel Mr. McGahn's testimony" (Def.'s Mot. at 52) is plainly meritless.[23]

If Congress does somehow need a statute to authorize it to file a lawsuit to enforce its subpoenas in vindication of its thwarted constitutional rights (for the reasons explained above, it does not), then the Declaratory Judgment Act plainly serves that purpose, as both Judge Bates and Judge Amy Berman Jackson have previously found, in parallel contexts. *See Miers*, 558 F. Supp. 2d at 78–88; *Holder*, 979 F. Supp. 2d at 22. This Court, too, concludes that the Judiciary Committee has satisfied the three established elements for seeking a declaration of rights under this statute: (1) it has established "a case of actual controversy"; (2) it has invoked an "independent basis for federal jurisdiction"; and (3) it has filed an "appropriate pleading." *Miers*, 558 F. Supp. 2d at 79 (internal quotation marks and citation omitted); *see also id.* at 81–82 (holding that where the Constitution creates a right, a plaintiff can use the Declaratory Judgment Act to vindicate that right); *Holder*, 979 F. Supp. 2d at 22 (finding that the House

---

[23] *Reed v. County Commissioners of Delaware County, Pa.*, 277 U.S. 376 (1928), which DOJ cites here, is not to the contrary. DOJ characterizes that opinion as holding "that a committee's power to issue subpoenas does not itself include the power to bring suit to enforce a subpoena in federal court" (*see* Def.'s Mot. at 52), but coming just months after the Court had held in *McGrain* that legislative subpoenas are an enforceable right of Congress, and given that Reed involved individual Senators who had filed suit to compel compliance with a Senate subpoena under circumstances in which those individual plaintiffs had not been authorized to sue on behalf of Congress, it is stretch to interpret the Supreme Court's statement that the suit was not "authorized by law" to stand for the proposition that, if Congress authorizes a committee to file a subpoena-enforcement lawsuit, that committee still has no cause of action to sue. Similarly unavailing is DOJ's reliance on *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018) and *Ziglar v. Abbassi*, 137 S. Ct. 1843 (2017). (*See* Def.'s Mot. at 53.) Both of those cases involved inferring private rights of actions for *damages* for violations of constitutional rights under *Bivens v. Six Unkown Fed. Narcotics Agents*, 403 U.S. 388 (1971), an area in which the Supreme Court has traditionally urged particular caution and deference to Congress, based on separation of powers concerns. *See Jesner*, 138 S. Ct. at 1402 (finding that courts must defer to Congress regarding the creation of a damages remedy "if there are sound reasons to think Congress might doubt the efficacy or necessity" of such a remedy). No such concerns are present here—indeed far from it— because the Constitution conveys (and thus necessarily endorses) the power of inquiry, and Judiciary Committee seeks only declaration and an injunction to vindicate its constitutional rights. *See Miers*, 558 F. Supp. 2d at 89 ("This is not a damages action. Thus, *Bivens* and its progeny are not strictly on point.").

Committee "is not looking to the Declaratory Judgment Act as the source of the right it is seeking to vindicate in this Court, but rather as the source of the mechanism to achieve the vindication of a right derived elsewhere"). That is all the law requires.

3. There Is No Separation-Of-Powers Impediment To The Judiciary Committee's Seeking To Vindicate Its Rights In Federal Court

DOJ's final argument as to why a duly authorized committee of the House of Representatives cannot be permitted to file a subpoena-enforcement lawsuit in federal court, even though ordinary civil litigants generally have unfettered access to the federal courts for this purpose, relies on a reassertion of constitutional separation-of-powers principles. (*See* Def.'s Mot. at 40–43.) Judge Bates soundly rejected DOJ's separation-of-powers-based lack of standing arguments in *Miers*. *See Miers*, 558 F. Supp. 3d at 95–99. This Court further addresses most of the conceptual problems with DOJ's arguments restricting the power of the courts to review a claim brought by a House committee against the Executive branch elsewhere in this Memorandum Opinion. (*See supra* Part IV.A.2.) In this section, the Court homes in on the obvious red flag that immediately appears with respect to even the most cursory review of DOJ's arguments regarding the constitutional limits of a House committee's subpoena-enforcement authority: the lack of any reason *why* the Constitution should be construed to command, or even countenance, this result, especially when other subpoena issuers routinely enlist the aid of the federal courts with respect to enforcing their mandates. (*See* Hr'g Tr. at 57:14–59:12.)

Apparently undisturbed by the manifest inequity of treating a committee of Congress less favorably than a litigating private citizen when it comes to identifying the appropriate mechanisms for the vindication of established legal rights, DOJ's brief

81

ignores this problem entirely.  And when asked about it during the motions hearing (*see* Hr'g Tr. at 57:20–25 (Court noting that "people can issue subpoenas and they can also come to court if the person who receives the subpoena doesn't provide the information that they say they are seeking to compel," and then asking, "why is the House worse off?")), DOJ's counsel responded, first, that "the House has never bothered to pass a statute giving it the authority to do any of this" (*id*. at 58:10–11), and, second, that "the House doesn't execute the laws" (*id*. at 59:1).  The first response is of no moment, since the power to investigate and to issue subpoenas is vested in the House of Representatives by the Constitution itself (*see supra* Part IV.B.2), and thus the Judiciary Committee does not *need* a statute to have the authority to act in vindication of its constitutional interests.  The second point is likewise unavailing, because no one reasonably claims that a private individual who is seeking to have its subpoenas enforced in court is executing laws.  *See Clinton v. Jones*, 520 U.S. 681, 701 (1997) (finding that "there is no suggestion that the Federal Judiciary is being asked to perform any function that might in some way be described as 'executive.'  Respondent is merely asking the courts to exercise their core Article III jurisdiction to decide cases and controversies").

DOJ does little else to address this Court's concerns about the implications of its argument that the Constitution requires the Judiciary Committee to go it alone with respect to seeking to have its subpoenas enforced, and thus, unlike other civil litigants, it cannot seek a court enforcement order.  Nevertheless, DOJ is undaunted, and it seems to float three arguments concerning this issue.  DOJ says (1) that the Judiciary Committee is not disadvantaged because it has other non-court options for enforcing its

subpoenas (*see* Def.'s Mem. at 41–42); (2) that, regardless, history establishes that the Committee does not have the right to sue in court (*see id.* at 32–36); and (3) that there is persuasive and precedential case law in this district that holds that a House committee has no standing to sue the Executive branch (*see id.* at 39.)  For the following reasons, none of these arguments persuades this Court to conclude that the Judiciary Committee cannot proceed to press the legal claims it has brought in this lawsuit.

First of all, the fact that the Judiciary Committee has "several political arrows in its quiver to counter perceived threats to its sphere of power[,]" *Mnuchin*, 379 F. Supp. 3d at 22—including, apparently, the manipulation of its appropriations power to starve the Executive branch of resources as a sanction for contempt (*see* Def. Mem. at 42; *see also* Hr'g Tr. at 65:17–20)—and, therefore, "this lawsuit is not a last resort for the House[,]" *Mnuchin*, 379 F. Supp. 3d at 22, is irrelevant.  The elements that courts must consider to determine whether a plaintiff has Article III standing are well established (*see supra* n.19), and they do not include a "last resort" requirement.  To the extent that federal courts have exercised their equitable powers to stay their own consideration of matters that are otherwise ripe for judicial review, it appears that they have done so in the relatively unusual circumstance in which the parties are on the brink of reaching a negotiated resolution of the conflict, *see, e.g.*, *AT & T I*, 551 F.2d at 394, or in the context of evaluating the justiciability of the plaintiff's claim under the political question doctrine; the latter ordinarily involves assessing the series of factors that the Supreme Court prescribed in *Baker v. Carr¸* 369 U.S. 186, 217 (1962), *see also Zivotofsky*, 132 S. Ct. at 1432 (Sotomayor, J., concurring) (explaining that "the final

three *Baker* factors address circumstances in which prudence may counsel against a court's resolution of an issue presented").  DOJ has disavowed the possibility that the parties here will settle (*see* Def.'s Accommodation Resp. at 2), and a quick review of its briefs indicates that it has not engaged with the *Baker* factors at all.

What is more, DOJ's suggestion that a thwarted House committee must eschew the courts and, instead, must rely on its "power to withhold appropriations" in order "to get the information that it needs" (Hr'g Tr. at 65:18–20) is nearly a practical nullity, because an appropriations sanction for non-compliance with a legislative subpoena cannot be implemented swiftly enough to preserve the utility of a defiant witness's testimony, and it also cannot be achieved without the cooperation of the entire Congress as well as the President whom the Judiciary Committee is investigating and whose allegedly unlawful directive to his senior-level aides is the impetus for the Committee's legal claims.  It is also quite clear that if the House attempts an appropriations penalty, or if it utilizes its sometimes-mentioned inherent power to send the Sergeant at Arms to arrest the contemptuous official, those "political arrows" are far more likely to raise legitimate separation-of-powers concerns than allowing the Judiciary Committee to file a civil action in federal court.

DOJ's second contention fares no better.  As the Court explained above, the fact that there are few recorded instances in the history of our Nation in which Congress has filed a legal claim against the Executive branch in court to enforce its subpoena rights (*see* Def.'s Mot. at 34–35), goes to show, at most, that the Legislature has rarely needed such assistance (*see supra* Part IV. A.2.b).  It says nothing about whether the Judiciary Committee can avail itself of the opportunity to file a legal action against the Executive

branch to protect against alleged transgressions of its Article I power of inquiry, consistent with well-established constitutional principles. And, again, DOJ has not offered a single case in which a binding authority has embraced the proposition that, under the Constitution, the House has no standing to proceed again the Executive branch in federal court despite its satisfaction of the well-worn requirements of a cognizable injury-in-fact that is redressable in the court. (*See supra* n.19.)

The only case that DOJ has offered that appears to provide direct support of this dubious legal proposition is a recent case from this district in which the court concluded that the House lacked standing to proceed in court with respect to its claim that the President's declaration of a national emergency to procure funding for the border wall violated the Appropriations Clause of the Constitution and the Administrative Procedures Act. *See Mnuchin*, 379 F. Supp. 3d at 12; *see also id*. at 10 ("This is a case about whether one chamber of Congress has the 'constitutional means' to conscript the Judiciary in a political turf war with the President over the implementation of legislation."). Notably, the *Mnuchin* case can be, and most likely should be, read to stand for the much more modest contention that the House had failed to satisfy the well-established injury-in-fact standing requirement, because the harm that it alleged was not a cognizable injury. *See id.* at 13 ("The Administration concedes, and the Court agrees, that only the first prong of the standing analysis—injury that is concrete and particularized—is at issue here. Applying the 'especially rigorous' analysis required, the Court finds that the House has failed to allege such an injury. So the Court must deny the House's [preliminary injunction] motion." (internal citation omitted)). Furthermore, in this regard, the *Mnuchin* case helpfully and specifically distinguished

"the supposed harm to Congress' Appropriations power[,]" *id.* at 16, from the harm to Congress' well founded investigatory interests, *id.* at 17, which is what the Judiciary Committee alleges in the instant case (*see* Pl's Mem. at 34–35). But if the essential holding of *Mnuchin* is that "[t]he Committee lacks standing foremost because centuries of historical practice show that the injury the Committee claims is not one traditionally deemed capable of redress through judicial process[,]" as DOJ suggests (Def.'s Mem. at 32 (citation omitted)), then this Court believes its holding is erroneous.

Here is why. The assertion that historical practice alone compels the conclusion that a dispute between the Executive branch and the Legislature is non-justiciable appears to rest on the Supreme Court's redressability reminder in *Raines* that a legally cognizable injury for standing purposes is an injury that has been "traditionally thought to be capable of resolution through the judicial process." (*See* Def.'s Mem. at 33 (quoting *Raines*, 521 U.S. at 826).) DOJ argues (and *Mnuchin* appears to accept) that *Raines* "teaches that in evaluating whether a suit between the political Branches is justiciable, a federal court must evaluate whether such a suit is consistent with historical practice." (Def.'s Mem. at 32.) A review of Supreme Court case law in the more than two decades since *Raines* was decided casts doubt on DOJ's conclusion that *Raines*'s historical overview was the primary determinant of the Supreme Court's holding there that the patently amorphous harm that the plaintiffs had alleged was not a cognizable injury. But even if *Raines* implicitly amended the Supreme Court's traditional Article III standing criteria to include an historical-practice element when a plaintiff's injury is assessed for the purpose of determining standing, in this Court's view, that element cannot be satisfied based solely on the fact that there are few

recorded cases in which that particular injury was previously claimed. As demonstrated above, a dearth of similar case law could just as easily be interpreted to mean that the political branches have typically been able to find other acceptable ways to resolve their disputes, and thus have avoided litigation. (*See* Part IV.A.2.b.) In other words, where the historical record shows that disputes between the Executive branch and the Legislature concerning the claimed injury are typically resolved through negotiation, the lack of prior cases says nothing about the *capability* of resolving those kinds of legal issues in the courts.

This Court also notes, as a general matter, that the utility of history depends on an assumption that the terms and conditions of the "battle" between the political branches *now* are the same as those that gave rise to similar disputes *in the past*. However, we are at a point in history in which the Executive branch appears to be categorically rejecting once-accepted and standard applications of Legislative and Judicial branch authority; therefore, federal courts are being called upon to evaluate novel exercises of Executive power that allegedly threaten the prerogatives of the other branches of government in unique ways. *See, e.g.*, Def.'s Mem. in Opp'n to the Mot. for Prelim. Inj., *Make the Road N.Y. v. McAleenan*, No. 19-cv-2369 (D.D.C.), at 75 (characterizing the statutorily required remedy for a procedural violation of the Administrative Procedure Act as a "nationwide injunction" and, having done so, arguing that that courts cannot invalidate unlawful agency rules in their entirety); *El Paso Cty. v. Trump*, No. 19-cv-66, 2019 WL 5092396 (W.D. Tex. Oct. 11, 2019) (rejecting the Executive branch argument that transferring funds for border wall construction from congressional appropriations made for other purposes is lawful); *City*

*of Philadelphia v. Attorney Gen. of United States*, 916 F.3d 276 (3d Cir. 2019), reh'g denied (June 24, 2019) (holding that Executive branch withholding of a congressional law enforcement grant because the City failed to comply with certain conditions that required greater coordination with federal officials on matters of immigration enforcement exceeded the authority granted to the Attorney General by Congress). This reality plainly limits the lessons that can properly be drawn from history. It also renders unpersuasive DOJ's assertion that, based on the branches' lengthy track record of negotiated resolutions, today's Judiciary Committee should be deemed to lack standing to protect its vital interests in the courts. In this Court's view, the fact that federal courts throughout history have not had occasion to address the kinds of perceived threats to constitutional and procedural norms that are being brought to federal courts' attention regularly in the present day actually says more about the unprecedented nature of the challenged actions and legal positions of the Executive branch than it does about the nature of the Judiciary Committee's claim or harm.

In any event, the federal courts have their *own* recorded history, and it consists of the precedential rulings that prior courts have rendered with respect to similar legal issues. (*See supra* Part III.B.) In this regard, the *Miers* case persuasively determined that the Judiciary Committee had Article III standing to file a subpoena-enforcement lawsuit seeking to vindicate its investigatory interests when a former White House Counsel refused to appear for testimony as directed. *See Miers*, 558 F. Supp. 2d at 68–78. And that case further noted that "the [Supreme] Court has never held that an institution, such as the House of Representatives, cannot file a suit to address an institutional harm." *Id*. at 70. No interim developments have changed the status of the

law.  Additionally, upon review of the Supreme Court's past jurisprudence on the matter, this Court found the following quote that renders dubious the standing and cause-of-action arguments that DOJ presses now:  "Without the power to investigate—including of course the authority to compel testimony, *either through its own processes or through judicial trial*—Congress could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively."  *Quinn v. United States*, 349 U.S. 155 (1955).

### C. The President Does Not Have The Power To Prevent His Aides From Responding To Legislative Subpoenas On The Basis Of Absolute Testimonial Immunity

The merits legal issues that the instant dispute between the House Judiciary Committee and the Executive branch raises are straightforward.  The Committee claims that it has issued a lawful subpoena to former White House Counsel Donald F. McGahn II (*see* Compl. ¶ 107); that McGahn has refused to appear before the Committee to provide testimony as required (*id.* ¶ 109); and that "[t]here is no lawful basis for McGahn's refusal to appear before the Judiciary Committee" (*id.* ¶ 110).  For its part, DOJ asserts that, consistent with its understanding of the longstanding view of the Department's Office of Legal Counsel, there *is* a lawful basis for McGahn's defiance of the Committee's valid subpoena:  the President has ordered him not to.  (*See* Def.'s Mot. at 27.)  DOJ asserts that current and former senior-level presidential aides have "absolute testimonial immunity" from compelled congressional process, as a matter of law; therefore, if the President invokes "executive privilege" over a current or former aides' testimony—as he has done with respect to McGahn—that aide need not accede to the lawful demands of Congress.  (*Id.* at 27–28.)  Thus, it is important to note at the outset, what is *not* at issue in the instant case.  No one contests the lawfulness of the

Judiciary's subpoena, and no one maintains that, if McGahn has the legal duty to testify before the Committee, that a senior-level aide in his position has no right to invoke executive privilege to withhold certain information in the course of his testimony, as appropriate.[24]

For the reasons that follow, this Court finds that the President does not have (and, thus, cannot lawfully assert) the power to prevent his current and former senior-level aides from responding to congressional subpoenas. As Judge Bates explained in *Miers*, as a matter of law, such aides do not have absolute testimonial immunity. Therefore, as it relates to them, a valid legislative subpoena issued by a duly authorized committee of Congress gives rise to a legally enforceable duty to perform. The President cannot override this duty, notwithstanding OLC's ostensible recognition of such power. Accordingly, if a duly authorized committee of Congress issues a valid legislative subpoena to a current or former senior-level presidential aide, the law requires the aide to appear as directed, and assert executive privilege as appropriate. *See Miers*, 558 F. Supp. 2d at 106.

1.     *Miers* Squarely Rejects The Argument Senior-Level Presidential Aides Enjoy Absolute Testimonial Immunity

*Committee on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008), is the only recorded case in our Nation's history that directly addresses the legal argument that a senior-level presidential aide is immune to a

---

[24] The astute reader will note that the Judiciary Committee's complaint does include an allegation that "[t]he President has waived executive privilege as to the subpoenaed testimony that relates to matters and information discussed in the Report." (Compl. ¶ 112.) However, by consent of the parties and with respect to the Court's consideration of the pending cross-motions for summary judgment, the question of whether and to what extent McGahn can actually invoke executive privilege during his testimony before the Committee in light of the President's alleged waiver has been put on hold.

legislative subpoena seeking testimony when the President directs him to ignore that congressional mandate. The dearth of cases involving compelled congressional process issued to Executive branch officials is likely attributable to the fact that subpoena-related conflicts between Congress and the Executive branch are usually negotiated, rather than litigated, as DOJ points out. (*See* Def.'s Mot. at 33–36.) In addition, while direct subpoena-related disputes between Congress and the Executive branch do exist, it appears that such conflicts have been relatively infrequent; the Court suspects that this is attributable to the fact that, as a general matter, Congress's clear constitutional prerogative to compel information in furtherance of its legislative and oversight functions has been historically recognized and is typically widely respected. *See Watkins*, 354 U.S. 187–88. Regardless, *Miers* is precedential with respect to the merits of DOJ's assertion that absolute testimonial immunity shields senior-level presidential aides, because Judge Bates squarely confronted the issue of whether the law permits the legal duty that arises when a senior-level presidential aide receives a legislative subpoena to be, in essence, canceled by the President.

In *Miers*, Judge Bates begins by stating his conclusion that "the asserted absolute immunity claim here is entirely unsupported by existing case law." *Miers*, 558 F. Supp. 2d at 99. The court explained that it had reached that conclusion primarily because "there is Supreme Court authority that is all but conclusive on this question and that powerfully suggests that such advisors do not enjoy absolute immunity." *Id. Miers* then turned to that case law, beginning with *United States v. Bryan*, 339 U.S. 323 (1950), in which "[t]he Supreme Court has made it abundantly clear that compliance with a congressional subpoena is a legal requirement." *Id.* (citing *Bryan*, 339 U.S. at

331).[25]  The *Miers* court next explained how, in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)—a case in which senior White House aides had been sued for civil damages— the Supreme Court had "virtually foreclosed" the argument that senior-level White House aides were entitled to absolute testimonial immunity.  *Miers*, 558 F. Supp. 2d at 100–01.  This was because, according to *Miers*, *Harlow* had concluded that such aides were, at best, entitled to *qualified* immunity, notwithstanding the fact that "absolute immunity [for civil damages] extended to legislators, judges, prosecutors, and the President himself[.]"  *Id.* at 100; *see also id.* (noting that, in *Harlow*, "the Supreme Court rejected the analogy to legislative aides that the Executive now invokes here").[26]

Even with respect to the underlying contention that the President himself is entitled to absolute testimonial immunity, *Miers* found binding Supreme Court cases that compelled the opposite conclusion.  For example, according to Judge Bates, *United States v. Nixon*, 418 U.S. at 707–08, holds that the President "may only be entitled to a presumptive, rather than an absolute, privilege[,]" and it would be manifestly inconsistent with the Supreme Court's holding in that regard to accord presidential aides a "superior card of immunity."  *Miers*, 558 F. Supp. 2d at 103.  Judge Bates also noted that, in *Clinton v. Jones*, 520 U.S. 681 (1997), "then-Chief Justice Rehnquist joined in the holding that even the demands of the President's schedule could not

---

[25] *Miers* noted, in particular, *Bryan's* classic observation that "[a] subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase."  *Miers*, 558 F. Supp. 2d at 99 (quoting *Bryan*, 339 U.S. at 33) (internal quotation marks omitted).

[26] *Harlow* addressed the applicability of the "alter ego" derivative immunity that the Supreme Court had determined applied to *legislative* aides in a case called *Gravel v. United States*, 408 U.S. 606 (1972), to senior-level presidential aides who worked in the White House.  457 U.S. at 809–11.  Like DOJ in this case (and in *Miers*), the argument on the table was that senior-level presidential aides should be deemed to have the absolute immunity from civil damages that the law confers to their boss.  *Id.* at 808.  As *Miers* pointed out, the *Harlow* Court rejected that argument.  *Id.* at 813.

relieve him of the duty to give a civil deposition." *Miers*, 558 F. Supp. 2d at 104

(citing *Clinton*, 520 U.S. at 706). And based on this key holding, Judge Bates pointed

out that "[i]f the President must find time to comply with compulsory process in a civil

lawsuit, so too must his senior advisors for a congressional subpoena." *Id*. at 105.

*Miers* also specifically rejected the asserted separation-of-powers basis for

recognizing absolute testimonial immunity by relying on the D.C. Circuit's language in

*Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973). There, in the context of a case

involving the enforcement of a grand jury subpoena *duces tecum* served on the

President, the Circuit specifically asserted that, "[i]f the claim of absolute privilege was

recognized, its mere invocation by the President or his surrogates could deny access to

all documents in all the Executive departments to all citizens and their representatives,

*including Congress*, the courts as well as grand juries, state governments, state officials

and all state subdivisions." *Sirica*, 487 F.2d at 715; *see also id.* (noting that, if absolute

immunity existed, "[t]he Freedom of Information Act could become nothing more than

a legislative statement of unenforceable rights[,]" and cogently concluding that

"[s]upport for this kind of mischief simply cannot be spun from incantation of the

doctrine of separation of powers"). And Judge Bates ably reasoned that "[t]hat passage

rather plainly contemplates that executive privilege is not absolute even when

Congress—rather than a grand jury—is the party requesting the information." *Miers,*

558 F. Supp. 2d at 103.

Finally, *Miers* further recognized that, "[t]ellingly, the only authority that the

Executive can muster in support of its absolute immunity assertion are two OLC

opinions authored by Attorney General Janet Reno and Principal Deputy Assistant

Attorney General Steven Bradbury, respectively." *Id.* at 104 (citing *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1 (1999); *Immunity of the Former Counsel to the President From Compelled Congressional Testimony*, 31 Op. O.L.C. 191 (2007)). *Miers* explained that because "[t]hose opinions conclude that immediate advisors to the President are immune from compelled congressional testimony[,] [t]he question, then, is how much credence to give to those opinions." *Id.* Ultimately, *Miers* determined that the opinions were not persuasive, largely because "[n]either cites to a single judicial opinion recognizing the asserted absolute immunity." *Id.* Furthermore, "the three-page Bradbury OLC opinion was hastily issued on the same day that the President instructed Ms. Miers to invoke absolute immunity, and it relies almost exclusively upon the conclusory Reno OLC opinion and a statement from a memorandum written by then-Assistant Attorney General William Rehnquist in 1971." *Id.*

In this Court's view, *Miers* employs sound reasoning. And with respect to the merits analysis, this Court adopts its absolute testimonial immunity analysis in full. In particular, the Court, too, reads the cited cases to support the finding that DOJ's absolute testimonial immunity argument is all but foreclosed by the binding case law the *Miers* cites, coupled with the logical flaws in DOJ's legal analysis, which is laid out in the discussion below. In short, this Court finds that the *Miers* court rightly determined not only that the principle of absolute testimonial immunity for senior-level presidential aides has no foundation in law, but also that such a proposition conflicts with key tenets of our constitutional order. And, notably, no other court has considered

the absolute testimonial immunity question that *Miers* addressed since that case was decided.[27]

In the context of the instant case, DOJ responds by asserting that *Miers* was wrongly decided. (*See* Def.'s Mot. at 48.) Moreover, and in any event, DOJ has emphasized that *Miers*'s sphere of influence is exceedingly limited. (*See* Hr'g Tr. at 118:13–118:14.) The thrust of the latter contention is that *Miers* is only one opinion— no binding authority followed—and, implicitly, the law is not established by the word of a single district court judge. *See id.* On the other hand, says DOJ, scores of OLC attorneys have considered this issue over the past five decades, and in a series of opinions, OLC has carefully concluded that senior-level presidential aides do enjoy absolute testimonial immunity. (*See* Def.'s Mot. at 60.) And by minimizing *Miers*'s reach in this way, DOJ suggests that, in the absence of a groundswell of judges rejecting the concept, this Court should not readily find that the law is what *Miers* concluded.

Setting aside the implications of DOJ's argument for *this* district court's consideration of these issues, its effort to undercut *Miers*'s holding is ineffectual, primarily because the argument inappropriately downplays both the importance of prior precedent in establishing the law as the next court understands it, and also the fact that DOJ itself controls whether more courts will have the opportunity to rule on the issue. To be sure, *Miers* is just one non-binding opinion. But, as noted, its analysis with

---

[27] In *Committee on Oversight & Government Reform v. Holder*, District Judge Amy Berman Jackson evaluated whether, pursuant to a congressional subpoena, documents over which the Attorney General had asserted executive privilege must be turned over to the congressional committee. 979 F. Supp. 2d 1. Although the *Holder* opinion adopts *Miers*'s reasoning with respect to the threshold issues of jurisdiction, standing, and cause of action, *see id.* at 10–12, 17–26, that court had no occasion to consider the merits of the absolute testimonial immunity claim that DOJ makes here.

respect to the absolute testimonial immunity issue is directly on point; therefore, it has considerable sway in terms of this Court's conclusions. Moreover, and in any event, this Court cannot ignore it and still remain consistent with traditional juridical norms.

Thus, DOJ's best chance of persuading this Court to rule differently was to counter the various aspects of *Miers*'s holding *directly*; a skillful play-by-play of *Miers*'s alleged analytical flaws would have been most useful. Instead, in its briefing, DOJ has presented essentially the same threshold and merits arguments that *Miers*'s rejected, almost as if this was a matter of first impression, and thus, it has given the Court no reasonable basis to distinguish the circumstances of the instant case, nor any principled reason to interpret the law in a different fashion than Judge Bates did, as explained above. (*See, e.g.*, Def.'s Mot. at 48–50 (asserting, over the span of two pages, that *Miers* was wrongly decided with respect to the threshold jurisdictional and standing issues, before proceeding to draw solely from OLC opinions to support the argument that senior-level presidential aides have absolute testimonial immunity).) The Court also observes that the lack of other cases on these issues is at least in part attributable to DOJ's prior rational decisions to enter into negotiations over the scope of testimony and records when past Executive branch officials received a legislative subpoena, rather than proceed to court to litigate the purported scope of those officials' purported immunity. (Def.'s Mot. at 32–36.) DOJ further argues here that an Executive branch official's alleged immunity to compelled congressional process is a non-justiciable issue. (Def.'s Mot. at 31–52.) Surely, DOJ cannot both act to keep the immunity issue away from the courts, and also be heard to suggest that the paucity of precedent is itself sufficient proof that the law must countenance the concept.

2. OLC's Long-Held View That Senior-Level Presidential Aides Have Absolute Testimonial Immunity Is Neither Precedential Nor Persuasive

That all said, it is certainly true that OLC has long been of the view that senior-level presidential aides have absolute testimonial immunity; indeed, as *Miers* indicates, the first recorded statement of the agency that specifically commits this view to writing was authored in 1971. *See* Mem. from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, to John D. Ehrlichman, Assistant to the President for Domestic Affairs, *Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971) ("1971 Memorandum"). In that year, then-Assistant Attorney General William Rehnquist produced a memorandum on the point that maintained (without direct citation) that "[t]he President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis—should be deemed absolutely immune from testimonial compulsion by a congressional committee." *Id.* at 7. This OLC memorandum further indicated that such persons "not only may not be examined with respect to their official duties, but they may not even be compelled to appear before a congressional committee." *Id.* But, of course, as definitive as this statement of law sounds, OLC serves as legal counsel to the Executive branch, and "the Executive cannot be the judge of its own privilege[.]" *Miers*, 558 F. Supp. 2d at 106. Consequently, its statement of the law is "entitled to only as much weight as the force of [its] reasoning will support." *Id.* at 104.

In this Court's view, the persuasiveness of OLC opinion that senior-level presidential aides enjoy immunity from compelled congressional process turns on two familiar factors: the authority that is provided in support of this proposition, and the reasons that are provided for why the author reached this conclusion. With respect to

the first consideration, it cannot be overstated that the 1971 Memorandum does not cite to a single case that stands for the asserted proposition, and the ten-plus subsequent statements by OLC that DOJ points to in support of this immunity simply reference back to the 1971 Memorandum without providing any court authority. It goes without saying that longevity alone does not transform an unsupported notion into law.

As for the logic behind the view, the original memorandum appears to reason by by analogy. It begins by recognizing the breadth of Congress' power of inquiry, which admittedly "carries with it the power to compel the testimony of a witness." 1971 Mem. at 1. And then as if providing the solution to a problem that it had not yet identified, the memo states that "if White House staff personnel are to be exempt from appearing or testifying before a congressional committee, it is because they have some special immunity or privilege not accorded others." *Id.* at 1. The remainder of the 8-page document devotes itself to developing potential reasons for such a privilege. It suggests, for example, "a certain analogy to judicial proceedings[,]" in which a "distinction" is made "between a claim of absolute immunity from even being sworn in as a witness, and a right to claim privilege in answering certain questions in the course of one's testimony as a witness." *Id.* at 4.

Ultimately, the 1971 Memorandum pushes for the former, on the basis of a handful of historical examples in which former assistants to various Presidents blatantly refused to appear before Congress in response to a legislative subpoena. *See id.* at 5–6. At least one of these folks was apparently polite enough to write a letter to the committee that "grounded his refusal on the confidential nature of his relationship with the President." *Id.* at 5. But others merely sent congressional subpoenas back with the

simple statement that "[i]n each instance that President directed me, in view of my duties as his Assistant, not to appear before your subcommittee." *Id.* at 5; *see also id.* at 6.

Tellingly, the 1971 Memorandum does not purport to suggest that the law already countenanced such behavior. Rather, the posture of the Memorandum appears to be a policy piece that provides its client with arguments for why it should be thus. Moreover, as *Miers* notes, Rehnquist admitted that "his conclusions [were] 'tentative and sketchy,'" *Miers*, 558 F. Supp. 2d at 104 (quoting 1971 Mem.at 7), and in his later role as a Supreme Court Justice, he "apparently recanted those views[,]" *id.* In one especially candid moment in the text of the Memorandum, Rehnquist admits that the historical precedents for refusing a congressional subpoena "are obviously quite inconclusive" but that "[i]n a strictly tactical sense, the Executive Branch has a headstart in any controversy with the Legislative Branch, since the Legislative Branch wants something the Executive Branch has, and therefore the initiative lies with the former." 1971 Mem. at 7. He continued: "[a]ll the Executive has to do is maintain the *status quo* and he prevails." *Id.* It is not surprising that, per this initial internal effort to establish the ways in which certain White House staff could prevail in any conflict with Congress over their legally enforceable duty to appear for testimony when subpoenaed, OLC subsequently developed an entire series of statements, each of which references the 1971 Memorandum, but none of which specifically acknowledges that the initial basis for this conclusion was seemingly formed out of nothing.[28]

---

[28] The Executive appears to have adopted a practice of regularly securing a new OLC opinion on the existence of testimonial immunity whenever faced with a new Congressional subpoena. *See, e.g.*, *Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to the*

This inauspicious start does not bode well for this Court's determination of whether OLC's persistent opinion that senior-level aides to the President are absolutely immune from having to respond to compelled congressional process should be credited. Additionally, subsequent developments in caselaw have cast doubt on the 1971 Memorandum's suggestion that the matter of the President's own absolute immunity was settled because "[e]veryone associated with the Executive Branch from [the prosecution of Aaron Burr] until now, so far as I know, has taken the position that the President himself is absolutely immune from subpoena by anyone[.]" 1971 Mem. at 3; *see also Clinton v. Jones*, 520 U.S. 681 (1997); *United States v. Nixon*, 418 U.S. 683 (1974).[29] Moreover, in this first formal floating of the principle of absolute testimonial immunity for certain aides of the President, the author was also crystal clear that the "absolute immun[ity] from testimonial compulsion by a congressional committee" that he was proposing was primarily due to the fact that such "immediate advisors" are "presumptively available to the President 24 hours a day, and the necessity of either accommodating a congressional committee or persuading a court to arrange a more convenient time, could impair that availability." 1971 Mem. at 7. Of course, that analysis does not support the extension of absolute immunity to *former* senior-level aides that DOJ has pressed in recent times.

---

*President*, 43 Op. O.L.C. __, at *1; *Immunity of Former Counsel to the President from Compelled Cong. Testimony*, 31 Op. O.L.C. 191 (2007).

[29] *Miers* suggests that the contention that the President enjoys absolute immunity from compelled congressional process was dubious as a legal proposition long before the Nixon and Clinton cases. *See Miers*, 558 F. Supp. 2d at 70. In this regard, Judge Bates points to Chief Justice Marshall's opinion in *United States v. Burr*, 25 F. Cas. 30 (C.C.D. Va. 1807). In *Burr*, Chief Justice Marshall explained that "the obligation [to comply with a subpoena] . . . is general; and it would seem that *no person* could claim an exemption from [it]." *Id*. at 34 (emphasis added). Therefore, in Chief Justice Marshall's view, "[t]he guard, furnished to [the President], to protect him from being harassed by vexatious and unnecessary subpoenas, is to be looked for in the conduct of a court after those subpoenas have issued; not in any circumstance which is to precede their being issued." *Id*.

In fairness, over time, the initial take on absolute testimonial evolved. It appears that OLC's subsequent statements in support of this proposition were beefed up with various other reasons for why one could plausibly assert that certain aides of the President should be absolutely immune from having to testify before Congress, which reasons largely invoke constitutional separation of powers concerns, including potential harassment of the aides (and thus, the President), the risk of disclosure of information covered by executive privilege, and the appearance that the Executive branch is subordinate to the Legislature. *See, e.g.*, *Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to the President*, 43 Op. O.L.C. __, at *2 ("Absent immunity, congressional committees could wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." (quotation marks and citation omitted)); *McGahn OLC Mem.*, 43 Op. O.L.C.__, at *5 ("The President is a separate branch of government. He may not compel congressmen to appear before him. As a matter of separation of powers, Congress may not compel him to appear before it." (quotation marks and citation omitted)); *Immunity of the Assistant to the President*, 38 Op. OLC at *4 ("The pressure of compelled live testimony about White House activities in a public congressional hearing would . . . create an inherent and substantial risk of inadvertent or coerced disclosure of confidential information relating to presidential decisionmaking—thereby ultimately threatening the President's ability to receive candid and carefully considered advice from his immediate advisers."). Many of these reasons appear in the brief that DOJ has submitted to support absolute immunity in the

context of this case. But, unfortunately for DOJ, its mere recantation of these aspirational assertions does not make the proposition any more persuasive, and in fact, given the history of how OLC's opinion has developed, it appears that an endorsement of the principles that OLC espouses would amount to adopting the absolute testimonial immunity for senior-level presidential aides by *ipse dixit*. Furthermore, because there are few, if any, well-formulated justifications for categorically excusing current and former senior-level presidential aides from responding to compelled congressional process, it would be difficult to do so consistent with existing case law, traditional norms of practice under our constitutional system of government, and common sense.

   3.   There Is No Principled Basis For Concluding That Senior-Level
        Presidential Aides Should Have Absolute Testimonial Immunity

DOJ maintains that its contention that senior-level presidential aides should enjoy absolute testimonial immunity plainly follows from two related premises: (1) that the President himself has absolute testimonial immunity from compelled congressional process, and (2) that, as a derivative matter, so too must his "immediate advisors. . . with whom the President customarily meets on a regular or frequent basis." (Def.'s Mot. at 60; *see also* Hr'g Tr. at 107:12-14 (acknowledging that DOJ is making "purely a derivative argument[,]" and that if the Court does not "think the President has absolute immunity, then that is a serious problem").) In *Miers*, Judge Bates ably explains that both of these assumptions stand on shaky footing after *United States v. Nixon*, *Clinton v. Jones,* and *Harlow v. Fitzgerald*. *See Miers*, 558 F. Supp. 2d at 100–05. This Court agrees with *Miers*'s analysis, and it also observes that none of the differences that DOJ has highlighted between the instant case, on the one hand, and *Clinton* and *Nixon*, on

102

the other, actually matters.[30]  The following brief observations further demonstrate that

the proposition that senior-level presidential aides are entitled to absolute testimonial

immunity has no principled justification, which further undermines DOJ's assertion that

such immunity must exist.

First of all, the concept of absolute immunity from compelled congressional

process cannot be gleaned from cases that endorse absolute testimonial immunity for

legislators, or those that accept absolute immunity *from civil damages* for a variety of

public officials.  For example, DOJ's reliance on *Gravel v. United States*, 408 U.S. 606

(1972) is obviously misplaced, because legislative aides derive their absolute immunity

from the Constitution's provision of absolute testimonial immunity to congresspersons

through the Speech and Debate Clause.  *See id.* at 615–17.  As *Miers* explained, the

Supreme Court in *Harlow* specifically addressed the argument that such immunity

applies to senior-level executive aides, then concluded that, in contrast to legislative

aides, senior-level executive aides are only entitled to *qualified* immunity.  *Harlow*, 457

U.S. at 809.

Nor can DOJ reasonably rely on the well-established body of case law that

applies to the very different circumstance of immunity from civil damages.  There are

---

[30] DOJ attempts to distinguish the *Clinton* and *Nixon* cases on the grounds that those cases involved subpoenas issued in the context of a private, civil action for damages and in grand jury proceedings, respectively, while, here, what is at issue is a *legislative* subpoena.  DOJ further contends that, in *Nixon*, live testimony by the President was not at issue.  However, these distinctions are immaterial from the standpoint of the Supreme Court's conclusion that, while presumptively important, a President's confidentiality interests may sometimes be overridden over his objection.  Furthermore, in this Court's view, DOJ's emphasis on the fact that what is at issue here is a *legislative* subpoena undercuts its argument, given the Supreme Court's long-held reverence for Congress's broad investigative authority.  Where the law has not provided absolute immunity for Presidents who are facing significant civil damages lawsuits or who have criminal exposure (i.e., compelling claims to the need for confidentiality), it seems unlikely that a President would be declared absolutely immune from compelled congressional process.

*reasons* why courts have determined that judges, and legislators, and presidents cannot be held liable for civil damages for discretionary decisions that they make in the course of their duties. *See, e.g.*, *Forrester v. White*, 484 U.S. 219, 225 (1988) (finding that absolute immunity from civil damages for judicial acts protects "the finality of judgments[,] discourage[es] inappropriate collateral attacks, [and] protect[s] judicial independence by insulating judges from vexatious actions prosecuted by disgruntled litigants" (citation omitted)); *Nixon v. Fitzgerald*, 457 U.S. 731, 751 (1982) (holding that the President is absolutely immune from civil damages due to "the singular importance of the President's duties," and that "diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government"); *Tenney v. Brandhove*, 341 U.S. 367, 375 (1951) (explaining that legislators "must be free to speak and act without fear of criminal and civil liability" as the reason for the absolute immunity endowed by the Speech and Debate Clause and similar provisions in "[f]orty-one of forty-eight State[]" constitutions); *see also Imbler v. Pachtman*, 424 U.S. 409, 424 (1976) (explaining the purpose of absolute immunity from civil damages for prosecutorial acts is to allow a prosecutor "to exercise his best judgment both in deciding which suits to bring and in conducting them in court"). And at least one of these justifications does not seem at all applicable to the reasons why one might have immunity from compelled congressional process.[31] One cannot simply

---

[31] For example, in *Mireles v. Waco*, 502 U.S. 9 (1991), the Supreme Court found that the district court had properly dismissed a case brought against a judge who had allegedly authorized police officers to use excessive force in seizing an individual because "a judicial officer, in exercising the authority vested in him, [must] be free to act upon his own convictions, without apprehension of personal consequences to himself." *Id.* at 10. By contrast, an executive branch official has no parallel expectation that he or she will not be called upon to testify about the operations of their offices. Indeed, Congress's long standing and widely accepted power of inquiry, makes the potential for being questioned about one's work an ever present possibility.

assume that the same rationale that compels the conclusion that those who hold certain civil functions are absolutely immune *from civil damages* necessitates absolute immunity *from compelled congressional process*, even for those same individuals.

DOJ's conception of absolute testimonial immunity for senior-level aides also turns out to be overbroad in application, which results in its imposing unwarranted societal costs. To understand why this is so, it is helpful to reflect on a hypothetical that the Court posed during the motions hearing. The Court posed to DOJ counsel a scenario in which an authorized House committee is interested in determining whether to appropriate special funding to improve the décor and the infrastructure-related working environment inside the White House. (Hr'g Tr. 124:8–20.) The committee wishes to evaluate the need for such additional funding, and it wants to talk to everyone who works there, and to compel this witness testimony, if needed. The Court asked DOJ counsel whether, if subpoenas issue, could the White House Counsel invoke absolute testimonial immunity to excuse the participation of senior-level presidential aides? (*See id.*)

After engaging briefly with the Court in a humorous exchange about the Executive branch's interest in addressing certain issues that currently exist with the White House (*see id.* at 124:21–22), DOJ counsel responded that "the President would probably allow his most sensitive aides to go testify" but "if the person has testimonial immunity and the President has asserted it . . . then, yes, [the committee] wouldn't be able to compel the person." (Hr'g Tr. at 124:25–125:6.) Upon reflection, looking at it logically, one has to wonder why that is the case? Those aides' status as senior-level assistants to the President seems irrelevant—i.e., when it comes to being asked about

the decor in the White House, either *no* White House worker should have to be bothered with Congress's questions, or *everyone* who is called should have to appear.  Therefore, the distinction between aides with heightened knowledge, access to the President, and special responsibilities (i.e., senior-level presidential aides) makes no difference where the topic of Congress's investigation does not even conceivably implicate such distinction.  Why, then, should senior-level presidential aides always get to play a special trump card with respect to such congressional requests?  Judge Bates reflected on a similar concern in *Miers*, and DOJ has yet to explain why "Congress should be left with no recourse to obtain information that is plainly not subject to any colorable claim of executive privilege."  *Miers*, 558 F. Supp. 2d at 106.

On the other hand, if Congress seeks to explore with certain senior-level White House aides topics of a potentially sensitive nature, it is widely accepted that the President can exert executive privilege with respect to his aides' answers, as appropriate, to protect any privileged information.  *Miers*, 225 F. Supp. 2d at 106.  Given this, the question becomes why, then, would such senior-level aides *need* absolute immunity?  In other words, even without a total exemption from compelled congressional process, senior-level White House aides can withhold the kinds of confidential and privileged information that distinguishes them from everybody else; they can do so by asserting an appropriate privilege if needed, when legislators ask questions that probe too deeply.  Thus, it appears that absolute testimonial immunity serves only the indefensible purpose of blocking testimony about *non*-protected subjects

that are relevant to a congressional investigation and that such an aide would otherwise have a legal duty to disclose.[32]

Notably, this would appear to be the case even with respect to aides who, like White House Counsels, are "at the hub of all presidential activity." (Def.'s Mot. at 69 (internal quotation marks and citation omitted)). To be sure, White House Counsels and other similar aides have unfettered access to the President on a regular basis (*see id.*), and their roles with the Executive branch involve daily contact with copious amounts of information that is confidential in nature, including information that has been classified for our national security. (*See* Def.'s Mot. at 70 (emphasizing that "the role of the Counsel is to provide advice and assistance to the President and to carry out 'responsibilities of utmost discretion and sensitivity' on his behalf in all realms of domestic, military, and foreign affairs" (quoting *Fitzgerald*, 457 U.S. at 749–50).) But DOJ has not persuasively explained why such access warrants absolute testimonial immunity, where such an individual would be counseled in any sworn communications with Congress, and would have ample opportunity to invoke executive privilege or any other lawful basis for withholding information, as needed to protect the legitimate interests of the Executive branch. And, of course, if such an aide cannot lawfully invoke any privilege to protect information in response to the committee's questions,

---

[32] DOJ suggests that there is something about Don McGahn's former proximity to national security matters that warrants his immunity nonetheless. (Def.'s Mot. at 69, 73.) But it has not explained why this is so, given that such senior-level aides would certainly have the right to withhold information on the grounds of an applicable privilege, where appropriate. Thus, the fact that McGahn was "White House Counsel" and undoubtedly had exposure to "matters affecting the military, foreign affairs, and national security" (Def.'s Mot. at 64 (quotation marks and citation omitted)) does not provide an additional justification for a grant of absolute testimonial immunity under these circumstances. If what he knows can be lawfully withheld as covered by an applicable privilege, then the law will preclude its disclosure, even if he is compelled to testify in the absence of immunity. And if he cannot properly invoke the privilege, then there is no rational basis for maintaining that he should be immune to Congress's questioning.

then there is no rational basis for maintaining that he should be immune from responding to Congress's valid subpoena in the first place.

It is also the case that the other rationale that such senior-level presidential aides might hope to rely on—'I'm too busy'—is unavailable in the wake of the Supreme Court's conclusion that even the President himself must find the time. *See Miers*, 558 F. Supp. 2d at 104. In any event, no such excuse could possibly apply to *former* senior-level aides, who have long departed from the White House, because such individuals no longer have proximity to power. What, then, justifies *their* right to be excused from the duty to respond to a call from Congress, especially when other private citizens have no choice? At a minimum, this perplexing question raises the following conceptual conundrum: if the purpose of providing certain senior-level presidential aides with absolute testimonial immunity is that the practicalities of their special roles demand it, then what justifies allowing that entitlement to follow them when they return to private life? As a matter of pure logic, it would seem that if one's access to the Oval Office is the reason that a categorical exemption from compelled congressional process is warranted, then that trump card should, at most, be a raincheck, and not the lifetime pass that DOJ proposes.

DOJ's apparent response to the concern that absolute testimonial immunity for current and former senior-level aides serves no purpose is its suggestion in its briefs that such broad immunity serves three more systematic goals. First, it asserts that absolute testimonial immunity facilitates frank communications in the White House, and without it, the potential "public spectacle" of having to appear before a congressional committee "would surely exert influence over [senior-level aides']

108

conduct in office, and could adversely affect the quality and candor of the counsel" that they offer to the President. (Def.'s Mot. at 70.) DOJ provides no evidence to support this representation. And it appears to contradict the lived experience of the many government officials who have testified before Congress, seemingly without consequence, over the years. *See Miers*, 558 F. Supp. 3d at 102 (observing that "the historical record produced by the Committee reveals that senior advisors to the President have often testified before Congress subject to various subpoenas dating back to 1973").

DOJ's assertions about the chilling effect of compelled congressional process also imply that congressional questioning is needlessly intrusive and unwarranted, and that characterization drastically discounts the reasons why executive branch officials, including members of the President's staff, are called to testify. As the Supreme Court has suggested on numerous occasions, Congress brings in witnesses not as punishment, but to provide the Legislature with the information that it needs to perform its critical legislative and oversight functions. *Watkins*, 354 U.S. at 187; *McGrain*, 273 U.S. at 175. Thus, the idea that having to testify truthfully about the inner workings of government is a threat that would actually be sufficient to prevent key public servants from competently performing as assistants to the President seems anomalous. Moreover, if the institutions of our government are all, in fact, pushing in the same direction as they should be—i.e., toward developing and implementing policies that are in the best interests of the People of the United States—then the possibility that one of the public servants who work within the government might be called upon to cooperate with Congress, and thereby perform his public duty of giving authorized legislators the

means of performing their own constitutional functions, provides no reasonable grounds for fear. And if it does, as DOJ here suggests, then that is all the more reason why such testimony is critical. In short, DOJ's implicit suggestion that compelled congressional process is a 'zero-sum' game in which the President's interest in confidentiality invariably outweighs the Legislature's interest in gathering truthful information, such that current and former senior-level presidential aides should be always and forever immune from answering probing questions, is manifestly inconsistent with a governmental scheme that can only function properly if its institutions work together. *See* The Federalist No. 51 (James Madison).

DOJ's second systematic concern is similarly discordant. DOJ insists that, without absolute testimonial immunity for senior-level presidential aides, the Executive branch would grind to a halt from the weight of the subpoenas that would be thrust upon it. (*See* Def.'s Mot. at 65.) This representation is plainly speculative. Furthermore, such speculation seems unreasonable, given two known facts. First of all, as DOJ itself admits, Congress has long demanded information from high-level members of the Executive branch, apparently without incident. *See Mazars*, 940 F.3d at 721 (noting that Presidents have "been the subjects of Congress's legislative investigations" as far back as 1832, and that "fewer of these have required judicial intervention"). As the Supreme Court commented in *Clinton v. Jones*, the President's "predictive judgment finds little support in either history or the relatively narrow compass of the issues raised in this particular case." *Clinton*, 520 U.S. at 702 (citations omitted)); *see also id*. ("As we have already noted, in the more than 200–year history of the Republic, only three sitting Presidents have been subjected to suits for their private

110

actions.  If the past is any indicator, it seems unlikely that a deluge of such litigation will ever engulf the Presidency.").

In addition, as relevant here, we have a test case by which we can prove, or disprove, DOJ's theory.  The second significant fact is that it has been more than a decade since Judge Bates released the *Miers* decision, which plainly announced that senior-level presidential aides lack absolute immunity from compelled congressional process.  Ironically, *Miers* itself observed that "[i]t is noteworthy that in an environment where there is no judicial support whatsoever for the Executive's claim of absolute immunity, the historical record also does not reflect the wholesale compulsion by Congress of testimony from senior presidential advisors that the Executive fears." *Miers*, 558 F. Supp. 2d at 102.  And the absence of such history seems even more noteworthy at present.  Surely if Congress was inclined to utilize its subpoena power to harass the Executive branch unjustifiably, then *Miers*'s own holding would have given it sufficient impetus to do so.  Yet, even DOJ must acknowledge that no such parade of horribles has happened.

DOJ's third argument for the necessity of absolute testimonial immunity for systematic reasons places it back in the familiar refuge of its constitutional separation-of-powers contentions.  In this regard, it maintains, that "the public spectacle of haling [current and] former advisors to a sitting President before a committee of Congress . . . promote[s] the perception of Executive subservience to the Legislature" (Def.'s Mot. at 70), which, in its view of what the Constitution permits, is improper, because "[a] committee of Congress could not, consistent with the separation of powers, hale the President before it to compel him to testify under oath, any more than the President may

compel congressmen to appear before him" (Def.'s Mot. at 63).  Here, once again, DOJ

calls on separation-of-powers principles to do work that the Framers never intended.

Indeed, *the entire point* of segregating the powers of a monarch into the three different

branches of government was to give each branch certain authority that the others did not

possess.  Thus, while the branches might well be conceived of as co-equals (in the sense

that one cannot unlawfully subvert the prerogatives of another), that does not mean that

all three branches must be deemed to have the *same* powers.  To the contrary, the

President cannot hale members of Congress into the White House for questioning

*precisely because* the power of inquiry resides with the Legislature, and also because

the Constitution itself expressly prevents the Executive branch from becoming

inquisitors by inflicting its own subpoena power on members of Congress for political

reasons.[33]

Therefore, DOJ's argument that the House of Representatives, which

unquestionably possesses the constitutionally authorized power of inquiry and also the

power of impeachment, should *not* be able to issue subpoenas to executive branch

officials because the President cannot do the same to them, simultaneously appreciates

traditional separation-of-powers principles *and* subverts them, and as such, truly makes

no sense.  *See Miers*, 558 F. Supp. 2d at 103 (explaining that the Executive branch's

---

[33] The Speech and Debate Clause mandates that members of the House and Senate and their aides "may not be made to answer—either in terms of questions or in terms of defending himself from prosecution—for the events that occurred" as part of the legislative process.  *See Gravel*, 408 U.S. at 614–16.  The Constitution, therefore, makes legislators and their aides immune to the force of subpoena with respect to protected legislative activity.  The Supreme Court has explained that the Speech and Debate Clause derives from a similar provision of the English Bill of Rights of 1689, which served to address successive monarchs' use of "criminal and civil law to suppress and intimidate critical legislators."  *See United States v. Johnson*, 383 U.S. 169, 179 (1966).  Thus, the purpose of the Speech and Debate Clause is to protect legislators from intimidating and/or hostile executive and judicial inquiry, a common abuse of power in seventeenth century England.  *See id*. at 181–82.  And, notably, the Constitution includes nothing akin to the Speech and Debate Clause for the Executive branch.

112

separation-of-powers interest in "[p]residential autonomy, such as it is, cannot mean that the Executive's actions are totally insulated from scrutiny by Congress. That would eviscerate Congress's historical oversight function").

    4.    <u>Concluding That Presidential Aides Enjoy Absolute Testimonial Immunity At The President's Discretion Conflicts With Core Constitutional Norms</u>

Finally, the Court turns to DOJ's contention that, quite apart from the accepted ability of a President to invoke executive privilege to protect confidential information during the course of aides' testimony before Congress, as a matter of law, it is the President who controls whether such aide provides any testimony whatsoever. During the motions hearing, DOJ's counsel repeatedly emphasized that the power to invoke absolute testimonial immunity with respect to current and former senior-level aides *belongs to the President*. (*See, e.g.*, Hr'g Tr. at 42:15–16 ("[T]he President owns the privilege here. So he is the owner of Mr. McGahn's absolute immunity from compulsion[.]"), 43:4–6 ("[T]he President owns the privilege as to former officials with the same vigor with which he owns it to current officials."), 125:5 (maintaining that immunity is "the President's to assert").) And when asked whether this power of the Executive is limited to such aides' communications with Congress in particular, or also extends to preventing his aides from speaking to anyone else (e.g., the media) even after their departure from the White House, counsel indicated that while the Executive branch has "not taken a position on that," it was "definitely not disclaiming that." (*Id.* at 43:12–16.) This single exchange—which brings to mind an Executive with the power to oversee and direct certain subordinates' communications for the remainder of their natural life—highlights the startling and untenable implications of DOJ's absolute

testimonial immunity argument, and also amply demonstrates its incompatibility with our constitutional scheme.

Stated simply, the primary takeaway from the past 250 years of recorded American history is that Presidents are not kings. *See* The Federalist No. 51 (James Madison); The Federalist No. 69 (Alexander Hamilton); 1 Alexis de Tocqueville, *Democracy in America* 115–18 (Harvey C. Mansfield & Delba Winthrop eds. & trans., Univ. of Chicago Press 2000) (1835). This means that they do not have subjects, bound by loyalty or blood, whose destiny they are entitled to control. Rather, in this land of liberty, it is indisputable that current and former employees of the White House work for the People of the United States, and that they take an oath to protect and defend the Constitution of the United States. Moreover, as citizens of the United States, current and former senior-level presidential aides have constitutional rights, including the right to free speech, and they retain these rights even after they have transitioned back into private life.

To be sure, there may well be circumstances in which certain aides of the President possess confidential, classified, or privileged information that cannot be divulged in the national interest and that such aides may be bound by statute or executive order to protect. But, in this Court's view, the withholding of such information from the public square in the national interest and at the behest of the President is a duty that the aide herself possesses. Furthermore, as previously mentioned, in the context of compelled congressional testimony, such withholding is properly and lawfully executed on a question-by-question basis through the invocation

of a privilege, where appropriate.[34]  As such, with the exception of the recognized

restrictions on the ability of current and former public officials to disclose certain

protected information, such officials (including senior-level presidential aides) still

enjoy the full measure of freedom that the Constitution affords.  Thus, DOJ's present

assertion that the absolute testimonial immunity that senior-level presidential aides

possess is, ultimately, owned by the President, and can be invoked by the President to

overcome the aides' own will to testify, is a proposition that cannot be squared with

core constitutional values, and for this reason alone, it cannot be sustained.

*  *  *

To make the point as plain as possible, it is clear to this Court for the reasons

explained above that, with respect to senior-level presidential aides, absolute immunity

from compelled congressional process simply does not exist.  Indeed, absolute

testimonial immunity for senior-level White House aides appears to be a fiction that has

been fastidiously maintained over time through the force of sheer repetition in OLC

opinions, and through accommodations that have permitted its proponents to avoid

having the proposition tested in the crucible of litigation.  And because the contention

that a President's top advisors cannot be subjected to compulsory congressional process

simply has no basis in the law, it does not matter whether such immunity would

theoretically be available to only a handful of presidential aides due to the sensitivity of

---

[34]  With respect to such withholding, the President can certainly identify sensitive information that he deems subject to executive privilege, *United States v. Nixon*, 418 U.S. at 713, and his doing so gives rise to a legal duty on the part of the aide to invoke the privilege on the President's behalf when, in the course of his testimony, he is asked a question that would require disclosure of that information.  But the invocation of the privilege by a testifying aide is an order of magnitude different than DOJ's current claim that the President essentially owns the *entirety* of a senior-level aide's testimony such that the White House can order the individual not to appear before Congress *at all*.

their positions, or to the entire Executive branch.  Nor does it make any difference whether the aides in question are privy to national security matters, or work solely on domestic issues.  And, of course, if *present* frequent occupants of the West Wing or Situation Room must find time to appear for testimony as a matter of law when Congress issues a subpoena, then any such immunity most certainly stops short of covering individuals who only purport to be cloaked with this authority because, at some point in the past, they *once* were in the President's employ.  This was the state of law when Judge Bates first considered the issue of whether former White House Counsel Harriet Miers had absolute testimonial immunity in 2008, and it remains the state of law today, and it goes without saying that the law applies to former White House Counsel Don McGahn, just as it does to other current and former senior-level White House officials.

Thus, for the myriad reasons laid out above as well as those that are articulated plainly in the prior precedents of the Supreme Court, the D.C. Circuit, and the U.S. District Court for the District of Columbia, this Court holds that individuals who have been subpoenaed for testimony by an authorized committee of Congress must appear for testimony in response to that subpoena—i.e., they cannot ignore or defy congressional compulsory process, by order of the President or otherwise.  Notably, however, in the context of that appearance, such individuals are free to assert any legally applicable privilege in response to the questions asked of them, where appropriate.

## V.  CONCLUSION

The United States of America has a government of laws and not of men.  The Constitution and federal law set the boundaries of what is acceptable conduct, and for

this reason, as explained above, when there is a dispute between the Legislature and the Executive branch over what the law requires about the circumstances under which government officials must act, the Judiciary has the authority, and the responsibility, to decide the issue. Moreover, as relevant here, when the issue in dispute is whether a government official has the duty to respond to a subpoena that a duly authorized committee of the House of Representatives has issued pursuant to its Article I authority, the official's defiance unquestionably inflicts a cognizable injury on Congress, and thereby, substantially harms the national interest as well. These injuries give rise to a right of a congressional committee to seek to vindicate its constitutionally conferred investigative power in the context of a civil action filed in court.

Notably, whether or not the law requires the recalcitrant official to release the testimonial information that the congressional committee requests is a separate question, and one that will depend in large part on whether the requested information is itself subject to withholding consistent with the law on the basis of a recognized privilege. But as far as the duty to appear is concerned, this Court holds that Executive branch officials are not absolutely immune from compulsory congressional process—no matter how many times the Executive branch has asserted as much over the years—even if the President expressly directs such officials' non-compliance.

This result is unavoidable as a matter of basic constitutional law, as the *Miers* court recognized more than a decade ago. Today, this Court adds that this conclusion is inescapable precisely because compulsory appearance by dint of a subpoena is a legal construct, not a political one, and per the Constitution, no one is above the law. That is to say, however busy or essential a presidential aide might be, and whatever their

117

proximity to sensitive domestic and national-security projects, the President does not have the power to excuse him or her from taking an action that the law requires. Fifty years of say so within the Executive branch does not change that fundamental truth. Nor is the power of the Executive unfairly or improperly diminished when the Judiciary mandates adherence to the law and thus refuses to recognize a veto-like discretionary power of the President to cancel his subordinates' legal obligations. To the contrary, when a duly authorized committee of Congress issues a valid subpoena to a current or former Executive branch official, and thereafter, a federal court determines that the subpoenaed official does, as a matter of law, have a duty to respond notwithstanding any contrary order of the President, the venerated constitutional principles that animate the structure of our government and undergird our most vital democratic institutions are preserved.

Consequently, and as set forth in the accompanying Order, Plaintiff's Motion for Expedited Partial Summary Judgment (ECF No. 22) is **GRANTED**, and Defendant's Motion for Summary Judgment (ECF No. 32) is **DENIED**.

DATE:  November 25, 2019          *Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                                    |   |                            |
|------------------------------------|---|----------------------------|
| COMMITTEE ON THE JUDICIARY,        | ) |                            |
| UNITED STATES HOUSE OF             | ) |                            |
| REPRESENTATIVES,                   | ) |                            |
|                                    | ) |                            |
|     Plaintiff, | ) |                            |
|                                    | ) |                            |
|     v.         | ) | Civ. No. 19-cv-2379 (KBJ)  |
|                                    | ) |                            |
| DONALD F. MCGAHN II,               | ) |                            |
|                                    | ) |                            |
|     Defendant. | ) |                            |
|                                    | ) |                            |

## ORDER

For the reasons stated in the Memorandum Opinion that accompanies this Order, it is hereby

**ORDERED** that Plaintiff's Motion for Expedited Partial Summary Judgment (ECF No. 22) is **GRANTED**, and Defendant's Motion for Summary Judgment (ECF NO. 32) is **DENIED**. Accordingly, it is

**DECLARED** that Donald F. McGahn II is not immune from compelled congressional process, and that he had no lawful basis for refusing to appear for testimony pursuant to the duly issued subpoena issued to him by the Committee on the Judiciary of the United States House of Representatives on April 22, 2019. Mr. McGahn's failure to appear was without legal justification. Therefore, it is

**FURTHER ORDERED** that, because Mr. McGahn is legally required to testify, Mr. McGahn is **ENJOINED** to appear before the Committee pursuant to the subpoena that was issued to him on April 22, 2019.

DATE:  November 25, 2019          *Ketanji Brown Jackson*
                                 KETANJI BROWN JACKSON
                                 United States District Judge